IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| SHAWN J. TARDY, et al.;            ) | |
| ) | |
| ) | |
| **Plaintiffs,**        ) | Case No.: 1:13-cv-02841 |
| ) | |
| **v.**        ) | |
| ) | |
| MARTIN J. O'MALLEY, in his official ) | |
| capacity as Governor of the State of ) | |
| Maryland, et al.;      ) | |
| ) | |
| ) | |
| **Defendants.**       ) | |
| ) | |
| ) | |
| <u>Serve On:</u>          ) | |
| ) | |
| **Office of the Attorney General**   ) | |
| **Douglas F. Gansler**     ) | |
| **Attorney General**       ) | |
| **200 St. Paul Place**      ) | |
| **Baltimore, Maryland 21202**   ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY
<u>RESTRAINING ORDER</u>**

## TABLE OF CONTENTS

Section...................................................................................................................................Page

Introduction..............................................................................................................................3

Facts.........................................................................................................................................4

Statements of Impact................................................................................................................6

Argument.................................................................................................................................14

A TEMPORARY RETRAINING ORDER IS NECESSARY
TO PRESERVE THE STATUS QUO AND PREVENT
DEFENDANTS' IMMINENT INFRINGEMENT OF
PLAINTIFFS' CONSTITUTIONAL RIGHTS.............................................................................14

   A.  Plaintiffs Are Likely To Succeed on the Merits...........................................................15

     1.  *The Act Results in a Categorical Ban on a Class
     of Firearms that Are in Common Use by Law-abiding Citizens*......................................16

     2.  *Even if the Act Is Not a Policy Choice* Heller
     *Takes Off the Table, Its Prohibitions Must Be Analyzed Under Strict Scrutiny*................18

     3.  *The Act Facially Discriminates Against
     Plaintiffs Who Are Not Retired Law Enforcement Officers*.............................................20

     4.  *Provisions of the Act Are Unconstitutionally Vague*....................................................22

   B.  The Balance of Equities Weighs Heavily in Plaintiffs' Favor.........................................26

   C.  Plaintiffs Will Suffer Irreparable Harm to Their Rights
   If the Injunctive Relief Is Not Granted............................................................................27

   D.  The Injunctive Relief Is in the Public Interest................................................................27

   E.  Any Security Should Be Waived or Set at $0.................................................................28

Conclusion...............................................................................................................................28

Plaintiffs Andrew W. Turner, Shawn J. Tardy, Matthew Godwin, Wink's Sporting Goods, Inc., Atlantic Guns, Inc. and association Plaintiffs Associated Gun Clubs of Baltimore, Inc., Maryland Shall Issue, Inc., Maryland State Rifle and Pistol Association, Inc., National Shooting Sports Foundation, Inc., and Maryland Licensed Firearms Dealers Association, Inc. (collectively, "Plaintiffs"), by and through undersigned counsel, hereby submit this Memorandum in Support of Motion for Temporary Restraining Order pursuant to Local Rule 105.

## INTRODUCTION

Plaintiffs bring this action for a temporary restraining order, pursuant to Federal Rule of Civil Procedure 65, to prevent the Defendants' enforcement of certain provisions of The Firearm Safety Act of 2013 (the "Act") that prohibit law-abiding, responsible Plaintiffs from acquiring or selling semiautomatic long guns or standard capacity magazines for semiautomatic pistols and rifles. Defendants' imminent enforcement of the Act will burden impermissibly the fundamental constitutional rights of individual Plaintiffs and members of association Plaintiffs to purchase and keep certain commonly used, semiautomatic rifles, shotguns, and pistols and standard capacity magazines for purposes of self-defense in their homes as guaranteed by the Second Amendment to the United States Constitution, and will cause significant economic harm to business Plaintiffs and individual members of Plaintiffs MLFDA and NSSF, insofar as they will be unable to sell these firearms and magazines, which constitute a significant portion of their business, without being subject to arrest and prosecution by Defendants.

For the reasons stated herein, Plaintiffs hereby request that this Court issue a temporary restraining order, pursuant to Federal Rule of Civil Procedure 65, enjoining Defendants from

3

enforcing the challenged provisions of the Maryland Firearm Safety Act of 2013 for fourteen days to allow the parties to bring, and Court to hold a hearing and issue a ruling on, a preliminary injunction.

## FACTS

### Statutory Framework

The provisions of the Act whose enforcement Plaintiffs seek to restrain amend various sections of the Maryland Code in both the Criminal Law Article and the Public Safety Article. Specifically, Plaintiffs seek to restrain the enforcement of Sections 4-303, 4-304, and 4-306 of the Criminal Law Article of the Maryland Code, all of which incorporate definitions from both Section 4-301 of the Criminal Law Article and Section 5-101 of the Public Safety Article, as amended by the Act, until such time as the Court can hold a hearing and render a decision as to whether a preliminary injunction should issue.

Under Section 4-303 of the Criminal Law Article, it is generally prohibited, as of October 1, 2013, for a person to "transport an assault weapon into the State; or possess, sell, offer to sell, transfer, purchase, or receive an assault weapon." Section 4-301(d) incorrectly and pejoratively designates the following commonly used semiautomatic[1] firearms to be "assault weapons" and thus banned:

1) Assault Long Guns

2) Assault Pistols

---

[1]      The term "semiautomatic" refers to the manner in which a firearm operates. Semiautomatic firearms use the recoil force of a discharging round to extract the spent shell casing from the recently fired round and chamber the next round. They will only fire one round with each pull of the trigger, regardless of how long the trigger is depressed. They are not fully automatic firearms, such as the M-16, that continue to fire until the trigger is released or the firearm runs out of ammunition.

3) Copycat Weapons

Section 4-301(e) defines a "copycat weapon" to be:

1) A semiautomatic centerfire rifle that can accept a detachable magazine and has any

two of the following

    a.  A folding stock;

    b.  A grenade launcher or flare launcher; or

    c.  A flash suppressor;

2) A semiautomatic centerfire rifle that has a fixed magazine with the capacity to accept

more than 10 rounds;

3) A semiautomatic centerfire rifle that has an overall length of less than 29 inches;

4) A semiautomatic pistol with a fixed magazine that can accept more than 10 rounds;

5) A semiautomatic shotgun that has a folding stock;

6) A shotgun with a revolving cylinder

The term "Assault long gun" is defined in Section 5-101(r)(2) of the Public Safety Article

and includes approximately[2] 68 commonly used semiautomatic rifles and shotguns listed by

manufacturer, model, and/or other name, but also "their copies, regardless of which company

produced and manufactured that assault weapon . . . ."

Under Section 4-305 of the Criminal Law Article, it is unlawful for anyone other than a

current or former law enforcement officer to "manufacture, sell, offer for sale, purchase, receive,

or transfer a detachable magazine that has a capacity of more than 10 rounds of ammunition for a

---

[2]    It is impossible to quantify the exact number of firearms that are contained within the list of Section 5-101(r)(2) because some elements of the list, Section 5-101(r)(2)(ii) for example, contain phrases such as "in all forms" that are unconstitutionally vague as discussed *infra* and encompass an unidentified and unidentifiable universe of firearms.

firearm." Section 4-301(f) defines a detachable magazine as "an ammunition feeding device that can be removed readily from a firearm without requiring disassembly of the firearm action or without the use of a tool, including a bullet or cartridge."

A violation of any of the aforementioned prohibitory provisions is punishable under Section 4-306 of the Criminal Law Article by imprisonment for up to three years and a fine of up to $5,000. Various exemptions exist to this prohibitory scheme, which will be discussed further *infra*, that allow current and former law enforcement officers, current and former members of the military, manufacturers, and those already in possession of prohibited firearms and magazines to continue acquiring and possessing these items. MD. CODE ANN., CRIM. L. § 4-303(b), § 4-305(a).

### Impact on Plaintiffs That Will Be Caused by Enforcement of Challenged Provisions

Individual Plaintiffs, business Plaintiffs, and members of association Plaintiffs will be immediately and irrevocably harmed by the enforcement of the specified provisions of the Act. As of October 1, 2013, individual Plaintiffs and members of association Plaintiffs will be completely barred from purchasing in Maryland, or transporting into Maryland, certain firearms that are commonly used for home defense. Moreover, individual Plaintiffs and members of association Plaintiffs will be unable to purchase standard issue magazines that hold more than ten rounds for their firearms. Business Plaintiffs will suffer a significant decrease in sales, as was noted in the Fiscal Note analyzing the Act's impact on small businesses.

Plaintiff Andrew Turner

Plaintiff Turner resides in Hyattsville Maryland and currently owns two firearms that will be classified as "assault weapons" under the Act, as well as multiple magazines of a type the

6

further acquisition of which will be banned by the Act. *See* Declaration of Andrew Turner at ¶¶ 2-3 (Attached as Exhibit 1). Plaintiff Turner intended to purchase, after October 1, 2013, certain semiautomatic handguns and long guns that come standard with magazines holding in excess of ten rounds. *Id.* at ¶¶ 4-5. He also planned to assemble "AR-15 style" long guns for his personal use after October 1, 2013. *Id.* at ¶ 5. Plaintiff Turner uses the firearms he currently owns, and would use the firearms he plans to acquire, but for the Act, for the lawful purposes of target shooting, hunting, and self-defense. *Id.* at ¶¶ 6-7. Plaintiff Turner also suffers from partial paralysis of his right hand, which is his dominant hand, such that it is difficult for him to operate quickly certain firearms and he requires magazines with a capacity of more than ten rounds to adequately defend himself. *See id.* at ¶ 8. As a result of the Act, Plaintiff Turner will no longer be able to acquire the magazines and firearms that he uses and plans to use for lawful purposes such as target shooting, hunting, and self-defense.

<u>Plaintiff Shawn J. Tardy</u>

Plaintiff Tardy resides in Aberdeen, Maryland and owns one long gun that will be characterized as an "assault weapon" under the Act, as well as three semiautomatic handguns and multiple magazines of a type the further acquisition of which will be banned by the Act. *See* Declaration of Shawn J. Tardy at ¶ 3 (Attached as Exhibit 2). Plaintiff Tardy intended to purchase, and would purchase but for the Act, firearms that are banned as "assault weapons" after October 1, 2013. *Id.* at ¶ 5. He also intends to purchase, after October 1, 2013, certain handguns that are normally provided with magazines that hold more than ten rounds of ammunition. *Id.* at ¶ 4. Plaintiff Tardy uses the firearms he currently owns, and would use the firearms he would acquire, but for the Act, for the lawful purpose of self-defense in his home.

7

*Id.* at ¶ 8.  Plaintiff Tardy suffers from a disability he incurred while serving in the United States military.  *Id.* at ¶ 6.  As a result of his disability, Plaintiff Tardy requires magazines capable of holding more than ten rounds to adequately defend himself.  *See id.* at ¶ 6.  As a result of the Act, Plaintiff Tardy will not be able to acquire the firearms he desires to defend himself, nor the magazines he needs to employ effectively the firearms he does have, in self-defense.

<u>Plaintiff Matthew Godwin</u>

Plaintiff Godwin resides in Waldorf, Maryland and owns long guns that will be classified as "assault weapons" under the Act, as well as a semiautomatic handgun and multiple magazines of a type the further acquisition of which will be banned by the Act.  *See* Declaration of Matthew Godwin at ¶ 3 (Attached as Exhibit 3).  Plaintiff Godwin planned on purchasing, after October 1, 2013, additional semiautomatic handguns that are equipped with magazines holding more than ten rounds.  *Id.* at ¶ 4.  He also planned on purchasing, after October 1, 2013, long guns that will be banned by the Act, which also come equipped with magazines banned by the Act.  *Id.* at ¶ 5.  Plaintiff Godwin uses the firearms he currently owns, and would use the firearms he planned to acquire but for the Act, for the lawful purpose of self-defense in his home.  *Id.* at ¶ 9.  Plaintiff Godwin suffers from a disability that impedes his mobility.  *Id.* at ¶ 7.  As a result of his disability, he requires the magazines that will be banned by the Act to adequately employ his firearms in self-defense.  *Id.* at ¶ 7.  As a result of the Act, Plaintiff Godwin will not be able to acquire the firearms he desires to defend himself, nor the magazines he needs to employ effectively the firearms he does have, in self-defense.

Plaintiff Wink's Sporting Goods, Inc.

Plaintiff Wink's Sporting Goods, Inc. ("Wink's"), located in Princess Anne, Maryland, is operated by Carol Wink, who is licensed as a regulated firearms dealer by the State of Maryland. *See* Declaration of Carol Wink at ¶ 2 (Attached as Exhibit 4). Wink's offers various services related to firearms, including gunsmithing, appraisal, and sales. *Id.* at ¶ 3. Wink's offers for sale, and would offer for sale after October 1, 2013, but for the Act, long guns that will be banned by the Act as well as numerous firearms that are sold with magazines containing more than ten rounds. *See id* at ¶ 4. The firearms that will be banned by the Act as "assault weapons" constitute a significant portion of Wink's sales, and the loss of those sales presents a serious threat to the economic well-being of Wink's. *Id.* Wink's will be further harmed by the enforcement of the Act in that it will no longer be able to sell standard capacity detachable magazines for any of the firearms it does sell. *Id.* Moreover, because the handguns Wink's has sold to date, but have not been transferred to the purchasers because of Defendant Maryland State Police's inability to review timely the purchasers' applications, were sold with magazines capable of holding more than ten rounds, Wink's will have to refund some of the purchase price to compensate for delivering a handgun with no magazine. *Id.* Finally, because Wink's cannot acquire quickly magazines capable of holding only ten rounds, it will not be able to provide these customers with any magazines, rendering their firearms useless for home defense. *Id.* As a result of the Act, Plaintiff Wink's Sporting Goods will suffer significant economic harm.

Plaintiff Atlantic Guns, Inc.

Plaintiff Atlantic Guns, Inc. ("Atlantic Guns"), which has locations in Silver Spring and Rockville, Maryland, is operated by Stephan Schneider, who is licensed as a regulated firearms

dealer by the State of Maryland. *See* Declaration of Stephen Schneider at ¶ 4 (Attached as Exhibit 5). Atlantic Guns offers various services related to firearms, including gunsmithing, appraisal, and sales. *Id.* at ¶ 5. Atlantic Guns offers for sale, and would offer for sale after October 1, 2013, but for the Act, long guns that will be banned by the Act as well as numerous firearms that are sold with magazines containing more than ten rounds. *See id* at ¶ 6. The firearms that will be banned by the Act as "assault weapons" constitute a significant portion of Atlantic Guns' sales, and the loss of those sales presents a serious threat to the economic well-being of Atlantic Guns. *Id.* Atlantic Guns will be further harmed by the enforcement of the Act in that it will no longer be able to sell standard capacity detachable magazines for any of the firearms it does sell. *Id.* Moreover, because the handguns Atlantic Guns has sold to date, but have not been transferred to the purchasers because of Defendant Maryland State Police's inability to review timely the purchasers' applications, were sold with magazines capable of holding more than ten rounds, Atlantic Guns will have to refund some of the purchase price to compensate for delivering a handgun with no magazine. *Id.* Finally, because Atlantic Guns cannot acquire quickly magazines capable of holding only ten rounds, it will not be able to provide these customers with any magazines, rendering their firearms useless for home defense. *Id.* As a result of the Act, Plaintiff Atlantic Guns will suffer significant economic harm.

Plaintiff Associated Gun Clubs of Baltimore, Inc.

Plaintiff Associated Gun Clubs of Baltimore, Inc. ("AGC") is an association that was formed by World War II veterans in the Baltimore area who wanted a place for recreational and competitive shooting. *See* Declaration of John Josselyn at ¶ 3 (Attached as Exhibit 6). AGC consists of 15 charter member clubs as well as 14 associate member clubs. *Id.* Among AGC's

club membership are numerous individuals who wish to purchase, on or after October 1, 2013, long guns that will be banned by the Act, as well as magazines that have a capacity of more than ten rounds. *Id* at ¶ 4-5. As a result of the Act, the individual members of Plaintiff AGC will not be able to acquire the firearms they desire to defend themselves, nor the magazines they need to employ effectively the firearms they do have, in self-defense.

<u>Plaintiff Maryland Shall Issue, Inc.</u>

Plaintiff Maryland Shall Issue, Inc. ("MSI") is an association dedicated to the preservation of Maryland firearm owners' rights. *See* Declaration of Patrick Shomo at ¶ 3 (Attached as Exhibit 7). Among MSI's club membership are numerous individuals who wish to purchase, on or after October 1, 2013, long guns that will be banned by the Act, as well as magazines that have a capacity of more than ten rounds. *Id* at ¶ 4-5. As a result of the Act, the individual members of Plaintiff MSI will not be able to acquire the firearms they desire to defend themselves, nor the magazines they need to employ effectively the firearms they do have, in self-defense.

<u>Plaintiff Maryland State Rifle and Pistol Association, Inc.</u>

Plaintiff Maryland State Rifles and Pistol Association, Inc ("MSRPA") is an association dedicated to promoting proper marksmanship and education regarding safe firearm handling. *See* Declaration of William Palk at ¶ 3 (Attached as Exhibit 8). MSRPA also sanctions various competitions in all shooting disciplines. *Id.* Among MSRPA's membership are numerous individuals who wish to purchase, on or after October 1, 2013, long guns that will be banned by the Act, as well as magazines that have a capacity of more than ten rounds. *Id* at ¶ 4-5. As a result of the Act, the individual members of Plaintiff MSRPA will not be able to acquire the

11

firearms they desire to defend themselves, nor the magazines they need to employ effectively the firearms they do have, in self-defense.

Plaintiff National Shooting Sports Foundation, Inc.

Plaintiff National Shooting Sports Foundation, Inc. ("NSSF") is the trade association for the firearms, ammunition, hunting, and shooting sports industry. Formed in 1961, the NSSF is a Connecticut non-profit tax-exempt corporation with a membership of more than 9,000 federally licensed firearms manufacturers, distributors, and retailers (also known as "federal firearms licensees" or "FFLs"); sportsmen's organizations; shooting ranges; gun clubs; publishers; hunters and recreational target shooters. The NSSF's mission is to promote, protect and preserve hunting and the shooting sports. The NSSF provides trusted leadership in addressing industry challenges; advances participation in and understanding of hunting and the shooting sports; reaffirms and strengthens its members' commitment to the safe and responsible use of their products; and promotes a political environment that is supportive of America's traditional hunting heritage and firearms freedoms. As a guardian of our nation's rich hunting and shooting traditions, the NSSF believes that lawful commerce in firearms and firearm-related products must be protected - and that, in particular, no law or regulation should unreasonably limit the lawful transfer of firearms to responsible, law-abiding adults who have individual constitutional rights guaranteed by the Second Amendment to the United States Constitution to purchase, own, possess and use such firearms and ammunition. The NSSF's interest in this action derives principally from the fact that the NSSF's FFL manufacturer, distributor, and retailer members provide the lawful commerce in firearms that makes the exercise of Second Amendment rights

possible. Until the effective date of the Act, NSSF's individual members have sold and will sell handguns, the sales of which will be prevented by the Act.

Plaintiff Maryland Licensed Firearms Dealers Association, Inc.

Plaintiff Maryland Licensed Firearms Dealers Association, Inc. ("MLFDA") is an association dedicated to the representing the interests of the numerous firearm dealers in the State of Maryland, as well as the interests of its members' customers. *See* Declaration of Stephen Schneider at ¶ 3. The firearms and magazines that will be banned by the Act constitute a significant portion of MLFDA's members' sales, such that the Act will cause those members severe economic harm. *See id.* at ¶ 6. For example, firearms based on the AR-15 platform are the most commonly purchased long gun in Maryland, and, as they are banned, the inability of MLFDA's members to sell these firearms will cause them significant injury. *Id.* Moreover, many firearms are sold with magazines containing more than 10 rounds as standard equipment, and there is little availability to acquire magazines that are capable of holding ten rounds or less. *See id.* Thus, members of MLFDA who are not able to acquire such magazines will be forced to refund some of the purchase price of the firearm, as a result of transferring a firearm with no magazines. *Id.* This is especially true for customers who have purchased a regulated firearm but have not been able to take possession of it due to Defendant Maryland State Police's failure to complete timely the applicant's background check. These customers will not be able to take possession of the magazines for which they have already paid. *See id.* As a result, the Act will cause significant economic harm to members of MLFDA in that their sales will decline severely.

## ARGUMENT

### A TEMPORARY RETRAINING ORDER IS NECESSARY TO PRESERVE THE STATUS QUO AND PREVENT DEFENDANTS' IMMINENT INFRINGEMENT OF PLAINTIFFS' CONSTITUTIONAL RIGHTS

Pursuant to Federal Rule of Civil Procedure 65, this Court has the power to issue temporary restraining orders ordering a party to refrain from performing a specific act. Whether to grant such relief lies within the sound discretion of this Court. *See United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013). To secure issuance of injunctive relief, such as a temporary restraining order, a proponent must allege and demonstrate: "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that the injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *Metropolitan Regional Information Systems, Inc. v. American Home Realty Network, Inc.*, 722 F.3d 591, 595 (4th Cir. 2013). The purpose of issuing a temporary restraining order is "to preserve the status quo only until a preliminary injunction hearing can be held." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999).

As explained below, this Court should issue a temporary restraining order ordering Defendants to refrain from enforcing the challenged provisions of the Act to preserve the status quo until such time as a decision can be rendered on whether a preliminary injunction should issue so as to protect the law-abiding, responsible Plaintiffs from irreparable harm that will occur because of the Act's unconstitutional infringement on their Second Amendment rights.

A.    Plaintiffs Are Likely to Succeed on the Merits.

The United States Supreme Court's landmark decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), made clear that the rights secured under the Second Amendment to the United States Constitution are individual rights.  Most sacrosanct among those rights is the "right of law-abiding, responsible citizens to use arms in defense of hearth and home," which the Court described as being "elevate[d] above all else."  *Id.* at 635.  As made applicable to the States in *McDonald v. City of Chicago*, 130 S.Ct 3020 (2010), the Second Amendment, thus, protects individual citizens from government intrusion into the decision to stand in armed defense of their homes and families.  This, however, is precisely the effect of the Act.

Individual Plaintiffs and members of association Plaintiffs in this case seek to acquire commonly used semiautomatic rifles and shotguns, as well as standard capacity magazines, so as to be able to defend themselves and their families from an increasingly dangerous criminal element.  Plaintiffs will demonstrate that the value in using the banned firearms for self-defense is beyond dispute, given that they allow for more accurate shots as compared to a handgun – an issue of critical importance to a Plaintiff dealing with the stress of a life-or-death situation.

The magazines the Act prohibits are vital to successful self-defense because they allow would-be victims to avoid the dangerous situation of reloading during an armed intrusion.  Importantly, persons attempting to defend themselves in a life-or-death situation are likely to have decreased accuracy and will likely need more rounds to effectively defend themselves.  Plaintiffs will demonstrate the seriousness of this issue by showing that the average police officer, a trained agent of the government, is a poor marksman at best, and becomes even worse when subjected to stressful conditions while firing his or her firearm.

The problems associated with having fewer rounds in a magazine are especially heightened for disabled persons who are not able to reload their firearms quickly and persons who only keep one loaded magazine in their home. Moreover, there are firearms for which magazines holding ten rounds or less do not exist, thus rendering such firearms functionally useless should any currently owned magazines cease to function or the firearm be transferred to a new owner.

The firearms and magazines banned by the Act are commonly used throughout Maryland and the United States for home defense, target shooting, and sport shooting. In fact, some of the banned firearms are used in the Civilian Marksmanship Program, which Congress established "to instruct citizens of the United States in marksmanship" and "to promote practice and safety in the use of firearms . . . ." 36 U.S.C. § 40722(1) & (2). The provisions of the Act itself demonstrate that the banned firearms and magazines are useful for lawful purposes as it allows retired law enforcement officers to acquire both. MD. CODE ANN., CRIM. L. § 4-302(7)(i), MD. CODE ANN., CRIM. L. § 4-305(a)(2). Thus, the prohibitions in the Act are designed to completely curtail the acquisition and use of a "'class of arms' that is overwhelmingly chosen for [a] lawful purpose" – a result the Supreme Court held could not stand. *Heller*, 554 U.S. at 628.

*1. The Act Results in a Categorical Ban on a Class of Firearms That Are in Common Use by Law-abiding, Responsible Citizens*

The Supreme Court held in *Heller* that a complete prohibition on a class of firearms commonly used for a lawful purpose is a policy choice that is "off the table." *Id.* at 636. In so doing, the Court did not articulate a level of scrutiny under which infringements upon the Second Amendment are to analyzed, except to say that rational-basis review is not sufficient. *Id.* at 628 n.27. The Court recognized that a total ban on the acquisition and ownership of a category of

16

firearms that are commonly used by law-abiding citizens is so blatant an unconstitutional policy that it need not resort to applying a particular standard of review. The Court noted, "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban," *id.* at 629, and that "the absolute prohibition of handguns held and used for self-defense in the home" is a policy choice that cannot stand. *Id.* at 636. The provisions of the Act Plaintiffs seek to restrain result in the same outright ban that was flatly rejected by the Court, except that *Heller* concerned a ban on handguns, while the Act here primarily bans classes of rifles and shotguns and magazines that are in use by law-abiding, responsible individuals. *See* Declaration of Stephen Schneider at ¶ 6 ("In fact, firearms based on the AR-15 platform are far and away them most commonly purchased long gun in Maryland, and are in common possession and use by the residents of Maryland.").

The distinction in the class of firearms that is banned is one without a difference, as the Court stated, "[i]t is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." *Id.* at 629. The natural and necessary corollary to the principle contained in this quotation is that it is also impermissible to ban the possession of commonly used semiautomatic rifles, shotguns, and magazines so long as other firearms and magazines are not prohibited. In creating such a ban, the challenged provisions of the Act contradict the central tenet in *Heller*: that categorical bans on classes of firearms that are in common use by law-abiding, responsible citizens "fail constitutional muster" on their face. *Id.* at 629; *see also McDonald* 130 S.Ct. at 3047 ("But what is most striking about their research is the paucity of precedent sustaining bans comparable to those at issue here and in

*Heller*. Municipal respondents cite precisely only one case (from the late 20th century) in which such a ban was sustained.").

### 2. Even If the Act Is Not a Policy Choice Heller Takes Off the Table, Its Prohibitions Must Be Analyzed Under Strict Scrutiny

Even if this Court does not agree that the complete ban effected by the Act must be struck down as a categorical matter without resort to applying a particular standard of review, it must analyze the challenged provisions of the Act under strict scrutiny. The application of strict scrutiny comports with *United States v. Chester*, 628 F.3d 673, 677 (4th Cir. 2010), a post-*Heller* decision involving whether a prohibition on possession of a firearm was constitutional as applied to a person convicted of a misdemeanor crime of domestic violence under 18 U.S.C. § 922(g)(9). Chester unsuccessfully moved to dismiss the indictment on the grounds that the Supreme Court, in *Heller*, had only identified the mentally ill and felons as classes of persons that could be denied the right to possess firearms, and he was a misdemeanant. The Fourth Circuit in *Chester* declined to apply strict scrutiny to the prohibition on ownership of firearms by misdemeanants, explaining:

> Although Chester asserts his right to possess a firearm in his home for the purpose of self-defense, we believe his claim is not within the core right identified in *Heller* – the right of a *law-abiding*, responsible citizen to possess and carry a weapon for self-defense – by virtue of Chester's criminal history as a domestic violence misdemeanant. Accordingly, we conclude that intermediate scrutiny is more appropriate than strict scrutiny for Chester and similarly situated persons.

*Id.* at 682-83 (emphasis in original). Plaintiffs possess the characteristics found lacking in defendant Chester: they are law-abiding, responsible citizens who seek to possess commonly used firearms and magazines for self-defense. Thus, they do *not* fall into the less protected

category, and any categorical prohibition on their ability to possess and use, in self-defense, firearms in their home must be analyzed under strict scrutiny.

The Fourth Circuit has reiterated that a ban on possession of firearms in the home is subject to strict scrutiny. "As we observe that any law regulating the content of speech is subject to strict scrutiny, . . . we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir.2011). *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013), agreed, adding that intermediate scrutiny applies to bearing arms outside the home, rejecting the view that would "place the right to arm oneself in public on equal footing with the right to arm oneself at home, *necessitating that we apply strict scrutiny . . . .*" *Id.* at 878 (emphasis added).

To be sure, the Supreme Court noted that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sales of arms." *Heller*, 554 U.S. at 626-27. The provisions of the Act challenged by Plaintiffs, however, are not directed at classes of individuals who are more likely to be a danger to the community (such as convicted criminals or the dangerously mentally ill) and they are not merely imposing conditions and qualifications on the commercial sales of arms. Rather, the challenged provisions of the Act are a blanket "prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose." *Id.* at 628.

19

The Act's complete ban is unquestionably invalid when analyzed through the lens of strict scrutiny. The Act is not narrowly tailored to prevent firearms and magazines capable of holding more than ten rounds from being acquired by criminals; rather, it flatly prohibits acquisition by all law-abiding, responsible citizens who do not fall into one of the Act's narrow exceptions. Moreover, the Act is not narrowly tailored to achieve the interest of preventing firearm violence, as the banned rifles, shotguns, and magazines are rarely used in crime. A report submitted to the Department of Justice analyzing the effects of the expired federal "assault weapon" ban, which prohibited a nearly identical class of firearms and magazines as the Act, found that the ban could not be credited with any of the nationwide drop in firearm related crimes. *See* Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence* 6 (March 13, 1997), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf ("[W]e cannot clearly credit the ban with any of the nation's recent drop in gun violence."). Thus, the Act appears tailored not to preventing criminal violence, but, instead, to restricting access to commonly used firearms and magazines by law-abiding, responsible citizens. This is most assuredly not a compelling government interest and, as such, the Act cannot stand.

### 3. The Act Facially Discriminates Against Plaintiffs Who Are Not Retired Law Enforcement Officers

The Fourteenth Amendment to the United States Constitution guarantees the right of the people not to be denied the equal protection of the law. The Act, however, allows retiring law enforcement officers to have transferred to them upon retirement a banned "assault weapon," MD. CODE ANN., CRIM. L. § 4-302(7)(i), and allows for active and retired law enforcement officers to purchase, sell, and transfer magazines with a capacity of more than ten rounds at any

time.   MD. CODE ANN., CRIM. L. § 4-305(a)(2).   Ordinary citizens, who have the same "fundamental right to life," *Panetti v. Quarterman*, 551 U.S. 930, 957 (2007), are subject to criminal penalties for doing the same.

No appreciable distinction exists between retired law enforcement officers and ordinary, law-abiding, responsible citizens with respect to self-defense needs.   The exemption of retired law enforcement officers is a tacit admission that the firearms and magazines banned by the Act are appropriate for self-defense in the home.   By exempting retired law enforcement officers from the prohibitions in the Act, Maryland has created a caste system with respect to the exercise of constitutional rights.   Those who are in the favored caste of former government agents are permitted to exercise their fundamental right to acquire and possess commonly used firearms and standard capacity magazines to defend themselves and their families in the home.   Those, such as Plaintiffs, who are members of the disfavored caste of ordinary citizens have had that right stripped from them.   Such a blatant rationing of constitutional rights would never be tolerated with respect to any of our other enumerated rights and cannot be tolerated with respect to rights secured by the Second Amendment.

This is precisely the decision reached by the Court of Appeals for the Ninth Circuit regarding a California firearms law with exemptions similar to those in the Act.   *Silveira v. Lockyer*, 312 F.3d 1052, 1090-91 (9th Cir. 2002), held that an exclusion for retired law enforcement from acquiring and possessing "assault weapons" lacked any rational basis and was a violation of the Equal Protection Clause,[3] because "the retired officers exception arbitrarily and

---

[3]      *Silveira* was decided before *Heller*, leading the Ninth Circuit to employ rational basis review because it did not find the Second Amendment to secure an individual right.   *Silveira*, 312 F.3d at 1088.   Given the holding in *Heller*, a Court must employ strict scrutiny, rather than rational basis review, because the discrimination applies to a

unreasonably affords a privilege to one group of individuals that is denied to others, including

plaintiffs." *Id.* at 1091. Given that the Act in question must be analyzed under a standard much

more exacting than mere rational basis, it certainly must fail muster.

Finally, the unconstitutional provisions here discriminating in favor of selected classes

may not simply be excised from the Act, because the Act does not make it a crime for the

favored classes to possess the subject firearms and magazines. A law from which a portion is

stricken remains fully operative only if "its elimination in no way alters the substantive reach of

the statute and leaves completely unchanged its basic operation." *United States v. Jackson,* 390

U.S. 570, 586 (1968). Declaring only the discriminations in favor of selected classes void would

criminalize that which the legislature has not criminalized. "To limit this statute in the manner

now asked for would be to make a new law, not to enforce an old one. This is no part of our

duty." *United States v. Reese,* 92 U.S. (2 Otto) 214, 221 (1875) (holding provisions not

severable). As a result of the Act's discriminatory purpose and effect, then, it is void in its

entirety.

### 4. *Provisions of the Act Are Unconstitutionally Vague*

The Due Process Clause of the Fourteenth Amendment to the United States Constitution

prohibits the enforcement of laws whose provisions are vague. The void-for-vagueness doctrine

is a necessary safeguard against arbitrary enforcement of laws that do not provide ordinary

citizens with sufficient information to avoid unlawful conduct:

> It is a basic principle of due process that an enactment is void for vagueness if its
> prohibitions are not clearly defined. Vague laws offend several important values.

---

fundamental, individual right. Regardless of the level of scrutiny, however, the exemption for retired law
enforcement officers is a blatant violation of the Equal Protection Clause and cannot stand.

> First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). In this case, the provisions of the Act delineating which firearms are banned and which are not are unconstitutionally vague and will "trap the innocent." Moreover, the vagueness of the law will have an extreme chilling effect on Plaintiffs' exercise of their Second Amendment rights in that the Act will effectively ban the acquisition of all semiautomatic long guns.

The Act lists approximately 68 semiautomatic rifles and shotguns and their "copies" as prohibited "long guns." MD. CODE ANN., PUB. SAF. § 5-101(r)(2). The listings are the same as originally enacted in Acts 2003, c. 5, § 2, and appear to be names of 1990s vintage. It is unclear if each listing refers to any firearm engraved with a specified name, regardless of its characteristics, or to objective characteristics of each firearm as manufactured at a given point in time.

The list includes a vast array of incongruous elements, including model names without manufacturer names, manufacturer names without model names, and manufacturer names with model names, as well as all "copies" thereof. The term "copies," however, is not defined in the least. The result of this patchwork of designations is a tangled mess that leaves a citizen of ordinary intelligence, as well as a law enforcement officer, incapable of determining what conduct is permitted and what is prohibited.

The vagueness and ambiguity is best demonstrated by the elements in subsection (xv), which are "Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle. Colt is a firearm manufacturer, and AR-15 Sporter H-BAR was a model produced by this manufacturer, but is no longer in production. Colt never produced civilian firearms with model names of AR-15 or CAR-15 standing alone.[4] A citizen of ordinary intelligence has no way of knowing which of the current models of rifles made by Colt or another manufacturer is permitted as an "H-BAR" and which would be prohibited as an AR-15 or CAR-15, because the designation fails to describe the characteristics of an H-BAR or to explain how one is to distinguish between a copy of a banned AR-15 and a permitted AR-15 H-BAR.

The entire definition of "assault weapon" as 34 specified firearms and other models with "slight modifications or enhancements" was declared unconstitutionally vague on its face in *Springfield Armory, Inc. v. City of Columbus,* 29 F.3d 250, 252 (6th Cir. 1994). "How is the ordinary consumer to determine which changes may be considered slight? A weapon's accuracy, magazine capacity, velocity, size and shape and the caliber of ammunition it takes can all be altered."[5] *Id.* at 253. The term "modification" was vague because "ordinary consumers cannot be expected to know the developmental history of a particular weapon":

---

[4]     Colt did, however, produce some fully automatic rifles for the military with these designations.

[5]     The court asked, *id.* at 253:

For example, the Colt Sporter Lightweight is a 5.56mm caliber weapon equipped with a 16 inch barrel, a 5-round magazine capacity, a 14.5 inch sight radius and weighs 6.7 lbs. . . . If Colt modifies this weapon so that it takes a 9mm cartridge, has a 20 inch barrel, a 20-round magazine capacity, a 19.75 inch sight radius and weighs 10 lbs., would this new weapon be a slight modification?

Nothing in the ordinance provides sufficient information to enable a person of average intelligence to determine whether a weapon they wish to purchase has a design history of the sort which would bring it within this ordinance's coverage. See *Robertson v. Denver*, 874 P.2d 325, 335 (Colo. 1994) (holding similar provision invalid because "ascertaining the design history and action design of a pistol is not something that can be expected of a person of common intelligence.") The record indicates that the average gun owner knows very little about how his gun operates or its design features.

*Id.* at 253.

Nor is it reasonable to suggest that gun owners can conduct research and tests to determine whether a specific gun is somehow a copy or duplicate of some other gun: "Whether persons of ordinary intelligence must necessarily guess as to an ordinance's meaning and application does not turn on whether some source exists for determining the proper application of a law." *Robertson*, 874 P.2d at 334-35. As that court added, "the assault weapon ordinance does not specify any source which would aid in defining what an assault pistol is, nor does it state where such a source can be found." *Id.* at 335.

"No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Lanzetta v. New Jersey*, 306 U.S. 451, 452-53 (1939). Yet defining "assault weapon" as 68 convoluted names and undefined "copies" thereof does just that. No requirement exists that a person know that a firearm have the characteristics that render it a named "assault weapon" or "copy" thereof, rendering it "little more than 'a trap for those who act in good faith.'" *Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522, 534 (6th Cir. 1998) (declaring "assault weapon" law vague and quoting *Colautti v. Franklin*, 439 U.S. 379, 395 (1979)). Moreover, when the vague provisions relating to the enumerated long guns are analyzed in conjunction with the expansive definition of "copycat weapons" in Section 4-301(e), the result is a complete, *de facto* ban on the acquisition of semiautomatic long guns. Thus,

25

Plaintiffs exercise of their fundamental right to possess a firearm in the home for self-defense will be completely chilled by virtue of the vagueness of the law. *Cf. Reno v.* ACLU, 521 U.S. 844, 871-72 (1997) ("The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech."). This is precisely the result against which the Due Process Clause protects citizens and cannot stand.

B.    The Balance of Equities Weighs Heavily in Plaintiffs' Favor.

There can be no doubt that the benefits that would be provided to individual Plaintiffs, and the individual members of association Plaintiffs by way of the requested temporary restraining order are profound. Specifically, such relief would enable those Plaintiffs to exercise their fundamental constitutional rights to purchase and keep commonly used firearms and magazines for purposes of self-defense in their homes as guaranteed by the Second Amendment to the United States Constitution. To the contrary, there exists little, if any, potential harm to Defendants resulting from such relief, which merely would compel Defendants to maintain enforcement of the law as it was before the Act was to take effect until a hearing on a preliminary injunction can be held. Issuance of the requested relief will not force the government to allocate funds to any particular entity nor will it cause a loss of revenue, as the fees implemented by the Act are, purportedly, for its own administration. Moreover, it will permit both Plaintiffs and Defendants to fully brief the issue for the Court before a hearing on a preliminary injunction. Thus, the balance of equities tips heavily in favor of Plaintiffs and issuance of the requested temporary restraining order.

C.    Plaintiffs Will Suffer Irreparable Harm to Their Rights If the Temporary Restraining Order Is Not Granted.

Plaintiffs possess a fundamental constitutional right to purchase and keep firearms for purposes of self-defense in their homes as guaranteed by the Second Amendment to the United States Constitution. *McDonald*, 130 S. Ct. 3020; *Heller*, 554 U.S. 570. In the absence of the requested temporary restraining order, Defendant's enforcement of the challenged provisions of the Act will cripple Plaintiffs' ability to acquire and possess certain commonly used semiautomatic rifles, shotguns, and standard capacity magazines for the purpose of defending themselves and their families in the home. This is a daily violation of Plaintiffs' rights under the Second Amendment and causes Plaintiffs to suffer irreparable harm. *See Ezell v. City of Chicago*, 651 F.3d 684, 710-11 (7th Cir. 2011) (remanding the case for entry of a preliminary injunction where Plaintiffs showed that "they are suffering violations of their Second Amendment rights every day. . . ."). Absent a temporary restraining order, Defendants' actions will continue to prevent Plaintiffs from exercising their fundamental constitutional rights, threatening to undermine Plaintiffs' ability to protect themselves, their families, and their homes from criminals and others who might seek to cause them harm.

D.    The Relief Is in the Public Interest.

The final requirement, that the imposition of the temporary restraining order be in the public interest, is manifestly met in this case. Plaintiffs seek to ensure that the government and its agents do not erode the core constitutional rights possessed by all law-abiding, responsible citizens. This is precisely the type of public interest that satisfies the imposition of a temporary restraining order, as the Fourth Circuit noted recently when upholding the grant of a preliminary injunction:

precedent counsels that "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (internal quotation marks omitted). It also teaches that "upholding constitutional rights surely serves the public interest." *Id.*

*Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013). Thus, because a temporary restraining order would prevent the enforcement of restrictions likely to be found unconstitutional until such time as the Court can determine whether a preliminary injunction should issue, such relief is in the public interest.

E.      Any Security Should Be Waived or Set at $0.

Under Federal Rule of Civil Procedure 65(c), a Court may only issue a temporary restraining order if "the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Court, however, retains discretion to waive the security requirement. *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013). In this case, Defendants will not sustain any damages nor incur any costs if the temporary restraining order issues. Thus, the Court should exercise its discretion to either waive the security requirement or set it at zero ($0) dollars.

## CONCLUSION

Based on the foregoing, Plaintiffs request respectfully that this Court grant a temporary restraining order restraining Defendants from enforcing the challenged provisions of the Maryland Firearm Safety Act of 2013 to allow the parties to brief and the Court to render a decision on whether to grant a preliminary injunction. The specific provisions for which Plaintiffs seek restraint are Sections 4-303, 4-304, and 4-306 of the Criminal Law Article of the Maryland Code, all of which incorporate definitions from both Section 4-301 of the Criminal

Law Article and Section 5-101 of the Public Safety Article, as amended by the Act.   Plaintiffs

also request that this Court exercise its discretion and waive any security or set it at $0.

Plaintiffs request respectfully that the Court hear oral argument on their Motion.

Respectfully submitted,

John Parker Sweeney (Bar No. 08761)
T. Sky Woodward (Bar No. 10823)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
P (202) 719-8216
F (202) 719-8316
JSweeney@babc.com

*Counsel for Plaintiffs.*