**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF MARYLAND**

| | | |
|---|---|---|
| SHAWN J. TARDY, *et al.*, | * | |
| *Plaintiffs,* | * | |
| v. | * | Civil Case No. 13-cv-02841-CCB |
| MARTIN O'MALLEY, *et al.,* | * | |
| *Defendants.* | * | |

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER**

DOUGLAS F. GANSLER
Attorney General of Maryland

MATTHEW J. FADER (Fed. Bar # 29294)
Assistant Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-7906 (tel.); 410-576-6955 (fax)
mfader@oag.state.md.us

DAN FRIEDMAN (Fed. Bar # 24535)
Assistant Attorney General
Office of the Attorney General
Legislative Services Building
90 State Circle, Room 104
Annapolis, Maryland 21401
410-946-5600 (tel.)
dfriedman@oag.state.md.us

Dated:  September 30, 2013          Attorneys for Defendants

# TABLE OF CONTENTS

Page

STATEMENT OF FACTS ................................................................................................. 2

ARGUMENT ...................................................................................................................... 3

I.    THE PLAINTIFFS ARE BARRED BY LACHES FROM RECEIVING PRELIMINARY
INJUNCTIVE RELIEF. ............................................................................................. 3

II.   THE PLAINTIFFS CANNOT SATISFY THE STANDARD FOR GRANTING A
TEMPORARY RESTRAINING ORDER. ....................................................................... 4

    A.    The Plaintiffs Cannot Identify Irreparable Harm Likely to Result
from the Denial of a Temporary Restraining Order. .................................... 6

    B.    The Plaintiffs Cannot Establish that They Are Likely to Succeed on
the Merits. ................................................................................................... 10

        i.    The Plaintiffs Are Not Likely to Succeed on the Merits in
Challenging the Assault Weapons Ban. ........................................... 13

        ii.   The Plaintiffs Are Not Likely to Succeed on the Merits in
Challenging the Ban on High-Capacity Magazines. ........................ 15

        iii.  The Plaintiffs Are Not Likely to Succeed on the Merits of
their Equal Protection Claim. .......................................................... 18

        iv.   The Plaintiffs Are Not Likely to Succeed on the Merits of
their Due Process Claim. .................................................................. 23

    C.    The Public Interest Weighs Heavily Against Temporary Injunctive
Relief. ......................................................................................................... 28

    D.    The Balance of the Equities Weighs Heavily Against Temporary
Injunctive Relief. ........................................................................................ 29

CONCLUSION ............................................................................................................... 30

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT COURT OF MARYLAND**

SHAWN J. TARDY, *et al.*,              *

    *Plaintiffs,*              *

    v.              *              Civil Case No. 13-cv-02841-CCB

MARTIN O'MALLEY, *et al.*,              *

    *Defendants.*              *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR TEMPORARY RESTRAINING ORDER**

    The defendants, Governor Martin O'Malley, Attorney General Douglas F. Gansler, Colonel Marcus L. Brown, all sued in their official capacities, and the Maryland State Police, oppose the plaintiffs' motion for a temporary restraining order. The plaintiffs cannot satisfy any of the four factors that they are required to meet to obtain preliminary injunctive relief. Moreover, the plaintiffs' decision to wait until almost six months after Chapter 427 of the 2013 Laws of Maryland, the Firearm Safety Act of 2013 ("Chapter 427"),[1] was passed, and more than four months after it was signed into law, to bring a challenge on the eve of its effective date precludes them from receiving the interim equitable relief that they seek.

---

[1] Chapter 427 was originally introduced as Senate Bill 281, and the plaintiffs continue to refer to it by that designation. Once signed into law by Governor O'Malley, Senate Bill 281 became Chapter 427.

## STATEMENT OF FACTS

Chapter 427 represents a comprehensive effort to amend Maryland's gun laws to enhance public safety, including by the establishment of a handgun qualification license for purchasers of handguns, a ban on armor-piercing bullets, a number of provisions addressing mental health issues connected with firearms, and several other provisions.

The plaintiffs in this case challenge two aspects of Chapter 427. First, the plaintiffs challenge a provision that prohibits a Maryland person from, among other things, possessing, selling, or receiving "assault long guns," "assault pistols," and "copycat weapons," (collectively "assault weapons") as those terms are specifically defined, after October 1, 2013. Md. Code Crim. Law ("CR") §§ 4-303(a), 4-301 (definitions). That prohibition does not apply to any assault long guns or copycat weapons that were lawfully possessed, or for which a purchase order or application to purchase was completed, before October 1, 2013. CR § 4-303(b)(3). Moreover, licensed firearms dealers to whom the law applies may "continue to possess, sell, offer for sale, or transfer an assault long gun or copycat weapon that the licensed firearms dealer lawfully possessed on or before October 1, 2013." CR § 4-303(b)(2).

Second, the plaintiffs challenge a provision of the law that generally prohibits a Maryland person, including a licensed firearms dealer, from, among other things, possessing, selling, or receiving "a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm." CR § 4-305. This represents a reduction from the existing prohibition on detachable magazines with a capacity of more than 20 rounds.

2

Chapter 427 was enacted in the wake of a series of mass shootings perpetrated by individuals using assault weapons and high-capacity magazines, culminating in the murder of 20 elementary school students and six teachers at an elementary school in Newtown, Connecticut on December 14, 2012.   According to the Connecticut State Police, the Newtown shooter used a Bushmaster .223 caliber XM 15-E2S assault rifle with a high-capacity 30-round magazine to perpetrate his heinous crime.[2]

Chapter 427 was introduced on January 18, 2013 as Senate Bill 281, passed by the General Assembly on April 4, 2013, and signed by Governor O'Malley on May 16, 2013. *See* History of Ch. 427, *available at* http://mgaleg.maryland.gov/webmga/frmMain.aspx?pid=billpage&stab=03&id=sb0281&tab=subject3&ys=2013RS (last visited Sept. 30, 2013).

## ARGUMENT

## I.   THE PLAINTIFFS ARE BARRED BY LACHES FROM RECEIVING PRELIMINARY INJUNCTIVE RELIEF.

The plaintiffs seek the extraordinary equitable relief of a temporary restraining order to preclude the enforcement of Chapter 427 by a motion filed two business days before its effective date.  Chapter 427 was passed by the General Assembly almost six months ago and signed into law by the Governor more than four months ago.   As economically rational as it may have been for the plaintiffs to decide to delay bringing

---

[2] *See* Ex. A, State of Connecticut Dep't of Emerg. Srvcs and Public Protection, State Police Identify Weapons Used in Sandy Hook Investigation; Investigation Continues, Jan. 18, 2013, *available at* http://www.ct.gov/despp/cwp/view.asp?Q=517284&A=4226 (last visited Sept. 27, 2013).

this challenge until the eve of Chapter 427's effective date,[3] the plaintiffs made that decision to sit on their claimed rights, and it should preclude their request for extraordinary preliminary equitable relief from this Court. *See, e.g.*, *Quince Orchard Valley Citizens Assoc., Inc. v. Hodel*, 872 F.3d 75, 79-80 (4th Cir. 1989) (holding that district court acted well within its discretion in concluding that much of plaintiffs' alleged "potential harm was a product of its own delay in pursuing this action" where the plaintiffs could have taken action in the nine months before their filing); *Mills v. Agnew*, 286 F. Supp. 107, 110 (D. Md. 1968) (in denying application for temporary restraining order, finding laches to be "an additional reason" for the denial "even if the case were otherwise meritorious"); *see also Gelineau v. Johnson*, 904 F. Supp. 2d 742, 745 (W.D. Mich. 2012) (denying an injunction on laches grounds when plaintiffs knew about the disputed issue "since early May" and yet failed to act until mid-September).

## II.   THE PLAINTIFFS CANNOT SATISFY THE STANDARD FOR GRANTING A TEMPORARY RESTRAINING ORDER.

To obtain a temporary restraining order, a plaintiff must establish:  (1) a likelihood of success on the merits; (2) that "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) that "the balance of equities tips in his favor"; and (4) that "an injunction is in the public interest."  *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir.

---

[3] The firearms dealer plaintiffs had an economic incentive to delay bringing this challenge, as firearms dealers statewide appear to have been the beneficiaries of a significant increase in sales of the weapons and magazines at issue in the months leading up to the effective date of Chapter 427.

2009), *vacated on other grounds*, *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010).   Before a preliminary injunction may issue, all four of these requirements "must be satisfied as articulated" in *Winters*.  *Real Truth*, 575 F.3d at 347.

As to the first requirement, the plaintiff "bears a heavy burden in showing its likelihood of success," and "[a]ny relaxation of its burden, for example to require that [plaintiff] show only a possibility that it will eventually prevail, would be inadequate." *Real Truth*, 575 F.3d at 349 (citing *Winter*, 129 S. Ct. at 375-76).   Under *Winter*, the "likelihood of success" requirement is "far stricter" than the *Blackwelder*[4] standard, which formerly permitted a plaintiff to obtain preliminary relief upon demonstrating "only a grave or serious question for litigation."  *Real Truth*, 575 F.3d at 347 (emphasis in original).  Similarly, under *Winter* the moving party must make a "clear showing" that it will suffer harm that is irreparable; it is no longer sufficient, as it might have been under *Blackwelder*, for a plaintiff to point to a "possibility" of harm or merely show that the plaintiff's injury will outweigh the defendant's.  *Real Truth*, 575 F.3d at 347.

Whereas the public interest requirement sometimes received little more than pro forma consideration under *Blackwelder*, *see Real Truth*, 575 F.3d at 347, *Winter* emphasizes the public interest and insists that a court of equity should "'pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'"  *Winter*, 129 S. Ct. at 376-77 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).   As further explained in *Romero-Barcelo*, if the requested

---

[4] *Blackwelder Furniture Co. of Statesville v. Selig Mfg. Co.,* 550 F.2d 189 (4th Cir. 1977).

preliminary injunction "'will adversely affect a public interest . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.'"  456 U.S. at 312 (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)).

### A.   The Plaintiffs Cannot Identify Irreparable Harm Likely to Result from the Denial of a Temporary Restraining Order.

To be eligible for the extraordinary equitable relief of a temporary restraining order, the plaintiffs are required to demonstrate that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20.  This requires a "clear showing" the plaintiffs will suffer harm that is irreparable, not the mere possibility of irreparable harm. *Real Truth*, 575 F.3d at 347.  The plaintiffs do not begin to meet that burden.

As an initial matter, although the plaintiffs attempt to portray the ban on assault long guns in Chapter 427 as effectively precluding effective home self-defense, their claims not only lack any legitimate evidentiary support but also contradict the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008).  In *Heller*, as discussed more fully below, the Supreme Court identified handguns as the type of firearm "that is overwhelmingly chosen by American society" for the lawful purpose of self-defense of the home. *Heller*, 554 U.S. at 628.  Although the plaintiffs cite this language repeatedly, they misapprehend its meaning in arguing that it somehow supports their claim that assault weapons are constitutionally necessary for home self-defense.  To the contrary, it was the status of handguns as the single class of firearms "overwhelmingly

chosen by American society" for self-defense within the home that rendered their complete ban unconstitutional.  The Supreme Court thus identified handguns—to the necessary exclusion of any other class of firearms—as uniquely chosen over all other classes of firearms for home self-defense.  Far from supporting their claims, the Supreme Court's holding precludes a finding that any other class of firearms has the same status as handguns with respect to home self-defense.  Chapter 427's bans on assault long guns and high-capacity detachable magazines do not interfere with the right recognized in *Heller*.

Moreover, each of the individual plaintiffs, and the individual members of the organizational plaintiffs, have the right under Maryland law to make application to purchase before October 1, 2013 any of the firearms at issue, and to take delivery of the weapons after October 1, 2013.  The plaintiffs, who filed this action several days before October 1, 2013, have not made any showing that they could not make application before that date to purchase any of the items they claim they would like to purchase after October 1, 2013.  Even if they could identify a need for a specific assault weapon after October 1, 2013, they have not been prohibited to date from purchasing it, and have not provided any explanation for why they could not have done so.

Furthermore, each of the individual plaintiffs admits to currently owning both assault weapons and "multiple" high-capacity detachable magazines.  *See* Memorandum in Support of Plaintiffs' Motion for Temporary Restraining Order ("Plaintiffs' Memorandum") (ECF No. 3-1) at 6-8.  Chapter 427 does not make unlawful the plaintiffs' continued possession or use (for lawful purposes) of those assault weapons and

7

magazines before or after its effective date.  As a result, even after October 1, 2013, all of the individual plaintiffs will have the full use of assault weapons and high-capacity detachable magazines for purposes including home self-defense.  Thus, even assuming these plaintiffs were ultimately able to show that the wide availability for purchase of handguns and numerous types of long guns that are not assault weapons is somehow insufficient for purposes of defending themselves in their homes, they have not identified any conceivable "irreparable" harm from being prohibited from acquiring further assault weapons and magazines before a preliminary injunction—or even a final resolution on the merits—can be considered.

With respect to the dealer plaintiffs, each has offered at most the possibility of economic harm arising from the inability to accrue additional profit from the sale of such assault weapons and high-capacity detachable magazines before the Court can consider the merits of a preliminary or permanent injunction.[5]  Plaintiffs' Memorandum at 9-10. That monetary harm does not qualify as irreparable harm.  *See Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).  Moreover, firearm dealers would be able to alter magazines to reduce their capacity, as has been done in the past to comport with the current 20-round limit.  Nor have any of the organizational plaintiffs identified any possibility of irreparable harm that is likely to occur before the Court is able to consider the merits of a preliminary injunction.

---

[5] These claims of economic harm from the firearms dealers are particularly ironic given the significant surge in sales of the weapons and magazines at issue in the months leading up to the effective date of Chapter 427.

Further evidence of the lack of irreparable harm comes in the delay in the plaintiffs' filing of this lawsuit, by which they have attempted to create an entirely unnecessary alleged need for immediate review.  Even if a "particular period of delay" does not rise to the level of laches that would "bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction."  *Quince Orchard*, 872 F.3d at 79-80 (quoting *Citibank*, 756 F.2d at 276).  Thus, a "[l]ack of diligence, standing alone, may . . . preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm . . . ."  *Quince Orchard*, 872 F.3d at 80 (quoting *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985)).  "'Since an application for preliminary injunction is based upon an urgent need for the protection of [a] Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required.'"  *Quince Orchard*, 872 F.3d at 80 (quoting *Skehan v. Bd. of Trustees of Bloomsburg State College*, 353 F. Supp. 542, 543 (M.D. Pa. 1973)).

In this case, Chapter 427 was passed by the General Assembly in early April 2013, and was the focus not only of significant press attention, but of vigorous objections during the legislative process by the very organizational plaintiffs bringing this case.[6] Notwithstanding their keen awareness of, and vehement opposition to, this legislation

---

[6] *See, e.g.*, Ex. B, Maryland Shall Issue, Press Release, Apr. 4, 2013, *available at* https://marylandshallissue.com/2013/04/last-chance-to-stop-sb281/ (last visited Sept. 30, 2013); Ex. C, National Rifle Assoc. Institute for Legislative Advocacy, Press Release, Mar. 8, 2013 (describing activities of NRA-ILA working "tirelessly" with "Maryland State Rifle and Pistol Association (MSRPA), Maryland Shall Issue (MSI) and Associated Gun Clubs of Baltimore (AGC)" to defeat what became Chapter 427), *available at* http://www.nraila.org/legislation/state-legislation/2013/3/maryland-second-amendment-supporters-actively-fight-governors-gun-grab-in-annapolis-fight-is-far-from-over.aspx (last visited Sept. 30, 2013).

even before it was enacted, the plaintiffs made a calculated decision to wait to bring their legal challenge until the eve of the law's effective date. These facts evidence the absence of any true irreparable harm. *Quince Orchard*, 872 F.3d at 79-80.

The plaintiffs' inability to establish any risk of irreparable harm, much less the *likelihood* of irreparable harm they are required to prove, mandates the denial of their motion for a temporary restraining order.

**B.      The Plaintiffs Cannot Establish that They Are Likely to Succeed on the Merits.**

In addition to establishing the likelihood of irreparable harm, to be eligible for a temporary restraining order, the plaintiffs must carry "a heavy burden" to demonstrate a "likelihood of success," not merely the possibility of success, on the merits of their claims. *Real Truth*, 575 F.3d at 349. The plaintiffs cannot carry that burden.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Supreme Court reviewed a District of Columbia law that imposed a "complete prohibition" on the possession of handguns in the home. 554 U.S. at 629. After engaging in a lengthy textual and historical analysis of the Second Amendment, the Court concluded: (1) that the amendment codified a pre-existing right, *id.* at 592; (2) that this right is an individual right, not dependent on militia service, *id.*; and (3) that, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *id.* at 635. As a result, the Supreme

10

Court held that that the District could not ban handguns, the class of arms "that is overwhelmingly chosen by American society" for the lawful purpose of self-defense in the home. *Id.* at 628.

Although the Supreme Court declined to speculate about other conduct that might fall *within* the protection of the Second Amendment, *id.*, the Court observed that, notwithstanding the amendment's unconditional language, "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. Indeed, the Court identified, by way of example, a number of types of laws that it presumed would fall *outside* the protection of the amendment. First, the Court observed that a majority of nineteenth-century courts had upheld the constitutionality of complete prohibitions on the carry of concealed weapons. *See id.* Second, the Court identified as "presumptively lawful regulatory measures": (i) longstanding bans on "the possession of firearms by felons and the mentally ill"; (ii) bans on "the carrying of firearms in sensitive places such as schools and government buildings"; and (iii) "laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27 & n.26. Third, the Court recognized that the right was limited to weapons "in common use at the time," a recognition supported by "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627 (quoting 4 Blackstone, Commentaries on the Laws of England 148-149 (1769)). The Court's list, which contained only "examples" of presumptively lawful regulations, did "not purport to be exhaustive." *Id.* at 627 n.26.

Two years after *Heller*, in *McDonald v. City of Chicago*, the Supreme Court held that the individual Second Amendment right is "fully applicable to the States." ___ U.S. ___, 130 S. Ct. at 3026 (2010). Although *McDonald* did not further clarify the substantive scope of the Second Amendment right, it promised that "'state and local experimentation with reasonable firearms regulation will continue under the Second Amendment.'" *Id.* at 3047 (quoting Brief of State of Texas, *et al.* as *Amici Curiae* at 23).

The Court of Appeals for the Fourth Circuit has adopted a two-pronged approach to analyzing laws under the Second Amendment. *Woollard v. Gallagher*, 712 F.3d 865, 874-75 (4th Cir. 2013); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). Under this approach, the first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Chester*, 628 F.3d at 680 (internal quotation marks omitted). If not, the challenged law is valid. *Id.* If, on the other hand, the burdened conduct is found to be within the scope of the Amendment, then the second prong requires the application of "an appropriate form of means-end scrutiny." *Id.* The Fourth Circuit—like nearly every other federal court to have considered the question—has adopted intermediate scrutiny as the appropriate test for regulations affecting behavior that implicates the Second Amendment right, but that is outside the core of in-home self-defense by law-abiding citizens. *United States v. Masciandaro*, 638 F.3d 458, 471 (4th Cir. 2011). Under that test, the government bears the burden of demonstrating that the challenged regulation "is reasonably adapted to a substantial government interest." *Id.*; *see also Chester*, 628 F.3d at 683 (under

intermediate scrutiny, "the government must demonstrate . . . that there is a 'reasonable fit' between the challenged regulation and a 'substantial' government objective").

### i. The Plaintiffs Are Not Likely to Succeed on the Merits in Challenging the Assault Weapons Ban.

Chapter 427 expands the longstanding (and never challenged) assault pistol ban to apply to a list of newly-prohibited assault long guns, Md. Code Ann., Pub. Safety ("PS") § 5-101(r)(2),[7] and "copycat weapons" as defined in CR § 4-301(e).  The assault weapons ban does not offend the Second Amendment because the only firearms it prohibits are "dangerous and unusual weapons" that are largely unrelated to home self-defense, at least as that term is commonly understood.  In fact, the Supreme Court's decision in *Heller* strongly implies that Court's understanding that these military-style assault weapons are outside the protections of the Second Amendment:

> It may be objected that if weapons that are most useful in military service—M-16 rifles and the like[8]—may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.

---

[7] This list is found at § 5-101(p)(2) of the Public Safety Article through October 1, 2013, and thereafter at § 5-101(r)(2).

[8] The M-16 rifle is, for purposes of this analysis, essentially the military version of the AR-15, an assault weapon specifically banned by Senate Bill 281. *See Heller v. District of Columbia*, 670 F.3d 1244, 1263 (D.C. Cir. 2011) ("*Heller II*") (discussing similarities between M-16 and AR-15).

*Heller*, 554 U.S. at 627-28. Thus, the Supreme Court assumed—and apparently considered the proposition to be so unassailable as to require no explanation—that military-style assault weapons such as those prohibited by Chapter 427 are outside of the protection of the Second Amendment and may be banned. *See People v. James*, 94 Cal. Rptr. 3d 576, 586 (Cal. Ct. App. 2009) (relying on the above-quoted passage from *Heller* to determine that assault weapons are not protected by the Second Amendment); *see also Kodak v. Holder*, 342 Fed. Appx. 907, 908 (4th Cir. 2009) (unpublished) (relying on this analysis from *Heller* to reject a claim that a federal ban on armor-piercing ammunition is unconstitutional).

Moreover, even if assault weapons are within the scope of the Second Amendment's protection, there is more than sufficient evidence to support a "substantial relationship or reasonable 'fit' between, on the one hand, the prohibition on assault weapons . . . and, on the other, [the State's] important interests in protecting police officers and controlling crime." *Heller II*, 670 F.3d at 1262 (affirming constitutionality of District of Columbia's ban on assault weapons). That conclusion is supported by evidence presented to the General Assembly in enacting Chapter 427. For example, the standing committees of the General Assembly with jurisdiction to consider Senate Bill 281 (the Senate Judicial Proceedings Committee and, operating jointly, the House Judiciary and the Health and Governmental Operations Committees) received testimony that design features of assault weapons contribute to their lethality and that "the greater the ammunition capacity of the firearm used in a mass shooting, the more victims were

injured or killed by gunfire."[9]   There was also testimony about the dangers that assault weapons present to law enforcement.[10]   Moreover, the General Assembly also relied on social science research that supported assault weapons bans in other jurisdictions.  *See, e.g., Heller II*, 670 F.3d at 1262-63 (discussing social science literature supporting D.C.'s assault weapon ban); Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban*, in Reducing Gun Violence in America: Informing Policy with Evidence and Analysis, 167 (2013) (discussing federal assault weapons ban); Christopher S. Koper & Jeffrey A. Roth, *The Impact of the 1994 Federal Assault Weapons Ban on Gun Violence Outcomes: An Assessment of Multiple Outcome Measures and Some Lessons for Policy Evaluation*, 17 J. of Qualitative Criminology 33 (2001) (same). Therefore, even if a law banning assault weapons is subject to Second Amendment scrutiny, it would still be constitutional.

### ii.     The Plaintiffs Are Not Likely to Succeed on the Merits in Challenging the Ban on High-Capacity Magazines.

Chapter 427 defines a detachable magazine as "an ammunition feeding device that can be removed readily from a firearm without requiring disassembly of the firearm

---

[9] Ex. D, Testimony of Daniel W. Webster, Professor, Johns Hopkins Bloomberg School of Public Health and Director of the Johns Hopkins Center for Gun Policy and Research, at 5 (hereinafter, "Webster Testimony") (and sources cited therein).

[10] Baltimore County Police Chief James W. Johnson presented oral testimony to the General Assembly that mirrored his recent congressional testimony in support of a federal assault weapons ban.  *See Testimony for Chief Jim Johnson, Baltimore County, Maryland Chair, National Law Enforcement Partnership to Prevent Gun Violence to the U.S. Senate Judiciary Committee* (Jan. 30, 2013) *available at* http://www.judiciary.senate.gov/pdf/1-30-13JohnsonTestimony.pdf.

action or without the use of a tool, including a bullet or a cartridge." CR § 4-301(f).  The law then states that a person "may not manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm." CR § 4-305(b).  The effect is a ban in the State of Maryland (with exceptions for law enforcement) on detachable magazines holding more than 10 rounds, referred to as high-capacity detachable magazines.[11]  Current law, effective until October 1, 2013, restricts magazines to no more than 20 rounds.  Thus, the effect of the new law is to reduce the limit from 20 rounds to 10 rounds, the constitutional significance of which the plaintiffs fail to address at all.

As an initial matter, it is far from clear that a high-capacity detachable magazine qualifies as an "arm" subject to protection under the Second Amendment at all.  A high-capacity magazine is neither a weapon itself, nor—given that weapons can be operated with lower-capacity magazines—is it required to operate a weapon.  If a ban on high-capacity magazines does not implicate the Second Amendment right, the plaintiffs' challenge would be subject only to rational basis scrutiny.

Even if it were to be assumed that high-capacity detachable magazines are entitled to protection under the Second Amendment, their prohibition would survive intermediate scrutiny because there is a substantial relationship between curtailing the use of high-capacity detachable magazines and the State's objectives of controlling crime and protecting law enforcement officers.  *See Heller II*, 670 F.3d at 1262-64 (affirming

---

[11] The plaintiffs refer to such magazines as "standard-capacity" magazines.  Semantics aside, the issue is detachable magazines holding more than 10 rounds.

constitutionality of District of Columbia's ban on high-capacity detachable magazines, citing evidence that they "significantly" increase danger to others, including when used for self-defense); *Woollard*, 712 F.3d at 877 (Given the extent of gun violence in Maryland, "we can easily appreciate Maryland's impetus to enact measures aimed at protecting public safety and preventing crime, and we readily conclude that such objectives are substantial governmental interests."). The social science evidence described above in connection with the assault weapons discussion also support this "substantial relationship."

Indeed, although high-capacity detachable magazines may be in common use, they serve to make the arms to which they attach significantly more dangerous. Many of the recent high-profile mass shootings were accomplished by use of these high-capacity magazines that allowed the perpetrators to maim and kill many people very quickly without having to pause to change the magazine, including those in Tucson, Arizona; Aurora, Colorado; Newtown, Connecticut; and, most recently, Chicago, Illinois.[12]

By contrast, it would seem that high-capacity detachable magazines have little if any nexus to standard home self-defense. *See* Webster Testimony, *supra* note 9 at 5 (citing Arthur L. Kellerman, *et al., Weapon Involvement in Home Invasion Crimes*, 273 J.

---

[12] *See* Mark Follman & Gavin Aronsen, *"A Killing Machine": Half of All Mass Shooters Used High-Capacity Magazines*, Mother Jones, Jan. 30, 2013, *available at* http://www.motherjones.com/politics/2013/01/high-capacity-magazines-mass-shootings (last visited Sept. 27, 2013); Ex. E, Amanda Watts, CNN, *Chicago Shooting: 4 Suspects Arrested, Charged*, Sept. 24, 2013 (reporting Chicago Police Superintendent as stating that Chicago shooting involved "[a]n assault-style rifle with a high-capacity magazine"), *available at* http://www.cnn.com/2013/09/23/justice/chicago-shooting/index.html (last visited Sept. 27, 2013).

Am. Med. Assoc. 1759 (1995)).  The plaintiffs' claim that individuals using firearms for home defense are likely to need to fire more than 10 rounds at a time because they are likely to be panicked and miss with most of their shots—and thus hit things or people other than the intruders at whom they are aiming—hardly supports an argument for a constitutional right to access to even more rounds that are likely to be misfired before having to change magazines.  Moreover, there is no evidentiary support for the plaintiffs' claim that home self-defense requires access to more than 10 rounds at a time.   In contrast to the clear utility of such high-capacity magazines in perpetrating mass shootings, the plaintiffs have not presented any evidence that home invasion self-defense generally requires the use of more than 10 rounds.  The plaintiffs have thus failed to carry their burden of demonstrating a likelihood of success on the merits.

### iii.    The Plaintiffs Are Not Likely to Succeed on the Merits of their Equal Protection Claim.

The plaintiffs have also failed to demonstrate a likelihood of success on the merits of their equal protection claim, in which they assert that Chapter 427 draws an impermissible distinction between retiring law enforcement officers and other citizens. Compl. (ECF No. 1) ¶¶ 88-91.[13]  To the contrary, there is ample basis in both fact and

_____

[13] In addition to challenging the distinction addressed in this section, which is the sole focus of the plaintiffs' request for a temporary restraining order, the complaint mentions the provision of Chapter 427 exempting United States government personnel, members of the armed forces or national guard, and active duty law enforcement personnel.  CR § 4-302(1).  Although the complaint is not without ambiguity, it does not appear that the plaintiffs are challenging this exemption.  Regardless, because this exemption is not raised by the plaintiffs' motion for temporary restraining order, it is not addressed in this memorandum.

law for this distinction, which would survive heightened scrutiny, but need satisfy only rational basis scrutiny.

The distinction about which the plaintiffs complain with respect to the assault weapons ban is much narrower than implied by their discussion.  Chapter 427 allows as an exception to the ban on the transfer of an assault weapon the transfer from a law enforcement agency to a retiring law enforcement officer only:  (1) on that officer's retirement, not at any time thereafter; and only (2) if the assault weapon or detachable magazine was purchased or obtained "for official use with the law enforcement agency before retirement."  CR § 4-302(7).  Thus, this exception does not allow all retired law enforcement officers to obtain as many assault weapons as they like, nor is the exception connected to a need for home self-defense.  Instead, this is a narrow exception allowing law enforcement officers who had official use of a particular assault weapon before their retirement—for use in protecting public safety—to receive that service weapon upon retirement.[14]

Such retiring law enforcement officers are not similarly situated with other citizens with respect to the receipt of such service weapons for numerous reasons, beginning with the fact that—to be eligible to receive such assault weapons or detachable magazines—they must have used those weapons or magazines in connection with their statutory duties to protect public safety.  *See* PS § 2-301(a) (defining the duties of the

---

[14] This requirement makes the Maryland law significantly narrower than the California provision held unconstitutional in *Silveira v. Lockyer*, 312 F.3d 1052, 1090-91 (9th Cir. 2002).  That law "would [have] permit[ted] the transfer of any number of assault weapons to *any* peace officer, regardless of whether that officer had ever come into contact with the weapons being acquired."  *Id.* at 1091.

members of the Department of State Police as including the duties to "preserve the public peace," "detect and prevent the commission of crime," "apprehend and arrest criminals," and "preserve order at public places").

Law enforcement officers are further differentiated by their experience of having been entrusted with the statutory duty to protect public safety, and the statutory authority to detain, arrest, and use force against other citizens to carry out their duties to protect public safety. *Id.*; *see also* PS § 3-101(e) (defining "law enforcement officer" as an individual who is a member of a law enforcement agency and "is authorized by law to make arrests"). Thus, law enforcement officers are "not to be equated with a private person engaged in routine public employment or other common occupations of the community who exercises no broad power over people generally." *Foley v. Connelie*, 435 U.S. 291, 298 (1978) (internal quotations omitted).

Maryland law enforcement officers are also differently situated than other citizens when it comes to the use of, and training with respect to, firearms. To be allowed to carry a firearm as a law enforcement officer in Maryland—including an assault weapon that could be transferred under CR § 4-302(7)—one has to successfully complete extensive firearms classroom instruction, training, and qualification on that firearm, COMAR 12.04.02.03A, and then submit to firearms training every year thereafter, COMAR 12.04.02.08A; *see also* COMAR 12.04.02.06A (requirements applicable to long guns); COMAR 12.04.02.06B(2) (initial training from 7-35 hours depending on the type of long gun); COMAR 12.04.02.06B(3) (minimum rounds fired requirements ranging from 50-350 rounds); COMAR 12.04.02.07 (course of fire requirements). Failure to

20

complete annual training on a firearm results in seizure of that firearm until successful completion of training is completed.  COMAR 12.04.02.08E.  Maryland law enforcement officers, unlike other Marylanders, also are required to receive—as part of their classroom instruction on firearms—training on the rules for the use of deadly force, judgmental training on the use of deadly force, and "emotional, mental, and psychological preparation needed for the possibility of a deadly force shooting situation." COMAR 12.04.02.10C.   These extensive, annual training requirements imposed on Maryland's law enforcement officers over the course of their careers differentiate them from other citizens with respect to firearm safety.  *See  Cabell v. Chavez-Salido*, 454 U.S. 432, 443-444 (1982) ("The general law enforcement character of all California 'peace officers' is underscored by the fact that all have the power to make arrests  and all receive a course of training in the exercise of their respective arrest powers and in the use of firearms.") (internal citations omitted); *Bell v. Maryland*, 378 U.S. 226, 327-328 (1964) ("Instead of attempting to take the law into their own hands, people have been taught to call for police protection to protect their rights wherever possible").

When considering challenges to state laws under the Equal Protection Clause, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).   Accordingly, the distinctions drawn between law enforcement officers and other citizens in Chapter 427 easily pass constitutional muster.  *See, e.g.*, *Williams v. Puerto Rico*, 910 F. Supp. 2d 386, 398-399 (D.P.R. 2012) (holding that Puerto Rico's Weapons Act of 2000, P.R. Laws

21

Ann. tit 25, §§ 455-460(k), which creates different weapons permitting procedures for government officials than other citizens, does not violate the Equal Protection Clause); *Pizzo v. City & County of San Francisco*, 2012 U.S. Dist. LEXIS 173370 (N.D. Cal. Dec. 5, 2012) (unpublished) (granting summary judgment to city defendants in case involving equal protection challenge to (a) sections of the California Penal Code that create an exception to concealed and loaded carry laws for honorably retired police officers with concealed carry permits and (b) the Federal Law Enforcement Officers Safety Act, 18 U.S.C. §§ 926B & 926C, which allows qualified federal law enforcement officers—both active and retired—to carry concealed firearms notwithstanding applicable state laws); *see also Hodges v. Colorado Springs*, 1992 U.S. App. LEXIS 10105, 2-3 (10th Cir. Colo. May 4, 1992) (unpublished) ("The differences between the duties of police officers and civilian employees demonstrate that the two groups are not similarly situated for equal protection analysis.").[15]

Finally, even if the plaintiffs' equal protection challenge were to succeed, the provision would clearly be severable. Indeed, that was the result of the only case on which the plaintiffs rely for their equal protection claim. *See Silveira*, 312 F.3d at 1091-92. The Maryland Court of Appeals has held that, "even in the absence of an express severability clause in legislation that is found defective in some severable part,

---

[15] The plaintiffs argue that strict scrutiny must be applied here because, in their view, these distinctions implicate a fundamental right to bear arms. However, there is no fundamental right to bear assault weapons and detachable magazines of more than 10 rounds, for reasons discussed above. *See Hightower v. City of Boston*, 693 F.3d 61, 83 (1st Cir. 2012) ("Given that the Second Amendment challenge fails, the equal protection claim is subject to rational basis review").

there 'is a strong presumption that if a portion of an enactment is found to be invalid, the intent is that such portion be severed.'"  *Muskin v. State Dept. of Assessments & Taxation*, 422 Md. 544, 554 n.5 (2011) (quoting *Board of Supervisors of Elections v. Smallwood*, 327 Md. 220, 245 (1992)).  The Maryland Code similarly provides that the "provisions of all statutes enacted after July 1, 1973 are severable unless the statute specifically provides that its provisions are not severable."  Md. Code Ann., art. I, § 23.

The plaintiffs are not likely to succeed on the merits of their equal protection claim.

### iv.   The Plaintiffs Are Not Likely to Succeed on the Merits of their Due Process Claim.

The plaintiffs have also failed to demonstrate a likelihood of success on the merits of their due process claim, in which they argue that Chapter 427's list of assault weapons is unconstitutionally vague.  The plaintiffs' challenge fails because:  (1) the list of assault weapons is not new, but has been a part of Maryland law since 1996; (2) the plaintiffs have not had any difficulty determining the applicability of the list to their own gun collections; (3) the language is not vague or ambiguous; and (4) even if the term "copies" were vague or ambiguous, the State has issued guidance as to its interpretation.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104 (1972). The "void for vagueness doctrine addresses at least two connected but discrete due process concerns:  first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those

enforcing the law do not act in an arbitrary or discriminatory way." *Federal Communications Commission v. Fox TV Stations*, 132 S. Ct. 2307, 2317 (2012). Thus, the Supreme Court found the FCC's attempts to enforce against television networks standards that changed over time without warning—from initially placing emphasis on whether broadcasts dwelled on or repeated offending content to a focus on "fleeting expletives"—failed to comply with due process because it afforded "no notice to [the networks] that a fleeting expletive or a brief shot of nudity could be actionably indecent." *Id.* at 2318.

However, courts "do not hold legislators to an unattainable standard when evaluating enactments in the face of vagueness challenges." *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 371 (4th Cir. 2012). "[B]ecause we are condemned to the use of words, we can never expect mathematical certainty from our language." *Id.* (internal quotation omitted). Thus, "'[a] statute need not spell out every possible factual scenario with 'celestial precision' to avoid being struck down on vagueness grounds.'" *United States v. Hager*, 721 F.3d 167, 183 (4th Cir. 2013) (quoting *United States v. Whorley*, 550 F.3d 326, 334 (4th Cir. 2008)). A statute "'must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score.'" *Hager*, 721 F.3d at 183 (quoting *United States v. Aguilar*, 585 F.3d 652, 658 (4th Cir. 2009)). Thus, if any aspect of a statute could be deemed vague, a "federal court must 'consider any limiting construction that a state court or enforcement agency has proffered.'" *Martin v. Lloyd*, 700 F.3d 132, 136 (4th Cir. 2012) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1983)).

24

Furthermore, outside of the First Amendment context, "courts will not hold a statute void for vagueness 'if the person challenging it had sufficient warning that his own conduct was unlawful.'"  *United States v. Joliff*, 548 F. Supp. 229, 230 (D. Md. 1981) (quoting *Robinson v. Berman*, 594 F.2d 1, 2 (1st Cir. 1979)).

Based on these standards, Chapter 427 is clearly constitutional.  Although the plaintiffs complain of the list of assault long guns as though it was newly enacted in Chapter 427, the list has been part of Maryland law since 1996, originally added as § 441(d) of then-Article 27 of the Maryland Code, which defined "assault weapon" as including "any of the following specific firearms or their copies."  That definition— contained in § 5-101(p)(2) of the Public Safety Article of the Maryland Code until October 1, 2013, and thereafter in § 5-101(r)(2)—has served for many years to apprise individuals and firearms dealers of which long guns could be transferred only after first submitting to the MSP a completed firearm application and waiting up to seven days for a response.  *See* PS § 5-101(r) (defining "regulated firearm"); § 5-117 (requiring submission of firearm application before purchase or transfer of a regulated firearm); § 5-118 (firearm application requirements); § 5-123(a) (prohibiting sale or transfer of regulated firearms until seven days after submission of firearm application to the MSP). The penalty for violating the regulated firearms law—by, for example, selling a "copy" of an assault weapon without submitting a firearm application—is up to five years imprisonment and a $10,000 fine.  PS § 5-144.[16]  By contrast, the penalty for violating

---

[16] Through September 30, 2013, this provision appeared at § 5-143 of the Public Safety Article of the Maryland Code.  Beginning October 1, 2013, it appears at § 5-144.

the assault weapons ban is up to 3 years imprisonment and a fine of up to $5,000.  CR § 4-306(a).  Thus, the same list the plaintiffs now claim to be too vague to comply with is one that Marylanders have actually been complying with for many years, under threat of even greater criminal penalties than those imposed under Chapter 427.

Moreover, the affidavits of the plaintiffs themselves demonstrate that they have little difficulty in determining which weapons do and do not fit within the definition of an assault long gun.  For example, plaintiff Andrew Turner's declaration states that he "currently own[s] three regulated long guns which are classified as 'assault weapons' by SB 281," (ECF No. 3-2, ¶ 3); plaintiff Shawn Tardy's declaration states that he "currently own[s] one regulated long gun which is classified as an 'assault weapon' by SB 281," (ECF No. 3-3, ¶ 3); plaintiff Matthew Godwin's declaration states that he "currently own[s] regulated long gun which are classified as 'assault weapons' by SB 281," (ECF No. 3-4, ¶ 3); plaintiff Carol Wink's declaration states that "regulated long guns classified as 'assault weapons' by SB 281 represent a substantial number of all long guns sold by Wink's Sporting Goods," a firearms dealer she operates (ECF No. 3-5, ¶ 4); and plaintiff Stephen Schneider, President of the Maryland Licensed Firearms Dealers Association, Inc., signed a declaration stating that "regulated long guns classified as 'assault weapons' by SB 281 represent a substantial number of all long guns sold by MLFDA's individual members" (ECF No. 3-6, ¶ 6).  None of these plaintiffs appear to have had any difficulty identifying with particularity long guns "classified as 'assault weapons' by" Chapter 427.

The reason none of these plaintiffs had difficulty identifying which long guns are classified assault weapons, and why the definition of assault weapons has been in place successfully for many years, is that it is not vague.  Assault long guns are defined as any of the weapons specifically listed and, because model names and manufacturers can change so quickly, their "copies."  Moreover, even if "copies" could have given rise to some ambiguity, the Attorney General of Maryland has provided guidance, followed by the MSP, that a copy requires more than cosmetic similarity, but instead requires that a listed weapon shares "a similarity between the internal components and function of the firearm in question."  *See* Ex. F, Regulated Firearms—Assault Weapons—Whether a Weapon Is a "Copy" of a Designated Assault Weapon and Therefore Subject to the Regulated Firearms Law, 95 Atty. Gen. Md. 101, 108 (2010).  In other words, an unlisted weapon must have interchangeable internal parts with a listed weapon to qualify as a copy, not merely a similar appearance.  Notably, the plaintiffs have not identified any instance of any enforcement abuses, difficulties, or irregularities in the many years in which this definition has been in force.

The plaintiffs have failed to demonstrate they are likely to succeed on the merits of their due process claim.

### C.    The Public Interest Weighs Heavily Against Temporary Injunctive Relief.

The plaintiffs pay scant attention to the requirement that they demonstrate that a temporary restraining order "is in the public interest."  *Real Truth*, 575 at 346.  Based purely on their erroneous contention that they are likely to succeed on the merits of their

constitutional claims, the plaintiffs contend that an injunction must necessarily be in the public interest to ensure constitutional rights are not eroded.  Plaintiffs' Memorandum (ECF No. 3-1) at 27-28.

In *Winter*, the Supreme Court emphasized that courts of equity should "'pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'"  *Winter*, 129 S. Ct. at 376-77 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).   In this case, based on evidence discussed above that was presented in the General Assembly's consideration of Chapter 427, Maryland's General Assembly determined that the assault weapons ban and ban on high-capacity detachable magazines was important to the public safety of Marylanders.  Indeed, as discussed above, high-capacity magazines have featured prominently in a number of recent mass shootings.

Although taking a moderate approach that did not make unlawful the possession or use of assault weapons acquired before the effective date of Chapter 427, the General Assembly concluded that there was a significant public safety interest in precluding the introduction of more assault weapons and high-capacity magazines after the law's effective date.  Any delay in the implementation of Chapter 427 risks placing more of such weapons and magazines in circulation.  The plaintiffs' invitation to this Court to expand—on a preliminary basis—the boundaries of the Second Amendment right well beyond that identified in *Heller* runs directly contrary to the Fourth Circuit's warning: "This is serious business.  We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we

miscalculated as to *Second Amendment* rights."   *United States v. Masciandaro*, 638 F.3d 458, 475-76 (2011).

The public interest weighs heavily against preliminary injunctive relief.

**D.      The Balance of the Equities Weighs Heavily Against Temporary Injunctive Relief.**

The fourth factor the plaintiffs are required to establish to obtain preliminary injunctive relief—that "the balance of equities tips in [their] favor," *Winter*, 555 U.S. at 20—also weighs heavily against issuance of a temporary restraining order.  As discussed above, the public interest in banning assault weapons and high-capacity magazines is significant, and the plaintiffs have not identified even the potential for harm before this Court would be able to consider whether a permanent injunction should issue, with the exception of the potential for lost sales by the firearms dealer plaintiffs, sales which presumably could be readily made up if the plaintiffs are ultimately successful in obtaining a permanent injunction.

## CONCLUSION

For these reasons, the Court should deny the plaintiffs' motion for a temporary restraining order.

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

      /s/
_____
MATTHEW J. FADER (Fed. Bar # 29294)
Assistant Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-7906 (tel.); 410-576-6955 (fax)
mfader@oag.state.md.us

DAN FRIEDMAN (Fed. Bar # 24535)
Assistant Attorney General
Office of the Attorney General
Legislative Services Building
90 State Circle, Room 104
Annapolis, Maryland 21401
Tel. 410-946-5600
dfriedman@oag.state.md.us

Dated:  September 30, 2013          Attorneys for Defendants