IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| ~~STEPHEN V. SHAWN J. TARDY~~KOLBE;~~ | ) |
| | ) |
| | ) |
| ANDREW C. TURNER; | )   Case No. 1:13-cv-02841-CCB |
| | ) |
| ~~STEPHEN V. KOLBE;~~ | ) |
| | ) |
| WINK'S SPORTING GOODS, INC.; | ) |
| | ) |
| ATLANTIC GUNS, INC.; | ) |
| | ) |
| ASSOCIATED GUN CLUBS OF BALTIMORE, INC.; | ) |
| | ) |
| MARYLAND SHALL ISSUE, INC.; | ) |
| | ) |
| MARYLAND STATE RIFLE AND PISTOL ASSOCIATION, INC.; | ) |
| | ) |
| NATIONAL SHOOTING SPORTS FOUNDATION, INC.; | ) |
| | ) |
| and, | ) |
| | ) |
| MARYLAND LICENSED FIREARMS DEALERS ASSOCIATION, INC., | ) |
| | ) |
|      Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| MARTIN J. O'MALLEY, in his official capacity as Governor of the State of Maryland; | ) |
| | ) |
| DOUGLAS F. GANSLER, in his official capacity as Attorney General of the State of Maryland, | ) |
| | ) |
| COL. MARCUS L. BROWN, in his | ) |

**official capacity as Secretary of the**            )
**Department of State Police and**                  )
**Superintendent of the Maryland State**            )
**Police,**                                          )
                                                     )
**and,**                                             )
                                                     )
**MARYLAND STATE POLICE,**                           )
                                                     )
                                                     )
      **Defendants.**  )
                                                     )
                                                     )
**Serve On:**                                        )
                                                     )
    **Office of the Attorney General**  )
    **Douglas F. Gansler**              )
    **Attorney General**                )
    **200 St. Paul Place**
    **Baltimore, Maryland 21202**

**~~SECOND~~THIRD AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF**

NOW COME Plaintiffs ~~Andrew C. Turner, Shawn J. Tardy,~~ Stephen V. Kolbe, Andrew

C. Turner, Wink's Sporting Goods, Inc., Atlantic Guns, Inc., Associated Gun Clubs of

Baltimore, Inc., Maryland Shall Issue, Inc., Maryland State Rifle and Pistol Association, Inc.,

National Shooting Sports Foundation, Inc., and Maryland Licensed Firearms Dealers

Association, Inc. (collectively, "Plaintiffs"), by and through their attorneys, and for their

complaint against Martin J. O'Malley, in his official capacity as Governor of the State of

Maryland; Douglas E. Gansler, in his official capacity as Attorney General of the State of

Maryland; Col. Marcus L. Brown, in his official capacity as Secretary of the Department of State

2

Police and Superintendent of the Maryland State Police; and Maryland State Police (collectively,

"Defendants"), state as follows:

Formatted: Font: Not Bold, No underline

Formatted: Justified

## **INTRODUCTION**

1.     Unlike most other States, Maryland has never recognized the right to keep and

bear arms in its constitution.  It is not surprising that Defendants enjoyed one of the nation's

more restrictive regimes regulating the acquisition and ownership of firearms at the time the

United States Supreme Court first definitively recognized this fundamental individual right.  The

Second Amendment declares that "the right of the people to keep and bear arms shall not be

infringed."  U.S. CONST. amend. II. The Second Amendment "elevates above all other interests

the right of law-abiding, responsible citizens to use arms in defense of hearth and home."

*District of Columbia v. Heller*, 554 U.S. 570, 635 (2008); *McDonald v. City of Chicago*, 130

S.Ct 3020 (2010) (incorporating the Second Amendment to be applicable to the States).  The

"arms" the Second Amendment protects are those "of the kind in common use … for lawful

purposes like self-defense."  *Heller*, 554 U.S. at 624.

2.     In flagrant disregard of this constitutional guarantee, the State of Maryland has

passed a law, The Firearm Safety Act of 2013 (the "Act"), broadly restricting the ability of law-

abiding, responsible citizens of the State to defend themselves, their families, and their homes by

prohibiting outright certain commonly used rifles and shotguns[1] and standard capacity

---

[1]     The Act broadly prohibits the transport into the State, possession, sale, offering for sale, transfer, purchase, and receipt of firearms it pejoratively and incorrectly characterizes as "assault weapons."  MD CODE ANN., CRIM.

3

ammunition magazines.[2]  In so doing, the Act restricts the "core right identified in *Heller* – the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010).  Defendants' policy choice to prohibit certain commonly used semiautomatic rifles and shotguns and standard capacity magazines cannot stand, for it is a choice that the Second Amendment takes "off the table." *Heller*, 554 U.S. at 636.

3.      For the reasons alleged below, Plaintiffs respectfully request that this Court enjoin Defendants temporarily, preliminarily, and permanently from enforcing the Act's prohibition of certain categories of commonly used firearms and standard capacity magazines and declare that Sections 4-301, 4-302, 4-303, 4-304, 4-305, 4-306 of the Criminal Law Article and Section 5-101(r)(2) of the Public Safety Article, Maryland Code Annotated, as amended by the Act, infringe on Plaintiffs' constitutional rights and are void.

## PARTIES

4.      Plaintiff Stephen V. Kolbe ("Plaintiff Kolbe," "individual Plaintiff") is a resident of Baltimore County, Maryland, and a citizen of the United States.  Plaintiff Kolbe does not currently own any firearms banned by the Act but wishes to purchase a firearm that is banned.

4. 5.   Plaintiff Andrew Turner ("Plaintiff Turner," "individual Plaintiff") is a resident of Prince George's County, Maryland, and a citizen of the Unites States.  He is a retired veteran of

---

LAW § 4-303(a).  "'Assault weapon' means: (1) an assault long gun; (2) an assault pistol; or (3) a copycat weapon." MD CODE ANN., CRIM. LAW § 4–301(d).

[2]      As amended by the Act, effective October 1, 2013, Maryland law generally makes it unlawful for a person to "manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm."  MD CODE ANN., CRIM. LAW § 4-305(b).

4

the United States Navy.  Plaintiff Turner suffered nerve damage in his right arm, while on duty

in the Navy, that caused partial paralysis.

5.     Plaintiff Shawn J. Tardy ("Plaintiff Tardy," "individual Plaintiff") is a resident of

Harford County, Maryland, and a citizen of the United States.  He is a retired veteran officer of

the United States Army.

6.     Plaintiff Stephen V. Kolbe ("Plaintiff Kolbe," "individual Plaintiff") is a resident

of Baltimore County, Maryland, and a citizen of the United States.  Plaintiff Kolbe does not

currently own any firearms banned by the Act but wishes to purchase a firearm that is banned.

7.6.    Each individual Plaintiff is eligible under the laws of the United States and the

State of Maryland to receive and possess firearms, including rifles, handguns, and shotguns and

intend to, and but for Maryland law would, purchase the commonly used semiautomatic rifles

and shotguns,[3] "copycat weapons,"[4] and standard capacity magazines,[5] including those banned

by the Act.

8.7.    Plaintiff Wink's Sporting Goods, Inc. ("Wink's," "business Plaintiff") is a

Maryland corporation with a principal place of business in Princess Anne, Maryland.  Wink's is

a licensed Maryland regulated firearms dealer, MD CODE ANN., PUB. SAF. § 5-106, which

permits it to buy, sell, import, and manufacture firearms and ammunition within the State of

---

[3]     All references to "commonly used semiautomatic rifles and shotguns" are to the semiautomatic rifles and various shotguns listed in Section 5-101(r)(2) of the Public Safety Article, Maryland Code Annotated.  Citations to the Maryland Code reflect any alterations made by the Act.

[4]     All references to "copycat weapons" are to any weapons captured by this term as it is used in Section 4-301(e) of the Criminal Law Article, Maryland Code Annotated.

[5]     All references to "standard capacity magazines" are to the magazines prohibited by Section 4-305(b) of the Criminal Law Article, Maryland Code Annotated.

Maryland.  As is typical of all Maryland regulated firearms dealers, Wink's buys, sells, receives, and transfers firearms within and without Maryland.  Wink's sells ammunition, as well as magazines that hold ammunition.  The firearms sold by Wink's include rifles, pistols, and shotguns.  Until the effective date of the Act, Wink's has sold and will sell commonly used semiautomatic rifles and shotguns and standard capacity magazines banned by the Act.

9.8.    Plaintiff Atlantic Guns, Inc. ("Atlantic Guns," "business Plaintiff") is a Maryland corporation with principal places of business in Silver Spring and Rockville, Maryland.  Atlantic Guns is a licensed Maryland regulated firearms dealer, MD CODE ANN., PUB. SAF. § 5-106, which permits it to buy, sell, import, and manufacture firearms and ammunition within the State of Maryland.  As is typical of all Maryland regulated firearms dealers, Atlantic Guns buys, sells, receives, and transfers firearms within and without Maryland.  Atlantic Guns sells ammunition, as well as magazines that hold ammunition.  The firearms sold by Atlantic Guns include rifles, pistols, and shotguns.  Until the effective date of the Act, Atlantic Guns has sold and will sell commonly used semiautomatic rifles and shotguns and standard capacity magazines banned by the Act.

10.9.   Business Plaintiffs are eligible under the laws of the United States and the State of Maryland to receive and possess firearms, including rifles, handguns, and shotguns and intends to, and but for Maryland law would, purchase and sell commonly used semiautomatic rifles and shotguns and standard capacity magazines banned by the Act.

11.10. Plaintiff Associated Gun Clubs of Baltimore, Inc. ("AGC," "association Plaintiff") is a Maryland corporation that was formed on July 1, 1944, when a number of World War II veterans in the Baltimore, Maryland area began looking for a place for recreational and

competitive shooting.  In addition to operating a target shooting range facility, providing hunting and target shooting instruction courses that promote general firearm safety, and offering programs and events that encourage adult and youth participation in the shooting sports, AGC supports, encourages, and actively promotes the private ownership of firearms for all law-abiding, responsible citizens.  AGC consists of 15 charter member clubs as well as 14 associate member clubs.

12.11.  Plaintiff Maryland Shall Issue, Inc. ("MSI," "association Plaintiff") is an all volunteer, non-partisan organization dedicated to the preservation and advancement of gun owners' rights in Maryland.  MSI seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public.

13.12.  Plaintiff Maryland State Rifle and Pistol Association, Inc. ("MSRPA," "association Plaintiff") is an organization dedicated to promoting safe and responsible marksmanship competition and hunter safety throughout Maryland.  MSRPA also seeks to educate citizens about responsible firearm ownership.  MSRPA advocates on behalf of its individual members.  Its individual members include both individual firearm owners and firearm and marksmanship clubs.

14.13.  The NSSF is the trade association for the firearms, ammunition, hunting, and shooting sports industry.  Formed in 1961, the NSSF is a Connecticut non-profit tax-exempt corporation with a membership of more than 9,000 federally licensed firearms manufacturers, distributors, and retailers (also known as "federal firearms licensees" or "FFLs"); sportsmen's organizations; shooting ranges; gun clubs; publishers; hunters and recreational target shooters.

7

The NSSF's mission is to promote, protect and preserve hunting and the shooting sports.  The NSSF provides trusted leadership in addressing industry challenges; advances participation in and understanding of hunting and the shooting sports; reaffirms and strengthens its members' commitment to the safe and responsible use of their products; and promotes a political environment that is supportive of America's traditional hunting heritage and firearms freedoms. As a guardian of our nation's rich hunting and shooting traditions, the NSSF believes that lawful commerce in firearms and firearm-related products must be protected - and that, in particular, no law or regulation should unreasonably limit the lawful transfer of firearms to responsible, law-abiding adults who have individual constitutional rights guaranteed by the Second Amendment to the United States Constitution to purchase, own, possess and use such firearms and ammunition.  The NSSF's interest in this action derives principally from the fact that the NSSF's FFL manufacturer, distributor, and retailer members provide the lawful commerce in firearms that makes the exercise of Second Amendment rights possible. Until the effective date of the Act, NSSF's individual members have sold and will sell commonly used semiautomatic rifles and shotguns and standard capacity magazines.

15.14.  Plaintiff Maryland Licensed Firearms Dealers Association, Inc. ("MLFDA," "association Plaintiff") is a Maryland corporation that represents the constitutional and economic interests of its individual firearms dealer members in the State of Maryland as well as those of its members' customers and potential customers.  MLFDA advocates on behalf of its individual members.  Specifically, many of MLFDA's individual members are Maryland regulated firearms dealers, such that they are permitted to buy, sell, import, and manufacture firearms and ammunition within the State of Maryland.  The firearms sold by MLFDA's individual members

8

include rifles, pistols, and shotguns.  MLFDA's individual members also sell ammunition, as well as magazines that hold ammunition.  Until the effective date of the Act, MLFDA's individual members have sold and will sell commonly used semiautomatic rifles and shotguns and standard capacity magazines.

16.15.  Individual members of NSSF and MLFDA, as well as business Plaintiffs, engage in lawful commerce in firearms that allows individual Plaintiffs, and other law-abiding citizens, to exercise their fundamental Second Amendment rights.

17.16.  Each of the above association Plaintiffs brings suit on its own behalf and on behalf of its members.

18.17.  Plaintiffs have standing to bring this challenge in that individual Plaintiffs and members of association Plaintiffs will imminently suffer, as of October 1, 2013, the deprivation of their Second Amendment right to purchase and possess, for self-defense in their home, certain commonly used firearms and magazines that will be prohibited by Defendants' enforcement of the Act.

19.18.  Business Plaintiffs and members of NSSF and MLFDA will imminently suffer a significant loss of income by virtue of Defendants' enforcement of the Act.  Moreover, business Plaintiffs and members of NSSF and MLFDA can and do represent the interests of their customers and potential customers in exercising their Second Amendment rights by acquiring the banned firearms and magazines.

20.19.  Defendant Gov. Martin J. O'Malley is the Governor of the State of Maryland.  As Governor, Defendant O'Malley serves as the Chief Executive Officer of the Executive Branch of the government of Maryland and is responsible for "tak[ing] care that the Laws are faithfully

executed." MD. CONST. ARTICLE II, § 9.  The Office of the Governor is a principal department of the government of the State of Maryland established by MD. CONST. ARTICLE II, § 1.

21.20.  Defendant Douglas F. Gansler is the Attorney General of the State of Maryland. As Attorney General, Defendant Gansler is responsible for providing legal advice to the Governor and the General Assembly and has authority to investigate and prosecute crimes on behalf of the State of Maryland.  MD. CONST. ARTICLE V, § 3.  The Office of the Attorney General is a principal department of the government of the State of Maryland established by MD. CONST. ARTICLE V, § 1.

22.21.  Defendant Col. Marcus L. Brown is the Secretary of the Department of State Police and Superintendent of the Maryland State Police.  Col. Brown is responsible for the operation of the Maryland State Police, including the Maryland State Police's Licensing Division.  The Licensing Division administers the law and conducts investigations concerning the sale and transfer of regulated firearms, the licensing and regulation of Maryland Registered Firearms Dealers, and the certification of regulated firearm[6] collectors.  In addition, Defendant Maryland State Police is charged with "the responsibility to . . . enforce the laws and ordinances of the State," MD CODE ANN., PUB. SAFETY § 2-301(a)(2)(iii), including the laws challenged in this action.

23.22.  Defendant Maryland State Police is a principal department of the State government of the State of Maryland, established and operated pursuant to Sections 2-101, *et seq.*, of the Public Safety Article, Maryland Code Annotated.

---

[6]     The term "regulated firearm" includes the semiautomatic rifles and various shotguns listed in Section 5-101(r)(2) of the Public Safety Article, Maryland Code Annotated, as well as all handguns.

10

24.23.  All Defendants herein are being sued in their official capacities.

## JURISDICTION

25.24.  Jurisdiction is founded on 28 U.S.C. § 1331, in that this action arises under the Constitution of the United States, and under 28 U.S.C. § 1343(3), in that this action seeks to redress the deprivation, under color of the laws, statutes, ordinances, regulations, customs, and usages of the State of Maryland, of rights, privileges, or immunities secured by the United States Constitution.

26.25.  This action seeks relief pursuant to 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. §§ 1983 and 1988.

27.26.  Venue lies in this District pursuant to 28 U.S.C. § 1391(b).

## FACTS

### The Maryland Firearm Safety Act of 2013

28.27.  On May 16, 2013, the Governor of Maryland signed into law the Firearm Safety Act of 2013.  The Act takes effect on October 1, 2013.  Act § 3.  Among other things, the Act imposes severe criminal penalties on previously lawful activities involving the acquisition and/or possession of commonly used semiautomatic rifles and shotguns and standard capacity ammunition magazines.  As such, the Act severely and adversely affects Plaintiffs and other law-abiding, responsible citizens in Maryland by unconstitutionally infringing on their core rights under the Second Amendment to the United State Constitution.

### Prohibitions on Rifles, Pistols, and Shotguns

11

29.28.  The Act prohibits, effective October 1, 2013, with some minor exceptions, a list of approximately 68 commonly used semiautomatic rifles.  Semiautomatic firearms fire only a single round with one pull of the trigger.  The Act also prohibits certain shotguns that are either semiautomatic or pump-action.  Pump-action shotguns fire only a single round with one pull of the trigger, and the shooter must manually chamber the next round by cycling a sliding forearm located under the barrel.  The Act further prohibits "their copies, regardless of which company produced and manufactured" the firearm.  MD CODE ANN., CRIM. LAW § 4-301(d); MD CODE ANN., PUB. SAF. § 5-101(r)(2).  These firearms are not "machine guns," which are fully automatic and continue to fire until the trigger is released or the firearm runs out of ammunition.

30.29.  As amended by the Act, Section 3-301(e)(1) of the Criminal Law Article, Maryland Code Annotated, defines "copycat weapon" to mean:

*Rifles*

i.   A semiautomatic centerfire rifle that can accept a detachable magazine and has any two of the following:
1.   a folding stock;
2.   a grenade launcher or flare launcher;
3.   a flash suppressor; or
ii.  A semiautomatic centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds;
iii. A semiautomatic centerfire rifle that has an overall length of less than 29 inches ….

*Pistols*

iv.  A semiautomatic pistol with a fixed magazine that can accept more than 10 rounds ….

*Shotguns*

12

     v.     A semiautomatic shotgun that has a folding stock; or

    vi.     A shotgun with a revolving cylinder.

     ~~31.~~30.  As amended by the Act, Maryland law pejoratively and incorrectly labels these firearms as "assault weapons" and makes it unlawful, as of October 1, 2013, for a person to transport into the State or to possess, sell, offer to sell, transfer, purchase, or receive a firearm described by paragraphs 28 and 29.  MD CODE ANN., CRIM. LAW § 4-303(a).

     ~~32.~~31.  Violators may be fined up to $5,000 and imprisoned for up to three years.  MD CODE ANN., CRIM. LAW § 4-306(a).

     ~~33.~~32.  It is a defense to charges under § 4–303(a) of transport or possession of a banned, commonly used semiautomatic rifle or shotgun that the person lawfully possessed, had a purchase order for, or completed an application to purchase such firearm before October 1, 2013.  MD CODE ANN., CRIM. LAW § 4-303(b)(3).

     ~~34.~~33.  A licensed firearms dealer may continue to possess, sell, offer for sale, or transfer a banned, commonly used semiautomatic rifle or shotgun or copycat weapon that the licensed firearms dealer lawfully possessed before October 1, 2013.  MD CODE ANN., CRIM. LAW § 4-303(b)(2).

### Prohibitions on Magazines

     ~~35.~~34.  As amended by the Act, effective October 1, 2013, Maryland law generally makes it unlawful for a person to "manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm." MD CODE ANN., CRIM. LAW § 4-305(b).

36.35.  Violators may be fined up to $5,000 and imprisoned for up to three years.  MD CODE ANN., CRIM. LAW § 4-306(a).

**Impact**

37.36.  The semiautomatic rifles and shotguns and standard capacity magazines banned by the Act are, and have been, commonly used by law-abiding, responsible citizens in Maryland and throughout the United States for lawful purposes, including defense of self and family in the home.

38.37.  Individual Plaintiffs Kolbe and Turner, Tardy, and Kolbe wish to acquire and possess rifles, shotguns, and magazines banned by the Act for the purpose of defending themselves in the home.  They are subject to and adversely affected by each and every restriction challenged in this complaint, including each definition herein.

39.38.  Members of association Plaintiffs AGC, MSRPA, MSI, and MLFDA ("members") wish to acquire and possess rifles, shotguns, and magazines banned by the Act and are subject to and adversely affected by each and every restriction challenged in this complaint, including each definition cited herein.

40.39.  Business Plaintiffs and members of NSSF and MLFDA are in the business of buying and selling firearms, magazines, and ammunition within and without the State of Maryland.  Their respective businesses are adversely affected by each and every restriction challenged in this complaint, including each definition cited herein.

41.40.  For example, business Plaintiffs Wink's and Atlantic Guns are in the business of buying, selling, and re-selling firearms and ammunition within and without the State of Maryland.  A substantial segment of their businesses involves the purchase of "AR"-type

14

firearms from out-of-state distributors and the sale of these "AR"-type firearms to customers in Maryland.  As a direct result of the Act, Wink's and Atlantic Guns anticipate that many of their out-of-state distributors will stop altogether the shipment of "AR"-type firearms to them due to the Act's prohibitions and concern and confusion over whether these types of arms can legally be shipped to, received by, and/or sold by a Maryland regulated firearm dealer.  The sale of such firearms is a vast majority of Wink's and Atlantic Guns' sales before passage of the Act.  These stoppages will cause actual harm to business Plaintiffs' sales and overall businesses.

42.41.  Another segment of business Plaintiffs' businesses involves the sale of ammunition magazines.  As a direct result of the Act, because ten round magazines may not even be manufactured for some firearm models, they will be unable to supply magazines for these firearms at all.  Moreover, the Act will have the added effect of rendering unusable and vastly devaluing any firearm for which magazines holding ten rounds or less do not exist, because it will be impossible to transfer such a weapon to a law-abiding, responsible citizen in Maryland with a magazine with which to actually fire it.

43.42.  As a direct result of the Act, Wink's and Atlantic Guns anticipate that their overall sales of rifles, pistols, and shotguns will decline drastically.  The likely decline of their long gun sales will be due to the Act's prohibitions and customer confusion over which kinds of firearms are banned and which are not, as well as customer concern that purchasing a firearm will subject the customer to criminal prosecution.  The decline of their pistol sales will be due to the fact that many, if not most, semiautomatic pistols come equipped with magazines holding more than ten rounds.

15

44.43.  But for the Act, on or after October 1, 2013, association Plaintiff members and individual Plaintiffs would acquire standard capacity magazines with a capacity of more than ten rounds.  But for the Act, association Plaintiff members and individual Plaintiffs would acquire and possess for defense of self and family in the home commonly used semiautomatic rifles and shotguns and "copycat weapons" as defined and banned by the provisions of the Act challenged in the complaint.

45.44.  While the Act's prohibition of certain magazines based on their capacity and its prohibition of certain firearms mischaracterized as "assault weapons" impermissibly restrict the core Second Amendment right of law-abiding, responsible citizens to acquire and possess these commonly used firearms and magazines in their homes for self-defense, the restrictions will not reduce homicides or other violent crime or improve public safety.

### Prevalence and Utility of Banned Firearms and Magazines

46.45.  The United States Supreme Court stated, in *Heller*, that "the sort of weapons protected" by the Second Amendment are those "'in common use at the time.'"  *Heller*, 554 U.S. at 627, *quoting United States v. Miller*, 307 U.S. 174, 179 (1939).  The Court held that "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose" was not constitutional, especially when that prohibition extends "to the home, where the need for defense of self, family, and property is most acute."  *Heller*, 554 U.S. at 628.

47.46.  The banned semiautomatic long guns are in common use at the present time. *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough

16

in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use' as the plaintiffs contend.").

48.47.  The common uses of the banned firearms include defense of self in the home, hunting, and sport.

49.48.  The banned semiautomatic long guns are not routinely used for criminal purposes. In fact, they are used in less than 10% of all gun crimes.

50.49.  The banned standard capacity magazines are in "common use" at the present time. *Heller II*, 670 F.3d at 1261.

51.50.  The primary common uses of the banned magazines are for sport and self-defense.

52.51.  The banned magazines are not any more useful in criminal activities than magazines that will be allowed under the Act, given that the majority of gun crimes result in fewer than three shots being fired.

53.52.  Between the Act's prohibition of the enumerated 68 long guns, their "copies," and the "copycat weapons," the Act effectively bans the acquisition of semiautomatic long guns that are commonly used for lawful purposes, including self-defense in the home.  The Act will also ban the use of standard capacity magazines that are commonly used for lawful purposes, including self-defense in the home.

## **Purported Justifications and Effects of Ban**

54.53.  Defendant O'Malley stated that the capacity restrictions on standard capacity magazines were implemented because such magazines "increase the potential lethality of any firearm that can accept such a magazine . . . ."  According to a report written to analyze the effect

17

of the now-expired federal Public Safety and Recreational Firearms Use Protection Act, which banned magazines capable of holding more than ten rounds, such magazines "were never involved in more than a modest fraction of all gun murders." Moreover, that same report, relied upon by supporters of the Act, notes that "[t]he limited data which do exist suggest that criminal gun attacks involve three or fewer shots on average."

55.54. The Act will have little impact on violent crime. Only a very small minority of gun crimes are committed with the banned weapons and magazines, as was shown by studies evaluating the now-expired 1994 federal ban, because the Act is not materially different than the federal law. Moreover, criminals are not likely to be deterred by the types of laws challenged in this suit, because criminals, by definition, do not follow the law. Furthermore, even if criminals were affected by the laws challenged in this suit, they could simply substitute other guns with similar capabilities for the banned guns. Therefore, the only effect the Act will have is to limit the types of firearms law abiding citizens have available to protect themselves from violent assailants.

56.55. Thus, the readily available data, some even cited by the Act's supporters before the General Assembly, that contradict the stated justification for the widely expansive prohibitions in the Act undermine any claim that the Act advances any compelling government interest, or even that the restrictions will have any meaningful effect on public safety.

57.56. Even further eviscerating any preventative value it might have, the Act does not prohibit the *possession* of magazines that can hold more than ten rounds. Thus, criminals desirous of using a magazine that holds more than ten rounds need only travel to a neighboring State in which the transfer of such an item is not prohibited to acquire these magazines. Because

18

the law contains broad language that prohibits "receiv[ing]" a banned magazine, thus implying any possession of such magazines is unlawful, law-abiding, responsible citizens are less likely to use these magazines, even if lawfully obtained, for fear of criminal prosecution.

58.57.  The Act itself recognizes the great value of the rifles and shotguns banned by the Act for self-protection by law-abiding, responsible individuals by permitting retiring law-enforcement officers to have transferred to them firearms that would otherwise be banned.  MD CODE ANN., CRIM. LAW § 4-302(7).  Moreover, the Act permits retired law enforcement officers to acquire standard capacity magazines capable of holding more than ten rounds at any time. MD CODE ANN., CRIM. LAW § 4-305(a)(2).  Besides unconstitutionally creating a two-tiered classification of citizens for purposes of exercising fundamental rights, discussed *infra*, this allowance is an acknowledgement that law-abiding, responsible citizens other than active law enforcement personnel have a legitimate need for the banned firearms and magazines for meaningful self-defense in their homes.

### Injury Threatened by Defendants

59.58.  The provisions of the Act set forth herein prohibit individual Plaintiffs, business Plaintiffs, and members of association Plaintiffs from buying, selling, and possessing firearms and magazines that are useful and commonly possessed for defense in the home, and thus from exercising their core Second Amendment rights.  Should any individual Plaintiff, business Plaintiffs, or member of association Plaintiff run afoul of any such provision, such person is subject to arrest, prosecution, conviction, incarceration, fines, forfeitures, loss of the right to keep and bear arms, and loss of other civil rights. Even individual Plaintiffs and members of association Plaintiffs in lawful possession of grandfathered firearms are likewise subject to

19

arrest, because it will be unlikely that individuals will have with them at all times paperwork sufficient to show that a particular firearm was obtained before the effective date of the Act, assuming such paperwork even exists.  Accordingly, as a proximate cause of the enforcement of the Act by Defendants as aforesaid, Plaintiffs will be subject to irreparable harm.

<u>**COUNT ONE**</u>
**(Prohibition on Commonly Possessed Firearms Violates the Second Amendment)**

~~60.~~59.  The preceding paragraphs are re-alleged and incorporated herein by reference.

~~61.~~60.  The Act broadly prohibits the transport into the State, possession, sale, offering for sale, transfer, purchase, and receipt of firearms it pejoratively and incorrectly characterizes as "assault weapons."  MD CODE ANN., CRIM. LAW § 4-303(a).  "'Assault weapon' means: (1) an assault long gun; (2) an assault pistol; or (3) a copycat weapon."  MD CODE ANN., CRIM. LAW § 4–301(d).

~~62.~~61.  The firearms described in paragraph ~~61~~60 are in common use both within Maryland and throughout the United States.

~~63.~~62.  "'Assault long gun' means any assault weapon listed under § 5–101(r)(2) of the Public Safety Article."  MD CODE ANN., CRIM. LAW § 4–301(d).  Section 5–101(r)(2) begins: "A firearm that is any of the following specific assault weapons or their copies, regardless of which company produced and manufactured that assault weapon," after which follows a list of the names of approximately 68 commonly used long guns.

~~64.~~63.  The list of "assault long guns" includes numerous semiautomatic rifles and shotguns identified by make, model, and/or some other term, that are among the most popular rifles in common use throughout the United States.  It includes the Springfield Armory M1A

20

rifle, which is widely used in competitions sponsored by the Civilian Marksmanship Program, a corporation established and promoted by an Act of Congress.  The list includes the "Bushmaster semi–auto rifle," presumably referring to any semiautomatic rifle made by Bushmaster, regardless of its features.  In short, the list consists of arbitrarily-selected rifles and an unknown, undefined universe of "copies" thereof.

65.64.  The rifles and shotguns banned by the Act have attributes that promote accuracy or otherwise promote their effective use.  For example, under the Act, a semiautomatic, centerfire rifle that simply has an ability to accept a detachable magazine in not an "assault weapon."  Nor is such a rifle with either a folding stock or a flash suppressor.  Under the Act's "two feature" test, however, this ordinary rifle becomes an "assault weapon" of the "copycat weapon" variety by reason of having both of these features—features that promote efficient and effective use and transport of the firearm.  MD CODE ANN., CRIM. LAW § 4-301(e)(1)(i).

66.65.  A "flash suppressor" reduces the visible flash of light produced by firing the rifle. This reduces the likelihood of momentarily blindness after firing at an assailant, and it may reduce an assailant's ability to pinpoint his potential victim's position when the potential victim fires a shot in low-light conditions.

67.66.  A "folding stock" allows a rifle to be stored and transported more compactly.

68.67.  These two features combine to allow law-abiding, responsible citizens to easily store a rifle in their homes and, if need be, use it effectively to defend themselves.

69.68.  In addition, semiautomatic, centerfire rifles having "a fixed magazine with the capacity to accept more than 10 rounds" are banned "assault weapons."  MD CODE ANN., CRIM.

LAW § 4-301(e)(1)(ii).  Like other magazines capable of holding more than 10 rounds, rifles with such magazines are useful for defensive purposes in the home.

70.69.  Similarly, having a fixed magazine that can accept more than 10 rounds transforms a semiautomatic pistol into an "assault weapon," and having a folding stock transforms a semiautomatic shotgun into an "assault weapon."  MD CODE ANN., CRIM. LAW § 4-301(e)(1)(iv)-(v).

71.70.  None of the above features makes a firearm more powerful or dangerous; rather, they allow citizens who are under the extreme stress of having to deal with an armed assailant to defend themselves more effectively.  Prohibiting firearms with features that promote their efficient and effective use infringes on the core Second Amendment right because it meaningfully limits the ability of law-abiding, responsible citizens to defend themselves in their own homes.

72.71.  These weapons are commonly used for defensive purposes and are highly useful for self-defense.  For example, semiautomatic rifles that will be banned by the Act allow individuals to accurately engage their assailants at distances further away than they would be able to with handguns, thus increasing the likelihood that the defender will survive an encounter.

73.72.  The Act effectively bans the acquisition of all semiautomatic long guns, by virtue of the enumerated list of 68 firearms, "their copies," and the expansive definition of "copycat weapons."  This is precisely the type of restriction found unconstitutional in *Heller*.

74.73.  But for the provisions of Maryland law prohibiting them to do so, individual Plaintiffs and members of association Plaintiffs, on or after October 1, 2013, would acquire and possess the banned firearms for protection of themselves and their families, for target shooting,

22

and for hunting, and business Plaintiffs and members of NSSF and MLFDA would engage in the business of selling such weapons for such purposes.

~~75.~~74.  The prohibitions and restrictions on the ordinary rifles, pistols, and shotguns Maryland law mischaracterizes as "assault weapons" challenged here are codified at Section 4-303(a) of the Criminal Law Article, Maryland Code Annotated, as amended by the Act.  "assault long guns" as defined in Section 5-101(r)(2) of the Public Safety Article, Maryland Code Annotated and "copycat weapons" as defined in Section 4-301(e)(1) of the Criminal Law Article, Maryland Code Annotated, except that these provisions are not challenged to the extent they regulate any fully automatic firearm.

~~76.~~75.  The aforesaid prohibitions and restrictions on firearms that are commonly possessed throughout the United States by law-abiding, responsible persons for lawful purposes, facially and as applied, infringe on the right of the people of Maryland, including Plaintiffs and members of Plaintiff associations, to keep and bear arms as guaranteed by the Second Amendment of the United States Constitution, and as made applicable to the State of Maryland by the Fourteenth Amendment.

**COUNT TWO**
**(Prohibition on Commonly Possessed Magazines Violates the Second Amendment)**

~~77.~~76.  The preceding paragraphs are re-alleged and incorporated herein by reference.

~~78.~~77.  As amended by the Act, effective October 1, 2013, Maryland law generally makes it unlawful for a person to "manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm." MD CODE ANN., CRIM. LAW § 4-305(b).

23

79.78.   The Act also bans, for the first time, semiautomatic handguns that have a fixed magazine capable of holding more than ten rounds as "copycat weapons."   MD CODE ANN., CRIM. LAW § 4-301(e)(iv).   This prohibition was clearly enacted solely to prohibit firearm purchasers from skirting the magazine prohibition described in paragraph 7877.

80.79.   Magazines are integral parts of firearms that impact their functionality and utility. Semi-automatic handguns cannot function as they are intended without a magazine and are, therefore, of limited or no utility for use in self-defense without a magazine.   Indeed, some firearms cannot fire a single round without a magazine.

81.80.   Magazine capacity is also a critical component of the functionality and utility of a firearm for self-defense, in that restrictions on magazine capacity limit the effectiveness of the firearm and, therefore, the ability of law-abiding citizens to defend themselves with that firearm.

82.81.   Magazines that have a capacity of more than 10 rounds of ammunition are commonly possessed by law-abiding, responsible citizens throughout Maryland and the United States for self-defense, target shooting, hunting, and other lawful purposes.   Many firearms, including most semiautomatic handguns, are designed for and sold with magazines that hold more than 10 rounds.   Although the Act does not make it unlawful to possess such magazines, it effectively prevents their acquisition by law-abiding, responsible citizens by making it unlawful to manufacture, sell, offer for sale, purchase, receive, or transfer them.

83.82.   The need for and usefulness of standard capacity magazines holding more than 10 rounds for lawful defense of self and others is demonstrated by the fact that they are issued routinely to Maryland law enforcement officers.   Furthermore, the need for such magazines is shown by the Act's own language, which creates an exception for retired law enforcement

24

officers, who have exactly the same defensive needs as any other citizen.  Criminals have and use magazines without any limitation in capacity.  The Act's provisions on magazines put law-abiding, responsible Maryland citizens including individual Plaintiffs at a grave disadvantage to criminals, who will not comply with the ten-round capacity limit.

84.83.  It is not a viable option to say that persons may obtain multiple magazines and change magazines if confronted with a sudden home invasion, robbery, or other attack.  For example, there are individual Plaintiffs and members of association Plaintiffs who only have one magazine for their firearm; own obsolete models of firearms for which extra magazines are no longer available; do not keep extra loaded magazines with their firearms; could not change magazines while under the extreme stress of a criminal attack; and could not change magazines quickly due to old age, major disability, arthritis, and other physical conditions.  They may not be able to access immediately multiple ten-round magazines in the face of a sudden attack.  Law-abiding, responsible Maryland citizens including individual Plaintiffs must be able to defend their homes in the face of surprise attack.

85.84.  Plaintiffs without experience dealing with the stress of firing in a combat situation will be more likely to miss than they otherwise would be, necessitating more shots being fired to subdue an aggressor.  Given that trained law enforcement officers have a hit rate substantially under 50%, a civilian whose only shooting experience is at a local range may well need more than ten rounds immediately available to effectively defend themselves in the home.

86.85.  The Massachusetts Municipal Training Committee's Patrol Rifle Instructor Course Manual makes this point clearly when it states "[w]e have found most officers have difficulty hitting the [standard law enforcement] target with regularity using their service pistol

25

at distances further than the 10 yard line.  Now, factor in the stress life of a life and death encounter with rapidly evolving circumstances – the hit ratio drops even further."  Thus, even trained law enforcement personnel firing without the added stress of a life or death encounter cannot reliably hit a person sized target at 30 feet.  An individual may often have to fire more than ten rounds to ensure that the assailant is incapacitated, necessitating a magazine that will hold more than ten rounds.

87.86.  Individual Plaintiffs and members of association Plaintiffs who have trained in engaging hostile targets with small caliber firearms, such as handguns, employ a shooting technique wherein three rounds are fired in rapid succession at specific parts of the enemy target. Assuming that this technique is perfectly employed by a Plaintiff under the stress of having to defend himself or herself with no preparation, a highly implausible assumption, the person would be able to engage only three targets before having to face his or her assailants unarmed or re-load, during which time he or she will effectively be unarmed.

88.87.  During a magazine change, individual Plaintiffs are effectively unarmed, and the extended time they need to re-load their firearms increases their vulnerability to a criminal attacker advancing during the change.  In a highly stressful situation, such as is faced by a person defending himself or herself, fine motor skills are compromised such that re-loading will take much longer or not be possible.  This vulnerability is eliminated if the person is allowed to use standard magazines that hold more than ten rounds: the more rounds these Plaintiffs are able to fire from a single magazine in a self-defense situation, the less exposed they are to the physical danger presented by a criminal during re-loading.  However, the Act's prohibition on standard capacity magazines increases their vulnerability.

26

89.88.  As described above, but for the provisions of the Act forbidding them to do so, individual Plaintiffs and members of association Plaintiffs on and after October 1, 2013, would acquire magazines with a capacity of over 10 rounds for handguns, rifles, and shotguns for protection of themselves and their families in their homes and for other lawful purposes. Similarly, but for the provisions of the Act forbidding them to do so, business Plaintiffs and members of association Plaintiffs on or after October 1, 2013, would, within the State of Maryland, engage in the business of selling such magazines to law-abiding, responsible citizens for use for defense of self and family within the home and other lawful purposes.

90.89.  The prohibitions and restrictions on magazines codified at Section 4-305(b) of the Criminal Law Article, Maryland Code Annotated, facially and as applied, infringe on the "core" right of the people of Maryland, including Plaintiffs and members of association Plaintiffs, to keep and bear arms for defensive use in the home as guaranteed by the Second Amendment of the United States Constitution and as made applicable to the State of Maryland by the Fourteenth Amendment.

## COUNT THREE
**(Prohibitions on Commonly Possessed Semiautomatic Rifles and Shotguns and Standard Capacity Magazines Deny Equal Protection of the Laws)**

91.90.  The preceding paragraphs are re-alleged and incorporated herein by reference.

92.91.  A law enforcement officer is entitled to purchase, sell, or possess firearms and magazines banned by Act.  MD. CODE ANN., CRIM. LAW §§ 4-302(1), 4-305(a)(2).  Yet a non-law enforcement officer, by contrast, is not permitted to purchase, sell, or possess such firearms or magazines.

27

93.92.  Retired law enforcement officers are also allowed to manufacture, sell, offer for sale, purchase, receive, or transfer a magazine with more than ten rounds at any time, MD. CODE ANN., CRIM. LAW § 4-305(a)(2), and are allowed to have a banned firearm transferred to them upon their retirement, regardless of whether that firearm was used in connection with their law enforcement service and regardless of whether they received any training in that banned firearm's use.   MD. CODE ANN., CRIM. LAW § 4-302(7)(i).   Yet retirees from any other profession, even former members of the military who have left the service in good standing, are not so permitted.

94.93.  Plaintiffs are similarly situated to retired law enforcement officers in that neither have a duty, or the authority, to ensure public safety or respond to criminal events.  There was no evidence presented to the General Assembly that retired law enforcement officers face any greater threat of harm than other members of the general public.  Plaintiffs, as members of the general public, face the same threat of harm as is faced by retired law enforcement officers.

95.94.  There is no requirement in the law, nor was there evidence before the General Assembly, that all retired law enforcement officers who can avail themselves of the exceptions to the Act actually have any greater training with the banned firearms than the general public. While some may, others may not, which renders retired law enforcement officers equivalent to the general public in this regard.

96.95.  There was no evidence presented to the General Assembly that retired law enforcement officers are less likely than other members of the general public to commit crimes, including crimes involving firearms. In fact, studies have shown that law enforcement officers are *more* likely than members of the general public to commit certain crimes.

97.96.  The result of the Act is to create a two-tiered system of permitting similarly situated citizens to exercise their fundamental rights wherein some former members of the government, though not the military, are given access to "core" Second Amendment rights, but law-abiding, responsible citizens who have chosen any profession other than law enforcement are denied such access.

98.97.  The Act facially discriminates against all Plaintiffs who are not retired law enforcement officers and wish to exercise their fundamental rights under the Second Amendment.  Such Plaintiffs are members of the class of "law-abiding, responsible citizen[s]," who seek to "possess and carry a weapon for self-defense," *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010), and any discrimination against them by the government must be analyzed under the most exacting scrutiny.  The Act's discrimination has no basis in law or fact and cannot survive strict scrutiny, under which such discrimination must be evaluated.  *Cf. id.*

99.98.  The aforesaid discrimination against law-abiding, responsible citizens, who wish to protect themselves and their families from violence or use such common firearms and magazines for other lawful purposes, denies to Plaintiffs and members of association Plaintiffs the equal protection of the laws, contrary to the Fourteenth Amendment to the United States Constitution.

100.99.The above provisions discriminating in favor of selected classes are not severable from the provisions discriminating against ordinary citizens, including the provisions making it a crime for an ordinary person to "manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm," MD CODE ANN., CRIM. LAW § 4-305(b), and to "(1) transport an assault weapon into the State;

or (2) possess, sell, offer to sell, transfer, purchase, or receive an assault weapon."  § 4–303(a).

These provisions are not severable because the legislature exempted retired law enforcement

officers from these crimes, and the court may not simply declare these exemptions alone void as

violative of equal protection, as that would criminalize that which the legislature has not

criminalized.  Accordingly, these denials of equal protection render Sections 4-305(b) and 4–

303(a) void in their entirety.

<u>**COUNT FOUR**</u>
**(Provisions that are Vague, Fail to Give Notice, and Violate Due Process)**

101.100.     The preceding paragraphs are re-alleged and incorporated herein by

reference.

102.101.     Parts of Maryland law, as amended by the Act, fail to provide adequate

notice and are vague, in violation of the Due Process Clause of the Fourteenth Amendment.  But

for these provisions of law, Plaintiffs and members of association Plaintiffs on or after October

1, 2013 would obtain, sell, and possess certain firearms, but they cannot determine whether such

firearms constitute "assault weapons."  Thus, the true effect of the Act is to create a complete

ban on the acquisition of semiautomatic long guns.

103.102.     "'Assault long gun' means any assault weapon listed under Section 5–

101(r)(2) of the Public Safety Article." MD CODE ANN., CRIM. LAW § 4–301(d).  Section 5–

101(r)(2), which concerns "regulated firearms," begins: "A firearm that is any of the following

specific assault weapons or their copies, regardless of which company produced and

manufactured that assault weapon," after which follows a list of approximately 68 names.  These

terms do not inform whether the "specific" firearms listed refer to objective characteristics

30

involving design and features of firearms as manufactured at a given point in time, or to the words stamped or engraved on the firearms.

104.103.     The terms "specific assault weapons" suggest that the listed items may be identified by objective characteristics involving design and features.  However, listing them primarily by manufacturer and model names suggests that they are identified by the words that are stamped or engraved thereon, without regard to objective characteristics.

105.104.     Section 5-101(r)(2) of the Public Safety Article, Maryland Code Annotated, also defines the banned long guns to include "copies" of the enumerated firearms but gives no information on what design characteristics or features make one firearm a "copy" of another, or how such person would know whether a firearm he or she possesses or wishes to purchase is a "copy" of some other firearm which such person does not possess and of which such person has no knowledge.

106.105.     The Act fails to inform a reasonable person how similar a firearm must be, including what factors to consider and how to measure them, to an "assault weapon" named in the Act to be deemed a "copy" thereof.  This requires a person to have specialized knowledge of the some 68 named "assault weapons" in the Act identified by manufacturer, model, or other term, and to understand the design and feature details that would elude virtually anyone but the engineers who designed such firearms.

107.106.     The term "copy" was used in the Public Safety Article, prior to its amendment by the Act, in defining what firearms were considered "regulated firearms" under prior law.

31

108.107.     The Office of the Defendant Attorney General issued an opinion, 95 Op. Att'y Gen. 101 (2010), in an attempt to clarify the ambiguity inherent in the term "copy."  The Opinion states, "in order for a firearm to be considered a copy of a listed assault weapon, and therefore governed by the regulated firearms law, there must be a similarity between the internal components and function of the firearm in question and those of one of the listed weapons.  A determination as to whether a particular firearm bears such similarity is a factual question entrusted in the first instance to the Department of State Police."

109.108.     By declaring that Defendant Maryland State Police needs to be the initial arbiter of whether a firearm is sufficiently similar so as to be considered to be a copy of an enumerated, banned firearm, the Office of the Defendant Attorney General has opined, in effect, that the law is too vague for a citizen of ordinary intelligence to be able to determine what conduct is prohibited.   The Office of the Defendant Attorney General admitted that the vagueness of this law delegates to Defendant Maryland State Police the determination of what firearms are or are not banned and, therefore, the definition of what acts are or are not criminal.

110.109.     It is impossible for a citizen to follow the advice of Defendant Attorney General, which would require a citizen to be in possession of every enumerated firearm in the list in Section 5-101(r)(2) so as to be able to compare the internal parts of a firearm in question with the internal parts of every banned firearm.   The ordinary citizen, however, is barred from acquiring any of the enumerated firearms that he or she did not possess on or before October 1, 2013, for any purpose.   Thus, the task is impossible for the ordinary person, who has no way to know that a firearm possessed would be "the copy" of a named "assault weapon" that the person does not possess and about which the person knows nothing.

32

~~111.~~ 110.     For example Section 5-101(r)(2) of the Public Safety Article, Maryland Code Annotated, includes the listing "Colt AR–15, CAR–15, and all imitations except Colt AR–15 Sporter H–BAR rifle," which must also be read with the terms "or their copies."   A reasonable person has no way to know whether a given rifle is an imitation or a copy of a Colt AR–15 Sporter H–BAR rifle rather than an imitation or a copy of a Colt AR-15 or CAR-15, because there is no information as to what differentiates the H-BAR from other Colt AR-15s.

~~112.~~ 111.     These terms first appeared in Acts of Maryland 2003, c. 5, § 2.   In the 1960s, Colt made firearms marked "AR-15" and "CAR-15" which were fully-automatic service rifles of the U.S. Armed Forces.   The "AR-15" was renamed the "M-16."   Colt never manufactured a semiautomatic rifle marked simply "AR-15" or "CAR-15," but did manufacture semiautomatic rifles with markings such as "AR-15 Sporter" and "AR-15 Sporter H-BAR."

~~113.~~ 112.     Colt discontinued the model names "AR-15 Sporter" and "AR-15 Sporter H-BAR" in the 1990s.   Currently, numerous manufacturers make rifles with design characteristics and features very similar to the AR-15 Sporter H-BAR.   Even if the terms "Colt AR-15," "CAR-15," "imitation," or "copy" were not vague and could be applied to a semiautomatic rifle, a reasonable person has no way to know whether a specific firearm is an imitation or copy of a Colt AR-15 Sporter H-BAR.   Moreover, because Colt H-BAR rifles are no longer manufactured, a person has no way of knowing if the exception for copies of the H-BAR rifle is still even valid.

~~114.~~ 113.     An example of the vagueness of the law can be seen with the SigSauer M400 rifle, which is not on the enumerated list.   Whether or not it is banned is determined by whether it is a "copy" of an enumerated firearm.   It is marketed as "[a] true AR platform rifle."

33

It has some internal components that are interchangeable with, and therefore similar to, those of the SigSauer 550/551 rifle, which is on the enumerated list of banned firearms, and other internal components that are not.  A person of average intelligence has no way of knowing whether it is sufficiently similar to be considered a "copy."  A citizen must either seek a declaration from Defendant Maryland State Police as to whether this rifle is banned, or choose to acquire or forgo acquisition of the rifle and face criminal sanction if the incorrect choice is made.

115.114.     Similarly, the Heckler & Koch ("HK") MR556A1 rifle is not on the enumerated list.  It is HK's commercial long gun copied from the AR-15, billing itself as "the preeminent AR type firearm."  Because HK uses proprietary parts, however, a citizen of ordinary intelligence has no way of knowing if it is a banned "copy" of the AR-15, because there is no way of telling if any or none of the internal parts of the MR556A1 can be interchanged with, and are therefore similar to, any of the parts of a banned, enumerated firearm.

116.115.     The result of the vagueness created by the use of the term "copy," even as construed by the Office of the Defendant Attorney General, is that a citizen of average intelligence is not aware of what conduct is prohibited.  This denies to Plaintiffs their right to due process of law, as guaranteed by the Fourteenth Amendment to the Constitution, because it subjects them to vague laws with which it is not possible to comply.

WHEREFORE, Plaintiffs pray that this Honorable Court:

A.     Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that provisions of the Maryland Code, as amended by the Act and as specified herein as Sections 4-301, 4-302, 4-303, 4-304, 4-305, 4-306 of the Criminal Law Article and Section 5-101(r)(2) of the Public Safety

Article, Maryland Code Annotated, infringe on the right of the people of Maryland including Plaintiffs to keep and bear arms, in violation of the Second and Fourteenth Amendments to the United States Constitution, and are void;

B.      Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that provisions of the Maryland Code, as amended by the Act and as specified herein as Section 5-101(r)(2) of the Public Safety Article, Maryland Code Annotated, are vague, fail to give notice, and violate the right of Plaintiffs to due process of law, contrary to the Fourteenth Amendment to the United States Constitution and are void;

C.      Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that provisions of the Maryland Code, as amended by the Act and as specified herein as Sections 4-302, 4-303, and 4-305 of the Criminal Law Article, Maryland Code Annotated, deny Plaintiffs equal protection under the law, in violation of the Fourteenth Amendment to the United State Constitution and are void;

D.      Enter a temporary restraining order and a preliminary and permanent injunction enjoining the Defendants and their officers, agents, and employees from administration and enforcement of the provisions alleged herein to violate the United States Constitution;

E.      Award Plaintiffs costs and attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

F.      Grant such other relief as the Court deems proper.

Respectfully submitted,

_____/s/ John Parker Sweeney_____
John Parker Sweeney (Bar No. 08761)
T. Sky Woodward (Bar No. 10823)
James W. Porter, III (Admitted *pro hac vice*)
BRADLEY ARANT BOULT CUMMINGS LLP

35

1615 L Street N.W., Suite 1350
Washington, D.C. 20036
P (202) 719-8216
F (202) 719-8316
JSweeney@babc.com

*Counsel for Plaintiffs*