**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| **STEPHEN V. KOLBE, et al.;** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No.: 1:13-cv-02841-CCB** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MARTIN J. O'MALLEY, et al.;** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

Plaintiffs Stephen V. Kolbe, Andrew C. Turner, Wink's Sporting Goods, Atlantic Guns,

Inc. and association Plaintiffs Associated Gun Clubs of Baltimore, Inc., Maryland Shall Issue,

Inc., Maryland State Rifle and Pistol Association, Inc., National Shooting Sports Foundation,

Inc., and Maryland Licensed Firearms Dealers Association, Inc. (collectively, "Plaintiffs"), by

and through undersigned counsel, hereby submit this Memorandum in Opposition to Defendants'

Motion to Dismiss Plaintiffs' Third Amended Complaint.

## TABLE OF CONTENTS

Section................................................................................................................................Page

Introduction...........................................................................................................................1

Facts.....................................................................................................................................1

Standard of Review................................................................................................................4

Argument...............................................................................................................................4

I.      RESTRICTIONS ON MAGAZINE CAPACITY IMPACT
        THE INTERESTS PROTECTED BY THE
        SECOND AMENDMENT AND, THEREFORE,
        ARE SUBJECT TO SCRUTINY UNDER
        THE SECOND AMENDMENT.......................................................................4

II.     PLAINTIFFS HAVE SUFFICIENTLY ALLEGED A
        DENIAL OF THEIR RIGHT TO EQUAL
        PROTECTION UNDER THE LAW..................................................................9

III.    PLAINTIFFS HAVE ALLEGED SUFFICIENT FACTS
        TO STATE A CLAIM THAT THE TERM "COPIES"
        IS UNCONSTITUTIONALLY VAGUE.......................................................15

IV.     BUSINESS PLAINTIFFS HAVE A SECOND
        AMENDMENT RIGHT TO SELL FIREARMS............................................22

Conclusion...........................................................................................................................25

**INTRODUCTION**

Defendants Gov. Martin J. O'Malley, Attorney General Douglas F. Gansler, Col. Marcus L. Brown, and Maryland State Police (collectively, "Defendants") have moved to dismiss Counts Two, Three, and Four of Plaintiffs' Third Amended Complaint and to dismiss Plaintiffs Wink's Sporting Goods, Atlantic Guns, Inc., Maryland Licensed Firearm Dealers Association, Inc., and "to the extent it purports to represent the interests of member firearms sellers," National Shooting Sports Foundation as Plaintiffs under Counts One and Two.   ECF No. 32-1 at 2 (hereinafter "Defendants' Motion").

Where the United States Supreme Court has left to future development many unanswered questions regarding the nature and scope of the Second Amendment rights and the permissible extent of State intrusion on their exercise, none of the Defendants' grounds for dismissal compel that extreme relief and can be raised again after discovery. Defendants concede that Plaintiffs have stated at least one cognizable claim for relief and that at least some plaintiffs have standing to pursue that claim. Under these circumstances, and considering the facial nature of the challenge and the accelerated discovery schedule agreed by the parties, Defendants can claim no hardship from denial of their motion to dismiss that would warrant forestalling discovery on some claims or issues at the pleadings stage. For the reasons set forth in this Memorandum, Defendants' arguments are without merit and their Motion should be denied.

**FACTS**

The Firearms Safety Act of 2013 amended various sections of the Maryland Code and implemented numerous novel restrictions on the rights of law-abiding, responsible citizens.  In this suit, Plaintiffs have challenged the proscriptions against purchasing and selling "assault

1

weapons" and magazines with a capacity of more than 10 rounds.  It is generally prohibited, as of October 1, 2013, for a person to "transport an assault weapon into the State; or possess, sell, offer to sell, transfer, purchase, or receive an assault weapon."  Md. Code Crim. L. ("CR") § 4-303

Section 4-301(d) of the Criminal Law Article sets forth the categories of firearms ("Banned Firearms") whose acquisition and sale is generally prohibited:

1) Assault Long Guns

2) Assault Pistols

3) Copycat Weapons

Section 4-301(e) defines a "copycat weapon" to be:

1) A semiautomatic centerfire rifle that can accept a detachable magazine and has any two of the following

   a. A folding stock;

   b. A grenade launcher or flare launcher; or

   c. A flash suppressor;

2) A semiautomatic centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds;

3) A semiautomatic centerfire rifle that has an overall length of less than 29 inches;

4) A semiautomatic pistol with a fixed magazine that can accept more than 10 rounds;

5) A semiautomatic shotgun that has a folding stock;

6) A shotgun with a revolving cylinder

The term "Assault long gun" is defined in Section 5-101(r)(2) of the Public Safety Article and includes approximately 68 commonly used semiautomatic rifles and shotguns listed by manufacturer, model, and/or other name, and also "their copies, regardless of which company produced and manufactured that assault weapon . . . ."

It is also unlawful for anyone other than a current or former law enforcement officer to "manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm." CR § 4-305.

A violation of any of the aforementioned prohibitory provisions is punishable under Section 4-306 of the Criminal Law Article by imprisonment for up to three years and a fine of up to $5,000. Various exemptions exist to this prohibitory scheme, both for the acquisition of Banned Firearms and magazines with a capacity greater than 10 rounds. Relevant to this suit, retiring law enforcement officers are permitted to have transferred to them upon retirement a Banned Firearm, without any requirement that the retiring officer have had any training or experience with the firearm. CR § 4-302(7). Additionally, retired law enforcement officers are exempt from the prohibition on manufacturing, selling, offering for sale, purchasing, receiving, or transferring a magazine with a capacity of more than 10 rounds of ammunition. CR § 4-305(a)(2). This latter exemption also has no requirement that the retired officer have trained or have had any experience with a magazine with a capacity of more than 10 rounds. Moreover, this exemption has no temporal restriction, such that, for the rest of their lives, retired law enforcement officers will be permitted both to purchase or acquire magazines to which Plaintiffs, and the general public, are denied access, and to sell magazines that Plaintiffs are not permitted to sell.

Individual Plaintiffs, Business Plaintiffs, and members of Association Plaintiffs have a constitutional right to, and wish to purchase and sell Banned Firearms and magazines with a capacity of more than 10 rounds for lawful purposes. As of October 1, 2013, they have been denied this right.  Business Plaintiffs and business members of Association Plaintiffs will suffer a significant decrease in sales, as was noted in the Fiscal Note analyzing the Act's impact on small businesses.  All Plaintiffs are being denied the equal protection of law in light of the significant exceptions granted to retired law enforcement officers.

## STANDARD OF REVIEW

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, a Court accepts all well-pled facts from the Complaint as true and draws all inferences and views the facts in the light most favorable to the Plaintiffs.  *Wag More Dogs, LLC v. Cozart* 680 F.3d 359, 634-35 (4th Cir. 2012).  While a Complaint need not spell out every possible fact needed to be proven, it must state a claim that is "plausible on its face;" a claim has facial plausibility "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129S. Ct. 1937, 1949 (2009).

## ARGUMENT

I.     **RESTRICTIONS ON MAGAZINE CAPACITY IMPACT THE INTERESTS PROTECTED BY THE SECOND AMENDMENT AND, THEREFORE, ARE SUBJECT TO SCRUTINY UNDER THE SECOND AMENDMENT.**

The United States Supreme Court's landmark decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), made clear that the rights secured under the Second Amendment to the United States Constitution are individual rights.  Most sacrosanct among those rights is the "right

4

of law-abiding, responsible citizens to use arms in defense of hearth and home," which the Court

described as being "elevate[d] above all else." *Id.* at 635. As made applicable to the States in

*McDonald v. City of Chicago*, 130 S.Ct 3020 (2010), the Second Amendment protects individual

citizens from government intrusion into their ability to stand in armed defense of their homes and

families.

The Fourth Circuit follows a two-tiered approach when analyzing claims that a law

offends the Second Amendment. *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010).

First, a Court must determine whether "the challenged law imposes a burden on conduct falling

within the scope of the Second Amendment's guarantee." *Id.* If it does, then the Court must

apply the appropriate level of constitutional scrutiny, which is determined by examining the

degree to which the law impacts Second Amendment rights, which the Fourth Circuit holds are

at their zenith in the home. *United States v. Masciandaro,* 638 F.3d 458, 471 (4th Cir. 2011).[1]

Defendants assert that the restriction on magazine capacity does not implicate any

interests protected by the Second Amendment because "[a] high capacity magazine is not an

'arm'; it is not itself a 'weapon[] of offence,' or a thing worn for defense or taken 'to case at or

---

[1]      By framing their response in the context of the two-tiered approached described herein, Plaintiffs are
merely responding to the argument presented by Defendants. Plaintiffs do not concede that the two-tiered approach
that has been employed in the Fourth Circuit is correct. Even if that method of analysis were correct, it would not be
appropriate to apply it in this instance, because, as was the case in *Heller*, the law is so patently offensive to the
Second Amendment that it does not require any resort to a particular means-end scrutiny. Plaintiffs, in this
Opposition, will continue to address the arguments made by Defendants within the framework they have devised,
but reserve the right to argue both that the two-tiered system of analysis is not consistent with the Supreme Court's
decision in *Heller*, *see Heller v. District of Columbia*, 670 F.3d 1244, 1271-86 (D.C. Cir. 2011) (Kavanaugh, J.,
dissenting), and that its application to this case is not warranted. *See also Ezell v. City of Chicago*, 651 F.3d 684,
703 (7th Cir. 2011) ("Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second
Amendment right . . . are categorically unconstitutional."); *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 n.9
(2d Cir. 2012) ("*Heller* stands for the rather unremarkable proposition that where a state regulation is entirely
inconsistent with the protections afforded by an enumerated constitutional right – as understood through that right's
text, history, and tradition – it is an exercise in futility to apply means-ends scrutiny.").

strike another.'"  Defendants' Motion at 11, *quoting Heller*, 554 U.S. at 581.  Defendants then assert that because firearms can function with magazines that are capable of holding less than 10 rounds, that magazines holding more than ten rounds are, therefore, "not necessary components of firearms."  Defendants' Motion at 12.

From the outset, Defendants have tried to frame the issue in way that obscures the relevant inquiry.  The Defendants have arbitrarily labeled magazines holding more than 10 rounds as "high-capacity" and are now arguing that the label they created somehow insulates the magazine restriction from Second Amendment scrutiny.  This argument strains logic and would have the result of removing laws from constitutional review simply by invoking the correct buzz words.

The controlling issue is whether magazines are deserving of Second Amendment protection.  If magazines are so deserving, then laws which place restrictions on the acquisition and possession of any group or category of magazines must be analyzed under the Second Amendment framework.  Whether a magazine is labeled as "high-capacity" only begs the true question: are magazines protected by the Second Amendment?

One of the major tenets of the Supreme Court's decision in *Heller* was that individual law-abiding, responsible citizens have a right to engage in armed self-defense, especially in their home.  *Heller*, 554 U.S. at 599 (stating that self-defense "was the *central component* of the right itself").  There can be no doubt that magazines are necessary to the functionality of semi-automatic firearms, as Plaintiffs have alleged in their Complaint.  Thus, restrictions on magazines bear on the operation and utility of firearms employed in self-defense in such a way that the impact of the restrictions must be analyzed under the Second Amendment in the same

way that the requirement that a firearm be rendered inoperable was analyzed in *Heller*.[2]  *Heller*, 554 U.S. at 635.

While the Fourth Circuit has not opined directly on this issue, the analysis of the D.C. Circuit in *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") is instructive, as is the decision of the Seventh Circuit in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011).  In *Heller II*, the D.C. Circuit considered the constitutionality of a package of firearm laws enacted by the District of Columbia.  One of those laws was a restriction on magazine capacity similar to the law being challenged by Plaintiffs.  In reviewing whether this law was constitutional, the D.C. Circuit stated that the evidence in that case made clear that magazines holding more than 10 rounds were in common use by the law-abiding public.  *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use' as the plaintiffs contend.").  The Court went on to assume, without deciding, that the magazine restriction implicated the core Second Amendment right of self-defense and utilized intermediate scrutiny to analyze the law.  *Id*.  The D.C. Circuit implicitly acknowledged that magazines are protected by the Second

---

[2]     It is also noteworthy that a magazine has no purpose *except* to make a firearm usable for self-defense. Thus, the true effect of the magazine ban is not to simply outlaw certain articles of commerce; rather, it is to prohibit the possession and use of firearms equipped with magazines holding more than ten rounds.  As Plaintiffs will demonstrate in their briefing on summary judgment, there is a severe shortage of magazines holding ten rounds or less for firearms that are usually sold with magazines holding more than ten rounds (this is especially true for one of the most popular handgun manufacturers selling firearms today, Glock).  As such, the ban has the practical effect of preventing the use, in self-defense, of commonly used firearms for the entire population of law-abiding citizens, including Plaintiffs, who need to acquire a magazine because, for example, their currently-owned magazine broke. Moreover, anyone purchasing a new or used firearm that, before October 1, 2013, would have been sold with a magazine holding more than ten rounds, will not be able to exercise their Second Amendment right to have an operable firearm in his or her home because he or she will not be able to acquire a magazine compatible with Maryland law.  Moreover, there are some firearms, particularly older firearms that are no longer in production, for which magazines holding more than ten rounds were never made, and manufacturers have no incentive to make them, because the firearms have been discontinued.

Amendment, because, if it had not, the Court would have accepted the District's argument that magazines holding more than ten rounds "are not 'Arms' protected by the Second Amendment," *id.*, and not analyzed the law at all.

*Ezell* is also instructive, because that decision stands for the principle that the Second Amendment protects more than firearms themselves.   In that case, Rhonda Ezell and other Plaintiffs challenged the City of Chicago's firearms laws that included, *inter alia*, a ban on the operation of firing ranges inside the City limits.   *Ezell*, 651 F.3d at 689-92.   In reviewing the district court's denial of the Plaintiffs' motion for a preliminary injunction, the Court noted that the protection of the Second Amendment must be understood to extend to laws restricting firing ranges because "the core right wouldn't mean much without the training and practice that make it effective."   *Id.* at 704.   This statement of the law resonates with the holding of the Supreme Court in *Heller* when it ruled that individual citizens have a right to own an *operable* firearm in their homes for self-defense.   *Heller*, 554 U.S. at 635.

*Heller* stands for more than the simple premise that the government cannot ban, wholesale, the ownership of commonly used firearms in the home.   Rather, *Heller* is an acknowledgement that the Second Amendment is, and always has been, a pillar upholding the right of law-abiding, responsible citizens to use firearms to defend themselves, especially in their homes. This is why the Supreme Court struck down, as offensive to the Second Amendment, the requirement that a firearm in the home had to be rendered non-functional.   *Id.*   Clearly, the Supreme Court's central concern was the impact the challenged regulations had on the ability of law-abiding citizens to effectively defend themselves.   This point is underscored by a quotation from *Heller* that is, ironically, cited by the Defendants.   When analyzing historical laws

8

regulating the amount of gunpowder that could be stored, the Supreme Court found them to be an inapt comparison to the complete ban at issue.  As the Court stated, such laws did not "remotely burden the right of self-defense **as much as** an absolute ban on handguns."  *Id.* at 632 (emphasis added).  Clearly, the Court was of the view that restrictions on gunpowder, which effectively were restrictions on the number of rounds that could be fired in defense, did burden the right to self-defense, albeit in a lesser manner than a complete ban of commonly possessed firearms. Thus, as with all laws that impact the right of armed self-defense, laws restricting magazine capacity must be analyzed under the Second Amendment framework.

The law now in place in Maryland meaningfully impacts the ability of law-abiding, responsible citizens from defending themselves with commonly used firearms operating with standard magazines. As Plaintiffs alleged in their complaint, and as they will demonstrate in their summary judgment brief, magazines are an integral component of firearm functionality, and laws that restrict magazine capacity impact on the ability of Plaintiffs to defend themselves in their homes.  Whether the 10-round limitation presents an impermissible infringement so as to render it unconstitutional raises a cognizable claim under the Second Amendment that must be addressed on the merits and cannot be disposed of without the presentation of evidence. Development of facts pertinent to this claim through discovery should not be curtailed at the pleading stage based on Defendants' ungenerous reading of the Second Amendment and *Heller*.

## II.   PLAINTIFFS HAVE SUFFICIENTLY ALLEGED A DENIAL OF THEIR RIGHT TO EQUAL PROTECTION UNDER THE LAW.

The Fourteenth Amendment to the United States Constitution guarantees the right of the people not to be denied the equal protection of the law.  The laws being challenged by Plaintiffs, however, allow retiring law enforcement officers to have transferred to them upon retirement a

9

banned "assault weapon," CL § 4-302(7)(i), and allow for retired law enforcement officers to purchase, sell, and transfer magazines with a capacity of more than ten rounds **at any time**. CL § 4-305(a)(2). Plaintiffs, who are ordinary citizens including former members of the military, are subject to criminal penalties for doing the same.

Defendants assert that Plaintiffs have failed to plead facts sufficient to "'overcome the presumption of rationality that applies to government classifications.'" Defendants' Motion at 17, *quoting Giarratano v. Johnson*, 521 F.3d 298, 303-04 (4th Cir. 2008). This argument, however, is wholly without merit. Plaintiffs made three specific assertions of similarity with retired law enforcement officers:

> Plaintiffs are similarly situated to retired law enforcement officers in that neither have a duty, or the authority, to ensure public safety or respond to criminal events. There was no evidence presented to the General Assembly that retired law enforcement officers face any greater threat of harm than other members of the general public. Plaintiffs, as members of the general public, face the same threat of harm as is faced by retired law enforcement officers.

> There is no requirement in the law, nor was there evidence before the General Assembly, that all retired law enforcement officers who can avail themselves of the exceptions to the Act actually have any greater training with the banned firearms than the general public. While some may, others may not, which renders retired law enforcement officers equivalent to the general public in this regard.

ECF No. 30 at ¶¶ 93-94.

As this quotation makes clear, Plaintiffs have alleged that they are similarly situated to retired law enforcement officers in that both groups are not currently charged with, or have the authority to, protect the public; both groups face the same threat of violence upon which the need for self-defense is predicated; and both groups have members with various levels of training with the banned firearms and magazines. Defendants' attempts to dismiss each of these similarities are unavailing.

First, Defendants assert that retired law enforcement officers are "differentiated by their experience of having been entrusted with the statutory duty to protect public safety, and the corresponding statutory authority to detain, arrest, and use force against other citizens to carry out their duty." Defendants' Motion at 18. While it is certainly true that *current* law enforcement officers can be meaningfully differentiated from Plaintiffs by virtue of the formers' duty to protect the public, *retired* law enforcement officers have no such duty and, even more importantly, no such special authority. With respect to this issue, Plaintiffs have sufficiently pled that they are similarly situated to *retired* law enforcement officers, and Defendants have not provided any citations to facts or law to undermine this claim.

Defendants next assert "retired law enforcement officers also can  be expected to face different types of threats after retirement than the public at large." *Id*. Defendants provide no citations, no law, and no facts to support this claim. As all facts asserted in the Complaint are taken to be true for purposes of resolving a Motion to Dismiss, Defendants have not made sufficient argument to dismiss Plaintiffs' claim of being similarly situated in this respect, either.

Defendants next wax eloquent about the training that is required of law enforcement officers to be able to carry a firearm and state "[t]hese extensive training requirements imposed on Maryland's law enforcement officers differentiate them from other citizens with respect to firearm safety." *Id*. at 19. While Plaintiffs do not dispute that law enforcement officers are required to undergo the training described by Defendants, such training does not undermine Plaintiffs allegations of being similarly situated. As a preliminary matter, there is no requirement that a law enforcement officer have carried, or even been trained on, a Banned Firearm to be eligible to have such a firearm transferred to them upon retirement. *See* CR § 4-302(7). Thus,

11

the community of retired law enforcement officers who are eligible to avail themselves of the exemption includes not only those with significant training with the Banned Firearms and magazines, but also those who have never handled such firearms and magazines.  This reflects exactly the community of individuals made up of individual Plaintiffs and members of Association Plaintiffs.  As such, and as alleged in their Third Amended Complaint, Plaintiffs are similarly situated to the community of retired law enforcement officers with respect to training.

Finally, Defendants assert that "it would also have been rational for the General Assembly to conclude that an assault weapon or high-capacity detachable magazine transferred to a law enforcement officer – combined with the general provisions of Chapter 427 that would prohibit such retired law enforcement officer from transferring possession of the weapon or magazine to others – would be less likely to end up in the hands of criminals."  Defendants' Motion at 19-20.  Preliminarily, this assertion has nothing to do with the sufficiency of Plaintiffs' allegations and is, therefore, not appropriate for resolution in a Motion to Dismiss for failing to state a claim upon which relief can be granted, if for no other reason that it requires a factual determination of the likelihood of a firearm owned by a retired law enforcement officer to be transferred illegally.  Defendants' argument on this point also ignores a critical aspect of the law they are attempting to defend -- the exemptions of retired law enforcement officers from the criminal prohibitions against selling otherwise-banned magazines.  *See* CR § 4-305(a)(2).  Moreover, the reasonableness of the inference that retired law enforcement officers are not likely to engage in an illegal transaction involving a firearm or magazine is a highly debatable, factual issue that should be developed through discovery.  *See, e.g., State v. Catrino*, Case No. 22-K-13-000497 (Wicomico County, Md. 2013) (copy of Defendant's and State's Memoranda of Law

attached as Exhibit A) (former law enforcement officer charged with selling a regulated firearm and four, loaded, 30-round magazines to an undercover officer out of the trunk of his car in a parking lot). *Catrino* illustrates starkly the extent of the exemption for retired law enforcement officers. As the Defendant was only convicted of the magazine charges, he would have been completely free from criminal consequence under the current law for engaging in a transaction that, were Plaintiffs to have so engaged, would have resulted in severe criminal penalty.

Finally, Defendants have not identified a legitimate government interest that the exemption for retired law enforcement officers actually serves. They state numerous times that the exemption of retired law enforcement officers is rational, and invoke the Supreme Court's statement in *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1995) that a statute that draws classifications will be upheld if it is rationally related to a legitimate government interest. But, Defendants never actually assert a legitimate government interest being furthered by the grant of additional rights to retired law enforcement officers.

Despite Defendants' argument that it is perfectly permissible to exempt retired law enforcement officers in the manner the challenged law does, the Ninth Circuit held a similar California firearms law, with exemptions similar to those currently at issue, to be a violation of the Equal Protection Clause, even when analyzed under the rational basis test. *Silveira v. Lockyer*, 312 F.3d 1052, 1090-91 (9th Cir. 2002), held that an exclusion allowing retired law enforcement to acquire and possess "assault weapons" lacked any rational basis and was a violation of the Equal Protection Clause, because "the retired officers exception arbitrarily and unreasonably affords a privilege to one group of individuals that is denied to others, including plaintiffs." *Id.* at 1091. The Court stated that there was no legitimate purpose being furthered

by permitting retired law enforcement officers to be exempt from the firearm and magazine prohibitions.  Here too, there is no legitimate government purpose behind exempting retired law enforcement officers, as is made vividly clear by the Defendants' failure to articulate any interest.

The cases cited by the Defendants in which laws making exemptions for retired law enforcement officers were not ruled unconstitutional, *Williams v. Puerto Rico*, 910 F. Supp. 2d 386 (D.P.R. 2012) and *Pizzo v. City & Cnty. of San Francisco*, 2012 U.S. Dist. LEXIS 173370 (N.D. Cal. Dec. 5, 2012) (unpublished), are not applicable to the instant case.

*Pizzo* involved a challenge to California's laws relating to carrying a concealed weapon, which included an exemption from the normal permitting process for active and retired law enforcement officers, under a variety of legal theories, including a violation of the Equal Protection Clause of the Fourteenth Amendment.  The district court, however, did not even engage in an analysis of the plaintiff's equal protection claim because it ruled that the plaintiff did not have standing to make such a challenge, because she had failed to properly complete her application to carry a concealed firearm.  *Pizzo*, 2012 U.S. Dist. LEXIS 173370 at *41-*47. While the district court in *Williams* did actually conduct a cursory review of the law on equal protection grounds, it did not make a distinction between retired and active law enforcement officers.  *Williams*, 910 F. Supp. 2d at 399-400.  Plaintiffs in the instant matter concede that there may be meaningful distinctions between active law enforcement officers and themselves, but have alleged facts sufficient to support their argument that retired law enforcement officers are not differently situated and should not be granted additional rights.

Plaintiffs have alleged sufficient factual similarities, which will be developed further in their brief on a motion for summary judgment, between themselves and retired law enforcement officers to make a prima facie case of discrimination in violation of the Equal Protection Clause, especially given the inability of Defendants to assert *any* government interest being served by the exemption to withstand a Motion to Dismiss, and Defendants' claims with respect to Count Three should be denied.

## III.   PLAINTIFFS HAVE ALLEGED SUFFICIENT FACTS TO STATE A CLAIM THAT THE TERM "COPIES" IS UNCONSTITUTIONALLY VAGUE.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits the enforcement of laws whose provisions are vague.  The void-for-vagueness doctrine is a necessary safeguard against arbitrary enforcement of laws that do not provide ordinary citizens with sufficient information to avoid unlawful conduct:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.  Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.  Vague laws may trap the innocent by not providing fair warning.  Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).  In reviewing whether a law is unconstitutionally vague, a criminal law can be unconstitutional for either of two reasons: 1) because it fails to provide sufficient notice for an ordinary person to understand what conduct is prohibited and 2) because it authorizes or encourages arbitrary enforcement.  *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *NAACP v. City of Annapolis*, 133 F. Supp. 2d. 795, 807 (D.

Md. 2001), *quoting Morales*.  In this case, the unconstitutional vagueness stems from the use of the term "copies," which is undefined in any statute, and, as Plaintiffs will develop during discovery, has resulted in arbitrary enforcement.

The inherent vagueness and ambiguity of the term "copies" can be seen in the elements in subsection (xv), which are "Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle."  Colt is a firearm manufacturer, and AR-15 Sporter H-BAR was a model produced by this manufacturer, but is no longer in production.  A citizen of ordinary intelligence has no way of knowing which of the current models of rifles made by Colt or another manufacturer is permitted as a "copy" of an "H-BAR" model and which would be prohibited as a "copy" of a banned AR-15 or CAR-15, because the designation fails to describe the characteristics of an H-BAR or to explain how one is to distinguish between a "copy" of a banned AR-15 and a permitted AR-15 H-BAR.  Indeed, if allowed to proceed on this claim, Plaintiffs will produce evidence that Defendant Maryland State Police admits there are no criteria for determining whether a firearm is a permitted "H-BAR." Plaintiffs' Count Four is sufficiently well-pled to allow Plaintiffs the opportunity to develop evidence to substantiate their allegations.

Defendants' primary argument as to why Plaintiffs' vagueness claim should be denied appears to be that Plaintiffs have not plead that the law is vague in all of its applications or that vagueness permeates the law.  Defendants' Motion at 25.  Plaintiffs, however, have made exactly this allegation with respect to the term "copies."   ECF No. 30 at ¶¶ 104-109.  As Plaintiffs alleged,

> [t]he Act fails to inform a reasonable person how similar a firearm must be,
> including  what  factors  to  consider  and  how  to  measure  them,  to  an  "assault

16

> weapon" named in the Act to be deemed a "copy" thereof.  This requires a person
> to have specialized knowledge of the some 68 named "assault weapons" in the
> Act identified by manufacturer, model, or other term, and to understand the
> design and feature details that would elude virtually anyone but the engineers who
> designed such firearms.

ECF No. 30 at ¶ 105.  As is made clear by the language used by Plaintiffs, the term "copy" is

vague in all of its applications because a person of ordinary intelligence does not have the ability

to determine whether a particular firearm is a "copy" of one of the enumerated, banned firearms.

Defendants' invocation of *Martin v. Lloyd*, 700 F.3d 132 (4th Cir. 2012), is not

persuasive in this context.  In *Martin*, Plaintiffs who operated a gaming enterprise sued over a

South Carolina statute that prohibited certain enumerated gaming machines as well as "other

devices pertaining to games of chance." *Id.* at 134.  The Fourth Circuit denied the challenge to

law on vagueness grounds because the Plaintiffs in that case were engaged in conduct that was

clearly prohibited (the operation of enumerated gaming machines) and because the Plaintiffs had

provided no evidence that they planned to operate machines to which it was unclear whether the

law applied. *Id*. at 137.  In this case, Plaintiffs have alleged that *all* uses of the term copies are

vague, and, thus, that this vagueness will prevent them from determining whether conduct in

which they intend to engage is prohibited.

Even more critically, *Martin* cuts against the Defendants' position.  In setting forth the

standard that needed to be met to strike down the law as unconstitutionally vague, the court

stated, "When considering a facial challenge, courts first determine whether the enactment

implicates a substantial amount of constitutionally protected conduct.  *If it does not*, then the

challenge should only succeed if the law is impermissibly vague in all of its applications." *Id.* at

135 (internal citations omitted) (emphasis added).  The law in the instant cases plainly *does*

17

implicate a substantial amount of constitutionally protected conduct: the possession in the home of commonly used firearms by law-abiding, responsible citizens.  As the law in *Martin* pertained to gambling, which is not constitutionally protected, the court required the heightened "in all of its applications" standard.  *Id.* at 135-36.  In the present case, however, the conduct is protected under the Constitution.  Moreover, the court stated, "where a statute imposes criminal penalties, the standard of certainty is high and the statute can be invalidated on its face 'even where it could conceivably have . . . some valid application.'"  *Id.*, *quoting Wright v. New Jersey*, 469 U.S. 1146, 1152 (1985).  Given that there is a criminal penalty for engaging in the conduct being challenged, CR § 4-306, Plaintiffs have a much lower burden of pleading to meet than Defendants assert, and have clearly met it.

Defendants have referred to general references to banned firearms in Plaintiffs' declarations submitted in support of their request for a Temporary Restraining Order as admissions that Plaintiffs do not find the definition vague.  Without conceding those declarations are properly before the Court on this Motion, Plaintiffs note that Plaintiff Andrew Turner declared that he wished to assemble firearms based on the AR-platform.  Without being able to discern what constitutes a "copy," he will be unable to assemble a firearm based on an AR platform, for fear of prosecution, because he has no way of knowing whether the firearm he assembles is a "copy" of a banned AR-15, a "copy" of a permitted AR-15 Sporter H-BAR, or not a "copy" at all.

Defendants next assert that the allegation that the statute's delegation to Defendant Maryland State Police of the authority to determine what conduct is criminal is constitutionally permissible because "courts are charged with looking to such limiting constructions as a way of

avoiding a conclusion of vagueness."  Defendants' Motion at 27.  Defendants, relatedly, argue that being required to consult with Defendant Maryland State Police as to whether a particular firearm is considered a "copy" is not problematic because Plaintiffs will not inadvertently engage in the prohibited conduct of transferring a "copy" of an enumerated, banned firearm as could happen with a loitering statute.  *Id.* at 28.  Both of these arguments are without merit.

Defendants' characterization of the delegation of authority to Defendant Maryland State Police to determine what conduct is prohibited is not a "limiting construction."  Rather, it is akin to the law that was struck down in *NAACP v. City of Annapolis, supra.*  In *City of Annapolis*, the Court determined that a loitering statute that gave law enforcement officers too much authority to determine what constituted "a pattern of conduct normally associated with . . . illegal distribution, purchase, or possession of drugs," and struck down the statute as unconstitutional. *City of Annapolis*, 133 F. Supp. at 808.  The Court was concerned – rightly so – that this discretion would lead to differing enforcement by different officers and towards different citizens.  *Id.* at 809.  This concern is present with the instant law.  By giving law enforcement officers charged with enforcing firearms law the discretion to determine what constitutes a "copy" on a case by case basis, the law is ripe for disparate treatment by different officers and for different citizens.

This concern is not mere conjecture.  If allowed to proceed on Count Four, Plaintiffs will produce evidence that Defendant Maryland State Police has provided contradictory statements as to whether a Bushmaster rifle with a heavy barrel would be permitted to be sold in Maryland.  As a result, even a citizen relying on a statement by Defendant Maryland State Police could be subject to criminal sanction, because a later administration reversed its prior decision.  The

resulting enforcement framework creates the spectre of uneven and arbitrary enforcement in the same manner as was held to be unconstitutional in *City of Annapolis*, and cannot stand.

Defendants' final assertion as to why Plaintiffs have failed to state a sufficient claim of vagueness is that the term "copies" has been used for over 20 years.  It is not clear how this is relevant.  Defendants have cited no authority that a vague law somehow loses its vagueness because it has been in effect for a certain period of time, and this would be a very incongruous understanding of constitutional law – an unconstitutional law is unconstitutional, no matter how long it takes for a challenge to its validity to percolate to the courts.

Declaring a firearms ban of this nature to be unconstitutionally vague is not a novel event, and Plaintiffs have identified at least two instances of its occurrence.  The entire definition of "assault weapon" as 34 specified firearms and other models with "slight modifications or enhancements" was declared unconstitutionally vague on its face in *Springfield Armory, Inc. v. City of Columbus,* 29 F.3d 250, 252 (6th Cir. 1994). "How is the ordinary consumer to determine which changes may be considered slight? A weapon's accuracy, magazine capacity, velocity, size and shape and the caliber of ammunition it takes can all be altered." *Id.* at 253.  The term "modification" was vague because "ordinary consumers cannot be expected to know the developmental history of a particular weapon":

> Nothing in the ordinance provides sufficient information to enable a person of average intelligence to determine whether a weapon they wish to purchase has a design history of the sort which would bring it within this ordinance's coverage. See *Robertson v. Denver*, 874 P.2d 325, 335 (Colo. 1994) (holding similar provision invalid because "ascertaining the design history and action design of a pistol is not something that can be expected of a person of common intelligence.") The record indicates that the average gun owner knows very little about how his gun operates or its design features.

*Id*. at 253.   The term "copies" suffers from the same infirmity that "slight modifications" suffered: a person of ordinary intelligence who reads the statute cannot determine what conduct is prohibited.   Moreover, that same person, who cannot acquire any of the firearms that are enumerated in the in the Public Safety Article because they are prohibited by name, is not able to examine their internal components, as the 2010 Opinion of the Attorney General suggests they should.  95 Op. Att'y Gen. 101, 108-09 (2010).  As a result, Plaintiffs are in the same position as the Plaintiffs in *Springfield Armory* and have been denied due process of the law.

Similarly, in *Robertson*, the Court stated that it was not reasonable to suggest that gun owners can conduct research and tests to determine whether a specific gun is somehow a copy or duplicate of some other gun: "Whether persons of ordinary intelligence must necessarily guess as to an ordinance's meaning and application does not turn on whether some source exists for determining the proper application of a law."   *Robertson*, 874 P.2d at 334-35.   As that court added, "the assault weapon ordinance does not specify any source which would aid in defining what an assault pistol is, nor does it state where such a source can be found."   *Id*. at 335.

"No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes."  *Lanzetta v. New Jersey*, 306 U.S. 451, 452-53 (1939).  Yet defining "assault weapon" as 68 convoluted names and undefined "copies" thereof does just that. No requirement exists that a person know that a firearm have the characteristics that render it a named "assault weapon" or "copy", rendering it "little more than 'a trap for those who act in good faith.'" *Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522, 534 (6th Cir. 1998) (declaring "assault weapon" law vague and quoting *Colautti v. Franklin*, 439 U.S. 379, 395 (1979)).

IV.    **BUSINESS PLAINTIFFS HAVE A SECOND AMENDMENT RIGHT TO SELL FIREARMS.**

Defendants' final argument is that Business Plaintiffs and Association Plaintiffs, insofar as they represent the business interests of their individual members, lack standing to pursue claims under the Second Amendment.  Preliminarily, it is unclear why Defendants are making this argument.  "As a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing."  *National Association of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 522 (9th Cir. 2009). Defendants have not, and indeed cannot, make a claim that *all* Plaintiffs lack standing to bring claims under the Second Amendment, and thus this Court has Article III jurisdiction to entertain the suit and pass judgment on the constitutionality of the law.  In such a circumstance, the Court need not expend its time addressing the standing of each Plaintiff.  *See id.*; *see also Clinton v. City of New York*, 524 U.S. 417, 433 n. 19 (1998) ("Because both the City of New York and the health care appellees have standing, we need not consider whether the appellee unions also have standing to sue."); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) ("It is clear that members of the Union, one of whom is an appellee here, will sustain injury by not receiving a scheduled increase in benefits.  . . .  This is sufficient to confer standing under § 274(a)(2) and Article III.  We therefore need not consider the standing issue as to the Union or Members of Congress.").

More importantly, Business Plaintiffs and members of Association Plaintiffs have standing to sue under the Second Amendment under the facts of this case for three reasons.  The first is that both groups of Plaintiffs are being denied the ability to acquire and possess the Banned Firearms and magazines capable of holding more than ten rounds, not only the ability to

sell such firearms and magazines. As such, they are being denied a possessory right under the Second Amendment and have a right to seek redress.

Secondly, the Supreme Court has repeatedly held that businesses have standing to raise constitutional challenges to statutes by asserting the interests of their customers or prospective customers. *Craig v. Boren*, 429 U.S. 190, 192-97 (1976) (permitting beer vendors to assert the interests of their male customers); *Carey v. Population Services International*, 431 U.S. 678, 682-84 (1977) (permitting contraceptive distributers to assert the interests of their customers); *Barrows v. Jackson*, 346 U.S. 249, 254-58 (1953) (permitting sellers of land to assert the interests of the prospective purchasers of that land).

Lastly, the Second Amendment must be read to protect the right to sell firearms to law-abiding, responsible individuals. The Supreme Court recognized that the District of Columbia was not permitted to enact laws that had the effect of preventing law-abiding, responsible citizens from possessing a handgun in their homes in *Heller*. It is axiomatic that for one to be able to possess a firearm, one must be able to acquire that firearm from somewhere. Ergo, it cannot be denied that there is a concomitant right under the Second Amendment to sell a firearm to a law-abiding, responsible citizen. To decide otherwise would eviscerate the holding in *Heller* and permit the government to do by banning sales what the Supreme Court dictated it could not do by banning possession. This is a conclusion that has been reached in a number of cases involving the sales of firearms, including as it was historically understood. *See United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3rd Cir. 2010) ("Commercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment under this reading."); *Kole v. Village of Norridge*, 94 F. Supp. 2d 933, ("Although the Supreme Court explained that laws

regulating the commercial sale of firearms are 'presumptively lawful,' it did not purport to exempt those laws from constitutional scrutiny."); *Andrews v. State*, 3 Heisk. 165, 50 Tenn. 165, 178 (Tenn. 1871) ("The right to keep arms, necessarily involves the right to purchase them . . . .")

Defendants cite the Fourth Circuit's unpublished opinion in *United States v. Chafin*, 423 F. App'x. 342 (4th Cir. 2012) to support their assertion that there is no Second Amendment right to sell firearms. While the Fourth Circuit made a sweeping statement that appears, at first blush, to lend some credence to Defendants position, *Chafin* is inapposite to the instant matter. In *Chafin*, the person claiming a Second Amendment right engaged in illegal conduct -- the sale of a firearm to a person he knew was a drug user. Plaintiffs in the instant case, however, are attempting to engage in transactions that would be lawful but for the provisions they are challenging, and are attempting to sell otherwise lawful firearms to law-abiding, responsible citizens. This is a critical distinction. As the Supreme Court made clear in *Heller*, there can be restrictions on the sales of firearms, such as not being permitted to sell to known drug users. Had the Court not thought that selling a firearm was deserving of Second Amendment protections, it would not have listed regulation of the commercial sales of firearms as a category of laws that are presumptively constitutional *under the Second Amendment*. Given this statement in *Heller*, *Chafin* is properly understood as standing for the principle that regulations on the sales of firearm, such as prohibiting the sale to criminals, are constitutional under the Second Amendment without resort to constitutional scrutiny, in the same way that a complete ban on handgun possession was unconstitutional without resort to constitutional scrutiny.

24

Finally, *Ezell, supra*, illustrates that the Second Amendment protects more than the ownership of firearms.  In that case, the Seventh Circuit stated that the Second Amendment also must be read so as to protect the interests of a firing range operator, because the right to own a firearm in self-defense meant relatively little without the attendant right to become proficient with that firearm.  This same logic leads to the conclusion that there is a protected right to sell a firearm to a law-abiding, responsible citizen.  The right to have a firearm operable in the home means absolutely nothing if there is no attendant right for a person or business to sell a firearm, because there is no way for a person to exercise their possessory right.

For all the above reasons, Defendants' arguments that Business Plaintiffs and Association Plaintiffs representing business interests should be dismissed are without merit and should be rejected.

<u>**CONCLUSION**</u>

Based on the foregoing, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss their Third Amended Complaint in its entirety.

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney (Bar No. 08761)
T. Sky Woodward (Bar No. 10823)
James W. Porter, III (Admitted *pro hac vice*)
Marc A. Nardone (Bar No. 18811)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
P (202) 719-8216
F (202) 719-8316
JSweeney@babc.com

*Counsel for Plaintiff*

25

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 9TH day of December, 2013, the foregoing was served, via electronic delivery to Defendants' counsel via CM/ECF system which will forward copies to Counsel of Record.

<em>/s/ John Parker Sweeney</em>

John Parker Sweeney (Bar No. 08761)