# EXHIBIT A

STATE OF MARYLAND

v.

DAVID CATRINO

Defendant

CASE NO. 22-K-13-000497

IN THE CIRCUIT COURT

FOR WICOMICO COUNTY

STATE OF MARYLAND

## Memorandum of Law

David Catrino, Defendant, by and through his attorney, John K. Phoebus and John K. Phoebus, P.A., provides this honorable Court with the following memorandum of law in support of arguments as to the elements of the offenses with which the Defendant is charged and the constitutionality of the statutes that the Defendant intends to advance at the trial of this matter.

### Introductory Statement

This matter is scheduled to be tried by the court on Tuesday, October 22, 2013 sitting without a jury. The operative facts in this case are not anticipated to be highly contested.

The Defendant presents this Memorandum of Law to the Court in order to assist it in evaluating the motion for judgment of acquittal that the Defendant intends to advance at the close of the State's case and, if necessary, to renew at the close of the receipt of all evidence.

### Anticipated Facts

Defendant is charged with knowingly participating in an illegal sale of a regulated firearm in violation of the Public Safety Article and with four counts of

selling a detachable magazine with a capacity of more than 20 rounds of ammunition in violation of Section 4-305 of the Criminal Law Article.

The facts that the Defendant anticipates that the State will introduce at trial will likely show that an undercover police officer, Officer Edwin Pauley, of the Fruitland Police Department and the Wicomico County Narcotics Task Force, purchased from the Defendant for $700 a semi-automatic rifle and four detachable magazines each loaded with 30 rounds of 7.62 x 39 mm ammunition in Wicomico County on June 24, 2013. This transfer occurred openly in a parking lot during the daytime and not at either a firearms dealer or at a designated law enforcement agency.

The State contends that the rifle purchased by Officer Pauley was a regulated firearm. (The Defendant disputes this characterization both factually and for legal arguments advanced below.) Specifically, as set forth in the State's Answer to the Defendant's Request for Bill of Particulars, the State contends that the firearm transferred by the Defendant to Officer Pauley was "an AK-47 or one of its copies, in any form." Section 5-101(p)(2) of the Public Safety Article defines as a "regulated firearm" "the following specific assault weapons or their copies" and lists at subparagraph (p)(2)(ii) "AK-47 in all forms".

The State does not contend that Officer Pauley was a person prohibited from purchasing or possessing a regulated firearm. This was specified in the State's Answer to the Defendant's Request for a Bill of Particulars.

The Defendant was a police officer with the Ocean City Police Department and with the Snow Hill Police Department. He departed his employment in good

standing from the Snow Hill Police Department. He is not currently employed as a police officer nor was he at the time of this incident.

## Maryland Law Relating to Regulated Firearms

The State of Maryland regulates handguns and certain enumerated long guns, which are collectively known as "regulated firearms". The list of regulated firearms is found in Section 5-101(p) of the Public Safety Article. Certain persons are prohibited by Maryland law from owning regulated firearms, such as convicted felons, persons subject to protective orders, habitual drunkards, and drug addicts. The complete list of circumstances that disqualify an individual from owning a regulated firearm is found in Section 5-133(b).

To implement this scheme, persons who wish to purchase a regulated firearm generally must submit an application (known as a Maryland State Police Form 77R) to the Secretary of State Police or his designee who has 7 days to review it. Typically, the State Police does not timely respond to these requests to review an application and, on the eighth day following the form's submission to the State Police, a regulated firearm can legally be transferred to the intended recipient unless before that time the purchase has been disapproved by the State Police. (The current backlog of applications is over two months. *See* "O'Malley pledges to end backlog of gun checks, BALTIMORE SUN (Sept. 11, 2013) available online at < http://articles.baltimoresun.com/2013-09-11/news/bs-md-gun-backlog-20130911_1_background-checks-gun-buyers-o-malley-pledges >). The State Police continue to review applications even after the 7-day window has closed and seek to

recover weapons from persons who fail the background check when they later discover that an application should be disapproved. *See id.*

Section 5-124 of the Public Safety imposes on private sellers and purchasers of regulated firearms rules that are similar to those imposed on licensed firearms dealers. So-called "secondary transfers" of regulated firearms between private individuals are permitted, but regulated. A person purchasing a regulated firearm must fill out the same Form 77R which is processed either through a firearms dealer or a designated law enforcement agency. A private seller is directed to wait at least the 7 days before transferring the weapon. While a transfer can occur on the eighth day if not first disapproved by the State Police, if a seller chooses to wait for the police to actually process the application, the seller is required to transfer the weapon within 90 days of when the application is marked "not disapproved" by the Secretary of State Police.

This current statutory framework for "regulated firearms" took effect when the General Assembly passed the Maryland Gun Violence Act of 1996 which was enacted as 1996 Maryland Laws Ch. 562 (H.B. 297) during the Parris Glendenning administration.

Under this law, which remained substantially the same from 1996 until October 1, 2013, only handguns and regulated firearms have restrictions on transfer. An unregulated firearm, such as most shotguns and rifles, can be transferred between private individuals without a background check and without any requirement that the weapon be registered to a certain individual.

4

Before the facts leading to this case occurred, in response to the Sandy Hook school shootings, the Maryland General Assembly enacted the Firearm Safety Act of 2013, which took effect October 1, 2013, after the facts of this case. This new law bans the sale of the long guns that are defined as "regulated firearms" after October 1, 2013. The new law also bans "copycat weapons" which are, for the first time, specifically defined based upon the characteristics of a weapon. A handgun qualification license is now required to purchase a handgun, requiring "live fire" tests for individuals. The capacity of detachable magazines that may be sold in Maryland is reduced from 20 to 10 rounds. The possession of weapons and magazines lawfully acquired before October 1, 2013 is permitted. However, certain firearms will now be required to be registered and, over the coming years, penalties for the failure to register weapons will be phased in.

## ARGUMENT

### I. A Violation of Section 5-143 of the Public Safety Article is a Specific Intent Crime, Requiring Proof that the Defendant Knew That the Sale of a Specific Weapon Required a Firearm's Application.

To convict the Defendant of participating in an illegal sale or transfer of a regulated firearm the State must prove that the Defendant knew the transaction was illegal. A violation of the regulated firearms statute is a specific intent crime and the state must prove that the Defendant possessed this requisite *mens rea* beyond a reasonable doubt.

The Defendant is charged under Section 5-143 of the Public Safety Article, which provides:

> Except as otherwise provided in this subtitle, a dealer or other person may not: (1) knowingly participate in the illegal sale, rental, transfer, purchase, possession or receipt of a regulated firearm in violation of this subtitle.

MD. CODE ANN., PUBLIC SAFETY § 5-143(a)(1) (West 2012).[1] Violations of Section 5-143 are a misdemeanor punishable by up to 5 years imprisonment, a fine up to $10,000, or both. *See id.* § 5-143(b).

In its Answer to the Defendant's Demand for a Bill of Particulars, the State specifies that:

> The section of Title 5 of the Public Safety Article, Annotated Code of Maryland that was not adhered to, complied with or otherwise followed so as to make the alleged sale of the firearm illegal is Public Safety Article 5-124.

Section 5-124(a) of the Public Safety Article governs what is termed a "secondary sale", as distinguished from sales made by dealers. It provides that:

> (1) A person who is not a licensee may not sell, rent, transfer, or purchase a regulated firearm until after 7 days following the time a firearm application is executed by the firearm applicant, in triplicate, and the original is forwarded by a licensee to the Secretary.
>
> (2) As an alternative to completing a secondary sale of a regulated firearm through a licensee, a prospective seller, lessor, or transferor and a prospective purchaser, lessee, or transferee may complete the transaction through a designated law enforcement agency.

MD. CODE ANN., PUBLIC SAFETY § 5-124(a) (West 2012). "Licensee" is defined as a person who holds a State regulated firearms dealer's license. *See id.* §§ 5-101(d), (e),

---

[1] Section 5-143 was renumbered Section 5-144 by passage of the Firearm Safety Act of 2013, 2013 Maryland Laws Ch. 427 (S.B. 281). References herein are generally made to the Maryland Annotated Code as it was in effect on or after October 1, 2012, not the newer versions of these statutes that took effect on October 1, 2013, unless specifically indicated. The current law is attached as an Exhibit hereto for the court's convenience.

(o), 5-124. "Secretary" means the Secretary of State Police or his designee. *See id.* § 5-101(s). A "designated law enforcement agency" is one that is designated by the Secretary of State Police to process applications to purchase regulated firearms. *See id.* § 5-101(f).

The Court of Appeals held in *Chow v. State,* 393 Md. 431 (2006), that to convict a defendant of violating the law on secondary sales currently found in Section 5-124 and to impose the punishment now set forth in Section 5-143 requires proof of specific intent.[2] Although *Chow* was decided under the original, 1996 enactment of this law, then found in Article 27, the operative provisions remain the same through the time of the facts of this case.

In *Chow,* a convenience store owner was stopped by the Prince George's County police for a minor traffic violation. The store owner's vehicle was searched

---

[2] At the time of the operative facts in *Chow,* what at the time of the facts of this case was MD. CODE ANN., PUBLIC SAFETY § 5-124 (West 2012) was then Article 27, Section 442(d), which provided:

> (1) A person who is not a regulated firearms dealer may not sell, rent, transfer, or purchase any regulated firearm until after 7 days shall have elapsed from the time an application to purchase or transfer shall have been executed by the prospective purchaser or transferee, in triplicate, and the original copy is forwarded by a regulated firearms dealer to the Secretary.

MD. CODE ANN., ART. 27, § 442(d)(1) (1996 Rep. Vol., 2002 Supp.). This is substantially identical language to the current statute. What at the time of the facts of this case was MD. CODE ANN., PUBLIC SAFETY § 5-143 (West 2012) was at the time of *Chow* Article 27, Section 449(f), which provided:

> Except as otherwise provided in this section, any dealer or person who knowingly participates in the illegal sale, rental, transfer, purchase, possession, or receipt of a regulated firearm in violation of this subheading shall be guilty of a misdemeanor and upon conviction shall be fined not more than $10,000 or imprisoned for not more than 5 years, or both. Each violation shall be considered a separate offense.

MD. CODE ANN., ART. 27, § 449(f)( (1996 Repl. Vol., 2002 Supp.). This, too, is identical language.

and a handgun that the store owner transported daily between his home and business for protection was seized because the owner did not have a carry permit. The store owner's friend, Officer Chow, was a Washington, D.C. police officer and was asked by the store owner for the loan of another handgun to use as protection until he could get his first handgun back from the police. Officer Chow loaned a handgun to the store owner. Three days after his first stop, the store owner was stopped again to be served with charging documents charging him with the first handgun violation. He was found to be in possession of Officer Chow's handgun. Officer Chow was charged with illegally transferring this handgun. At trial, Officer Chow argued that a temporary loan was not a "transfer" as defined by the statute and that the State failed to prove that he knew the transfer to the store owner was illegal. The trial court disagreed and convicted him, imposing only a suspended sentence from which Chow appealed. *Chow,* 393 Md. at 435-39. The Court of Special Appeals affirmed. *See id.* at 441. The Court of Appeals reversed, holding both that a temporary, gratuitous loan is not a "transfer" as defined in the statute and further holding that specific intent is the requisite *mens rea* for a conviction under the regulated firearms subtitle. *See id.* at 472-73.

Judge Cathell, writing for the Court of Appeals, reviewed the language of Article 27, Section 449(f), identical in all respects to Section 5-133, and its use of the word "knowingly", concluding:

> Therefore, we find that a violation of § 442(d) and imposition of a penalty under § 449(f) requires that one have a specific intent and requires that a defendant "knows" that the sale, rental, transfer,

8

purchase, possession, or receipt of a regulated firearm of which they are a participant in is in a manner that is illegal and not a legal sale.

*Chow,* 393 Md. at 471. The Court continued:

We also conclude that the inclusion of the term "knowingly" in § 449(f) creates a specific intent *mens rea* for violations of that subsection. Thus, in order to be in violation of § 449(f), a person must know that the activity they are engaging in is illegal.

*Id.* at 473. Thus, in order to convict the Defendant in this case, the State is required to prove that the Defendant actually knew that his conduct was illegal and that he had the specific intent to violate the regulatory scheme set out in the Public Safety Article.

## II.   The Regulated Firearms Statute is Void for Vagueness and the Enforcement of the Law Against the Defendant is Unconstitutional

To pass constitutional muster, a statute must clearly prohibit certain conduct such that a person of ordinary intelligence can govern their behavior in a manner that avoids criminal liability. The list of regulated firearms found in Section 5-101(p)(2) of the Public Safety Article is so vague that persons of ordinary intelligence cannot discern what weapons are regulated and which are not.

Because Maryland imposes no transfer restrictions upon unregulated firearms sold between private individuals, yet it authorizes 5 years in prison for persons who knowingly transfer regulated firearms in violation of the Public Safety Article, being able to distinguish between a regulated firearm and an unregulated firearm is essential in order for citizens to comport their behavior to comply with the law. This is impossible for persons of ordinary intelligence given the vague definitions of what constitutes a "regulated firearm" in Section 5-101(p)(2).

Under the statutory scheme in effect at the time of the facts of this case,

"regulated firearms" were divided into two categories: (1) handguns and (2) "a

firearm that is any of the following specific assault weapons or their copies, regardless

of which company produced and manufactured that assault weapon." MD. CODE

ANN., PUBLIC SAFETY § 5-101(p). Handguns are clearly defined as "a firearm with a

barrel less than 16 inches in length." *Id* § 5-101(n)(1). The definition of "the

following specific assault weapons or their copies" and the list that follows is not so

easily understood. That list reads:

(i) American Arms Spectre da Semiautomatic carbine;
(ii) AK–47 in all forms;
(iii) Algimec AGM–1 type semi-auto;
(iv) AR 100 type semi-auto;
(v) AR 180 type semi-auto;
(vi) Argentine L.S.R. semi-auto;
(vii) Australian Automatic Arms SAR type semi-auto;
(viii) Auto–Ordnance Thompson M1 and 1927 semi-automatics;
(ix) Barrett light .50 cal. semi-auto;
(x) Beretta AR70 type semi-auto;
(xi) Bushmaster semi-auto rifle;
(xii) Calico models M–100 and M–900;
(xiii) CIS SR 88 type semi-auto;
(xiv) Claridge HI TEC C–9 carbines;
(xv) Colt AR–15, CAR–15, and all imitations except Colt AR–15 Sporter H–BAR rifle;
(xvi) Daewoo MAX 1 and MAX 2, aka AR 100, 110C, K–1, and K–2;
(xvii) Dragunov Chinese made semi-auto;
(xviii) Famas semi-auto (.223 caliber);
(xix) Feather AT–9 semi-auto;
(xx) FN LAR and FN FAL assault rifle;
(xxi) FNC semi-auto type carbine;
(xxii) F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun;
(xxiii) Steyr–AUG–SA semi-auto;
(xxiv) Galil models AR and ARM semi-auto;

(xxv) Heckler and Koch HK–91 A3, HK–93 A2, HK–94 A2 and A3;
(xxvi) Holmes model 88 shotgun;
(xxvii) Avtomat Kalashnikov semiautomatic rifle in any format;
(xxviii) Manchester Arms "Commando" MK–45, MK–9;
(xxix) Mandell TAC–1 semi-auto carbine;
(xxx) Mossberg model 500 Bullpup assault shotgun;
(xxxi) Sterling Mark 6;
(xxxii) P.A.W.S. carbine;
(xxxiii) Ruger mini–14 folding stock model (.223 caliber);
(xxxiv) SIG 550/551 assault rifle (.223 caliber);
(xxxv) SKS with detachable magazine;
(xxxvi) AP–74 Commando type semi-auto;
(xxxvii) Springfield Armory BM–59, SAR–48, G3, SAR–3, M–21 sniper rifle, M1A, excluding the M1 Garand;
(xxxviii) Street sweeper assault type shotgun;
(xxxix) Striker 12 assault shotgun in all formats;
(xl) Unique F11 semi-auto type;
(xli) Daewoo USAS 12 semi-auto shotgun;
(xlii) UZI 9mm carbine or rifle;
(xliii) Valmet M–76 and M–78 semi-auto;
(xliv) Weaver Arms "Nighthawk" semi-auto carbine; or
(xlv) Wilkinson Arms 9mm semi-auto "Terry".

*Id* § 5-101(p)(2).

The Supreme Court has held that the Due Process Clause of the Fourteenth

Amendment to the United States Constitution prohibits the enforcement of laws

whose provisions are vague. Describing this doctrine, the Court said:

> It is a basic principle of due process that an enactment is void
> for vagueness if its prohibitions are not clearly defined. Vague laws
> offend several important values. First, because we assume that man is
> free to steer between lawful and unlawful conduct, we insist that laws
> give the person of ordinary intelligence a reasonable opportunity to
> know what is prohibited so that he may act accordingly. Vague laws
> trap the innocent by not providing fair warning. Second, if arbitrary
> and discriminatory enforcement is to be prevented, laws must provide
> explicit standards for those who apply them. A vague law
> impermissibly delegates basic policy matters to policemen, judges, and
> juries for resolution on an *ad hoc* and subjective basis, with the
> attendant dangers of arbitrary and discriminatory application.

*Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

Courts look more skeptically upon potentially vague statutes when the subject

matter of the conduct regulated is also a constitutionally protected right, such as the

right to free speech or, as here, the right to bear arms. As discussed by the Court of

Appeals in *Ayres v. State*:

> Generally, the constitutionality of a statute challenged on vagueness
> grounds must be considered as applied to the facts of the particular
> case. *Bowers v. State*, 283 Md. 115, 122 [(1978)]. Where, however, the
> statute appears to impinge upon fundamental constitutional rights
> such as the First Amendment guarantees of free speech and assembly,
> the statute is tested for vagueness on its face because its indefiniteness
> may have a chilling effect on the exercise of First Amendment
> liberties. *Id.* at 122–23. This principle is, in essence, a rule of standing
> which allows a defendant to challenge the validity of a statute even
> though the statute as applied to the defendant is constitutional. *Id.*

*Ayres v. State*, 335 Md. 602, 624-25 (1994).

11

The Supreme Court recognized in its landmark decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008) that the rights secured under the Second Amendment are individual rights and, chief among these is the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. Two years later, the Supreme Court held that these rights were incorporated into the Fourteenth Amendment and made applicable to the States. *See McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010). The Maryland definition of regulated firearms thus intersects with and curtails rights guaranteed by the Second Amendment, thus subjecting it to scrutiny for vagueness on its face, not just as applied to the facts of this case.

Here, the list of regulated firearms in Section 5-101(p)(2) is unconstitutionally vague both on the face of the statute and as applied to the facts of this case, because the firearm that the Defendant is charged with knowingly selling in violation of the subtitle is not a listed firearm and no mechanism is created statutorily for determining what firearms that are not listed are also regulated. The definition of regulated firearms, as it applies to the enumerated "assault weapons or their copies" is unconstitutionally vague and will trap the innocent.

The list in Section 5-101(p)(2) contains 45 subparagraphs listing about 68 semiautomatic rifles and shotguns and their "copies" as regulated "long guns." The listing has remained the same since the original enactment of the Maryland Gun Violence Act of 1996 which was enacted as 1996 Maryland Laws Ch. 562 (H.B. 297), which contained the same 45 subparagraphs as the current enactment.

It is not clear from the statute whether the law prohibits any firearm engraved with a specified name, regardless of its characteristics, or to objective characteristics of each firearm as manufactured at a certain time that was unspecified in the statute.

The list varies widely in its description. For instance all specified semiautomatic rifles by a certain company are banned, essentially placing restriction on a single manufacturer. *See* § 5-101(p)(2)(xi) ("Bushmaster semi-auto rifle"). Bushmaster is a manufacturer and that is the only identifying characteristic of that listing. *See also* § 5-101(p)(2)(xvii) ("Dragunov Chinese made semi-auto"). Other listings define a style of a weapon using jargon that is undefined and susceptible of a variety of interpretations. *See* § 5-101(p)(2)(xxxviii) ("Street sweeper assault type shotgun"). "Street sweeper" is not the name of a manufacturer. In addition to listing manufacturers without model numbers there are also listed model numbers without reference to manufacturers. *See, e.g.,* § 5-101(p)(2)(iv) ("AR 100 type semi-auto"). "AR-100" is a model number. In other cases, a specific manufacturer and model number is specified. *See* § 5-101(p)(2)(xxxiii) ("Ruger mini-14 folding stock model (.223 caliber)").[3]

---

[3] One need only contrast the definition of "regulated firearm" in the 1996 law with the more specific and objective language used by the Maryland General Assembly in the Firearm Safety Act of 2013 that just took effect. Language in that law demonstrates that it is possible to regulate long guns in a manner that is understandable by persons of average intelligence. Under the new law, not applicable here, "copy cat" weapons are prohibited from sale and are defined as:

> (i) a semiautomatic centerfire rifle that can accept a detachable magazine and has any two of the following:
> 1. a folding stock;
> 2. a grenade launcher or flare launcher; or
> 3. a flash suppressor;
> (ii) a semiautomatic centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds;

13

The list of regulated firearms most significantly regulates "copies" of the 68 or so listed weapons. The term "copies" is not defined whatsoever in the statute. This leaves the ordinary citizen, as well as law enforcement officers, and firearms dealers unsure and completely confused as to what it takes for a weapon to be a copy of another weapon. Is it entirely cosmetic? Or is it based upon certain, objective characteristics? The statute does not say.[4] The Attorney General has recognized this vagueness and lack of definition in its opinion letter to Maryland State Police Col. Terrence Sheridan, 95 Op. Att'y Gen. 101 (May 24, 2010), in which the Attorney General opines that, whether something is a "copy" or not "is a factual question entrusted in the first instance to the Department of State Police. *Id.* at 108-09.

---

(iii) a semiautomatic centerfire rifle that has an overall length of less than 29 inches;
(iv) a semiautomatic pistol with a fixed magazine that can accept more than 10 rounds;
(v) a semiautomatic shotgun that has a folding stock; or
(vi) a shotgun with a revolving cylinder.
2013 Maryland Laws Ch. 427 (S.B. 281). This is language ordinary people can understand.

[4]     In the federal lawsuit challenging the new firearms law, this same list (which now describes weapons that cannot be sold at all, but which remain legal to possess) is criticized with the following example:

> "The vagueness and ambiguity is best demonstrated by the elements in subsection (xv) which are "Colt AR-15, CAR-15, and all imitations except Cold AR-15 Sporter H-BAR rifle." Colt is a firearm manufacturer, and AR-15 Sporter H-BAR was a model produced by this manufacturer, but is no longer in production. Colt never produced civilian firearms with model names of AR-15 or CAR-15 standing alone. A citizen of ordinary intelligence has no way of knowing which of the current models of rifles made by Colt or another manufacturer is permitted as an "H-BAR" and which would be prohibited as an AR-15 or CAR-15, because the designation fails to describe the characteristics of an H-BAR or to explain how one is to distinguish between a copy of a banned AR-15 and a permitted AR-15 HBAR."

*Tardy et al. v. O'Malley*, United States District Court for the District of Maryland, Case No. 1:13-cv-02841 document 3-1 at p 23-24 (Motion for Temporary Restraining Order).

While in areas such boating law and natural resources violations, the General Assembly has expressly delegated authority to make rules to agencies of the executive branch, *see, e.g., Christ by Christ v. Maryland Dept. of Natural Resources*, 335 Md. 427 (1994), here, the Maryland State Police has not exercised any rule-making authority to which it may have been delegated. A scan of COMAR Title 29, Subtitle 3 reveals that the State Police has not undertaken to publish a list of which weapons it considers to be "copies" of the enumerated firearms on the list. Instead, "regulated firearms" is defined simply by reference to the "meaning stated in Public Safety Article, §5-101(p), Annotated Code of Maryland." COMAR 29.3.01.01(B)(25). The term "copy" or "copies" is not defined. Indeed, the list of "assault weapons" published by the Maryland State Police on their website is simply a photocopy of Section 5-101(p). *See* https://www.mdsp.org/LinkClick.aspx?fileticket=iZtlxYPN2QI%3d&tabid=429&mid=1072 (attached as an Exhibit hereto). "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 109.

The Sixth Circuit declared a similar statute void on vagueness grounds in the case of *Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 150 (6th Cir. 1994). There a law defining "assault weapon" as 34 specified firearms and other models with "slight modifications or enhancements" was struck down on constitutional grounds. *See id.* at 252. The court asked "How is the ordinary consumer to determine which changes may be considered slight? A weapon's accuracy, magazine capacity, velocity, size and

shape and the caliber of ammunition it takes can all be altered." *Id* at 253. The term

"modification" was vague because "ordinary consumers cannot be expected to know

the developmental history of a particular weapon.":

> Nothing in the ordinance provides sufficient information to
> enable a person of average intelligence to determine whether a weapon
> they wish to purchase has a design history of the sort which would
> bring it within this ordinance's coverage. The record indicates that the
> average gun owner knows very little about how his gun operates or its
> design features.

*Id.*

The Supreme Court, in applying the void for vagueness doctrine, has stated

"No one may be required at peril of life, liberty or property to speculate as to the

meaning of penal statutes." *Lanzetta v New Jersey*, 306 U.S. 451, 452-53 (1939). The

Maryland list of regulated firearms requires its citizens to do just that.

Combining the vagueness of the statute with the important, individual right to

bear arms recognized by the Second Amendment as applied to the States by

incorporation into the Fourteenth Amendment, the Maryland regulatory scheme,

especially as applied to "copies" or "any form" of an enumerated weapon would have

a chilling effect on the important constitutional right of a citizen to bear arms. This

statute fails both as applied to the facts of this case, and facially.

In this case, the weapon is described as follows on the ATF trace report:

| | |
|---|---|
| Manufacturer: | MAADI COMPANY |
| Model: | MISR |
| Caliber | 762 |
| Serial Number | CM15559 |
| Type | Rifle |
| Country | Egypt |
| Importer: | Century Arms, Inc (CAI) |

"Maadi Company" is not a manufacturer whose name appears on the list of regulated firearms. The model name "MISR" does not appear in the list. The caliber of "7.62" is not a caliber listed in the statute. Nor is Century Arms a dealer or importer whose weapons are prohibited.

How then is a person who looks at this weapon to know that it is regulated if, in fact, it even is? It is precisely this sort of vague law that the Supreme Court has held violates the Due Process Clause. The enforcement of this vague law against the Defendant deprives him of the due process guaranteed to him by both the Fourteenth Amendment and by Article 24 of the Maryland Declaration of Rights.

## IV. It Was Legally Impossible for the Defendant to Violate Title 5, Subtitle 1 of the Public Safety Article Because the Statute Specifically Exempts Transactions Involving a Police Officer.

The statutory scheme for regulated firearms established by the Title 5, Subtitle 1 of the Public Safety Article specifies categories of persons or transactions that are excluded from the law's ambit:

> This subtitle does not apply to:
>     (1) the transfer or possession of a regulated firearm or detachable magazine:
>         (i) for testing or experimentation authorized by the Secretary; and
>         (ii) by a federally licensed gun manufacturer, dealer, or importer;
>     (2) the sale, transfer, or possession of an antique firearm;
>     (3) an unserviceable firearm sold, transferred, or possessed as a curio or museum piece;
>     *(4) law enforcement personnel of any unit of* the federal government, members of the armed forces of the United States or the National Guard, or law enforcement personnel of the State or *any local agency in the State, while those*

> *personnel or members are acting within the scope of their*
> *official duties;*
> (5) a regulated firearm modified to render it permanently
> inoperative;
> (6) purchases, sales, and transportation to or by a federally
> licensed gun manufacturer, dealer, or importer;
> (7) an organization that is required or authorized by federal law
> governing its specific business or activity to maintain firearms;
> (8) the receipt of a regulated firearm by inheritance, if the heir
> forwards to the Secretary a completed application to purchase
> or transfer that regulated firearm; or
> (9) a signal pistol or other visual distress signal that the United
> States Coast Guard approves as a marine safety device.

MD. CODE ANN., PUBLIC SAFETY § 5-102 (West 2012) (emphasis added).

At the time of the alleged offense, one of the parties to the transaction was

Officer Edwin Pauley, who at the time he purchased the weapon from the

Defendant, was acting within the scope of his official duties as a member of the

Wicomico County Narcotics Task Force. Thus, under the regulatory framework of

the statute, Officer Pauley was not required to file an application before receiving a

regulated firearm. The Defendant violated no law by transferring the weapon to a

person not required to submit an application before receiving the weapon.

This is unlike a case involving contraband, where there mere possession of an

item is unlawful. Nothing in Title 5, Subtitle 1 of the Public Safety Article

criminalized the possession of a regulated firearm by David Catrino, who is not a

person disqualified from possessing or purchasing such a weapon. Nor does anything

in the statute criminalize the possession of a regulated firearm by Officer Edwin

Pauley, who is also not a person disqualified by the statute. Rather, it is the

transaction that is alleged to be unlawful. For there to be a transaction, there must be

two parties to an exchange. Here, the recipient of the weapon, Officer Pauley, was a person to whom the statute expressly did not apply.

The exemption of law enforcement officers from the coverage of the statute made Officer Pauley a poor choice to set up the Defendant. Regardless of what the Defendant knew about Officer Pauley, he was in fact a law enforcement officer engaged in the performance of his duties and thus exempt from the requirements to transfer regulated firearms in the statute. It was a legal impossibility for the Defendant to have participated in an illegal transfer, when, in actuality, the transfer of the weapon to Officer Pauley was legal.

This case is akin to the case of *Moore v State*, 388 Md. 623 (2005), where a person was charged with engaging in computer communications "for the purpose of engaging in sexual conduct" with a minor when, in actuality, the person with whom the defendant was communicating was not 14 years old, but an adult, undercover police officer. The Court of Appeals, there, held that the statute prohibited communications only with actual minors, not with persons posing as minors and that the defendant could not be convicted thereunder. *See id.* at 631.

Because the transfer of the firearm to a law enforcement officer engaged in the scope of his duties is not prohibited or regulated in any way by the statute, even if the weapon transferred by the Defendant is regulated, the Defendant was not required to ensure that Officer Pauley submitted the required paperwork to the State Police because no such paperwork was required.

## V.     The Amendments to the Detachable Magazine Statute Completely Decriminalize the Defendant's Sale of a 30-Round Magazine.

The law pertaining to detachable magazines has changed before the

Defendant is to be tried in this matter, essentially decriminalizing the behavior that is

the subject of counts two through five of the charging document. Under the recent

decision of *Waker v. State*, 431 Md. 1 (2013), the Defendant is entitled to the benefit

of this decriminalization.

At the time of the conduct that is the subject of this case, Section 4-305 of the

Criminal Law Article read as follows:

> (a) This section does not apply to a .22 caliber rifle with a tubular magazine
>
> (b) A person may not manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than 20 rounds of ammunition for a firearm.

MD. CODE ANN., CRIM. LAW § 4-305 (West 2012).

As of October 1, 2013, this law has been amended to exempt current and

former law enforcement officers from its restrictions:

> (a) This section does not apply to:
>
> (1) a .22 caliber rifle with a tubular magazine; or
> (2) a law enforcement officer or **a person who retired in good standing from service with** a law enforcement agency of the United States, the State, or **any law enforcement agency in the State.**
>
> (b) A person may not manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm.

MD. CODE ANN., CRIM. LAW § 4-305 (West 2013) (emphasis added).

Under the common law of Maryland, when a statute was repealed while criminal cases were proceeding, any prosecutions commenced under the repealed statue were terminated. *See Bell v. Maryland*, 378 U.S. 226, 230 (1964) ("when the legislature repeals a criminal statute or otherwise removes the State's condemnation from conduct that was formerly deemed criminal, this action requires the dismissal of a pending criminal proceeding charging such conduct").

Here, the General Assembly, in the Firearm Safety Act of 2013 specifically stated that the purpose of the act was to repeal the former Section 4-305 of the Criminal Law Article and to reenact that section with amendments:

> BY repealing and reenacting, with amendments,
> Article—Criminal Law
> Section 4–102, 4–203(b), and 4–301 through 4–306 to be under the amended subtitle "Subtitle 3. Assault Weapons and Detachable Magazines"
> Annotated Code of Maryland
> (2012 Replacement Volume and 2012 Supplement)

Firearm Safety Act of 2013, 2013 Maryland Laws Ch. 427 (S.B. 281).

Maryland has adopted a "general savings clause" which provides:

> any statute, civil or criminal, shall not have the effect to release, extinguish, alter, modify or change, in whole or in part, any penalty, forfeiture or liability, either civil or criminal, which shall have been incurred under such statute, section or part thereof, unless the repealing, repealing and reenacting, revising, amending or consolidating act shall expressly so provide; and such statute, section or part thereof, so repealed, repealed and reenacted, revised, amended or consolidated, shall be treated and held as still remaining in force for the purpose of sustaining any and all proper actions, suits, proceedings or prosecutions, civil or criminal, for the enforcement of such penalty, forfeiture or liability, as well as for the purpose of sustaining any judgment, decree or order which can or may be rendered, entered or made in such actions, suits, proceedings or prosecutions imposing, inflicting or declaring such penalty, forfeiture or liability.

MD. ANN. CODE ART. 1, § 3.

In *Waker v State*, the Court of Appeals declared the general savings clause to be merely "an aid to interpretation" and declined to impose a more severe penalty authorized by prior law, when a repeal and an enactment of a new law before a defendant was sentenced caused the law in effect at the time of sentencing to be lessened.

In the case of *Waker v State*, 431 Md. 1 (2013), a defendant had been charged with stealing something worth $615 at a time when theft over $500 was considered a felony and was punishable by up to 15 years. After his crime, but before his sentencing, the new theft statute took effect, increasing the threshold amount for felony theft from $500 to $1,000. At the time of his sentencing, theft of $615 was punishable by up to 18 months imprisonment. Walker was sentenced to ten years in prison. *See id.* at 2-4.

In *Waker*, the Court of Appeals declined to apply the General Savings Clause of Article 1, Section 3. The Court contrasted the facts of *Waker* with the only prior decision involving a statute, *State v Johnson*, 285 Md. 339 (1979). In *Johnson*, the Defendant had already been sentenced when the law changed and was attempting to take advantage of new laws in the context of a violation of probation hearing. The Court of Appeals determined that this was distinguishable. It held, as follows:

> This Court has held that the general saving clause "is merely an aid to interpretation, stating the general rule against repeals by implication in more specific form." *State v Kennerly*, 204 Md. 412, 417, 104 A.2d 632, 634 (1954). Accordingly, there are cases in which this Court has held that the statute does not apply. In *Miles v State, supra,*

349 Md. at 230–232, 707 A.2d at 849, the Court held that the general saving clause does not apply to municipal ordinances. *See also State v. American Bonding Co., supra,* 128 Md. at 272–273, 97 A. at 531, decided four years after the enactment of the general savings clause in its present form, but the Court applied the common law principle to the repeal of an earlier statute. We are not aware of any decision by this Court applying the general saving clause to circumstances like those in the present case.

Moreover, some of the wording of the general saving clause, like the wording in the *Johnson* opinion previously discussed, suggests that the general saving clause is inapplicable in criminal cases where the trial and sentencing occur after the effective date of the new law which is more favorable to the defendant.[3] Thus, the language of the general saving clause preserves "any penalty, forfeiture or liability, either civil or criminal, *which shall have been incurred* under such [repealed or amended] statute...." (Emphasis added). In light of the presumption of innocence, it is reasonable to conclude that Waker did not *incur* criminal liability and a criminal penalty until the conclusion of his trial in December 2009. Therefore, what the general saving clause should preserve was Waker's criminal liability and sentence under the law as it existed in December 2009.

*Id.* at 11-12.

Like *Waker*, the change to Maryland law here has occurred before the Defendant has been tried. Under the new law, as a retired law enforcement officer who left his agency in good standing, the Defendant is entitled to sell detachable magazines regardless of their capacity. Officer Pauley, as a current law enforcement officer, is entitled to possess them.

While this conduct was ostensibly prohibited in June of 2013, it is perfectly legal today. Accordingly, under the teachings of *Waker v. State*, 431 Md. 1 (2013), the Defendant is entitled to the benefit of the decriminalization of his conduct that

occurred between the time of the offense and trial and cannot be convicted today of

things that are no longer a crime.

## VI.   The Second Amendment Protects the Right of the Defendant to Sell and Transfer a Detachable Magazine with a Capacity of 30 Rounds.

In the *Heller* decision, the Supreme Court held that the Second Amendment

protects against statutes that seek to curtain or infringe upon the acquisition and use

of a "'class of arms' that is overwhelmingly chosen for [a] lawful purpose." *Heller*, 554

U.S. at 628. A 30-round magazine is an integral part of a class of weapons that is

overwhelming used by American citizens for a lawful purpose. The most popular rifle

in America is the AR-15 style rifle, which ships standard with a 30-round detachable

magazine. Erica Goode, "Rifle Used in Killings, America's Most Popular, Highlights

Regulation Debate" *New York Times* A25 (Dec. 16, 2012). Thus, a semi-automatic rifle

with a 30-round magazine is precisely the type of weapon that is typically possessed

by law-abiding citizens for lawful purposes and is protected under *Heller*. By

criminalizing the transfer of a 30-round magazine, Section 4-305 of the Criminal Law

Article curtails the ability of a citizen to acquire or to make use of a class of arms that

is overwhelmingly used by Americans for a lawful purpose.

While Section 4-305 of the does not prohibit the possession of a 30-round

detachable magazine, it does prohibit the transfer of the weapon. Certain exceptions

on transfers are set out in Section 4-302, but those exceptions pertain only to law

enforcement officers, persons repairing weapons for law enforcement officers, and

personal representatives and heirs of estates. Thus, an ordinary person cannot take his or her 30-round magazine to a gun dealer to be repaired.

For instance, all of the following scenarios are prohibited under the statute:

- A gun owner loaning his or her firearm with the magazine to a spouse, family member, or friend;
- A gun owner entrusting his weapon to a gunsmith for repair;
- A military reservist leaving his firearms and their associated magazines with a spouse when he is called into service away from home;
- Temporarily handing a firearm with its magazine to a firearms safety instructor so that the owner can be shown by the instructor how to better rip, aim or otherwise use the firearm.

Under the *Heller* decision, made applicable to the States through the Fourteenth Amendment, laws which curtail a class of arms commonly enjoyed lawfully by American citizens violates the Second Amendment. The restrictions on the transfer of 30-round magazines violates the Second Amendments and cannot withstand constitutional scrutiny.

## CONCLUSION

The Defendant reserves the right to advance additional arguments at the motion for judgment of acquittal that he intends to advance at the conclusion of the State's case.

John K. Phoebus
JOHN K. PHOEBUS, P.A.
517 West Main Street
P.O. Box 70
Crisfield, Maryland 21817

(410) 968-9200
john@phoebuslaw.com
Attorney for the Defendant

## Certificate of Service

I hereby certify that on this 18th day of October, 2013, an exact copy of the foregoing document was hand delivered to Ella Disharoon, Esquire, Deputy State's Attorney for Wicomico County, Office of the State's Attorney for Wicomico County, Court House, P.O. Box 1006, Salisbury, Maryland 21803-1006.

_____
John K. Phoebus

| STATE OF MARYLAND | * | CASE NO. 22-K-13-0497 |
| | * | IN THE CIRCUIT COURT |
| v. | * | FOR WICOMICO COUNTY |
| DAVID CATRINO | * | STATE OF MARYLAND |
| Defendant | * | |

## MEMORANDUM OF LAW

The State of Maryland, by Ella M. Disharoon, Deputy State's Attorney for Wicomico County, Maryland provides this honorable Court with the following response to Defendant's memorandum of law in support of his arguments as to the elements of the offenses with which the Defendant, David Catrino, is charged.

### Introductory Statement

On October 22, 2013, this honorable Court presided over the trial of the above captioned matter wherein the Defendant is charged with knowingly participating in an illegal sale of a regulated firearm in violation of the Public Safety Article and with four counts of selling a detachable magazine with a capacity of more than 20 rounds of ammunition in violation of Section 4-305 of the Criminal Law Article. This honorable Court reserved ruling on Defendant's motion for judgment of acquittal at the close of both the State's and the Defendant's case.

### Evidence Present at Trial

A summary of the evidence produced at trial consists of the following:

(1) **Testimony of Officer Edmund Pauley of the Fruitland Police Department currently assigned to the Wicomico County Narcotics Task Force (hereinafter referred to as WINTF).** Officer Pauley testified that during the week of June 17, 2013, WINTF received information that the Defendant was attempting to sell an AK-47, a regulated firearm. On June 21, 2013, Officer Pauley, in an undercover capacity, made contact with the Defendant via cellular telephone (443-235 -9136). Officer Pauley testified that during that telephone conversation he advised the Defendant that a friend told him that (the Defendant) had a rifle for sale. Officer Pauley testified that the Defendant responded that the rifle for sale was an Egyptian made AK-47 with

1

ammunition and four banana clips. Officer Pauley clarified that these banana clips were ammunition magazines, each of which held 30 rounds of ammunition. Officer Pauley testified that he then made arrangements, via text messages, to meet with the Defendant to purchase the rifle. Photographs of the text messages to and from the Defendant were taken by Officer Pauley and those photos were received into evidence. Officer Pauley went on to testify that at shortly before 4:30 pm he met with the Defendant at the Sherwood Auto Outlet 99 in Salisbury, Wicomico County, Maryland. The Defendant led Officer Pauley to a Mitsubishi Eclipse, which was parked in an adjacent lot, and opened the trunk of the vehicle. Within the trunk of the vehicle was a black bag which contained a Maadi brand AK-47 semi-automatic rifle, four detachable magazines, each loaded with 30 rounds of 7.62 x39 mm ammunition, as well as several additional boxes of 7.62 x39 mm ammunition. After viewing these items, Officer Pauley agreed to purchase the items and paid the Defendant $700.00 in U.S. currency. Officer Pauley then departed with the black bag containing the above noted items. Officer Pauley remained in an undercover capacity at all times during the transaction and when dealing with the Defendant. The sale of the rifle, magazines and ammunition did not occur at either a firearms dealer or at a designated law enforcement agency.

Officer Pauley further testified that at no time did the defendant inquire as to the officer's full name and Officer Pauley believed he may have provided the Defendant with a first name; however, he could not remember what name he may have provided. At no time did Officer Pauley give the defendant his real name or reveal that he was a police officer. Officer Pauley testified that at no time did the Defendant ask him for any identification, nor did the Defendant inquire as to whether or not Officer Pauley was a convicted felon, or prohibited from possessing a firearm. Officer Pauley did not complete a firearm application (Maryland State Police Form 77R) to the Secretary of the State Police nor was he requested to do so by the Defendant. The rifle was transferred to Officer Pauley on June 21, 2013, the same day he made contact with the Defendant. Office Pauley testified that the Defendant did not comply with the seven day waiting period prior to transferring the rifle as required by Maryland law.

During the trial, Officer Pauley identified the rifle, the four ammunition magazines and the ammunition, all of which was subsequently received into evidence.

2

(2) **Testimony of Detective Mike Houck of the Wicomico County Sheriff's Office currently assigned to the Wicomico County Narcotics Task Force.** Det. Houck testified that he was the lead investigator assigned to this case. Det. Houck testified that he received information that the Defendant was trying to sale an AK-47 rifle. Pursuant to that information, Det. Houck elicited Officer Pauley's assistance in conducting an undercover buy of the rifle. Det. Houck testified that he too traveled to the Auto Outlet 99 where he observed, from a covert location, the Defendant sell the rifle to Officer Pauley. Det. Houck testified that he observed Officer Pauley and the Defendant walk to the trunk of a Mitsubishi Eclipse, observed the trunk open, observed the exchange of the U.S. currency and then observed Officer Pauley depart with the black bag. Det. Houck testified that upon returning to the Wicomico County Narcotics Task Force, the black bag was turned over to his custody by Officer Pauley and that Det. Houck confirmed the contents therein. He testified consistent with Officer Pauley that the black bag contained a Maadi MISR 762 semi-automatic rifle, four detachable magazines, each loaded with 30 rounds of 7.62 x39 mm ammunition, as well as several additional boxes of 7.62 x39 mm ammunition. Det. Houck also testified that the Defendant had purchased a handgun in 1999 complying with the requirements set forth in Title 5 of the Public Safety Article of the Maryland Code for purchasing a regulated firearm. A copy of the Firearm Application submitted by the Defendant for the purchase of the handgun in 1999 was received into evidence. Det. Houck further testified that he was familiar with the Defendant and that he had personal knowledge that the Defendant had previously been a police officer with the Ocean City Police Department as well as the Snow Hill Police Department. Det. Houck further testified that the Defendant had been a member of the Worcester County Narcotics Task Force.

(3) **Testimony of Trooper Kenny Moore of the Maryland State Police currently assigned to the Gang Enforcement Unit and is also a designated ATF Agent for the lower shore area.** Trooper Moore testified as an expert witness in firearms identification, operability and requirements for selling and purchasing regulated firearms. Trooper Moore testified that in his expert opinion the rifle sold by the Defendant and purchased by Officer Pauley is a copy or form of an AK-47. Trooper Moore testified as to certain factors (i.e., detachable magazine, folding stock, bayonet lug, inner workings, ect.) which qualified the rifle as a copy or variant of an AK-47. He further testified that

3

pursuant to the Title 5 of the Public Safety Article, the AK-47 semi-automatic rifle is designated as a regulated firearm.  As such, the rifle could not, on June 21, 2013, be sold by an individual who did not hold a Federal Firearms Dealer's License without complying with the requirements set forth in Title 5 of the Public Safety Article.  Title 5 of the Public Safety Article requires persons who wish to purchase a regulated firearm to submit an application (Maryland State Police Form 77R) to the Secretary of the State Police or his designee, who then has 7 days to review said application.  On the eighth day following the forms submission, the firearm may be released or transferred to the purchaser unless before that time the purchase has been disapproved by the State Police.

Trooper Moore testified that a buyer and seller of a regulated firearm may take the firearm to the Maryland State Police Barrack in Salisbury, Maryland wherein the firearm will be verified by a designated individual of the MSP.  Both the individuals will be required to fill out a two part form and pay a $10 application fee.  The firearm will remain with the seller until the eighth day following the submission of the application.

Trooper Moore testified that in his expert opinion, an AK-47 or a copy thereof is easily recognized by its characteristics and the frequency in which it appears in the media, in movies and in video games.  Trooper Moore also testified that he is familiar with the Defendant as a former law enforcement officer.  Trooper Moore testified that he worked with the Defendant at one point in time in the Narcotics Task Force.  Trooper Moore recollected that the Defendant had been a police officer for at least 10 years.

(4) **Testimony of the Defendant**.  The Defendant testified on his own behalf that he had been a law enforcement officer for twenty plus years.  The Defendant admitted that he did sell a Maadi brand semi-automatic rifle, four detachable magazines, each loaded with 30 rounds of 7.62 x39 mm ammunition, as well as several additional boxes of 7.62 x39 mm ammunition to Officer Pauley on June 21, 2013 for $700.00 in U.S. currency.  The Defendant acknowledged having a telephone conversation with Officer Pauley on June 21, 2013 and subsequently sending and receiving text messages with Officer Pauley.  The Defendant testified that he had previously been a law enforcement officer for 20 plus years.  The Defendant further testified that he resigned from both the Ocean City Police Department and the Snow Hill Police Department, neither departure being on

4

good terms. The Defendant acknowledged that he had previously purchased a regulated firearm in 1999 and had complied with the requirements set forth in Title 5 of the Public Safety Article. The Defendant does not hold a federal firearms dealer's license.

## Analysis of the Facts to the Law

### Knowing Violation of Section 5-125

Section 5-124 of the Public Safety Article imposes on private sellers and purchasers of regulated firearms certain rules that must be followed. "Secondary transactions" of regulated firearms are sales and purchases of regulated firearms between private individuals who are not licensees. Section 5-124 provides that

(1) A person who is not a licensee may not sell, rent, transfer, or purchase a regulated firearm until after 7 days following the time a firearm application is executed by the firearm applicant, in triplicate, and the original is forwarded by a licensee to the Secretary.
(2) As an alternative to completing a secondary sale of a regulated firearm through a licensee, a prospective seller, lessor, or transferor and a prospective purchaser, lease, or transferee may complete the transaction through a designated law enforcement agency.

To convict the Defendant of participating in an illegal sale of a regulated firearm the State must prove that the Defendant sold, transferred or purchased a regulated firearm in violation of Section 5-124 and knew the transaction was illegal.

There is sufficient evidence before this Court to find the defendant knowingly violated section 5-124 of the Public Safety Article. There is the testimony from Officer Pauley and confirmation by the Defendant that the Defendant sold an Egyptian made Maadi MISR 762 semi-automatic rifle to Officer Pauley for $700.00 on June 21, 2013 in an adjacent parking lot to the Auto Outlet 99 in Salisbury, Wicomico County, Maryland. Neither Officer Pauley nor the Defendant is a licensee and both Officer Pauley and the Defendant acknowledge that the requirements of section 5-124 were not complied with.

The Defendant argues that he was not aware that the rifle he sold was a regulated firearm; however, there is evidence to the contrary. Officer Pauley testified that during the initial telephone conversation between himself and the Defendant, the Defendant told Officer Pauley that the rifle for sale was an Egyptian made AK-47. The defendant did not deny that he

said this; he only stated that he could not recall making that statement and that he was not aware that the rifle was an AK-47. There is no evidence before this Court which would discredit the testimony of Officer Pauley. Additionally, Trooper Moore testified that in his experience, an AK-47 is likely the easiest firearm to recognize due to its unique characteristics, constant appearance in the media, in movies and in video games. Furthermore, the Defendant was a law enforcement officer for more than 20 years, some of which assigned to a narcotics task force. Although the Defendant testified that he had little to no involvement with firearms during his tenure as a law enforcement officer, it's patently difficult to believe that a law enforcement officer of 20 plus years cannot recognize an AK-47. As a former police officer the Defendant was well aware that he could have inquired with several different sources to confirm that the rifle he was selling was not in fact a regulated firearm. Trooper Moore testified that the Maryland Gun Control Center has a 1-800 number which has been widely published to the general public. The Defendant undoubtedly has numerous friends and/or acquaintances in law enforcement many of which he could have inquired with as to the legality of the transfer. The Defendant could have called the Maryland State Police and inquired as to the status of the gun. Finally, the Defendant could have spent 30 seconds on the Google search engine. As evidenced by Exhibit A, all one has to do is type the word "Maadi" into the search engine and the very first reference that appears is "Maadi AK-47". If you then click on any one of the suggested searches, images appear of the exact style weapon the Defendant sold to Officer Pauley.

The Court should consider the statement of the Defendant to Officer Pauley and also consider all the surrounding circumstances and any permissible inferences drawn there from in determining whether the defendant knew that the rifle he sold to Officer Pauley was an regulated firearm and therefore certain requirements must be met before conducting a secondary sale of the rifle. The Defendant has previously purchased a regulated firearm and complied with the requirements set forth in Title 5 of the Public Safety Article. The Defendant knew there was an application process and a waiting period for the sale or purchase of a regulated firearm. The Defendant knew full well that one could not just sell a regulated firearm out of the trunk of one's vehicle. A person is presumed to know the law. This analysis is akin to a mistake of fact. An honest and reasonable mistake of fact can negate criminality by negating the mental state; however, the mistaken belief cannot be due to the defendant's "laxness or lack of diligence on his part to ascertain the fact" *Brawn v. State,* 230 Md. 82, 90 (1962).

6

### The Charging Document is not Defective

In the case at bar, Defense contended that Count 1 of the charging document was defective as the criminal information specified the incorrect weapon. Section § 5-101(p)(2) specifies a list of weapons that have been defined as "regulated" for purposes of this statute. Defense counsel argued that the Defendant should have been charged under the provision regulating an "Avtomat Kalashnikov semiautomatic rifle in any format", Public Safety Article § 5-101(p)(2)(xxvii), rather than the provision regulating an "AK-47 in all forms," Public Safety Article § 5-101(p)(2)(ii). Defense counsel's argument fails for two reasons.

Firstly, the charging document is not defective as it listed the correct weapon. The Defendant is charged with violating Public Safety Article § 5-143, the unlawful sale or transfer of a regulated firearm to wit: an AK-47 (Public Safety Article § 5-101(p)(2)(ii)). Section 5-101(p)(2)(ii) regulates an "AK-47 in all forms." There is sufficient evidence before the Court to find that the weapon in the instant case is an AK-47. Defense counsel argued that because the weapon being a semiautomatic rifle, that the charging document should have listed this gun under § 5-101(p)(2)(xxvii). Avtomat Kalashnikov as listed in §5-101(p)(2)(xxvii) is one of many gun <u>manufacturers</u> which produced AK-47 weapons. However, the AK-47 weapon at issue was manufactured by MAADI Company, not Avtomat Kalashnikov. Therefore, as the weapon did not fit the criteria of § 5-101(p)(2)(xxvii), but was still an AK-47, the weapon was correctly charged as a regulated weapon under § 5-101(p)(2)(ii). Thus, the charging document is not defective. Additionally, the difference between 5-101(p)(2)(ii) and 5-101(p)(2)(xxvii) cannot be based on whether or not the weapon is fully automatic or semi-automatic as the Defendant suggests due to the fact that all fully automatic weapons are deemed to be "machine guns" and would therefore be charged under Subtitle 4 of the Criminal Law Article, Uniform Machine Gun Act.

Alternatively, Defense counsel's argument was untimely. Maryland Rule 4-252(a)(2) reads as follows:

> In the circuit court, the following matters shall be raised by motion in conformity with this Rule and if not so raised are waived unless the court, for good cause shown, orders otherwise: . . . (2) A defect in the charging document other than its failure to show jurisdiction in the court or its failure to charge an offense. . . .

Maryland Rule 4-252(b) states that such motions ". . . shall be filed within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant . . ., except when discovery discloses the basis for a motion, the motion may be filed within five days after the discovery." The Defendant has been aware via charging document as well as in Answer to a

Request for Bill of Particulars that the State's contention is that the regulated firearm at issue in this case falls under the category of § 5-101(p)(2)(ii) "AK-47, in all forms" since August 5, 2013.

Defense counsel did not argue that the State failed to charge an offense. Defense counsel argued that the State listed the incorrect regulated weapon, making the charging document defective. Defense counsel was provided with the criminal information and discovery in this case that the regulated weapon was an AK-47, including the following information:

| | |
|---|---|
| Manufacturer: | MAADI Company |
| Model: | MISR |
| Caliber: | 762 |
| Serial Number: | CM15559 |
| Type: | Rifle |
| Country: | Egypt |
| Importer: | Century Arms, Inc. (CAI) |

Defense counsel contended that the regulated firearm that should have been listed was the "Avtomat Kalashnikov semiautomatic rifle."

Under Maryland Rule 4-252(b), this argument was untimely. Even if discovery disclosed the basis for this motion, the time to have filed this motion was "within five days after the discovery is furnished." Discovery was provided in this case on July 30, 2013. The State provided the Defense an answer to the Demand for a Bill of Particulars on August 5, 2013. Defense counsel had ample time and opportunity to have presented this argument prior to the Motion for Judgment of Acquittal.

For these reasons, Defense counsel's Motion for Judgment of Acquittal based on the argument that there was a defect in the charging document should not be granted.

### The Regulated Firearm Statute is not Void for Vagueness

The Regulated Firearm Statute at issue in this case clearing puts an individual on notice as to what conduct is prohibited. Section 5-124 of the Public Safety Article clearly sets forth what conduct is prohibited with respect to secondary transactions of regulated firearms. Section 5-124 provides that:

(1) A person who is not a licensee may not sell, rent, transfer, or purchase a regulated firearm until after 7 days following the time a firearm application is executed by the firearm applicant, in triplicate, and the original is forwarded by a licensee to the Secretary.

(2) As an alternative to completing a secondary sale of a regulated firearm through a licensee, a prospective seller, lessor, or transferor and a prospective purchaser,

8

lease, or transferee may complete the transaction through a designated law enforcement agency.

Each of these terms is clearly defined in Public Safety Article 5-101 of the Annotated Code of Maryland:

A **"Licensee"** means a person who holds a dealer's license to engage in the business of selling, renting or transferring firearms at wholesale or retail.

A **"Regulated Firearm"** includes an **AK-47 in all forms**.

A **"Firearm Applicant"** means a person who makes a firearm application

A **"Firearm Application"** means an application to purchase, rent or transfer a regulated firearm.

A **"Designated Law Enforcement Agency"** means a law enforcement agency that the Secretary of the State Police designates to process applications to purchase regulated firearms for secondary sales.

A **"Secondary Sale"** means the sale of a regulated firearm in which neither party to the sale is a licensee or is licensed by the federal government as a firearms dealer.

Any person of average intelligence can govern their behavior in a manner that avoids criminal liability.

As stated in by the Court of Appeals, "Generally, the constitutionality of a statute challenged on vagueness grounds must be considered as applied to the facts of the particular case." *Bowers v. State,* 283 Md. 115 (1978). "As a general rule, the application of the void-for-vagueness doctrine is based on the application of the statute to the 'facts at hand." *Galloway v. State,* 365 Md, 599, 615-16 (2001). Thus, a Court looks to whether the Act is impermissibly vague as applied to the Defendant's conduct. When considering whether a law is void for vagueness, courts consider two criteria. *McFarlin v. State,* 409 Md. 391, 411 (2009). "The first criterion is that a statute must be 'sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." *Livingston v. State,* 192 Md. App. 553 (2010). The Court of Appeals has explained that "the standard for determining whether a statute provides fair notice is 'whether a person of "common intelligence must necessarily guess at [the statute's] meaning"" *Williams v. State,* 329 Md. 1, 8 (1992). A statute does not fail for

vagueness "simply because it requires conformity to an imprecise normative standard," nor is it vague "if it's meaning of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even words themselves, if they possess a common and generally accepted meaning." *Maryland v. Phillips,* 210 Md. App. 239 (2013), (quoting *Livingston v. State,* 192 Md. App. at 569). If one can fairly ascertain the meaning of words in controversy by consulting a dictionary, one can certainly ascertain the classification of a particular weapon by an internet search or by making a simple telephone call to the Maryland State Police.

The second criterion pertains to enforcement of the statute, and it requires "'that criminal statutes provide "legally fixed standards and adequate guidelines for police, judicial officers, triers of fact and others whose obligation it is to enforce, apply and administer the penal laws."'" "A statute is not unconstitutionally vague merely because it allows for the exercise of some discretion on the part of law enforcement officers and judicial officials. Rather it is only where a statute is so broad as to be susceptible to irrational and selective patterns of enforcement that it will be held unconstitutional under the second arm of the vagueness principle." *Maryland v. Phillips,* 210 Md. App. 239 (2013). Section 5-101(p)(2) is not so broad as to be susceptible to irrational and selective patterns of enforcement, nor did the Defendant contend such.

The defendant argues that the list of regulated firearms in Section 5-101(p)(2) is unconstitutionally vague because the firearm the Defendant is charged with knowingly selling in violation of the subtitle is not a listed firearm and no mechanism is created statutorily for determining what firearms that are no listed are also regulated.

The list of regulated firearms found in Section 5-101(p)(2) of the Public Safety Article is not at all vague in reference to the regulated firearm at issue in this case, i.e., a Maadi MISR 762 semi-automatic rifle. As previously stated, all one would be required to do is a simple Google search or make a phone call (due diligence) to become aware that this particular rifle is a "form of an AK-47". With that knowledge, one would clearly be on notice that the Maadi MISR 762 semi-automatic rifle is a regulated firearm as Section 5-101(p)(2) of the Public Safety Article clearly sets forth "**AK-47 in all forms**" as regulated firearms.

10

**It Was Not Legally Impossible for the Defendant to Violate Title 5, Subtitle 1 of the Public Safety Article**

The defendant claims that it was legally impossible for the Defendant to violate Title 5, Subtitle 1 of the Public Safety Article because at the time of the offense, one of the parties to the transaction was Officer Edwin Pauley, who at the time he purchased the weapon from the Defendant, was acting within the scope of his official duties as a member of the Wicomico County Narcotics Task Force. The defendant claims that it would be impossible for him to have violated the law by transferring the weapon to a person to whom the subtitle did not apply. This interpretation of the law would be absurd. "The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature" *Collins v. State,* 383 Md. 684 (2004). Statutory construction begins with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of it's terminology. *Chow v. State,* 393 Md. 431 (2006). "In construing the plain language, a court may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, nor may it construe the statute with forced or subtle interpretations that limit or extend its application." *Price v. State,* 378 Md. 378 (2003). The plain language of a provision is not interpreted in isolation. Rather, the statutory scheme as a whole should be analyzed in an attempt to harmonize provisions dealing with the same subject so that each may be given effect. *Deville v. State,* 383 Md. 217 (2004).

The statute at issue, Public Safety Article 5-124 provides the following:

> (1) A person who is not a licensee may not sell, rent, transfer, or purchase a regulated firearm until after 7 days following the time a firearm application is executed by the firearm applicant, in triplicate, and the original is forwarded by a licensee to the Secretary.
> (2) As an alternative to completing a secondary sale of a regulated firearm through a licensee, a prospective seller, lessor, or transferor and a prospective purchaser, lease, or transferee may complete the transaction through a designated law enforcement agency.

Section 5-124 states clearly and unambiguously that "a person" many not sell, rent, transfer or purchase a regulated firearm... The statute does not say that "parties" to a transaction may not sell, rent, purchase or transfer a regulated firearm. Although one party may be exempted from a statute for other reasons, does not make the entire transaction legal.

11

A review of the Maryland Gun Violence Act of 1996 makes clear that the legislature's purpose for requiring private sales and transfers of regulated firearms to comply with certain requirements was to diminish the proliferation of <u>illegal sales</u> and possession of regulated firearms to minors or persons prohibited by state and federal laws.  The Gun Violence Act was an attempt to reduce the availability of regulated firearms to prohibited persons.  Section 5-124 requires sales between individuals to go through the same scrutiny as initial purchases from a gun dealer: a background check and a seven-day waiting period.  The required application purpose/registration of secondary sales...will disrupt established gun trafficking patterns by reducing the supply of regulated firearms in the illegal market." *Chow v. State,* 393  Md. 491(2006). A reading of the statute decriminalizing the sale or transfer of a regulated firearm because an undercover police officer is a party to the transaction would defeat this purpose in that those individuals who illegally sell regulated firearms with no regard to whom they are being sold would face no criminal sanction for their conduct.  Such an interpretation would severely curtail the ability of law enforcement officers to enforce this law.  The provision would have little value if it applied only to transactions involving civilians.  How would it be enforced? If two individuals, neither of which are law enforcement officers, conduct a sale in violation of the statute, which one of them is going to make a report to law enforcement officer that the sale occurred and was illegal.  Such an interpretation is absurd.

The Defense asserts that the State should use a non-law enforcement officer to conduct the purchase of a suspected illegal sale of a regulated firearm.  However, this would expose that individual to potential criminal liability for their participation in illegal activity. Although one could argue that the State of Maryland has discretion to prosecute, unlike the Drug Dealer Liability Act set forth in Courts and Judicial Proceedings Article, Subtitle 16, Section 3-1605 which prohibits liability of a person acting at the direction of the law enforcement officer, there is no such prohibition within the Regulated Firearms Statute. A person, other than a law enforcement officer, who participates in a secondary sale of a regulated firearm without following the requirements, is subject to criminal liability.

The exemption of law enforcement officers from Section 5-124 also eliminates the illogical effect the statute would have on other law enforcement duties.  If applicable to law enforcement officers, a law enforcement agency would have to do a background check and

comply with the seven-day waiting period each and every time it issued a duty weapon to an officer. It would require that law enforcement officers file an application with the Secretary of the State Police and comply with the seven-day waiting period each time they seized a firearm as that would be deemed a transfer of a regulated firearm. The possibilities of the absurdity of such an interpretation are numerous and clearly not the intent of the legislature when enacting the statute.

### The Defendant Does Not Qualify as a Retire Law Enforcement Officer in Good Standing therefore the Amendments to the Detachable Magazine Statute Have No Effect on this Case

The Court must decide whether the defendant is considered a "person who retired in good standing from service with a law enforcement agency of the United States, the State, or any law enforcement agency in the State." The defendant, according to his testimony on the stand, was a former police officer for both the Ocean City, Maryland, Police Department and the Snow Hill, Maryland, Police Department. Maryland Code Ann., Crim. Law Section 4-305 does not use the verbiage "former employee" of a qualifying law enforcement agency, it reads "retired in good standing" as the qualification to be exempt from the law. Maryland law does not statutorily define "retired law enforcement officer in good standing". Therefore the court must look to other sources to help determine what the definition of "retired in good standing" means.

The regulatory body that controls the certification of all police officers in Maryland is the Maryland Police Training Commission (MPTC). Every agency of government in Maryland that employs police officers must apply through MPTC to have a person certified as a police officer. Likewise, every agency must notify MPTC when a person should no longer be certified as a police officer in Maryland. This notification is done through a form titled "Notice of Personnel Action Law Enforcement", form "DPSCS-PCTC-18", which was revised June 1, 2009. This form contains identifying information for the police officer in question, a place for a responsible official from the police agency to affirm, sign and date and seven general "personnel action" categories to inform MPTC of changes affecting an officer's status. The category that is applicable to the current case is I, "Separation of Employment". Choices under this category include: "Type of Separation" (either "Resignation", "Retirement" or "Involuntary Termination") and "Condition of Separation", which include: "General (separated in good standing)", "Related

13

to administrative or criminal investigation or charge", "Felony or misdemeanor conviction", "Reclassified to civilian position with department" or "Deceased".

The defendant's DPSCS-PCTC-18 form from Snow Hill Police Department, which is attached hereto as an Exhibit, clearly shows the "Resignation" block checked under "Type of Separation", not "Retirement". Additionally, the "Condition of Separation" block has the box checked indicating "Related to administrative or criminal investigation or charge" not "General (separated in good standing)". This form is signed by M. Kirk Daugherty, Chief of Snow Hill Police Department and dated September 22, 2010. Clearly, Snow Hill Police Department does not consider the defendant neither retired, nor separated in good standing.

The defendant's form from Ocean City Police Department to MPTC attached hereto as an Exhibit is an older version of the form, prior to the revision date of June 1, 2009. It is signed by PFC Vance Row and dated July 25, 2007. The older version of the form contains the same basic categories, choices and information as the revised form, just in slightly different format and verbiage. The notable section in the Ocean City form is category two (2), which allows the agency official to choose either "Resignation" or "Retirement". Ocean City Police Department officials chose "Resignation" for the defendant, not "Retirement", to inform MPTC why the defendant should no longer be certified as a police officer in Maryland. Additionally, Ocean City Police Department officials selected subcategory B, "While under administrative complaint or investigation", not subcategory A, "General, without prejudice". Clearly Ocean City Police Department officials consider the defendant neither retired nor in good standing.

Ocean City Police Department's documentation is clear about the status of the defendant upon his resignation. This status is further evidenced by an attached letter from Snow Hill Police Department signed by Chief Daugherty to MPTC official Ann Kochanski, dated January 25, 2010, attached hereto as Exhibit 3, requesting that "the flag on his certification be lifted" so that Snow Hill Police Department can have the defendant certified as a Snow Hill Police Officer. The defendant's certification was flagged by Ocean City Police Department because he resigned and left their employ not in good standing.

Further, Snow Hill Police Department's documentation is clear about the status of the defendant upon his resignation. This status is further evidenced by an attached letter from Snow Hill Police Department to the defendant dated September 10, 2010 and signed by Chief

Daugherty, and attached hereto as Exhibit 4. This letter was given to the defendant and states that his "employment with the Snow Hill Police Department has been terminated, effective immediately." Chief Daugherty did allow the defendant to subsequently submit a letter of resignation, dated September 13, 2010, attached hereto as Exhibit 5.

The defendant testified that he had had been a seasonal police officer for Ocean City from 1988 for several years, then as a full time police officer for Ocean City from the early 1990's until 2007. He then worked as a full time police officer for Snow Hill from approximately January 2010 until September 2010. He presented no evidence that either agency considered him retired.

It is instructive for the court to examine what factors the Maryland Department of State Police, the only issuers of handgun permits in Maryland, references when qualifying a retired or former police officer to apply for a handgun permit. A printout, from their website, is attached hereto as Exhibit 6. The Maryland Department of State Police indicates under the Section of Md. Public Safety Code Ann. 5-301 to 5-314, subsection 4, "Former Police Officers: If you have resigned or retired, you must provide a photocopy of your retired I.D. card (front and back) and produce a letter from your former agency advising that you resigned/retired in good standing, your official resignation/retirement date and how many years of service. NOTE: Permits are issued based on the 'immediacy' of the application and years of service." The defendant, while not applying for a handgun permit, would not qualify to be considered retired or resigned in good standing by the Maryland Department of State Police and offered no evidence at trial that he has any type of "retired or resigned" identification card.

It is also instructive for the court to examine any claim the defendant would have to being a retired law enforcement officer in good standing under federal law since Maryland is silent on the subject.

The source of any claim to this status would be the Law Enforcement Officers Safety Act of 2004 (LEOSA), U.S. Code Sections 926 B and 926 C and Law Enforcement Officers Safety Act Improvements Act of 2010, attached hereto as Exhibit 7. This act was passed as a response to the terrorist attacks of September 2001 to allow current and retired police officers to carry concealed firearms in other jurisdictions across the United States where it may have been previously illegal. The federal government had to define what constituted a retired police

15

officer when local jurisdiction's definitions varied greatly or did not exist.  LEOSA defines the term "qualified retired law enforcement officer" as an individual who—

### SECTION 3. EXEMPTION OF QUALIFIED RETIRED LAW ENFORCEMENT OFFICERS FROM STATE LAWS PROHIBITING THE CARRYING OF CONCEALED FIREARMS.

**(c)** (1) separated from service in good standing from service with a public agency as a law enforcement officer,......

(3)(A) before such separation, served as a law enforcement officer for an aggregate of 10 years or more; or

(B) separated from service with such agency, after completing any applicable probationary period of such service, due to a service-connected disability, as determined by such agency;.....

**(d)** The identification required by this subsection is—

(1) a photographic identification issued by the agency from which the individual separated from service as a law enforcement officer......

LEOSA's intent is to allow active and retired law enforcement officers to carry concealed weapons outside their jurisdictions, but not to define retired law enforcement officer.  It is instructive for the court to examine, because any claim the defendant makes as being a retired officer under LEOSA due to his years of service, is void, since he left both Maryland Police Agencies that he worked for not in good standing and not considered retired by either agency; as evidenced by the fact he was also not issued a retired identification card by either agency.

The defendant is clearly not considered a retired in good standing law enforcement officer by either police agency that he worked for because both agencies flagged his certification with MPTC, checked boxes not indicating retired and did not provide him with any identification card or other symbols of retirement.


### SECOND AMENDMENT ISSUE

The Defendant asserts that the Second Amendment protects the right of the defendant to sell and transfer a detachable magazine with a capacity of 30 rounds.  As the Defendant points out in his Memorandum of Law, in response to the Sandy Hook school shootings, the

Maryland General Assembly enacted the Firearm Safety Act of 2013.  Under this new law, magazines which hold more than 10 rounds of ammunition are now illegal.  Both the House and the Senate have had numerous hearings on the provisions of this new law and have deemed, in their infinite wisdom, deemed these magazines unsafe.

Additionally, Criminal Law Article 4-305 does not ban the magazines altogether.  The law does not prohibit the possession of such a magazine, it only prohibits the transfer of such therefore does not infringe upon an individuals right to bear arms.

The Defendant, in his memorandum, poses multiple scenarios which would be prohibited under the statute, all of which are completely legal under *Chow v. State,* 393 Md. 431 (2006).  The Court of Appeals in *Chow v. State* considered the meaning of the term "transfer" as it related the use in Public Safety Article 5-124 of the Annotated Code of Maryland.  The Court held that the legislative intent involving the use of the word "transfer" meant "a permanent exchange of title or possession, without consideration".  *Chow,* 393 Md. at 462.  This none of the scenarios as posed by the Defendant would qualify as a "transfer" under the law, thus no infringement of an individuals right to bear arms (or ammo).

## CONCLUSION

For the reasons set forth above, the Defendant's motion for judgment of acquittal should be denied and a verdict of guilty should be entered as to all counts.

Ella Disharoon

Deputy State's Attorney

Wicomico County, MD

## CERTIFCATE OF SERVICE

I HEREBY CERTIFY that on this 24TH day of October 2013, an exact copy of the foregoing DISCLOSURE TO DEFENDANT and REQUEST for DISCOVERY was delivered to John K. Phoebus, attorney for the defendant, by regular mail to: John K. Phoebus, 517 West Main Street, P.O. Box 70, Crisfield, Maryland 21817.

Ella M. Disharoon

18

| | |
|---|---|
| STATE OF MARYLAND | CASE NO. 22-K-13-000497 |
| v. | IN THE CIRCUIT COURT |
| DAVID CATRINO | FOR WICOMICO COUNTY |
| Defendant | STATE OF MARYLAND |

## Supplemental Memorandum of Law

David Catrino, Defendant, by and through his attorney, John K. Phoebus and John K. Phoebus, P.A., provides this honorable Court with the following, supplemental Memorandum of Law to address issues that were raised at the trial of the captioned matter.

### Introductory Statement

While most of the legal issues that arose at trial were covered by the Defendant's previously submitted memorandum of law, a few questions were raised at the trial of the captioned matter on Tuesday, October 22, 2013, that were not addressed. The Defendant provides this brief supplemental memorandum to address issues raised by the argument presented at the presentation and renewal of the Defendant's motion for judgment of acquittal.

**A.     The exemption of the application of Title 5, Subtitle 1 of the Public Safety Article to law enforcement officers contained in Section 5-102 is not limited to the issuance to them of their service weapons.**

In the argument presented in Part IV of the Defendant's memorandum, he argued that he could not be convicted under Count 1 of the charging document because the sale of a regulated firearm to a police officer, even if unbeknownst to the Defendant, was exempted by Section 5-102(5) of the Public Safety Article.

Section 5-102 of the Public Safety Article provides as follows, in pertinent part:

> This subtitle does not apply to:
> (4) Law enforcement personnel of any unit of ... any local agency in the State, while those personnel or members are acting within the scope of their official duties.

MD. CODE ANN., PUBLIC SAFETY § 5-102 (West 2012). The Firearm Safety Act of 2013, effective October 1, 2013, made no changes to this section. 2013 Laws of Maryland Ch. 427 (S.B. 281).

This section is derived from former Article 27, Section 441A which provided:

> The prohibitions of this subheading do not apply to:
> (2) Law enforcement personnel of ... any local agency in this State while such persons are acting within the scope of their official duties.

MD. CODE ANN., ART. 27, §441A (1996). Section 441A was added to the ANnotated Code by the Maryland Gun Violence Act of 1996, 1996 Laws of Maryland Ch. 562 (H.B. 297). The "subheading" referred to in Section 441A was the subheading that contained restrictions on the transfers of regulated firearms.

The Defendant argues that this exemption makes the procedure for transferring a regulated firearm set forth under the Public Safety Article inapplicable to any transaction involving Officer Pauley because, at the time he purchased the weapon from the Defendant, Officer Pauley was a law enforcement officer of a local police agency who was acting in the scope of his official duty.

The State urges this honorable Court to insert language into this exemption that simply is not in the statute. Section 5-102(4) does not state that it applies only to the issuance of a service weapon to a police officer by an agency. Instead, that exemption exempts any transactions involving regulated firearms where one of the parties is a police officer. For instance, the statute would exempt:

- Wink's Sporting Goods in Princess Anne from selling a regulated firearm to a member of the Somerset County Narcotics Task Force who was about to go on a raid and discovered, on a weekend, that a Somerset County Sheriff's Department issued AR-15 was not functioning and the armorer of the Sherriff's Department, which is not a full-time agency, was not available to locate and release another weapon.

- A police officer from a small agency who is suddenly found to be in a hostage situation from taking possession of a Draganov sniper rifle from a local firearms collector in order to set up an "overlook" position on a nearby rooftop. If the firearm were damaged and the local police department later sought to compensate the owner for the

weapon, it could be considered a sale.

- The transfer of an officer's service weapon to that officer's individual possession and ownership as a gift from the agency from which he was about to retire.

- The purchase of a new weapon by a local police agency for ultimate delivery to soon-to-retire police officer as a gift. This would technically be a straw purchase under the act.

All of these scenarios are exempted by Section 5-102(4) and none of the above scenarios would subject either the civilian seller or transferor to criminal liability any more than it would the transferee.

**B.    Once the evidence generated the possibility that an exception to the crime applied, the State bore the burden of proving beyond a reasonable doubt that the Defendant was not a person who retired in good standing from service with any law enforcement agency in Maryland.**

As of October 1, 2013, the new Maryland gun laws provide, in Section 4-305(a)(2) of the Criminal Law Article, that police officers and police officers who "retired in good standing" may sell detachable magazines of any capacity, such as the 30-round magazines that form the basis of Counts Two through Four of the charging document. As argued by the Defendant, in Part IV of his memorandum, he is entitled to this decriminalization of his actions.

The State argues that this is an affirmative defense that the Defendant must prove to the court. Placing on the Defendant the burden of proving that the statute does not apply to him, when the State's case-in-chief fairly generated the issue of the statute's applicability, impermissibly shifts the burden of proof to the Defendant in violation of the due process of law.

All of the state's witnesses testified that they knew the Defendant from when he was a police officer. At least one of the State's witnesses testified that he knew that the Defendant was no longer a police officer. The length of service attributed to the Defendant by one of the state's witnesses, Detective Houck, was in excess of 20 years. No evidence was offered in the State's case in chief to suggest the circumstances of the Defendant's departure from his employment as a police officer. The State's case suggested that he was employed as a car salesman at the time of the case.

This evidence by the state fairly generated a factual basis for the exception that the Defendant relies upon. Once generated, the State bore the burden of proving it beyond a reasonable doubt.

The Second Circuit considered the nature of the "antique firearms" exception to the National Firearms Act in the case of *United States v. Mayo*, 705 F.2d 62 (2d Cir. 1983). There, the defendant was convicted of, among other things, being engaged in the business of dealing in firearms without a license in violation of 18 U.S.C.A. Section 922(a)(1). Excepted from the definition of "firearm" in 18 U.S.C.A Section 921(a)(3) (1976) were "antique firearms", which can be lawfully traded without a license. The defense argued that the government had failed to prove that the weapons that were the subject of the case were not firearms. However, no evidence was produced, whatsoever, that the weapons were antique firearms.

The Second Circuit determined that some evidence of the applicability of the exception had to be generated by the evidence and then the State would have to prove the exceptions inapplicability beyond a reasonable doubt:

> The government does not argue that the appellants bore the burden of proof or persuasion on the antique firearm exception. Instead, the government contends that the antique firearms exception in 18 U.S.C. Sec. 921(a)(3) is a form of affirmative defense on which the appellants were obligated to produce some evidence to put the exception at issue before the government was obligated to prove its inapplicability beyond a reasonable doubt. In *McKelvey v. United States*, 260 U.S. 353 (1922), the Court held that:

>> an indictment or other pleading founded on a general provision defining the elements of an offense, or of a right conferred, need not negative the matter of an exception made by a proviso or other distinct clause, whether in the same section or elsewhere... [I]t is incumbent on one who relies on such an exception to set it up and establish it.

*Id.* at 357. *See United States v. Stout*, 667 F.2d 1347, 1353 (11th Cir.1982); *United States v. Guess*, 629 F.2d 573, 576 (9th Cir.1980); *United States v. Henry*, 615 F.2d 1223, 1234-35 (9th Cir.1980). The minimal burden placed on the defendant relying on a statutory exception does not impinge on constitutional rights because the government ultimately bears the burden of disproving the applicability of the exception when it is properly presented. *See Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975) ("We therefore hold that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the

heat of passion on sudden provocation when the issue is properly presented in a homicide case."); *United States v. Oba*, 448 F.2d 892, 894 (9th Cir.1971) ("affirmative defense, ... if asserted, must be negated beyond a reasonable doubt by the prosecution"), *cert. denied*, 405 U.S. 935 (1972).

*Mayo*, 705 F.2d at 74-75 (footnote omitted)

In *Mayo*, there was no evidence to generate the antique firearms defense. Here, however, the State's case in chief generated the set of facts that implicated the retired law enforcement officer exception of Maryland Criminal Law Article Section 4-305(a)(2). While typically, an affirmative defense is raised by evidence that the Defendant introduces, here, each of the State's own witnesses testified as to the Defendant's long standing tenure as a police officer with the Ocean City Police Department, an agency that falls within the retired law enforcement officer exception.

Once generated by the State's own evidence, the State bore the burden of proving the inapplicability of the affirmative defense. Judge Moylan has referred to this as the "Thayer-Wignmore bursting bubble presumption:

The procedural device that effectuates this compromise is the Thayer–Wigmore[10] or so-called "bursting bubble" presumption. By placing the burden of initial production on the defendant with respect to relatively rare and essentially esoteric defenses, the presumption relieves the State of the inefficient and unduly onerous obligation to prove a series of negative propositions, most of which would be completely immaterial in any given case. W.R. LaFave and A.W. Scott, 1 *Substantive Criminal Law* (1986), at 72, well explains the reason for allocating to the defense this burden of raising an issue:

Experience shows that most people who commit crimes are sane and conscious; they are not compelled to commit them; and they are not so intoxicated that they cannot entertain the states of mind which their crimes may require. Thus it makes good sense to say that if any of these unusual features are to be injected into the case, the defendant is the one to do it; it would not be sensible to make the prosecution in all cases prove the defendant's sanity, sobriety and freedom from compulsion.

(Footnote omitted).

The Thayer–Wigmore presumption is also called the "bursting bubble" presumption because once the defense has produced even a *prima facie* rebuttal of the presumption, the bubble bursts and the presumption totally disappears from the case. This is, generally speaking, the limited way in which a presumption may operate in favor of the State in a criminal case. In a civil case, by contrast, a presumption may, even after a *prima facie* rebuttal, remain in a case as the equivalent of an item of evidence entitled to some weight and as the subject of a jury instruction.

*Herd v. State*, 125 Md. App. 77, 100-01 (1999).

The facts before this honorable Court, as presented in the State's own case, fairly generated the retired law enforcement officer exception to the detachable magazine statute. Once generated as a possible exception, it was the State's burden to prove beyond a reasonable doubt that this was not an exception that applied. Because the State offered little evidence, except the acknowledgment that the Defendant's departure was not on "good terms" (a far cry from not being in "good standing") from his prior agencies, the State failed to carry this burden of proof beyond a reasonable doubt.

Contrary to the State's assertion, the Defendant was not required to himself prove that he fell within the exception. Instead, they had to prove he did not, once some evidence generated the possibility that he may. To place on the Defendant this burden would be to improperly shift to him the burden of proving his innocence in violation of the Due Process guarantees of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights.

## C.     The Defendant is a retired police officer in good standing.

The Defendant testified that he worked for more than 20 years as a police officer in both Ocean City and Snow Hill Police Departments, both local municipal police agencies. He testified that, because he was so recently separated from his last agency, that he remains eligible to retain his Maryland Police Training Commission certification enabling him to take the part-time job at the Fruitland Police Department upon completion of only the 16 hours of refresher training called for by COMAR 12.04.01.07(B) for police officers last who left their last employment within 3 years. (Even if more time passed, the MPTC regulations would permit recertification within 5 years.)

The Defendant's uncontradicted testimony that he is eligible to begin work at another police agency with only this minimal amount of refresher training itself is

6

suggested that, in the eyes of the MPTC, he left his employment with his prior agencies in good standing.

The State went to great lengths to elicit a concession from the Defendant that he perhaps did not leave "on good terms" from either Snow Hill or Ocean City. The Defendant resigned from both agencies. He was not fired. According to his testimony he remains eligible to be reemployed as a police officer. He retains his pension benefits that accrued to him at the State of Maryland pension system.

The Defendant testified on cross examination that he sued the Town of Ocean City. Significantly, the Law Enforcement Officers Bill of Rights secures for police officers the right to sue. *See* MD. CODE ANN., PUBLIC SAFETY § 3-103(d), (e).

Under Maryland law, except for minor, summary punishments, a police officer cannot be disciplined nor can any punitive action be taken against him except in accordance with the procedures set forth in the Law Enforcement Officers Bill of Rights, *See* MD. CODE ANN., PUBLIC SAFETY § 3-101 *et seq*. This bill of rights creates a hearing board process and appeal rights that attach to every disciplinary action that might be taken against a police officer that could possibly be considered to result in them leaving a department "not in good standing."

John K. Phoebus
JOHN K. PHOEBUS, P.A.
517 West Main Street
P.O. Box 70
Crisfield, Maryland 21817
(410) 968-9200
john@phoebuslaw.com
Attorney for the Defendant

## Certificate of Service

I hereby certify that on this 15th day of October, 2013, an exact copy of the foregoing document was hand delivered to Ella Disharoon, Esquire, Deputy State's Attorney for Wicomico County, Office of the State's Attorney for Wicomico County, Court House, P.O. Box 1006, Salisbury, Maryland 21803-1006.

John K. Phoebus