**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

STEPHEN V. KOLBE, et al.                    *

        Plaintiffs                             *

        v.                                          *          Civil No:  13-cv-02841-CCB

MARTIN J. O'MALLEY, et al.               *

        Defendants                          *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MOTION AND MEMORANDUM *AMICUS CURIAE***
**ON BEHALF OF**
**MARYLANDERS TO PREVENT GUN VIOLENCE, INC.**

Marylanders to Prevent Gun Violence, Inc., by its undersigned counsel, moves the Court

to permit intervention, and to accept its argument *amicus curiae* in support of the Motion for

Summary Judgment filed on behalf of the defendants.

**<u>Identity and Interest of Proposed *Amicus*</u>**

1.  Marylanders to Prevent Gun Violence, Inc. is a Maryland non-profit, tax-exempt

corporation established in January 2013, following the episode of gun violence in Sandy Hook,

New York, and in contemplation of efforts in the 2013 session of the Maryland General

Assembly to address longstanding concerns of Maryland citizens.

2.  Movant's stated purposes in its Articles of Incorporation are as follows:

a.  [T]o educate, motivate and organize the citizens of Maryland with respect to relevant
data and effective strategies to prevent gun violence in all its forms.
b.  To work with local partners including community and faith-based groups, public
health providers, elected officials, business and others leaders to understand the causes of
violence by use of firearms that plague our citizenry in all sectors of Maryland, and to
urge prompt adoption of strong and lasting measures to reduce unlawful use of guns.

c.  To support legislative efforts to adopt meaningful and effective laws and regulations calculated to keep guns out of the wrong hands and thereby prevent gun violence.
d.  To ease the burdens of government by assisting in the formulation and adoption of public policies designed to promote community healing, and to avoid the incidence of criminal, domestic and personal violence.

3.  Your *Amicus* in fact participated actively to form a broad-based coalition to educate and mobilize our citizens, and subsequently to present evidence and arguments urging our legislators to adopt the robust measures subsequently enacted as the Maryland Firearm Safety Act of 2013 (the Act).

4.  *Amicus* now seeks an opportunity to assist the Court by presenting novel argument for upholding the constitutionality of all of the salutary provisions of the Act, including specifically, the provisions challenged by the plaintiffs in this action.

## Corporate Disclosure Statement

As a non-profit, non-stock corporation, representative of community interests, *Amicus* asserts both that it has no parent corporation and that no publicly-held corporation owns any interest nor controls any of its activities.

## ARGUMENT

The Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008) agreed with the longstanding precedent of *United States v. Miller*, 307 U.S. 174 (1939) that "the Second Amendment right, whatever its nature, extends only to certain types of weapons" *Heller* at 623, and that protected firearms do not include short-barreled shotguns and machineguns.[1] We submit that assault weapons are similarly "not eligible for Second Amendment protection…," *Heller* at 622, since assault weapons are not "in common use" and they are as "dangerous and unusual" as other weapons which the Supreme Court has stated may be banned.

---

[1] The second time *Heller* refers to machineguns it calls them "M-16 rifles and the like…." *Heller* at 627.

I.   **Plaintiffs' application of "in common use" is taken out of context. When understood in proper context, assault weapons are not "the kind in common use at the time," and therefore are not protected by the Second Amendment.**

In overly-simple terms, *Heller* says that the Second Amendment applies only to "common" firearms. In pressing their argument that assault weapons are "common," we believe plaintiffs take the word out of context in two ways – in numbers and in law. As we examine both, we must keep in mind that "common" is a relative term. Common compared to what?

Of 310 million civilian-owned firearms in the United States, 114 million are handguns, 110 million are rifles, and 86 million are shotguns.[2] If handguns constitute "an entire class of 'arms'…," *Heller* at 628, then rifles and shotguns would be the other two classes. *Heller* teaches that handguns – which comprise 37 percent of all firearms – are "in common use." From *Heller*, we understand also that sawed-off shotguns, machineguns, and presumably all weapons strictly controlled by the National Firearms Act (NFA)[3] are not "in common use."

As of April 2013, there were a total of 3,510,980 NFA-regulated weapons in the hands of civilians, including 130,105 short-barreled shotguns, 505,861 machineguns, and 2,205,487 destructive devices.[4] In fact, there are more than 25,000 registered machineguns in Maryland alone.[5] *Heller* does not define "common" beyond finding that handguns (114 million) are "common" while machineguns (one-half million) are not "common."

---

[2] U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States 2011*, August 2011, p. 15.

[3] The NFA, enacted in 1934 to combat gangland-style crime, also bans several other types of weapons, including short-barreled rifles, guns secreted in pens or canes or other similar devices, rifles and handguns with extra-wide barrels, as well as silencers, grenade launchers, and explosive devices. The strong limitation on all these weapons has been in effect for 80 years, and should be considered as entirely settled in constitutional law.

[4] *Firearms Commerce in the United States, Annual Statistical Update 2013*, U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, page 14. They are all defined as "firearms" under the NFA, 26 U.S.C. Sec. 5845(a).

[5] Id.

Because the gun industry is not required to report on the quantity of firearms by model, it is impossible to say with certainty just how many assault weapons are in private hands. A Justice Department-funded study estimated there were about 1.5 million assault weapons in civilian hands in 1994.[6] The same study produced charts that indicate about 650 thousand assault weapons were produced between 1995 and 2001, and production fell sharply from 1999 to 2001.[7] That means there were 2.15 million assault weapons at the end of 2001 and certainly fewer than 2.5 million in 2004.

Since the federal ban was lifted in 2004, new assault weapons have entered the civilian market but the total cannot be more than a few million.[8] This puts the number of assault weapons vastly closer to the number of machineguns than to the number of handguns. If weapons subject to the National Firearms Act are not "in common use," per *Heller*, then neither are the weapons subject to the Maryland Firearm Safety Act.

Moving to the legal standard – Where did the Supreme Court's test come from? And what exactly does it mean? Both *Heller* and *Miller* teach that the Second Amendment envisioned the Revolutionary War-era method of calling together a militia, during which able-bodied "men were expected to appear bearing arms supplied by themselves, and of the kind in common use at the time." *Heller* at 624, quoting *Miller* at 179.

*Miller* was making the point that "the kind [of weapon] in common use at the time" was mostly of flintlock technology, as compared to earlier eras with even more primitive guns, or

---

[6] Christopher S. Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, Report to the National Institute of Justice, June 2004, page 1.

[7] *Id.* at 34 and 36.

[8] Without ruling on whether they are "common," the U.S. Court of Appeals for the District of Columbia said that "Approximately 1.6 million AR-15s alone have been manufactured since 1986…" *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (hereinafter *Heller II*). This figure comes from a *Heller II* exhibit, the Declaration of Mark Overstreet (Research Coordinator for the National Rifle Association), who estimated that between 1986 and 2007 a total of 1,625,525 AR-15 types were made by 13 different companies.

simply bladed weapons (reference to "King Alfred" from the 9th century).[9] *Miller* used the

phrase to acknowledge that militiamen brought different kinds of weapons depending on the era

– from swords and pikes to wheel locks and flintlocks. *Miller* did not distinguish one "kind"

from another. The way plaintiffs use the phrase one might guess or assume that during the

Revolutionary period some "kinds" of guns were used by law-abiding people for lawful

purposes, while other "kinds" were used by criminals for nefarious purposes. But that is

historically not the case.[10]

   To apply this phrase in a fair and logical manner to our present circumstances, we should

address a series of questions: (1) What is a "kind" of weapon? (2) What then is meant by "in

common use"? (3) And at what "time" should we judge such common use?

   *What is a "kind"?* – To understand the "kind" of weaponry brought to a militia muster,

we need to understand the personal guns of the Revolutionary War period. There were three

kinds: pistols, rifles, and muskets.[11] Pistols were the handguns of the day, which some soldiers

used as backup guns. As today, rifles were long guns that have "rifled" grooves inside the barrel

which make the bullet spin like a football's spiral, enabling it to travel farther with more

accuracy. In the military these guns were used by sharpshooters. Muskets were long guns with a

smooth bore inside the barrel – what we would call a shotgun today. The typical infantryman

carried a musket, and all of these were single-shot firearms.[12]

---

[9] Firearms didn't arrive on European battlefields until the 14th century. Chris Stone, Editor, *Gun: A Visual History,* (DK Publishing, 2007), page 110.

[10] "American legislatures had enacted scarcely any gun control statutes…" Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA Law Review 1343, 1354 (2009).

[11] Smithsonian, *Military History: The Definitive Visual Guide to the Objects of Warfare*, (DK Publishing, 2012), pages 190-191; J. Supica, D. Wicklund, P. Schreier, *The Illustrated History of Firearms*, (Chartwell Books, 2011) pages 34-41.

[12] *Id.*

During that era, while some persons might be banned from owning *any* kind of firearm (e.g. African-Americans and Native Americans),[13] no "kind" of firearm was banned.[14] There was no type or subtype that was not "in common use" by lawful citizens for lawful purposes. There were even short-barreled muskets – very much like short-barreled shotguns – which were used by militiamen in the Revolution.[15] Militiamen brought any and every gun they wanted to. There is no "kind" of firearm that was not "in common use."

*What is "in common use"?* – In the absence of context, plaintiff uses *Heller's* phrase "in common use" as a circular argument, that is, a gun is restricted and therefore it is no longer in common use. For example, short-barreled shotguns (and machineguns) were not "in common use" by law-abiding Americans when *Miller* was decided in 1939 and are not today *precisely because* they were severely restricted by the National Firearms Act in 1934. The Constitution would not be much of a foundational document if circular logic ends the discussion. Assault weapons cannot be protected today as slightly more common, because obviously, these guns will become quickly less common if assault weapon bans are enacted and upheld.

*At what time?* – It seems inconceivable that the Second Amendment means that a gun could be constitutionally protected in a particular year, but the same gun prohibited 13 years later. Since there were only 2.15 million assault weapons in 2001, they were less than one percent of all firearms. That small number or percentage should not be considered "in common

---

[13] E.g. "Every free white man may keep and bear arms." *Aymette v. Stone*, 21 Tenn. 154, 158 (1840).

[14] Throughout *Heller's* many examples of gun limitations during the Founding Fathers' era, not one of them bans any type of firearm. Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA Law Review 1343 (2009), *see* discussion of each example at 1362-1364.

[15] J. Supica, D. Wicklund, P. Schreier, *The Illustrated History of Firearms* (Chartwell Books, 2011), page 39.

use" since it's far closer to machineguns than to handguns.[16] It defies logic that the Second Amendment did not protect assault weapons in 2001, but shields them from regulation or prohibition now that there are marginally more of them.

Similarly, because of California's longstanding prohibition, lawful assault weapons are quite "uncommon" there – assault weapons are almost exactly as "common" in that state as machineguns are today in Maryland.[17] The Constitution should not be interpreted to mean that assault weapons could be banned by California in 1989 simply because of their lack of numbers at the time. By the same token, the Second Amendment cannot mean that assault weapons can be banned in California today because they are few in number there, and at the same time, forbid Maryland from enacting a similar law.

In sum, *Heller* drew a line. On one side of that line are handguns (114 million), an "entire class" or "kind" of firearms. On the other side are NFA weapons (3.5 million) like machineguns (one-half million). *Heller* gives no reason for this Court to find that "common" means the line is as low as assault weapons (a few million). At the same time, drawing the line so that it protects assault weapons would guarantee absurd results; constitutional protections would change in just a few years based on how rapidly guns sell and how quickly legislatures act. This issue is crucial because lawsuits involving other types of guns will surely follow this one.

If assault weapons are not "the kind in common use at the time," they are not protected by the Constitution and the argument is over. But if the Court finds the Second Amendment is nevertheless implicated, *Amicus* argues assault weapons may still be banned by Maryland law.

---

[16] *Firearms Commerce in the United States, Annual Statistical Update 2013*, U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, page 14. Surely, NFA weapons are not "in common use."

[17] California, with a population over 38 million, has 155,122 registered assault weapons while Maryland, with a population a bit under 8 million, has 25,022 registered machineguns. Per capita, there are slightly fewer registered assault weapons in California than registered machineguns in Maryland.

**II.** *Heller's* **reference to "dangerous and unusual weapons" makes sense only as a standard to compare assault weapons to other firearms. Applying that standard, assault weapons are at least as "dangerous and unusual" as machineguns and sawed-off shotguns.**

Advances in firearms technology have created new policy problems that the framers of the Second Amendment could not imagine. Obviously, all firearms are dangerous; that's why they are regulated by federal and state law. Without question, modern firearms are more dangerous (fire more rapidly – have a longer range – are significantly more lethal to a target) than the guns of the Revolutionary period.[18] So *Heller's* standard of "dangerous and unusual" is a matter of comparing one modern weapon to another. Let us consider the characteristics of guns that are relevant to this case.

*Handguns* – A ban on handguns is logically a ban on the average American firearm. There are 114 million handguns in circulation; as a class, their danger is average for firearms. It was Congress that decided in 1934 that handguns are not *unusually* dangerous. The bill that became the National Firearms Act first included handguns as weapons banned along with machineguns and short-barreled long guns.[19] It was amended in committee so that the NFA no longer applied to handguns.[20]

*Machineguns* – All should readily agree that a machinegun stands outside the Second Amendment's protections because it is far more dangerous than the average American gun in

---

[18] Patrick Sweeney, *Gun Digest Book of the Tactical Rifle* (2011), page 19.

[19] *National Firearms Act*, Hearings before the Committee on Ways and Means, U.S. House of Representatives, 73rd Congress, 2nd Session on H.R. 9066 (1934), page 1.

[20] "Your committee is of the opinion that limiting the bill to the taxing of sawed-off guns and machineguns is sufficient at this time. It is not thought necessary to go so far as to include pistols and revolvers and sporting arms. But while there is justification for permitting the citizen to keep a pistol or revolver for his own protection without any restriction, there is no reason why anyone except a law officer should have a machine gun or sawed-off shotgun." *Taxation and Regulation of Firearms*, U.S. House Committee on Ways and Means, Report No. 1780 (May 28, 1934), page 1.

8

civilian hands. An M-16, for example, fires at a rate of 750 to 900 rounds per minute (12 to 15 rounds per second).[21] Responding to a loud and long-standing argument by gun advocates that the Second Amendment protects their right to own machineguns, because they are the standard firearm of infantrymen today, *Heller* responds: "That would be a startling reading of the [*Miller*] opinion …." *Heller* at 624.

*Short-barreled shotguns* – Under federal law, "the term 'short-barreled shotgun'[22] means a shotgun having one or more barrels less than eighteen inches in length, as well as any weapon made from a shotgun – whether by alteration, modification or otherwise – if such a weapon as modified has an overall length of less than 26 inches." 18 U.S.C. 921(a)(6)(2006).[23]

The double-barreled 12-gauge Stevens shotgun ruled not constitutionally protected in *Miller* shoots two shells and then the user has to hinge it open, remove the shell casings, manually insert new shells, and reclose the gun.[24] That makes it one of the slowest guns to fire multiple rounds. And yet, it is dangerous enough for its strict control to not infringe on the Second Amendment. A short-barreled shotgun seems far less dangerous than the average American firearm. How can this be justified?

As the *Encyclopedia of Gun Control and Gun Rights* explains:

[The sawed-off shotgun] is an intimidating weapon that can coincide nicely with criminal intentions. At close distances, it can have savage effects and can be used quickly because it does not require deliberate aiming. It is easily concealed on the person, either in a

---

[21] Technical Specifications of Colt M16A4 Rifle, http://www.colt.com/ColtMilitary/Products/ColtM16A4Rifle.aspx (last visited February 11, 2014).

[22] Throughout the hearings on H.R. 9066, which became the NFA, these were always called "sawed-off shotguns."

[23] It is the measurement in inches that triggers the strict control. Why is a shotgun with a 17½ inch barrel unprotected by the Second Amendment compared to the same shotgun with a half-inch longer barrel? It is the legislature's prerogative to distinguish between them, to decide what is and is not unusually dangerous.

[24] Dave Coustan, *How Stuff Works, How Shotguns Work, Break, Bolt & Pump Actions*, http://science.howstuffworks.com/shotgun5.htm (last visited February 11, 2014). One can visualize how slowly this gun reloads by looking at a Stevens double-barreled 12-gauge shotgun of this era in Exhibit A, page 1.

holster, as used by the notorious bank robber Clyde Barrow, who developed a quick-draw technique; or kept beneath a coat, dangling by a cord hung from the neck.[25]

The fact that it's intimidating is significant. If someone is trying to rob a bank or store, they don't want to shoot the gun; they want the cashier to cooperate without a fight. The hole at the end of a 12-gauge is itself intimidating: about 18.5 millimeters wide, more than twice the width of today's all-too-common 9 millimeter pistol.[26]

During the 1934 hearings on the NFA, no one ever questioned the need for restricting short-barreled shotguns. U.S. Attorney General Homer S. Cummings simply said: "A sawed-off shotgun is one of the most dangerous and deadly weapons"[27] and the National Rifle Association's Executive Vice President, General Milton A. Reckord, readily agreed.[28] So clearly, short-barreled shotguns are unusually dangerous, but for a completely different reason than machineguns.

*Plastic guns* – Consider one more gun. In December 2013, both houses of Congress rushed to extend the 1988 Undetectable Firearms Act for another ten years.[29] This is the ban on so-called "plastic guns." The National Rifle Association facilitated the frantic passage of this bill just before the ban expired.[30] Nobody challenges the constitutionality of that ban. But plastic guns are not dangerous because of an unusual range or rate of fire, it's because they defeat (or more accurately, might defeat) current metal-detectors. Yet, they would be detected by the TSA

---

[25] Glenn H. Utter, *Encyclopedia of Gun Control and Gun Rights*, (Oryx Press, 2000), pages 261-2.

[26] Dave Coustan, *How Stuff Works, How Shotguns Work, Break, Bolt & Pump Actions,* http://science.howstuffworks.com/shotgun5.htm (last visited February 11, 2014)

[27] National Firearms Act, Hearings before the Committee on Ways and Means, U.S. House of Representatives, 73rd Congress, 2nd Session on H.R. 9066 (1934), page 6.

[28] *Id.* at pages 111, 115, 116, 124, and 160.

[29] Ed O'Keefe, *Congress Reauthorizes Ban On Plastic Guns*, The Washington Post, December 9, 2013.

[30] *Id.*

scanners now in use at airports across the country.[31] Will the ban become unconstitutional in the near future when those guns no longer defeat security devices? That makes no sense. Once again, the legislative branch has determined there is a sub-category of guns that is unusually dangerous for a reason that is completely different from the factors that make machineguns or short-barreled shotguns unusually dangerous.

*Assault weapons* – At Sandy Hook Elementary School in Newtown, Connecticut, 20 children and 6 faculty members were murdered with an AR-15 assault rifle, a version of the U.S. military's M-16. At Columbine High School in Littleton, Colorado, 13 students were killed and 23 wounded with four guns, including 55 rounds fired from a TEC-9 assault pistol. At Cleveland Elementary School in Stockton, California, 5 small children were killed and 30 others wounded with a semiautomatic copy of the Soviet military's AK-47 rifle.

What makes these assault weapons unusually dangerous is that each incorporates the features of a modern military rifle or submachinegun, enabling the shooter to fire numerous bullets very rapidly, and yet keep control of the gun.[32] For example, because it's a version of the M-16, the Bushmaster AR-15 used to kill children in Newtown is *designed* with a pistol grip so it can be fired rapidly from the shoulder or hip; it is *designed* with a barrel shroud so the non-trigger hand can keep the gun stable during rapid fire; it is *designed* to accept very large capacity magazines so there is no pause to reload.[33] The parts or features of an assault weapon are not

---

[31] William Harris, How Stuff Works, *How Millimeter Wave Scanners Work*, http://science.howstuffworks.com/millimeter-wave-scanner.htm (last visited February 11, 2014).

[32] As the D.C. Circuit Court found in *Heller II*, "Far from being simply 'cosmetic,' [these features]…all contribute to the unique function of any assault weapon to deliver extraordinary firepower." *Heller II* at 1264.

[33] "Pistol grips help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position. Assault weapons are generally equipped with large-capacity ammunition magazines that allow the shooter to fire many more rounds than conventional firearms. In addition, features such as barrel shrouds on assault pistols protect the shooter's hands from the heat generated by firing many rounds in rapid succession." *Committee Report on Bill*

there to *look* scary; they are there to make it possible for the shooter *to do scary things*.

With these features, any deranged person can empty a 30 round magazine as fast as he or she can pull the trigger, while maintaining control of the gun. But assault weapons can shoot even faster. A replacement stock made for the purpose enables an assault weapon to fire so fast it "mimics a fully automatic weapon."[34] Videos are available today on YouTube, to instruct a potential mass murderer or crazed individual on this technique called "bump firing." *See e.g.*: *Incredible Bump Fire! New ATF Approved stock for AR-15 Allows Easy & Safe Bump Firing.*[35] The same result cannot be achieved with common hunting or sporting weapons because those common guns lack large-capacity magazines and other military features designed to enable a shooter to maintain control during rapid fire.

Attached is an exhibit permitting the Court to appreciate characteristics of the assault weapons listed in the Firearms Safety Act. The pistol grips and large magazines are self-evident.

Each of these assault weapons is just as dangerous as a modern military rifle because they are essentially the same gun but fixed in semiautomatic mode. For example, there are two models of the standard military M-16. One has a switch that allows the rifle to be fired in full-auto (bullets stream out as you hold down the trigger) or in semiautomatic mode (one shot for each pull of the trigger).[36] The other has a switch that allows the M-16 to be fired in a three-shot

---

*17-843, 'Firearms Registration Amendment Act of 2008*,' Council of the District of Columbia Committee on Public Safety and the Judiciary, November 25, 2008, page 7.

[34] Dana Liebelson, *How to Make Your Gun Shoot Like It's Fully Automatic—in One Easy Step: A legal add-on can make assault rifles fire as a machine gun would,* Mother Jones, December 21, 2012, with a video demonstration available at: http://www.motherjones.com/politics/2012/12/how-make-your-gun-shoot-fully-automatic-one-easy-step (Last visited February 11, 2014).

[35] You Tube; http://www.youtube.com/watch?v=_U6tORrODJE (last visited February 11, 2014).

[36] Headquarters, Department of the Army, *Rifle Marksmanship M16-/M4-Series Weapons* (August 2008), page 4-11, Figure 4-10.

burst or in semiautomatic mode.[37] The AR-15 is virtually identical to an M-16 fixed in semiautomatic mode.[38] In fact, the AR-15 and other assault weapons can be converted to full-auto and there are conversion kits available all over the Internet making that rather simple.[39]

Even without the full-auto conversion, there is really little difference in how dangerous a semiautomatic assault weapon (AR-15) is compared to the same weapon with a switch for full-auto fire (M-16). The U.S. Army trains its soldiers that "The most important firing technique during fast-moving, modern combat is rapid semiautomatic fire."[40] Or as a veteran battlefield reporter explains:

> [D]oes the infantry need full auto when most battle-seasoned veterans – including special operators – agree that semi-auto fire is highly effective for suppressing the enemy?... Back in the mid-1980s – before the shift to the M16A2 and the three-round burst – active-duty infantry units kept to a strict rule that rifleman only fired their M16A1s on semi auto. Today's combat-experienced infantrymen are even more disciplined.[41]

When soldiers fire M-16s in semi-auto, it is the same as if they were firing AR-15s.

Finally, we've been comparing modern assault weapons to modern military rifles. But it wasn't modern machineguns that persuaded Congress to impose a regime of strict control in 1934; it was the Tommy Gun in the hands of gangsters. The Thompson fires a .45 caliber pistol cartridge which is not very powerful compared to modern military ammunition. An AR-15 firing the military's standard 5.56 NATO round has a muzzle velocity more than three times faster than the Thompson and shoots accurately (has an effective firing range) about ten times farther than

---

[37] *Id*, Figure 4-11.

[38] See a comparison of the parts here: AR15.com, AR-15 parts vs. M-16P Parts, https://www.ar15.com/content/legal/AR15-M16Parts/ (Last visited February 11, 2014).

[39] *See* e.g. AR-15 Conversion Kit.  http://www.brownells.com/items/ar-15-conversion-kit.aspx (Last visited February 11, 2014). Note how the conversion kits are "AR-15/M-16" parts meaning they are compatible for both weapons.

[40] Headquarters, Department of the Army, *Rifle Marksmanship M16-/M4-Series Weapons* (August 2008), page 7-8.

[41] Matthew Cox, *Full Auto: Battlefield Necessity or A Waste of Ammo?,* Kit Up Military.Com (December 21, 2011) http://kitup.military.com/2011/12/full-auto-battlefield-necessity.html (Last visited February 11, 2014).

the Thompson.[42] In short, an AR-15 or similar semiautomatic version of a military rifle is in many ways more dangerous than the fully automatic Tommy Gun.

While assault weapons are just as dangerous as modern machineguns and more dangerous than the Thompson, they are enormously more dangerous than the short-barreled shotgun in *Miller*. An assault pistol or an assault rifle/shotgun with a collapsible stock is at least as concealable and maneuverable in close quarters as a short-barreled shotgun. And an assault weapon is far more useful for intimidation and spreading terror. An assault weapon has every characteristic that a short-barreled shotgun has that makes it ineligible for protection under the Second Amendment – to a significantly greater degree.

### III.    Conclusion

Out of context, the language of *Heller* is easily misconstrued. Plaintiffs' interpretation, if adopted, would unmoor the Constitution from practical, fixed principles, and let it drift on circular arguments and subjective redefinitions of words. There is a better way forward.

*Amicus* urges this Court to declare that assault weapons do not implicate the Second Amendment because they are not "the kind in common use at the time." Alternatively, we urge the Court to consider what makes the machinegun and short-barreled shotgun ineligible for Second Amendment protection. We suggest that these two weapons, as well as plastic guns, are substantially more dangerous than average firearms, each in very different ways. Assault weapons are as "unusually dangerous" as modern machineguns, more so than classic Thompsons, and far more than short-barreled shotguns. They are not, and cannot logically be, protected by the Second Amendment.

---

[42]  Maxim Poneker, World Guns, AR-15 Semiautomatic Rifles (2012) http://world.guns.ru/civil/usa/ar-15-e.html (Last Visited February 13, 2014). World Guns, Thompson M1921 M1928 M1 and M1A1 submachine gun / "Tommy Gun" (USA) http://world.guns.ru/smg/usa/thompson-e.html.

Respectfully submitted,

/s/  VaLiesha M. Brown\
VaLiesha M. Brown (Fed. Bar # 18927)\
O'Malley, Miles, Nylen & Gilmore, P.A\
11785 Beltsville Drive, 10th Floor\
Calverton, MD 20705\
(253)970-6322; (301)572-6655 (fax)\
valieshabrown@gmail.com

/s/  Bernard P. Horn\
Bernard P. Horn (Fed. Bar # 02356)\
1825 K Street, NW, Suite 450\
Washington, DC 20006\
(202)248-5349; (301)572-6655 (fax)\
bhorn@ourfuture.org

Leonard L. Lucchi (Fed. Bar # 02432)\
O'Malley, Miles, Nylen & Gilmore, P.A\
11785 Beltsville Drive, 10th Floor\
Calverton, MD 20705\
(301)572-7900; (301)572-6655 (fax)\
llucchi@omng.com

Michael A. Pretl (Fed. Bar # 07849)\
Law Office of Michael A. Pretl, P.A.\
Riverton Wharf Road\
Riverton, MD 21837\
(443)323-3060; (443)323-3061(fax)\
mikepretl@aol.com

Stuart O. Simms (Fed Bar #27090)\
Brown Goldstein Levy\
120 E. Baltimore Street, Suite 1700\
Baltimore, MD 21202\
(410)962-1030; (410)385-0869 (fax)\
sos@browngold.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of February, 2014, copies of this Motion and Memorandum *Amicus Curiae* on behalf of Marylanders to Prevent Gun Violence, Inc., were served, via electronic delivery, to the e-mail addresses below:

Douglas F. Gansler\
Attorney General of Maryland\
Matthew J. Fader\
Assistant Attorney General\
mfader@oag.state.md.us\
200 St. Paul Place, Baltimore, MD 21202\
Dan Friedman\
Assistant Attorney General\
dfriedman@oag.state.md.us\
90 State Circle, #104, Annapolis, MD 21401\
Mark H. Bowen\
Assistant Attorney General\
mark.bowen@maryland.gov\
1201 Reisterstown Road, Pikesville, MD 21208\
*Counsel for Defendants*

John Parker Sweeney\
JSweeney@babc.com\
T. Sky Woodward\
Swoodward@babc.com\
Bradley Arant Boult Cummings LLP\
1615 L Street, NW, Suite 1350\
Washington, D.C. 20036\
*Counsel for Plaintiffs*

/s/  VaLiesha M. Brown\
VaLiesha M. Brown (Fed. Bar # 18927)