**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| STEPHEN V. KOLBE, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 1:13-cv-02841-CCB |
| v. | : | |
| | : | |
| MARTIN O'MALLEY, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**BRIEF OF *AMICUS CURIAE*
BRADY CENTER TO PREVENT GUN VIOLENCE
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

*Of Counsel:*

Jonathan E. Lowy
Elizabeth M. Burke
Alla Lefkowitz
BRADY CENTER TO
PREVENT GUN VIOLENCE
LEGAL ACTION PROJECT
840 First Street NE, Suite 400
Washington, DC 20002
Tel: 202-370-8101
jlowy@bradymail.org
eburke@bradymail.org
alefkowitz@bradymail.org

Benjamin C. Block (D. Md. #15811)
*Of Counsel:*
Elliott Schulder
Justin T. Lepp
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: 202-662-5205
Fax: 202-778-5205
bblock@cov.com
eschulder@cov.com
jlepp@cov.com

February 14, 2014

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ........................................................................ 1

INTRODUCTION ......................................................................................... 2

ARGUMENT ................................................................................................ 3

I.   Firearms Regulations Are Evaluated Using a Well-Accepted Two-Part Test ......................................................................................................... 4

II.  The Weapons Regulated by the Maryland Act Are Not Protected by the Second Amendment ................................................................................. 6

    A.   Assault Weapons and High-Capacity Magazines Are Not Commonly Used ................................................................................. 7

    B.   Assault Weapons and High-Capacity Magazines Are Not Related to Self-Defense in the Home ..................................................... 11

    C.   Assault Weapons and High-Capacity Magazines Are Dangerous and Unusual ........................................................................ 13

III. Even Assuming That the Maryland Act Implicates the Second Amendment, the Act Is Constitutional ........................................... 16

    A.   Strict Scrutiny Is Not the Appropriate Standard of Review ................ 16

    B.   Under Fourth Circuit Precedent, Intermediate Scrutiny Is The Applicable Standard of Review ............................................................ 18

    C.   The Act Is Constitutional Because It Is Substantially Related to the Important Governmental Objective of Protecting Communities from Gun Violence .............................................. 21

CONCLUSION ............................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bd. of Trustees of State Univ. of N.Y. v. Fox,*
  492 U.S. 469 (1989) ............................................ 21

*Clark v. Jeter,*
  486 U.S. 456 (1988) ............................................ 21

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) .....................................................*passim*

*English v. State,*
  35 Tex. 473 (1871) ............................................ 14

*Heller v. Dist. of Columbia*, 698 F. Supp. 2d 179 (D.D.C. 2010),
  *aff'd*, 670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*)........................ 5, 18, 19, 20, 23, 24

*McDonald v. City of Chicago,*
  130 S. Ct. 3020 (2010) .................................... 1, 5, 11, 16, 17

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*, No. 13-CV-291S,
  2013 WL 6909955 (W.D.N.Y. Dec. 31, 2013)............................. 1, 8, 14, 18, 20, 24

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
  700 F.3d 185 (5th Cir. 2012) ................................... 5

*Schenck v. Pro-Choice Network of W. N.Y.,*
  519 U.S. 357 (1997) ............................................ 21

*Shew v. Malloy,*
  No. 3:13CV739, 2014 WL 346859 (D. Conn. Jan. 30, 2014) ...................... 1, 20, 24

*United States v. Chester,*
  628 F.3d 673 (4th Cir. 2010) ..................................... 4, 13-14, 17-18, 21

*United States v. Greeno,*
  679 F.3d 510 (6th Cir. 2012) ................................... 5

*United States v. Hayes,*
   555 U.S. 415 (2009) ........................................................................ 1

*United States v. Lahey,*
   No. 10-CR-765, 2013 WL 4792852 (S.D.N.Y. Aug. 8, 2013) ............... 18-19

*United States v. Marzzarella,* 595 F. Supp. 2d 596 (W.D. Pa. 2009),
   *aff'd,* 614 F.3d 85 (3d Cir. 2010) ........................................ 5, 12, 13, 18

*United States v. Masciandaro,*
   683 F.3d 458 (4th Cir. 2011) ......................................................... 18, 19

*United States v. Miller,*
   307 U.S. 174 (1939) ......................................................................... 7, 9

*United States v. Salerno,*
   481 U.S. 739 (1987) ............................................................................ 21

*Woollard v. Gallagher,*
   712 F.3d 865 (4th Cir. 2013) ................................... 4, 11, 18, 19, 21, 23

**Constitutional Provision and Statutes**

U.S. Const., Second Amendment .....................................................*passim*

Firearm Safety Act of 2013, Md. Laws Ch. 427....................................*passim*

Md. Code Ann., Crim. Law § 4-301 ...................................................... 8, 14

Md. Code Ann., Crim. Law §§ 4-301–05 ..................................................... 2

Md. Code Ann., Pub. Safety § 5-101(r)(2)(xxxvii) ......................................... 8

**Other Authorities**

Kevin Ashton, *The Physics of Mass Killing* (Jan. 24, 2013)....................... 15

4 William Blackstone, Commentaries (1769) ............................................. 14

Brady Center to Prevent Gun Violence, *Assault Weapons: "Mass Pro-
   duced Mayhem"* (Oct. 2008) ........................................................ 12, 22

Saul Cornell & Nathan DeDino, *A Well Regulated Right, The Early
   American Origins of Gun Control,* 73 Fordham L. Rev. 487 (2005) ..................... 17

Department of Treasury, *Studying the Sporting Suitability of Modified Semiautomatic Assault Rifles* (1998) ............................................................ 13, 14

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J.Crim. L. & Criminology 150 (1995) ........................................................................................................ 22

Gary Kleck, *Point Blank, Guns & Violence in America* (paperback ed. 2005)....................................................................................................................... 12

Christopher Koper, *America's Experience with the Federal Assault Weapons Ban, 1994-2004*, in *Reducing Gun Violence in America* (Daniel W. Webster and Jon S. Vernick eds., 2013). ........................................... 15

Christopher Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, Report to the National Institute of Justice, U.S. Dep't of Justice (June 2004) ................................................................................................... 10

Maryland Attorney General's Letter Regarding the Firearm Safety Act of 2013 (Apr. 30, 2013) .......................................................................... 22

Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings* (Sept. 2013)......................................................................................................... 22, 25

Mayors Against Illegal Guns, *Mass Shootings Since January 20, 2009* (2013) ..................................................................................................... 15

*More Than Half of Mass Shooters Used Assault Weapons and High-Capacity Magazines*, Mother Jones (Feb. 27, 2013)....................................... 23

National Shooting Sports Federation, *Modern Sporting Rifle (MSR) – Comprehensive Consumer Report 2010* .................................................... 9

Lawrence Rosenthal & Joyce Lee Malcolm, *McDonald v. Chicago: Which Standard of Scrutiny Should Apply to Gun Control Laws?*, 105 Nw. U. L. Rev. 437 (2011) ............................................................. 16

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443 (2009) .................................................................... 12

Daniel W. Webster, *Testimony in Support of HB 294–Firearm Safety Act of 2013 Before the Maryland House Judiciary Committee* ............................ 22

## STATEMENT OF INTEREST

The Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. In support of that mission, the Brady Center files this brief as *amicus curiae* in support of Defendants. This brief principally addresses the scope of the Second Amendment's application to restrictions on the possession of certain categories of firearms, and the legal standards for reviewing those restrictions.

The Brady Center has a substantial interest in ensuring that the Second Amendment is not interpreted or applied in a way that would jeopardize the public's interest in protecting families and communities from the effects of gun violence. Through its Legal Action Project, the Brady Center has filed numerous *amicus* briefs in cases involving firearms regulations, including *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), *United States v. Hayes*, 555 U.S. 415, 427 (2009) (citing Brady Center brief), and *District of Columbia v. Heller*, 554 U.S. 570 (2008). The Brady Center has also filed *amicus* briefs in cases before the United States District Courts, including *Shew v. Malloy*, No. 3:13CV739, 2014 WL 346859 (D. Conn. Jan. 30, 2014), and *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, No. 13-CV-291S, 2013 WL 6909955, at *10 (W.D.N.Y. Dec. 31, 2013) (citing Brady Center brief).

# INTRODUCTION

The statutes enacted by the State of Maryland to regulate the possession of firearms do not prohibit all guns or even all semi-automatic weapons. Instead, the Firearm Safety Act of 2013, Chapter 427 of the 2007 Laws of Maryland (the "Act"), prohibits the possession, sale, transfer, purchase, or receipt of only certain types of semi-automatic rifles and shotguns possessing a set of distinct characteristics, along with detachable magazines with capacities of more than 10 rounds of ammunition. *See* Md. Code Ann., Crim. Law §§ 4-301-05. The rifles, shotguns, and magazines prohibited by the Act share two key features: (1) they are especially useful in the commission of violent crime and mass murder—and, indeed, have been used that way all too frequently; and (2) they are especially ill-suited for what the Supreme Court has called the "core protection" of the Second Amendment, the "defense of hearth and home." *Dist. of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008).

The Act regulates weapons and magazines specifically designed for one purpose only: to fire the most bullets at the most people in the shortest amount of time. In banning these assault weapons, the State of Maryland has sought to protect its citizens from mass killings that terrorize society and undermine the public's sense of safety and security. The State has sought to regulate weapons and magazines that generate fear and uncertainty— and place people at grave risk of death or injury—as they go about their daily lives in public places like schools, shopping malls, and movie theaters. This is a legitimate State interest that does not infringe the Second Amendment.

After the expiration of the federal assault weapons ban in 2004, sales of assault weapons sharply increased. Plaintiffs argue that the sudden increase in popularity of military-style assault weapons has—virtually overnight—triggered Second Amendment protections so broad in scope that the legislature is powerless to regulate the most dangerous assault weapons despite the overwhelming public policy interest in doing so.

Plaintiffs misconstrue the Second Amendment. It does not protect dangerous assault weapons and high-capacity magazines, like those targeted by the Act, that are not commonly used by law-abiding, responsible citizens for lawful purposes, the "central component" of which is self-defense in the home. Even with respect to weapons that are commonly used for lawful purposes, the Second Amendment permits legislatures to enact reasonable regulations to protect the public interest. Under this standard, the Firearm Safety Act of 2013 is constitutional.

## ARGUMENT

The Act imposes reasonable restrictions on the possession of especially dangerous weapons that are not commonly used for lawful purposes. None of the characteristics set forth in the Act to identify prohibited weapons relates to the functionality of the weapon for self-defense. Many other types of weapons are permitted, including a range of ordinary rifles, shotguns, and handguns. Those weapons are significantly more suited for self-defense. Plaintiffs, however, seek to extend Second Amendment protection to military-style weapons and large magazines that are designed to kill large numbers of people in a short period of time.

As shown below, the Act does not burden Plaintiffs' rights under the Second Amendment. Therefore, the Court need not address the appropriate standard of review. However, even assuming that the Act places limitations on some rights protected by the Second Amendment, the appropriate standard of review is intermediate scrutiny. Under that test, the Act is constitutional because it is substantially related to the important governmental objectives of public safety and crime control. Every court that has considered similar regulations under the Second Amendment has found intermediate scrutiny to be the proper standard, and each of those courts has rejected Second Amendment challenges to restrictions on the possession of assault weapons and high-capacity magazines. For these reasons, the Court should grant Defendants' motion for summary judgment and dismiss Plaintiffs' Second Amendment challenge.

## I.      Firearms Regulations Are Evaluated Using a Well-Accepted Two-Part Test

The Fourth Circuit has concluded that "a two-part approach to Second Amendment claims seems appropriate under *Heller*." *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (citing cases); *see also Woollard v. Gallagher*, 712 F.3d 865, 874–75 (4th Cir. 2013). Under this approach:

> The first question is whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification. If it was not, then the challenged law is valid. If the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end scrutiny.

*Chester*, 628 F.3d at 680 (citations and internal quotation marks omitted).

Plaintiffs contend that this two-part approach is inappropriate, either because it is not actually authorized by *Heller*, or because the limitations imposed by the Act are contrary to the Second Amendment's protections and automatically invalid. *See* Pl. Opp. to Def. Mot. to Dismiss, ECF No. 33, at 5 n.1. Neither of these contentions has merit.

In *Heller*, the Supreme Court examined a District of Columbia regulation that completely banned the possession of handguns in the home. 554 U.S. at 628. Finding that self-defense was "the central component" of the Second Amendment right and that the D.C. regulation burdened that right, *id.* at 599, 628, the Court held that the regulation was unconstitutional under any level of scrutiny it could apply, *id.* at 628–29. Since *Heller*, numerous courts in addition to the Fourth Circuit have held that this two-step process of first identifying the scope of the Second Amendment's protections and then determining whether a given restriction is justified under the appropriate level of scrutiny is the appropriate inquiry. *See, e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (*Heller II*).

Plaintiffs may argue that Maryland's prohibition of a limited range of dangerous assault weapons is akin to the total handgun bans invalidated in *Heller* and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), but any such argument should be rejected. As *Heller* repeatedly emphasized, a complete handgun ban implicates the very core of the Second Amendment right because handguns are "overwhelmingly chosen by American

society" for self-defense in the home. 554 U.S. at 628–29. As explained in more detail below, Maryland's Firearm Safety Act is not a complete ban, and it indisputably leaves many makes and models of firearms alone. The Act applies only to a subset of particularly dangerous assault weapons bearing a few specific secondary characteristics, a far cry from the regulations considered in *Heller* and *McDonald*.

This Court should therefore proceed to the first step of the analysis mandated by *Chester*, and determine whether the Act even touches on rights protected by the Second Amendment. As shown in the following section, the Second Amendment does not apply to assault weapons and high-capacity magazines, because these weapons are not commonly used for self-defense in the home and they are so dangerous and unusual that they have historically received no constitutional protection.

## II.   The Weapons Regulated by the Maryland Act Are Not Protected by the Second Amendment

The Supreme Court has made very clear that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" in scope and does not amount to "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.

Under the first prong of the *Heller* test, a court must determine whether the weapons subject to the challenged regulation fall within the scope of the Amendment's protection. *Heller* stands for the proposition that a weapon is only protected if: (A) it is commonly used "at the time"; (B) for lawful self-defense in the home; and (C) it is not dangerous and unusual. *See id.* at 627, 634. The regulated weapons must meet each of

these criteria to qualify for constitutional protection. The weapons that are regulated by the Maryland Act do not meet any of these criteria.

### A.      Assault Weapons and High-Capacity Magazines Are Not Commonly Used

In *Heller*, the Supreme Court held that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes … ." 554 U.S. at 625. The Court noted that historically "the sorts of weapons protected were those 'in common use at the time.'" *Id.* at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). According to *Heller*, the Second Amendment does not permit a total ban on possession of handguns in the home because they are "overwhelmingly chosen by American society" for self-defense. *Id.* at 629. Handguns are essentially in a class by themselves. According to the Court, "the American people have considered the handgun to be the quintessential self-defense weapon," and "handguns are the most popular weapon chosen by Americans for self-defense in the home … ." *Id.* No other weapon has been shown to be as popular, and the Court did not explain whether any lower level of "use" could be deemed "common." Under any reasonable interpretation, the weapons regulated by the Act are not in common use.

First, there is no evidence that the level of use of restricted assault weapons and high-capacity magazines remotely approaches the level of handgun use deemed so crucial in *Heller*. The assault weapons that are the focus of Plaintiffs' Second Amendment challenge—semi-automatic rifles and shotguns that possess the characteristics identified by the Act—are neither the "quintessential self-defense weapon," nor "the most popular

weapon chosen by Americans for self-defense in the home." In their Complaint, Plaintiffs repeatedly assert that these weapons are in common use, but, in fact, assault weapons of the type restricted by the Act are not commonly owned—certainly not for lawful self-defense in the home. Although precise data are hard to come by, assault weapons make up only an estimated 2% of the guns owned in the United States, hardly enough to establish their "common use." *See N.Y. State Rifle & Pistol Ass'n v. Cuomo*, No. 13-CV-291S, 2013 WL 6909955, at *10 (W.D.N.Y. Dec. 31, 2013).

Second, even if Plaintiffs could show that semi-automatic rifles and shotguns are commonly owned, the Act does not prohibit all such weapons. Rather, the Act targets only a defined list of specific firearms and other "copycat" assault weapons that possess certain secondary characteristics, such as a folding stock or a shotgun with a revolving cylinder. *See* Md. Code Ann., Crim. Law § 4-301. Plaintiffs cite no legal basis for asserting that the Second Amendment protects secondary characteristics that do not relate to the basic functionality of a given weapon.

In addition, Plaintiffs cannot point to any evidence that weapons with the particular secondary characteristics identified in the Act are commonly used for lawful home defense.[1] For example, according to the National Shooting Sports Foundation, only 60% of "modern sporting rifles" (semi-automatic rifles) have a collapsible or folding stock,

---

[1] Although Plaintiffs assert that some of the specifically prohibited firearms "are among the most popular" in the United States, they offer no factual support for their assertion. For example, they complain that the Springfield Armory M1A rifle is prohibited, *see* Compl. ¶ 63, but neglect to mention that a more commonplace version, the M1 Garand, is specifically permitted by the Act, *see* Md. Code Ann., Pub. Safety § 5-101(r)(2)(xxxvii).

and only 64% of semi-automatic rifles have a permanent or non-permanent flash-hider.[2] If, as noted above, assault weapons constitute only 2% of American firearms, it follows that a significantly lower number of those are among the assault weapons prohibited under Maryland law. These data demonstrate that there is no basis for concluding that weapons with the secondary characteristics regulated by the Act are commonly used.

Third, Plaintiffs cannot show that the prohibited assault weapons and high-capacity magazines were in common use during a relevant historical timeframe. The Supreme Court in *Heller* emphasized that the Second Amendment protects the sorts of weapons "in common use at the time," but it declined to elaborate on what the relevant timeframe should be. 554 U.S. at 627. The phrase originated in *Miller*, where the Court stated that "ordinarily, when [the Militia was] called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Miller*, 307 U.S. at 179. In this context, the phrase appears to signify that the relevant time is when the militiamen are called upon to serve, but that is of little help when evaluating the constitutionality of a statute far removed from Colonial-era military norms.

It would be unreasonable to look only to the day on which the statute was enacted or, as Plaintiffs seem to prefer, the "present time" as the relevant reference point. Compl. ¶ 46. Suppose, for example, that a new, unregulated and highly lethal weapon were developed before a statute was enacted. When first offered for sale, the weapon would not

---

[2] National Shooting Sports Federation, *Modern Sporting Rifle (MSR)–Comprehensive Consumer Report 2010*, at 7, *available at* http://nssf.org/share/PDF/MSRConsumer Report2010.pdf.

be protected because it would not be in common use. However, under Plaintiffs' theory, if sales of the weapon grew explosively over the next year, prior to any legislation, then the weapon would, within that short time frame, become constitutionally protected, even though a ban would have been permissible had the legislature acted just a few months earlier. Such an approach makes little sense. If "common use at the time" is a relevant criterion, then "the time" must at least be understood to cover a historically representative period of time during which the weapons exhibiting the particular characteristics were available and widely used for purposes of self-defense.[3] There is no evidence that the assault weapons regulated by the Act have been in common use for a representative period of time.

---

[3] Although it appears that sales of semi-automatic rifles have increased in recent years, partly due to the expiration of the federal assault weapons ban in 2004, these weapons were not historically popular—and certainly not historically popular for lawful self-defense in the home. *See* Christopher Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003*, Report to the National Institute of Justice, U.S. Dep't of Justice, at 10 (June 2004) ("Around 1990, there were an estimated 1 million privately owned AWs in the U.S. (about 0.5% of the estimated civilian gun stock).").

**B.     Assault Weapons and High-Capacity Magazines Are Not Related to Self-Defense in the Home**

Even if Plaintiffs could demonstrate that the weapons regulated by the Maryland Act were in "common use at the time," that alone would not be sufficient to bring the weapons within the scope of Second Amendment protection. Such common use must have been for a lawful purpose. The primary "lawful purpose" identified by the Supreme Court in *Heller* is self-defense within the home. *See Woollard*, 712 F.3d at 874 ("*Heller* … was principally concerned with the 'core protection' of the Second Amendment: 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" (quoting *Heller*, 554 U.S. at 634–35)); *see also McDonald*, 130 S. Ct. at 3044 (reiterating that the "central holding in *Heller*" is that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home").

Given the Second Amendment's limited scope, a critical question in determining whether the Act oversteps constitutional bounds is whether it impinges on the ability of the regulated weapons to serve their basic function of self-defense in the home. Indeed, the functionality of the weapon was at the heart of *Heller*, which invalidated a D.C. gun regulation that required handguns to be disabled inside the home. According to the Supreme Court, that requirement "makes it impossible for citizens to use [the firearm] for the core lawful purpose of self-defense and is hence unconstitutional." 554 U.S. at 630.

In short, if the regulated characteristics meaningfully affect the weapons' utility for self-defense, then the regulations are more likely to implicate the Second Amendment. However, if regulating the weapons' secondary characteristics does not undermine their

utility for self-defense, then the regulation falls outside the scope of the Second Amendment. "[I]t … would make little sense to categorically protect a class of weapons bearing a certain characteristic wholly unrelated to their utility. *Heller* distinguished handguns from other classes of firearms, such as long guns, by looking to their functionality." *Marzzarella*, 614 F.3d at 94; *see also Heller*, 554 U.S. at 629 (discussing handguns' ease in storage, access, and use in case of confrontation).

The Act's restrictions do not affect a semi-automatic weapon's utility for self-defense. As noted, the Act does not prohibit all semi-automatic weapons, but only those that possess the enumerated characteristics. The prohibited characteristics do not affect the weapons' utility for self-defense at all. For example, according to former Baltimore County Police Department Colonel Leonard J. Supenski: "The typical self-defense scenario in a home does not require more ammunition than is available in a standard 6-shot revolver or 6–10 round semiautomatic pistol." Brady Center to Prevent Gun Violence, *Assault Weapons: "Mass Produced Mayhem*," at 16 (Oct. 2008).[4] The Act's focus on a limited number of secondary characteristics and high-capacity magazines therefore will not have a meaningful impact on the self-defense right at the core of the Second Amendment.

---

[4] In practice, "nearly all shootings, including criminal ones, use many fewer rounds" than ten, and "until recently even police officers would routinely carry revolvers, which tended to hold only six rounds." Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1489 (2009); *see also* Gary Kleck, *Point Blank, Guns & Violence in America* 79 (paperback ed. 2005) (explaining that only a tiny fraction of gun homicides involve more than ten shots fired).

In fact, assault weapons with the prohibited characteristics may be substantially *worse* for self-defense purposes than those permitted by the Act. For example, a semi-automatic rifle with a large magazine could increase the risk that innocent bystanders could be shot accidentally. Similarly, the Act prohibits certain semi-automatic rifles and shotguns with folding stocks. This feature also increases the risk of injury to bystanders or passers-by: as the ATF has concluded, "[t]hese stocks allow the firearm to be fired from the folded position, yet it cannot be fired nearly as accurately as with an open stock." *See* Dep't of Treasury, *Studying the Sporting Suitability of Modified Semiautomatic Assault Rifles*, Ex. 5 (1998) [hereinafter *Sporting Suitability Study*], *available at* https://www.atf.gov/files/firearms/industry/april-1998-sporting-suitability-of-modified-semiautomatic-assault-rifles.pdf. Considering that the Supreme Court identified self-defense in the home as the central component of the Second Amendment right, and the reality that the assault weapons prohibited by the Act are generally ill-suited for self-defense, this Court should conclude that the targeted weapons fall outside the scope of the Second Amendment.

### C.   Assault Weapons and High-Capacity Magazines Are Dangerous and Unusual

The Supreme Court found that "dangerous and unusual weapons" are not protected by the Second Amendment. *See Heller*, 554 U.S. at 571; *Marzzarella*, 614 F.3d at 91 ("By equating the list of presumptively lawful regulations with restrictions on dangerous and unusual weapons, we believe the Court intended to treat them equivalently—as exceptions to the Second Amendment guarantee."); *see also Chester*, 628 F.3d at 678–79 ("[A] citizen's right to carry or keep sawed-off shotguns, for instance, would not come within the ambit of

the Second Amendment."). Thus, its protection does not extend to weapons that terrify the population, *see* 4 William Blackstone, Commentaries *148 (1769) ("The offense of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land ... ."), or to weapons that are particularly suited for crime, *see English v. State*, 35 Tex. 473, 476 (1871) ("No kind of travesty, however subtle or ingenious, could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice [pistols], from which so many murders, assassinations, and deadly assaults have sprung ... .").

Assault weapons clearly have the ability to terrify the population and are used disproportionately in crime. The Act covers certain characteristics that do not relate to the utility of the weapons for self-defense (or even for sporting purposes), but rather their utility for mass murder. For example, it prohibits certain semi-automatic rifles that have any two of the following: a folding stock, a grenade or flare launcher, or a flash suppressor. *See* Md. Code, Crim. Law § 4-301(e)(1)(i). According to the ATF, a flash suppressor

> disperses the muzzle flash when the firearm is fired to help conceal the shooter's position, especially at night ... [and] assist[s] in controlling the "muzzle climb" of the rifle, particularly when fired as a fully automatic weapon. From the standpoint of a traditional sporting firearm, there is no particular benefit in suppressing muzzle flash.

*Sporting Suitability Study*, Ex. 5. In a similar way, "[f]olding and telescoping stocks aid concealability and portability." *Cuomo*, 2013 WL 6909955, at *16. The ability to easily conceal and transport a semi-automatic rifle or shotgun is terrifying for obvious reasons: potential assailants can easily smuggle weapons into public places.

—14—

Assault weapons are particularly dangerous. Not surprisingly, academic research has found that the average number of people killed or wounded in mass shootings doubled when assault weapons or semi-automatic firearms with high capacity magazines were used in the shooting. *See* Christopher Koper, *America's Experience with the Federal Assault Weapons Ban, 1994–2004*, in *Reducing Gun Violence in America* 167 (Daniel W. Webster and Jon S. Vernick eds., 2013). For mass shootings from January 2009 to January 2013, the use of assault weapons or high capacity magazines resulted in more than double the number of people shot and more than 50 percent more people killed.[5] Likewise, an analysis of a database of mass shootings from 1984 to 2012 found positive correlations between rounds fired per minute and the number of people hit and killed. *See* Kevin Ashton, *The Physics of Mass Killing* (Jan. 24, 2013), *available at* http://kevinjashton. com/2013/01/24/the-physics-of-mass-killing/. Reducing access to assault weapons and high capacity magazines reduces the ability of criminals to spray-fire a continuous stream of hundreds of bullets into crowds. The extreme danger posed by the assault weapons prohibited by the Act, along with their unique capacity to terrify the public, renders them "dangerous and unusual," and thus outside the scope of the Second Amendment.

---

[5] A study of recent mass shootings found: "Assault weapons or high-capacity magazines were used in at least 12 of the incidents (28%). These incidents resulted in an average of 15.6 total people shot—123% more people shot than in other incidents (7.0) and 8.3 deaths—54 percent more deaths than in other incidents (5.4)." Mayors Against Illegal Guns, *Mass Shootings Since January 20, 2009* (2013), *available at* http://www.minnpost.com/sites/default/files/attachments/mass_shootings_2009-13_jan_29 _12pm.pdf.

### III. Even Assuming That the Maryland Act Implicates the Second Amendment, the Act Is Constitutional

In *McDonald*, the Supreme Court noted that the Second Amendment's guarantee "limits (but by no means eliminates) [the States'] ability to devise solutions to social problems that suit local needs and values." *McDonald*, 130 S. Ct. at 3046. The Court readily acknowledged that "state and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *Id.* (alteration omitted). Here, the State of Maryland has engaged in exactly the sort of local experimentation envisioned in *McDonald*. As described above, the Act does not implicate the Second Amendment because the prohibited assault weapons are not among the arms that the Amendment was designed to protect. However, even if this Court were to conclude that the Act restricts rights protected by the Second Amendment, it does so only marginally, and the restriction is far outweighed by Maryland's important governmental interest in ensuring the safety and security of its citizens.

#### A. Strict Scrutiny Is Not the Appropriate Standard of Review

The Supreme Court has not articulated a constitutional standard of review for Second Amendment challenges.[6] However, the Court has made clear that an individual's right to keep and bear arms *is* subject to reasonable regulation by the legislature. *See McDonald*, 130 S. Ct. at 3046 (describing "state and local experimentation with reasonable firearms regulations"). Although Plaintiffs urge this Court to apply strict scrutiny to

---

[6] *See* Lawrence Rosenthal & Joyce Lee Malcolm, *McDonald v. Chicago: Which Standard of Scrutiny Should Apply to Gun Control Laws?* 105 Nw. U. L. Rev. 437, 438-39 (2011).

Maryland's legislation, *see* Compl. ¶ 97, neither the Fourth Circuit nor any other court has ever held that such a standard applies to reasonable regulations like those at issue here. Indeed, *Heller* and *McDonald* implicitly rejected strict scrutiny.

As the Court in *Heller* explained, the Constitution provides legislatures with "a variety of tools for combating" the "problem of handgun violence." 554 U.S. at 636. The Court set forth a non-exclusive list of gun control regulations that it found to be "presumptively lawful," such as banning firearm possession by felons, and imposing conditions and qualifications on the commercial sale of arms. *Id.* at 626–27. In *McDonald*, the Court observed that the Second Amendment "does not imperil every law regulating firearms." 130 S. Ct. at 3047. The Court's repeated references to constitutionally permissible firearms regulations are inconsistent with the strong presumption against constitutionality that would accompany strict scrutiny.[7] Indeed, the four dissenting justices in *Heller* pointed out that "the majority implicitly, and appropriately, rejects [the] suggestion [that strict scrutiny should apply] by broadly approving a set of laws … whose constitutionality under a strict scrutiny standard would be far from clear." 554 U.S. at 688 (Breyer, J., dissenting).

Every court to consider this question in the Second Amendment context—including the Fourth Circuit—has rejected strict scrutiny. *See Chester*, 628 F.3d at 683 (refusing to

---

[7] States have long implemented wide-ranging restrictions on procuring, possessing, or using firearms since the formation of the United States. *See* Saul Cornell & Nathan DeDino, *A Well Regulated Right, The Early American Origins of Gun Control,* 73 Fordham L. Rev. 487, 502-05 (2005).

apply strict scrutiny to the ban on firearm possession by domestic violence misdemeanants); *Woollard*, 712 F.3d at 878 (rejecting argument that strict scrutiny should apply to Maryland's handgun permitting requirements as "foreclosed by [Fourth Circuit] precedent"); *see also, e.g., Heller v. Dist. of Columbia*, 698 F. Supp. 2d 179, 187 (D.D.C. 2010) ("[A] strict scrutiny standard of review would not square with [the Supreme Court's decision in *Heller*]."), *aff'd*, 670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*); *United States v. Marzzarella*, 595 F. Supp. 2d 596, 604 (W.D. Pa. 2009) ("[T]he [Supreme] Court's willingness to presume the validity of several types of gun regulations is arguably inconsistent with the adoption of a strict scrutiny standard of review.").

## B.   Under Fourth Circuit Precedent, Intermediate Scrutiny Is The Applicable Standard of Review

The Fourth Circuit, like other courts, has repeatedly concluded that intermediate scrutiny is the appropriate constitutional standard of review for Second Amendment challenges. *See Chester*, 628 F.3d at 683 ("[W]e conclude that intermediate scrutiny is more appropriate than strict scrutiny for Chester and similarly situated persons."); *Woollard*, 712 F.3d at 878 (applying intermediate scrutiny); *United States v. Masciandaro*, 683 F.3d 458, 471 (4th Cir. 2011) (applying intermediate scrutiny). "[A]lthough addressing varied and divergent laws, courts throughout the country have nearly universally applied some form of intermediate scrutiny in the Second Amendment context." *Cuomo*, 2013 WL 6909955, at \*12; *see also United States v. Lahey*, No. 10-CR-765, 2013 WL 4792852, at \*15 (S.D.N.Y. Aug. 8, 2013) ("[T]he emerging consensus appears to be that intermediate

scrutiny is generally the appropriate level of scrutiny for laws which substantially burden Second Amendment rights.") (collecting cases).

Plaintiffs may attempt to argue that Maryland's legislation burdens the "core" of their Second Amendment rights, defined in *Heller* as "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 634–35. Any such argument would not withstand scrutiny because the Maryland statute does not implicate this right.

Based on *Heller*'s invalidation of a firearms regulation that completely banned all handguns in the home, the Fourth Circuit has assumed, without deciding, that any law burdening the "core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *Masciandaro*, 683 F.3d at 470. "But, as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." *Id.* (citing *Heller*, 554 U.S. at 626).

Maryland's statute does not implicate the right of self-defense in the home; indeed, it places no limitations whatsoever on the ability of individuals to use "the quintessential self-defense weapon," the handgun, for purposes of defending their homes. *Heller*, 554 U.S. at 629. After the Supreme Court struck down the handgun ban in *Heller*, the District of Columbia enacted a prohibition on certain types of semi-automatic rifles and magazines with a capacity of more than ten rounds of ammunition. *See Heller II*, 670 F.3d at 1249. The D.C. Circuit concluded that the new regulation did not burden the "core" right to defend one's home because the prohibition did nothing to "prevent a person from keeping a

suitable and commonly used weapon for protection in the home or for hunting, whether a handgun or a non-automatic long gun." *Id.* at 1262. "[T]he prohibition of semi-automatic rifles and large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves." *Id.* Accordingly, the D.C. Circuit applied intermediate scrutiny, and it upheld the ban. *Id.* at 1262–63.

Other courts have examined similar state prohibitions on assault weapons and high-capacity magazines, and each has confronted the argument that such prohibitions burden the "core" Second Amendment right identified in *Heller*. Each court that has considered the argument has rejected it and found that a state's prohibition of certain types of assault weapons does not meaningfully impair the right of law-abiding citizens to defend "hearth and home." *See Cuomo*, 2013 WL 6909955, at *13 (finding that because "alternative channels for the possession of substitute firearms exist—the restrictions should be judged under intermediate scrutiny"); *Shew v. Malloy*, No. 3:13CV739, 2014 WL 346859, at *7 (D. Conn. Jan. 30, 2014) ("Unlike the law struck down in *Heller*, the legislation here does not amount to a complete prohibition on firearms for self-defense in the home. … The challenged legislation provides alternate access to similar firearms and does not categorically ban a universally recognized class of firearms.").

This Court should similarly find that because the Act places only a marginal burden, if any, on protected Second Amendment rights, intermediate scrutiny is the appropriate standard.

### C.   The Act Is Constitutional Because It Is Substantially Related to the Important Governmental Objective of Protecting Communities from Gun Violence

To pass muster under intermediate scrutiny, Maryland must show that the requirements of the legislation are "substantially related to an important government objective." *Clark v. Jeter,* 486 U.S. 456, 461 (1988); *see also Chester*, 628 F.3d at 683 ("[T]he government must demonstrate under the intermediate scrutiny standard that there is a 'reasonable fit' between the challenged regulation and a 'substantial' government objective." (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)). That standard is clearly met here.

Less than a year ago, the Fourth Circuit stated, "[W]e can easily appreciate Maryland's impetus to enact measures aimed at protecting public safety and preventing crime, and we readily conclude that such objectives are substantial governmental interests." *Woollard*, 712 F.3d at 877 (citing *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997) (referring to "the significant governmental interest in public safety") and *United States v. Salerno*, 481 U.S. 739, 750 (1987) (characterizing as "compelling" "the Government's general interest in preventing crime")). When it enacted the Firearm Safety Act of 2013, the Maryland Legislature considered significant evidence regarding the lethality of assault weapons and their lack of utility as a common method of self-defense. The relevant legislative committees heard testimony that "[a]ssault weapons and other firearms with large capacity ammunition feeding devices are commonly used in mass shootings and the greater the ammunition capacity of the firearm used in a mass shooting,

the more victims were injured or killed by gunfire."[8] The Legislature received additional testimony that the drastic increase in the number of assault weapons available since the federal assault weapons ban expired in 2004 presented significant dangers to communities and risks to law enforcement personnel.[9]

Furthermore, the Legislature considered evidence that the assault weapons prohibited by the Act are unlikely to be useful for the purpose of self-defense in the home, nor are they commonly used for that purpose. One witness, Professor Daniel Webster from Johns Hopkins, testified concerning a study showing that "[i]ncidents in which a law-abiding citizen would need and be able to use a firearm that could hold more than ten rounds of ammunition[] are likely to be extremely rare."[10] Indeed, the subset of guns subject to Maryland's prohibition is "preferred by criminals over law abiding citizens eight to one." *See* Brady Center, *Mass Produced Mayhem* at 10. Although the weapons now

---

[8] *See* Daniel W. Webster, Professor, Johns Hopkins Bloomberg School of Public Health and Director of the Johns Hopkins Center for Gun Policy and Research, *Testimony in Support of HB 294–Firearm Safety Act of 2013 Before the Maryland House Judiciary Committee*, at 5, *available at* http://mgaleg.maryland.gov/2013RS/ag_letters/sb0281.pdf. Based on data collected by the FBI, mass shooting incidents involving assault weapons, high-capacity magazines, or both resulted in 151% more people shot than similar incidents without these weapons, and 63% more deaths. *See* Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings* (Sept. 2013), *available at* https://s3.amazonaws.com/s3.mayors againstillegalguns.org/images/Analysis_of_Mass_Shootings.pdf.

[9] *See* Maryland Attorney General's Letter Regarding the Firearm Safety Act of 2013, at 5 (Apr. 30, 2013), *available at* http://mgaleg.maryland.gov/2013RS/ag_letters/sb0281.pdf (citing the testimony of Baltimore County Police Chief Jim Johnson).

[10] *See* Webster, *supra* note 8, citing Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J.Crim. L. & Criminology 150, 185 (1995) (revolvers and semi-automatic pistols are together used almost 80% of the time in incidents of self-defense with a gun).

prohibited under Maryland law constitute fewer than 2% of American firearms, *see* p. 8, *supra*, these types of firearms continue to be responsible for a disproportionately high number of mass shootings.[11]

Given these gruesome statistics, there can be no question that Maryland has an important and substantial governmental interest in protecting its citizens from the violent effects of assault weapons and high-capacity magazines. The Fourth Circuit in *Woollard* conclusively held that the interest in preventing gun violence was a substantial one. *See Woollard*, 712 F.3d at 877. Numerous other courts have upheld nearly identical prohibitions of assault weapons and high-capacity magazines against Second Amendment challenge. For example, the D.C. Circuit in *Heller II* examined the District of Columbia's ban on certain semi-automatic rifles and high-capacity magazines. *See Heller II*, 670 F.3d at 1249. The court held that these regulations satisfied intermediate scrutiny after considering evidence that the weapons in question are designed "to shoot multiple human targets very rapidly," and "are preferred by criminals and place law enforcement officers at particular risk because of their high firepower." *Id.* at 1263 (citations omitted). The court further found that high-capacity magazines "tend to pose a danger to innocent

---

[11] In an examination of 62 mass shootings in the United States over the past 30 years, one study found that 33 of these mass shootings involved assault weapons, high-capacity magazines, or both. *See More Than Half of Mass Shooters Used Assault Weapons and High-Capacity Magazines*, Mother Jones (Feb. 27, 2013), *available at* http://www.motherjones.com/politics/2013/02/assault-weapons-high-capacity-magazines-mass-shootings-feinstein.

people and particularly to police officers, which supports the District's claim that a ban on such magazines is likely to promote its important governmental interests." *Id.* at 1264.

Most recently, several district courts have upheld legislation similar to Maryland's against Second Amendment challenges. In *New York State Rifle & Pistol Association, Inc. v. Cuomo*, the court examined a New York law that prohibited assault weapons with certain specific secondary characteristics as well as magazines with a capacity of over ten rounds of ammunition. *Cuomo*, 2013 WL 6909955, at *3. The court held that because of the extreme and increasing risk to public safety posed by these weapons and the comparatively low burden on Second Amendment rights, New York's ban satisfied intermediate scrutiny. *See id.* at *17–18.

Likewise, in *Shew v. Malloy*, the court examined a Connecticut law similar to the legislation in New York and Maryland. *See Shew*, 2014 WL 346859, at *2. The court upheld the constitutionality of Connecticut's legislation, concluding that the assault weapon characteristics targeted by the state's prohibition "increase a firearm's 'lethalness.'" *Id.* at *9. The court went on to note that "the evidence suggests that limiting the number of rounds in a magazine promotes and is substantially related to the important governmental interest in crime control and safety." *Id.*; *see also Heller II*, 670 F.3d at 1264 ("We conclude the District has carried its burden of showing a substantial relationship between the prohibition of both semi-automatic rifles and magazines holding more than ten rounds and the objectives of protecting police officers and controlling crime.").

Between January 2009 and September 2013, there were 93 mass shootings in 35 states. Not all of these involved assault weapons or high-capacity magazines, but those that did resulted in an average of 14.4 people shot, more than three times the number of people shot in similar incidents that did not involve these dangerous weapons. *See* Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings*, *supra* note 8, at 3. When assault weapons and high-capacity magazines were involved, nearly 8 people were killed in each mass shooting incident, compared to fewer than 5 people when other types of weapons were involved. *See id*. Accordingly, even if the limited prohibition on certain firearms in the Maryland Act implicates rights protected by the Second Amendment (which it does not), the Act easily passes constitutional muster under intermediate scrutiny by virtue of the State's strong interest in protecting its citizens from the effects of this violence.

**CONCLUSION**

For the foregoing reasons, this Court should grant Defendants' motion for summary judgment and dismiss Plaintiffs' complaint.

Respectfully submitted,

*Of Counsel:*

Jonathan E. Lowy
Elizabeth M. Burke
Alla Lefkowitz
BRADY CENTER TO
PREVENT GUN VIOLENCE
LEGAL ACTION PROJECT
840 First Street NE, Suite 400
Washington, DC 20002
Tel: 202-370-8101
jlowy@bradymail.org
eburke@bradymail.org
alefkowitz@bradymail.org

    /s/ Benjamin C. Block
Benjamin C. Block (D. Md. #15811)
*Of Counsel:*
Elliott Schulder
Justin T. Lepp
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: 202-662-5205
Fax: 202-778-5205
bblock@cov.com
eschulder@cov.com
jlepp@cov.com

February 14, 2014

*Counsel for Amicus Curiae*