# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

|  |  |  |
|---|---|---|
| STEPHEN V. KOLBE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | Case No.: 1:13-cv-02841-CCB |
| | ) | |
| v. | ) | **REDACTED** |
| | ) | |
| MARTIN O'MALLEY, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Douglas F. Gansler
Attorney General of Maryland

Matthew J. Fader (Fed. Bar # 29294)
Jennifer L. Katz (Fed. Bar # 28973)
Assistant Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-7906 (tel.); 410-576-6955 (fax)
mfader@oag.state.md.us

Dan Friedman (Fed. Bar # 24535)
Assistant Attorney General
Office of the Attorney General
Legislative Services Building
90 State Circle, Room 104
Annapolis, Maryland 21401
Tel. 410-946-5600
dfriedman@oag.state.md.us

Dated: February 14, 2014          Attorneys for Defendants

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS .................................................................................... 3

I.   DEVELOPMENT OF MILITARY-STYLE ASSAULT WEAPONS ...................................... 3

    A.   The Assault Weapons Banned in Maryland Were Designed for
        Combat Use. ................................................................................... 3

    B.   The Colt AR-15 .............................................................................. 5

    C.   The AK-47 ...................................................................................... 8

    D.   Full Automatic Versus Semi-Automatic Firing ............................ 8

II.  REGULATION OF MILITARY-STYLE ASSAULT WEAPONS AND LARGE-
    CAPACITY MAGAZINES ....................................................................................... 10

    A.   Regulation of Military-Style Assault Weapons and Large-Capacity
        Magazines in Maryland before the Firearm Safety Act ............... 10

    B.   The Firearm Safety Act of 2013 .................................................. 12

ARGUMENT ...................................................................................................... 14

I.   THE STATE'S BANS ON ASSAULT WEAPONS AND LARGE-CAPACITY
    MAGAZINES ARE CONSTITUTIONAL. ................................................................ 14

    A.   The Second Amendment Framework .......................................... 14

    B.   Every Court to Consider the Question Has Upheld Prohibitions on
        Assault Weapons and Large-Capacity Magazines. ..................... 18

    C.   The Firearm Safety Act's Bans on Assault Rifles and Large-
        Capacity Magazines Do Not Burden Conduct Falling Within the
        Scope of the Second Amendment. ............................................... 21

1.     Assault Weapons Do Not Fall Within the Protection of the Second Amendment Because They Are Not Commonly Owned, Nor Are They Commonly Used for Self-Defense. .............................................................. 25

     a.     Assault Weapons Are Not Commonly Owned. ................... 25

     b.     Assault Weapons Are Not Commonly Used for Self-Defense. ......................................................... 28

2.     The Banned Large-Capacity Magazines Do Not Fall Within the Protection of the Second Amendment Because They Are Not Protected Arms Nor Are They Commonly Used in Self-Defense. ........................................................................... 29

     a.     Large-Capacity Magazines Are Not Arms Protected by the Second Amendment. ....................................... 29

     b.     Large-Capacity Magazines Are Not Commonly Used for Self-Defense. .................................................... 31

3.     The Banned Assault Weapons and Large-Capacity Magazines Do Not Fall Within the Protection of the Second Amendment Because They Are Dangerous and Unusual. .................................... 32

D.     Even if the Firearm Safety Act's Bans on Assault Rifles and Large-Capacity Magazines Implicate the Second Amendment, the Law Is Constitutional. ........................................................................... 37

1.     To the Extent Heightened Scrutiny Is Warranted, Intermediate Scrutiny Is the Appropriate Standard of Review. ........................................................................... 37

2.     The Firearm Safety Act Is Reasonably Adapted to the State's Substantial Interests in Protecting Public Safety and Reducing the Negative Effects of Firearms Crime. .......................................... 42

     a.     Top Maryland Law Enforcement Officials Testified That the Firearm Safety Act Is Reasonably Adapted to Protecting Public Safety and Reducing the Negative Effects of Firearms Crime. .................................... 42

          b.      The Best Available Social Science Evidence Supports the General Assembly's Conclusion that the Firearm Safety Act Will Protect Public Safety and Reduce the Negative Effects of Firearms Crime. .................................... 48

II.    THE BANS' EXEMPTIONS FOR RETIRED POLICE OFFICERS DO NOT VIOLATE THE EQUAL PROTECTION CLAUSE.. ........................................................ 55

III.   THE FIREARM SAFETY ACT IS NOT VOID FOR VAGUENESS. .................................. 59

    A.    Plaintiffs' Facial Vagueness Challenge to the Law Is Invalid. ................... 60

    B.    The Firearm Safety Act Identifies a Clearly Defined Core of Prohibited Conduct and Does Not Encourage Arbitrary and Discriminatory Enforcement. .................................................................... 61

        1.    The Firearm Safety Act Proscribes an Identifiable and Understandable Core of Prohibited Conduct. ................................... 62

            a.      The Plaintiffs' Own Allegations Confirm There Is an Identifiable and Understandable Core of Prohibited Conduct............................................................... 64

            b.      Maryland Law Has Contained the Same Definition of Assault Long Guns for Twenty Years. ............................. 66

        2.    The Firearm Safety Act Does Not Encourage Arbitrary or Discriminatory Enforcement.......................................................... 67

        3.    Regulation of "Copies" Is Necessary to Further the Legislative Purpose of the Firearm Safety Act and to Minimize Circumvention of the Law. ............................................... 69

    C.    Other Similar Laws Have Not Been Found Void for Vagueness. .............. 71

        1.    Courts in Other States Have Rejected Vagueness Challenges to Similar Provisions. .................................................... 71

        2.    Other Statutes Regulating "Copies" of Illegal Items Have Not Been Found Void for Vagueness. ............................................. 72

CONCLUSION ................................................................................................. 75

# TABLE OF AUTHORITIES

Page

## Cases

*Arnold* v. *City of Cleveland*, 616 N.E.2d 163 (Ohio 1993) ............................................... 19

*Bell v. Maryland*, 378 U.S. 226 (1964) ............................................................... 59

*Benjamin v. Bailey*, 662 A.2d 1226, 1230-35 (Conn. 1995) ....................................... 19, 72

*Board of Trs. v. Fox*, 492 U.S. 469 (1989) ........................................................ 41

*Buckley v. Valeo*, 424 U.S. 1 (1976).............................................................. 40

*Cabell v. Chavez-Salido*, 454 U.S. 432 (1982)................................................... 58

*City of Cincinnati v. Langan*, 640 N.E.2d 200 (Ohio Ct. App. 1994)............................. 19

*City of Clebourne v. Clebourne City Ctr., Inc.* 473 U.S. 432 (1985)............................ 56

*Coalition of N.J. Sportsmen, Inc. v. Whitman*, 44 F. Supp. 2d 666 (D.N.J. 1999),
    *aff'd*, 263 F.3d 157 (3d Cir. 2001) ........................................................ 72

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971)............................................. 62

*Cooke v. Hickenlooper*, 2013 U.S. Dist. LEXIS 168806 (D. Colo. Nov. 27, 2013)......... 66

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ....................................... passim

*Federal Commc'ns Comm'n v. Fox TV Stations,* 132 S. Ct. 2307 (2012) ........................ 62

*Foley v. Connelie*, 435 U.S. 291 (1978) ......................................................... 57

*Green v. City of Raleigh,* 523 F.3d 293 (4th Cir. 2008) ....................................... 67

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ........................... passim

*Heller v. District of Columbia*, 698 F. Supp. 2d 179 (D.D.C. 2010) ........................... 18

*Hightower v. City of Boston*, 693 F.3d 61 (1st Cir. 2012).................................... 29

*Hill v. Colorado*, 503 U.S. 703 (2000) ..................................................... 62, 63

*In re R.C.*, 745 N.E.2d 1233 (Ill. 2001)....................................................... 69

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012),
    *cert denied,* 133 S. Ct. 1806 (Apr. 15, 2013)....................................... 15, 41, 61

*Kampfer v. Cuomo*, No. 6:13-cv-82,
    2014 U.S. Dist. LEXIS 1479 (N.D.N.Y. Jan. 7, 2014) ........................................ 19, 20

*Martin v. Lloyd*, 700 F.3d 132 (4th Cir. 2012)........................................... 60, 62

*McDonald v. City of Chicago*, ___ U.S. ___, 130 S. Ct. 3020 (2010) ........................... 15

iv

*NAACP v. City of Annapolis*, 133 F. Supp. 2d 795 (D. Md. 2001) .............................. 68, 69

*National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms,*
  *& Explosives*, 700 F.3d 185 (5th Cir. 2012) ................................................. 15

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, No. 13-CV-291S,
  2013 U.S. Dist. LEXIS 182307 (W.D.N.Y. Dec. 31, 2013) ................................... passim

*People v. James*, 94 Cal. Rptr. 3d 576 (Ct. App. 2009) ..................................... 18

*Richmond Boro Gun Club*, 896 F. Supp. 276 (E.D.N.Y. 1995) ........................................ 65

*Richmond Med Ctr. for Women v. Gilmore*, 144 F. 3d 326 (4th Cir. 1998) .................... 66

*Robertson v. City & County of Denver*, 874 P.2d 325 (Colo. 1994) ................................ 19

*Sabri v. United States*, 541 U.S. 600 (2004) ....................................................... 60

*San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121 (9th Cir. 1996) .................... 56

*Shew v. Malloy*, No. 3:13cv739,
  2014 U.S. Dist. LEXIS 11339 (D. Conn. Jan. 30, 2014) ........... 19, 20, 21, 24, 38, 54, 55

*Smith v. Goguen*, 415 U.S. 566 (1974) ........................................................ 62, 67

*Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250 (6th Cir. 1994) .............. 70, 72

*Staples v. United States*, 511 U.S. 600 (1994) ................................................... 8

*State v. Warriner*, 731 A.2d 86 (N.J. Super. 1999) .............................................. 72

*Steffel v. Thompson*, 415 U.S. 452 (1974) ....................................................... 60

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ......................................... 41

*United States v. Chapman*, 666 F.3d 220 (4th Cir. 2012) ...................................... 30

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ................................ 16, 38, 39

*United States v. Desurra*, 865 F.2d 651 (5th Cir. 1989) ....................................... 73

*United States v. Fisher*, 289 F.3d 1329 (11th Cir. 2002) ...................................... 73

*United States v. Hager*, 721 F.3d 167 (4th Cir. 2013) ......................................... 62

*United States v. Hodge*, 321 F.3d 429 (3d Cir. 2003) .......................................... 73

*United States v. Hofstatter*, 8 F.3d 316 (6th Cir. 1993) ....................................... 73

*United States v. Klecker*, 348 F.3d 69 (4th Cir. 2003) .................................. 60, 73, 74

*United States v. Lanning*, 723 F.3d 476 (4th Cir. 2013) ................................... 62, 67

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ....................... 15, 29, 38, 39

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) ................. 16, 17, 39, 40, 41

*United States v. Miller*, 307 U.S. 174 (1939) .............................................. 15, 22

*United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29 (1963) ................................ 61

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010) ...................................... 15

*United States v. Salerno*, 481 U.S. 739 (1987)...................................................... 61

*United States v. Staten*, 666 F.3d 154 (2011) .................................................... 40

*United States v. Sun*, 278 F.3d 302 (4th Cir. 2002)........................................... 61

*United States v. Washam*, 312 F.3d 926 (8th Cir. 2002)..............................73, 74

*United States v. Whorley*, 550 F.3d 326 (4th Cir. 2008) ................................... 62

*United States v. Williams,* 553 U.S. 285 (2008) .................................................. 60

*Village of Hoffman Estates v. Flipside, Hoffman Estates Inc.*,
    455 U.S. 489 (1982) ........................................................59, 60, 61, 62, 64, 67

*Wag More Dogs, LLC v. Cozart,* 680 F.3d 359 (4th Cir. 2012)...........................62, 63, 67

*Washington State Grange v. Washington State Republican Party*,
    552 U.S. 442 (2008) ............................................................................................. 60

*Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483 (1955)................ 40

*Wilson v. Cnty. of Cook*, 968 N.E.2d 641 (Ill. 2012) ...........................70, 71, 72

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir.),
    *cert. denied* 134 S. Ct. 422 (2013) ....................................................passim

## Constitutions

U.S. Const., amend. I........................................................................................60, 61

U.S. Const., amend. II ......................................................................................passim

U.S. Const., amend. XIV, § 1 ............................................................................55

## Statutes

18 U.S.C. § 921 (repealed) ............................................................................... 11

18 U.S.C. § 921(a)(30)(A)-(D) (repealed)........................................................ 11

18 U.S.C. § 921(a)(31)(A) (repealed) ..........................................................11, 12

18 U.S.C. § 922 (repealed) ............................................................................... 11

18 U.S.C. § 922(v)(1) (repealed)...................................................................... 11

18 U.S.C. § 922(v)(2) (repealed)...................................................................... 12

18 U.S.C. § 922(w)(1) (repealed)..................................................................... 12

18 U.S.C. § 922(w)(2) (repealed) ...................................................................... 12

1994 Laws of Md., Ch. 456. ............................................................................. 11

21 U.S.C. § 802 ................................................................................................ 73

21 U.S.C. § 813 ................................................................................................ 73

21 U.S.C. §§ 801-904 ...................................................................................... 73

Cal. Penal Code §§ 12275-12290 .................................................................... 10

Md. Ann. Code art. 27, § 441(d) (1989) .......................................................... 66

Md. Code Ann., Crim. Law § 4-301(f) .............................................................. 13

Md. Code Ann., Crim. Law § 4-302(7) ............................................................. 56

Md. Code Ann., Crim. Law § 4-303(a) .............................................................. 12

Md. Code Ann., Crim. Law § 4-303(a)(2) ......................................................... 13

Md. Code Ann., Crim. Law § 4-303(b)(3) ......................................................... 13

Md. Code Ann., Crim. Law § 4-305 ............................................................. 13, 56

Md. Code Ann., Pub. Safety § 3-101(e) ............................................................ 57

Md. Code Ann., Pub. Safety § 4-301 ........................................................... 12, 63

Md. Code Ann., Pub. Safety § 5-101(r)(2) .......................................... 3, 13, 59, 63, 66

Md. Code Ann., Pub. Safety § 5-101(r)(2)(xv) .................................................. 65

Pub. L. No. 103-322, 108 Stat. 1796 (1994) ................................................ 11, 12

Pub. L. No. 99-570, 100 Stat. 3207-13 (1986) ................................................. 73

## Other Authorities

1 A New and Complete Law Dictionary ............................................................ 30

1 Dictionary of the English Language (4th ed.) (reprinted 1978) ...................... 30

95 Op. Att'y Gen. Md. 101 (2010) .............................................................. 63, 68

American Heritage Dictionary of the English Language (5th ed. 2011) ............. 26

History of Ch. 427 ........................................................................................... 13

http://www.youtube.com/watch?v=65AZWtAqf40 ............................................. 9

U.S. Census Bureau: State and County QuickFacts, Maryland ......................... 28

**Regulations**

COMAR 12.04.02.03A ................................................................................................. 57

COMAR 12.04.02.06A ................................................................................................. 57

COMAR 12.04.02.06B(2) ............................................................................................ 57

COMAR 12.04.02.06B(3) ............................................................................................ 57

COMAR 12.04.02.07 ................................................................................................... 57

COMAR 12.04.02.08A ................................................................................................. 57

COMAR 12.04.02.08E ................................................................................................. 57

COMAR 12.04.02.10C ................................................................................................. 58

COMAR 12.04.02.10D ................................................................................................. 58

## INTRODUCTION

As part of a comprehensive effort to amend Maryland's gun laws to promote public safety and save lives, the Maryland General Assembly enacted Chapter 427 of the 2013 Laws of Maryland, the Firearm Safety Act of 2013 (the "Firearm Safety Act"). Enacted in the context of gun violence that remains far too high and in the wake of a number of mass shootings—the most recent of which was the murder of 26 people, including 20 six- and seven-year old children, in Newtown, Connecticut by a shooter armed with a Bushmaster AR-15 assault rifle with multiple 30-round magazines—the Firearm Safety Act included a ban on the sale, transfer, and receipt of certain assault weapons and large-capacity magazines, along with provisions addressing mental health issues connected with firearms, establishment of a handgun qualification license requirement for purchasers of handguns, a ban on armor-piercing bullets, and others.

In this lawsuit, the plaintiffs bring a facial challenge to the bans on assault long guns and large-capacity magazines, contending erroneously that the bans violate their Second Amendment right to keep and bear arms.  The plaintiffs also claim that exceptions in the ban applicable to retired law enforcement officers violate the Equal Protection Clause, and that the ban on assault weapons is void for vagueness.  All of these claims lack merit.

The plaintiffs' Second Amendment claims fail because the assault weapons and large-capacity magazine bans do not burden conduct protected by the Second Amendment.  Assault weapons are a subclass of unreasonably dangerous firearms developed and adopted for their military effectiveness, with features appropriate for

military and some law-enforcement purposes, but which are not commonly owned generally, or commonly used for self-defense. Large-capacity magazines are not even "arms" entitled to protection under the Second Amendment, and are also unreasonably dangerous, useful for military and some law enforcement purposes, but not necessary or appropriate for self-defense.

Moreover, even if the bans on assault weapons and large-capacity magazines do burden conduct protected by the Second Amendment, they satisfy intermediate scrutiny, the most demanding level of scrutiny that could apply. Evidence demonstrates that the bans are a reasonable fit to the State's substantial interest in public safety and reducing the harms associated with gun violence, especially in connection with mass shootings and harm to law enforcement officers. No Maryland citizen is denied the right to own firearms, of any class they choose, or to acquire as much ammunition as they choose, to defend themselves or for any other lawful purpose. There is more-than-sufficient evidence to support the Maryland General Assembly's predictive judgment that the Firearm Safety Act will advance Maryland's substantial interests without denying anyone their Second Amendment rights.

The plaintiffs' equal protection claim fails because retired law enforcement officers are not similarly situated to other citizens who have not been law enforcement officers when it comes to firearms training, use, and ownership.

Finally, the plaintiffs' pre-enforcement, non-First Amendment vagueness claim fails because the plaintiffs cannot demonstrate that the definition of assault long guns in the Firearm Safety Act—which Maryland has applied in a regulatory context for twenty

years—is vague in all of its applications.  To the contrary, the plaintiffs' own allegations establish just the opposite.

The assault weapons and large-capacity magazine bans of the Firearm Safety Act are public safety measures that do not infringe on the Second Amendment rights of Maryland citizens, that advance Maryland's interests in promoting public safety and reducing the harmful effects of gun violence, and that are supported by substantial evidence.  The defendants are entitled to summary judgment as to all counts of the third amended complaint.

## STATEMENT OF FACTS

### I.  DEVELOPMENT OF MILITARY-STYLE ASSAULT WEAPONS

#### A.  The Assault Weapons Banned in Maryland Were Designed for Combat Use.

The Firearm Safety Act bans a set of specifically-enumerated assault long guns and their copies, as set forth in § 5-101(r)(2) of the Public Safety Article, most of which are military-style semi-automatic rifles.  (*See, e.g.*, Ex. 11, Decl. of Kristin Jones Bryce, Ex. (containing photographs of enumerated assault long guns).)[1]  The firearms that are by far the most widely-owned of those banned by the Firearm Safety Act—the AR-15, the AK-47, and their copies—are essentially identical to the firearms that are the most widely-used by militaries around the world, with the exception that the versions targeted by the Firearm Safety Act are semiautomatic, whereas the military versions are also

_____

[1] Three of the firearms covered by the law are semiautomatic shotguns, not rifles.

capable of firing in full automatic mode.  (*See* Ex. 41, Tr. of Dep. Jim Supica 75-77; Ex. 42, Tr. of Dep. Buford Boone 95; Ex. 44, Tr. of Dep. James Curcuruto 91.)

Assault long guns trace their origins to the German *Sturmgewehr* (assault rifle), designed in the late stages of World War II to combine the power, long-range accuracy, and penetrating ability of a rifle with the ability to fire multiple rounds at the fast rate of speed of submachine guns.  (Ex. 61, Expert Report of Jim Supica ("Supica Report"), at 10-11; Ex. 71, Edward Clinton Ezell, *Small Arms of the World* 17 (12th ed. 1983) (the idea was to combine the "rapid, massed and shocking power of the sub-machine gun with the lethality of the standard infantry rifle cartridge").)  The firearms were developed for the military, designed specifically for the battlefield, and eventually adopted by militaries around the world for their military effectiveness.  As a result, assault weapons often come equipped with military-style features designed to serve specific combat needs and enhance the usefulness of the weapon for military purposes, including:.

- The ability to accept a large-capacity magazine originally designed and produced for a military assault weapon;

- Flash suppressors, which disperse the flash down and away from a shooter's eye to enable more efficient successive shots and to hide a shooter's position, allowing for more effective, aggressive engagements;

- Coiling shrouds that cover the barrel of assault weapons to allow a shooter to hold a weapon with greater ease while firing dozens or hundreds of rounds in a brief period of time with limited mechanical failure;

- Pistol grips that allow greater control of a firearm while being held at one's hip, which allows for un-aimed "spray" fire, in either automatic or semi-automatic mode;

- Collapsible or folding stocks to aid in the concealment of high-powered assault weapons, to allow for adjustment of the weapon for use by multiple

members of a combat regimen or SWAT team, or to be used with protective body armor.

(Ex. 15, Department of the Treasury, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* 1, Ex. 5 (1998); Ex. 14, Department of the Treasury, *Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles* 6-7 (1989); *see also* Ex. 16, ATF, *Study on the Importability of Certain Shotguns* 9-12 (2011); Ex. 3, Decl. of James Johnson ¶ 32; Ex. 4, Decl. of Anthony Batts ¶ 33.)  (*See also* Ex. 15, 1998 ATF Study 1 (semiautomatic assault rifles, "while no longer machineguns, still had a military configuration that was designed for killing and disabling the enemy"); *id.* at Ex. 5 (listing and describing features consistent with a military configuration); Ex. 3, Johnson Decl. ¶¶ 32-33.)

## B.    The Colt AR-15

The AR-15, by far the most popular of the banned assault rifles and the central focus of the plaintiffs' claims (Ex. 44, Curcuruto Dep. 74-75; Ex. 62, Decl. of Stephen Schneider ¶ 6; Ex. 63, Decl. of Carol Wink ¶ 4; Ex. 45, Tr. of Dep. Stephen Schneider 18-19), was originally adopted by the United States military and other militaries around the world because of its efficiency as a military assault rifle.  The AR-15 replaced the M14, a selective fire rifle that the Army had adopted in 1959, as the standard issue U.S. Army firearm.  (Ex. 17, Duncan Long, *The Complete AR-15/M16 Sourcebook* 19, 25-28

(2d ed. 2001).)[2]  At the same time the United States was adopting the M14, however, a company called Armalite was developing the AR-15, and marketing that firearm to the U.S. military and other militaries around the world.  (Ex. 17, Long 17-19, 23-25.)  As originally developed, the AR-15, like the M14, was a selective fire automatic rifle.  The AR-15 was designed to meet new U.S. Army specifications, including firing a round that would penetrate body armor and a steel helmet, holding a detachable 20-round magazine, having a weight of less than 6 pounds fully loaded, and allowing troops to rapidly fire multiple rounds in a controlled, yet simultaneously spread pattern.  (Ex. 18, Doug Howlett, *Shooter's Bible Guide to AR-15s*, at 10 (2011); Ex. 17, Long 17.)  After military testing, Armalite implemented a number of changes suggested by the Army, including strengthening the AR-15's barrel and adding a flash suppressor.  (Ex. 17, Long 18.)

Armalite's design performed so well that the military concluded that a 5-man squad armed with AR-15s was as good or better "in hit-and-kill potential in combat-style tests" than an 11-man squad armed with M14 rifles.  (*Id.* at 19.)  In field testing in Vietnam, troops were impressed, reporting that "[a]mputations of limbs, massive body wounds, and decapitations had all been caused by the very high velocity AR-15 projectiles."  (Ex. 19, Kevin Dockery, *Special Warfare, Special Weapons* 131.)  The military ultimately adopted the AR-15 as its standard-issue service rifle, and renamed it the M16.  (Ex. 17, Long 26.)

---

[2] "Selective fire" means that the M14 could be set to fire in full automatic (*i.e.*, one trigger pull releases multiple rounds of ammunition) or semi-automatic (*i.e.*, one trigger pull releases one round of ammunition) mode.

Before the Army adopted the AR-15, Armalite sold its licensing rights to Colt. (Ex. 17, Long 23.) In addition to fulfilling its military contracts, Colt also manufactured AR-15s for the civilian market. To comply with the National Firearms Act, which regulates the sale of fully-automatic firearms in the civilian market, Colt sold a "slightly modified" version of the AR-15 that was adjusted so that it could not fire in full automatic mode, but that otherwise retained all military features and capabilities. (Ex. 20, Christopher R. Bartocci, *Black Rifle II* 235.) Thus, M16 is the name used to refer to versions of the firearm sold to the United States military, and AR-15 is the name used to refer to semiautomatic versions sold in the civilian market or to law enforcement.

Colt relies heavily on the AR-15's military origins, features, and specifications when marketing to civilians, boasting that its rifles are "based on the same military standards and specifications as the United States issue Colt M16 rifle and M4 carbine." (Ex. 69, Colt, http://www.coltsmfg.com/Catalog/ColtRifles.aspx (last visited Feb. 13, 2014).) Because Colt's patent on the original AR-15 expired many years ago, copies of the AR-15 have been manufactured by dozens of different firearms manufacturers. (*See* Ex. 64, Expert Report of James Curcuruto ("Curcuruto Report") ¶ 1; Ex. 44, Curcuruto Dep. 76-77; Ex. 41, Supica Dep. 148; Ex. 48, Tr. of Dep. Patrick Shomo Dep. 27.) Many of these manufacturers also stress the military origins and features in marketing their firearms. (*See, e.g.*, Ex. 33, Blackheart International, *2013 Tactical Firearms Catalog*; Ex. 70, Bushmaster Firearms, *2011 Bushmaster Product Catalog* 16, 32; *see also* Ex. 21, Violence Policy Center, *Militarization* (2011).)

## C.     The AK-47

Shortly after World War II, the Soviet Union produced the AK-47, the "most produced military firearm in history." (Ex. 61, Supica Report 11; *see generally* Ex. 22, Val Shilin & Charlie Cutshaw, *Legends and Reality of the AK* 19-29 (2000).)  Like the AR-15, the AK-47 was developed for military use, and full automatic versions of that firearm have been adopted by many militaries around the world.  (Ex. 22, Shilin & Cutshaw 19-23.)  Semiautomatic versions of the AK-47, and subsequent variations like the AK-74, are the second-most popular type of centerfire semiautomatic rifle in the United States, behind the AR-15.  (Ex. 61, Supica Report 11.)

## D.     Full Automatic Versus Semi-Automatic Firing

The only functional difference between the M16 and full automatic AK-47, on the one hand, and the AR-15 and semi-automatic AK-47, on the other hand, is that the former are capable of full automatic fire.  (*See* Ex. 46, Tr. of Dep. John Josselyn 24-25; Ex. 47, Tr. of Dep. Gregory Nolte 18-19; Ex. 48, Shomo Dep. 37; Ex. 49, Tr. of Dep. Robert Warnick 53; Ex. 50, Tr. of Dep. Andrew Turner 152-53, 166-67; Ex. 41, Supica Dep. 75-77; Ex. 42, Boone Dep. 95; Ex. 43, Tr. of Dep. Guy Rossi 95, 106; Ex. 44, Curcuruto Dep. 91.; Ex. 3, Johnson Decl. ¶ 36; Ex. 23, H.R. Rep. No. 103-489, at 17 (1994).)  The Supreme Court has thus identified the AR-15 as "the civilian version of the military's M-16 rifle."  *Staples v. United States*, 511 U.S. 600, 603 (1994).  While an automatic weapon "fires repeatedly with a single pull of the trigger," a semiautomatic weapon "fires only one shot with each pull of the trigger," but  still automatically places "another round in the chamber after each round is fired."  *Staples*, 511 U.S. at 602 n.1.

Although semiautomatic assault rifles have a slower rate of fire than automatic firearms, their rate of fire is limited only by the speed at which an individual can pull a trigger.  (Ex. 46, Josselyn Dep. 26; Ex. 51, Tr. of Dep. Gary Kleck 151.)  In fact, while it takes just 2 seconds to empty a 30-round magazine on full automatic fire, a 30-round magazine in a semi-automatic rifle can be emptied *in approximately 5 seconds*. *Heller v. District of Columbia*, 670 F.3d 1244, 1263 (D.C. Cir. 2011) ("*Heller II*") (citing Testimony of Brian J. Siebel, Brady Center to Prevent Gun Violence, at 1 (Oct. 8, 2008) ("Siebel Testimony")); (*see also* Ex. 51, Kleck Dep. 151; Ex. 3, Johnson Decl. ¶ 36.)[3] Thus, the D.C. Circuit concluded that the distinction between the two types of firearms is not meaningful in practice.  *Heller II*, 670 F.3d at 1263; (*see also* Ex. 23, H.R. Rep. 103-489, at 18 (citing congressional testimony that "semiautomatic weapons can be fired at rates of 300 to 500 rounds per minute, making them virtually indistinguishable in practical effect from machineguns").)

Military and law enforcement agencies alike have concluded that weapons capable of full automatic fire are generally more effective—even for military and specialized law enforcement purposes—in semiautomatic mode.  Thus, the United States Army considers the M16 to be more effective in semiautomatic mode in almost all combat situations, and discourages full automatic fire because it "is rarely effective."  (Ex. 25, United States Army's M16/M4 Training Manual, 7-8 through 7-13, 7-47 (Aug. 2008).)   Similarly,

---

[3] Visual presentations of the rapid rate of fire of semiautomatic assault rifles are ubiquitous on the Internet.  One such video, titled "AR-15 Rapid Fire," demonstrates a shooter firing 30 rounds in only 6 seconds: http://www.youtube.com/watch?v=65AZWtAqf40 (last visited Feb. 13, 2014)

many law enforcement agencies instruct officers to use fully-automatic firearms only in semi-automatic mode.   (*See, e.g.*, Ex. 3, Batts Decl. ¶¶ 19, 23.)   Accordingly, the preferred weapon for use in the military theater and in the most intense law enforcement activities is essentially indistinguishable from the civilian AR-15.

## II.   REGULATION OF MILITARY-STYLE ASSAULT WEAPONS AND LARGE-CAPACITY MAGAZINES

### A.   Regulation of Military-Style Assault Weapons and Large-Capacity Magazines in Maryland before the Firearm Safety Act

Coinciding with the heavy marketing of assault weapons to the civilian population in the 1980s (*see* Ex. 21, VPC *Militarization* 21, 29; Ex. 48, Shomo Dep. 37-38), the use of these weapons in a spate of mass shootings and other crimes garnered national attention and concern.   (*See* Ex. 6, Decl. of Daniel Webster ("Webster Decl.") ¶ 10; Ex. 23, H.R. Rep. 103-489, at 12-15; Ex. 32, Department of the Treasury, *Assault Weapons Profile* 1-17 (1994) ("1994 ATF Profile") (describing various crimes committed with different models of assault rifles).)[4]   California enacted the first state assault weapons ban in 1989.  Cal. Penal Code §§ 12275-12290.

---

[4] The most notorious of these mass shootings include the 1984 shooting at a McDonald's restaurant in California that led to 21 deaths and 19 with nonfatal wounds; the 1989 shooting at a schoolyard in Stockton, California that killed five children and left 29 others with nonfatal wounds; a 1989 workplace shooting in Louisville, Kentucky that left seven dead and 15 with nonfatal wounds; a 1991 shooting at a diner in Killeen, Texas that left 23 dead and 27 more wounded; and a 1993 shooting on a Long Island Railroad train of 25 people, six of whom died.  (Ex. 6, Webster Decl. ¶ 10.)

Early in 1994, Maryland enacted a ban on assault pistols. 1994 Laws of Md., Ch. 456 (attached as Ex. 35). In the same legislation, Maryland also identified a list of specifically-enumerated assault long guns, and required that purchasers of those assault long guns or their "copies" complete an application that had to be forwarded to the Maryland State Police, which then conducted a background check on the buyer. *Id.* That registration requirement, which also applied to any handgun sold in the State, was in effect until October 1, 2013, when it was replaced, pursuant to the Firearm Safety Act, with a ban on the same enumerated assault weapons and their copies. In the same 1994 legislation, Maryland enacted a ban on the transfer, sale, or receipt of detachable magazines with a capacity of more than 20 rounds of ammunition. *Id.*

Later in 1994, the federal government enacted a ban on certain new assault weapons as part of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994). *See* 18 U.S.C. §§ 921-22 (repealed). The federal assault weapons ban was intended to be a prohibition on those semiautomatic weapons having features that are useful in military and criminal applications, but that are unnecessary in shooting sports or for self-defense. (*See* Ex. 23, H.R. Rep. 103-489, at 17-20.) The federal ban applied to both a list of 18 models and variations of semiautomatic assault weapons by name, along with their "duplicates and copies," and to other semiautomatic assault weapons that share two or more of a set of identified military-style features. 18 U.S.C. § 921(a)(30)(A)-(D) (repealed); *id.* § 922(v)(1) (repealed). The federal ban also established a prohibition on "large capacity ammunition feeding devices" capable of holding more than ten rounds. 18 U.S.C. § 921(a)(31)(A) (repealed); *id.*

11

§ 922(w)(1) (repealed).   The federal ban applied only to new assault weapons and magazines manufactured after September 13, 1994, and did not prevent the transfer, sale, or receipt of any assault weapons or magazines manufactured before that date.   18 U.S.C. § 921(a)(31)(A) (repealed); *id.* § 922(v)(2) (repealed); *id.* § 922(w)(2) (repealed); (*see* Ex. 23, H.R. Rep. 103-489, at 20.)   The federal ban expired on September 13, 2004.   Pub. L. No. 103-322, § 110105(2), 108 Stat. 2000.

### B.      The Firearm Safety Act of 2013

Last year, the Maryland General Assembly enacted the Firearm Safety Act as a comprehensive effort to amend Maryland's gun laws to further promote public safety and save lives.   (*See, e.g.*, Ex. 26, Testimony of Governor Martin O'Malley, Feb. 6, 2013.) Aspects of that comprehensive reform that are not at issue in this litigation include a number of provisions addressing mental health issues connected with firearms, the establishment of a handgun qualification license requirement for purchasers of handguns, and a ban on armor-piercing bullets, among others.   (*See generally* Ex. 13, the Firearm Safety Act.)

Two aspects of the Firearm Safety Act are challenged in this case.   First, the Firearm Safety Act generally prohibits a Maryland person, after October 1, 2013, from among other things, possessing, selling, or receiving "assault long guns" and "copycat weapons," (collectively "assault weapons"), as defined in the law.   Md. Code Ann., Crim. Law ("CR") §§ 4-303(a), 4-301.   "Assault long guns" are defined by reference to the same list of long guns that had been regulated in Maryland since 1994.   *Id.*; Md. Code

12

Ann., Pub. Safety ("PS") § 5-101(r)(2).  That ban allows anyone who owned an assault long gun or copycat weapon before October 1, 2013 to continue to possess it, CR § 4-303(b)(3), but not to transfer or sell it within the State, CR § 4-303(a)(2).

Second, the Firearm Safety Act generally prohibits a Maryland person, including a licensed firearms dealer, from, among other things, manufacturing, selling, receiving, or transferring "a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm."  CR § 4-305.  A detachable magazine is "an ammunition feeding device that can be removed readily from a firearm without requiring disassembly of the firearm action or without the use of a tool, including a bullet or a cartridge."  CR § 4-301(f).  This provision of the Firearm Safety Act represents a reduction from the prior ban on detachable magazines with a capacity of more than 20 rounds.

The Firearm Safety Act was enacted in the wake of a series of mass shootings perpetrated using assault weapons and large-capacity magazines, most immediately the murder of 20 elementary school students and six teachers in Newtown, Connecticut in December 2012, using a Bushmaster AR-15 assault rifle and several large-capacity magazines.  (Ex. 27, Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School, Nov. 25, 2013.)  The Firearm Safety Act was introduced on January 18, 2013 as Senate Bill 281, passed by the General Assembly on April 4, 2013, and signed by Governor O'Malley on May 16, 2013.[5]

---

[5]      *See* History of Ch. 427, *available at* http://mgaleg.maryland.gov/webmga/frmMain.aspx?pid=billpage&stab=03&id=sb0281&tab=subject3&ys=2013RS (last visited Feb. 13, 2014).

**ARGUMENT**

I.   **THE STATE'S BANS ON ASSAULT WEAPONS AND LARGE-CAPACITY MAGAZINES ARE CONSTITUTIONAL.**

A.     **The Second Amendment Framework**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II.  In *District of Columbia v. Heller*, the Supreme Court reviewed a District of Columbia law that imposed a "complete prohibition" on the possession of handguns in the home.  554 U.S. 570, 629 (2008).  After engaging in a textual and historical analysis of the Second Amendment, the Court concluded: (1) that the amendment codified a pre-existing right, *id.* at 592; (2) that this right is an individual right, not dependent on militia service, *id.*; and (3) that, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *id.* at 635.  The Supreme Court held that the District could not ban handguns, the class of arms "that is overwhelmingly chosen by American society" for the lawful purpose of self-defense in the home.  *Id.* at 628.

Although the Supreme Court declined to speculate about other conduct that might fall *within* the protection of the Second Amendment, *id.*, it observed, notwithstanding the amendment's unconditional language, that "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.* at 626.  Indeed, the Court identified a non-exhaustive set of types of laws that it presumed

14

would fall outside the protection of the amendment, including complete prohibitions on the carry of concealed weapons, bans on possession of firearms by felons and the mentally ill, bans on carrying firearms in sensitive places, and laws regulating the commercial sale of arms. *Heller*, 554 U.S. at 626-27 & n.26. The Court further recognized that its 1939 decision in *United States v. Miller* had described the types of weapons protected by the Second Amendment as those "in common use at the time," *id.* at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)), a limitation the Court found "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *id.* at 627.

Two years later, in *McDonald v. City of Chicago*, the Supreme Court held that the individual Second Amendment right is "fully applicable to the States." ___ U.S. ___, 130 S. Ct. 3020, 3026 (2010). Although *McDonald* did not further clarify the substantive scope of the Second Amendment right, it promised that "'state and local experimentation with reasonable firearms regulation will continue under the Second Amendment.'" *Id.* at 3046 (quotation omitted).

The United States Court of Appeals for the Fourth Circuit has adopted a two-pronged approach to analyzing Second Amendment claims.[6] *Woollard v. Gallagher*,

---

[6] This same two-pronged approach has been adopted by most other circuits to have addressed similar questions. *See, e.g.*, *Kachalsky v. County of Westchester*, 701 F.3d 81, 88-93 (2d Cir. 2012), *cert denied*, 133 S. Ct. 1806 (Apr. 15, 2013); *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012); *Heller II*, 670 F.3d at 1252; *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *but see Peruta v. County of San Diego*, 10-56971, slip op. (9th Cir. Feb. 13, 2014).

712 F.3d 865, 874-75 (4th Cir.), *cert. denied*, 134 S. Ct. 422 (2013); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). Under this approach, the first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Chester*, 628 F.3d at 680 (internal quotation marks omitted). If not, the challenged law is valid. *Id.* If, on the other hand, the burdened conduct is found to be within the scope of the Amendment, then the second prong requires the application of "an appropriate form of means-end scrutiny." *Id*. In determining the appropriate form of means-end scrutiny, the Fourth Circuit assesses the "burdens on Second Amendment rights . . . tak[ing] into account the nature of a person's Second Amendment interest, the extent to which those interests are burdened by government regulation, and the strength of the government's justifications for the regulation." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011).

In *Woollard*, the Fourth Circuit addressed the constitutionality of a Maryland requirement that an applicant for a handgun wear-and-carry permit demonstrate a "good and substantial reason" why the permit was needed. 712 F.3d at 868. In upholding the requirement, the Fourth Circuit assumed, without deciding, that the good-and-substantial-reason requirement burdened conduct falling within the scope of the Second Amendment's protection. *Id.* at 876. The court went on to hold that Maryland's law satisfied intermediate scrutiny, *id.* at 878, relying on declarations from three law enforcement officials, then-Commissioner of the Baltimore Police Department Frederick H. Bealefeld III, then-Superintendent of the Maryland State Police Terrence Sheridan, and Chief of the Baltimore County Police Department James W. Johnson, concluding that

the challenged requirement advanced Maryland's interest in public safety. *Id.* at 877 n.6.[7]  Although the plaintiffs disagreed, the Court held that it could not substitute their "views for the considered judgment of the General Assembly that the [challenged] requirement strikes an appropriate balance . . . ." *Id.* at 881.

The Fourth Circuit has separately cautioned against "circumscrib[ing] the scope of popular governance" by pushing the Second Amendment right beyond that identified by the Supreme Court:  "This is serious business.  We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." *Masciandaro*, 638 F.3d at 475 (Wilkinson, J., writing for the court).

The plaintiffs' challenge to Maryland's bans on assault weapons and large-capacity magazines fails on both prongs of the test applied by the Fourth Circuit.  First, the bans do not impose any burden on conduct protected by the Second Amendment because assault weapons and large-capacity magazines are not protected by the Second Amendment.  Second, even if the Court were to assume that the bans do burden constitutionally-protected conduct, they are a reasonable fit to the State's interest in protecting public safety, and, thus, they withstand constitutional scrutiny.  The defendants are entitled to summary judgment as to Counts I and II.

---

[7] Among other evidence discussed below, the State in this case presents declarations of Chief Johnson, as well as the current Commissioner of the Baltimore Police Department, Anthony Batts, and the current Superintendent of the Maryland State Police, Colonel Marcus Brown.  *See* Exs. A, B, and C.

### B. Every Court to Consider the Question Has Upheld Prohibitions on Assault Weapons and Large-Capacity Magazines.

Faced with similar constitutional challenges, courts have universally upheld state and local assault weapons and large capacity magazine bans.  In *Heller II*, the D.C. Circuit upheld a District of Columbia law that banned assault weapons having any one of a list of military-style features.  *See* 670 F.3d at 1264.  Although the district court had concluded that "assault weapons and large capacity ammunition feeding devices fall outside the scope of the core Second Amendment right," 698 F. Supp. 2d 179, 195 (D.D.C. 2010), the D.C. Circuit withheld judgment on that question, but upheld the law under intermediate scrutiny.  *Heller II*, 670 F.3d at 1261-62 ("Although we cannot be confident the prohibitions impinge at all upon the core right protected by the Second Amendment, we are reasonably certain the prohibitions do not impose a substantial burden upon that right.").  Relying on similar evidence to that presented here, the circuit court concluded that the District's bans were substantially related to its important interests in public safety, and, thus, did not violate the Second Amendment.  *Id.* at 1261-64.

In *People v. James*, 94 Cal. Rptr. 3d 576, 585-86 (Ct. App. 2009), the California Court of Appeals, in upholding that state's ban on assault weapons, concluded that "*Heller* does not extend Second Amendment protection to assault weapons," noting that "assault weapons, like machine guns, are not in common use by law-abiding citizens for

18

lawful purposes and likewise fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."[8]

Since this lawsuit was filed, three federal district courts, all relying on evidence similar to that contained in the record before this Court, have upheld on summary judgment the constitutionality of bans on assault weapons and large-capacity magazines enacted in 2013 by New York and by Connecticut. *See Shew v. Malloy*, No. 3:13cv739, 2014 U.S. Dist. LEXIS 11339, at *36-40 (D. Conn. Jan. 30, 2014); *Kampfer v. Cuomo*, No. 6:13-cv-82, 2014 U.S. Dist. LEXIS 1479, at *18-19 (N.D.N.Y. Jan. 7, 2014); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, No. 13-CV-291S, 2013 U.S. Dist. LEXIS 182307, at *45-56 (W.D.N.Y. Dec. 31, 2013).

In *New York State Rifle & Pistol Ass'n*, the district court granted the defendants' motion for summary judgment upholding New York's assault weapons and large-capacity magazine bans.[9] Finding that assault weapons and large-capacity magazines are commonly owned and used for lawful purposes, and finding New York's restrictions "deserving of constitutional scrutiny," *id.* at *37-38, the court applied intermediate

---

[8] Prior to *Heller*, numerous state court decisions, without exception, held that assault weapons and large-capacity magazines were not entitled to protection under state constitutional provisions. *See, e.g.*, *Benjamin v. Bailey*, 662 A.2d 1226, 1230-35 (Conn. 1995); *Robertson v. City & County of Denver*, 874 P.2d 325, 331-33 (Colo. 1994); *Arnold v. City of Cleveland*, 616 N.E.2d 163, 166-73 (Ohio 1993); *City of Cincinnati v. Langan*, 640 N.E.2d 200, 203 n.1, 205-06 (Ohio Ct. App. 1994).

[9] The district court granted summary judgment for the plaintiffs on a separate provision of New York's law precluding those legally possessing magazines with a capacity in excess of seven rounds from loading more than seven rounds of ammunition in them. 2013 U.S. Dist. LEXIS 182307, at *56-60. Chapter 427 does not contain any analogous provision.

scrutiny and held that the bans satisfied that test because "substantial evidence support[ed] [New York's] judgment that the banned features [of assault weapons] are unusually dangerous, commonly associated with military combat situations, and are commonly found on weapons used in mass shootings," and because the "[e]vidence also suggest[ed] that, quite simply, more people die when a shooter has a large-capacity magazine." *Id.* at *47, *55. Reserving judgment on the policies' merits, the court satisfied itself that "reasonably relevant evidence" supported a link between the regulations and New York's compelling interest of public safety. *Id.* at *54, *56.

In *Kampfer*, the district court granted the defendants' motion for summary judgment upholding the same New York laws. The court concluded that the regulations did not impose a substantial burden on the plaintiff's exercise of his Second Amendment rights because any burden on the possession of an assault weapon did not impede the general ability to possess arms. 2014 U.S. Dist. LEXIS 1479, at *17-19 & n.10. The court then held that because New York's laws "attempt only to decrease in number certain firearms deemed particularly dangerous by the legislature for the sake of public safety, which interests are clearly advanced by the legislation, they do not infringe the Second Amendment right to keep and bear arms, and are plainly legitimate in their sweep." *Id.* at *19.

Most recently, in *Shew*, the district court granted the defendants' motion for summary judgment upholding Connecticut's assault weapons and large-capacity magazine bans. The court held that the firearms and magazines are "'in common use' within the meaning of *Heller* and, presumably, used for lawful purposes." 2014 U.S.

Dist. LEXIS 11339, at *26-27.  The court then considered the applicable level of scrutiny for the second prong of the test, concluding that intermediate scrutiny was most appropriate because the "challenged legislation provides alternate access to similar firearms and does not categorically ban a universally recognized class of firearms," and, thus, "do[es] not impose a substantial burden upon the core right protected by the Second Amendment."  *Id.* at *31-32 (internal quotation marks and footnotes omitted).  The court then reviewed the record before it, discussed the evidence that features of assault weapons and large-capacity magazines increase a firearm's "lethalness," and held that the bans satisfied intermediate scrutiny because they were substantially related to the "important governmental objectives of protecting police officers and controlling crime." *Id.* at *36-40.

Thus, courts nationwide are unanimous in finding bans on assault weapons and large capacity magazines constitutional.

**C.     The Firearm Safety Act's Bans on Assault Rifles and Large-Capacity Magazines Do Not Burden Conduct Falling Within the Scope of the Second Amendment.**

In *Heller*, the Supreme Court struck down absolute bans on the possession in the home of the entire class of handguns, the "quintessential" and "most popular weapon chosen by Americans for self-defense in the home," 554 U.S. at 629, but emphasized that the Second Amendment right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever for whatever purpose," *id.* at 626.  The first prong of the Second

Amendment analysis requires this Court to determine whether assault weapons and large-capacity magazines fall within the scope of protection of the Second Amendment.

The plaintiffs contend that assault weapons and large-capacity magazines must be protected by the Second Amendment because they are "in common use," for lawful purposes, relying entirely on the Supreme Court's statement in *Heller* that its 1939 decision in *Miller* had described the types of weapons protected by the Second Amendment as those "in common use at the time," *id.* at 627 (quoting *Miller*, 307 U.S. at 179), which the *Heller* Court found to be a limitation that was "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *id.* at 627.  Ignoring the context in which *Heller* uses and explains the phrase "in common use," the plaintiffs apparently contend that because millions of assault weapons and large-capacity magazines are owned, they must necessarily be "common," and thus subject to protection under the Second Amendment.

If this is the plaintiffs' analysis of the Supreme Court's reference to its earlier decision in *Miller*, then it is too simplistic.  In *Miller*, the Supreme Court's reference to weapons "in common use" came in the context of explaining a militia-centric view of the Second Amendment, noting that citizens called to muster would necessarily bring the weapons they had in their homes, which by definition would have to be the weapons "in common use" at the time.  307 U.S. at 179-80.  In *Heller*, the Supreme Court rejected that militia-centric view of the Second Amendment, but nonetheless confirmed *Miller's* specific holding that certain firearms, in that case short-barreled shotguns and machine guns, were not protected by the Second Amendment.  554 U.S. at 627.  However,

*Heller's* approval of *Miller's* holding was not based on *Miller's* militia-focused analysis that the Second Amendment protected the commonly-owned weapons citizens would bring to a militia muster, but was instead based on the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"  *Id.* at 627.[10]  This understanding is consistent with the remainder of the *Heller* Court's analysis of the contours of the Second Amendment, which rejected the militia-centric view of the Second Amendment in favor of an individual right to keep and bear arms.  Thus, the Court noted, the fact that the Second Amendment does not preclude bans on military weapons, such as "M-16 rifles and the like," is of no moment because the right is distinct from its initial militia purpose. *Id.*

Although the Supreme Court did not expand on what it meant by "in common use" or "dangerous and unusual," it is thus appropriate to consider those concepts not in isolation, but as a related inquiry regarding the status of the "arms" at issue in light of the historical tradition on which the *Heller* Court relied.  That understanding is further bolstered by the absurdities that would accompany the plaintiffs' contrary understanding. For example, focusing solely on the number of firearms owned would make the constitutionality of a ban dependent on the time at which it was enacted, with a weapon not subject to constitutional protection suddenly becoming entitled to such protection

---

[10]  The earliest citation of this formulation that was cited by *Heller*, Blackstone's influential Commentaries on the Laws of England, refers not to "dangerous and unusual weapons," but to "dangerous or unusual weapons," the carrying of which Blackstone thought would have the effect of "terrifying the good people of the land."  4 Blackstone, Commentaries on the Laws of England 148-149 (1769) (attached as Ex. 72).

once an imaginary "constitutional" numerosity threshold was reached.  In effect, gun manufacturers' marketing efforts, such as the effort to re-brand assault weapons as "Modern Sporting Rifles,"[11] could effectively be decisive as to whether a particular subclass of firearms obtains constitutional protection.  Moreover, some weapons may not actually give rise to public safety concerns that would justify banning them *until* they are so commonly owned that they pose such a risk.  Although some other courts appear to have adopted this focus on numbers to at least some degree, *see, e.g.*, *Shew*, 2014 U.S. Dist. LEXIS 11339, at *24-26; *New York State Rifle & Pistol Ass'n*, 2013 U.S. Dist. LEXIS 182307, at *37-38, a focus solely on numerical prevalence is a circular argument for constitutionality that cannot be what the Supreme Court intended.

Moreover, a focus on "common use" begs the question of "common use" for what. Although the plaintiffs contend this means "common use" for any lawful purpose, the *Heller* Court explained that the core of the right codified in the Second Amendment was self-defense.  554 U.S. at 599 (explaining that "self-defense . . . was the *central component* of the right itself" (emphasis in original)).  Entirely absent in the discussion of the purposes of the Second Amendment in *Heller* is any discussion of the right being intended to protect an individual's desire to shoot, or possess, a particular firearm.

---

[11] Although the firearms at issue had become widely known as assault weapons, largely through branding by manufacturers who viewed their military characteristics as a selling point (*see* Ex. 73, Phillip Peterson, *Buyer's Guide to Assault Weapons* 11 (Gun Digest Books 2008); Ex. 21, *Militarization*), around 2008 the gun industry's trade association, plaintiff National Shooting Sports Foundation ("NSSF"), began a campaign to rebrand these firearms as "Modern Sporting Rifles."  (Ex. 44, Curcuruto Depo. at 69-70.)

As explained below, assault weapons fall outside of the protection of the Second Amendment because: (1) they are not "in common use," even if numerosity were the proper constitutional standard; (2) they are not in common use for self-defense; and (3) they are particularly dangerous and unusual. Large-capacity magazines similarly fall outside the protection of the Second Amendment because: (1) they are not "arms" protected by the Second Amendment; (2) they are not necessary for self-defense; and (3) they are also particularly dangerous and unusual.

**1.   Assault Weapons Do Not Fall Within the Protection of the Second Amendment Because They Are Not Commonly Owned, Nor Are They Commonly Used for Self-Defense.**

**a.   Assault Weapons Are Not Commonly Owned.**

Recent estimates indicate that Americans own approximately 310 million firearms. (Ex. 28, William J. Krouse, Congressional Research Service, *Gun Control Legislation* 8 (2012).) Although the share of these that are made up by assault weapons is subject to dispute, the ceiling of that number is plaintiff NSSF's claim that there were approximately 8.2 million "Modern Sporting Rifles" introduced into the civilian market in the United States from 1990 through 2012, with the numbers steadily rising throughout that time period. (Ex. 64, Curcuruto Report ¶ 1; Ex. 44, Curcuruto Dep. 177.)[12]

---

[12] Plaintiff NSSF's estimates are flawed and likely excessive. Among other problems with its estimates: (1) the NSSF does not even have a real definition of what constitutes a Modern Sporting Rifle, (Ex. 44, Curcuruto Dep. 80 (stating he cannot define with precision what a Modern Sporting Rifle is, but that he knows one when he sees it)); and (2) the NSSF's calculations are based largely on guesswork and assumptions, some

Assuming sales outside that time period raised the total even to 9 million, at most such firearms comprise approximately 3% of the current civilian gun stock, a percentage that does not equate to "common" ownership as that term is widely understood.  (Ex. 74, Testimony of Lawrence H. Tribe at 24-25 (Feb. 12, 2013).)  *See* American Heritage Dictionary of the English Language 372 (5th ed. 2011) (defining "common" as "relating to the community as a whole," "widespread," or "prevalent").

Moreover, the absolute number of assault weapons vastly exceeds the number of people who own them.  In recent decades, gun ownership in the United States has been becoming increasingly concentrated, with fewer and fewer households owning firearms, but owning more and more of them.  (*See* Ex. 6, Webster Decl. ¶¶ 13-14; Ex. 36, Violence Policy Center, *A Shrinking Minority: The Continuing Decline of Gun Ownership in America* (2013) (reporting a 40% drop in the percentage of American households owning a gun between 1977 and 2010).) ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ Plaintiff NSSF contends that the average assault weapons owner owned 3.1 such weapons in 2013.  (Ex. 75, NSSF, *MSR Consumer*

provided by individuals they did not make available to testify (*id.* at 101-03). Nonetheless, solely to provide an upper limit for purposes of this motion for summary judgment, the defendants will assume plaintiffs could demonstrate that there are 9 million assault weapons in the United States.

*Report* 13 (2013).)[13]  Even if there were nine million assault weapons in civilian hands, that would mean they would be in the hands of fewer than 3 million Americans, less than 1% of the total population.

Available data for Maryland is consistent.  Since 1994, Maryland has gathered information regarding the transfer of what are now banned as assault long guns, along with handguns (but not other rifles or shotguns).  (Ex. 10, Decl. of Captain Dalaine Brady, ¶¶ 21-27).  According to that database, from 1994 through 2012 there were a total of 604,051 total transfers of regulated firearms, of which 46,577 were assault weapons. (*Id.* ¶ 29 & Ex. C.)[14]  Again using the plaintiffs' figure that the average owner of an assault weapon owns 3.1 of them, this would amount to approximately 15,000 Marylanders owning those 46,577 firearms (even assuming there was no double-

---

[13] In the same profile of assault weapons owners, plaintiff NSSF found that:  (1) 99% of assault weapons owners are male; (2) 27% of assault weapons owners own four or more assault weapons; (3) 99% of assault weapons owners owned at least one firearm other than an assault weapon before purchasing their first assault weapons; (4) nearly 20% of assault weapons owners do not secure their assault weapons when they are not in use; and (5) 41% of assault weapons owners own at least 1,000 rounds of ammunition for them. (Ex. 75, *MSR Consumer Report* 5, 6, 9, 13, 15, 46, 50, 53.)

[14] Although the relevant database does not yet contain a complete count of firearms transferred during 2013 (Ex. 10, Brady Decl. ¶ 30), that number is likely to be much larger than any prior year.  However, those were primarily purchased after the General Assembly enacted Chapter 427, and so should not be part of the analysis regarding the constitutionality of the General Assembly's act in early 2013.  Moreover, as occurred in the past with the federal assault weapons ban and Maryland's ban on Saturday night specials, the dramatic increase in sales was an aberration apparently resulting from the passage of Chapter 427.  (*See, e.g.*, Ex. 6, Webster Decl. ¶ 22 (noting increase in sales in advance of effective dates of both federal assault weapons ban and Maryland's ban on Saturday night specials); ██████████████████████████████  It would be a strange result if opponents were able to buy their way out of the effects of a ban.

counting), a tiny fraction of the approximately 4.5 million adult Marylanders.  (*See* U.S. Census Bureau: State and County QuickFacts, Maryland (last revised, Jan. 6, 2014), *available at* http://quickfacts.census.gov/qfd/states/24000.html.)  Moreover, those 46,577 assault weapons were dwarfed by the more than 500,000 handguns transferred during that same timeframe.  (Ex. 10, Brady Decl. Ex. C.)  Thus, even in the light most favorable to the plaintiffs, when the General Assembly enacted the Firearm Safety Act, only a small fraction of a percent of Marylanders owned an assault weapon.

**b.  Assault Weapons Are Not Commonly Used for Self-Defense.**

The plaintiffs have failed to identify a single incident in which an individual in Maryland has used an assault weapon in self-defense.  To the contrary, ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████  As discussed further below, there is no evidence that assault weapons are necessary, or are commonly used, for self-defense in Maryland.

The plaintiffs may contend that assault weapons could conceivably be used for self-defense (as could any firearm); that there are a handful of isolated examples of assault weapons being used for self-defense outside of Maryland (though, in each case, when another firearm could have been equally effective); that they believe particular

28

assault weapons are well-suited for self-defense (contrary to the views of law enforcement, as discussed below); or that some owners of assault weapons say they intend to use one for self-defense if the need arises, none of that constitutes evidence that such firearms are commonly used in self-defense.  Nor does a stated desire to keep a particularly-dangerous subclass of firearm for self-defense make that type of weapon protected under the Second Amendment:  "it cannot be the case that possession of a firearm in the home for self-defense is a protected form of possession under all circumstances."  *Marzzarella*, 614 F.3d at 94.  Otherwise, a machine gun, which could certainly be used for self-defense, would fall within the Second Amendment's protection.  *See id.*  The Supreme Court has already rejected that contention in *Miller*.  *See also Hightower v. City of Boston*, 693 F.3d 61, 71 (1st Cir. 2012) (unlike handguns, large capacity weapons were not "of the type characteristically used to protect the home"); *Heller II*, 670 F.3d at 1263-64 (relying on the District's evidence that "large-capacity magazines are dangerous in self-defense situations") (internal quotation marks omitted).

> **2.    The Banned Large-Capacity Magazines Do Not Fall Within the Protection of the Second Amendment Because They Are Not Protected Arms Nor Are They Commonly Used in Self-Defense.**
>
> > **a.    Large-Capacity Magazines Are Not Arms Protected by the Second Amendment.**

As discussed more thoroughly in the defendants' motion to dismiss the plaintiffs' third amended complaint, the large-capacity detachable magazines banned by the Firearm Safety Act fall outside the scope of the Second Amendment's protections because they do not "constitute bearable arms."  *See Heller*, 554 U.S. at 582; *see generally* ECF No. 32-1,

Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint, at 10-16.  In *Heller*, in answering what types of "arms" are protected by the Second Amendment, the Supreme Court observed that the "18th-century meaning" of "arms" "is no different from the meaning today": "'weapons of offence, or armour of defence.'"  *Id.* at 581 (quoting 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)).  Another late 18th-century legal dictionary relied upon by the Court defined arms as "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'"  *Id.* (quoting 1 A New and Complete Law Dictionary).  Thus, the Supreme Court held, the amendment's protection "extends, prima facie, to all instruments that constitute bearable arms . . . ."  554 U.S. at 582.

A large-capacity detachable magazine is not an "arm"; it is not itself a "weapon[] of offence," or a thing worn for defense or taken "to cast at or strike another."  Rather, it is a particular subclass of ammunition container used to load a firearm.  In this respect, large-capacity detachable magazines are not even ammunition, but instead are devices used for feeding ammunition into firearms that can easily be switched out for other devices that are of lower capacity but that can still feed ammunition, up to 10 rounds at a time, into a firearm.  Moreover, neither the firearms nor the ammunition they fire operate any differently using magazines permitted by Maryland's law than they do using large-capacity magazines.  (Ex. 42, Boone Dep. 132-33; Ex. 43, Rossi Dep. 33-34.)

Furthermore, because the Fourth Circuit has looked to whether a law regulates conduct protected by "the Second Amendment as historically understood," *United States v. Chapman*, 666 F.3d 220, 225 (4th Cir. 2012), it is notable that at the time of the

30

ratification of the Second Amendment there were a number of statutes that severely restricted access to ammunition—which, unlike a particular size of magazine, *is* necessary for a firearm to function. *See Heller*, 554 U.S. at 684-85, 683-87 (Breyer, J., dissenting) (discussing these laws and their effects); *see also id.* at 632 (majority op.) (distinguishing laws that actually restricted access to or use of gunpowder—a necessary component for the operation of any firearm of the day—from the District's law because they did not "remotely burden the right of self-defense as much as an absolute ban on handguns"). The Firearm Safety Act does not restrict access to ammunition or any necessary component for the operation of a firearm for in-home self-defense, nor does it regulate the amount of ammunition any individual can have available in the event a self-defense need arises. Because large-capacity detachable magazines are neither "arms" nor are they required to operate arms, they fall outside the scope of the Second Amendment's protection, and the plaintiffs' claims in Count Two fail.

### b. Large-Capacity Magazines Are Not Commonly Used for Self-Defense.

Even if large-capacity magazines were properly considered "arms" protected by the Second Amendment, there is no evidence that their extra capacity is commonly used in self-defense, because there is no evidence that firing more than 10 rounds is necessary for self-defense. (*See* Ex. 74, Tribe Testimony 14 (explaining that "in the case of large-capacity magazines, significant market presence does not necessarily translate into heavy reliance by American gun owners on those magazines for self-defense").)

Maryland law enforcement officials confirm they are unaware of a single example in Maryland of an individual needing to fire more than 10 rounds in self-defense.  (Ex. 3, Johnson Decl. ¶¶ 30-31, 39, 40; Ex. 4, Batts Decl. ¶¶ 29-31, 37; Ex. 5, Decl. of Henry P. Stawinski ¶¶ 25-26, 34; Ex. 2 Brown Decl. ¶ 18.)  And in the single example identified by the plaintiffs in which someone fired more than 10 rounds in a self-defense incident, the circumstances indicate that a number of the rounds were fired as the perpetrators were fleeing the scene.  (*See* Ex. 4, Batts Decl. ¶ 31; Ex. 46, Josselyn Dep. 15-19.)

Moreover, an analysis of an NRA collection of reports of citizen self-defense incidents over a three-year period from January 2011 through December 2013 failed to identify a single incident in which more than 10 shots were fired.  (Ex. 9, Decl. of Lucy P. Allen Decl. ¶ 12).  According to that analysis, the average number of shots fired was 2, and no shots at all were fired in 16% of the incidents.  (*Id.*)  That analysis was consistent with the results of an earlier analysis examining the same NRA collection of reports over a five-year period.  (Ex. 9, Allen Decl. ¶¶ 9-10.)  Put simply, there is no evidence that the extra capacity of large-capacity magazines is commonly used for, much less necessary for, legitimate self-defense by law-abiding citizens.

### 3. The Banned Assault Weapons and Large-Capacity Magazines Do Not Fall Within the Protection of the Second Amendment Because They Are Dangerous and Unusual.

The Supreme Court has not provided any guidance for determining when a firearm is "dangerous and unusual," and thus outside the scope of the protection of the Second Amendment.  All "arms," and especially all firearms, are dangerous by definition.  Thus,

to fall outside the scope of the protection of the Second Amendment, an arm must presumably be more dangerous than other arms.  There can be no genuine dispute but that assault weapons and, if they are "arms," large-capacity magazines, meet that test.  As a general matter, with the exception of an inability to fire in automatic mode, these are the firearms that militaries around the world have chosen as the small arms of choice to supply their soldiers on the battlefield.

From their ability to fire large numbers of devastatingly-effective rounds to the enemy over very short periods of time, to the special features designed to make them more effective in the battlefield, these weapons have been designed, and continue to be used, specifically for their dangerousness in battle.  *See* discussion above at 3-8.  Unsurprisingly, the semiautomatic AR-15, AK-47, and other assault weapons banned by the Firearm Safety Act are nearly identical in functioning, dangerousness, and killing capacity as the full automatic versions.  (*See* Ex. 42, Boone Dep. 95-98; Ex. 43, Rossi Dep. 94-95; Ex. 23, H.R. Rep. 103-489, at 18-20).  Indeed, Bushmaster advertises its Adaptive Combat Rifle ("ACR") as "the ultimate military combat weapons systems," and markets that firearm to the civilian market as "designed to master the extreme scenarios faced in the world of law enforcement and personal defense."  (Ex. 70, Bushmaster Firearms, *2011 Bushmaster Product Catalog* 3.)

Semiautomatic firearms can fire very rapidly, and are viewed as even more effective for most military and law enforcement purposes in semiautomatic mode.  *See* discussion above at 8-10.  Notably, it was not the capacity for full automatic fire that caused the military to adopt the AR-15 as its standard service rifle, as the M14 rifle it

replaced was also a selective fire rifle.  It was thus other features, those shared equally by the AR-15 and M16, that convinced the military to adopt it.  Many of the features of the banned assault long guns have been found to "serve specific, combat-functional ends," and their "net effect . . . is a capability for lethality—more wounds, more serious, in more victims—far beyond that of firearms in general, including other semiautomatic guns." (Ex. 23, H.R. Rep. 103-489, at 18-20; *see also* Ex. 16, 2011 ATF Study 9-12; Ex. 15, 1998 ATF Study, Ex. 5; Ex. 14, 1989 ATF Report 6-7.)

Large-capacity magazines, a feature common, but not unique, to assault long guns, serve an obvious utility in military combat by allowing the shooter to fire more rounds before having to pause to reload.  Thus, like assault weapons, "magazines capable of holding large amounts of ammunition, regardless of type, are particularly designed and most suitable for military and law enforcement applications."  (Ex. 16, 2011 ATF Study 10-11; Ex. 15, 1998 ATF Study 38 (explaining that a firearm's ability "to accept a detachable large capacity military magazine gives [the firearm] the capability to expel large amounts of ammunition quickly," which "serves a function in combat and crime, but serves no sporting purpose").)

The same capability can allow a criminal using a large-capacity magazine to fire more rounds without having to reload.  (*See* Ex. 51, Kleck Dep. 139-40 (mass shooter in Aurora, Colorado movie theater was using 100-round drums and, thus, could fire 200 rounds with only one reload).)  And the same capability can also ensure that private citizens, who the plaintiffs repeatedly emphasize are likely to miss with the vast majority of shots they take, will hit many more things other than their intended targets when they

fire more rounds from a larger magazine.   (*See* Ex. 46, Josselyn Dep. 71; Ex. 45, Schneider Dep. 81 (he wants more rounds in case he misses "on the first or the second or the fifth or the ninth" shots); Ex. 53, Wink Dep. 67; Ex. 42, Boone Dep. 159-62; Ex. 41, Supica Dep. 113; Ex. 43, Rossi Dep. 29-30.)   Although the plaintiffs argue that attributes of assault weapons and large-capacity magazines that make them useful in the military theater or for law enforcement purposes also make them useful for self-defense, that does not demonstrate that the firearms and magazines are not unusually dangerous; to the contrary, it is an argument that the plaintiffs want the ability to utilize those unusually dangerous attributes themselves.   *See New York State Rifle & Pistol Ass'n*, 2013 U.S. Dist. LEXIS 182307, at \*45-46 (plaintiffs' argument that features of assault weapons "increase the utility" of the weapons for self-defense "is just another way of saying that the features increase their lethality").

The dangerous and unusual character of assault weapons and large-capacity magazines is also evident from their over-representation in mass shootings.   (Ex. 7, Decl. of Christopher S. Koper ¶¶ 16-18, 23, 24, 36; Ex. 6, Webster Decl. ¶¶ 10-11, 15.)   At the time of the 1994 federal ban, all assault weapons (including both assault pistols and assault long guns) comprised 1% or less of the civilian gun stock.   (Ex. 7, Koper Decl. ¶ 19.)   But evidence from before the federal ban suggests that assault weapons or large-capacity magazines were involved in 40% of mass shooting incidents between 1984 and 1993.   (Ex. 7, Koper Decl. ¶ 24; Ex. 6, Webster Decl. ¶ 15.)   A more recent media investigation by Mother Jones magazine analyzed and compiled data on sixty-two public mass shootings between 1982 and 2012, and found that 21% of those incidents involved

use of an assault rifle, and more than half involved assault weapons, large-capacity magazines, or both.  (Ex. 7, Koper Decl. ¶ 25; Exs. 29-30, Mother Jones, US Mass Shootings, 1982-2012. Data from Mother Jones' Investigation (Dec. 28, 2012).).  And recent studies indicate that over the last three decades large-capacity magazines were used in 85% of mass shootings where the magazine capacity was known (34 out of 40 shootings), including five of seven in the last two years.  (Ex. 9, Allen Decl. ¶ 15.)[15]   In mass shootings in which large-capacity magazines were used, the average number of shots fired was 75.  (Ex. 9, Allen Decl. ¶ 16.)

Further analysis of the *Mother Jones* data has demonstrated that mass shootings involving assault weapons resulted, on average, in more fatalities (10.4 to 7.7) and more injuries (13.5 to 6.4) than shootings that did not involve assault weapons.  (Ex. 7, Koper Decl. ¶ 27.)  Moreover, mass shootings in which shooters had large-capacity magazines had significantly higher numbers of fatalities (10.19 to 6.35) and casualties (12.39 to 3.55) than mass shootings that did not involve large capacity magazines.  (Ex. 7, Koper Decl. ¶ 38.)  These effects have been corroborated by other studies, including a study in Baltimore finding that gun incidents in which a victim was shot were 17% to 26% more likely to involve large-capacity magazines than gun incidents in which there were no wounded victims.  (Ex. 7, Koper Decl. ¶¶ 39-42.)

Assault weapons and large-capacity magazines are also disproportionately represented in murders of law enforcement officers.  (Ex. 7, Koper Decl. ¶¶ 16, 22, 23,

---

[15] There were an additional five mass shootings with unknown magazine size in the last two years.  (Ex. 9, Allen Decl. ¶ 15 n.7.)

29, 35; Ex. 6, Webster Decl. ¶¶ 15, 18.)   Thus, a study of murders of officers while on duty in 1994 found that assault weapons were used in 16% of the murders, and large-capacity magazines were involved in 31% to 41% of the murders.   (Ex. 6, Webster Decl. ¶ 18.)   Similarly, a study by the Violence Policy Center found that 19.4% of law enforcement officers murdered in the line of duty from 1998 to 2001 had been shot with an assault weapon.   (Ex. 6, Webster Decl. ¶ 18; Ex. 56, Violence Policy Center, *Officer Down* 5 (2003).)

In sum, assault weapons and large-capacity magazines are dangerous and unusual arms that fall outside of the scope of the Second Amendment, and the defendants are entitled to summary judgment as to Counts One and Two of the Third Amended Complaint.

> **D.     Even if the Firearm Safety Act's Bans on Assault Rifles and Large-Capacity Magazines Implicate the Second Amendment, the Law Is Constitutional.**
>
> > **1.     To the Extent Heightened Scrutiny Is Warranted, Intermediate Scrutiny Is the Appropriate Standard of Review.**

The Fourth Circuit, like nearly every other federal court to have considered the question, has adopted intermediate scrutiny as the appropriate test for regulations that affect conduct protected by the Second Amendment, but that do not substantially burden the core right of in-home self-defense by responsible, law-abiding citizens.   *See, e.g.*,

*Chester*, 628 F.3d at 683; *Heller II*, 670 F.3d at 1262; *Marzzarella*, 614 F.3d at 97.[16]

Similarly, every federal court to have examined a challenge to a state assault weapons and large-capacity magazine ban post-*Heller* has applied intermediate scrutiny. *See Heller II*, 670 F.3d at 1261-62 (rejecting strict scrutiny because the law did "not prohibit the possession of 'the quintessential self-defense weapon,' to wit, the handgun" and did not "prevent a person from keeping a suitable and commonly used weapon for protection in the home or for hunting, whether a handgun or a non-automatic long gun") (quoting *Heller*, 554 U.S. at 629)); *New York State Rifle & Pistol Ass'n*, 2013 U.S. Dist. LEXIS 182307, at *39-43 (applying intermediate scrutiny where other courts have "nearly universally" done so; application of strict scrutiny would be inconsistent with *Heller*; and the assault weapons and large-capacity magazine bans do not impose severe burdens); *Shew*, 2014 U.S. Dist. LEXIS 11339, at *30-32 (applying intermediate scrutiny to challenge to assault weapons and large capacity magazine bans because the prohibitions do not impose a substantial burden on the core right to self-defense in the home).

As those courts correctly found in *Heller II*, *New York State Rifle & Pistol Assoc.*, and *Shew*, assault weapons and large-capacity magazine bans do not impose a substantial burden, if they impose any burden at all, on the core right to self-defense in the home.

_____

[16] As such, the defendants understand that intermediate scrutiny governs the case at this stage. However, the defendants reserve the right to argue on appeal that the proper standard to apply is the reasonable regulation standard, which is more onerous than rational basis and better suited to addressing Second Amendment issues. *See, e.g.*, *State v. Cole*, 665 N.W.2d 328, 338 (Wis. 2003) (standard focuses on whether "the restriction . . . is a reasonable exercise of the State's inherent police powers," not "merely on whether any conceivable rationale exists under which the legislature may have concluded the law could promote the public welfare").

Maryland's law does not substantially burden an individual's ability to acquire any number of firearms—including handguns, the "quintessential" self-defense weapon—for legitimate in-home self-defense or any other lawful purposes.  Rather, the law bans only a subset of particularly dangerous semiautomatic long guns with military-style features and large-capacity magazines.   Accordingly, if any form of heightened scrutiny is implicated here, it is intermediate scrutiny.  *See Masciandaro*, 638 F.3d at 470 (explaining that the appropriate level of means-end scrutiny depends, in part, on "the extent to which [a person's Second Amendment] interests are burdened by government regulation"); *see also Woollard*, 712 F.3d at 878 (noting the court has "rejected the proposition that [it] must 'apply strict scrutiny whenever a law impinges upon a [fundamental] right'" (quoting *Chester*, 628 F.3d at 682) (alteration in *Woollard*)).

Under intermediate scrutiny, the government bears the burden of demonstrating that the challenged regulation "is reasonably adapted to a substantial government interest."  *Masciandaro*, 638 F.3d at 471; *see also Woollard*, 712 F.3d at 876 (same); *Chester*, 628 F.3d at 683 (under intermediate scrutiny, "the government must demonstrate . . . that there is a 'reasonable fit' between the challenged regulation and a 'substantial' government objective").  As the Fourth Circuit has emphasized, "the State must show a fit that is 'reasonable, not perfect.'"  *Woollard*, 712 F.3d at 878 (quoting *United States v. Carter*, 669 F.3d 411, 417 (4th Cir. 2012) (quoting *Marzzarella*, 614 F.3d at 98)).  The State makes this showing by demonstrating that its "interests are substantially served" by the challenged law.  *Woollard*, 712 F.3d at 878 (internal quotation marks omitted).

Intermediate scrutiny does not require either that the challenged law "'be the least intrusive means of achieving the relevant government objective[s], or that there be no burden whatsoever on' [the plaintiffs'] Second Amendment right." *Id.* at 878-79 (quoting *Masciandaro*, 638 F.3d at 474). Moreover, the law need not aim to "strike at all evils at the same time"; rather, "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Buckley v. Valeo*, 424 U.S. 1, 105 (1976) (citations and internal quotation marks omitted). The General Assembly may conclude problems of different dimensions and proportions require different remedies, or that reform should occur one step at a time, or "may select one phase of one field and apply a remedy there, neglecting the others." *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489 (1955).

The State can meet its burden under intermediate scrutiny by presenting evidence, in the form of testimony from experienced law enforcement personnel or empirical data, that the challenged law "advances the [State's] objectives" in enacting the law. *See Woollard*, 712 F.3d at 879; *id.* at 877-80 & n.6 (relying on declarations of three experienced law enforcement personnel to conclude that the State had met its burden under intermediate scrutiny); *United States v. Staten*, 666 F.3d 154, 163-67 (2011) (relying on government's submission of scholarly social science evidence).

In sum, the State's burden under intermediate scrutiny is not to prove that the legislature made the correct policy decision, nor is it the Court's role to weigh the evidence in support of and in opposition to a legislative enactment and determine for itself which is more persuasive. *See Heller II*, 670 F.3d at 1269 (the court's role is not

"to determine in the first instance whether banning [assault weapons and large-capacity magazines] would promote important law-enforcement objectives" but rather "to determine whether the District has presented evidence sufficient to 'establish the reasonable fit we require' between the law at issue and an important or substantial governmental interest" (quoting *Board of Trs. v. Fox*, 492 U.S. 469, 480 (1989)). Thus, the existence of evidence challenging the legislature's judgment is not sufficient to invalidate the law. *See Woollard*, 712 F.3d at 881 (the court "cannot substitute [contrary] views for the considered judgment of the General Assembly"); *Masciandaro*, 638 F.3d at 473 (deferring to the judgment of the Secretary of the Interior, who "could have reasonably concluded that, when concealed within a motor vehicle, a loaded weapon becomes even more dangerous"). As the Fourth Circuit explained in *Woollard*, "[i]t is the legislature's job," and not the province of the court, "to weigh conflicting evidence and make policy judgments" regarding the dangers that firearms pose to public safety. *Id.* at 881 (quoting *Kachalsky*, 701 F.3d at 99); *see also Kachalsky*, 701 F.3d at 97 ("In the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." (quoting *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 665 (1994))).

2.  **The Firearm Safety Act Is Reasonably Adapted to the State's Substantial Interests in Protecting Public Safety and Reducing the Negative Effects of Firearms Crime.**

Advancing public safety and reducing the negative effects of firearms crime are substantial government interests. *Woollard*, 712 F.3d at 877, 878. Thus, the Court need only determine whether the bans on assault weapons and large-capacity magazines are "reasonably adapted" to these substantial government interests. The Firearm Safety Act easily survives scrutiny under this framework. The State has produced substantial evidence, in the form of declarations of experienced law enforcement officials, opinions of experts, and empirical data, that its bans on assault weapons and large-capacity magazines are reasonably adapted to protecting public safety and reducing the negative effects of firearms crime.

a.  **Top Maryland Law Enforcement Officials Testified That the Firearm Safety Act Is Reasonably Adapted to Protecting Public Safety and Reducing the Negative Effects of Firearms Crime.**

In support of its motion for summary judgment, Maryland has presented declarations from four top law enforcement officers, Superintendent of State Police Marcus Brown (Ex. 2), Chief of the Baltimore County Police Department James W. Johnson (Ex. 3), Commissioner of the Baltimore City Police Department Anthony W. Batts (Ex. 4), and Deputy Chief of the Prince George's County Police Department Henry P. Stawinski (Ex. 5), all of whom conclude that Maryland's assault weapons and large-capacity magazine bans will advance Maryland's interests in promoting public safety and

reducing the negative effects of firearms crime.  Those four law enforcement officers represent a combined 110 years of experience in law enforcement, along with substantial knowledge and direct relevant experience.  (Ex. 2, Brown Decl. ¶¶ 2-10; Ex. 3, Johnson Decl. ¶¶ 3-7; Ex. 4, Batts Decl. ¶¶ 3, 8-12, 18-22; Ex. 5, Stawinski Decl. ¶¶ 3-6, 18.)

According to these officers, assault weapons are particularly dangerous firearms that are not appropriate for self-defense.  Those firearms were specifically designed for military applications, and have features that are useful only for military and law enforcement applications.  (Ex. 2, Brown Decl. ¶ 12; Ex. 3, Johnson Decl. ¶¶ 32, 33; Ex. 4, Batts Decl. ¶¶ 20-21, 33; Ex. 5, Stawinski Decl. ¶ 44; Decl. of Joseph J. Vince, Jr. ¶¶ 21-22 .)  In fact, assault weapons can be a detriment to self-defense.  (Ex. 2, Brown Decl. ¶ 20; Ex. 3, Johnson Decl. ¶ 34; Ex. 4, Batts Decl. ¶ 34; Ex. 5, Stawinski Decl. ¶ 28.)  Shotguns and handguns are better suited for self-defense.  (Ex. 3, Johnson Decl. ¶¶ 34-35; Ex. 4, Batts Decl. ¶ 34; Ex. 5, Stawinski Decl. ¶¶ 27-28.); *see also Heller*, 554 U.S. at 629 ("There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police.")

Moreover, although semiautomatic assault weapons are not capable of full automatic fire, they are "absolutely devastating weapons" that can still expend enormous firepower in a brief period of time.  (Ex. 3, Johnson Decl. ¶ 36; *see also* Ex. 2, Brown Decl. ¶ 12; Ex. 4, Batts Decl. ¶ 36.)  Use of assault weapons and large-capacity

43

magazines by untrained civilians also poses risks to innocent bystanders, including those behind walls and doors, who may be at risk of being hit by errant rounds.  (Ex. 3, Johnson Decl. ¶ 38; Ex. 4, Batts Decl. ¶ 42; Ex. 5, Stawinski Decl. ¶¶ 29-30, 33-33, 35-36; Ex. 8, Vince Decl. ¶ 20; *see also* Ex. 58, Brady Center to Prevent Gun Violence, *Assault Weapons "Mass Produced Mayhem"* 16 (October 2008).)  That risk is aggravated by "the tendency . . . for defenders to keep firing until all bullets have been expended[.]"  *Heller II*, 670 F.3d at 1263-64 (quoting Siebel Testimony); (*see also* Ex.46, Josselyn Dep. 74 (explaining that it is "not uncommon to have the police arrive on a scene and see someone there still pulling the trigger, even though the gun is long empty").)

Moreover, limiting magazine capacity to no more than 10 rounds is likely to save lives, a conclusion bolstered by lessons learned from incidents such as the shooting in Tucson, Arizona, in which the shooter was tackled while attempting to change magazines; and the shooting in Newtown, Connecticut in which school children were able to escape while the shooter was reloading.  (Ex. 3, Johnson Decl. ¶¶ 54-56; Ex. 5, Stawinski Decl. ¶¶ 39-40; *see also* Ex. 38, Marc Lacey, *Evidence Points to Methodical Planning*, New York Times, Jan. 9, 2011 (several victims overwhelmed shooter "as he tried to reload his gun"); Ex. 39, Michael Melia, *Jessie Lewis, Newtown Victim, Shouted for Classmates to Run: Mom*, Associated Press, Oct. 18, 2013 (children escaped from classroom when shooter paused to reload)); *see also Heller II*, 670 F.3d at 1264 (quoting Chief of Police's testimony that the "'2 or 3 second pause' during which a criminal reloads his firearm 'can be of critical benefit to law enforcement'").  Had those shooters been forced to reload after 10 rounds, instead of 30, more lives may have been saved.

44

(*Id.*)  Media reports have identified numerous other examples of situations in which bystanders were able to intervene, victims escape, or confrontations otherwise end when a magazine needed to be changed.  (*see, e.g.*, Ex. 40 (collecting newspaper articles.) Those results are to be expected given that a mass shooter who has to load ten 10-round magazines to fire 100 rounds, as opposed to a 100-round drum, will necessarily give bystanders nine more chances to intervene, victims nine more chances to get away, and nine other chances for the gun or magazine to jam.  (Ex. 4, Batts Decl. ¶ 49.)

By contrast, none of the law enforcement officers is aware of any circumstance in which an assault weapon was used for self-defense within Maryland, or in which an individual was required to expend more than 10 rounds in self-defense in Maryland.  (Ex. 2, Brown Decl. ¶ 18; Ex. 3, Johnson Decl. ¶¶ 30-31, 39, 40; Ex. 4, Batts Decl. ¶¶ 29-31, 37; Ex. 5, Stawinski Decl. ¶¶ 25-26, 34.)

Although assault weapons are not used in crime with nearly the frequency of handguns, they are used in crime in Maryland, including by way of example, the Bushmaster semi-automatic rifle used to carry out the so-called "D.C. Sniper" murders. (Ex. 2, Brown Decl. ¶ 21; Ex. 3, Johnson Decl. ¶¶ 42-43, 47; Ex. 4, Batts Decl. ¶¶ 43-44; Ex. 5, Stawinski Decl. ¶ 44.)  Moreover, assault weapons are also particularly dangerous for law enforcement, as rounds from them will easily penetrate soft body armor worn by most law enforcement personnel.  (Ex. 42, Boone Dep. 60, 65-66; Ex. 52, Roberts Dep. 49; Ex. 57 National Law Enforcement and Corrections Technology Center, *Selection and Application Guide to Personal Body Armor, NIJ Guide* 100–01, at 34-35 (2001); Ex. 3, Johnson Decl. ¶¶ 45-46; Ex. 5, Stawinski Decl. ¶¶ 31-33.)  Assault weapons also allow

criminals to effectively engage law enforcement officers at much greater distances, making it more difficult for law enforcement officers to take control of situations.  (Ex. 2, Brown Decl. ¶ 23; Ex. 3, Johnson Decl. ¶¶ 45-46; Ex. 4, Batts Decl. ¶¶ 45-46; Ex. 5, Stawinski Decl. ¶¶ 31-33.)  Large-capacity magazines are also particularly dangerous, as more shots available means more shots fired, more hits, and more death and injury.  (Ex. 2, Brown Decl. ¶ 24; Ex. 3, Johnson Decl. ¶ 44; Ex. 4, Batts Decl. ¶ 48; Ex. 5, Stawinski Decl. ¶ 37.)

Although Maryland law enforcement agencies allow some of their officers to carry assault weapons in the course of their duties, they do so only after rigorous training specifically on that firearm in addition to the rigorous firearms training all law enforcement officers are required to undergo by law.  (Ex. 3, Johnson Decl. ¶¶ 17-24; Ex. 4, Batts Decl. ¶¶ 26-28; Ex. 5, Stawinski Decl. ¶¶ 12-18.)  Moreover, assault weapons and large capacity magazines are used by law enforcement for law enforcement purposes in situations that do not resemble civilian self-defense scenarios.  Such situations often involve distances greater than those involved in home defense scenarios, entering structures or environments where there is a need to conduct lengthy and dangerous searches, engaging criminals on territory controlled by the criminals, searching large wooded areas, breeching buildings housing suspected criminals, and addressing barricade and hostage situations.  (Ex. 2, Brown Decl. ¶ 16; Ex. 3, Johnson Decl. ¶¶ 22, 25, 26, 29; Ex. 4, Batts Decl. ¶¶ 18, 22-24; Ex. 5, Stawinski Decl. ¶¶ 20-23.)  Thus, whereas a civilian has accomplished his self-defense goal if the assailant flees, the law

enforcement officer is charged with persisting in tracking down and apprehending the assailant.  (Ex. 2, Brown Decl. ¶ 16; Ex. 3, Johnson Decl. ¶ 29; Ex. 4, Batts Decl. ¶ 40.)

Law enforcement officers do not fire their weapons offensively, or ever with the intent of killing the target.  (Ex. 3, Johnson Decl. ¶ 29; Ex. 4, Batts Decl. ¶ 38; Ex. 5, Stawinski Decl. ¶ 23.)  But the situations in which law enforcement officers engage, and their obligation to take aggressive action to protect public safety, may require the use of tools that are simply not appropriate for civilian self-defense.  (Ex. 2, Brown Decl. ¶ 16; Ex. 3, Johnson Decl. ¶ 29; Ex. 4, Batts Decl. ¶¶ 39-41; Ex. 5, Stawinski Decl. ¶¶ 20-23.)

Moreover, because criminals obtain most of their firearms through straw purchases, purchases on the secondary market from legal owners, and theft from law-abiding individuals, reducing their availability generally is critical to reducing their availability to criminals.  (Ex. 3, Johnson Decl. ¶¶ 48, 61; Ex. 4, Batts Decl. ¶ 48; Ex. 5, Stawinski Decl. ¶¶ 38, 50; Ex. 8, Vince Decl. ¶ 23.)

Thus, these law enforcement officers, based on their expertise from decades of experience in law enforcement, have concluded that assault weapons and large-capacity magazines are dangerous and unusual firearms, and Maryland's assault weapons and large-capacity magazine bans will advance Maryland's interest in public safety by reducing the availability of those firearms and magazines for use by criminals, reducing the threat to innocent civilians from unintentional misuse by otherwise law-abiding citizens, and helping protect law enforcement officers.  (Ex. 2, Brown Decl. ¶¶ 27-28, 33; Ex. 3, Johnson Decl. ¶¶ 16, 57-61, 71; Ex. 4, Batts Decl. ¶¶ 16, 50, 54-60; Ex. 5, Stawinski Decl. ¶¶ 49-50, 53.).

The expert opinions offered by these top Maryland law enforcement officers are shared by major national law enforcement organizations that have concluded that assault weapons bans and large capacity magazine bans are important steps in protecting public safety and reducing the negative effects of firearms crime.   The National Law Enforcement Partnership to Prevent Gun Violence is an association created by a number of leading law enforcement groups to advocate positions with broad support among its members.  (Ex. 3, Johnson Decl. ¶¶ 7-8.)  The Partnership has taken a strong position in support of assault weapons and large capacity magazine bans like those enacted in Maryland.  (Ex. 3, Johnson Decl. ¶ 8 & Ex. A).  The International Association of Chiefs of Police ("IACP"), one of the world's premier law enforcement organizations for more than 100 years, has also taken a position in support of assault weapons and large capacity magazine bans like those enacted by Maryland.  (Ex. 3, Johnson Decl. ¶¶ 9-10 & Ex. B; Ex. 8, Vince Decl. ¶¶ 29-30 & Ex. B).   And the Major Cities Chiefs Association, a professional association of Chiefs and Sheriffs representing the largest cities in the United States and Canada serving 82.5 million people, also supports assault weapons and large capacity magazine bans like those enacted by Maryland.  (Ex. 3, Johnson Decl. ¶¶ 11-12 & Ex. C).

> **b.     The Best Available Social Science Evidence Supports the General Assembly's Conclusion that the Firearm Safety Act Will Protect Public Safety and Reduce the Negative Effects of Firearms Crime.**

The best available social science evidence also supports the General Assembly's conclusion that the Firearm Safety Act will protect public safety and reduce the negative

effects of firearms crime.   That is the conclusion of two expert witnesses whose declarations are submitted in support of the defendants' motion for summary judgment, Christopher S. Koper, Associate Professor of Criminology at George Mason University, and the primary author of the only academic studies to examine the effects of the 1994 federal assault weapons ban (Ex. 7); and Daniel W. Webster, Professor of Health Policy and Management and Director of the Johns Hopkins Center for Gun Policy and Research at the Johns Hopkins Bloomberg School of Public Health, who has studied gun violence issues for more than two decades (Ex. 6), and is supported by substantial evidence.

Assault weapons are a subset of semiautomatic weapons that include semiautomatic pistols, rifles, and shotguns with military features that are conducive to military and potential criminal applications, but that are unnecessary in shooting sports or for self-defense.   (Ex. 7, Koper Decl. ¶ 13; Ex. 6, Webster Decl. ¶¶ 7-8; Ex. 8, Vince Decl. ¶¶ 10-11.)   The ability to accept large-capacity detachable magazines is a common feature of assault weapons, but is also a feature of firearms other than assault weapons. (Ex. 7, Koper Decl. ¶ 14.)   The best available evidence supports one of the core rationales for banning assault weapons and large-capacity magazines, which is that they are capable of wounding and killing larger numbers of people because of their capacity for rapid firing of high numbers of rounds in a short period of time.   (Ex. 7, Koper Decl. ¶ 15.)   In particular, the best available evidence indicates that attacks with assault weapons and other firearms with large-capacity magazines generally result in more shots fired, persons wounded, and wounds per victim than other gun attacks.  (Ex. 7, Koper Decl. ¶ 15.)

49

Assault weapons and large-capacity magazines are disproportionately represented in mass public shootings, in which their use is also correlated with more fatalities and more injuries than mass public shootings in which they are not used. *See* discussion above at 35-36.   And, assault weapons and large-capacity magazines are also disproportionately represented in murders of law enforcement officers. *See* discussion above at pages 36-37.   Although handguns remain the firearm used in the majority of murders of law enforcement officers, assault weapons pose particular risks to law enforcement. *See* discussion above at pages 43-46.   In contrast to the data indicating that assault weapons and large-capacity magazines increase casualties from mass shootings and pose particular dangers to law enforcement officers, there are no studies or systematic data indicating that assault weapons features or large-capacity magazines are necessary for home self-defense.  (Ex. 6, Webster Decl. ¶ 20.)

In 2004, Professor Koper published a study of the effects of the federal assault weapons ban.  The federal assault weapons ban had a number of important exemptions and limitations that undermined its effectiveness.  (Ex. 7, Koper Decl. ¶¶ 50-52.)  First, the federal ban not only grandfathered in existing assault weapons and large-capacity magazines, but allowed the continued sale and transfer of those firearms, without restriction, during the period of the "ban."  (Ex. 7, Koper Decl. ¶ 50.)  Moreover, although the stock of large capacity magazines in the country before the ban took effect was estimated at between 25 and 50 million, the federal government approved the importation of more than 45 million more large-capacity magazines from abroad.  (Ex. 7, Koper Decl. ¶ 51.)   The federal ban also prohibited "copies and duplicates" of

specifically-named assault weapons, but that provision was interpreted to cover only firearms that were exact copies in all respects, including with respect to relatively easily-modified external features, which made it easy for manufacturers to evade the restrictions.  (Ex. 7, Koper Decl. ¶ 52.)

In light of the limitations of the ban, as well as the significant increase in manufacture of covered firearms and magazines before the ban took effect, any effect of the federal ban on crime generally was likely to be small and gradual.  (Ex. 7, Koper Decl. ¶ 66; Ex. 6, Webster Decl. ¶¶ 22-23.)  Nonetheless, evidence demonstrates that crimes with assault weapons declined shortly after the ban was enacted, although, given the more frequent use of assault pistols in crimes before the ban was enacted, much of that appears to have been attributable to a reduction in use of assault pistols in crimes. (Ex. 7, Koper Decl. ¶¶ 55-58; Ex. 6, Webster Decl. ¶ 33.)

With respect to large-capacity magazines, as a result of the increase in the availability of large-capacity magazines immediately before the ban took effect, and the continued influx of millions of additional magazines from overseas throughout the ban period, the data available at the time of Professor's Koper's 2004 study did not yet show a reduction in the use of large-capacity magazines in crimes.  (Ex. 7, Koper Decl. ¶¶ 60-62.)  That delayed effect was to be expected in light of the provisions of the ban and the continued availability for sale of grandfathered magazines. (Ex. 6, Webster Decl. ¶ 23.)  However, a subsequent analysis by the Washington Post demonstrates that the share of crime guns in Virginia with large-capacity magazines declined substantially during the period of the federal ban, and rebounded after the ban expired.  (Ex. 7, Koper

51

Decl. ¶ 64; Ex. 6, Webster Decl. ¶ 25; Ex. 31, David S. Fallis & James V. Grimaldi, *Va.*

*Data Show Drop in Criminal Firepower During Assault Gun Ban*, Wash. Post, Jan. 23,

2011.)  These data suggest that the federal ban may have begun reducing the use of large-

capacity magazines in crime by the time it was allowed to expire in 2004.  (Ex. 7, Koper

Decl. ¶ 65; Ex. 6, Webster Decl. ¶ 25.)  Ultimately, Professor Koper concluded that if the

federal ban had remained in effect over the long-term, it could have had a potentially

significant impact on the number of crimes involving large-capacity magazines, and thus

reduced the lethality and injuriousness of gunshot victimizations.  (Ex. 7, Koper Decl.

¶¶ 67-68.)  In light of the fact that Professor Koper's 2004 analysis could not have

considered data from the last few years of the ban, which is when it was likely to have

had the greatest effect, its findings likely underestimated the large-capacity magazine

ban's effects on gun violence.  (Ex. 6, Webster Decl. ¶¶ 26-27.)

Significantly, even modest reductions in the number of crimes in which assault

weapons and large-capacity magazines are used can have significant impacts on public

safety by forcing criminals to use less lethal weapons and magazines and, thus, reducing

the number of gunshot victims and gunshot wounds per victim.  (Ex. 7, Koper Decl.

¶¶ 15, 69.)  The latter is especially significant because, unsurprisingly, all other things

being equal, there is a significantly greater chance of death for an individual who has

sustained multiple gunshot wounds than for an individual who has sustained only a single

gunshot wound.  (Ex. 12, Decl. of Edward E. Cornwell, III ¶¶ 16 & Fig. 1, 19 & Fig. 2,

27-28.)  Professor Koper estimates that had the federal ban remained in effect, it could

have produced a 5% reduction in gunshot victimizations, which means 3,241 fewer

people being wounded or killed as a result of gun crime on an annual basis.  (Ex. 7, Koper Decl. ¶ 69.)

Moreover, although the relative rarity of mass shooting events makes drawing conclusions from them difficult, the temporal pattern of those events is consistent with the hypothesis that the federal assault weapons and large-capacity magazine bans had a protective effect on public safety.  (Ex. 6, Webster Decl. ¶¶ 28-29.)  Specifically, it appears that the number of mass shootings increased leading up to the 1994 ban, leveled off during the ban, and has increased substantially since the ban expired; and, significantly, that the number of persons injured in such shootings followed the same pattern. (*Id*.)

Based on his study of the federal assault weapons ban and Maryland's assault weapons and high-capacity magazine bans, it is Professor Koper's expert opinion that "Maryland's bans on assault weapons and large-capacity magazines, and particularly its ban on [large-capacity magazines], have the potential to prevent and limit shooting injuries in the state over the long-run.   In doing so, the Act is likely to advance Maryland's interest in reducing the harms caused by gun violence." (Ex. 7, Koper Decl. ¶ 86.)   Similarly, Professor Webster concludes that Maryland's assault weapons and large-capacity magazine bans are "likely to advance Maryland's interest in reducing the harms caused by gun violence."  (Ex. 6, Webster Decl. ¶ 33.)  Both experts agree that Maryland's ban is stronger than the federal ban in important respects, most notably that unlike the federal ban, Maryland prohibits the transfer, sale, and receipt of the grandfathered firearms and magazines.  (Ex. 7, Koper Decl. ¶ 66; Ex. 6, Webster Decl.

¶ 33.)  Thus, whereas under the federal ban a person could still purchase an assault weapon or large-capacity magazine from their local gun store, Maryland's law prohibits such transfers.  (Ex. 7, Koper Decl. ¶¶ 78-79; Ex. 6, Webster Decl. ¶ 33.)

Thus, the Maryland assault weapons ban is "likely to meaningfully limit the number of long guns with military-style characteristics in Maryland, and to further reduce and/or prevent increases in the use of such weapons in crime."  (Ex. 7, Koper Decl. ¶ 78.) Similarly, by banning the transfer of large-capacity magazines within the state, even though it does not prohibit residents from acquiring magazines outside the state, Maryland's ban on large-capacity magazines could show effect more quickly than did the federal ban, which could have "a meaningful effect on public safety."  (Ex. 7, Koper Decl. ¶¶ 80-83.)  Specifically, if Maryland's ban "is allowed to operate over the long-term, it should reduce the number of [large-capacity magazines] in circulation and potentially reduce the number and lethality of gunshot victimizations."  (Ex. 7, Koper Decl. ¶ 83.)

Based on similar evidence, other courts have readily concluded that the record provides "substantial evidence" to support the state's enactment of assault weapons and large capacity magazine bans.  *See, e.g.*, *New York State Rifle & Pistol Ass'n.*, 2013 U.S. Dist. LEXIS 182307, at *54, *56, *see also id.* at *48, *54-55 (accepting state's evidence, similar to that presented here, "that assault weapons are often used to devastating effect in mass shootings"; "large-capacity magazines are used regularly in mass shootings"; and that "more people die when a shooter has a large-capacity magazine"); *Shew*, 2014 U.S. Dist. LEXIS 11339, at *39-40.  Other federal district courts have expressly relied on

Professor Koper's opinions in upholding assault weapons and large-capacity magazine bans enacted by New York and Connecticut. *See New York State Rifle & Pistol Ass'n.*, 2013 U.S. Dist. LEXIS 182307, at *52 (New York); *Shew*, 2014 U.S. Dist. LEXIS 11339, at *36 n.51 (Connecticut).

Notably, while the defendants believe that they have, by far, the better of the social science debate, it is not their burden to prove to a scientific certainty that Maryland's assault weapons and large-capacity magazine bans will have the predicted effects. Rather, it is their burden to show that the available evidence supports a reasonable fit to the State's substantial interests. About this, there can be no genuine dispute. Accordingly, the state is entitled to judgment in its favor as to Counts I and II.

## II.   THE BANS' EXEMPTIONS FOR RETIRED POLICE OFFICERS DO NOT VIOLATE THE EQUAL PROTECTION CLAUSE.

The defendants are entitled to summary judgment on Plaintiffs' claim that the Firearms Safety Act violates the Equal Protection Clause of the Fourteenth Amendment by treating retired law enforcement officers differently than other individuals for purposes of the acquisition of assault weapons and large-capacity magazines (ECF No. 30, Third Am. Complaint ¶¶ 91-98). However, the plaintiffs' claim fails because retired law enforcement officers are not similarly situated to individuals covered by the law. Therefore, the defendants are entitled to summary judgment as to Count III.

The Equal Protection Clause of the Fourteenth Amendment states that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the law." U.S. Const., amend. XIV, § 1. This requires that similarly-situated individuals be treated

alike. *City of Clebourne v. Clebourne City Ctr., Inc.* 473 U.S. 432, 439 (1985). However, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id*. at 440.

As exceptions to the ban on the transfer of an assault weapon, the Firearm Safety Act permits the transfer from a law enforcement agency to a retired law enforcement officer only if: (1) it is sold or transferred on retirement, or (2) it was "purchased or obtained by the person for official use with the law enforcement agency before retirement." CR § 4-302(7). Thus, these are not broad exceptions allowing all retired law enforcement officers to obtain as many assault weapons as they like whenever they would like. Instead, the first is an exception applicable only to transfers to law enforcement personnel by a law enforcement agency upon retirement, and the second permits the transfer only of weapons actually obtained by such a law enforcement officer for official use. These exceptions are thus similar to an exception previously contained in the federal assault weapons ban. *See San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1124 (9th Cir. 1996) (stating that the federal "Act exempt[ed] government[al] agencies and law enforcement officers, as well as firearms transferred to an individual upon retirement from a law enforcement agency"). The Firearm Safety Act also generally exempts retired law enforcement officers, among others, from the large capacity magazine ban. CR § 4-305(a)(2).

Retired law enforcement officers are not similarly situated to other citizens with respect to either exception. Law enforcement officers are differentiated by their experience of having been entrusted with the statutory duty to protect public safety, and

the corresponding statutory authority to detain, arrest, and use force against other citizens to carry out their duty. *Id.*; *see also* PS § 3-101(e) (defining "law enforcement officer" as an individual who is a member of a law enforcement agency and "is authorized by law to make arrests"). Thus, a law enforcement officer is "not to be equated with a private person engaged in routine public employment or other common occupations of the community who exercises no broad power over people generally." *Foley v. Connelie*, 435 U.S. 291, 298 (1978) (internal quotations omitted).

Retired Maryland law enforcement officers are also differently situated than other citizens when it comes to the use of, and training with respect to, firearms. To be allowed to carry a firearm as a law enforcement officer in Maryland—including an assault weapon—one has to successfully complete extensive firearms classroom instruction, training, and qualification on that firearm, Code of Maryland Regulations ("COMAR") 12.04.02.03A, and then submit to firearms training every year thereafter, COMAR 12.04.02.08A; *see also* COMAR 12.04.02.06A (requirements applicable to long guns); COMAR 12.04.02.06B(2) (initial training from 7-35 hours depending on the type of long gun); COMAR 12.04.02.06B(3) (minimum rounds fired requirements ranging from 50-350 rounds); COMAR 12.04.02.07 (course of fire requirements). Failure to complete annual training on a firearm results in seizure of that firearm until successful completion of training is completed. COMAR 12.04.02.08E.

In addition to this extensive training on the use of firearms generally, law enforcement officers must receive exhaustive additional training to use assault weapons, including how and when they may be used and techniques to minimize the risk of harm to

innocent civilians.  (Ex. 4, Batts Decl. ¶ 27; Ex. 3, Johnson Decl. ¶¶ 18, 22.)  Officers

must undergo additional periodic re-qualification specifically on those assault weapons to

continue to be eligible to carry them in the line of duty.  (Ex. 4, Batts Decl. ¶ 27; Ex. 3,

Johnson Decl. ¶ 20.)  This training can exceed four weeks per year and virtually monthly

certification.  (Ex. 3, Johnson Decl. ¶ 21.)  Even to qualify for the training, officers in the

Baltimore County Police Department must undergo an internal review of the officer's

work history, education, time on the job, and internal files.  (*Id.* ¶ 20.)

In addition to training on use of weapons, law enforcement officers receive

training on the use of large-capacity magazines, and are trained on how not to

indiscriminately exhaust a magazine, to assess each shot for effectiveness, and to assess

the circumstances before continuing to fire additional rounds.  (Ex. 3, Johnson Decl.

¶ 27.)  Maryland law enforcement officers, unlike other Marylanders, are also required to

receive—as part of their classroom instruction on firearms—training on the rules for the

use of deadly force, judgment training on the use of deadly force, and "emotional, mental,

and psychological preparation needed for the possibility of a deadly force shooting

situation."  COMAR 12.04.02.10C.  Law enforcement officers also are trained on safe

handling and safe storage of firearms, including in their homes.  COMAR 12.04.02.10D;

(*see also* Ex. 42, Boone Dep. 40-42 (describing FBI training on firearms, which includes

home storage).)

All of these extensive training requirements imposed on Maryland's law

enforcement officers differentiate them from other citizens.  *See Cabell v. Chavez-Salido*,

454 U.S. 432, 443-44 (1982) ("The general law enforcement character of all California

'peace officers' is underscored by the fact that all have the power to make arrests and all receive a course of training in the exercise of their respective arrest powers and in the use of firearms") (internal citations omitted); *Bell v. Maryland*, 378 U.S. 226, 327-28 (1964) ("Instead of attempting to take the law into their own hands, people have been taught to call for police protection to protect their rights wherever possible").   The Plaintiffs are not similarly situated to law enforcement officers in these important respects.

Moreover, it would also have been rational for the General Assembly to conclude that an assault weapon or large-capacity magazine transferred to a law enforcement officer—combined with the general provisions of the Firearm Safety Act that would prohibit such retired law enforcement officer from transferring possession of the weapon or magazine to others—would be less likely to end up in the hands of criminals.   Because retired law enforcement officers are not similarly-situated to others, the Defendants are entitled to summary judgment on Count III as a matter of law.

## III.   THE FIREARM SAFETY ACT IS NOT VOID FOR VAGUENESS.

The plaintiffs' contention that the Firearm Safety Act's application to "copies" of the specifically-enumerated assault long guns in § 5-101(r)(2) of the Public Safety Article is unconstitutionally vague under the Due Process clause is deficient because they cannot show that the statute is vague "in all of its applications," as the analysis requires.   *See Village of Hoffman Estates v. Flipside, Hoffman Estates Inc.*, 455 U.S. 489, 497 (1982). To the contrary, the Firearm Safety Act provides adequate notice of its prohibitions to the

public and to law enforcement, is not vague, and, therefore, the defendants are entitled to summary judgment as to Count IV.

### A.  Plaintiffs' Facial Vagueness Challenge to the Law Is Invalid.

The plaintiffs' facial vagueness challenge to the Firearm Safety Act may only succeed if the law is incapable of any valid application or is "so standardless that it authorizes or encourages seriously discriminatory enforcement."  *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)); *see Hoffman Estates*, 455 U.S. at 494 n.5 (describing a facial challenge as "a claim that the law is 'invalid in toto — and therefore incapable of any valid application'") (quoting *Steffel v. Thompson*, 415 U.S. 452, 474 (1974)).  Courts also generally disfavor facial constitutional challenges, which require demonstrating that "no application of the statute would be constitutional."  *Sabri v. United States*, 541 U.S. 600, 609 (2004). Facial challenges are disfavored because they often rest on speculation, are contrary to the principles of judicial restraint, and "short circuit" the democratic process. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008).  The plaintiffs have not even alleged that the Firearm Safety Act is incapable of any valid application, or that it authorizes or encourages seriously discriminatory enforcement.

Moreover, "[f]acial vagueness challenges to criminal statutes are allowed only when the statute implicates First Amendment rights."  *United States v. Klecker*, 348 F.3d 69, 71 (4th Cir. 2003) (rejecting a facial vagueness challenge to a federal law regarding

the manufacture of "substantially similar" controlled substances); *see United States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002) (declining to consider a facial vagueness challenge to the Arms Export Control Act).   First Amendment cases warrant special concern for vagueness, with respect to speech in particular, because "vagueness may in itself deter constitutionally protected and socially desirable conduct." *Sun*, 278 F.3d at 309 (quoting *United States v. Nat'l Dairy Prods. Corp.,* 372 U.S. 29, 36 (1963)).   None of these special concerns are at issue in this case.

For both of these reasons, the plaintiffs' pre-enforcement facial vagueness challenge to a statute that does not implicate First Amendment protections must fail at the outset.[17]

### B.     The Firearm Safety Act Identifies a Clearly Defined Core of Prohibited Conduct and Does Not Encourage Arbitrary and Discriminatory Enforcement.

Even if the Firearm Safety Act were properly subject to a pre-enforcement facial vagueness challenge, to succeed, the plaintiffs would have to establish that "no set of circumstances exists under which the Act would be valid."   *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Hoffman Estates*, 455 U.S. at 497.   To survive a vagueness challenge, a statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not

---

[17] Recognizing important differences between the types of fundamental rights codified in the first two amendments to the United States Constitution, the Fourth Circuit has joined other courts in rejecting prior attempts to import substantive First Amendment principles into Second Amendment jurisprudence.   *Woollard*, 712 F.3d at 883 n.11 (rejecting prior restraint argument) (citing *Kachalsky*, 701 F.3d at 91-92).

encourage arbitrary and discriminatory enforcement.  *See Federal Commc'ns Comm'n v. Fox TV Stations,* 132 S. Ct. 2307, 2317 (2012); *Hill v. Colorado*, 503 U.S. 703, 732 (2000).  This assessment of vagueness entails two inquiries: first, the law must apply to an identifiable "core" of prohibited conduct.  *Hoffman Estates*, 455 U.S. at 497; *Martin*, 700 F.3d 132; *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 370-71 (4th Cir. 2012). Second, the law must "establish minimal guidelines to govern law enforcement.'"  *United States v. Lanning*, 723 F.3d 476, 482 (4th Cir. 2013) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)).  These inquiries do not require "mathematical certainty" of language, *Wag More Dogs*, 680 F.3d at 371, and "need not spell out every possible factual scenario with 'celestial precision.'"  *United States v. Hager*, 721 F.3d 167, 183 (4th Cir. 2013) (quoting *United States v. Whorley*, 550 F.3d 326, 334 (4th Cir. 2008)).

### 1.  The Firearm Safety Act Proscribes an Identifiable and Understandable Core of Prohibited Conduct.

So long as a statute covers an identifiable core of prohibited conduct, it will not be considered void for vagueness even if it includes some imprecise terms.  In other words, a statute is not vague if "it requires a person to conform his conduct to an imprecise but comprehensible normative standard"; it is vague only if "no standard of conduct is specified at all."  *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971).

The Firearm Safety Act's prohibition on specific assault weapons and "copies" proscribes an identifiable core of prohibited conduct.  Plaintiffs contend that the word "copies," in and of itself, is inherently ambiguous.  Third Am. Compl. at ¶ 107.  But

courts do not strike down laws for vagueness due to hypothetical applications of a word

that might lead to an ambiguous application of the law.  *Hill*, 530 U.S. at 733.

> We do not hold legislators to an unattainable standard when evaluating enactments in the face of vagueness challenges. While there is little doubt that imagination can conjure up hypothetical cases in which the meaning of . . . terms will be in nice question, because we are condemned to the use of words, we can never expect mathematical certainty from our language.

*Wag More Dogs*, 680 F.3d at 371 (internal quotations omitted).

The Firearm Safety Act's assault long guns ban encompasses specifically-listed

firearms, by make and model descriptions, and their "copies."    CL  §  4-301(d);

PS § 5-101(r)(2).  The term "copies" has been further clarified through guidance from the

Attorney General and guidance from the MSP that will govern its enforcement activities.

In a formal opinion of the Attorney General of Maryland, the Attorney General

concluded that to be a "copy" of a specifically-enumerated assault weapon requires not

just cosmetic similarity, but that there "must be a similarity between the internal

components and function of the firearms."  95 Op. Att'y Gen. Md. 101, 108 (2010).

Relying on that advice, the MSP, the State entity primarily charged with enforcing the

State's firearms laws, has issued a Firearms Bulletin explaining that it considers a firearm

that is cosmetically similar to one of the specifically-enumerated assault weapons to be a

copy only if it also possesses "completely interchangeable internal components necessary

for the full operation and function of any one of the specifically-enumerated assault

weapons."  (Ex. 10, Brady Decl. ¶ 10 & Ex. B.)  Thus, the MSP is guided, and

constrained, by its published guidance, which has been distributed to all Maryland

firearms dealers and which is available to the public.  (Ex. 10, Brady Decl. ¶ 7.)  Such

administrative interpretations are a well-accepted method by which the government can clarify potentially vague statutory terms. *See Hoffman Estates*, 455 U.S. at 504 (A jurisdiction "may adopt administrative regulations that will sufficiently narrow potentially vague or arbitrary interpretations of the ordinance").

### a. The Plaintiffs' Own Allegations Confirm There Is an Identifiable and Understandable Core of Prohibited Conduct.

The plaintiffs' own testimony confirms that they are well aware of the assault long guns that are within the core of what is prohibited by the Firearm Safety Act, especially the AR-15, the AK-47, and their copies. (Ex. 46, Josselyn Dep. 55-56 (85% of firearms observed at the range are either AR-15s or AK-47s); ███████████████

███████████████████████████████████████████

███████████████████ Ex. 55, Kolbe Dep. 57-58 (he wishes to purchase an AR-15, but understands it is banned by the Firearm Safety Act); Ex. 63, Wink Decl. ¶ 4 (a "substantial number" of long guns sold by Wink's Sporting Goods are classified as assault weapons by the Firearm Safety Act); Ex. 62, Schneider Decl. ¶ 6 (same with respect to members of plaintiff Maryland Licensed Firearms Dealers Association and plaintiff Atlantic Guns); ███████████████████████

███████████████; *id.* at 38 (AR-15 is the "most popular firearm within our membership"); *id.* at 43-48 (commenting on popularity of the AR-15 and the focus on the AR-15 among those testifying against the Firearms Safety Act).) In sum, the plaintiffs themselves have clearly confirmed that there is an identifiable and understandable core of prohibited conduct, and that they know what it is. Thus, the Firearm Safety Act cannot

64

possibly be vague in "all of its applications," and the defendants are entitled to judgment as to Count Four.

Although the plaintiffs attempt to identify specific examples of firearms as to which they claim the Firearms Safety Act is vague, such individual examples are irrelevant in the context of a facial challenge to the statute.[18]   In light of their demonstrated understanding of firearms prohibited by the Firearm Safety Act, even if the plaintiffs could identify specific firearms as to which the law is vague, they are insufficient to demonstrate that the law is vague in all of its applications.   "[W]hen a statute is challenged for facial vagueness, the issue is not whether plaintiffs can posit some application not clearly defined by the legislation. The issue is whether all applications are impermissibly vague."  *See Richmond Boro Gun Club*, 896 F. Supp. 276, 290 (E.D.N.Y. 1995).   As set forth above, the plaintiffs do not even come close to meeting that standard.

---

[18] Moreover, the examples they choose do not remotely call into question the core conduct prohibited by the statute.  For example, the plaintiffs allege that the statute is vague with respect to its application to the "Colt AR-15 Sporter H-BAR rifle," which is the sole specific exception included in the list of enumerated assault long guns. PS § 5-101(r)(2)(xv) (excepting the Colt AR-15 Sporter H-BAR rifle).  The AR-15 H-BAR has been marketed by Colt as its "first-rate target rifle."  (Ex. 54, "One look and you'll see the difference," Colt advertisement.)  The plaintiffs allege that it is impossible for them to determine whether a copy of an AR-15 falls within this express exception for the AR-15 Sporter H-BAR.  Third Am. Compl. ¶¶ 110-12.  However, for the purposes of enforcing the statute, the MSP relies on a manufacturer's designation as to whether a copy of an AR-15 is an H-BAR, or heavy-barreled, version of such a firearm.  (Ex. 10, Brady Decl. ¶ 17.)  Thus, what the plaintiffs have characterized as impossible to figure out is really as easy as knowing what designation a manufacturer has applied to an assault weapon one would like to buy or sell.

### b. Maryland Law Has Contained the Same Definition of Assault Long Guns for Twenty Years.

The word "copies" is not new to Maryland firearms law.  In fact, the word has served to apprise Marylanders of which assault long guns have been subject to regulation for two decades. The same list of banned assault long guns which today defines "assault weapon" as including "any of the following specific firearms or their copies" was originally added as Section 441(d) of then-Article 27 of the Maryland Code in 1989. That definition—now contained in § 5-101(r)(2) of the Public Safety Article—has long existed, with significant potential criminal consequences, originally for a failure to comply with the application process and now for failure to comply with the ban. Yet, the plaintiffs have not identified a single known arrest, let alone conviction, based upon an unduly expansive interpretation of the word "copies," nor any acquittal based upon the alleged vagueness of the term "copies."  That there has been no prosecution in over two decades for a misunderstanding of the word "copies" provides an indication that the law is not vague and, moreover, that the plaintiffs are not under a "credible threat" of prosecution. *See Richmond Med Ctr. for Women v. Gilmore*, 144 F. 3d 326, 328 (4th Cir. 1998); *New York State Rifle & Pistol Ass'n*, 2013 U.S. Dist. LEXIS 182307 at *68-69 (in the course of rejecting a vagueness challenge to New York's assault weapons ban, stating that plaintiffs "presented no evidence that there has been any confusion on this issue in the many years of its existence"); *Cooke v. Hickenlooper*, 2013 U.S. Dist. LEXIS 168806, *20 (D. Colo. Nov. 27, 2013) (rejecting vagueness challenge where plaintiffs failed to demonstrate any threat of prosecution).

66

## 2. The Firearm Safety Act Does Not Encourage Arbitrary or Discriminatory Enforcement.

In addition to providing ordinary people with sufficient notice of prohibited conduct, the void for vagueness doctrine requires that a criminal statute not encourage arbitrary and discriminatory enforcement. *Hoffman Estates*, 455 U.S. at 498. Accordingly, a criminal statute must "establish minimal guidelines to govern law enforcement." *Goguen*, 415 U.S. at 574. More than the ability of ordinary citizens to determine which conduct is prohibited, the establishment of minimal guidelines to enforce the law is the more "meaningful" factor of the vagueness test. *Lanning*, 723 F.3d at 482 (quoting *Goguen*, 415 U.S. at 574). When the terms of a regulation are clear and not subject to attack for vagueness, the plaintiff bears a high burden to show that the standards used by officials enforcing the statute nevertheless give rise to a vagueness challenge. *Wag More Dogs*, 680 F.3d at 372 (citing *Green v. City of Raleigh,* 523 F.3d 293, 306 (4th Cir. 2008)).

As of this filing, there have been no arrests or prosecutions based on the assault weapons ban, nor have any been threatened, based on any confusion over what constitutes a copy of a specifically-enumerated assault weapon. The plaintiffs have not identified any facts that would suggest that the MSP might engage in arbitrary or discriminatory enforcement. As set forth above, additional guidance interpreting the statute has been provided by the Attorney General in a formal opinion, 95 Op. Att'y Gen.

Md. 101, and the MSP has published the standards it uses to determine whether a firearm is a copy of a specifically-enumerated firearm.[19]

Moreover, the MSP is available to provide guidance to consumers who have questions about specific firearms.[20]   If consumers have questions regarding whether specific firearms are covered as copies of specifically-enumerated assault long guns, and they do not know whether the firearm at issue has interchangeable internal components with a specifically-enumerated assault long gun, MSP will provide assistance.  (Ex. 10, Brady Decl. ¶ 13).  In the vast majority of cases, the determination can be made by resort to publicly-available sources.  (*Id.*).  The Firearm Safety Act is thus a far cry from laws like that struck down in *NAACP v. City of Annapolis*, which defined loitering to include "making hand signals associated with drug related activity" and "engaging in a pattern of any other conduct normally associated by law enforcement agencies with the illegal distribution, purchase or possession of drugs."  133 F. Supp. 2d 795, 808 (D. Md. 2001). The loitering law provided no objective guidance as to the meaning of the statutory terms, instead leaving determinations about unspecified "hand signals" or undefined

---

[19] Moreover, to the extent the MSP previously interpreted "copies" more broadly, until receiving the Attorney General's Opinion in 2010, that is no longer the case (and has not been the case since well before the effective date of the Firearm Safety Act).

[20] The MSP also responds to inquiries from dealers regarding particular firearms.  Ex. 45, Schneider Dep. 22-24, 86, 100; Ex. 49, Warnick Dep. 19-20, 49; Ex. 53, Wink Dep. 27-31.  If the MSP does not already know whether a particular firearm is or is not a copy of a specifically-enumerated assault weapon, MSP will generally provide the dealer with a copy of Firearms Bulletin # 10-02 and refer the dealer to the manufacturer.  (Ex. 10, Brady Decl. ¶ 12.)  It is MSP's experience that manufacturers, with whom dealers are in position to interact, are readily able to identify whether firearms they manufacture have interchangeable internal components with the specifically-enumerated firearms.  (*Id.*)

"other conduct" to the subjective opinion or caprice of the police officer observing the behavior.  *Id.*  In contrast, the Firearm Safety Act and the MSP's guidance are not subject to subjective opinion or caprice.  No one need accidentally or inadvertently put himself in danger of prosecution.  The plaintiffs have adduced no evidence, much less a genuine issue of material fact, to suggest that the guidance will result in the arbitrary or discriminatory application of the Firearm Safety Act.

> **3.     Regulation of "Copies" Is Necessary to Further the
>         Legislative Purpose of the Firearm Safety Act and
>         to Minimize Circumvention of the Law.**

A relevant consideration in a vagueness challenge is the legislative goals of the statute and the evils the statute was designed to remedy.  *In re R.C.*, 745 N.E.2d 1233, 1239 (Ill. 2001).  Absent some manner of capturing firearms that are essentially the same as those that are listed, manufacturers whose weapons are not listed among the prohibited firearms could escape the law entirely, and listed manufacturers could simply change the names of their listed firearms.  Indeed, with respect to a firearm like the AR-15, whose patent expired long ago, there are now dozens of manufacturers of copies under a variety of different brand and model names.  (Ex. 48, Shomo Dep. 27 (there are "hundreds" of manufacturers of the AR-15 "at a minimum" because "[a]nybody with a machine shop can manufacture one of these things").)

The Illinois Supreme Court recently recognized the importance of a similar "copies" provision, finding that the "copies or duplicates" language was added to the ordinance at issue to prevent manufacturers from avoiding criminal liability by simply changing the name of the enumerated weapons.  *Wilson v. Cnty. of Cook*, 968 N.E.2d

69

641, 652 (Ill. 2012); *cf. Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 252 (6th Cir. 1994) (noting a provision relating to copies was "integral to the ordinance since without it manufacturers could circumvent the ban by merely changing the names of the listed weapons"). In *Springfield Armory*, the Sixth Circuit rejected a ban on "*slight modifications or enhancements*" of other models of specific assault weapons "by the same manufacturer with the same action design," in part because the ban arbitrarily excluded identical weapons made by different manufacturers. *Id.* at 251-52. The inclusion of language designed to defeat efforts to easily circumvent a ban is important to achieving the legislative goal of protecting public safety.

The ease with which the federal assault weapons ban was circumvented by manufacturers based on the interpretation that the "copies and duplicates" to which it applied must be exact copies in all respects has been well documented. *See* discussion above at 50-51. Thus, a number of manufacturers were able to circumvent the prohibitions of the ban by making cosmetic changes to weapons and marketing them with different model names.[21] For example, following the explicit ban of the AR-15, Bushmaster began manufacturing the Bushmaster XM-15 to circumvent the ban, boasting

---

[21] *See* Ex. 59, Violence Policy Center, *United States of Assault Weapons: Gunmakers Evading the Federal Assault Weapons Ban* 2-3 (July 2004) (including photographs of firearms banned by the 1994 Federal Assault Weapons Ban and the subsequent "copycats" that were manufactured to circumvent the law); Ex. 60, Melvin Claxton & William Gaines, Assault Gun 'Ban' Designed to Backfire, Chicago Tribune (Dec. 31, 1997) (explaining of the 19 weapons banned by the Federal Assault Weapons Act, at least a dozen have resurfaced under other names).

that "the changes [it made] were all cosmetic, and didn't affect the gun's performance."[22]

Maryland's application of the term copies is designed to be an objective test, focusing on the interchangeability of internal components, while avoiding at least some of the ease with which manufacturers were able to avoid the federal ban.

### C.   Other Similar Laws Have Not Been Found Void for Vagueness.

#### 1.   Courts in Other States Have Rejected Vagueness Challenges to Similar Provisions.

All other courts considering similar statutory restrictions on "copies" of specific weapons have rejected vagueness challenges to that term.  The Illinois Supreme Court's rejection of a vagueness challenge to that state's ban on "copies or duplicates" of a list of assault weapons is instructive.  *Wilson*, 968 N.E. 2d at 649-53. In *Wilson*, the court stated: "A person of ordinary intelligence would understand that section 54–211(7) includes the specific weapons listed and any imitations or reproductions of those weapons made by that manufacturer or another.  When read together with the listed weapons, the provision is not vague."  *Id.* at 652.  The court noted that the ordinance with "copies or

---

[22] Ex. 66, Matt Wickenheiser, *As Sales Soar, Bushmaster Shrugs At Bid to Renew Gun Ban*, Portland Press Herald (May 14, 2003).  Similarly, the TEC-9 assault pistol was renamed several times to circumvent bans.  In 1991, to skirt a District of Columbia ban that identified it by name, the firearm was renamed the TEC-DC9.  *See* Ex. 67, Barbara Vobejda, *The Colorado Pistol with 'DC' in Its Name*, The Wash. Post (May 1, 1999).  In response to the federal ban's naming of both varieties, the manufacturer renamed it the AB-10, with "AB" standing for "after ban."  Ex. 68, Consumer Federation of America, *Back in Business:  The Gun Industry Plans for the Expiration of the Federal Assault Weapons Ban* 4 (Sept. 7, 2004).

duplicates" language combined with interpretive guidance "provides standards and a reasoned basis on which to determine whether a firearm is banned." *Id.* at 653.

Courts have also upheld language that approximates "copies," in slightly different terms that nevertheless indicate a copycat weapon. *See Coalition of N.J. Sportsmen, Inc. v. Whitman*, 44 F. Supp. 2d 666, 679-80 (D.N.J. 1999), *aff'd*, 263 F.3d 157 (3d Cir. 2001) (holding that use of the phrase "substantially identical" in conjunction with the list of banned assault firearms was not unconstitutionally vague "in all of its applications"); *State v. Warriner*, 731 A.2d 86, 90 (N.J. Super. 1999) (concluding that the term "M1 carbine type" in a statute defining terms applicable to weapons possession crimes and weapons possession licensing provisions was not void for vagueness); *Benjamin v. Bailey*, 662 A.2d at 1228 (concluding that use of the word "type" to capture like weapons, *i.e.* regulating "AK-47 type," "MAC-10, MAC-11 and MAC-11 Carbine type," and "Auto-Ordnance Thompson type" guns, in an assault weapons ban was not facially vague).[23]

### 2. Other Statutes Regulating "Copies" of Illegal Items Have Not Been Found Void for Vagueness.

An instructive analogy concerns federal statutes addressing the problem of designer drugs—that is, drugs that are nearly identical to substances specifically listed

---

[23] Courts that have found assault weapons bans vague have done so based on language not included in the Firearm Safety Act. *See New York State Rifle & Pistol Ass'n*, 2013 U.S. Dist. LEXIS 182307, at *73 (finding provision of the New York Penal Law regulating "semiautomatic versions of an automatic rifle, shotgun or firearm" to be "excessively vague."); *Springfield Armory*, 29 F. 3d at 253 (finding prohibition on "slight modifications" of specific manufacturers' guns void for vagueness).

under the Controlled Substances Act, 21 U.S.C. §§ 801-904.   Such substances are

regulated as "analogues" of those substances specifically regulated under the CSA. *See*

The Controlled Substance Analogue Enforcement Act of 1986.  Pub. L. No. 99-570, 100

Stat. 3207-13 (1986), codified at 21 U.S.C. §§ 802, 813 (the Analogue Act).

The Analogue Act defines an "analogue" of a controlled substance as a

"substantially similar" substance that is intended to have a "substantially similar" effect.

Under the Analogue Act, a controlled substance analogue "shall, to the extent intended

for human consumption, be treated . . . as a controlled substance in Schedule I."   21

U.S.C. § 813.  In passing the Analogue Act, Congress understood that the prohibitions of

the Controlled Substances Act would be too easily circumvented if drug traffickers could

simply develop drugs with only slight variations to their chemical or physical structure.

Congress' goal was "to prevent underground chemists from producing slightly modified

drugs that are legal but have the same effects and dangers as scheduled controlled

substances." *United States v. Hodge*, 321 F.3d 429, 432 (3d Cir. 2003).

The "substantially similar" language in the Analogue Act is broader and less

definite than Maryland's application of the term "copies."  Yet federal appellate courts

"have unanimously rejected vagueness challenges to Analogue Act prosecutions."

*Klecker*, 348 F.3d at 72.  *See, e.g.*, *United States v. Washam*, 312 F.3d 926, 930-32 (8th

Cir. 2002); *United States v. Fisher*, 289 F.3d 1329, 1333-39 (11th Cir. 2002); *United

States v. Hofstatter*, 8 F.3d 316, 321-22 (6th Cir. 1993) (per curiam); *United States v.

Desurra*, 865 F.2d 651, 653 (5th Cir. 1989) (per curiam).  Courts have rejected vagueness

arguments regarding the Analogue Act even though the Act requires technical,

specialized knowledge sufficient to evaluate the similarities between the chemical composition of the "analogue" drug and the more than 200 drugs currently listed as Schedule I or Schedule II substances. *See, e.g.*, *Washam*, 312 F.3d at 931 ("Rather than unanimous expert ratification, we look to whether the statute gave adequate warning, under a specific set of facts, that the defendant's behavior was a criminal offense."). Indeed, in *Klecker* there was expert disagreement as to whether the alleged analogue ("Foxy") really was "substantially similar" to Schedule I diethyltryptamine. 348 F.3d at 71-72. Despite this disagreement, and despite the court's acknowledgement that there "are important differences between Foxy and DET," the court concluded that "the similarities in their structures would put a reasonable person on notice" that Foxy was a prohibited analogue. *Id*. at 72. For similar reasons, this Court should reject plaintiffs' argument that the "interchangeable parts" test is vague. Third Am. Compl. ¶ 105. Plaintiffs' allegations demonstrate they are sufficiently aware of the similarities between specifically-enumerated assault weapons and their copies to be on notice of what the law proscribes.

In sum, given the identifiable core of prohibited conduct, the guidance supplied by the Attorney General and the MSP, and the legislative goals, the law is not void for vagueness. Plaintiffs have not shown there is a genuine issue of material fact regarding the alleged vagueness of the law in all of its applications. Accordingly, this Court should grant summary judgment in favor of the defendants and dismiss the plaintiff's vagueness challenge.

## CONCLUSION

The Court should grant the defendants' motion for summary judgment, and enter

judgment in favor of the defendants as to all counts of the third amended complaint.

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland


_____/s/_____
MATTHEW J. FADER (Fed. Bar # 29294)
JENNIFER L. KATZ (Fed. Bar # 28973)
Assistant Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-7906 (tel.); 410-576-6955 (fax)
mfader@oag.state.md.us

DAN FRIEDMAN (Fed. Bar # 24535)
Assistant Attorney General
Office of the Attorney General
Legislative Services Building
90 State Circle, Room 104
Annapolis, Maryland 21401
Tel. 410-946-5600
dfriedman@oag.state.md.us

Dated: February 14, 2014                    Attorneys for Defendants

TABLE OF EXHIBITS TO
DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Exhibit No.   Title

1.   Intentionally left blank

2.   Declaration of Colonel Marcus Brown, Superintendent of the Maryland
     State Police

3.   Declaration of Chief James W. Johnson, Baltimore County Police
     Department

     A.   National Law Enforcement Partnership to Prevent Gun Violence,
          Protecting Communities from Assault Weapons and High-Capacity
          Magazines.

     B.   International Association of Chiefs of Police Position Paper on
          Firearm Violence.

     C.   Letter from Commissioner Charles H. Ramsey, President of Major
          Cities Chiefs Association, to The Vice President, Dec. 28, 2012, and
          attached Major Cities Chiefs Firearms Violence Policy

4.   Declaration of Commissioner Anthony W. Batts, Baltimore Police
     Department

5.   Declaration of Deputy Chief Henry P. Stawinski, Prince George's County
     Police Department

6.   Declaration of Professor Daniel W. Webster

7.   Declaration of Professor Christopher S. Koper

     A.   Christopher S. Koper, America's Experience with the Federal
          Assault Weapons Ban, 1994-2004, in Reducing Gun Violence in
          America:  Informing Policy with Evidence and Analysis (eds. Daniel
          W. Webster and Jon S. Vernick, 2013)

     B.   Christopher S. Koper, Updated Assessment of the Federal Assault
          Weapons Ban:  Impacts on Gun Markets and Gun Violence, 1994-
          2003, July 2004

C.     Jeffrey A. Roth and Christopher S. Koper, Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994, Final Report, The Urban Institute, March 13, 1997

8.     Declaration of Joseph J. Vince, Jr.

9.     Declaration of Lucy P. Allen

10.    Declaration of Captain Dalaine M. Brady, Maryland State Police

A.     Maryland State Police, Licensing Division, Firearms Bulletin #10-2, November 4, 2010

B.     Maryland Attorney General, Regulated Firearms – Assault Weapons – Whether a Weapon Is a "Copy" of a Designated Assault Weapon and Therefore Subject to the Regulated Firearms Law, 95 Op. Att'y Gen. 101 (2010)

11.    Declaration of Kristin Jones Bryce

12.    Declaration of Edward E. Cornwell, III, M.D.

13.    Chapter 427 of the 2013 Laws of Maryland

14.    Bureau of Alcohol Tobacco and Firearms, *Report and Recommendation on the Importability of Certain Semiautomatic Firearms*, July 6, 1989

15.    Bureau of Alcohol Tobacco and Firearms, *Department of The Treasury Study on The Sporting Suitability of Modified Semiautomatic Assault Rifles,* April 1998

16.    Bureau of Alcohol Tobacco and Firearms, *ATF study on the Importability of Certain Shotguns,* January 2011

17.    Excerpts from Duncan Long, *The Complete AR-15/M16 Sourcebook, What Every Shooter Needs to Know* (2001)

18.    Excerpts from Doug Howlett, *The Shooter's Bible Guide to AR-15s* (2011)

19.    Excerpts from Kevin Dockery, *Special Warfare: Special Weapons* (2001)

20.    Excerpts from Christopher B. Bartocci, *Black Rifle II, The M16 Into The 21st Century* (2004)

21.     Violence Policy Center, *The Militarization of the U.S. Civilian Firearms Market,* June 2011

22.     Excerpts from Val Shilin, Charlie Cutshaw, Legends and Reality, AK Behind-the-Scenes Look at the History, Design, and Impact of the Kalashnikov Family of Weapons (2000)

23.     House of Representatives Report No. 103-489 (1994)

24.     Testimony of Brian J. Siebel, Brady Center to Prevent Gun Violence, Before the Council of the District of Columbia, October 1, 2008

25.     Excerpts from Department of the Army, *Rifle Marksmanship M16-/M4-Series Weapons,* August 2008

26.     Gov. Martin O'Malley, *Testimony on the Firearms Safety Act of 2013* (February 6, 2013)

27.     Stephen J. Sedensky, III, *Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yoganda Street, Newtown, Connecticut on December 14, 2012,* November 25, 2013

28.     William J. Krouse, Congressional Research Service, *Gun Control Legislation,* November 14, 2012

29.     Mark Follman, Gavin Aronsen, Deanna Pan, Maggie Caldwell, *U.S. Mass Shootings, 1982-2012:  Data From Mother Jones' Investigation,* Mother Jones Magazine, December 28, 2012

30.     Mark Follman, Gavin Aronse, Jaeah Lee, *More Than Half of Mass Shooters Used Assault Weapons and High-Capacity Magazines,* Mother Jones Magazine, February 27, 2013

31.     David S. Fallis, James V. Grimaldi, In Virginia, *High-Yield Clip Seizures Rise,* The Washington Post,  January 23, 2011

32.     Bureau of Alcohol, *Tobacco and Firearms, Assault Weapons Profile*, April 1994

33.     Blackheart International, 2013 Tactical Firearms Catalog

34.     Declaration of Jennifer L. Katz

35.     Chapter 456 of the 1994 Laws of Maryland

36.     Violence Policy Center, *A Shrinking Minority, The Continuing Decline of Gun Ownership in America*

37.     Violence Policy Center, *Firearm Justifiable Homicides and Non-Fatal Self Defense Gun Use*, April 2013

38.     Marc Lacey, *Evidence Points to Methodical Planning*, New York Times, January 9, 2011

39.     Michael Melia, Associated Press, *Jesse Lewis, Newtown Victim, Shouted for Classmates to Run: Mom,* Huffington Post, October, 18, 2013

40.     Collection of Newspaper Articles

41.     Transcript of Deposition of Jim Supica, January 6, 2014

42.     Transcript of Deposition of Buford Boone, January 3, 2014

43.     Transcript of Deposition of Guy Rossi, January 6, 2014

44.     Transcript of Deposition of James Curcuruto, January 24, 2014

45.     Transcript of Deposition of Stephen Schneider, December 19, 2013

46.     Transcript of Deposition of John Josselyn, December 3, 2013

47.     Transcript of Deposition of Gregory Nolte, December 3, 2013

48.     Transcript of Deposition of Patrick Shomo, December 18, 2013

49.     Transcript of Deposition of Robert Warnick, December 18, 2013

50.     Transcript of Deposition of Andrew Turner, November 26, 2013

51.     Transcript of Deposition of Gary Kleck, January 2, 2014

52.     Transcript of Deposition of Gary K. Roberts, D.D.S., January 8, 2014

53.     Transcript of Deposition of Carol Wink, December 3, 2013

54.     Colt H-BAR 1987 Advertisement

55.     Transcript of Deposition of Stephen Kolbe, November 26, 2013

56.     Violence Policy Center, *"Officer Down" Assault Weapons and the War on Law Enforcement,* May 2003

57.     National Institute of Justice, *Selection and Application Guide to Personal Body Armor*, November 2001

58.     Brady Center to Prevent Gun Violence, *Assault Weapons "Mass Produced Mayhem"(* October 2008)

59.     Violence Policy Center, *United States of Assault Weapons Gunmakers Evading the Federal Assault Weapons Ban,* July 2004

60.     Melvin Claxton, William Gaines, *Assault Gun 'Ban' Designed to BackFire*, Chicago Tribune Co., December 31, 1997

61.     Expert Report of Jim Supica, December 12, 2013

62.     Declaration of Stephen Schneider, Maryland Licensed Firearm Dealers Association, Inc.

63.     Declaration of Carol Wink, Wink's Sporting Goods

64.     Expert Report of James Curcuruto, December 13, 2013

65.     Declaration of Andrew Turner

66.     Matt Wickenheiser, *As Sales Soar, Bushmaster Shrugs at Bid to Renew Ban,* Blethen Maine, Newspaper Inc., May 14, 2013

67.     Barbara Vobejda, *Why a Colorado Pistol Has 'DC' in Its Name,* Washington Post, May 1, 1999

68.     Consumer Federation of America, *Back in Business,* September 7, 2004

69.     Colt's Manufacturing Company,  About Colt Rifles, Colt.com, 2013

70.     Bushmaster Firearms, 2011 Bushmaster Product Catalog

71.    Excerpts from Edward Clinton Ezell, *Small Arms of the World* (1983)

72.    4 Blackstone, William. *Commentaries on the Laws of England* (Clarendon Press 1769)

73.    Excerpts from Phillip Peterson, *Buyer's Guide to Assault Weapons* (2008)

74.    Testimony of Laurence H. Tribe, *Proposals to Reduce Gun Violence: Protecting Our Communities While Respecting the Second Amendment*, February 12, 2013

75.    National Shooting Sports Foundation,  Modern Sporting Rifle Comprehensive Consumer Report 2013