Exhibit 2

To Defendants' Memorandum in Support of Motion for

Summary Judgment

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| STEPHEN V. KOLBE, *et al.*; | ) | |
| | ) | |
| | ) | |
| *Plaintiffs*, | ) | Case No.: 1:13-cv-02841-CCB |
| | ) | |
| v. | ) | |
| | ) | |
| MARTIN O'MALLEY, *et al.*; | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

**<u>DECLARATION OF MARCUS BROWN</u>**

I, Marcus Brown, under penalty of perjury, declare and state:

1.      I am the Superintendent of the Maryland State Police.  I am over the age of 18 and have personal knowledge of the facts and events referred to in this declaration, and am competent to testify to the matters stated below.

2.      I have been a law enforcement officer since 1989, when I became a patrol officer with the San Jose Police Department.  After three years in San Jose, I joined the Baltimore City Police Department, eventually becoming Deputy Commissioner of Operations.

3.      In 2007, I left the Baltimore Police Department to become Chief of the Maryland Transportation Authority Police, a position I held until August 1, 2011, when I became the Superintendent of the Maryland State Police.

4.      While with the Baltimore City Police Department, I was a member of the Department's Special Weapons and Tactics, or SWAT, team, was later in charge of the SWAT team as a lieutenant, and also had responsibility for the SWAT team when I was promoted to the position of major in charge of all special operations.  Thus, I am familiar with SWAT armaments, operations, deployment, and tactics.

5.      As a member of the Baltimore City Police Department, I went through the standard firearms training required of all police officers in that department, including specific firearms training on the standard-issue departmental handguns.  That training covered not only technical aspects of the firearms, but also training regarding how and when the firearm should be used and how to employ the weapon with the least risk to innocent civilians.

6.      Upon becoming a member of the SWAT team, I received an additional two weeks of basic SWAT training, including special training for making entries, specific scenario training, hostage barricade training, and other specialized training.  That was followed by a separate week of specific firearms training on firearms used by the SWAT team.

7.      When I first joined the SWAT team, the primary firearms used in addition to the standard-issue department handgun were military surplus M16 and M14 assault weapons.  The M16s were "select fire," meaning they could be set to fire in fully-automatic mode; burst-fire mode, in which a single pull of the trigger would release up to three rounds; or semi-automatic mode, in which each pull of the trigger released a single

round.  The SWAT team was later issued AR-15 assault rifles, which also had select-fire capabilities and which I was also trained on.

8.     After receiving initial training, members of the SWAT team received regular, periodic training on those same firearms, and were required to re-qualify on the same firearms on a regular basis.

9.     Although the M16 and AR-15 assault weapons both had fully-automatic capabilities, we were instructed never to use that function.  The semi-automatic function was deemed appropriate for all SWAT team uses.

10.     I found the AR-15 to be an effective weapon for the specialized purposes of the SWAT team, including undertaking offensive actions such as raiding structures and addressing barricade hostage situations.

11.     I understand that the plaintiffs in this lawsuit are challenging the assault weapons and large-capacity magazine bans enacted as part of the Firearms Safety Act of 2013.

12.     The assault weapons ban makes it illegal to import into Maryland, or to transfer or accept transfer of, certain firearms defined by statute as "assault long guns." Generally, the firearms defined as assault long guns in § 5-101(r)(2) of the Public Safety Article (including copies of specifically-enumerated firearms) are semi-automatic long guns, mostly rifles, with the capability to accept large-capacity detachable magazines and one or more military-style features.  These are firearms designed for the battlefield, for the soldier to be able to shoot a large number of rounds across a battlefield at a high rate of speed.  They were later adapted to law enforcement uses.  For purposes of this

3

declaration, I use the phrase "assault weapons" to refer to the firearms identified in § 5-101(r)(2) of the Public Safety Article.

13.     The large capacity magazine ban generally makes it illegal to transfer or accept transfer of magazines with a capacity in excess of 10 rounds.  For purposes of this declaration, I use the phrase "large-capacity magazines" to refer to the magazines for which transfer is now prohibited in Maryland.

14.     The Maryland State Police currently issues a limited number of AR-15 assault weapons to troopers who have undertaken special training and qualification related to that firearm.

15.     In addition, the Maryland State Police maintains an officer-owned patrol rifle program through which individual officers may acquire their own approved assault weapons and use them in the line of duty provided they also complete the same special training and regular qualification on those firearms.  This program is essential to the Maryland State Police's ability to maintain a sufficient number of assault weapons available for law enforcement purposes, because we do not have a sufficient budget to supply those firearms.

16.     Law enforcement officers use firearms for law enforcement purposes. Those law enforcement purposes are very different from the civilian use of firearms for self-defense.  A law enforcement officer is asked by the community to be proactive in fighting crime, apprehending suspects, and confronting violent offenders, often on territory controlled by those offenders.  A law enforcement officer is often called upon to take over territory controlled by suspects and to track down and take suspects into

custody for the protection of the general public.  By contrast, a private citizen's position defending his or her person, family, and home is a purely defensive position, and the private citizen's interest is in chasing away an assailant, not pursuing and capturing that assailant.

17.    As a result of these differences, law enforcement personnel may have the need to use firearms that are more appropriate for their unique purposes, and magazines capable of holding more than 10 rounds, whereas citizens do not.

18.    After consulting with personnel within the Maryland State Police who I would expect to be aware of such situations if they existed, I am not aware of a single incident in the State of Maryland in which an assault weapon has been used in self-defense, or in which even 10 rounds was required to be fired to stop or chase away a perpetrator.

19.    Moreover, I am not aware of any self-defense situation in which a firearm other than an assault weapon or a magazine with a capacity of fewer than 10 rounds was used where an assault weapon or high-capacity magazine would have been more effective.

20.    In fact, in many home defense situations assault weapons are likely to be less effective than handguns because they are less maneuverable in confined areas like hallways and staircases.

21.    In contrast to my lack of information about the use of assault weapons and large-capacity magazines in citizen self-defense, I am aware that assault weapons have been used in numerous crimes in Maryland, perhaps the most well-known of which was

the case of the so-called D.C. Sniper, John Allen Muhammed, who used a Bushmaster semi-automatic rifle to terrorize people in the Maryland and Virginia suburbs of Washington, D.C., murdering and wounding people throughout the region, including murdering 6 people in Maryland.

22.     I am also aware of incidents in which more than 10 rounds were fired by criminals to kill people in Baltimore City.  Although those incidents are not nearly as common as crimes in which fewer than 10 rounds were fired by any single shooter, they do occur.

23.     Through my training and experience, I am aware that the ammunition fired by assault weapons is capable of penetrating the soft body armor customarily worn by law enforcement officers.  Although that is also true of other rifles, that combined with the military-style features and ability to accept large capacity detachable magazines make assault weapons especially dangerous for law enforcement officers.

24.     As a result, Maryland's ban on assault weapons and large-capacity magazines does not interfere with self-defense, but instead prevents assault weapons and large-capacity magazines from proliferating in public places where, in the hands of criminals, they can result in the firing of more rounds, causing more intended damage, than other firearms or magazines, and, in the hands of untrained or undertrained civilians, they can result in the firing of more rounds, causing more unintended damage, than other firearms or magazines.

25.     Maryland is fortunate not to have had a mass shooting incident like those that have afflicted many other states in recent years, although the recent incident in the

Columbia Mall demonstrated that Maryland is not immune to the actions of active shooters. Regardless, the absence of a mass shooting thus far is not a reason to avoid taking action to restrict the availability of assault weapons and large-capacity magazines, which are used disproportionately in such mass shootings nationally, and which produce more deaths and injuries when they are used in such incidents. To the contrary, this is the type of proactive action, looking to reduce the long-term availability of particularly dangerous firearms, that is designed to promote public safety and save lives.

26.     Assault weapons are currently used in only a small percentage of criminal acts, especially as compared to handguns, but the need to check their long-term availability for criminal uses comes from the damage of which they are capable, the special risks they pose to law enforcement officers, and the risk that their increasing availability will make them more available and affordable in the future to criminals, especially those planning to engage law enforcement and conduct mass shootings.

27.     I understand that Maryland has not banned the possession of assault weapons or large-capacity magazines owned before October 1, 2013, nor has it banned the transport of large-capacity magazines into the state. However, Maryland has banned the sale, transfer, purchase, or receipt of assault weapons and large-capacity magazines within the state, as well as the transport of assault weapons into the state, after October 1, 2013.

28.     In my experience, most criminals are not committed enough to go to great lengths to evade these restrictions, or to travel out of state to obtain large-capacity magazines instead of using smaller-capacity magazines available within the state. As a

7

result, even if surrounding states do not enact similar limitations, I expect Maryland's bans, over the long term, to reduce the availability of both assault long-guns and large-capacity magazines to criminals in Maryland, with a positive impact on public safety.  If surrounding states enact similar limitations, the bans will be even more effective.

29.    I understand that Maryland's assault weapons ban does not cover the AR-10 firearm and exempts heavy-barreled versions of the AR-15.  I am not aware of any crimes that have been committed in Maryland with AR-10s or heavy-barreled versions of the AR-15.  If those or any other firearms with similar capabilities and characteristics to the firearms on Maryland's list of banned assault weapons begins being used as a substitute for weapons that are on the list, and giving rise to public safety risks similar to those associated with, for example, standard AR-15s or AK-47s, I would expect law enforcement to petition the General Assembly to include those other firearms among those that are banned.

30.    I understand that the assault weapons and large-capacity magazines bans contain exceptions for retired law enforcement officers.

31.    The Maryland State Police does not transfer assault weapons to retiring or retired law enforcement officers, nor does it have any intention of doing so.  I am not aware of any other law enforcement agency in Maryland that transfers or intends to transfer assault weapons to retired or retiring law enforcement officers.

32.    The Maryland State Police does allow retiring law enforcement officers to purchase their service weapons, along with associated magazines (which now hold 15 rounds), at replacement cost.  This is a time-honored tradition among law enforcement

agencies nationwide that recognizes the contributions made by law enforcement officers and provides a way for law enforcement agencies to replenish their armories with new firearms at no cost to the agencies.

33.     Maryland's assault weapons and large-capacity magazine bans do not restrict any firearms or magazines that I am aware have been used, or are appropriate for use, in self-defense. To the contrary, Maryland's assault weapons and large-capacity magazine bans restrict firearms that are particularly dangerous and unusual, were designed for use in combat situations, and that pose special risks for law enforcement officers and in mass shootings.

Date: _____          _____

Marcus Brown, Superintendent
Maryland State Police