Exhibit 3

To Defendants' Memorandum in Support of Motion for

Summary Judgment

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

STEPHEN V. KOLBE, *et al.*;     )
    )
    )
    *Plaintiffs,*    )  Case No.: 1:13-cv-02841-CCB
    )
v.    )
    )
MARTIN J. O'MALLEY, *et al.*;    )
    )
    )
    *Defendants.*    )

## DECLARATION OF JAMES W. JOHNSON

I, Chief James W. Johnson, under penalty of perjury, declare and state:

1.    I am the Chief of the Baltimore County Police Department. I am over the age of 18 and am competent to testify to the matters stated below.

2.    The Baltimore County Police Department is the 20th largest police department in the United States, with 1,900 officers and an operating budget of more than $110 million a year. The Department is responsible for an area covering 675 miles, including 175 miles of waterfront, with a residential population of 850,000 and a work-day population in excess of 1 million people.

3.    I joined the Baltimore County Police Department as a cadet at the age of 18 in January 1979, and have held every sworn rank in the Department, including police

officer, corporal, sergeant, lieutenant, captain, major, and colonel. I have been Chief since May 31, 2007.

4.      I have received training on numerous handguns and shotguns during my law enforcement career. From my role as Chief and previous supervisory roles, as well as from regular interaction with other law enforcement officers and the public, I am familiar with the capabilities, attributes, and uses of firearms generally used in the law enforcement community for law enforcement purposes and by civilians in self-defense.

5.      I have also been a hunter for all of my adult life, and am generally familiar with the capabilities, attributes, and uses of firearms in hunting.

6.      In my role as Chief, and also in my role as a Chairman of the National Law Enforcement Partnership to Prevent Gun Violence, I have spent hundreds of hours studying firearms issues, including assault weapons and large capacity magazines, the use of assault weapons and large-capacity magazines in crime, and lack of suitability of assault weapons and large-capacity magazines for lawful purposes other than military and law enforcement purposes. After exhaustive study, I have concluded that assault weapons and large-capacity magazines are particularly dangerous and unusual and lack any place in our society other than military and law enforcement purposes. My expertise in these issues arises from my experience with the Baltimore County Police Department, hundreds of hours of research into those issues, attendance at law enforcement meetings and conferences, and hundreds of conversations with other law enforcement officers regarding their experience with assault weapons and large capacity magazines. All of these are things that a person in my position, as the head of a large urban/suburban police

department, would normally rely upon in analyzing the threats posed to public safety and the steps required to address those threats.

7.     In addition to being Chief of the Baltimore County Police Department, I am also Chairman of the National Law Enforcement Partnership to Prevent Gun Violence, an association created by a number of leading law enforcement groups.  The Partnership is comprised of the Commission on Accreditation for Law Enforcement Agencies, Inc., the Hispanic American Police Command Officers Association, the International Association of Campus Law Enforcement Administrators, the International Association of Chiefs of Police, the Major Cities Chiefs Association, the National Association of Women Law Enforcement Executives, the National Organization of Black Law Enforcement Executives, the Police Executive Research Forum, and the Police Foundation.

8.     The National Law Enforcement Partnership to Prevent Gun Violence advocates positions with broad support among law enforcement groups on issues related to law enforcement.  The Partnership, based on a vote of its members, has taken a position in support of assault weapons and large-capacity magazine bans like those enacted in Maryland.  A true and correct copy of the most recent official position of the Partnership on these issues is attached as exhibit A.

9.     I am also a member of the International Association of Chiefs of Police ("IACP"), one of the world's premier law enforcement organizations.  For over 100 years, the IACP has been launching programs, speaking on behalf of law enforcement, conducting ground-breaking research, and providing exemplary programs and services to support law enforcement across the world.  The IACP is a leading voice for law

enforcement professionals in policy debates, and provides training and research for the benefit of law enforcement officers worldwide.

10.     The IACP has taken a position in support of assault weapons and large capacity magazine bans like those enacted by Maryland.  A true and correct copy of the most recent official position of the IACP on these issues is attached as exhibit B.

11.     I am also a member of the Major Cities Chiefs Association ("MCCA"), a professional association of Chiefs and Sheriffs representing the largest cities in the United States and Canada.  Members of the MCCA include the chiefs and sheriffs of the 66 largest law enforcement agencies in the United States and the nine largest in Canada, as well as one agency in the United Kingdom.  They serve 82.5 million people with a sworn workforce of 190,402 officers and non-sworn personnel.  The MCCA exists to provide a forum for executives to share ideas, experiences and strategies for addressing the challenges of policing large urban communities, and also seeks to influence national public policy on law enforcement matters.

12.     The MCCA has taken a position in support of assault weapons and large capacity magazine bans like those enacted by Maryland.  A true and correct copy of the most recent official position of the Association on these issues is attached as exhibit C.

**Maryland's Assault Weapons and High-Capacity Magazine Bans**

13.     I understand that the plaintiffs in this lawsuit are challenging the assault weapons and large-capacity magazine bans enacted as part of the Firearms Safety Act of 2013.

14.    The assault weapons ban makes it illegal to import into Maryland, or to transfer or accept transfer of, certain firearms defined by statute as "assault long guns." Generally, the firearms defined as assault long guns in § 5-101(r)(2) of the Public Safety Article (including copies of specifically-enumerated firearms) are semi-automatic long guns, mostly rifles, with the capability to accept large-capacity detachable magazines and one or more military-style features, which I discuss further below.  For purposes of this declaration, I use the phrase "assault weapons" to refer to the firearms identified in § 5-101(r)(2) of the Public Safety Article.

15.    The large-capacity magazine ban generally makes it illegal to transfer or accept transfer of magazines with a capacity in excess of 10 rounds.  For purposes of this declaration, I use the phrase "large-capacity magazines" to refer to the magazines for which transfer is now prohibited in Maryland.

16.    For reasons discussed below, it is my opinion that Maryland's assault weapons ban and large-capacity magazine ban will make Maryland safer by reducing the availability of these dangerous and unusual firearms and magazines for use by criminals, and also by reducing the threat to innocent civilians from the unintentional misuse of these firearms and magazines by otherwise law-abiding citizens.  These bans will also help protect law enforcement officers from the dangers posed by these weapons.

**Use of Assault Weapons and High-Capacity Magazines by the Baltimore County Police Department**

17.    The Baltimore County Police Department has a limited number of assault weapons available for use by law enforcement officers.    The primary use of assault weapons is by the special tactical forces.    In addition, a limited number of patrol officers have access to assault weapon in case the law enforcement-related need to use them arises.

18.    The process to permit a Baltimore County Police Department officer to become qualified to carry an assault weapon is exhaustive.    An officer must initially qualify on the Department's official side arm, which is now an FNS .40 caliber handgun. That requires an intense two-week training on the firearm, which includes specific training not only on the firearm itself but also when the firearm should and should not be used and how to use the firearm to minimize risk to innocent civilians.

19.    After initially qualifying on the Department's standard service weapon, officers must be re-qualified annually, in both day and night scenarios.

20.    To qualify to carry an assault weapon, there is first an internal review of the officer's work history, education, time on the job, and internal files.    If accepted, that is followed by a lengthy regimen of training at the range to demonstrate proficiency, followed by regular recertification processes on that specific assault weapon thereafter.

21.    Tactical teams that are specifically issued assault weapons receive training that exceeds four weeks per year and virtually monthly certification.

22.     One significant difference in the training officers receive on assault weapons as opposed to handguns is with respect to the distance at which one needs to develop proficiency. Assault weapons are used for attacks or offensive maneuvers that involve greater distances, whereas handguns are more appropriate for the vast majority of police shooting encounters, which occur in a much more limited distance of less than five feet. There is thus an exhaustive amount of training that goes into when an assault weapon should be used and in what environment.

23.     The standard service weapons issued to Baltimore County Police Department Officers come with 14-round magazines. Baltimore County Police Department Officers permitted to carry assault weapons are issued 30-round magazines with those weapons.

24.     Baltimore County Police Department officers are trained when it is and is not appropriate to use an assault weapon. For the vast majority of engagements in which it is necessary to draw or use a firearm, an officer's sidearm is the most appropriate tool.

25.     Circumstances in which it may be appropriate to use an assault weapon, and circumstances in which it may be necessary to have more than 10 rounds available, involve uniquely law enforcement functions such as entering structures or environments where there is a need to conduct lengthy and dangerous searches in an offensive mode, searching large wooded areas, breeching buildings housing suspected criminals, and attempting to apprehend dangerous criminals.

26.     Unlike civilians, whose self-defense interest is in scaring off or stopping criminals, law enforcement officers are called upon not just to protect themselves, but to

protect the public generally and to affirmatively and aggressively track down and capture criminals. Assault weapons and large capacity magazines are appropriate for the uniquely law-enforcement tasks of offensively engaging criminals, often on territory occupied or controlled by the criminals.

27. Law enforcement officers are trained not to indiscriminately exhaust a magazine, but to assess each shot for effectiveness. Most training involves a two-round discharge, followed by a period of assessment. Although that is not always possible in a combat situation if the adversary is advancing, even in law enforcement gun battle encounters most officers are firing between three and five rounds.

28. I understand that the plaintiffs in this case have attempted to equate the use of firearms in civilian self-defense to the use of firearms in law enforcement operations. As described above, it is my opinion, based on my extensive experience and study, that this false analogy betrays a fundamental misunderstanding of law enforcement responsibilities.

29. Although law enforcement only fire firearms in defense of self and others, they use firearms in connection with a wide variety of actions that are inherently offensive in nature, including circumstances in which law enforcement officers must aggressively seek confrontations with criminals, often on territory controlled by the criminals, in an effort to apprehend the criminals or halt ongoing criminal activity. If law enforcement officers encounter resistance in these actions, they need to be prepared to use the firearms in connection with their unique responsibilities. These activities bear no resemblance to citizen self-defense.

**Use of Assault Weapons and High-Capacity Magazines in Civilian Self-Defense**

30.    After consulting with officers in the Baltimore County Police Department who I would expect to have knowledge of any such incidents, we are unaware of any incident in which a civilian in Baltimore County has ever used an assault weapon in self-defense, or any incident in which a civilian in Baltimore County has ever fired as many as 10 rounds in a self-defense incident.

31.    I am similarly unaware of any self-defense incident involving an assault weapon, or in which it was necessary to fire as many as 10 rounds in self-defense, anywhere else in Maryland, although I do not have the same access to information about incidents outside of Baltimore County.

32.    In addition to being generally unaware of any such incidents, it is my opinion, based on my extensive experience and research, that an assault weapon is not an appropriate self-defense weapon.    Assault weapons were designed for military applications, and the features of those weapons assist with those applications.    For example:

    a. Flash suppressors on assault weapons are engineered and designed to disperse the flash down and away from a shooter's eye to be able to take successive shots with greater efficiency, as well as to hide a shooter's position to allow for more effective, aggressive engagements.

    b. Coiling shrouds that cover the barrel of assault weapons are designed to allow a shooter to hold a weapon with greater ease while firing dozens or

hundreds of rounds in a brief period of time with limited mechanical failure.

c. Handgrips in front of a weapon and pistol grips are designed to allow greater control of a firearm while being held at one's hip, which allows for un-aimed "spray" fire, in either automatic or semi-automatic mode.

d. Collapsible or folding stocks aid in the concealment of high-powered assault weapons, and also allow for adjustment of the weapon to be used by multiple members of a combat regimen or SWAT team, or to be used with protective body armor.

e. Many assault weapons are designed so that gases can be expelled in such a way as to minimize the kick from firing, thus allowing for sustained, on-target firing for long periods of time without breaking. That feature is especially important for military assaults, but not for civilian self-defense.

33. All of these features are useful in military assaults, and some can be useful in aggressive, offensive law enforcement actions against hostile, non-compliant, well-armed criminals, but are not useful in civilian self-defense scenarios. Although I understand that some critics of assault weapons bans hypothesize civilian self-defense scenarios that resemble military theaters, those scenarios are not realistic.

34. In fact, based on my experience and research, assault weapons are a detriment to home defense. The length of assault weapons make them inferior to handguns for most home self-defense uses in light of relatively tight spaces in homes and the need to turn corners and maneuver in hallways.

35.   A shotgun would also be a superior self-defense weapon to an assault weapon, at least if it is loaded with appropriate shot that does not give rise to too great a risk of over penetration.

36.   The only difference between automatic firearms actually used by the military, such as the M16, and assault weapons covered by the ban, such as the AR-15, is that the M16 is fully automatic.   Although I believe automatic weapons are more dangerous than semi-automatic weapons, semi-automatic weapons that can accept 30-round magazines or greater are absolutely devastating weapons.   The rate of fire from such weapons is limited only by the speed at which the shooter can pull the trigger, allowing a 30-round magazine to be completely expended in 5 seconds or less.   Such weapons are dangerous and unusual and have no place in our society other than for use in military or law enforcement applications.

37.   It is also my opinion, based on my extensive experience and research, that a large-capacity magazine is not appropriate or necessary for self-defense.   As noted, I am not aware of a single incident anywhere in which more than 10 rounds was required to be fired in a self-defense incident.   In the vast majority of self-defense cases involving a firearm, knowledge that the victim has a firearm is all that is necessary to send the assailant away.   In other cases, one or only a few shots fired are sufficient to end the encounter.   I do not believe the hypothetical scenarios in which 10 or more shots are required in civilian self-defense, at least those where the victims are law-abiding, are realistic.

38.     By contrast, the use of large capacity magazines in self-defense can have severe adverse consequences for innocent bystanders.  Civilians by and large lack the training and experience of law enforcement officers with respect to the use of ammunition, and may be more inclined to fire more rounds of ammunition than necessary simply because they are readily available.  That in turn risks the lives of innocent civilians, including those that may be behind walls and doors, invisible to the individual using the firearm.

39.     Baltimore County may have on average 30 home invasions annually.  Although most of those are drug-related, where the victims are themselves criminals unable to lawfully possess firearms, there have been others.  However, even those situations do not involve circumstances in which assault weapons or large capacity magazines, as opposed to other firearms or magazines holding 10 or fewer rounds, would be useful.  I am not aware of any such situation in which more than 10 rounds were expended in self-defense, or where more than 10 rounds were not available, but would have been useful.

40.     I do not consider assault weapons to be commonly used in self-defense, and am unaware of a single incident in which one has been used for that purpose.  By contrast, I am aware of numerous incidents in which handguns or shotguns have been used in self-defense.

41.     I am also a hunter myself, and I do not believe assault weapons are either commonly used in hunting in Maryland, or well-suited for hunting.  The firepower and

military characteristics of an assault weapon are simply not appropriate or necessary for any type of hunting with which I am familiar.

## Use of Assault Weapons and High-Capacity Magazines by Criminals

42.     As of today, handguns are still the weapon used in the majority of crimes committed in Maryland and nationally.  However, assault weapons are showing up in an increasing number of crimes, and in the hands of increasing numbers of criminals. Because of the greater dangers posed by assault weapons, especially to law enforcement, it is appropriate to restrict their availability like we restrict the availability of other dangerous and unusual weapons like switch blade knives and brass knuckles.

43.     In Baltimore County, we recently determined that approximately 5% of weapons taken in by the property evidence unit were semi-automatic rifles capable of accepting large-capacity detachable magazines.  It is not at all unusual to encounter such weapons when executing search and seizure warrants for drug crimes or crimes of violence.  We are also aware of at least six instances where a suspect has used an assault weapon in a crime in Baltimore County, and such instances are becoming more prevalent.

44.     The ability to accept large-capacity magazines is one of the most significant and dangerous features of assault weapons.  More shots available means more shots fired, which means more hits, which means more death and injury.

45.     Moreover, assault weapons are disproportionately used in murders of police officers. Assault weapons are particular threats to law enforcement officers because their rounds easily pass through the soft body armor worn by most law enforcement officers,

including by the Baltimore County Police Department. Assault weapons also allow criminals to engage law enforcement officers from much greater distances, making it much more difficult for law enforcement officers to take control of situations.

46.   My research regarding assault weapons and large-capacity magazines has paid particular attention to their use against law enforcement, both for the purpose of understanding what steps need to be taken to minimize risk to my officers, as well as in connection with positions taken by organizations of which I am a part. Based on my research and briefings from other law enforcement officers, I am aware of are numerous incidents nationally in which assault weapons and large-capacity magazines have been used to murder public safety officers, including the June 29, 2011 murder of Berks County Deputy Sheriff Kyle Pagerly with an AK-47, and the December 24, 2012 murder of two first responders in Webster, New York with an AR-15. Other incidents are detailed in Law Enforcement Officers Killed in Action reports published annually.

47.   Although no Baltimore County police officer has been killed by an assault weapon, my officers have been fired upon by assault weapons and we regularly confront assault weapons, usually held by people with no legal right to possess any firearm.

48.   In light of the extreme damage they can do, and their particular utility in attacking law enforcement officers, reducing the availability of assault weapons and large capacity magazines to criminals is critical. Because criminals obtain most of their firearms through straw purchases, purchases on the secondary market from individuals who own firearms lawfully, and theft from law-abiding individuals, reducing the availability of assault weapons to criminals means reducing their availability overall.

49.     It is true that assault weapons continue to make up a relatively small portion of firearms used in violent crimes in Maryland and nationwide, but they are used disproportionately in mass shootings and in murders of law enforcement officers, and their dangers make the consequences of their use more potentially catastrophic than use of other firearms.

50.     Moreover, although I do not believe assault weapons to be common relative to ownership of other types of firearms, they have become increasingly common over the last 10 years.  Based on my research, ownership of assault weapons has increased from approximately 1 million at the time of the expiration of the federal ban to approximately 5 million now.  Recognizing a trend that is giving rise to increasing risks to public safety, we should not be required to wait until the problem is too large to contain before we can address this particularly dangerous and unusual risk.

51.     Although Maryland's assault weapons ban does not cover every semi-automatic rifle with the capacity to accept a large-capacity magazine and other military features, I believe it is a comprehensive list of those firearms in that category that law enforcement regularly confront.

52.     If any other semi-automatic rifles with capabilities similar to those on the list of banned firearms begin being used as substitutes for firearms that are on the banned list, and giving rise to public safety risks similar to those associated with AR-15s and AK-47s, I would expect law enforcement to support adding those firearms to the list of banned firearms.

53.     I have taken a very strong position on limiting the capacity of magazines, as have numerous leading law enforcement organizations, including the National Law Enforcement Partnership for the Prevention of Gun Violence, the Major City Chiefs Association, and the International Association of Chiefs of Police.

54.     Limiting the availability of large capacity magazines can reduce catastrophic consequences from their possession by both criminals and law-abiding citizens. Based on my research and briefings from other law enforcement officers, we have seen numerous shootings across the country in which an innocent bystander intervened during the reloading process, including in the shooting by Jared Loughner in Tucson, Arizona.[1] If Mr. Loughner had been required to reload after ten rounds, instead of 30, many more lives may have been saved.

55.     Based on my research and briefings from other law enforcement officers, we have also seen cases in which additional potential victims have been able to escape harm during the reloading process, including in the shooting by Adam Lanza in Newtown, Connecticut.  If Mr. Lanza had been required to reload after ten rounds, instead of 30, many more children's lives may have been saved.[2]

56.     Although it is possible to reload a magazine in a non-stressful situation in 2-4 seconds, that is much more difficult in a chaotic environment, under high stress.

---

[1] *See* Marc Lacey, *Evidence Points to Methodical Planning*, New York Times, Jan. 9, 2011, available at
http://www.nytimes.com/2011/01/10/us/10giffords.html?pagewanted=all.

[2] *See* Michael Melia, *Jessie Lewis, Newtown Victim, Shouted for Classmates to Run: Mom*, Associated Press, Oct. 18, 2013, available at
http://www.huffingtonpost.com/2013/10/18/jesse-lewis-newtown_n_4125282.html.

Criminals, including mass shooters, are often unable to quickly reload, allowing more and sooner opportunities for intervention or for potential victims to seek cover or escape.

57.     I understand that Maryland has not banned the continued possession of assault long guns or large-capacity magazines owned before October 1, 2013, nor has it banned the transport of large-capacity magazines into the state.  However, Maryland has banned the sale, transfer, purchase, or receipt of both assault long guns and large-capacity magazines within the state, as well as the transport of assault long guns into the state, after October 1, 2013.

58.     In that respect, Maryland's ban is more comprehensive, and more likely to be effective, than the earlier federal ban, which did not address the continued sale and transfer of existing supplies of assault weapons and large-capacity magazines, including millions of large-capacity magazines that continued to be imported from abroad long after the ban had supposedly taken effect.

59.     In my experience, most criminals will not go to great lengths to evade these restrictions, or to travel out of state to obtain large-capacity magazines instead of using smaller-capacity magazines available within the state.  As a result, I expect Maryland's bans, over the long term, to reduce the availability of both assault long-guns and large-capacity magazines to criminals in Maryland, with a positive impact on public safety.

60.     I also disagree with those who claim that restricting availability of assault weapons and large capacity magazines will not work because, they claim, criminals will acquire the firearms anyway.

61.    Criminals acquire firearms and magazines from individuals who initially own or purchase them lawfully, either through straw purchases, theft, or purchases on the secondary market.  Reducing availability generally will reduce availability to criminals. Most criminals are simply not dedicated enough to a particular type of firearm or magazine to go to great lengths to acquire something that is not readily available.

**Exemptions for Law Enforcement Officers**

62.    I understand that the assault weapons and large-capacity magazines contain exceptions for active and retired law enforcement officers.

63.    I actively lobbied for the exception for active law enforcement officers, which is critical to ensuring that law enforcement officers have the tools required to confront increasingly well-armed criminals in situations that are unique to law enforcement.  Law enforcement agencies face restricted budgets.  As a result, many law enforcement agencies have enacted officer-owned firearm programs in which officers are permitted to acquire assault weapons that they then are able to use in connection with their law enforcement work.  This provides important tools for law enforcement work that the agencies would otherwise be without.

64.    I do not believe such programs would be effective if law enforcement officers were prohibited from using the firearms they acquire outside of their law enforcement work, or were prohibited from continuing to own those firearms after retiring from law enforcement, because that would diminish the incentive for the officers to expend their own funds to acquire the firearms in the first place.

65.     Moreover, I do not believe that active or retired law enforcement officers are similarly situated to members of the general public with respect to ownership of firearms generally or assault weapons in particular by virtue of the selection process for law enforcement officers and the extensive training they receive on a regular basis on firearms, including not only technical and proficiency training, but training on how and in what circumstances to use firearms.

66.     The Baltimore County Police Department has no intention to transfer ownership of any assault weapons to any active or retired law enforcement officer, nor am I aware of any other law enforcement agency that has any such program or intention.

67.     The Baltimore County Police Department, like many other law enforcement agencies, allows retiring law enforcement officers to purchase their older model service handguns, including any associated large-capacity magazines, at retirement by paying the market value of the handguns.  That enables the Department to replenish its firearms inventory with newer firearms at reduced cost to the Department.

**Conclusion**

68.     I am a strong supporter of the right to keep and bear arms.

69.     I believe that citizens have a right to defend themselves against potential attack, and should have appropriate firearms available for that purpose.

70.     I am also a hunter, and believe that citizens should have appropriate firearms available for that purpose.

71.    Maryland's assault weapons and large-capacity magazine bans do not restrict any firearms or magazines that are necessary or even appropriate for use in self-defense or hunting.   To the contrary, Maryland's assault weapons and large-capacity magazine bans restrict firearms that, based on my experience and hundreds of hours of research, are particularly dangerous and unusual, not commonly owned, and that have no place in society outside of military and law enforcement applications.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: _____

_____

James W. Johnson
Chief, Baltimore County Police Department

Exhibit A


To Declaration of Chief James W. Johnson

# NATIONAL LAW ENFORCEMENT PARTNERSHIP TO PREVENT GUN VIOLENCE

## PROTECTING COMMUNITIES FROM ASSAULT WEAPONS AND HIGH-CAPACITY AMMUNITION MAGAZINES





### BACKGROUND ON ASSAULT WEAPONS AND HIGH-CAPACITY AMMUNITION MAGAZINES

Assault weapons were designed for the battlefield and have no place in our communities. These weapons were developed to enable a shooter to rapidly spray-fire multiple rounds at an enemy in combat, not to gun down small children, moviegoers, firefighters – or the law enforcement officers protecting them. This kind of excessive firepower has particular utility in the hands of dangerous people intent on wreaking havoc.



Each of the combat hardware features on assault weapons has a military purpose. For example, a pistol grip stabilizes the weapon and enables the shooter to spray-fire from the hip; a barrel shroud cools the barrel when multiple rounds are fired, preventing the weapon from overheating and allows the shooter to grasp the barrel; a threaded barrel accommodates military accessories such as a flash suppressor or grenade launcher; and a telescoping, folding or detachable stock allows for easier concealment.



High-capacity ammunition magazines dramatically increase a shooter's ability to massacre large numbers of people. Prohibiting the manufacture, transfer and importation of high-capacity magazines that hold more than ten rounds would reduce the number of bullets a shooter could use before having to stop to reload. Reloading can provide a critical window of time in which to take down a shooter, as we saw in Tucson.



### ASSAULT WEAPONS AND HIGH-CAPACITY AMMUNITION MAGAZINES ARE THE INSTRUMENTS OF MASS SHOOTERS





Horrific mass shootings are happening all too often all across our nation. Last December, Adam Lanza forced his way into a Newtown, CT, elementary school and opened fire with a .223 caliber Bushmaster AR-15 semiautomatic assault weapon and multiple 30-round ammunition magazines, killing 26 people, including 20 small children. In July of last year, James Holmes entered an Aurora, CO, movie theater and allegedly used an AR-15 assault weapon equipped with a 100-round drum magazine to mow down moviegoers, killing 12 and wounding 58 others.[1]

It is hard to imagine a gunman using a firearm equipped with a magazine holding fewer than ten rounds causing the devastation that resulted from an assault weapon equipped with a 100-round drum magazine. A semiautomatic assault rifle with a 100-round drum magazine – or a pistol equipped with a 30-round magazine – has one purpose: to kill as many people as possible as quickly as possible.

---

[1] Goode, Erica, "Rifle Used in Killings, America's Most Popular, Highlights Regulation Debate," *New York Times*, Dec. 16, 2012 (http://www.nytimes.com/2012/12/17/us/lanza-used-a-popular-ar-15-style-rifle-in-newtown.html?pagewanted=all&_r=0) and Kleinfield, N.R., "Gunman Took Big Supply of Ammunition to School After Killing Mother at Home," *New York Times*, Dec. 16, 2012 (http://www.nytimes.com/2012/12/17/nyregion/sandy-hook-school-shooting-in-newtown.html?ref=us)..

The devastating effects of these weapons are felt by law enforcement as criminals up the ante with firepower in excess of what police officers typically use. Reports from law enforcement leaders around the country indicate that assault weapons are increasingly being used against law enforcement officers. Current restrictions on the release of Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) trace data make it impossible to know exactly how often these firearms are being used in crimes.[2] But according to the Department of Justice, high-capacity ammunition magazines are used in 31 to 41 percent of fatal police shootings, varying across cities analyzed.[3]

## EFFECTIVENESS OF THE 1994 ASSAULT WEAPONS AND HIGH-CAPACITY AMMUNITION MAGAZINE BAN

The 1994 assault weapons ban prohibited the manufacture, transfer, sale or possession of new semiautomatic assault weapons and high-capacity ammunition magazines in excess of ten rounds. The ban expired in 2004.

Studies show the 1994 assault weapons ban worked:

- A 2004 University of Pennsylvania study found that, in the nine years after the ban took effect, the percentage of gun crimes involving assault weapons decreased by 70 percent.[4]

- In 1998, four years after the assault weapons and high-capacity ammunition magazine ban was enacted, the percentage of firearms with large-capacity magazines recovered by Virginia police decreased and continued to drop until it hit a low of 9 percent in 2004, the year the ban expired. That figure more than doubled since the ban's expiration, hitting a high of 20 percent in 2010, according to a Washington Post analysis.[5]

- After the ban expired in 2004, 37 percent of police agencies saw increases in criminals' use of assault weapons, and 38 percent reported a noticeable increase in criminals' use of high-capacity magazines, according to a 2010 Police Executive Research Forum survey.[6]

## NEW LEGISLATION

The Partnership calls on Congress to pass S.150, the Assault Weapons Ban of 2013, introduced by Senator Dianne Feinstein (D-CA) in the U.S. Senate, and the companion bill, H.R.437, introduced by Representative Carolyn McCarthy (D-NY) in the House of Representatives. The legislation bans the sale, transfer, manufacture and importation of:

- *New* semiautomatic rifles that can accept a detachable magazine and have at least one military feature, such as pistol grip; forward grip; folding, telescoping, or detachable stock; grenade launcher or rocket launcher; barrel shroud; or threaded barrel.

- *New* semiautomatic pistols that can accept a detachable magazine and have at least one military feature, including threaded barrel; second pistol grip; barrel shroud; capacity to accept a

[2] International Association of Chiefs of Police (IACP), *Taking a Stand: Reducing Gun Violence in Our Communities*, Sept. 2007 (http://www.theiacp.org/PublicationsGuides/TopicalIndex/tabid/216/Default.aspx?id=893&v=1).
[3] Koper, Christopher S., "An Updated Assessment of the Federal Assault Weapons Ban," National Institute of Justice, U.S. Department of Justice, June 2004 (https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf).
[4] Koper, Christopher S., "An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003" (http://www.sas.upenn.edu/jerrylee/research/aw_final2004.pdf).
[5] Fallis, David S. and Grimaldi, James V.,"In Virginia, High-Yield Clip Seizures Rise," *Washington Post*, January 23, 2011 (http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012204046.html).
[6] Police Executive Research Forum, *Guns and Crime: Breaking New Ground By Focusing on the Local Impact*, May 2010 (policeforum.org/library/critical-issues-in-policing.../GunsandCrime.pdf).

detachable magazine at some location outside of the pistol grip; or semiautomatic version of an automatic firearm.

- *New* semiautomatic shotguns that have a folding, telescoping, or detachable stock; pistol grip; fixed magazine with the capacity to accept more than five rounds; ability to accept a detachable magazine; forward grip; grenade launcher or rocket launcher; or shotgun with a revolving cylinder.

- *New* high-capacity ammunition feeding devices that have the capacity to hold more than ten rounds of ammunition that come in many forms, including a magazine, belt, drum, or feed strip.

The 2013 Assault Weapons Ban excludes any weapon that is lawfully possessed when the bill is enacted; any firearm manually operated by a bolt, pump, lever or slide action; assault weapons used by military, law enforcement, and retired law enforcement; and antique weapons. It also excludes 2,258 legitimate hunting and sporting rifles and shotguns by specific make and model.

Additionally, the new legislation strengthens the provisions of the expired 1994 law by banning dangerous devices designed to circumvent the law, including bump or slide fire stocks, which are modified stocks that enable semi-automatic weapons to fire at rates similar to fully automatic machine guns; "bullet buttons" that allow rapid replacement of ammunition magazines, frequently used as a workaround to prohibitions on detachable magazines; and thumbhole stocks, a type of stock that was created as a workaround to avoid prohibitions on pistol grips.

The 2013 Assault Weapons Ban addresses the millions of assault weapons and large-capacity magazines currently in existence by requiring a background check on all sales or transfers of grandfathered assault weapons and prohibiting the sale or transfer of high-capacity ammunition feeding devices lawfully possessed on the date of enactment of the bill.

## OUTLAWING ASSAULT WEAPONS AND HIGH-CAPACITY MAGAZINES DOES NOT INFRINGE ON THE SECOND AMENDMENT

The Assault Weapons Ban would affect only a particularly dangerous class of weapons, and law-abiding citizens will continue to be able to choose from and acquire the vast array of firearm models on the market.  In the 2008 case of *District of Columbia v. Heller*, the United States Supreme Court ruled that the Second Amendment protects an individual's right to possess a firearm. The ruling, however, recognized that "like most rights, the right secured by the Second Amendment is not unlimited," and listed several categories of restrictions that are presumptively constitutional, such as: laws prohibiting convicted felons or the mentally ill from possessing firearms; laws prohibiting the carrying of firearms in government buildings or schools; laws prohibiting possession of "dangerous and unusual" weapons that are not "in common use at the time."[7]

## EXAMPLES OF THE DEVASTATION CAUSED BY ASSAULT WEAPONS AND HIGH-CAPACITY AMMUNITION MAGAZINES

- In Newtown, CT, on December 14, 2012, Adam Lanza allegedly shot and killed 26 people, including 20 first-grade children, at Sandy Hook Elementary School with an assault weapon and multiple 30-round magazines.

- On August 5, 2012, in Oak Creek, WI, Wade Michael Page killed six people and wounded three others at a Sikh temple with a semiautomatic handgun and three 19-round magazines.

---

[7] *District of Columbia v. Heller,* 554 U.S. 570 (2008).

- In Aurora, CO, on July 20, 2012, James Holmes allegedly shot and killed 12 people and injured 58 others at a movie theater. Holmes allegedly used two semiautomatic handguns, a shotgun and an assault weapon equipped with a 100-round drum magazine.

- On January 8, 2011, Jared Loughner shot and killed six people and wounded 13 others in Tucson, AZ, including U.S. Representative Gabrielle Giffords. Loughner fired all 33 rounds from a semiautomatic handgun with a 33-round magazine before being tackled while trying to reload another magazine.

- In Fort Hood, TX, on November 5, 2009, Major Nidal Hasan allegedly shot and killed 13 people and wounded 34 others during a rampage at the Fort Hood military installation. He allegedly used a semiautomatic handgun and 20- and 30-round magazines.

- On April 3, 2009, Jiverly Wong shot and killed 13 people and injured four others at the American Civic Association in Binghamton, NY, firing 99 rounds from two semiautomatic handguns. A 30-round capacity magazine was found at the scene.

## AMERICANS SUPPORT FOR A BAN ON ASSAULT WEAPONS AND HIGH-CAPACITY AMMUNITION MAGAZINES

- In a December 2012 poll, 81 percent of registered voters – including 71 percent of gun owners – supported renewing the federal ban on assault weapons.[8]

- In the same December 2012 poll, 72 percent of voters, including 59 percent of gun owners, supported a ban on the sale of high-capacity magazines.[9]

- In a Johns Hopkins University Bloomberg School of Public Health survey, 69 percent of respondents supported a ban on the sale of military-style assault rifles.[10]

- In a January 2013 Washington Post-ABC poll, 58 percent of Americans said they supported a nationwide ban on the sale of assault weapons.[11]

---

[8] Douglas E. Schoen, "National Gun Survey," January 2013 (http://libcloud.s3.amazonaws.com/9/13/a/1088/schoen_summary_memo_-3.pdf).
[9] Douglas E. Schoen, "National Gun Survey," January 2013 (http://libcloud.s3.amazonaws.com/9/13/a/1088/schoen_summary_memo_-3.pdf).
[10] Johns Hopkins Bloomberg School of Public Health Survey, "Majority of Americans Support Dozens of Policies to Strengthen U.S. Gun Laws," Jan. 28, 2013 (http://www.jhsph.edu/news/news-releases/2013/Barry-Majority-of-Americans-Support-Policies-to-Strengthen-Gun-Laws.html).
[11] ABC News/Washington Post Poll, "On Eve of Newtown Recommendations, Most Back New Gun Control Measures, Jan. 14, 2013 (http://www.langerresearch.com/uploads/1146a1GunControl.pdf).

Exhibit B


To Declaration of Chief James W. Johnson



**International Association of Chiefs of Police**
**Position Paper on Firearm Violence**

The International Association of Chiefs of Police (IACP), an organization of law enforcement executives from around the globe, has long held positions intended to reduce and prevent firearms violence. As police chiefs, it is our duty to protect and serve our communities and display the leadership needed to ensure public safety.

The persistent and pernicious problem of gun violence impacts communities across the United States on a daily basis. Ranging from random shootings and suicides to retaliatory assaults and targeted mass killings, violence committed with firearms universally challenges law enforcement and taxes resources. This insidious problem requires law enforcement to lead a new, coordinated, and dedicated response involving citizens, elected leaders, lawmakers, and the entire criminal justice system

In the years since the terrorist attacks of 2001, over 300,000 American lives have been lost to gun violence.

### We are clearly facing a crisis.

In response, the IACP has long advocated for the adoption of common sense policies that will assist in reducing gun violence.  These proposals are drawn from the policy positions adopted by the 21,000 members of the IACP over the past several years.

**Armor Piercing Ammunition**
The IACP supports legislation and policies that will prohibit the sale or transfer of armor piercing ammunition.  In addition, the IACP believes that the process utilized to determine whether a round of ammunition is armor piercing should include performance based testing conducted by the Bureau of Alcohol, Tobacco and Firearms.

**Assault Weapons Ban**
First passed in 1994, the assault weapons ban required domestic gun manufacturers to stop production of semiautomatic assault weapons and ammunition magazines holding more than ten rounds except for military or police use.  While the ban was in place, it was remarkably effective in

reducing the number of crimes involving assault weapons. In the period of the ban, (1994-2004) the proportion of assault weapons traced to crimes fell by a dramatic 66 percent.

Assault weapons are routinely the weapons of choice for gang members and drug dealers. They are regularly encountered in drug busts and are all too often used against police officers..

The IACP has been a strong supporter of the assault weapons ban since 1992, and our membership has approved several reauthorizations of support in the years since. The membership took this action because we, as law enforcement executives, understand that semiautomatic assault weapons pose a grave risk to our officers and the communities they are sworn to protect.

**Body Armor**
The IACP supports legislation to prohibit the mail order sale of bulletproof vests and body armor to all individuals except sworn or certified law enforcement officers.  In recent years, the safety of law enforcement officers has often been compromised due to the possession of body armor and bulletproof vests by the criminals they were attempting to apprehend. The IACP believes that the sale, transfer, or acquisition of these items should be conducted in person in order to make it more difficult for criminals to acquire and use these items while committing crimes of violence.

**Concealed Weapons**
The IACP continues to oppose any federal legislative proposals that would either pre-empt and/or mandate the liberalization of individual states' CCW laws pertaining to the carrying of concealed weapons in other states without meeting that state's requirements. This applies to private citizens as well as active, former, and/or federal, tribal, state and local law enforcement personnel.  IACP believes it is essential that state governments maintain the ability to legislate concealed carry laws that best fit the needs of their communities.

**Firearms Enforcement**
The IACP urges Congress to increase resources to better allow state, local and tribal law enforcement agencies and the Department of Justice to enable greater prosecution of individuals for Brady Act violations.  In addition, the IACP supports firearms enforcement programs that involve local, state and federal agencies, such as Project Safe Neighborhoods and Project Exile, which have shown significant reductions in firearms-related violent crime.

**Firearms Offender Registry**

The reduction of firearms-related violent crime has been and continues to be a major goal of IACP. Studies have shown that firearm offenders have a higher recidivist rate for committing other firearms-related violent crime with firearms than the rate for sexual offenders. Therefore, the IACP supports creating a federal registry, similar to the sexual offender registry, for offenders who have been previously convicted of a felony firearm violation or a misdemeanor that involved violent or threatening acts with firearms. At little cost, this registry would have great benefit toward preventing and investigating a myriad of violent crimes, as well as establishing a computerized list of dangerous offenders that could be utilized as a notification system to alert officers of potential danger.

**Firearm Purchase Waiting Period**

The IACP has gone on record supporting a waiting period for the purchase of a handgun.  In the past, waiting periods have not only served as time for a thorough background investigation, but also as an informal cooling off period for handgun purchasers.  However, the time needed to perform most background checks has become obsolete due to transition to the National Instant Check Background System (NICS).  Nevertheless, the IACP believes there must still be a cooling off period in place before an individual can purchase a handgun.  Therefore, the IACP supports legislation to create a mandatory five-day waiting period prior to the completion of a handgun purchase.

**Gun Show Loophole**

The federal Gun Control Act of 1968 stipulates that individuals "engaged in the business" of selling firearms must possess a Federal Firearms License (FFL). Holders of FFLs are required to conduct background checks and maintain a record of all their firearm sales. Certain gun sales and transfers between private individuals, however, are exempt from this requirement.

Those who would fail a background check can access firearms through these sources. Unlike an FFL, the seller is not required to conduct a background check to determine whether the purchaser is prohibited from purchasing and possessing a gun. Federal, state, local and tribal laws should be enacted to close these loopholes. If all gun sales proceed through an FFL, a single, consistent system for conducting gun sales, including background checks, will be established.

The laws we have in place to ensure gun purchasers go through FFLs are undermined by oversights in the law that allow individuals prohibited from owning firearms to obtain weapons at events such as gun shows without undergoing a background check. The IACP calls on Congress to act swiftly to close these loopholes and preserve the effectiveness of the laws in place.

**Illegal Firearms Trafficking/Firearms Tracing**

The IACP opposes any legislation that would limit or reduce the ability of our nation's law enforcement agencies to combat the sale of illegal guns. The IACP believes that the ability to trace illegal firearms effectively plays a critical role in law enforcement's ability to protect communities from the scourge of firearms violence.

The IACP is opposed to the "Tiahrt Amendment" restricts the ATF's ability to share vital gun trace information with its state and local counterparts, which severely limits the ability of those agencies to conduct critical investigations designed to identify and apprehend corrupt firearms dealers and the traffickers they supply.

The IACP strongly believes that these provisions, and others like them, put our citizens and our officers at risk.  Therefore, the IACP strongly supports efforts to repeal the Tiahrt amendment and any piece of legislation containing provisions that would weaken law enforcement's ability to trace illegal firearms.

**Juvenile Crime Firearms Disability**

The IACP believes that juveniles must be held accountable for their acts of violence. Therefore, the IACP supports the passage of legislation, sometimes referred to as Juvenile Brady, which would permanently prohibit gun ownership by an individual, if that individual, while a juvenile, commits a crime that would have triggered a gun disability if their crime had been committed as an adult.

Exhibit C


To Declaration of Chief James W. Johnson



# MAJOR CITIES CHIEFS ASSOCIATION

Albuquerque, New Mexico
Arlington, Texas
Atlanta, Georgia
Austin, Texas
Baltimore City, Maryland
Baltimore Co., Maryland
Boston, Massachusetts
Buffalo, New York
Calgary, Alberta
Charlotte-Mecklenburg, North Carolina
Chicago, Illinois
Cincinnati, Ohio
Cleveland, Ohio
Colorado Springs, Colorado
Dallas, Texas
Denver, Colorado
Detroit, Michigan
Edmonton, Alberta
El Paso, Texas
Fairfax County, Virginia
Fort Worth, Texas
Fresno, California
Honolulu, Hawaii
Houston, Texas
Indianapolis, Indiana
Jacksonville, Florida
Kansas City, Missouri
Las Vegas Metro, Nevada
Long Beach, California
Los Angeles, California
Los Angeles Co., California
Louisville, Kentucky
Memphis, Tennessee
Mesa, Arizona
Miami-Dade, Florida
Milwaukee, Wisconsin
Minneapolis, Minnesota
Montgomery Co., Maryland
Montreal, Quebec
Nashville, Tennessee
Nassau Co., New York
New Orleans, Louisiana
New York City, New York
Newark, New Jersey
Oakland, California
Oklahoma City, Oklahoma
Ottawa, Ontario
Philadelphia, Pennsylvania
Phoenix, Arizona
Pittsburg, Pennsylvania
Portland, Oregon
Prince George's Co., Maryland
Raleigh, North Carolina
Sacramento, California
Salt Lake City, Utah
San Antonio, Texas
San Diego, California
San Francisco, California
San Jose, California
Seattle, Washington
St. Louis, Missouri
Suffolk Co., New York
Toronto, Ontario
Tucson, Arizona
Tulsa, Oklahoma
Vancouver, British Columbia
Virginia Beach, Virginia
Washington, DC
Winnipeg, Manitoba

December 28, 2012

The Vice President
 The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

Dear Mr. Vice President:

We are grateful for this opportunity to join in a vital national discussion to reform firearms policy. In response to your request, we are sending two documents to support your efforts.

First is a comprehensive discussion paper entitled, "Firearms Violence – Issues for Consideration."  In our view, the policy issues described in this document should be considered as needed steps toward reform of our Nation's gun laws and policies.

Second is the current adopted policy statement of Major Cities Chiefs entitled, "Firearms Violence Policy" approved by a vote of our membership, the largest cities in the Nation.

We are committed to reform that will reduce the threat of gun violence in America and we look forward to working with the White House on a comprehensive national strategy.

Sincerely,

Commissioner Charles H. Ramsey
Philadelphia Police Department
President
Major Cities Chiefs Association



## MAJOR CITIES CHIEFS ASSOCIATION

Albuquerque, New Mexico
Arlington, Texas
Atlanta, Georgia
Austin, Texas
Baltimore City, Maryland
Baltimore Co., Maryland
Boston, Massachusetts
Buffalo, New York
Calgary, Alberta
Charlotte-Mecklenburg, North Carolina
Chicago, Illinois
Cincinnati, Ohio
Cleveland, Ohio
Colorado Springs, Colorado
Dallas, Texas
Denver, Colorado
Detroit, Michigan
Edmonton, Alberta
El Paso, Texas
Fairfax County, Virginia
Fort Worth, Texas
Fresno, California
Honolulu, Hawaii
Houston, Texas
Indianapolis, Indiana
Jacksonville, Florida
Kansas City, Missouri
Las Vegas Metro, Nevada
Long Beach, California
Los Angeles, California
Los Angeles Co., California
Louisville, Kentucky
Memphis, Tennessee
Mesa, Arizona
Miami-Dade, Florida
Milwaukee, Wisconsin
Minneapolis, Minnesota
Montgomery Co., Maryland
Montreal, Quebec
Nashville, Tennessee
Nassau Co., New York
New Orleans, Louisiana
New York City, New York
Newark, New Jersey
Oakland, California
Oklahoma City, Oklahoma
Ottawa, Ontario
Philadelphia, Pennsylvania
Phoenix, Arizona
Pittsburg, Pennsylvania
Portland, Oregon
Prince George's Co., Maryland
Raleigh, North Carolina
Sacramento, California
Salt Lake City, Utah
San Antonio, Texas
San Diego, California
San Francisco, California
San Jose, California
Seattle, Washington
St. Louis, Missouri
Suffolk Co., New York
Toronto, Ontario
Tucson, Arizona
Tulsa, Oklahoma
Vancouver, British Columbia
Virginia Beach, Virginia
Washington, DC
Winnipeg, Manitoba

## Firearms Violence Policy
### Adopted by Membership Vote

The Major Cities Chiefs Association has been a strong advocate for sensible gun policy for many years and has taken positions on a wide range of issues.

### Legislative Positions

- Reinstate the assault weapons ban and encourage stiffer penalties for illegal guns
- Ban high capacity magazines (10+ rounds)
- Ban internet ammo sales, require in-person transactions, records of sales and licensing of ammo vendors
- Oppose legislation that would require states to recognize any and all concealed carry permits
- Oppose legislation that further erodes ATF authority
- Prevent known terrorists from purchasing firearms
- Require unlicensed private dealers to do background checks at gun shows

### Policy Statements

- Encourage aggressive federal prosecution of violent offenders using guns. Conviction in Federal Court generally results in stronger sanctions, removes the offenders from the streets and serves as a deterrent.
- Encourage mandatory reporting of all purchases, transfers and stolen firearms. This measure would assist law enforcement agencies with identification, criminal investigations and recovery of stolen firearms.
- Establish harsher penalties and aggressively prosecute straw purchasers, who are responsible for putting a substantial number of guns used in criminal acts. More aggressive prosecution with strong penalties would hold them accountable and act as a deterrent.
- Strengthen the national criminal instant background check system. The background check system does not have complete data at the current time. Mental health information, for example, is incomplete. The system needs to be improved.



**MAJOR CITIES CHIEFS ASSOCIATION**

Albuquerque, New Mexico
Arlington, Texas
Atlanta, Georgia
Austin, Texas
Baltimore City, Maryland
Baltimore Co., Maryland
Boston, Massachusetts
Buffalo, New York
Calgary, Alberta
Charlotte-Mecklenburg, North Carolina
Chicago, Illinois
Cincinnati, Ohio
Cleveland, Ohio
Colorado Springs, Colorado
Dallas, Texas
Denver, Colorado
Detroit, Michigan
Edmonton, Alberta
El Paso, Texas
Fairfax County, Virginia
Fort Worth, Texas
Fresno, California
Honolulu, Hawaii
Houston, Texas
Indianapolis, Indiana
Jacksonville, Florida
Kansas City, Missouri
Las Vegas Metro, Nevada
Long Beach, California
Los Angeles, California
Los Angeles Co., California
Louisville, Kentucky
Memphis, Tennessee
Mesa, Arizona
Miami-Dade, Florida
Milwaukee, Wisconsin
Minneapolis, Minnesota
Montgomery Co., Maryland
Montreal, Quebec
Nashville, Tennessee
Nassau Co., New York
New Orleans, Louisiana
New York City, New York
Newark, New Jersey
Oakland, California
Oklahoma City, Oklahoma
Ottawa, Ontario
Philadelphia, Pennsylvania
Phoenix, Arizona
Pittsburg, Pennsylvania
Portland, Oregon
Prince George's Co., Maryland
Raleigh, North Carolina
Sacramento, California
Salt Lake City, Utah
San Antonio, Texas
San Diego, California
San Francisco, California
San Jose, California
Seattle, Washington
St. Louis, Missouri
Suffolk Co., New York
Toronto, Ontario
Tucson, Arizona
Tulsa, Oklahoma
Vancouver, British Columbia
Virginia Beach, Virginia
Washington, DC
Winnipeg, Manitoba

# Firearms Violence
# Issues for Consideration

The Major Cities Chiefs Association has been a strong advocate for sensible gun policy for many years and has taken positions on a wide range of issues.

**The White House and Congress should consider these measures as elements in a comprehensive plan for reform of public policy on firearms and to prevent further gun violence in America. Long overdue, a National Crime Commission should be established with firearms policy as its top priority.**

- ## Assault Weapons and High Capacity Magazines
  Congress should reinstate the assault weapons ban and prohibit high capacity magazines (10+ rounds). Assault-type weapons have no sporting, recreation, or hunting purpose.

  The legislation should:
  a)  Ban the possession, sale, manufacture and importation of high capacity magazines;
  b)  Ban both dealer and private sale, transfer, manufacture and importation of assault  weapons; and
  c)  Require owner background checks and registration for assault weapons acquired prior  to the date of enactment.

- ## Sale of Firearms and Ammunition
  Major Cities Chiefs call upon Federal, State and local officials to consider these reforms:
  a)   Require registration of all firearms, and reporting of all transfers and lost or stolen firearms;
  b)  Commence registration of all FFL and private firearms purchases and transfers;
  c)  Strengthen the National Instant Background Check System (NICS) to require 100%  background clearance:
    - ✓  Permit sales only when clearance is received by FFL
    - ✓  Require current and complete mental health information



## MAJOR CITIES CHIEFS ASSOCIATION

Albuquerque, New Mexico
Arlington, Texas
Atlanta, Georgia
Austin, Texas
Baltimore City, Maryland
Baltimore Co., Maryland
Boston, Massachusetts
Buffalo, New York
Calgary, Alberta
Charlotte-Mecklenburg, North Carolina
Chicago, Illinois
Cincinnati, Ohio
Cleveland, Ohio
Colorado Springs, Colorado
Dallas, Texas
Denver, Colorado
Detroit, Michigan
Edmonton, Alberta
El Paso, Texas
Fairfax County, Virginia
Fort Worth, Texas
Fresno, California
Honolulu, Hawaii
Houston, Texas
Indianapolis, Indiana
Jacksonville, Florida
Kansas City, Missouri
Las Vegas Metro, Nevada
Long Beach, California
Los Angeles, California
Los Angeles Co., California
Louisville, Kentucky
Memphis, Tennessee
Mesa, Arizona
Miami-Dade, Florida
Milwaukee, Wisconsin
Minneapolis, Minnesota
Montgomery Co., Maryland
Montreal, Quebec
Nashville, Tennessee
Nassau Co., New York
New Orleans, Louisiana
New York City, New York
Newark, New Jersey
Oakland, California
Oklahoma City, Oklahoma
Ottawa, Ontario
Philadelphia, Pennsylvania
Phoenix, Arizona
Pittsburg, Pennsylvania
Portland, Oregon
Prince George's Co., Maryland
Raleigh, North Carolina
Sacramento, California
Salt Lake City, Utah
San Antonio, Texas
San Diego, California
San Francisco, California
San Jose, California
Seattle, Washington
St. Louis, Missouri
Suffolk Co., New York
Toronto, Ontario
Tucson, Arizona
Tulsa, Oklahoma
Vancouver, British Columbia
Virginia Beach, Virginia
Washington, DC
Winnipeg, Manitoba

✓ Prevent known terrorists from purchasing firearms
✓ Require unlicensed private persons and dealers to do background checks through an FFL for gun shows and individual sales or transfers

d) Ban internet sales of ammunition, require in-person transactions, records of ammunition sales and licensing of ammunition dealers;
e) New and imported firearms should bear micro stamp identification as well as a visible serial number;
f) Specialized ammunition not intended for target shooting or hunting, (such as armor piercing and coated rounds), should be available only to military and law enforcement, not to the public; and
g) Straw purchasers should be aggressively prosecuted and harsher penalties should be imposed.

- **Firearms Safety**
  Major Cities Chiefs propose that the White House bring together a coalition of public and private agencies to form a national gun safety and public awareness initiative. Firearms safety and training must become a nation-wide goal that includes more widespread safety instruction, mandatory secure storage of weapons and mandatory trigger locks. This national gun safety strategy should also call for:

  a) Proof of a safety course certification for all firearms purchases; and
  b) Measures to prevent access to firearms by persons who are mentally disturbed or pose a threat to public safety.

- **School Safety and Prevention of Violence**
  The White House and Congress should work together to restore funding for school security and violence prevention programs at the U.S. Departments of Justice and Education to include the COPS Office School Resource Officer Program and the Safe and Drug Free Schools Program.

- **ATF Authority**
  Major Cities Chiefs ask Congress to take these necessary remedial



# MAJOR CITIES CHIEFS ASSOCIATION

Albuquerque, New Mexico
Arlington, Texas
Atlanta, Georgia
Austin, Texas
Baltimore City, Maryland
Baltimore Co., Maryland
Boston, Massachusetts
Buffalo, New York
Calgary, Alberta
Charlotte-Mecklenburg, North Carolina
Chicago, Illinois
Cincinnati, Ohio
Cleveland, Ohio
Colorado Springs, Colorado
Dallas, Texas
Denver, Colorado
Detroit, Michigan
Edmonton, Alberta
El Paso, Texas
Fairfax County, Virginia
Fort Worth, Texas
Fresno, California
Honolulu, Hawaii
Houston, Texas
Indianapolis, Indiana
Jacksonville, Florida
Kansas City, Missouri
Las Vegas Metro, Nevada
Long Beach, California
Los Angeles, California
Los Angeles Co., California
Louisville, Kentucky
Memphis, Tennessee
Mesa, Arizona
Miami-Dade, Florida
Milwaukee, Wisconsin
Minneapolis, Minnesota
Montgomery Co., Maryland
Montreal, Quebec
Nashville, Tennessee
Nassau Co., New York
New Orleans, Louisiana
New York City, New York
Newark, New Jersey
Oakland, California
Oklahoma City, Oklahoma
Ottawa, Ontario
Philadelphia, Pennsylvania
Phoenix, Arizona
Pittsburg, Pennsylvania
Portland, Oregon
Prince George's Co., Maryland
Raleigh, North Carolina
Sacramento, California
Salt Lake City, Utah
San Antonio, Texas
San Diego, California
San Francisco, California
San Jose, California
Seattle, Washington
St. Louis, Missouri
Suffolk Co., New York
Toronto, Ontario
Tucson, Arizona
Tulsa, Oklahoma
Vancouver, British Columbia
Virginia Beach, Virginia
Washington, DC
Winnipeg, Manitoba

actions:

a)  Reject any proposed legislation to further erode ATF authority;

b)  Require reports on large quantity sales of semi-automatic rifles and ammunition;

c)  Allow ATF to inspect sales records and permit more than one FFL inspection per year;

d)  Require annual inventories and security features at FFL points of sale; and

e)  Confirm an ATF Director to ensure clear policy and consistent enforcement of Federal firearms laws.

- **Concealed Weapons**

  Major Cities Chiefs oppose Federal legislation that would require States to recognize any and all concealed carry permits. These permits should be subject to State law and local control. Moreover, a national database should be established for storage and sharing of permit information by law enforcement.

- **Gun Trafficking**

  Congress should enact legislation to halt domestic and international gun trafficking and impose stiffer penalties for illegal guns. Congress must adopt a Federal Firearms Trafficking Statute to strengthen law enforcement efforts and curb trafficking of illegal guns.