Exhibit 4

To Defendants' Memorandum in Support of Motion for

Summary Judgment

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| STEPHEN V. KOLBE, *et al.*; | ) |
| | ) |
| *Plaintiffs*, | ) Case No.: 1:13-cv-02841-CCB |
| | ) |
| v. | ) |
| | ) |
| MARTIN O'MALLEY, *et al.*; | ) |
| | ) |
| *Defendants*. | ) |

## DECLARATION OF ANTHONY W. BATTS

I, Anthony W. Batts, under penalty of perjury, declare and state:

1. I am the Commissioner of the Baltimore Police Department. I am over the age of 18 and have personal knowledge of the facts and events referred to in this declaration, and am competent to testify to the matters stated below.

2. The Baltimore Police Department is the eighth largest police agency in the United States, with more than 2,850 sworn officers.

3. I began my career in law enforcement in 1981 as a Hawthorne (Cal.) Police Reserve Officer, and moved on in 1982 as a police officer working street patrol and narcotics cases for the Long Beach (Cal.) Police Department. I served as an officer with the Long Beach Police Department through 2009, including holding positions as commander of East Patrol Division (1991-1992), commander of Community Relations Division (1992-1994), commander of Field Support Division (1995-1997), commander of

South Patrol Division (1997-1998), deputy chief of investigations (1999-2001), and Chief of Police (2002-2009). As Chief of Police, I oversaw approximately 1,600 officers and other employees.

4. From October 2009 through November 2011, I served as Chief of Police for the Oakland (Cal.) Police Department.

5. I was appointed Commissioner of the Baltimore Police Department in September 2012.

6. I hold a doctorate in public administration from the University of La Verne (1998), a master's degree in business management from the University of Redlands (1988), and a bachelor's degree in law enforcement administration from California State University, Long Beach (1986).

7. During my career, I have received numerous awards, citations and honors, including the Governor's Award for the most effective crime fighting program in California (1991), the NAACP Community Service Award (2006), and the Long Beach Police Department Meritorious Award for Heroism (1992).

8. Throughout my career I have also consistently engaged in professional activities to further my knowledge and skill with respect to commanding law enforcement agencies and addressing pressing criminal justice issues, including gun violence. Those activities have included many training programs, including Harvard's Executive Session on Policing (2007), the FBI National Executive Institute (2004), the National Organization of Black Law Enforcement Executives Executive Training (1998). I have also participated in numerous forums and briefings to learn from the experience of other law enforcement

officers, and am constantly reading law enforcement publications and reports from other law enforcement agencies and organizations to stay abreast of developments and strategies that bear on my own responsibilities. All of these are things that a person in my position, as the head of a large urban police department, would normally rely upon in analyzing the threats posed to public safety and the steps required to address those threats.

9. In my career, I have been the head of 3 major law enforcement agencies, dealt with a number of officer-involved shootings, served as the head of a special weapons and tactics (SWAT) team for more than 2 years, dealt with barricade and hostage situations, and been in charge when two of my officers were ambushed by attackers with assault weapons.

10. One problem of great concern to all law enforcement agencies in recent years is how to deal with "active shooter" scenarios. In such a scenario an individual is actively engaged in killing or attempting to kill people in a confined and populated area, generally with no pattern or method to the selection of victims. Killing is the shooter's primary objective, as opposed to a shooter who kills incidental to perpetrating another crime. This is the scenario presented by many recent mass shootings reported by the press, including those in Newtown, CT, Aurora, CO, and Tucson, AZ. I have conducted research regarding active shooters, been involved in multiple preparations for dealing with active shooters, and attended symposia including presentation by other chiefs of police who have responded to and critiqued responses to active shooter scenarios.

11. In the course of my career, I have had training on multiple types of firearms, including various semi-automatic handguns that I have been issued as my primary service

firearms. During my time as the head of a SWAT team in Long Beach, I also received basic training on the AR-15s that were used by the SWAT team. From my role as Commissioner, my former roles as Chief of Police in Long Beach and Oakland, and my more than 30 years in law enforcement, I am generally familiar with the capabilities, attributes, and uses of firearms used by law enforcement for law enforcement purposes and by civilians for self-defense.

12.     Based on my professional experience gained throughout my career, including importantly, the knowledge of various types of firearms, their attributes, and capabilities, it is my opinion that assault weapons (*i.e.*, automatic or semiautomatic firearms with military features) and/or weapons with large-capacity magazines (*i.e.*, automatic or semiautomatic firearms capable of firing more than ten rounds of bullets) are particularly dangerous and unusual firearms, and that such weapons are inappropriate for civilian use, especially for home safety in cramped hallways or small spaces. Assault weapons and weapons with large capacity magazines should be restricted for use only by the military and law enforcement agencies.

**Maryland's Assault Long Guns and High-Capacity Magazine Bans**

13.     I understand that the plaintiffs in this lawsuit are challenging the assault weapons and large-capacity magazine bans enacted as part of the Firearms Safety Act of 2013.

14.     The assault weapons ban makes it illegal to import into Maryland, or to transfer or accept transfer of, certain firearms defined by statute as "assault long guns,"

which are generally semi-automatic long guns, mostly rifles, with the capacity to accept large-capacity detachable magazines and one or more other military-style features. For purposes of this declaration, I use the phrase "assault weapons" to refer to the assault long guns identified in § 5-101(r)(2) of the Public Safety Article.

15. The large capacity magazine ban generally makes it illegal to transfer or accept transfer of magazines with a capacity in excess of 10 rounds. For purposes of this declaration, I use the phrase "large-capacity magazines" to refer to the magazines for which transfer is now prohibited in Maryland.

16. For reasons discussed below, it is my opinion that Maryland's assault weapons ban and large-capacity magazine ban will help move Maryland in a safer direction by reducing the availability of these dangerous and unusual firearms and magazines for use by criminals, and also by reducing the threat to innocent civilians from the unintentional misuse of assault weapons and large-capacity magazines by otherwise law-abiding citizens. These bans will also help protect law enforcement officers from the particular dangers posed by assault weapons and weapons with large-capacity magazines.

**Use of Assault Weapons and High-Capacity Magazines by the Law Enforcement Agencies I Have Led**

17. Each of the law enforcement agencies I have led used assault weapons and weapons with large-capacity magazines for specialized law enforcement purposes.

18. While with the Long Beach Police Department, I served as the head of Special Weapons And Tactics ("SWAT"), team, which used, among other types of weapons, assault weapons and weapons with large-capacity magazines. The SWAT team

was charged with handling specialized law enforcement situations that, as its name suggests, required special weapons and tactics. These included dealing with barricaded suspects, hostage situations, and the need to breech certain structures believed to be inhabited by armed and hostile suspects. In such circumstances, which often included multiple suspects or assailants who were armed in unpredictable and dangerous situations, the SWAT team's use of assault weapons and/or weapons with large capacity magazines was necessary and appropriate.

19.  I became familiar with assault weapons from a hands-on perspective while the head of the Long Beach SWAT team. In light of the specialized responsibilities and training of the SWAT team, my SWAT officers were issued MP5's and AR-15 assault weapons. Although those particular firearms had the capability to fire automatically, officers were trained to fire them only in semi-automatic mode, which was deemed appropriate for all of the specialized law enforcement actions which the SWAT team performed.

20.  I have learned through my research and experience that assault weapons like the AR-15 were adopted by the United States military because of their efficiency in mounting military actions, *i.e.*, among other things, they do not need to be re-loaded and they are capable of firing multiple runs in a short period of time. Law enforcement agencies subsequently adopted such assault weapons for law enforcement purposes.

21.  While commanding the Long Beach SWAT team, I oversaw research into the rounds fired by various weapons, including the .223 rounds fired by the SWAT team's AR-15s. From that research, I learned that the .223 rounds fired by the AR-15s were

designed as a weapon of attrition, intended to fragment and mushroom in the enemy's body (rather than to go straight through), and thus, the .223 rounds cause more significant and consistent damage than other rounds. The testing process involved actually firing rounds from various weapons into various types of materials, we verified that this was true. Although some different types of rounds from different firearms penetrated further in some instances, the .223 rounds had significant penetrating ability and more consistently fragmented and mushroomed when compared to other rounds. I believe that .223 rounds have greater capacity to do significant bodily damage than other rounds tested.

22. The AR-15s and MP5s employed by the Long Beach SWAT team were used for specialized offensive operations, such as assaulting small structures in which suspects were located, assaulting locations where suspects were barricaded, and entering areas where we believed suspects might themselves possess high powered or automatic weapons. In other words, the AR-15s and MP5s were used in those unique situations in which normal police officers on the street would have been outgunned and outmanned.

23. The Baltimore Police Department currently issues assault weapons—which have full automatic capacity but which are utilized only in semi-automatic mode—exclusively to members of its SWAT team, for use in the same types of specialized law enforcement activities performed by the Long Beach SWAT team delineated in paragraph 22 above.

24. The Baltimore Police Department has recently ordered additional assault weapons, which will be issued to a specialized cadre of patrol officers who undergo additional specialized training specific to those firearms. The Department is acquiring

these additional long guns to combat the increasing firepower available to criminals who are willing to engage in shooting confrontations with law enforcement officers. These assault weapons are not intended to be used in everyday police encounters, but instead will only be for use in specialized circumstances by specially-trained officers.

25. The standard sidearm issue to officers in the Baltimore Police Department is a Glock 20, a semi-automatic handgun which comes with a 15-round magazine.

26. Law enforcement officers in the departments I have led receive extensive training on firearms generally, before they are permitted to carry them in the line of duty. That includes training on when and under what circumstances it is appropriate to use a firearm, and how to use reasonable care to avoid injuries to innocent civilians. After undergoing initial training, BPD law enforcement officers are then required to go through re-qualification, once a year at the firearms facility, where they must qualify with their weapons and pass a written examination on the appropriate use of deadly force.

27. Law enforcement officers who are permitted to carry assault weapons are given substantial additional training specific to those assault weapons, including how and when they may be used and techniques to minimize the risk of harm to innocent civilians. They are then required to undergo additional periodic re-qualification specifically on those assault weapons to continue to be eligible to carry them in the line of duty.

28. Law enforcement officers thus generally have much more training, more relevant training, more specific training, and more frequent training, than most civilians.

**Use of Assault Weapons and High-Capacity Magazines in Civilian Self-Defense**

29.     After consulting with supervisors in the Baltimore Police Department who I would expect to be familiar with this information, we are unaware of any incident in which a civilian in Baltimore City has ever used an assault weapon in self-defense, or any incident in which a civilian in Baltimore City has been required to fire as many as 10 rounds in a self-defense incident.

30.     I do not recall any self-defense incident involving an assault weapon or as many as 10 rounds fired in self-defense anywhere else in Maryland, although I do not have the same access to information about incidents outside of Baltimore City.

31.     In fact, we are aware of only one incident in which a civilian in Baltimore City has fired more than 10 rounds in a self-defense incident, and, based on the official incident report and recap sheet associated with that incident, a number of those rounds appear to have been fired only after the assailants were attempting to escape the scene. The incident is reported to have occurred in 2006 with witnesses present in a parking lot area outside a bank in the Shops at Cross Keys. According to the police reports, an individual who was attempting to make a large bank deposit was assaulted in his car by two men, at which time the individual was able to retrieve a semi-automatic handgun he kept in his car, which was loaded with 16 rounds. According to the reports, the individual fired all 16 rounds at the assailants, including four rounds that hit, and killed, one of the assailants. The reports state that all four of those rounds hit the assailant in his back, suggesting that the assailant was trying to run away when hit by all four rounds. The reports also indicate that several rounds were fired from inside the car, but that several others were fired from

outside of the vehicle, suggesting that those rounds were fired at the assailants only after the assailants and the robbery victim had both gotten out of the vehicle, and the assailants were attempting to flee.

32. I am also not aware of any incident occurring in Long Beach or Oakland California while I was Chief of Police in those two cities that involved a civilian using an assault weapon in self-defense or being required to expend as many as 10 rounds in self-defense.

33. In my opinion, assault weapons and/or weapons with large capacity magazines are not appropriate firearms to use in home self-defense. Many of the features of assault weapons are particularly appropriate for the military uses for which they were designed, not for civilian self-defense. Pistol grips allow greater control of a firearm while "spray" firing from one's hip. A number of these features can be useful in actions that law enforcement agencies are sometimes required to take in affirmatively confronting and pursuing criminal suspects. They can also be useful in criminal activities such as drive-by shootings, or mass shootings. But, based on my experience and knowledge, these features are not useful in civilian home self-defense situations of which I am aware.

34. Although the most appropriate firearm to use in self-defense may vary based on the person using it, I have recommended .38 caliber snub nose revolvers for self-defense when asked by members of my family for a recommendation. Those firearms are simple to operate, reliable, have more than sufficient stopping power, and are easily maneuverable in a typical home defense situation. In fact, one lesson learned from the Navy Yard shooting was how difficult it was for law enforcement to maneuver assault weapons down

the narrow hallways and the corridors between partitions in that office building, which are similar to hallways in private homes. Handguns are also generally much easier to store in a safe place than long guns.

35. Although any firearm can be effective in self-defense—just as any firearm can be lethal to a law enforcement officer—assault weapons are designed for the modern military battlefield, and are primarily suited for circumstances that resemble military theaters.

36. Although assault weapons now banned by Maryland law are semi-automatic versions of automatic weapons, that one difference does not make them significantly less dangerous. Assault weapons like the AR-15 can still fire many rounds in a very short period of time, limited only by the amount of time it takes a shooter to pull the trigger. It is telling that the assault weapons employed by both the Baltimore Police Department SWAT team and those used by the Long Beach SWAT team are only allowed to be fired in semi-automatic mode, even though they have the capability to be fired in fully automatic mode.

37. It is also my opinion that large-capacity magazines are not necessary or appropriate for use in self-defense. I am not aware of a single case in which it was necessary for a civilian to fire more than 10 rounds in self-defense. I do not believe the hypothetical scenarios in which 10 or more shots are required in civilian self-defense, at least those where the victims are law-abiding, are realistic.

38. I understand the plaintiffs and certain of their experts have made the argument that because law enforcement officers only fire firearms in defense of self and

others -- and with the intent of stopping, rather than killing, the target -- that law enforcement uses of firearms and civilian self-defense with firearms are essentially the same; as a result, they go on to argue, the same firearms and magazines used by law enforcement should be available to citizens. In my opinion, this argument is based on a misunderstanding of the difference between law enforcement and civilian self-defense, and the different capabilities required by each.

39. Circumstances in which it may be appropriate to use an assault weapon, and circumstances in which it may be necessary to have more than 10 rounds available, involve uniquely law enforcement functions such as affirmatively engaging criminal suspects. There are times when law enforcement officers are required to act in an offensive manner, such as when they are required to bring suspects into custody, to engage violent people who are attempting to kill multiple people at the same time, to conduct aggressive searches to locate and apprehend a suspect, and to breech buildings housing suspected criminals.

40. Unlike a law enforcement officer attempting to apprehend a suspect, a civilian acts only in self-defense. When a criminal runs away from a civilian acting in self-defense, the civilian has accomplished his goal. When a criminal runs away from a law enforcement officer charged with apprehending him the law enforcement officer must be prepared to launch a sustained, aggressive effort to capture the suspect and end the broader threat to the general public.

41. Although law enforcement personnel are necessarily concerned with their own safety, as well as that of the general public, in carrying out all of their responsibilities, it is particularly inappropriate to attempt to equate law enforcement use of firearms with

civilian self-defense. If law enforcement personnel were concerned only with their own self-defense, they would not require use of the specialized firearms they employ to undertake their broader law enforcement duties. Specialized law enforcement responsibilities and civilian self-defense involve vastly different scenarios, and could potentially call for different firearms with different capabilities.

42. It is also my understanding that the plaintiffs have argued that civilians need large-capacity magazines because they are likely to miss their target with the vast majority of their shots. In my opinion, based on my experience and concern for public safety, this is an additional argument for limiting magazine capacity, not for expanding it. The shots that miss their targets will hit something, or someone, else. The risk of indiscriminate firing from untrained or undertrained individuals with access to large numbers of highly-lethal rounds, especially combined with the improbability that such rounds will actually be necessary to end any particular attack, is an additional and, in my view, unacceptable risk to public safety from the proliferation of large-capacity magazines.

**Use of Assault Weapons and High-Capacity Magazines by Criminals**

43. Handguns remain the weapon used in the majority of firearm crimes in Baltimore City. However, on relatively few occasions assault weapons have been used by criminals in Baltimore City, raising far-reaching concerns for officer safety, and having the capacity to cause significantly more carnage than other firearms.

44. Assault weapons are sometimes used in crime in Baltimore City. Although we do not always recover the firearms used in crimes, and although criminals often go to

great lengths to recover casings expended in shooting incidents, we have found .223 casings used by assault weapons including AR-15s at a number of crime scenes, including the first and last shootings in Baltimore City in 2012.

45.   I am aware of numerous circumstances in which suspects have used assault weapons and large capacity magazines to murder law enforcement officers. Assault weapons pose particular dangers to law enforcement officers because they allow criminals to effectively engage law enforcement officers from great distances (far beyond distances usually involved in civilian self-defense scenarios), they are more effective than handguns against soft body armor worn by law enforcement officers, they offer the capacity to fire dozens of highly-lethal rounds without having to change magazines. Moreover, my opinion is that features such as flash suppressors, pistol grips, flare launchers, and folding stocks provide a military-style advantage to criminals in a firefight with law enforcement.

46.   I had the unfortunate experience of being in command in Long Beach when two law enforcement officers who were part of an gang enforcement unit were ambushed by criminals with an assault weapon and high-capacity magazine. One of the officers, Daryle W. Black, was murdered in the incident when multiple rounds from the assault weapon pierced the officers' vehicle.

47.   My understand is that assault weapons and weapons with large-capacity magazines have also been used disproportionately in mass shootings, and their use in those incidents poses particular dangers to the law enforcement officers responsible for intervening.

48. My opinion is that a shooter can kill as many people as there are bullets in a gun, so it makes sense to limit the number of bullets that can be loaded into a criminal's firearm. More shots available means more shots fired, which means more hits, which means more death and injury. Limiting magazine size will effectively, over the long term, limit criminals' access to these magazines. It is believed that the most common means of criminal acquisition of firearms are burglaries, straw purchases, and purchases from lawful owners on the secondary market.

49. Although criminals can carry multiple 10-round magazines with them, that does not pose the same dangers as 30- or 50- round magazines, or 100-round drums. A shooter carrying ten 10-round magazines will have to change magazines nine times before expending 100 rounds, while the same shooter carrying four 30-round magazines, two 50-round magazines, or a single 100-round drum, will only have to change magazines three, one, or zero times to expend the same number of rounds. Use of ten-round magazines would thus offer six to nine more chances for bystanders or law enforcement to intervene during a pause in firing, six to nine more chances for something to go wrong with a magazine during a change, six to nine more chances for the shooter to have problems quickly changing a magazine under intense pressure, and six to nine more chances for potential victims to find safety during a pause in firing. Those six to nine additional chances can mean the difference between life and death for many people.

50. Assault weapons and firearms with large-capacity magazines are dangerous and unusual weapons with applications only for military or law enforcement uses. They

can seriously undermine the ability of the Baltimore Police Department to protect public safety.

**Exemptions for Law Enforcement Officers**

51. I understand that the assault weapons and large-capacity magazines contain an exception for retired law enforcement officers.

52. The Baltimore Police Department does not transfer assault weapons to retiring or retired law enforcement officers. I am not aware of any other law enforcement agency in Maryland that transfers or intends to transfer assault weapons to retired or retiring law enforcement officers.

53. The Baltimore Police Department allows retiring law enforcement officers to purchase their service weapons, along with associated magazines (which now hold 15 rounds), at replacement cost. This is a time-honored tradition among law enforcement agencies nationwide that recognizes the contributions made by law enforcement officers and provides a way for law enforcement agencies to replenish their armories with new firearms at no cost to the agencies.

**Conclusions**

54. Nationally we have seen far too many tragic mass shootings involving assault weapons and large-capacity magazines, including recent shootings in Aurora, Colorado and Newtown, Connecticut, each of which left double-digit murders by shooters who acquired their firearms and magazines lawfully. The recent shooting at the Columbia Mall reminds us there is no reason to believe that Maryland is immune from such incidents, and

it is thus appropriate for Maryland to take steps to reduce availability of the firearms and magazines that pose the greatest risk in such incidents. Had the Columbia Mall shooter possessed one of the banned assault rifles and a banned large magazine, and not the shot gun which he possessed, instead of three casualties there could have been many more.

55. The plaintiffs' contention that there is no need for a ban on assault weapons and large capacity magazines because we have never experienced a mass shooting is dangerous, because it implies that Maryland is prohibited from taking an action that will help reduce the chances of an unthinkably devastating act of violence occurring in our state until after it occurs. That type of mentality leads to reactive and ineffective policy that leaves our streets more dangerous.

56. I understand that the number of assault weapons sold in recent years is far above their historic sales levels. As more assault weapons are sold, it can be expected that more will become available to criminals, especially as the price of assault weapons goes down. Maryland should not be required to wait to act until the supply of assault weapons is dramatically higher than it is now.

57. In my opinion, based on more than 30 years of law enforcement experience and education, Maryland's bans on assault weapons and large capacity magazines will make Maryland safer. Assault weapons and firearms with large-capacity magazines are particularly dangerous and unusual weapons that pose particular risks to law enforcement officers. Whether you are in a rural area or an urban area, it is my opinion that such firearms are not appropriate firearms for self-defense, hunting, or sporting purposes.

58. I believe that civilians have a right to defend themselves against potential attack, and should have appropriate firearms available for that purpose; however, I do not believe the right to self defense encompasses the right to choose any firearm no matter how inappropriate for self defense or how great the dangers it may pose to the rest of society. Indeed, taking the legal arguments proffered by the plaintiffs to their logical end, citizens (in the name of self defense) should be able to purchase hand grenades, sophisticated bombs, bazookas, or other high grade military style weaponry (including drones).

59. Maryland's assault weapons and large-capacity magazine bans do not restrict any firearms or magazines that are necessary or even appropriate for use in self-defense. To the contrary, Maryland's assault weapons and large-capacity magazine bans restrict firearms that, based on my experience, are particularly dangerous and unusual, not commonly owned, and that have only military and law enforcement applications.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 2/13/14

Anthony W. Batts
Commissioner, Baltimore Police Department