Exhibit 5

To Defendants' Memorandum in Support of Motion for

Summary Judgment

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| STEPHEN V. KOLBE, *et al.*; | ) |
| *Plaintiffs,* | ) Case No.: 1:13-cv-02841-CCB |
| v. | ) |
| MARTIN J. O'MALLEY, *et al.*; | ) |
| *Defendants.* | ) |

## **DECLARATION OF HENRY P. STAWINSKI**

I, Deputy Chief Henry P. Stawinski, under penalty of perjury, declare and state:

1. I am Deputy Chief of the Prince George's County Police Department. I am over the age of 18 and am competent to testify to the matters stated below.

2. The Prince George's County Police Department is the 28th largest police department in the United States, with approximately 1,700 sworn officers. The Department is responsible for an area covering 486 square miles with a residential population of approximately 1 million people.

3. My responsibilities as Deputy Chief include supervision of approximately 1,100 of the 1,700 sworn officers in the Department, including supervision of six district police stations and the Department's Special Operation Division, including its emergency services team, commonly referred to as the SWAT team.

4. I joined the Prince George's County Police Department in October 1992 as a patrol officer, and have worked my way through the ranks to my current position as Deputy Chief, which I assumed in September 2011.

5. I have a bachelor's degree in biology from Boston College, and am pursuing a Master's degree in Management from Johns Hopkins University. I am also a graduate of the Senior Management Institute for Police through the Police Executive Research Forum and have a certificate in Negotiation from Harvard's Kennedy School.

6. I have received firearms training on the two service weapons I have been issued, the Beretta 9mm and the Smith & Wesson .40 caliber, as well as training on a shotgun while in the police academy. I have also had occasion to fire a number of other firearms in connection with my official responsibilities, including an AR-15, which we refer to as a "patrol rifle." However, I have not received formal training on an AR-15, I have not been qualified on that firearm, and I am therefore not authorized under Department regulations to carry it in the line of duty.

**Maryland's Assault Weapons and High-Capacity Magazine Bans**

7. I understand that the plaintiffs in this lawsuit are challenging the assault weapons and large-capacity magazine bans enacted as part of the Firearms Safety Act of 2013.

8. The assault weapons ban makes it illegal to import into Maryland, or to transfer or accept transfer of, certain firearms defined by statute as "assault long guns." Generally, the firearms defined as assault long guns in § 5-101(r)(2) of the Public Safety

Article (including copies of specifically-enumerated firearms) are semi-automatic long guns, mostly rifles, with the capability to accept large-capacity detachable magazines and one or more military-style features. For purposes of this declaration, I use the phrase "assault weapons" to refer to the firearms identified in § 5-101(r)(2) of the Public Safety Article.

9. The large-capacity magazine ban generally makes it illegal to transfer or accept transfer of magazines with a capacity in excess of 10 rounds. For purposes of this declaration, I use the phrase "large-capacity magazines" to refer to those magazines.

10. Based on my experience and knowledge, it is my opinion that assault weapons and large-capacity magazines are unreasonably dangerous, and that Maryland's bans on assault weapons and large-capacity magazines will advance Maryland's interest in reducing the harm of gun violence and in improving public safety by, over the long term, reducing the availability to criminals of assault weapons and large-capacity magazines, reducing the possibility of harm from misuse of these military-style weapons and large-capacity magazines by non-criminals, and helping protect law enforcement officers.

**Use of Assault Weapons and High-Capacity Magazines by the Prince George's County Police Department**

11. The standard issue sidearm for the Prince George's County Police Department is the Smith & Wesson M&P .40 caliber handgun, which is issued with magazines with a capacity to hold 15 rounds.

12. All Prince George's County police officers are required to go through extensive firearms training required by State regulations and the Maryland Police and Correctional Training Commissions, which includes training not only on the specific firearms used in the line of duty, but also on such subjects as the appropriate circumstances in which firearms should be used and how to prevent harm to innocent civilians.

13. The Department has recently attempted to increase the number of AR-15 assault weapons to which officers have access to better prepare us, if necessary, to confront a heavily-armed "active shooter" or other heavily-armed threats. An active shooter is an individual who is actively engaged in killing or attempting to kill people in a confined and populated area, generally without any pattern or method to selecting victims. In response to recent active shooter incidents in other states, the Department, like law enforcement agencies across the country, has been focused on preparing to deal with future incidents, including having the capability to effectively engage an active shooter from long distances.

14. The Prince George's County Police Department has approximately 70 AR-15 assault weapons available for use by law enforcement officers, equipped with 30-round magazines. In addition to assault weapons owned by the Department, officers who go through special training and qualification are also allowed to have access in the line of duty to approved AR-15 assault weapons that they own personally.

15. Shotguns traditionally used by the Department have limited range, and are thus less useful in active shooter situations than they are in situations involving shorter

distances, such as home defense.  Having AR-15s presents the Department with the ability to project fire from a distance in a sophisticated way to neutralize an active shooter threat.

16.   Increasing the availability of AR-15 assault weapons to the Department, both through Department purchases and the personal rifle program, is being undertaken alongside additional investments in defense equipment available to officers including additional body armor and shields.

17.   Before an officer in the Prince George's County Police Department can have access to an AR-15 assault weapon, either Department-owned or personally-owned, in the line of duty, he must first go through rigorous training specifically on that firearm, in addition to the general firearms training provided to all officers, and demonstrate proficiency and skill with that firearm.  This additional training includes a requirement to qualify at greater distances than are required for handguns, and training on when and under what circumstances the assault weapon should be used and how to stow and maneuver the firearm.

18.   Based on my experience in the Prince George's County Police Department, including my role in supervising the operations of our emergency services (SWAT) team, I am generally familiar with the capabilities of the firearms used within the Department, including semi-automatic handguns, shotguns, and AR-15 assault weapons.

19.   I understand that the plaintiffs in this case, and some of their expert witnesses, have argued that civilians should have access to any firearms and accessories to which law enforcement has access.  I further understand that they make this claim

based on an assertion that civilian self-defense and law enforcement responsibilities both involve firing only in self-defense and with the goal of stopping an aggressor. In my opinion, these views are based on a fundamental misunderstanding of the unique role played by law enforcement, and differences between what law enforcement officers do in carrying out their law enforcement responsibilities and what civilians do in self-defense.

20.   Law enforcement officers, when fulfilling certain functions, need special firearms and additional magazine capacity because their duty is not just to defend, but to persist and apprehend. Thus, law enforcement officers often have responsibilities to affirmatively seek out and pursue criminal suspects, often in territory that is unfamiliar to the officers, where suspects may be lying in wait for them, or where there is ongoing criminal activity.

21.   For example, if a criminal threatened a room full of people, one of whom was a law enforcement officer, with a firearm, the ordinary citizen's self-defense interest would be satisfied if brandishing a firearm convinced the criminal to flee, which is often the case. The law enforcement officer's responsibility, however, would be to protect the public, which would include pursuing the criminal threat and persisting until the criminal could be apprehended. The expectation for the law enforcement officer is to have the ability to not only seek out a criminal threat, but to engage that threat in a prolonged confrontation and resolve it.

22.   Moreover, in many cases, a criminal inclined to flee from a civilian with a firearm will be more likely to put up armed resistance against a law enforcement officer whose duty is to pursue and apprehend that criminal, not let him flee.

23. It is true that law enforcement officers only fire firearms in defense of self or others, but the situations in which those threats might arise are entirely different from civilian self-defense situations, and require different tools.

**Use of Assault Weapons and High-Capacity Magazines in Civilian Self-Defense**

24. After consulting with officers in the Prince George's County Police Department who I would expect to have knowledge of any such incidents, we are unaware of any incident in which a civilian in Prince George's County has ever used an assault weapon in self-defense, or any incident in which a civilian in Prince George's County has ever fired as many as 10 rounds in a self-defense incident.

25. I am similarly unaware of any self-defense incident involving an assault weapon, or in which it was necessary to fire as many as 10 rounds in self-defense, anywhere else in Maryland, although I do not have the same access to information about incidents outside of Prince George's County.

26. Through my experience in the Prince George's County Police Department, I am aware of numerous incidents in which civilians have used firearms for self-defense. In each incident, the weapon used has been a handgun.

27. When asked to recommend a firearm for home defense by someone intent on buying a firearm, I have recommended purchase of a simple revolver, which I believe is easier to operate for people without substantial training than a semi-automatic handgun.

28. Handguns are generally more appropriate firearms for home self-defense because they are easier to store and maneuver in a home defense situation. One lesson learned from the recent active shooter incident in the Washington Navy Yard, as conveyed by Chief Cathy Lanier, is the difficulties the Metropolitan Police Department had in maneuvering assault rifles in the tight spaces of that office building, which are similar to hallways in many homes. For similar reasons, I believe assault weapons could be difficult to maneuver in home self-defense situations relative to handguns.

29. In addition, in light of the powerful capabilities of assault weapons, they pose particular dangers in the hands of civilians who, for the most part, lack the extensive training and preparation of law enforcement officers.

30. Most assault weapons have significant penetration capabilities that are especially dangerous to both law enforcement officers and civilians alike.

31. With respect to law enforcement officers, the soft body armor worn by most law enforcement officers is not effective against rifle rounds fired by assault weapons, nor are many kinds of bullet-resistant glass used by law enforcement agencies. I have personally observed rounds from an assault weapon piercing soft body armor that will stop virtually any handgun round. We also have on display in the Prince George's County Police Department headquarters a piece of bullet-resistant glass that stopped projectiles from other firearms, but that was pierced straight through by a round from an assault weapon.

32. Although the ability to penetrate soft body armor and bullet-resistant glass is shared by rounds fired by rifles other than assault weapons, most other rifles lack other

features that contribute to the overall dangerousness of assault weapons – and the overall appeal of such weapons to criminals – such as the capability to accept large-capacity detachable magazines and other military-style features.

33. With respect to civilians, rounds from assault weapons have the ability to easily penetrate most materials used in standard home construction, car doors, and similar materials. Although rounds from many handguns can also penetrate through such materials, the rounds from assault weapons like the AR-15 are more dangerous and effective once they do so.

34. It is also my opinion, based on my experience and knowledge, that a large-capacity magazine is not appropriate or necessary for self-defense. In my experience, when firearms are used in self-defense, very few shots, if any, are ever fired. I am not aware of any circumstance in which more than 10 rounds would have been needed or even useful in a home self-defense encounter. As a result, it is my opinion that the current magazine-capacity limit of 10 rounds is more than sufficient for civilian self-defense needs.

35. By contrast, the use of large capacity magazines in self-defense can have severe adverse consequences for innocent bystanders. Unlike law enforcement officers who are trained to limit risk to innocent civilians and to regularly assess the need for additional shots, civilians do not receive any such training, and so are more likely to continue shooting even after a threat has disappeared, or to hit unintended targets with more errant shots.

36. I understand the plaintiffs have contended that civilians in a self-defense situation are likely to miss their target with the majority of rounds they fire because of statistics showing that certain law enforcement officers, in certain circumstances, have missed their targets with a majority of rounds they fire.

37. Although I do not have an opinion with respect to how frequently a civilian acting in self-defense would be able to hit a target, I do not believe it is relevant or informative to compare the likely hit rate of a civilian acting in self-defense to the hit rate of law enforcement officers acting in the course of their duties. For the same reasons discussed above, law enforcement responsibilities are significantly different than civilian self-defense situations, and the situations in which firearms might be fired are also substantially different. For example, law enforcement officers may be forced to fire while actively pursuing dangerous, fleeing suspects in hostile territory, while self-defense situations are generally in close quarters and often in a familiar location. That does not necessarily mean civilians acting in self-defense are likely to be more accurate than law enforcement, but, in my opinion, the comparison of hit rates is not meaningful.

38. I previously mentioned the Department's efforts to increase our ability to confront the all-too-real possibility of having an "active shooter" in Prince George's County. In my opinion, Maryland's assault weapons and large-capacity magazine bans will assist with those efforts by reducing the availability, over the long term, of assault weapons and large-capacity magazines for use by such active shooters in Maryland.

39. In recent years, a number of perpetrators of the most heinous acts of violence have used assault weapons, large-capacity magazines, or both to murder dozens

of people, including at the movie theater in Aurora, Colorado, the school in Newtown, Connecticut, and the parking lot in Tucson, Arizona. In determining how we can best protect the citizens of Prince George's County, the Department has paid close attention to the lessons learned from law enforcement briefings and news accounts about these and other mass shootings.

40.   Based on briefings and news accounts, in the incidents in Colorado and Connecticut, among a number of others, the shooters used assault weapons to carry out their murders, and in all three incidents the shooters made use of large-capacity magazines to murder multiple individuals. Notably, in two of the three incidents lives were saved during magazine changes. In Tucson, the shooter was tackled by bystanders when he stopped to reload between 30-round magazines. In Newtown, a number of children escaped when the shooter stopped to reload between 30-round magazines. Had the shooters been limited to 10-round magazines, more lives may very well have been saved.

**Use of Assault Weapons and High-Capacity Magazines by Criminals**

41.   Handguns remain the weapon used in the majority of firearms crimes committed in Prince George's County.

42.   By comparison with handguns, assault weapons are used relatively infrequently in firearms crimes in Prince George's County. However, that does not diminish the unusually dangerous quality of assault weapons for several reasons.

43.     First, when assault weapons are used in crimes in Prince George's County, they appear in particularly dangerous situations. In one example, a criminal suspect wielding an AK-47 assault rifle effectively pinned down an officer, who was lucky not to be struck before escaping. In another example, a criminal attempted an armored car robbery with an assault rifle, and in a third incident officers encountered an individual with an assault rifle who had just committed a double murder.

44.     Second, the fact that assault weapons are not yet used with great frequency in crimes in Prince George's County has nothing at all to do with how objectively dangerous they are. Designed for military-style assaults to be able to project significant volumes of lethal rounds across long distances at high rates of speed with great accuracy, and adopted by militaries around the world for their effectiveness in doing that, the firearms are unusually dangerous as compared to most other rifles, shotguns, and handguns. Although many of the characteristics that make assault weapons particularly useful in military combat also have application in certain law enforcement contexts, that does not make them either less dangerous or more suitable for general civilian use.

45.     In light of their dangerousness, it is lucky that assault weapons are not yet used more frequently in crimes. However, I understand that assault weapons have been purchased in much greater numbers in recent years, and continued increases in their general availability would necessarily make them more available to criminals in the long term. If Maryland were to have waited to act to restrict availability of assault weapons until they actually became commonly owned, the negative impact on public safety from the availability of these firearms to criminals would likely be much greater than it is now.

46. Third, we know from experiences of other jurisdictions around the country that assault weapons have been used in a number of mass shootings, some of which were discussed above. Maryland's fortunate lack of a similar mass shooting does not mean we are not at risk of one, that we should not be taking all appropriate steps to reduce the likelihood of one occurring, or that we should not be taking all appropriate steps to reduce the likely carnage of such a shooting if it does occur.

47. By contrast, large-capacity magazines are used frequently by criminals in Prince George's County. Although we do not keep specific statistics on the capacity of magazines recovered, it is very common to recover semi-automatic handguns with large-capacity magazines from criminals. The additional capacity in the hands of criminals poses a significant threat to civilians and law enforcement alike.

48. I understand the plaintiffs have contended that limiting magazine capacity to 10 rounds or less is unlikely to have an impact on criminal actions because criminals will be able to carry multiple magazines, and change those magazines quickly under the stress of a gun battle. Based on my experience, that argument gives far too much credit to the capabilities of most criminals, who generally have relatively little experience, training, or knowledge regarding the firearms and firearm accessories they carry. In my opinion, most criminals would not be proficient at quickly changing magazines, especially under the stress of a gun battle. Moreover, the potential for victims to intervene or escape during reloading is confirmed by incidents like those discussed above.

49. In light of the extreme damage they can do, and their particular utility in attacking law enforcement officers, reducing the availability of assault weapons and large capacity magazines to criminals is critical.

50. Criminals obtain most of their firearms through straw purchases, purchases on the secondary market from individuals who own firearms lawfully, and theft from law-abiding individuals.

51. The Prince George's County Police Department has no intention to transfer ownership of any assault weapons to any active or retired law enforcement officer, nor am I aware of any other law enforcement agency that has any such program or intention.

**Conclusion**

52. Maryland's assault weapons and large-capacity magazine bans do not restrict any firearms or magazines that are necessary or even appropriate for use in self-defense. To the contrary, Maryland's assault weapons and large-capacity magazine bans restrict firearms that, based on my experience, are particularly dangerous and unusual.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: FEBRUARY 14, 2014

_____
Henry P. Stawinski
Deputy Chief, Prince George's County Police Department