Exhibit 8

To Defendants' Memorandum in Support of Motion for

Summary Judgment

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| STEPHEN V. KOLBE, *et al.*; ) | |
| ) | |
| ) | |
| *Plaintiffs*, ) | Case No.: 1:13-cv-02841-CCB |
| ) | |
| v. ) | |
| ) | |
| MARTIN O'MALLEY, *et al.*; ) | |
| ) | |
| ) | |
| *Defendants*. ) | |

## DECLARATION OF JOSEPH J. VINCE, JR.

I, Joseph J. Vince, Jr., under penalty of perjury, declare and state:

1.	I am over the age of 21, and I am competent to make this declaration and to swear to the matters contained herein.

2.	I am the Director of the Criminal Justice Programs at Mount St. Mary's University in Emmitsburg, Maryland. I am also the President of Crime Gun Solutions, LLC, a private consulting firm dedicated to assisting and training law enforcement and other groups in reducing firearm-related violent crime.

### QUALIFICATIONS

3.	I earned a Bachelor of Arts degree in Criminal Justice from Youngstown State University in Youngstown, Ohio in 1970. In 1979, I earned a Master of Arts degree in Criminal Justice from the University of Detroit in Detroit, Michigan.

4.      I joined the United States Bureau of Alcohol, Tobacco, & Firearms ("BATF") in May of 1971 and served in positions of increasing responsibility until my retirement from that agency in January of 1999. My postings have included as Chief of BATF's Crime Gun Analysis Branch in Falling Waters, West Virginia (1997-1999); Chief (1995-1997) and Deputy Chief (1993-1995) of BATF's Firearms Enforcement Division in Washington, D.C.; Special Agent in Charge of BATF's Division Office in Chicago, Illinois (1991-1993); Assistant Special Agent in Charge and Team Supervisor of BATF's Southeast National Response Team in Miami, Florida (1986-1991); Special Agent in Charge of BATF's Intelligence Branch (1985-1986); and Special Agent in Charge of BATF's Firearms Tracing Branch (1983-1985).

5.      I was appointed to serve as the United States' representative to the United Nations Working Group on Small Arms Proliferation.

6.      I was assigned to the U.S.'s negotiating team under the direction of the Office of National Drug Policy to attempt to negotiate an agreement with Mexico regarding the cross-border flow of drugs and guns.

7.      I have trained law enforcement officers throughout the United States, Europe, South America, and Mexico on firearms-related topics including methods for preventing criminals from obtaining firearms.

8.      My full *curriculum vita* is attached as Exhibit A to this Declaration.

## FINDINGS

*A.   Definitions of Assault Weapons and Large-Capacity Magazines*

  9. There are three principal classes of firearms:

    a. "handguns," which are defined to mean "a firearm with a short stock and designed to be held and fired by the use of a single hand;"

    b. "shotguns," which are defined to mean "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger;" and

    c. "rifles" which are defined to mean "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifle bore for each single pull of the trigger."

Gun Control Act of 1968, 18 U.S.C. §921(3).

  10. Semiautomatic rifles are a subgroup within the class of rifles. The Gun Control Act of 1968 defined these as "any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge."

  11. Most of the "assault long guns" that are banned by the State of Maryland under Senate Bill 281 of 2013 are a subgroup of the subclass of semiautomatic rifles comprised of semiautomatic rifles with features designed for military combat.

12.     The remaining firearms designated as "assault long guns" are a subclass of specially-designed assault shotguns.[1]

## B.     *History and Development of Assault Weapons*

13.     The history of these assault long guns is instructive. Beginning near the end of World War II, military planners and weapons designers from various militarized countries sought to develop small arms that combined the "rapid, massed, and shocking power" of a submachine gun with the lethality of a standard infantry cartridge. They wanted a weapon that could produce massed firepower to accompany the offensive thrust of armored forces. These military planners saw that with the vast armies in the field they would no longer have the opportunity to try to teach their soldiers to be proficient marksmen but instead would try to equip them with weapons that would increase the volume and velocity of their fire. They wanted a weapon that would produce bursts of fire in the general direction of the enemy to inflict random hits and, at the same time, keep the enemy pinned down with suppressive fire. They also wanted the new weapon to be accurate at longer range and to have sufficient power to pierce body armor and the military helmets of the day.  Finally, they wanted it to be lightweight, rugged, and durable.  This history is described in Edward Clinton Ezell's Small Arms of the World (12th ed. 1983).

---

[1] Maryland Code, Public Safety ("PS") Article, § 5-101 (r) (2) (xxx) ("Mossberg model 500 Bullpup assault shotgun"); *id*. at (xxxviii) ("Street sweeper assault type shotgun"); *id*. at (xxxix) ("Striker 12 assault shotgun in all formats"); *id*. at (xli) ("Daewoo USAS 12 semi-auto shotgun").

14. The results of their efforts were a series of new weapons, led by the German *Sturmgewehr* (generally translated as "assault rifle"), the Soviet AK-47, and the United States' M-16 rifle, among others. These weapons, frequently called "assault weapons," shared several characteristics including the ability to accept detachable, large-capacity magazines, use of an intermediate cartridge (generally 7.62 x 51 mm NATO, 7.62 x 39 M43 (Soviet), the 5.56 x 45 mm, and the .223 caliber), and the ability to fire on full automatic or semiautomatic settings. They were also designed to be lightweight, durable, cheap, and easy to mass-produce. They became, and remain, the standard combat rifle for the world's armies.

15. Weapons designers also added other features to these assault weapons to make them more effective in military situations, including barrel shrouds, which helps dissipate the heat of the barrel when a gun is fired repeatedly and gives the shooter a place to hold while spray firing; pistol grips, which make it easier to control the weapon when firing from the hip and laying down suppressive fire; flash hiders or suppressors, which help hide the soldier's position from enemies; and folding and collapsible stocks, which aid in concealability and allow different-statured soldiers to be able to use the same weapon.

16. To expand their markets, arms makers the world over have taken these military assault weapons, disabled the ability to fire on full automatic, and sold to civilians weapons that otherwise have the exact same characteristics.

C.  *Assault Weapons and Large-Capacity Magazines are "Dangerous and Unusual"*

17. Assault long guns were designed as military instruments of warfare to produce large amounts of firepower with significant penetration capability. They were created with the purpose of killing and incapacitating as many people as possible as quickly as possible. Therefore, it is my opinion that assault long guns, as defined by the Maryland law, are an unusual and dangerous subcategory of the subclasses of semiautomatic rifles and shotguns.

18. Many semiautomatic firearms, including assault weapons and many other firearms, are designed to work with detachable magazines that hold and feed the ammunition ("rounds") that the firearms fire. The magazine functions by moving the cartridges stored in the magazine into a position where they may be loaded into the chamber by the action of the firearm. Firearms using detachable magazines can be reloaded by releasing one magazine, often at the press of a button, and then inserting a new, loaded magazine. Detachable magazines can be of almost any size. As a general matter, differences in magazine capacity do not affect the performance of the firearm or of the rounds expended by the firearm.

19. Large-capacity magazines (those holding more than 10 rounds) are a subclass of magazines for semi-automatic weapons. Large-capacity magazines are not necessary for the operation of a firearm and make no difference in the performance of the firearm. Because large-capacity magazines allow a shooter to produce large amounts of

firepower, larger than is reasonably necessary for home self-defense by civilians, I consider them especially dangerous.

### D.     Firearms for Home Defense

20.     In my opinion, the assault long guns banned by the State of Maryland are particularly ill-suited for home self-defense. They are large and can be cumbersome in the tight confines of a home. These weapons bear a significant risk of "over-penetration" and may travel through interior, common, and even exterior walls to place family, friends, neighbors, and even passers-by at risk of being hit with a stray bullet. These risks are also increased exponentially because of the number of bullets these assault weapons can fire in a short space of time. Moreover, such firepower is unnecessary. I have never—in all my years of law enforcement focused on firearms—heard of a single incident in which a citizen was required to use 10 or more bullets to defend his or her home.

21.     I understand that the plaintiffs have made the argument that civilians should be permitted to arm themselves with the same weapons that police utilize in their law enforcement activities. This argument is illogical and unrealistic and, if implemented, presents a danger to public safety. Law enforcement officers are only allowed to use these firearms with specialized, on-going training. While some civilians may theoretically receive comparable training—or may have received such training in the past if they were in law enforcement or the military—that is rare. In most circumstances, civilians are significantly less well-trained in the appropriate, careful, and effective use of assault weapons.

22. Moreover, law enforcement officers engage in many offensive activities that are nothing like civilian self-defense. These potentially offensive activities include but are not limited to: the execution of search warrants of dwellings where criminals are armed; the execution of arrest warrants against armed and dangerous criminals; the safe extraction of hostages held by barricaded gunmen; and the pursuit of armed criminals in vehicles and boats. Thus, the decision to provide law enforcement with certain firearms or large-capacity magazines to help them carry out unique law enforcement duties does not remotely suggest the appropriateness of the same firearms and magazines for civilian self-defense.

E. *Keeping Assault Weapons and Large-Capacity Magazines out of the Hands of Criminals*

23. Providing citizens easy access to assault weapons and large-capacity magazines also increases their availability to criminals. I have found through years of study and enforcement experience that criminals acquire their firearms through 'straw purchases,' theft, and secondary market sales. Banning the sale of such firearms and magazines decreases the ability of criminals to acquire them.

24. In 1934, the United States Congress passed the National Firearms Act that mandated the registration (with extensive background checks) of the dangerous and unusual criminal weapons of the day (i.e. short barreled shotguns and rifles, machineguns, silencers, etc.). Over time, the nation saw a significant decrease in crime with these weapons as their availability to criminals diminished.

25.     Similarly, I expect that over time, Maryland's ban on assault weapons and large-capacity magazines will decrease the availability of those firearms and magazines to criminals.

## F.     Safety of Law Enforcement Officers

26.     Law enforcement is a dangerous job. It becomes more dangerous when criminals are armed with assault weapons and large-capacity magazines. Criminals so armed can fire more bullets, faster. And the bullets that they fire from these assault weapons have the ability to penetrate the soft body armor worn by most police officers.

27.     Studies of police officers killed-in-the-line-of-duty has shown that a significant number are being killed with assault weapons. Unless something is done to stop the proliferation of these weapons, that number will undoubtedly increase.

28.     I am also deeply concerned that the proliferation of assault weapons and their use by criminals will force police to change their enforcement tactics. I do not wish to see an increase in armored vehicles and SWAT-type units being deployed for what are currently seen as minor enforcement matters. But that is precisely what will happen if assault weapons become more widely owned, and thus more widely available to criminals.

## G.     Law Enforcement's Recommendations about Banning Assault Weapons and Large-Capacity Magazines.

29.     The International Association of Chiefs of Police ("IACP") is the oldest and largest professional law enforcement organization in the world. Founded in 1893, the IACP's goals are to advance the science and art of police services; to develop and

disseminate improved administrative, technical and operational practices and promote their use in police work; to foster police cooperation and the exchange of information and experience among police administrators throughout the world; to bring about recruitment and training in the police profession of qualified persons; and to encourage adherence of all police officers to high professional standards of performance and conduct.

30. The IACP, like other major law enforcement organizations, has taken a strong position in support of bans on assault weapons and large-capacity magazines. Attached as Exhibit B is a true and correct copy of a statement from the President of the IACP in 2004 with respect to the sunset of the federal assault weapons ban. Among other points, the statement highlights the views of IACP members that assault weapons are routinely used by gang members and drug dealers, and too often against law enforcement officers; that unlike other rifles, assault rifles are designed to maximize lethal effects through rapid rates of fire; that assault weapons are designed so they can be spray-fired from the hip while maintaining control even while firing many rounds in rapid succession; that military features of assault weapons such as flash suppressors, pistol grips, and folding stocks were designed to increase the lethality of the weapons and make them more concealable; and that such weapons serve no legitimate sporting or hunting purposes and have no place in our communities. I share these views.

## CONCLUSIONS

31. Whatever one believes about the benefits of employing firearms for home or self-defense, reasonable and sensible gun policies – such as the banning of assault type

-10-

weapons and large-capacity magazines – are required in the best interest of public safety. I believe that the current State of Maryland ban on assault weapons and large-capacity magazines has little effect on the ability of law abiding citizens to reasonably defend themselves with firearms. Equally, it is my opinion that the Ban will promote the general welfare by protecting the public from harm by these especially dangerous firearms and magazines, criminally and otherwise.

32.   In the same manner that legislators may find that citizens hunting with a rifle on flat topography is not a safe practice, they can find the arming of citizens with firearms that were designed for modern day warfare in places like Iraq and Afghanistan are also an unsafe practice in their State. Maintaining safety in our person and homes does not equate to uncontrolled and unregulated firearm usage. Assault weapons and large-capacity magazines are not needed or sensible for home defense and certainly are properly considered "dangerous and unusual" weapons.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

_____  2/11/14
Joseph J. Vince, Jr.

Exhibit A

To Declaration of Joseph J. Vince, Jr.

## APPENDIX 'A'

# Joseph J. Vince, Jr.
2214 W. Greenleaf Drive
Frederick, MD 21702
(301) 631-2950•JVincecgs@msn.com

**Education**    1979    M. A., *University of Detroit*, Detroit, MI
Criminal Justice

1970    B. A., *Youngstown State University*, Youngstown, OH
Major: Criminal Justice
Minor: History and Education

**Formal Managerial Training**
January 1994    *Senior Executive Service Candidate*, SES, Washington, DC
March 1987    *Leadership Development Program*, Center for Creative Leadership, Greensboro, NC
August 1981    *Executive Development Seminar*, OPM, Kings Point, NY
February 1980    *Supervision and Group Performance*, OPM, St. Louis, MO

**Experience**

| | | |
|---|---|---|
| May 2002-Present | Faculty | **Professor – Mount St. Mary's Univ., Emmitsburg, MD** |
| January 1999-Present | President | ***Crime Gun Solutions LLC*** |
| June 2013 – Present | Member | **Amer. Bar Association – 'Stand Your Ground' Task Force** |
| 2010 - Present | Member | **Board Member-Frederick Comm. College-CJ Depart.** |
| January 2002–2004 | Member | ***State and Local LE Advisory Board to the U.S. Counterdrug Intelligence Coordinating Group (CDX) US Department of Justice*** |
| February 2001–2004 | Member | ***Government Intelligence Training Initiative*** |
| May 2005 – 2008 | Board of Dir. | ***American Hunters and Shooters Association, Inc.*** |
| September 2001–Pres. | Director | ***The Father Delaney Center for Public Safety Practices at Mount Saint Mary's University*** |

**US Bureau of Alcohol, Tobacco and Firearms**

| | | |
|---|---|---|
| July 1997-January 1999 | Chief | Crime Gun Analysis Branch, Falling Waters, WV |
| July 1995-July 1997 | Chief | Firearms Enforcement Division, Headquarters, Washington, DC |
| July 1993-July 1995 | Deputy Chief | Firearms Enforcement Division, Headquarters, Washington, DC |
| March 1991-July 1993 | Special Agent In Charge | Division Office, Chicago, IL |
| October 1986-March 1991 | Assistant Special Agent in Charge | Team Supervisor, ATF Southeast National Response Team (NRT); Division Office, Miami, FL |
| January 1985-October 1986 | Special Agent In Charge | Intelligence Branch, Headquarters, Washington, DC |
| November 1983-January 1985 | Special Agent In Charge | Firearms Tracing Branch, Headquarters, Washington, DC |
| June 1983-November 1983 | Operations Officer | Firearms Division, Headquarters, Washington, DC |
| August 1979-June 1983 | Resident Agent In Charge | Division Office, Omaha, NE |
| October 1974-August 1979 | Criminal Investigator | Special Agent, Division Office, Flint, MI |
| May 1971-October 1974 | Criminal Investigator | Special Agent, Division Office, Detroit, MI |

***Other Law Enforcement Experience***

June 1969-May 1971     Deputy Sheriff     **Trumbull County Sheriff's Office, Warren, OH**

## Awards

| | | |
|---|---|---|
| 1997 | *Innovations in American Government, Finalist* | Presented by the Ford Foundation and the John F. Kennedy School of Government at Harvard University for work on the project "Disarming the Criminal" |
| 1996 | *Vice Presidential Hammer Award* | Three awards were presented for innovations in Federal Firearms Enforcement |
| 1997 | *ATF Gold Star Award* | Awarded for wounds received in action |

Numerous other awards and recognition have been presented throughout 27 years of service for the United States Department of the Treasury, Bureau of Alcohol Tobacco and Firearms by the United States Government and by other law enforcement agencies for quality investigative work and courageous leadership

## Other Pertinent Experience

### Publications/Research

| | | |
|---|---|---|
| 2004 | Evidence Collection Toolbox & Field Guide | Criminal Justice textbook and field guide to be published by Jones & Bartlett in March 2005. |
| 1998 | Youth Crime Gun Interdiction Initiative | Crime Gun Analysis Reports of the Illegal Youth Firearms Markets in 27 Communities |
| 1997 | Youth Crime Gun Interdiction Initiative | Crime Gun Analysis Reports of the Illegal Youth Firearms Markets in 17 Communities |
| 1992 | Protecting America: The Effectiveness Of the Federal Armed Career Criminal Statutes | A Study by The Bureau of Alcohol, Tobacco and Firearms, United States Department of the Treasury |
| 1986 | The Encyclopedia of Police Science | Contributing writer |
| 1983 | "MERT – Response for the 80's" | Law Enforcement Periodical |
| 1980 | "Achievement Through Cooperation" | Nebraska Law Enforcement Magazine |

Authored or managed numerous studies and reports for ATF, which were utilized by the White House, Congress, other law enforcement agencies for policy and strategic matters.

### Organizations

Member, International Association of Chiefs of Police

Member, International Association of Chiefs of Police, Firearms Committee Member & Consultant

Member, American Society of Law Enforcement Trainers

### Public Instruction

Lectures, Speeches and Presentations to Numerous Law Enforcement Groups, Academies/Universities in Reference to ATF's Mission, Findings and Accomplishments (Both U.S. & Abroad).

### Media Appearances

Quoted in newspapers as firearms-realted crime/law enforcement expert to include:
New York Times, Wall Street Journal, Washington Post, Washington Times, USA Today and other national and international publications.
Appeared on Radio and TV commenting on crime and law enforcement issues to include:
60 Minutes, CNN, ABC, CBS, FOX, PBS as well as local television stations across the U.S. and internationally to include: Canada, Great Britain, and Japan

# Exhibit B

# To Declaration of Joseph J. Vince, Jr.



send to a friend

**President's Message: Reauthorization of the Assault Weapons Ban**
*By Chief Joseph M. Polisar, Garden Grove, California*



Chief Joseph M. Polisar, Garden Grove, California

By the time you read this column, it is highly probable that the federal ban on semiautomatic assault weapons will have expired and once again these weapons will begin to flood our communities and threaten our officers.

First passed in 1994, the assault weapons ban required domestic gun manufacturers to stop production of semiautomatic assault weapons and ammunition magazines holding more than 10 rounds except for military or police use. Imports of assault weapons not already banned by administrative action under Presidents Ronald Reagan and George H. W. Bush were also halted.

Since the law was enacted, the ban has proven remarkably effective in reducing the number of crimes involving assault weapons. Since 1994 the proportion of assault weapons traced to crimes has fallen by a dramatic 66 percent. Public opinion polls continue to prove that more than 75 percent of the public supports a reauthorization of the current ban.

The IACP has been a strong supporter of the assault weapons ban since 1992, and our membership approved a resolution calling for its reauthorization at our 2003 conference. The membership took this action because we, as law enforcement executives, understand that semiautomatic assault weapons pose a grave risk to our officers and the communities they are sworn to protect.

It is deeply troubling that Congress and the administration have so far failed to reauthorize this critically important legislation.

Assault weapons are routinely the weapons of choice for gang members and drug dealers. They are regularly encountered in drug busts and are all too often used against our officers. In fact, one in five law enforcement officers slain in the line of duty between January 1, 1998, and December 31, 2001, was killed with an assault weapon, according to "Officer Down," a report from the Violence Policy Center. The weapons in question—including the Colt AR-15, a semiautomatic version of the M-16 machine gun used by our armed forces, the Uzi, and the Tec-9 pistol, whose manufacturer's advertisements hailed its "fingerprint-resistant" finish—have been used in countless murders such as the Stockton schoolyard and Columbine High School shootings.

Opponents of the assault weapons ban often argue that the ban only outlawed certain weapons because of their "cosmetic features" and not because they are inherently more dangerous than other weapons. This is simply not true.

While most rifles are designed to be fired from the shoulder and depend upon the accuracy of a precisely aimed projectile, semiautomatic assault weapons are

designed to maximize lethal effects through a rapid rate of fire. Assault weapons are designed to be spray-fired from the hip, and because of their design a shooter can maintain control of the weapon even while firing many rounds in rapid succession.

The cosmetic features opponents of the ban point to are actually military features such as silencers, flash suppressors, pistol grips, folding stocks, and bayonets that were designed specifically to increase the lethality of these weapons and make them more concealable. Many come equipped with large ammunition magazines allowing 50 or more bullets to be fired without reloading.

Weapons of this nature serve no legitimate sporting or hunting purposes and have no place in our communities. Unless Congress acts, the firearms of choice for terrorists, drug dealers, and gang members will be back on our streets—where, once again, our officers will be outgunned by criminals.

If Congress and the administration fail to reauthorize the assault weapons ban, it will be up to the law enforcement community to demand that it be reinstated. Over the last decade, we have made significant progress in our efforts to reduce violent crime rates. The ban on assault weapons and high-capacity magazines has been a crucial component of our national crime-fighting strategy.

We must not surrender the gains that we have made.

It is vital that we, as police chiefs, take a leading role in this effort. We know the tremendous harm that these weapons can inflict on our communities and we know what the proliferation of these weapons will mean to our officers. We need to be leaders, both in word and in deed, and we must make every effort to ensure that our elected officials understand that failure to reauthorize the assault weapons ban is a significant step back for law enforcement and public safety

Our communities and the officers we lead expect this of us; our duty demands it. ∎

Top

From The Police Chief, vol. 71, no. 9, September 2004. Copyright held by the International Association of Chiefs of Police, 515 North Washington Street, Alexandria, VA 22314 USA.

Return to Article

The official publication of the International Association of Chiefs of Police.
The online version of the Police Chief Magazine is possible through a grant from the IACP Foundation. To learn more about the IACP Foundation, click here.

All contents Copyright © 2003 - 2014 International Association of Chiefs of Police. All Rights Reserved.
Copyright and Trademark Notice | Member and Non-Member Supplied Information | Links Policy

44 Canal Center Plaza, Suite 200, Alexandria, VA USA 22314 phone: 703.836.6767 or 1.800.THE IACP fax: 703.836.4543
Created by Matrix Group International, Inc.®