Exhibit 10

To Defendants' Memorandum in Support of Motion for

Summary Judgment

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| STEPHEN V. KOLBE, *et al.*; | ) | |
| | ) | |
| | ) | |
| *Plaintiffs*, | ) | Case No.: 1:13-cv-02841-CCB |
| | ) | |
| v. | ) | |
| | ) | |
| MARTIN J. O'MALLEY, *et al.*; | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

## DECLARATION OF CAPTAIN DALAINE M. BRADY

I, Captain Dalaine M. Brady, under penalty of perjury, declare and state:

1.     I am a Captain in the Maryland State Police ("MSP").  I have supervisory responsibility over the Licensing Division of the MSP, which includes responsibility for processing applications to purchase regulated firearms, commonly referred to as 77R applications.  I am over the age of 18 and am competent to testify to the matters stated below.

2.     Through October 1, 2013, applicants for the purchase of regulated firearms were required to complete an application for purchase of a regulated firearm, commonly referred to as a 77R application.  That application was required to be forwarded to the MSP's Licensing Division to conduct a background investigation.

3.     Regulated firearms that could not be transferred without first completing a 77R application included all handguns, as well as regulated long guns identified in

§ 5-101(r)(2) of the Public Safety Article.  Before October 1, 2013, this list was provided at § 5-101(p)(2) of the Public Safety Article.

4.      In connection with its general responsibilities for enforcing the laws of the State, and specifically with respect to compliance with the 77R process, the Licensing Division has provided guidance to dealers and consumers with respect to determining whether specific firearms were regulated long guns (before October 1, 2013) or banned assault long guns (on or after October 1, 2013).

5.      Attached as Exhibit A is a true and correct copy of Firearms Bulletin # 10-02, which is a bulletin the Licensing Division issued to disseminate information regarding the MSP's interpretation of how to determine whether firearms are covered as copies of the firearms specifically enumerated as assault long guns in § 5-101(r)(2) of the Public Safety Article.

6.      Firearms Bulletin # 10-02 was issued after the MSP obtained guidance from the Maryland Attorney General regarding the interpretation of the law.  A true and correct copy of that opinion, which appears at 95 Op. Att'y Gen. 101, is attached as Exhibit B to this Declaration.

7.      MSP initially distributed a copy of Firearms Bulletin # 10-02 to all firearms dealers in Maryland at the time it was issued, provides a copy to any new registered firearms dealer, and provides additional copies on request.  MSP also brought additional copies of Firearms Bulletin # 10-02 to distribute to dealers during meetings held in 2013 to discuss implementation of the Firearms Safety Act of 2013.

8.     Before the Attorney General's Opinion was issued in May 2010, MSP focused its inquiry with respect to whether a particular firearm was a copy of a specifically-enumerated regulated long gun on whether the firearm was cosmetically similar to a specifically-enumerated regulated long gun.

9.     As a result of inquiries regarding .22 caliber long rifles that were cosmetically similar to AR-15s, MSP requested an opinion from the Attorney General regarding whether such rifles were regulated as copies of AR-15s.

10.    Based on the Attorney General's Opinion, as implemented under Firearms Bulletin # 10-02, MSP considers firearms to be banned as copies of assault long guns if, in addition to being cosmetically similar to a specifically-enumerated long gun, they have "completely interchangeable internal components necessary for the full operation and function of any one of the specifically-enumerated assault weapons."

11.    It is MSP's experience that, with respect to the vast majority of firearms, dealers, manufacturers, and consumers are readily able to determine whether firearms meet this standard.

12.    If dealers have questions regarding whether specific firearms are covered as copies of specifically-enumerated assault long guns, and they do not know whether the firearm at issue has interchangeable internal components with a specifically-enumerated assault long gun, MSP provides a copy of Firearms Bulletin # 10-02 and refers the dealer to the manufacturer.  It is MSP's experience that manufacturers, with whom dealers are in position to interact, are readily able to identify whether firearms they manufacture have interchangeable internal components with the specifically-enumerated firearms.

13.     If consumers have questions regarding whether specific firearms are covered as copies of specifically-enumerated assault long guns, and they do not know whether the firearm at issue has interchangeable internal components with a specifically-enumerated assault long gun, MSP will provide assistance in making that determination. In the vast majority of cases, the determination can be made by resort to publicly-available sources.

14.     I understand the plaintiffs have raised issues concerning the MSP's determinations with respect to treatment of firearms that are copies of a Colt AR-15 Sporter H-BAR.

15.     Section 5-101(r)(2) of the Public Safety Article defines an assault long gun to include the "following firearms and their copies, regardless of which company produced and manufactured that assault weapon: . . . (xv) Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle."

16.     The Colt AR-15 Sporter H-BAR rifle is a heavy-barreled version of Colt's AR-15.  However, although Colt H-BARs are stamped with its trademark "H-BAR," heavy barreled versions of the AR-15 made by many other manufacturers are not.

17.     MSP does not have a specific definition based on barrel diameter or weight of when a firearm constitutes a heavy-barreled version of an AR-15 that is exempted from the ban as a copy of a Colt AR-15 Sporter H-BAR.  Instead, MSP relies on the manufacturer's designation of a firearm as an H-BAR or heavy-barreled version of an AR-15 to determine whether it is exempt from the ban as a copy of a Colt AR-15 Sporter H-BAR.

18.    The one exception is Bushmaster H-BAR rifles.   MSP previously considered Bushmaster H-BAR rifles to be exempt from the ban as a copy of a Colt AR-15 Sporter H-BAR, based on the same analysis already discussed.

19.    In response to a new inquiry regarding the Bushmaster H-BAR in 2013, MSP reviewed its conclusion regarding that firearm in light of not only the provision of the law related to the exemption for the Colt AR-15 Sporter H-BAR, but also the separate, more specific, prohibition of "Bushmaster semi-auto rifle" in § 5-101(r)(2)(xi) of the Public Safety Article.

20.    As a matter of statutory interpretation, MSP determined that the more specific prohibition on all Bushmaster semiautomatic rifles governs over the more general exemption for copies of the Colt AR-15 Sporter H-BAR.   Thus, MSP concluded that Bushmaster AR-15 H-BAR firearms are, as of October 1, 2013, banned assault long guns that may not be transported into the State of Maryland or transferred, sold, or received within the State of Maryland.   That determination relates exclusively to the Bushmaster H-BAR, and is based on the statute's unique treatment of Bushmaster semi-automatic rifles.

**Information Regarding the Number of Applications to Purchase Regulated Firearms in Maryland.**

21.    Before October 1, 2013, for firearms purchases involving licensed firearms dealers, 77R applications were available from licensed firearms dealers, who were responsible for ensuring that they were completed and provided to MSP.   Dealers were

responsible for determining whether any particular firearm they sold was a regulated firearm for which a 77R application was required.

22.     For firearms purchases between private citizens, 77R applications were available from the Maryland State Police.

23.     At the time a 77R application was completed, the dealer (or the parties to a private sale) were responsible for identifying which type of regulated firearm was at issue.

24.     With the exception of assault pistols, lever action handguns, and single-shot handguns, firearms dealers were supposed to code handguns either "A," for semi-automatic handguns, or "R," for revolvers, on the application.

25.     Firearms dealers were supposed to code regulated long guns, as well as assault pistols, as "X" on the application.

26.     Firearms dealers were supposed to code regulated frames and receivers, as well as lever action or single-shot handguns, as "O" on the application.

27.     When MSP processed an application to purchase a regulated firearm, it entered the information into the Maryland Automated Firearms Services System ("MAFSS").  The MAFSS database is maintained by the Department of Public Safety and Correctional Services ("DPSCS"), not by the MSP.  However, the MSP is able to request information from the MAFSS database from DPSCS.

28.     When entering information into MAFSS, MSP entered the information provided by the firearms dealer or by the private parties to a sale.

29.     In response to requests made by the plaintiffs in this case, the MSP requested from DPSCS the total number of applications and transfers of regulated firearms reflected in MAFSS for each year from 1994 through 2013.  Attached as Exhibit C to this Declaration is a true and correct printout of the information reported from MAFSS.

30.     With respect to 2013, additional applications that have not yet been processed are not yet accounted for in these numbers.  With respect to earlier years, the numbers are current as of the date and time they were queried, subject to future updates as records are reconciled.

31.     The MAFSS database contains information about applications for the initial purchase of regulated firearms, as well as subsequent transfers of regulated firearms, as reported by the transferors.

32.     As such, the MAFSS database is not a record of the number of regulated long guns in the State of Maryland.  MSP does not track the number of regulated long guns in the State of Maryland.

33.     There are several ways in which the number of transfers of regulated long guns in the MAFSS database may overstate the number of regulated long guns in the state:

   a. First, the MAFSS database records all transfers, even if the transfer is of a firearm previously transferred.  Thus, if a single firearm had been transferred five times in the last two decades, it would appear as five separate transactions in the database.

b. Second, the MAFSS database does not record what happens to firearms after a transfer. Therefore, the database continues to reflect firearms transferred to Maryland residents who subsequently moved out of state or sold the long guns to out-of-state purchasers.

c. Third, I understand that the business plaintiffs in this lawsuit have claimed that they completed 77R applications prophylactically on a regular basis for firearms that they believed might not be regulated long guns. If they and other firearms dealers did so, and if the firearms at issue were not regulated long guns, the information in MAFSS likely overstates the number of regulated firearms within Maryland.

34. Similarly, there are some ways in which the number of transfers may understate the number of regulated long guns in the state:

a. First, before October 1, 2013 there was no requirement that new Maryland residents register firearms they brought into the state. Therefore, the database would not reflect firearms entering the state that way.

b. Second, to the extent private citizens transferred firearms without complying with the requirement to complete a 77R application, those firearms also would not be reflected in the database.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Capt. Dalaine M. Brady
Maryland State Police

Exhibit A


To Declaration of Captain Dalaine M. Brady



**MARTIN O'MALLEY**
GOVERNOR

**ANTHONY G. BROWN**
LT GOVERNOR

STATE OF MARYLAND
## MARYLAND STATE POLICE

*Licensing Division*
1111 Reisterstown Rd
Pikesville, MD 21208

*November 4, 2010*



**COLONEL**
**TERRENCE B. SHERIDAN**
SUPERINTENDENT

*FIREARMS BULLETIN #10-2*

*TO: ALL REGULATED FIREARMS DEALERS*

*SUBJECT: INFORMATION ON ASSAULT WEAPON PURCHASES*

The purpose of this bulletin is to disseminate information regarding the Maryland Regulated Firearms Laws pertaining to the regulation of assault weapons.

Manufacturers have been producing firearms that are reproductions or imitations of specifically enumerated assault weapons as defined in Public Safety Title 5, subtitle 1, section 101(P)(2). At issue is which of these firearms does an individual have to complete an Application to Purchase a Regulated Firearm (MSP 77R-1, 77R-2, 77R-3) to comply with Maryland Regulations.

The Maryland State Police Firearms Registration Section will not require an individual to complete an Application to Purchase a Regulated Firearm (MSP 77R-1, 77R-2, 77R-3) for a reproduction or imitation of a firearm that is only cosmetically similar to a specifically enumerated assault weapon as defined in Public Safety Title 5, subtitle 1, section 101(P)(2). The individual will have to comply with all Federal Regulations regarding the purchase of firearms.

An individual will be required to comply with Maryland Regulations for a firearm that is:
1) a reproduction or imitation of a firearm that is cosmetically similar to a specifically enumerated assault weapon as defined in Public Safety Title 5, subtitle 1, section 101(P)(2) and;

2) has completely interchangeable internal components necessary for the full operation and function of any one of the specifically enumerated assault weapons as defined in Public Safety Title 5, subtitle 1, section 101(P)(2).

It is hoped that the information in this bulletin regarding the Assault Weapon Regulations will help your business comply with Maryland Law. If you have any questions about the procedures to be followed please contact the Firearms Registration Section at 410-653-4500.

Sincerely,

Lt. Donald Harrison
Commander
Licensing Division

*"Maryland's Finest"*

Exhibit B


To Declaration of Captain Dalaine M. Brady

# FIREARMS

### REGULATED FIREARMS – ASSAULT WEAPONS – WHETHER A WEAPON IS A "COPY" OF A DESIGNATED ASSAULT WEAPON AND THEREFORE SUBJECT TO THE REGULATED FIREARMS LAW

May 24, 2010

*Colonel Terrence B. Sheridan*
*Superintendent, Maryland State Police*

You have asked for an interpretation of the part of Maryland's regulated firearms law that describes the weapons covered by that law. The statutory definition of "regulated firearm" specifies a list of designated assault weapons "or their copies." You have asked for our opinion on the meaning of the word "copies" in that context.

In our opinion, to come within the definition of "regulated firearm," a copy of a designated assault weapon must be similar in its internal components and function to the designated weapon. Cosmetic similarity to an enumerated assault weapon alone would not bring a weapon within the regulated firearms law.

## I

## Assault Weapons as "Regulated Firearms"

The State's regulated firearms law governs the possession, sale, and transfer of certain weapons. Annotated Code of Maryland, Public Safety Article ("PS"), §5-101 *et seq.* Under that law, for example, an individual may be disqualified from obtaining a regulated firearm for various reasons – *e.g.,* conviction of certain crimes. *See* PS §5-134. Accordingly, an individual seeking to purchase, rent, or transfer a regulated firearm must submit an application for review and approval of the transaction by the Department of State Police. PS §5-117 *et seq.*

The statute defines "regulated firearm" to include two categories of firearms. The first category is handguns. PS §5-101(p)(1). The second category consists of "a firearm that is any of

the following specific assault weapons *or their copies, regardless of which company produced and manufactured that assault weapon...*" PS §5-101(p)(2) (emphasis added).   The statute then identifies specific assault weapons, listed by manufacturer and model.   *Id.*[1]

---

[1] The statute lists the following assault weapons:

| | |
|---|---|
| (i) | American Arms Spectre da Semiautomatic carbine; |
| (ii) | AK-47 in all forms; |
| (iii) | Algimec AGM-1 type semi-auto; |
| (iv) | AR 100 type semi-auto; |
| (v) | AR 180 type semi-auto; |
| (vi) | Argentine L.S.R. semi-auto; |
| (vii) | Australian Automatic Arms SAR type semi-auto; |
| (viii) | Auto-Ordnance Thompson M1 and 1927 semi-automatics; |
| (ix) | Barrett light .50 cal. semi-auto; |
| (x) | Beretta AR70 type semi-auto; |
| (xi) | Bushmaster semi-auto rifle; |
| (xii) | Calico models M-100 and M-900; |
| (xiii) | CIS SR 88 type semi-auto; |
| (xiv) | Claridge HI TEC C-9 carbines; |
| (xv) | Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle; |
| (xvi) | Daewoo MAX 1 and MAX 2, aka AR 100, 110C, K-1, and K-2; |
| (xvii) | Dragunov Chinese made semi-auto; |
| (xviii) | Famas semi-auto (.223 caliber); |
| (xix) | Feather AT-9 semi-auto; |
| (xx) | FN LAR and FN FAL assault rifle; |
| (xxi) | FNC semi-auto type carbine; |
| (xxii) | F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun; |
| (xxiii) | Steyr-AUG-SA semi-auto; |
| (xxiv) | Galil models AR and ARM semi-auto; |
| (xxv) | Heckler and Koch HK-91 A3, HK-93 A2, HK-94 A2 and A3; |
| (xxvi) | Holmes model 88 shotgun; |
| (xxvii) | Avtomat Kalashnikov semiautomatic rifle in any format; |
| (xxviii) | Manchester Arms "Commando" MK-45, MK-9; |
| (xxix) | Mandell TAC-1 semi-auto carbine; |
| (xxx) | Mossberg model 500 Bullpup assault shotgun; |

(continued...)

The statute does not further define the word "copies" in this context.

## II

## Analysis

You have asked for an interpretation of the regulated firearms statute.  The goal of statutory construction is to discern and carry out the intention of the Legislature.  *See, e.g.*, *Dutta v. State Farm Ins. Co.*, 363 Md. 540, 549-50, 769 A.2d 948 (2001).  While legislative intent is generally derived from the words of the statute, "external manifestations" or "persuasive evidence," including amendments that occurred as a bill passed through the Legislature, the bill's relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goals, may be considered.  *Id.*

### A.   Statutory Language

As indicated above, the statute defines "regulated firearm" to encompass a list of specific firearms, "or their copies, regardless of which company produced and manufactured that assault weapon."  You state that there has been disagreement about whether a copy in

---

[1] (...continued)

|  |  |
|---|---|
| (xxxi) | Sterling Mark 6; |
| (xxxii) | P.A.W.S. carbine; |
| (xxxiii) | Ruger mini-14 folding stock model (.223 caliber); |
| (xxxiv) | SIG 550/551 assault rifle (.223 caliber); |
| (xxxv) | SKS with detachable magazine; |
| (xxxvi) | AP-74 Commando type semi-auto; |
| (xxxvii) | Springfield Armory BM-59, SAR-48, G3, SAR-3, -21 sniper rifle, M1A, excluding the M1 Garand; |
| (xxxviii) | Street sweeper assault type shotgun; |
| (xxxix) | Striker 12 assault shotgun in all formats; |
| (xl) | Unique F11 semi-auto type; |
| (xli) | Daewoo USAS 12 semi-auto shotgun; |
| (xlii) | UZI 9mm carbine or rifle; |
| (xliii) | Valmet M-76 and M-78 semi-auto; |
| (xliv) | Weaver Arms "Nighthawk" semi-auto carbine; or |
| (xlv) | Wilkinson Arms 9mm semi-auto "Terry." |

this context would mean a firearm with internal functions and mechanisms similar to an enumerated firearm or would extend to a firearm that is simply similar in appearance to one of the enumerated weapons.

Other than to indicate that there is no special limitation as to the maker of a copy, the definition of "regulated firearm" does not resolve this debate.  Nor does the statute expressly define "copies." A common dictionary definition states that a "copy" is "a reproduction or imitation of an original."  Webster's II New College Dictionary (1995) at p. 249; *see also* <http://dictionary.reference.com/browse/copy>.  What must be reproduced or imitated to create a "copy" in this context?  Other parts of the statute offer some clues.

The statute defines "firearm" to mean, among other things, "the frame or receiver" of a weapon that "expels ... a projectile by the action of an explosive."  PS §5-101(h)(1)(ii).  This suggests that the Legislature deemed the frame or receiver[2] as a distinctive component of a firearm.  Presumably, a "copy" of a firearm would incorporate a reproduction or imitation of the frame or receiver of that firearm. Thus, an analysis of whether the frame or receiver of a given firearm are similar to the frame or receiver of an enumerated firearm would appear to be one criterion that could be considered in determining whether a firearm is a "copy" of an assault weapon.

The list of assault weapons in the statute that would be the subject of any "copy" suggests that cosmetic similarity alone would not suffice.  For example, three of the firearms listed in PS 5-101(p)(2)[3] are described by specific calibers.  The specification of

---

[2] The State firearms law does not define "frame or receiver." Federal law, which contains a similar definition of "firearm," defines "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechlock, and firing mechanism, and which is usually threaded at its forward position to receive the barrel."  27 CFR §478.11.

[3] *See* PS §5-101(p)(2)(xviii) (Famas semi-auto (.223 caliber)); PS §5-101(p)(2)(xxxiii) (Ruger mini-14 folding stock model (.223 caliber)); and PS §5-101(p)(2)(xxxiv) (SIG 550/551 assault rifle (.223 caliber)).

the caliber indicates that an otherwise identical weapon of a different caliber would not be a regulated firearm.[4]

These textual clues indicate that it is not merely the appearance of a weapon, but its internal components and function, that determine whether the weapon is a copy of a listed weapon. Ultimately, that determination must be guided by the legislative purpose in regulating copies. We turn to the legislative history of the regulated firearms law for a fuller understanding of why the General Assembly included "copies" in this definition.

## B.   *Legislative History of Definition of "Assault Weapon"*

The reference to "copies" originally entered the firearms law as part of a definition of "assault weapon" in a statute regulating assault weapons. That definition was later consolidated with a reference to handguns to create the current definition of "regulated firearm."

### *Definition and Regulation of "Assault Weapons"*

The precursor of PS §5-101(p) was enacted in 1989 as part of the original legislation regulating assault weapons. In that year, bills were introduced to prohibit the sale, transfer, importation, possession, or purchase of assault weapons, except in narrowly defined circumstances. Senate Bill 531 (1989) and House Bill 1118 (1989). The proposed definition of "assault weapon" in the original bills included several generic descriptions: any semi-automatic rifle or semi-automatic handgun that would accept a detachable magazine with a capacity of 20 rounds or more; a shotgun with a magazine capacity of 6 rounds or more; any part, or combination of parts, designed or intended to readily convert a firearm into an assault weapon. *See* Senate Bill 531 (1989), first reader; House Bill 1118 (1989), first reader. It also included a list of eight specific firearms, "or their copies regardless of which company produced that firearm." *Id.*

---

[4] By contrast, the federal assault weapon law, enacted in 1994, defined "semiautomatic assault weapon" to include a list of nine specific firearms, "or copies or duplicates of the firearms in any caliber." 18 U.S.C. §921(a)(30)(A). The federal semiautomatic assault weapons law expired in 2004. *See* Pub.L. 103-322, Title XI, §110105(2), 108 Stat. 2000 (September 13, 1994).

The reference to "copies" in the original bills thus pertained only to the specifically-named firearms, not to the generically-described weapons. Presumably, a reference to "copies" was not included for the generic categories because it was considered unnecessary; the generic categories already included *any* weapon meeting the specified criteria, thus encompassing any weapons that had similar internal components and function, but not necessarily weapons with only superficial similarities. If the term "copies" was understood to refer to cosmetic similarities, the definition in the original bills would have reached superficial imitations of only eight weapons, but not of the majority of assault weapons covered by the generic descriptions. Therefore, it seems clear that the term "copies" in the original bills was not intended to mean "look alike." More likely, the reference to "copies" of specific weapons was intended to ensure that the requirements of the law could not be avoided simply by rebranding or superficially changing a named weapon. This also suggests that "copies" was intended to relate to components and function, not simply appearance.

The proponents of the bills testified that the legislation was intended to limit the availability of military style assault weapons and other anti-personnel firearms. *See* Testimony of Delegate Peter Franchot concerning House Bill 1118. However, concerns were expressed that the proposed definition of "assault weapon" in the bills was too broad and might encompass "legitimate sporting, hunting, and recreational arms." *See, e.g.*, Letter of Colonel Leonard J. Supenski to Delegate Robert L. Flanagan concerning House Bill 1118 (February 19, 1989) ("Supenski Letter"); Testimony of Izaak Walton League concerning House Bill 1118.

With assistance from Maryland law enforcement officials, the proponents developed amendments to the bills to "provide a workable bill which balances the rights of hunters and sportsmen with the right of the public to be protected from the proliferation of such anti-personnel firearms." Supenski Letter; *see also* Letter of Delegates John Gary and Peter Franchot (February 22, 1989). The amendments deleted the generic language in the definition of "assault weapon" and, instead, expanded the list of named weapons to 24 enumerated firearms "or their copies regardless of which company produced and manufactured that firearm." The amendments also provided that the sale or transfer of assault weapons would be regulated in the same manner as the sale or transfer of pistols and revolvers and directed the State Police to adopt regulations for that purpose. The House version of the bill received an unfavorable report, but the Senate version, as thus

amended, was enacted as Chapter 293, Laws of Maryland 1989. The new assault weapons law, including that definition, was codified at Annotated Code of Maryland, Article 27, §481E.[5]

Thus, the apparent compromise that was struck to achieve passage of the bill was to eliminate the generically-described categories and limit the range of weapons subject to the new law to "copies" of specifically-named weapons. Given the objections to the original proposed definition, it seems unlikely that the General Assembly contemplated that a superficial similarity alone to a listed gun would suffice to bring a weapon within the statute. Instead, it limited the reach of regulation to weapons that functioned in a very similar manner.

*"Assault Weapons" Included in the Definition of "Regulated Firearm"*

In 1996, the Legislature further tightened regulation of assault weapons and handguns in the Maryland Gun Violence Act of 1996. Chapters 561, 562, Laws of Maryland 1996. As part of that legislation, the term "regulated firearm" was added to the law to encompass both assault weapons and handguns. The definition of "assault weapon," newly codified in Article 27, §441(d), contained the same list of specific weapons as the prior version and continued to include "copies" of the listed firearms, "regardless of which company produced and manufactured that firearm." As originally drafted, the bill would have expanded the list of enumerated weapons to include "any other firearm defined as an assault weapon by federal law"; however, that provision was amended out of the final versions of the bills.

In 2003, as part of the code revision process, the regulation of firearms was recodified in the new Public Safety Article. As part of that revision, the definition of "assault weapon" was incorporated into the definition of "regulated firearm," in new PS §5-101(p). Minor changes in the wording of the definition were not intended to

---

[5] In 1994, the Legislature revised the list of specific firearms set forth in the definition of "assault weapon." Chapter 456, Laws of Maryland 1994. As part of that revision, the legislation removed from the list certain assault pistols that were otherwise being banned under other provisions of that legislation; the bill also added to the list other assault weapons "that have come into existence since the creation of the list." Senate Floor Report for Senate Bill 619 (1994). The statute continued to cover "copies" of all listed firearms.

effect any substantive change.  *See* Chapter 5, §2, Revisor's Note, Laws of Maryland 2003 at p. 211.

### C.   Summary

   While the regulated firearms law does not define "copy," the statutory definition of "firearm" and the specifications in the list of named assault weapons both suggest that a weapon must have more than a cosmetic similarity to be a "copy."  Moreover, in enacting and amending the law regarding "assault weapons," the General Assembly  has rejected attempts to define "assault weapons" broadly, based on general characteristics or a reference to the more inclusive federal definition.  Instead, it has chosen to establish a list of specific weapons, and in some cases, specific calibers. Interpreting "copy" to include any firearm that merely looked like one of the enumerated firearms would run contrary to the choices made by the Legislature.

   As the proponents of the original 1989 legislation indicated when they crafted the amendments to achieve its passage, the purpose of listing specific weapons and their "copies" was to distinguish "anti-personnel" assault weapons from firearms used by hunters and sportsmen that might fall within a more generic definition.  Consistent with the General Assembly's apparent intent to create a definition with an eye toward the function of the weapon, a "copy" would include a firearm whose internal components and function, necessary to the operation of the firearm, are similar to those of one of the specifically enumerated assault weapons.  As the agency charged with administering the regulated firearms law, the Department of State Police must make that assessment.


### III

### Conclusion

   For the reasons set forth above, it is our opinion that the reference to "copies" in PS §5-101(p)(2) does not extend the regulated firearms law to weapons that bear a mere cosmetic similarity to a listed weapon.  Rather, in order for a firearm to be considered a copy of a listed assault weapon, and therefore governed by the regulated firearms law, there must be a similarity between the internal components and function of the firearm in question and those of one of the listed weapons.  A determination as to whether

a particular firearm bears such similarity is a factual question entrusted in the first instance to the Department of State Police.

Douglas F. Gansler
*Attorney General*

Mark H. Bowen
*Assistant Attorney General*

Robert N. McDonald
*Chief Counsel*
  *Opinions and Advice*

Exhibit C


To Declaration of Captain Dalaine M. Brady

**Maryland Automated Firearms Services System Data**

12/18/2013

## 1. Hand guns (Type "A" and "R").

| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # Appl's. | 37,884 | 29,550 | 28,320 | 23,470 | 21,950 | 26,284 | 29,478 | 23,221 | 20,223 | 18,874 | 18,258 | 20,377 | 21,782 | 24,199 | 29,102 | 33,743 | 31,717 | 38,728 | 55,475 | 41,367 |
| # Xfers (approved). | 37,825 | 29,445 | 28,316 | 23,467 | 21,940 | 26,275 | 29,444 | 22,849 | 19,863 | 18,395 | 17,844 | 19,727 | 21,195 | 23,657 | 28,364 | 32,891 | 31,262 | 38,338 | 54,504 | 40,663 |
| # disapp. | 54 | 101 | 0 | 0 | 0 | 1 | 4 | 7 | 3 | 3 | 5 | 2 | 4 | 3 | 16 | 10 | 6 | 7 | 17 | 31 |
| # Other Disp's | 5 | 4 | 4 | 3 | 10 | 7 | 30 | 365 | 357 | 476 | 409 | 648 | 583 | 539 | 722 | 842 | 449 | 383 | 954 | 673 |

## 2. Type "O" (Frames/Receivers).

| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # Appl's. | 728 | 687 | 713 | 863 | 911 | 1,706 | 2,192 | 1,392 | 1,024 | 1,199 | 883 | 1,089 | 1,455 | 1,988 | 2,195 | 1,809 | 1,451 | 1,803 | 3,589 | 5,163 |
| # transfers (approved). | 728 | 683 | 713 | 863 | 908 | 1,698 | 2,185 | 1,369 | 1,005 | 1,172 | 869 | 1,054 | 1,417 | 1,931 | 2,128 | 1,762 | 1,423 | 1,782 | 3,520 | 5,083 |
| #disapproved | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 1 | 2 | 4 | 0 | 1 | 1 | 2 |
| # Other Disps | 0 | 0 | 0 | 0 | 3 | 8 | 7 | 23 | 17 | 27 | 14 | 30 | 38 | 56 | 65 | 43 | 19 | 20 | 68 | 78 |

## 3. Regulate Firearms (all firearm types in MAFSS).

| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # Appl's. | 40,301 | 31,066 | 29,761 | 24,986 | 23,846 | 31,928 | 33,925 | 27,296 | 23,154 | 21,807 | 21,287 | 23,766 | 25,789 | 29,423 | 35,525 | 41,688 | 37,909 | 45,912 | 69,693 | 56,592 |
| # Xfers (approved) | 40,095 | 30,814 | 29,648 | 24,895 | 23,513 | 29,497 | 33,493 | 26,231 | 22,349 | 20,971 | 20,421 | 22,702 | 24,790 | 28,544 | 34,532 | 40,612 | 37,296 | 45,335 | 68,313 | 55,458 |
| # disapp. | 56 | 106 | 0 | 0 | 0 | 1 | 4 | 8 | 5 | 3 | 5 | 2 | 4 | 4 | 18 | 16 | 6 | 8 | 20 | 33 |
| #Other Disps | 150 | 146 | 113 | 91 | 333 | 2,438 | 428 | 1,057 | 800 | 833 | 861 | 1,062 | 995 | 875 | 975 | 1,060 | 607 | 669 | 1,360 | 1,101 |

## 4. Assault Weapons (Type "X").

| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # Appl's. | 1,539 | 686 | 619 | 562 | 637 | 859 | 1,079 | 1,182 | 1,124 | 1,263 | 1,493 | 1,728 | 2,055 | 2,810 | 3,958 | 5,957 | 4,602 | 5,108 | 10,176 | 9,664 |
| # Xfers (approved). | 1,535 | 684 | 619 | 561 | 637 | 858 | 1,067 | 1,145 | 1,095 | 1,223 | 1,470 | 1,660 | 1,994 | 2,749 | 3,879 | 5,849 | 4,539 | 5,050 | 9,963 | 9,516 |
| # disapp. | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| # Other Disps | 2 | 1 | 0 | 1 | 0 | 1 | 12 | 37 | 29 | 40 | 23 | 68 | 61 | 61 | 79 | 106 | 63 | 58 | 211 | 148 |