Exhibit 14

To Defendants' Memorandum in Support of Motion for

Summary Judgment



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

JUL 06 1989

MEMORANDUM TO:   Director

FROM:   Associate Director (Compliance Operations)

SUBJECT:   Report and Recommendation on the Importability of Certain Semiautomatic Rifles

The working group has completed its evaluation of the semiautomatic rifles whose importation was suspended pending a determination as to whether these weapons are, as required by 18 U.S.C. § 925(d)(3), of a type "generally recognized as particularly suitable for or readily adaptable to sporting purposes".

Attached for your review and approval is the report and recommendation on the importability of these rifles.

*Daniel R. Black*
Daniel Black

Attachment

Approved: *Stephen E. Higgins 7/6/89*

Disapprove: _____

# REPORT AND RECOMMENDATION OF THE ATF WORKING GROUP ON THE IMPORTABILITY OF CERTAIN SEMIAUTOMATIC RIFLES

## SUSPENSION OF ASSAULT-TYPE RIFLE IMPORTATIONS

On March 14, 1989, ATF announced that it was suspending, effective immediately, the importation of several makes of assault-type rifles, pending a decision as to whether these weapons meet the statutory test that they are of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes. The announcement stated that ATF would not approve, until further notice, the importation of AKS-type weapons, Uzi carbines, FN/FAL-type weapons, FN/FNC-type weapons and Steyr Aug semiautomatic weapons. On April 5, 1989, the suspension was expanded to include all similar assault-type rifles.

For purposes of this suspension, assault-type rifles were rifles which generally met the following criteria:

    a. military appearance

    b. large magazine capacity

    c. semiautomatic version of a machinegun

Based on these criteria, ATF suspended action on pending applications and suspended outstanding permits covering certain firearms listed in Attachment 1. These included both centerfire and .22 rimfire caliber firearms. At that time, ATF indicated that the reexamination of these weapons would take approximately 90 days.

This ATF working group was established to conduct the reevaluation of the importability of these semiautomatic rifles. This report represents the findings and recommendations of the working group.

## BACKGROUND

Section 925(d)(3) of Title 18, United States Code, as amended, provides in pertinent part that:

> The Secretary shall authorize a firearm. . .to be imported or brought into the United States . . if the firearm . .
>
> > (3) is of a type that does not fall within the definition of a firearm as defined in section 5845(a) of the Internal Revenue Code of 1954 and is generally recognized as particularly suitable for or readily

                adaptable to sporting purposes, excluding surplus
                military firearms...

This provision was originally enacted by Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, and was also contained in Title I of the Gun Control Act of 1968, which amended Title IV later that year. According to the Senate Report on Title IV, this provision was intended to "curb the flow of surplus military weapons and other firearms being brought into the United States which are not particularly suitable for target shooting or hunting." S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News 2112, 2167.

Moreover, there is legislative history which indicates that Congress intended the standard to allow the importation of traditional sporting rifles, while excluding military-type rifles. The Senate Report on the Gun Control Act observed that the importation standards "... are designed and intended to provide for the importation of quality made, sporting firearms, including ... rifles such as those manufactured and imported by Browning and other such manufacturers and importers of firearms." S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968). Significantly, the rifles being imported by Browning at that time were semiautomatic and manually operated traditional sporting rifles of high quality.[1]

An explanation of the effect of this section by one of the sponsors of the bill specifically stated that military firearms would not meet the "sporting purposes" test for importation. The mere fact that a military firearm may be used in a sporting event does not make it importable as a sporting firearm[2].

There is a reference in the Senate Report on Title IV which notes that the importation prohibition "... would not interfere with the bringing in of currently produced firearms, such as rifles ... of recognized quality which are used for hunting and for recreational purposes, or for personal protection." S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News 2112, 2167. However, this language is not inconsistent with the expressed purpose of restricting importation to firearms particularly suitable for target shooting or hunting since firearms particularly suitable for those purposes can obviously be used for other purposes such as recreational shooting and personal protection.

The determination of a weapon's suitability for sporting purposes "rest[s] directly with the Secretary of the Treasury." 114 Cong. Rec. 27465 (1968) (Statement of Sen. Murphy). While the legislative history suggests that the term "sporting purposes" refers to the traditional sports of target shooting, trap and skeet shooting, and hunting, the statute itself provides no criteria beyond the "generally recognized" language of section 925(d)(3). S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News 2167. The Senate Report on the Gun Control Act stated:

    The difficulty of defining weapons characteristics to meet this target [of eliminating importation of weapons used in crime] without discriminating against sporting quality firearms, was a major reason why the Secretary of the Treasury has been given fairly broad discretion in defining and administering the import prohibition.

S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

Following enactment of the Gun Control Act in 1968, the Secretary established a Firearms Evaluation Panel to provide guidelines for implementation of the "sporting purposes" test of section 925(d)(3). This panel was composed of representatives from the military, law enforcement, and the firearms industry. The panel focused its attention on handguns and recommended the adoption of factoring criteria to evaluate the various types of handguns. These factoring criteria are based upon such considerations as overall length of the firearm, caliber, safety features, and frame construction. An evaluation sheet (ATF Form 4590) was developed thereafter by ATF and put into use for evaluating handguns pursuant to section 925(d)(3). Attachment 2.

The 1968 Firearms Evaluation Panel did not propose criteria for evaluating rifles and shotguns under section 925(d)(3). Other than surplus military firearms which Congress addressed separately, long guns being imported prior to 1968 were generally conventional rifles and shotguns specifically intended for sporting purposes. Thus, in 1968, there was no cause to develop criteria for evaluating the sporting purposes of rifles and shotguns. Until recently, all rifles and shotguns were approved for importation so long as they were not otherwise excluded by section 925(d)(3). Only rifles and shotguns covered by the National Firearms Act (NFA), 26 U.S.C. S 5845(a) (for example, machineguns and short-barreled rifles and short-barreled shotguns), and surplus military rifles and shotguns had been denied importation.

The Firearms Evaluation Panel did briefly comment on whether a model BM59 Beretta, 7.62mm NATO Caliber Sporter Version Rifle was suitable for sporting purposes. Minutes of the Firearms Advisory Panel, December 10, 1968. Attachment 3. It was the consensus of the Panel that this rifle did have a particular use in target shooting and hunting. Accordingly, it was recommended that importation of the Beretta BM59, together with the SIG-AMT 7.62mm NATO Caliber Sporting Rifle and the Cetme 7.62mm NATO Caliber Sporting Rifle, be authorized for importation. (The Beretta BM59 and the Cetme, the predecessor to the HK91, are two of the rifles whose importation has been suspended. The SIG-AMT is no longer being produced.) However, the Panel recommended that importation of these weapons should include the restriction that they not possess combination flash suppressors/grenade launchers.

The working group found the Panel's consideration of these rifles to be superficial and unpersuasive. The vast majority of the work of the 1968 Panel was devoted to handguns and the establishment of the factoring criteria for the importation of handguns. Indeed, we found compelling evidence that these rifles are not generally recognized as particularly suitable for sporting purposes.

The first time that ATF looked beyond the restrictions on NFA and surplus military rifles and shotguns and undertook a meaningful analysis under the "sporting purposes" test was in 1984. At that time, ATF was faced with a new breed of imported shotgun. It was clear that the historical assumption that all shotguns were sporting was no longer viable. Specifically, ATF was asked to determine whether the Striker-12 shotgun was suitable for sporting purposes. This shotgun is a military/law enforcement weapon initially designed and manufactured in South Africa for riot control. When the importer was asked to provide evidence of sporting purposes for the weapon, ATF was provided information that the weapon was suitable for police/combat style competitions. ATF determined that this type of competition did not constitute "sporting purposes" under the statute, and that this shotgun was not suitable for traditional sporting purposes, such as hunting, and trap and skeet shooting. Accordingly, importation was denied. Attachment 4.

Page 4

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

DEF 003233

Thereafter, in 1986, the Gilbert Equipment Company requested that the USAS-12 shotgun be classified as a sporting firearm under section 925(d)(3). After examination and testing of the weapon, ATF found that it was a semiautomatic version of a selective fire military-type assault shotgun. In this case, ATF determined that, due to its weight, size, bulk, designed magazine capacity, configuration, and other factors, the USAS-12 was not particularly suitable for or readily adaptable to sporting purposes. Again, ATF refused to recognize police/combat competitions as a sporting purpose under section 925(d)(3). The shotgun was reviewed on the basis of its suitability for traditional shotgun sports of hunting, and trap and skeet shooting and its importation was denied. Attachment 5. This decision was upheld by the United States District Court in Gilbert Equipment Company, Inc. v. Higgins, 709 F. Supp. 1071 (S.D. Ala. 1989). The case is currently on appeal to the Eleventh Circuit.

These two cases involving shotguns represent ATF's first thorough examination of the suitability of certain combat-type weapons for sporting purposes. In these cases ATF adopted an interpretation of sporting as being limited to certain traditional sports and not simply any lawful activity in which the weapons might be employed.

## ANALYSIS

A. <u>Defining the type of weapon under review</u>.

As noted above, section 925(d)(3) expressly provides that the Secretary shall authorize the importation of a firearm that is of a <u>type</u> that is generally recognized as particularly suitable for sporting purposes. The legislative history also makes it clear that the Secretary shall scrutinize types of firearms in exercising his authority under section 925(d). Specifically, in its explanation of section 925(d)(3), the Senate Report on the Gun Control Act stated:

> This subsection gives the Secretary authority to permit the importation of ammunition and certain <u>types</u> of firearms--(1) those imported for scientific or research purposes or for use in competition or training under chapter 401 of title 10 of the United States Code; (2) an unserviceable firearm other than a machinegun; (3) those firearms not coming within the purview of the National Firearms Act (26 U.S.C. 5801, <u>et seq.</u>) and suitable for sporting purposes (in the case of surplus military weapons this type is limited to shotguns and rifles) and those taken out of the United States. (Emphasis added.)

S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

In light of the statutory mandate that types of firearms be scrutinized, the working group first attempted to determine whether the semiautomatic rifles suspended from importation fall within a type of firearm.

The working group determined that the semiautomatic rifles in question are generally semiautomatic versions of true selective fire military assault rifles.[3] As a class or type of firearm they are often referred to as "assault rifles," "assault-type rifles," "military style rifles," or "paramilitary rifles."[4] Since we are only concerned with semiautomatic rifles, it is somewhat of a misnomer to refer to these weapons as "assault rifles." True assault rifles are selective fire

Page 5

**Report and Recommendation on the Importability of Certain Semiautomatic Rifles**

DEF 3234

weapons that will fire in a fully automatic mode.[5] For the purposes of this paper, it was necessary to settle on one term that best describes the weapons under consideration, and we will refer to these weapons as "semiautomatic assault rifles." They represent a distinctive type of rifle distinguished by certain general characteristics which are common to the modern military assault rifle. The modern military assault rifle, such as the U.S. M16, German G3, Belgian FN/FAL, and Soviet AK47, is a weapon designed for killing or disabling the enemy and, as described below, has characteristics designed to accomplish this purpose.

We found that the modern military assault rifle contains a variety of physical features and characteristics designed for military applications which distinguishes it from traditional sporting rifles.[6] These military features and characteristics (other than selective fire) are carried over to the semiautomatic versions of the original military rifle. These features and characteristics are as follows:

1. Military Configuration.

    a. Ability to accept a detachable magazine. Virtually all modern military firearms are designed to accept large, detachable magazines.[7] This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload. Thus, large capacity magazines are indicative of military firearms. While detachable magazines are not limited to military firearms, most traditional semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity. In addition, some States have a limit on the magazine capacity allowed for hunting, usually 8 rounds or less.[8] That a firearm is designed and sold with a large capacity magazine, e.g., 20-30 rounds, is a factor to be considered in determining whether a firearm is a semiautomatic assault rifle.

    b. Folding/telescoping stocks. Many military firearms incorporate folding or telescoping stocks.[9] The main advantage of this item is portability, especially for airborne troops. These stocks allow the firearm to be fired from the folded position, yet it cannot be fired nearly as accurately as with an open stock. With respect to possible sporting uses of this feature, the folding stock makes it easier to carry the firearm when hiking or backpacking. However, its predominant advantage is for military purposes, and it is normally not found on the traditional sporting rifle.

    c. Pistol grips. The vast majority of military firearms employ a well-defined pistol grip that protrudes conspicuously beneath the action of the weapon.[10] In most cases, the "straight line design" of the military weapon dictates a grip of this type so that the shooter can hold and fire the weapon. Further, a pistol grip can be an aid in one-handed firing of the weapon in a combat situation. Further, such grips were designed to assist in controlling machineguns during automatic fire. On the other hand, the vast majority of sporting firearms employ a more traditional pistol grip built into the wrist of the stock of the firearm since one-handed shooting is not usually employed in hunting or competitive target competitions.

    d. Ability to accept a bayonet. A bayonet has distinct military purposes.[11] First, it has a psychological affect on the enemy. Second, it enables soldiers to fight in close quarters

with a knife attached to their rifles. We know of no traditional sporting application for a bayonet.

    e. Flash suppressor. A flash suppressor generally serves one or two functions. First, in military firearms it disperses the muzzle flash when the firearm is fired to help conceal the shooter's position, especially at night. A second purpose of some flash suppressors is to assist in controlling the "muzzle climb" of the rifle, particularly when fired fully automatic.[12] From the standpoint of a traditional sporting firearm, there is no particular benefit in suppressing muzzle flash. Those flash suppressors which also serve to dampen "muzzle climb" have a limited benefit in sporting uses by allowing the shooter to reacquire the target for a second shot. However, the barrel of a sporting rifle can be modified by "magna-porting" to achieve the same result. There are also muzzle attachments for sporting firearms to assist in the reduction of muzzle climb. In the case of military-style weapons that have flash suppressors incorporated in their design, the mere removal of the flash suppressor may have an adverse impact on the accuracy of the firearm.

    f. Bipods. The majority of military firearms have bipods as an integral part of the firearm or contain specific mounting points to which bipods may be attached.[13] The military utility of the bipod is primarily to provide stability and support for the weapon when fired from the prone position, especially when fired fully automatic. Bipods are available accessory items for sporting rifles and are used primarily in long-range shooting to enhance stability. However, traditional sporting rifles do not come equipped with bipods, nor are they specifically designed to accommodate them. Instead, bipods for sporting firearms are generally designed to attach to a detachable "sling swivel mount" or simply clamp onto the firearm.

    g. Grenade launcher. Grenade launchers are incorporated in the majority of military firearms as a device to facilitate the launching of explosive grenades.[14] Such launchers are generally of two types. The first type is a flash suppressor designed to function as a grenade launcher. The second type attaches to the barrel of the rifle either by screws or clamps. We are not aware of any particular sporting use for grenade launchers.

    h. Night sights. Many military firearms are equipped with luminous sights to facilitate sight alignment and target acquisition in poor light or darkness.[15] Their uses are generally for military and law enforcement purposes and are not usually found on sporting firearms since it is generally illegal to hunt at night.

2. Whether the weapon is a semiautomatic version of a machinegun.

    The vast majority of modern military firearms are selective fire, i.e., they can shoot either fully automatic or semiautomatic. Since machineguns are prohibited from importation (except for law enforcement use) the manufacturers of such weapons have developed semiautomatic versions of these firearms.[16]

3. Whether the rifle is chambered to accept a centerfire cartridge case having a length of 2.25 inches or less.

Page 7

**Report and Recommendation on the Importability of Certain Semiautomatic Rifles**

DEF003236

Modern military assault rifles and submachineguns are generally chambered to accept a centerfire cartridge case of 2.25 inches or less.[17] On the other hand, while many traditional sporting rifles will fire a cartridge of 2.25 inches or less, such firearms usually do not have the other military features outlined in Items 1a-h.

These features and characteristics are not usually found on traditional sporting firearms.[18] This is not to say that a particular rifle having one or more of the listed features should necessarily be classified as a semiautomatic assault rifle. Indeed, many traditional sporting firearms are . semiautomatic or have detachable magazines. Thus, the criteria must be viewed in total to determine whether the overall configuration places the rifle fairly within the semiautomatic assault rifle category.

Using these criteria, we determined that, on balance, all of the firearms on the original suspension list are properly included in the semiautomatic assault rifle category, with the exception of the .22 rimfire caliber rifles and the Valmet Hunter. While the .22 rimfire caliber rifles bear a striking resemblance to the true assault rifle, these rifles[19] employ, by and large, conventional .22 rimfire caliber semiautomatic mechanisms. Moreover, they are not semiautomatic versions of a machinegun and contain only a few of the other relevant characteristics. Further, the working group determined that, in general, .22 caliber rifles are generally recognized as suitable for small game hunting. The Valmet Hunter, while based on the operating mechanism of the AK47 assault rifle, has been substantially changed so that it is now akin to a traditional sporting rifle and does not properly fall within the semiautomatic assault rifle category. More specifically, its receiver has been modified and its pistol grips, bayonet, and flash suppressor have been removed. The trigger mechanism has been moved to the rear of the modified receiver to facilitate its use with a traditional sporting stock. Also, its military-style sights have been replaced with traditional sporting-style sights. See Attachment 6.

B. Scope of "Sporting Purposes".

The second step of our process was to determine the scope of "sporting purposes" as used in the statute. This is a critical aspect of the process. The broadest interpretation could take in virtually any lawful activity or competition which any person or groups of persons might undertake. Under this interpretation, any rifle could meet the "sporting purposes" test. A narrower interpretation which focuses on the traditional sports of hunting and organized marksmanship competition would result in a more selective importation process.[20]

To determine the proper interpretation, we consulted the statute itself, its legislative history, applicable case law, the work of the original Firearms Evaluation Panel, and prior interpretations by ATF. In terms of the statute itself, the structure of the importation provisions would suggest a somewhat narrow interpretation. In this regard, firearms are prohibited from importation (section 922(1)) with certain specific exceptions (section 925(d)(3)). A broad interpretation which permits virtually any firearm to be imported because someone may wish to use it in some lawful shooting activity would render the statute meaningless.

As discussed earlier, the legislative history suggests a narrow meaning and indicates that the term "sporting purposes" refers to the traditional sports of target shooting, skeet and trap shooting, and hunting. Moreover, the history discussed earlier strongly suggests that Congress intended the provision to allow the importation of traditional sporting type rifles while excluding military type rifles. There is nothing in its history to indicate that it was intended to recognize every conceivable

type of activity or competition which might employ a firearm. To the contrary, the history indicates that mere use in some competition would not make the rifle a sporting rifle.

Finally, the 1968 Firearms Evaluation Panel specifically addressed at least one informal shooting activity and determined that it was not a legitimate sporting purpose under the statute. The panel addressed what is commonly referred to as "plinking" (shooting at randomly selected targets such as bottles and cans). It was the Panel's view that "while many persons participated in this type of activity and much ammunition was expended in such endeavors, it was primarily a pastime and could not be considered a sport for the purposes of importation. . ."
See Attachment 3.

Based on the above, the working group determined that the term "sporting purpose" should properly be given a narrow reading. It was determined that while hunting has been a recognized rifle sport for centuries, and competitive target shooting is a recognized rifle sport, the so-called activity of plinking is not a recognized sport. Moreover, we believe that reference to sporting purposes was intended also to stand in contrast to military and law enforcement applications. Consequently, the working group does not

believe that police/combat-type competitions should be treated as sporting activities. This position is supported by the court's decision in Gilbert Equipment Company, Inc., v Higgins, 709 F. Supp. 1071 (S.D. Ala. 1989) and is consistent with prior interpretations of ATF as noted on pages 4 and 5 in discussing the Striker-12 shotgun and USAS-12 shotgun.

C. Suitability.

The final step in our review involved an evaluation of whether semiautomatic assault rifles are a type of rifle generally recognized as particularly suitable for or readily adaptable to the traditional sporting applications discussed above.

The criminal misuse of semiautomatic assault rifles is a matter of significant public concern and was an important factor in the decision to suspend their importation. Nevertheless, the working group did not consider criminal misuse as a factor in its analysis of the importability of this type of rifle. Instead, the working group confined its analysis to the question of whether this type of rifle meets the test provided in section 925(d)(3).

Rather than criminal misuse, our comprehensive examination of this issue focused on the legal analysis and technical assessment of these firearms discussed earlier. In addition, the working group used the information gathered under Items 1-7 outlined in the next section in determining whether this type of firearm is generally recognized as particularly suitable for sporting purposes. These items take into account technical and marketing data, expert opinions, the recommended uses of the firearms, and data on the actual uses for which the weapons are employed in this country.

In evaluating these firearms, we believe that all rifles which are fairly typed as semiautomatic assault rifles should be treated the same. Therefore, the fact that there may be some evidence that a particular rifle of this type is used or recommended for sporting purposes should not control its importability.[21] Rather, all findings as to suitability of these rifles as a whole should govern each rifle within this type.

This is consistent with the approach taken with respect to handguns since 1968. Although certain handguns may be used or recommended for sporting purposes, they may fall within the type of easily concealable handguns barred from importation by the administrative factoring criteria used by ATF to determine the importability of handguns. Furthermore, a pistol specifically designed for target shooting, but lacking a safety as required by the factoring criteria, would be a type of handgun prohibited from importation as not particularly suitable for sporting purposes for this reason. Finally, just as ATF allows handguns to be modified so as to meet the factoring criteria, a semiautomatic assault rifle could be modified into a sporting configuration and be importable, as was done in the case of the Valmet Hunter referred to earlier.

D. Evaluation of Information from Outside Sources

As part of our comprehensive analysis as to whether semiautomatic assault rifles meet the statutory criteria for importation, the following sources of information were also considered:

1. How has the weapon been advertised, marketed and categorized by the manufacturer and/or importer?

2. How has the use of the rifle been described by firearms technical writers?

3. What is the rifle's reported use by importers?

4. Do hunting guides recommend the rifle?

5. Do editors of hunting magazines recommend the rifle?

6. Is the rifle used in target shooting competitions?

7. Do State game commissions allow the use of the rifle to hunt?

Items 1-6 focus upon how the rifles are marketed, advertised, and recommended for use. Item 7 addresses the legal restrictions pertaining to the use of the weapons for sporting purposes.

The working group reviewed the advertising and marketing literature concerning each of the weapons (Item 1) and reviewed evaluations of the firearms by technical writers (Item 2). In addition, the working group solicited information from the importers of the weapons and other knowledgeable sources (Items 3-6).

Questionnaires were drafted and sent out to licensed hunting guides, State game and fish commissions, local hunting associations, competitive shooting groups, and hunting/shooting magazine editors to determine the extent to which the weapons are used for sporting purposes or recommended for such use. The working group believed that the actual uses of the weapons for sporting purposes would be a factor to be considered in determining whether this type of rifle meets the sporting purposes test.

The review of advertising and marketing literature indicates that these rifles are not generally marketed for hunting or competitive shooting. The review of the technical evaluations revealed that these rifles are not regarded as suitable for these sporting activities.22

To the extent that the technical evaluations made recommendations with respect to the use of the rifles suspended from importation, the majority recommended them for law enforcement or military use or for activities such as collecting, plinking, home and self-defense, and combat target shooting. Only 5 of over 50 evaluations reviewed contained recommendations for the use of these firearms for hunting purposes.

The importers were asked to submit information concerning the sporting uses of the semiautomatic rifles they import. Thirty-nine importers were asked to submit this information and 19 responded. In general, their comments were conclusory and stated that their weapons could be used for sporting purposes. A small number of importers, e.g., Gun South, Inc., and Heckler & Koch, Inc., provided more specific data showing the sporting uses made of their firearms by their customers.

Of 3 hunting associations to whom questionnaires were sent, 2 responded. They stated that they place no restrictions on the use of semiautomatic rifles by their members, on the minimum caliber of ammunition used to hunt large game, or on the number of rounds allowed in semiautomatic rifle magazines. However, over 1,800 hunting guides were sent questionnaires and, of these, 706 responded. Over 73 percent of those responding indicated that their patrons used either bolt or lever action rifles for hunting. Only 10 of the 706 guides indicated that their patrons had used any of the rifles whose importation had been temporarily suspended.

Of the 20 hunting/shooting editors to whom questionnaires were sent, 14 responded. Nine of the fourteen editors recommended semiautomatic rifles for use in hunting large game, including 5 who recommended use of any of the rifles subject to the temporary suspension. Eleven of the fourteen editors recommended semiautomatic rifles for target competitions, including 7 who recommended semiautomatic assault rifles for such use.

The recommendations of editors were contradictory. One editor pointed out that what made the assault rifle successful as a military weapon made the semiautomatic version totally unfit for any other use. On the other hand, another editor stated that semiautomatic rifles had certain advantages over conventional sporting rifles especially for the physically disabled and left-handed shooters. While this may be true, there appears to be no advantage to using a semiautomatic assault rifle as opposed to a semiautomatic sporting rifle.

A total of 54 competitive shooting groups were sent a questionnaire and 53 groups responded (some of the responses were from unsolicited groups). Fifty of these groups indicated that they sponsor high power rifle competition events. While none of the groups prohibited the use of the semiautomatic assault rifles in their competitions, none stated that any of the rifles covered by the temporary suspension were used in a specific event.

Finally, the information gathered under Item 7 reveals that most of these weapons could legally be used in most States for most hunting purposes.

The working group reviewed all of the information gathered under Items 1-6 and determined that while these weapons may legally be used for sporting purposes in most States, the evidence was compelling that, as a type of firearm, the semiautomatic assault rifle is not generally recognized as particularly suitable for sporting purposes. The working group found persuasive the technical and expert evaluations of these firearms which generally did not recommend them as particularly suitable for sporting purposes. The group was also impressed by the comments of the hunting guides which showed that these rifles were not widely used for hunting purposes. The comments of the hunting guides are consistent with the opinion of the technical experts who generally do not recommend the rifles for hunting purposes.

The opinions of the editors were fairly divided with respect to the sporting uses of these rifles. The importers generally recommended their own weapons for such uses. The competitive shooting groups indicated that the rifles could be used in certain shooting events. Thus, while there was some evidence that these rifles could be used for hunting and target shooting, there was no evidence of any widespread use for such purposes. The mere fact that they are not generally prohibited from use for sporting purposes does not mean that the rifles meet the test for importation.

## CONCLUSIONS

The working group has dealt with a complex issue, the resolution of which has required the group to take into account interpretations of law, technical assessments of firearms and their physical characteristics, marketing data, the assessment of data compiled from responses to questionnaires and, finally, Bureau expertise with respect to firearms. We fully recognize that particular findings as well as the results will be controversial.

From the cross section of representation within ATF, we have brought to bear our technical, legal, and administrative expertise to resolve the issues in what we believe to be a fair manner, taking into consideration all points of view. While some of the issues were difficult to resolve, in the end we believe that the ultimate conclusion is clear and compelling. These semiautomatic assault rifles were designed and intended to be particularly suitable for combat rather than sporting applications. While these weapons can be used, and indeed may be used by some, for hunting and target shooting, we believe it is clear that they are not generally recognized as particularly suitable for these purposes.

The purpose of section 925(d)(3) was to make a limited exception to the general prohibition on the importation of firearms, to preserve the sportsman's right to sporting firearms. This decision will in no way preclude the importation of true sporting firearms. It will only prevent the importation of military-style firearms which, although popular among some gun owners for collection, self-defense, combat competitions, or plinking, simply cannot be fairly characterized as sporting rifles.

Therefore, it is the finding of the working group that the semiautomatic assault rifle is not a type of firearm generally recognized as particularly suitable for or readily adaptable to sporting purposes and that importation of these rifles should not be authorized under 18 U.S.C. § 925(d)(3).

Based on our evaluation, we recommend that the firearms listed on Attachment 7 not be authorized for importation. For the reasons discussed in this report, we recommend that the firearms listed on Attachment 8 be authorized for importation. These are the .22 rimfire caliber rifles and the Valmet Hunter which we do not believe are properly included in the category of semiautomatic assault rifles. Attachment 9 is a compilation of the responses from the questionnaires. Attachment 10 combines the criteria for identifying semiautomatic assault rifles and the items considered in assessing suitability. Attachments 11 and 12 contain the data compiled for each of the criteria listed in Attachment 10. Finally, Attachment 13 contains the source materials used in locating persons and organizations who were sent questionnaires.

## NOTES

1. Paul Wahl, ed., Gun Trader's Guide, 13th Edition, (South Hackensack, NJ. 1987), 155-162.

2. Although a firearm might be recognized as "suitable" for use in traditional sports, it would not meet the statutory criteria unless it were recognized as particularly suitable for such use. Indeed, Senator Dodd made clear that the intent of the legislation was to" [regulate] the importation of firearms by excluding surplus military handguns; and rifles and shotguns that are not truly suitable for sporting purposes." 114 Cong. Rec. 13325 (1968) (Statement of Sen. Dodd) [emphasis added].

    Similarly, it is apparent that the drafters of the legislation did not intend for "sports" to include every conceivable type of activity or competition which might employ a firearm; otherwise a "sporting purpose" could be advanced for every firearm sought to be imported. For example, in response to Sen. Hansen's question concerning the meaning of "sporting purposes" in the bill which became section 925(d), Senators Dodd and Hansen engaged in the following colloquy:

    > Mr. HANSEN. Would the Olympic shooting competition be a "sporting purpose? "
    >
    > Mr. DODD. I would think so.
    >
    > Mr. HANSEN. What about trap and skeet shooting?
    >
    > Mr. DODD. I would think so. I would think trap and skeet shooting would certainly be a sporting activity.
    >
    > Mr. HANSEN. Would the Camp Perry national matches be considered a "sporting purpose?"
    >
    > Mr. DODD. Yes: that would not [sic] fall in that arena. It should be described as a sporting purpose.
    >
    > Mr. HANSEN. I understand the only difference is in the type of firearms used at Camp Perry which includes a wide variety of military types as well as commercial.

> Would all of these firearms be classified as weapons constituting a "sporting purpose?"
>
> Mr. DODD. No. I would not say so. I think when we get into that, we definitely get into military type of weapon for use in matches like these at Camp Perry; but I do not think it is generally described as a sporting weapon. It is a military weapon. I assume they have certain types of competition in which they use these military weapons as they would in an otherwise completely sporting event. I do not think that fact would change the nature of the weapon from a military to a sporting one.
>
> Mr. HANSEN. Is it not true that military weapons are used in Olympic competition also?
>
> Mr. DODD. I do not know. Perhaps the Senator can tell me. I am not well informed on that.
>
> Mr. HANSEN. It is my understanding that they are. Would the Senator be inclined to modify his response if
> I say that is true? (27461)
>
> Mr. DODD. It is not that I doubt the Senator's word. Here again I would have to say that if a military weapon is used in a special sporting event, it does not become a sporting weapon. It is a military weapon used in a special sporting event. I think the Senator would agree with that. I do not know how else we could describe it.
>
> Mr. HANSEN. <u>If I understand the Senator correctly, he said that despite the fact that a military weapon may be used in a sporting event it did not, by that action become a sporting rifle Is that correct?</u>
>
> Mr. DODD. That would seem right to me ..... As I said previously the language says no firearms will be admitted into this country unless they are genuine sporting weapons...... I think the Senator and I know what a genuine sporting gun is.

114 Cong. Rec. 27461-62 (1968).(Emphasis added.)

3. Ken Warner, ed., <u>Gun Digest 1989</u>, (Northbrook, Il. 1988), pp. 293-300; William S. Jarrett, ed., <u>Shooter's Bible, No. 80</u>, (Hackensack, NJ. 1988), pp. 345-363; Edward Clinton Ezell, <u>Small Arms of the World</u>, (Harrisburg, Pa. 1983), p. 844; Pete Dickey, "The Military Look-Alikes," <u>American Rifleman</u>, (April 1980), p. 31. Also, see generally, Ian V. Hogg, ed., <u>Jane's Infantry Weapons, 1987-88</u>, (New York 1987); Jack Lewis, ed., <u>The Gun Digest Book of Assault Weapons</u>, (Northbrook, Il. 1986).

4. Art Blatt, "Tomorrow's State-of-the-Art Sporting Rifle," <u>Guns & Ammo</u>, (July 1981), p. 48; Jarrett, pp. 345-363; Warner, pp. 293-300.

5. Daniel D. Musgrave and Thomas B. Nelson, <u>The World's Assault Rifles</u>, (Virginia, 1967), p. 1.

6. See generally, Angus Laidlaw, ed., <u>Paul Wahl's Big Gun Catalog/1</u>, (Bogota, NJ. 1988); Musgrave and Nelson; Hogg; Jarrett; and Warner.

7. Ibid.

8. Arizona, 5 rounds; Colorado, 6 rounds; Michigan 6 rounds; New Hampshire, 5 rounds; New York, 6 rounds; North Carolina, 6 rounds; North Dakota, 8 rounds; Oregon, 5 rounds; Pennsylvania, semiautomatic rifles prohibited; Vermont, 6 rounds.

9. See generally, Hogg; Musgave and Nelson; Ezell; Warner; Jarrett; Laidlaw; and Lewis.

10. Ibid.

11. Ibid.

12. Ibid.

13. Ibid.

14. Ibid.

15. Ibid.

16. Ezell, p. 844; Dickey, p. 31.

17. Musgrave and Nelson, pp. 11-29; and, see generally, Hogg; and Ezell.

18. Ezell, pp.844-866; and, see generally, Warner; Jarrett; and Laidlaw.

19. See, for example, Walter Rickell, "The Plinker's AK GunsMagazine, (July 1986) p. 21; John Lachuk, "Bantam Battle Rifles," Guns & Ammo, (January 1987), p. 37; John Lachuk, ".22 Erma Carbine," Guns & Ammo, (May 1968), p. 58; JackLewis, "Something New: The AK in Twenty-Two," Gun World, (July 1985), p. 32; Roger Combs, "A Most Unique Carbine," Gun World, (December 1985), p. 28; Garry James, "Mitchell Arms AK-22," Guns & Ammo, (November 1985), p. 72.

20. See note 2, colloquy between Senators Dodd and Hansen.

21. Ibid.

22. See generally, bibliography.

# BIBLIOGRAPHY

"Armalite AR-180 Rifle," American Rifleman, (February 1981), 65-66.

"Beretta AR. 70 Rifle," American Rifleman, (March 1988), 64-66.

Blatt, Art. "Beretta M-70/Sport Rifle," Guns & Ammo, (December 1983), 64-65.

Blatt, Art. "Tomorrow's Sporting Rifles," Guns & Ammo, (July 1981), 48-57, 78, 79.

Bruce, Robert. "The AUG Assault System," Guns Magazine, (September 1986), 37-39, 42, 43, 57-61.

Clapp, Wiley. "Great To-Do With the Daewoo," The Gun Digest Book of Assault Weapons, (1986), 82-87.

Combs, Roger. "A Most Unique Carbine," Gun World, (December 1985), 28-31, 47.

Combs, Roger. "Galil 7.62mm Nato Rifle", Gun World, (October 1985), 32-36.

Combs, Roger. "The Avtomat Kalashnikov Goes .22," The Gun Digest Book of Assault Weapons, (1986), 182-195.

Combs, Roger. "The Uniquely Unique F-11," The Gun Digest Book of Assault Weapons, (1988), 188-195.

"Cooking and Heckling with H & K's HK94A3," Gun World, (August 1984), 18-20.

Davis, Russ. "Have Your AK and Shoot it, Too," Guns Magazine, (February 1987), 39, 62-64.

Dickey, Pete. "The Military Look-Alikes," American Rifleman, (April 1980), 30-31, 76.

Egolf, Dick. "Heckler & Koch's Super Semi-Auto," American Rifleman, (June 1985), 29-32, 65-67.

Ezell, Edward Clinton. Small Arms of the World. Harrisburg: Stackpole Books, 1983.

"FN FNC Rifle," American Rifleman, (January 1988), 58-60.

Ferguson, Tom. "A Hard Look at The AR-180", The Gun Digest Book of Assault Weapons, (1986), 121-127.

French, Howard. "H & K's 9mm Paracarbine," Guns & Ammo, (November 1983), 42-44.

Grennell, Dean A. "The Mitchell AK-47," Gun World, (September 1986), 40-41.

"Heckler & Koch 91," American Rifleman, (October 1981), 56-58.

"Heckler & Koch Model 94 Carbine," American Rifleman, (February 1988), 46-48.

Hogg, Ian V., ed. Janes' Infantry Weapons. 1987-1988. New York: Jane's Publishing Company, 1987.

Hunnicutt, Robert W. "The Bullpups Have Arrived", American Rifleman, (March 1987), 30-35, 70-71.

James, Frank W. "The Springfield Armory SAR-3, " Special Weapons and Tactics, (July 1989), 42-46.

James, Garry. "Austrailian L1A1A Rifle," Guns & Ammo, (December 1987),

James, Garry. "Chinese AK-47 .223," Guns & Ammo, (August 1986), 84-86.

James, Garry. "Mitchell Arms AK-22," Guns & Ammo, (November 1985), 72-73, 97.

James, Garry. "Mitchell Heavy Barrel AK-47," Guns & Ammo, (November 1986), 83-84.

James, Garry. "PTK Chinese M-14S Rifle," American Rifleman, (July 1988), 81-82.

James, Garry. "The SAR-48 Rifle, Springfield Armory Reproduces a Classic," Guns & Ammo, (August 1985), 64-66.

Jarrett, William S., ed. Shooter's Bible. No. 80. Hackensack: Stoeger Publishing Company, 1988.

Kapelsohn, Emanuel. "Steyr's Space-Age AUG," The Gun Digest Book of Assault Weapons, (1986), 45-49.

Karwan, Chuck. "The Fetching Famas," Gun World, (October 1988), 18-21, 78.

Karwan, Chuck. "The Rugged Rifles of Springfield Armory," Gun World, (March 1989), 72-76.

Karwan, Chuck. "ilalmet's Assault Family," The Gun Digest Book of Assault Weapons, (1986), 70-75.

Lachuk, John. ".22 Erma Carbine," Guns & Ammo, (May 1968), 58-60.

Lachuk, John. "Bantam Battle Rifles," Guns & Ammo, (January 1987), 36-39, 75-76.

Laidlaw, Angus, ed. Paul Wahl's Big Gun Catalog/1. Bogatao Paul Wahl Corporation, 1988.

Lewis, Jack, ed. The Gun Digest Book of Assault Weapons. Northbrook: DBI Books, Inc., 1986.

Lewis, Jack. "A Family Affair," The Gun Digest Book of Assault Weapons, (1986), 76-81.

Lewis, Jack. "EMF's Look-Alike AP-74," The Gun Digest Book of Assault Weapons, (1986), 166-171.

Lewis, Jack. "Something New: The AK in Twenty-Two," Gun World, (July 1985), 32-35.

Lewis, Jack. "Springfield's S.A.R. 48," The Gun Digit Book of Assault Weapons, (1968), 88-93.

Lewis, Jack. "The Why and How of Rimfires," The Gun Digest Book of Assault Weapons, (1986), 160-171.

Mason, James D. "The Maadi in America," Guns Magazine, (January 1983), 33-35, 78.

Musgrave, Daniel D. and Nelson, Thomas B. The World's Assault Rifles. Washington, DC: Goetz Company, 1967.

O'Meara, Robert. "The Guns of Israel," Guns Magazine, (January 1989), 33-35, 51.

Paige, Alan. "The AK-47 As A Bullpup?" Firepower, (January 1989), 48-53.

Rees, Clair. "Valmet M71-S," Guns & Ammo, (October 1976), 86, 137.

Rickell, Walter. "The Plinker's AK," Guns Magazine, (July 1986), 21.

Roberts, J.B. "Bernosky Wins His Fourth," American Rifleman, (Oct. 1980), 49-51.

Sanow, Ed. "National Match AK-47/S," Firepower, (January 1989), 66-71.

Shults, Jim. "The Mean Machine," Gun World, (April 1982), 26-28.

"Springfield Armory S.A.R. 48," American Rifleman, (March 1986), 57-58.

Steele, Kevin E. "Beretta BM-59," Guns Magazine, (January 1983), 14.

Steele, Kevin E. "Sporting Firearms Update," Guns Magazine, (Feburary 1980), 52-55, 79, 84-85.

"Steyr-AUG: The Terrible Toy," Gun World, (December 1984), 32-35.

Swenson, Thomas J. "The Incredible Uzi," Guns & Ammo, (Jaunary 1982), 32-36, 76.Tappan, Mel. "Survive: Survival Rifles-Part 2, " Guns & Ammo, (August 1978), 68, 96-97.

Traister, John. "AK Rifle: Chinese AKS or Type 56S," American Rifleman, (May 1988), 50-51.

"UZI Semi-Automatic .45 Carbine," American Rifleman, (January 1986), 59.

"Uzi Semi-Automatic Carbine," American Rifleman, (August 1981), 55-57.

DEF 003248

"Valmet M78 Rifle," American Rifleman, (April 1988), 64-66

Wahl, Paul, ed. Gun Trader's Guide, 13th Edition, South Hackensack: Stoeger Publishing Company, 1987.

Warner, Ken, ed. Gun Digest 1989. Northbrook: DBI Books, Inc., 1988.

Wood, J.B. "Beretta's AR70 Sporter," Guns Magazine, (March 1986), 38-39, 65-66.

Woods, Jim. "Firepower From the Far East-Daewoo," Guns Magazine, (February 1986), 28-29, 60-61.

Zwirz, Bob. "Valmet's Military Look," Gun World, (September 1988), 28-30.

> **NOTE:** This information was extracted from the document titled, **"Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles"**, published in a memorandum to the Director, Stephen E. Higgins from the Associate Director, Daniel R. Black and approved on July 6, 1989.