Exhibit 24

To Defendants' Memorandum in Support of Motion for

Summary Judgment



# Brady Center
## To Prevent Gun Violence

**Testimony of Brian J. Siebel**
**Senior Attorney**
**Brady Center to Prevent Gun Violence**
**Before the Council of the District of Columbia**
**October 1, 2008**

Thank you, Chairman Mendelson and other members of the Council, for inviting the Brady Center to Prevent Gun Violence to speak at this important committee hearing.

The Brady Center to Prevent Gun Violence and the Brady Campaign to Prevent Gun Violence are the nation's largest organizations working for sensible gun policies. The Legal Action Project of the Brady Center represents victims of gun violence and defends gun laws in the courts.

In addition to the other measures being suggested here today, which we support, the Brady Center and Brady Campaign strongly urge the Council to pass an assault weapons ban, a ban on .50 caliber sniper rifles, and retain its recently-passed ban on high-capacity ammunition magazines, as part of its process of strengthening the District's gun laws in light of the *Heller* decision.

### The Need for An Assault Weapons Ban

Assault weapons had been banned for more than 30 years under the broader D.C. ban on all semiautomatic weapons. However, now that that ban has been repealed, an assault weapon ban is needed to protect the people of the District, visitors, and law enforcement from these particularly dangerous weapons. An assault weapons ban would continue to allow law-abiding citizens to have common pistols in their homes for self-defense, and would remain in compliance with the *Heller* decision. We believe it is imperative for the Council, now that it has legalized common semiautomatic pistols, to restore a ban on military-style assault weapons.

### Assault Weapons Are "Mass Produced Mayhem"

Assault weapons are semiautomatic versions of fully automatic guns designed for military use. Even semiautomatic assault weapons unleash extraordinary firepower. When San Jose, California, police test-fired an UZI, a 30-round magazine was emptied in slightly less than two seconds on full automatic, while the same magazine was emptied in just five seconds on semiautomatic.

The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has described assault weapons in stark terms.

> Assault weapons were designed for rapid fire, close quarter shooting at human beings. That is why they were put together the way they were. You will not find these guns in a duck blind or at the Olympics. **They are mass produced mayhem.**[1]

Assault weapons have distinct features that separate them from sporting firearms.[2] While hunting rifles are designed to be fired from the shoulder and depend upon the accuracy of a precisely aimed projectile, the military features of semiautomatic assault weapons are designed to enhance their capacity to shoot multiple human targets very rapidly. Assault weapons are generally equipped with large-capacity ammunition magazines that allow the shooter to fire 20, 50, or even more than 100 rounds without having to reload. Pistol grips on assault rifles and shotguns help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position. Barrel shrouds on assault pistols protect the shooter's hands from the heat generated by firing many rounds in rapid succession. Far from being simply "cosmetic," these features all contribute to the unique function of any assault weapon to deliver extraordinary firepower. They are uniquely military features, with no sporting purpose whatsoever.

Accordingly, ATF has concluded that assault weapons "are not generally recognized as particularly suitable for or readily adaptable to sporting purposes" and instead "are attractive to certain criminals."[3] ATF's analysis of guns traced to crime showed that assault weapons "are preferred by criminals over law abiding citizens eight to one.... Access to them shifts the balance of power to the lawless."[4]

It is no accident that when a madman, Gian Luigi Ferri, decided to assault the law offices at 101 California Street in San Francisco, he armed himself with two TEC-9 assault weapons with 50 round magazines, which enabled him to kill eight people and wound six others.[5] Or that the Columbine high school shooters who killed 12 students and a teacher included a TEC-9 assault weapon in their arsenal. Or that James Huberty used an UZI assault pistol and a shotgun to kill 21 people and wound 19 others at a McDonald's in San Ysidro, California.[6] Or that Patrick Purdy used an AK-47 assault rifle to kill five children and wound 29 others and a teacher at an elementary School in Stockton, California. Equipped with a 75-round "drum" magazine, Purdy was able to shoot 106 rounds in less than two minutes.[7] The list goes on.

---

[1] ATF, *Assault Weapons Profile* 19 (1994) (emphasis added).

[2] *Id.* at 20.

[3] DEP'T OF TREASURY, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* 38 (1998).

[4] ATF, *Assault Weapons Profile, supra* note 1, at 19-20.

[5] *Ferri Used Guns That California Ban Does Not Forbid*, SAN FRANCISCO EXAMINER, July 4, 1993.

[6] *Satellite College Campus Helps to Heal the Scars at San Ysidro Massacre*, LOS ANGELES TIMES, Mar. 30, 1989; *A 77-Minute Moment in History That Will Never Be Forgotten*, LOS ANGELES TIMES, July 16, 1989.

[7] *The Kinds of Guns School Killer Used*, SAN FRANCISCO CHRONICLE, Jan. 19, 1989; Michael Taylor & Leslie Guevarra, *Mysterious Scrawlings and Slogans, School Killer's Last Days, Toy Army in his Room*, SAN FRANCISCO CHRONICLE, Jan. 19, 1989.

## Assault Weapons Threaten Law Enforcement

Law enforcement officers are at particular risk from these weapons because of their high firepower, which often leaves them outgunned by criminals. A researcher for the Department of Justice found that

> assault weapons account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful.[8]

Assault weapons have even been used in a brazen attack at D.C. Police Headquarters. On November 22, 1994, a man armed with a MAC-11 assault pistol walked into Metropolitan Police headquarters and shot and killed Sergeant Henry Daly and FBI Agents Mike Miller and Martha Martinez. The shooter seriously wounded FBI Agent John Kuchta and shot at couches, walls, computers, and desks before shooting and killing himself with Agent Martinez's gun.[9]

In addition, numerous law enforcement officers have been killed with high-firepower assault weapons. Here are a few recent examples:

- **Philadelphia, PA. May 3, 2008.** Officer Stephen Liczbinski was shot and killed by an assault rifle as he was responding to a robbery at a Bank of America branch. Three men robbed the bank and were fleeing when Officer Liczbinski stopped their car and exited his patrol car. At that time, one of the bank robbers opened fire with an SKS assault rifle, striking Liczbinski numerous times. One suspect was eventually shot and killed by police and the other two suspects were arrested and charged with murder.[10]

- **Miami, Florida. September 13, 2007.** Police spotted a vehicle driving erratically and followed it until it stopped in a residential complex. The suspect got out and hopped a fence to the rear of the home; the officers exited their patrol car and went to the front of the home and were granted permission to search by a female resident. The suspect grabbed a high-powered, military-grade rifle and fired at the police officers through a window, killing Officer Jose Somohano. The suspect then exited the house and shot three other officers as he escaped. The shooter was caught later that day but would not relinquish his assault rifle so he was shot and killed by police officers.[11]

---

[8] Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, U. Penn. Jerry Lee Center of Criminology 87 (June 2004).

[9] Brian Reilly, *Cop killers' guns similar; handgun converted to fiercer weapon*, THE WASHINGTON TIMES, May 1, 1995.

[10] Joseph A. Gambardello, *Liczbinski suspect's girlfriend to stand trial*, PHILADELPHIA INQUIRER, July 17, 2008; *Officer shot, killed after bank robbery*, NBC 10.COM, May 3, 2008; Sergeant Stephen Liczbinski, www.odmp.org, available at: http://www.odmp.org/officer/19359-sergeant-stephen-liczbinski (last visited Sept. 30, 2008).

[11] David Ovalle et. al., *The murder and the manhunt started in a South Miami-Dade townhouse, zigzagged...*, MIAMI HERALD, Sept. 15, 2007.

3

- **Chantilly, Virginia. May 8, 2006.** A teenager with an AK-47 and 5 handguns engaged in a firefight at a police station in suburban Virginia, killing Detective Vicky Armel immediately and wounding two other officers, one of whom, Officer Michael Garbarino, died nine days later from his injuries.[12]

The threat posed to law enforcement is one reason why major law enforcement organizations are united in supporting bans on assault weapons.

### Assault Weapons Threaten Civilians

Assault weapons have also been used to massacre and terrorize civilians. Who can forget the nightmare we lived through in the District of Columbia and surrounding communities during the attacks committed by the D.C. snipers. Their weapon of choice? A Bushmaster XM-15 assault rifle.

There have been hundreds of other shootings committed with semiautomatic assault weapons. Here, we list just a few recent examples:

- **Arvada & Colorado Springs, Colorado. December 9, 2007.** One man with an assault rifle attacked a missionary training center in Arvada and a church in Colorado Springs. He killed two people and injured two others in Arvada, and killed two and injured three others, including two teenage sisters, in Colorado Springs. He died after being shot by a security guard and then shooting himself.[13]

- **Omaha, Nebraska. December 5, 2007.** Nine people were shot to death and five others were injured after a 20-year-old shooter, armed with a military-style assault rifle, attacked shoppers in a department store in a Nebraska mall.[14]

- **Indianapolis, Indiana. June 2, 2006.** Seven family members, four adults and three children, were shot and killed in their home by a robber armed with an assault rifle. Nearly 30 shell casings were found.[15]

- **Tyler, Texas. February 25, 2005.** A gunman with a history of domestic violence and a felony conviction, who was reportedly fighting with his ex-wife over child support for their two youngest children, shot over 50 rounds from an SKS assault rifle on the steps of his local courthouse when his ex-wife exited the building. His ex-wife was killed along with a bystander who tried to shoot the gunman. The shooter's 23-year-old son and three law enforcement officers were wounded during the shooting, including a 28-year-old deputy who

---

[12] Ian Urbina, *Fatal police station attach shocks tranquil community*, NEW YORK TIMES, May 10, 2006; *Officer Killed*, BOSTON GLOBE, May 18, 2006.

[13] Erin Emery, *Report details church shooting, the document chronicles the days leading up to the Dec. 9 deaths of four young people*, DENVER POST, Mar. 13, 2008.

[14] *The American Way*, REGISTER-GUARD, Dec. 17, 2007.

[15] Ashley M. Heher, *Suspect in slaying of 7 family members surrenders / Indianapolis police say he had nowhere else to go*, HOUSTON CHRONICLE, June 4, 2006.

4

was in grave condition. The gunman fled the scene but was pursued and shot by police when he exited his car and shot toward officers.[16]

- **Akron, Ohio. February 24, 2005.** A man shot and killed his girlfriend and her seven-year old son using an AR-15 assault weapon, then fired more than one hundred rounds at a dozen law enforcement officers as he fled the murder scene. The gunman was arrested the next morning inside the apartment of a Kent State University student, who he also murdered with the AR-15 assault weapon. Police subsequently seized 21 weapons kept by the suspect, including an Uzi and an AK-47.[17]

### Assault Weapons Threaten Homeland Security

These weapons pose particular and severe risks for homeland security here in the Nation's Capital. The extraordinary firepower of these weapons could wreak havoc at any number of high-profile sites or events that occur in Washington, or victimize any number of high-profile targets, from government officials to foreign dignitaries.

And make no mistake: these weapons have great appeal for terrorists. The oft-seen file footage of Osama Bin Laden, aiming his AK-47 at an unknown target, is now a familiar reminder of the incontrovertible connection between terrorism and assault weapons.

The *Chicago Tribune* has reported that, found among the mounds of rubble at a training facility in Kabul for a radical Pakistan-based Islamic terrorist organization, was a manual entitled "How Can I Train Myself for Jihad" containing an entire section on "Firearms Training."[18] Tellingly, the manual singles out the United States for its easy availability of firearms and stipulates that al-Qaeda members living in the United States "obtain an assault weapon legally, preferably AK-47 or variations."

Terrorists have used assault weapons in numerous attacks. I am going to mention just one that is close to home.

- **Langley, Virginia, January 25, 1993.** Pakistani national Mir Aimal Kasi killed two CIA employees and wounded three others outside the entrance to CIA headquarters in Langley, Virginia. Kasi used a Chinese-made semiautomatic AK-47 assault rifle equipped with a 30-round magazine purchased from a Northern Virginia gun store.[19] After fleeing the country, he was arrested in Pakistan in 1997.[20]

---

[16] Bill Hanna & Jack Douglas Jr., *Rampage in Tyler leaves three dead, four wounded*, FORT WORTH STAR-TELEGRAM, Feb. 25, 2005; Jack Douglas Jr. & Bill Hanna, *Police order emergency trace on weapon used in shootings*, FORT WORTH STAR-TELEGRAM, FEB. 26, 2005.

[17] Ed Meyer, *Police eye semiautomatic rifles, Brimfield officials want to be prepared after recent shooting rampage that killed 3 people*, AKRON BEACON JOURNAL, Feb. 24, 2005.

[18] Paul Salopek, *A Chilling Look into Terror's Lair*, CHICAGO TRIBUNE, Nov. 18, 2001.

[19] *CIA Killings Prompt Scrutiny on 2 Fronts; Fairfax Loophole Expedited Gun Purchase*, WASHINGTON POST, Feb. 11, 1993.

[20] Robert O'Harrow, Jr., *Kansi's Shadowy Stay in U.S. Leaves a Hazy Portrait*, WASHINGTON POST, Mar. 3, 1993.

5

### .50 Caliber Sniper Rifles Pose Serious Dangers

Fifty caliber sniper rifles also pose an extraordinary risk in the District. In 1987, Barrett Firearms Manufacturing Inc., patented its self-described "armor-penetrating" .50 caliber BMG sniper rifle.[21] Capable of destroying armored personnel carriers, aircraft and bulk fuel and ammunition sites, the .50 caliber sniper rifle is now proliferating in the civilian market.[22] Accurate at up to 2,000 yards, it can inflict effective damage to targets over four miles away.[23] With more power on impact then any other semi-automatic rifle legally available on the civilian market,[24] the .50 caliber represents a serious threat to local law enforcement and national security. A 2004 report on airport security at Los Angeles International Airport warned that terrorists could use .50-caliber sniper rifles to target parked and taxiing airplanes "firing over 50 shots in five minutes."[25] The Council should take action to prohibit the possession of these weapons in civilian hands.

### High-Capacity Magazines Increase Firepower

The threat posed by military-style assault weapons is increased significantly if they can be equipped with high-capacity ammunition magazines, defined as those accepting more than ten rounds. The 1994-2004 federal ban on assault weapons also banned these magazines. By permitting a shooter to fire more than ten rounds without reloading, they greatly increase the firepower of mass shooters. For example, the shooter at Virginia Tech equipped himself with numerous high-capacity magazines of up to 30 rounds, which enabled him to get off nearly 200 rounds in his attack. In self-defense situations, too much firepower is a hazard, because the tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders.

### Assault Weapons Bans Already In Place

Six states currently ban assault weapons. Those include California, which passed the nation's first statewide ban in May 1989, as well as New Jersey (1990), Hawaii (1991), Connecticut (1993), Maryland (1994), Massachusetts (1998), and New York (2000). California expanded its ban in 2000 to include all semiautomatic rifles or pistols that have the ability to accept a detachable magazine and contain any one of a series of military-style features. We strongly support that legislation as a model for the District of Columbia.

---

[21] Carolyn Marshall, *California Bans Large Caliber Guns, and the Battle is on*, NEW YORK TIMES, Jan. 4, 2005.

[22] *See,* Government Accounting Office for U.S. House of Representatives, Committee on Government Reform, *Long Range 50 Caliber Sniper Weapons* 4 (May 3, 1999).

[23] *Id.*

[24] *Id.* at 3.

[25] Donald Stevens, *Near Term Options for Improving Security at Los Angeles International Airport*, RAND (2004).

6

In addition, from 1994-2004, there was a federal ban on assault weapons. Plus, as mentioned above, ATF currently bans assault weapons from being imported into this country because they are not weapons suitable for sporting purposes.

### Banning Assault Weapons and Sniper Rifles Is Consistent with *Heller*

A ban on assault weapons and .50 caliber sniper rifles would be constitutional and consistent with the Supreme Court's decision in *District of Columbia v. Heller*. In *D.C. v. Heller*, the Supreme Court narrowly defined the Second Amendment as protecting the right of law-abiding citizens to keep and use guns in the home for self-defense. At the same time, the Court indicated that the right to keep and bear arms is limited in a number of ways. The Court made clear that the Second Amendment does not entitle citizens to any and all guns. Certainly, military-style assault weapons and .50 caliber sniper rifles are not a part of this right. The Court held that not all "arms" are protected.

> We also recognize another important limitation on the right to keep and carry arms. [*U.S. v.*] *Miller* said, as we have explained, that the sorts of weapons protected were those **"in common use at the time."** We think that limitation is fairly supported by the historical tradition of prohibiting carrying of **"dangerous and unusual weapons."**[26]

Assault weapons and .50 caliber sniper rifles are certainly "dangerous and unusual weapons" according to any reasonable analysis of that phrase. They are military-style offensive weapons designed to slaughter human beings. This differentiates them from all hunting rifles and shotguns, as well as common handguns, which are often used in crime but have also been used in self-defense.

Moreover, assault weapons and .50 caliber sniper rifles are not "in common use." As semiautomatic versions of machine guns developed for use during the World Wars of the 20th Century, assault weapons are a relatively recent invention. Plus, ATF has twice concluded, after thorough analyses in 1989 and 1998, that assault weapons have no sporting purpose. And the Barrett .50 caliber sniper rifles was patented a mere twenty-one years ago, and was made for military, not civilian use.

Finally, assault weapon bans have been challenged in court, but have never been struck down as unconstitutional under the Second Amendment or under right to bear arms provisions in state constitutions.[27]

### Conclusion

Outside of the military or law enforcement, assault weapons and .50 caliber sniper rifles have no place in civilized society. We would urge the D.C. Council to adopt a ban on these weapons. Thank you.

---

[26] *District of Columbia v. Heller*, 128 S.Ct. 2783 (2008).

[27] *See, e.g., Benjamin v. Bailey*, 662 A.2d 1226 (Conn. 1995); *Robertson v. Denver*, 874 P.2d 325 (Colo. 1994); *Arnold v. City of Cleveland*, 616 N.E.2d (Ohio 1993).

7

**Daniel W. Webster, Co-Director, Johns Hopkins Center for Gun Policy and Research**
**Testimony on firearm sales regulations before the District of Columbia's Council Committee on Public Safety and the Judiciary, October 1, 2008**

Chairman Mendelson and council members, thank you for inviting me to testify today. I am here to urge the Council to develop a comprehensive set of policies and procedures for regulating guns that are grounded in the best available science relevant to protecting public safety. I am an associate professor and co-director of the Center for Gun Policy and Research at the Johns Hopkins Bloomberg School of Public Health. I have studied gun violence and its prevention for 20 years and have worked with several cities on their efforts to curb gun violence.

The primary goal of the District's gun laws should be to maximize public safety without preventing truly law-abiding, mentally-stable adults to possess firearms. The most effective gun policies will 1) proscribe the most dangerous people from possessing firearms; and 2) establish accountability measures to discourage illegal transfer to and acquisition by those proscribed individuals. Unfortunately, federal law and most state laws allow criminals convicted of misdemeanor crimes involving violence, weapons, drugs, and alcohol abuse to legally acquire as many firearms as they please. Current law in the District of Columbia wisely prohibits criminals convicted of crimes involving violence and/or guns or anyone convicted of an offense involving illegal drugs within the past five years to possess firearms regardless of whether the convictions were for felonies or misdemeanors. Prior research has shown that young men with misdemeanor convictions who were legally able to purchase handguns went on to commit crimes involving violence at a rate that was 2- to 10-times higher (depending on the prior offense) than that of men who were truly law-abiding when they purchased a handgun.[1] Prohibitions of firearm ownership by violent misdemeanants is associated with lower rates of violence by this high-risk group[2] and has broad public support, even among gun owners.[3]

While the standards for firearm registrants in the District of Columbia are appropriate, they could be improved by denying registration to individuals who have 2 or more violations for driving while intoxicated. In addition to having demonstrated a history of reckless behavior that threatens public safety, repeat DUI/DWI offenders have very high rates of substance abuse and other psychiatric disorders.[4,5,6] Such offenders have less self-control[7] and have higher rates of repeated arrests[8] - not a group that should be trusted with firearms.

Another group of individuals who should be prohibited from possessing firearms (but aren't currently prohibited) because they are a clear threat to others, including innocent children, are domestic violence offenders. I co-authored a large study to determine what factors most contributed to lethal outcomes from domestic violence. Abuser's ownership of a firearm increased the risk of homicide five-fold, more than any other risk factor we identified.[9] Federal law and many state laws prohibit firearm possession by persons restrained by protective orders issued by courts to protect victims of domestic violence. Research has demonstrated that these policies save lives.[10] Because these orders rarely last more than 12 months despite a more enduring threat, I recommend that the offender should be proscribed from possessing firearms in the District for a five-year period as is the case now for drug offenders.

In addition to setting high standards for legal firearm ownership, the District should have a set of regulations and enforcement procedures to reduce the likelihood that dangerous people can obtain firearms. My own research demonstrates that the rate at which new guns are diverted to criminals can be significantly reduced by regulation, oversight, and scrutiny that retail gun shops receive.[11,12,13,14,15] The District should set the highest of standards for obtaining and retaining a license to sell firearms. In addition to standard record-keeping requirements to ensure accountability, I urge the Council to make most of the firearms sales policies that Wal-Mart (the world's largest retail seller of firearms) is implementing mandatory for all firearm dealers. These include point-of-sale security cameras, criminal

204

background checks of employees, requirements that dealers safely lock up their guns, employee training to identify fake IDs and illegal straw purchases, and regular audits of inventory. Twenty gun stores agreed to adopt these measures after they were caught making gun sales of questionable legality as part of their legal settlement with New York City. I analyzed sales and crime gun recovery data for the dealers who had been keeping individualized gun sales records and documented a dramatic decrease in the risk that a gun sold by the dealers would subsequently be recovered from criminals.[15]

In Maryland and Virginia and throughout the U.S., there have been cases in which gun dealers were allowed to retain their licenses for many years despite racking up hundreds of firearm sales violations, failing to account for hundreds of guns, and being a well-known conduit for guns into the criminal market. The District should avoid such travesties by requiring gun dealers to conduct and submit a list of guns in their inventory when they renew their licenses annually, and to report any loss or theft of firearms immediately upon discovering missing firearms. In addition, the District should allow the Metropolitan Police Department to suspend, revoke, or deny renewal of a license to sell firearms to gun dealers who do not comply with regulations.

Private gun owners must be held accountable for selling to individuals who do not have a valid license to own a firearm and who have not passed a background check. Gun owners should also be required to keep their guns locked up when they are not being used to prevent access to children, teens, or thieves. In addition to reducing accidental shootings,[16,17,18] my research has shown that safe gun storage laws significantly reduce adolescent suicides.[19] Some of this research has indicated that so-called Child Access Prevention laws are most effective when penalties are strong.[17,18] Thus, I believe there is good justification to allow for felony prosecution when a gun owners' failure to comply with the CAP law results in injury to others, to penalize unsafe gun storage that enables a minor to access the firearm, and to require gun dealers to post signs reminding gun purchasers of their duty to keep guns safely stored to prevent child access.

The final recommendation, supported by research I have led, is that the District of Columbia should ban the sale and possession of "junk guns" – a category of handguns characterized by their very small size and concealability and poor construction. Five states, including Maryland, have banned junk guns (though through somewhat different approaches or criteria) because they are prone to misfire, fire when dropped, and are disproportionately involved in crime. My colleagues and I studied the effect of a large gun dealer near Milwaukee who, after receiving bad publicity for the large number of his guns that were being linked to violent crimes, voluntarily decided to stop selling junk guns. We found that this change in sales policy led to 77% reduction in the number of new guns sold by the dealer that were soon recovered from criminals.[12] My research on Maryland's ban of these guns demonstrated that the law was associated with 40 fewer homicides per year during the first 9 years the law was in place.[20]

205

## References

[1] Wintemute GJ, Drake CM, Beaumont JJ, Wright MA. Prior misdemeanor convictions as a risk factor for later violent and firearm-related criminal activity among authorized purchasers of handguns. JAMA. 1998;280:2083-7.

[2] Wintemute GJ, Wright MA, Drake CM, Beaumont JJ. Subsequent criminal activity among violent misdemeanants who seek to purchase handguns: risk factors and effectiveness of denying handgun purchase. *Journal of the American Medical Association* 2001;285:1019-1026.

[3] Teret SP, Webster DW, Vernick JS, et al. Support for new policies to regulate firearms. Results of two national surveys. N Engl J Med. 1998;339:813-8.

[4] Shaffer HJ, Nelson SE, LaPlante DA, LaBrie RA, Albanese M, Caro G. The epidemiology of psychiatric disorders among repeat DUI offenders accepting a treatment-sentencing option. *Journal of Consulting and Clinical Psychology* 2007;75:795-804.

[5] Lapham SC, Baca JC, McMillan GP, Lapidus J. Psychiatric disorders in a sample of repeat impaired-driving offenders. *Journal of Studies on Alcohol.* 2006;67: 707-713.

[6] Lapham SC, Smith E, Baca JC, Chang IY, Skipper BJ, Baum G, Hunt WC. Prevalence of psychiatric disorders among persons convicted of driving while impaired. Archives of General Psychiatry 2001;58:943-949.

[7] Keane C, Maxim PS, Teevan JJ. Drinking and driving, self-control, and gender – testing a general-theory of crime. Journal of Research in Crime and Delinquency. 30(1):30-46; 1993.

[8] Lucker GW, Kruzich DJ, Holt MT, Gold JD. The prevalence of antisocial behavior among U.S. Army DWI offenders. Journal of Studies on Alcohol. 52(4):318-20; 1991.

[9] Campbell JC, Webster DW, Koziol-McLain J, et al. Risk factors for femicide within physically abusive intimate relationships: Results from a multi-site case control study. *American Journal of Public Health* 2003; 93:1089-1097.

[10] Vigdor ER, Mercy JA. Do laws restricting access to firearms by domestic violence offenders prevent intimate partner homicide? *Evaluation Review* 2006;30:313-346.

[11] Webster DW, Bulzacchelli MT, Zeoli AM, Vernick JS. Effects of undercover police stings of gun dealers on the supply of new guns to criminals. *Injury Prevention.*2006; 12:225-230.

[12] Webster DW, Vernick JS, Bulzacchelli MT. Effects of a gun dealer's change in sales practices on the supply of guns to criminals. *Journal of Urban Health* 2006; 83:778-787.

[13] Webster DW, Vernick JS, Bulzacchelli MT. The association between state regulation of gun dealers, law enforcement practices, and the supply of guns to criminals. Presented at the Annual Meeting of the American Society of Criminology, Atlanta, November 2007.

[14] Webster DW. Supplemental expert report submitted for City of New York V. A-1 Jewerly & Pawn, Inc. *et al.*, 06 CV 2233, City of New York V. Bob Moates' Sport Shop, INC., *et al.*, 06 CV 6504, May 27, 2008.

[15] Vernick JS, Webster DW, Bulzacchelli MT. Regulating firearms dealers in the United States: an analysis of state law and opportunities for improvement. *Journal of Law, Medicine, and Ethics* 2006;34:765.

[16] Hepburn L, Azrael D, Miller M, Hemenway D. The effect of child access prevention laws on unintentional child firearm fatalities, 1979-2000. *Journal of Trauma* 2006;61:423-428.

[17] Webster DW, Starnes M. Reexamining the association between child access prevention gun laws and unintentional firearm deaths among children, *Pediatrics*, 2000;106:1466-1469.

[18] Cummings P, Grossman DC, Rivara FP, Koepsell TD. State gun safe storage laws and child mortality due to firearms. *Journal of the American Medical Association* 1997;278:1084-6.

[19] Webster DW, Vernick JS, Zeoli AM, Manganello JA. Effects of youth-focused firearm laws on youth suicides. *JAMA* 2004; 292:594-601.

[20] Webster DW, Vernick JS, Hepburn LM. Effects of Maryland's law banning Saturday night special handguns on homicides. *American Journal of Epidemiology* 2002;155:406-412.