Exhibit 42

To Defendants' Memorandum in Support of Motion for

Summary Judgment

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT COURT OF MARYLAND
 2

 3                   CASE NO. 13-CV-02841-CCB

 4     STEPHEN V. KOLBE, et al.,
              Plaintiffs,
 5     vs.

 6     MARTIN O'MALLEY, et al.,
              Defendants.
 7     _____

 8

 9

10

11     DEPOSITION OF:          BUFORD BOONE

12     TAKEN AT THE INSTANCE OF: The DEFENDANTS

13     DATE:                   January 3, 2014

14     TIME:                   Commenced at 9:36 a.m.
                               Concluded at 12:53 p.m.
15
       LOCATION:               600 West Gaines Street
16                             Tallahassee, FL

17     REPORTED BY:            JUDY CHIN
                               judychin@embarqmail.com
18                             RPR, CRR

19

20

21

22

23              ACCURATE STENOTYPE REPORTERS, INC
                    2894 REMINGTON GREEN LANE
24           TALLAHASSEE, FL  32308   (850)878-2221

25
```

Q    You mentioned in the course of your report,
talking about being a firearms instructor, that you
provided judgmental instruction utilizing firearms
training simulator equipment.

A    Yes.

Q    You use the acronym FATS, F A T S.

A    Yes.

Q    What did that involve?

A    In laymen's terms it's a large video screen
with a firearm -- an inactive firearm that shoots a
laser.  I believe it was a laser beam.

    But it puts a student in front of a large
video screen where a scenario is played out for the
student to act as if it was a real-life scenario.  The
instructor can direct the course of the scenario based
on the student's actions.  In other words, if you are
not doing what you should be doing to make the subject
comply, the instructor can make the subject not comply.
If you are doing what you should be doing, he can make
the subject comply.  It was judgmental training that was
mainly run by the legal instruction unit, but they had
firearms instructors in with them giving the judgmental
shooting.

Q    So it sounds like there was a distinction with
respect to firearms issues between firearms training on

1    the one hand and legal on the other, is that right?

2         A    Correct.

3         Q    Were you ever on the legal side?

4         A    No.

5         Q    Other than firearms training and legal

6    training, were there any other aspects of the training?

7         A    Of the FATS?

8         Q    No.  Of training generally.

9              It sounds from what you described you had at

10   least two sets of different instruction, one set on the

11   firearms and another set on legal.

12             Was there a third set that we haven't talked

13   about?

14        A    That I participated in or that agents took?

15        Q    That agents took.

16        A    Oh, absolutely.  There were practical

17   exercises, there was academic, training in the law,

18   there was training in search and seizure, which of

19   course is part of the law.  But there were many other

20   aspects of the academy training.

21        Q    I am talking about training specifically with

22   respect to firearms.

23             It sounds like you have the training on how to

24   use the firearm, which you were involved in; training on

25   effectively when you can use the firearm, which was what

1    legal did --

2         A    How specific are you asking me to be?

3         Q    I'm asking generally.

4              It sounds like from what you said so far you

5    divided things up, into dealing with a firearms training

6    into two categories; the firearm itself and firing it,

7    which you participated in; and legal, which you didn't

8    participate in, which was instruction on when you could

9    use the firearm.

10             And I am asking generally if there was another

11   category that some other group handled dealing

12   specifically with the use of the firearm.

13             MR. SWEENEY:  Objection.

14             Go ahead.  Go ahead.

15             THE WITNESS:  The practical applications unit

16        would use firearms in their training.

17             I'm not exactly sure of what they did or

18        didn't do.  But they would teach arrest scenarios.

19             And because they were all intertwined, the

20        practical application unit did use firearms.

21             When I asked about how specific you wanted me

22        to be, I want you to understand that firearms

23        training is more than just how to shoot the gun;

24        for example, what do you do with your firearm when

25        you go to a public restroom.  We gave training in

1        that.  We gave training in how to be a responsible

2        user of a firearm and how to interact with it,

3        because it was going to be part of the agents'

4        daily lives.  They needed to know what they should

5        and shouldn't do, know ways to protect themselves

6        and protect their family.

7            So training you what to do with your pistol

8        when you go to the restroom is not really firearms

9        training; but, yes, we gave them that training to

10       make sure.

11           We also instituted a program where trainees

12       were required to carry a Crayon gun, being a

13       plastic gun, that wouldn't -- in no way is a

14       firearm, but it appeared to be one and it had the

15       same weight.  And we required trainees to wear

16       those almost all the time they were at the academy

17       so they would learn in a safe environment with an

18       inert piece of plastic how to interact with a real

19       firearm.

20    BY MR. FADER

21       Q    And was that training on what you do when you

22    go to the bathroom or have it at home with your firearm,

23    was that part of your firearms training or part of the

24    practical application group training?

25       A    Both, I believe.

```
1              I know it was part of firearms training.  I
2    believe practical application also trained them with
3    that.
4              To my knowledge, all practical instructors
5    were also firearms instructors.
6         Q    And was there training on all of those
7    aspects, legal, practical applications, and firearms at
8    the academy?
9         A    Yes.
10        Q    And was there ongoing training as an FBI agent
11   that was fired in all three of those areas after the
12   academy?
13        A    Yes.
14        Q    On what --
15             How frequent of a basis?
16        A    Four times a year you were required to fire.
17   And during the firearms qualification, we also
18   integrated legal training, defensive tactics, and
19   practical applications.  I don't recall the exact
20   percentages.  But you had one day of training to
21   accomplish everything, and you were expected to
22   accomplish as much as you could.
23        Q    At four times a year throughout your career as
24   an agent?
25        A    You are required to qualify quarterly
```

1      A      You could stack layers of Kevlar until you

2  stopped it, of course.

3             But none that I know of that are designed to

4  be worn.  I never shot soft-body armor that stopped any

5  centerfire rifle cartridge.

6      Q      And by any centerfire rifle cartridge, within

7  that any cartridge designed to be fired from a modern

8  sporting rifle, is that right?

9      A      No.  I've seen modern sporting rifles

10 chambered in pistol caliber cartridges.  I'd say

11 centerfire rifle cartridges.

12     Q      Which would include the 223 Remington?

13     A      Correct.

14     Q      5.56 NATO?

15     A      Yes.

16     Q      7.26 NATO?

17     A      7.62.

18     Q      7.62 NATO?

19     A      Correct.

20     Q      And the latter is what most AK47s are

21 chambered for?

22     A      No.

23     Q      7.62?

24     A      7.62 NATO, no.

25     Q      What are most AK47s?

1        A      7.62x39.

2        Q      And soft-body armor is not going to stop that,

3    is it?

4        A      It is unlikely that it will stop any

5    centerfire rifle cartridge, and that is one of them.

6              (Exhibit No. 2 marked for

7    identification.)

8    BY MR. FADER

9        Q      Sir, you have before you what's been marked as

10   Boone Exhibit 2.

11             Is this a copy of the FBI Body Armor Test

12   Protocol that you were involved in creating?

13       A      It appears to be version one.  Yes, sir.  It

14   appears to have been modified.  You should have a copy

15   of the latest version as well, because based on my

16   memory, Maryland State Police just before I retired got

17   information from me.

18       Q      It was an updated copy of the FBI body armor

19   test protocol?

20       A      Well, one of the things I did, I would put

21   everything that I would give out on one disk.

22             When I say they should have a copy of this, if

23   I sent anything I typically would send one disk, and

24   that's why I say they should have a copy of the updated

25   one.

1    Q    This was actually obtained from the internet,

2    not from the Maryland State Police.

3    A    Okay.

4         When I created this, I wanted this document to

5    be an open-source document.  I sought permission and got

6    permission to make it open source.  Because my main

7    purpose of creating this document was to give

8    manufacturers a method where they could create and test

9    body armor that would meet what we wanted, because we

10   were not the research arm of any manufacturer.  In other

11   words, if you brought a vest to me that you said passed

12   our protocol, I would first say, can you show me the

13   data?  Because getting a test conducted was probably

14   $20,000, I think is what HP White charged.  And the

15   FBI's business was not to conduct testing for

16   manufacturers.  Our business is to take care of the

17   United States Government.  So we put this out as a

18   general issue document.  I don't recall whether the

19   later versions were put out on the internet or not, but

20   I hope they were.

21   Q    And am I to understand that in the body armor

22   test protocol the intent was to gear testing to the

23   worst case handgun round?

24   A    Yes.

25   Q    And there was no intent to gear testing

64

1    were incorporated into the NIJ's testing?

2         A    Some of them, and not the exact standard.

3              For example, one of the things that we did is

4    we incorporated an extreme heat and an extreme cold

5    test.  If you are an agent in Fairbanks, Alaska and a

6    bank gets robbed and you go to your car, your truck, and

7    you take your body armor out of the trunk, should it

8    work?  Absolutely it should work, regardless of how cold

9    it is.  So we instituted a cold test.

10             We did the similar thing with a hot test,

11   because if you are in Phoenix, Arizona and you need to

12   retrieve the body armor from the trunk of your car, it

13   should still work.  Those aren't parts of the test that

14   the NIJ did prior to the FBI test.

15             We had a submersion in water test that we

16   required body armor to be submerged in water and still

17   work.  Whereas it is well known that the woven Aramid

18   fiber-type body armors when they get wet they are quite

19   easily penetrated, so we wrote that in.

20             I believe NIJ has a water component as well

21   now.  I am not sure.  I didn't study the NIJ standards.

22             We made part of our protocol be that it had

23   the NIJ certification before we would test it.  That was

24   done intentionally.  That was a decision that was made

25   by myself and others because we knew we would be

1    criticized by the NIJ for having our own protocol.  And

2    the best way to remove the criticism was to incorporate

3    it.  How can you criticize me if I'm incorporating your

4    protocol into my test?

5           And their protocol is not bad.

6       Q    It sounds from what you said they criticized

7    you anyway?

8       A    They did.  They didn't think I would see it.

9           I'm not bothered by that.  I was protecting

10   agents.  There was a selfish component, I wore this

11   stuff.

12      Q    What level of body armor did you wear?

13      A    It would best be characterized as three-plus.

14   It was a 3A.

15          I'm sorry.  Not three-plus.  3A-plus.  It was

16   3A body armor, but then it passed our test as well.  And

17   then I sometimes wore a hard plate in conjunction with

18   that, which would be -- there is no threat-level

19   protection for the plates that I wore.  They were tested

20   beyond anything that the NIJ had.

21      Q    You say plates.  It is my understanding that

22   some soft-body armor is made with the ability to stick a

23   plate in the front and/or the back that would be a hard

24   plate in that armor, is that right?

25      A    Or you could use a plate carrier over your

1  soft-body armor.

2        But, for example, when we went overseas, we

3  always carried plates.  I say overseas.  When we went to

4  war zones, we always carried plates.

5      Q    How often did you go to war zones?

6      A    I only went once.

7      Q    Where was that?

8      A    Afghanistan.  I was also briefly in Kuwait.

9  But it was a very brief trip, the trip I went on.

10     Q    Why was it a protocol to always wear plates

11  traveling to war zones?

12     A    Because we knew we were facing centerfire

13  rifles.

14          (Exhibit No. 4 marked for

15  identification.)

16  BY MR. FADER

17     Q    Sir, you have been handed a document that's

18  been labeled Boone Exhibit 4.

19          Are you familiar with that document?

20     A    I'm not familiar with it.  I may have seen it

21  before.  I would be surprised if I have not seen it.

22  But it does not strike my memory.

23     Q    Okay.

24          MR. SWEENEY:  Would this be a good time to

25     take a short break?

1          MR. FADER:  Sure.  Any time you want to take a

2     break, just let me know and we can.  We can do one

3     right now.

4          THE WITNESS:  I'm happy to keep going as long

5     as you all want.  I have nothing else scheduled

6     today.

7          MR. SWEENEY:  Good.  Mr. Sweeney suggested a

8     break, and we can take one now.

9          (Brief recess.)

10  BY MR. FADER

11     Q    Mr. Boone, you talked about the testing that

12  the FBI did at the Ballistics Research Facility with

13  respect to gel designed to simulate a human body.

14     A    Correct.  And it is Ballistic Research

15  Facility.  No S.

16     Q    I apologize.

17          Was there also testing done on rounds through

18  or into bulletproof or shatterproof glass?

19     A    Projectile resistant glass.  There is no

20  bullet proof or shatterproof glass.

21          Yes, we did testing into glass.

22     Q    And are there different levels of projectile

23  resistant glass just like there are different levels of

24  soft-body armor?

25     A    I believe there are, yes.

94

```
1        Q    Yes.

2        A    No.

3        Q    What are the ways in which a threat can be

4   stopped?

5        A    Psychological or physiological.

6        Q    In order to stop a threat, does it always

7   require injuring the person?

8        A    No.

9        Q    What other ways are there that a threatening

10  situation can be stopped?

11       A    If the person that is threatening you or the

12  animal is threatening you is scared and runs away, then

13  you stopped the threat.

14       Q    Do you have an understanding whether most home

15  defense threats are expected as opposed to unexpected?

16       A    No, I don't.

17       Q    Would the nature of a threat as expected or

18  unexpected play a role in weapon selection?

19       A    It would for me.

20       Q    How so?

21       A    For an unexpected threat, I would likely have

22  a handgun.

23            For an expected threat, I cannot imagine a

24  scenario where I would have anything other than a

25  centerfire rifle with a standard capacity magazine.
```

1    **Q**    For an expected threat, would you be inclined

2    to have called law enforcement before using your own

3    centerfire rifle?

4         A    It depends on the situation.

5             For an expected threat, given enough time,

6    absolutely I would call law enforcement right away.  But

7    if I didn't have that option, then I couldn't.

8    **Q**    In your report you state that there is at

9    least one significant difference between modern sporting

10   rifles and military rifles, which is that the modern

11   sporting rifles are not automatic.

12        A    Fully automatic.

13   **Q**    Not fully automatic.

14            And there any other significant differences?

15        A    There are military rifles which are shorter

16   than modern sporting rifles because they are restricted

17   -- the overall length of rifles is restricted I believe

18   by the Gun Control Act of '68; isn't it?

19   **Q**    I'm not here to answer the questions.  But if

20   you don't know, just go on.

21        A    I don't know.

22            But there is a restriction on the overall

23   length of rifles which does not apply to military.

24            But aside from full automatic, that would be

25   the only other thing that I could think of.

1      Q      Is there any difference in the penetration of

2  a round based on whether it is fired from a

3  semi-automatic or an automatic rifle?

4      A      One round?

5      Q      Yes.

6      A      No.

7      Q      Is there any difference in penetration of

8  multiple rounds?

9      A      Impacting where?

10     Q      The human torso.

11     A      How close together?

12     Q      How close together the rounds are?

13     A      Correct.

14     Q      Can you tell me if that is a factor.  Explain

15  how.

16     A      Absolutely.  If the rounds impact one on top

17  of the other, the previous rounds will clear the path

18  for the rounds following.  In other words, all the

19  tissue that the projectile number one destroys is not

20  going to be encountered by projectile number two.

21          Similarly, if fired in rapid succession, rapid

22  enough, and I don't know how to clarify what that is,

23  but it would be faster than you could shoot, if round

24  number two impacts the tissue during the maximum

25  temporary cavity of round number one, that would change

1    the penetration.

2          It can best be seen with something like

3    buckshot from a 12-gauge shotgun.  The projectiles in

4    that payload, the front ones clear the way for the rear

5    projectiles.

6          So, yes, in that instance there is quite a

7    difference.  That's not a centerfire rifle cartridge,

8    though.

9       Q    Is it common from centerfire rifle cartridges

10   fired from automatic weapons that you would have that

11   phenomenon of one going the exact same place right after

12   the first?

13      A    No.

14      Q    So is that a phenomenon primarily in the

15   situation of buckshot from a shotgun?

16      A    Yes.

17      Q    But with respect to penetration from a

18   semi-automatic versus an automatic rifle -- fully

19   automatic rifle, is there any difference in the

20   penetration of rounds?

21      A    Before I answer, to back up, when you said

22   automatic, you meant fully automatic impacting exactly

23   in the same spot?

24      Q    Yes.

25      A    It is uncommon for fully automatic projectiles

1    to impact in exactly the same spot.

2         I'm sorry to interrupt you.  Now your second

3    question was penetration?

4     Q    Just given the clarification that was made as

5    far as that phenomenon of one round coming in right

6    after another being primarily a phenomenon of buckshot

7    from a shotgun shell, I am now asking the more general

8    question about the difference in a centerfire

9    semi-automatic rifle as opposed to centerfire automatic

10   rifle, whether there is a difference in the amount of

11   penetration from the same cartridge.

12    A    I would say no.

13        And I'm going to try to paraphrase, so correct

14   me if I'm wrong.

15        But the buckshot penetration occurs because

16   some pellets follow the others, so they are traveling

17   through the temporary cavity.

18        With a fully automatic rifle, I am unaware of

19   any fully automatic rifle which fires fast enough for

20   the following projectiles to impact the tissue while the

21   temporary cavity is at its maximum stretch.  Does that

22   answer -- does that meet with what you were asking?

23    Q    I believe so, yes.

24    A    Okay.

25    Q    With respect to expansion, are the cartridges

1   fired from a semi-automatic rifle different than the

2   cartridges fired from a fully automatic rifle?

3       A    If you --

4           You mean if you fire the same cartridge in a

5   semi-automatic versus fully automatic would the

6   expansion be different?

7       Q    Yes.

8       A    No.

9       Q    What about the retained weight?

10      A    I am going to say no.

11          But I need to qualify this, that no beyond the

12  parameters that would normally be seen in that

13  projectile's retained weight or expansion.  For example,

14  if a projectile normally retains 90 percent of its

15  retained weight, then it will not be accurate to say you

16  won't have one that retains 89 percent or 92 percent.

17          So within the parameters that that projectile

18  expands or retains weight, no, they will not perform

19  differently from fully automatic versus semi-automatic.

20      Q    What about with respect to consistency?

21      A    No.

22      Q    With respect to the factors that the FBI looks

23  at in the effectiveness of a cartridge, there really

24  isn't any difference between that cartridge being fired

25  from a fully automatic centerfire rifle as opposed to a

1       A       Yes.

2       Q       How do you know that?

3       A       I worked with Glock.  The FBI issued Glocks

4    for a long time.  And a number of years ago there were

5    restrictions on magazine capacities.  Agents are allowed

6    to purchase personally their own weapons.  And when

7    those restrictions came out I believe is when Glock

8    started making the restricted capacity magazines.  There

9    is quite a bit of discussion and controversy over what

10   the agents will be allowed to purchase when they

11   purchased a personally owned weapon.

12           The ultimate decision I believe from memory

13   was that agents would be allowed to purchase the Glocks

14   with the restricted capacity magazines, but that those

15   magazines would be replaced by the FBI with standard

16   capacity magazines.  And then upon the agent's

17   retirement, the FBI would replace the magazines with the

18   restricted capacity magazines.

19           I believe that law has been discontinued now.

20   But the 10-round magazines to my knowledge did not exist

21   until the standard capacity magazines were outlawed.

22      Q       In 1994?

23      A       I don't remember the date, but that sounds

24   about right.

25      Q       But since that time, Glock in fact has

1    manufactured and sells 10-round magazines?

2         A    When the restrictions came out, they

3    manufactured and sold them.  I don't know if they still

4    do or not.

5              I believe there are some states where they are

6    still restricted.  So it would not surprise me if they

7    continue to manufacture restricted capacity magazines.

8              I go back to the time when they actually

9    marked the standard capacity magazines as law

10   enforcement only.

11        Q    You say in your report that the FBI has never

12   advocated carrying less ammunition than your system was

13   originally designed to use.

14             The Glock that comes with 15-round magazines,

15   does it function any differently with a 10-round

16   magazine?

17        A    By function differently, you mean other than

18   firing less shots before you reload?

19        Q    Right.  With respect to the first 10 rounds

20   fired from a Glock with a 15-round magazine, and then

21   the ten rounds fired from a Glock with a 10-round

22   magazine, is there any difference?

23        A    There should not be.

24        Q    Are you leaving anything out there that we

25   don't know about by saying should not be?

A     I never tested the 10-round magazines, so I
cannot say that they function exactly the same way.

I am going on good faith that Glock wouldn't
put them out if they didn't function the same way.

Q     Have you ever heard of them functioning
differently, the 10-round magazines as opposed to the
15?

A     No.

Q     You then go on to a section of your report,
"handguns versus long guns."  And you state that
handguns are more convenient but less effective than
shotguns or rifles for self-defense, is that right?

A     Correct.

Q     And you focus on concealability.  But the
convenience factor with handguns is certainly more than
about concealability?  Isn't it easier to have one by
your nightstand?

A     Not for me.

So far as having your hands free, and
concealability is one of them, but if you want to be
able to work with your hands free without a long gun
bartering you around, a handgun is more convenient.

I can work on my tractor with a rifle slung
over my shoulder, but it is not as convenient as the
handgun on my hip.

1          So I use handguns for convenience, not for

2     effectiveness.

3          Q     Are there any self-defense scenarios you are

4     aware of where being able to hold a firearm closer to

5     your body can be an advantage?

6          A     If you have foolishly allowed an aggressor to

7     be that close to you, yes; then you would be dealing

8     with the ability to maintain control of the weapon.

9          Q     Which would be easier with a handgun that you

10    can keep close --

11         A     No.  It is be far easier with a rifle.

12         Q     To maintain control?

13         A     Absolutely.  You grab my rifle, I will shoot

14    you with it just as fast as you can imagine.  With a

15    handgun, it might be harder.  You can grab a handgun and

16    deactivate it.  If you grab my rifle, you really can't

17    deactivate it very easily.

18         Q     What is the length of an AR15?

19         A     I don't know.

20         Q     What's the total length --

21               Certainly over 2 feet, right?

22         A     Yes.  The AR15 barrel is going to be 16 --

23    minimum 16 inches.

24         Q     You mentioned handguns are less terminally

25    effective than rifles.

1    A    Yeah.  I wouldn't make the statement that it

2    was -- it would be easier to fire it accurately

3    one-handed, although it would not surprise me if it

4    would.  I would have to do testing.

5         My point was that it was easier to hold the

6    rifle and hold a flashlight or a phone in your other

7    hand because most responsible citizens if they defend

8    their home and the subject gives up and doesn't run away

9    they are going to maintain observation of him while they

10   await the police.  You wouldn't leave him in your front

11   yard or leave him in your front hallway and go back to

12   bed waiting on the cops to get there, that could be

13   quite a long time if you ever waited for the police.

14   Seconds seem like minutes.

15        So that was my point about the vertical pistol

16   grip.

17        (Brief recess.)

18   BY MR. FADER

19   Q    Sir, we had marked earlier as Exhibit 6 the

20   paper, "Handgun Wounding Factors and Effectiveness."

21   A    Yes, sir.

22   Q    If you can turn to page 12 of that.

23   A    Okay.

24   Q    And I understand you were not involved with

25   authoring this document.

1          But you referred to it as an authoritative

2     document within the FBI, is that right?

3          A     Yes, sir.  It was one of the cornerstones of

4     what we did.

5          Q     Could you read just the last full paragraph on

6     that page, not into the record, but just to yourself.

7          A     Okay.

8          Q     And I'm curious about the sentence in the

9     middle that says, "No law enforcement officer has lost

10    his life because a bullet over-penetrated his adversary

11    and virtually none have ever been sued for hitting an

12    innocent bystander through an adversary."

13         The last part of that sentence is curious.  Do

14    you have an understanding of why that's in here?

15         A     Yes.  My understanding is what I was told.

16         I don't find it curious.  What I find curious

17    is the perception that over-penetration is going to be

18    such a major factor.

19         And if we go back and we look at the

20    statistics that say that the majority of law enforcement

21    shots missed their target, and I don't know what the

22    number is, but if we can agree in this forum the

23    majority of law enforcement shots missed their target, I

24    would have to question why the concern is more focused

25    towards over-penetration than it is towards missed

 1  shots.

 2          Because a missed shot is a total

 3  over-penetration.  And I believe, and I base this belief

 4  having spoken to Urey Patrick, the author of this on it,

 5  that he intentionally put that in here because of the

 6  big concern in law enforcement, particularly at that

 7  time and continues to this day, of an over-penetration

 8  issue, that many law enforcement agencies choose their

 9  ammunition based on they don't want it to

10  over-penetrate.  They forget about the fact that shots

11  are going to miss, and those are absolutely going to

12  over-penetrate.  So they err on the side of what is

13  emotion rather than fact; the emotion being that

14  over-penetration is going to be the big problem when in

15  fact under-penetration is going to be the big problem.

16      Q    And I guess what seems curious to me the focus

17  is on whether law enforcement officers have been sued

18  for hitting an innocent bystander through an adversary,

19  not whether they had actually been hit by a round fired

20  through an adversary.

21          Do you have an understanding of why the focus

22  was on lawsuits?

23      A    Every police officer I know of is terribly

24  afraid of lawsuits, terribly afraid of doing their best

25  to protect citizens and putting their life on the line

1    yet being sued for their efforts.

2            It is kind of like the sniper situation that I

3    teach about in Phoenix, Arizona where the subject had a

4    shotgun taped to the woman's head and a friend of mine

5    shot him right through the tip of the nose saving the

6    woman's life, who then came back and sued the FBI for

7    exposing her to AIDS blood.  You know, her options were

8    to be shot by the shotgun or to have her life saved, and

9    so she came back and sued the FBI.

10       Q    Now, in your explanation just before you said

11   that a lot of shots will miss.

12       A    Yes.

13       Q    And you described that as a clear

14   over-penetration?

15       A    Yes.

16       Q    And it is over-penetration because the shots

17   are going to go somewhere other than where they were

18   intended, is that what you mean?

19       A    It probably would be better to phrase that as

20   a more drastic effect than an over-penetration.

21   Actually they are a non-penetration.  The fear of an

22   over-penetration is that you will hit the subject, the

23   projectile will continue on to hit unintended targets.

24   If you miss the subject, I can absolutely guarantee you

25   will hit unintended targets.

1       Q      And law enforcement officers as you said miss

2   more often than they hit, is that right?

3       A      Yes.  In confrontations.

4       Q      And is it your understanding that civilians in

5   confrontations miss at a rate even greater than law

6   enforcement officers do?

7       A      Yes.  Typically with respect to handguns.

8       Q      Well, do they miss at a greater rate with

9   respect to long guns as well?

10      A      I don't know.

11             I can tell you that law enforcement officers

12  miss with handguns far more than they miss with long

13  guns, and I can base that on all the training I've given

14  the FBI agents and watched the scores.  And the typical

15  scores, for example, when I became a firearms

16  instructor, the score you had to shoot with a handgun

17  was 90 percent if you wanted to continue in the course.

18  The score you had to shoot with the MP5 was 96.

19      Q      Do you have an understanding of whether the

20  average round from a 9-millimeter handgun is likely to

21  travel without hitting something farther or not as far

22  than the average round from an AR15?

23      A      It would depend on the surroundings you are

24  in.

25             For example, in Times Square, they will hit