Exhibit 43

To Defendants' Memorandum in Support of Motion for

Summary Judgment

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MARYLAND

 3                       (Northern Division)

 4

 5   SHAWN J. TARDY, et al.

 6             Plaintiffs              Case No.

 7   vs.                               1:13-cv-02841-CCB

 8   MARTIN J. O'MALLEY, et al.

 9             Defendants
10   _____/

11

12

13             The deposition of GUY ROSSI was taken on

14   Monday, January 6 2014, commencing at 9:06 a.m., at the

15   Office of the Attorney General, 200 Saint Paul Place,

16   20th Floor, Baltimore, Maryland 21202, before Dawn L.

17   Venker, Notary Public.

18

19

20

21   REPORTED BY:  Dawn L. Venker
```

Page 26

1  yes. Sometimes no. I also have my own company called
2  Guy Rossi & Associates that I do training as well as a
3  consultant.
4  Q. So the training you are providing to the
5  general public, is that through your company?
6  A. Well, when you say "general public," the
7  general public in New York State could mean securities.
8  So --
9  Q. Okay. I mean, people who are seeking
10 training not because they need it for employment, but
11 because they want it for knowledge for personal
12 protection or such?
13 A. Yes. The answer is yes.
14 Q. And that's through your company?
15 A. Yes.
16 Q. How big are the class sizes?
17 A. They are relatively small. I -- I -- I
18 would say three or four. And the reason being is I --
19 I tend to be very particular about the people that I
20 train. Law abiding citizens. Especially people that
21 have been victimized are my priority.

Page 27

1  Q. And you said you train them using
2  simunitions?
3  A. Simunitions, airsoft training guns, and
4  real firearms as well.
5  Q. And when you provide training to these --
6  I'm just going to call it general citizens, as opposed
7  to people who need it for some employment purpose -- in
8  the use of firearms against an assailant, are you
9  providing them with specific training, again, as to how
10 many rounds they should fire at an assailant?
11 A. Well, first of all, I train them in Article
12 35 in New York State penal law. That's critical that
13 they know the law of the State of New York. It's also
14 critical they understand that they are -- they have a
15 right to protect themselves against the imminent use of
16 deadly physical force being used against them. And
17 that it has to be reasonable.
18     In New York State, with the exception of
19 your home, you may have to retreat. We discuss issues
20 involving that. And we also discuss issues of
21 versus -- a stop versus kill. And to make sure that

Page 28

1  they understand the difference between the two.
2  Q. And what is that difference that you
3  instruct them on?
4  A. Well, they continue to shoot until the
5  threat has ceased or they've -- they've stopped the
6  threat. And sometimes that, you know, evolves into a
7  death and sometimes it doesn't. You know, if you shoot
8  at somebody and you miss them, they drop the gun and
9  they give up, it's a stop.
10 Q. Do you instruct them that they should fire
11 one round and wait to see what happens, or that she
12 should continue to fire until, as you say, the
13 individual drops the gun -- drops, flees, what have
14 you?
15     MR. SWEENEY: Object to the form of the
16 question, but you can answer.
17 A. Okay. Generally we instruct them -- I
18 instruct them to shoot twice rapidly once they sight
19 their target, and monitor the situation. If the threat
20 is nonexistent at that point, or the person obeys
21 commands, they hold their position. And hopefully they

Page 29

1  are able to gain some sort of assistance from law
2  enforcement or whoever.
3  Q. Do you have any discussions with your
4  students about how likely it is that they are going to
5  miss the target, or chances that they are going to miss
6  the target?
7  A. I do.
8  Q. And what do you tell them about missing
9  targets?
10 A. Well, here's what I tell them. That
11 trained law enforcement officers, myself having been
12 one of them -- seen many trained law enforcement
13 officers in my time shoot under stress -- tend to
14 hit -- we are going back maybe even the revolver days
15 of six rounds. Within six rounds a trained law
16 enforcement officer tends to hit his target one or two
17 times out of those six rounds under stress. And that
18 the possibility of them missing, regardless of how well
19 trained they are, you know, probably not going to
20 exceed the expectations of the trained law enforcement
21 who is training two or three times a year with that

Shawn J. Tardy, et al. vs.
Martin J. O'Malley, et al.

Guy Rossi - Vol. 1
January 6, 2014

Page 30

1  firearm.
2      I don't tell them how many rounds to shoot.
3  However, what I tell them is the reality of the hit
4  ratio of officer involved shootings, and it's pretty
5  low.
6  Q.   Have you, yourself, ever used a firearm in
7  self-defense in your own home?
8  A.   No.
9  Q.   All right.  I'm going to now start asking
10 you some questions about your report.
11 A.   Sure.
12 Q.   Just to let you know where I'm heading
13 next.
14 A.   Okay.
15 Q.   On Page 2 of your report you say that most
16 pistols are manufactured with magazines holding 10 to
17 17 rounds.  Wouldn't it be fair to say that most
18 pistols are sold with magazines that carry 10 to 17
19 rounds?
20     MR. PORTER: Object to form.  You can
21 answer the question.

Page 31

1  A.   In my experience, my statement that I made
2  is -- is my perception of -- of the incident.  I'm not
3  a firearms dealer.  And so I don't know exactly how
4  they are sold.  All I can tell you is that the majority
5  of people that come to me for training, including law
6  enforcement, have had a weapon.  And most commonly a
7  Glock per se.  Not to name any one manufacturer, but
8  it's 75 percent of the market for handgun, and 10 to 17
9  rounds is the norm.
10 Q.   But it's attached to a magazine that is
11 certainly not manufactured into the pistol, correct?
12 A.   It's what -- it's what the manufacturer
13 sends.  So, you know, I guess if you are talking about
14 what's manufactured in the pistol, I don't know what
15 the manufacturer has set aside for that pistol.
16     The only thing I can tell you is that the
17 manufacturers are very cognizant of the round ratio to
18 what is in that magazine and how the gun operates.  I
19 mean, that the magazine itself is very critical to how
20 that weapon operates.
21 Q.   But a pistol with a detachable magazine

Page 32

1  will operate even if there is just round of ammunition
2  in the magazine, correct?
3  A.   It will operate with one round in the
4  chamber.  One round in the magazine, unless the round
5  is loaded into the chamber, does not necessarily mean
6  that it might operate.
7  Q.   But if you were to take a magazine that had
8  one round in it --
9  A.   Okay.
10 Q.   -- put it into the pistol --
11 A.   Uh-huh.
12 Q.   -- you could load the round into the
13 chamber and fire the pistol even though there is only
14 one round in the magazine, correct?
15 A.   That's correct.
16 Q.   So whether it's one round or two rounds or
17 three rounds or 10 rounds or 17 rounds.  In other
18 words, a pistol that's sold with a 17-round magazine
19 does not have to have 17 rounds of ammunition in the
20 magazine for the pistol to operate?
21     MR. PORTER: I object to the form of the

Page 33

1  question, but you can answer.
2  A.   Once again, I -- I can only defer to the
3  manufacturer's research on how well the weapon
4  manufactured, with a certain amount of rounds in it, in
5  the magazine.  Only because of the fact that, as I
6  said, that magazine is critical to how that weapon
7  functions.
8      The fact that you have one round in the
9  chamber -- I mean, your single shot rifle is going to
10 work.  I mean, the bottom line is if that spring
11 tension is different at all, other than what the
12 manufacturer has specified for that gun, it may not
13 function.
14 Q.   But the spring tension changes as rounds
15 are expelled from the magazine, correct?
16 A.   But it's designed for that.  What I'm
17 saying, if it -- if that magazine is altered, or a
18 different magazine, a secondary market magazine is
19 placed in that gun that the manufacturer hasn't
20 designed that gun for, it may not function as intended.
21     And that's why I'm saying that the

Shawn J. Tardy, et al. vs.
Martin J. O'Malley, et al.

Guy Rossi - Vol. 1
January 6, 2014

Page 34

1  manufacturer, when they developed the gun, they
2  researched and they developed the gun, they researched
3  it for specific magazine capacity.  And it could be six
4  rounds.  It doesn't have to be 17.  But the point I'm
5  trying to make is when they design the gun, how they
6  design that magazine is critical to how that gun works.
7  Q.   But there is some manufacturers that have
8  alternative capacity magazines, is that not correct?
9  A.   That is correct.
10 Q.   So as long as the magazine meets the
11 manufacturer's specifications, the number of rounds of
12 capacity are irrelevant to the function of the weapon?
13 A.   I believe that to be a safe comment to
14 make.
15 Q.   And revolvers generally have six rounds of
16 ammunition, correct?
17 A.   Generally.
18 Q.   Generally.  I understand there are 7-round
19 revolvers.  There may be 8, 9, or 10-round revolvers --
20 A.   Right.
21 Q.   -- depending on the size of the ammunition.

Page 35

1  A.   Right.
2  Q.   But, as a general principle, most revolvers
3  would carry six rounds of ammunition?
4  A.   Five to six.
5       MR. PORTER: I object to the form of the
6  question, but you can answer.
7  A.   Sorry.  Five to six.
8  Q.   That doesn't render them unuseful for home
9  defense, does it?
10 A.   Well, it depends.  You know, I -- I have a
11 hard time making that broad statement, to be honest
12 with you.
13 Q.   Why?
14 A.   Well, I mean, first of all, if we go back
15 to one of the things I talked about initially, about
16 the hit ratio of police officers in high-stress
17 situations of one to five, one to six.  One opponent
18 with a five or six-round revolver, you just expended an
19 entire cylinder of ammunition on one opponent.
20 That's -- that's stating that you hit that opponent.
21 So it's not easy for me to say that.

Page 36

1  Q.   Well, do you have any information on the
2  average number of rounds expended by a homeowner when
3  faced with an assailant?
4  A.   No.
5  Q.   Do you have any information on the number
6  of assailants who have continued to approach the
7  homeowner after the homeowner has discharged any number
8  of rounds?
9  A.   No.
10 Q.   So you really can't say that a handgun
11 would be unsuitable for home defense because you have
12 no basis for determining how many rounds on average a
13 homeowner discharges?
14      MR. PORTER: Object to form of the
15 question.  If you can answer the question as asked, you
16 can answer.
17 A.   I disagree with you.  Based on my training
18 and experience, I would disagree with you.
19 Q.   But you have no information to base your
20 opinion.
21 A.   Information is -- experience is

Page 37

1  information.  And, in my experience, if you are dealing
2  with more than one aggressor, even one aggressor, if
3  you had a five-shot snubnose revolver, you would really
4  be pushing your luck in hoping that, number one, you
5  would hit him, whether you are a civilian or a cop, who
6  is better trained than a civilian.  And then you are
7  left with an empty gun.  So I don't think that's a
8  reasonable choice for a civilian.
9  Q.   But your experience is based on that as a
10 police officer, correct?
11 A.   Well, that's correct.  And a person that
12 sees it on a day-to-day basis.
13 Q.   Right.  But police officers are different
14 than citizens.  The -- the occasions upon which --
15      MR. PORTER: Wait.  I'm sorry to interrupt.
16 Was that a question, or were you leading into a
17 question?
18      MR. BOWEN: Well, it was a question, but
19 since he didn't answer, I'm going to change the
20 question.
21      MR. PORTER: Okay.  Well, he didn't have an

Shawn J. Tardy, et al. vs.
Martin J. O'Malley, et al.

Guy Rossi - Vol. 1
January 6, 2014

Page 90

1  his or her home and discharging the firearm, was it?
2  A.  No.
3  Q.  So back to the effects of delay.  You said,
4  "Carrying an unloaded firearm will often not provide a
5  viable means of self-defense.  The victim" -- I am
6  skipping a bit.  "The victim is left with a firearm she
7  needs to retain so that she is not shot with her own
8  weapon."  If the weapon is unloaded because of the
9  delay in reloading it, how is a citizen going to be
10 shot with her own weapon?
11 A.  I think you have to read the rest of that
12 paragraph.  "The victim is left with a firearm that she
13 needs to retain so that she is not shot with her own
14 gun.  At best, the firearm becomes a bludgeoning tool."
15 Q.  But your statement is that the delay in
16 reloading may cause her to be shot with her own weapon.
17 My question is if the weapon is not loaded, how can she
18 be shot with her own weapon?
19 A.  Well, I think we are talking about
20 reloading a weapon here.  And trying to reload a weapon
21 under stress.  And when you try to do that under

Page 91

1  stress, and somebody is closing the gap, trying to get
2  a magazine into a gun, or whatever, could end with a --
3  with a AD, you know, an accidental discharge where they
4  could get shot with their own gun.
5  Q.  But that's not the assailant taking the gun
6  away from them and shooting them with their own gun?
7  A.  Okay.  I understand what you are trying to
8  -- I understand what you are getting at here.  That may
9  have been a misstatement by me.
10 Q.  Okay.  Fair enough.  Moving on to Section
11 3, "Effect of Loss of Defensive Use of Non" --
12    (The reporter asked for clarification.)
13 Q.  "Effect of Loss of Defensive Use of the
14 Non-dominant Arm or Hand," on Page 7.
15 A.  Uh-huh.
16 Q.  You say that, "The delay in loading a
17 firearm has additional deadly implications.  While the
18 left arm and hand are being used to load the handgun,
19 they cannot be used for anything else, such as opening
20 a door to retreat or redirecting a family member out of
21 harm's way."

Page 92

1  How many instances are you aware of where
2  the lack of the reloading hand or arm has resulted in
3  deadly or nondeadly consequences?
4  A.  I can only speak to law enforcement issues
5  here.  But, again, this is almost a common sense type
6  of issue here.  If -- if you are right hand dominant,
7  and you are using your left hand to load a gun, it's
8  not going to allow you the same time to use a phone to
9  call for help, open a door to try to retreat, you know,
10 push an innocent person out of the way.  That was the
11 point that I'm trying to make her.
12    As far as how many specific incidences I'm
13 aware of, I -- I guess specific real life incidences, I
14 can't -- I can't speak to that because I don't know
15 that.  It -- it -- it -- to me it's -- it's a common
16 sense issue more than I could tell you.  Dealing in
17 defensive tactics, you tie up that hand, you are not
18 going to be able to react.  You are not going to be
19 able to stop that person from closing the gap.  You are
20 not going to be able to push that door open.  You are
21 not going to be able to use that phone.

Page 93

1  Q.  Right.  My question was simply how many
2  real world instances were you aware of where the lack
3  of the use of the reloading hand caused a problem for
4  the homeowner?
5  A.  Well, I -- homeowner.  Homeowner is none.
6  Q.  That's all I was asking about, just
7  homeowners.  That's what we are focusing on as the use
8  of weapons in self-defense by the homeowner.
9     MR. PORTER: Object to form of the
10 question.
11 A.  I understand.
12    MR. BOWEN: Okay.
13    MR. PORTER: If it's a deposition, it's
14 questions and answers, not -- I assume that was a
15 question?
16    MR. BOWEN: No.  It wasn't a question,
17 but --
18 Q.  All right.  In Section 4 you talk about the
19 effects of attention distraction caused by loading.
20 A.  Uh-huh.
21 Q.  How many incidents are you aware of where

Shawn J. Tardy, et al. vs.
Martin J. O'Malley, et al.

Guy Rossi - Vol. 1
January 6, 2014

Page 94

1 the attacker continued to threaten the homeowner after
2 the homeowner had expended all the rounds in the
3 magazine and needed to reload?
4 A. I know of one instance where a civilian had
5 an empty gun and the person still complied, if that's
6 what you are asking. And wasn't able to reload, but
7 the person -- bad guy didn't know of it. Your specific
8 question --
9 Q. I'm asking in how many instances of which
10 you are aware did the homeowner expend all the rounds
11 from the gun, have to reload the gun, and while the
12 homeowner was doing that the assailant continued to
13 advance?
14 A. None.
15 Q. Moving on to Section 5, the difference
16 between the AR15s, M16s and M4s.
17 A. Uh-huh.
18 Q. What are the functional differences between
19 the M16 and the AR-15, apart from the ability to fire
20 in fully-automatic mode?
21 A. You are asking me what the differences are?

Page 95

1 Okay.
2 Q. In function.
3 A. In --
4 Q. Function?
5 A. -- function. Not in parts?
6 Q. No. In function.
7 A. That is the biggest difference.
8 Q. Is there any difference other than -- in
9 function, other than the inability to fire
10 fully-automatic mode?
11 A. In function, no.
12 Q. You state that, "The semi-automatic
13 firearms design is in no manner 'based on or is a
14 variation of' the full-automatic design feature." What
15 is your basis for saying that?
16 A. Please point out where that says that to
17 me, please.
18 Q. Under Section 5. Second paragraph.
19 A. Okay.
20 Q. Second sentence. "The semi-automatic
21 firearm design feature is in no manner 'based on or is

Page 96

1 a variation of' the full-automatic design feature."
2 A. I still don't see it here. I'm sorry.
3 Would you just mark my copy where you are talking
4 about?
5 Q. I found it. I think you are a page ahead
6 of me. Do you have Page 7?
7 A. That's probably the reason.
8 Q. There in that second sentence.
9 A. Well, I think the weapons that we are
10 talking about are two different weapons. I don't
11 understand exactly what you are trying to ask me with
12 this question. So maybe if you'll clarify it again for
13 me.
14 Q. Well, I was trying to find out what you
15 were trying to state, but let me ask a different
16 question. You say that they are different weapons, the
17 AR-15 and the M16 --
18 A. They are.
19 Q. -- correct?
20 A. Yes.
21 Q. How are they different?

Page 97

1 A. Well, one is a military rifle. The other
2 one is a civilian rifle. One shoots specifically .556
3 ammunition. The other one shoots .223 and .556
4 ammunition, depending on the weapon manufacturer. One
5 can be fired full auto. One could have shorter barrel
6 lengths. Collapsible stocks. Attachments such as a
7 grenade launcher. Bayonet attachments that the
8 civilian version does not have.
9     And there are component parts of the M16
10 and the AR-15 that are different. Besides the selector
11 switch that allows it to be fired full auto.
12 Q. What are those differences?
13 A. The bolt carrier is bolstered in the M16,
14 M4. The barrel itself on an M16 and M4 are slightly
15 more fortified than the ARs that are sold to civilians.
16 The slide -- the ramp chamber and the ramp in the
17 chamber are different to be able to take the higher
18 pressure of the .556 over the .223. And full-auto mode
19 as well, the chamber itself where the bullet goes into.
20 Q. But you just said that the AR-15 comes in
21 the same caliber and cartridge size.

Page 102

1  and ease of use is what you talk about for the AR-15.
2  Would those characteristics also apply to the M16?  I
3  jumped ahead a little bit.
4  A.  Yeah.  Help me here.
5  Q.  For instance, on Page 9 of your report,
6  under Section 7 --
7  A.  Okay.
8  Q.  -- you talk about, "Safety, Accuracy and
9  Ease-of-Use" --
10  A.  Okay.
11  Q.  -- "The firearms banned by the Act,
12  particularly the AR-15..."
13  A.  Okay.  So your question is?
14  Q.  My question is those features, the safety,
15  accuracy, and ease of use were also features present in
16  the M16, correct?
17  A.  The features are present in the M16 as
18  well, yes.
19  Q.  That's my question.
20  A.  Yes.
21  Q.  You talk about -- Page 9 maybe.  On the M16

Page 103

1  you talk about it's not possible to achieve aimed fire
2  in full-automatic mode with the M16.
3  A.  Uh-huh.
4  Q.  Have you ever trained on an M16?
5  A.  I have.
6  Q.  And trained in full-auto mode?
7  A.  I have.
8  Q.  And were you -- did you receive training on
9  how to attempt to hit targets in full-auto mode?
10  A.  Yes.
11  Q.  And what were you taught on that?
12  A.  It takes a lot of practice.  Can you hit
13  the target?  The answer is yes.  It takes practice.  It
14  takes a lot of control over the weapon.  It is not the
15  preferred method of shooting that weapon.  If you -- if
16  you look at the hand manual for the M16 or the M4, the
17  military says -- says that specifically, that it's not
18  really the best use of that weapon, full auto.  And
19  obviously it shows on my silhouette when I shoot one.
20      So, yeah, it's -- it's -- it's not easy.
21  It mean, it's easier to control than, let's say, a

Page 104

1  Thompson submachine gun than full auto or, you know, a
2  German World War II machine gun.  A grease gun.  A lot
3  easier than any of those weapons, but it's not -- it
4  still takes practice to be able to keep all the rounds
5  on the silhouette.
6  Q.  Accuracy in semi-automatic mode is greater
7  than accuracy in full-automatic mode, correct?
8  A.  Oh, absolutely.
9  Q.  Because why?
10  A.  Well, let me back off here for just one
11  second and just say this.  Accuracy really depends on
12  the shooter's training and ability.  It's a very
13  personalized ability.  It's not -- it's not something
14  that is same for everybody.  Okay.
15      So when you say accuracy in a
16  semi-automatic mode, you know, I know people that could
17  shoot one shot, you know, and hit the wings off a fly
18  at 100 yards.  And they don't need to have two shots.
19  So it's very individualized.
20      To say that somebody will always be
21  accurate in semi-automatic mode is not accurate in and

Page 105

1  of itself because of the fact that it really depends on
2  the shooter's skills and abilities.  But generally,
3  semi-automatic fire is more accurate than
4  full-automatic fire, especially when it's aimed fire.
5  I don't know if that's what you are --
6  Q.  So an individual of a given skill level
7  would be more accurate with semi-automatic aimed fire
8  than firing the same weapon in fully-automatic mode,
9  correct?
10  A.  I believe so.
11  Q.  Moving on to Section 6.  You talk about the
12  military history of banned firearms.  And on the top of
13  Page 9 you talk about, "Many other of the military's
14  firearms that would not be banned under the Act are
15  available in some form in the civilian market."  You
16  refer to the Mossberg 500 and the Remington 700.  But
17  neither of those weapons is a semi-automatic weapon,
18  correct?
19  A.  No.
20  Q.  Moving on to Section 7, "The Difference
21  Between 'Military' and 'Non-Military' Firearms."

Page 106

 1  Again, on Page 9. You state that, "The AR-15 cannot
 2  fire in fully-automatic mode and therefore cannot be
 3  considered military weapons. The ability to fire in
 4  fully-automatic" --
 5      (The reporter made a statement.)
 6  Q.  -- "The ability to fire in fully-automatic
 7  mode is a military function."
 8      So your definition of a military function
 9  for firearms is the ability to fire in fully-automatic
10  mode?
11  A.  Well, when I say "fully-automatic mode," I
12  also mean three-round bursts as well. So that would be
13  automatic three rounds by one press of the trigger.
14  That's one of the differences, yes. There are other
15  differences.
16  Q.  Other differences in functionality?
17      MR. PORTER: Object to form of the
18  question. You can answer.
19  A.  Not functionality.
20  Q.  On Page 9 you talk about banned firearms,
21  particularly the AR-15 -- this is under the section

Page 107

 1  "Safety, Accuracy, Ease-of-Use." -- are also
 2  significantly more accurate than many nonbanned
 3  firearms, are lighter (and therefore easier to aim...)
 4  and have far less recoil. These are the same
 5  characteristics that apply to the M16, correct?
 6  A.  The firearms -- so it -- as I understand
 7  your question, you are asking me if it's the common --
 8  it's common that the AR-15 and the M16 share the
 9  same --
10  Q.  Set of attributes?
11  A.  Yes.
12  Q.  Okay. And those are attributes that the
13  military was interested in obtaining when they selected
14  the M16. Would you agree?
15      MR. PORTER: Object to the form of the
16  question, but you can answer.
17  A.  I believe so.
18  Q.  And these attributes would also be helpful
19  to individuals who wanted to use an AR-15 in an
20  unlawful manner, for instance, to commit a mass
21  shooting?

Page 108

 1      MR. PORTER: Object to the form of the
 2  question, but you can answer.
 3  A.  That's a difficult question to answer.
 4  It's a difficult question to answer because given
 5  this -- the same weapon to two individuals, one being a
 6  criminal and one not being a criminal, is it easy --
 7  just as easy for him to use that weapon? Sure, if
 8  that's what you are asking me.
 9  Q.  No. My -- my question was, those features
10  that you highlighted, increases in accuracy, lighter,
11  easier to aim, have less recoil, aren't those factors
12  advantageous do the illegal use of an AR-15 such as in
13  a mass shooting event?
14  A.  It is. Regardless of a mass shooting event
15  or not, it's just easier to shoot. That's the
16  statement that I'm making here.
17      I don't -- it's hard to -- to say that if
18  it's easier for this person because they have that
19  weapon to create a mass shooting. That's -- that's
20  individual choice. I mean, mass shootings have been
21  done with pump shotguns. Virginia Tech was done with

Page 109

 1  two handguns. One being a .22 long rifle. That is
 2  really up to the individual that chooses to commit that
 3  crime.
 4      So to say that one weapon is their weapon
 5  of choice is an individual choice. And I would be
 6  hard-pressed to say that any one weapon is what people
 7  choose. People -- Columbine used bombs as well. So
 8  Matt [sic], you know, active killer, as you are
 9  describing them, does not always have to use a gun.
10      So the point I'm trying to make is it's the
11  individual's choice of what weapon they pick up, but
12  they're a criminal just the same.
13  Q.  My question is not as to whether this would
14  cause somebody to choose a weapon. What I'm asking is
15  these design features that you talk about would make it
16  easier for an active shooter to kill large numbers of
17  people than a weapon that did not possess these
18  factors?
19      MR. PORTER: Object to form of the
20  question. You can answer.
21  A.  That assumes that the civilians, the school