# Exhibit 45

## To Defendants' Memorandum in Support of Motion for Summary Judgment

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

(Northern Division)

SHAWN J. TARDY, et al.

Plaintiffs                    Case No.

vs.                           1:13-cv-02841-CCB

MARTIN J. O'MALLEY, et al.

Defendants

___________________________/

The deposition of STEPHEN SCHNEIDER was held on Thursday, December 19, 2013, commencing at 10:00 a.m., at the Office of the Attorney General, 200 Saint Paul Place, 20th Floor, Baltimore, Maryland 21202, before Oneeka S. Hill, Notary Public.

REPORTED BY: Oneeka S. Hill

Page 14

A. In regard to this or in regards to this?
Q. Yeah, in regard to that, Exhibit 2.
A. Exhibit 2, no.
Q. Okay. And you said you were involved in the preparation of the Plaintiffs' Response to Defendants' First Set of Requests -- sorry, the First Set of Interrogatories, what's been marked as Exhibit 3?
A. I was.
Q. Have you reviewed these responses?
A. I have.
Q. And is everything still accurate?
A. It is.
Q. Are you aware of anything that needs to be supplemented?
A. Nothing that I'm aware of.
Q. Okay. I'll ask you those questions for Exhibit 4 as well. Have you reviewed those responses, that's the supplemental answers?
A. Yes, I have.
Q. And is everything in there still

Page 15

accurate?
A. Still accurate.
Q. And is there anything you think needs to be supplemented?
A. Nothing that I can think of that needs to be supplemented.
Q. Okay. Thank you. Turning back to Atlantic Guns. So you said it was a family business that started in 1950?
A. (Witness nods.)
Q. And when did you start working there?
A. Well, I actually started working there when I was still in high school. Probably in the early 70s; late 60s, early 70s. And I started working there full time a number of years after I got of college, which would have probably been the late 70s. And then purchased the business in about 1983.
Q. Did you have other professions besides working at Atlantic Guns?
A. I did. I worked -- I worked for some

Page 16

distributors and so forth prior to coming on board. And then some part-time jobs while in college and so forth.
Q. By distributors, did you mean firearms distributors?
A. Firearms distributors and electronics distributors.
Q. Any other professional experience outside of what you've listed?
A. No, that was all.
Q. Does Atlantic Guns have any association with Atlantic Firearms --
A. None at all.
Q. LLC?
A. None at all.
Q. Are you familiar with --
A. Yes, and it's caused some confusion. We are completely separate, different, no overlap at all.
Q. Okay.
A. In ownership and type of business even,

Page 17

completely difference.
Q. What is the difference between your business and theirs?
MR. PORTER: Object to form --
A. I believe --
MR. PORTER: You can answer, if you can.
A. I'm sorry. I believe that they are a -- more of a wholesale or a on-line type of a business, where we are a brick and mortar store front type of business.
Q. What types of firearms are sold at your stores?
A. A broad variety of firearms. Rifles, shotguns, handguns, shooting sports equipment, ammunition. We -- we employ a full-time gunsmith to do repairs and maintenance of firearms. We can supply anything from somebody that wants to shoot sporting clays, to a shotgun, to going hunting, to match target shooting. Kind of run the whole gamut.
(Schneider Exhibit 5 was marked for purposes of identification.)

Q. I'm showing you what's been marked as Schneider Exhibit 5. This is Section 5101 of the Public Safety Article, which contains the list of regulated firearms that are now banned.
A. Uh-huh.
Q. Are you familiar with this document?
A. Let's see, the list of --
Q. Page four has the -- begins the list.
A. Uh-huh. Yes, I am familiar with it.
Q. Prior to October 1st of this year, did your store sell any of the weapons on this list?
A. Certainly, yes, we did.
Q. Which ones were those?
A. You're talking about which numbers on page four did we sell; which of the --
Q. You can say the names, the manufacturer's names.
A. Oh my. Well, some of the items on here are not even made anymore. But I would probably say a good number of these guns at one point in time we have sold. Some of these I have never heard of, but

most of them we have sold on this list, you know, over the past 20 years or 30 years.
Q. Any in particular that you remember selling with some frequency?
A. I would say on this list by far the most popular gun that we sell are AR15 firearms.
Q. Any others?
A. I would say probably the AK-47, the Springfield Armory M1A would probably be the -- probably be the most popular of all these that we sell.
Q. How do you decide which firearms to have in stock?
A. Well, we base it on what the demand of our customers is, what -- you know -- what sells. Like I guess in any business, what -- what your clientele wants.
Q. Makes sense. For the three that you just listed, the AR15, the AK-47 and the Springfield Armory M1A, did you always have those -- did you always try to have those in stock?

A. Yes, we did. They -- 30 years ago -- I mean I can go back 30 or 40 years ago. They weren't nearly as much in demand as they are today. Over time it's kind of evolved and they've gotten a lot more popular in -- in recent years.
Q. Why do you think that is?
A. I think it's as with all technology, and automobiles, and stereo equipment, and everything, you have a younger crowd, you have more exposure to it in the military, people that have gotten out of the military, people want the latest. They want the most modern. And I think that translates in all businesses, and firearms are not immune to that. Firearms, also, the gun business is along those same lines.
Q. Do you work with any manufacturers in particular?
Let's start with the AR15, which manufacturers do you work with for the AR15?
MR. PORTER: Object to the form of the question, but you can answer.

A. Uh-huh. Number one vendor for AR15s has probably been a company called Rock River, but other -- we sell other AR15s also, other manufacturers. AR Colts and other AR15s.
Q. How about for AK-47s, what's your major manufacturer?
A. They -- I don't know that there's really a manufacturer. There's importers that we deal with that bring AK-47-type firearms. Some of them are actually made in this country now. I couldn't pick one particular importer that I could think of offhand.
Q. For the AR15 there are hundreds of manufacturers, isn't that right?
A. I don't know about hundreds. There are many.
Q. There are many. How do you pick which manufacturers you plan to have in stock?
A. We generally pick manufacturers that builds a very high quality product.
Q. You comply with the 77R process, correct?

Page 22

A. Of course, we do.
Q. Have you made any complaints to the Maryland State Police about your inability to comply with any part of the 77R process?
MR. PORTER: Object to the form of the question, but you can answer.
A. Are we talking about over time, are we talking about since October 1 or in -- in what regard do you mean?
Q. In general.
A. I mean, we have questions ongoing that we'll address to the State Police regarding how certain things are handled, or if there's issues or problems or something like that. I -- I -- you'd have to be a little more specific for me to answer that question I think.
Q. Can you think of an example where you would asked the MSP for guidance on the 77R?
A. You're talking about for completing the 77R.
Q. Yes.

Page 23

A. There was a question a number of years ago regarding the fire shell casing requirement, and whether we would need to have a fire shell casing for a company that did not hold a manufacturer's license in the United States. In other words, an importer of a firearm from overseas, the question posed was, would the firearm, when it was sold, would we have to supply a fire shell casing for that firearm.
Q. Was the MSP able to answer that question?
A. They were. They were.
Q. Have you ever asked questions to the MSP about whether a firearm you wanted to sell qualified as a regulated firearm?
A. We have.
Q. Can you give me an example?
A. Well, we've asked them questions regarding whether certain types of ARs, AR15s were regulated and -- you know -- in the past. And many times they could not answer directly. They say, well, here's the law, you figure it out.

Page 24

Q. How do you figure it out?
A. It's tough sometimes. And we have always aired on the side of -- Atlantic Guns have always aired on the side of being very conservative. And when these guns were regulated, often times we would complete a 77R to send in, even though there was a question about whether the gun was a regulated gun, was a copy perhaps of one of these listed guns or not. We would go ahead and do it anyway.
Q. This -- the list of banned guns that you have in Schneider Exhibit 5, are there any differences, that you know of, between that list and a list of previously regulated long guns?
A. I believe it is the same list.
Q. Just for ease of conversation, I'll refer to those as the banned long guns.
A. Okay.
Q. Since October 1st when the new law went into effect, have you asked the MSP any questions about which long guns are banned long guns?
A. We have not. Atlantic Guns has not

Page 25

directly, no.
Q. Okay. Are you aware of any criminal penalties that were put in place prior to the passage of this law with respect to the 77R process?
MR. PORTER: Object to the form of the question, but you can answer.
A. I don't understand what you mean by that.
Q. Do you know of any gunshop owner facing many criminal penalties for problems complying with the 77R process?
A. I do not.
Q. And have you made any eighth day releases?
MR. PORTER: Object to the form of the question.
Q. Do you know what I mean when I say eight-day release?
A. I think I do.
Q. What I mean is, after the seven day waiting expires, but before a background investigation is completed, are you familiar with

Page 30

a trigger, according to your hand, eye coordination -- now I would say you cannot do that accurately. But it depends on the amount of training you have and what you're shooting at; and what you're shooting at as to how fast you want to shoot the firearm.
Q. If you want to shoot it quickly, it's as fast as a pull of a trigger?
A. It's as fast as how quickly you can pull the trigger.
Q. Had you ever timed how quickly you can pull the trigger?
A. I never have, no.
Q. Do you have a sense of how long it would take between shots?
MR. PORTER: Objection to form.
A. A second, I guess. I really don't know, otherwise you just be wasting ammo. Because if you fired it that fast, you're probably not going to hit anything.
Q. When you have fired AR15s, where have you

Page 31

typically been firing them?
A. Most at the range, primarily, and in the woods hunting.
Q. When you are at the range, how long do you take between shots?
A. Oh, I'm shooting for accuracy, and usually at 100 yards or 100 yards plus, so it can be minutes between shots. I mean, there's no difference between how long I would shoot an AR15 and say, a Bolt Action rifle. It would be the same.

Page 32

Page 33



[redacted]

[redacted]
Q. Okay. Do you do any competitive shooting?
A. I do not anymore.
Q. Not anymore, but you did at one point?
A. I did.
Q. Can you describe what that was?
A. The competitive shooting that I did was -- there was a competition 25 years ago called the Chevrolet Team Challenge, where you shot a rifle, a shotgun and a handgun. And you shot as a team, a three-person team. And there were different stages that you would shoot; with clay birds with a shotgun and metallic or wet targets with a 22 and a handgun. It was a lot of fun.
Q. Was that also known as a three-gun competition?
A. It wasn't at the time.
Q. Okay.
A. There is a competition now called a three-gun competition. It is different but it's --

I think the three-gun competition today does not utilize a 22 rim fire cartridge. It uses a 223, like an AR15-type of rifle, as opposed to a 22 rifle in prior years, which is what the Chevy Team Challenge was.
Q. For the challenges that you participated in, were you able to pick your own weapons?
A. You can pick your own weapons within certain classifications of weapons.
Q. Okay.
A. Yeah.
[redacted]

[redacted]
MR. PORTER: Could we go off the record for just a second.
MR. RUCKMAN: Sure.
(A discussion was held off the record.)
MR. RUCKMAN: Back on?
THE REPORTER: Yes.
[redacted]

Page 38

Page 40

Page 39

Page 41

A. Well, I've -- I've been around firearms since I was a little boy. I have had hunters safety training. Primarily the training that I've had is with my -- growing up with my father, years of -- of being around firearms and handling firearms.

There were a couple of courses that I took back in college, small barrel rifle courses, competition-type courses.

But, I mean, I'm about 60, and I will say since I was 10 I've been around firearms so --

Q. It's a lot of firearms experience.

A. Yes, it is.

Q. Did you ever take any courses on self-defense with firearms?

A. I have not.

Q. Have you ever had to use one of your firearms in your home?

A. I have not.

Q. Have you ever had an intruder at your home?

A. I have not.

direction from State Police or from the State of Maryland as to what kind of modifications would be considered okay.
Q. Have you asked the State Police?
A. No, we have not.
Q. And I was talking about hunting a second ago. What's the most -- how many rounds -- what's the most -- strike that.
What's the most number of rounds you've fired in a hunting context?
A. Four or five maybe.
You mean at one -- at one game animal at one time you mean?
Q. Yeah, one hunting event?
A. One hunting event?
Q. Yes.
A. I would probably say it, but I'm a good shot so it usually doesn't take more than one.
Q. So regardless of the size of the beast -- I have never gone deer hunting. Regardless of the size of the beast, the better you are, the fewer

shots you need?
A. Generally I would say that's probably true. In a hunting situation I would definitely say that's true.
MR. PORTER: I'm going to withhold my objection to the use of the term "beast."
MR. RUCKMAN: Beautiful animal, God's creation.
MR. FADER: We've been going for an hour and and a half. Want to take a quick break.
THE WITNESS: That'll be great, yeah.
MR. RUCKMAN: Yeah. Yeah. Thanks. Lost track of time.
(A break was taken.)
MR. RUCKMAN: Back on?
THE REPORTER: Yes.
Q. We were talking about rounds you fired while hunting. Would you say that magazines with more than 10 rounds are commonly used for self-defense?
A. You mean guns with magazines that hold

more than 10 rounds are common for self-defense?
Yes, of course.
Q. Do you have a knowledge of an incident where more than 10 rounds have been fired in self-defense?
A. I don't. I don't have any personal knowledge of that.
Q. Do you have any personal knowledge of a incident in which more than six rounds were fired in self-defense?
A. To be honest, I don't really know how many rounds somebody would have fired in self-defense. It's not something that I have any personal knowledge of, whether it's one or 10 or 20.
Q. If, God forbid, you were ever in a situation where you did need to fire one of your weapons in self-defense, how many rounds would you expect to fire?
A. As many as it takes. As many as it takes to stop the threat.
Q. Do you think more fire power is always

better?
A. I absolutely would think that, yes.
Q. If you were faced with an intruder, which weapons would you pick up?
A. Well, I would pick up the weapon that was at my closest, you know, disposal, to be honest with you. But if I had a choice, it would be a firearm that had the higher capacity of rounds in it.
Q. And why is that?
A. Because if I missed on the first or the second or the fifth or the ninth, I'd know that I still have one or two or five rounds left in the magazine.
I mean, you don't know in a stressful situation, you know, how you're going to react. You know, we have many police officers that I know have been involved in firefights, and sometimes it takes them a number of shots to -- if they use it, to subdue the situation.
Q. Do you have customers that come into your stores asking specifically for a certain firearm to

Page 82

use for self-defense?
MR. POTTER: Objection to form. You could answer.
A. Sometimes people will do their own research and come in and say, I want a such and such firearm. Many times they come in and say, what would you recommend, here's my -- then we'll ask questions, what are your circumstances, what is your training, that sort of thing; what do you feel comfortable with.
Q. What function would you say is served by an AR15 in home self-defense that's not served by other firearms?
A. I guess some of the things that could be served by an AR would be served by others also, but I would probably say a low recoil aspect to the gun.
It's very easy to handle in -- in some configurations. It can be -- as opposed to perhaps a shotgun, it can be a smaller gun in stature and size. Having a collapsible stock would be easier for many more people to use instead of -- for

Page 83

example, if you determine to use a shotgun in the home, it would have a longer stock, which is a little bit more difficult to use. As we mentioned earlier with a shotgun, particularly a 12 gauge, has far, far more recoil than what an AR15 would have.
Q. None of those features you listed, though, are strictly necessary to defend your home, would they?
A. I guess you could say that. I don't know what you mean by -- would be strictly necessary? I don't quite understand the question.
Q. If you didn't have an AR15, there are other firearms you could effectively defend your home?
A. Yeah. But maybe not as effectively as you could perhaps with an AR.
For example, if you were -- had a military background and you used an AR15 a lot, and now you're out of the military, that's the gun that you know, and that's the gun that would be your go to simply because you've trained with it, you know

Page 84

the firearm, and you know its reliability and you feel comfortable with it.
Q. With magazine capacity, you said more fire power is better. Is it necessary to have more than 10 rounds to defend yourself?
A. It may be for some people, yes. Just -- I mean -- you know, you could say you could defend yourself with a single shot Flintlock rifle, or you could defend yourself with an AR15 with 20 rounds in a magazine. I mean, they're two kind of opposite ends in a way.
But if you ask somebody which they would prefer and which they feel more comfortable with, you know, defending themselves, I don't think many people would pick a Flintlock rifle, although both of them could potential get the job done.
Q. You don't know of a situation where one used more than 10 rounds to defend their home?
A. I do not have any personal knowledge of that.
Q. You had said in Schneider Exhibit 2, in

Page 85

response eight, that firearm may be used effectively in home defense without a shot being fired, as its mere presence may be sufficient to dissuade an attack or intruder, is that correct?
A. Yes.
Q. That is consistent with the story you said at your store, is that correct?
A. Yes.
Q. You share this view?
A. Oh, most certainly I do.
Q. Do you know of situations where -- well, strike that.
Can a handgun be used effectively in this manner?
A. It can be. But in my opinion, a handgun does not have the deterrent effect of a long gun.
Q. Can a hunting rifle be used in this way?
A. It could be.
Q. Earlier in our conversation I think you had said that you had questions -- you had posed questions to MSP about whether certain AR15s are

Page 86

covered as regulated, is that correct?
A. We have in the past, yes.
Q. In the past, meaning prior to October 1?
A. Yes, nothing after October 1, but prior to October 1.
Over the course of years we've had a good relationship with Maryland State Police. The folks in the firearms licensing have been great people. But they often times cannot answer direct questions, specific questions about the types of things -- what is regulated and what is not regulated -- what was regulated and what was not regulated.
Q. What firearms were you asking them about specifically?
A. I can't remember specifically what firearm it was. And the advice that we received from -- that I received from Maryland State Police was that, whatever decision -- they would not answer the question. But they said, whatever decision you make, be sure that you have good reasoning for the decision that you make, which is not the answer to

Page 87

the question that I was really asking. But they didn't want to go out on a limb, I assume, and say one thing or another. First of all, it would have just been a verbal.
And we have -- with very few instances, been able to get anything in writing from the Maryland State Police over all the years.
Q. But that one firearm you were just talking about, you can't remember --
A. I cannot remember what it was. It was a number of years ago when I went to the Maryland State Police to pick up copies of, you know, 77R blank forms. And the officer that helped me load it in my vehicle, we got into a conversation and I asked -- I really cannot remember exactly what it was. But his response to me is, I cannot answer that directly, but whatever decision you make to determine whether it is a regulated or whether it isn't a regulated firearm, be sure that you have good reasoning as to why you, you know, decide one way or the other.

Page 88

Q. Are there other occasions where you asked questions about whether a firearm is covered?
A. There may have been over the years. One in particular, going back a ways, was the 22 long rifle copies -- or they're not really copies, but 22 long rifles that look like an AR15 or look like an Uzi or some of the other guns.
For years we'd ask, is that considered a copy and is it regulated, and we would get varying responses. And then finally, after years the State Police finally did put in writing, that no, it's not a regulated firearm, we do not consider it a regulated firearm. That's one of the few instances that I can remember where they actually put something in writing.
It was most of the time where they didn't put it in writing. They would just verbally say, you have to make the decision, but be sure whatever decision you make, you can argue for that. And that kind of left us flapping in the breeze, so to speak.
And we specifically, as Atlantic Guns,

Page 89

maybe to our detriment, always took a conservative approach, and we considered it regulated, even though many other shops perhaps did not.
Q. I think you had said earlier that there are certain weapons that are now banned as copycats?
A. Certain firearms.
Q. Certain firearms. What are those weapons?
A. Specifically I can't think of one right -- you kind of caught me short. But, I mean, there are others that are not on that list that have two of the criteria that are detachable box magazine guns that have two or more of the features that are -- that would cause it to be banned. I can't think of any right offhand, but there are guns of that nature.
And there are more guns -- when that list -- it's more firearms that were produced after that list was made, newer guns that are not on the list of specifically banned guns, but that would now be banned because they have two of those features.

gas piston gun.

And, you know, that's -- that's what we've been going on for years, until we get another directive from the State Police saying, no, any AR, regardless of its operating system, is now banned.

So there's a great deal of confusion there about, you know, whether -- what they're saying is a copy, is really -- you know -- really has any teeth anymore; whether it does require that all the parts that can be interchangeable between the two to allow full operation.

Q. So do you no longer sell those weapons as a result of your uncertainty?

A. For now, yeah, we have pulled them from our shelves because we're just not certain for sure whether they're a copy or not. We never considered them a copy in the past.

Q. And just for clarity, what was the most recent advice you received from MSP about that?

A. We haven't received any direct advice from MSP.

Q. Okay. We've been talking a lot about how you would use a weapon, one of these banned weapons. It's also possible that criminals may use one of these banned weapons. In Schneider Exhibit 3 you talk about how a criminal could substitute any available firearm for one that is banned, is that correct?

A. Uh-huh. Yes.

Q. Could law-abiding citizens do the same thing?

A. In other words --

Q. Substitute one of the banned firearms for one that's not banned?

(Mr. Fader is no longer present.)

A. They probably could, yes. Maybe. But it may not be their reference to do that.

But, I mean, you can -- like I said earlier, you could potentially use a Flintlock rifle in your home to protect yourself, so it's a matter of what you're comfortable with.

Q. What's the difference between an AR10 and an AR15?

A. An AR10, the way it's -- the operation of the gun is similar to an AR15, but I guess it -- for lack of a better way to describe it, it's kind of an AR15 on steroids. It's a larger -- everything is larger than the AR10. The size of the gun, the size of the receiver. It's also in caliber -- well, there's various calibers. But most popular caliber is a 308 Winchester, which is much, much larger caliber. Much more powerful caliber than what the 223 is.

Q. And is it your understanding that that is not covered by the ban?

A. As long as it does not fit the copycat, it would not be considered banned.

And we attended a State Police seminar where the State Police specifically said that that was not covered. Verbally said that that was not covered.

Q. How about the Ruger Mini 14?

MR. PORTER: Object to the form.

Q. Let me rephrase. Is it your understanding that the Ruger Mini 14 is not covered by the ban?

A. The Ruger Mini 14 is not covered by the ban unless it has a folding stock, because that's one of the listed guns.

Q. What is the difference between a folding stock and a traditional stock, and how would you explain that difference?

A. Well, there's no -- I wouldn't call it a traditional stock. There are collapsible stocks. There are folding stocks and there are fixed stocks. And there are adjustable stocks, adjustable fixed stocks. So it's really -- there's different types of stocks that you could use to shoot the gun.

So I wouldn't really tend to say traditional necessarily, just fixed. Meaning it's not adjustable.

Q. So a Ruger Mini 14 with a folding stock more concealable than one with a fixed stock?

MR. PORTER: Object to form.