REDACTED

Exhibit 46

To Defendants' Memorandum in Support of Motion for

Summary Judgment

1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MARYLAND
 3                    (Northern Division)
 4
 5   SHAWN J. TARDY, et al.
 6            Plaintiffs              Case No.
 7   vs.                              1:13-cv-02841-CCB
 8   MARTIN J. O'MALLEY, et al.
 9            Defendants
10   _____/
11
12
13            The deposition of JOHN JOSSELYN was held on
14   Tuesday, December 3, 2013, commencing at 2:10 p.m., at
15   the Office of the Attorney General, Civil Litigation
16   Division, 200 Saint Paul Place, 19th Floor, Baltimore,
17   Maryland 21202, before Susan M. Wootton, RPR, CLR,
18   Notary Public.
19
20
21   REPORTED BY: Susan M. Wootton, RPR, CLR
```

Case 1:13-cv-02841-CCB   Document 44-46   Filed 02/14/14   Page 3 of 11

Shawn J. Tardy, et al. vs.
Martin J. O'Malley, et al.

John Josselyn - Vol. 1
December 3, 2013

Page 14

 1  I interrupted you.  Yes.  Yes.
 2  Q.  And what was your role in responding to the
 3  request for production of documents?
 4  A.  I provided all the documents that I could
 5  locate that were germane and applicable to the request.
 6  Q.  Who else, to your knowledge, was involved
 7  in that effort?
 8  A.  Within my organization?
 9  Q.  Yes.
10  A.  Just myself.
11  Q.  The next document, Nolte Exhibit 4, is a
12  response by a number of organizations, including the
13  Associated Gun Clubs of Baltimore, to Defendant's First
14  Set of Interrogatories.
15      Do you have that in front of you?
16  A.  Yes, I do.
17  Q.  All right.  Are you familiar with this
18  document?
19  A.  Yes, I am.
20  Q.  Is that in fact your signature on the
21  signature block at the back of the document?

Page 15

 1  A.  Yes.
 2  Q.  Is all of the information provided in the
 3  responses to the interrogatories still accurate?
 4  A.  To the best of my knowledge and belief,
 5  yes.
 6  Q.  And are you aware of any supplementation or
 7  additional information that would be called for if you
 8  were answering these today?
 9  A.  If you'll bear with me while I flip through
10  to refresh my memory.
11  Q.  Please do.
12  A.  On interrogatory number 3, I do have
13  additional information that I've been able to verify.
14  Q.  What is that?
15  A.  An incident that occurred, it requests,
16  identify any incidents since October 1, 2003 in which
17  an individual discharged more than 10 rounds from a
18  single firearm in a home defense.
19      I know of an incident that was not home
20  defense, per se, but it was self-defense.
21  Q.  Could you please describe that for me?

Page 16

 1  A.  As I recall the details, it was about 2006,
 2  late winter, early spring.
 3      A gentleman was accosted by three and
 4  perhaps as many as four persons who approached him when
 5  he was exiting his vehicle to make a bank deposit of
 6  his corporate funds.  He owned several gas stations in
 7  Baltimore City.
 8      A car pulled up, a number of persons jumped
 9  out.  I'm not sure whether it was two or three.  It was
10  at least two, perhaps three, who then I attacked him.
11      He retreated to his vehicle.  He was unable
12  to make an exit.
13      He did have a carry permit, and he drew his
14  legally owned 9-millimeter pistol and defended himself
15  as justifiable and appropriate.
16  Q.  Go ahead.
17  A.  He expended the entire magazine in the
18  encounter, which was approximately 16 rounds.
19      And subsequent to that, as he covered the
20  situation, he then reloaded to make sure that there
21  were no more assailants in the area that he hadn't yet

Page 17

 1  identified.
 2      During this period of time, those surviving
 3  assailants left in a vehicle at a high rate of speed.
 4  They were subsequently arrested and charged and
 5  convicted.
 6  Q.  Where did this occur?
 7  A.  Baltimore City.
 8  Q.  What was the individual's name?
 9  A.  I believe it was Mark Beckwith, but it
10  might have been Beckworth.
11  Q.  What is your source of information about
12  the incident?
13  A.  News accounts at the time that it happened,
14  both on the television and radio media, as well as the
15  print media, and a conversation with him that I had
16  long since forgotten that suddenly popped into my mind
17  when I was prepping for today, that I started to recall
18  the details of the incident.
19  Q.  When did you have that conversation?
20  A.  With the gentleman?
21  Q.  Yes.

Page 18

1  A.  Oh, at least a year ago.
2  Q.  Okay.
3  A.  It was, it was a casual conversation. It
4  wasn't a fact-finding mission.
5    It was, are you okay, can we do anything to
6  help? He was not one of our members.
7  Q.  Did you learn any information about the
8  incident from any source, other than your conversation
9  with him?
10 A.  Just what I saw in the media and heard, you
11 know, in the news.
12 Q.  And was that information that you heard or
13 saw back in 2006?
14 A.  It would have been, yes.
15 Q.  And did you review any of that information
16 in the last year?
17 A.  I, I went back. Once I recalled the
18 incident, I went back to the Internet and did a Google
19 search and, just to get an idea when it occurred
20 because I couldn't recall the year any more.
21 Q.  Do you know if any police report was filed?

Page 19

1  A.  Oh, I'm sure it was. The case was
2  prosecuted.
3  Q.  Were any of the assailants hit with the
4  rounds?
5  A.  Two were struck.
6  Q.  And did both survive?
7  A.  One survived. I believe he was apprehended
8  in the hospital when he sought medical aid.
9    The other one was left at the scene by his
10 colleagues and subsequently died of his wounds.
11 Q.  Other than that incident that you've just
12 described, are there any other additions or changes
13 that you would make to any of the interrogatory
14 responses, if you were responding today?
15 A.  I'm not sure it's exactly aligned with it,
16 but on number 5, and it may not be number 5, it was an
17 incident that I heard in testimony in the 1990s, I
18 think.
19   I don't recall the name of the person
20 testifying. It was, it was a young lady, a young
21 mother, and after her husband had gone to work, one or

Page 20

1  more persons invaded their home.
2    She was a competitive target shooter who
3  routinely used the firearms that had been banned.
4    When she heard the break-in, she gathered
5  her children in a safe room, and she proceeded to load
6  her rifle and perform the operation we usually call
7  dropping the bullet, which is to hit the bullet release
8  so it will chamber a round.
9    That's usually a fairly loud affair in a
10 quiet house. Immediately upon that sound, the person
11 or persons exited the home and she never did see them.
12 Q.  Do you know what kind of firearm that was?
13 A.  It was an AR-15.
14 Q.  Does chambering a round in an AR-15 sound
15 much different than chambering a round in say an AR-10?
16 A.  I've never heard a round chambered in an
17 AR-10, so I can't say.
18   But I would say they're probably similar,
19 but they're going to be distinct because the AR-15 is a
20 much lighter round and it would chamber faster. It
21 would make a sharper rap.

Page 21

1  Q.  Sharper but quieter?
2  A.  I can't speak to that. I don't know.
3  Q.  And have you ever heard a round, I guess
4  the sound it makes when you're preparing to shoot a
5  shotgun?
6  A.  Yes.
7  Q.  How does that sound compare to chambering a
8  round in an AR-15?
9  A.  It's distinctly different.
10 Q.  In what way?
11 A.  It's a heavier sound because the components
12 are heavier.
13 Q.  So that's a sound that would be even louder
14 than an AR-15?
15 A.  It would depend on whether it was a pump
16 shotgun or a semi-automatic. A semi-automatic closes
17 at a given rate, but a pump is how fast you move it.
18   There's no comparison. It's an apples and
19 oranges.
20 Q.  But both fairly distinctive sounds
21 indicating preparing to shoot a firearm?

Case 1:13-cv-02841-CCB   Document 44-46   Filed 02/14/14   Page 5 of 11

Shawn J. Tardy, et al.  vs.
Martin J. O'Malley, et al.

John Josselyn - Vol. 1
December 3, 2013

Page 22

1  A.  I would think so.
2  Q.  So, in the incident you're describing with
3  respect to interrogatory number 5, no shots were
4  actually fired, is that right?
5  A.  That is correct.
6  Q.  Any other additional information that you
7  would add to the interrogatory responses?
8  A.  Not at this time, no.
9  Q.  You mentioned the AR-15 and the response
10  that you just provided.
11     What is an AR-15?
12  A.  An AR-15 is a semi-automatic firearm that
13  was designed in the late 1950s, became fairly common to
14  the, the citizens, the general public, if you will, in
15  I would say the first half of the 1960s, probably
16  subsequent to 1963.
17     It's probably the most common
18  semi-automatic firearm in the country.
19  Q.  What is your firearms background,
20  generally?
21  A.  I'm an NRA certified instructor in rifle,

Page 23

1  pistol, shotgun, home firearm safety, and I'm also a
2  range safety officer.
3     I also am certified in personal protection
4  in the home.  I'm also a State certified handgun
5  instructor.
6  Q.  Have you undertaken any sort, any form of
7  education in firearms?
8  A.  Formal in the sense of the instructor
9  courses I've taken from the NRA, yes.
10  Q.  Anything beyond that?
11  A.  No.
12  Q.  Getting back to the AR-15, you said it was
13  designed in the late 1950s.  Was it designed for
14  military use?
15  A.  It was originally designed as a line of a
16  number of prototypes that were being developed in the
17  hope that the military would buy them.
18     But they were being designed as fully
19  automatic firearms.
20  Q.  So the --
21  A.  Once it was adopted by the military, it was

Page 24

1  then designated as the M16, and the AR-15 ceased to
2  exist as a selected fire device, and Colt then
3  manufactured it for the general public as a
4  semi-automatic only firearm that is not readily
5  convertible to the fully automatic mode in compliance
6  with ATF regs.
7  Q.  And other than the facts that the AR-15 is
8  semi-automatic, whereas the M16 is selective fire with
9  an automatic option, are there differences between the
10  AR-15 and the M16?
11  A.  Yes and no.  Functionally they're
12  relatively similar, depending on which model you're
13  looking at.
14     As it evolved and weaknesses were
15  identified, the manufacturer then upgraded the model,
16  the chrome-lined barrel, forward bolt assist, that sort
17  of thing.
18     But the general operation remained the
19  same.
20  Q.  With the exception of the automatic versus
21  semi-automatic?

Page 25

1  A.  That is correct.
2  Q.  How many manufacturers are there that
3  manufacture AR-15s?
4  A.  AR-15, only one, that is a Colt trademark,
5  but the AR-15 family, there are dozens.
6  Q.  And so does Bushmaster have an AR-15?
7  A.  They had an AR-15 looking firearm.
8  Q.  And was that firearm one that had
9  essentially interchangeable parts with the Colt AR-15?
10  A.  I'm not certain.  I've heard rumor that
11  some parts don't interchange well, but I don't know
12  that is true, so I can't speak to that as being a fact.
13  Q.  What about DPMS, do they have an AR-15
14  equivalent?
15  A.  It's my understanding that they do.
16  Q.  And are you aware of any differences
17  between the DPMS and the Colt AR-15?
18  A.  No, I'm not, I'm not that familiar with the
19  DPMS model.
20  Q.  Are you aware of the rate of fire from a
21  Colt AR-15?

Page 26

1  A.  Define rate of fire?
2  Q.  The rate at which you can fire a round from
3  the Colt AR-15.
4  A.  Since it's semi-automatic, it will fire at
5  whatever rate you can pull the trigger, so it's germane
6  to the user rather than the firearm.
7  Q.  So, as quickly as a user can pull the
8  trigger, the AR-15 can fire off a round?
9  A.  That is true of any semi-automatic.
10 Q.  Was there a time that you're aware of that
11 the AR-15 took off in popularity in the civilian
12 market?
13 A.  Are we speaking before the legislation was
14 offered or throughout its history?
15 Q.  Say through its history, before January 1st
16 of 2013.
17 A.  I would say prior to that the bumps
18 occurred whenever either the State or Federal
19 government wanted to ban them.
20 Q.  And by bumps, do you mean increases in
21 popularity?

Page 27

1  A.  People who were putting off the purchase
2  for reasons of economics, or whatever their motivation
3  would be for delaying, would see that, if they didn't
4  buy it while it was still available, they'd never be
5  able to own one.
6      Essentially we saw the same thing that
7  happened with prohibition.  When something is banned,
8  the American people historically will try to obtain it
9  because they're freedom loving people.
10 Q.  Do you have, have you ever heard the term
11 modern sporting rifle?
12 A.  I probably have but never attributed any
13 significance to the term.
14 Q.  So, do you have an understanding of what it
15 refers to?
16 A.  I couldn't say that I've ever seen a real
17 definition, unless it has something to do with what is
18 in the curio and relic.
19 Q.  For the AR-15s, does the Associated Gun
20 Clubs of Baltimore take the position that ownership of
21 AR-15s is common in Maryland?

Page 28

1  A.  I don't know that we've taken any formal
2  position, but it's been my experience, when I'm out on
3  the line visiting the range, that 60 or more percent of
4  the firearms on the range are either AR-15s or AR-15
5  clones.
6  Q.  When you say AR-15 clones, what are you
7  referring to?
8  A.  If you're standing back 20 yards, you don't
9  know whether it's an AR-15 or a Bushmaster or a DPMS.
10 Q.  That is based on the fact that you --
11 A.  The cosmetic appearance, it's that type of
12 firearm.
13 Q.  And that is, and when you're referring to
14 AR-15, again, you're referring only to ones
15 manufactured by Colt because they own the trademark on
16 that, is that correct?
17 A.  That is correct.  Ownership is not limited
18 to the AR-15s.
19     There's a wide spectrum, as you've already
20 noted, of manufacturers who produce these firearms that
21 it's, since they're all so very, very similar, it's

Page 29

1  personal preference as to manufacturer.
2  Q.  That 60 percent figure, is that based on
3  your own personal observations?
4  A.  That is based on my observations on the
5  range, looking at the number of shooting positions that
6  are occupied, firearms in the racks and, yes, compared
7  to the non-AR-15 types.
8  Q.  Is that just your own sort of guesstimate,
9  or have you actually recorded any figures to, to work
10 out that percentage?
11 A.  Just knowing the number of shooting
12 positions we have on the line and seeing the number of
13 positions filled by these types of firearms, it's a
14 pretty accurate guesstimate, yes, and I think
15 60 percent would be the bottom line.
16     It's probably higher because some of them
17 were in the racks, they weren't actively being used on
18 the line because the shooter was using something else,
19 so 60, I would say, is a good minimum.
20 Q.  And have you, have you recorded that
21 information anywhere?

Case 1:13-cv-02841-CCB   Document 44-46   Filed 02/14/14   Page 7 of 11

Shawn J. Tardy, et al.  vs.
Martin J. O'Malley, et al.

John Josselyn - Vol. 1
December 3, 2013

Page 30

1  A.  No.
2  Q.  Or is that just based on your own recall
3  from your observations?
4  A.  It's based on my observations, and it
5  wasn't recorded because I never anticipated being asked
6  that question.
7  Q.  Other than your observations at the
8  shooting range, do you have any other basis for the
9  claim that ownership of AR-15s is common in Maryland?
10 A.  I think, if you visited a gun show and you
11 looked at the depth of the lines in front of the
12 dealers who are selling that type of firearm, it's
13 pretty clear that they're the most popular choice.
14 Q.  Any other basis for that?
15 A.  None that come to mind.
16 Q.  Is it the position of the Associated Gun
17 Clubs of Baltimore that AR-15s are commonly used in
18 self-defense in Maryland?
19 A.  Yes.
20 Q.  And what's the basis for that?
21 A.  Because they are so common, ownership is so

Page 31

1  widespread, that the probability statistically is that
2  they would be used.
3  Q.  Is there any other basis for the claim that
4  they're commonly used in self-defense, other than
5  probability?
6  A.  It's an excellent firearm for that purpose.
7  Q.  What's the basis for that statement?
8  A.  Their gestation period has been so long,
9  they've been in use for so long that all the mechanical
10 bugs that could be in it have been worked out.
11    That makes it a very reliable, durable
12 firearm that you can have faith in, that it will work
13 when you need it.
14 Q.  Okay.
15 A.  It's a versatile firearm, so you have a
16 chance to practice with it at the range, and
17 competition and sporting use are just good practice for
18 self-defense.
19    What you're familiar with is what you will
20 normally pick, so what you've trained on is what you're
21 familiar with, and under a time of stress, you're going

Page 32

1  to want something that you can instinctively use
2  without having to think about it, that you know what to
3  do and you don't have to stop and say, I have to do
4  this, I have to do that.
5  Q.  So, you think it's reliable because the
6  bugs have all been worked out and because it's used for
7  sporting purposes, people are familiar with it, and
8  that they'll reach for it in self-defense?
9  A.  I don't, I don't know if that makes it
10 reliable, but I believe that they will reach for it in
11 self-defense because it's something they've used so
12 often that it's all second nature to them.
13 Q.  Other than those two factors, is there any
14 other basis for the claim that they are an excellent
15 firearm for self-defense?
16 A.  I think the historical record that we've
17 spoken of, how common they are and how people use them,
18 that they're reliable, they're effective.
19    I think that is all that needs to be said
20 about a firearm, is that it does all things well within
21 the capabilities of its cartridge.

Page 33

1  Q.  Are handguns also useful in self-defense?
2  A.  Any firearm is useful in self-defense.
3  Q.  Is it the position of the Associated Gun
4  Clubs of Baltimore that AR-15s are better self-defense
5  weapons than handguns?
6  A.  That would depend on the person.  If, if
7  they have never used an AR-15 but they own a handgun,
8  then the handgun is the better choice.
9     It goes back to, what are you familiar
10 with.
11 Q.  What about a shotgun, could that also be an
12 effective weapon for self-defense?
13 A.  I repeat, any firearm is an effective
14 device for self-defense.



Shawn J. Tardy, et al. vs.
Martin J. O'Malley, et al.

John Josselyn - Vol. 1
December 3, 2013

Page 34

14  Q.  I don't think we, I don't think you talked
15  about it before.
16      What is your business?
17  A.  I design fire suppression systems.
18  Q.  Is that your own business?
19  A.  Yes.

Page 35

Page 36

13  Q.  And are you, in fact, familiar with the
14  list that is on pages 3 to 5 of Nolte Exhibit 1 as the
15  list of banned firearms from Senate Bill 281?
16  A.  The list, as I understand it, that you've
17  described was based upon previous legislation.
18      As modified by SB 281 and the language of
19  281, I'm honestly no longer sure what's banned and what
20  isn't.
21  Q.  What about the language of Senate Bill 281

Page 37

1  has made you uncertain?
2  A.  The references to clones and copies and how
3  they will be defined by law enforcement agencies that
4  historically take certain poetic license with what they
5  do.
6  Q.  Now, there is no reference to clones in
7  the --
8  A.  I believe they term it copycat.
9  Q.  Okay.  And let's just clarify what you mean
10 there.
11     There is a term copycat, and then there's a
12 term copies, right?
13     And if you could look at page 3 where it
14 introduces the list that you've just been looking at,
15 in R2, it says, a firearm that is any of the following
16 specific assault weapons or their copies.
17     Now, is that one of the references to
18 copies that you were talking about?
19 A.  There's also a term that appeared in the
20 legislation where they used the term copycat.
21 Q.  Right, okay.  I'll talk about that

Case 1:13-cv-02841-CCB   Document 44-46   Filed 02/14/14   Page 9 of 11

Shawn J. Tardy, et al. vs.
Martin J. O'Malley, et al.

John Josselyn - Vol. 1
December 3, 2013

Page 54

1  Q.  So, is it the case then, the AK-47 now has
2  been used to refer to both selective fire as well as
3  purely semi-automatic weapons?
4  A.  It's my impression that, when the term
5  AK-47 is used, the non-shooting public presumes that
6  the firearm that the civilian owns is identical to what
7  the Soviet Union issued to its troops, but they don't
8  understand.
9  Q.  Without respect to what the general public
10 may or may not understand, is it your understanding
11 that the AK-47 has, is used to refer both to the
12 selective fire weapon used in the Russian military as
13 well as semi-automatic versions that have been marketed
14 to the civilian public?
15 A.  I would say that is probably a true
16 statement because those of us in, in the shooting
17 community, we know what we mean.
18     We know that it's not going to be fully
19 automatic.  We know they haven't been allowed in the
20 country since about 1968.  I've only seen one real AK
21 in my life.

Page 55

1  Q.  The semi-automatic versions of the AK that
2  are in, in this country, in the civilian market, are
3  you aware of any differences between those and the
4  selective fire AK-47s, other than that the civilian
5  ones are only semi-automatic as opposed to fully
6  automatic?
7  A.  I'm not aware of any differences, but I'm
8  not a big fan of the AK.  Even though I respect it for
9  the quality of its mechanism and the reliability, it,
10 it doesn't fit my body.
11 Q.  Is it the position of the Associated Gun
12 Clubs of Baltimore that the AK-47 is commonly possessed
13 in Maryland?
14 A.  I would say yes.
15 Q.  And what is the basis for that?
16 A.  Observations on the range.
17 Q.  And are you talking about your personal
18 observations?
19 A.  Yes.
20 Q.  And you gave a 60 percent figure earlier
21 for the AR-15 usage on the range.

Page 56

1     Do you have a similar figure for the AK-47?
2  A.  I would say at least 25 percent.
3  Q.  So you believe that 85 percent of the long
4  guns that you see used on the range are either AR-15s
5  or AK-47s?
6  A.  I think that is reasonable.
7  Q.  What makes up the remaining 15 percent?
8  A.  But we, we need to clarify that, because
9  persons who collect firearms that resemble what the
10 military used will probably own both, so it won't
11 necessarily be on the line at the same time, though it
12 may be one on the line, one in the rack, you know,
13 behind the line.
14 Q.  Okay.
15 A.  And as far as the remaining firearms, it's
16 a little of everything.
17     You see people shooting bolt action Mosin
18 Nagants, Mosin, M-O-S-I-N, N-A-G-A-N-T, it's Russian,
19 M1 Garands, M1 Carbines, all manner of lever action
20 deer rifles.
21     It's whatever the person likes.

Page 57

1  Q.  Other than the AR-15 and the AK-47, are
2  there any other of the firearms that are listed on
3  Nolte Exhibit 1 that Associated Gun Clubs of Baltimore
4  believes to be in common use in Maryland?
5  A.  I would say there's at least a half a dozen
6  of these that are fairly common.
7  Q.  What are those?
8  A.  The auto-ordinance Thompson M1, page, page
9  3 of 5, that would be item 8.  Of course, we've already
10 discussed the AK-47.
11     The Barrett Light 50, of course all of the
12 Colts, Dragunov, the FN series, the FN and FAL, all of
13 the Heckler and Koch family.
14     The Avtomat Kalashnikova, which is actually
15 a duplication, because that is what AK stands for.
16     The Ruger Mini-14 with a folding stock, the
17 SIG 550 and 551, all of the Springfield Armory family,
18 the Uzi 9-millimeter Carbine rifle.
19     They're the ones that are frequently seen
20 there.
21 Q.  And is that all based on your personal

Case 1:13-cv-02841-CCB   Document 44-46   Filed 02/14/14   Page 10 of 11

Shawn J. Tardy, et al. vs.
Martin J. O'Malley, et al.

John Josselyn - Vol. 1
December 3, 2013

Page 70

1  A.  They're the only three that appear on this
2  document, yes, but I can't speak to whether or not it
3  was the only three.
4  Q.  When did you do this?
5  A.  There was no mandate that we find
6  everything.
7     It was to go out and look and see what our
8  research can uncover that is responsive to the
9  questions we were being asked.
10     So I didn't try to get every possible
11  instance.
12  Q.  When did you do this research?
13  A.  Within the past two, two months I would
14  guess, three months.
15  Q.  And did you do it for the purpose of
16  responding to discovery in this lawsuit?
17  A.  Yes.
18  Q.  If you could please turn to Nolte Exhibit 8
19  now, which has Bates numbers ACG000010 to 11 --
20  A.  Uh-huh.
21  Q.  -- and has the title, information on ratios

Page 71

1  of rounds fired to hits obtained for law enforcement.
2     Is this another document that you put
3  together?
4  A.  Yes, it is.
5  Q.  What was the purpose of putting this
6  together?
7  A.  It was to establish the fact that we don't
8  live in a perfect world, and while many people would
9  think that every time you fire at an assailant in
10  self-defense it ends with the first shot, that it isn't
11  true, that under stress, the rounds aren't always
12  exactly where you would like to put them and they
13  aren't always effective.
14     So, therefore, having a magazine of
15  sufficient capacity to let you survive that encounter
16  is an advantage, can be a lifesaving advantage.
17     And this was to demonstrate what the
18  so-called professionals achieved with their training
19  and their street smarts.
20  Q.  Did you do any research into whether you
21  could find any incidents in which, with non-law

Page 72

1  enforcement officers, individuals attempting to attack
2  them had not been sent away by the first shots that
3  were fired?
4     MR. PORTER: Objection to the form.  You
5  can answer, though, if you can.
6     THE WITNESS: The incident that occurred in
7  Baltimore City, on Falls Road that we spoke of, that
8  magazine held at least 16 rounds.
9     He emptied the magazine.  One assailant was
10  down, one assailant fled, and he took that moment,
11  because the attack had paused, to reload.
12     He did the proper thing.  When he had the
13  opportunity, he reloaded as soon as possible while
14  covering the situation, which is to look for additional
15  assailants.
16     These things aren't preplanned by the
17  victim, they're preplanned by the perpetrator, and the
18  victim doesn't know how many assailants there really
19  are.
20  Q.  As I understand or understood your account
21  of it, the other victim, or the other assailant fled as

Page 73

1  soon as he stopped to reload, is that right?
2  A.  No, the other assailant fled after his
3  colleague went down, to my understanding that the
4  assailant that fled was struck in the hand.
5  Q.  Was there any pause in the firing at all
6  before he stopped to reload?
7  A.  I can't speak to that.  I wasn't there.
8  Q.  Are you aware of any situation, in the
9  research that you've done, in which assailants have not
10  fled as a result of the first round being fired?
11  A.  This was an example right here.
12  Q.  Well, I thought that you said that you
13  weren't aware at all of whether the assailant fled
14  before there was the first break in the fire?
15  A.  The first, it's my understanding that the
16  assailant who perished was hit multiple times, so
17  clearly the citizen defending himself continued firing
18  until the threat was over, and he had multiple people
19  that he was facing.
20     So, I would have to say, logic would
21  dictate that after the first round they didn't flee.

Case 1:13-cv-02841-CCB   Document 44-46   Filed 02/14/14   Page 11 of 11

Shawn J. Tardy, et al. vs.
Martin J. O'Malley, et al.

John Josselyn - Vol. 1
December 3, 2013

Page 74

1  Q.  Well, you said that he continued shooting
2  until he was out of rounds, not until he was out of
3  danger.
4     Do you recognize any difference there?
5  A.  He -- you have to understand that under
6  stress, you're not counting one, two, three, four.
7     It's not uncommon to have the police arrive
8  on a scene and see someone there still pulling the
9  trigger, even though the gun is long empty, that they
10 are so stressed they are still in a defense mode and
11 pulling the trigger, and it's going click, click,
12 click.
13    So these events happen in such a short
14 period of time it's very difficult to microimage which
15 round was fired when.
16    When someone is coming at you and they are
17 literally in your face, and they were closer to him
18 than we are to each other, it isn't something that you
19 say, oh, time, I'm going to reload.
20    One went down.  One started to flee.  He
21 realized he was empty and reloaded, cover the area and

Page 75

1  see if anyone else there is.
2  Q.  So, if he had had a 30-round clip, would
3  you have expected him to empty that one as well?
4  A.  No.
5  Q.  Why not?
6  A.  Because a 30-round clip wouldn't have fit
7  under his coat in his holster.  It would hang out of
8  the pistol by about 6 inches.
9  Q.  So it's not that you think that he wouldn't
10 have run through it, if he had had it, you just think
11 that he wouldn't have had it?
12 A.  I can't speak to what he might or might not
13 have done.  I wasn't there.  I wasn't in his shoes.
14 Q.  Well, the phenomenon that you just
15 described of people still sitting there clicking the
16 firearm, even after it's empty, would suggest that
17 somebody is going to empty whatever clip they have, no
18 matter how many rounds are in there, isn't that right?
19 A.  I think that is true in so many scenarios,
20 and you can't limit it just to civilians.
21    I would point out to you that police carry

Page 76

1  two spare magazines, minimum.  When you're fighting for
2  your life, you don't count.
3  Q.  Turning now from the magazine size to the
4  banned firearms in Senate Bill 281, as I understand it,
5  the position of the Associated Gun Clubs of Maryland is
6  that, at least certain of the weapons on the list are
7  very well suited for self-defense, is that true?
8  A.  To go back to my original statement, any
9  firearm is suitable for self-defense.
10 Q.  Does the Associated Gun Clubs of Baltimore
11 have a view on what might make a particular firearm
12 more or less suitable for self-defense?
13 A.  It's dependent upon the person.
14 Q.  As a general matter, -- well, let me step
15 back a minute.
16    Would an M16 be useful for self-defense?
17 A.  Our police defend themselves with them all
18 the time.
19 Q.  Do you believe an M16 would be an
20 appropriate weapon for civilian self-defense?
21 A.  You're going to have to define

Page 77

1  inappropriate.
2  Q.  I asked you if you thought it would be an
3  appropriate weapon for self-defense?
4     MR. PORTER:  Could you repeat the question
5  for him?  I want to make sure that we're clear.
6     MR. FADER:  Sure.  As the representative of
7  the Associated Gun Clubs of Baltimore here at this
8  deposition, is it your position that an M16 fully
9  automatic would be an appropriate weapon for
10 self-defense?
11    THE WITNESS:  If it's all that you have,
12 absolutely, but if you have an AR-15, use that.
13 Q.  What if you have a handgun?
14 A.  If that is all you have.
15 Q.  If you have a handgun and an M16, would the
16 M16 be an appropriate weapon to use for self-defense?
17 A.  It's an unfair question, and I say it for
18 this reason.
19    Quite often the firearm that you use in
20 self-defense, even when you're exonerated, will not be
21 returned.