REDACTED

# Exhibit 47

To Defendants' Memorandum in Support of Motion for Summary Judgment

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

SHAWN J. TARDY, et al.
Plaintiffs Case No.
vs. 1:13-cv-02841-CCB
MARTIN J. O'MALLEY, et al.
Defendants
___________________________/

The deposition of GREGORY NOLTE was held on Tuesday, December 3, 2013, commencing at 9:10 a.m., at the Office of the Attorney General, Civil Litigation Division, 200 Saint Paul Place, 19th Floor, Baltimore, Maryland 21202, before Susan M. Wootton, RPR, CLR, Notary Public.

REPORTED BY: Susan M. Wootton, RPR, CLR

A. What kind of clubs?
Q. Yes.
A. Hunting, hunting clubs, other, you know, other gun clubs throughout the state.
Q. What is your position within MSRPA?
A. I am the second vice president for legislative affairs.
Q. What are your responsibilities in that role?
A. I'm still figuring them out. Newly elected.
Q. Congratulations.
A. Thank you.
Q. How long have you had that position?
A. I looked last night. I thought that you might ask.
October 27th was when I was voted in.
Q. So are you involved any lobbying?
A. I don't know exactly what the term lobbying means.
Q. Okay. So your title, if I got it

correctly, is the second vice president for legislative affairs, is that right?
A. That's correct.
Q. So, do you get involved in trying to effect legislation in Annapolis?
A. I have not as of yet but probably would.
Q. All right. Did you have any role in connection with any efforts that MSRPA made with respect to the passage of Senate Bill 281?
A. No, I was not in any official capacity, nor was I member actually of MSRPA at the time.
Q. When did you join MSRPA?
A. About a month before I was elected.
Q. And where does MSRPA get its funding?
A. From our members, from their dues.
Q. So, soley a dues funding organization?
A. To the best of my knowledge. I mean again I am new.
I have not necessarily been privy to funding, et cetera, but one would have to assume from membership, from our dues.

(Nolte Exhibit 3 and Exhibit 4 were marked for purposes of identification.)
Q. Mr. Nolte, I'm showing you what's been marked as Nolte Exhibit 3, which is a copy of Plaintiff's Responses to Defendant's First Set of Request for Production of Documents.
Have you seen Nolte Exhibit 3 before?
A. I would have to review. There have been a lot of documents that have come over via E-Mail.
I can't say that I have read all of them, nor reviewed all of them.
Q. Well, do you recall receiving a request for any documents that MSRPA might have related to this lawsuit?
A. That request probably came through before I was actually voted in and a member, and a member, yes, I'm going to presume.
Q. Okay. And is that because you have no knowledge of any requests for documents from MSRPA?
A. I personally, no, have none.
Q. So I take it then that you're not aware of

any searching that may have been done for any documents, is that right?
A. Correct.
Q. Okay. I'm showing you what's been marked as Nolte Exhibit 4, which is a copy of Responses to Interrogatories made by a number of different organizations, including MSRPA, and I believe that's your signature on the signature page towards the back of the document?
A. I reviewed this last night, so, yes, I will look for it, but, yes, at this point in time I was now involved on behalf of MSRPA.
Q. Okay. And is that in fact your signature dated November 14th of 2013?
A. That is.
Q. And were you involved in providing information to respond to these interrogatories?
A. Yes.
Q. And, to the best of your knowledge, are all the responses that were made in here still accurate?
A. I would have to completely review them,

Page 18

but, yep, I mean there's no reason for anyone to provide false information.
Q. You said that you reviewed this last night, right?
A. Correct.
Q. Did you notice anything that you thought was inaccurate?
A. No.
Q. Did you notice anything that you thought needed to be added to the responses?
A. No. Actually this was this morning, is when I reviewed it.
Q. Mr. Nolte, do you have an understanding of what an AR-15 is?
A. A general understanding, yes.
Q. What is it?
A. Wow, it is a semi-automatic firearm that is typically black in color. It uses external magazines that are exchangeable.
It has, say, a likeness in appearance to a military version of an M16, but the key difference

Page 19

being an M16 or say the later M4 would have select fire.
It would be full auto or a three-round burst. AR-15 is a purely semi-automatic firearm.
Q. Are there any other differences you're aware of between the military M16 or M4 and the AR-15?
A. None that I'm aware of, or that I can think of off the top of my head.
Q. What is your background in firearms?
A. When I was a teenager, I shot down on my friend's farm. We would go out and basically use a hand thrower, shoot clay pigeons.
Recently, say 2008 or so, I became interested in it again, joined a club in Annapolis, and became involved in my local club and am instrumental with them as well.
So I enjoy basically anything and everything with respect to firearms.
Q. Is that the Anne Arundel Fishing and Hunting Club?
A. No.

Page 20

Q. What club is that in Annapolis?
A. Anne Arundel Fish and Game.
Q. Anne Arundel Fish and Game?
A. Yes.
Q. And when did you get involved with them?
A. 2009, I think is when I inquired to membership.
Q. Are you aware of who manufacturers AR-15?
A. I believe there are a plethora of manufacturers of what would generally be considered an AR-15.
Q. Can you name some of them?
A. Bushmaster, Colt, the list goes on, Daniel Defense.
Q. There's a lot basically, is that right?
A. I'll reuse the term, plethora.
Q. Are you aware of how long it takes to, to get off a round on an AR-15?
A. No.

Page 21

Page 46

A. Not to my knowledge.
Q. And are you aware of any such incidents?
A. No.
Q. And are you aware of any incidents involving the use of magazines with a capacity of more than 10 rounds in home self-defense?
A. I am not, say, readily aware, but, you know, all of the information that's been provided in 5, 6 and 7 is apparently readily available through Internet searches.
So whether or not in the past I personally have seen such articles and just not recall could very well be the case.
But reviewing these I did not search for, nor provide this information.
Q. All right. And is it the case that you are in fact not aware of any examples of home self-defense using more than 10 rounds in a single magazine?
A. I personally am not aware. You know, I mean, other than what we have here, I'm sure there are multitudes, if and when this stuff actually gets

Page 47

reported, because many of these tend to get suppressed by the press.
Q. And you said, I'm not personally aware. I just want to clarify.
You are in fact here testifying as the designee of MSRPA, correct?
A. Well, we covered that initially, yes, so there have been some MSRPA questions as well as some personal questions as well.
Q. Actually all of my questions are directed to you in your capacity as representative of MSRPA because your counsel had clarified at the beginning of the deposition that you're not here in your personal capacity.
A. Okay.
Q. So, in your capacity representing MSRPA, are you aware of any incidents involving the use of more than 10 rounds in a self-defense situation?
A. I have not been provided, in my capacity at MSRPA, any of the information, nor have I searched for it.

Page 48

Q. And so, you're not aware of any such incidents, is that correct?
A. That's correct.
Q. If you would now look at Nolte Exhibit 8, which has the title, Information on Ratios of Rounds Fired to Hits Obtained for Law Enforcement, are you familiar with this document?
A. No.
Q. Are you aware of anybody at MSRPA having any involvement in creating the document or searching for the information in it?
A. I am not aware.
Q. Do I correctly understand that it is MSRPA's position that the banned long guns are commonly used for self-defense in Maryland?
A. Yes.
Q. Is it MSRPA's position that the, those weapons are well suited for use in self-defense in Maryland?
A. Yes.
Q. And what's the basis for that position,

Page 49

that these weapons are well suited for self-defense use?
A. Given say the, just anecdotal information, because we don't collect or store -- can you repeat, what is the --
Q. The basis for MSRPA's position that the banned firearms are well suited for self-defense in Maryland?
A. The basis would be pure, purely anecdotal.
Q. What's the anecdotal basis for that?
A. Conversations.
Q. Conversations in which people have told you that they used them for self-defense?
A. Conversations that would be something along the lines of, if this is my only firearm, God forbid anything happened, right, it would be used.
Q. And from any of those anecdotal conversations, are you aware that there's anybody for whom this is their only firearm?
A. Personally, no.
Q. I take it then that it's not your only

Page 50

firearm, is that true?
A. It is not.
[redacted]

Page 51

[redacted]

Page 52

[redacted]
Q. And from the anecdotal information that you have been relying on for your testimony on behalf of MSRPA today, is it your understanding that handguns are the most frequently used weapons for self-defense?
A. No, it is not.
Q. Do you have an understanding of what the most frequently used weapons for self-defense are?
A. They vary from the person. It could be a shotgun, it could be a pistol, or it could be, you

Page 53

know, any one of the banned long guns that we have.
Q. So, is it the case then that you don't have any particular understanding that any particular type of weapon is most commonly used for self-defense?
A. They're all common. Any particular, it just depends on the person.
Q. So, is it the case then that you believe handguns are suitable self-defense weapons?
A. I believe I've stated, you know, anyone of these long, long arms, rifles could be used. Anything can be used.
I mean the bottom line is, you know, firearms in the past have been viewed as the great equalizer.
Q. And that's any type of firearm, is that right?
A. Pretty much any type of firearm.
Q. If you could please pull back out Nolte Exhibit 4, which is the responses to interrogatories.
Do you have those in front of you?
A. I do.