Exhibit 49

To Defendants' Memorandum in Support of Motion for

Summary Judgment

```
 1           IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF MARYLAND
 3                     (Northern Division)
 4
 5   SHAWN J. TARDY, et al.
 6             Plaintiffs              Case No.
 7   vs.                               1:13-cv-02841-CCB
 8   MARTIN J. O'MALLEY, et al.
 9             Defendants
10   _____/
11
12
13            The deposition of ROBERT WARNICK was held
14   on Wednesday, December 18, 2013, commencing at 9:00
15   a.m., at Maryland State Police Headquarters, 1201
16   Reisterstown Road, the Executive Building, Baltimore,
17   Maryland 21202, before Susan M. Wootton, Notary Public.
18
19
20
21   REPORTED BY: Susan M. Wootton, RPR, CLR
```

Shawn J. Tardy, et al. vs.
Martin J. O'Malley, et al.

Robert Warnick - Vol. 1
December 18, 2013

Page 18

1  AR-15 is, come from?
2  A.  I don't understand what you mean by where
3  it came from.
4  Q.  You've testified about what your
5  understanding of an AR-15 is.
6      Where did you develop that understanding?
7  A.  From working in The Gun Shop.
8  Q.  Do you have an understanding of
9  approximately how many AR-15s you've sold in your 22
10  years owning or partially owning The Gun Shop?
11  A.  I have no idea how many we've sold.
12  Q.  Do you have an understanding of what an
13  AR-15 H-BAR is?
14  A.  Yes.
15  Q.  What's that?
16  A.  It's a heavy barrel Colt-manufactured
17  rifle.
18  Q.  And do other manufacturers of AR-15s make
19  heavy barreled varieties of those weapons as well?
20  A.  Yes.
21  Q.  Which ones?

Page 19

1  A.  I think just about every remanufacturer
2  makes a heavy barrel.
3  Q.  And what does that mean, a heavy, a heavy
4  barrel?
5  A.  The thickness of the barrel is a little
6  thicker than the nonheavy barrel.
7  Q.  As the, as the licensed firearms dealer who
8  would be selling these, how do you know whether a
9  firearm is a heavy barrel as opposed to not heavy
10  barrel?
11  A.  It's difficult.  Even the state can't
12  define what a heavy barrel is.
13      I've called the state police.  I had one
14  that was listed as a heavy barrel.  I called License
15  and Permits and explained it to them, and they told me
16  it was a heavy barrel because it was listed as a heavy
17  barrel.
18  Q.  So the manufacturer listed it as a heavy
19  barrel?
20  A.  Yes.
21  Q.  If the manufacturer had listed it as a

Page 20

1  heavy barrel, why do you say it's difficult to figure
2  out if it's a heavy barrel?
3  A.  Just, it looks like just any other rifle.
4  Q.  Does it say heavy barrel on it?
5  A.  Only in the description.
6  Q.  The manufacturer's description?
7  A.  Right.
8  Q.  Do you know who you spoke with at the state
9  police when you asked?
10  A.  No.
11  Q.  Why was it that you called the state
12  police?
13  A.  I had a question about the heavy barrel.
14  Q.  And am I correct that you said that the
15  answer that you got was, if it's listed by the
16  manufacturer as having a heavy barrel, then it's a
17  heavy barrel?
18  A.  Right.
19  Q.  Did that answer the question as to whether
20  or not it was a regulated long gun?  Let me step back
21  from that.

Page 21

1      Was the reason you were calling to ask that
2  question because you were trying to figure out whether
3  or not the firearm at issue was a regulated long gun?
4  A.  The reason I called was for my
5  clarification.  My policy was all guns, all AR-15
6  platforms went through paperwork, irregardless.
7      But it was for my clarification if it was a
8  heavy barrel or not.
9  Q.  When did you make that call?
10  A.  Oh.  I know it's been at least a year or
11  two ago.
12  Q.  Have you had other occasions to call the
13  state police to ask clarification questions with
14  respect to firearms?
15  A.  No.
16  Q.  I forget if I asked this but did you -- or
17  who did you speak with at the state police, do you
18  remember?
19  A.  I don't remember.
20  Q.  Since the new law went into effect on
21  October 1st of 2013, have any questions arisen in your

Shawn J. Tardy, et al. vs.
Martin J. O'Malley, et al.

Robert Warnick - Vol. 1
December 18, 2013

Page 46

1  THE WITNESS: What's the question again?
2  MR. FADER: Is it the association's
3  position that magazines with a capacity of more than 10
4  are necessary for self-defense?
5  THE WITNESS: Purely for self-defense, no.
6  Q. Is it the association's position that such
7  magazines are necessary for hunting?
8  A. Again, purely for hunting, no.
9  Q. What distinction are you drawing by adding
10 the word purely?
11 A. A magazine with a capacity over 10 rounds
12 is much better when you are target shooting.
13 You can load 20 rounds and shoot 20 rounds
14 instead of loading two magazines. So purely hunting,
15 you can put 20 rounds in and shoot one round and bag
16 what you want to bag.
17 So, just purely hunting, no. And purely
18 self-defense, no. It's all collective.
19 Q. Is it the case you believe they're
20 primarily useful for sports shooting?
21 A. I think they're primarily used for sports

Page 47

1  shooting, competition and hunting.
2  Q. Is it possible to hunt with a magazine with
3  a capacity of only 10 or fewer rounds?
4  A. It's possible to hunt with a magazine with
5  one round.
6  Q. Is it possible to engage in sports shooting
7  with a magazine that has only a capacity of 10 rounds
8  or lower?
9  A. It's possible, yes.
10 Q. Sir, if you could turn back to Warnick
11 Exhibit 3, the Answers to Interrogatories, am I correct
12 that you did not review these before they were
13 finalized?
14 A. Right.
15 Q. But you've reviewed them since then?
16 A. Yes, I've looked at them.
17 Q. Sir, have you ever had any questions in
18 your capacity as co-owner of The Gun Shop related to
19 whether firearms manufactured by LWRC International
20 were or were not AR-15s?
21 A. No.

Page 48

1  Q. What about with respect to firearms made by
2  Adcor Defense products and whether those were or were
3  not AR-15s?
4  A. No.
5  Q. And, in fact, you do sell, or you have sold
6  AR-15s manufactured by LWRC International, is that
7  right?
8  A. Yes.
9  MR. PORTER: Object to the form of the
10 question.
11 MR. FADER: And that was before the October
12 1st, 2013 --
13 THE WITNESS: Yes.
14 Q. If you could please turn to interrogatory
15 number 4.
16 We talked earlier about the fact that
17 you're not aware of any incidents in which firearms now
18 designated as assault long guns were used in home
19 defense in Maryland.
20 This asks about firearms used in home
21 defense in any state other than Maryland.

Page 49

1  The answer that's provided cites to five
2  news stories about incidents in other states.
3  Other than those five, are you, on behalf
4  of the association, aware of any other incidents of
5  home defense using any of the firearms now designated
6  as assault long guns outside of the state of Maryland
7  for self-defense?
8  A. No.
9  Q. Do you, in The Gun Shop, sell AR-10s?
10 A. Yes.
11 Q. Do you have an understanding of whether
12 AR-10s are or are not banned firearms in Maryland
13 today?
14 A. They are not.
15 Q. And what's that understanding based on?
16 A. Based on talking to Trooper Pickles.
17 Q. Is he a trooper with the Maryland State
18 Police?
19 A. License Division, yes.
20 Q. When did you have that conversation?
21 A. Several months ago.

Shawn J. Tardy, et al. vs.
Martin J. O'Malley, et al.

Robert Warnick - Vol. 1
December 18, 2013

Page 50

1  Q.  Have you had any other conversations with
2  anybody at Maryland State Police about whether
3  something is or is not a banned firearm in Maryland
4  now?
5  A.  No.
6  Q.  And you said your understanding is based on
7  a conversation with Trooper Pickles.
8      Did he, in fact, tell you that AR-10s are
9  not banned firearms in Maryland?
10 A.  Yes.
11 Q.  Do you have an understanding of how an
12 AR-10 differs from an AR-15?
13 A.  Other than the caliber, no.
14 Q.  How do you tell the difference between an
15 AR-10 and an AR-15?
16 A.  By the caliber.
17     MR. FADER: I don't have too much more.
18 Can we just take a five-minute break?
19     MR. PORTER: Yeah, sure.
20     (A short break was taken.)
21

Page 51

1      BY MR. FADER:
2  Q.  Sir, you mentioned that in the early '60s
3  you were in the Marine Corps.
4      What firearms did you use in that capacity?
5  A.  M1.
6  Q.  Did you ever use an M-16?
7  A.  Yes.
8  Q.  In the Marine Corps?
9  A.  Yes.
10 Q.  And you were trained presumably in the
11 Marine Corps to use that M-16?
12 A.  Yes.
13 Q.  What training did you receive?
14 A.  Basic training.
15 Q.  And that included?
16 A.  Target shooting.
17 Q.  Any live fire exercises?
18 A.  No.
19 Q.  Do you have an understanding of --
20 A.  When you say live fire are you, what are
21 you referring to, target shooting?

Page 52

1  Q.  Target shooting or any other --
2  A.  Yes, target shooting was always live fire.
3  Q.  And other than the M1 and the M-16, did you
4  have any other firearms during your time in the Marine
5  Corps?
6  A.  A side arm.
7  Q.  What was that?
8  A.  Colt 45.
9  Q.  Do you have an understanding of differences
10 between the M-16 and the AR-15?
11 A.  Yes.
12 Q.  What is that?
13 A.  The looks.
14 Q.  How do they look different?
15 A.  The forearm is different.  One is round,
16 one is like triangle.
17 Q.  What part is the forearm?
18 A.  The part that's near the front of the
19 barrel.
20 Q.  Any other differences?
21 A.  I couldn't see any.

Page 53

1  Q.  The M-16, as I understand it, is automatic
2  fire whereas AR-15 is semiautomatic fire, is that
3  right?
4  A.  Yes.
5  Q.  Other than that and the shape of the
6  forearm, are you aware of any other differences?
7  A.  No.



18 Q.  And you had testified about when people
19 come in looking for a firearm for self defense, you'll
20 ask some questions.
21     Ones of the questions I believe you said

Page 54

 1  you asked is where they live, is that right?
 2  A.  No.  I don't ask that question.  I ask if
 3  they've ever fired a gun before and then I go from
 4  there.
 5  Q.  Okay.  But so where --
 6  A.  I said, when it comes to a gun, it depends
 7  on where they live.  Some guns are not suitable for
 8  close quarters.
 9  Q.  Such as what?
10  A.  Well, just about all of them.
11  Q.  Just about all guns are not suitable for
12  close quarters?
13  A.  Well, in, if you're defending your home,
14  and you live in a townhouse, the bullet is subject to
15  go, you know, it could penetrate the wall.
16  Q.  So how does that impact what
17  recommendations you make with respect to a firearm for
18  self-defense?
19  A.  I don't base my suggestions on that.  I
20  just ask them what are they used to, what have they
21  used, if they've ever used a gun before, and then I

Page 55

 1  make suggestions that these are the guns that are
 2  available.
 3     Then they have to make the decision.
 4  Q.  Okay.  So am I correct that you were just
 5  stating a personal view with respect to whether
 6  firearms may be appropriate for self-defense in close
 7  quarters, in a townhouse, for example, is that right?
 8  A.  Repeat that question.
 9  Q.  I'm trying to figure out where the views
10  you were expressing as to whether certain firearms
11  might be suitable for self-defense in a townhouse,
12  where that fits in with your testimony with respect to
13  assisting people who are coming in looking for a
14  firearm for self-defense.
15     Where does your view with respect to
16  suitability of firearms in, for example a townhouse
17  setting, fit into how you respond to questions of
18  people looking for firearms for self-defense?
19  A.  The firearm is one of the weapons that I
20  would consider for self-defense.  The projectile is the
21  one that I would consider, as far as my surroundings.

Page 56

 1  Q.  And how would you take that into account?
 2  A.  If it was, if I lived in a townhouse, I
 3  would use the type of shell that disintegrates on
 4  impact.
 5     If I was hunting an animal, then I would
 6  use one that had penetrating power.
 7     MR. FADER: Thank you.  I don't have any
 8  further questions.
 9     MR. PORTER: We have no questions.  We will
10  read and sign.
11     (Deposition concluded at 10:06 a.m.)

Page 57

 1  CERTIFICATE OF DEPONENT
 2     I hereby certify that I have read and
 3  examined the foregoing transcript, and the same is a
 4  true and accurate record of the testimony given by me.
 5     Any additions or corrections that I feel
 6  are necessary will be made on the Errata Sheet.

11  _____
12     (If needed, make additional copies of the
13  Errata Sheet on the next page or use a blank piece of
14  paper.)