REDACTED

# Exhibit 50

## To Defendants' Memorandum in Support of Motion for Summary Judgment

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

(Northern Division)

SHAWN J. TARDY, et al.

Plaintiffs Case No.

vs. 1:13-cv-02841-CCB

MARTIN J. O'MALLEY, et al.

Defendants

___________________________/

The deposition of ANDREW TURNER was held on Tuesday, November 26, 2013, commencing at 1:05 p.m., at the Office of the Attorney General, 200 St. Paul Plaza, 20th Floor, Baltimore, Maryland 21202, before Oneeka S. Hill, Notary Public.

REPORTED BY: Oneeka S. Hill

finally pretty much have lost most of the use of.
I got the use of my thumb and my first finger. The other three are just kind of there. I can make a grip. I can hold a pen. I can do things with my hand. I've relearned to do some things, but much of it is not there so --
Q. Have they -- is there a prognosis? Is there -- are they still working on it?
A. No.
Q. Were you discharged because of the injury?
A. Yes.
Q. Okay. And I understand from somewhere in here that that was your dominant hand?
A. It is, sir.
Q. Okay. Since your discharge you've been working for ICE?
A. Yes, sir.
Q. Straight through?
A. No, sir. I started with them under a program called Operation War Fighter. It was an

internship for the last few months of my career in the Navy.
The Department of Defense puts you on temporary duty out to a federal agency just to give you a little extra experience for your resume', and the possibility of maybe a job.
But there wasn't a job opening at the time with them. So I learned, because I had some paralegal law clerk experience from my time in Korea, and that had also served -- you know -- part of the Master-At-Arms duties is also bailiff duties, and that type of thing for the military courts, so it wasn't a far stretch for me. That they said, well, we have this paralegal position. I didn't know what -- I knew what the Freedom of Information Act was, but I didn't know that's what it was. They just said it's a paralegal specialist position, but as an intern, do you want to go try that. It would be something more suited to you, you know, dealing with back injuries and everything else. You're not having to -- because I knew my career as a law

enforcement officer was limited, if at all.
And so, I had to find a job, and that's what that program was for. To retrain you, to help you to find new opportunities post-military and plan ahead.
So I went and did the internship. I guess I so impressed my bosses and the director for the -- the FOIA director for Immigration and Customs, that when a position did open up around Christmastime, I had applied for it, I made the certification list. The day I made the certification list, the director called me and said, can you come in tomorrow for an interview. Within six weeks I was working for ICE, and that was February of this year.

Page 138

to assume that there may have been a possible break-in for the alarm to go off. And it would have sent us into our home-defense ideal.

Now, when I go into that mode, my wife and my sister-in-law both -- we all have rooms upstairs. My wife and I have one, my sister-in-law has another, we have a third room, but they immediately know to go into the bathroom, lock the door, get into the tub. Because that will give them at least some protection should any type of weapons fire goes off.

Q. Do you practice that plan?

A. We haven't very often, but we have. We have a few times.

Q. Do you have similar plans for other types of contingency?

A. I do. Because I actually went through multiple courses on disaster preparedness. And so, we -- we plan for different contingencies, power outs, you know.

If we know that a storm's coming, like a

Page 139

heavy -- you know -- we actually have a couple of -- what are called aqua pods. And they hold 60 gallons of water each that can fill up in the -- in the tub. And that gives us a 120 gallons of powerable water.

That way, if, for some reason -- cause we've lost power for like a week at a time. We do have plans to add a backup generator on the home that actually is a kick on, but we actually haven't gotten around to doing that. But there's -- you know -- we like to make sure that we're abatable.

Because there has been severe weather, and the infrastructure in that area of Hyattsville kind of feeds off of D.C.s -- Pepco's not a very great electrical system, so we like to prepare for power outages and just, you know, drastic weather.

Q. Fires?

A. We have fire -- fire alarms throughout the house. We have fire extinguishers throughout the house. We keep meaning to add an escape system. But we do have two areas off the top floor where you can actually get out of a window and go on to

Page 140

portions of the lower part of the house, climb down.

Q. Do you feel that your self-defense plan is sufficient to protect you and your family?

A. I don't think any plan's ever sufficient, you know. It's -- it's just like the military, you never stop training. You never stop planning. You go through it and you go through it and you go through it again. But until something happens, you won't know. There's no way to know if it's sufficient until something happens.

Page 141

Page 142

[content redacted]

Page 144

[content redacted]

Page 143

[content redacted]

Page 145

[lines 1-5 redacted]

6 Q. Okay. And are you familiar with the
7 Second Amendment to the United States Constitution?
8 A. Yes, sir.
9 Q. Have you read the Supreme Court's
10 decision in Heller?
11 A. I've not -- I haven't read much of it.
12 I'm sort of familiar with it but --
13 Q. Do you have a view on whether the Second
14 Amendment protects a citizen's right to use a
15 firearm to engage in subsistence hunting?
16 A. The Second Amendment guarantees the right
17 to keep and bear arms. If subsistence hunting is
18 something you do with those arms that you own, then
19 it protects it.
20 Q. Do you have a view on whether the Second
21 Amendment protects a citizen's right to engage in

A. Again, it's -- it's something that falls under an NFA rule. As long as you go to the ATF and the ATF grants you that permission.
Q. How about the prior limit of 20 bullets in a magazine, that was Maryland law?
A. That was a regulation that Maryland decided to enact.
Q. Was that constitutional or unconstitutional under the Second Amendment?
A. In a Second Amendment it's the right to keep and bear arms. How many bullets go into a magazine isn't always exactly clear on that, and that's something we leave to the Supreme Court to decide.
Q. Is it your view that magazines aren't protected by the Second Amendment?
A. Without a magazine the -- the gun won't function, which means you can't really keep and bear arms and be able to use it without those magazines.
Q. Sum in sum, right?
You told me about some guns don't require

a magazine?
A. Every gun requires some type of magazines. Some have internal, some have external, except for a single shot shotgun.
Q. Okay. Thank you. Are you aware that your counsel has identified you as an expert witness?
A. Yes, sir.
Q. And are you familiar with the topics about which you have been identified as an expert?
A. Yes, sir.
Q. And what are those topics?
A. I -- I -- I have been qualified in homeland security to level four. I have been certified as a close protection agent through the International Association of Personal Protection Agents. I'm a certified protection officer. At one time I carried the certified master anti-terrorism specialist, but that's lapsed. I'm a journeyman security specialist. I'm a journeyman computer peripheral information specialist. I'm a certified

chemical process technician.
Q. And for what -- which of those topics do you expect to be called at the trial in this case?
A. Probably I would say homeland security and security specialist. And then possibly with the certified protection officer.
Q. And what have those certifications -- strike that.
I understand that you're going to testify to that of common usage of the AR15 guns, is that correct?
A. Yes, sir.
Q. And what is the basis for your belief that those are in common usage?
A. Well, considering the AR15 is one of the highest selling rifles, if not the highest selling rifle last year, outselling common usage other items, such as certain vehicles, the AR15 is the military's weapon of choice via the M16, M4, the AR15 platform. So ultimately, you may be looking at a million plus of those.

Any time we train any foreign military, if we're not training them on the AK platform, we're training them on our platform, which is the AR15. So who knows how many of those are out there worldwide that have become common use.
It's one of the largest portions of sport shooting right now that's called three gun, and that's handgun, semi-auto rifle shotgun.
The semi-auto rifle typically is an AR15 or a submachine gun. And these are continually growing in sport shooting because the features are available for anyone. The platform is low recoil, it's similar function. There's just not much maintenance to them. It's -- it's an easy entry level rifle for anyone to learn to use.
Q. Are you aware of -- have you reviewed statistics about sales of AR15 and --
A. I've looked at them before but not in -- not any time recently.
Q. I also understand that you're going to talk about the suitability of the AR15 platform gun

have of the one they talked about on the regulated list prior to October 1 and then became banned October 1. Because this was the same one that's been on the list for many years.

It's -- to me it seems like a very -- it's not a very common weapon. I would never see that as a common one. I've not seen many of that specific model.

Now, if you're talking the Bushmaster 223 AR, I've seen tons of them. They make them all the time. And so, there's not very much clarification on what they are saying, because all they are saying is the Bushmaster Semi-auto 223.

Q. Semi-auto rifle?

A. Sure. That would be the Bushmaster AR15.

That's the problem with that item there, is it's so -- the clarity for that item, it's -- it could -- it could be a bunch of different Bushmasters. Bushmaster is the brand.

Q. Right. Right. Would you interpret that to mean every semi-automatic rifle made by

Bushmaster or any copy thereof?

A. Actually the understanding I had before at briefings that Maryland State Police had given during the legislation, the picture they showed was a specific bulb pub-style Bushmaster 223, not the AR15s made by Bushmaster. Not any other semi-automatic, but they showed a specific picture. And so, that led everyone to believe that it was a specific gun they were talking about.

But if I read SB281 and see that, I now have to say, well, if I didn't know better -- and has never seen that picture, I would assume that it's anything made by Bushmaster.

Q. The list also includes Oftomokov Charismakov (phonetic) semi-automatic rifle in any format?

A. That's the same, that's just an AK.

Q. Just an AK?

A. Right.

Q. AK-47?

A. Correct. Well, no, that's not an AK-47

because there's other AKs. There's the AK-74, which shoot the smaller rounds.

So by that they've actually banned anything that would be under the AK or the copycat of the AK. And the AK-74 is actually more compact weapon than that -- the Russians used for home-clearing during the Balkan wars, you know. Not the Balkans, the -- when they had the break up and there was a lot of terrorism incidents in Chechnya and everything. The AK-74 is what they were using when they actually had to go into homes, because so much more compact weapon.

It has a smaller round, so they didn't have to worry so much about penetration through walls. But it's not as -- you know -- other than the AK-47, they are not as easy to get here in America. They're here, but they're not -- I wouldn't --

Q. Do you know whether it's in common use for self-defense?

A. In America?

Q. In the United States.

A. No, I don't think it is, the AK-47 version. So to say over all, yes.

Q. My question was the AK-74.

A. No, I don't think it is.

Q. Okay. Thank you. Do you have a view -- I also understand that you're going to give an opinion about magazines that hold in excess of 10 rounds?

A. Yes, sir.

Q. Are those in common usage?

A. In the U.S.?

Q. In the U.S.?

A. Yes, sir.

Q. And what is the basis for that opinion?

A. Because most manufacturers actually ship their weapons with magazines larger than 10 rounds. And so, there's many weapons companies that will not even ship their guns to Maryland anymore because they don't even make magazines that are 10 rounds or less for their weapons.

Page 166

Q. Do you have a view about the history of magazine size in semi-automatic -- in semi-automatic weapons over the last, say 30 years?
A. Military use or civilian use?
Q. Both.
A. You know, military use it's the typical standard for semi-automatic rifles. Always been 30 rounds. The AK, the AR, everybody builds off that platform.
I -- I would love to give you a reason why. I wasn't the planner. I -- you know -- but I -- I -- they fit properly in your gear. You can carry them properly, and that's -- I have to assume that it was just that the size was just perfect. It was enough rounds to do what needed to be done for military use.
When those became civilian weapons, when they became the AR platform -- because before it was the AR platform it was a select fire platform, you know. The -- the -- the company that originally designed it designed it for military use. When it

Page 167

became that civilian platform, it crossed over with those same style of magazines because there was military surplus. And so, typically when you bought a M16, you know, prior to say the Brady 8 -- the Brady laws going into effect, when you would buy an M16 that you could -- in semi-auto, then you can run to the military surplus store and pick yourself up some 30 round magazines.
Why 30 round magazines? Because that's all the military did. That was what they had. From then on it's just become a traditional thing for them to build.
Now, since then and since the Brady Law Act has expired, there's many companies that have come along and built magazines of 100, 150 rounds, like the Beta magazines. They're not as common. They're expensive. I think there's flaws to their design. They don't function well. And that's the one thing that you'll always find with those 30 rounds round magazines, that they are dependable.
You know the round is going to feed every

Page 168

single time, as long as you do your maintenance on your magazines.
Q. How about for semi-automatic pistols?
A. You know, larger, like with the 9 millimeter it's the most common semi-auto pistol sold. It's the most common. Glocks, Smith & Wesson, the majority of them make double stack magazines, and that's what they ship with their guns.
They do that much of the time because, one, it's got civilian use. But two, they have their law enforcement clients. The law enforcement clients decided, hey, we need rounds. What happens if we get into a fire fight, what happens if five guys attack us, we got three magazines. We don't carry much more than that.
Now in this day and age some of them carry their assault vests and they'll have all kinds of things all over it. And they may be carrying 50 magazines, I don't know. You know, it always depends on what the law enforcement agency decides

Page 169

is proper, you know, standard operating procedure for how many they should, or how many they issue them, or if they can buy their own. But typically it's always been at three magazines.
And so, I would hate to -- I would hate to make a guess, but I would make a pretty strong guess to say that if we polled police departments across the U.S., and ask how many of them issued their officers magazines with 10 rounds or less, I would bet you'd find less than 10%.
Because they know in a situation when the adrenalin's pumping, you're not going to hit the target much of the time.
Q. Do you have data to support the hit and miss --
A. Actually there's a Firearm Safety Act that the president had put into effect under I think Executive Order 4 or -- I don't remember the exact Executive Order. But there's a Fire Safety Act that came out in June. You can actually pull it up.
They are -- they still have not briefed