Exhibit 52

To Defendants' Memorandum in Support of Motion for

Summary Judgment

## Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
 2       FOR THE DISTRICT OF MARYLAND
 3   -----------------------------x
 4   STEPHEN V. KOLBE, et al.,   :
 5         Plaintiffs,   : Civil Case
 6      v.         : No. 13-cv-02841-CCB
 7   MARTIN O'MALLEY, et al.,   :
 8         Defendants.   :
 9   -----------------------------x
10
11    CONFIDENTIAL ATTORNEYS' EYES ONLY PORTIONS
12      Deposition of GARY K. ROBERTS, D.D.S.
13          Palo Alto, California
14         Wednesday, January 8, 2014
15           7:10 a.m.
16
...
23   Job No.: 50497
24   Pages: 1 - 120
25   Reported by: Lisa R. Keeling CSR
```

## Page 2

```
 1      Deposition of GARY K. ROBERTS, D.D.S., held
 2   at the offices of:
 3
 4
 5      REGUS BUSINESS CENTER
 6      530 Lytton Avenue
 7      Second Floor
 8      Palo Alto, California 94301
 9      (650) 617-3200
10
...
14      Pursuant to Notice, before Lisa R. Keeling,
15   Certified Shorhand Reporter in and for the State
16   of California.
```

## Page 3

```
 1            A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFFS:
 3      BRADLEY ARANT BOULT CUMMINGS, LLP
 4      JAMES W. PORTER, III, ESQUIRE
 5      1615 L Street NW
 6      Suite 1350
 7      Washington, DC 20036
 8      (202) 719-8232
 9
10   ON BEHALF OF THE DEFENDANT:
11      OFFICE OF THE ATTORNEY GENERAL
12      DAN FRIEDMAN, ESQUIRE
13      STEPHEN RUCKMAN, ESQUIRE
14      200 St. Pauls Place
15      20th Floor
16      Baltimore, Maryland 21202
17      (410) 946-5600
18      (Appearing via Video Stream
19       and Telephonically)
```

## Page 4

```
 1           C O N T E N T S
 2   Examination of GARY K. ROBERTS, D.D.S       PAGE
 3     By Mr. Friedman             5
 4
 5
 6           E X H I B I T S
 7         (None marked)
 8
 9
10   CONFIDENTIAL ATTORNEYS' EYES ONLY PORTIONS:
11   PAGES 29:2 - 31:3
12   PAGES 91:9 - 97:7
```

Page 45

1 questions all the time from agencies, and I just taught a
2 California POST-certified firearms class in October. So
3 yes, I'm still involved on a more multi-jurisdictional
4 level, but I'm not with a specific agency.
5  Q. Okay. Do you advertise these services on -- in
6 trade magazines?
7  A. No.
8  Q. Do you advertise it on the Internet?
9  A. No.
10  Q. They just find you?
11  A. That would seem to be what happens.
12  Q. I want to ask you about some publications that
13 you've written. I have a copy of an article called,
14 "Protective Ability of the Standard U.S. Military Personal
15 Armor System for Ground Troops, PASGT, Fragmentation Vest
16 Against Common Small Arms Projectiles."
17   You wrote that in 1993; is that correct?
18  A. That is correct.
19  Q. And you coauthored with special agent Michael
20 Bullian?
21  A. That's correct.
22  Q. And can you tell me a little bit about that, the
23 studies that you were reporting about?
24  A. Certainly. The governor of California asked us
25 to -- through the attorney general asked us to do that

Page 46

1 study during the Rodney King rioting time frame. National
2 guard troops were being sent to Los Angeles to help quell
3 the rioting and protect the City, and no one had ever
4 studied whether the flak vest, which is a fragmentation
5 vest the military wears, would stop common civilian small
6 arms.
7  Q. When you say we were at -- how did that request
8 come from the California attorney general to -- and to
9 whom did it go? To whom was that request made?
10  A. I believe the attorney general asked the experts
11 at DOJ. DOJ asked me to conduct the study.
12  Q. Got it. And what were the conclusions that you
13 reported?
14  A. The PASGT vest offers protection against small
15 arms roughly equivalent to a level 2 to 3A soft body armor
16 as used by law enforcement.
17  Q. So there was a lot of discussion in this article
18 about tissue stimulants. Can you tell me what that
19 discussion was about and what the controversy is about
20 tissue stimulants?
21  A. I'm not aware of any controversy about tissue
22 stimulants at this time.
23  Q. What I understood was that some folks were using
24 clay, but you preferred gelatin, and I wanted to make sure
25 I understood that.

Page 47

1  A. You're talking about backing material for body
2 armor testing, which is somewhat different than a tissue
3 stimulant. The backing material behind the armor affects
4 how the armor responds to a projectile strike.
5   If you take your finger and press it into your
6 abdomen hard and withdraw your finger, does your stomach
7 stay impressed in, indented, or does your tissue bounce
8 back?
9   Clay doesn't bounce back. Real tissue does.
10 Therefore, using an inelastic stimulant like clay does not
11 realistically test the performance parameters of the body
12 armor.
13  Q. Right. That's exactly what I understood. "One
14 of the major problems of the NIJ testing is the use of
15 clay as a tissue stimulant. This inelastic material
16 poorly replicates" --
17   THE REPORTER: Hold on a minute. Are you
18 reading, because I couldn't understand some of it.
19   MR. FRIEDMAN: I apologize, ma'am. Let me see if
20 I can read that to you slower.
21   "One of the major problems of the NIJ testing is
22 the use of clay as a tissue stimulant. This inelastic
23 material poorly replicates the elastic properties of
24 living tissue."
25   THE REPORTER: Thank you.

Page 48

1   MR. FRIEDMAN: Thank you.
2  Q. You also -- I'm sorry, you've just testified that
3 it provided -- did you call it the PASGT?
4  A. Correct.
5  Q. "The PASGT vest provides protection from many of
6 the commonly encountered handgun bullets and shotgun
7 pellets."
8   The report also goes on to say, "but not from
9 shotgun slugs or center-fire rifle bullets."
10   Did you conduct testing with the center-fire
11 rifle bullets on that vest?
12  A. Yes.
13  Q. And do you -- I know this is a long time ago.
14 I'm just trying to figure out which those were.
15  A. I would have to look that up.
16  Q. Okay.
17  A. I have a copy of it on my computer if you want me
18 to, but it will take a few minutes to warm the computer
19 up.
20  Q. Let's hold that to the end, please.
21  A. Yes, sir.
22  Q. Thank you. Do you have an opinion -- maybe the
23 better way to do this is to ask if those vests are less
24 effective against center-fire rifle bullets in 223 or in
25 5.56.

49

1  A. No soft armor vests as currently produced, be
2  they military or law enforcement vests, that are soft
3  armor of a rating of 3A or less will generally stop
4  center-fire rifle bullets, particularly 223 or 556.
5  Q. Okay. Thank you. I also want to ask you about a
6  more recent article that you've written. This one was
7  back in June of this last year, 2013. This is called "The
8  1911 for LE and Special Team Use."
9      Where was that published?
10  A. Don't recall off the top of my head. I think
11  someone -- it was a paper originally written for a law
12  enforcement agency in the Midwest, and I believe an F.B.I.
13  agent saw it and put it up on his website.
14  Q. I see.
15  A. I think it was Modern Service Weapons, which is
16  owned by an F.B.I. agent on the East Coast.
17  Q. I see.
18  A. And he did ask me permission.
19  Q. I'm sorry?
20  A. He asked me permission after he saw it if he
21  could put it on his website, and I had no objection to it
22  after removing the identifying agency information.
23  Q. And the conclusion in that -- what was your
24  conclusion in that paper, if you recall?
25  A. I think the conclusion was that the 1911 doesn't

50

1  make sense for most law enforcement agencies in America at
2  this time due to the expense, cost and time required to
3  maintain that service pistol.
4  Q. And what did you recommend instead of the 1911?
5  A. A more modern, modular design probably best in
6  nine millimeter.
7  Q. Have you contributed articles to other websites?
8  A. Articles? I think I've made postings online
9  quite a bit over the years in response to questions and
10  things, but I wouldn't call them articles per se.
11  Q. Okay. When you participate in those Internet
12  chat rooms, you use the name .GKR; is that right?
13  A. I have used that name, yeah.
14  Q. Are there other names that you use?
15  A. Not off the top of my head. But I don't know if
16  other people have used .GKR in other forms, other places.
17  Q. So if I was to look on the Internet for
18  occurrences of .GKR, some of them would be you, but others
19  might be somebody else?
20  A. Could be. I don't hold a patent or a trademark
21  to the name so...
22  Q. Have you encountered examples of people using
23  that handle --
24  A. Yes.
25  Q. -- and passing themselves off as you?

51

1  A. There has been a couple cases where somebody's
2  posted something under as .GKR, and it was not me.
3  Q. Interesting. And you've used other names other
4  than .GKR, but you don't remember what those were?
5  A. I don't believe I've ever used anything other
6  than that or my full name Gary Roberts.
7  Q. Okay. How many of these chat rooms do you
8  participate in?
9  A. I believe at the current time it's pretty much
10  confined to a military oriented one called Lightfighter
11  and a -- one called Pistol-Forum.Com.
12  Q. What was the second one again, please?
13  A. Pistol-Forum.com.
14  Q. Is there a time when you ceased to participate in
15  one called M4carbine.com?
16  A. Yes. I no longer participate there.
17  Q. What was the reason that you ceased to
18  participate there?
19  A. I don't believe that the owner is ethical.
20  Q. Is that Mr. Vickers?
21  A. No, I don't believe Mr. Vickers owns it.
22  Q. Who do you believe owns it?
23  A. I believe a gentleman by the name of Grant
24  Timberlake owns it, and it's managed by a gentleman named
25  Paul Hotling. I believe -- excuse me one second. I

52

1  believe the spelling on -- which one did you want?
2      THE REPORTER: Paul.
3      THE WITNESS: H-O-T-L-I-N-G.
4      MR. FRIEDMAN: Q. What caused you to form the
5  opinion that they were unethical?
6  A. There were a number of things that happened over
7  the last several years coming to a head, I believe,
8  following a training class I took with a gentleman by the
9  name of Ken Hackathorn. He used to provide training for
10  the F.B.I. and some military units, and they objected to a
11  review of the class that I wrote.
12  Q. Was that review critical?
13  A. No, it was quite positive, actually.
14  Q. And why did they object?
15  A. I -- I do not understand.
16  Q. Is the acronym AAR frequently used for reviews of
17  shooting classes?
18  A. It's a military acronym that refers to After
19  Action Report, which is the post event review of anything
20  in the military. It could be a training event. It could
21  be a military action report. It could be a post medical
22  emergency report.
23  Q. But is it also applied to these reviews of
24  shooting clinics?
25  A. I believe it's become a colloquial expression

Case 1:13-cv-02841-CCB  Document 44-52  Filed 02/14/14  Page 5 of 5
CONFIDENTIAL DEPOSITION OF GARY K. ROBERTS, D.D.S.
CONDUCTED ON WEDNESDAY, JANUARY 8, 2014

26 (Pages 101 to 104)

101

1    A.  According to the U.S. military, they state that
2  an AR15 type rifle, be it an M16 or an AR15, fires about
3  45 to 90 rates per minute of accurate semi-automatic fire.
4    Q.  Can you go faster than that but sacrificing
5  accuracy?
6    A.  I don't know.  I'm using the data that is in the
7  Army field manual.
8    Q.  In the -- with respect to automatic fire, you
9  told me that things that limited and may cause the
10  difference between a good score of 970 rounds per minute
11  and a less good store of 700 --
12    A.  Oh, you're misunderstanding something there.
13    Q.  Oh, good.
14    A.  Faster is not necessarily better.  Faster --
15    Q.  Okay.
16    A.  -- is not necessarily better.  That's simply a
17  number that tells you, you know, the rounds per minute.
18  Is a car that revs at 4000 rpm worse than a car that revs
19  at 6000 rpm maximum?
20    Q.  What is limited -- what are the factors that
21  differentiate between an AR15 that fires at 45 rounds per
22  minute and one that fires at 90 rounds per minute?
23    A.  I have no idea.  That's simply the range that the
24  Army put in their field manual.
25    Q.  With respect to the M16 on fully automatic, you

102

1  talked about the buffer and the gas impingement system and
2  the round as being important factors in determining the
3  speed at which the gun can fire.
4    A.  Correct.
5    Q.  Are those same factors, limitations or changes in
6  the rate of fire that the AR15 can fire in semi-automatic
7  mode?
8    A.  No, completely different.  With a fully automatic
9  fire, you fire all those rounds with one squeeze of the
10  trigger.  You pull the trigger back once and multiple
11  rounds are fired.
12       On a semi-automatic fire, you have to pull the
13  trigger separately for each shot.
14    Q.  So is the limitation how fast one can pull the
15  trigger?
16    A.  I believe that would be one of the limitations.
17    Q.  Are there other limitations that might come into
18  play?
19    A.  I don't know what the Army criteria was, but I
20  would assume since they said accurate semi fire --
21  semi-automatic fire, accuracy was probably a component in
22  there as well since they included that terminology.
23    Q.  Okay.  On page 12 -- I'm going to flip you to
24  page 12, but keep your hand on page 7 so we could flip
25  back there.  I'm just looking at something on page 12,

103

1  okay?
2    A.  Okay.  I got to find 12.  Which is 12?
3    Q.  The first word on the page is "people," and it
4  ends with a six or seven-line italicized quote.
5       MR. PORTER:  That's correct.
6       THE WITNESS:  Okay.  Got it.
7       MR. FRIEDMAN:  Q.  This is that quote from Ken
8  Newgard.  He's talking about how a marginally trained
9  person can fire at a rate of two shots per second.
10    A.  Yeah.  He's talking about a handgun.
11    Q.  Okay.  And that translates -- I just want to be
12  clear -- to 120 rounds per minute?
13    A.  That would be what it says under Newgard's paper
14  there.
15    Q.  I'm just -- I'm just trying to figure it out.  Is
16  there a fatigue factor if you're trying to pull that
17  trigger for a minute?
18    A.  I don't know.  I suppose with some people it
19  might.
20    Q.  Have you ever done any testing like this?
21    A.  For --
22       MR. PORTER:  Object to the form of the question.
23       You can answer.
24       THE WITNESS:  Are you talking about for rounds
25  per minute testing on semi-automatic fire?

104

1       MR. FRIEDMAN:  Q.  Yes, sir.
2    A.  Nope.
3    Q.  Do you know anybody who has?
4    A.  Just the U.S. Army that has that field manual
5  there.
6    Q.  Okay.  And you are pointing out the difference
7  between the speeds and -- and that's the point of that
8  paragraph; am I correct?
9    A.  I'm pointing out that the United States
10  government has published two different rates of fire, one
11  based on semi-automatic and one based on fully automatic
12  fire for that weapon system.
13    Q.  Okay.  But you're drawing a conclusion that those
14  are profoundly and obviously different; am I correct?
15       MR. PORTER:  Object to the form of the question.
16       THE WITNESS:  It would appear to be about a ten
17  times rate difference.  By a factor of ten would seem
18  rather significant.
19       MR. FRIEDMAN:  Q.  Okay.  Thank you.
20       On page 10 of your report, you're talking about
21  both the commonness -- the commonness of the AR15; is that
22  correct?
23    A.  I see that paragraph there that starts "As a
24  result."
25    Q.  Yes.