Exhibit 53

To Defendants' Memorandum in Support of Motion for

Summary Judgment

1

1    IN THE UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF MARYLAND
3              (Northern Division)
4
5  SHAWN J. TARDY, et al.
6         Plaintiffs                Case No.
7  vs.                              1:13-cv-02841-CCB
8  MARTIN J. O'MALLEY, et al.
9         Defendants
10 _____/
11
12
13         The deposition of CAROL WINK was held on
14 Tuesday, December 3, 2013, commencing at 10:50 a.m., at
15 the Office of the Attorney General, Civil Litigation
16 Division, 200 Saint Paul Place, 19th Floor, Baltimore,
17 Maryland 21202, before Susan M. Wootton, RPR, CLR,
18 Notary Public.
19
20
21 REPORTED BY: Susan M. Wootton, RPR, CLR

Page 10

1  passage of Senate Bill 281 or its House counterpart?
2  A. Not personally.
3  Q. Were you involved in any way?
4  A. The only thing I did was help provide a bus
5  of local citizens to go up to a rally.
6  Q. And by help provide, did you pay for the
7  bus?
8  A. No.
9  Q. How did you help to provide it?
10 A. Answered the phone and contacted -- I
11 didn't contact the bus company, but I found the bus
12 company for them.
13 Q. If you could please look at what's been
14 previously marked as Nolte Exhibit 1, this is a copy of
15 Section 5-101 of the Public Safety Article, and
16 starting on the third page at Section 5-101 R2, there's
17 a list of regulated long guns.
18    I would ask if you recognize this as the
19 list of firearms that is at issue in the lawsuit that
20 you filed?
21 A. Yes.

Page 11

1  Q. And if I use the phrase, banned long guns
2  or banned firearms, will you understand that as a
3  reference to this list of firearms?
4  A. Yes.
5  Q. Ma'am, you have been identified, in
6  disclosures by the plaintiffs, as a likely witness in
7  the case and you've also been designated to respond to
8  areas of testimony on behalf of Wink's Sporting Goods.
9    Maybe I should direct this to your counsel,
10 but is Ms. Wink here as, only on behalf of her business
11 or in an individual capacity as well?
12    MR. SWEENEY: The former.
13    MR. FADER: Okay. So your testimony here
14 today is on behalf of your business, Wink's Sporting
15 Goods, is that correct?
16    THE WITNESS: Correct.
17    MR. FADER: Would you please mark that?
18    (Wink Exhibit 1 was marked for purposes of
19 identification.)
20 Q. Ma'am, we've shown you what's been marked
21 as Wink Exhibit 1, which has designated areas of

Page 12

1  requested testimony from business plaintiffs.
2    Have you seen this document before?
3  A. Yes.
4  Q. And are you here prepared to testify on
5  behalf of Wink's Sporting Goods with respect to all of
6  the designated areas of requested testimony?
7  A. To the best of my ability.
8  Q. Ma'am, what associations is, if any, is
9  Wink's Sporting goods a member of?
10 A. National Shooting Sports Foundation,
11 National Archery Buyers Association. I don't know of
12 any others.
13 Q. Is Wink's a member of the Maryland Licensed
14 Firearms Dealers Association?
15 A. No.
16 Q. Is Wink's a member of any other firearms
17 dealers associations?
18 A. No.
19 Q. How long has Wink's been in business?
20 A. Oh, let's see, in a retail setting, since
21 2003. I actually had a smaller -- well, that's

Page 13

1  probably 2003.
2  Q. And did Wink's exist in some other format
3  before that?
4  A. Just my husband with his FFL was doing some
5  transfers, but that was it. It wasn't actually the
6  business.
7  Q. Okay. What is your role in the business?
8  A. I'm a co-owner and office manager.
9  Q. What is your background in firearms?
10 A. Background in firearms, I have no
11 background in firearms.
12 Q. Do you shoot firearms?
13 A. I do.
14 Q. How often?
15 A. Every couple of months.
16 Q. In competitions?
17 A. No, I'm not very good.
18 Q. Have you ever participated in competitions?
19 A. No.
20 Q. Do you hunt?
21 A. No.

Page 14

1  Q. When you shoot, is it just going to the
2  range and shooting?
3  A. It's in my backyard.



Page 15

Page 16

9  Q. Ma'am, showing you what has been marked as
10  Nolte Exhibit 3, --
11  A. Uh-huh.
12  Q. -- this is Plaintiff's Response to
13  Defendant's First Set of Requests for Production of
14  Documents.
15    Have you seen this document before?
16  A. Yes.
17  Q. Were you involved on behalf of Wink's
18  Sporting Goods in providing responsive documents?
19  A. Yes.
20  Q. And did you provide all documents that you
21  believed were responsive to the request from the

Page 17

1  defendants?
2  A. I would like to look at this for a few
3  minutes, please.
4  Q. Sure.
5  A. I need to change my answer. This is not
6  the document that I thought it was.
7    I have not seen this before.
8  Q. Okay. Did you see a document that
9  contained requests for documents from the defendants?
10  A. Only the one that related to me, to Wink's.
11  Q. Okay, so let me do this.
12    (Wink Exhibit 2 was marked for purposes of
13  identification.)
14  Q. Now, showing you what has been marked as
15  Wink 2, is this perhaps the document that you had
16  been --
17  A. Yes.
18  Q. -- thinking the other one was?
19  A. Uh-huh.
20  Q. And these are Wink's Responses to
21  Interrogatories?

Page 26

1  A.  It's in my blue Federal Firearms
2  Regulations book that I use to know what I'm to do.
3  Q.  That list in Nolte Exhibit 1, for example,
4  includes the Colt AR-15, but it didn't specifically say
5  a Stag AR-15.
6      How did you know whether the Stag AR-15 was
7  covered or not?
8  A.  If it didn't have HBAR stamped on it, I
9  didn't sell it.
10 Q.  Because you understood that it was covered
11 as a regulated long gun?
12 A.  At that time, yes.
13 Q.  Has that ever changed?
14 A.  Has it ever changed that I understand what
15 a Colt HBAR, they don't make Colt HBARs any more.
16 Q.  No, you said that you understood at that
17 time, which I think we're talking about the 2000, the
18 time before 2007 when you were not allowed to sell
19 regulated firearms, that you had an understanding that
20 an AR-15 that didn't have HBAR stamped on it was a
21 weapon that you could not sell, is that right?

Page 27

1  A.  That's correct.
2  Q.  Starting in 2007, you were able to sell
3  those firearms subject to the 77R process, is that
4  correct?
5  A.  That's correct.
6  Q.  Okay.  And did your understanding of what
7  was or was not covered by the regulated firearms law
8  change at any point after 2007?
9  A.  Only to the extent that I could call the
10 State Police at that point and ask them what I should
11 do in any given situation.
12     Up until then, I erred on the side of
13 caution.  If I thought it could be, then I just didn't.
14 Q.  And when did you realize that you could
15 call the State Police?
16 A.  When I got my, I call it my handgun
17 license, when I got my regulated firearm, when I got my
18 State license.
19 Q.  Did you take advantage of that ability to
20 call the MSP?
21 A.  Any time that I had a question.

Page 28

1  Q.  And did they respond to your questions?
2  A.  They responded to my questions, yes.  Did
3  they always give me a direct answer, no.  They very
4  often put it in my court to decide.
5  Q.  Can you give me an example?
6  A.  Is the Remington R-15 regulated, does it
7  have HBAR stamped on the barrel?  Well, no.
8      The words to me were, err on the side of
9  caution.
10 Q.  And that's which firearm, the Remington?
11 A.  That's the Remington R-15.
12 Q.  Is that an AR-15?
13 A.  It's a 243 on an AR platform.
14 Q.  243 meaning that that's the caliber of the
15 round?
16 A.  That's the caliber, yes.  It is a
17 camouflaged rifle.
18 Q.  Okay.
19 A.  I considered it a heavy barrel, but rather
20 than get in any problems, I did 77R anyway.
21 Q.  You considered it to be a heavy barrel

Page 29

1  because it's heavier than the 223?
2  A.  No, the barrel itself, not the caliber.
3  Q.  And the Colt AR-15 HBAR, what caliber does
4  that, what caliber round does that fire?
5  A.  223 or 556.
6  Q.  Okay.  And the Remington R-15 you
7  considered to be a heavy barrel because the barrel was
8  heavier than most AR-15s?
9  A.  Because it was a heavy barrel, yes.  In my
10 opinion, it was a heavy barrel.
11 Q.  And does that relate purely to the weight
12 of the barrel?
13 A.  Thickness, weight.
14 Q.  Okay.  Were there any other circumstances
15 in which you asked the State Police a question about a
16 firearm and whether or not it qualified as a regulated
17 firearm?
18 A.  I don't recall exact -- any time that I had
19 a question I called them.  I can't give you specifics.
20 Q.  Well, I mean, was it more than 10 times
21 over the years?

Page 30

1  A. Probably not.
2  Q. Were there any other occasions, other than
3  with the Remington R-15, where you recall the State
4  Police not providing a direct response?
5  A. I think that probably came up more than one
6  time, that same question, is it a heavy barrel, and it
7  may have, but I can't give specifics so I'm not even
8  going to try.
9  Q. But, other than the question as to whether
10 something was or was not a heavy barrel, do you recall
11 any other questions asked to the State Police that
12 weren't answered directly?
13 A. No, they were very helpful.
14 Q. And on other occasions where you called to
15 inquire about a particular firearm, did they in fact
16 tell you whether or not it was covered?
17 A. I didn't ask that question very often. My
18 questions usually were, did you get my fax and have you
19 sent back my response?
20 Q. And on those questions, the State Police
21 were very helpful?

Page 31

1  A. Very helpful.
2  Q. Since 2007, when you got the Maryland
3  license, have you always complied with the 77R process?
4  A. Yes.
5  Q. And how did, how did you comply?
6  A. How do I comply with the 77R process?
7  Q. Yes, what does that involve?
8  A. There are about three or four pages that
9  each person has to fill out when they want to purchase
10 a regulated firearm. I always got the documentation
11 that was needed.
12     The first thing was, had they taken a class
13 online or had they been in the military? I made them
14 provide proof of one of those things.
15     I copied their driver's license. I put all
16 the documentation together, and I can say very clearly
17 that I complied.
18     My audit, the time before last, the auditor
19 said that he wished that he could send me out to train
20 all new licensees, so --
21 Q. And did you comply with that process every

Page 32

1  time that you sold a firearm that you understood was
2  covered as a regulated firearm?
3  A. Yes.
4  Q. And that involved all handguns, is that
5  right?
6  A. Yes.
7  Q. And it also involved any of the banned
8  firearms listed on Nolte Exhibit 1?
9  A. At that time, it took all regulated
10 firearms, not banned, they were regulated.
11 Q. Right, those are the ones that we're now
12 describing as the banned firearms?
13 A. I would assume. I don't have the two to
14 compare and actually make sure that they are exactly
15 word per word the same.
16 Q. Okay.
17 A. But the list that the State had provided up
18 until October 1st I complied with, yes.
19 Q. And you still need to comply with the list
20 now by not selling any of those weapons, correct?
21 A. Correct.

Page 33

1  Q. Okay. Are you aware of any differences in
2  the two lists?
3  A. I'm not, no.
4  Q. I think they are identical lists. I mean
5  have you taken any action to treat it, the list, now
6  any differently than you did before?
7  A. The only thing that I have tried to watch
8  out for is the copycat portion, and I still don't
9  understand all I know about that, but I have tried to
10 make sure that I have complied.
11     I know that I haven't sold any that had a
12 grenade launcher on, so I feel pretty sure that I've
13 complied there.
14 Q. And before October 1st of 2013, why did you
15 comply with the 77R process?
16 A. Because that was a requirement of my
17 license.
18 Q. Did you also understand that there were
19 criminal sanctions for not complying with it?
20 A. Yes.
21 Q. You mentioned having sold the AR-15s

Page 66

1  shooting, is that right?
2  A.  I do not, no.
3  Q.  And is that the same answer for whether
4  they're in common use for hunting?
5  A.  I do not have that information.
6  Q.  Beyond whatever has been communicated to
7  you verbally by customers?
8  A.  That's correct.
9  Q.  And I assume, and just like with respect to
10 self-defense, I assume that none of that is in writing
11 anywhere, is that right?
12 A.  No, nobody writes that down when they come
13 in and talk to me about it.
14 Q.  Does Wink's Sporting Goods have a position
15 as to whether magazines with a capacity in excess of 10
16 rounds are necessary for home self-defense?
17 A.  Does, do I have a position on that, Wink's
18 Sporting Goods?
19 Q.  Yes.
20 A.  Yes.
21 Q.  What is that position?

Page 67

1  A.  That position is that I want all the fire
2  power that I can possibly have if my life is in danger.
3  Q.  And so, what does that mean with respect to
4  whether --
5  A.  That means that I can't shoot very well.  I
6  personally am left eye dominant.  I don't know if
7  you're familiar with what that means.
8      But for the last, I don't know how many
9  years, I've been missing everything that I shoot at,
10 but with enough and close enough, then I could hit
11 them.
12     And I'm just learning to shoot a little
13 better since we discovered that I'm looking out of the
14 wrong eye all these years, that I want as many shots as
15 I can possibly get.
16     Is there going to be one person that breaks
17 into my house, knowing that I have the firearms there
18 or that I have whatever there, is there going to be one
19 person, three people, four people?
20     I don't want just 10 because I'm going to
21 be shaking.

Page 68

1  Q.  Be shaking, worried that you're going to
2  miss with most of the shots that you take?
3  A.  No, worried that they're going to get me
4  because there's so many of them.
5  Q.  So many?
6  A.  People that break into my house.  I don't
7  look for one person to come to my house.
8      I live out in the country.  I have an alarm
9  system.  Nobody will get there.
10 Q.  Nobody meaning the police officers?
11 A.  Right, they won't get there.
12 Q.  How many people have broken into your house
13 in the past?
14 A.  None.
15 Q.  Are you aware of any case in which anybody
16 in Maryland has needed more than 10 rounds to, in a
17 self-defense scenario?
18 A.  No.
19 Q.  But you believe that it's possible that you
20 might at some point?
21 A.  I believe it's possible that anybody might

Page 69

1  at some point.
2  Q.  And is there any other reason, other than
3  the belief that multiple individuals may come attacking
4  your house at the same time, that you believe magazines
5  with a capacity of more than 10 rounds are necessary
6  for self-defense?
7  A.  Nope, that's enough.



11 Q.  Does Wink's Sporting Goods have a position
12 as to whether magazines with a capacity in excess of 10
13 rounds are necessary for hunting?
14 A.  No, they're not necessary for hunting.
15 Q.  Does Wink's Sporting Goods have a position
16 as to whether magazines with a capacity in excess of 10
17 rounds are necessary for sports shooting?
18 A.  Necessary for sports shooting, no.  More
19 enjoyable for sports shooting, yes.
20 Q.  And is it more enjoyable just because you
21 don't have to stop and change after 10 rounds?