Exhibit 55

To Defendants' Memorandum in Support of Motion for

Summary Judgment

```
                                                          1

 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF MARYLAND
 3                    (Northern Division)
 4
 5   SHAWN J. TARDY, et al.
 6            Plaintiffs              Case No.
 7   vs.                              1:13-cv-02841-CCB
 8   MARTIN J. O'MALLEY, et al.
 9            Defendants
10   _____/
11
12
13           The deposition of STEPHEN KOLBE was held
14   on Tuesday, November 26, 2013, commencing at 10:07
15   a.m., at the Offices of the Attorney General, 200
16   Saint Paul Plaza, Baltimore, Maryland  21202, before
17   Oneeka S. Hill, Notary Public.
18
19
20
21   REPORTED BY:  Oneeka S. Hill
```

Page 26

1  A. 2009, nothing in between.
2  Q. And where was that offered?
3  A. Shrewsbury, Pennsylvania.
4  Q. And did you receive a certification at
5   the conclusion of this?
6  A. Yes, sir.
7  Q. And what was that?
8  A. The NRA -- it was an NRA certification.
9  Q. And do you recall what the title of the
10  certificate was?
11 A. Either First Steps or Safety in the Home.
12 Q. Do you have a paper that someone -- that
13  would identify what course that was?
14 A. Yes, sir.
15    MR. FRIEDMAN: I believe we've requested,
16  and if we haven't, we will. And I'd like -- I'd
17  just like to see a copy to see what particular --
18    MR. PORTER: We could provide you with a
19  copy. He's got one.
20    MR. FRIEDMAN: Okay. Thank you very
21  much.

Page 27

1     MR. PORTER: No problem.
2  Q. And how many course -- how many hours of
3   instruction was involved in it, NRA course in
4   Shrewsbury?
5  A. As I recall, approximately six -- eight.
6  Q. And did that include both classroom and
7   range instruction?
8  A. Yes, sir.
9  Q. And can you describe the course and the
10  content of the course, generally?
11 A. My answer won't provide a comprehensive
12  detailing of the -- the syllabus because we'd need a
13  lot of time to do that, but I can give you some
14  elements of the class.
15    Is that acceptable?
16 Q. That's -- I'm looking for your general
17  recollection of what the big topics were.
18 A. Thank you. Firearm safety in the home,
19  how to properly care for, store, a firearm. How to
20  disassemble and reassemble a firearm. Range time
21  with an instructor, which included one-on-one

Page 28

1  instruction on how to use the firearm in my
2  possession at the time. Some tips with respect to
3  what to do if you -- if an intruder entered the
4  home.
5     Again, there was more to the class. We
6  can continue, if you'd like me -- if you'd like me
7  to on this -- on this thread.



Page 29

1  Q. Okay.
2  A. Thank you.
3  Q. Sure. I don't want you to get the
4   impression that this is a trick or a memory test, so
5   I appreciate your clarifying.
6  A. Thank you.
7  Q. Were there other students there who had
8   other types of firearms that they were training
9   with?
10 A. Yes, sir.
11 Q. And what -- do you know what those were?
12 A. I was more focused on getting the maximum
13  that I possibly could out of the class. I did not
14  pay a lot of attention to the other firearms that
15  were in the room. But my recollection was that they
16  were mostly, if not, all handguns.
17 Q. Okay. Was there any discussion of -- in
18  the training about what guns were -- which firearms
19  were appropriate for different types of uses?
20 A. No.
21 Q. Okay.

Case 1:13-cv-02841-CCB   Document 44-55   Filed 02/14/14   Page 4 of 6

Page 30

1  A.  Could you restate that question please?
2      Was it appropriate --
3  Q.  Going to try -- I'm thinking through
4  trying to figure out exactly what I want to say.
5  A.  Understand.
6  Q.  Was there a discussion of different
7  classes of firearms being appropriate for different
8  uses, different applications, different situations?
9  A.  There were -- there were discussions
10 about the impact.  For example, the different
11 calibers of firearms would have on things, such as
12 recoil, the amount of force that the projectile
13 would -- would have on its target.
14     Mostly wrapped around safety, as I
15 recall.  So, forgive me, if it's okay to, you know,
16 add that clarification.



Page 54

1  Q.  Do you practice your plan?
2  A.  Yes.
3  Q.  How frequently?
4  A.  We -- I interpret practice as being talk
5  about the plan or role play the plan.  We most
6  recently spoke about the plan last week.  We
7  routinely -- we remind the children about the plan.
8  And also, my wife and I reflect on the plan, I would
9  say, once every three months.  We have acted the
10 plan out, I would say maybe once a year.
11 Q.  Did you design the plan yourself or did
12 you have assistance in doing so?
13 A.  In conjunction with guidance from the
14 trainer at that NRA class that I took.
15 Q.  Great.  Thank you.  Do you have plans for
16 other emergencies in your home?
17 A.  Yes.
18 Q.  And can you describe those to me?
19 A.  Sure.  We have water and canned food in
20 the event that there's a natural disaster, four foot
21 of snow that we -- you know --

Page 55

1  Q.  Tomorrow?
2  A.  Yes, exactly.
3      MR. SWEENEY: No, don't say that.
4      THE WITNESS: Can you state the question
5  again?
6  Q.  I'm sorry.  It was my fault.  I was
7  asking you about other emergency plans that you have
8  in your home.
9  A.  Okay.  So everything we just said.
10     We -- we also, when a strange person
11 comes to the house -- I mentioned people that come
12 up the driveway, will -- and this is more of an
13 informal practice.  We make certain that the dog is
14 in the house and nearby, but behind a closed glass
15 door so that the person who is at the door can see
16 that we have a dog.
17 Q.  Do you have a fire plan?
18 A.  Yes.
19 Q.  And could you describe that to me please?
20 A.  Because we live in a rancher that is
21 fairly simple.  The expectation is that the children

Page 56

1  would -- would go out the -- would close the door
2  and would go out the windows in their bedroom, if
3  they -- if indeed they're in their bedroom at the
4  time that the firearm happens.  If not, then the
5  expectation is that they would just go out a door if
6  it's daytime.
7      We have fire extinguishers, which are --
8  which are current, which we keep in the kitchen or
9  in the passageway by the kitchen actually.  Which
10 would be -- which would be used in the event that a
11 fire were to occur.
12 Q.  And do you practice that plan with the
13 children?
14 A.  Yes.
15 Q.  How frequently?
16 A.  About the same amount of time as we would
17 with the self-defense plan.
18 Q.  Okay.
19 A.  And also with respect to setting
20 expectations on what to do when a stranger comes to
21 the door.

Page 57

1  Q.  Right.
2  A.  Don't answer.  If someone calls, don't
3  say my parents are, you know, not here, or those
4  types of things that you would teach kids on how to,
5  you know, conduct themselves appropriately with
6  strangers.
7      Our son would be possibly unable to open
8  or unlock the bedroom window.  So my wife and I have
9  -- both understand that one of us may need to go
10 retrieve him from his bedroom, in the event that a
11 fire breaks out.
12     Our daughter being 11 is perfectly
13 capable of doing that herself, although naturally we
14 would check on her in the case of a fire or, you
15 know, a self-defense situation.
16 Q.  Sorry.  We've been at this for an hour
17 and 15, do you want to break, keep going?
18 A.  I've got my cookies here, I'm good.
19 Q.  Paragraph four of the complaint you aver
20 that you do not currently own any firearms banned by
21 the act, but wishes to purchase a firearm that is

Page 58

1 banned?
2 A. Yes.
3 Q. And could you tell me what firearm you
4 would like to purchase?
5 A. Sure. A -- I would -- I would like to
6 own --
7 Q. I didn't mean to hide that from you?
8 A. That's okay. I remember it. I would
9 like to purchase a rifle, particularly an AR15.
10 Q. And why would you like an AR15?
11 A. Okay. For all of the reasons that we --
12 that we discussed before about why a single firearm
13 is insufficient for our family.
14     Should I recall all of them?
15 Q. I would appreciate if you would describe
16 for me why you think an AR15 would be a useful
17 purchase for your family?
18 A. Sure. Recreational, being able to go to
19 the range with my family, including my wife, my
20 children, my other family members who have them; my
21 cousin who is in law enforcement, my father who also

Page 59

1 owns an AR15.
2     I would like to be able to teach my
3 children, which is one of the greater reasons, in my
4 opinion, why I would really like to have it. I
5 would like to be able to teach my children how to be
6 responsible owners and users, if they would like to
7 be at some point in time, of a -- of a rifle like an
8 AR15.
9     I am -- I would add that I'm attracted to
10 the AR15 platform because it is very commonly used,
11 and a platform that has been around for a long time.
12 I believe that it would be more reliable, sturdy,
13 than perhaps other -- other choices, which might be
14 available on the market. But I would add that I'm
15 not a -- I'm not a gun expert.
16     I -- we talked about -- we talked about
17 self-defense. I believe that it would be important
18 to have a rifle, such as an AR15, in scenarios which
19 would require more fire power than a 9 millimeter
20 handgun.
21     Those are some of the reasons why I would

Page 60

1 like to own an AR15.
2 Q. And as you may know, the -- when the law
3 was passed, it provided for a later effective date
4 and allowed subsequent purchases of these firearms.
5 Is there a reason that you didn't purchase between
6 the time when it was known that they would be
7 banned, and the time when, in fact, the law went
8 into effect banning them?
9 A. Well, I would respectfully -- I may be
10 wrong. You're certainly more of an expert than I
11 am. I would respectfully disagree with the
12 question, because most laws that the State of
13 Maryland pass have an effective -- or, excuse me,
14 many laws that the State of Maryland pass have an
15 effective date of October 1. It's no different than
16 the effective date to other things, such as the
17 texting while driving banned, which went into effect
18 last year.
19     Am I not correct, sir?
20 Q. Let me see if I can rearticulate the
21 question.

Page 61

1 A. Yes, sir.
2 Q. There was a period of time between the
3 passage of the bill, signature by the governor and
4 its effective date?
5 A. Yes, sir.
6 Q. I don't mean to -- I apologize for
7 characterizing that period. But there was a time I
8 believe from May until October 1st, during which was
9 known that they would become banned, but they were
10 not yet banned.
11     And my question is, if -- why did you not
12 purchase an AR15 during that period?
13 A. Because I don't have the money.
14 Q. Thank you. Are you familiar with the
15 Second Amendment to the United States constitution?
16 A. In so much as a responsible citizen such
17 as myself could be. I'm not an expert on the
18 constitution, but I am familiar with the -- with
19 the -- I am familiar with the Second Amendment.
20 Q. Have you read the Supreme Court's
21 decision in Heller?