Exhibit 67

To Defendants' Memorandum in Support of Motion for

Summary Judgment



1 of 1 DOCUMENT

Copyright 1999 The Washington Post
The Washington Post

May 01, 1999, Saturday, Final Edition

**SECTION:** A SECTION; Pg. A01

**LENGTH:** 1529 words

**HEADLINE:** Why a Colorado Pistol Has 'DC' in Its Name; Relabeling Helps Firms Skirt Gun Laws

**BYLINE:** Barbara Vobejda, Washington Post Staff Writer

**BODY:**

Etched boldly on the frame of the semiautomatic pistol that Eric Harris and Dylan Klebold carried into Columbine High School last week is a tidy set of characters -- "TEC-DC9." To those who know guns, the "TEC" and the "9" signal a mythologized weapon infamous for its use in multiple slayings.

The "DC," according to modern gun legend and court documents, stands for the District of Columbia.

Those two letters and how they came to grace the side of a weapon offer a fascinating tale of gunmaking -- and remaking. It is a story common among gun manufacturers who have artfully -- and legally -- skirted state and federal laws either by slightly changing their firearms or simply renaming them.

In this case, Miami-based Navegar Inc. added the "DC" to the TEC-9 label in 1992 after the District adopted a law making manufacturers liable for gun deaths.

The TEC-9 specifically was listed in the measure, but Navegar quickly changed the name to "TEC-DC9." That simple step took the weapon off the list.

Such practices are at the heart of troubling questions raised by the 15 violent deaths in Colorado -- how military-style weapons fall easily into teenagers' hands, and why these firearms remain so ubiquitous in American society.

One answer is this: Companies that make assault-style weapons continue to pump out a stream of products, despite a 1994 federal ban, because they have simply altered certain features on their guns without changing the basic design or lethality. They then rename the weapons and put them back on the market, legally.

"It's a fairly common practice," said Jay Wachtel, a criminal justice professor at California State University at

Case 1:13-cv-02841-CCB   Document 44-67   Filed 02/14/14   Page 3 of 5

Page 2

Why a Colorado Pistol Has 'DC' in Its Name; Relabeling Helps Firms Skirt Gun Laws The Washington Post May 01, 1999, Saturday, Final Edition

Fullerton. The assault weapons ban, he argued, "is essentially meaningless in having any impact on lethal weapons because the manufacturers decided to circumvent" the law.

Navegar is hardly alone. After the federal ban became law, Colt's Manufacturing Co. replaced its AR-15, the civilian version of the M16 standard Army rifle, with the "Colt Sporter." The Sporter was the same weapon, minus a "flash suppressor" and bayonet mount, both external characteristics that did not alter its basic design.

"Their tactic is to associate with sporting activity" to get around the ban, said Kristen Rand at the Violence Policy Center, a gun control group. "It's called sporterizing."

Importers of assault rifles, primarily knockoffs of Russian AK-47s, made similar changes after a 1989 presidential order banned such weapons unless they were used for sport. Tens of thousands of the semiautomatics continued to pour into the country until a 1998 presidential order closed the loophole.

From the industry perspective, manufacturers are merely following the law.

The federal ban, for example, specifies that a semiautomatic rifle becomes an assault weapon if it has two or more features from a list that includes a folding stock, a pistol grip and a bayonet mount.

"If that's what Congress has decided are the features that are bad, companies have the right, in fact the duty, to change those bad features," said Richard E. Gardiner, an attorney who has represented firearms companies and is former counsel to the National Rifle Association.

With attention focused on the Colorado shootings, the evolution of Navegar's TEC-DC9 adds another twist to the gun's notorious history. Shrouded with a ventilated barrel to prevent hand burns and coated with a dark finish, the weapon flashed through scenes in "Miami Vice" and "RoboCop." But it has also played a role in mass shootings and other major crimes.

Gian Luigi Ferri used two TEC-DC9s to kill eight people in a San Francisco law office in 1993, a massacre that prompted a landmark lawsuit against Navegar. A version of the gun also was used when two FBI agents and a police detective were killed at D.C. police headquarters in a 1994 rampage.

In late 1990, the District council adopted the nation's first manufacturers' liability law. It was repealed under pressure from Congress a few months later, but resurrected in 1991 by a voter referendum that passed overwhelmingly after a grass-roots movement led by the city's African American clergy.

The measure named several assault weapons, including the Uzi, the Beretta and the TEC-9. And it solidified the District's reputation as a leader in gun control, dating from the city's 1976 handgun ban.

"Our thought process was that if we have the strictest law in the country and we can't keep handguns out, then maybe we should hold manufacturers liable and they'll just stop making them or do something to keep them out of here," said D.C. Council member Jack Evans (D-Ward 2).

Manufacturers opted for a different strategy.

A few months after the referendum, Navegar, also known as Intratec, changed the gun's name, exempting it both from the District's liability law and a California assault weapons ban.

Michael Solodovnick, former Navegar marketing and sales director, said in a deposition for the San Francisco lawsuit that the "TEC-DC9" label was meant to circumvent anti-gun laws. He said Navegar owner Carlos Garcia told him that the letters stood for the District of Columbia.

That has been widely interpreted as Garcia's gibe at the city for a law that still threatens him and other

Why a Colorado Pistol Has 'DC' in Its Name; Relabeling Helps Firms Skirt Gun Laws The Washington Post May 01, 1999, Saturday, Final Edition

manufacturers.

Garcia, however, has testified that the initials stand for "defensive carry," a reference to a slightly altered shoulder sling on the weapon.

A Cuban immigrant who built a successful enterprise from his Miami warehouse, Garcia did not return several phone calls. Two attorneys who have represented Navegar also declined to comment on the practice of revising and renaming weapons.

"Navegar has probably been the most determined assault weapons manufacturer in terms of playing the name game," said Dennis Henigan, director of the Legal Action Project at the Center to Prevent Handgun Violence in Washington. Henigan represented victims' families in the San Francisco lawsuit against Navegar.

In a court brief, Henigan states that Navegar initially changed only the weapon's name, then made about 36,000 TEC-DC9s before it altered the shoulder sling.

This was not the first time, or the last, that the company renamed its weapon.

The gun was first known as the KG-9. The "9" signaled that it was a 9mm weapon. The "KG" represented the initials of Garcia and his partner in designing the weapon.

In 1982, the federal Bureau of Alcohol, Tobacco and Firearms determined that the KG-9 could be converted too easily to a fully automatic weapon and thus could not be sold to the public. Navegar changed the weapon and its name, calling it the KG-99.

In 1985, ATF ruled that the redesigned gun could not be sold because its forward grip rendered it too close to an assault weapon. Navegar removed the grip and renamed the gun the TEC-9.

In 1992 the TEC-9 became the TEC-DC9. Finally, after Congress enacted the assault weapons ban in 1994, Navegar once more redesigned its product, removing the ventilated shroud around the barrel, making other minor changes and renaming the weapon the AB-10.

"AB" is interpreted as Navegar's shorthand for "after the ban."

It was in its incarnation as the TEC-DC9 that the weapon was used by Ferri, an unstable mortgage broker, in the San Francisco law office. The victims' families argued in their lawsuit that the company should have foreseen that its marketing methods could lead to the weapon's use in a mass shooting.

"They set out to find a niche market for their guns, which consisted of consumers who desired extraordinary firepower," Henigan said. Magazine ads boasted of the weapon's "gutsy performance," compared it to the Uzi military assault gun and described its finish as having "excellent resistance to fingerprints."

"Those kinds of phrases, words and images are designed to appeal to inherently high-risk users, including criminals, militia types, survivalists and deranged individuals who are planning military-type assaults," Henigan said.

The case against Navegar -- the first of its kind against a gunmaker -- was dismissed by San Francisco Superior Court Judge James Warren. An appeal is set for oral argument this month.

When the case was before Warren, California already had a state law that banned the sale and advertising of certain firearms, including the TEC-9.

As part of the lawsuit, Navegar attorney Ernest Getto bought a TEC-DC9 and tried to register it with the state, a requirement for weapons covered by the state ban. But he was told registration was unnecessary because the renamed

Case 1:13-cv-02841-CCB   Document 44-67   Filed 02/14/14   Page 5 of 5

Page 4
Why a Colorado Pistol Has 'DC' in Its Name; Relabeling Helps Firms Skirt Gun Laws The Washington Post May 01, 1999, Saturday, Final Edition

gun was not covered by the law.

Nevertheless, said one Navegar attorney, Garcia decided not to market the TEC-DC9 in California, knowing the law could be extended to similar weapons.

Navegar has not gone silently into the fight. The company has sued the federal government, claiming the assault weapons ban and its list of specific manufacturers are unconstitutional. Navegar lost in U.S. District Court and the case is on appeal in federal court in the District of Columbia.

Staff writer David B. Ottaway and staff researcher Alice Crites contributed to this report.

**LOAD-DATE:** May 01, 1999