Exhibit 68

To Defendants' Memorandum in Support of Motion for

Summary Judgment



# BACK IN
# BUSINE$$

*Gun Industry Plans for the Expiration of the Federal Assault Weapons Ban*

September 7, 2004

Consumer Federation of America

The **Consumer Federation of America** (CFA) is a nonprofit association of 300 consumer groups, representing more than 50 million Americans that was established in 1968 to advance the consumer interest through research, education, and advocacy.

This report was authored by CFA Firearms Project Director Susan Peschin, MHS. Research assistance was provided by Josh Brownstein.  Special thanks to Whit Collins, Robert Ricker, and Joseph Vince for their expertise, comments, and review.

## Introduction

In 1994, President Clinton signed The Violent Crime Control and Law Enforcement Act, which included a ban on semiautomatic assault weapons such as the Uzi, AK-47, and TEC-9.  The "assault weapons ban" also outlawed high-capacity ammunition magazines that hold more than ten rounds.  However, in the negotiating process, lawmakers agreed to a ten-year sunset clause in the legislation.  Thus, the assault weapons ban will expire on September 13, 2004 unless Congress and President Bush renew it.

Both President Bush and Attorney General Ashcroft have repeatedly said that they support the assault weapons ban, and Attorney General Ashcroft has declared the ban constitutional.  Due to the efforts of state gun violence prevention groups, reauthorization and strengthening of the ban is supported by more than 2,000 police chiefs, sheriffs, district attorneys and law enforcement groups.  In addition, a majority of Americans support the assault weapons ban.  Two national polls commissioned by CFA in September 2003 and February 2004 found that substantial majorities of the public supported renewing the federal assault weapons ban and even more strongly supported new measures to strengthen the ban.  Two important findings of the 2003 and 2004 surveys were the high percentage of Americans who wanted President Bush to persuade Congress to renew the ban, and the growth of support for extending and strengthening the ban in the six-month period between surveys.[1]  An April 2004 survey by the National Annenberg Election Survey found that most Americans—including half of NRA households—want the ban extended.[2]

Despite public support for the ban, it appears increasingly likely that Congress and President Bush will let it expire.  Some have suggested that the ban's expiration will have little impact.  Others have argued that an expired ban will have significant consequences for public safety.

Given the debate over the impact of an expired ban, Consumer Federation of America (CFA) sought answers from an unconventional source: the gun industry itself.  Through email responses from industry marketing representatives,[3] interviews with gun industry experts, and manufacturer catalogs and websites, CFA found that, while many things won't change if the assault weapons ban expires, there will be some potentially significant ramifications:

- Assault weapons will be more lethal and less expensive.  High-capacity magazines will be back in production for civilian sale, and manufacturers will package them with new semi-automatic firearms.  Prices will drop as supply dramatically increases.

---

[1] "Consumers Strongly Support Renewing and Strengthening the Assault Weapons Ban," Consumer Federation of America, February 2004. http://www.consumerfed.org/backpage/guns.cfm

[2] Most of Public Wants the Assault Weapons Ban Extended; So Do Half of NRA Households," National Annenberg Election Survey, April 2004.

[3] Names of industry representatives and their employers are not included in this report.

- Fueled by gun buyer nostalgia, makers of assault weapons will blitz the market with new models of guns banned under the 1994 law, such as AK-47s, TEC-9s and Uzis.  If the original manufacturers are out of business, existing manufacturers may buy the rights to the older weapon designs.

- Domestic manufacturers will be able to evade current executive orders banning the import of foreign made "non-sporting" assault weapons.  By shipping key component parts to the United States and combining these foreign made parts with new U.S. made parts importers will be able to make fully legal pre-ban assault weapons.  The otherwise restricted assault weapons can then be sold legally in the United States.

- Law enforcement may be forced to adopt a more militaristic approach to policing. For example, officers may opt to remain in their cruisers and ask individuals to come out of their cars during traffic stops, and they may need armored vehicles for increased protection.  Some experts have hypothesized that these tactics may eventually replace current law enforcement strategies such as Community Oriented Policing.

It remains to be seen whether or not the ban's expiration will impact public safety.  What is certain is that the gun industry is gearing up for September 13th and it intends to capitalize on it.


## Background: Effectiveness of the Current Ban

The Violent Crime Control and Law Enforcement Act of 1994 passed on September 13, 1994.  Included in the Act was a ban on the manufacture, transfer and possession of semi-automatic assault weapons and the transfer and possession of large capacity ammunition feeding devices (i.e. capable of holding more than 10 rounds of ammunition).  The law bans 19 named types, models and series of assault weapons, including such guns as the Uzi, AK-47 and TEC-9, and any semi-automatic firearm with at least two specified military features and the ability to accept a detachable magazine (the detachable magazine criterion does not apply to shotguns).

The law attempted to address the issue of industry innovation by including a list of definitional characteristics.  A firearm was considered an assault weapon if it accepted a detachable ammunition magazine and incorporated two other assault weapon characteristics such as a pistol grip and folding stock.  The law also "grandfathered"—or allowed the sale and possession of—assault weapons and high-capacity magazines that were owned or manufactured prior to the date of enactment of the ban.  The ban passed with a 10-year "sunset" provision, and will expire on September 13, 2004, unless Congress and the President renew it.

In 1999, a study by the National Institute of Justice (NIJ) found that gun trace requests for assault weapons declined 20 percent in the year after the ban went into effect.[4]

---

[4] Koper, Christopher and Roth, Jeffrey, "Impacts of the 1994 Assault Weapons Ban: 1994-96," National Institute of Justice Report, March 1999.

Subsequent studies by NIJ and national advocacy groups debate the longer-term effects of the ban.

Part of the problem in determining the ban's effectiveness is the lack of reliable data on assault weapon-related deaths and injuries.  Exactly how many people are killed or injured each year by assault weapons is unknown.  As a result, pro-gun advocates use this deficiency to claim that assault weapons pose no increased risk to public safety.  Those in favor of banning assault weapons point to the NIJ study and an analysis of law enforcement officers killed in the line of duty between 1998 and 2001.  However, there is no federal agency that specifically categorizes deaths or injuries from "assault weapons."[5]

It is widely acknowledged that the gun industry easily circumvented the 1994 assault weapons ban by making minor cosmetic changes, renaming them, and putting nearly identical "post-ban" weapons back on the market.  For example, Intratec's TEC-9 assault pistol was banned in the 1994 law.  The company changed a few features and came out with something they mockingly called the AB-10, which stood for "After Ban" 10.  The law banned the Colt AR-15, but a legal clone, the Bushmaster XM15, was the weapon of choice of the snipers who used it to murder 10 and injure three in the Washington, DC area in October 2002.   Senator Jon Corzine (D-NJ) stated in August 2003, "This is a little bit like somebody changing the color of a pill after the copyright has actually gone off, and so they say they've actually invented a new drug, when it's really just a replication of the same thing.  It's really a dangerous circumvention of what was intended with the assault weapon ban."[6]

The gun industry was able to get away with making and marketing "post-ban" weapons because, unlike virtually all other consumer products, firearms are not regulated for health and safety.  Most federal agencies collect data on the products they regulate, but no agency has regulatory authority over the gun industry.  As a result, there is no national data collected on the number of deaths from handguns, sporting rifles and shotguns, assault weapons, or machine guns—let alone the number of deaths and injuries by firearm make and model.

---

[5] The Violence Policy Center (VPC) analyzed Federal Bureau of Investigation (FBI) data on law enforcement officers killed in the line of duty, which were obtained by the VPC through a Freedom of Information Act request.  The VPC's analysis, released in its study, *"Officer Down:" Assault Weapons and the War on Law Enforcement* found that "**at least 41 of the 211 law enforcement officers slain in the line of duty between January 1, 1998, and December 31, 2001, were killed with assault weapons. Using these figures, one in five law enforcement officers slain in the line of duty was killed with an assault weapon"** [emphasis in original].  The study did not define "assault weapon" for its analysis, but its charts list several "post-ban" weapons.  In a March 10, 2004 letter to the editor of *The Washington Times*, VPC's Legislative Director wrote, "The test the VPC used to identify assault weapons is simple: Is the gun in fact an assault weapon—one of a discrete category of semiautomatic firearms with specific design characteristics developed for use on the field of battle, but all too often turned on law enforcement with deadly consequences?"

[6] "Unregulated, Untested, Unsafe: The U.S. Gun Industry," Consumer Federation of America, September 2003.

In addition, the problems with the assault weapons ban illustrate the futility of a piecemeal approach to product regulation.  Comprehensive health and safety regulation would allow a federal agency to close the loopholes in the assault weapons ban through administrative procedures.  The ban could also be quickly updated to respond to gun industry ingenuity.

Ultimately, if Congress truly intends to ban assault weapons, the gun industry must be regulated for health and safety.  At the very least, the ban itself should be strengthened to address loopholes in current law.  Absent health and safety regulation or legislation to strengthen the ban, assault weapon manufacturers will continue to circumvent federal law.  So, will the gun industry's products and marketing change at all if the ban expires?  Will the risks to public safety increase, decrease or remain the same?

The following responses from gun industry officials help shed light on these important questions.

## High-capacity magazines = normal capacity magazines?

The 1994 assault weapons ban forbade new production of magazines that can hold more than 10 rounds, except those made only for export, government or for use by law enforcement, which must be stamped "for law enforcement use only."  Private possession of high-capacity post-ban magazines by civilians is a felony.

The 1994 ban "grandfathered," or kept legal, existing magazines when the new law went into effect.  Manufacturers increased production before the ban went into effect, stockpiling millions of magazines.  These grandfathered magazines are legal for resale but carry a premium price.[7]

If the ban expires, both pre- and post-ban guns will be sold with new high-capacity magazines.  This added capacity has the potential to make assault weapons more lethal.  Currently, most post-ban guns are sold with new 10-round magazines.

Before the ban, manufacturers would ship two or three magazines with each new gun, a practice that is likely to return if the ban expires according to industry experts.  Production will rise considerably and prices will go down as manufacturers flood the civilian market with new high-capacity magazines.  According to recent communication with one assault weapon manufacturer's sales and marketing director:

> We will be offering high capacity magazines, yes.  At this time, again, we can still manufacture them—they just have to be properly marked as Law Enforcement only type magazines. We will simply no longer mark the mags [sic].

The expiration of the high-capacity magazine ban also has implications for pistol manufacturers that were otherwise restricted to manufacture of 10+1 round-magazines for civilian sale:

> High capacity magazines, this is a rough term for me to accept, they are more like normal capacity magazines.  These weapons were designed with light weight and lots of ammo, that is what makes the AR-15 design so great….The original [9mm] Glock 17 had a 17 round magazine, now is restricted to 10 [rounds] for new mags [sic]…this makes part of the design pointless…why else would you have such a wide, not so comfortable grip, except to put more rounds in the handle?….Once the ban goes away I'm sure every mag [sic] manufacturer is going to up their production as much as possible, before an even more restrictive ban comes up.

This summer, Berretta seized upon the upcoming expiration by offering consumers a deal: purchase a new Beretta 92/96 Series handgun or Cx4 Storm carbine and receive two high-capacity 15-round magazines for free.  Consumers are directed to click on a coupon for the magazines, which they are instructed to redeem after the ban expires between September 14th and November 30th.  Both the website and the coupon caution consumers that the offer is valid "…only if Federal prohibition on sale of high-capacity magazines to consumers expires on September 14, 2004."

---

[7] The industry maintains that pre-ban stock is dwindling—which is their rationale for price gouging—but weak federal guidelines regarding imported magazines and law-enforcement trade-in programs have helped replenish supply.

**2 FREE HIGH-CAPACITY MAGAZINES**
**Purchase a New Beretta 92/96 Series handgun or C4x Storm**
**(9mm and 40 S&W calibers only) Through June 1-October 31,**
**2004 and receive two High-Capacity Magazines for Free.\***

| Name | |
|---|---|
| Address | |
| City | |
| State | Zip |
| Phone | |
| Email | |
| Serial # | |

**Promotion Code W002**

**REDEMPTION REQUIREMENTS: Mail to:**
**• Original dated sales receipt**
**• Box label showing UPC code**
**• Purchase between June 1 - October 31**
**• Redemption no later than November 30, 2004**
**• For rebate info call 800-717-3488**

**MAILTO:**
**High Capacity Magazine Promotion**
**P. O. Box 4421**
**Ridgely, MD 21649**

**\*Offer valid on 9mm and 40 S&W calibers only if Federal**
**prohibition on sale of high-capacity magazines to consumers**
**expires on September 14, 2004. Offer void for customers in states**
**that have restrictions on private sale or ownership of high capacity**
**magazines (California, New York, Massachusetts and**
**Hawaii). Redemption, subject to these restrictions, will take place**
**between September 14, 2004 through November 30, 2004.**

The Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) is also gearing up for the ban's expiration.  According to the August 15, 2004 issue of *The New Firearms Business*, ATF discussed the impact of the ban's pending expiration on industry at its third annual "ATF & The Imports Community" meeting in late July.  At the conference, Teresa Ficaretta, ATF's associate chief counsel, explosives, firearms & arson, explained that:

> If the law sunsets on September 13th, ATF would most likely issue an open letter to the industry advising that the restrictions on post-ban over ten-round law enforcement magazines as well as those for receivers of those firearms presently designated under federal law as so-called 'assault weapons' would "become meaningless," Ficaretta said. The result would be that such magazines "could be freely sold."

## Marketing Nostalgia

Fueled by gun buyer "nostalgia," assault weapon manufacturers will blitz the market with new models of guns banned under the 1994 law, such as AK-47s, TEC-9s and Uzis.  Today, gun owners can easily purchase variants of the guns listed in the 1994 ban and components to (illegally) restore their post-ban guns to pre-ban configurations. However, manufacturers maintain that gun owners want the real thing back at cheaper prices:

> As there will be few "entirely new" products, they will simply seek to re-establish the collection of previous banned firearms at fair market value, rather than at the falsely inflated prices created by the AWB.

> What we will likely see is production of product that was already available prior to the ban….We may move to shorter barrels on long guns and might even produce the 1928 version of the Tommy Gun….We will reintroduce the 50 round drum for our Thompson Semi-Automatic.  I believe there is pent up demand for pre-ban items.

Manufacturers believe there is demand for original configurations:

> We do not really plan to change much at this time if the ban lapses.  The main change would be that the compensators on the AR-15 style rifles would be able to be unscrewed and we would most likely start sending the 20 round magazines with the rifles.

> The only real difference that is going to be made by our firearms, is we will restore them to there [sic] original state, with bayonet lugs, and threaded muzzle (for flash suppressors).

The switch back to a threaded barrel will mean that rifles can be adapted to all the prohibited features, since adding and removing flash suppressors and grenade-launchers will easily be possible.

Several assault weapons manufacturers went out of business after the 1994 ban.  Gun industry experts believe that if the original manufacturers do not re-enter the market, existing manufacturers may buy the rights to the older weapon designs.  In addition, manufacturers believe that the ban's expiration will increase imports.  One manufacturer commented:

> All the ban did is stop the manufacturing of certain features on assault type weapons, all of the assault weapons, and "high capacity mags" that were in circulation before the ban, are still in circulation, and will be for a very long time, these items were produced in the 10's of millions by company's [sic] all over the world, and still are in many other countries, just waiting to be imported here, when the ban goes away…

Foreign manufacturers have been trying to circumvent the U.S. import ban on assault weapons for years.  In 1989, President George H.W. Bush, signed an executive order banning the importation of many military style assault weapons.  In 1998, several years after Congress passed the1994 ban, President Bill Clinton signed an additional executive order banning the importation of many modified foreign-made weapons. The Clinton administration ruled that most post-ban importable assault weapons did not meet current import standards because they were not "particularly suited" for sporting purposes.  The 1994 ban, coupled with the presidential import restrictions, had the practical effect of banning the importation of many post-ban assault weapons. The expiration of the 1994 ban will simply reopen a huge loophole in the law.  The evasive practice of shipping imports to "custom bonded warehouses" in the United States where weapons can be disassembled, their key firing components destroyed and the remaining parts reconfigured into new pre-ban weapons will become commonplace.[8]

In April 2004, Century International Arms Inc. was linked to the discovery of a cache of 7,500 AK-47s confiscated in Italy that were bound for the United States.  About 7,500 AK-47s, AKM rifles and other weapons worth an estimated $6 million were seized.  But the Bureau of Alcohol, Tobacco, Firearms and Explosives said the weapons actually were cleared by U.S. authorities under the rationale that they were going to being held in custom-bonded warehouses and converted to legally saleable semiautomatic arms.

Century's Web site does not show that the company sells AK-47s, a weapon commonly associated with terrorists and guerrilla movements around the world.  The company does sell a post-ban AK, the WASR 10 semiautomatic rifle.

In addition, Israel Military Industries (IMI), maker of the Uzi, is looking forward to renewing its business.  An August 13, 2003 article in the Israeli business paper, *Globes*, reported that  "Uzi manufacturer Israel Military Industries is optimistic that it will be able to resume sales in the US….The [assault weapons] law expires this year, and IMI believes that the Republican administration and Republican-controlled Congress will not renew it."  Company sources interviewed for the article stated that:

> We plan to bring in partners to the light arms plant, which also makes the Uzi. The fact that the law will expire and the US market will be reopened to us may raise the value of the factory.  We'll be pleased if the law is changed before the investors visit the factory.  At this stage, we have no special deployment in advance of a change in policy in the US.

Some advocates maintain that "sporterized" semi-automatic UZI variants have been imported into the United States for years, and are being currently manufactured right here in the United States by companies such as Vector Arms.  However, former NRA

---

[8]  According to ATF, Title 27 Code of Federal Regulations (CFR) Section 178.39 states that no person shall assemble a semiautomatic rifle or any shotgun using more than 10 of 20 specified imported parts if the assembled firearm is prohibited from importation under section 925 (d) (3).

9

lobbyist Robert Ricker argues strongly that post-ban Uzi "knock-offs" will likely lose their popularity with gun owners:

> Companies like Vector Arms and Norinco have been importing Uzi "variants" since the 1989 import ban.  But these guns are not "true" Uzis.  They are "sporterized" versions and lack some of the functionality of the original Uzi. This means they have welded stocks or ugly wooden fixed stocks and 10 round magazines…These guns are not very popular with consumers because they are not considered "the real thing."  Gun owners are "detail oriented" and want the real thing—an Uzi, not a Vector or a Norinco.  That's why Action Arms, IMI's US importer, went out of business in 1996.  They couldn't make a profit on Uzi knock-offs.  IMI is counting on huge consumer demand for the real thing….My experience tells me that if the ban expires IMI will sell a lot of real Uzis, with new high capacity magazines.  This means more firepower on the street no matter how you look at it.

## "...the very next day without doubt."

With the pending expiration date, one manufacturer is already trying to woo consumers with a special "Post-PostBan™ Rifle Program."  Mark Westrom, President of ArmaLite®—an assault weapons manufacturer in Geneseo, Illinois—describes the program on the company's website.[9]  The text of his message is underneath a picture of an AR-15, which is banned under the 1994 law.

Westrom begins by outlining the possible scenarios concerning the expiration of the ban and the purpose of the program:

> Fact:  Unless reauthorized or replaced with a worse program, the Assault Weapon Act of 1994 will expire in September, 2004.  Possible outcomes are: "Reauthorization," i.e. no change in the law.  Replacement with a worse law, even to the possibility that production is halted.  Expiration of the law.  Expiration for only a short time, and then be reauthorization or worse.

> The AW Ban is a cosmetic law, and we'd all like to own rifles without the blemishes that it established.  If the law expires, there's plenty of time to wait for a new rifle with "pre-ban" characteristics.  If any of the other three outcomes occur, a delay could be a real mistake.  The purpose of the PPB program is to prepare purchasers for any outcome.  The program offers customers a way to avoid the risk of delay, yet also have the benefits of a change in law.  The opportunity is provided by the design of ArmaLite's® 2003 rifles.

Here is the full offer:

> 1.  Beginning immediately, ArmaLite® 2003 rifles (with a pinned muzzle brake, or none installed) ship with a certificate that will provide customers a pin-on flash suppressor and installation instructions at no charge.  Unless earlier legislation makes it illegal for customers to install the device, flash suppressors will ship in summer 2004 to allow time to get the rifle modified even if there's an opportunity of only a few days.

---

[9] www.armalite.com

Until the law changes, the flash suppressor will provide a reminder to every customer that it is essential to get out the vote in 2004.

2.  For customers who wish to go an extra step and install a bayonet lug, ArmaLite® will continue to sell pin-on sight bases with bayonet lugs, and will provide installation instructions for gunsmiths.  All ArmaLite® clamping front sight bases are easily removable, with no pin-holes in the barrel, so pin-on bases can be easily installed.

3.  For customers who wish to be able to convert their rifle to a "Pre-Ban" configuration immediately upon expiration, ArmaLite® will produce and sell AR-10™ collapsing buttstocks (the AR-10™ requires a special collapsing buttstock).  It is likely that prompt installation of such a buttstock will allow customers to make other changes at a more leisurely pace.

Installation of options 2 and 3 both are already available for law enforcement customers (with proper rifle markings).  Civil customers must await a change in the law, and flash suppressors, bayonet lugs, and collapsing stocks will all be accompanied by clear information about the law to prevent a violation.

4.  Pre-2003 rifles with pinned front sight bases or threaded-pinned-welded brakes, or customers who wish threaded brakes on 2003 models instead of pinned ones, require gunsmith or factory replacement of those parts.  ArmaLite® offers the components for sale, and will perform conversions at normal shop charges.

The promo ends with "Don't risk a delay… prepare for possible AW expiration today with ArmaLite®."

Westrom goes on to explain the conditions of the program, which require gun buyers to pre-pay for the non-refundable rifles and accept liability if the ban is renewed:

Many customers think that they will immediately be able to purchase PreBan configuration rifles at current prices if the law sunsets.  This is not true.  Manufacturers are not building PreBan configuration rifles before the Sunset because doing so would require that the rifles receive Law Enforcement markings that would deface the rifles. Last minute extension of the law would saddle manufacturers with unwanted inventory. Deliveries of PreBan configuration rifles will therefore be delayed until supplies of the appropriate components are received and the rifles can make their way through the assembly line.

ArmaLite has been repeatedly asked if customers may pre-pay orders for "Pre-Ban" configuration rifles to be delivered fast if the current ban sunsets.  Some have voiced concerns that the law could sunset for only a few days, and that they would like to have rifles built during even a short window of opportunity.  ArmaLite has not accepted such requests because of the problems that would occur as customers abandoned orders if the current law was extended or worsened.

As a result of continued requests to order rifles now, ArmaLite has created the "Prepaid-PreBan"™ (or PPB™) program to allow customers to order PreBan configuration ArmaLites, in both .308 and .223 calibers, for delivery immediately upon expiration of the current law, and at current prices.  Provisions of the program include:

1.  Full pre-payment, non-refundable.  No credit cards or credit terms can be accepted.

11

2.  Waiting until after September 14 for shipment.  ArmaLite will purchase and stock components for immediate final assembly if the law sunsets.  Final assembly and shipping will take a short time.

3.  Customer benefit and risk.  Your benefit is to buy now at a lower current price and get in line for the limited capacity of the Prepaid-PreBan program.  If the current law is reauthorized or worsened, the customer is responsible for reconfiguring or disposing of the rifle properly.

Retail customers should visit their dealers today to begin the process.  Dealers should accept prepayment of the usual retail cost of the rifle, and forward the "dealer price" prepayment and the customer's name to ArmaLite for production.

ArmaLite's campaign is political as well as capitalistic in nature.  Inside its 2004 catalog supplement, ArmaLite features a picture of a hand holding a flash suppressor with the headline, "You can't put this flash suppressor on your ArmaLite® today.  It's prohibited by the 'Assault Rifle' ban."  The ad continues:

But that ban is set to expire in late-2004.  The problem is there are those who think you shouldn't be able to buy an ArmaLite® at all and would love to ban them totally in 2004.  Sort of makes it hard to decide whether to buy a rifle today, or to wait, doesn't it?

So ArmaLite® is giving a coupon for a free flash suppressor with each new AR-10A4™/AR-10A2™ and M-15A4™/M-15A2™ to keep in your pocket as a reminder to work with the NRA to get out the vote, and to keep writing and calling your legislators.

Toward the bottom, in small print, the ad reminds consumers that "It is not legal to install this on a post ban rifle until the assault weapons ban sunsets."

12



## You can't put this flash suppressor on your ArmaLite® today.   It's prohibited by the "Assault Rifle" ban.

But that ban is set to expire in late-2004.
The problem is that there are those who think you
shouldn't be able to buy an ArmaLite® at all
and would love to ban them totally in 2004.
Sort of makes it hard to decide whether
to buy a rifle today, or to wait, doesn't it?

So ArmaLite® is giving a coupon for a free flash suppressor
with each new AR-10A4™/AR-10A2™ and M-15A4™/M-15A2™ to keep
in your pocket as a reminder to work with the NRA to get out the vote, and to keep
writing and calling your legislators.

(And by the way... ArmaLite® rifles are made to be easily retrofitted with
your new flash suppressor and other pre-ban features, so you don't have to
wait if you choose an ArmaLite®.)

**Don't let your dealer pull anything but an ArmaLite off the rack.**

Note: It is not legal to install this on a post ban rifle until the assult weapons ban sunsets.

| | | |
|---|---|---|
| 10108200 | AR-10 A2 FLASH SUPPRESSOR PHOSPHATED | $65.00 |
| 10108205 | AR-10 A2 FLASH SUPPRESSOR STAINLESS STEEL | $65.00 |
| EA2020 | 308 COLLAPSING BUTTSTOCK ASSY. (BLK) | $150.00 |
| EA2020G | 308 COLLAPSING BUTTSTOCK ASSY. (GRN) | $150.00 |
| EMK015 | 223 COLLAPSING BUTTSTOCK ASSY (BLK) | $130.00 |
| EMK015G | 223 COLLAPSING BUTTSTOCK ASSY (GRN) | $80.00 |
| EU0100 | 223 PREBAN FLASH HIDER | $5.25 |

POST POST BAN PROGRAM ITEMS CANNOT BE RETURNED OR REFUNDED

**Q.  What is barrel lapping?  Why are ArmaLite's barrels lapped?**

A.  Barrel lapping is a method of smoothing the bore of a barrel.  It involves polishing the bore by passing lead slugs up and down the barrel repeatedly.  The slugs are impregnated with fine lapping compound, which does the actual smoothing.

Barrels are lapped to smooth out machine marks left by the rifling process and to make the bore diameter more uniform from one end to the other.  The smoothed barrels don't damage passing bullets as much as rougher barrels, and this reduction in bullet damage is linked to improved accuracy.

13

ArmaLite's program is likely to be copied by other manufacturers.   A marketing director from another company wrote:

> When the AWB sunsets, which I fully expect it to do, we will be manufacturing pre-ban style weapons and shipping them to the general public through distribution systems and dealers *the very next day without doubt* [emphasis in original].  We look forward to supplying the public with the firearms that they desire to own, as well as the weapons that they have the constitutional right to own for self and property preservation….We look forward to September 14th with great enthusiasm.

Arizona Expert Arms has set up a timer at the top of its website home page that marks the time left on the assault weapons ban down to the second.  It reads, "Days left until the stupid, ineffective 'Assault Weapons High Capacity Magazine Ban of 1994' Sunsets!!"  The site notes that the company is "doing a complete site re-write due up in mid September."

Another Arizona-based company, Bobcat Weapons Inc., posted an August 23rd announcement on its website that it would take orders post-September 13th for its PDW (personal defense weapon) 9mm semiautomatic assault rifle and 9mm semiautomatic assault pistol.  Both firearms will come with a 30-round magazine.

## "A Great Day for the Freedom of America:" the Expiration's Impact on Law Enforcement

Law enforcement veterans believe that, while the ban ultimately needs to be strengthened to be effective, there is value in keeping that "line in the sand."  Joseph Vince worked at the Bureau of Alcohol, Tobacco and Firearms (ATF) for nearly 30 years, most recently serving as Chief of ATF's Crime Gun Analysis Branch from 1997 to 1999.  When asked what will happen if the ban expires, he said:

> We're going to see the market flooded again.  It will negate everything that's been done all these years.  We're reverting back to 1980's, and we should know just by experience.  Unfortunately we haven't learned and we're taking a step back.

Semi-automatic assault weapons pose a unique threat to law enforcement.  As recently as August 18, an Indianapolis, Indiana officer was killed and five others were wounded after responding to a call reporting a man walking in neighborhood streets with an SKS assault rifle.  In July, three police officers were gunned down and one was injured with an SKS[10] assault rifle when they approached a house in Birmingham, Alabama to serve warrants.  In addition to the

---

[10] The SKS rifle is a "post-ban" version of the AK-47 assault rifle.  It is cited by the Bureau of Alcohol, Tobacco, Firearms and Explosives as the rifle most frequently used to kill law enforcement officers.  The SKS was developed in the late 1940s for use by the Russian military, and was adopted and produced in huge quantities by China through the 1970s.  In its original form, the SKS is a gas-powered, semi-automatic rifle with a fixed magazine that holds 10 rounds.  The Type 84 is a semi-auto carbine, which was modified to accept AK-47 detachable magazines.  Models "D" and "M" stand for "detachable" or "magazine," as in detachable AK-47 magazine.  These are sometimes referred to as "Sportsters."  SKS rifles have been used in other high-profile shootings.  One was used by an assailant who killed four people and wounded four others at a Navistar International plant in Illinois in 2001.  SKS assault rifles are not banned under current law.

number of rounds that such guns can rapidly fire, one other factor makes them a terrible threat to police officers—the bullet-resistant vests typically worn by officers are virtually useless against the ammunition they use.[11]  Montgomery Police Chief John Wilson confirmed that the vests worn by Montgomery officers would provide little or no protection against such weapons as the one used in the Birmingham shootings.  Chief Wilson said that "It would take body protection something like our troops are wearing in Iraq to protect against such weapons, and even then they are not perfect."

At the 2002 American Society of Law Enforcement Training[12] Conference, Dr. Aaron J. Westrick, Director of Research, Composite Development for Second Chance Body Armor and Principal of Ballistic Armor Research Group, LLC advised attendees that understanding the threats to officers is important toward preventing injury and death.[13]  To that point, Dr. Westrick provided the following facts:

- Over half of the officers killed with rifles are killed on approach to an incident, not during interaction.
- The largest proportion of officers killed with rifles were serving warrants or executing traffic stops.  One third of officers killed with rifles were killed during traffic stops.
- Most officers shot with rifles are hit from the front with almost half being shot in the head.
- The .22 caliber rifle (bullets can be stopped on soft armor) is being used less to kill officers and is being replaced by the assault rifle calibers.
- The general profile of a rifle wielding police murderer is different than the common armed killer of patrol and corrections officers.  It appears that criminals using rifles against police are more calculating and determined.
- There appears to be an overall increase in the use of rifles to kill officers in tactical situations and on patrol assignments.

---

[11] The gun lobby maintains that ammunition from virtually any hunting rifle can penetrate a police vest and that semi-automatic assault rifles pose no additional threat.  However, semi-automatic assault rifles differ from hunting rifles in several key ways:

- Semi-automatic assault rifles are able to accept high-capacity magazines, capable of holding from 10 to more than 100 rounds of ammunition
- Assault rifles maintain features that make it easy to simply point (as opposed to carefully aim) the gun while rapidly pulling the trigger.  These include pistol grips, or magazines that function as pistol grips—on the fore end of the gun; and barrel shrouds, which are ventilated tubes that surround the otherwise too-hot-to-hold barrel, providing an area that is cool enough to be directly grasped by the shooter even after scores of rounds have been fired.

Taken together, these features make it possible for the shooter of an assault weapon to quickly "hose down" a relatively wide area with lethal spray of bullets.  This increased lethality makes semiautomatic assault weapons particularly dangerous in civilian use.  It explains why mass murderers, cop killers, and other violent criminals prefer them.  It also distinguishes them from true hunting or target guns.

[12] The American Society of Law Enforcement Training (ASLET) is an organization whose members instruct police officers in methods of survival and continually educates members in order to expand their knowledge of officer safety.

[13] Westrick, Aaron J., *"How We Are Murdered,"* Ballistic Armor Research Group, LLC, Copyright 2000.

- The rifle types most employed by criminals during such attacks encompass the most common assault rifle calibers in the world.
- The common rifle used is the 7.62x39 caliber (AK-47/SKS type), which accounted for over one third of officers killed by rifle deaths do to a sharp increase in its use.
- Other common rifle threats are the .223 (AR-15/Mini-14 type) and .308 (HK-91 type).

Since the beginning of the late 1990's, law enforcement officials have recognized the criminal trend toward utilizing assault rifles against police officers.  Joseph Vince believes that as more criminals choose assault weapons to kill law enforcement, policing methods will have to change:

> Until manufacturers redesign body armor to meet the latest threat, current policing methods will need to be altered to provide the appropriate level of protection for officers. The change in police approaches will need to mirror those utilized by the military that face similar weapons on the battlefield and employ armored vehicles for protection.  This is certainly not in keeping with current law enforcement strategies such as Community Oriented Policing.

Unfortunately, manufacturers have no qualms about using the fear of government to sell their product:

> The sunset of the AWB will cause a frenzied buying spurt.  People who have never owned a semi-automatic rifle will buy one for the simple fact that they can get what they have always wanted again.  People will buy them in high quantities, just because they will fear that this ban may go into effect yet again.  It will put firearms in the hands of citizens who have always wanted one, but never spent the money to get one.  It will be a great day for the freedom of America.

## Conclusion

There is no question that, due to the gun industry's evasion of the 1994 ban, there are more assault weapons on the market today than ever before.  However, despite all the post-ban assault weapon modifications the industry developed over the last 10 years, what the industry and a tiny number of gun owners seem to want are pre-ban guns packaged with high-capacity magazines.  If the ban expires, the gun industry is poised to capitalize on this marketing opportunity and both pre- and post-ban guns will be cheaper and sold with more firepower than ever before.

The ArmaLite campaign reveals the lengths that manufacturers will go to re-energize the market for pre-ban guns.  It offers a sobering example of the lack of responsibility and regulation in the industry.  Ultimately, CFA supports regulating guns for health and safety.  In the absence of such regulation, Congress and the President should do their utmost to protect public safety and ban assault weapons.

16