Exhibit 74

To Defendants' Memorandum in Support of Motion for

Summary Judgment

**Proposals to Reduce Gun Violence:**
**Protecting Our Communities While Respecting the Second Amendment.**

Senate Judiciary Committee
Subcommittee on the Constitution, Civil Rights and Human Rights

February 12, 2013


Prepared Testimony by Laurence H. Tribe[*]


Mr. Chairman and members of the Committee:


I am honored and grateful for the invitation to testify before you today.  I know I am not alone in wanting us to do all we can, consistent with the Constitution, to reduce the awful specter of rampant gun violence and the far too frequent massacres of our children, our friends, and our fellow citizens.


Like all decent Americans, I felt a pang of unspeakable horror on December 14, when I learned that twenty first-grade children had been brutally slaughtered in their first-grade classroom in Newtown, Connecticut.  Those children, and the brave grown-ups who died at Adam Lanza's hands as they tried to save the young lives entrusted to their care, deserve every effort to translate our shared grief into shared national action.  That action must not be deterred by the defeatist argument that, because we will never solve this problem in its entirety, we might as well give up. Nor should it be deterred by distorted interpretations of the United States Constitution. As others have often reminded us about that great and enduring document, it is many things to many people, but one thing it is *not* is a suicide pact.

---

[*] Carl M. Loeb University Professor and Professor of Constitutional Law, Harvard Law School. The institutional affiliation is noted for identification purposes only.

While we debate the pending proposals to reduce gun violence through measures focused on gun safety as part of a holistic national response, it's crucial that we not permit any part of our Constitution to become a collateral casualty of our conversation. Proposals to disarm the American people, to leave firearms solely in the hands of the military and the police, have been decisively taken off the table – if they were ever truly *on* the table – by the Supreme Court's Second Amendment decisions in 2008 and 2010. "Slippery slope" arguments predicated on the unsettled state of the law prior to 2008 have been rendered irrelevant. The only proposals under serious consideration in this body are reasonable measures that would fully respect the basic rights of responsible citizens to use ordinary firearms for self-defense and other lawful purposes. They cannot lead to unacceptably extreme measures as long as the Supreme Court sits.

Having examined those proposals, having looked at the steps announced by the President under his power faithfully to execute the laws of the United States, and having studied the decisions of the Supreme Court and lower courts around the country, I am convinced that nothing under discussion in the Senate Judiciary Committee represents a threat to the Constitution or even comes close to violating the Second Amendment or the Constitution's structural limits either on congressional power or on executive authority.

Undoubtedly we should have a national debate about how best to reconcile the Second Amendment rights of every individual with the full range of proposals to reduce gun violence in America. As someone who has studied and taught constitutional law for four decades and argued dozens of cases in the Supreme Court and dozens more in the lower courts, I am obviously interested in engaging those questions.  In today's testimony, however, I will focus not on

competing theories of how the Second Amendment ought to have been interpreted but on the law as it stands. I am here not as an academic theorist but as a constitutional lawyer.  As a lawyer, I've won some and I've lost some, and I know a losing argument when I see it. And the argument that any of the proposals to reduce gun violence currently being considered here might be struck down as unconstitutional is decidedly a losing argument.

There is plenty of room for policy debate over the best steps to take to reduce gun violence, but we mustn't confuse those policy differences or the ideological and cultural divisions that underlie them with genuine constitutional doubts about whether any of those steps crosses the constitutional line. Everyone in this room knows that anything Congress or the President does in this field will confront opposition. And in a nation as litigious as ours, some of that opposition will no doubt find its way into the courts.  But there is no basis to suppose that the courts will or should rebuff any of the steps being debated here today.  They should not, and they will not.

What I hope to do this morning, setting all hyperbole aside and approaching the law on the books with a fair-minded eye, is explain why reforms such as those this committee is considering clearly pass constitutional muster.

# I. Introduction:

## Taking the Second Amendment Seriously, But Applying it Cautiously

I begin by reaffirming my agreement with the Supreme Court that the Second Amendment guarantees Americans the right as individuals to possess guns for reasonable self-defense.   Some of my friends and colleagues devoted to the cause of responsible firearms regulation evidently wish to relitigate this point.  They continue to insist that the best reading of the Second Amendment would secure gun rights only in connection with service in the state militia and not for individual possession and use.  For nearly a decade and a half, I have disagreed with them and have defended the individual rights view ultimately taken by the Supreme Court in 2008.  In October of 1999, for example, I joined a fellow constitutional law scholar in publishing an op-ed in *The New York Times* arguing that "bearing arms [is] a 'privilege' of each citizen."[1]  I continue to defend this position today.

That matters only insofar as it bears on my credibility as a witness in today's hearing. If I were among those who had *opposed* the individual rights interpretation adopted by the Supreme Court in *Heller*, some might wonder whether my conclusions about the regulations *Heller* permits Congress to adopt reflect wishful thinking rather than a realistic and sympathetic appraisal of what the Court that decided *Heller* would in fact permit. But there is no wishful thinking here. I am being a hard-headed realist in reading the *Heller* decision and extrapolating conclusions from the majority opinion.

---

[1] Laurence H. Tribe & Akhil Reed Amar, *Well Regulated Militias and More*, N.Y. TIMES, Oct. 28, 1999, at A25; 1 Laurence H. Tribe, *American Constitutional Law* 900–902 (3d ed. 2000).

Although many in the community advocating gun rights had long assumed that the individual rights interpretation governed the scope of the Second Amendment, it was not until the Supreme Court's 2008 ruling in *District of Columbia v. Heller*[2] that a majority of the Court's Justices agreed.  In so doing, the Court recognized that the core individual liberty protected by the amendment affords Americans the right to purchase and store operable firearms for self-defense in the home.  Two years later, in *McDonald v. City of Chicago*,[3] the Court extended the *Heller* ruling to cover restrictions imposed by state and local governments, making it unmistakably clear that the right at issue was not and is not simply a right of the state-organized militia against being overrun by federal authority.

Despite this fundamental affirmation, the *Heller* decision is exceedingly narrow in many important respects.  As Judge Brett Kavanaugh of the D.C. Circuit Court of Appeals recently put it, "It bears emphasis that *Heller,* while enormously significant jurisprudentially, was not revolutionary in terms of its immediate real-world effects on American gun regulation."  "Indeed," he continued, "*Heller* largely preserved the status quo of gun regulation in the United States."[4]  To understand what he meant, it helps to look first to the Washington, DC ordinance implicated in the *Heller* case.  The District had in place one of the most restrictive firearms regulations in the nation; it essentially outlawed the possession of handguns in the home, where the need for self-defense is, as Justice Scalia wrote, "most acute."[5]  For the majority on the Court, a policy like the one the District had adopted, a policy on the outer edge of gun control's reach in the United States, was irreconcilable with the Second Amendment.

---

[2] 554 U.S. 570 (2008).
[3] 130 S.Ct. 3020 (2010).
[4] Heller v. Dist. of Columbia, 670 F.3d 1244, 1270 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).
[5] *Heller*, 544 U.S. at 628.

The *Heller* decision took great pains to emphasize its relative modesty.  It repeated the mantra that the Second Amendment right "is not unlimited"[6] and devoted an entire section to listing types of regulation – for example, limits on gun ownership "by felons and the mentally ill" and, most relevant to today's hearing, regulation of "dangerous and unusual weapons" – the constitutionality of which the Court had no intention of casting into doubt.[7]  The decision paused to note that, by specifically giving a constitutional green light to some regulatory efforts, the Court did not mean to signal that others were constitutionally dubious.[8]  Justice Scalia closed his opinion for the Court with an expression of solicitude for the regulatory goals that Washington, DC sought to advance and, more importantly, an invitation to pursue those goals with the "variety of tools" still available to the District and to other states and localities across the country even in *Heller*'s wake.[9]

Since that decision and its extension to state and local laws in 2010, the vast majority of federal and state courts to adjudicate Second Amendment claims have responsibly hewed to the cautious approach espoused by the Supreme Court in *Heller* and *McDonald*.  For example, in a ruling highly relevant to the topic of this hearing, the D.C. Circuit recently upheld the constitutionality of Washington D.C.'s assault weapons ban, which included a restriction on

---

[6] *Id.* at 595, 626.

[7] *Id.*  at 626 – 28.

[8] *Id*. at 627 n. 26. There is no doubt, for instance, that regulatory provisions targeting firearms and ammunitions *manufacturers* in addition to those who transfer, possess, carry, or use the resulting weapons are at least as easy to defend from Second Amendment challenge as are measures that do not take effect until the point of sale.

[9] *Id.* at 636.

high-capacity magazines, as well as gun registration requirements.[10]  The majority in the case,

following the broad consensus that has emerged among federal and state judges,[11] evaluated the

regulations against a standard of heightened judicial scrutiny while preserving both the option to

adopt a more skeptical mode of review for restrictions on core self-defense firearm possession

and the option to exempt other laws from Second Amendment review entirely when they do not

enter the amendment's zone of protected conduct.[12]  In another notable decision staking out a

similar approach, a panel of the Seventh Circuit Court of Appeals struck down Chicago's firing-

range ban given the close nexus between regular firing practice and training and safe, responsible

self-defense in the home.[13]  And state appellate courts from North Carolina to Wisconsin to

California have joined with their federal brethren in upholding state restrictions on firearms

ownership under this middle-of-the-road approach that molds the degree of judicial scrutiny to

the extent of a law's burden on the core self-defense right secured by the Second Amendment.[14]


        The central message of *Heller* and its lower-court progeny is thus to take the application

of the Second Amendment seriously but also cautiously.  When necessary to vindicate the core

right to self-defense respected by *Heller*, neither courts nor lawmakers should be shy about

invoking the Second Amendment.  But because few public responsibilities are as important to

---

[10] Heller v. Dist. of Columbia, 670 F.3d 1244 (D.C. Cir. 2011).

[11] *See, e.g.*, Kachalsky v. County of Westchester, 701 F.3d 81, 93 – 94 (2d Cir. 2012); United States v. Booker, 644 F.3d 12, 25 (1st Cir. 2011) cert. denied, 132 S. Ct. 1538 (U.S. 2012); United States v. Masciandaro, 638 F.3d 458, 469-70 (4th Cir. 2011) cert. denied, 132 S. Ct. 756 (U.S. 2011); United States v. Marzzarella, 614 F.3d 85, 97 (3d Cir. 2010);

[12] *Heller*, 670 F.3d at 1256 – 58.

[13] The court applied what it called "not quite strict scrutiny" because the law's burden struck so close to the core Second Amendment right to self-defense in the home.  Ezell v. City of Chicago, 651 F.3d 684, 708 (7th Cir. 2011).

[14] *See, e.g.*, Johnston v. State, 735 S.E.2d 859 (N.C. Ct. App. 2012); State v. Brown, 815 N.W.2d 407 (Ct. App. Wisc. 2012); People v. Ellison, 196 Cal. App. 4th 1342, 1347 (2011).

good governance as legislating to secure public safety, lawmakers and jurists should not casually

give the amendment an expansive scope nor unduly scrutinize reasonable firearm regulations.  In

the wake of the Newtown massacre and the push to propose sensible new rules about firearms,

the Obama administration and many leaders in Congress have conducted themselves precisely

along these lines.


## II. The Second Amendment Propriety of Recent Policy Proposals


<u>Limits on Large-Capacity Magazines</u>


A core feature of the Assault Weapons Ban of 2013, introduced by Senator Dianne

Feinstein, as well as the primary component of a freestanding bill championed by Senator Frank

Lautenberg, is a ban on magazines capable of firing more than ten rounds of ammunition without

reloading.[15]  Before moving into the weeds of the constitutional analysis, it would be useful to

contrast such a high-capacity magazine restriction to the law *Heller* struck down.  *Heller* axed a

local ordinance that adopted about as blunt an approach to restraining gun violence as possible:

By its very design, the DC law espoused disagreement with the whole idea of law-abiding gun

ownership for self-defense in the home.  A limit on large-capacity magazines, by contrast, is a

regulation of an entirely different caliber.  It does not challenge the fundamental recognition that

gun possession for self-defense is a right of every citizen; it merely seeks to reset the parameters

of responsible ownership to advance the cause of public safety.   It operates with a scalpel rather

than an ax. Even Robert Levy, the man who largely funded the challenge to DC's sweeping

---

[15] The Assault Weapons Ban of 2013 also prohibits firearms with fixed magazines capable of
holding more than ten rounds of ammunition.

handgun ban in *Heller* and served as an attorney on the case, concedes that bans on both high-capacity magazines and assault weapons almost certainly do not infringe the Second Amendment rights he successfully fought to vindicate in court.[16]

By any reasonable reckoning, this crucial measure might not even trigger heightened Second Amendment review at the threshold stage that the *Heller* ruling requires courts to undertake.  But even if the high-capacity magazine prohibition does require further analysis, it safely falls within a zone of regulations that do not unconstitutionally abridge Second Amendment rights.

Most constitutional challenges require lawyers and scholars to carry out two stages of analysis.  First, we must assess whether a given government policy even *implicates* a given right in the first place.  For example, in 1915, the Supreme Court entertained a First Amendment challenge to a filmmaker's punishment under an Ohio censorship law but, in a clear misjudgment the Court would later correct, decided that movies were not even a form of "speech" entitled to First Amendment protection.[17]  More recently, in a ruling that may perhaps give pause to members of this committee (despite the distinct protections of the Constitution's Speech and Debate Clause), the Court concluded that votes by legislators are not a form of "speech" over which any public official can claim a personal First Amendment right.[18]  Assuming that a law *does* implicate the right in question, the government must then proceed to justify the challenged

---

[16] Interview with Robert A. Levy by the Washington Post (Jan. 10, 2013), *transcript available at* http://articles.washingtonpost.com/2013-01-10/lifestyle/36272630_1_assault-weapons-high-capacity-magazines-military-style-guns.
[17] Mut. Film Corp. v. Indus. Comm'n of Ohio, 236 U.S. 230, 243 (1915).
[18] Nevada Comm'n on Ethics v. Carrigan, 131 S. Ct. 2343, 2350 (2011).

law so that the court hearing the challenge may evaluate, roughly speaking, whether the justification is strong enough to permit the law to stand or, alternatively, whether the measure goes too far and thus violates the Constitution.

I begin with this return to fundamentals because it never ceases to surprise me how often those engaged in legal debate talk past one another by conflating these distinct steps. In the Second Amendment context particularly, there is no excuse for making that mistake. For *Heller* itself makes it absolutely plain that not every gun regulation even triggers Second Amendment review.  In other words, sometimes governments may enact regulations addressing the manufacture, transfer, possession or use of firearms that categorically fall outside the Second Amendment's scope, freeing governments of any burden even to make detailed defenses of the provisions in question.   For example, the *Heller* opinion specifically named "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" as illustrative examples of regulations that should not even receive further constitutional review.[19]  The importance of this point should not be underemphasized.  If too many entirely reasonable firearm regulations, like assault weapon bans and background checks, or rules about trafficking and straw purchases, are subjected to heightened Second Amendment review, it will become difficult if not impossible to separate those regulations categorically from the restrictions that *Heller* specifically approved without subjecting them to any "scrutiny" at all.

---

[19] Dist. of Columbia v. Heller, 554 U.S. 570, 626 - 27 (2008).

Beyond the examples appearing in the decision, *Heller* also identifies the three primary factors to consider in judging whether other types of regulation trip the Second Amendment's alarm.   First, the Court carefully frames the scope of the Second Amendment to cover *only* firearms "in common use at the time."[20]

Second, *Heller* recognized that "dangerous or unusual" weapons may be and have historically been heavily regulated or banned.[21]  It is not inconceivable – indeed, it seems quite likely – that the Court's pause to distinguish unusually dangerous weapons from widely possessed handguns had precisely the 1994 Assault Weapons Ban, which included a prohibition on high-capacity magazines, in mind.   At the very least, the *Heller* majority recognized that the government could keep machine guns —"M-16 rifles and the like"—out of the hands of civilians.[22] The Supreme Court thus emphatically rejected the extravagant, or as Justice Scalia characterized it, "startling" notion, still promoted by some, that the Second Amendment could fulfill its original purposes only if citizens were guaranteed a right to arm themselves to the teeth, matching in their private armories essentially the full array of weapons possessed by the United States Military.[23]

Third and finally, the Court emphasized the importance of a nexus to core self-defense needs.[24]  The majority in *Heller* had no trouble recognizing that handguns represented the

---

[20] *Id.* at 627.

[21] *Id.*

[22] *Id.*

[23] *Id.* at 624.

[24] *Id.* at 599 ("Justice Breyer's assertion that individual self-defense is merely a 'subsidiary interest' of the right to keep and bear arms . . . is profoundly mistaken.  He bases that assertion

"quintessential self-defense weapon," particularly in the home.[25]  Moreover, handguns were not categorically more dangerous than other types of firearms.  So Washington D.C.'s handgun ban clearly fell within the scope of the Second Amendment.

The clarity of *Heller*'s guidance on how to apply these threshold factors begins to dissipate, however, when they no longer align so strikingly in one direction.  To begin with, the Court left "dangerousness" undefined, and what the Court meant by that term is not entirely self-evident.  In an obvious sense, *all* firearms are dangerous; that is what makes them effective instruments of self-defense.  The *Heller* ruling, therefore, asks us to balance any *exceptional* dangerousness of particular firearm design features against the potential self-defense value of those features.  For example, even if home possession of machine guns for self-defense might, on rare occasion, deter criminal trespassers more than home possession of handguns, that benefit is simply not sufficient to overcome the substantial hazards to innocent bystanders and intentional targets, in particular the police.  *Heller* obviously does not contemplate asking the government to provide an intricately reasoned justification for banning machine guns; instead, it recognizes – and it surely authorizes Congress, and indeed all of us, to recognize – excessive dangerousness in the inherent design of the weapon[26] so as to cut off Second Amendment review at the threshold.

---

solely upon the prologue—but that can only show that self-defense had little to do with the right's *codification;* it was the *central component* of the right itself." (emphasis in original)).

[25] *Heller*, 544 U.S. at 629.

[26] Throughout this debate, opponents of restrictions on large-capacity magazines have repeatedly demanded empirical evidence showing a link between magazine capacity and gun violence. Studies in that mold certainly exist, and I discuss them later. *See, e.g.,* text accompanying notes 48 – 50.  But at this threshold stage of the Second Amendment inquiry, the *Heller* decision's meaning of dangerousness cannot be equivalent to an empirically demonstrated effect on public safety.  Rather, the standard is one that asks us to examine design features to assess whether the

All things considered, I conclude that reasonably restricting magazine size and availability does not implicate the core Second Amendment right as *Heller* conceived of it.   The reason is not the first factor, that of "common use," because, of course, large-capacity ammunition magazines and the firearms outfitted for them are, by any reasonable measure, in quite common use in the United States.   I note here just a few examples.   The standard Glock pistol, the firearm that one reporter called "America's handgun" in a recent book on the subject, comes equipped with a seventeen-round magazine.[27]   And America's most popular rifle, the AR-15 model,[28] typically comes with a thirty-round magazine and can accommodate magazines with even larger capacities.[29]

But to contend that the sizeable market presence of a particular firearm feature is sufficient in itself to trigger full Second Amendment scrutiny is to misrepresent the lesson of *Heller*.   The relative dangerousness and self-defense-serving capacity of a firearm or design

---

weapon poses an aggravated threat to safety as a common-sense matter.   First, if the former were the meaning of dangerousness, the threshold inquiry, which may lead courts to conclude that the Second Amendment does not even apply, would become indistinguishable from the more advanced stage of review, in which courts scrutinize a government's public safety rationale. Second, making empirical evidence of salutary public-safety impacts a prerequisite to gun regulation would defeat efforts to respond to new technologies and lethal features that pose a substantial threat to public safety.   The Second Amendment does not require that Americans afford the gun industry a "wait and see" grace period on the (in)famous theory that even a vicious dog deserves one free bite.

[27] Erin McCarthy, *Why the Glock Became America's Handgun,* POPULAR MECHANICS (Jan. 12, 2012, 6:30 AM), http://www.popularmechanics.com/technology/military/weapons/why-the-glock-became-americas-handgun

[28] Erica Goode, *Rifle Used in Killings, America's Most Popular, Highlights Regulation Debate*, N.Y. TIMES (Dec. 16, 2012), http://www.nytimes.com/2012/12/17/us/lanza-used-a-popular-ar-15-style-rifle-in-newtown.html?pagewanted=all.

[29] Steven Almasy, *Newton Shooter's Guns: What We Know*, CNN (Dec. 19, 2012, 10:11 AM), http://www.cnn.com/2012/12/18/us/connecticut-lanza-guns/index.html.

feature are also crucial considerations.  This approach makes complete sense.  The common use

and possession of a given firearm feature is, at best, just one helpful indicator of whether

restricting that feature will stymie or frustrate the exercise of the core Second Amendment

protection of lawful self-defense to a constitutionally cognizable degree.  For instance, in the

case of high-capacity magazines, significant market presence does not necessarily translate into

heavy reliance by American gun owners on those magazines for self-defense.  Analysis of the

modern development of the U.S. gun market demonstrates that the firearms industry, driven by

an obvious profit motive, ushered in a revolution in the state of the market during the 1980s.

Manufacturers began to roll out increasing numbers of pistols with ever-larger-capacity

magazines rather than revolvers, which take just six rounds of ammunition and had traditionally

been the most popular firearm for personal self-defense.[30]  The frequent purchase of such large-

capacity magazines, then, may not be attributable purely or even primarily to actual gun-owner

preferences, much less to gun-owner needs.  Rather, guns equipped with or ready for large-

capacity magazines may simply be the weapons most readily made available on the market.  And

even if this market presence begins to influence more Americans to purchase firearms with high-

capacity magazines because they fear attacks from criminals possessing guns outfitted with the

same high-capacity magazines, nothing in *Heller* suggests that it is improper for the government

to halt the escalation of this arms race in its tracks.  The one-way ratchet of ever more powerful

firearms is not a constitutional inevitability. For unlike the doctrine of mutually assured

destruction that some say maintained an uneasy peace during the nuclear arms buildup of the

---

[30] *See* DC Reedy & CS Koper, *Impact of handgun types on gun assault outcomes: a comparison
of gun assaults involving semiautomatic pistols and revolvers*, 9 INJURY PREVENTION 151, 151
(2002), *available at* http://injuryprevention.bmj.com/content/9/2/151.full#aff-1.
 VIOLENCE POLICY CENTER, BACKGROUNDER ON GLOCK 19 PISTOL AND AMMUNITION
MAGAZINES USED IN ATTACK ON REPRESENTATIVE GABRIELLE GIFFORDS AND OTHERS 1 (2011),
*available at* www.vpc.org/fact_sht/AZbackgrounder.pdf.

Cold War, the propagation of increasingly dangerous guns on American streets has already taken an all-too- violent toll.  In other words, tempering the trend toward more dangerous weapons actually *vindicates* the core Second Amendment right of self-defense and personal safety that *Heller* recognizes. In this context, as in many others, less is more.

But even looking beyond the market saturation of large-capacity magazines, this feature runs headlong into the other threshold obstacles that *Heller* requires Second Amendment claims to clear.   As experts in effective firearms regulation have preached for years and particularly fervently in recent weeks, higher-capacity magazines pose greater dangers to public safety.  By permitting shooters using semi-automatic weapons to continue firing more bullets without interruption, these magazines increase the potential lethality of armed killers.[31]  Though well-trained gun users can change magazines quickly, this interruption may, as we saw last year in the Arizona shooting of Rep. Gabby Giffords, afford time for heroic men or women to intervene and disarm the shooter.[32]  Moreover, this interruption gives our police a chance to return fire.[33]  And it may even provide time for reflection and rethinking before murder becomes massacre.

---

[31] BRADY CAMPAIGN TO PREVENT GUN VIOLENCE, ASSAULT-STYLE WEAPONS: HIGH-CAPACITY MAGAZINES, http://www.bradycampaign.org/legislation/msassaultweapons/highcapacity (last visited Feb. 2, 2013).

[32] Ken Dolak & Justin Wealer, *Woman Wrestled Fresh Ammo Clip From Tucson Shooter as He Tried to Reload*, ABC NEWS (Jan. 9, 2011), http://abcnews.go.com/Politics/patricia-maisch-describes-stopping-gunman-reloading/story?id=12577933.

[33] I believe I can speak for many Americans when I thank Baltimore County Police Chief Jim Johnson for the illuminating insights he has publicly offered on the threats of high-capacity weapons not just to public safety in general but also law enforcement officer safety more specifically.  *See, e.g.*, John Quinones, *Baltimore Police Chief Wants to Ban High-Capacity Firepower*, ABC NEWS (Dec. 20, 2012), http://abcnews.go.com/US/baltimore-police-chief-ban-high-capacity-firepower/story?id=18030163

Against the evident dangerousness of high-capacity magazines as a design feature, we must evaluate the strength and plausibility of asserted self-defense interests.  Critics of recent proposals to reestablish a limit on high-capacity magazines have argued that firing more than ten rounds without changing a magazine is necessary for effective self-defense.  While I have no doubt that subscription to this perspective among some law-abiding gun owners is sincere, I doubt that it is well-founded.  It's rhetorically effective to ask, "How many bullets do *you* want in your magazine when an intruder breaks into your home?" But the answer tells us little that is of relevance to the Second Amendment as *Heller* conceives that provision. I might want a magazine with twice as many bullets as any possible home intruder; I might want a machine gun too. But in the end that can't be the measure of what the Second Amendment says I have a *right* to own and deploy.

Despite the emotional resonance of this kind of appeal, incidents like burglaries and home invasions – even when they lead to the exchange of fire – are unlikely to *require* firing many shots.  The NRA publishes a regular column featuring newspaper clippings of gun owners protecting themselves against intruder attacks, and an analysis of these reports over a five-year period demonstrated that in 50% of all cases, two or fewer shots were fired, and the average number of shots fired across the entire data sample was also about two.[34]  Of course, this data comes from the episodes the NRA chooses to report, so selection bias is possible, meaning the

---

[34] Claude Verner performed the analysis of reporting over the period 1997 to 2001.  The findings further show that when many shots were fired, a (presumably frightened) gun owner finished an entire magazine rather than firing the number of shots that necessarily had to be fired in light of the scenario.  The analysis can be found reprinted with the author's permission at *Analysis of Five Years of Armed Encounters (With Data Tables)*, GunsSaveLives.net (March 12, 2012), http://gunssavelives.net/self-defense/analysis-of-five-years-of-armed-encounters-with-data-tables/.

average number of shots fired per incident could be even lower.[35]   Even police officers

traditionally found revolvers with six-bullet magazines sufficient for their own safety until more

dangerous guns flooded the market.[36]   And we should not lose track of the bigger picture: studies

show that self-defense in the home with firearms is rare.[37]   Additionally, firearms accidents are

all too common: between 1965 and 2000, unintentional shootings accounted for the deaths of

over 60,000 Americans.[38]   Firing more bullets quickly may compound their damage.


Another version of the critics' response is that in scary situations, like home invasions,

gun owners may go through bullets too quickly in a fit of nervousness or panic.[39]   That may be

true, but it also aggravates the downside hazard in cases of error,[40] so it is not at all clear that

increased access to large-capacity magazines for shooters subject to fragile nerves represents a

---

[35] It seems likely, for example, that merely brandishing a weapon may often lead intruders to flee.  A non-exhaustive review of the NRA column reveals several examples of exactly this scenario, giving me the impression that the NRA's reporting is not demonstrably biased toward extreme scenarios or even those in which some shots are fired.  *See, e.g.*, Armed Citizen, NRA (March 2012), http://www.nrapublications.org/index.php/12492/armed-citizen-23/ ("[The resident] met the intruder at her bedroom door, pointed the gun at him and demanded he leave. The trespasser fled without hesitation.").

[36] *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. REV. 1443, 1489 (2009).

[37] A study of Atlanta police records, for example, found that victims of burglaries used guns in self-defense just 3% of the time.  For a description of the study and a rich discussion of self-defense uses for firearms, see DAVID HEMENWAY, PRIVATE GUNS, PUBLIC HEALTH 67 (2004). The study is A.L. Kellermann et al., *Weapon involvement in home invasion crises*, 273 J. OF THE AM. MED. ASSOC. 1759 (1995).

[38] HEMENWAY, *supra* note 38, at 27 – 35.

[39] *See, e.g.*, Heller v. Dist. of Columbia, 670 F.3d 1244, 1261 (D.C. Cir. 2011); Emily Miller, *The High Capacity Magazine Myth*, WASHINGTON TIMES (Jan. 27, 2013), http://www.washingtontimes.com/news/2013/jan/27/the-high-capacity-magazine-myth/; Jacob Sullum, *The Threat Posed by Gun Magazine Limits*, REASON (Jan. 16, 2013), http://reason.com/archives/2013/01/16/the-threat-posed-by-gun-magazine-limits.

[40] *Heller*, 670 F.3d at 1263 - 64 ("[T]he tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders." (internal quotations omitted)).

net gain for home security or public safety.  Finally, some critics of magazine-capacity limits

have pointed out that, realistically, many gun owners have not received proper training and for

that reason, may fire bullets indiscriminately; a larger magazine – so the thinking presumably

goes – will increase the chances that at least one of their wayward shots will hit its mark.[41]  As

the Supreme Court recognized in *Heller*, however, the Second Amendment protects only the

right of "*responsible* citizens to use arms in defense of hearth and home."[42]  In other words, a

dangerous firearms feature otherwise outside the Second Amendment's scope cannot become

subject to heightened constitutional scrutiny because of the shortcomings of *irresponsible* gun

owners.


To be sure, *some* gun owners may struggle to change magazines quickly not for lack of

adequate training but rather by reason of disability or old age.[43] Perhaps a ban on high-capacity

magazines without any exception for the disabled or elderly might, for this reason, trigger

heightened scrutiny of such a ban as applied specifically to those individuals.  But the possibility

that a prohibition could raise constitutional questions in some subset of its applications does not

mean that the prohibition is constitutionally vulnerable on its face.[44] And it remains the case that

---

[41] *See, e.g.*, Stephen Hunder, *Why 33 rounds makes sense in a defensive weapon*, WASHINGTON POST (Feb. 6, 2011),
 http://www.washingtonpost.com/wp-dyn/content/article/2011/02/04/AR2011020407083.html
[42] Dist. of Columbia v. Heller, 554 U.S. 570, 635 (2008) (emphasis added).
[43] Yih Chau-Chang, *High-Capacity Magazines And Their Critical Role In Lawful Self-Defense*, THE EXAMINER (March 10, 2011), http://www.examiner.com/article/high-capacity-magazines-and-their-critical-role-lawful-self-defense
[44] The Supreme Court has exhibited an extreme reluctance to strike down laws on their face – meaning in all applications – when only some applications would fall afoul of a constitutional provision (with the exception of the First Amendment, as facially overbroad laws may chill protected free speech).  *See* RICHARD H. FALLON, DANIEL J. MELTZER & DAVID L. SHAPIRO, HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 162, 168 (6th ed. 2009).

large-capacity magazines are highly unlikely to be necessary to self-defense in the vast majority of home invasions or burglaries, even those that resort to the exchange of fire. The facial validity of a high-capacity magazine ban is therefore clear.

Despite the considerable market presence of high-capacity magazines, the danger they pose to public safety and the weakness of the self-defense justification for their possession means that two of the three threshold *Heller* factors point strongly against extending Second Amendment protection to high-capacity magazines.   The D.C. Circuit Court of Appeals, in a case challenging Washington D.C.'s restriction on magazines with more than ten rounds, recently struggled with this first stage of analysis and determined that the court did not have before it sufficient evidence to decide whether the Second Amendment even *reached* large-capacity magazines.[45]   However, the court went on to conclude that, even if it was proper to extend coverage of the amendment to large-capacity magazines, the government's interest in banning them was strong enough to do so without violating Second Amendment rights.[46]

Having now reviewed the best evidence and argumentation advanced by defenders of high-capacity magazine possession, I doubt that the Supreme Court would find it necessary to reach that second stage of review in dealing with a ban on high-capacity magazines and am quite confident that, in any event, the Court would agree with the ultimate conclusion that, even if the amendment applies, a ban on high-capacity magazines withstands Second Amendment scrutiny.

---

[45] *Heller*, 670 F.3d at 1261.
[46] *Id.* at 1263 – 64.

In explaining that conclusion, I emphasize that commonly advanced rejections of a legitimate government interest in banning high-capacity magazines are deeply misleading.  Many opponents of reasonable firearms regulation insist that we tried banning large-capacity magazines in 1994: the results are in, they say, and we failed.  One favorite trope is to cite to a 1997 Department of Justice study, which, according to the recent testimony of Wayne LaPierre, "proved that [the] ban had no impact on lowering crime."[47]  But no one is even *arguing* that a ban on high-capacity magazines (or on assault weapons, for that matter) will necessarily decrease crime rates; highly lethal firearms will still be widely available on the market, and some criminals will use them, just as they do now.

What defenders of a ban on high-capacity magazines *do* argue is that such a ban will help prevent these criminals from killing or maiming as many people when they commit violent crimes.  And that argument is solidly grounded. One study, for example, found that between 1984 and 1993, criminals using guns with high-capacity magazines  or assault weapons as defined by the 1994 Assault Weapons Ban killed or injured an average of 29 victims, compared to the average 13 victims shot by criminals unequipped with large-capacity magazines.[48] Another study suggests that, since the lapse of the ban in 2004, high-capacity magazines have once again

---

[47] *See, e.g.*, *What Should America Do About Gun Violence?: Hearing Before the S. Judiciary Comm.,* 113th Cong. (2013) (prepared testimony of Wayne LaPierre, Executive Vice President and Chief Executive Officer of the National Rifle Association).

[48] This study considered all "mass shooting" incidents: those in which six or more were killed or twelve or more were wounded.  For an explanation of this study, see Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban*, *in* REDUCING GUN VIOLENCE IN AMERICA 167 (Daniel W. Webster & Jon S. Vernick, eds., 2013).  The study is Christopher S. Koper & Jeffrey A. Roth, *The Impact of the 1994 Federal Assault Weapon Ban on Gun Violence Outcomes: An Assessment of Multiple Outcome Measures and Some Lessons for Policy Evaluation*, 17 J. OF QUANTITATIVE CRIMINOLOGY 33 (2001).

become common in episodes of violent crime after the beginnings of a decline, which probably took place because the black market for these magazines had begun to dry up.[49]

Even more misleading is the suggestion that in 1997 we could (or even today that we can) draw meaningful conclusions from the absence of unmistakable evidence of a decrease in violence following the 1994 ban.  That legislation grandfathered or exempted many thousands of weapons already owned, and those could still be sold or transferred.[50]  In other words, the 1994 ban was crafted with long-term effects in mind; to measure its effects notwithstanding its untimely end is to misunderstand fundamentally how the legislation was designed to work.  It is therefore all the more telling that supporters of reasonable regulation can cite studies based upon identifiable trends emerging during the latter years of the ban, as well as evidence from both before and after the ban, showing that the legal availability of large-capacity magazines is indeed correlated with increased deaths and injuries caused by gun violence.  Considered alongside the dangerousness inherent in a large-capacity magazine as a design feature, this evidence provides the government with a sufficient basis to satisfy the Second Amendment under any plausible understanding of the Supreme Court's jurisprudence surrounding that amendment.

---

[49] *See* David S. Fallis and James V. Grimaldi, *Va. data show drop in criminal firepower during assault gun ban*, WASH. POST (Jan. 23, 2011), http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012203452.html (finding that in Richmond, Virginia, the percentage of guns with high-capacity magazines seized from criminals by police fell to a low of 10% by 2004, when the federal assault weapons ban expired, but has since rebounded to 22%).
[50] Koper, REDUCING GUN VIOLENCE IN AMERICA, *supra* note 49, at 165 – 66.

**Assault Weapons Ban**

By many accounts, the most important component of the newly proposed assault weapons ban is its prohibition on high-capacity magazines.[51]  But that does not mean that the remaining features of the proposal stand on weaker constitutional ground.   Far from it. Application of *Heller*'s three threshold factors – dangerousness, commonness of use, and connection to core self-defense interests – demonstrates that the Second Amendment does not provide legal shelter to the features that trigger a firearm's prohibition under the ban.

Opponents of the legislation as well as some proponents of new firearms regulation have observed that some of the "military characteristics" that can lead to prohibition under the legislation[52] (and, by some accounts, under assault weapons bans in general[53]) are mostly cosmetic traits designed to make a gun *appear* dangerous and are not, in fact, intrinsically hazardous.  But Congress would surely be acting within its constitutional authority if it were to reject this characterization as self-serving or otherwise unreliable. For example, the Brady Campaign to Prevent Gun Violence insists that "[p]istol grips . . . help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position [and that] [b]arrel

---

[51] Tom Diaz, a researcher for the Violence Policy Center, has repeatedly called on lawmakers to focus their attention on a high-capacity magazine ban.  *E.g.*, Tom Diaz, *Ten Ways to Spot a Sell-Out on Gun Control*, FAIRLY CIVIL (Jan. 14, 2013, 2:26 PM), http://tomdiazgunsandgangs.com/2013/01/14/ten-ways-to-spot-a-sell-out-on-gun-control/ ("An effective law will focus on one prime feature—the ability to accept a high-capacity magazine.").
[52] *See, e.g.*, *What Should America Do About Gun Violence?: Hearing Before the S. Judiciary Comm.*, 113th Cong. (2013) (statement by Sen. Ted Cruz) ("Now, what the assault weapons ban instead targets are cosmetic features.").
[53] See, e.g., Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue: Stenberg Principles, Assault Weapons, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285, 1295 (2009).

shrouds on assault pistols protect the shooter's hands from the heat generated by firing many

rounds in rapid succession."[54]  Moreover, even if the characterization of these features as

cosmetic were accurate, it would make little difference as a constitutional matter.   In a recent

televised interview, Justice Scalia explained the basis in history for exempting certain types of

regulations from Second Amendment review.  Certain limitations on gun ownership are

constitutionally permissible, he contended, "because there were some [regulations] that were

acknowledged at the time [of the Founding]. For example, there was a tort called affrighting . . .

if you carried around a really horrible weapon just to scare people, like a head ax or something. .

. ."[55]  What the Justice evidently meant was that regulating weapons because they are chosen

specifically for their intimidating appearance is constitutionally unproblematic because the very

use of intimidation is unnecessarily disruptive to organized society.[56]


        Even more important to the constitutionality of the assault weapons ban is the absence of

any connection to the core Second Amendment right to defend oneself with a firearm.  At this

committee's hearing on January 30, several witnesses criticized the assault weapons ban on

policy grounds, but in my role as a constitutional lawyer listening intently for arguments relevant

to the proposal's Second Amendment propriety, I was struck by the failure of anyone's

---

[54] Brady Campaign to Prevent Gun Violence, The Top 10 NRA Myths About Assault Weapons,
http:// www.bradycampaign.org/issues/assaultweapons/nramyths/.
[55] Interview with Justice Antonin Scalia by Chris Wallace, FOX NEWS SUNDAY (July 29, 2012),
*transcript available at* http://www.foxnews.com/on-air/fox-news-sunday/2012/07/29/justice-
antonin-scalia-issues-facing-scotus-and-country#p//v/1760654457001.
[56] Justice Scalia's point about the tort of affrighting surfaces in the *Heller* decision itself: the
majority opinion cited three illustrative examples of state courts entertaining such actions in the
nineteenth century.  *See* Dist. of Columbia v. Heller, 554 U.S. 570, 627 (2008) (citing, e.g., State
v. Lanier, 71 N.C. 288, 289 (1874) ("The elementary writers say that the offence of going armed
with dangerous or unusual weapons is a crime against the public peace by terrifying the good
people of the land, and this Court has declared the same. . . .")).

testimony to support these features as essential to self-defense.   In fact, I have searched in vain for any reasoned arguments that pistol grips, forward grips, telescoping stocks, grenade or rocket launchers, and barrel shrouds are indispensable or even contribute to self-defense.

Finally, it is relevant to ask how many assault weapons Americans currently own.  Data is hard to come by in large part because firearms manufacturers refuse to release data tracking their sales.[57]  What we do know is that the number of weapons that would qualify under either the proposed ban's so-called "characteristics test" or its explicit list of banned models is smaller than the number of guns with standard-issue high-capacity magazines.[58]  One reporter's painstaking analysis estimated that there are 3.75 million AR-15-style rifles owned in the U.S. today, and AR-15s are the most popular although not the exclusive type of qualifying assault weapon.[59]  The NRA's lobbying arm estimates that, depending upon the definition of assault weapon, assault weapons represent 15% of all semi-automatic guns owned in the U.S., which in turn represent about 15% of all firearms owned in the U.S.[60]  Given that the Congressional Research Service recently found that, as of 2009, Americans own about 310 million guns,[61] the NRA's estimate would translate into approximately 7 million assault weapons owned today. Although 7 million is hardly a negligible figure, it still corresponds to quite a small portion of the

---

[57] Justin Peters, *How Many Assault Weapons Are There in America? How Much Would It Cost the Government To Buy Them Back?*, SLATE (Dec. 20, 2012), http://www.slate.com/blogs/crime/2012/12/20/assault_rifle_stats_how_many_assault_rifles_are_there_in_america.html.

[58] *See* Koper, REDUCING GUN VIOLENCE IN AMERICA, *supra* note 49, at 161 (explaining that the universe of large-capacity magazine equipped firearms is broader than the universe of weapons satisfying the criteria for categorization as an assault weapon).

[59] Peters, *supra* note 58.

[60] *Top Ten Frequently Asked Questions*, NRA-ILA, http://www.gunbanfacts.com/FAQ.aspx (last visited February 2, 2013).

[61] WILLIAM J. KROUSE, CONG. RES. SERV., RL32842, GUN CONTROL LEGISLATION 8 (2012).

overall gun market – hardly enough to justify calling such weapons "common" within the meaning of *Heller*.

But for the purposes of constitutional analysis, debating how to characterize the significance of assault weapons' market presence would be a waste of time. To make a difference to *Heller*'s threshold inquiry, which must take notice of the complete lack of any connection of assault-weapon features to self-defense as well as these features' dangerousness in both fact and appearance, the market presence of assault weapons would have to be overwhelmingly large (and even then, I doubt seriously the bottom line would change as a constitutional matter). And overwhelmingly large it assuredly is not.

## Universal Registration and Background Checks

All responsible participants in the gun safety debate agree that some groups of people simply should not be allowed to own, keep, or carry guns. Those groups include children, dangerous felons, and those with serious mental illnesses that preclude safe gun ownership. When some observers casually compare the Second Amendment to the First, they forget this essential difference: Although freedom of speech sometimes comes at a price, and although speech can at times pose dangers, our constitutional system addresses those dangers by permitting government to impose carefully crafted limits on speech, not by limiting or licensing eligible speakers. The Constitution's strategy with respect to guns is entirely different. It addresses the dangers of guns in the wrong hands by permitting government to keep them out of

those hands in the first place, and, of course, by permitting government to regulate where and under what conditions people can bear those weapons in possible confrontation with others.

Accordingly, this Congress might be called upon to consider measures designed to minimize the risk that guns fall into the hands of such prohibited purchasers and owners. Measures dealing with straw purchases and trafficking are obviously important in that effort and are clearly constitutional. Rather than spending the committee's time on those measures, I will focus here on provisions that mandate universal registration requirements or a universal background check, closing the many notorious loopholes that characterize current laws on the subject. There is no serious doubt that requiring universal registration or a universal background check would comply with the Second Amendment.

It is important to recognize, at the outset, that prohibiting particular groups of people from owning or possessing guns is fully compatible with the Second Amendment. In the first place, such prohibitions are consistent with the original and traditional understanding of the Second Amendment. It was widely accepted at the time of the framing that not every person had a right to keep and bear arms; instead, the right was closely tied to the notion of responsible citizenship, and it has long been denied to criminals and others whose possession of guns would pose a severe danger to the public.[62] On this point, precedent aligns closely with history. The Supreme Court said in *District of Columbia v. Heller*: "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the

---

[62] *See United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009).

mentally ill …"[63] The Court fortified this conclusion in *McDonald v. City of Chicago*, when it added: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill' … We repeat those assurances here."[64]

Once the constitutionality of prohibiting gun possession by some people is accepted, the constitutionality of a reasonable system of registration or background checks follows automatically. The most powerful argument for this inference is not a technical legal point; it is, instead, common sense. And, although it shouldn't be necessary to cite authority for the point, it's worth noting that as eminent an authority as Alexander Hamilton wrote in *The Federalist* that "[t]he rules of legal interpretation are rules of *common sense*," and that the "true test" of a "just application" of these rules is whether the resulting interpretation is "consistent with reason and common sense."[65]

Consider, then, whether the Constitution would be "consistent with reason and common sense" if it allowed prohibitions on firearms purchases by felons but disallowed background checks to determine whether a felon was the would-be purchaser of a firearm. As a matter of common sense, we all know that guns do not of their own accord stay out of the hands of prohibited purchasers. Nor are prohibited purchasers likely to confess their legal inability to buy guns when talking to gun dealers. The prohibitions, in short, do not enforce themselves. In order to be effective, in order to be meaningful, in order to be anything more than rules on paper, they

---

[63] 554 U.S. 570, 626 (2008).

[64] 130 S. Ct. 3020, 3047 (2010) (plurality opinion).

[65] *The Federalist* No. 83, at 495 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

must be comprehensive and must be carried into operation by the government. It contradicts common sense—it ignores the fact that "the framers of the Constitution were not mere visionaries, toying with speculations or theories, but practical men"[66]—to say on the one hand that prohibiting felons from owning guns is constitutional, but to insist on the other hand that the background checks that seek to make those prohibitions effective are unconstitutional.

The Supreme Court's decisions in *District of Columbia v. Heller* and *McDonald v. City of Chicago* confirm the constitutionality of reasonable background check requirements. *Heller* expressly affirms that the Court was not calling into doubt "laws imposing conditions and qualifications on the commercial sale of arms."[67] The *McDonald* Court "repeat[ed] those assurances," observing that its holding "does not imperil every law regulating firearms."[68] The universal registration requirement or background check is simply a "condition[]" on the transfer of arms; it is therefore expressly within the zone of permissible regulation identified by *Heller* and *McDonald*.

Analogous Supreme Court doctrine points in the same direction. The right to vote, like the right to keep and bear arms, is a fundamental right of Americans.[69] But no serious legal scholar doubts that before letting a citizen cast his ballot, the government may require the citizen to register and may take steps to check whether he or she really is an eligible voter. And the

---

[66] *NFIB v. Sebelius*, 132 S. Ct. 2566, 2589 (2012) (opinion of Roberts, C.J.) (quoting *South Carolina v. United States*, 199 U.S. 437, 449 (1905)).

[67] 554 U.S. at 626–27.

[68] 130 S. Ct. at 3047 (plurality opinion).

[69] *Compare Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966) (holding that the right to vote is fundamental), *with McDonald v. City of Chicago*, 130 S. Ct. 2020 (2010) (holding that the right to keep and bear arms is fundamental).

Supreme Court agrees; in *Crawford v. Marion County Election Board*, for example, it concluded that Indiana's voter ID law was a permissible means of ensuring that only eligible voters participate in an election.[70] Checking whether a voter is eligible before giving that voter a ballot is comparable to checking whether a purchaser is eligible before letting her acquire a gun. Just as the former is constitutional, so is the latter. And the argument is of course even stronger in the instance of firearms. For, unlike a ballot in the hands of an ineligible voter, which might in the end prove to make no difference to who wins or loses the election at issue, a gun in the hands of even one ineligible owner poses a deadly danger all by itself.

History reinforces common sense and case law in this regard. The Supreme Court in *Heller* and *McDonald* stressed the role of history in interpreting the scope of the Second Amendment; "longstanding" prohibitions upon gun ownership, the Court indicated, are presumptively exempt from Second Amendment scrutiny.[71] Lower courts have likewise noted that history plays an important, though not exclusive, role in determining the scope of permissible regulation under the Second Amendment.[72] Measures to keep guns out of the hands of prohibited owners – owners who could not safely be entrusted with control of a lethal weapon – have a strong historical pedigree. For example, many states have longstanding laws— sometimes, laws dating back a century or more—requiring sellers to keep registers of all firearm purchasers; the registers had to be open to peace officers.[73] The government could use thus use

---

[70] 553 U.S. 181 (2008) (plurality opinion).

[71] *See* 554 U.S. at 626–27; 130 S. Ct. at 3047 (plurality opinion).

[72] *See, e.g.*, *Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011); *Ezell v. City of Chicago*, 651 F.3d 684, 701–04 (7th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010).

[73] *See Heller*, 670 F.3d at 1253–54.

these registers to determine whether any of the purchasers had obtained weapons in violation of the law.

To be sure, modern computerized background checks differ from the more cumbersome historical enforcement measures known to hisory. But "a constitution [is] intended to endure for ages to come."[74] Just as the Second Amendment covers modern weapons, like handguns, that did not exist when the Bill of Rights was ratified in 1791, so too does it cover modern enforcement measures, like mandatory computerized background checks, that could not have been anticipated in 1791. Reasonable background checks fit into the long historical tradition to which registration requirements belong, and that is enough to sustain them without further ado under the tests established by the Supreme Court in *Heller* and *McDonald*.

In short, all relevant legal considerations—logic and common sense, directly applicable precedent, analogies to surrounding legal doctrines, and history and tradition—point to the same conclusion. The Second Amendment does not prohibit Congress from passing laws to carry into effect concededly constitutional prohibitions on firearm purchases. The universal background check, in particular, easily passes constitutional muster as a permissible regulation of the transfer of firearms.

This is not to say that all conceivable background check systems would comport with the Constitution. Suppose, for example, that Congress were to pass a law requiring handgun purchasers to undergo an extensive check on the purchasers themselves and all their family

---

[74] *McCulloch v. Maryland*, 17 U.S. 316, 415 (1819).

members and housemates, a check that took years to complete. Such a scheme would plainly impose a very severe burden on the right to keep and bear arms for self-defense. The burden would be entirely disproportionate to the objective the government is seeking to pursue. Where a background check is taken to such lengths that it effectively destroys the right to keep and bear arms, rather than ensuring that the right is enjoyed only by those constitutionally entitled to it, the government has overstepped the lawful boundaries of its power.

Such concerns are entirely out of place here, however. Whether a particular background check scheme that Congress adopts would go too far obviously depends on the specific details of that scheme. But none of the proposals seriously under consideration at the present come remotely close to overstepping constitutional boundaries. The proposed background check frameworks, especially those that rely on checks conducted instantaneously through the National Instant Background Check System, impose a constitutionally insignificant burden upon law-abiding citizens. Indeed, an instant background check is much *less* onerous than the Voter ID law that the Supreme Court upheld in *Crawford v. Marion County Election Board*; it is also much less cumbersome than longstanding registration requirements and other conditions on sale[75] that are concededly constitutional. Ultimately, therefore, I see no merit to the constitutional objections to the background check proposals presently being seriously considered by Congress.

### III. The Consistency of the President's Measures with the Separation of Powers

---

[75] *See Heller*, 670 F.3d at 1253.

This January, President Obama announced twenty-three steps that his Administration would take to prevent gun violence.[76] The President has begun to implement these steps by using the executive powers vested in him by the Constitution and laws of the United States. Because the President adopted these measures by executive action, without specific congressional involvement, some have concluded that the President violated the separation of powers established by the Constitution. This claim is legally untenable; the President is acting well within his powers as head of the executive branch.

Some of the President's measures involve nothing beyond communicating with members of the public. Measure 23, for example, is to "[l]aunch a national dialogue … on mental health." There is plainly no constitutional problem with executive steps of this sort. The President obviously does not need congressional permission every time he decides to give a speech or publish a press release.

Another category of measures—and this covers the great majority of the actions that the President has committed to take—includes steps that will improve the enforcement of federal laws already on the books. Thus, the President has agreed to "[m]aximize enforcement efforts to prevent gun violence and prosecute gun crime."[77] He has likewise decided "to require federal law enforcement to trace guns recovered in criminal investigations."[78] These improvements to

---

[76] *See, e.g.*, Colleen Curtis, *President Obama Announces New Measures to Prevent Gun Violence*, Jan. 16, 2013, available at http://www.whitehouse.gov/blog/2013/01/16/president-obama-announces-new-measures-prevent-gun-violence.

[77] Measure 13.

[78] Measure 9.

federal law enforcement efforts plainly fall within the President's constitutional power—and constitutional responsibility—to "take Care that the Laws be faithfully executed."[79]

A third group of measures involves the making of rules and regulations under preexisting congressionally granted authority. For instance, step 21—"[f]inalize regulations clarifying essential health benefits and parity requirements within ACA exchanges"—simply carries into effect authority granted by the Patient Protection and Affordable Care Act.[80]

Step 11, "[n]ominate an ATF director," is equally clearly within the President's constitutional powers; the Constitution expressly states that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint … Officers of the United States."[81] Likewise, the Constitution plainly authorizes the President's requests for information from executive branch officials, such as step 15, "direct[ing] the Attorney General to issue a report on the availability and most effective use of new gun safety technologies and challenge the private sector to develop innovative technologies"; Article II provides that the President "may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices."[82]

Finally, and perhaps most controversially, some of the President's measures entail the issuance of interpretations of existing laws. To this class belongs, for instance, step 16, "[c]larify[ing] that the Affordable Care Act does not prohibit doctors asking their patients about

---

[79] U.S. Const. art. II, § 3.
[80] Patient Protection and Affordable Care Act of 2010, Pub. L. 111-148, § 1321(a).
[81] U.S. Const. art. II, § 2, cl. 2.
[82] U.S. Const. art. II, § 2, cl. 1.

guns in their homes." To be sure, the Article III judiciary must ultimately interpret laws when applying those laws in the context of concrete cases or controversies. But it is well established that the President also has the authority to interpret the law—and especially the power to announce legal interpretations concerning issues that have not yet been settled by the courts. In fact, the tradition of presidential clarifications of the law goes back to President George Washington's Neutrality Proclamation. The tradition also has a solid grounding in the text of the Constitution; it is based on the Constitution's vesting in the President of "the executive Power," and in its imposition on the President of the power and duty to "take Care that the Laws be faithfully executed."[83]

In sum, although some opponents of gun regulation might disagree with some of the President's executive actions as a matter of policy, those disagreements cannot plausibly be translated into constitutional objections. From a separation-of-powers perspective, the President has acted well within the bounds of his constitutionally assigned authority.

*****************

In closing, I note that I share the beliefs of many that the prevalence of guns in our country is by no means the only significant contributor to the tragedy at Newtown and to the many other gun-related massacres we have seen in recent months and recent years, or to the deaths of an average of over 30 Americans, nearly 5 of them children, *each and every day* as a result of gunfire homicides in less visible, and often virtually unnoticed, tragic incidents. [84]

---

[83] U.S. Const. art. II, §§ 1, 3.

[84] The Center for Disease Control reports that in 2010, 11,078 individuals in the U.S. died from firearm-related homicides.  1,773 of them were between the ages of 0 and 19.  *See* CENTER FOR DISEASE CONTROL, NATIONAL CENTER FOR INJURY PREVENTION & CONTROL, *WISQARS*

Violence has many causes. Violent video games, for example, some of them simulating mass shootings, may well play a significant role in the inculcation of violent attitudes among children.[85] And mental illness plainly played a significant part in bringing about the massacre at Newtown. If our country is to reduce the incidence of similar unspeakable violence in the future, the widespread availability of high-powered guns to people who should not possess them and who have no constitutional right to do so is by no means the only phenomenon that our government, our society, and our families need to address.

But it is simply not true that the presence of other causes of gun violence means that we neither can nor should do anything significant about the prevalence, too often in the wrong hands, of high-powered guns and high-capacity magazines that turn those guns from means of self-defense into weapons of mass destruction. It is not true constitutionally, it is not true politically, and it is not true morally. We must do our best to address in a serious way *every* source of avoidable death by firearms that we can, and if we always point to other problems still waiting to be solved we will never get started.

The time to get started on sensible gun regulation is not now—it was weeks, months, years, even decades ago. The Second Amendment is not a barrier. We have already delayed too long, and our society has paid a terrible price. We should delay no longer.

---

*Fatal Injury Reports, National and Regional, 1999 – 2010,*
http://webappa.cdc.gov/sasweb/ncipc/mortrate10_us.html (last visited Feb. 4, 2013).
[85] *See Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729, 2767–71 (2011) (Breyer, J., dissenting).