IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)

STEPHEN V. KOLBE, et al.                    *

            vs.                             *            Case No. 1:13-cv-02841-CCB

MARTIN O'MALLEY, et al.                     *
                                        ******

**BRIEF OF AMICUS CURIAE PINK PISTOLS IN SUPPORT OF PLAINTIFFS**

Date:  March 17, 2014                       James B. Astrachan, Bar No. 03566
                                            Elizabeth A. Harlan, Bar No. 18285
*Of Counsel*:                               ASTRACHAN GUNST THOMAS, P.C.
Brian S. Koukoutchos                        217 East Redwood Street, Suite 2100
28 Eagle Trace                              Baltimore, MD  21202
Mandeville, LA  70471                       (410) 783.3550
(985) 626-5052                              (410) 783.3530 (Facsimile)
                                            jastrachan@agtlawyers.com
                                            eharlan@agtlawyers.com


                                            *Counsel for Amicus Curiae*
                                            *Pink Pistols*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTEREST OF AMICUS CURIAE .................................................................................... 1

INTRODUCTION .............................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.      THE SECOND AMENDMENT PROTECTS OWNERSHIP OF FIREARMS THAT ARE
IN COMMON USE FOR LAWFUL PURPOSES. .................................................................. 2

        A.     *Heller* Forbids Any Form of Interest-Balancing when the Challenged
Law Is a Categorical Ban on Particular Firearms. ............................................... 2

        B.     The Second Amendment Protects the Individual Right To Possess Firearms that Are
Commonly Used by Law-Abiding Citizens for Lawful Purposes. ....................... 3

II.     THE ACT'S BAN ON MAGAZINES OF MORE THAN TEN ROUNDS OUTLAWS A NEARLY UNIVERSAL
FEATURE OF FIREARMS COMMONLY USED FOR LAWFUL PURPOSES. ................................ 4

III.    THE ACT'S BAN ON SO-CALLED "ASSAULT WEAPONS" OUTLAWS AN ENORMOUS CLASS OF
FIREARMS COMMONLY USED FOR LAWFUL PURPOSES. ................................................. 13

IV.    BANNING SO-CALLED "ASSAULT WEAPONS" AND LARGE CAPACITY MAGAZINES
WOULD DO NOTHING TO REDUCE VIOLENT CRIME. ...................................................... 20

V.     THE SAD TRUTH IS THAT THE ACT CHALLENGED HERE WOULD NOT HAVE PREVENTED THE
ATROCITY THAT SPAWNED IT—THE HORRIFYING MASSACRE AT THE NEWTOWN ELEMENTARY
SCHOOL. ................................................................................................................. 30

CONCLUSION ................................................................................................................ 35

i

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Brown v. Louisiana*, 383 U.S. 131 (1966) ............................................................................30

*DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189 (1989) ............................9

*District of Columbia v. Heller*, 554 U.S. 570 (2008)....................................................... *passim*

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)........................................4, 13

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010)........................................................2, 3

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)....................................................................3

*National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
  714 F.3d 334 (5th Cir. 2013) ...............................................................................................9

*Rex v. Dewhurst*, 1 State Trials, New Series 529 (1820)........................................................18

*Robb v. Hungerbeeler*, 370 F.3d 735 (8th Cir. 2004) ...........................................................29

*Staples v. United States*, 511 U.S. 600 (1994) .....................................................................14

*Stenberg v. Carhart*, 530 U.S. 914 (2000) ...........................................................................19

*Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. 748 (2005)..........................................9

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997)............................................................3

*United States v. Carter*, 669 F.3d 411 (4th Cir. 2012)...........................................................21

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)..........................................................21

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010)...........................................................21

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) .................................................21

*Warren v. District of Columbia*, 444 A.2d 1 (D.C. 1981) ........................................................9

**Statutes and Legislative Materials**

U.S. CONST. amend. II ...................................................................................... *passim*

18 U.S.C. § 922(o) ...............................................................................................14

36 U.S.C. § 40701 ................................................................................................12

MD. CODE ANN., CRIM. LAW

  § 4-301 ...........................................................................................................1

  § 4-303 ...........................................................................................................1

  § 4-303(b)........................................................................................................1

  § 4-304 ...........................................................................................................1

§ 4-305(b) ....................................................................................................1

§ 4-306 .........................................................................................................1

§ 4-306(a) .....................................................................................................1

§ 4-403 .......................................................................................................14

MD. CODE ANN., PUB. SAFETY

§ 5-101 ..........................................................................................................1

§ 5-101(r)(2)(x) ...........................................................................................14

§ 5-101(r)(2)(xv) ...................................................................................14, 33

§ 5-101(r)(2)(xxxiii) .................................................................................24,32

*Assault Weapons: A View from the Front Lines: Hearing on S. 639 and S. 653 Before the S. Comm. on the Judiciary*, 103d Cong. (1993) ....................................27, 28, 29

Title XI of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994) ...............................................................................21

## Other

1 WILLIAM HAWKINS, TREATISE OF THE PLEAS OF THE CROWN 136 (1716) ...................................3

1 WILLIAM RUSSELL, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 272 (1831) .................18

2013 CMP Sales Catalog, CIVILIAN MARKSMANSHIP PROGRAM, www.odcmp.com/Sales/pdfs/catalog.pdf (last visited Mar. 14, 2014) ...............................................12

*22 Round .40 Glock Factory Magazine*, GLOCKMEISTER, www.glockmeister.com/22-Round-40-GLOCK-Factory-Magazine/productinfo/G22MAGHF22 (last visited Mar. 14, 2014) ....................6

3 B. WILSON, WORKS OF THE HONOURABLE JAMES WILSON (1804) ...........................................18

*About Us*, CIVILIAN MARKSMANSHIP PROGRAM, www.odcmp.com/Comm/About_Us.htm (last visited Mar. 14, 2014)...............................................................12

AMERICAN RIFLEMAN: ARMALITE 50 YEARS (Dec. 2004) ........................................................16

Anthony J. Pinizzotto et al., VIOLENT ENCOUNTERS: A STUDY OF FELONIOUS ASSAULTS ON OUR NATION'S LAW ENFORCEMENT OFFICERS (FBI Crim. Justice Info. Servs. Div. 2006)................28

Brian McCombie, *An Inside Look at FBI Handgun Training*, GUNS & AMMO HANDGUNS (June 20, 2013), www.handgunsmag.com/2013/06/20/new-fbi-handgun-training/ (last visited Mar. 14, 2014)...............................................................7

Bruce Kobayashi & Joseph Olson, *In re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons,"* 8 STAN. L. & POL'Y REV. 41 (1997) .......................................................14, 19

BUREAU OF JUSTICE STATISTICS: CENSUS OF STATE AND LOCAL LAW ENFORCEMENT AGENCIES, 2008 (July 2011), *available at* www.bjs.gov/content/pub/pdf/csllea08.pdf (last visited Mar. 14, 2014) ..............................................................................................................................6

*Bushmaster Supplies Md. Park Police with Carbines*, POLICE MAGAZINE (Sept. 9, 2011), www.policemag.com/channel/weapons/news/2011/09/09/bushmaster-supplies-md-park-police-with-carbines.aspx (last visited Mar. 14, 2014) ......................................................................17

Centers for Disease Control, *Recommendations To Reduce Violence Through Early Childhood Home Visitation, Therapeutic Foster Care, and Firearms Laws*, 28 AM. J. PREV. MED. 6 (2005).....25

CHAD ADAMS, COMPLETE GUIDE TO 3-GUN COMPETITION (2012).........................................................11

Charles Krauthammer, Column, *Disarm the Citizenry*, THE WASHINGTON POST (Apr. 5, 1996) .............20

CHRISTOPHER R. BARTOCCI, BLACK RIFLE II: THE M16 INTO THE 21ST CENTURY (2004) ............16, 17, 26

Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, Report to the Nat'l Inst. of Justice, Dep't of Justice (2004)........................................................................................................5, 13, 23

Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994-2004*, *in* REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH EVIDENCE AND ANALYSIS (Daniel W. Webster & Jon S. Vernick eds., 2013) ....................................................................23, 30

*Crime in the United States 2012: Expanded Homicide Data Table 8, Murder Victims by Age*, FBI, www2.fbi.gov/ucr/cius2007/offenses/expanded_information/data/shrtable_08.html (last visited Mar. 14, 2014).................................................................................................................................30

*Crime in the United States 2012: Expanded Homicide Data Table 8, Murder Victims*, FBI, www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2012/crime-in-the-u.s.-2012/offenses-known-to-law-enforcement/expanded-homicide/expanded_homicide_data_table_8_murder_victims_by_weapon_2008-2012.xls  (last visited Mar. 14, 2014)...............................................................................................................30, 31

*Crime in the United States, Violent Crime, 2012*, FBI, www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2012/crime-in-the-u.s.-2012/violent-crime/violent-crime (last visited Mar. 14, 2014)..................9

Dale Miles, *New M-16 EIC Match Scores a Hit at Nationals*, CIVILIAN MARKSMANSHIP PROGRAM, www.odcmp.org/0904/M-16Match.asp (last visited Mar. 14, 2014) ...................................................12

Dan Haar, *America's Rifle: Rise of the AR-15*, HARTFORD COURANT (Mar. 9, 2013), articles.courant.com/2013-03-09/business/hc-haar-ar-15-it-gun-20130308_1_new-rifle-colt-firearms-military-rifle (last visited Mar. 14, 2014)............................................................................15

David B. Kopel, *"Assault Weapons," in* GUNS: WHO SHOULD HAVE THEM (David B. Kopel ed., 1995) ......................................................................................................8, 10, 21, 26, 28, 33

DAVID DIXON, NEVER COME TO PEACE AGAIN: PONTIAC'S UPRISING AND THE FATE OF THE BRITISH EMPIRE IN NORTH AMERICA (2005) ....................................................................................................32

David M. Fortier, *AR Trends: What is Hot and What is Not,* Shotgun News (Mar. 20, 2014) .................15

DEFENSE INTELLIGENCE AGENCY, SMALL ARMS IDENTIFICATION AND OPERATION GUIDE (1988)...........19

DEP'T OF JUSTICE, GUNS USED IN CRIME (1995) .................................................................13

Dick Metcalf, *The Big Boys*, in GUNS & AMMO (Jan. 2013) ....................................10

Doug Wyllie, *PoliceOne's Gun Control Survey: 11 Key Lessons from Officers' Perspectives* (Apr. 8, 2013), POLICEONE.COM, www.policeone.com/Gun-Legislation-Law-Enforcement/ articles/6183787-PoliceOnes-Gun-Control-Survey-11-key-lessons-from-officers-perspectives/.......27

Editorial, THE WASHINGTON POST (Sept. 1994) .................................................................20

Edward W. "Ned" Hill, *How Many Guns Are in the United States? Americans Own Between 262 Million and 310 Million Firearms*, Cleveland State Univ. (2013), www.urban.csuohio .edu/publications/hill/GunsInTheUS_Hill_032813.pdf (last visited Mar. 14, 2014) .........................15

Eric Poole, *Ready To Arm: It's Time To Rethink Home Security*, in BOOK OF THE AR-15 (Eric R. Poole ed., 2013) ...................................................................................................................17

Eric R. Poole, *The AR Meets Generation X: Accessorizing This Rifle Icon Has Developed Its Own Industry*, in SHOOTING ILLUSTRATED, THE AMERICAN RIFLEMAN GUIDE TO BLACK RIFLES (Michael O. Humphries ed., 2006).........................................................................................16

*Fired into a Group of Children*, N.Y. TIMES (Apr. 10, 1891), *available at* http://query.nytimes. com/mem/archive-free/pdf?res=F10A1EFF3D5E10738DDDA90994DC405B8185F0D3...............32

GARY PAUL JOHNSTON & THOMAS B. NELSON, THE WORLD'S ASSAULT RIFLES (2010)........16, 19, 24, 25

Glenn M. Gilbert, *The Making of a Match Rifle*, in SHOOTING ILLUSTRATED, THE AMERICAN RIFLEMAN GUIDE TO BLACK RIFLES (Michael O. Humphries ed., 2006).............................................16

*Gun Control: Gun Ban Would Protect More than 2,200 Firearms*, ABC7 (Feb. 16, 2013, 8:38 AM),    www.wjla.com/articles/2013/02/gun-control-gun-ban-would-protect-more-than-2-200-firearms-85315.html..................................................................................................................24

GUN DIGEST 2013 (Jerry Lee ed., 67th ed. 2012) .................................................................16

*Gun Policy & Law Enforcement: Survey Results*, POLICEONE.COM (2013), www.policeone.com/ police-products/firearms/articles/6188462-policeones-2013-gun-policy-law-enforcement-surve y-results-executive-summary/.........................................................................................27

GUN: A VISUAL HISTORY (Chris Stone ed., 2012) ...........................................................5, 6, 33

GUNS & AMMO, BOOK OF THE AR-15 (Eric R. Poole ed., 2013) .......................................5, 15, 16

HANDGUNS: 2013 BUYER'S GUIDE (2013) ..........................................................................5

*How They Were Equipped That Day*, Jefferson County, Colorado, Sheriff, CNN.COM, *available at* www.cnn.com/SPECIALS/2000/columbine.cd/Pages/EQUIPMENT_TEXT.htm............................32

INTERNATIONAL PRACTICAL SHOOTING CONFEDERATION, www.ipsc.org (last visited Mar. 14, 2014).....11

J. Guthrie, *The 300 Blackout Story*, in GUNS & AMMO, BOOK OF THE AR-15: 300 BLACKOUT EDI-TION (Eric R. Poole ed., 2013) ......................................................................................10

J. Guthrie, *Versatile Defender: An Argument for Advanced AR Carbines in the Home*, *in* BOOK OF THE AR-15 (Eric R. Poole ed., 2013)...........................................................................16

Jeffrey A. Roth & Christopher S. Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994 (Final Report)* (Mar. 13, 1997), *available at* www.urban.org/UploadedPDF/aw_final.pdf .................................................................22

JOHN HENWOOD, THE 8 AND THE 81: A HISTORY OF REMINGTON'S PIONEER AUTOLOADING RIFLES (1993).........................................................................................................................................13

Joseph von Benedikt, *Double Down: Get Your DA Revolver Skills Up to Snuff with These Pro Tips*, *in* GUNS & AMMO, HANDGUNS (Aug./Sept. 2013)......................................................34

Josh Sugarmann, *Assault Weapons and Accessories in America*, VIOLENCE POLICY CENTER, www.vpc.org/studies/awaconc.htm (last visited Mar. 14, 2014)..........................................19

JOYCE LEE MALCOLM, GUNS & VIOLENCE: THE ENGLISH EXPERIENCE 239 (2002) ................................10

Julia Gronnevet, *Norway Killer Got on Ferry in Uniform*, Assoc. Press (May 4, 2012), articles.philly.com/2012-05-04/news/31573726_1_bomb-attack-island-attack-police-officer (last visited Mar. 14, 2014).................................................................................................24, 32

Justin Peters, *"We Still Look at Ourselves as Survivors": More than Eighty Years Later, Remembering the Deadliest School Massacre in American History*, SLATE (Dec. 18, 2012), *available at* www.slate.com/blogs/crime/2012/12/18/bath_school_bombing_remembering_ the_deadliest_school_massacre_in_american.html ...........................................................32

K.D. KIRKLAND, AMERICA'S PREMIER GUNMAKERS: BROWNING (2013).............................................6, 13

LAW ENFORCEMENT OFFICERS KILLED & ASSAULTED: 2010, www.fbi.gov/about-us/cjis/ucr/leoka/2010.................................................................................................................................26, 27

LAW ENFORCEMENT OFFICERS KILLED & ASSAULTED: 2011, *About Law Enforcement Officers Killed and Assaulted*, www.fbi.gov/about-us/cjis/ucr/leoka/2011 ....................................28

LAW ENFORCEMENT OFFICERS KILLED & ASSAULTED: 2011, *Law Enforcement Officers Feloniously Killed*, FBI, www.fbi.gov/about-us/cjis/ucr/leoka/2011/tables/table-46 .........................................26

Mark Kayser, *AR-15 for Home & the Hunt*, *in* PERSONAL & HOME DEFENSE (2013)..............................16

MARK OWEN & KEVIN MAURER, NO EASY DAY: THE FIRSTHAND ACCOUNT OF THE MISSION THAT KILLED OSAMA BIN LADEN (2012) .......................................................................................17

*Market Data Center, Auto Sales* (% Market Share YTD 2012), WALL STREET JOURNAL, wap.wsj.com/mdc/public/page/2_3022-autosales.html (last visited Mar. 14, 2014)...........................15

Mary Ellen Clark & Noreen O'Donnell, *Newtown School Gunman Fired 154 Rounds in Less than Five Minutes*, REUTERS U.S. EDITION (Mar. 28, 2013), www.reuters.com/article/2013/03/28/us-usa-shooting-connecticut-idUSBRE92R0EM20130328 ...............................................33

*Maryland State Police Switch from Berettas to Glocks*, WBALTV (June 6, 2012, 8:38 AM), www.wbaltv.com/news/maryland/Maryland-State-Police-switch-from-Berettas-to-Glocks/-/9379376/14743582/-/m1j154z/-/index.html (last visited Mar. 14, 2014) ...........................................6

MASSAD AYOOB, THE COMPLETE BOOK OF HANDGUNS (2013) ................................................................6

MAXIM POPENKER & ANTHONY G. WILLIAMS, ASSAULT RIFLE (2004) ....................................................19

*M1 Carbine 30 Round Magazines*, CIVILIAN MARKSMANSHIP PROGRAM, www.odcmp.com/Sales/pdfs/Carbine_30_Round_Magazines_September_2007.pdf (last visited Mar. 14, 2014) ....................................................................................................................12

Michael O. Humphries, *Welcome to the American Rifleman Guide to Black Rifles, in* SHOOTING ILLUSTRATED, THE AMERICAN RIFLEMAN GUIDE TO BLACK RIFLES (Michael O. Humphries ed., 2006) ....................................................................................................................................................14, 15

Michael Remez, *A Civilian Version of an M-16: Bushmaster Rifle a Common Choice*, HARTFORD COURANT (Oct. 25, 2002), articles.courant.com/2002-10-25/news/0210252068_1_ bushmaster-firearms-john-allen-williams-distributor-in-washington-state (last visited Mar. 14, 2014) ..............................................................................................................................................17

MILITARY SMALL ARMS (Graham Smith ed., 1994) ..................................................................5, 6, 33, 34

N.R. Kleinfield et al., *Newtown Killer's Obsessions, in Chilling Detail*, N.Y. TIMES, Mar. 28, 2013 .....33

NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW (Charles F. Wellford et al. eds., 2005) ............................................................................................................................25

*National Trophy Pistol Matches*, CIVILIAN MARKSMANSHIP PROGRAM, www.odcmp.com/NM/ Pistol.htm (last visited Mar. 14, 2014) ..................................................................................................12

Nicolas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion Analogue: Stenberg Principles, Assault Weapon, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285 (2009) ....................................................................................................................................................19

PAUL M. BARRETT, GLOCK: THE RISE OF AMERICA'S GUN (2012) ............................................6, 13, 24

PUBLIC INQUIRY INTO THE SHOOTINGS AT DUNBLANE PRIMARY SCHOOL ON 13 MARCH 1996, www.ssaa.org.au/research/1996/1996-10-16_public-inquiry-dunblane-lord-cullen.pdf ....................34

Robert A. Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREV. MED. 40 (2005) ............................................................................................................25

*Small Arms Firing Schools*, CIVILIAN MARKSMANSHIP PROGRAM, www.odcmp.com/NM/ SAFS.htm (last visited Mar. 14, 2014) ..................................................................................................12

THE COMPLETE BOOK OF AUTOPISTOLS: 2013 BUYER'S GUIDE (2013) ........................................................5

*USPSA Shows Record Breaking Membership Numbers in 2013*, UNITED STATES PRACTICAL SHOOTING ASSOC., www.uspsa.org/uspsa-announcements-details.php?USPSA-shows-record-breaking-membership-numbers-in-2013-112 (last visited Mar. 14, 2014)........................................11

WEBSTER'S NEW 20TH CENTURY DICTIONARY (2d ed. 1975) ....................................................................15

WILL FOWLER AND PATRICK SWEENEY, WORLD ENCYCLOPEDIA OF RIFLES AND MACHINE GUNS (2012)................................................................................................................................................6, 34

## INTEREST OF AMICUS CURIAE

Pink Pistols is a shooting society that honors diversity and that is open to all. It advocates the responsible use of lawfully owned and lawfully carried firearms for self-defense, whether by sexual minorities (a group that FBI statistics identify as particularly subject to violence based on discriminatory animus) or by any other individuals, all of whom have a Second Amendment right to armed self-defense.  Pink Pistols has twenty-six active chapters across the United States and the organization is experiencing rapid growth, with requests to form new local chapters coming in all the time.

## INTRODUCTION

The Maryland Firearms Safety Act of 2013 ("the Act") outlaws the possession, receipt, transfer or transportation of many commonly used semiautomatic rifles, shotguns and handguns.  *See* MD. CODE ANN., CRIM. LAW §§ 4-301, 4-303, 4-304, 4-306; MD. CODE ANN., PUB. SAFETY § 5-101.  Dozens of firearms are classified as illegal "assault long gun[s]" or "assault pistol[s]" by name; the statute extends that ban to any "cop[ies]" or "copycat[s]" of those firearms, "regardless of the producer or manufacturer," that possess two enumerated features, such as a "flash suppressor" or  "a folding stock."  MD. CODE ANN., CRIM. LAW § 4-301.   Possession of banned items already owned by Maryland residents prior to the statute's effective date appears to be protected by a grandfather clause.  *Id*. § 4-303(b).  The Act also bans the manufacture, receipt or transfer in Maryland of standard firearm magazines with "a capacity of more than 10 rounds of ammunition."  *Id*. § 4-305(b).  This ban also appears to contain a grandfather clause.  *See id.*  These bans will be referred to as the Assault Weapons Ban ("AW Ban") and the Large Capacity Magazine Ban ("LCM Ban").  Violations of these bans are punishable by up to three years in prison.  *See id.* § 4-306(a).   Because the Act categorically outlaws common firearms and standard magazines that are "of the kind in common use . . . for lawful purposes," *District of Columbia v. Heller*, 554

U.S. 570, 624 (2008) (internal quotation marks omitted), the Act violates the Second Amendment and should be struck down.

## ARGUMENT

I. **THE SECOND AMENDMENT PROTECTS OWNERSHIP OF FIREARMS THAT ARE IN COMMON USE FOR LAWFUL PURPOSES.**

A. ***Heller* Forbids Any Form of Interest-Balancing when the Challenged Law Is a Categorical Ban on Particular Firearms.**

In *Heller*, the Supreme Court ruled that the line between permissible regulations and impermissible bans on firearms *is not* to be established by balancing the individual right protected by the Second Amendment against competing government interests such as public safety, *because that balance has already been struck*:  The Second Amendment itself  "is the very *product* of an interest-balancing by the people," and "[t]he very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."  *Heller*, 554 U.S. at 634, 635 (emphasis in original).  Although *Heller* stated that D.C.'s handgun ban would fail "any of the standards of scrutiny that [the courts have] applied to enumerated constitutional rights," *id.* at 628, the Court made a point of *not* applying any of those standards.  Instead, the Court categorically struck down the ban after finding it irreconcilable with the Second Amendment's text and history.  Indeed, the Court *expressly disavowed* the "interest-balancing" and intermediate scrutiny proposed by Justice Breyer in dissent.  *See id.* at 634-35 (opinion of the Court); *id.* at 704-05 (Breyer, J., dissenting).  In *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), the Court reiterated that *Heller* "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing."  *Id.* at 3047 (controlling opinion of Alito, J.).  *McDonald* emphasized that resolving Second Amendment cases *would not* "require judges to assess the costs and benefits of firearms restrictions and

thus to make difficult empirical judgments in an area in which they lack expertise." *Id*. at 3050.  As Judge Posner wrote in the Seventh Circuit's decision striking down the Illinois ban on carrying firearms for self-defense outside the home, "the Supreme Court made clear in *Heller* that it wasn't going to make the right to bear arms depend on casualty counts." *Moore v. Madigan*, 702 F.3d 933, 939 (7th Cir. 2012) (citing *Heller*, 554 U.S. at 636).[1]

**B.      The Second Amendment Protects the Individual Right To Possess Firearms that Are Commonly Used by Law-Abiding Citizens for Lawful Purposes.**

The firearms protected by the Second Amendment are those "arms 'in common use at the time' for lawful purposes like self-defense." *Heller*, 554 U.S. at 624.  Conversely, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," such as sawed-off shotguns.  *Id*. at 625.  The Court ruled that this distinction is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " *id*. at 627 – a tradition that did not bar "Persons of Quality [from] wearing *common Weapons* . . . for their Ornament or Defence, in such places, and upon such Occasions, in which it is common Fashion to make use of them, without causing the least Suspicion of an intention to commit any Act of Violence or Disturbance of the Peace," 1 WILLIAM HAWKINS, TREATISE OF THE PLEAS OF THE CROWN 136 (1716) (emphasis added). Applying this "common use" test, rather than any nebulous form of multi-tiered scrutiny, *Heller* struck down the D.C. ban on handguns:  "The handgun ban amounts to a prohibition of an entire class of

---

[1] Despite the clarity of the *Heller* ruling, Maryland will no doubt urge this Court to apply intermediate scrutiny, and they will likely invoke *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997).  *Turner* is a decision that Justice Breyer relied upon in his *Heller* dissent, *see* 554 U.S. at 690, 696, 704-05 (Breyer, J., dissenting), but that the majority of the Court rejected, *see id*. at 634 (majority op.).

'arms' that is overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]." 554 U.S. at 628; *see also id.* at 628-29.

## II.    THE ACT'S BAN ON MAGAZINES OF MORE THAN TEN ROUNDS OUTLAWS A NEARLY UNIVER-SAL FEATURE OF FIREARMS COMMONLY USED FOR LAWFUL PURPOSES.

The principles established by *Heller* compel the conclusion that the Act's prohibition on maga-zines capable of holding more than 10 rounds of ammunition ("Large Capacity Magazines" or "LCMs") is unconstitutional.  The test is whether LCMs and the firearms capable of accepting them constitute "arms 'in common use at the time' for lawful purposes like self-defense," *Heller*, 554 U.S. at 624, or are instead "weapons not typically possessed by law-abiding citizens for lawful purposes," *id.* at 625.  This is not a close question.  Indeed, in *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("*Heller II*"), the only federal Court of Appeals decision to consider the constitutionality of a ban on LCMs, the panel majority concluded that:

> We think it clear enough in the record that . . . magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend . . . .  There may well be some capacity above which magazines are not in common use but, if so, the record is de-void of evidence as to what that capacity is; in any event, that capacity surely is not ten.[2]

The panel majority in *Heller II* actually understated the ubiquity of LCMs.  Americans own tens of millions of rifle and pistol magazines that hold more than ten rounds; therefore, such magazines are

---

[2] The *Heller II* court purported to be unable to answer whether LCMs, while common, are com-monly used by law-abiding citizens for lawful purposes.  670 F.3d at 1261.  As explained in the text be-low, it is clear that they are.  Thus, the *Heller II* panel should have stopped there, because the determina-tion that a weapon is in common use for lawful purposes *is the decisive issue under Heller*, *see* 554 U.S. at 624-25, 627, not merely a threshold to the application of intermediate scrutiny. *See Heller II*, 670 F.3d at 1269, 1271-72, 1273, 1276-77 & n.8 (Kavanaugh, J., dissenting).  Once a court has established that a class of firearms is "in common use at the time for lawful purposes like self-defense," *Heller*, 554 U.S. at 624 (internal quotation marks omitted), that class of firearms enjoys Second Amendment protection and the court's work is done.  *See also id.* at 625, 627, 628-29.

"in common use" by any conceivable standard.[3]   Indeed, the tendentious label "large capacity maga-

zine" is a misnomer because magazines that will hold more than ten rounds are *standard equipment* on

(a) the predominant brands of semiautomatic rifles used for both self-defense and recreational purposes,

such as the AR-15, and (b) most semiautomatic pistols sold in America, whether to law enforcement of-

ficers or the general public (with limited exceptions such as diminutive pocket pistols or certain pistols

designed for large cartridges, such as the .45 ACP).   With respect to these commonly-owned weapons,

the standard-issue magazines for semiautomatic pistols have capacities ranging from 10 to 30 rounds,

with a great many being around 15 to 17 rounds.[4]   The standard-issue magazines for AR-15 semiauto-

matic rifles (and their numerous clones) hold 30 rounds.[5]   For this reason, it is misleading to describe

magazines that hold more than ten rounds as "unusual," *see Heller*, 554 U.S. at 627: these are the *stand-*

*ard*-capacity magazines with which commonly used firearms are sold.   Indeed, the "unusual" gun is the

semiautomatic firearm (particularly handgun) that can hold *only* magazines of ten or fewer rounds.[6]   In-

---

[3] *See* Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, Rep. to the Nat'l Inst. of Justice, U. S. Dep't of Justice at 65 (2004) [hereinafter "Koper DOJ Rep. 2004"] (explaining that by the year 2000 more than 70 million such magazines were available in or approved for importation into the United States).

[4] *See* HANDGUNS: 2013 BUYER'S GUIDE 11-13, 50-55, 86-123 (2013); THE COMPLETE BOOK OF AUTOPISTOLS: 2013 BUYER'S GUIDE 73-97 (2013).

[5] *See* GUNS & AMMO, BOOK OF THE AR-15 3, 18, 32-33, 52, 70, 82, 146 (Eric R. Poole ed., 2013) (articles and advertisements of AR-15 rifles that come standard with a 30-round magazine).

[6] The large capacity magazine is a feature of firearms that has been familiar for more than 150 years.  Indeed, many rifles with magazine capacities in excess of ten rounds date from the era of ratification of the 14th Amendment.  The Jennings rifle of 1849 had a 20-round magazine, the Volcanic rifle of the 1850s had a 30-round magazine, both the 1873 Winchester and the 1860 Henry had 16-round magazines, the 1898 Mauser Gewehr accepted a box magazine of 20 rounds, and the 1903 Springfield rifle accepted a box magazine of 25 rounds. *See* MILITARY SMALL ARMS 146-47, 149 (Graham Smith ed., 1994); GUN: A VISUAL HISTORY 170-71, 174-75, 196-97 (Chris Stone ed., 2012).

With respect to semiautomatic handguns: the 1896 Mauser C/96 could accept a detachable 20-round box magazine, the widely used German Luger (1902 or 1908 models) could accept a detachable

sofar as firearms equipped with magazines of more than 10 rounds are in "common use" for "lawful purposes"—particularly the paramount "lawful purpose [of] self-defense"—the Second Amendment guarantees the right of law-abiding, responsible citizens to acquire, possess, and use them. *Heller*, 554 U.S. at 624.

The proposition that LCMs are in common use is underscored by police practices. The six-shot revolvers so familiar from police films and TV shows of the 1960's and 1970's were superseded nearly 30 years ago.[7]  Today the nation's nearly one million law enforcement agents at the federal, state and local levels[8] are armed with semiautomatic handguns with magazines holding more than 10 and as many as 20 rounds of ammunition.[9]  This trend is borne out in Maryland itself, where the State Police have recently transitioned from the Beretta PX4 (with its 14-round magazine) to the Glock 22, with its magazines that hold 15, 17, or even 24 rounds.[10]

---

32-round drum magazine, and the 1935 Browning High-Power pistol (actually designed in 1926) came standard with a 13-round magazine.  *See* GUN: A VISUAL HISTORY, *supra*, at 68-69, 81; WILL FOWLER & PATRICK SWEENEY, WORLD ENCYCLOPEDIA OF RIFLES AND MACHINE GUNS 138, 141 (2012); K.D. KIRKLAND, AMERICA'S PREMIER GUNMAKERS: BROWNING 31 (2013); MILITARY SMALL ARMS, *supra*, at 89, 96-97.

[7] PAUL M. BARRETT, GLOCK: THE RISE OF AMERICA'S GUN 1-5, 20-21 (2012).

[8] *See* BUREAU OF JUSTICE STATISTICS: CENSUS OF STATE AND LOCAL LAW ENFORCEMENT AGENCIES, 2008 (July 2011), *available at* www.bjs.gov/content/pub/pdf/csllea08.pdf (last visited Mar. 14, 2014).

[9] *See* MASSAD AYOOB, THE COMPLETE BOOK OF HANDGUNS 50 (2013) (discussing police transition from revolvers to semiautomatics with large magazines); *id.* at 87 ("Known as the Glock 22, this pistol is believed to be in use by more American police departments than any other."); *id.* at 90 ("The most popular police handgun in America, the Glock is also hugely popular for action pistol competition and home and personal defense.").

[10] See *Maryland State Police Switch from Berettas to Glocks*, WBALTV (June 6, 2012, 8:38 AM), www.wbaltv.com/news/maryland/Maryland-State-Police-switch-from-Berettas-to-Glocks/-/9379376/14743582/-/m1j154z/-/index.html (last visited Mar. 14, 2014).  *See also 22 Round .40 Glock Factory Magazine*, GLOCKMEISTER , www.glockmeister.com/22-Round-40-GLOCK-Factory-Magazine/productinfo/G22MAGHF22 (last visited Mar. 14, 2014).

Such firepower has proved to be essential in police encounters with armed criminals. The FBI recently made a major change in its firearms training protocol based on its discovery that 75% of FBI agent shoot-outs involved criminals who were within nine feet of the agent.[11] This tracks the experience of police officers nationwide: 65% of law enforcement officers who have been murdered in the line of duty were killed by assailants who were within ten feet of them.[12] Even at such close ranges, police officers miss their target far more often than they hit it. A study of the Metro-Dade police in Florida revealed that officers who fired at suspects, even at these close ranges, missed 85% of the time.[13] New York City's police did slightly better: its officers only missed 83% of the time when the assailant was nine to twenty-one feet away, and when the assailant was within six feet the police still missed 62% of the time.[14]

It is little wonder that police officers, even with all their training, deem high-capacity magazines essential to protect themselves from armed criminals. The virtually universal use of semiautomatic pistols with LCMs by a million American law-enforcement officers is sufficient by itself to confirm that pistols with LCMs are "in common use" for "lawful purposes like self-defense." *Heller*, 554 U.S. at 624. If Maryland were correct that high-capacity "assault weapons" are instead useful only for mass slaughter of the innocent, then "such killing machines have no place in the hands of domestic law en-

---

[11] *See* Brian McCombie, *An Inside Look at FBI Handgun Training*, GUNS & AMMO HANDGUNS (June 20, 2013), www.handgunsmag.com/2013/06/20/new-fbi-handgun-training/ (last visited Mar. 14, 2014).

[12] *Id.* (considering data from 2002 through 2011).

[13] *Id.* (considering one decade's worth of data).

[14] *Id.*

forcement."[15]  But in truth, the high-capacity magazines that the State has banned are essential tools for self-defense, which Maryland tacitly—but unavoidably—concedes by arming its police with semiautomatic handguns that can hold at least 15 rounds and semiautomatic patrol rifles that hold 30 rounds.[16] Indeed, the State emphasizes that law enforcement officials carry firearms purely for defensive purposes:  "Law enforcement officers do not fire their weapons offensively, or ever with the intent of killing the target."  State Br. 47.

Moreover, if *police officers* need that much firepower to defend themselves against armed criminals, *a fortiori* law-abiding citizens need the same firepower, if not more.[17]  Police officers have many advantages over civilians when it comes to self-defense: (1) they wear bullet-proof vests; (2) they carry at least two extra magazines on their utility belts; (3) they usually have a smaller, back-up pistol hidden away; (4) they have additional firepower available in their patrol cars, such as a 12-gauge shotgun or a patrol rifle (and the latter is usually the semiautomatic AR-15 that Maryland now outlaws as an "assault weapon"); (5) they have additional weapons on their belts, including Tasers, police batons and chemical weapons such as Mace or pepper spray; (6) they often have a partner in the car who is similarly armed; and (7) back-up police reinforcements, including paramilitary SWAT teams, are only a radio call away. Regular civilians do not have those resources, so their need for standard pistol magazines that hold as many rounds as possible is both acute and undeniable.

It is no answer to say that because the police are so well-armed, citizens need not be.  Not only is that proposition wrong as a matter of law—because the Second Amendment's right to bear arms is con-

---

[15] *See* David B. Kopel, "*Assault Weapons*," *in* GUNS: WHO SHOULD HAVE THEM 176, 202 (David B. Kopel ed., 1995).

[16] *See supra* note 10; *infra* note 47.

[17] Kopel, *in* GUNS: WHO SHOULD HAVE THEM, *supra* note 15, at 202.

ferred on private citizens—it is also tragically false as a matter of fact.  No citizen enjoys a constitutional right to police protection from assailants[18] and the police are, unfortunately, often not around when a citizen is being assaulted.[19]  Nor can the Act be redeemed by pointing out the many firearms that it does *not* ban.  "It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed."  *Heller*, 554 U.S. at 629.  "[R]estating the Second Amendment right in terms of what IS LEFT after the regulation rather than what EXISTED historically, as a means of lowering the level of scrutiny, is exactly backward from *Heller*'s reasoning."  *National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 714 F.3d 334, 345 (5th Cir. 2013) (Jones, J., joined by Jolly, Smith, Clement, Owen, and Elrod, JJ., dissenting from denial of rehearing en banc).

Finally, the Act cannot justify denying civilians the semiautomatic, high-capacity firearms that are issued to the police on grounds that civilians, unlike trained law enforcement officers, cannot be trusted to use their defensive firearms responsibly.  The fact is that armed civilians—even though they outnumber police by several orders of magnitude—make far fewer mistakes with their firearms.  Each year there are approximately 30 instances in which an armed civilian mistakenly shoots and kills an innocent individual who was not actually a murderer, mugger, or similar threat—but "[o]ver the same pe-

---

[18] *See, e.g.*, *Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. 748, 757-67 (2005); *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 197 (1989); *Warren v. District of Columbia*, 444 A.2d 1, 3 (D.C. 1981).

[19] Consider the crime statistics for 2012: in that year the police were unable to protect the public from 14,827 murders, 84,376 rapes, 354,520 robberies and 760,739 aggravated assaults.  *Crime in the United States, Violent Crime, 2012*, FBI, www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2012/crime-in-the-u.s.-2012/violent-crime/violent-crime (browse by violent crime category) (last visited Mar. 14, 2014).

riod the police erroneously kill *five to eleven times* more innocent people."[20]

The undeniable reality is that civilians are often left to defend themselves, and the Second Amendment guarantees that they may do so with firearms that are "in common use" and "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624, 625. Semiautomatic pistols and rifles with large magazines are among "the most preferred firearm[s] in the nation to 'keep' and use for protection of one's home and family." *Id.* at 628-29. Maryland's restriction on magazine capacity—an essential feature of defensive gun use—is just as unconstitutional as the D.C. handgun ban struck down in *Heller* or the D.C. requirement that handguns be disabled by a trigger lock, which was also categorically struck down in *Heller*. In this case, as in *Heller*, the state has outlawed a class of arms "overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]," *id.* at 628, and therefore the result here should be the same as in *Heller:* the Act should be struck down.

Magazines holding more than 10 rounds are just as standard and common, and therefore just as constitutionally protected, on rifles such as the semiautomatic, civilian versions of the AR-15—rifles that the Act outlaws as "assault weapons" but that are, in fact, frequently used for hunting,[21] which is protected by the Second Amendment. *See id.* at 599. Magazines that hold more than 10 rounds are also necessary in competitive shooting sports. Large ammunition capacity is essential when proceeding

---

[20] JOYCE LEE MALCOLM, GUNS & VIOLENCE: THE ENGLISH EXPERIENCE 239 & n.71 (2002) (emphasis added).

[21] It is a common occurrence for a hunter to need quick, multiple shots to take down small, fleet-footed game. And the need for multiple, follow-up shots is even more vital when using a semiautomatic rifle to take down bigger, more dangerous game, such as feral pigs weighing over 300 pounds. *See generally* Kopel, *in* GUNS: WHO SHOULD HAVE THEM, *supra* note 15, at 171 (explaining that hunters often need to take multiple shots). *See also* Dick Metcalf, *The Big Boys*, *in* GUNS & AMMO 51 (Jan. 2013); J. Guthrie, *The 300 Blackout Story*, *in* GUNS & AMMO, BOOK OF THE AR-15: 300 BLACKOUT EDITION 18 (Eric R. Poole ed., 2013).

through multi-target stages of competitions sponsored by the highly popular International Practical

Shooting Confederation.[22]  This is even more true for "3-Gun Competition," the fastest-growing shoot-

ing sport in America,[23] where participants compete in three categories, including (a) rifle (typically us-

ing an AR-15 with 30- or 60-round magazines),[24] (b) shotgun (typically using 23-round magazines),[25]

and (c) handgun (typically using 17- or 33-round magazines).[26]  Three-Gun competition is not merely

recreational—it is viewed "first and foremost as a law enforcement training event, and participating of-

ficers received a certificate of competition towards training credits."[27]  One of the major 3-Gun matches

is hosted at Fort Benning, Georgia by the United States Army Marksmanship Unit,[28] Army units, includ-

ing the Fifth Special Forces Group and the Oregon National Guard, have recognized the value of 3-Gun

competition in refreshing their firearm skills prior to deployment in Iraq or Afghanistan.[29]

     Finally, the "assault weapons" and magazines that Maryland bans are the standard for the Na-

tional Match Competitions sponsored by the federal government's Civilian Marksmanship Program

("CMP"), which was established a century ago to improve the shooting skills of the nation's young men

---

[22] *See* INTERNATIONAL PRACTICAL SHOOTING CONFEDERATION, www.ipsc.org (last visited Mar. 14, 2014).  As a sign of the popularity of the competition, the United States Practical Shooting Association has more than 24,000 members.  *See USPSA Shows Record Breaking Membership Numbers in 2013*, UNITED STATES PRACTICAL SHOOTING ASSOC., www.uspsa.org/uspsa-announcements-details.php?USPSA-shows-record-breaking-membership-numbers-in-2013-112 (last visited Mar. 14, 2014).

[23] *See* CHAD ADAMS, COMPLETE GUIDE TO 3-GUN COMPETITION 89 (2012).

[24] *See id.* at 31, 33, 161.

[25] *See id.* at 75, 92-94.

[26] *See id.* at 75, 130, 132.

[27] *See id.* at 30.

[28] *See id.* at 43.

[29] *See id.* at 53-54.

in case they were called to military service.[30]  The CMP and its five thousand local clubs provide safety and marksmanship training to over one million citizens each year.[31]  Under the auspices of the Army Marksmanship Unit, thousands of participants—both adolescents and adults, and civilians as well as military members and law enforcement officers—compete using standard, rack-grade, military-issue M9 Beretta handguns (which hold 15-round magazines) and M-16 rifles (which are issued with 30-round magazines); these weapons are drawn directly from the arsenal of the Army's Small Arms School.[32]  To finance its operations, the CMP for many decades has been selling surplus military rifles to civilians, including the nearly 75-year-old semiautomatic M-1 Carbine, which can use a 15- or 30-round detachable magazine.[33]

---

[30] *See* CIVILIAN MARKSMANSHIP PROGRAM, www.odcmp.com (last visited Mar. 14, 2014).  For 80 years, the CMP was administered by the U.S. Army.  Now it is run by a non-profit 501(c)(3) organization chartered by Congress and known as the Corporation for the Promotion of Rifle Practice & Firearms Safety, Inc.  *See* 36 U.S.C. § 40701 *et seq.*

[31] *See About Us*, CIVILIAN MARKSMANSHIP PROGRAM, www.odcmp.com/Comm/About_Us.htm (last visited Mar. 14, 2014); *see also id.*, 2013 CMP Sales Catalog at 12-13, CIVILIAN MARKSMANSHIP PROGRAM, www.odcmp.com/Sales/pdfs/catalog.pdf (last visited Mar. 14, 2014) (noting thousands of affiliated organizations, including the Boy Scouts, 4-H Clubs, the American Legion, and JROTC, and the one million youth who "are now reached annually by CMP marksmanship training and education initiatives").

[32] *See* Dale Miles, *New M-16 EIC Match Scores a Hit at Nationals*, CIVILIAN MARKSMANSHIP PROGRAM, www.odcmp.org/0904/M-16Match.asp (last visited Mar. 14, 2014); *National Trophy Pistol Matches*, CIVILIAN MARKSMANSHIP PROGRAM, www.odcmp.com/NM/Pistol.htm (last visited Mar. 14, 2014).  The minimum age for participating in the Army's Small Arms Firing Schools, sponsored by the CMP and conducted by the Army's Marksmanship Unit, is 14 for pistol students and 12 for rifle students. *See Small Arms Firing Schools*, CIVILIAN MARKSMANSHIP PROGRAM, www.odcmp.com/NM/SAFS.htm (last visited Mar. 14, 2014).

[33] See 2013 CMP Sales Catalog, *supra* note 31, at 5 (selling M-1 carbines with 15-round magazines); *see also M1 Carbine 30 Round Magazines*, CIVILIAN MARKSMANSHIP PROGRAM, www.odcmp.com/Sales/pdfs/Carbine_30_Round_Magazines_September_2007.pdf (last visited Mar. 14, 2014).

In sum, what the Act demonizes and bans as high-capacity magazines are in fact nothing more than millions of ordinary, standard-issue magazines that are "typically possessed" by law-abiding citizens and that are " 'in common use' . . . for lawful purposes like self-defense," hunting, and recreational shooting.  *Heller*, 554 US at 625, 624.  The Act is therefore unconstitutional.

III.   THE ACT'S BAN ON SO-CALLED "ASSAULT WEAPONS" OUTLAWS AN ENORMOUS CLASS OF FIREARMS COMMONLY USED FOR LAWFUL PURPOSES.

Once again, the dispositive factual question posed by the Supreme Court in *Heller* has already been conceded with respect to semiautomatic rifles by the only federal Court of Appeals to reach the issue.  The D.C. Circuit expressly found that "semi-automatic rifles . . . are indeed in 'common use,' as the plaintiffs contend."  *Heller II*, 670 F.3d at 1261.  The court purported to be unable to determine whether they are commonly used for lawful purposes, *id.*, but as explained below it is clear that they are.  The Court of Appeals should have stopped here, because "common use for lawful purposes" is the test under *Heller*.  *See* 554 U.S. at 624-25, 627, 628-29.  It is undeniable that semiautomatic rifles, shotguns and handguns are common in modern America; indeed, they have been commercially available and widely popular for more than a century.[34]  Semiautomatic pistols with magazine capacities of more than ten rounds have overtaken revolvers and dominated both the police and civilian markets for nearly three decades.[35]

---

[34] Remington was making semiautomatic rifles in 1906.  *See* KIRKLAND, AMERICA'S PREMIER GUNMAKERS: BROWNING, *supra* note 6, at 44; *see also* JOHN HENWOOD, THE 8 AND THE 81: A HISTORY OF REMINGTON'S PIONEER AUTOLOADING RIFLES 5 (1993) (Winchester introduced semiautomatic rifles in 1903).  These semiautomatic rifles were designed and marketed primarily for use as hunting rifles.  *See* HENWOOD, THE 8 AND THE 81, *supra*, at 115-21.

[35] *See* Koper DOJ Rep. 2004 at 81 (80% of handguns produced in 1993 were semiautomatic); DEP'T OF JUSTICE, GUNS USED IN CRIME 3 (1995) ("Most new handguns are pistols rather than revolvers."); BARRETT, GLOCK, *supra* note 7, at 2-5 (discussing the FBI's shootout with bank robbers in Miami

The Act also outlaws many semiautomatic long arms, but its unconstitutionality can be demonstrated by considering just one of the myriad examples: the ban on the semiautomatic AR-15 rifle (including all of its variations, whether made by Colt, Bushmaster or any other company).  *See* MD. CODE ANN., PUB. SAFETY § 5-101(r)(2)(xi), (xv)).  Fortunately, this Court need not write on a blank slate, because the Supreme Court has described the "AR-15 [a]s the *civilian* version of the military's M-16 rifle."  *Staples v. United States*, 511 U.S. 600, 603 (1994) (emphasis added).  The Court stressed that, unlike "machineguns, sawed-off shotguns, and artillery pieces," "semiautomatic" firearms such as the AR-15 "*traditionally have been widely accepted as lawful possessions*."  *Id.* at 611-12 (emphasis added).  In particular, the Court took pains to distinguish routine civilian ownership of a *semiautomatic* AR-15 from the potentially felonious possession of the military's *fully automatic* M-16.  *See id.* at 603, 612 & n.6.[36] The distinction drawn by the Supreme Court between semiautomatic and fully automatic weapons accurately captures the taxonomy of firearms in American civilian use.[37]  Of course, the Supreme Court's

---

on April 11, 1986, the "bloodiest day in FBI history," which catalyzed law enforcement to switch from revolvers to semiautomatic pistols with large capacity magazines.).

[36] Automatic weapons are legal under both federal and Maryland law, but the regulation of such weapons is extraordinarily strict.  *See* 18 U.S.C. § 922(o); MD. CODE ANN., CRIM. LAW § 4-403.  These laws are not at issue here.  When Congress was first considering a federal "assault weapons" ban, the BATF defined that category as strictly limited to guns capable of fully automatic fire and distinguished it from the category of "Assault Weapon Derived Semi-Auto—a firearm cosmetically similar to an Assault Weapon, but incorporating entirely different receiver and internal components, designed in cooperation with BATF, not to be convertible to full-auto, rendering the firearm capable of semi-auto fire only, it is functionally identical to commercial semi-auto hunting rifles, target rifles and shotguns . . . ."  Bruce H. Kobayashi & Joseph E. Olson, *In re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons*," 8 STAN. L. & POL'Y REV. 41, 43 (1997) (citing *Hearings to Consider S. 386, the Assault Weapon Control Act of 1989, and Similar S. 747 the Antidrug, Assault Weapons Limitation Act of 1989 Before the Subcomm. on the Constitution of the Senate Judiciary Comm.*, 101st Cong. (Feb. 10, 1989) (Attachment 1 to the statement of Edward D. Conroy, Deputy Associate Director, Bureau of Alcohol, Tobacco, & Firearms)).

[37] As explained in a leading firearms journal devoted to the AR-15-style rifle:

opinion on the matter binds this Court.

If anything, the majority in *Heller II* understated the ubiquity of semiautomatic rifles like the AR-15.  There are approximately five million AR-15 rifles in this country; the firearm accounts for 60% of all civilian rifles sold each year in the United States.[38]  There are 200 manufacturers of AR rifles. David M. Fortier, *AR Trends: What is Hot and What is Not*, Shotgun News (Mar. 20, 2014).  That undoubtedly qualifies the AR-15 as being "in common use" and "typically possessed by law-abiding citizens for lawful purposes."  *Heller*, 554 U.S. at 624, 625.[39]  Dozens of companies manufacture their own

---

> While the rifles covered in these pages were inspired by military designs, it is extremely important to remember that all of them are semi-automatic-only rifles that bear only superficial familial ties to the originals.  The "black rifle"—in its civilian-legal, semi-automatic form—has become a category of firearms extremely popular with sportsmen, competitive shooters, plinkers and everyday gun owners.

Michael O. Humphries, *Welcome to the American Rifleman Guide to Black Rifles*, *in* Shooting Illustrated, The American Rifleman Guide to Black Rifles 6 (Michael O. Humphries ed., 2006) [hereinafter "Black Rifles"].

[38] *See* Dan Haar, *America's Rifle: Rise of the AR-15*, Hartford Courant (Mar. 9, 2013), articles.courant.com/2013-03-09/business/hc-haar-ar-15-it-gun-20130308_1_new-rifle-colt-firearms-military-rifle (last visited Mar. 14, 2014); *see also* Guns & Ammo, Book of the AR-15, *supra* note 5, at 4.

[39] It is pointless for Maryland to argue that the AR-15 is insufficiently "in common use" to fall within the "core" of the Second Amendment, ostensibly on grounds that the five million AR-15 rifles are dwarfed by the total number of privately-owned firearms in the United States, which is estimated to be between 262 million and 310 million. *See* Edward W. "Ned" Hill, *How Many Guns Are in the United States? Americans Own Between 262 Million and 310 Million Firearms*, Cleveland State Univ. (2013), www.urban.csuohio.edu/publications/hill/GunsInTheUS_Hill_032813.pdf (last visited Mar. 14, 2014). That would be an odd definition of the word "common," which in this context means "of frequent or usual occurrence; not extraordinary."  Webster's New 20th Century Dictionary 365 (2d ed. 1975). That definition fits the AR-15 to a T.  The position of Maryland is tantamount to saying that cars made by Volvo, Audi, and BMW should not be considered to be "in common use" in America because they have, respectively, 0.5%, 0.9%, and 1.7% of the automobile market.  *See Market Data Center, Auto Sales* (% Market Share YTD 2012), Wall Street Journal, wap.wsj.com/mdc/public/page/2_3022-autosales.html (last visited Mar. 14, 2014).

versions of the AR-15 for civilian use,[40] and the popularity of the weapon has spawned an entire indus-

try devoted to accessorizing and customizing this semiautomatic rifle.[41]  As explained above, the versa-

tile AR-15 is widely used for hunting—its standard .223 Remington round was developed from a hunt-

ing cartridge, rather than a military round[42]—and it also dominates target shooting competition:  "If you

are not shooting an AR-15, you are not in the game."[43]  Both hunting and target shooting are "lawful

purposes" for possessing a semiautomatic rifle like the AR-15.

Finally, the AR-15 is widely used for self-defense, whether on a farm, a ranch, or in one's

home.[44]  The uninformed opinion that this rifle is not suitable for self-defense within the confines of a

---

[40] *See generally* GUNS & AMMO, BOOK OF THE AR-15, *supra* note 5, at 11, 14, 18, 32, 52, 70, 82 (noting AR-15 models produced by, *inter alia*, Daniel Defense, Yankee Hill Machine, Colt, Smith & Wesson, Rock River Arms, Del-Ton); Humphries, *Welcome to the American Rifleman Guide to Black Rifles*, BLACK RIFLES, *supra* note 37, at 70, 72, 78-86, 89-95 (describing AR-15 models made by, *inter alia*, Rock River Arms, Stag Arms, Alexander Arms, ArmaLite, Barrett Firearms, Bushmaster, Cobb Manufacturing, Colt, DoubleStar, DPMS Panther Arms, DS Arms, Fulton Armory, High Standard, Knight's Manufacturing Co., Les Baer, Olympic Arms, Rock River Arms, SigArms, Smith & Wesson, Stag Arms, Wilson Combat); GUN DIGEST 2013 268-69, 455-63, 497-99 (Jerry Lee ed., 67th ed. 2012) (discussing or listing many manufacturers of civilian semiautomatic AR-15-type rifles).

[41] *See, e.g.*, GUNS & AMMO, BOOK OF THE AR-15, *supra* note 5, at i-ii, 9, 24-27, 30-32, 34, 35, 48-52, 63, 70, 75-76, 88, 90-92, 94, 95, 123, 135, 137, 160-61; *see also* CHRISTOPHER R. BARTOCCI, BLACK RIFLE II: THE M16 INTO THE 21ST CENTURY i-ii, xxv (2004).  Civilian shooters of the semiautomatic AR-15 and the manufacturers who cater to them began enhancing and accessorizing the rifle long before the military did the same with its fully automatic versions. *See* Eric R. Poole, *The AR Meets Generation X: Accessorizing This Rifle Icon Has Developed Its Own Industry*, *in* BLACK RIFLES 48, 49.

[42] *See* GARY PAUL JOHNSTON & THOMAS B. NELSON, THE WORLD'S ASSAULT RIFLES 19-20, 23, 1036 (2010).

[43] *See* Glenn M. Gilbert, *The Making of a Match Rifle*, *in* BLACK RIFLES 38, 40; *see also id.* at 43 ("The AR-15 has come a long way. Long derided as a plastic toy, it is now the benchmark in accuracy among semiauto rifles."); AMERICAN RIFLEMAN: ARMALITE 50 YEARS 76 (Dec. 2004) ("Even a casual observer of these highpower service rifle matches would recognize one thing quickly—the dominance of the AR-style rifle on the firing line.").

[44] *See* J. Guthrie, *Versatile Defender: An Argument for Advanced AR Carbines in the Home*, *in* GUNS & AMMO, BOOK OF THE AR-15 *supra* note 5, at 134 ("If a system is good enough for the U.S. Army's Delta and the U.S. Navy SEALs, surely it should be my weapon of choice, should I be a police of-

house would stun the tens of thousands of soldiers and Marines who have, in the last decade, used their

military-issue M-16 rifles and M-4 carbines to defend themselves and their comrades in close-quarters

fighting in the cities of Iraq and Afghanistan.  Osama bin Laden—were he still alive—would be equally

surprised by this proposition, given that two fully automatic military variants of the semiautomatic AR-

15, the M-4 carbine and the H&K 416 rifle, were used by Navy SEALs to shoot him during a mission

which called for extraordinary accuracy to avoid collateral injury to the many non-combatant women

and children living in the compound.[45]  Plainly, the AR-15 works exceedingly well as a defensive fire-

arm inside dwellings.

　　　If that were not endorsement enough, the AR-15 is perhaps the most widely-issued police patrol

rifle in the country.[46]  Many agencies use Colt AR-15s, but other manufacturers have also responded to

the demands of Maryland law enforcement agencies for more firepower.  For example, Maryland's Na-

tional Capital Park Police are armed with Bushmaster M4 Patrolman's Carbines, a variation of the AR-

15.[47]

　　　Thus, a semiautomatic rifle with an adjustable stock, a flash hider and a large magazine—as ex-

---

ficer or Mr. John Q. Public looking to defend my home."); Eric Poole, *Ready To Arm: It's Time To Re-think Home Security*, *in* GUNS & AMMO, BOOK OF THE AR-15, *supra* note 5, at 15-22 (discussing virtues of the AR-15 platform as a home defense weapon); Mark Kayser, *AR-15 for Home & the Hunt*, *in* PERSONAL & HOME DEFENSE 28-29, 30-31 (2013) (advising use of AR-15 for self-defense in the home).

[45] *See* MARK OWEN & KEVIN MAURER, NO EASY DAY: THE FIRSTHAND ACCOUNT OF THE MISSION THAT KILLED OSAMA BIN LADEN 44-45, 203, 226, 232, 234-36 (2012).

[46] Michael Remez, *A Civilian Version of an M-16: Bushmaster Rifle a Common Choice*, HARTFORD COURANT (Oct. 25, 2002), articles.courant.com/2002-10-25/news/0210252068_1_bushmaster-firearms-john-allen-williams-distributor-in-washington-state (last visited Mar. 14, 2014); BARTOCCI, BLACK RIFLE II, *supra* note 41, at 126.

[47] *See Bushmaster Supplies Md. Park Police with Carbines*, POLICE MAGAZINE (Sept. 9, 2011), www.policemag.com/channel/weapons/news/2011/09/09/bushmaster-supplies-md-park-police-with-carbines.aspx (last visited Mar. 14, 2014).

emplified by the AR-15—has to count as among the "most popular weapon[s] chosen by Americans" for lawful purposes ranging from hunting to target shooting to self-defense. *Heller*, 554 U.S. at 628-29. There are literally millions of these semiautomatic rifles in private hands in America, and therefore they cannot be marginalized as "highly unusual in society" or dismissed as "not typically possessed by law-abiding citizens for lawful purposes." *Id*. at 627, 625. Hence they fall within the Second Amendment's protection and may not be outlawed by Maryland.

The *Heller* Court drew support for its "common use" test from the historical prohibition on carrying "dangerous *and* unusual weapons." 554 U.S. at 627 (emphasis added). That formulation, derived by the Court from Blackstone and early American legal scholars, is more properly read as a context-based restriction on the carrying and use of arms.[48] But even if read as a test for the arms that may be kept and borne, it would require both elements. By itself, the fact that a particular gun is "dangerous" would not distinguish it from any other firearm in human history, because it is in the very nature of firearms to be dangerous—that is their *raison d'être*. The second, cumulative element of the *Heller* Court's test—the requirement that a banned firearm be "unusual"—comports perfectly with the Court's repeated emphasis on protecting firearms that are "in common use," "typically possessed," and "preferred" by law-abiding Americans for lawful purposes. *Id.* at 624, 625, 628-29.

---

[48] *See, e.g.*, 3 B. WILSON, WORKS OF THE HONOURABLE JAMES WILSON 79 (1804) (an affray may occur when a person "arms himself with dangerous and unusual weapons, *in such a manner as will naturally diffuse a terrour among the people*" (emphasis added)); 1 WILLIAM RUSSELL, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 272 (1831) ("[N]o wearing of arms is within [the meaning of the law], *unless it be accompanied with such circumstances as are apt to terrify the people.*" (emphasis added) (internal numbering omitted)); *Rex v. Dewhurst*, 1 State Trials, New Series 529, 601-02 (1820) ("A man has a clear right to protect himself when he is going singly or in a small party upon the road where he is travelling or going for the ordinary purposes of business. But I have no difficulties in saying you have no right to carry arms to a public meeting, if the number of arms which are so carried are *calculated to produce terror and alarm* . . . ." (emphasis added)).

None of the semiautomatic weapons outlawed by the Act is unusual, nor can the Maryland General Assembly fill the gaping hole in its argument by tarring these popular, widely-used semiautomatic firearms with the epithet "assault weapons."  That is a politically spawned, partisan term of opprobrium that does not exist in firearms taxonomy and does not denote any category of weapon recognized at any time in the long history of firearms.[49]  Even those who oppose the Second Amendment have openly admitted that the term "assault weapon" was deliberately concocted as a cynical public-relations ruse to mislead people into confusing civilian semiautomatic rifles with military machineguns.[50]  This rather transparent ploy has enjoyed some success, because the Act's defenders are prone to (a) equating commonly owned semiautomatic firearms with fully-automatic military machine guns, and (b) implying that semiautomatic firearms are in fact fully automatic, by repeatedly (and erroneously) describing semiautomatics as capable of "burst" or "spray" fire.  Once the term "semiautomatic" is properly understood—

---

[49] There is a well-established firearms category known as the "assault rifle."  This denotes "a hand-held weapon capable of semiautomatic or *fully automatic* (selective) fire, fed from a detachable box magazine, which fires an intermediate rifle cartridge."  JOHNSTON & NELSON, THE WORLD'S ASSAULT RIFLES, *supra* note 42, at i (emphasis added). *See also id.* at 1196 (Glossary of Terms); DEFENSE INTELLIGENCE AGENCY, SMALL ARMS IDENTIFICATION AND OPERATION GUIDE 105 (1988) (fully automatic fire).  In other words, by definition all assault rifles can be fired in fully automatic mode.  *See* MAXIM POPENKER & ANTHONY G. WILLIAMS, ASSAULT RIFLE 9, 12, 212 (2004).  Thus, "semiautomatic assault weapon" is a nonsense phrase, a contradiction in terms.

[50] Remarkably, the man responsible for this deception openly takes credit for it. *See* Josh Sugarmann, *Assault Weapons and Accessories in America*, VIOLENCE POLICY CENTER, www.vpc.org/studies/awaconc.htm (last visited March 14, 2014).  *See also Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting); Nicolas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion Analogue: Stenberg Principles, Assault Weapson, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285, 1289-90 (2009) ("Some people still believe the assault weapons debate is about machine guns.  This is not surprising given that proponents of the 1994 ban were counting on precisely that confusion.  The calculation was political."); Bruce Kobayashi & Joseph Olson, *In re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons*," 8 STAN. L. & POL'Y REV. 41, 43 (1997) (critiquing Sugarmann's strategy as a "swindle").

one pull of the trigger fires one, and only one, round—there is nothing in the Act that distinguishes banned semiautomatic "assault weapons" from permissible semiautomatic firearms on a *rational, functional* basis.  Instead, the Act, like every other "assault weapons ban" enacted by any State, lists features that are either cosmetic, imaginary, or pointless (or that actually enhance a firearm's accuracy or ease of use)—a proposition on which there is agreement from both ends of the political spectrum.[51]

## IV.   BANNING SO-CALLED "ASSAULT WEAPONS" AND LARGE CAPACITY MAGAZINES WOULD DO NOTHING TO REDUCE VIOLENT CRIME.

As demonstrated above, the challenge to Maryland's ban on particular firearms and magazines can and should be resolved by application of the principles applied in *Heller*, which itself involved a categorical ban on a particular type of firearm. But even if the interest-balancing that *Heller* forbids were employed here, along the lines of the "tiers" of judicial scrutiny that might be imported from Equal Protection Clause or First Amendment doctrine, and even if, contrary to *Heller*, intermediate scrutiny were the correct standard of review, the Act's ban on "assault weapons" and large capacity magazines would be nevertheless unconstitutional.

Intermediate scrutiny requires the State to make a "strong showing" that the law is substantially related to an important government objective.  *United States v. Chester*, 628 F.3d 673, 683 (4th Cir.

---

[51] *Compare* Charles Krauthammer, Column, *Disarm the Citizenry*, THE WASHINGTON POST (Apr. 5, 1996) ("Passing a law like the assault weapons ban is . . . purely symbolic"), *with* Editorial, THE WASHINGTON POST (Sept. 1994) ("No one should have any illusions about what was accomplished (by the ban). Assault weapons play a part in only a small percentage of crime. The provision is mainly symbolic; its virtue will be if it turns out to be, as hoped, a stepping stone to broader gun control.").  The Maryland Act's focus on the cosmetic or aesthetic appearance of a firearm should come as no surprise because California's list of "assault weapons," which is the origin of the list of outlawed firearms in every state and federal ban enacted thereafter, "was derived by flipping through a picture book of guns and picking out those that looked the most menacing" to the legislative staff.  Kopel, *in* GUNS: WHO SHOULD HAVE THEM, *supra* note 15, at 176 & n.68.

2010) (quoting *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc)); *see also United States v. Masciandaro*, 638 F.3d 458, 471 (4th Cir. 2011) (explaining that the government must establish the law is supported by a "substantial governmental interest").  For a law to survive intermediate scrutiny, "the government may not rely upon mere anecdote and supposition," but instead must defend the law with "tangible evidence" rather than "unsupported intuitions."  *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012) (internal quotation marks omitted).  Indeed, the standard of proof required of the State is more demanding here than in *Chester*, *Masciandaro*, or *Carter* because: (a) this categorical ban on firearms reaches into the home, *Heller*, 554 U.S. at 628; and (b) unlike criminal defendants who raise Second Amendment defenses to criminal prosecution, the plaintiffs here are not criminals, but are instead "*law-abiding, responsible* citizen[s]," whose Second Amendment rights receive full solicitude, *Chester*, 628 F.3d at 683 (emphasis added by the Fourth Circuit) (citing *Heller*, 554 U.S. at 635).

The State cannot meet this standard because all the empirical studies of federal or state AW or LCM bans—including the studies commissioned by the Justice Department itself—reveal that this kind of legislation has no discernible impact on firearms violence because criminal use of these types of weapons has always been—and still remains—extremely rare.  Title XI of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994) (the "Federal Ban"), was in effect from 1994 through 2004. The first review of the Federal Ban, in 1997, acknowledged that "[a]ny effort to estimate how the ban affected the gun murder rate must confront a fundamental problem, *that the maximum achievable preventive effect of the ban is almost certainly too small to detect statisti-*

*cally.*"[52]   The "banned weapons and magazines were never involved in more than a modest fraction of all gun murders,"[53] and therefore "[t]he evidence is not strong enough for us to conclude that there was any meaningful effect (i.e., that the effect was different from zero)."[54]

A follow-up report done for the Justice Department in 2004 concluded that the Federal Ban made no difference in rates of gun violence:

> [W]e cannot clearly credit the ban with *any* of the nation's recent drop in gun violence. And, indeed, there has been *no discernible reduction in the lethality and injuriousness of gun violence*, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury, as we might have expected had the ban reduced crimes with both AWs and LCMs.[55]

---

[52] Jeffrey A. Roth & Christopher S. Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994 (Final Report)* at 79 (Mar. 13, 1997) (emphasis added), *available at* www.urban.org/UploadedPDF/aw_final.pdf) [hereinafter "Roth & Koper DOJ Rep. 1997"].

[53] *Id.* at 2, 70 ("[A]ssault weapons are rare among crime guns.").

[54] *Id.* at 6.  *See also id.* at 6 ("[We] found no statistical evidence of post-ban decreases in either the number of victims per gun homicide incident, the number of gunshot wounds per victim, or the proportion of gunshot victims with multiple wounds. Nor did we find assault weapons to be overrepresented in a sample of mass murders involving guns."); *id.* at 2 ("We were unable to detect any reduction to date in two types of gun murders that are thought to be closely associated with assault weapons, those with multiple victims in a single incident and those producing multiple bullet wounds per victim."); *id.* at 10 ("There is very little empirical evidence, however, on the direct role of ammunition capacity in determining the outcomes of criminal gun attacks. The limited data which do exist suggest that criminal gun attacks involve three or fewer shots on average. Further, there is no evidence comparing the fatality rate of attacks perpetrated with guns having large-capacity magazines to those involving guns without large-capacity magazines (indeed, there is no evidence comparing the fatality rate of attacks with semiautomatics to those with other firearms." (citations omitted)); *id.* at 11 ("[T]here have been no studies comparing the fatality rate of attacks with assault weapons to those committed with other firearms."); *id.* at 78 ("The ban on large-capacity magazines does not seem to have discouraged the use of these guns."); *id.* at 79 (hypothetical decreases in use of AWs and LCMs due to the Federal Ban "would be impossible to detect in a statistical sense[,] . . . we caution that for the reasons just explained, we cannot statistically rule out the possibility that no effect occurred."); *id.* at 85-86, 88, 91 (in fact, both "victims per incident" and "the average number of gunshot wounds per victim" *actually increased* under the Ban—although not by a statistically significant margin).

[55] Koper DOJ Rep. 2004 at 96 (emphasis added).

Studies of state-law bans likewise have found that such bans "have not reduced crime."[56]  The Justice Department report concluded that, "[s]hould it be renewed, the ban's effects on gun violence are likely to be small at best and perhaps too small for reliable measurement."[57]  Remarkably, the Justice Department report conceded that criminals denied "assault weapons" or large capacity magazines will simply substitute other firearms: "Because offenders can substitute non-banned guns and small magazines for banned AWs and LCMs, there is not a clear rationale for expecting the ban to reduce assaults and robberies with guns."[58]  And criminals are, by definition, not likely to be deterred by the ban in any event.

Ironically, the Act specifically exempts from its ban most versions of the Ruger Mini-14 rifle, which fires precisely the same cartridge, from the same 30-round magazine, with precisely the same

---

[56] *Id*. at 81 n.95.

[57] *Id*. at 3.  *See also id*. ("AWs were rarely used in gun crimes even before the ban.  LCMs are involved in a more substantial share of gun crimes, but it is not clear how often the outcomes of gun attacks depend on the ability of offenders to fire more than ten shots (the current magazine capacity limit) without reloading."); *id*. at 97("the ban's impact on gun violence is likely to be small at best, and perhaps too small for reliable measurement."); *id*. at 92 n.109 ("It is now more difficult to credit the ban with any of the drop in gun murders in 1995 or any time since."); *id*. at 92 ("neither medical nor criminological data sources have shown any post-ban reduction in the percentage of crime-related gunshot victims who die."); *id*. at 79 ("the consistent failure to find clear evidence of a pre-post drop in LCM use across these geographically diverse locations strengthens the inference that the findings are indicative of a national pattern."); *id*. at 79 n.93 ("the more critical point would seem to be that nearly a decade after the ban, LCM use has still not declined demonstrably below pre-ban levels."); *id.* at 76 ("it is not clear that LCM use has declined demonstrably below pre-ban levels."); *id*. at 78 ("criminal use of LCMs was rising or steady through at least the latter 1990s" while the ban was in effect, and the data since 2000 "provide no definitive evidence of a drop below pre-ban levels."); *id*. at 83 ("studies that attempted to make more explicit links between the use of semiautomatic firearms and trends in lethal gun violence via time-series analysis failed to produce convincing evidence of such links.").

[58] Koper DOJ Rep. 2004 at 81 n.95.  In a follow-up essay in 2013, the principal author of the two Justice Department studies reiterated that, "[b]ecause offenders can substitute non-banned guns and small magazines for banned AWs and LCMs, there was not a clear rationale for expecting the ban to reduce assaults and robberies with guns."  Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994-2004, in* REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH EVIDENCE AND ANALYSIS 165 (Daniel W. Webster & Jon S. Vernick eds., 2013) [hereinafter "Koper DOJ Review 2013"].

force, and at precisely the same semiautomatic pace, as all of the variations on the AR-15 that the Act

does ban. *See* MD. CODE ANN., PUB. SAFETY § 5-101(r)(2)(xxxiii) (banning only the "folding stock

model" of the Ruger Mini-14). The only difference is that the Ruger Ranch Rifle has a solid wooden

stock like a traditional hunting rifle, rather than a pistol grip and an adjustable folding stock, and there-

fore may appear less menacing to those who know nothing about firearms. But those differences do not

make Ruger's Mini-14 Ranch Rifle any less dangerous: that was the weapon that Norwegian fascist An-

ders Behring used to massacre 69 teenagers at a summer camp in July of 2011.[59] The new Maryland

Act does not regulate the purchase or use of that weapon, which was modeled on the U.S. Army's then-

standard M-14 combat rifle,[60] and was used by the criminal at the Miami shootout in 1986 that led po-

lice and the FBI to conclude that they were outgunned and had to replace their revolvers with semiauto-

matic handguns with magazines of twelve, fifteen or even seventeen rounds.[61] Former FBI agent John

Hanlon, who was shot four times by the criminal wielding the Ruger Mini-14 on that day in Miami, de-

nounced "assault weapons" bans based on features such as folding stocks as "a joke."[62] "I don't think it

would have changed a damn thing. I don't see what makes that gun less dangerous" when it has a tradi-

tional fixed stock.[63] Agent Edmund Morales, another FBI agent who survived the Miami shootout, said

that AW bans focus on "irrelevant" features and that the host of other semiautomatic rifles that are not

---

[59] *See* Julia Gronnevet, *Norway Killer Got on Ferry in Uniform*, Assoc. Press (May 4, 2012), articles.philly.com/2012-05-04/news/31573726_1_bomb-attack-island-attack-police-officer (last visited Mar. 14, 2014).

[60] *See* JOHNSTON & NELSON, THE WORLD'S ASSAULT RIFLES, *supra* note 42, at 1001-02, 1006.

[61] *See* BARRETT, GLOCK, *supra* note 7, at 1-5.

[62] *Gun Control: Gun Ban Would Protect More than 2,200 Firearms*, ABC7 (Feb. 16, 2013, 8:38 AM), www.wjla.com/articles/2013/02/gun-control-gun-ban-would-protect-more-than-2-200-firearms-85315.html.

[63] *Id.* The folding stock reduces the rifle's length by a mere 2.75 inches. *Id.*

banned are "equally dangerous."  For example, the ban ignores AR-10s, the more powerful 762 x51mm

caliber version of the banned AR-15.[64]

The failure of the Federal Ban on AWs and LCMs to have *any* discernible effect on gun violence

has been confirmed by two organizations—the National Research Council and the Centers for Disease

Control—that conducted comprehensive reviews of all the published literature on firearms control and

violence.  The NRC and CDC have both concluded that there is insufficient evidence to conclude that

bans on "assault weapons" or other particular firearms or firearms features have had any beneficial ef-

fect on gun violence.[65]

Proponents of bans on so-called "assault weapons" and "large capacity magazines" often as-

sert—but uniformly fail to document—that AWs and LCM pose a particular risk to law enforcement

officers.  In truth, there are no data indicating that the risk is statistically discernible.  Consider the FBI's

---

[64] *Id.*  The Act likewise expressly exempts from its ban the semiautomatic Ruger Mini-30, which fires the Russian Kalashnikov 7.62x39mm cartridge used in the fully automatic versions of the AK-47 assault rifle. *See* JOHNSTON & NELSON, THE WORLD'S ASSAULT RIFLES, *supra* note 42, at 1004.

[65] *See* NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 97 (Charles F. Wellford et al. eds., 2005) ("[G]iven the nature of the [1994 assault weapons ban], the maximum potential effect of the ban on gun violence outcomes would be very small and, if there were any observable effects, very difficult to disentangle from chance yearly variation and other state and local gun violence initiatives that took place simultaneously."); Centers for Disease Control, *Recommendations To Reduce Violence Through Early Childhood Home Visitation, Therapeutic Foster Care, and Firearms Laws*, 28 AM. J. PREV. MED. 6, 7 (2005) (With respect to "bans on specified firearms or ammunition," the CDC Task Force found that "[e]vidence was insufficient to determine the effectiveness of bans . . . for the prevention of violence."); *see also* Robert A. Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREV. MED. 40, 49 (2005) ("available evidence is insufficient to determine the effectiveness or ineffectiveness on violent outcomes of banning the acquisition and possession of [particular] firearms"); *id.* (noting that the studies, including Koper's report, were "limited in their design and execution, and results were inconsistent."); *id.* at 42 (the CDC task force distinguished its own report from previous literature reviews by noting it alone "is based on systematic epidemiologic evaluations and syntheses of all available literature meeting specified criteria.").

crime statistics on LAW ENFORCEMENT OFFICERS KILLED & ASSAULTED ("LEOKA").[66]  In 2010 there

were 56 law enforcement officer ("LEO") homicides in 49 separate incidents (there were also 72 acci-

dental deaths of police officers while on duty).  The annual LEOKA report usually describes only the

*caliber* of the firearm involved in the homicide, not the firearm or its magazine capacity; consequently,

out of those 56 homicides, the FBI identifies only one firearm that would definitely fall within Mary-

land's ban on AWs and LCMs: a semiautomatic rifle that had been illegally converted to fire in fully

automatic mode and was therefore already illegal under both federal and Maryland law, wholly inde-

pendent of the Act challenged here.[67]  Moreover, the perpetrator in that case was a convicted felon with

a history of violent crimes and weapons violations, and therefore already ineligible to own *any* firearm.

No ban on AWs or LCMs was necessary to outlaw that individual's actions and, in any event, it is plain

that outlawing AWs and LCMs would have no effect on a hardened criminal who was prepared to mur-

der a police officer.  Thus, for all that can be determined from the FBI's own data, in 2010 a law en-

forcement officer was more likely to be murdered with a revolver than with an AW or LCM,[68] more

likely to be killed with his own service pistol, more likely to be killed by a "firearms mishap" during po-

---

[66] LAW ENFORCEMENT OFFICERS KILLED & ASSAULTED: 2010 [hereinafter "LEOKA 2010"], www.fbi.gov/about-us/cjis/ucr/leoka/2010.

[67] *See id.*  The LEOKA statistics for 2011 are similar.  *See* LAW ENFORCEMENT OFFICERS KILLED & ASSAULTED: 2011 [hereinafter "LEOKA 2011"], *About Law Enforcement Officers Killed and Assaulted*, www.fbi.gov/about-us/cjis/ucr/leoka/2011 (reporting 63 incidents, some involving semiau-tomatic handguns or rifles and a few involving the firing of many rounds, but not identifying any firearm or magazine banned by the Maryland Act).  Incidentally, Colt and other companies that manufacture M-16 and M-4 assault rifles for the military have gone to great lengths to engineer their civilian, semiauto-matic AR-15 rifles with multiple features that prevent the conversion of the gun to fully automatic fir-ing.  *See* BARTOCCI, BLACK RIFLE II, *supra* note 41, at 233-35, 248.

[68] *See* Kopel, *in* GUNS: WHO SHOULD HAVE THEM, *supra* note 15, at 182 (" 'It is interesting to note, in the current hysteria over semi-automatic and military look-alike weapons, that the most common weapon used to murder peace officers was that of the .38 Special and the .357 Magnum revolvers.' ") (quoting a report in The Journal of California Law Enforcement).

lice training (whether by his own hand or that of a fellow officer), and more likely to be killed in the line

of duty by accident—usually by being run over by another motorist while the officer was standing on a

roadside to issue somebody a traffic ticket.[69]

These facts explain why professional, rank-and-file police officers (as distinguished from elected

or politically-appointed law enforcement chiefs) oppose bans on so-called "assault weapons."[70]  In his

congressional testimony prior to the first ban enacted by Congress in 1994, Joseph Constance, the Chief

of Detectives and a 25-year veteran of the Trenton police, explained that New Jersey had had such a ban

in place for years and that the "practical value of such bans" is zero because their rationale is cosmetic.[71]

"Despite their intimidating appearance, no auto-loading rifle is as dangerous as an old-fashioned double-

---

[69] *See* LEOKA 2010, *supra* note 66.

[70] *See* Kopel, *in* GUNS: WHO SHOULD HAVE THEM, *supra* note 15, at 189 (discussing polls of police officers revealing that 75% of them oppose a ban on "assault weapons," with the figure rising to 85% when only street patrol officers are polled); Doug Wyllie, *PoliceOne's Gun Control Survey: 11 Key Lessons from Officers' Perspectives* (Apr. 8, 2013), POLICEONE.COM, www.policeone.com/Gun-Legislation-Law-Enforcement/articles/6183787-PoliceOnes-Gun-Control-Survey-11-key-lessons-from-officers-perspectives/ (reporting that the most comprehensive survey ever conducted of law enforcement officers (some 15,000 were polled) revealed that "95 percent say that a federal ban on manufacture and sale of ammunition magazines that hold more than 10 rounds would not reduce violent crime."); *id.* (91% say that a "ban on the manufacture and sale of some semiautomatics would have no effect on reducing violent crime" or "would actually have a negative effect on reducing violent crime"); *id.* (85% say that passage of the federal "assault weapons" ban proposed in 2013 "would have a zero or negative effect on their safety"); *id.* ("The overwhelming majority (almost 90 percent) of officers believe that casualties would be decreased if armed citizens were present at the onset of an active-shooter incident."); *Gun Policy & Law Enforcement: Survey Results* at 13, POLICEONE.COM (2013), www.policeone.com/police-products/firearms/articles/6188462-policeones-2013-gun-policy-law-enforcement-survey-results-executive-summary/ (follow "View the complete findings of the survey" hyperlink) (responding to a survey question that referred to the Newtown and Aurora massacres); *id.* ("More than 80 percent of respondents support arming school teachers and administrators who willingly volunteer to train with firearms and carry one in the course of the job.").

[71] *Assault Weapons: A View from the Front Lines: Hearing on S. 639 and S. 653 Before the S. Comm. on the Judiciary*, 103d Cong. 83-84 (1993) (statement of Joseph Constance, Deputy Chief, Trenton, New Jersey Police Department).

barreled 12-gauge shotgun."[72] The so-called "assault weapon[s]," Chief Constance testified, "were used

in an underwhelming .026 of 1 percent of crimes in New Jersey. . . .  That is really nothing. This means

that my officers are more likely to confront an escaped tiger from the local zoo than they are to confront

one of these weapons."[73]

Finally, in the vast majority of LEO homicides in both 2010 and 2011, the perpetrator likely was

a felon for whom ownership of *any* firearm, not just an AW or LCM, was a serious crime under federal

law (and probably under state law as well).[74]  Plainly, no firearms law is going to affect a felon's deci-

sion whether to employ an "assault weapon" with a "large capacity magazine" on his next crime, or to

use an unbanned, legal firearm instead, *because for felons there are no legal firearms.* A criminal's

choice of firearm is determined by what is available on the street for illegal purchase at the time he

wants a gun.[75]  An FBI study in 2006 found—unsurprisingly—that 97% of the firearms used to attack

---

[72] *Id.* at 83.  *See* Kopel, *in* GUNS: WHO SHOULD HAVE THEM, *supra* note 15, at 164 ("The Winchester Model 12 pump action shotgun (defined as a 'recreational' firearm by [assault weapons bans]) can fire six 00 buckshot shells, each shell containing twelve .33 caliber pellets, in three seconds. Each of the pellets is about the same size as the bullet fired by a[] [Russian] AKS (a semiautomatic look-alike of an AK-47 rifle). In other words, the Winchester Model 12 pump action shotgun can in three seconds unleash seventy two separate projectiles . . . .  The Remington Model 1100 shotgun (a common semiautomatic duck-hunting gun, also defined as a 'recreational' firearm) can unleash the same 72 projectiles in 2.5 seconds.").

[73] *Assault Weapons*, 103d Cong., *supra* note 71, at 85 (statement of Joseph Constance, Deputy Chief, Trenton, New Jersey Police Department).

[74] *See* LEOKA 2011, *Law Enforcement Officers Feloniously Killed*, FBI, www.fbi.gov/about-us/cjis/ucr/leoka/2011/tables/table-46.

[75] *See* Anthony J. Pinizzotto et al., VIOLENT ENCOUNTERS: A STUDY OF FELONIOUS ASSAULTS ON OUR NATION'S LAW ENFORCEMENT OFFICERS 9, 43-45 (FBI Crim. Justice Info. Servs. Div. 2006).  *See also id.* at 43-44 (interviewed criminals "stated that none of these laws or statutes deterred them" because all the guns they used were stolen, often from other criminals); *id*. at 45 ("availability was the overriding factor in weapons choice"); *id*. at 50 (no gang members "obtained their weapons legally," instead they "trade, swap, rent and barter guns" with other criminals, making it "just as easy to obtain an illegal firearm as it was to obtain drugs.").

police officers "were obtained illegally."[76] Bans on AWs or LCMs "have no effect on the stemming of crime or the provision of public safety" because they only affect law-abiding citizens who buy their guns through legal channels.[77] As Chief Constance explained, New Jersey's AW ban was pointless because "rank-and-file officers in New Jersey knew to a certainty that criminals would continue to obtain guns illegally, no matter how strict we made our gun laws. Our prediction of failure has been borne out. Simply put, ladies and gentlemen, criminals do not fill out forms."[78] Such laws "have no effect on the stemming of crime or the provision of public safety" because they affect only law-abiding citizens.[79]

The stubborn fact is that criminals are not deterred by firearms regulations; therefore the only people affected by bans such as the Act are law-abiding citizens who buy their firearms though properly licensed firearms merchants. Thus we are told that the gun-buying rights of law-abiding citizens may be restricted based not on fears about what *they* will do with the firearms they purchase, but on the violence that the state anticipates may come from others—that is, from criminals who may steal those firearms. But to ban firearms because criminals use them is to tell law-abiding citizens that their liberties depend not on their own conduct, but on the conduct of the lawless, and that the law can vouchsafe the law-abiding only such rights as the lawless will allow. Surely this cannot be. Just as "[t]he First Amendment knows no heckler's veto," *Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004), the Second Amendment cannot tolerate restrictions on law-abiding citizens' right to keep and bear arms based on

---

[76] *See id.* at 50-51.

[77] *See Assault Weapons*, 103d Cong., *supra* note 71, at 84 (statement of Deputy Chief Joseph Constance).

[78] *See id.*

[79] *See id.*

the threat to public safety posed not by those citizens, but by criminals who may obtain such firearms illegally. *See also Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966).

In short, the incremental effect, if any, of the Act on criminals will be minute and statistically unknowable. But the effect on the Second Amendment rights of law-abiding citizens will be far more pronounced.

## V.   THE SAD TRUTH IS THAT THE ACT CHALLENGED HERE WOULD NOT HAVE PREVENTED THE ATROCITY THAT SPAWNED IT—THE HORRIFYING MASSACRE AT THE NEWTOWN ELEMENTARY SCHOOL.

Professor Christopher Koper, who performed all of the Justice Department's reviews of the impact of the federal assault weapons ban that had been in effect for ten years, has conceded that the use of "assault weapons" to commit crimes is exceedingly rare, accounting for a mere two percent of guns used in crime ("according to a compilation of 38 sources").[80]  According to the FBI, there were 55,168 murders committed with firearms of any kind from 2007 through 2012.[81]  Applying the two percent figure for the portion of firearms crimes that involve assault weapons, just 1,103 of those murders were committed with assault weapons. To put that number in perspective, in the same period of time there were six times as many murders (6,019) committed with bare hands (whether by punching, strangling, being

---

[80] Koper DOJ Review 2013 at 162.

[81] *See Crime in the United States 2012: Expanded Homicide Data Table 8, Murder Victims*, FBI, www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2012/crime-in-the-u.s.-2012/offenses-known-to-law-enforcement/expanded-homicide/expanded_homicide_data_table_8_murder_victims_by_weapon _2008-2012.xls (last visited Mar. 14, 2014); *Crime in the United States 2012: Expanded Homicide Data Table 8, Murder Victims by Age*, FBI, www2.fbi.gov/ucr/cius2007/offenses/expanded_information/data /shrtable_08.html (last visited Mar. 14, 2014).

pushed out of a window or other unarmed means), and nearly ten times as many (10,556) committed with knives or other cutting instruments.[82]

Well aware that all the research has demonstrated that AW and LCM bans do not reduce firearms crime, defenders of such bans shift to arguing that, although such bans have no effect on firearms violence overall, they may at least give us partial relief from mass killings such as those at Newtown, Aurora and Columbine.  This is a false hope.  Although the author of the DOJ reports, Professor Christopher Koper, has recently noted that some stories in the news media may suggest that the now-defunct federal ban on AWs and LCMs might eventually have had some "modest[]" effect on mass killings and other gun crime if it had been reenacted by Congress, Koper DOJ Review 2013 at 158, 164-65, 170, Professor Koper himself concluded that the studies he reviewed show "no discernible reduction in the lethality or injuriousness of gun violence during the post-ban years," *id*. at 165, and that "it was impossible to make definitive assessments of the ban's impact on gun violence," *id*. at 166.

The problem is that mass killers can easily substitute other equally or more deadly weapons if legislation such as the Maryland Act renders certain firearms unavailable.  Mass killings in schools are not a new phenomenon, and their history reveals myriad means of skirting an AW ban by employing different weapons. For example, the first school massacre was recorded in Pennsylvania in 1764 when a

---

[82] *Id*.  Assault-weapon crimes are so rare that the FBI does not even given them their own category in its annual crime statistics.  There are separate categories of murders by such means as "Poison," "Explosives," and even "Asphyxiation," but none for assault weapons.  Nor do the FBI reports identify which, if any, of the firearms murders were committed with handguns, rifles or shotguns that had magazines holding more than ten rounds of ammunition.  *See Crime in the United States 2012: Expanded Homicide Data Table 8, Murder Victims*, FBI, *supra* note 81.

teacher and ten of her students were scalped or shot dead by Lenape Indians.[83]  In 1891 a man used a shotgun to kill children on a playground at a parochial school in New York.[84]  And the worst school massacre in American history took place in Bath, Michigan, in 1927, when a madman killed 45 students and teachers with bombs he planted in the local school.[85]  None of these massacres required an "assault weapon" or a "large capacity magazine."

Moving to the present day, nothing in the Maryland Act would have changed the outcome in recent mass killings.  The Act does not ban the double-barreled and pump shotguns, or Hi-Point Model 995 9mm carbine (with a ten-round magazine) that Dylan Klebold and Eric Harris used at Columbine High School.[86]  Although the Act bans the "Ruger mini-14 folding stock model," MD. CODE ANN., PUB. SAFETY § 5-101(r)(2)(xxxiii), it does not ban the more common Mini-14 Ranch Rifle, which differs from the banned rifle only in that the Ranch Rifle has a traditional wooden stock.  That hunting rifle is what a demented Norwegian used to gun down 69 teenagers at a summer camp in Norway on July 22, 2011.[87]

Finally, we must confront the stubborn fact that nothing that this Act does would have changed anything at the Newtown school.  Limiting detachable magazines to ten rounds would have made no dif-

---

[83] DAVID DIXON, NEVER COME TO PEACE AGAIN: PONTIAC'S UPRISING AND THE FATE OF THE BRITISH EMPIRE IN NORTH AMERICA 236 (2005).

[84] *Fired into a Group of Children*, N.Y. TIMES (Apr. 10, 1891), *available at* http://query.nytimes.com/mem/archive-free/pdf?res=F10A1EFF3D5E10738DDDA90994DC405B8185F0D3.

[85] Justin Peters, *"We Still Look at Ourselves as Survivors": More than Eighty Years Later, Remembering the Deadliest School Massacre in American History*, SLATE (Dec. 18, 2012), *available at* www.slate.com/blogs/crime/2012/12/18/bath_school_bombing_remembering_the_deadliest_school_massacre_in_american.html.

[86] *How They Were Equipped That Day*, Jefferson County, Colorado, Sheriff, CNN.COM, *available at* www.cnn.com/SPECIALS/2000/columbine.cd/Pages/EQUIPMENT_TEXT.htm.

[87] *See* Gronnevet, *supra* note 59.

ference:  Adam Lanza used 30-round magazines, but he changed many of them out before they were exhausted and he could just as easily have changed out 10-round magazines after firing every last round in them.[88]  Or instead of reloading his AR-15, he could have employed either of the two semiautomatic pistols that he was carrying, or even the shotgun that he also brought to the school but left in his car.[89]  For that matter, Lanza or some other maniac could avoid Maryland's new ban on AR-15 rifles by using the Colt AR-15 Sporter H-BAR rifle, which is specifically exempted from the Act's ban[90] but differs from other AR-15 models only in that it has a heavier barrel that enhances long-distance marksmanship—whether at a shooting range or next to a school playground.  Deranged spree killers tend to arm themselves with multiple guns, as Adam Lanza did at Newtown.

Nor did the rate of fire of Lanza's semiautomatic AR-15 make a difference, because it was the same as every other semiautomatic rifle—one pull of the trigger and the gun fires one bullet.  Indeed, even if *all* semiautomatic rifles were outlawed, Lanza could still have used a 150-year-old lever-action rifle such as the Volcanic, the Henry, or the Winchester—cowboy guns familiar to us from a thousand movies and TV Westerns.  Lanza fired 154 shots in about five minutes, or 30 shots per minute.[91]  That same rate of fire can be achieved with a Winchester lever-action carbine from 1866,[92] a Volcanic lever-

---

[88] N.R. Kleinfield et al., *Newtown Killer's Obsessions, in Chilling Detail*, N.Y. TIMES, Mar. 28, 2013, at A1.

[89] *Id.*, *see* Kopel, *in* GUNS: WHO SHOULD HAVE THEM, *supra* note 15, at 164, for an explanation of the massive killing power that can be unleashed in three seconds by a regular shotgun statutorily classified as "recreational" and therefore not subject to any "assault weapons" ban.

[90] *See* PUB. SAFETY § 5-101(r)(2)(xv).

[91] *See* Mary Ellen Clark & Noreen O'Donnell, *Newtown School Gunman Fired 154 Rounds in Less than Five Minutes*, REUTERS U.S. EDITION (Mar. 28, 2013), www.reuters.com/article/2013/03/28/us-usa-shooting-connecticut-idUSBRE92R0EM20130328.

[92] *See* GUN: A VISUAL HISTORY, *supra* note 6, at 174; MILITARY SMALL ARMS, *supra* note 6, at

action rifle from the 1850s (which had a 30-round magazine),[93] or a World War I bolt-action British

SMLE rifle, which can fire up to 37 aimed shots per minute with its ten-round magazine—precisely the

size that the Act permits.[94]

Finally, Lanza could have accomplished his grim atrocities without any rifle at all, but with a

mere revolver that could rapidly be reloaded with the use of such common and inexpensive devices as

speed-loaders, full- or half-moon clips, or Quickstrips.[95]   Thus firearms technology that is more than a

century old would have wrought the same destruction at Newtown as the modern semiautomatic rifle

---

147.

[93] *See* MILITARY SMALL ARMS, *supra* note 6, at 146.

[94] *See* FOWLER & SWEENEY, WORLD ENCYCLOPEDIA OF RIFLES AND MACHINE GUNS, *supra* note 6, at 40. Adam Lanza apparently also possessed some type of "Enfield bolt-action rifle" at his home. *See* Clark & O'Donnell, *supra* note 91.

[95] *See* Joseph von Benedikt, *Double Down: Get Your DA Revolver Skills Up to Snuff with These Pro Tips*, *in* GUNS & AMMO, HANDGUNS 62-63 (Aug./Sept. 2013).  Further evidence of the rapid reload ability of revolvers comes from the Scottish government's PUBLIC INQUIRY INTO THE SHOOTINGS AT DUNBLANE PRIMARY SCHOOL ON 13 MARCH 1996, led by Lord Cullen.  *See* www.ssaa.org.au/ research/1996/1996-10-16_public-inquiry-dunblane-lord-cullen.pdf.  On that day, a madman named Thomas Hamilton walked into a primary school in Scotland and, within four minutes, shot 30 teachers and children with a 9mm Browning semiautomatic pistol before killing himself with a single shot from one of the two .357 magnum Smith & Wesson revolvers that he was carrying.  *See id.* at ¶ 1.3, 6.10(i). Hamilton shot all of his victims with the 9mm Browning semiautomatic that he kept reloading with 20-round magazines (he fired 105 rounds in total).  *Id.* at ¶ 3.39.  However, the Public Inquiry by Lord Cullen concluded that Hamilton could easily have inflicted the same bloodshed in the same amount of time with either of his revolvers: "[W]ith a revolver it is possible to maintain a speed of firing which approaches that of the self-loading pistol.  Further, as I stated earlier, the use of a speedloader in conjunction with a revolver which had a cylinder which could be swung out would enable a whole set of cartridges to be removed and replaced very quickly."  *Id.* at ¶ 9.51.  The Inquiry further noted that use of a shotgun would have been far more deadly, on the basis of evidence showing that one could, within the same span of time, discharge and reload a double-barreled shotgun 105 times—the same number of shots that Hamilton had fired—but with much more destruction from the approximately 675 to 1000 projectiles that would be fired if one were using buckshot.  *Id.* at ¶ 9.53.  As a result of the Dunblane massacre, the British government outlawed virtually all private ownership of handguns—an option that the Second Amendment forbids in this country.

that Lanza used.  The monstrosity at Newtown was not the weapon, but the depraved individual who wielded it.

## CONCLUSION

This case should be decided by the principles for evaluating categorical bans on particular firearms that were laid down by the Supreme Court in *Heller*.  Insofar as the weapons categorically banned by the Maryland Act are "arms 'in common use at the time' for lawful purposes like self-defense," *Heller*, 554 U.S. at 624, or are weapons "typically possessed by law-abiding citizens for lawful purposes," *id.* at 625, they are within the scope of the Second Amendment.

Respectfully submitted,

Date:   March 17, 2014

*Of Counsel*:
Brian S. Koukoutchos
28 Eagle Trace
Mandeville, LA  70471
(985) 626-5052

/s/ *James B. Astrachan*
James B. Astrachan, Bar No. 03566
Elizabeth A. Harlan, Bar No. 18285
ASTRACHAN GUNST THOMAS, P.C.
217 East Redwood Street, Suite 2100
Baltimore, MD  21202
(410) 783.3550
(410) 783.3530 (Facsimile)
jastrachan@agtlawyers.com
eharlan@agtlawyers.com

*Counsel for Amicus Curiae*
*Pink Pistols*