### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### (NORTHERN DIVISION)

**STEPHEN V. KOLBE, et al.**      *

        **vs.**            *         **Case No. 1:13-cv-02841-CCB**

**MARTIN O'MALLEY, et al.**      *
                     ******

## BRIEF OF AMICUS CURIAE NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.

March 17, 2014

Vincent J. Colatriano, D. Md. No. 0-8023
*Of Counsel*:
Charles J. Cooper
David H. Thompson
Peter A. Patterson
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
vcolatriano@cooperkirk.com
ccooper@cooperkirk.com
dthompson@cooperkirk.com
ppatterson@cooperkirk.com

*Counsel for Amicus Curiae*
*National Rifle Association of America, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

INTEREST OF AMICUS CURIAE ...........................................................................1

BACKGROUND AND SUMMARY OF THE ARGUMENT .....................................1

ARGUMENT ...............................................................................................................2

I.      Principles Established by *Heller* and *McDonald*. ...............................................2

II.     The Second Amendment's Protection of Certain "Arms" Is Absolute..............................6

III.    The Act's "Assault Weapon" Ban Outlaws Firearms Commonly Used
        for Lawful Purposes and Is Therefore Unconstitutional......................................8

IV.     The Act Is Unconstitutional Under Any Level of Scrutiny,
        Even if Such Balancing Tests Were Appropriate. ...........................................13

V.      The Ban on Magazines Capable of Holding More than Ten Rounds
        Also Violates the Second Amendment. .............................................................19

VI.     The Majority Opinion of the D.C. Circuit in *Heller II* Was Deeply Flawed....................23

CONCLUSION.........................................................................................................28

**TABLE OF AUTHORITIES**

**Cases**                                                                                       **Page**

*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991) ........................................................25

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)........................................19

*Clark v. Jeter*, 486 U.S. 456 (1988)................................................................................14

*Department of Agric. v. Moreno*, 413 U.S. 528 (1973) ....................................................19

*District of Columbia v. Heller*, 554 U.S. 570 (2008)............................................. *passim*

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...................................................5

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)......................... *passim*

*Houston v. City of New Orleans*, 675 F.3d 441 (5th Cir. 2012),
    *withdrawn & superseded on reh'g on other grounds*, 682 F.3d 361 ........................5

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010)...............................................2, 4

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)........................................5, 18, 19

*Nguyen v. INS*, 533 U.S. 53 (2001)...............................................................................19

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978)..................................................25

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)....................14

*Peruta v. County of San Diego*, --- F.3d ---,
    No. 10-56971, 2014 WL 555862 (9th Cir. Feb. 13, 2014) ....................................5

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ....................................14

*Staples v. United States*, 511 U.S. 600 (1994) ...............................................................5

*Stenberg v. Carhart*, 530 U.S. 914 (2000) ......................................................... *passim*

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997)................................................12

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)........................................14, 19

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ...........................................7

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)........................................14

*United States v. Miller*, 307 U.S. 174 (1939)..........................................................2, 6, 7

*United States v. Virginia*, 518 U.S. 515 (1996) ......................................................14, 19

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) ..................................................14

**Constitutional Material & Statutes**

U.S. CONST. amend. II ............................................................................... *passim*

MD. CODE ANN., CRIM. LAW

§ 4-301 ....................................................................................................1, 8
§ 4-301(e)(1)(i) ..............................................................................................10
§ 4-303 ....................................................................................................1, 8
§ 4-303(b) ........................................................................................................1
§ 4-304 ............................................................................................................1
§ 4-305 ............................................................................................................8
§ 4-305(b) ........................................................................................................1
§ 4-306 ............................................................................................................1
§ 4-306(a) ........................................................................................................1

MD. CODE ANN., PUB. SAFETY

§ 5-101 ....................................................................................................1, 8
§ 5-101(p)(2) ..................................................................................................10
§ 5-101(r)(2)(xv) ............................................................................................10
§ 5-101(r)(2)(xxxiii) .......................................................................................16

*What Should America Do About Gun Violence?: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (2013), *available at* www.judiciary.senate.gov/pdf/ 1-30-13KopelTestimony.pdf ..............................................................................20, 22

## **Other**

1 WILLIAM HAWKINS, TREATISE OF THE PLEAS OF THE CROWN (1716) ........................................7

Allen Rostron, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 GEO. WASH. L. REV. 703 (2012) ........................................................................4

Bruce Kobayashi & Joseph Olson, *In re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons,"* 8 STAN. L. & POL'Y REV. 41 (1997) ........................................................................13

Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, Report to the Nat'l Inst. of Justice, Dep't of Justice (2004) ........................................................17, 18, 20, 21

Darrell A.H. Miller, *Text, History, and Tradition: What the Seventh Amendment Can Teach Us About the Second*, 122 YALE L.J. 852 (2013) ..........................................4, 5

David B. Kopel, *Assault Weapons*, in GUNS: WHO SHOULD HAVE THEM? (David B. Kopel ed., 1995) ..............................................................................11

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381 (1994) ..............................................................8, 11, 18

Declaration of Mark Overstreet, *Shew v. Malloy*, No. 13-739 (D. Conn. July 15, 2013), ECF No. 15-1 ..................................................................................................9

GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL (1997) ..................................*passim*

GUN DIGEST 2013 (Jerry Lee ed., 67th ed. 2012) ...................................................................20

Josh Sugarmann, *Assault Weapons and Accessories in America*, VIOLENCE POLICY CENTER, www.vpc.org/studies/awaconc.htm (last visited March 14, 2014) ...............................12, 13

Julia Gronnevet, *Norway Killer Got on Ferry in Uniform*, ASSOC. PRESS (May 4, 2012), *available at* http://articles.philly.com/2012-05-04/news/31573726_1_bomb-attack-island-attack-police-officer ...........................................................................................16

Mark Gius, *An Examination of the Effects of Concealed Weapons Laws and Assault Weapons Bans on State-Level Murder Rates*, 21 APPLIED ECONOMICS LETTERS 265 (2014) ............................................................................................................................ 18

Mother Jones, *More than Half of Mass Shooters Used Assault Weapons and High-Capacity Magazines* (Feb. 27, 2013), Doc. 44-30 .....................................................16, 15

NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 97 (Charles F. Wellford et al. eds., 2005) ................................................................................17

Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion Analogue*, 60 HASTINGS L.J. 1285 (2009) ............................................................ *passim*

Peter Reuter & Jenny Mouzos, *Australia: A Massive Buyback of Low-Risk Guns*, *in* EVALUATING GUN POLICY 121 (Jens Ludwig & Philip J. Cook eds., 2003) ..................................17

Randy Barnett, *Gun Control Fails Rationality Test*, WASH. EXAMINER (Jan. 29, 2013), *available at* http://washingtonexaminer.com/gun-control-fails-rationality-test/article/2519971.........................................................................................................................19

Thomas E. Romano, *Firing Back: Legislative Attempts To Combat Assault Weapons*, 19 SETON HALL LEGIS. J. 857 (1995)........................................................................17, 18

UNITED STATES DEP'T OF ARMY, RIFLE MARKSMANSHIP, M16/M4 SERIES WEAPONS (2008), *available at* http://armypubs.army.mil/doctrine/DR_pubs/dr_a/pdf/fm3_22x9.pdf ...................................................................................................................27

**INTEREST OF AMICUS CURIAE**

The National Rifle Association of America, Inc. ("NRA") is America's foremost and oldest defender of Second Amendment rights. Founded in 1871, the NRA has approximately five million members and is America's leading provider of firearms marksmanship and safety training for civilians. The NRA has a strong interest in this case, because the law at issue here violates the Second Amendment rights of its many members residing in Maryland by prohibiting them from possessing or acquiring commonly owned firearms and ammunition magazines.

**BACKGROUND AND SUMMARY OF THE ARGUMENT**

The Maryland Firearms Safety Act of 2013 ("the Act") amends the Maryland criminal law and public safety codes to outlaw the possession, receipt, transfer, or transportation of many commonly used semi-automatic rifles, shotguns, and handguns. *See* MD. CODE ANN., CRIM. LAW §§ 4-301, 4-303, 4-304, 4-306; MD. CODE ANN., PUB. SAFETY § 5-101. Some sixty-eight firearms are designated by name as illegal "assault long guns" or "assault pistol; any "copies" or "copycat[s]" of those firearms (whatever those vague terms may mean) are also banned, without regard to the gun's manufacturer, if the guns possess two or more listed features, such as a flash suppressor or a folding stock. Possession of "assault long guns" and "copycat weapons" already owned or purchased by Maryland residents at the time the law went into effect remain legal. *See* MD. CODE ANN., CRIM. LAW § 4-303(b). The Act further amends the criminal code to outlaw the manufacture, receipt, or transfer of standard firearm magazines with "a capacity of more than 10 rounds of ammunition." *Id.* § 4-305(b). *See also id.* (grandfathering in previously owned magazines). Violations of the Act carry a three-year prison term. *Id.* § 4-306(a). These provisions ban, even for use for self-defense inside one's home, the possession and acquisition of firearms and magazines that are "of the kind in common use . . . for lawful purposes," *District of*

*Columbia v. Heller*, 554 U.S. 570, 624 (2008), and therefore the Act cannot be reconciled with the Second Amendment.

## ARGUMENT

**I.    Principles Established by *Heller* and *McDonald*.**

The Supreme Court's decisions in *Heller* and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), provide authoritative guidance for applying the Second Amendment.

*First*, the Second Amendment protects an "*individual right*" that "*belongs to all Americans*." *Heller*, 554 U.S. at 581, 595 (emphasis added).  As the Court emphasized in both *Heller* and *McDonald*, the "inherent" and "pre-existing" right of self-defense is the "core" and "the *central component* of the [Second-Amendment] right itself."  *Id*. at 592, 599, 628, 630; *accord McDonald*, 130 S. Ct. at 3036; *id*. at 3047 (controlling opinion of Alito, J.).

*Second*, the right to keep and bear arms is a *fundamental* right "deeply rooted in this Nation's history and tradition."  *Id*. at 3036.  This right is entitled to no less respect than the other fundamental rights protected by our Constitution and may not to be "treat[ed] . . . as a second-class right" or "singled out for special—and specially unfavorable—treatment."  *Id*. at 3043, 3044.

*Third*, the Second Amendment is "enshrined with the scope [it was] understood to have *when the people adopted [it]*, whether or not future legislatures or (yes) even future judges think that scope too broad."  *Heller*, 554 U.S. at 634-35 (emphasis added).  Accordingly, the Second Amendment's scope is to be determined through "historical analysis" and any limits on the right must be supported by "historical justifications."  *Id*. at 627, 635.

*Fourth*, the line between permissible and impermissible arms regulations *is not* to be established by balancing the individual right protected by the Second Amendment against purportedly competing

government interests.  This balance has already been struck, for the Second Amendment "is the very

*product* of an interest-balancing by the people," and "[t]he very enumeration of the right takes out of the

hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth*

insisting upon."  *Id.* at 634, 635 (emphases in original).

 *Fifth*, the Second Amendment protects the possession of arms " 'in common use at the time' for

lawful purposes like self-defense."  *Id.* at 624 (quoting *United States v. Miller*, 307 U.S. 174, 179

(1939)).  But the Second Amendment does *not* protect "those weapons not typically possessed by law-

abiding citizens for lawful purposes," *id.* at 625, and that are "highly unusual in society at large," *id.* at

627.  The Supreme Court in *Heller* struck down a ban on the possession of handguns in part because

"the American people have considered the handgun to be the quintessential self-defense weapon."  *Id.* at

629.

 Thus, while *Heller* made clear that the District of Columbia's handgun ban would fail "any of

the standards of scrutiny that [the Court has] applied to enumerated constitutional rights," *id.* at 628, the

Court pointedly did not apply any of those standards but instead categorically struck down the ban after

finding it irreconcilable with the Second Amendment's text and history.  Likewise, the Court

categorically invalidated the so-called "trigger-lock requirement"—the separate, independent provision

of D.C. law requiring "that firearms in the home be rendered and kept inoperable at all times"—without

subjecting it to any of the "tiers" or "levels" of scrutiny familiar in other areas of constitutional doctrine.

*Id.* at 630.

 Finally, the Court expressly rejected the "interest-balancing" approach proposed by Justice

Breyer in dissent, *see id.* at 634-35, an approach that was in substance, if not in name, a form of

intermediate scrutiny, *see, e.g.*, *id.* at 704-05 (Breyer, J., dissenting) (finding "no cause here to depart

3

from the standard set forth in *Turner* [*Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997)]," a "First Amendment case[] applying intermediate scrutiny").  The *Heller* Court's decision not to employ strict or intermediate scrutiny was deliberate.  During the *Heller* argument, the Chief Justice pointed out that "these various phrases under the different standards that are proposed, 'compelling interest,' 'significant interest,' 'narrowly tailored'—none of them appears in the Constitution . . . .  I mean, these standards that apply in the First Amendment just kind of developed over the years as sort of baggage that the First Amendment picked up."  Tr. of Oral Arg. at 44, *Heller*, 554 U.S. 570 (No. 07-290) (Roberts, C.J.).  If there were any lingering doubt on this vital question, the Court dispelled it in *McDonald* when it reiterated that *Heller* "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest-balancing."  130 S. Ct. at 3047 (controlling opinion of Alito, J.).  And *McDonald* emphasized that resolving Second Amendment cases *would not* "require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise."  *Id.* at 3050.

Despite this unambiguous guidance from the Supreme Court, a number of lower courts in the wake of *Heller* have ignored the Court's explicit instructions and resolved Second Amendment claims by applying a levels-of-scrutiny analysis, usually selecting a form of intermediate scrutiny resembling Justice Breyer's interest-balancing test—the very test that the Court flatly rejected in *Heller*.  These decisions, we respectfully submit, are not faithful to *Heller* and *McDonald*.  *See, e.g.*, Allen Rostron, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 GEO. WASH. L. REV. 703, 706-07 (2012) ("The lower courts . . . have effectively embraced the sort of interest-balancing approach that Justice Scalia condemned . . . ."); Darrell A.H. Miller, *Text, History, and Tradition: What the Seventh Amendment Can Teach Us About the Second*, 122 YALE L.J. 852, 855 (2013) ("Some judges . . .

have simply ignored the Court's rejection of balancing tests."); *Heller v. District of Columbia*, 670 F.3d 1244, 1271 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting) ("*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test"); *Houston v. City of New Orleans*, 675 F.3d 441, 448 (5th Cir. 2012) (Elrod, J., dissenting) ("*Heller* and *McDonald* rule out scrutiny analysis."), *withdrawn & superseded on reh'g on other grounds*, 682 F.3d 361.

The Fourth Circuit is among the courts that have applied a tiers of scrutiny analysis in Second Amendment cases. But this does not foreclose the application of *Heller*'s categorical approach here where, as in *Heller*, the challenged law (a) applies to law-abiding, responsible citizens and (b) amounts to a flat ban on the exercise of protected Second Amendment activity. "Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional." *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011). Thus, other courts that generally employ a tiers-of-scrutiny analysis have eschewed it when faced with laws that are wholly incompatible with the Second Amendment. *See Moore v. Madigan*, 702 F.3d 933, 940-41 (7th Cir. 2012) (striking down Illinois's "flat ban on carrying ready-to-use guns outside the home" without resort to "degrees of scrutiny" analysis); *Peruta v. County of San Diego*, __ F.3d __, No. 10-56971, 2014 WL 555862, at *20 (9th Cir. Feb. 13, 2014) (striking down San Diego's requirement that individuals must demonstrate "good cause" to obtain a concealed carry permit by employing the categorical "approach used in *Heller*" rather than a tiers of scrutiny analysis). The same result should obtain here. Indeed, given that Maryland's ban applies both inside and outside the home the case for applying *Heller*'s approach is even stronger here than in *Moore* and *Peruta*.

## II.      The Second Amendment's Protection of Certain "Arms" Is Absolute.

The text of the Second Amendment provides that "the right of the people to keep and bear *Arms*, shall not be infringed."  U.S. CONST. amend. II (emphasis added).  It follows that there are certain "instruments that constitute bearable arms," *Heller*, 554 U.S. at 582, which law-abiding, responsible, adult citizens have an inviolable right to acquire, possess, and use.  Indeed, the Second Amendment's "core protection"—the right to armed self-defense, including, most acutely, in the home—is no less absolute than the First Amendment's protection of the expression of unpopular opinions: "The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrongheaded views.  The Second Amendment is no different."  *Id.* at 635.  Thus, in the words of *Heller*, "whatever else it leaves to future evaluation, [the Second Amendment] surely *elevates above all other interests* the right of law-abiding, responsible citizens to use *arms* in defense of hearth and home."  *Id.* (emphases added).

When confronted with a ban on certain types of weapons, then, the key question facing a court is whether those weapons are "arms" protected by the Second Amendment.  The Supreme Court has held that the firearms protected by the Second Amendment are those weapons " 'of the kind in common use at the time' for lawful purposes like self-defense."  *Id.* at 624 (quoting *Miller*, 307 U.S. at 179).  Conversely, "the Second Amendment *does not* protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."  *Id.* at 625 (emphasis added).  According to *Heller*, then, the possession and use of sawn-off shotguns, like the possession and use of fully automatic machine guns such as military "M-16 rifles" and other "sophisticated arms that are

6

highly unusual in society at large," may be restricted.  *Id.* at 627.  But the possession of firearms of the kind in common use for self-defense and other lawful purposes is constitutionally protected.[1]

This distinction is "supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " *id.*—a tradition that did *not* bar

> Persons of Quality [from] wearing *common Weapons* . . . for their Ornament or Defence, in such Places, and upon such Occasions, in which it is common Fashion to make use of them, without causing the least Suspicion of an Intention to commit any Act of Violence or Disturbance of the Peace.

1 WILLIAM HAWKINS, TREATISE OF THE PLEAS OF THE CROWN 136 (1716) (emphasis added).  This distinction is also rooted in founding-era militia practices: "Ordinarily when called for militia service able-bodied men were expected to appear bearing arms supplied by themselves and of the kind *in common use* at the time."  *Heller*, 554 U.S. at 624 (quoting *Miller*, 307 U.S. at 179 (emphasis added) (brackets omitted)).

Further, *Heller* makes clear that, to determine whether a firearm is in "common use at the time," courts must ask whether a firearm is in common use today.  *See, e.g.*, *Heller*, 554 U.S. at 629 (explaining that a complete ban on handguns is unconstitutional because "handguns are the most popular weapon chosen by Americans for self-defense in the home . . . .").  Indeed, *Heller* dismisses as

---

[1] The decision in *Heller* makes clear that, to determine whether a firearm is in "common use at the time," courts must ask whether a firearm is in common use today.  *See Heller*, 554 U.S. at 629 (explaining that a complete ban on handguns is unconstitutional because "handguns are the most popular weapon chosen by Americans for self-defense in the home . . . ."); *see also Heller II*, 670 F.3d at 1261 (concluding that semi-automatic rifles and magazines holding more than ten rounds are "in common use at the time" because they are commonly manufactured and owned today); *United States v. Marzzarella*, 614 F.3d 85, 93 (3d Cir. 2010) (rejecting the argument that the Second Amendment protects only "firearms in common use at the time of ratification" and explaining that the decision of the Supreme Court in "*Heller* cautions against using such a historically fact-bound approach when defining the types of weapons within the scope of the right").

"bordering on the frivolous" "the argument . . . that only those arms in existence in the 18th century are protected by the Second Amendment." *Id.* at 582.

Applying this "common use" test, *Heller* struck down the District of Columbia's handgun ban because it "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]." *Id.*; *see also id.* at 628-29 (Handguns are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family."); *id.* at 629 ("[T]he American people have considered the handgun to be the quintessential self-defense weapon."); *id.* ("handguns are the most popular weapon chosen by Americans for self-defense in the home").

## III.   The Act's "Assault Weapon" Ban Outlaws Firearms Commonly Used for Lawful Purposes and Is Therefore Unconstitutional.

The constitutionality of the Maryland Act thus turns on whether the banned rifles, shotguns, and pistols are in common use for lawful purposes in this Nation.  The answer to that question is yes.

Indeed, the answer to that question should be apparent from the very definition the Act uses for the weapons it seeks to ban.  It describes "assault weapons" as "semiautomatic" rifles, shotguns, and pistols of particular makes and models or with additional features that, as explained below, generally make those firearms easier and safer to use.  *See* MD. CODE ANN., CRIM. LAW §§ 4-301, 4-303, 4-305; MD. CODE ANN., PUB. SAFETY § 5-101.  And while, as explained below, "assault weapon" is a term of opprobrium invented for political and public-relations purposes, "semiautomatic" is a term that has a distinct meaning, and it is a weapon type that has been in existence for over one hundred years.  *See* David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 413 (1994) (stating that "semiautomatics are more than a century old").  And unlike "machineguns, sawed-off shotguns, and artillery pieces," semiautomatic firearms "traditionally have been widely accepted as

lawful possessions." *Staples v. United States*, 511 U.S. 600, 611-12 (1994).  Indeed, semiautomatic

firearms are the most widely owned and used kind of firearms and are commonly employed for lawful

purposes including home protection, hunting, and recreational shooting.

The "automatic" part of "semi-automatic" refers to the fact that the user need not manipulate the

firearm (via mechanisms such as a bolt or lever) to place another round in the chamber after each single

shot is fired.  Unlike an *automatic* weapon such as a machine gun, a *semiautomatic* firearm will *not* fire

continuously on one pull of its trigger; rather, the user must pull the trigger each time he or she wants to

discharge a single round.  *See id*. at 602 n.1.  In that regard, it is functionally no different than another

common firearm, the revolver.

An enormous portion of the firearms in common civilian use in the United States are

semiautomatic, including many handgun, rifle, and shotgun models that fall outside the Act's definition

of "assault weapons."  Indeed, "it is just not credible to say that semiautomatic technology is unusual or

uncommon," given that "sixty percent of gun owners [own] some type of semiautomatic firearm."

Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion Analogue*, 60

HASTINGS L.J. 1285, 1293-95 (2009) (discussing 1994 survey).  Further, "[t]he vast majority of

handguns today are semi-automatic."  *Heller II*, 670 F.3d at 1286 (Kavanaugh, J., dissenting); *accord*

Declaration of Mark Overstreet, *Shew v. Malloy*, No. 13-739 (D. Conn. July 15, 2013), ECF No. 15-1, ¶

13 ("Annual firearm manufacturing and export statistics released by the [ATF] indicate that

semiautomatic pistols rose as a percentage of total handguns made in the United States and not exported,

from 50 percent of 1.3 million handguns in 1986, to 82 percent of three million handguns in 2011.").

Given that handguns are generally regarded by the American people as "the quintessential self-defense

weapon" and thus cannot be prohibited, *Heller*, 554 U.S. at 629, and that more than four out of every

9

five handguns sold today is a semiautomatic handgun, it follows that "semi-automatic handguns are constitutionally protected under the Supreme Court's decision in *Heller*," *see Heller II*, 670 F.3d at 1289 (Kavanaugh, J., dissenting).

Again, *all* semiautomatic firearms—including those banned under the Act—discharge only a single shot per trigger pull.  They are thus fundamentally different from fully automatic military weapons.  But the firearms banned by the Maryland Act are *not* fundamentally different from some of the semiautomatic firearms that it permits.

Indeed, Americans own millions of the very semiautomatic firearms the Act bans.  The prohibited AR-15 rifle,[2] for example, is "now the best-selling rifle type in the United States."  Johnson, 60 HASTINGS L.J. at 1296; *see also Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting) (AR-15 is America's "most popular semi-automatic rifle.").  Indeed, the State concedes that it is the "most popular type of centerfire semiautomatic rifle in the United States."  Defs.' Mem. in Supp. of Mot. To Dismiss ("State Br."), Doc. 44-1 at 8.  Nearly twenty years ago, the Supreme Court *expressly distinguished* the semiautomatic AR-15 as "the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon. The M-16, in contrast, is a selective fire rifle that allows the operator, by rotating a selector switch, to choose semiautomatic or automatic fire."  *Staples*, 511 U.S. at 603.  Thus the semiautomatic, civilian AR-15 that is outlawed by the Maryland Act is the very firearm that the Supreme Court in *Staples* identified as being among those firearms that "traditionally have been widely accepted as lawful possessions."  *Id*. at 612.  That decision binds this Court.

---

[2] *See* MD. CODE ANN., PUB. SAFETY § 5-101(r)(2)(xv).

10

The Act outlaws many other commonly used firearms through its ban on any and all "copies" of the firearms specifically listed in the Act, "regardless of which company produced and manufactured that assault weapon." MD. CODE ANN, PUB. SAFETY § 5-101(p)(2). Similarly, the Act bans "semiautomatic centerfire rifle[s]" that have particular features; such firearms are classified as "copycat weapon[s]." MD. CODE ANN, CRIM. LAW § 4-301(e)(1)(i). Semiautomatic rifles with the capacity to accept detachable magazines are banned if they have two additional enumerated features, such as "a folding stock" or "a flash suppressor." *Id.* A detachable magazine in such a rifle does nothing to distinguish a semiautomatic firearm from other familiar, commonly possessed firearms. Indeed, the vast majority of semiautomatic firearms in America have a detachable magazine. *See* Johnson, 60 HASTINGS L.J. at 1298 n.100; David B. Kopel, *Assault Weapons*, *in* GUNS: WHO SHOULD HAVE THEM 159, 165 (David B. Kopel ed., 1995).

To be sure, under the Act a detachable magazine, standing alone, is not enough to transform an otherwise lawful rifle into a banned "assault weapon." But to the extent the additional attributes that, when combined with a detachable magazine, push a firearm over the line from acceptable to contraband are *functional* attributes, they tend to *improve* the firearm's utility and safety for self-defense, recreational shooting, and other lawful purposes. Thus a folding stock makes it easier to transport a rifle or shotgun in a vehicle or to store it in the home. *See* Kopel, 20 J. CONTEMP. L. at 398-99. The virtue of a "flash suppressor" is evident from the face of the Act itself: section 4-301(g) defines it as "a device that functions, or is intended to function, to perceptibly reduce or redirect muzzle flash from the shooter's field of vision." MD. CODE ANN, CRIM. LAW § 4-301(e)(1)(i). Thus the Act outlaws a feature that makes the firearm *more accurate* by reducing the operator's distraction and loss of night vision resulting from muzzle flash when the rifle is fired. Such a feature is particularly useful for a citizen

defending her home at night: by enhancing accurate shooting, a flash suppressor makes it more likely

the citizen will hit the criminal intruder and less likely that the shot will go wide and endanger another

member of the household (or a member of the public).  Maryland cannot possibly have a *legitimate*

interest, let alone an important or compelling one, in rendering firearms *less* accurate and therefore *more*

dangerous.  Features such as these are at least as useful for lawful self-defense and recreational use as

for criminal aggression.

What, then, can possibly explain why the Act singles out and condemns the firearms that it does?

A little history goes a long way towards providing an explanation.  The term "assault weapon" is a

neologism—a recent invention that does not denote any category of weapon recognized in the history of

firearms:

> Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms.  It is a
> political term, developed by anti-gun publicists to expand the category of 'assault rifles'
> so as to allow an attack on as many additional firearms as possible on the basis of
> undefined 'evil' appearance.

*Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (internal quotation

marks omitted).  Those who led this movement to demonize and outlaw semiautomatic rifles were not

coy about their agenda to deliberately mislead the public and distort public policy with imagined

problems.  In a strategy memorandum that he circulated to his colleagues, one of the leading advocates

of banning semiautomatic firearms wrote:

> Assault weapons . . . are a new topic.  The weapons' menacing looks, coupled with the
> public's confusion over fully automatic machine guns versus semi-automatic assault
> weapons—anything that looks like a machine gun is assumed to be a machine gun—can
> only increase the chance of public support for restrictions on these weapons.

Josh Sugarmann, *Assault Weapons and Accessories in America*, Violence Policy Center (emphasis

omitted), www.vpc.org/studies/awaconc.htm (last visited March 14, 2014).  *See also* Johnson, 60

HASTINGS L.J. at 1289-90 ("Some people still believe the assault weapons debate is about machine guns. This is not surprising given that proponents of the 1994 ban were counting on precisely that confusion. The calculation was political."); Bruce Kobayashi & Joseph Olson, *In re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons,"* 8 STAN. L. & POL'Y REV. 41, 43 (1997) (recounting Sugarmann's strategy and describing it as a "swindle").

In accord with this pedigree, the Act's pejorative classification of "assault weapons" turns not on a firearm's utility or appropriateness for self-defense or other lawful civilian purposes, nor on features that render a firearm unusually dangerous to the public or the police. *See Heller*, 554 U.S. at 627. Indeed, the State's own evidence acknowledges that "assault weapon" is a "political term[]." Mother Jones, *More than Half of Mass Shooters Used Assault Weapons and High-Capacity Magazines* (Feb. 27, 2013), Doc. 44-30 at 2. Rather, firearms are classified (and banned) based primarily on whether they have features frequently found on military firearms (other than automatic action, of course, which has long been sharply restricted on civilian firearms) or are believed simply to have particularly "menacing looks." Sugarmann, *Assault Weapons and Accessories in America*, *supra*. This explains the frequent use in the briefs of the State and its amici of terms like "military-style" firearms. The Act is all about style, not substance. And that sort of loose classification will not stand when what is at stake is a fundamental, enumerated constitutional right.

## IV.   The Act Is Unconstitutional Under Any Level of Scrutiny, Even if Such Balancing Tests Were Appropriate.

As an initial matter, the only balancing test that could possibly be appropriate is strict scrutiny, which requires that a restriction on a fundamental constitutional right be narrowly tailored to serve a compelling governmental interest. As explained above, the Supreme Court held in *McDonald* that the Second Amendment right to keep and bear arms is *fundamental*. And when a law interferes with

"fundamental constitutional rights," it generally is subject to "strict judicial scrutiny." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973). *See also, e.g.*, *Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("[C]lassifications affecting fundamental rights . . . are given the most exacting scrutiny."); *Perry Educ. Assoc. v. Perry Local Educators' Assoc.*, 460 U.S. 37, 54 (1983) ("[S]trict scrutiny [is] applied when government action impinges upon a fundamental right protected by the Constitution."). Because the Act strikes directly at the fundamental, enumerated right to keep and bear arms, nothing less than strict scrutiny would be permissible.

Indeed, the State concedes, as it must, that under Fourth Circuit precedent intermediate scrutiny is appropriate only when the law in question does "not substantially burden the core right of in-home self-defense by responsible, law-abiding citizens." State Br. 37. Thus, while the Fourth Circuit has applied intermediate scrutiny to laws restricting possession of arms outside the home, *see United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013), and to laws restricting possession of arms by criminals, *see United States v. Chester*, 628 F.3d 673, 682-83 (4th Cir. 2010), it has also made clear that "strict scrutiny [is] important to protect the core right of the self-defense of a law-abiding citizen in his home," *Masciandaro*, 638 F.3d at 471; *see also Woollard*, 712 F.3d at 876 ("[W]e assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny."). *Id*. at 459-60. That is precisely what is at stake here.

In any event, the Act could not pass even intermediate scrutiny because it is not "substantially related to the achievement" of the government's objective of advancing public safety. *United States v. Virginia*, 518 U.S. 515, 533 (1996). Indeed, *Heller* forecloses any possibility that the Act could satisfy intermediate scrutiny. The centerpiece of the State's attempted defense of the Act is its claim that the

arms banned by the Act "are disproportionately represented in mass public shootings."  State Br. 50.

But according to the State's own evidence, "[b]y far the *most* common weapons used in [mass

shootings] are semi-automatic handguns."  Mother Jones, *supra*, Doc. 44-30 at 3 (emphasis added).

Because under *Heller* banning these most common weapons used in mass shootings fails "any of the

standards of scrutiny [the Supreme Court has] applied to enumerated constitutional rights"—including

intermediate scrutiny—it follows *a fortiorari* that Maryland's Act does as well.  *Heller*, 554 U.S. at 628

& n.27.

　　　Furthermore, to the extent that some of the forbidden features—such as a flash suppressor—

singled out by the Act actually *enhance* a firearm's utility and safety for self-defense, the Act's ban on

certain types of semiautomatic firearms not only does not *substantially serve* its goal of advancing

public safety, it is affirmatively at war with it.

　　　In addition, it is wholly implausible that criminals bent on committing murder or other acts of

armed violence would pause to consider whether possession of their weapon of choice would be a

misdemeanor under the Maryland Act.  And even if this were not the case, a criminal could simply

substitute for a banned firearm another equally powerful—or even more powerful—semiautomatic

firearm that is not banned by the Act.  The 5.56 mm. round fired by the banned AR-15, for example, is

far less powerful and less lethal than typical hunting cartridges such as the Winchester .308, the .30-06

Springfield, or the 7 mm. Remington Magnum.  *See* GARY KLECK, TARGETING GUNS: FIREARMS AND

THEIR CONTROL 128 (1997) (Assault rifles "are generally less lethal than ordinary hunting rifles, while

['assault weapon'] pistols are no more lethal than [non-'assault weapon'] handguns.").  Again, the

term "assault weapon" does not denote any mechanically or functionally distinct category of

semiautomatic firearms but rather bans some semiautomatic firearms because of certain user-friendly

15

features or simply because of the way they look, while leaving other functionally indistinguishable and equally (or more) lethal firearms untouched.  As Gary Kleck—who is the Bordua Professor of Criminology at Florida State University—has explained: "The few dozen models of semiautomatic guns that ha[d] been banned as ['assault weapons' by the 1994 federal ban and similar State laws] are, as a group, mechanically identical to the hundreds of models not banned," and "[t]herefore, there is no basis for expecting that the outcomes of *any shootings* would be different (e.g., fewer lives lost or fewer persons shot) if unbanned semiautomatic guns capable of accepting detachable magazines were used instead of *mechanically identical, though cosmetically different*, banned ['assault weapons']."  GARY KLECK, TARGETING GUNS at 121 (emphasis added).

For example, the Act bans the "Ruger mini-14 folding stock model," MD. CODE ANN., PUB. SAFETY § 5-101(r)(2)(xxxiii), but not the far more common (and less expensive) Mini-14 Ranch Rifle, which fires precisely the same ammunition at precisely the same muzzle velocity and at precisely the same semiautomatic rate—one bullet at a time.  The only difference is that the Ranch Rifle has a solid wooden stock like a traditional hunting rifle, rather than a pistol grip and an adjustable folding stock, and therefore may appear less menacing to those who know nothing about firearms.  But it is plainly just as deadly, because the Ruger Mini-14 Ranch Rifle is what fascist lunatic Anders Behring used to slaughter sixty-nine teenagers at a summer camp in Norway on July 22, 2011.[3]  The new Maryland Act does not regulate the purchase and use of that weapon.

Empirical evidence from the now-expired 1994 federal ban on semiautomatic "assault weapons" supports the commonsense proposition that the Maryland Act will not materially advance public safety.

---

[3] *See* Julia Gronnevet, *Norway Killer Got on Ferry in Uniform*, ASSOC. PRESS (May 4, 2012), *available at* http://articles.philly.com/2012-05-04/news/31573726_1_bomb-attack-island-attack-police-officer.

To begin, this evidence indicates that criminals use "assault weapons" so infrequently that it cannot reasonably be expected that banning them would have a significant impact on crime or homicide rates. "Assault weapons" "were used in only a small fraction of gun crimes prior to the [1994] ban: about 2% according to most studies and no more than 8%." Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, Report to the Nat'l Inst. of Justice, Dep't of Justice (2004); *see also* KLECK, TARGETING GUNS at 41-42, 112. These results are consistent with surveys of convicted felons indicating that "criminals not only did not 'prefer' military-style guns, they were strongly *dis*inclined to carry them during commission of their crimes, even when they owned one." KLECK, TARGETING GUNS at 117. Police officers also report that criminals prefer not to use "the sophisticated and expensive assault weapons as commonly thought." Thomas E. Romano, *Firing Back: Legislative Attempts To Combat Assault Weapons*, 19 SETON HALL LEGIS. J. 857, 890 & n.171 (1995) (citing George R. Wilson, chief of the firearms division for the Washington, D.C. police department).

It is therefore not surprising that the effects on homicide of the now-expired federal "assault weapons" ban were "statistically insignificant." Peter Reuter & Jenny Mouzos, *Australia: A Massive Buyback of Low-Risk Guns*, in EVALUATING GUN POLICY 121, 141 (Jens Ludwig & Philip J. Cook eds., 2003); NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 97 (Charles F. Wellford et al. eds., 2005) ("[G]iven the nature of the [1994 assault weapons ban], the maximum potential effect of the ban on gun violence outcomes would be very small and, if there were any observable effects, very difficult to disentangle from chance yearly variation and other state and local gun violence initiatives that took place simultaneously."). Indeed, before the 1994 ban expired in 2004, a study sponsored by the National Institute of Justice reported that, if the ban were continued,

"effects on gun violence [were] likely to be small at best and perhaps too small for reliable measurement."  Koper, Report to the Nat'l Inst. of Justice at 3.  *See also* Johnson, 60 HASTINGS L.J. at 1290, 1302; Kopel, 20 J. CONTEMP. L. at 404-13.  Studies of state-level "assault weapons" bans likewise "suggest that [they] have not reduced crime."  Koper, Report to the Nat'l Inst. of Justice at 81 n.95.  *See also* Mark Gius, *An Examination of the Effects of Concealed Weapons Laws and Assault Weapons Bans on State-Level Murder Rates*, 21 APPLIED ECONOMICS LETTERS 265, 267 (2014) (finding no statistically significant relationship between state assault weapons bans and gun murder rates).

The greatest impact that the Act could possibly have is the inconsequential substitution of a lawful (but equally deadly) semiautomatic firearm for the banned firearm.  "[V]iolent criminals will simply resort to more easily attainable, equally lethal weapons."  Romano, 19 SETON HALL LEGIS. J. at 892; KLECK, TARGETING GUNS at 106 ("[R]estrictions on one subtype of firearms encourage criminals to substitute other gun types, and in some cases the most likely substitutes are even more dangerous than the targeted weapons.").

In sum, given the Act's arbitrary classification of firearms on the basis of cosmetic differences, its effect of making unavailable firearm features that improve functionality for personal protection, and the ready ability and eagerness of criminals to substitute functionally indistinguishable and equally deadly lawful firearms for the firearms it would ban, the Act's prohibition against *law-abiding* citizens owning certain semiautomatic firearms will not improve public safety.  This dooms the Act under intermediate scrutiny, for a legislative restriction on a constitutional right is presumed invalid unless the state can carry its burden of proof to show that the restriction serves an important government interest in a direct and substantial way.  *See, e.g.*, *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012) (The

burden is on the State "to make a 'strong showing' that a gun ban [i]s vital to public safety."); *Chester*, 628 F.3d at 683 ("intermediate scrutiny places the burden of establishing the required fit squarely upon the government"); *see also Nguyen v. INS.*, 533 U.S. 53, 73 (2001) (upholding sex classification because it was based on genuine "biological differences" between men and woman, not "misconceptions and prejudices"); *Virginia*, 518 U.S. at 533 (striking down sex classification that relied on "overbroad generalizations" rather than "enduring" or "inherent" differences between men and women).  Indeed, prohibitions on certain semiautomatic firearms are, as Law Professor Randy Barnett has recently explained, "simply irrational and therefore unconstitutional" under any standard of review.  Randy Barnett, *Gun Control Fails Rationality Test*, WASH. EXAMINER (Jan. 29, 2013), *available at* http://washingtonexaminer.com/gun-control-fails-rationality-test/article/2519971; *cf., e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) (requiring a special use permit for a home for the mentally disabled failed rational basis review because there was no "rational basis for believing" that the "home and those who would occupy it would threaten legitimate interests of the city in a way that other permitted uses such as boarding houses and hospitals would not"); *Department of Agric. v. Moreno*, 413 U.S. 528, 537 (1973) (a limitation on food stamp eligibility failed rational basis review because "[m]ost people in th[e] category" targeted by Congress "can and will alter their living arrangements in order to remain eligible for food stamps").

## V.      The Ban on Magazines Capable of Holding More than Ten Rounds Also Violates the Second Amendment.

The principles established by *Heller* and *McDonald* likewise dictate that the Act's prohibition on the purchase, sale, or transfer of magazines capable of holding more than ten rounds of ammunition is unconstitutional.  Again, the key question is whether firearms equipped with such magazines are in common use for lawful purposes.  Clearly they are.

19

Americans own tens of millions of magazines fitting this description.  *See* Koper, Report to the Nat'l Inst. of Justice at 65 ("[G]un industry sources estimated that there were 25 million [such magazines] available as of 1995 . . . .  [N]early 4.8 million . . . were imported for commercial sale . . . from 1994 through 2000 . . . .  During this period, furthermore, importers received permission to import a total of 47.2 million [such magazines]; consequently, an additional 42 million . . . may have arrived after 2000 or still be on their way, based on just those approved through 2000.").  Indeed, such magazines are standard equipment on many popular firearms owned by many millions of Americans for self-defense, hunting, and target shooting.  *See What Should America Do About Gun Violence?: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. 15-17 (2013), *available at* www.judiciary.senate.gov/pdf/1-30-13KopelTestimony.pdf (written testimony of David B. Kopel) [hereinafter "Kopel Testimony"].[4]

Because firearms equipped with magazines capable of holding more than ten rounds are in "common use" for "lawful purposes," the Constitution guarantees the right of law-abiding, responsible citizens to acquire, possess, and use them.  *Heller*, 554 U.S. at 624.  But even if a levels-of-scrutiny

---

[4] A review of the 2013 edition of Gun Digest, a standard reference work that includes specifications of currently available firearms, indicates that about two-thirds of the distinct models of semiautomatic centerfire rifles listed are normally sold with detachable magazines that hold more than ten rounds of ammunition. Even many rifles normally sold with magazines of smaller capacity are also capable of accepting standard magazines without modification. *See* GUN DIGEST 2013 455-64, 497-99 (Jerry Lee ed., 67th ed. 2012).  Similarly, somewhere between  one-third and one-half of distinct models of semiautomatic handguns listed—even allowing for versions sold in different calibers, which often have different ammunition capacities—are normally sold with magazines that hold more than ten rounds of ammunition.  *Id.* at 407-39.  In both cases, but especially for handguns, these figures underestimate the ubiquity of magazines capable of holding more than ten rounds of ammunition, because these figures include many diminutive pocket pistols and myriad minor variations of high-caliber handguns with large cartridges and therefore lower-capacity magazines (such as the ever-popular Colt .45 Model 1911), offered by low-volume custom manufacturers.

analysis were to apply, and even if, contrary to *Heller*, intermediate scrutiny were the applicable standard of review, the Act's magazine ban could not stand.

By definition, the magazines banned by the Act hold more rounds of ammunition than do those permitted. This allows the user to continue to operate his or her semiautomatic firearm—one round at a time—for a longer period of time without having to change magazines, a benefit both in a defensive confrontation (where most lawful firearm owners do not carry spare magazines) and also for developing precision in target shooting and other sporting uses. To the extent the time and presence of mind it takes to change magazines could, in some situations, make a difference in the outcome of a confrontation, it is clear that, on balance, restricting citizens to ten-round magazines will work to the advantage of criminals, not law-abiding citizens. First, there are tens of millions of higher capacity magazines already in circulation, and while law-abiding citizens will obey any new law restricting such magazines, criminals will not. And even if one indulges the nonsensical notion that such a ban will affect law-abiding citizens and criminals equally, it is predatory criminals, not their victims, who choose the time and place of confrontation. A criminal can thus plan in advance for the possibility that he will need more than a single ten-round magazine and equip himself accordingly.

Nor does available empirical evidence support a substantial connection between limiting citizens to ten-round magazines and public safety. As an initial matter, such a limit will be simply irrelevant to the vast majority of gun crimes. *See* KLECK, TARGETING GUNS at 123 ("It is unlikely that large-capacity magazines are currently relevant to the outcome of a large number of violent incidents, since few cases involve large numbers of shots fired."). "[A]vailable studies on shots fired show that assailants fire less than four shots on average . . . ." Koper, Report to the Nat'l Inst. of Justice at 90. Further, it is unlikely that such a limit would have much of an impact even in those rare instances in which criminals fire more

21

than ten shots.  A study of "mass shootings"—i.e., incidents in which "six or more victims were shot

dead with a gun, or twelve or more total were wounded"—found that "[f]or those incidents where the

number of rounds fired and the duration of the shooting were both reported, the rate of fire never was

faster than about one round every two seconds, and was usually much slower than that."  KLECK,

TARGETING GUNS at 124-25.  Thus, "[n]one of the mass killers maintained a sustained rate of fire that

could not also have been maintained—even taking reloading time into account—with either multiple

guns or with an ordinary six-shot revolver and the common loading devices known as 'speedloaders.' "

*Id*. at 125.  Furthermore, as more recent incidents demonstrate, mass shooters simply (and quickly)

change magazines even before the current magazine is empty.  *See* Kopel Testimony at 19 ("At

Newtown, the murderer changed magazines many times, firing only a portion of the rounds in each

magazine . . . .  In the Virginia Tech murders, the perpetrator changed magazines 17 times.").  Finally, a

criminal with multiple guns can avoid the need to reload by merely changing guns when the first gun

runs out of ammunition. The perpetrators of the majority of mass shootings carry multiple firearms.

KLECK, TARGETING GUNS at 125, 144 (table 4.2).

By contrast, the defensive utility of having a magazine capable of holding more than ten rounds

of ammunition is obvious.  A law-abiding person who runs out of ammunition before her attacker does

is very likely to become a crime victim.  And a person faced with one or more armed assailants could

well need to fire more than ten shots to defend herself and may not be able to change magazines

immediately.  Criminals do not announce their intentions in advance; therefore victims will rarely have

more than a single magazine immediately available, and even if a victim has additional magazines, a

law-abiding person suddenly stressed by a violent armed attacker is likely to take longer to change

magazines than when calmly shooting at the firing range.  And if the victim is elderly or disabled,

changing magazines in time to make a difference may be impossible.

## VI.    The Majority Opinion of the D.C. Circuit in *Heller II* Was Deeply Flawed.

In *Heller II*, a divided panel of the D.C. Circuit held that the District of Columbia's ban on

semiautomatic "assault rifles" did not violate the Second Amendment.  Judge Kavanaugh's dissent

forcefully and compellingly explains why *Heller* and *McDonald* mandate a textual and historical

inquiry, not an intermediate scrutiny analysis, and why D.C.'s "assault rifle" ban—and therefore the

Maryland Act's "assault weapon" ban—is unconstitutional under either of these approaches.  *Heller II* is

the only circuit court of appeals decision to consider a ban on semiautomatic weapons and magazines

that hold more than ten rounds.  The majority opinion in *Heller II* was deeply flawed for a variety of

reasons pertinent to the constitutionality of the Act.

*First*, the panel majority acknowledged that semi-automatic rifles are in "common use" (without

identifying the purposes for which they are commonly used) and that there is no "longstanding" tradition

of prohibiting their use.  *See Heller II*, 670 F.3d at 1260-61.  Under *Heller*, that should have been the

end of the matter, and the District of Columbia's ban should have been struck down.  But the panel

majority instead proceeded to apply a levels-of-scrutiny analysis, with the level of scrutiny turning on

the Court's view of "how severely the prohibitions burden the Second Amendment right."  *Id*. at 1261.

Under the panel majority's analysis, in other words, the level of scrutiny to be applied in Second

Amendment cases turns on the very balancing of interests that *Heller* expressly forbids.

*Second*, the panel majority erred by deeming intermediate scrutiny the proper standard.  As

explained above, the *Heller* majority rejected the test Justice Breyer advanced in his dissent, which was

a form of intermediate scrutiny.  Indeed, it is telling that in explicating the intermediate scrutiny standard

it was applying, the panel majority in *Heller II* repeatedly invoked *Turner Broadcasting*, the very case that Justice Breyer held up as exemplary of the interest-balancing approach he was advocating, and indeed the panel majority *quoted much of the same language from Turner quoted by Justice Breyer*. *Compare Heller II*, 670 F.3d at 1259, *with Heller*, 554 U.S. at 704-05 (Breyer, J., dissenting). *Heller* prohibits application of this standard to a ban on firearms protected by the Second Amendment.

*Third*, the panel majority's rationale for applying intermediate scrutiny cannot be squared with *Heller*. The panel majority reasoned that "the laws at issue here do not prohibit the possession of 'the quintessential self-defense weapon,' to wit, the handgun," *Heller II*, 670 F.3d at 1261-62 (quoting *Heller*, 554 U.S. at 629), and therefore concluded that "the ban on certain semi-automatic rifles [does not] prevent a person from keeping a suitable and commonly used weapon for protection in the home or for hunting," *id.* at 1262. Leaving aside the fact that the Act *does* prohibit many common handguns, the *Heller II* panel majority's reasoning is unpersuasive. Its argument is "a bit like saying books can be banned because people can always read newspapers. That is not a persuasive or legitimate way to analyze a law that directly infringes an enumerated constitutional right." *Id.* at 1289 (Kavanaugh, J., dissenting). And under *Heller*, it is not the government's prerogative to pick and choose which constitutionally protected arms may be used for lawful purposes; rather, that right is reserved to the law-abiding citizens of this Nation. The Second Amendment confers a *right* that the government may not infringe, not a mere privilege that the government may suspend. Thus, in *Heller*, "[i]t [was] no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms . . . is allowed." 554 U.S. at 629. And in *Heller II*, it likewise should have been no answer to say that it is permissible to ban some semiautomatic rifles so long as the possession of other firearms is allowed.

*Fourth*, the panel majority's application of intermediate scrutiny cannot be reconciled with *Heller*.  *Heller* concluded, as noted earlier, that the District of Columbia's handgun ban would "fail constitutional muster" under "any of the standards of scrutiny the Court has applied to enumerated constitutional rights," 554 U.S. at 571, including intermediate scrutiny, which is applied in some situations in which an enumerated right is burdened in an incidental or marginal way.  *See, e.g.*, *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991) ("expressive conduct within the outer perimeters of the First Amendment, though . . . only marginally so"); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) (commercial speech, which has a "subordinate position in the scale of First Amendment values").  If the District of Columbia's ban on handguns could not pass intermediate scrutiny (i.e., was not substantially related to public safety), it follows that its ban on certain semiautomatic firearms likewise could not pass this level of heightened scrutiny.  For while the panel majority labored mightily to prove the unremarkable proposition that *criminals* could misuse "assault weapons," *see Heller II*, 670 F.3d at 1262-63, the same was true of the handguns at issue in *Heller*, where the point was subject to lively debate but persuaded only the *dissenters*.  *See, e.g.*, *Heller*, 554 U.S. at 697-99 (Breyer, J., dissenting) ("From 1993 to 1997, 81% of firearm-homicide victims were killed by handgun . . . .  Handguns also appear to be a very popular weapon among criminals . . . .  [T]he linkage of handguns to firearms deaths and injuries appears to be much stronger in urban than in rural areas.").

This illustrates what is perhaps the most fundamental flaw in the panel majority's reasoning:  its focus on ways in which certain firearms may be misused by *criminals*, rather than on ways in which they may be put to lawful defensive use by *law-abiding citizens*.  Unlike the *Heller* dissenters, the Supreme Court's majority opinion focused on the latter, not the former, explaining that a handgun

> is easier to store in a location that is readily accessible in an emergency; it cannot easily
> be redirected or wrestled away by an attacker; it is easier to use for those without the

25

> upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one
> hand while the other hand dials the police.

554 U.S. at 629.  Many of these attributes, of course, also explain why criminals prefer to use handguns,

but that is not what the *Heller* majority deemed relevant.  Conversely, many of the attributes of "assault

weapons" that the *Heller II* panel majority deemed pernicious enhance their fitness as defensive, *anti-*

*assault* weapons when in the hands of law-abiding citizens.  *See Heller II*, 670 F.3d at 1262-63.

The Supreme Court's approach is binding on this Court, of course, but in any event it also makes

more sense.  Criminals are by definition much less likely than law-abiding citizens to comply with

restrictions on firearms.  Thus, to the extent a certain firearm gives one party to a confrontation an

advantage, banning that firearm will work to the benefit of the criminals, not their law-abiding victims.

At any rate, the panel majority's intermediate-scrutiny analysis ultimately is at war with itself.

Recall the panel majority's reasoning for applying intermediate scrutiny in the first place: that the ban

would not "prevent a person from keeping a suitable and commonly used weapon for protection in the

home or for hunting." *Heller II*, 670 F.3d at 1262.  Of course, it is also true that the ban would not

prevent a criminal from simply substituting for a banned semiautomatic "assault rifle" another equally

lethal semiautomatic firearm just as "suitable and commonly used" for criminal purposes.  It is therefore

simply irrational to expect that dubbing a subcategory of semiautomatic firearms "assault weapons" and

banning their possession will improve public safety.

*Fifth*, and finally, the panel majority erred by equating semiautomatic firearms like the civilian

AR-15 with fully automatic firearms like the military M-16.  According to the panel majority, "*Heller*

suggests 'M-16 rifles and the like' may be banned because they are 'dangerous and unusual.' "  *Heller*

*II*, 670 F.3d at 1263 (quoting *Heller*, 554 U.S. at 627).  Citing the *Staples* decision, the panel majority

then indulged a stunning *non sequitur* by blithely concluding that the two firearms are equivalent: "The

26

Court had previously described the 'AR-15' as 'the civilian version of the military's M-16 rifle.' " *Id.* (quoting *Staples*, 511 U.S. at 603). But *Staples* was not *equating* the AR-15 with the M-16; to the contrary, it held that the AR-15, *unlike* the M-16, is among weapons that "*traditionally have been widely accepted as lawful possessions*." *Staples*, 511 U.S. at 612 (emphasis added). The key distinction between these two firearms, of course, is that the AR-15 is semiautomatic, while the M-16 is fully automatic and thus has long been effectively restricted to military use. The *Heller II* panel majority acknowledged this difference, but instead of recognizing it as an essential distinction, sought to diminish it: "Although semi-automatic firearms, unlike automatic M-16s, fire only one shot with each pull of the trigger, semi-automatics still fire almost as rapidly as automatics." 670 F.3d at 1263 (citation omitted) (internal quotation marks omitted). There are several problems with this argument. First, the "the majority opinion's data indicate that semi-automatics actually fire two-and-a-half times slower than automatics." *Id.* at 1289 (Kavanaugh, J., dissenting). Second, the majority opinion's data is suspect—it uncritically cites legislative testimony by lobbyist Brian Siebel that a semiautomatic firearm emptied a 30-round magazine in five seconds, thus firing six shots per second. *Id.* at 1263. But the United States Army M16/M4 Training Manual, which the State itself relies on here, State Br. 9, indicates that the maximum effective rate of fire for semiautomatic firing is 45 rounds per minute—less than one round per second. *See* UNITED STATES DEP'T OF ARMY, RIFLE MARKSMANSHIP, M16/M4 SERIES WEAPONS 2-1 (2008), *available at* http://armypubs.army.mil/doctrine/DR_pubs/dr_a/pdf/fm3_22x9.pdf. Finally, taken to its logical conclusion, the majority opinion's reasoning would justify a ban on *all* semiautomatic weapons. This cannot possibly be right under *Heller*, given that semiautomatic firearms are ubiquitous and used by tens of millions of Americans for self-defense, hunting, target-shooting and other lawful purposes.

27

The plaintiffs in *Heller II* also challenged the District of Columbia's ban on magazines capable of holding more than ten rounds of ammunition.  The *Heller II* panel majority also rejected this challenge.  (Judge Kavanaugh would have remanded for further proceedings on this issue.)  Given that the panel majority addressed both bans together, the panel majority's ruling on the magazine ban is subject to most of the same criticisms as its erroneous ruling on the semiautomatic "assault rifle" ban.  For example, like "assault rifles," the panel majority found it "clear enough" that "magazines holding more than ten rounds are indeed in 'common use.' " *Heller II*, 670 F.3d at 1261.  That is undoubtedly true and it should have been the end of the matter.  But instead of striking down the law, the panel majority applied intermediate scrutiny and pointed to testimony that "the '2 or 3 second pause' during which a criminal reloads his firearm 'can be of critical benefit to law enforcement,' " while ignoring the obvious corollary that such a 2 or 3 second pause during which a *victim* reloads a firearm *can be of equally critical benefit to a criminal*.  *Id.* at 1264.  And the panel majority did not address the evidence discussed above showing that banning magazines capable of holding more than ten rounds of ammunition is unlikely to promote public safety.

For these reasons, any reliance upon *Heller II* to support the constitutionality of the Maryland Act is ill-founded.  *Heller* and *McDonald* (and not the flawed analysis of *Heller II*) govern the examination to be given to the Act.  The firearms and magazines which are banned by the Act and which future firearms owners cannot even consider purchasing are clearly ones long in common use.  Thus, *Heller II* notwithstanding, the Act is in violation of the Second Amendment.

## CONCLUSION

The principles established by the Supreme Court's decisions in *Heller* and *McDonald* make it clear that the Act's ban on certain common firearms and standard magazines violates the Second

Amendment by prohibiting the use of arms that are in common use by ordinary Americans for self-

defense and other lawful purposes.


March 17, 2014                                    Respectfully submitted,

                                                  /s/ Vincent J. Colatriano
                                                 Vincent J. Colatriano, D. Md. No. 0-8023
                                                 *Of Counsel*:
                                                 Charles J. Cooper
                                                 David H. Thompson
                                                 Peter A. Patterson
                                                 COOPER & KIRK, PLLC
                                                 1523 New Hampshire Avenue, N.W.
                                                 Washington, D.C. 20036
                                                 (202) 220-9600
                                                 (202) 220-9601 (fax)
                                                 vcolatriano@cooperkirk.com
                                                 ccooper@cooperkirk.com
                                                 dthompson@cooperkirk.com
                                                 ppatterson@cooperkirk.com

                                                 *Counsel for Amicus Curiae*
                                                 *National Rifle Association of America, Inc.*