**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

| | | |
|---|---|---|
| **STEPHEN V. KOLBE, et al.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No.: 1:13-cv-02841-CCB** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MARTIN J. O'MALLEY, et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY
JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Plaintiffs Stephen V. Kolbe, Andrew C. Turner, Wink's Sporting Goods, Atlantic Guns, Inc. and

association Plaintiffs Associated Gun Clubs of Baltimore, Inc., Maryland Shall Issue, Inc., Maryland

State Rifle and Pistol Association, Inc., National Shooting Sports Foundation, Inc., and Maryland

Licensed Firearms Dealers Association, Inc. (collectively, "Plaintiffs"), by and through undersigned

counsel, submit this Memorandum in Support of Plaintiffs' Cross-Motion for Summary Judgment and in

Opposition to Defendants' Motion for Summary Judgment.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

THE PLAINTIFFS.........................................................................................................................4

INTRODUCTION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT ................... 8

STANDARD OF REVIEW..............................................................................................................11

STATUTORY FRAMEWORK…………………………………………………………………………12

STATEMENT OF UNDISPUTED FACTS ................................................................................ 13

    A.     The Banned Firearms and Magazines Are Commonly Possessed.....................................13
    B.     The Banned Firearms and Magazines are Possessed for Lawful Purposes.....................16
    C.     Bans on "Assault Weapons" and "Large Capacity Magazines" Are Ineffective..............19
    D.     Plaintiffs Are Similarly Situated with Retired Law Enforcement Officers......................21
    E.     The Term "Copies" Is Subject to Differing Interpretations.............................................22

ARGUMENT ON PLAINTIFFS' CROSS-MOTION ................................................................ 23

    A.     The Challenged Laws Deny Plaintiffs Rights Protected by the Second Amendment ...... 23

          1.     The Textual and Historical Foundations of the Second Amendment Illustrate
                 that the Maryland Laws Challenged by Plaintiffs Are Unconstitutional..............23
          2.     Alternatively, If the Court Does Apply a Balancing Test,
                 It Must Apply Strict Scrutiny.................................................................25

    B.     The Challenged Laws Fail Even Intermediate Scrutiny .................................................. 31

    C.     The Challenged Laws Deny Plaintiffs Equal Protection Under the Law ........................ 38

    D.     The Term "Copies" Is Vague, Denying Plaintiffs Due Process of Law .......................... 40

CONCLUSION ON PLAINTIFFS' CROSS-MOTION....................................................................... 44

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ................................. 46

ARGUMENT IN OPPOSITION TO DEFENDANTS' MOTION ....................................................... 49

    A.     The Facts Set Forth by Defendants Are Disputed, Non-Material, or Conclusions.......... 49

    B.     Defendants' Legal Arguments Misstate and Misapply the Law........................................ 59

          1.     Defendants Misstate the Applicable Second Amendment Standards .................... 59

                i)     The Banned Firearms Do Not Fall Outside the Protections
                       of the Second Amendment........................................................ 62

                ii)     The Banned Magazines Are Protected by the Second Amendment........... 66

                iii)    The Challenged Laws Are Unconstitutional Under the Second
                      Amendment............................................................................. 74

i

2.      Plaintiffs Are Similarly Situated to Retired Law Enforcement Officers
        and the Challenged Laws Deny Them Equal Protection of the Law ................... 80

3.      The Term "Copies" Is Unconstitutionally Vague .................................................. 82

CONCLUSION IN OPPOSITION TO DEFENDANTS' MOTION ....................................................... 86

## TABLE OF MAJOR AUTHORITIES

**Cases**

*11126 Baltimore Boulevard v. Prince George's County*,
886 F.2d 1415 (4th Cir. 1989) ............................................................................... 34

*Centro Tepeyac v. Montgomery County*,
722 F.3d 184 (4th Cir. 2013) .................................................................................. 28

*City of Chicago v. Morales*,
527 U.S. 41 (1999) .................................................................................................. 41

*City of Cleburne v. Cleburne Living Center*,
473 U.S. 432 (1995) ................................................................................................ 82

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ......................................................................................... passim

*Drake v. Filko*,
724 F.3d 426 (3rd Cir. 2013) ................................................................................. 33

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ............................................................ 9, 26, 61, 67, 68

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ................................................................................................ 40

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") ................................................... passim

*In re Balas*,
449 B.R. 567 (Bkr. C.D. Cal. 2011) ...................................................................... 35

*Kachalsky v. County of Westchester*,
701 F.3d 81 (2012) .................................................................................................. 32

*Kampfer v. Cuomo*,
2014 U.S. Dist LEXIS 1479 (N.D.N.Y. 2014) ...................................................... 61

*Libertarian Party of Va. v. Judd.*,
718 F.3d 308 (4th Cir. 2013) .................................................................................. 30

*McDonald v. City of Chicago*,
130 S.Ct. 3020 (2010) ......................................................................................... 1, 23

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
2013 U.S. Dist. LEXIS 182307 (W.D.N.Y. 2013) ......................................... passim

*NAACP v. City of Annapolis*,
133 F. Supp. 2d. 795 (D. Md. 2001) ...................................................................... 41

*Panetti v. Quarterman*,
    551 U.S. 930 (2007)................................................................................................ 38

*Peruta v. County of San Diego*, No. 10-56971,
    2014 U.S. App. LEXIS 2786 (9th Cir. Feb. 13, 2014) ................................ passim

*Rothe Dev. Corp. v. Department of Defense*,
    262 F.3d 1306 (Fed. Cir. 2001) ......................................................................... 28

*Rothe Dev. Corp v. Department of Defense*,
    413 F.3d 1327 (Fed. Cir. 2005) ......................................................................... 29

*Rothe Dev. Corp. v. Department of Defense*,
    545 F.3d 1023 (Fed. Cir. 2008) ......................................................................... 28

*Shew v. Malloy*,
    2014 U.S. Dist. LEXIS 11339 (D. Conn. 2014) ....................................... passim

*Silveira v. Lockyer*,
    312 F.3d 1052 (9th Cir. 2002) ..................................................................... 39, 82

*Sons of Confederate Veterans v. Comm'r of the Va. Dept. of Motor Vehicles*,
    288 F.310 610 (4th Cir. 2002) ........................................................................... 30

*Springfield Armory, Inc. v. City of Columbus*,
    29 F.3d 250 (6th Cir. 1994) ............................................................................... 83

*Staples v. United States*,
    511 U.S. 600 (1994)........................................................................................... 25

*State v. Catrino*,
    Case No. 22-K-13-000497 (Wicomico County, Md. 2013) ............................... 81

*Turner Broadcasting Systems, Inc. v. FCC*,
    512 U.S. 622 (1994).......................................................................................... 9, 32

*United States v Forbes*,
    806 F. Supp 232 (D. Colo. 1992)....................................................................... 85

*United States v. Carter*,
    669 F.3d 411 (4th Cir. 2012) ................................................................ 27, 28, 34

*United States v. Chester*,
    628 F.3d 673 (4th Cir. 2010) ...................................................................... passim

*United States v. Clifford*,
    197 F. Supp. 2d 516 (E.D. Va. 2002) ................................................................ 85

*United States v. Hodge*,
    321 F.3d 429 (3rd Cir. 2003) ............................................................................. 85

*United States v. Jackson*,
    390 U.S. 570 (1968)........................................................................................... 39

*United States v. Klecker,*
   348 F.3d 69 (4th Cir. 2003) ................................................................ 85, 86

*United States v. Klecker,*
   228 F. Supp. 2d 702 (E.D. Va. 2002) .................................................. 85, 86

*United States v. Masciandaro,*
   638 F.3d 458 (4th Cir. 2011) ................................................................... 27

*United States v. Miller,*
   307 U.S. 174 (1939) ........................................................................... 23, 24

*United States v. Reese,*
   92 U.S. (2 Otto) 214 (1875) ..................................................................... 40

*United States v. Roberts,*
   No. 01 Cr. 410, 2001 U.S. Dist. LEXIS 20577 (S.D.N.Y Dec. 14, 2001),
   *vacated on other grounds by* 363 F.3d 118 (2nd Cir. 2004) ................... 85

*United States v. Vickery,*
   199 F. Supp. 2d 1363 (N.D. Ga. 2002) ................................................... 85

*United States v. Virginia,*
   518 U.S. 515 (1996) ................................................................................. 35

*United States v. Washam,*
   312 F.3d 926 (8th Cir. 2002) ................................................................... 85

*Wilson v. County of Cook,*
   968 N.E.2d 641 (Ill. 2012) ....................................................................... 84

*Woollard v. Gallagher,*
   712 F.3d 865 (4th Cir. 2013) ............................................................ 28, 35

**Statutes**

18 U.S.C. § 922(g)(9) ................................................................................... 25

21 U. S. C. § 802 .......................................................................................... 85

MD. CODE ANN. CRIM. L. § 4-301(d) ............................................................ 53

MD. CODE ANN. CRIM. L. § 4-301(e)(1)(i) ..................................................... 51

MD. CODE ANN. CRIM. L. § 4-302(7) .............................................. 10, 21, 81

MD. CODE ANN. CRIM. L. § 4-302(7)(i) .......................................................... 38

MD. CODE ANN. CRIM. L. § 4-303 ................................................................ 12

MD. CODE ANN. CRIM. L. § 4-305 ................................................................ 13

MD. CODE ANN. CRIM. L. § 4-305(a)(2) ....................................... 10, 21, 38, 53

MD. CODE ANN. CRIM. L. § 4-402(b)(4) ........................................................ 59

Md. Code Ann. Crim. L. §§ 4-303(a)(2), 4-305(b) ................................................................... 2

**Other Authorities**

95 Op. Att'y Gen. 101 (2010) ........................................................................................... 43, 83

Daily Mail Reporter, *"I Didn't Have Time to Get Scared:" Surveillance Camera Captures the Moment Mother Opens Fire on Home Invaders with Assault Rifle* ...................................... 65, 66

Fed. R. Civ. P. 56 .............................................................................................................. 11, 49

Jessica Anderson & Justin George,
    *Police Say Columbia Mall Shooter Wanted to Mimic Columbine* ......................................... 1

## PRELIMINARY STATEMENT

Unlike many other States, Maryland has never preserved in its constitution the right to keep and bear arms.  It is not surprising, then, that Defendants already employed one of the nation's more restrictive regimes regulating the acquisition and ownership of firearms at the time the United States Supreme Court first recognized this fundamental individual right. *See District of Columbia v. Heller*, 554 U.S. 570 (2008) (recognizing that the Second Amendment protects an individual, rather than collective, right to possess a commonly-possessed firearm); *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010) (incorporating the Second Amendment to be applicable to the States).  Instead of narrowing its firearms regulations in light of the Supreme Court's teaching to ensure the State did not infringe on Plaintiffs' fundamental constitutional rights, however, Maryland chose to increase the infringement of those rights, based on rationales that could never justify intruding on other constitutional rights.

Within the last week, the Howard County Police released the findings of their investigation of the shooting that occurred at the Columbia Mall in Howard County.  *See* Jessica Anderson & Justin George, *Police Say Columbia Mall Shooter Wanted to Mimic Columbine*, *available at http://www.baltimoresun.com/news/maryland/howard/columbia/bs-md-columbia-mall-shooting-update-20140312,0,5307854.full.story*.  The investigation revealed that the mentally ill man who committed this crime with a shotgun was "inspired by the 1999 Columbine High School shootings."  *Id.*  Had the government banned reporting on mass shootings, such as that at Columbine High School, the tragic event at the Columbia Mall plausibly could have been prevented.  Yet, no legislature has called for such a law, and for good reason; such a content-based restriction on fundamental First Amendment rights would be an anathema – an affront to the right of free speech that is fundamental to our scheme of liberty.

1

Yet, based on equally flimsy speculation, Defendants are restricting severely Plaintiffs' fundamental right protected by the Second Amendment to acquire firearms commonly possessed for lawful purposes.  The Maryland Firearm Safety Act of 2013 (the "Act") amended various sections of the Maryland Code to prohibit the possession, sale, offering for sale, transfer, purchase, or receipt of various commonly possessed firearms (designated "Assault Long Guns").   The Act also prohibits the manufacture, sale, purchase, receipt, or transfer of commonly possessed detachable magazines with a capacity of more than ten rounds of ammunition (designated "Large Capacity Magazines"). MD. CODE. ANN. CRIM. L. §§ 4-303(a)(2), 4-305(b).  Because the Maryland General Assembly made no findings, we are left to speculate as to the intended purpose of the Act.  Defendants have advanced an after-the-fact rationale that the Act was passed in hope of deterring mass shootings in Maryland.  The laws challenged by Plaintiffs will do nothing to promote safety, or any other legitimate purpose, but do infringe the constitutional rights of Plaintiffs and responsible, law-abiding citizens across Maryland.

The fact that patent violations of the Second Amendment do not evoke the same visceral public condemnation is not a reflection that those rights are second-class rights; rather, it is the natural result of two centuries having elapsed before the scope of the Second Amendment was made clear.  Courts and legislatures not only have failed to embrace fully the Supreme Court's holding in *Heller*, they have gone to great lengths to manipulate and distort the Court's holding, or otherwise chisel away or constrain its scope.  This has been done in flagrant disregard of constitutional demands.

This phenomenon has precedent in modern jurisprudence.  After the United States Supreme Court's seminal decision in *Roe v. Wade*, 410 U.S. 113 (1973), state legislatures and lower courts throughout the country made every effort to deny, ignore, limit, misapply and restrict the rights the Court had acknowledged for the first time.  This led to years of frustration and litigation, culminating in

several later decisions where the Supreme Court overturned restriction after restriction, explaining every time that its holding in *Roe* was not being given the credence it required by the legislatures or lower courts. *See City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416 (1983); *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747 (1986); *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992); and *Stenberg v. Carhart*, 530 U.S. 914 (2000).

This same phenomenon has been demonstrated in the majority of Second Amendment cases that have followed *Heller* and even *McDonald*, where governmental defendants have chided plaintiffs (sadly, often with the approval of the courts) for relying on *dicta* in *Heller* to interpret that case to stand for anything other than banning handguns is unconstitutional. At the same time, those same defendants rely upon *Heller*'s statements regarding "dangerous and unusual weapons" and express recognition of regulation of the M-16 which are, of course, *dicta*. Plaintiffs recognize that there exists a serious and legitimate policy debate as to the rights protected by the Second Amendment, but as the Supreme Court has held, "[This] raises moral and spiritual questions over which honorable persons disagree sincerely and profoundly. But those disagreements did not then and do not now relieve us of our duty to apply the Constitution faithfully." *Thornburgh*, *supra*, at 771-772. Should the people as a nation ever determine that the Second Amendment is no longer necessary, or has proven too burdensome, there exists a political mechanism for amending the Constitution.

For the first time in Maryland, this Court is faced with a Second Amendment challenge to a law that infringes upon the right of law-abiding, responsible citizens to acquire commonly-possessed firearms in their homes. The scope of the challenged laws, the teachings of *Heller*, and the facts of the case make clear: bans on commonly possessed firearms and magazines are plainly offensive to the

Second and Fourteenth Amendments, and this Court must protect Plaintiffs' rights against the enforcement of these laws.

## THE PLAINTIFFS

Plaintiff Stephen V. Kolbe is a small business owner.  (Declaration of Stephen V. Kolbe, Ex. 2 at ¶ 9.)  He is the married father of two young children.  (*Id.* at ¶ 12.)  He currently owns only a single handgun with a standard capacity magazine exceeding ten rounds.  (*Id.* at ¶ 3.)  Plaintiff Kolbe did not purchase a banned firearm prior to the ban because he could not afford to purchase one at the time. (*Id.* at ¶ 5.)  He wishes to purchase one in the future, however, if the law allows him to do so.  (*Id.*)  Plaintiff Kolbe lives on a busy highway, and strangers often approach his house.  (*Id.* at ¶ 10.)  He waited over 30 minutes once for police to respond when an employee of his nearby small business was threatened with deadly harm.  (*Id.* at ¶ 9)  He simply wishes to have access to firearms and magazines of his choice to protect himself and his family in their home, and believes that the challenged law is an unconstitutional restriction on his right of self-defense.  (*Id.* at ¶ 13.)

Plaintiff Andrew C. Turner is a retired Master-At-Arms of the United States Navy. (Declaration of Andrew C. Turner, Ex. 3 at ¶ 8.)  He suffers a partial paralysis of his right (dominant) hand, which was caused by an injury to his right arm he received while on active duty in the Navy.  (*Id.*)  As a result, it is difficult for Plaintiff Turner to operate quickly some types of firearms.  (*Id.*)  He requires access to standard capacity magazines and semi-automatic firearms to fully utilize those firearms at the practice range and to ensure his ability to defend himself in his home.  (*Id.*)  While he currently owns at least one of the now-banned firearms, he would like to purchase others in the future, and would like to build and shoot his own AR-platform rifle as part of his rehabilitation therapy. (*Id.* at ¶ 5)  He also owns at least one semi-automatic handgun with a standard capacity in excess of ten rounds, and wants to be able to

purchase other magazines so he can fully utilize his handgun and adequately defend himself in his home. (*Id.* at ¶¶ 3, 8.)

Plaintiff Atlantic Guns, Inc. ("Atlantic Guns"), is a family-owned gun store founded in 1950 by the father of the current owner. It has locations in Silver Spring and Rockville, Maryland. (Declaration of Steven G. Schneider, Ex. 4 at ¶ 4.) Atlantic Guns is a licensed Maryland regulated firearms dealer, and it buys, sells, receives, and transfers firearms within and without Maryland. (*Id.* at ¶¶ 4, 5.) Atlantic Guns sells ammunition and magazines. (*Id.* at ¶ 5.) Prior to the implementation of the ban, Atlantic Guns sold commonly used firearms and standard capacity magazines banned by the Act. (*Id.*) Atlantic Guns' business has been severely impacted by the passage of the Act by not being able to provide customers the commonly possessed firearms and magazines of their choice. (*Id.* ¶ 6.)

Plaintiff Wink's Sporting Goods ("Wink's") is a family-owned outdoor sporting goods store with its principal place of business in the small community of Princess Anne, Maryland. (Declaration of Carol O. Wink, Ex. 5 at ¶¶ 2, 6.) Wink's is a licensed Maryland regulated firearms dealer, and it buys, sells, receives, and transfers firearms within and without Maryland. (*Id.* at ¶¶ 2, 3.) Wink's also sells ammunition and magazines. (*Id.* at ¶ 3.) Prior to the passage of the Act, Wink's sold commonly used semiautomatic rifles and standard capacity magazines banned by the Act, but has suffered substantial harm to its business as a result of the Act by not being able to provide customers the commonly possessed firearms and magazines of their choice. (*Id.* at ¶ 4-6.)

Plaintiff Associated Gun Clubs of Maryland ("AGC") is a Maryland corporation that was formed on July 1, 1944, when a number of World War II veterans in the Baltimore area began looking for a place for recreational and competitive shooting. (Declaration of John H. Josselyn, Ex. 6 at ¶ 3.) In addition to operating a target shooting range facility in Marriottsville; providing hunting and target

5

shooting instruction courses that promote general firearm safety; and offering programs and events that encourage adult and youth participation in the shooting sports, AGC supports, encourages, and actively promotes the private ownership of firearms for all law-abiding, responsible citizens.  (*Id.*)  AGC consists of 15 charter member clubs as well as 14 associate member clubs.  (*Id.*)  The individual members of AGC are suffering infringement of their right to acquire commonly possessed firearms for use in self-defense and other lawful purposes.  (*Id.* at ¶ 5, 6.)

Plaintiff Maryland Licensed Firearms Dealers Association ("MLFDA") is a Maryland corporation that represents the constitutional and economic interests of its individual firearms dealer members in the State of Maryland as well as those of its members' customers and potential customers. (Declaration of Steven G. Schneider, Ex. 4 at ¶ 3.)  MLFDA advocates on behalf of its individual members. (*Id.*)  Specifically, many of MLFDA's individual members are Maryland regulated firearms dealers, such that they are permitted to buy, sell, import, and manufacture firearms and ammunition within the State of Maryland.  (*Id.*)  Until the effective date of the Act, MLFDA's individual members sold the now-banned commonly used firearms and magazines, but now have been severely impacted by not being able to provide customers the commonly possessed firearms and magazines of their choice. (*Id.* at ¶ 6.)

Plaintiff Maryland Shall Issue ("MSI") is an all volunteer, non-partisan organization dedicated to the preservation and advancement of gun owners' rights in Maryland. (Declaration of Patrick W. Shomo, Ex. 7 at ¶ 3.)  MSI seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public.  (*Id.*)  The individual members of MSI are being denied their right to acquire commonly possessed firearms for use in self-defense and other lawful purposes. (*Id.* at ¶ 7.)

6

Plaintiff Maryland State Rifle and Pistol Association ("MSRPA") is an organization dedicated to promoting safe and responsible marksmanship competition and hunter safety throughout Maryland. (Declaration of Gregory J. Nolte, Ex. 8 at ¶ 3.)  MSRPA also seeks to educate citizens about responsible firearm ownership.   MSRPA advocates on behalf of its individual members. (*Id.*)   Its individual members include both marksmanship clubs and individual firearm owners, who are being denied their right to acquire commonly possessed firearms for use in self-defense and other lawful purposes. (*Id.* at ¶ 7.)

Plaintiff National Shooting Sports Foundation ("NSSF") is the trade association for the firearms, ammunition, hunting, and shooting sports industry. (Declaration of James Curcuruto, Ex. 9 at Attachment A, p. 2.)  Formed in 1961, the NSSF is a Connecticut non-profit tax-exempt corporation with a membership of more than 9,000 federally licensed firearms manufacturers, distributors, and retailers (also known as "federal firearms licensees" or "FFLs"), sportsmen's organizations, shooting ranges, gun clubs, publishers, hunters and recreational target shooters.  (*Id.*)  The NSSF's mission is to promote, protect and preserve hunting and the shooting sports.  As a guardian of our nation's rich hunting and shooting traditions, the NSSF believes that lawful commerce in firearms and firearm-related products must be protected - and that, in particular, no law or regulation should unreasonably limit the lawful transfer of firearms to responsible, law-abiding adults who have individual constitutional rights guaranteed by the Second Amendment to the United States Constitution to purchase, own, possess and use such firearms and ammunition.  (*Id.*)   Until the effective date of the Act, NSSF's individual members sold the now-banned commonly used firearms and magazines, but now have been severely impacted by not being able to provide customers the commonly possessed firearms and magazines of their choice.  (*Id.* at p. 5)

**INTRODUCTION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Maryland's ban on commonly possessed firearms and magazines cannot be reconciled with a right protected by the Second and Fourteenth Amendments -- held by all responsible, law-abiding citizens of Maryland -- to possess firearms of their choice for self-defense. The Supreme Court made clear in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that the rights enshrined under the Second Amendment to the United States Constitution are individual rights. In so doing, the Court set forth an analytical framework for scrutinizing laws and regulations that impact the interests protected by the Second Amendment – a framework grounded in the text and history of the Amendment and its ratification. The Court held unequivocally that the firearms protected by the Second Amendment are those that are "typically possessed for lawful purposes by law-abiding, responsible citizens." *Id.* at 625. Thus, the *only* relevant inquiry is whether the firearms and magazines banned by the State of Maryland are commonly possessed for lawful purposes. As there is no question that the firearms and magazines banned by the Act are commonly possessed, the Act is offensive to the Constitution and cannot stand.

The Supreme Court held that no means-end analysis is to be applied when a law prohibits the ownership of a commonly possessed firearm. Courts of Appeals, however, have adopted a two-step test for determining whether a law is offensive to the Second Amendment. *See, e.g., United States v. Chester*, 628 F.3d 673 (4th Cir. 2010). Under this test, a court first must determine whether the challenged laws restrict conduct that implicates rights protected by the Second Amendment as it was historically understood. *Id.* at 680. If they do, the court proceeds to the second step to determine the level of scrutiny to be applied in reviewing the challenged laws. *Id.* This test, however, is not incompatible with the standard espoused in *Heller*. Courts of Appeals that have considered laws that enact complete prohibitions on the exercise of a right protected by the Second Amendment have struck

8

down the challenged laws as "categorically unconstitutional." *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011); *see also Moore v. Madigan*, 702 F.3d 933, 940-40 (7th Cir. 2012), *Peruta v. County of San Diego*, No. 10-56971, 2014 U.S. App. LEXIS 2786 (9th Cir. Feb. 13, 2014).  Because the challenged laws effect a complete ban on the ownership of commonly possessed firearms, this Court need not employ the tiered analysis that has been applied in other cases such as *Chester*.

Even applying the tiered framework, the laws challenged by Plaintiffs implicate conduct that is protected by the Second Amendment, because they flatly prohibit acquisition by law-abiding, responsible citizens of commonly possessed firearms.  Moreover, United States Court of Appeals for the Fourth Circuit case law dictates that the only appropriate level of means-end analysis is strict scrutiny. Strict scrutiny requires that the Defendants prove that the challenged bans are narrowly tailored to further a compelling state interest. The Defendants cannot meet that standard, and, therefore, the laws do not pass constitutional muster and must be declared unconstitutional.

Even if this Court ignores both the Supreme Court's mandate and the Fourth Circuit case law and follows the intermediate scrutiny approach adopted by the Court of Appeals for the District of Columbia Circuit in *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"), when it considered a challenge to laws similar to those challenged by Plaintiffs, the undisputed material facts fail to show that the legislature "has drawn reasonable inferences based on substantial evidence," *Turner Broadcasting Systems, Inc. v. FCC*, 512 U.S. 622, 666 (1994), such that the challenged laws can survive constitutional scrutiny.  The Maryland General Assembly received testimony from a single expert in support of the bill, and his testimony on the issues challenged by Plaintiffs was aspirational speculation limited to a four-sentence paragraph based on two studies from over fifteen years ago, the conclusions of which did not even support his position.  This meager showing cannot meet the "substantial evidence"

hurdle established by the Supreme Court.  Moreover, the undisputed evidence in this case shows that the banned firearms and magazines are commonly possessed for lawful purposes by law-abiding, responsible citizens; that the banned firearms are only rarely used in crime; that the banned magazines are largely irrelevant to criminal use because fewer than five shots are fired in most crimes; and that the law is expected, even by Defendants' own experts' admissions, to have no measurable effect in reducing crime.  For these reasons, the challenged laws cannot meet even the lower level of scrutiny that Defendants urge.

Additionally, the Act violates Plaintiffs' rights under the Fourteenth Amendment's guarantee of equal protection of law because both the assault weapon and magazine bans exempt without justification retired law enforcement officers from their prohibitions.  Retired law enforcement officers are permitted to acquire and possess as many banned firearms as they want, so long as they are transferred at the time of retirement.  MD. CODE ANN. CRIM. L. § 4-302(7).  The exemption with respect to banned magazines is even more expansive.  It permits retired law enforcement officers to buy and sell as many prohibited magazines, of any capacity, as they wish, at any time.  MD. CODE ANN. CRIM. L. § 4-305(a)(2).  There is no meaningful difference between retired law enforcement officers and the similarly situated Plaintiffs and other responsible, law-abiding citizens, and the Maryland General Assembly articulated no government interest in making such an invidious distinction.  These exceptions deny Plaintiffs equal protection under the law, requiring that the firearms and magazines bans be found unconstitutional.

Finally, the Act prohibits the possession, sale, or transfer of a list of enumerated long guns[1] and their "copies."  MD. CODE ANN. PUB. SAF. § 5-101(r)(2).  The statute does not define "copies," and the

---

[1]     Plaintiffs, throughout this Motion, use the term "enumerated long guns" to refer to the firearms on the list of semi-automatic rifles and shotguns in Section 5-101(r)(2) of the Public Safety Article of the Maryland Code whose possession is now prohibited.

term is unconstitutionally vague, in violation of due process of law under the Fourteenth Amendment. The vagueness inherent in this term is not assuaged by any guidance from Defendant Maryland State Police ("MSP"), which has changed its determination of whether a firearm is a "copy" of an enumerated long gun multiple times in the past, and claims the authority to do so again in the future. The commanding officer of the MSP Licensing Division admitted that she has discretion under the Act to change the definition MSP uses in making such a determination.  The shifting and tangled web of MSP interpretation of this vague statutory term is an inadequate substitute for a cogent statutory provision. Even if a person were to contact MSP and rely on its determination at a given time, that person may become a criminal by virtue of a later change in MSP policy with no notice.  The term "copies" is vague, encourages arbitrary and uneven enforcement, and is offensive to the Fourteenth Amendment.

For all these reasons, the undisputed material evidence shows that Plaintiffs are entitled to judgment as a matter of law under controlling Supreme Court and Fourth Circuit precedent. Accordingly, Plaintiffs move this Court to grant summary judgment in their favor.

**STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56, a party is entitled to summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once the movant has made the requisite showing, it is incumbent on the non-moving party to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*, 475 U.S. 574, 587 (1986) (*quoting* Fed. R. Civ. P. 56(e)).  In determining whether this standard is met, a court "should draw all reasonable inferences in favor of the non-moving party" and "may not make credibility determinations

or weigh the evidence." *Edell & Assocs, P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 435-36 (4th Cir. 2001).

## STATUTORY FRAMEWORK

The Act amended various sections of the Maryland Code, creating numerous novel restrictions on the rights of law-abiding, responsible citizens. Germane to this suit are the new bans on commonly possessed firearms and magazines.

It is generally prohibited, as of October 1, 2013, for a person to "transport an assault weapon into the State; or possess, sell, offer to sell, transfer, purchase, or receive an assault weapon." MD. CODE ANN. CRIM. L. § 4-303.   Section 4-301(d) of the Criminal Law Article sets forth the categories of firearms whose acquisition and sale is generally prohibited:

1) Assault Long Guns;

2) Assault Pistols;[2]

3) Copycat Weapons.

Section 4-301(e) of the Criminal Law Article defines a "copycat weapon" to be:

1) A semiautomatic centerfire rifle that can accept a detachable magazine and has any two of the following:

   a. A folding stock;

   b. A grenade launcher or flare launcher; or

   c. A flash suppressor;

---

[2]      Plaintiffs are not challenging here the ban on assault pistols as that term is defined in Maryland. *See* MD. CODE ANN. CRIM. L. § 4-301(c) (defining "Assault Pistol").

2)   A semiautomatic centerfire rifle that has a fixed magazine with the capacity to accept more
     than ten rounds;

3)   A semiautomatic centerfire rifle that has an overall length of less than twenty-nine inches;

4)   A semiautomatic pistol with a fixed magazine that can accept more than ten rounds;

5)   A semiautomatic shotgun that has a folding stock;

6)   A shotgun with a revolving cylinder.

The term "Assault Long Gun" is defined as any of the firearms in Section 5-101(r)(2) of the

Public Safety Article, which includes approximately 68 commonly possessed semiautomatic rifles and

shotguns listed by manufacturer, model, and/or other name, and also "their copies, regardless of which

company produced and manufactured that assault weapon . . . ."

It is also unlawful for anyone other than a current or former law enforcement officer to

"manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity

of more than 10 rounds of ammunition for a firearm."  MD. CODE ANN. CRIM. L § 4-305.

Any violation is punishable under Section 4-306 of the Criminal Law Article by imprisonment

for up to three years and a fine of up to $5,000.

## STATEMENT OF UNDISPUTED FACTS[3]

**A.     The Banned Firearms and Magazines Are Commonly Possessed.**

Every federal Court that has analyzed the issue has determined that the semi-automatic long guns

banned in Maryland are commonly possessed.  The first Court to do so was the D.C. Circuit in *Heller II*,

where the Plaintiffs challenged a host of restrictive firearms laws enacted by the D.C. Council, including

---

[3]       Plaintiffs present in support of their Motion material facts based on the report, declaration and deposition admissions
of Defendants' own witnesses and experts, as well as unrefuted testimony of Plaintiffs' witnesses and experts.

laws that prohibited ownership of various semi-automatic long guns and restricted magazines with a capacity greater than ten.  The court in that case addressed the issue of commonality directly, stating

> We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend. Approximately 1.6 million AR-15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market.  As for magazines, fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000.  There may well be some capacity above which magazines are not in common use but, if so, the record is devoid of evidence as to what that capacity is; in any event, that capacity surely is not ten.

*Id.* at 1261.

Recent cases in other United States District Courts have confirmed the finding of the D.C. Circuit: the semi-automatic long guns banned in Maryland and magazines holding more than ten rounds are commonly possessed.  For example, in *Shew v. Malloy*, No. 3:13CV739(AVC), 2014 U.S. Dist. LEXIS 11339 (D. Conn. Jan. 30, 2014), the district court found that,

> [t]he Connecticut legislation here bans firearms in common use.  Millions of Americans possess the firearms banned by this act for hunting and target shooting.  Additionally, millions of Americans commonly possess firearms that have magazines which hold more than ten cartridges.  The court concludes that the firearms and magazines at issue are 'in common use' within the meaning of *Heller*[.]

*Id.* at *25-*27 (internal citations omitted).  Similarly, in *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, No. 13-cv-291S, 2013 U.S. Dist. LEXIS 182307 (W.D.N.Y. Dec. 31, 2013), the district court assumed that the semiautomatic long guns banned by the New York legislature were commonly possessed and noted that the defendants in that case conceded that magazines with a capacity of more than ten rounds were commonly possessed.  *Id.* at *37.  Most recently, the district court in *Fyock v. City of Sunnyvale*, No. C-13-5807-RMW, 2014 U.S. Dist. LEXIS 29722 at *10-11 (N.D. Cal. March 5, 2014) confirmed the

unanimous view that magazines with a capacity greater than ten rounds are commonly possessed and are protected by the Second Amendment.

In this case as well, the evidence shows clearly that the firearms banned by the Act are commonly possessed.  The data from MSP show that the banned long guns have been increasing in popularity since 1995 and that, in the past three years alone, approximately 35,000 banned firearms and frames/receivers of such firearms have been transferred to law-abiding citizens in Maryland.  (Decl. of Capt. Dalaine Brady, Defendants' Exhibit 10, Ex. C.)  Captain Dalaine Brady, Commander of MSP's Licensing Division, volunteered during her deposition that one of the banned firearms, the AR-15, "is predominantly the weapon of choice amongst a lot of the clients that we service."  (Dep. of Capt. Dalaine Brady, Ex. 16, at 39:20-21.)  The Defendants' witnesses have admitted that there are at least 5 million of the banned firearms possessed nationwide (Dep. of Chief James Johnson, Ex. 17 at 43:9) and that the number may be as high as 9 million.  (Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment, ECF No. 44-1, at 26.)

The banned firearms are indisputably "popular and commonly owned and used by millions of persons in the United States."  (Decl. of Jim Curcuruto, Ex. 9, Attachment A at ¶ 1.)  Reports from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") "show that between 1990 and 2012, United States manufacturers produced approximately 4,796,400 AR-platform rifles for sale in the United States commercial marketplace."  (*Id.*)  During the same timeframe, "approximately 3,415,000 AR and AK-platform rifles were imported into the United Sates for sale in the commercial marketplace."  (*Id.*)  In 2012, more AR and AK style rifles were manufactured or imported than the most commonly sold vehicle in the United States.  (*Id.*)  Additionally, retailers reported that AR and AK platform rifles "account[ed] for 20.3 percent of the firearms they sold in 2012," (*id.* at ¶ 3), and were "the most popular

long gun sold" in that year.  (*Id.*)  In other words, there were more than 8.2 million such firearms in the United States, and that number has increased since then, as these firearms have become more and more popular.

Defendants have not challenged Plaintiffs' estimate that there are as many as 158 million such magazines in circulation.  (*Id.* at ¶ 6.)  Defendants' expert has admitted that there are, at a minimum, 29.7 million magazines with a capacity greater than ten rounds in circulation nationwide.  (Decl. of Christopher Koper, Defendants' Exhibit 7, Ex. B at 1.)

**B.      The Banned Firearms and Magazines Are Possessed for Lawful Purposes.**

Defendants and their experts have admitted that the banned firearms are possessed for lawful purposes in Maryland (Dep. of Daniel Webster, Ex. 18 at 114:15-20), such as hunting (Defendants' Responses to Plaintiffs' First Set of Requests for Admission, Ex. 25 at Response 7), competitive marksmanship (*id.* at Response 8), and self-defense (Dep. of Daniel Webster, Ex. 18 at 115:5-6).  These admissions comport with the reality recognized recently by the district court in *Shew*, which stated that "the firearms and magazines at issue are 'in common use' within the meaning of *Heller* and, presumably, used for lawful purposes."  *Shew*, No. 3:13CV739(AVC), 2014 U.S. Dist. LEXIS 11339 at *26-*27.  In fact, "AR15 rifles have consistently been used by the winning competitor for the past quarter of a century at the U.S. Civilian Marksmanship National Match target shooting championships held each year at Camp Perry, Ohio[,]" (Decl. of Gary Roberts, Ex. 10 at ¶ 18) and represent approximately 60% of the firearms in use at any one time at ranges here in Maryland.  (Decl. of John Josselyn, Ex. 6 at ¶ 7.) These are all lawful purposes for which law-abiding citizens possess banned firearms.

The banned firearms constitute an extremely small percentage of firearms used in crime in Maryland.  (Dep. of Col. Marcus Brown, Ex. 19 at 53:6-10; Dep. of Christopher Koper, Ex. 20 at 97:21 – 98:2; Decl. of Christopher Koper, Defendants' Exhibit 7, Ex. B at 3; Dep. of Deputy Chief Stawinski, Ex. 21 at 52:18-02; Dep. of Comm'r Anthony Batts, Ex. 31 at 45:13-15.)  In fact, in 2012, only 322 of the 12,765 murder victims nationwide were killed with rifles.  (Decl. of Mark Gius, Ex. 12, Attachment A at ¶ 3.)  Thus, at most, the banned firearms could account for only 2.52% of all murder victims.  (*Id.*)  Even if one looks at only firearm related murders, a maximum of 3.6% of murders are attributable to the banned firearms.  (*Id.*)

The banned firearms are used infrequently in the murder of law enforcement officers. (Federal Bureau of Investigation, Law Enforcement Officers Killed and Assaulted, Table 27, Ex. 27.)  From 2003-2012, rifles as a whole were used in only 92 of the 493 (18.7%) law enforcement officer murders in the United States.  (*Id.*)  Because the FBI data includes all rifle murders, the number involving banned firearms must necessarily be less.  Furthermore, they are also no more dangerous to law enforcement officers than any other centerfire rifle with respect to their ability to penetrate body armor. (Dep. of Daniel Webster, Ex. 18 at 104:12-17; Decl. of Gary Roberts, Ex. 10 at ¶ 5; Decl. of Buford Boone, Ex. 13 at ¶ 4.)

The .223/5.56mm round, used in the AR-15 and the majority of the banned firearms, "pale[s] in destructive capacity when compared to common civilian hunting rifles."  (Decl. of Gary Roberts, Ex. 10, Attachment A at p. 3)  Indeed, "[e]ven hunting rifles in older calibers from the 1800's, like .30-30 and .45-70, penetrate much deeper and are far more damaging than the .223/5.56mm ammunition fired by the AR15 carbines." (*Id.*)  In fact, "many M16 users in Vietnam concluded that [the .223 round] produced unacceptably minimal, rather than 'massive,' wounds." (*Id.* at p. 9.)

17

The .223/5.56mm round was tested by the FBI for its usefulness in defensive situations by agents and, specifically, whether it presents a legitimate threat of over-penetration:

> the FBI has explicitly stated that the duty .223/5.56mm load used in their AR15's was the only ammunition that offered ideal penetration of 12-18 inches in all test events, that the issued .223/5.56mm had no over-penetration issues compared with the other service caliber handgun, shotgun, and rifle ammunition tested, and that .223/5.56mm was more consistent in performance than all the other calibers."

(Decl. of Gary Roberts, Ex. 10 at ¶ 9.)   Specifically, the FBI tests showed that the .223 round penetrated less than a .40 S&W round (a handgun caliber) (Bureau of Alcohol, Tobacco, and Firearms, Weapons Selection Slides, Ex. 30 at slide 15; Decl. of Buford Boone, Ex. 13 at ¶ 7) and penetrated less than both the 9mm and .40 S&W when fired through an intervening medium. (Bureau of Alcohol, Tobacco, and Firearms, Weapons Selection Slides, Ex. 30 at slide 18.)   Federal agencies also conducted tests to determine the penetration capabilities of the .223 round with respect to interior walls, a specific concern for defensive firearm use in the home.   The results showed that the .223 round, regardless of the firearm from which it was fired, has less ability to penetrate walls than a 9mm or .40 S&W handgun round. (Bureau of Alcohol, Tobacco, and Firearms, Weapons Selection Slides, Ex. 30 at slides 20-26; Decl. of Buford Boone, Ex. 10 at ¶ 17.)

Similarly, the majority of banned magazines in Maryland are possessed by Marylanders who are law-abiding citizens using them for lawful purposes.   (Dep. of Col. Marcus Brown, Ex. 19 at 44.)   In fact, some "competitions are designed specifically for pistols, rifles, and shotguns capable of holding a greater number of rounds than" are permitted by Maryland law. (Decl. of Guy Rossi, Ex. 11, Attachment A at p. 2; *see also* Dep. of John Josselyn, Ex. 24 at 51.)

Magazines with a capacity greater than ten are the standard equipment provided with the purchase of the majority of all new pistols (Decl. of Guy Rossi, Ex. 11, Attachment 2 at p. 2), and are

therefore not "unusual."  In fact, firearms capable of holding more than ten rounds were produced in substantial quantities as early as 1855, with the introduction of the Volcanic lever-action rifle. (Decl. of James W. Supica, Ex. 14, Attachment A at p. 5.)  Detachable magazines with a capacity of more than ten have been sold in the civilian market for over a hundred years. (*Id.* at p. 7.)

**C.     Bans on "Assault Weapons" and "Large Capacity Magazines" Are Ineffective.**

Bans on "assault weapons" and "large capacity magazines" have proved wholly ineffective. Defendants' experts admit the evidence does not show that the Maryland ban on commonly possessed firearms and magazines will reduce firearm crime in general, or even reduce the criminal use of the banned firearms and magazines.  As was noted by Dr. Daniel Webster during his deposition, he was the only expert to submit testimony in favor of the Act (Dep. of Daniel Webster, Ex. 18 at 113:11-14), and his testimony that actually was directed at the issues in this case was limited to a single paragraph based on Dr. Christopher Koper's work.  (Testimony of Daniel Webster on SB 281, Ex. 29 at 5.)  Dr. Webster has done no original work of his own to study the effectiveness of bans on assault weapons or large capacity magazines. (Dep. of Daniel Webster, Ex. 18 at 136.)

Dr. Koper, one of the Defendants' experts, analyzed the impact of the decade-long federal assault weapons and large capacity magazines ban and stated in his published work: "There is not a clear rationale for expecting the ban to reduce assaults and robberies with guns."  (Decl. of Christopher Koper, Defendants' Exhibit 7, Ex. B at 81.)  This statement was confirmed by Dr. Koper at his deposition, where he admitted that he "cannot conclude to a reasonable degree of probability that the federal ban on assault weapons and large capacity magazines reduced crimes related to guns." (Dep. of Christopher Koper, Ex. 20 at 83:1-12, 96:4-8.)  He also confirmed the ban "didn't reduce the number of deaths or injuries caused by guns either…." (*Id.* at 96:9-11.)  He also admitted that he is not aware of

19

any expert who has studied the impact of the federal ban and has come to a different conclusion. (*Id*. at 95:1-6.)  He admitted that "there has not been a clear decline in the use of [Assault Rifles]" in crime as a result of the federal assault weapon ban. (Decl. of Christopher Koper, Defendants' Exhibit 7, Ex. B at 2.)   Moreover, the federal ban did not cause a decline in the criminal use of magazines with more than ten rounds.  (*Id*.)  Finally, he admitted that "[t]here has been no discernible reduction in the lethality and injuriousness of gun violence" as a result of the federal ban. (Dep. of Christopher Koper, Ex. 20 at 94:11-14.)  With respect to prior state-level bans such as Maryland's challenged here, he stated that the available studies suggest "state-level AW bans have not reduced crime." (Decl. of Christopher Koper, Defendants' Exhibit 7, Ex. B at 81, n. 95; Dep. of Christopher Koper, Ex. 20 at 84:21-85:5.)

Based on the social science evidence, Dr. Koper admitted that he would not expect a ban on assault weapons and large capacity magazines to reduce the number of firearm-related assaults and robberies, firearm-related home invasions, or firearms assaults on police officers. (Dep. of Christopher Koper, Ex. 20 at 84:13-16.)  He admitted that, even if you were to ban all assault weapons, you could not assume there would be no more mass shootings (*id*. at 129:1-7); and he could not state to a reasonable degree of scientific certainty that an assault weapon ban will reduce the number of mass shootings (*id*. at 131:4-11).   He agreed that "one has to be cautious" evaluating the "very small numbers" of mass shooting related to assault weapons (*id*. at 126:6-9), and that "it's not fair to say that other firearms with large capacity magazines are used in a higher share of mass public shootings" (*id*. at 121:16-122:1).  He admitted that law enforcement officers are more likely to be killed by a handgun, a shotgun or in a car accident than by an assault weapon. (*Id*. at 128:8-18.)

Dr. Koper cannot state to a reasonable degree of scientific probability that the challenged Maryland law will reduce the number of crimes committed with assault weapons and other firearms with

large capacity magazines; that the challenged Maryland law will reduce the number of shots fired in gun crimes; that the challenged Maryland law will reduce the number of gunshot victims in gun crimes; that the challenged Maryland law will reduce the number of wounds per gunshot victim; that the challenged Maryland law will reduce the lethality of gunshot injuries when they do occur; or that the challenged Maryland law will reduce the substantial societal costs that flow from shootings. (*Id*. at 170:20-172:11.)

**D.      Plaintiffs Are Similarly Situated with Retired Law Enforcement Officers.**

Retiring law enforcement officers are permitted to have transferred to them upon retirement an unlimited number of banned firearms, without any requirement that the retiring officer have had any training or experience with the firearm.  MD. CODE ANN. CRIM. L § 4-302(7).  Additionally, retired law enforcement officers are exempt from the prohibition on manufacturing, selling, offering for sale, purchasing, receiving, or transferring magazines with a capacity of more than ten rounds of ammunition. MD. CODE ANN. CRIM. L § 4-305(a)(2).  This latter exemption also has no requirement that the retired officer have trained or have had any experience with a magazine with a capacity of more than ten rounds.[4]  Moreover, this exemption has no limitation in time. For the rest of their lives, retired law enforcement officers will be permitted to purchase, acquire, or sell magazines that the Plaintiffs, and the general public, cannot.

Plaintiffs are similarly situated with retired law enforcement officers in that neither has the duty or authority to engage in law enforcement activities (Dep. of Lt. Col. Pallozzi, Ex. 22 at 33:2-4), and both have varying levels of training with the banned firearms. (*Id.* at 21:1-3 (stating that training on patrol rifles is optional).)

---

[4]      While most current law enforcement officers are issued magazines with a capacity greater than ten, the exception applies to all retired law enforcement officers, including those who retired before semi-automatic pistols replaced revolvers as the standard issue sidearm.

**E.      The Term "Copies" Is Subject to Differing Interpretations.**

Maryland law does not provide a definition for the term "copies" as it is used in Section 5-101(r)(2) of the Public Safety Article.  The Commander of the MSP Licensing Division has the authority to make a change to MSP's definition of what constitutes a "copy," within the general constraints of the interpretation of the law provided by the Office of the Attorney General requiring a "similarity" of internal components. (Dep. of Capt. Dalaine Brady, Ex. 16 at 66:9-11.)  Currently, the MSP policy is that the firearm in question must have completely interchangeable parts with an enumerated banned firearm for it to be a "copy."  (Firearms Bulletin 10-2, Ex. 43.)  MSP does not publish a list of firearms for which it has made a determination of whether they are "copies."  (Dep. of Capt. Dalaine Brady, Ex. 16 at 44-45.)

Defendant MSP has changed its determination of whether particular firearms are "copies" of enumerated long guns multiple times in the past. (MSP's Supplemental Response to Interrogatory No. 11, Ex. 26; Dep. of Capt. Dalaine Brady, Ex. 16 at 51-60.)  Specifically, MSP has changed its determination with respect to both shotguns and rifles (MSP's Supplemental Response to Interrogatory No. 11, Ex. 26.) and, in at least one case, does not even know of which enumerated long gun a questionable shotgun was determined to be a copy. (Dep. of Capt. Dalaine Brady, Ex. 16 at 51:12-13.) With respect to the specific exemption for AR-15s with a heavy barrel ("H-BAR"),  Maryland does not have a definition of H-BAR that can be used by citizens to ensure that their firearms are compliant with the law.  (Dep. of Capt. Dalaine Brady, Ex. 16 at 40:3-4.)

## ARGUMENT ON PLAINTIFFS' CROSS-MOTION

**A.     The Challenged Laws Deny Plaintiffs Rights Protected by the Second Amendment.**

   **1.     *The Textual and Historical Foundations of the Second Amendment Show that the Maryland Laws Challenged by Plaintiffs Are Unconstitutional.***

   In *Heller*, the Supreme Court held that a prohibition on a class of firearms commonly possessed for a lawful purpose is a policy choice that is "off the table." *Heller,* 554 U.S. at 636.  The Court recognized that a prohibition of a category of firearms that are commonly possessed by law-abiding citizens is so clearly unconstitutional that the Court need not resort to applying any further standard of review, noting that, "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban," *id.* at 629, and that "the absolute prohibition of handguns held and used for self-defense in the home" is a policy choice that cannot stand. *Id.* at 636.  Two years later, in *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010), the Supreme Court held that the Second Amendment was incorporated against the States and that "[t]he right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of Rights." *McDonald*, 130 S.Ct. at 3037.

   *Heller*'s controlling issue in determining whether rights protected by the Second Amendment are infringed by a law was whether the firearms were commonly possessed by law-abiding, responsible citizens for lawful purposes. Once the Court was satisfied that this condition had been met, it concluded that a prohibition on ownership could not survive. The converse of the Court's ruling is the Court's acknowledgement that "dangerous and unusual" firearms have long been prohibited because they are not commonly possessed for lawful purposes and pose a unique danger to the public, such as short-barreled shotguns and automatic firearms. *Heller*, 554 U.S. at 626-27.  The Court observed that traditional prohibitions against the ownership of firearms that are not commonly possessed for lawful purposes, such as short-barreled shotguns, may be permissible. *Id.* at 627 (citing *United States v. Miller*, 307 U.S.

174 (1939)).[5]  Thus, the Court laid out a clear framework for analyzing laws that ban a firearm or a group of firearms:  if the law prevents law-abiding, responsible citizens from possessing firearms that are commonly possessed for lawful purposes, the law is unconstitutional under the Second Amendment; if the law prohibits only the possession of firearms that are dangerous and unusual and that have been restricted traditionally, the law is not offensive to the Second Amendment and can be enforced.

Thus the first consideration must be whether the firearms are commonly possessed for lawful purposes.  Once it is established that the firearms are commonly possessed for lawful purposes, it follows necessarily that they cannot be "dangerous and unusual," and they are thus entitled to protection under the Second Amendment.  Indeed, it is not possible for a firearm simultaneously to be both "typically possessed" and "unusual."  Thus, the proper understanding of *Heller* is that firearms fall into two categories: commonly possessed for lawful purposes or dangerous and unusual.

In this case, the undisputed facts and consistent determinations of other courts demonstrate that the firearms and magazines banned in Maryland are commonly possessed.  Statement of Undisputed Facts, *supra* pp. 16-17.  Moreover, as Defendants and their experts concede, the firearms and magazines are possessed for lawful purposes, including sport shooting, hunting, and self-defense.  *Id.*  Finally, there is no support for the notion that semi-automatic long guns, such as those prohibited by Maryland law, have been historically banned.  *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting).  As Judge Kavanaugh correctly noted in his dissent in *Heller II*, "[m]ore to the point for purposes of the *Heller* analysis, the Second Amendment as construed in *Heller* protects weapons that have not traditionally been banned and are in common use by law-abiding citizens. Semi-automatic rifles have not

---

[5]       Notably, *Heller* did not overrule *Miller*'s central holding that the types of firearms protected by the Second Amendment are those that would be useful if a citizen were called to militia service.  *See Heller*, 554 U.S. at 624-25.

traditionally been banned and are in common use today, and are thus protected under *Heller*."   *Id.* at

1286-87 (Kavanaugh, J., dissenting); *see also id.* at 1260; *Staples v. United States*, 511 U.S. 600, 611-12

(1994) (stating that guns that fall outside the traditionally regulated categories of automatic weapons,

sawed-off shotguns, and artillery, "traditionally have been widely accepted as lawful possessions.").

The analysis and its conclusions regarding the protected status of the banned magazines is the

same as for the banned firearms.   As is undisputed, the magazines banned by Maryland law are

commonly possessed for lawful purposes.   Moreover, there is no longstanding tradition of banning

magazines with a capacity of more than ten rounds: "[w]e are not aware of evidence that prohibitions on

either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a

presumption of validity."   *Heller II*, 670 F.3d at 1260.

Clearly, the magazines and firearms that Plaintiffs seek to possess are protected under the

standard set forth by the Supreme Court in *Heller*.   Therefore, a complete prohibition on their ownership

should be found unconstitutional, without resorting to any balancing test, as was the case with the

District of Columbia's handgun ban in *Heller*.

### 2. Alternatively, If the Court Does Apply a Balancing Test, It Must Apply Strict Scrutiny.

Even if the Court does not agree that the text-and-history approach outlined above is the

appropriate method of analyzing the challenged laws, it must apply strict scrutiny under Fourth Circuit

precedent.   In *United States v. Chester*, 628 F.3d 673, 677 (4th Cir. 2010), the Fourth Circuit decided

whether a prohibition on possession of a firearm was constitutional as applied to a person convicted of a

misdemeanor crime of domestic violence under 18 U.S.C. § 922(g)(9).   The Court adopted a two-part

test that had been used by the Court of Appeals for the Third Circuit in *United States v. Marzzarella*,

614 F.3d 85 (3rd Cir. 2010).   *Chester*, 628 F.3d at 680.   Under this test, a court must first determine

whether the conduct being prohibited or regulated by the challenged laws is protected by the Second Amendment as it was historically understood.  *Id.*  If it does, the court must then apply "an appropriate form of means-end scrutiny."  *Id.*

In the instant case, there can be no doubt that the challenged laws prohibit conduct protected by the Second Amendment as it was historically understood.  Plaintiffs are prohibited from acquiring firearms commonly possessed for lawful purposes, which is precisely what the Supreme Court found to be protected by the Second Amendment in *Heller.  See Shew,* No. 3:13CV739(AVC), 2014 U.S. Dist. LEXIS 11339 at *27 (describing the ban on assault weapons and magazines with a capacity greater than ten rounds as "a substantial burden on plaintiffs' Second Amendment rights").

Despite the existence of the tiered analysis in Fourth Circuit precedent, the fact that the challenged laws effect a complete prohibition on the exercise of a right protected by the Second Amendment renders the law unconstitutional without resort to any interest balancing.  The Court of Appeals for the Seventh Circuit made this point clearly, stating "[b]oth *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right – like the handgun bans at issue in those cases – are categorically unconstitutional."  *Ezell*, 651 F.3d at 703.  This approach was employed again by the Seventh Circuit when considering a law that impacted rights protected by the Second Amendment outside the home.  *Moore, supra,* 702 F.3d at 940-41.  The analysis of these courts is compatible with the tiered approach that has been used in other cases within the Fourth Circuit, because none of those cases involved a complete prohibition of the possession of a commonly possessed firearm within the home by law-abiding citizens.  Thus, despite the existence of a tiered approach generally, the challenged law should be struck down without employing a balancing test.

Even if this Court does use the tiered approach that has been applied in other cases within this Circuit, Fourth Circuit precedent requires strict scrutiny.  In this regard, the Fourth Circuit has provided extensive guidance.  From the time that it adopted the two-part test in *Chester*, our Circuit Court has noted repeatedly that if a challenged law implicated the right of a law-abiding, responsible citizen to possess a firearm in his or her home, the law is subject to a strict scrutiny analysis.  In *Chester*, the defendant, a misdemeanant, unsuccessfully moved to dismiss his indictment on the grounds that the Supreme Court had identified only the mentally ill and felons as classes of persons that could be denied the right to possess firearms.  The Fourth Circuit in *Chester* declined to apply strict scrutiny to the prohibition on ownership of firearms by misdemeanants, explaining:

> Although Chester asserts his right to possess a firearm in his home for the purpose of self-defense, we believe his claim is not within the core right identified in *Heller* – the right of a *law-abiding*, responsible citizen to possess and carry a weapon for self-defense – by virtue of Chester's criminal history as a domestic violence misdemeanant. Accordingly, we conclude that intermediate scrutiny is more appropriate than strict scrutiny for Chester and similarly situated persons.

*Id*. at 682-83 (emphasis in original).  Plaintiffs possess the characteristics found lacking in defendant Chester: they are law-abiding, responsible citizens who seek to acquire commonly possessed firearms and magazines for self-defense.  Thus, they do not fall into any less-protected category, and any complete prohibition on their ability to possess and use firearms in their home is subject to strict scrutiny.

More recently, the Fourth Circuit has opined that a ban on possession of firearms in the home is subject to strict scrutiny:  "As we observe that any law regulating the content of speech is subject to strict scrutiny, . . . we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny."  *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) (emphasis added). *See also United States v. Carter*, 669

27

F.3d 411, 416 (4th Cir. 2012) ("[W]e have noted that the application of strict scrutiny is important to protect the core right of self-defense identified in *Heller*....").

The court in *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013), agreed, adding that intermediate scrutiny applies to bearing arms outside the home, rejecting the view that would "place the right to arm oneself in public on equal footing with the right to arm oneself at home, necessitating that we apply strict scrutiny . . . ." *Id*. at 878. Thus, applicable Fourth Circuit law mandates that when a law infringes on the right of a law-abiding, responsible citizen "to arm oneself at the home," strict scrutiny is the proper standard of review.

To satisfy the demanding strict scrutiny standard, the Defendants must establish that the challenged laws are narrowly tailored to promote a compelling government interest. *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 189 (4th Cir. 2013). When conducting a strict scrutiny analysis, "'the court must review the government's evidentiary support to determine whether the legislative body had a 'strong basis in evidence'" to justify its legislation. *Rothe Dev. Corp. v. Department of Defense*, 545 F.3d 1023, 1036 (Fed. Cir. 2008) ("*Rothe III*") (applying strict scrutiny to a race-based classification that was intended to remedy prior discrimination) (*quoting Rothe Dev. Corp. v. Department of Defense*, 262 F.3d 1306, 1317 (Fed. Cir. 2001) ("*Rothe I*")).

The *Rothe* opinions set forth the proper scope of a court's review in a strict scrutiny analysis. In these cases, Rothe challenged an Air Force contract award to a competing company. Rothe contended that a federal statute, 10 U.S.C. § 2323, which was designed to make socially and economically disadvantaged businesses more able to compete with other businesses, was a violation of its rights to equal protection under the law as incorporated under the Fifth Amendment. Specifically, Rothe argued that, because the law presumed businesses run by certain racial and ethnic minorities to be part of the

28

protected class of business, the law was facially discriminatory, and there was not sufficient evidence to support its discriminatory provisions.

Most relevant to the issue raised by Plaintiffs in this case is the Federal Circuit's earlier opinion in *Rothe Dev. Corp v. Department of Defense*, 413 F.3d 1327 (Fed. Cir. 2005) ("*Rothe II*"), in which it directly addressed Rothe's contention that evidence that was not presented to Congress should either be stricken from the record or given no weight.  Agreeing with Rothe, the Federal Circuit expressed clearly the evidentiary standard in this regard:

> Thus, to be relevant in the strict scrutiny analysis, the evidence must be proven to have been before Congress prior to enactment of the racial classification.  Although these statistical studies predate the present reauthorization of section 1207 in 2002, their relevance is unclear because it is uncertain whether they were ever before Congress in relation to section 1207.  Without a finding that these studies were put before Congress prior to the date of the present reauthorization in relation to section 1207 and to ground its enactment, it was error for the district court to rely on the studies.

*Id.* at 1338.

In the present case, there was scant evidence actually before the Maryland General Assembly on the impacts of the law.  The only expert to actually testify in favor of the legislation was Dr. Daniel Webster.  Statement of Undisputed Facts, *supra* p. 19.  Tellingly, Dr. Webster's conclusion that the challenged provisions of the Maryland law would have a positive impact on public safety was based on a 1997 report by Dr. Christopher Koper regarding the efficacy of the federal assault weapons ban, which states: "[u]sing a variety of national and local data sources, we found no statistical evidence of post-ban decreases in either the number of victims per gun homicide incident, the number of gunshot wounds per victim, or the proportion of gunshot victims with multiple wounds.  Nor did we find assault weapons to be overrepresented in a sample of mass murders involving guns."  (Decl. of Christopher Koper, Defendants' Exhibit 7, Ex. C at 6.)  Thus, the expert evidence that was actually before the Maryland

General Assembly confirms Plaintiffs' argument: the challenged laws will not enhance public safety. *See also infra*, pp. 75-76 (discussing in further detail the lack of evidence put before the legislature).

Dr. Koper, the academic whose work formed the foundation of Dr. Webster's testimony regarding the banned firearms and magazines, recognized this point and stated as much in his 2004 report on the federal assault weapon law: "[t]here is not a clear rationale for expecting the ban to reduce assaults and robberies with guns."[6]  (Decl. of Christopher Koper, Ex. B at 81.)  As noted above, it is undisputed that the federal assault weapons ban did not reduce firearm crime or the use of assault rifles in crime, and that there is no evidence to support the speculation that a state-level assault weapon ban will have an impact on crime. Statement of Undisputed Facts, *supra* pp. 19-21.

Strict scrutiny requires that the Defendants produce evidence to establish that the challenged law is "narrowly tailored to serve a compelling state interest." *Libertarian Party of Va. v. Judd.*, 718 F.3d 308, 317 (4th Cir. 2013) (internal quotations omitted).  A law is only appropriately tailored under strict scrutiny if it "is the least restrictive means available" to serve the compelling interest.  *Sons of Confederate Veterans v. Comm'r of the Va. Dept. of Motor Vehicles*, 288 F.3d 610, 626 (4th Cir. 2002). Clearly, the challenged Maryland laws are not the least restrictive means available to serve the government's interest in public safety and preventing firearm crime with the banned firearms, given that the statutory scheme in place before the Act permitted law-abiding, responsible citizens to own the firearms, yet they were infrequently, if ever, actually used in crime.  Moreover, there were *no* mass shootings in Maryland involving these firearms.[7]  Given that Defendants have put forth absolutely no

---

[6]     Perhaps this explains why Dr. Webster relied on Dr. Koper's 1997 study and not his more comprehensive 2004 study and analysis.

[7]     Defendants' attempts to manipulate the "Beltway Snipers" incidents in inapposite.  Those were separate incidences that occurred over a long period of time, and that they used a banned firearm is irrelevant.  They could have substituted nearly any centerfire rifle with the same effect.  (Decl. of Buford Boone, Ex. 13 at ¶ 20.)

evidence, nor even argument, and have failed utterly to meet their burden showing that the challenged laws are the least restrictive means to achieving the government's asserted interests, the challenged laws cannot survive strict scrutiny analysis.

While Plaintiffs accept that ensuring public safety is a compelling government interest, the evidence that was presented to the Maryland General Assembly is insufficient to establish that the challenged laws will have any impact on public safety whatsoever.  Even if this Court were to consider Defendants' after-the-fact evidence that was not presented to the Maryland General Assembly, or the rationale they have belatedly adopted in response to this litigation, it is Defendants' own expert opinion that there is no rationale to believe that the challenged laws will have an impact on gun violence, as discussed *supra*, at pp. 20-21.  Thus, Defendants have not presented expert evidence that the laws are even tailored at all toward achieving the government's asserted interests, much less that they are the "least restrictive means available."

Accordingly, the challenged laws are not narrowly tailored toward achieving the government interests in ensuring public safety or reducing firearm violence and, therefore, they cannot survive a strict scrutiny analysis.

**B.      The Challenged Laws Fail Even Intermediate Scrutiny.**

Even if this Court adopts the flawed approach used by the D.C. Circuit when considering similar laws in *Heller II* and applies intermediate scrutiny, the challenged Maryland laws still cannot survive.  It should be noted here that the D.C. Circuit adopted a heightened scrutiny standard much more akin to the strict scrutiny standard of the Fourth Circuit than to our Circuit's intermediate scrutiny standard.  Under the Fourth Circuit's definition of intermediate scrutiny, a law is constitutional only if there is a "'reasonable fit' between the challenged regulation and a 'substantial' government objective." *Chester*,

31

628 F.3d at 683.   This standard is little more than rational basis review cloaked in the guise of "intermediate scrutiny."   The court in *Heller II* held: "the District must establish a tight 'fit'' between the [challenged laws] and an important or substantial government interest, a fit that employs not necessarily the least restrictive means, but . . . a means narrowly tailored to achieve the desired objective."   *Heller II*, 670 F.3d at 1258 (internal quotations omitted).   Thus, while the D.C. Circuit applied intermediate scrutiny in name, the standard used was practically strict scrutiny as applied by our Circuit Court.   Thus, if this Court does follow the D.C. Circuit to apply intermediate scrutiny in name, the Court should use the level of scrutiny actually used by the D.C. Circuit in *Heller II*.

Under either Circuit's standard, the proper method of engaging in an intermediate scrutiny analysis was set forth by the Supreme Court long before *Chester* and *Heller II*.   In *Turner Broadcasting Systems, Inc. v. FCC*, 512 U.S. 622 (1994), the Supreme Court applied intermediate scrutiny when analyzing whether a federal law that required broadcasters to carry certain channels violated the First Amendment.   The Court noted that it was not the role of a federal court to replace the considered judgment of the legislature with its own.   This does not mean that predictive judgments of the legislature are insulated from review; rather, a court must "assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences *based on substantial evidence*."   *Turner Broadcasting Systems*, 512 U.S. at 666 (emphasis added).   This language from *Turner Broadcasting* has been used by both circuit and district courts when analyzing Second Amendment issues.   *See Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2nd Cir. 2012) ("Thus, our role is only 'to assure that, in formulating its judgments, [New York] has drawn reasonable inferences based on substantial evidence.'"); *Shew,* No. 3:13CV739(AVC), 2014 U.S. Dist. LEXIS 11339 at *35 ("Accordingly, the court must only 'assure that, in formulating its judgments, [Connecticut] has drawn reasonable inferences based on substantial

evidence.'"").   Implicit in the concept of "draw[ing] reasonable inferences based on substantial evidence," of course, is that the evidence from which such inferences are drawn is actually presented to the legislature for its consideration.  It would not make much sense for the Supreme Court to mandate that a federal court limit its review to whether the judgment of a legislature was "based on substantial evidence" but permit the court to consider evidence upon which the judgment of the legislature could not have been predicated.

This is especially true in the present case where the Maryland General Assembly had full knowledge that the Second Amendment protects an individual, fundamental right to bear arms when it enacted the challenged laws.   Notably, the Third Circuit excused the State of New Jersey from presenting evidence upon which its legislature actually relied when crafting a firearm law *only* because the law was enacted long before the Supreme Court's decision in *Heller*, and the "legislature could not have foreseen that restrictions on carrying a firearm outside the home could run afoul of a Second Amendment that had not yet been held to protect an *individual* right to bear arms."  *Drake v. Filko*, 724 F.3d 426, 438 (3rd Cir. 2013) (emphasis in original).  The Maryland General Assembly has no such excuse, as both *Heller* and *McDonald* were decided long before the enactment of the challenged laws, and *Heller II*, which would have put the Maryland General Assembly on notice that laws prohibiting certain long guns and magazines are subject to the Second Amendment, also was decided before the challenged laws' enactment.

Thus, the only evidence that should be considered by this Court if it conducts an intermediate scrutiny analysis is that which was actually before the Maryland General Assembly before the Act was

passed; nothing produced subsequent to the Act's passage could possibly have formed the basis for the government's interests or how appropriately tailored the laws are, and is thus irrelevant.[8]

The appropriate scope of this Court's review is to determine if the Defendants established a tight fit between the challenged laws and an important government interest that is 1) narrowly tailored to achieve the desired interest and 2) based on substantial evidence that was before the Maryland General Assembly. As illustrated above, the expert evidence before the legislature was a single paragraph presented by a single witness. The opinion letters from various law enforcement groups were conclusory and based on supposition. *See Carter*, 669 F.3d at 418 (noting that the state may not "rely upon mere 'anecdote and supposition'" in attempting to establish its governmental interest). This is clearly not sufficiently substantial to withstand constitutional scrutiny and, therefore, the challenged laws cannot survive even under the more permissible intermediate scrutiny standard.

Such credulous deference to the "predictive judgments" of the Maryland General Assembly is inappropriate as illustrated by the Court of Appeals for the Ninth Circuit's recent holding in *Peruta v. County of San Diego*, No. 10-56971, 2014 U.S. App. LEXIS 2786 (9th Cir. Feb. 13, 2014). In *Peruta*, the Ninth Circuit struck down a municipal ordinance forbidding the concealed carry of firearms without the proper permit, which could be obtained only upon a demonstration of "good cause." The court provided a principled criticism of the approach recently taken in the Second, Third and Fourth Circuits with respect to deference to legislative findings in the Second Amendment context. The *Peruta* court first took the other Circuits to task for abdicating their responsibility to ensure that the legislative

---

[8]     The Fourth Circuit's opinion in *11126 Baltimore Boulevard v. Prince George's County*, 886 F.2d 1415 (4th Cir. 1989), in which the Court explained that evidence marshaled after the enactment of a law, to support the constitutionality of a law, was "routinely admitted" is not controlling in this case because that decision predates the Supreme Court's ruling in *Turner Broadcasting* that, for a law to pass constitutional muster, any predictive judgments of the legislature must be based on substantial evidence.

judgments underlying the laws challenged in those cases were based on substantial evidence, but, instead engaging in a balancing test that directly contradicted the Supreme Court's ruling in *Heller*. *Id.* at *91-93. The Ninth Circuit next noted that these other Circuit Courts had failed to ensure that the challenged laws "did not burden the right substantially more than is necessary to further [the government's legitimate] interests." *Id.* at *94 (internal quotations omitted). The Ninth Circuit quoted at length former Maryland District Judge Legg's well reasoned analysis in his opinion in *Woollard v. Sheridan*, 863 F. Supp. 2d 462 (D. Md. 2012) (*rev'd sub nom Woollard*, 712 F.3d at 865). The most relevant to this Court's analysis of the quotations used by the Ninth Circuit is the standard to which Judge Legg held the government: "The Maryland statute's failure lies in the overly broad means by which it seeks to advance this undoubtedly legitimate end. . . . The solution, then, is not tailored to the problem it is intended to solve." *Woollard*, 863 F. Supp. 2d at 474-75.

The *Peruta* court concluded that the Fourth, Second, and Third Circuits had erred in striking down the restrictive carry-permit laws because the government had failed to carry its burden of proof. *Id.* at *95-97. Whenever heightened scrutiny is implicated, the Act cannot be defended "by advancing hypothetical rationales, independent of the legislative record; rather, the government is limited to 'invoking [the legislature's] *actual* justification for the law." *In re Balas*, 449 B.R. 567, 574 (Bkr. C.D. Cal. 2011)(quoting and incorporating the February 23, 2011 Letter from Attorney General Eric Holder to Speaker of the House of Representatives John Boehner, regarding the constitutional infirmity of the Defense of Marriage Act)(emphasis added). Furthermore, any such "justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

The "bill file" in this case that was disclosed by the Defendants illustrates the paucity of evidence that was actually presented to the Maryland General Assembly.  No studies or data were produced to justify the infringement on Plaintiffs' constitutional rights.  Indeed, the majority of the evidence, some even from law enforcement officers' groups, strongly opposed the Act.  Even more telling is that the bill file produced by Defendants is not even half of the actual bill file maintained by the Senate Judicial Proceedings Committee; Defendants produced a "bill file" that consisted of 350 pages of material that was submitted to the legislature, but the actual bill file contains approximately 1010 pages of submitted material.  (*See* Declaration of Marc Nardone, Ex. 33, at ¶ 3.)  The material left out by Defendants contains arguments and statements submitted in opposition to the Act (*id.* at ¶ 5), such as a letter from retired Maryland State Trooper Lawrence Nelson, who relayed his personal account of needing more than ten rounds of ammunition to stop an aggressor. (*See* Letter from Lawrence Nelson to Maryland Senate (undated), Ex. 34.)  The Maryland General Assembly was not provided any statistical data on the efficacy of the Act, nor any expert social science testimony beyond that of Dr. Webster discussed above.  There simply was not substantial evidence before the legislature to support its conclusions, and, thus, the challenged laws fail intermediate scrutiny.

Even if this Court were to consider the evidence marshaled subsequent to the Act's passage – evidence that was never considered by the Maryland General Assembly – it is still insufficient to show that the challenged laws are a "reasonable fit" to the government interests of ensuring public safety and lessening firearm violence.  Defendants carry the burden of proving that the challenged laws are constitutional.  *Chester*, 628 F.3d at 683 ("Significantly, intermediate scrutiny places the burden of establishing the required fit squarely upon the government.").  Not only are Defendants unable to

provide sufficient evidence to carry their burden, the available evidence illustrates clearly that the challenged laws are not a reasonable fit to achieve the asserted government interests.

Defendants' experts admitted that there was no reason to expect the federal ban, after which the challenged Maryland laws were modeled, to have an impact on firearm violence: "[t]here is not a clear rationale for expecting the ban to reduce assaults and robberies with guns." (Declaration of Christopher Koper, Defendants' Exhibit 7, Ex. B at 81.)  Dr. Koper reiterated in his deposition that this was an accurate statement of his view of the anticipated effects of the federal ban.  Statement of Undisputed Facts, *supra* p. 19.  Moreover, Dr. Koper explicitly noted that there was no evidence showing that state-level assault weapons bans have any impact on crime.  Statement of Undisputed Facts, *supra* p. 20.  In fact, even the federal assault weapons ban, which covered every jurisdiction in the United States, did not produce a measurable reduction in the use of assault rifles by criminals.  Statement of Undisputed Facts, *supra* p. 20.  Part of the reason for the lack of evidence of any reduction in the criminal use of the firearms now banned in Maryland is that they are rarely used in the commission of crimes in the first place.  Statement of Undisputed Facts, *supra* p. 17.  The undisputed facts also show that there was no reduction in the criminal use of magazines banned by the federal law in the decade after its enactment.  Statement of Undisputed Facts, *supra* pp. 19-20.

The undisputed evidence also shows that the banned firearms are not more dangerous than any other centerfire rifle when it comes to threats against law enforcement officers wearing protective body armor.  Statement of Undisputed Facts, *supra* pp. 17-18.  Nor do they pose a substantial risk of over-penetrating walls, even when compared to handguns.  Statement of Undisputed Facts, *supra* p. 18.  Thus, the two other theoretical interests the challenged laws could serve – protecting law enforcement

officers and preventing errant shots fired in defense from harming bystanders – are not served by the law.

Taken in sum, the undisputed evidence in this case fails to establish that the banned firearms pose any greater threat to public safety than non-banned firearms.  The challenged laws are not a tight fit to asserted interests, narrowly tailored to achieve the desired objective but rather "lev[y] a substantial burden on plaintiffs' Second Amendment rights," *Shew*, No. 3:13CV739(AVC), 2014 U.S. Dist. LEXIS 11339 at *27, while advancing very little, if at all, the government's interest in public safety.  For these reasons, the challenged laws cannot withstand even intermediate scrutiny, the lowest standard to which they can be held.

**C.    The Challenged Laws Deny Plaintiffs Equal Protection Under the Law.**

The Fourteenth Amendment to the United States Constitution guarantees equal protection of the law.  The challenged laws allow retiring law enforcement officers to receive banned firearms upon retirement, MD. CODE ANN., CRIM. L. § 4-302(7)(i), and allow retired law enforcement officers to purchase, sell, and transfer magazines with a capacity of more than ten rounds at any time.  MD. CODE ANN., CRIM. L. § 4-305(a)(2).  Ordinary citizens are subject to criminal penalties for engaging in the exact same conduct, even though they have the same "fundamental right to life." *Panetti v. Quarterman*, 551 U.S. 930, 957 (2007).

No appreciable distinction exists between retired law enforcement officers and law-abiding, responsible citizens to justify the invidious discrimination to which Plaintiffs are subjected under color of law.  Indeed, it is undisputed that retired law enforcement officers have neither the duty, nor the authority, to engage in police activities such as making arrests, pursuing criminals above and beyond that which any other citizen is entitled to do, or conducting investigations.  Statement of Undisputed

Facts, *supra* p. 21.  The exceptions applicable to retired law enforcement officers do not mandate that they have any experience with the banned firearms and magazines. Therefore, there is no appreciable distinction between Plaintiffs and the class favored by the challenged laws with respect to training.

The Maryland General Assembly provided no findings and declared no justification for the invidious distinction it drew between retired law enforcement officers and Plaintiffs.  There is no legitimate government interest to justify the discrimination to which Plaintiffs are subjected.  This was precisely the decision reached by the Ninth Circuit regarding a California firearms law with exemptions similar to those in the Act.  *Silveira v. Lockyer*, 312 F.3d 1052, 1090-91 (9th Cir. 2002), held that an exclusion for retired law enforcement from acquiring and possessing "assault weapons" lacked any rational basis and was a violation of the Equal Protection Clause, because "the retired officers exception arbitrarily and unreasonably affords a privilege to one group of individuals that is denied to others, including plaintiffs." *Id.* at 1091.  The challenged Maryland laws inflict exactly the same constitutional harm as that which was held to be impermissible in *Silveira*: a constitutional privilege is being afforded to one group of individuals that is denied to others.  Indeed, it is telling that Defendants have been unable to articulate a legitimate government interest at any point in this litigation that would be served by the discrimination in the challenged laws.  *See* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, *infra,* at 80-82.

In addition, the provisions of Maryland law exempting retired or retiring law enforcement officers may not simply be excised, because the law does not make it a crime for the favored class to possess the otherwise banned firearms and magazines.  A partially invalid law remains fully operative only if "its elimination in no way alters the substantive reach of the statute and leaves completely unchanged its basic operation." *United States v. Jackson*, 390 U.S. 570, 586 (1968).  Declaring only the

discriminations in favor of retiring and retired law enforcement officers void would criminalize that which the legislature has not criminalized: "To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one. This is no part of our duty."  *United States v. Reese,* 92 U.S. (2 Otto) 214, 221 (1876) (holding provisions not severable).  As a result of the challenged laws' discriminatory purpose and effect, they are void in their entirety.

**D.    The Term "Copies" Is Vague, Denying Plaintiffs Due Process of Law.**

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits the enforcement of laws whose provisions are vague.  The void-for-vagueness doctrine is a necessary safeguard against arbitrary enforcement of laws that do not provide ordinary citizens with sufficient information to avoid unlawful conduct:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.  Vague laws offend several important values.  First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.  Vague laws may trap the innocent by not providing fair warning.  Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

As an initial matter, the Supreme Court has "expressed greater tolerance of [vague] enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-499 (1982) (citing *Barenblatt v. United States*, 360 U.S, 109, 137 (1959)).  In addition, if the vague enactment interferes with a constitutionally protected right "a more stringent vagueness test should apply." *Id.* (citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972)).   The challenged laws provide

40

criminal penalties for constitutionally protected rights, therefore they must be treated with the least amount of tolerance and the most stringent of vagueness standards must apply.

In reviewing whether a law is unconstitutionally vague, a criminal law can be unconstitutional for either of two reasons: 1) it fails to provide sufficient notice for an ordinary person to understand what conduct is prohibited or 2) it authorizes or encourages arbitrary enforcement. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *NAACP v. City of Annapolis*, 133 F. Supp. 2d. 795, 807 (D. Md. 2001) (*quoting Morales)*. In this case, the unconstitutional vagueness stems from the use of the term "copies," which is undefined in any statute, and, as can be seen from the undisputed facts, implicates both the failure to provide sufficient notice as to what conduct is prohibited and the authorization of arbitrary enforcement.

The inherent vagueness and ambiguity of the term "copies" can be seen as applied to the elements in subsection (xv), which are "Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle." Colt is a firearm manufacturer, and AR-15 Sporter H-BAR was a model produced by this manufacturer, but is no longer in production. It is differentiated from an AR-15 by virtue of its heavy barrel (H-BAR) but has no other distinguishing feature. A citizen of ordinary intelligence has no way of knowing which of the current models of rifles made by Colt or another manufacturer is permitted as a "copy" of an H-BAR model and which would be prohibited as a "copy" of a banned AR-15, because the designation fails to describe the characteristics of an H-BAR. Even more confounding is the fact that Maryland does not have a definition of what constitutes an H-BAR. Statement of Undisputed Facts, *supra* p. 22. A citizen has no way of knowing whether a court will determine that his or her rifle is a permitted H-BAR or not, and, thus, whether his or her conduct is criminal or not.

41

The problem of determining which firearms come under the protection of the H-BAR exception is illustrated clearly by the fact that even Defendant MSP cannot accurately determine whether particular firearms are "copies" with respect to the H-BAR exemption.  The MSP originally determined that the Bushmaster H-BAR rifle was exempted from the regulatory scheme in place prior to the passage of the Act because it was a copy of an AR-15 H-BAR.  Statement of Undisputed Facts, *supra* p. 22; *see also* Letter from Superintendent Edward T. Norris, Maryland State Police to William R. Lynch (September 15, 2003), Ex. 37.  Recently, however, MSP reviewed that determination and concluded that H-BAR rifles made by Bushmaster are banned under Maryland law and that the previous guidance provided regarding this issue was incorrect.  Statement of Undisputed Facts, *supra* p. 22; s*ee also* Letter from Lt. Col. William Pallozzi, Maryland State Police, to Lawrence Keane, National Shooting Sports Foundation (August 28, 2013), Ex. 36.  Because this change in longstanding policy occurred without notice shortly before the Act's effective date, any Marylander thereafter acquiring a Bushmaster (but *only* a Bushmaster brand) H-BAR would be a criminal in possession of a banned firearm they did not possess before October 1, 2013.

The Bushmaster H-BAR determination is not the only occasion in which MSP changed its position in this regard.  MSP also changed its determination that the Saiga shotgun is a "copy." Statement of Undisputed Facts, *supra* p. 22.  Given that even the Commander of MSP's Licensing Division was not sure of which enumerated long gun the Saiga was said to be a "copy" of (Statement of Undisputed Facts *supra* p. 22) it is not reasonable to expect an average citizen to be able to determine whether a firearm is a "copy" of a banned long gun.

The trend of MSP not adhering to its initial determinations is also shown by its treatment of .22 cal. replicas of enumerated banned long guns.  MSP initially determined that .22 cal. replicas were

"copies" if they were cosmetically similar to the enumerated long guns listed in the Public Safety Article.  Statement of Undisputed Facts, *supra* p. 22.  MSP changed its conclusion after the Attorney General issued its opinion stating that a "copy" had to have "a similarity between the internal components and functions" of an enumerated long gun.  Statement of Undisputed Facts, *supra* p. 22.  While the Opinion of the Attorney General is advanced by Defendants as alleviating the concern regarding vagueness, it only highlights the problem.  The Opinion of the Attorney General uses the phrase "similarity" between the internal components and mechanisms.  95 Op. Att'y Gen. 101, 108-09 (2010).  This phrase, however, is no less vague than "copies."  MSP has interpreted this standard more narrowly to mean that the internal components must be "completely interchangeable." Statement of Undisputed Facts, *supra* p. 22.

The standard of "completely interchangeable" presents two problems.  The first is that an average citizen is not going to know if the components are completely interchangeable such that he or she is aware of whether the firearm he or she wishes to purchase or sell is banned.  It is also no answer to say that the citizen can simply contact the manufacturer as (1) there is no guarantee the manufacturer knows the internal components of each and every enumerated long gun such that it can make that determination, and (2) there may be firearms manufacturers that are no longer in business and the citizen will be incapable of finding the answer.  Even more problematic is the fact that MSP claims the authority to change its interpretation of the Attorney General's guidance at any time.  Statement of Undisputed Facts, *supra* p. 22.

Thus, a citizen has no way of knowing whether his or her continued possession of a firearm that was once determined not to be a "copy" of an enumerated long gun has become the possession of a prohibited "assault weapon" due to a change in  MSP interpretations.  This is precisely the type of

43

arbitrary enforcement that the due process clause is intended to prevent.  Without statutory provisions defining adequately what constitutes a "copy," a citizen of ordinary intelligence is not provided with information sufficient to know whether his or her intended course of conduct – the acquisition or possession of a firearm – is prohibited by law.  This is especially true because MSP does not publish a list of firearms for which it has made "copy" determinations.  Statement of Undisputed Facts, *supra* p. 22.  Thus, any citizen who purchases a semi-automatic long gun after Oct. 1, 2013, is faced with the prospect of becoming a criminal possessor of an "assault weapon" through no fault, or action, of their own.

The term "copies" is so vague as to not provide a citizen of ordinary intelligence sufficient guidance to determine whether his or her conduct is prohibited.  Additionally, it authorizes arbitrary enforcement by each new MSP leadership team.  Therefore, it denies Plaintiffs due process of law under the Fourteenth Amendment, is unconstitutional, and must be stricken from the Public Safety Article, leaving only the enumerated list of banned long guns.

## CONCLUSION ON PLAINTIFFS' CROSS-MOTION

The undisputed facts of this case illustrate clearly that the firearms and magazines that are banned by Maryland law are commonly possessed for lawful purposes including self-defense and are, therefore, not dangerous and unusual weapons that traditionally have been banned.  Given these undisputed facts, Plaintiffs are entitled to judgment as a matter of law under Rule 56 because they have established that the challenged laws violate the principle set forth in *Heller* that the government cannot prohibit acquisition of commonly possessed firearms.

Even if the Court declines to follow the Supreme Court's mandate, however, and applies a means-end analysis, the challenged laws still fail constitutional muster.  Fourth Circuit law establishes

clearly that the challenged laws must be analyzed under strict scrutiny, and there is not sufficient evidence that the bans are narrowly tailored to achieve a compelling interest.  The challenged laws fail even the intermediate scrutiny review of the D.C. Circuit, because the evidence considered by the Maryland General Assembly is not sufficient to establish that the challenged laws will be effective in promoting the now-asserted interests of public safety and lessening firearm violence.  Even considering evidence that was not before the legislature, the established and undisputed facts do not show that the challenged laws are a tight fit, narrowly tailored to achieving the now-asserted government interests of public safety and preventing firearm crime.

The challenged laws also violate Plaintiffs' Equal Protection and Due Process rights under the Fourteenth Amendment.  First, they discriminate in favor of similarly situated retired law enforcement officers without asserting any legitimate government interest.  Second, the laws deny Plaintiffs due process of law by virtue of the fact that the term "copies" is unconstitutionally vague as it is used in the Public Safety Article. Finally, MSP arbitrarily decides what constitutes a "copy" with no notice to the public of any changes in its policies.

For the foregoing reasons, Plaintiffs respectfully request this Court to grant their Cross-Motion for Summary Judgment, declare the challenged portions of Maryland law to be unconstitutional under Second and Fourteenth Amendments to the Constitution, and enjoin Defendants from enforcing those laws.

**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In seeking summary judgment, Defendants ask this Court to ignore the consistent findings of the other courts that have addressed these issues, all of which have concluded that the banned firearms are commonly possessed for lawful purposes by law-abiding, responsible citizens and that the challenged prohibitions burden rights protected by the Second Amendment.  Not surprisingly then, a review of the "facts" set forth by Defendants reveals a number of material assertions that are disputed by Plaintiffs, many facts that are not material, and erroneous conclusions offered as "facts."  Accordingly, summary judgment for Defendants would be unwarranted even if their legal theories were correct, which they are not, because the material facts upon which they rely are in dispute.  An examination of Defendants' constitutional theories demonstrate that they fly in the face of the rulings of other courts addressing similar bans, as well as the teachings of the United States Supreme Court and the Courts of Appeals of the Fourth Circuit and other circuits.

First, Defendants fail to demonstrate how the complete prohibition of commonly possessed firearms and magazines survives a Second Amendment challenge under any appropriate level of scrutiny.  Categorical bans of protected firearms are forbidden by the Second Amendment, even if alternative firearms choices remain available, without resort to any interest-balancing test.  Even if a balancing of interests were to be conducted, Defendants' experts admit the challenged bans are not likely to have any measurable impact on firearm violence or public safety, but they will infringe impermissibly upon Plaintiffs' fundamental rights.

Defendants first assert that Plaintiffs' Second Amendment rights are not implicated whatsoever by the challenged laws because "assault weapons and large-capacity magazine bans do not burden conduct protected by the Second Amendment." (Defendants' Memorandum in Support of Motion for

Summary Judgment, ECF 44-1, at 1 ("Defendants' Motion").) In seeking to avoid any accountability under the Second Amendment, Defendants assert that the banned firearms are not commonly possessed even though the undisputed facts show they are chosen by millions of Americans and tens of thousands of law-abiding, responsible Marylanders.  This assertion is wholly without merit, as is demonstrated by the fact that every court that has addressed similar laws to those challenged in this suit has determined that the firearms in question are commonly possessed and are protected by the Second Amendment. Similarly, Defendants' claim that magazine restrictions are not entitled to any Second Amendment protection has not been adopted by other courts and is without merit because restrictions on magazines impact the ability to use a commonly possessed firearm for lawful purposes.

Defendants completely ignore the United States Supreme Court's textual and historical review of a similar firearms ban that scrutinized whether the challenged laws have a basis in text and history sufficient to support their enactment.  If no such basis can be found, the laws cannot stand.  Moreover, Defendants misstate the appropriate level of scrutiny if this Court does employ a means-ends analysis akin to those used in the First Amendment context.  The proper level of review, as is made clear by unequivocal statements from the Fourth Circuit, is strict scrutiny because the challenged laws impact the rights of law-abiding citizens to acquire commonly possessed firearms in their homes.  Under this high standard, Defendants bear the burden of establishing that the challenged laws are narrowly tailored to meet a compelling government interest.  Apparently conceding that they cannot meet this high burden, Defendants do not even attempt to make such a showing.  Finally, even if this Court does utilize the standard of review championed by the Defendants – intermediate scrutiny – the challenged laws still cannot meet constitutional muster because the evidence that was put before the legislature does not illustrate that the laws at issues are a tight fit narrowly tailored to achieving any government interest.

47

Defendants' assertions that the Plaintiffs cannot maintain their equal protection challenge because they are not similarly situated to retired law enforcement officers is likewise without merit.  As demonstrated by Defendants' own testimony, retired law enforcement officers are similarly situated to Plaintiffs in all relevant, material ways.  Both retired law enforcement officers and Plaintiffs:  1) have varying levels of training with the banned firearms and magazines; 2) have no right or duty to act any differently than members of the general public in a threatening situation; and 3) are not entrusted with the authority to engage in law-enforcement activities.  The Maryland General Assembly made no findings and provided no justification for this invidious distinction.  Defendants have not articulated any legitimate government interest in permitting retired law enforcement officers to acquire as many banned magazines as they wish at any time, nor any interest in allowing a retiring law enforcement officer to receive a banned firearm.

Finally, Defendants' argument that "plaintiffs' pre-enforcement, non-First Amendment vagueness claim fails because the plaintiffs cannot demonstrate that the definition of assault long guns" is vague in all its applications (Defendants' Motion at 2) misstates the applicable standard and ignores the evidence advanced by Plaintiffs.  As is undisputed, both the interpretation of the term "copies" in Section 5-101(r)(2) of the Public Safety Article and Defendant MSP's application of that definition have changed over time, resulting in changes in determinations of what firearms are copies, such that the use of the term "copies" is vague and is subject to arbitrary enforcement.

The challenged laws infringe impermissibly upon Plaintiffs fundamental constitutional right to defend themselves in their homes with the commonly possessed firearms of their choice protected by the Second and Fourteenth Amendments, and their rights to equal protection and due process of law under the Fourteenth Amendment. Defendants have failed in their burden of demonstrating that they are

entitled to summary judgment as a matter of law on the undisputed material facts.  Plaintiffs respectfully request that Defendants' Motion for Summary Judgment be denied.

## ARGUMENT IN OPPOSITION TO DEFENDANTS' MOTION

**A.      The Facts Set Forth by Defendants Are Disputed, Non-Material, or Conclusions.**

The Defendants' "Statement of Facts" (Defendants' Motion at 3-13) is not a presentation of the undisputed material facts of the case as is envisioned by the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 56(a), (c).  Defendants proffer facts that are genuinely disputed by Plaintiffs, facts that are immaterial to the issues at hand, and "facts" that are, in reality, conclusions masquerading under the label "facts."  Moreover, Defendants present facts throughout their motion that are not captured by their "statement of facts" and that similarly are based on disputed evidence.  Clearly, Defendants have not presented a clear, concise statement of material facts sufficient to support their motion for summary judgment in keeping with both the letter, and spirit, of Rule 56.

At the outset, Plaintiffs must dispute the definition of "assault weapon" used by Defendants and used by Defendants' experts in both their analyses and reports.  Defendants have defined "assault weapons" as "a subset of semi-automatic weapons that include semiautomatic pistols, rifles, and shotguns with military features. . . ."  (Defendants' Motion at 49.)  By using a definition of "assault weapons" that includes firearms that are not at issue in the case, Defendants have injected hopeless ambiguity into their entire argument.  Indeed, it is sometimes impossible to know whether the statements and arguments made by Defendants are related to pistols, which are not relevant to the issues at hand, or the weapons actually at issue in this case.  As an example, the definition of "assault weapon" used by Dr. Koper, Defendants' expert upon whose work other defense experts rely, includes pistols.  (Decl. of Christopher Koper, Defendants' Exhibit 7 at paragraph 13.)  This misleading definition infects all of his

opinions, as can best be seen by the fact that his "best resource" (*id.* at paragraph 4) uses the same definition when concluding that the federal assault weapons ban had an impact on criminal use of banned firearms, but mentions, only in passing, that "there has not been a clear decline in the use of [assault rifles]." (*Id.* at  Ex. B at 2.)  By framing the definition of "assault weapons" to include pistols that are not at issue in this case, Defendants rely on facts that are not material.  Plaintiffs dispute any and all factual assertions and conclusions made by Defendants and their experts that use this definition.

Defendants assert that the banned firearms "are essentially identical to the firearms that are the most widely-used by militaries around the world." (Defendants' Motion at 3.)  Plaintiffs dispute this "fact."   The critical difference is that the banned firearms are semi-automatic, rather than the fully automatic versions used by the militaries.  These two distinct classes of firearms cannot be "essentially identical" and yet differ completely in their most material respect.  Moreover, this aspersion is besides the point because all modern firearms are derived from firearms that were constructed for use on the battlefield.  For example, modern Revolvers are derived from the Colt Model 1889 Navy revolver, (Decl. of James W. Supica, Ex. 14, Attachment A at p. 6) and modern semi-automatic pistols from the Mauser. (*Id.* at p. 8.)

Defendants next cast aspersions on certain features of some, but not all, enumerated long guns. They first claim that flash suppressors were designed to allow for more aggressive engagements. (Defendants' Motion at 4.)  Plaintiffs dispute this fact, given that the purpose of a flash suppressor is to reduce the flash of light that occurs when a round is fired, such that individuals who are forced to fire a firearm in self-defense are less likely to be blinded momentarily, an occurrence that is especially problematic in low-light conditions, such as are to be expected if a homeowner is defending himself or herself at night.  (Decl. of James W. Supica, Ex. 14, Attachment A at p. 17; Decl. of Buford Boone, Ex.

13 at ¶ 8.)  Defendants also claim that "coiling shrouds that cover the barrel of assault weapons" allow a shooter to hold a weapon and fire "dozens or hundreds" of shots with ease. (Defendants' Motion at 4.) Assuming that Defendants are referring to cooling shrouds, Plaintiffs dispute this "fact" because Defendants' statements inaccurately imply that this is a feature unique to "assault weapons."  In fact, most firearms have either an extended stock or a barrel shroud to prevent the shooter's hand from being burned, which can occur when even a few shots are fired.  (Decl. of James W. Supica, Ex. 14 at ¶ 4; Decl. of Buford Boone, Ex. 13 at ¶ 9.)  Plaintiffs also strongly dispute Defendants' characterization of pistol grips. (Defendants Motion at 4.)  Pistol grips, despite Defendants' assertions to the contrary, are not designed to allow for "spray" fire from the hip; rather, they are designed to allow for better accuracy and, actually, impede such use.  (Decl. of James W. Supica, Ex. 14 at ¶ 5, Decl. of Buford Boone, Ex. 13 at ¶ 10, Decl. of Gary Roberts, Ex. 10 at ¶ 4.)  Finally, Plaintiffs dispute Defendants statement that "[c]ollapsible or folding stocks . . . aid in the concealment of high-powered assault weapons. . . ." (Defendants' Motion at 4.)[9] A folding stock aids a law-abiding, responsible citizen in storing the firearm in their home so that it is readily accessible in case of an emergency.  (Decl. of James W. Supica, Ex. 14 at ¶ 6.)  Defendants also have presented a conclusion intertwined with their "fact": that the features of certain banned firearms "serve specific combat needs" that are not applicable to the defensive use of a firearm.  (Defendants' Motion at 4.)  This conclusion is based on facts that are genuinely disputed by Plaintiffs and is not proper in a Statement of Facts in support of a Motion for Summary Judgment.

Next, Plaintiffs dispute Defendants' incorrect characterization of the effectiveness of the .223 round.  Specifically, Defendants state that such rounds are capable of expelling projectiles that can cause

---

[9]        Any facts related to Defendants' analysis of collapsible stocks are not material, as the challenged laws do not apply to collapsible stocks.  *See* MD. CODE ANN. CRIM. L. 4-301(e)(1)(i) (including only folding stocks as features relevant to determining whether a firearm is a "copycat weapon" and thus banned).

"amputation of limbs, massive body wounds, and decapitations. . . ."  (Defendants' Motion at 6.)   In fact, the .223 round, used in the AR-15, "pale[s] in destructive capacity when compared to common civilian hunting rifles." (Decl. of Gary Roberts, Ex. 10, Attachment A at p. 3.)  Indeed, "[e]ven hunting rifles in older calibers from the 1800's, like .30-30 and .45-70, penetrate much deeper and are far more damaging than the .223/5.56mm ammunition fired by the AR15 carbines."  (*Id.*)  "[M]any M16 users in Vietnam concluded that [the .223 round] produced unacceptably minimal, rather than 'massive,' wounds."  (*Id.* at p. 9.)  Defendants present no scientific evidence to support their false assertion that .223 rounds are somehow more injurious than handgun, shotgun, or other rifle rounds.

Plaintiffs next dispute Defendants' mischaracterization of the rate of fire of semiautomatic firearms.  Defendants state that a 30-round magazine can be emptied in 5 seconds.  (Defendants' Motion at 9.)  The U.S. Army M-16 manual, upon which Defendants rely on the very same page of their brief, states that the effective rate of fire in semiautomatic mode is only 45 rounds per minute.  (Department of the Army, *Rifle Marksmanship M16-/M4-Series Weapons* (August 2008), Ex. 38 at 2-1.)   This corresponds to discharging a 30-round magazine in 40 seconds, or eight times as long as Defendants assert, and twenty times as long as the time referenced by Defendants for a magazine to be emptied in a fully automatic firearm.[10]  Moreover, the fact that the United States Army considers semi-automatic firing to be more effective in combat scenarios does not alter the undisputed fact that the firearms banned by the challenged laws are not automatic.  Defendants also conclude that "the preferred weapon for use in the military theater and in the most intense law enforcement activities is essentially

---

[10]      Defendants' citation, in a footnote, to a video on YouTube, which was never disclosed to Plaintiffs as a source upon which they would rely, is also insufficient to establish their "fact" of the rate of fire because: 1) there is no way to confirm that the video is even real; 2) there is no way to confirm that the firearm in the video, even if it is real, has not been modified in some way to make it fire more quickly; and 3) there is no mention of what firearm is actually in the video, such that not even Defendants can claim to know whether it is a firearm banned in Maryland and thus germane to the issue at hand.

indistinguishable from the civilian AR-15." (Defendants' Motion at 10.)  This erroneous conclusion is not supported by the facts in the case, given that the firearm being used by the entities identified by Defendants is fully automatic.

Plaintiffs next dispute Defendants' characterization of the 1994 ban on assault pistols, 1994 Laws of Md., Ch. 456.  (Defendants' Motion at 11.)  Defendants claim that this law "identified a list of specifically-enumerated assault long guns," the purchase of which was subject to increased scrutiny. (Defendants' Motion at 11.)  The 1994 law, however, created a list of "Regulated Firearms" that included the list of now-banned long guns.  It was the Act that maligned these commonly possessed firearms by coining the term "assault long guns."  *See* MD. CODE ANN. CRIM. L. 4-301(d); 2013 Senate Bill 281, Ex. 39, at 9:20-21.

Plaintiffs also dispute Defendants' statement of the challenged laws, because Defendants omit crucial exceptions of the challenged laws in their Statement of Facts.  The challenged laws allow retiring law enforcement officers to have transferred to them upon retirement otherwise banned firearms, MD. CODE ANN., CRIM. L. § 4-302(7)(i), and allow retired law enforcement officers to purchase, sell, and transfer magazines with a capacity of more than ten rounds at any time.  MD. CODE ANN., CRIM. L. § 4-305(a)(2).

Plaintiffs next dispute Defendants' calculation of the number of banned firearms in Maryland based on the data provided by MSP.  (Defendants' Motion at 27.)  First, Defendants have not included data for 2013 (*id.*), asserting that the lawful sales in that year are somehow discounted because the Legislature was considering passing the Act.  This position is unreasonable and illustrates only the lengths to which Defendants will go to avoid the overwhelming evidence that the banned firearms are commonly possessed.  Even more fundamentally, however, the Defendants' figure of 46,577 omits all of

the frames and receivers of banned firearms that are used by law-abiding citizens as a platform to assemble a full firearm that now also are banned.  Including the omitted regulated frames and receivers for the time period used by Defendants brings the total number of banned firearms transferred to 73,787, an increase of nearly 30,000 banned firearms.  (*See* Decl. of Capt. Dalaine Brady, Defendants' Exhibit 10, Ex. C.)  Moreover, including the omitted year brings the true total of banned firearms transferred between 1994 and 2013 to 88,386 – nearly double the figure reported by Defendants.  (*See id.*)  Thus, the evidence cited by Defendants establishes that their "facts" with respect to commonality are not even correct, much less undisputed.

Plaintiffs also dispute Defendants' characterization of the Act as not restricting access to "any necessary component for the operation of a firearm for in-home self-defense" and not "regulat[ing] the amount of ammunition any individual can have available in the event a self-defense need arises." (Defendants' Motion at 31.)  These statements are highly disputed.  First, the statement that the challenged laws do not restrict access to "any necessary component for the operation of a firearm" overlooks the uncontested fact that magazines that meet the requirements of the new law are difficult, if not impossible, to find for sale.  (Decl. of Carol O. Wink, Ex. 5 at ¶ 4; Email from Darren Gates to Wink's Sporting Goods (November 11, 2013, Ex. 40).)  In addition, Plaintiffs dispute Defendants' contention that the law does not regulate the amount of ammunition that is available in the event a self-defense need arises.  In the stressful situation of using a firearm for home defense, Plaintiffs will be unable to load rounds of ammunition into a magazine that has been emptied and will not be able to quickly or efficiently change magazines.  (Decl. of Guy Rossi, Ex. 11, Attachment A at pp. 3-7.)

Next, Plaintiffs dispute Defendants' assertions with respect to the study conducted by Defendants' expert, Lucy Allen, that reviewed a small sample of National Rifle Association stories.

Defendants note that her study did not identify any stories in which more than ten rounds were fired in self-defense, and that such was "consistent with the results of an earlier analysis of the same" National Rifle Association database over different years.  (Defendants' Motion at 32.)  This statement is simply false.  As was noted by Ms. Allen in her deposition, the earlier study, conducted by Claude Werner, did find at least one instance in which more than ten rounds were fired in self-defense.  (Dep. of Lucy Allen, Ex. 23 at 45:10-22.)  Additionally, Plaintiffs dispute the validity of all of Ms. Allen's conclusions that are based on the stories that she reviewed, as Ms. Allen readily admits that this data is subject to selection bias (*id*. at 31:16-17); that the she does not "expect" that the reported stories are a representative sample of defensive firearm use (*id*. at 31:9-12); and she did not do any independent research to support her claim that the stories she studied represent "quite a comprehensive list."  (*Id*. at 32:5-10.)

Plaintiffs also dispute Defendants' assertion that the ability to fire in automatic mode was not a concern of the military when it adopted the M16 rifle.  (Defendants' Motion at 33-34 ("it was not the capacity for full automatic fire that caused the military to adopt the AR-15 as its standard service rifle, as the M14 rifle it replaced was also a selective fire rifle.").)  This statement is clearly false.  First, the M16 replaced the M14, not the AR-15.  Second, the M14's performance during automatic fire was an impetus for the change.  (Duncan Long, *The Complete AR-15/M16 Sourcebook, What Every Shooter Needs to Know*, Ex. 41 at 16 ("Meanwhile, the U.S. Army – just as its tests in 1959 had suggested – was finding that the M14 was too heavy for troops to handle easily and that automatic fire was so haphazard that most guns were being modified to fire in semiautomatic only.  . . .  Colt representatives were soon pointing out such problems to potential buyers and paving the way for future sales. . . ."); *see also* Decl. of James W. Supica, Ex. 14 at ¶ 7.)

Plaintiffs next dispute Defendants' assertion that the banned firearms are over-represented in mass shootings.  (Defendants' Motion at 35.)  This assertion is based on the declaration of Dr. Koper and data from *Mother Jones* magazine that has never been formally published for peer review. (Defendants' Motion at 35-36.)  Dr. Koper's present claim that the banned firearms are over-represented in mass shootings is directly contrary to what he found when he studied the issue in 1997.  In that study, Dr. Koper used the traditional definition of a mass shooting as being "the killing of four or more victims in one place by a lone offender."  (Decl. of Christopher Koper, Defendants' Exhibit 7 at Ex. C at A-1.) Using that definition, Dr. Koper concluded that "contrary to our expectations, only 2 – 3.8 percent – of the 52 mass murders we gleaned from the Nexis search unambiguously involved assault weapons.  This is about the same percentage as for other murders."  (*Id.*; *see also id.* at 6 ("Nor did we find assault weapons to be overrepresented in a sample of mass murders involving guns.").)  Given that the Maryland definition of banned "assault weapons" challenged here is even less broad than that used by Dr. Koper because it does not include "assault pistols," it stands to reason that the Maryland banned firearms are used even less frequently in mass murders.

The declaration of Dr. Koper in this case, in which he opines that the banned firearms or magazines were used in 40% of mass shooting incidents, is based on his 2004 study, in which he changed the definition of mass murder used for his study.  (Dep. of Christopher Koper, Ex. 20 at 113 (noting that his criteria in the 2004 study for a mass murder was six or more people killed or 12 or more people shot).)  Given that Dr. Koper had a strong expectation to find "assault weapons" over-represented in mass murders, but did not find that to be the case, and only then changed his definition of mass murder to bias the incidents selected towards those involving "assault weapons," his conclusion is highly suspect and would appear to be extremely susceptible to confirmation bias.  Even more critically,

when considering the broad category "assault weapons," even Dr. Koper's own 2004 data betray his conclusion. He notes that, nationally, "assault weapons" were used in 4-13% of mass murders of 4 or more persons 1992-1994. (Decl. of Christopher Koper, Defendants' Exhibit 7, Ex. B at 15.) This conclusion is based on *one* mass murder, out of 28, involving an "assault weapon." (*Id.* at 15 n.13.) Clearly, this is not an "over-representative" sample and Dr. Koper's declaration is hyperbole rather than fact.

Plaintiffs next dispute Defendants' claim that the use of the banned firearms for self-defense "poses risks to innocent bystanders, including those behind walls and doors, who may be at risk of being hit by errant rounds." (Defendants' Motion at 43-44.) This statement is directly contradicted by the ballistics studies conducted by the Federal Bureau of Investigation that illustrated that the .223 round used by most of the banned firearms penetrated *less* than handgun rounds through interior walls. *See* Statement of Undisputed Facts, *supra*, p. 18. Notably, none of the declarants upon which Defendants rely for this assertion even purport to be ballistics experts and thus competent to refute the findings of the FBI data. (*See* Decls. of James Johnson, Defendants' Exhibit 3, Anthony Batts, Defendants' Exhibit 4, Henry Stawinksi, Defendants' Exhibit 5, Joseph Vince, Defendants' Exhibit 8.) Three of these declarants expressly denied being ballistics experts in their depositions. (Dep. of Chief James Johnson, Ex. 17 at 54:1; Dep. of Comm'r Anthony Batts, Ex. 31 at 6:17; Dep. of Joseph Vince, Ex. 32 at 21:12-14.)

Plaintiffs next dispute the characterization of assault weapons being "particularly dangerous" because they penetrate soft body armor and allow criminals to attack law enforcement officers from long distances. (Defendants' Motion at 45-46.) Plaintiffs dispute these claims because they are intentionally misleading. The fact is, nearly all rifles (other than .22 rimfire and a few others) fire centerfire rounds,

and any centerfire round fired from a rifle will penetrate the soft body armor worn by law enforcement officers.  Statement of Undisputed Facts, *supra*, p. 17.  In fact, soft body armor is rated to stop *only handgun rounds*. (Decl. of Buford Boone, Ex. 13 at ¶ 4; Decl. of Jack McCauley, Ex. 15 at ¶ 10; Decl. of Gary Roberts at Ex. 10 at ¶ 5); *see also* National Institute of Justice, Department of Justice, *Ballistic Resistance of Body Armor* at 3, *available at https://www.ncjrs.gov/pdffiles1/nij/223054.pdf* (last visited March 16, 2014).

Finally, Plaintiffs dispute Defendants' assertion that "plaintiffs have not identified any facts that would suggest that the MSP might engage in arbitrary or discriminatory enforcement."  (Defendants' Motion at 67.)  This statement is false, as Plaintiffs have identified numerous facts, such as the shifting definition of "copies" and the fact that the Commander of the MSP Licensing Division has the authority to make further changes to that definition such that one might become a criminal by virtue of only a change in mind or leadership at MSP.  The facts "suggest MSP might engage in arbitrary enforcement." *See* Statement of Undisputed Material Facts at 22.

Defendants also assert myriad non-material facts in their "statement of facts" in an attempt to obfuscate the actual issues involved in this case.  Plaintiffs contend that the only facts that are material to resolving the issue at hand are those that go to determining whether the firearms at issue are commonly possessed for lawful purposes by law-abiding, responsible citizens, because that is the test mandated by *Heller.  See supra,* pp. 23-25.  Even if the Court does apply a balancing test, however, its analysis should be limited to the evidence that was actually before the Maryland General Assembly at the time it enacted the Act, such that all of the social science evidence, and, indeed *all* of the evidence, submitted by Defendants is not material. *See supra*, pp. 28-29, 32-34 (discussing the impropriety of considering evidence that was not before the legislature at the time of enactment when analyzing laws

under heightened scrutiny). Even if the Court does consider evidence that was not before the Maryland General Assembly, Defendants still present a plethora of "facts" that are not relevant to the issues at hand.

Defendants' assertion that military and law enforcement officers instruct their soldiers and officers to use fully automatic firearms in semi-automatic mode (Defendants' Motion at 10) is irrelevant, because the laws Plaintiffs challenge do not ban fully automatic firearms.  In this regard, Plaintiffs note that the fully automatic firearms much maligned by the Defendants can be acquired legally and possessed in the State of Maryland, even after the passage of the Act.  *See* Dep. of Lt. Col. Pallozzi, Ex. 22 at 117:14-19; *see also* MD. CODE ANN. CRIM. L. § 4-402(b)(4) (permitting the ownership of a "machine gun" so long as the ownership is not for an aggressive purpose).

Defendants present detailed facts of various mass shootings that have nothing to do with the resolution of the merits of this case and are designed to appeal to passion rather than any applicable legal standards.  (Defendants' Motion at 10 n.4, 13.)  Defendant Col. Marcus Brown acknowledged that there has never been a mass shooting in Maryland.  (Dep. of Col. Marcus Brown, Ex. 19 at 52:2-4.)  More importantly, Defendants' expert Dr. Koper admitted during his deposition that he could not state to a reasonably degree of scientific probability that the challenged laws would prevent a mass shooting in the future.  (Dep. of Christopher Koper, Ex. 20 at 131.)

**B.**      **Defendants' Legal Arguments Misstate and Misapply the Law.**

*1.*      *Defendants Misstate the Applicable Second Amendment Standards.*

The Defendants are correct that in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the United States Supreme Court, for the first time, recognized that the Second Amendment to the Constitution protects a law-abiding, responsible individual's right to possess a firearm in his or her

home.  *Id*. at 635.  Plaintiffs agree that the Court conducted an overview of the historical underpinnings of the Second Amendment and the previous judicial opinions interpreting its scope, and concluded that the rights protected by the Second Amendment were individual rights not tied to militia service.  *Id*. at 592.  The Plaintiffs agree with Defendants that the Court recognized that, like all constitutional rights, rights protected by the Second Amendment are not absolute.

As discussed Plaintiffs' Cross-Motion, *see supra* pp. 23-24, the Court in *Heller* acknowledged traditional restrictions on "those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."  *Id.* at 625.  The Supreme Court distinguished between those firearms that are commonly possessed for lawful purposes – and are therefore, by definition, not dangerous and unusual – and those that are not, such as the short-barreled shotgun or machine guns.[11] Firearms commonly possessed for lawful purposes, however, cannot be prohibited.

Plaintiffs agree with Defendants that the Fourth Circuit has adopted an approach to analyzing constitutional challenges under the Second Amendment that involves a two-step inquiry.  *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010).  First, a court must review the law to determine whether the challenged law imposes a burden on conduct protected by the Second Amendment.  *Id.*  If so, then the Court must apply "an appropriate form of means-end scrutiny."  *Id.*  Notably, "the Government bears the burden of justifying the constitutional validity of the law."  *Id.*  As discussed more fully in Plaintiffs' Cross-Motion for Summary Judgment, *supra* pp. 25-26, the Fourth Circuit has misapplied *Heller* by endorsing any type of means-end scrutiny, whether strict or intermediate, in Second Amendment cases. The flaw in that approach was noted by the Ninth Circuit in *Peruta*, No. 10-56971, 2014 U.S. App.

---

[11]     Note that *Miller* did not involve the outright prohibition on ownership of these firearms; rather, the National Firearm Act prohibited their ownership without proper registration.  The fully automatic version of the banned AR-15, the M-16, can be purchased and possessed lawfully, provided it is registered, even after the passage of the challenged Act.

LEXIS 2786, as well as by Judge Kavanaugh in his dissent in *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011).  But even if the Fourth Circuit was correct in importing the two-step process for the cases it was considering, such an approach is not warranted in this case because the challenged laws flatly prohibit the exercise of a right protected by the Second Amendment.  *Supra*, p. 26; *see also Moore*, 702 F.3d at 940-41; *Ezell*, 651 F.3d at 684.

State laws banning the ownership of commonly possessed firearms have been challenged in other courts, and Defendants are correct that other courts have upheld similar laws.  *See Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (*Heller II); Shew v. Malloy,* No. 3:13CV739(AVC), 2014 U.S. Dist. LEXIS 11339 (D. Conn. Jan. 30, 2014); *Kampfer v. Cuomo,* No. 6:13-cv-82(GLS/ATB), 2014 U.S. Dist LEXIS 1479 (N.D. N.Y. Jan. 7, 2014); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, No. 13-cv-291S, 2013 U.S. Dist. LEXIS 182307 (W.D. N.Y. Dec. 31, 2013).  In each of those cases, however, the district court applied the incorrect type of constitutional review to the laws at issue.[12]  The proper analysis, as is made clear by *Heller*, is a textual/historical approach.  *See supra* at 23-25.

The propriety of the textual/historical approach was made clear by the Ninth Circuit in *Peruta*. At issue in *Peruta* was whether a municipal ordinance forbidding the concealed carry of firearms without the proper permit, given only upon a demonstration of "good cause," was violative of the Second Amendment.  The Court first structured its analysis around determining whether the right to

---

[12]     *Kampfer* applied rational basis review to the challenged laws, even after finding that they impacted the plaintiff's rights protected by the Second Amendment, because they did not burden such rights "substantially."  *Kampfer,* 2014 U.S. Dist LEXIS 1479 at *17.  Not only did this analysis deviate from the earlier decision of another district court *on the same exact law*, *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 2013 U.S. Dist. LEXIS 182307, the Court applied rational basis review despite *Heller's* explicit mandate that rational review is not appropriate for reviewing laws implicating the Second Amendment.  *Heller*, 554 U.S. at 629 n. 27.

61

carry a firearm outside the home was historically understood as protected. *Peruta*, No. 10-56971, 2014 U.S. App. LEXIS 2786 at *16-64. Judge Kavanaugh in his dissenting opinion in *Heller II* also articulated the proper procedure for reviewing a law under the Second Amendment: "[t]he Supreme Court struck down D.C.'s handgun ban because handguns have not traditionally been banned and are in common use by law-abiding citizens, not because the ban failed to serve an important government interest and thus failed the intermediate scrutiny test. And the Court endorsed certain gun laws because they were rooted in history and tradition, not because they passed the intermediate scrutiny test." *Heller II*, 670 F.3d at 1284 (Kavanaugh, J., dissenting).

Defendants urge this Court to turn away from the Supreme Court's Second Amendment teachings, arguing that First Amendment parallels should be applied to this case. Even if the Court does employ a traditional First Amendment standard, however, Fourth Circuit precedent establishes that strict scrutiny is the proper test, despite Defendants' assertion that intermediate scrutiny is the highest standard to which the laws can be held. Defendants' Motion at 37-38; *see also supra*, pp. 25-31 (explaining that the Fourth Circuit, at every possible opportunity, has stated that when a law burdens the right of a law-abiding, responsible, citizen to possess a firearm in his or her home, strict scrutiny is required). Given that none of the cases relied upon by Defendants in their brief employed the proper standard of review, and the courts are not consistent in the standard of review to apply, the standards applied in these cases do not guide the Court here.

> **i)      The Banned Firearms Do Not Fall Outside the Protections of the Second Amendment.**

Defendants' first substantive argument is that the firearms banned by the challenged laws are outside the protections of the Second Amendment. (Defendants' Motion at 21-29.) Defendants first assert that the banned firearms are not commonly possessed, relying on their conclusion that "only a

small fraction of a percent of Marylanders owned an assault weapon." (Defendants' Motion at 28.) This argument has been rejected by every federal court that has considered it and is belied by Defendants' own witnesses' testimony.

Preliminarily, Defendants appear to take issue with the use of numerosity as the proper measuring stick for determining whether a category of firearms is commonly possessed. (Defendants' Motion at 23-24.) Defendants fail, however, to articulate any other standard by which commonality is to be measured and employ an analysis based upon numerosity in presenting their own arguments. (Defendants' Motion at 25-28.) It appears that, despite Defendants' assertions to the contrary, the parties are in agreement that the proper analysis is to assess the commonality of the banned firearms by reviewing their prevalence in ownership by law-abiding citizens.

Indeed, all the federal courts that have reviewed laws banning so-called "assault weapons" have focused similarly on prevalence. *See Heller II*, 670 F.3d 1244; *Shew v. Malloy,* No. 3:13CV739(AVC), 2014 U.S. Dist. LEXIS 11339; *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, No. 13-cv-291S, 2013 U.S. Dist. LEXIS 182307 (W.D.N.Y. Dec. 31, 2013). The courts conducting that inquiry have found that the banned so-called "assault weapons" are commonly possessed. *See supra* pp. 13-15.

Defendants attempt to avoid the conclusions reached by the federal courts that do not agree with them by asserting that the banned firearms "comprise approximately 3% of the current civilian gun stock" and that this percentage does not show that they are common. (Defendants' Motion at 26.) This assertion flies in the face of the evidence produced in this case. For example, Captain Dalaine Brady, Commander of MSP's Licensing Division, volunteered during her deposition that one of the banned firearms, the AR-15, "is predominantly the weapon of choice amongst a lot of the clients that we service." (Dep. of Capt. Dalaine Brady, Ex. 16 at 39:20-21.) Moreover, retailers reported that AR and

AK platform rifles "account[ed] for 20.3 percent of the firearms they sold in 2012," (Decl. of Jim Curcuruto, Ex. 9, Attachment A at ¶ 3) and were "the most popular long gun sold" in that year.  (*Id.*) The data supplied by MSP show that the banned firearms have been increasing in popularity since 1995. In the past three years alone, approximately 35,000 banned firearms and frames/receivers of such firearms have been transferred to law-abiding citizens in Maryland.  (Decl. of Capt. Dalaine Brady, Defendants' Exhibit 10, Ex. C.)   Indeed, Defendants' *own brief* contradicts their argument: "Semiautomatic versions of the AK-47, and subsequent variations like the AK-74, are the second-most popular types of centerfire semiautomatic rifle in the United States, behind the AR-15."  (Defendants' Motion at 8.)

Defendants then pivot their argument and assert that, because individuals who own the banned firearms are likely to own more than one of them, the firearms are even less common.  (Defendants' Brief at 27.)  In *Heller*, the Court made clear that the firearms protected under the Second Amendment were those commonly possessed by law-abiding citizens for lawful purposes.  *See Heller*, 554 U.S. at 625.  The Court was concerned with whether the firearms themselves were commonly possessed, not how many firearms each individual may possess.

Defendants next argue that because the banned firearms are not commonly used for self-defense in Maryland, they are somehow unprotected by the Second Amendment.  This argument misreads *Heller*: the Court did not require that the firearm be "used," for lawful purposes like self-defense; rather, the inquiry was whether the firearms were "not typically *possessed* by law-abiding citizens for lawful purposes, such as short-barreled shotguns."  *Heller*, 554 U.S. at 625 (emphasis added).  Nowhere in the Court's opinion did it speak to requiring evidence regarding the frequency of use of such weapons.  This is most clear when the Court analyzed the law at issue itself.  The Court struck down the ban on

handguns without resort to any analysis on the frequency of their use in self-defense; rather, the Court concluded that because handguns were "overwhelmingly chosen" for the lawful purpose of self-defense, a ban on their possession could not stand.  *Id*. at 628.  Had the Court considered the "use" of handguns to be the gravamen of its analysis, it would have indicated such and remanded the case for a factual determination of the frequency of use.  Given that neither of these occurred, it is clear that frequency of use is not the proper focus.  Even if "use" were the proper standard, Plaintiffs dispute Defendants' anecdotal claim that the banned firearms are not used in self-defense.  Dr. Gary Kleck conducted a survey in 1994 that estimated the number of defensive firearm uses in the United States at 2.5 million each year.  (Decl. of Gary Kleck, Ex. No. 44, Attachment A at p. 2.)  Even using Defendants' estimation that the banned firearms comprise 3% of the firearms possessed by civilians, there would be, statistically, 75,000 instances of defensive firearm use with a banned firearm.

When a citizen keeps a firearm that is ready for self-defense, or lawfully bears the firearm at home or in public, the citizen is using the firearm.  Law enforcement officers rarely shoot their duty arms, except during target practice, but they use their guns every day.  They use their firearms by possessing them in a manner so that they can be fired in the unlikely event of an emergency.  Indeed, by using firearms as an available deterrent, law enforcement officers reduce the need to fire their guns.  The same is true for ordinary citizens.  People use the firearms that they possess in many ways for self-defense, and most of these uses do not involve pulling a trigger against a violent attacker.

A widely-discussed example of a person using an "assault weapon" to defend themselves and their family in their home occurred just this past month in Detroit.  A woman was at home with her two children when three masked men kicked in her door in an attempt to rob her.  DAILY MAIL REPORTER, *"I Didn't Have Time to Get Scared:" Surveillance Camera Captures the Moment Mother Opens Fire on*

*Home Invaders with Assault Rifle*, http://www.dailymail.co.uk/news/article-2562768/I-didnt-time-scared-CCTV-captures-moment-mother-opens-fire-home-invaders-assault-rifle.html (last visited March 17, 2014).  She quickly picked up an "assault rifle" that she had purchased for just this type of event and fired shots that scared off the would-be robbers.  (*Id.*)  This entire event can be seen on video from surveillance cameras that were installed (*id.*), and it is quite clear that this woman was able to protect herself and her family because she possessed an "assault weapon" for the unlikely day she would need to use it.

### ii)        The Banned Magazines Are Protected by the Second Amendment.

Defendants first assert that "large-capacity detachable magazines banned by the Firearm Safety Act fall outside the scope of the Second Amendment's protections."  (Defendants' Motion at 29.)  Defendants then assert that, because firearms can function with magazines that are capable of holding less than ten rounds, magazines holding more than ten rounds are, therefore, "not necessary components of firearms."  (Defendants' Motion at 31.)  Neither argument is consistent with the facts or *Heller*.

The Act arbitrarily labels commonly possessed, standard capacity magazines holding more than ten rounds as "large-capacity," and Defendants now argue that this label somehow insulates the magazine restriction from Second Amendment scrutiny.  The controlling issue is whether magazines are protected by the Second Amendment.  If magazines are protected, then laws that place restrictions on the acquisition and possession of any group or category of magazines must be analyzed under the Second Amendment framework.  Whether a magazine is labeled as "large-capacity" or not only begs the true question: are magazines protected by the Second Amendment?

One of the major tenets of the Supreme Court's decision in *Heller* was that law-abiding, responsible citizens have a right to engage in armed self-defense.  *Heller*, 554 U.S. at 599 (stating that

self-defense "was the *central component* of the right itself"). There is no dispute that magazines are necessary to the functionality of semi-automatic firearms. (Defendants' Response to Plaintiffs' First Set of Requests for Admissions, Ex. 25, at Response 18.) Thus, restrictions on magazines impact the operation and utility of firearms employed in self-defense and any restriction must be analyzed under the Second Amendment in the same way that the requirement that a firearm be rendered inoperable in the home was analyzed in *Heller*.[13] *Heller*, 554 U.S. at 635. The Court struck down this requirement, holding that the rights protected by the Second Amendment include the right to possess an operable firearm. *Id.*

While the Fourth Circuit has not opined directly on this issue, the analysis of the D.C. Circuit in *Heller II* is instructive, as is the decision of the Seventh Circuit in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011). In *Heller II*, the D.C. Circuit considered the constitutionality of a package of firearm laws enacted by the District of Columbia. One of those laws was a restriction on magazine capacity similar to the law being challenged by Plaintiffs. In reviewing whether this law was constitutional, the D.C. Circuit stated that the evidence in that case made clear that magazines holding more than ten rounds were commonly possessed by the law-abiding public. *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are

---

[13]     A magazine has no purpose *except* to make a firearm usable for self-defense. Thus, the effect of the magazine ban is not to simply outlaw certain articles of commerce; rather, it is to prohibit the possession and use of firearms equipped with magazines holding more than ten rounds. As can be seen from the emails to and from Plaintiff Carol Wink (Email from Darren Gates to Wink's Sporting Goods (November 11, 2013, Ex. 40), there is a severe shortage of magazines holding ten rounds or less for firearms that are designed for and sold with magazines holding more than ten rounds (this is especially true for one of the most popular handgun manufacturers selling firearms today, Glock). As such, the ban has the practical effect of preventing the use, in self-defense, of commonly used firearms for the entire population of law-abiding citizens, including Plaintiffs, who need to acquire a magazine because, for example, their currently-possessed magazine broke, or they must purchase a new firearm without any magazines at all. Anyone purchasing a new or used firearm that, before October 1, 2013, would have been sold with a magazine holding more than ten rounds, will not be able to exercise their Second Amendment right to possess an operable firearm if he or she will not be able to acquire a magazine compatible with Maryland law.

indeed in 'common use,' as the plaintiffs contend.")  The Court went on to assume, without deciding, that the magazine restriction implicated the core Second Amendment right of self-defense and utilized intermediate scrutiny to analyze the law.  *Id*.  The D.C. Circuit implicitly acknowledged that magazines are protected by the Second Amendment, because, if it had not, the Court would have accepted the District's argument that magazines holding more than ten rounds are not "'Arms' protected by the Second Amendment," *id.*, and not analyzed the law at all.

*Ezell* is likewise instructive, because that decision stands for the principle that the Second Amendment protects more than firearms themselves.  In that case, Rhonda Ezell and other Plaintiffs challenged the City of Chicago's firearms laws that included, *inter alia*, a ban on the operation of firing ranges inside the City limits.  *Ezell*, 651 F.3d at 689-92.  In reviewing the district court's denial of the Plaintiffs' motion for a preliminary injunction, the Court noted that the protection of the Second Amendment must be understood to extend to laws restricting firing ranges because "the core right wouldn't mean much without the training and practice that make it effective." *Id.* at 704.

*Heller* stands for more than the simple premise that the government cannot ban commonly possessed firearms.  Rather, *Heller* makes clear that the Second Amendment is, and always has been, a pillar protecting the right of law-abiding, responsible citizens to possess firearms to defend themselves, which is why the Supreme Court struck down the requirement that a firearm in the home had to be rendered non-functional.  *Id.*  Clearly, the Supreme Court's central concern was the impact the challenged regulations had on the ability of law-abiding citizens to effectively defend themselves. Defendants make much of a quotation from *Heller* that historical laws regulating the amount of gunpowder that could be stored did not "remotely burden the right of self-defense *as much as* an absolute ban on handguns." *Id.* at 632 (emphasis added).  The Court was of the view that restrictions on

gunpowder, which effectively were restrictions on the number of rounds that could be fired in defense, did in fact burden the right to self-defense. Thus, as with all laws that impact the right of armed self-defense, laws restricting magazine capacity must be analyzed under the Second Amendment framework.

Defendants next invoke the same mistaken argument for excluding the banned magazines from Second Amendment review that they provided with respect to the banned firearms: that because they are not commonly used for self-defense, they are somehow devoid of protection. Their argument not only misinterprets the relevant law, it also makes the completely outlandish assertion that although the banned magazines may be commonly possessed for lawful purposes including self-defense, the "extra capacity" that these magazines have is not ever used in self-defense, such that the magazines can be banned. This argument stretches the bounds of credibility and cannot serve as the basis for exempting the magazine restriction from Second Amendment review.

As a preliminary matter, there is no dispute that magazines holding more than ten rounds are commonly possessed for lawful purposes. This has been the determination of the federal courts that have reviewed the issue, and the undisputed facts presented *supra* pp. 13-15 confirm the fact that this determination is correct, given that there are over 150 million such magazines in circulation in the United States. Moreover, as is made clear by the declarations of Plaintiffs and their experts, magazines holding more than ten rounds are the standard equipment provided with most handguns, such that the "quintessential self-defense weapon," *Heller,* 554 U.S. at 629, usually comes equipped with a magazine that Defendants ask this Court to find is not commonly used. The fact that Plaintiffs may not need to fire more than ten rounds in self-defense – indeed may never need to fire a single round in self-defense – is of no moment; the relevant inquiry is whether the magazines at issue, those holding more than ten rounds, are commonly possessed for lawful purposes, including self-defense. Given that not even

Defendants assert that they are not commonly possessed, they are deserving of Second Amendment protection.

Defendants also inject the concept of "necessity" for self-defense in the concluding sentence of their argument in this regard.  (Defendants' Motion at 32.)  They do not, and indeed cannot, provide any citation to law for this point.  As the Court in *Heller* made clear, necessity is not a factor in the constitutional analysis of firearm laws.  *Heller*, 554 U.S. at 629 (rejecting the argument that the ban on handguns was permissible because other firearms were available for self-defense use and thus handgun ownership was not necessary).

The Defendants' final argument as to why the banned firearms and magazines are not deserving of Second Amendment scrutiny is they are "dangerous and unusual."  (Defendants' Motion at 32.)  This argument is meritless and untethered to any basis in law.  The Defendants assert that the Supreme Court provided no guidance on determining whether a firearm is "dangerous and unusual," but, without citation to any law or source of any kind, state that "to fall outside the protections of the Second Amendment, an arm must presumably be more dangerous than other arms."  (Defendants' Motion at 33.)  As a general matter, the Court did explain what it meant when it used the term "dangerous and unusual" by contrasting it to those firearms that are commonly possessed.  Thus, a commonly possessed firearm is, by definition, a firearm that is not "dangerous and unusual." *See Heller,* 554 U.S. 570 at 627.  A firearm cannot simultaneously be both "common" and "unusual." Defendants' interpretation of *Heller* as imposing *both* common possession *and* not "dangerous and unusual" requirements on Second Amendment-protected firearms is wrong and should be rejected.

Defendants' argument that the *Heller* Court articulated a "dangerous and unusual" limitation on the "in common use" test appears to be taken from Professor Laurence Tribe's testimony before the Senate Judiciary Committee on February 12, 2013.  Professor Tribe, like many who have advocated a narrow reading of *Heller,* is guilty of changing the Court's words to fit his argument.  Significantly, the Court did not recognize, as Professor Tribe states, that "dangerous *or* unusual" firearms fall outside Second Amendment protections.  Rather, the Court used the conjunctive "dangerous *and* unusual," and did so only as historical support for protection of firearms "in common use at the time." 554 U.S. at 627 (emphasis added).  The distinction between these phrases is significant.  If the *Heller* Court intended that Second Amendment protections would be lost on a mere showing that a firearm presented potential dangers, it would not have struck down the D.C. handgun ban as unconstitutional.

The Defendants' theory that a firearm that is "more dangerous than other arms" has no basis in the law, provides no standard "arm" by which to make such a judgment, and would lead to the absurd result of potentially every firearm more dangerous than the crudest single-shot percussion pistol being unprotected by the Second Amendment.  Defendants never even compare the banned firearms to any particular firearm in an attempt to apply the standard that they advocate.  Indeed, this would be a futile exercise, as countless firearms that are not banned are more dangerous than the firearms that are banned.  For example, .308 cal. AR-10 rifles are not banned, yet these rifles are functionally identical to the banned AR-15 but for the fact that the former fires a round that is larger, faster, and penetrates further than the AR-15 round.  (Decl. of James W. Supica, Ex. 14, Attachment A at p. 20; Decl. of Buford Boone, Ex. 13 at ¶ 16; Decl. of Gary Roberts, Ex. 10 at ¶ 6.)  Even the round fire by the banned AR-15 is used in a pistol that the MSP has explicitly approved for sale in Maryland, the SIGSAUER P556 handgun.  *See* Maryland Handgun  Roster List, *available at https://www.mdsp.org/Organization/*

*SupportServicesBureau/LicensingDivision/MainLicensingPage/HandgunRoster.aspx.*   Given that the Maryland Handgun Roster Board is statutorily required to consider the caliber of the handgun before approving a handgun for sale, MD. CODE ANN. PUB. SAF. 5-405(b)(7), it is flatly disingenuous, not to mention incredible, that the MSP is now contending that the banned firearms, including the AR-15, are more dangerous than other firearms.

Finally, Defendants attempt to bolster their argument that the banned firearms and magazines are dangerous and unusual by asserting that they are over-represented in mass shootings.  There are two gaping flaws in Defendants arguments in this regard.  First, all of their evidence is based on studies that use varying definitions of "assault weapons" that are not coterminous with the definition of the firearms banned by the challenged laws; in fact, the studies relied upon by Defendants include assault *pistols* in their definition of assault weapons.  *Supra,* pp. 49-50; *see also* Dep. of Christopher Koper, Ex. 20 at 98. Thus, any relevance they might have to the instant matter is diminished entirely, because Defendants are not comparing like firearms.

Also problematic is the fact that Defendants base a substantial part of their argument on the findings of a study conducted by an online magazine, *Mother Jones*.  (Defendants' Motion at 36-37.) The *Mother Jones* data has not been analyzed by the Defendants' experts to ensure its validity and uses a definition of "assault weapon" that differs from the Maryland definition.  (Dep. of Christopher Koper, Ex. 20 at 176-177.)  In fact, when one reviews the *Mother Jones* data on the make/model of the firearm used, in only 9 of the 67 cases was an "assault weapon" used unambiguously as the term is defined in Maryland law.  (*See* Mark Follman, Gavin Aronsen, Deanna Pan, Maggie Caldwell, *U.S. Mass Shootings, 1982-2012: Data From Mother Jones' Investigation,* MOTHER JONES MAGAZINE, February 27, 2013, Ex. 42.)  The fact that the banned firearms are not actually over-represented in mass shootings

comports with Dr. Koper's original study on the effects of the federal assault weapons ban that was published in 1997.  In that study, Dr. Koper used the traditional definition of a mass shooting as being "the killing of four or more victims in one place by a lone offender."  (Decl. of Christopher Koper, Defendants' Exhibit 7, Ex. C at A-1.)  Using that definition, Dr. Koper concluded that "contrary to our expectations, only 2 – 3.8 percent – of the 52 mass murders we gleaned from the Nexis search unambiguously involved assault weapons.  This is about the same percentage as for other murders." (*Id.*; *see also id.* at 6 ("Nor did we find assault weapons to be overrepresented in a sample of mass murders involving guns.").)  Given that the Maryland definition is less broad than that used by Dr. Koper, it stands to reason that the Maryland banned firearms are used even less frequently in mass murders.

The banned firearms and magazines are not outside the scope of the Second Amendment because they are commonly possessed for lawful purposes by law-abiding, responsible citizens.  Defendants' assertions to the contrary conflict with the undisputed facts of the case and contradict the findings of the federal courts that have heretofore considered the issue.  Moreover, Defendants' argument that the Act's arbitrary designation of magazines capable of holding more than ten rounds as "large-capacity" somehow insulates laws banning those magazines from constitutional review is wholly without merit. Remarkably, nowhere do Defendants point to any rationale or justification for drawing the line at ten.  It is perforce an arbitrary distinction.  The relevant question is whether magazines must be afforded Second Amendment protection, which clearly they must, such that laws regulating them must be analyzed under a constitutional standard.  Finally, Defendants' invocation of "dangerous and unusual" as some additional standard, above "typically possessed for lawful purposes," has no basis in law or fact and goes against the basic principles of *Heller*.  For these reasons, Defendants' arguments that the

challenged laws are outside the scope of the Second Amendment do not warrant summary judgment in their favor.

### iii)      The Challenged Laws Are Unconstitutional Under the Second Amendment.

From the outset, Defendants have ignored the two most appropriate standards of review applicable to this case.   Defendants have never even mentioned the correct standard of review: the textual and historical analysis.   Defendants also ignore that Fourth Circuit case law dictates that the Court employ strict scrutiny because the challenged laws impact law-abiding, responsible citizens acquiring firearms for self-defense in the home.   Tellingly, Defendants have but a single citation to Fourth Circuit case law as the basis for their dismissal of strict scrutiny as the correct standard, and their citation is not correct.   Defendants imply that *Chester* stands for the principle that, as long as the challenged law does not impose a "substantial" burden on Second Amendment rights, intermediate scrutiny is the appropriate standard.   *Chester* makes no such proclamation.   Instead, *Chester* stands for the rather unremarkable principle that challenges advanced by a citizen who is not law-abiding are not to be analyzed under strict scrutiny.[14]   Contrary to Defendants' assertions, the Fourth Circuit has made clear that when a law touches on a law-abiding, responsible citizen's right to possess a firearm in the home, strict scrutiny is warranted.   *See supra*, p. 25-31 (discussing Fourth Circuit precedent).

Moreover, as demonstrated above, if this Court were to follow the D.C. Circuit to apply only intermediate scrutiny, it should apply the standard explained there:  "a tight fit . . . narrowly tailored to achieve a substantial interest."   *Heller II*, 670 F.3d at 1258.   Even proceeding under the Defendants'

---

[14]      The simple fact that the Fourth Circuit in *Chester* applied intermediate scrutiny to the Second Amendment rights of a person who was not law-abiding would clearly require the conclusion that some even higher level of scrutiny must be applied to this case. To give no more protection to the Second Amendment rights of responsible, law-abiding citizens than those of the non law-abiding would be illogical.

preferred, but erroneous, application of the Fourth Circuit's standard of intermediate scrutiny, the inescapable conclusion still is that the challenged laws are not constitutional.  Under the Fourth Circuit's definition of intermediate scrutiny, a law is constitutional only if there is a "'reasonable fit' between the challenged regulation and a 'substantial' government objective." *Chester*, 628 F.3d at 683.  The proper method of engaging in an intermediate scrutiny analysis involves a review of the evidence that was put before the legislature to ensure that its conclusions were based on substantial evidence. *Supra,* pp. 32-35.

In the present case, there was scant evidence actually before the Maryland General Assembly on the impacts of the law.  Even more glaring is the fact that Defendants only put before this Court a single piece of evidence that was actually before the Maryland General Assembly: the testimony of Defendant Martin O'Malley.  (Testimony of Martin O'Malley, Defendants' Ex. 26.)  This testimony contains a single line about the firearms being banned: "[t]his legislation bans the sale of military-style assault weapons." (*Id.* at 3.)  The only information relevant to the magazine ban is an unsupported assertion that "four states ban high capacity magazines with more than ten rounds.  All are among the states with the lowest rates of gun deaths." (*Id.*)  Additionally, Defendant O'Malley identified no documents in response to our request that he identify all documents upon which he relied when preparing his testimony before the Maryland General Assembly.  (*See* Defendant O'Malley's Response to Interrogatories 11, Ex. 27.)  Clearly, a single statement from one speaker, who is a Defendant in this lawsuit and had no basis for his claims, is insufficient to carry the Defendants' burden of proof.

Considering the bill file as a whole, the only expert to actually testify in favor of the legislation was Dr. Webster.  Statement of Undisputed Facts, *supra* p. 19.  Dr. Webster's conclusion that the challenged provisions of the Maryland law would have a positive impact on public safety were based on

a 1997 report regarding the efficacy of the federal assault weapons ban by Dr. Koper, which actually states, "[u]sing a variety of national and local data sources, we found no statistical evidence of post-ban decreases in either the number of victims per gun homicide incident, the number of gunshot wounds per victim, or the proportion of gunshot victims with multiply wounds. Nor did we find assault weapons to be overrepresented in a sample of mass murders involving guns." (Decl. of Christopher Koper, Defendants' Exhibit 7, Ex. C at 6.) Thus, the expert evidence that was actually cited to the Maryland General Assembly confirms Plaintiffs' position that the challenged laws will not have an impact on public safety.[15]

Undeterred by the lack of evidence that was brought before the legislature, Defendants first highlight the fact that "four top law enforcement officers" have submitted declarations extolling the virtues of the challenged laws. (Defendants' Motion at 42.) The credibility of these declarations, however, is severely undercut when one considers that Defendants' "top law enforcement officers" have submitted declarations that are almost carbon copies of each other. The statements contained in the declarations of these political appointees appear designed not to identify the true effects and nature of the challenged laws relevant to law enforcement, but, rather, to make statements in line with the positions espoused by their political factions. It is even more telling that the opinions of the politically-appointed senior officers in support of the Act were directly contradicted by letters in opposition sent by rank-and-file officers – the officers likely to face any actual threat posed by the firearms and magazines banned by the challenged laws. (*See* Letter in Opposition from Maryland Troopers Association to

---

[15] As noted above, it is undisputed that the federal assault weapons' ban did not reduce firearm crime or the use of assault rifles in crime, and that there is no evidence to support the presumption that a state-level assault weapon ban will have an impact on crime. Statement of Undisputed Facts, *supra* p. 20. Dr. Koper, the academic whose work formed the foundation of Dr. Webster's testimony regarding the banned firearms and magazines recognized this point and stated as much in his 2004 report on the federal assault weapon law: "There is not a clear rationale for expecting the ban to reduce assaults and robberies with guns." (Decl. of Christopher Koper, Ex. B at 81.)

Maryland Senate (February 6, 2013), Ex. 35; Letter from Lawrence J. Nelson to Maryland Senate (undated), Ex. 34.)   Finally, Plaintiffs' experts, some of whom are also former high-level law enforcement officers, have reached the opposite conclusion.  (*E.g.*, Decl. of Buford Boone, Ex. 13 at ¶ 5; Decl. of Jack McCauley, Ex. 15 at ¶¶ 4-8.)

Defendants next assert that the banned firearms are not appropriate for self-defense, claiming that shotguns and handguns are better suited.  (Defendants' Motion at 43.)  As is made clear in *Heller*, as a matter of law the substitution of other firearms for banned firearms that are commonly possessed for lawful purposes cannot save a prohibition on commonly possessed firearms.   Further, Plaintiffs' declarations demonstrate as a matter of fact the banned rifles have attributes that make them useful for home defense use.  (Decl. of Stephen Kolbe, Ex. 2 at ¶ 8; Decl. of James W. Supica, Ex. 14 at ¶¶ 4-6; Decl. of Buford Boone, Ex. 13, Attachment A at p. 11.)

Defendants next claim that limiting magazine capacity is "likely to save lives" because they have been able to find one or two instances in which a criminal was interrupted while reloading.  (Defendants' Motion at 44.)  The basic premise of their argument is not supported.  A shooter intent on firing as many rounds as possible can fire thirty rounds using three ten-round magazines and reloading equally fast as a shooter firing deliberately can fire thirty rounds from a thirty-round magazine.  The magazine restriction will not have an impact on a mass-shooter intent on shooting as many people as possible in as short a timeframe as possible.

Defendants also claim that the challenged laws will save the lives of law enforcement officers in particular because "rounds from [the banned firearms] will easily penetrate soft body armor worn by most law enforcement personnel."  (Defendants' Motion at 45.)  This statement is wildly misleading, both because nearly all rounds fired from nearly all rifles will penetrate the soft body armor worn by law

enforcement officers, Statement of Undisputed Facts, *supra*, p. 17, and because rifles in general and banned rifles in particular are rarely, if ever, used to kill law enforcement officers.

Defendants also invoke the conclusions of social scientists Dr. Koper and Dr. Webster in an attempt to support the challenged laws.  From the outset, the opinions of these scientists are suspect, at best, given that their definition of "assault weapon" includes firearms that are not captured by the laws challenged in the instant matter.  *See supra,* pp. 49-50. This problem infects all of Dr. Koper's opinions because his research used the same definition, as well as Dr. Webster's, because the latter has not conducted any of his own original research.  (Dep. of Daniel Webster, Ex. 18 at 136 ("Principally the only thing I did was examine the trends just to get an understanding of the general temporal pattern for the number of incidents and the number of individuals shot or killed in public mass shootings, that's – that's the only analysis I did.").)   As such, the opinions relied upon by Defendants are not truly applicable to the challenged laws and should be afforded minimal weight.

Even the social science data produced by Defendants' witnesses, however, do not support the Defendants' claims that the challenged laws will have an impact on crime.  Dr. Koper, the only researcher to have performed his own original research on the effects of the federal assault weapon ban, found that "there has not been a clear decline in the use of [assault rifles]," (Decl. of Christopher Koper, Defendants' Exhibit 7, Ex. B at 2.)  Clearly, then, the best available data provided by the Defendants confirms the Plaintiffs' arguments: the challenged laws will not have an impact on firearm crime.  It is very curious that Dr. Koper has stated that the challenged laws will have an impact on crime, given that his opinion on the effects of state-level assault weapons laws in his 2004 report was diametrically opposed to this view, concluding "a few studies suggest that state-level [assault weapons] bans have not reduced crime."  (Decl. of Christopher Koper, Defendants' Exhibit 7, Ex. B at 81 n.95.)  This is even

more curious given that he agreed in his testimony that "[m]y conclusion on the impact of the federal ban are most accurately and completely set forth in my 2004 and 2013 reports."  (Dep. of Christopher Koper, Ex. 20 at 26.)

Defendants highlight mass shootings as an illustration of the types of crimes for which the challenged laws might make the most difference.  (Defendants' Motion at 53.)  At the outset, however, Defendants note that because of the rarity of these events, drawing conclusions from them is difficult. This is an understatement, as Dr. Koper himself admitted: "one must be cautious" in drawing any conclusions from events as rare as mass shootings.  (Dep. of Christopher Koper, Ex. 20 at 111.)  Dr. Gius has confirmed that mass shootings are too infrequent to allow for any conclusions to be drawn from them.  (Decl. of Mark Gius, Ex. 12 at ¶ 6.)

Finally, even Dr. Koper admits that his studies could not show a reduction in the criminal use of banned magazines as a result of the federal ban.  (Decl. of Koper at ¶¶ 60-62.)  He maintains, however, that this was due to the large stock of such magazines in circulation before the ban and the importation of new magazines during the ban.  Without asserting a basis, he then speculates that, if the ban were to have been left in effect for a longer period of time, there might have been an effect.  There are two problems with this hopeful conclusion.  First, the challenged laws permit the influx of a limitless number of banned magazines, so long as they are purchased out-of-state.  As such, there is no reason to believe that the criminal access to these magazines will be impacted in any meaningful way.  Moreover, Dr. Koper provides no timeframe within which one might expect to see any results of the ban.  If after ten years there was no impact on the federal level, how long does Dr. Koper believe law-abiding citizens should have their rights infringed before he will admit that the passage of time has only strengthened his original conclusion that the banning of magazines will not have an impact on criminal use?  Defendants

offered no evidence that criminals will abide by the challenged bans here any more than they did the federal ban.

### 2. Plaintiffs Are Similarly Situated to Retired Law Enforcement Officers and the Challenged Laws Deny them Equal Protection of the Law.

First, Defendants assert that retired law enforcement officers are "differentiated by their experience of having been entrusted with the statutory duty to protect public safety, and the corresponding statutory authority to detain, arrest, and use force against other citizens to carry out their duty." (Defendants' Motion at 56-57.) While it is certainly true that *current* law enforcement officers can be meaningfully differentiated from Plaintiffs by virtue of the formers' duty to protect the public, *retired* law enforcement officers have no such duty and, even more importantly, no such special authority. This fact was confirmed by Defendants' own witnesses. *See* Statement of Undisputed Facts, *supra*, at p. 21.

Defendants next point to the training that is required of law enforcement officers to be able to carry a firearm and state "[t]hese extensive training requirements imposed on Maryland's law enforcement officers differentiate them from other citizens with respect to firearm safety." (Defendants' Motion at 58.) By this sleight of hand, Defendants attempt to swap in "firearm safety" as the critical government interest here, rather than protecting against the criminal misuse of firearms. Law enforcement training is not an assurance that firearms will not be criminally misused. Just last fall, a retired law enforcement officer was killed after firing multiple shots from an "assault weapon" at the federal building in Wheeling, Va. *See* Kevin Begos, *Wheeling Federal Building Shooter Dead: Cops*, http://www.huffingtonpost.com/2013/10/09/wheeling-federal-building-shooting_n_4073123.html (last visited March 16, 2014). Moreover, while Plaintiffs do not dispute that some law enforcement officers are required to undergo the training described by Defendants, such training does not undermine

Plaintiffs allegations of being similarly situated.  As a preliminary matter, there is no requirement that a law enforcement officer have carried, or even been trained on, a banned firearm to be eligible to have such a firearm transferred to them upon retirement.  *See* MD. CODE ANN. CRIM. L. § 4-302(7).  Thus, the community of retired law enforcement officers who are eligible to avail themselves of the exemption includes not only those with significant training with the banned firearms and magazines, but also those who have never handled such firearms and magazines.  This reflects exactly the community of individuals made up of individual Plaintiffs and members of Association Plaintiffs.  As such, Plaintiffs are similarly situated to the community of retired law enforcement officers with respect to training.

Defendants also assert without supporting evidence that "it would also have been rational for the General Assembly to conclude that an assault weapon or high-capacity detachable magazine transferred to a law enforcement officer – combined with the general provisions of Chapter 427 that would prohibit such retired law enforcement officer from transferring possession of the weapon or magazine to others – would be less likely to end up in the hands of criminals."  (Defendants' Motion at 59.)  The reasonableness of that inference is highly debatable.  *See, e.g., State v. Catrino*, Case No. 22-K-13-000497 (Wicomico County, Md. 2013) (former law enforcement officer charged with selling a regulated firearm and four, loaded, 30-round magazines to an undercover officer out of the trunk of his car in a parking lot).  *Catrino* illustrates starkly the unfairness of the exemption for retired law enforcement officers.  The defendant in that case would have been free from criminal consequence under the current law for engaging in a transaction that would have resulted in severe criminal penalty for Plaintiffs.

Finally, and tellingly, Defendants have not identified a legitimate government interest that the exemption for retired law enforcement officers actually serves.  They state numerous times that the exemption of retired law enforcement officers is rational and invoke the Supreme Court's statement in

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985), that a statute that draws classifications will be upheld if it is "rationally related to a legitimate [government] interest." But, Defendants never actually assert a legitimate government interest being furthered by the grant of additional rights to retired law enforcement officers.

Despite Defendants' argument that it is perfectly permissible to exempt retired law enforcement officers in the manner the challenged law does, the Ninth Circuit held a similar California firearms law, with exemptions similar to those currently at issue, to be a violation of the Equal Protection Clause, even when analyzed under the rational basis test. *Silveira, supra,* 312 F.3d at 1090-91, held that an exclusion allowing retired law enforcement to acquire and possess "assault weapons" lacked any rational basis and was a violation of the Equal Protection Clause, because "the retired officers exception arbitrarily and unreasonably affords a privilege to one group of individuals that is denied to others, including plaintiffs." *Id.* at 1091. The Court stated that there was no legitimate purpose being furthered by permitting retired law enforcement officers to be exempt from the firearm and magazine prohibitions. Here, too, there is no legitimate government purpose behind exempting retired law enforcement officers, as is made vividly clear by the Defendants' failure to articulate any interest.

### 3.     The Term "Copies" Is Unconstitutionally Vague.

Defendants have placed faith in the fact that MSP has been delegated the authority to interpret the term "copies" and because MSP claims it has finally arrived at a stable definition, the law is not unconstitutionally vague. Despite Defendants' assertions to the contrary, however (Defendants' Motion at 63), MSP's guidance is not sufficient to overcome the inherent vagueness in the challenged laws. This is illustrated clearly by the fact that even Defendant MSP has not been able to accurately determine on multiple occasions whether particular firearms are "copies."

While the Defendants maintain that the Opinion of the Attorney General constrains MSP, the Opinion only exacerbates the problem.   The Opinion of the Attorney General uses the phrase "similarity" between the internal components and mechanisms.   95 Op. Att'y Gen. 101, 108-09.   MSP, however, has interpreted this to mean that the internal components must be "completely interchangeable."   Statement of Undisputed Facts, *supra* p. 22.   The fundamental problem with this is the fact that the Commander of the licensing division has the authority to change MSP's interpretation of the Attorney General's guidance.   Statement of Undisputed Facts, *supra* p. 22.

In an attempt to bolster their arguments, Defendants assert that the term "copies" is "necessary to further the legislative purpose of the act."   (Defendants' Motion at 69.)   They claim, relying on *Wilson v. Cnty. of Cook*, 968 N.E. 2d 641 (Ill. 2012) and *Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250 (6th Cir. 1994), that manufacturers would be able to skirt the law easily were the law to not include "copies" in its sweep.   (Defendants' Motion at 70.)   This assertion defies logic and ignores the statements of Capt. Dalaine Brady, Commander of the Licensing Division, responsible for determining whether a particular firearm is a "copy."   Capt. Brady confirmed during her deposition that an AR-15 will be permitted to be sold if the manufacturer stamps its barrel with H-BAR or if it notes on its website that the AR-15 in question has a "heavy barrel."   Because Maryland does not have a definition of what constitutes a "heavy barrel," Statement of Undisputed Facts, *supra*, pp. 22, it appears that a manufacturer need only place a sentence on its website to cause its firearm to be exempted from the ban.[16]   The ease with which the ban can be circumvented also illustrates the threat of prosecution faced

---

[16]      This is, of course, not true with respect to a single firearm manufacturer, Bushmaster, because the Act bans all its models including its "heavy barrel."   The fact that Bushmaster is prevented from making an identical H-BAR rifle to one made by Colt is contrary to the Defendants' own interpretation and use of *Springfield Armory*.   (*See* Defendants' Motion at 70 ("The Sixth Circuit rejected a ban on 'slight modifications or enhancements' of other models of specific assault weapons 'by the same manufacturer with the same action design,' *in part because the ban arbitrarily excluded identical weapons made by different manufacturers*.' (emphasis added)).)

by Plaintiffs.  Whether or not they are violating Maryland law by purchasing, selling, or even continuing to possess a firearm will turn on whether a manufacturer has decided to remove a sentence on its website that the firearm has a heavy barrel.  This is a completely arbitrary mechanism of enforcement that has no place in an organized scheme of law.

Defendants also rely on *Wilson* to support their position that the term "copies" is not unconstitutionally vague.  While it is true that the Illinois Supreme Court did determine that the Illinois statute's use of the phrase "copies and duplicates" was not unconstitutionally vague, there are important differences in the context of that phrase's use that distinguish it from the instant matter.  In *Wilson*, the court stated that "[a] person of ordinary intelligence would understand that Section 54-211(7) includes the specific weapons listed and any imitations or reproductions of those weapons made by that manufacturer or another."  *Wilson*, 968 N.E.2d at 652.  Critically, the Maryland law does not cover "any" imitations or reproductions of the enumerated banned long guns in Section 5-101(r)(2) of the Public Safety Article.  Rather, it only includes those that have internal components that are "interchangeable" with the enumerated long guns without regard to whether the firearm is an imitation or a reproduction of an enumerated long gun.  It is not consistent with the Due Process Clause to expect a citizen of ordinary intelligence to know the inner workings of every one of a list of at least 67 firearms, which they are not able to acquire, to know if the parts of a firearm they wish to purchase are interchangeable.  Moreover, it is impossible to know what standard the MSP is using when it determines if parts are interchangeable.  For instance, it is possible that any one part of a firearm in question is not interchangeable with the parts of an enumerated firearm, but, when a group of parts is replaced at once,

the parts are interchangeable.[17]   The fact that Maryland does not simply apply its "copies" definition to all copies as the Illinois law did renders *Wilson* of little help to the Defendants, and underscores the Plaintiffs' concern.

Finally, Defendants attempt to analogize the use of the term "copies" in the challenged Maryland laws with the term "analogue" in the federal Controlled Substance Analogue Enforcement Act of 1986, 21 U. S. C. § 802, which numerous courts have held is not unconstitutionally vague.  *E.g. United States v. Klecker*, 348 F.3d 69 (4th Cir. 2003); *United States v. Washam*, 312 F.3d 926 (8th Cir. 2002).  This analogy fails under even the most cursory of analyses.  The federal act defines an "analogue" as:

> a substance -
>     (i)   the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;
>     (ii)   which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect of a controlled substance in schedule I or II; or
>     (iii)   with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

*Klecker*, 348 F.3d at 71.  Importantly, federal courts are unanimous that all three elements must be proven to sustain a conviction under this act.  *See United States v. Hodge,* 321 F.3d 429, 436 (3rd Cir. 2003) ("We reject the District Court's disjunctive reading and adopt instead the conjunctive reading endorsed in [*United States v Forbes*, 806 F. Supp 232 (D. Colo. 1992)], [*United States v. Roberts*, No. 01 Cr. 410 (RWS), 2001 U.S. Dist. LEXIS 20577 (S.D. N.Y Dec. 14, 2001), *vacated on other grounds by* 363 F.3d 118 (2nd Cir. 2004)], [*United States v. Clifford*, 197 F. Supp. 2d 516 (E.D. Va. 2002)], [*United States v. Vickery*, 199 F.Supp. 2d 1363 (N.D. Ga. 2002)], [*United States v. Klecker*, 228 F.

---

[17]     As an example, it may not be possible to interchange just the bolt from one firearm to an enumerated firearm, but it would be possible to interchange the entire bolt-carrier group of parts.  (*See* Decl. of James W. Supica, Ex. 14 at ¶ 8.)

Supp. 2d 702 (E.D. Va. 2002)]"); *see also Klecker*, 348 F.3d at 71 (requiring that all three elements be proven for a conviction).   Thus, not only is there the requirement that the substance be "substantially similar" in its chemical composition as the Defendants allege, but also that the substance have substantially similar effects and that the defendant in such a case have intended or represented that the substance in question have substantially similar effects.   In this regard, it is telling that Defendants cut short their quotation of the Court's opinion with respect to being "on notice" that the substance in question was prohibited: "the similarities in their structures would put a reasonable person on notice that Foxy [the drug at issue] might be regarded as a DET analogue, *particularly if that person intended (as Klecker plainly did) that Foxy be ingested as a hallucinogen*."   *Klecker*, 348 F.3d at 72 (emphasis added).   The emphasized portion of the quotation, markedly absent from Defendants' brief, illustrates clearly the importance of the intent element and why the challenged Maryland law that utilizes the term "copies" is readily distinguishable: it has no intent requirement.   Unlike individuals charged under the Controlled Substances Analogue Act, Plaintiffs who have no intent to violate the law are subject to criminal penalty.

## CONCLUSION IN OPPOSITION

Because there are genuine disputes of material facts as presented by Defendants, and their legal theories are inconsistent with the controlling authorities, Defendants' Motion for Summary Judgment should be DENIED.

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney (Bar No. 08761)
T. Sky Woodward (Bar No. 10823)
James W. Porter, III (Admitted *pro hac vice*)
Marc A. Nardone (Bar No. 18811)
BRADLEY ARANT BOULT CUMMINGS LLP

1615 L Street N.W., Suite 1350
Washington, D.C. 20036
P (202) 719-8216
F (202) 719-8316
JSweeney@babc.com

*Counsel for Plaintiffs*

**TABLE OF EXHIBITS TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Exhibit No.    Exhibit Title

1.    Intentionally left blank

2.    Declaration of Stephen V. Kolbe

3.    Declaration of Andrew C. Turner

4.    Declaration of Steven G. Schneider

5.    Declaration of Carol O. Wink

6.    Declaration of John H. Josselyn

7.    Declaration of Patrick W. Shomo

8.    Declaration of Gregory J. Nolte

9.    Declaration of James Curcuruto

    A.    Expert Report of James Curcuruto

    B.    National Shooting Sports Foundation Reports

10.    Declaration of Gary K. Roberts

    A.    Expert Report of Gary Roberts

11.    Declaration of Guy Rossi

    A.    Expert Report of Guy Rossi

12.    Declaration of Mark P. Gius

    A.    Expert Report of Mark Gius

13.    Declaration of Buford Boone

    A.    Expert Report of Buford Boone

14.    Declaration of James W. Supica

    A.    Expert Report of James W. Supica

15.    Declaration of Capt. (Ret.) Jack McCauley

16.    Transcript of the Deposition of Capt. Dalaine Brady, February 6, 2014

17.    Transcript of the Deposition of Chief James Johnson, December 17, 2013

18.    Transcript of the Deposition of Daniel Webster, January 17, 2014

19.    Transcript of the Deposition of Col. Marcus Brown, December 18, 2013

20.    Transcript of the Deposition of Christopher Koper, February 3, 2014

21.    Transcript of the Deposition of Deputy Chief Henry Stawinski, December 20, 2013

22.    Transcript of the Deposition of Lt. Col. William Pallozzi, December 20, 2013

23.    Transcript of the Deposition of Lucy Allen, January 24, 2014

24.    Transcript of the Deposition of John Josselyn, December 3, 2013

25.    Defendants' Responses to Plaintiff Maryland State Rifle and Pistol Association's Requests for Admissions

26.    Defendant Maryland State Police's Supplemental Answers to Plaintiff Maryland State Rifle and Pistol Association's Interrogatories 6, 7, and 11

27.    Defendant Governor Martin J. O'Malley's Answers to Plaintiff Maryland State Rifle and Pistol Association's First Set of Interrogatories

28.    Federal Bureau of Investigation, Law Enforcement Officers Killed and Assault (2012), Table 27

29.    Testimony of Daniel Webster before the Maryland Senate Judicial Proceedings Committee

30.    Bureau of Alcohol, Tobacco, and Firearms, Weapons Selection Slides, *Data Analysis of .223 Caliber Ammunition*

31.    Transcript of the Deposition of Commissioner Anthony Batts, December 19, 2013

32.    Transcript of the Deposition of Joseph Vince, January 17, 2014

33.    Declaration of Marc A. Nardone

34.    Letter from Lawrence J. Nelson to Maryland Senate (undated)

35.    Letter from Maryland Troopers Association to Maryland Senate (February 6, 2013)

36.    Letter from Lt. Col. William Pallozzi, Maryland State Police, to Lawrence K[e]ane, National Shooting Sports Foundation (August 28, 2013)

37.    Letter from Superintendent Edward T. Norris, Maryland State Police, to William R. Lynch (September 15, 2003)

38.    Excerpts from Department of the Army, *Rifle Marksmanship M16-/M4-Series Weapons* (August 2008)

39.    Text of 2013 Senate Bill 281, Final Version

40.    Email from Darren Gates to Wink's Sporting Goods (November 11, 2013)

41.    Excerpts from Duncan Long, *The Complete AR-15/M16 Sourcebook, What Every Shooter Needs to Know* (1992)

42.    Mark Follman, Gavin Aronsen, Deanna Pan, Maggie Caldwell, *U.S. Mass Shootings, 1982-2012: Data From Mother Jones' Investigation,* MOTHER JONES MAGAZINE, February 27, 2013

43.    Maryland State Police Firearms Bulletin 10-2 (November 4, 2010)

44.    Declaration of Gary Kleck

        A.    Expert Report of Gary Kleck