Exhibit 11

to

Plaintiffs' Cross-Motion for Summary Judgment

and

Opposition to Defendants' Motion for Summary Judgment

## DECLARATION OF GUY ROSSI

I, Guy Rossi, under penalty of perjury, declare and state as follows:

1.      I am over the age of 18, have personal knowledge of the facts and events referred

to in this declaration, and am competent to testify to the matters stated below.

2.      I am enclosing a copy of my expert report in this matter, dated December 13,

2013, the contents of which are, to the best of my knowledge and belief, true and accurate. I

hereby adopt and incorporate my expert report in this declaration as if fully set forth herein.

I declare under penalty of perjury that the foregoing is true and correct.


_____                    12/13/13
Guy Rossi                                                            Date

Attachment A

# EXPERT REPORT OF GUY ROSSI

Guy Rossi and Associates, LLC
64 Loch Revan Heights
Rochester, NY 14617
(585) 752-4805
grossi@rochester.rr.com
December 13, 2013

I offer the following opinions as my expert report in this matter, based upon my knowledge, experience and review of the Maryland Firearm Safety Act of 2013 (the "Act"). I am charging $150.00 per hour for my services.

Guy Rossi

## I.  EXPERIENCE & TRAINING

I am a retired Police Sergeant of the Rochester, New York Police Department. During my years on the force I specialized in patrol, recruit, field training, firearms, and defensive tactics instruction.  I have been a nationally recognized law enforcement trainer since 1982.  My teachings in officer survival skills have been published in over two hundred (200) magazine articles and book chapters.

I have developed and trained recruits, instructors, and supervisors in firearms, defensive tactics, and justified use of force.  I have developed and instructed hundreds of cognitive and psychomotor skill related programs, including New York State Penal Law Article 35 – Defense of Justification, Liability Issues for Police Supervisors, Firearms and Defensive Tactic Instructor Courses, Multimedia for Law Enforcement Trainers, and, most recently, a web-based learning program in Community College Citizen Preparedness for FEMA.  The curriculum and training which I developed and instructed  have been recognized on a international basis, and are based upon my career employment  ás a police officer and my extensive knowledge of firearms (including those characterized as "assault weapons" by Maryland law). My declaration is also based on my real life experiences with firearms and application of the use of force during training, on the street as a police officer, a law abiding citizen and homeowner.

I have a Master's Degree in Adult Education – Instructional Design.   I am a charter and advisory board member of the International Law Enforcement and Educators Trainers Association (ILEETA), as well as the (former) Editor of *The ILEETA Review*.  Significant certifications/credentials of mine include NYS Division of Criminal Justice Services Master Instructor in General Topics, Defensive Tactics, Firearms, Field Training and Aerosol Subject Restraint, Law Enforcement Accreditation Manager, Security Guard Instructor, Safariland Master Baton and Defensive Tactic Instructor, Taser Instructor, Force Science Analyst Certification and Independent Consultant/Trainer in Verbal Defense and Influence.

As a result of the aforementioned education, training and experience I have developed an extensive knowledge of firearms, their various features, their safe operation,

1

and their use for self defense. I have been qualified as an expert witness on the use of force in local, state and federal courts.

## II.   THE ACT'S RESTRICTIONS ON MAGAZINES & ROUNDS

The Act bans standard magazines that are in common use These magazines are generally defined by the Act to include devices "that ha[ve] a capacity of more than 10 rounds of ammunition for a firearm." Md. Code Ann. Criminal Law § 4-305(b).

The Act prohibits the sale, manufacture, or transfer of a magazine capable of holding more than ten rounds ("LCM"). However, on a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds. Many popular rifles are manufactured with magazines holding twenty or thirty rounds. These pistols, rifles and shotguns are sold to civilians and are in common use for self defense, hunting, and nationally established sporting competitions. Some of these competitions are designed specifically for pistols, rifles and shotguns capable of holding a greater number of rounds than the Act permits.

## III.   THE ACT'S RESTRICTIONS ON STOCKS OF PISTOLS, RIFLES & SHOTGUNS

The Act significantly redefines the term "assault weapon" so as to criminalize features that are commonly found on rifles, pistols and shotguns. Transfer or possession of an "assault weapon" is a felony. Under the Act, the presence of the following features qualifies a firearm as an "assault weapon":

I.   A semiautomatic, centerfire rifle that can accept a detachable magazine and has at least two of the following:

1.   A folding stock;

2.   A grenade launcher or flare launcher; or

3.   A flash suppressor.

II.   A semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds;

III.   A semiautomatic, centerfire rifle that has an overall length of less than 29 inches;

IV.   A semiautomatic pistol with a fixed magazine that can accept more than 10 rounds;

V.   A semiautomatic shotgun that has a folding stock; or

VI.   A shotgun with a revolving cylinder.

*See* MD CODE ANN. CRIMINAL LAW § 4-301(e).

2

Restricting pistols, rifles and shotguns on the basis of the above features is not rationally related to the safety and goals that the statute purports to achieve.

## IV.   THE IMPACT OF THE ACT'S TEN-ROUND RESTRICTION ON THE ABILITY TO RE-LOAD UNDER THE DURESS OF A SUDDEN ATTACK.

The Act's limitation of the number of rounds allowable for a firearm in the home significantly impairs a homeowner's ability to successfully defend him- or herself while under a criminal attack in the home. The ten-round limitation unreasonably assumes that all homeowners will not need to fire more than ten rounds to defend themselves, or if they need to fire more than ten rounds, that all homeowners possess more than one magazine and are able to load, fire and reload their firearm magazine under criminal attack (as described below). However, a homeowner under the extreme duress of an armed and advancing attacker is likely to fire at, but miss, his or her target. Nervousness and anxiety, lighting conditions, the presence of physical obstacles that obscure a "clean" line of sight to the target, and the mechanics of retreat are all factors which contribute to this likelihood. Under such expected conditions, it is of paramount importance that a homeowner have quick and ready access to ammunition in quantities sufficient to provide a meaningful opportunity to defend herself and/or her loved ones. It is equally important that the homeowner under attack have that capability quickly and efficiently to re-load a firearm after all of the rounds it holds are fired.  However, many homeowners cannot re-load quickly or efficiently due to such factors as age, physical limitations, and the stress / anxiety produced by a potentially life-threatening situation. This sets up the law-abiding citizen for failure as they are unlikely trained to reload under stress.

In order to fully understand this point, an explanation of the mechanics of loading and re-loading a firearm, as well as the physiological response process of a person under the stress of an attack, are required.

### A.   It May Be Difficult Or Impossible To Load and/or Re-Load The Firearm In Time To Save Oneself From A Sudden Attack.

This section of the Declaration explains the mechanics of loading handguns and using them for self defense.

Police have neither the legal obligation nor the practical ability to rescue all crime victims. Hence, it is essential that all law-abiding citizens be able to protect themselves. This ability to defend one's life and the lives of family and guests is perhaps most crucial in the home, where citizens should feel safe, be able to relax and NOT feel vigilant or concerned about their safety at all times.  Violent criminal attacks frequently occur suddenly and without warning, leaving the victim with very little time to fire the handgun to save herself. Reaction time under stress is complicated and can be attributed to many physiological, psychological and environmental factors, but the three most basic are: the ability for an individual to perceive a threat (Perceptual Processing), the ability to make a decision (Cognitive Processing), and the ability of the brain to send messages to the muscles to react (Motor Processing).  This processing takes, minimally, several seconds without consideration of other factors such as distractions, noise, multiple assailants, lighting conditions, nervousness and fatigue.  Ref:  Management of Aggressive Behavior Instructor Manual, MOAB Training International.

3

In the well-known Tueller Drill for police training, it is emphasized that an attacker who is 21 feet away can close the entire distance between himself and the victim in a second-and-a half.[1]   Most citizens in their homes are not prepared for a potential attack. However if the victim had forewarning, it may be possible to deploy a *loaded* handgun quickly enough for defense against a sudden attack.  However, it is impossible to do so with an unloaded handgun. If the victim is not expecting an attack, the fastest reaction time, even for a trained officer with a loaded firearm, is about 3.5 seconds. Bob Irwin, *Rethinking the 21-Foot Rule: You can't react to a knife attack as fast as you think you can*, POLICE, Oct. 1, 2007, http://www.policemag.com/Channel/Patrol/Articles/2007/10/Rethinking-the-21-Foot-Rule.aspx.  It is important to note that during the Tueller Study, the officers knew they were facing a man with a knife during optimum environmental conditions (thereby negating Perceptual Processor Time).  Also, the assailant volunteers used in the study were veteran fellow officers that were not affected by stimulants or were extremely fit and athletic or did not display the characteristics of a motivated aggressor.

1.   **The Mechanics of Loading / Re-loading a Semi-automatic Handgun.**

The following is the procedure for loading or re-loading a semi-automatic firearm. We assume that the crime victim is a right-handed person, who has done everything lawfully possible to optimize the loading process: namely, she is carrying the handgun in her right hand, and has ready access to a nearby magazine (a rectangular or parallelogram box which holds the ammunition).

1.   Grasp the grip (the butt) of the gun with the right hand.

2.   Grasp the magazine with the left hand.

3.   Bring the gun and the magazine towards the center of one's body. Tilt the gun so that the butt is pointing towards one's left.

4.   Depress a magazine release button. (Only required for re-loading. When re-loading, this would be the first step).

5.   Use the left hand to insert the magazine into the magazine well of the gun. (In a semi-automatic, the grip is hollow, and contains a space to accommodate the magazine).

6.   Use the base of the left hand to push hard on the magazine, so that it clicks into place inside the handgun grip.

7.   Turn the handgun so that it is in front of the body, with the muzzle pointing

---

[1]  The Tueller Drill is performed by trained police with loaded guns. (Or, more precisely, guns which simulate being loaded, such as with special "ammunition" that "fires" a laser when the trigger is pulled). The Tueller reaction times are for officers who already know that the aggressor is encroaching with a knife.  Hence, the cognitive deadly force decision-making has been virtually eliminated from the reaction time, and the officer's gun is already loaded.  Even then, fewer than 50% of officers were able to draw and fire if the attacker started from within 15 feet away.

to the left. (Alternatively, hold the handgun so that the muzzle points forward).

8. Continue to hold the handgun grip with the right hand. With the left hand, grasp the top of the handgun.

9. Move the top cartridge in the magazine into the handgun's firing chamber. (A "cartridge" is one unit of ammunition. A unit of ammunition is also called a "round"). Using the left hand, pull the slide of the handgun all the way to its maximum rear position. This requires moving the slide one or more inches against the force of a heavy spring. If the slide is moved even a fraction of an inch short of its maximum rear position, this step will fail, and the gun will not function. The slide is moved with the non-dominant hand. For people without strong upper bodies, including most women, pulling the slide all the way is not an easy maneuver.

10. Now release the slide. The compressed spring pushes the slide forward. As the slide moves forward, it pushes the first cartridge from the magazine into the firing chamber.

11. Now move the left hand to the grip of the gun so that is supports the right hand. Although one-handed shooting is possible, accuracy is substantially improved by a two-handed grip.

12. Finally, bring the handgun up to eye level, and point it at the target.[2] If the aggressor is within 15 feet, there will not be time to bring the gun to eye level, so the victim simply points the gun at the center of the aggressor's mass.

As the above makes clear, loading a firearm requires two hands. Loading is far more difficult when someone is physically handicapped, or one hand is wounded during an attack. During my extensive experience with force-on-force simulation training, it was a very common occurrence (30-40% occurrence rate) for police officers engaged in a gunfight to be struck in the hand by the attacker. The reason is simple: we shoot at the muzzle flash that draws our attention, and at the opposite end of that flash are hands holding a gun. Having more rounds in a magazine allows the victim to better protect themselves without the need to reload, especially if the victim is handicapped, disabled or injured.

It is known fact that under the "stress flood" of a life or death encounter the blood within one's body is re-routed to the larger muscles so as to allow a "flee or fight" response. This physiological reaction to extreme stress causes significant reloading difficulty during an attack due to loss of fine motor control in the fingers. Trying to push a magazine release or align a magazine with the magazine well with fingers that are shaking and weakened due

---

[2] Pointing the handgun at the target may be all that time allows, if it allows that much. If there is time to use the handgun's sights, acquire a sight picture by aligning the front sight (which is a small vertical rectangle) within the rear sight (shaped like a "U", but angular), with the same amount of light showing on either side of the front sight, right and left. The top of the front sight should appear flush with top of the rear sight.

to blood loss is very difficult for a seasoned veteran soldier or police officer who expects this phenomena. These crucial tasks are far more difficult for a civilian who has never been trained that such changes will occur, or trained during realistic scenario-based training, or who is experiencing a life-threatening attack for the first time.

The legitimate and compelling need for an LC magazine for self-defense is underscored by the fact that police officers and retired law enforcement officers are exempt from the restrictions on magazine capacity and on loading more than ten rounds in a magazine. MD CODE ANN. CRIMINAL LAW § 4-305(a)(2). The 2010 New York City Police Department's *Annual Firearms Discharge Report* [3] ("NYPD AFDR") provides detailed information on all incidents in which NYPD officers discharged their weapons in 2010. In that year there were thirty three (33) incidents of the police intentionally discharging firearms in encounters of adversarial conflict. NYPD AFDR at p.8, Figure A.10. 65% of these incidents took place at a distance of less than ten (10) feet. NYPD AFDR at p.9, Figure A.11. In 33% of these incidents, the NYPD officer(s) involved fired more than 7 rounds. NYPD AFDR at p.8, Figure A.10. In 21% of these incidents, the NYPD officer(s) fired more than 10 rounds. Id. If highly trained and experienced police officers required the use of at least 11 rounds in 21% of their close-range encounters to subdue an aggressive assailant, it stands to reason that an untrained civilian gun owner under duress (and certainly far less experienced and trained than a police officer) would need at least that many rounds to stop an imminent assault by one or more armed assailants within his/her home.

### 2.   The Effect of Time Delay Caused by Loading

Police and civilians who train in defensive handgun use learn to draw a loaded handgun, quickly acquire a sight picture, and place two shots on the attacker's upper center of mass. Optimally, all this can be accomplished in a little over two seconds. Bill Lewinski, *Biomechanics of Lethal Forces Encounters-Officer Movements*, THE POLICE MARKSMAN, Nov./Dec. 2002, at 19 (during a test of 68 Los Angeles Police Dept. officers using already-loaded guns, they took an average of 1.71 seconds to draw a firearm from an unsnapped holster and fire one shot, with the hand already very near the holster; .38 seconds to fire second shot).

Quite obviously, the process of loading the handgun will take at least a few extra seconds. Extensive practice can reduce how long it takes a person to load a firearm under stress, but that time cannot be reduced to zero. Accordingly, the simple time delay of loading a spent firearm may result in the success of a violent attacker who otherwise could have been thwarted.

Carrying an unloaded firearm will often not provide a viable means of self-defense and would frequently result in a situation where the assailant has closed the distance on the victim so that the assailant is on the person of the victim. The victim is left with a firearm she needs to retain so that she is not shot with her own gun. At best then, the firearm becomes a bludgeoning tool.

### 3.   The Effect of the Loss of Defensive Use of the Non-dominant Arm and Hand.

---

[3] http://www.nyc.gov/html/nypd/downloads/pdf/analysis_and_planning/afdr_20111116.pdf

The delay in loading a firearm has additional deadly implications. While the left arm and hand are being used to load the handgun, they cannot be used for anything else, such as opening a door to retreat or redirecting a family member out of harm's way. The victim is more vulnerable because both hands are occupied. The non-gun hand becomes useless to fend off the attacker or to deflect the attacker's knife, stick, or other weapon.

Further, if the victim were to be grabbed during the loading of the firearm, the sympathetic nervous system reaction of clenching one hand to retain the magazine, or simply tightening muscles under stress would further limit the victim's ability to complete the loading of the firearm.

### 4.   The Effects of Attention Distraction Caused by Loading.

The unloaded firearm forces the victim to focus her attention on the firearm in order to load and chamber the ammunition. As a result, the victim is impeded from focusing attention on the assailant and her surroundings. Specifically, the need to load while under imminent threat:

- compromises and complicates decision making;

- limits perception of surroundings, increasing the likelihood that a fired shot will miss the intended target and strike an unintended target;

- limits ability to determine if retreat to safety is possible;

- limits ability to determine if there is another assailant; and

- limits ability to assess the level and nature of threat (i.e., has the aggressor drawn another weapon? Engaged someone as an accomplice? Given other pre-fight indicators, such as changing stance, glancing at the potential target?).

Brain-wave research of Olympic shooters shows that the greater a shooter's distraction, the greater the possibility of a miss. Bill Lewinski, *Stress Reactions of Lethal Forces Encounters*, THE POLICE MARKSMAN, May/June 2002, at 27; N. Konttinen, D.M. Landers, & H. Lyytinen, *Aiming Routines and Their Electrocortical Concomitants Among Competitive Rifle Shooters*, 10 SCANDANAVIAN J. MED. & SCI. IN SPORT 169 (2000).

## V.   THE DIFFERENCE BETWEEN THE AR-15 AND THE M-16 AND M-4.

The state appears to believe that the only functional difference between an M-16 and AR-15 is that the AR-15 fires on semiautomatic only, and cannot fire on full automatic.

The difference between a semiautomatic firearm like the AR-15 and a fully automatic firearms like the M-16 is *extremely* significant. The semiautomatic firearm design feature is in no manner "based on or is a variation of" the full automatic design feature: civilian firearms like the AR-15 cannot fire in fully automatic mode and therefore

7

cannot be considered military weapons.

Another extremely significant difference is that fully automatic firing mode does not allow for aimed firing. Instead, fully automatic firing mode allows only for "point shooting" and "spray firing."

Aimed firing, as the name suggests, involves the shooter aligning his or her eye with the firearm's sights and superimposing that sight picture upon the threat. In point shooting, the shooter does not rely on the firearm's sites. Point shooting is used for circumstances in which aimed fire is not possible. These typically arise in close quarters, when the shooter is under attack and does not have time to acquire a site picture. In other words, with point shooting the shooter does not have time to take an aimed or sighted shot, but instead merely points the firearm in the direction of the target.

In full auto mode it is not possible to achieve aimed fire. In full auto mode, it is possible only to spray fire (as in laying down suppressive fire), or to point shoot. In semi automatic mode it is possible to either aim fire or to point shoot, but it is not possible to spray fire in the manner as one would in fully automatic mode.

Both aimed fire and point shooting have valid self-defense applications. In terms of safety, however, aimed fire is the safest type of fire because the shooter has aligned the sights for a more accurate shot placement and has identified the target and what lies beyond it.

The biggest difference between the AR-15 and the M-16 and M-4 is that the M-16 and the M-4 are designed for combat and can fire in full automatic mode, while the AR-15 is designed for civilian and sporting purposes and can only fire in semiautomatic mode.

## VI.  ABOUT THE MILITARY HISTORY OF THE BANNED FIREARMS.

The US military has long allowed citizen access to its cutting-edge rifle designs. For example, the 1903 Springfield .308 caliber bolt action was America's front-line rifle from World War I through the beginning of World War II. Yet, as early as the 1920s and 1930s, civilians could purchase the 1903 Springfield "NRA Sporter" variant of the rifle.[4]

During World War II, the US military developed the M-1 carbine magazine-fed semi-automatic rifle for "combat situations" in World War II. Marines, paratroopers, and Special Forces preferred its light weight and high volume of fire.[5] Yet, by the 1950s, while the rifle was still in use by American servicemen in Korea and would later be used in Vietnam, the M1 became very popular as a ranch and varmint rifle.[6]

The Vietnam era M14 rifle is another example. Over 1 million of these arms were produced for the Vietnam War, and variants of the rifle still serve today's Special Forces.[7] Yet by 1971, while the war in Vietnam raged, civilians could purchase a variant and sales

---

[4] See http://m1903.com/odd1903/ (last visited 12/04/13).
[5] See http://www.history.com/shows/top-shot/videos/weapons-rundown-m1-carbine# (last visited 12/04/13).
[6] See http://www.m1carbinesinc.com/ (last visited 12/04/13).
[7] See http://www.americanrifleman.org/articles/m14-enhanced-battle-rifle/ (last visited 12/04/13).

have continued to today.[8]

Many other of the military's firearms that would not be banned under the Act are available in some form in the civilian market. The Mossberg 500 is the US military's standard shotgun, while a nearly identical commercial form is available.[9] The civilian market's version of the military's Remington 700 bolt-action sniper rifle is one of the most popular hunting rifles in the country.[10]

Though these arms originated in the military, they are also extremely useful for civilian purposes such as hunting, sporting competitions and self-defense, and are widely sought after by civilians for these purposes. The AR-15 and similar rifles are not fundamentally different, and should not be treated differently.

## VII.   THE DIFFERENCE BETWEEN "MILITARY" AND "NON-MILITARY" FIREARMS.

The Defendants have argued that firearms banned by the Act have features that are designed for combat purposes and for enhancing a soldier's ability to kill the enemy. The Defendants have not used particularly precise language, and are confusing the military function of a firearm with the various items that one might attach to a firearm.

The defining characteristic of military weapons designed for combat – the characteristic that separates military weapons from civilian firearms - is their functional ability to fire in fully automatic mode, 3-round burst mode, or select fire mode (i.e., a mode that allows the shooter to switch between fully automatic or semi-automatic modes).

The significance of this functional difference cannot be understated: as stated above, civilian firearms like the AR-15 cannot fire in fully automatic mode and therefore cannot be considered military weapons. The ability to fire in fully automatic mode is a military function.

Flash hiders prevent a firearm owner who is shooting at night from being momentarily blinded while firing.

Safety, Accuracy, Ease-of-Use. The firearms banned by the Act, particularly the AR-15, are also significantly more accurate than many non-banned firearms, are lighter (and therefore easier to aim and more safe to handle), and have far less recoil than non-banned firearms. These characteristics greatly increase functionality, safety and ease-of-use.

Sporting Purpose. The firearms banned by the Act and the devices defined as "large capacity magazines" under the Act have been widely and legally used for sporting purposes (as well as for self-defense and hunting) throughout Maryland and the United States for decades.

---

[8] *See*
http://photos.imageevent.com/badgerdog/generalstorage/m14tecnicalfolder/M14%20RHAD%20Online%20Ed ition%20070603.pdf , pg. 129 (last visited 12/04/13).
[9] *See* http://www.mossberg.com/products/shotguns/pump-action (last visited 12/04/13).
[10] *See* http://www.remingtonmilitary.com/Firearms/Sniper%20Rifles/M24.aspx (last visited 12/04/13).

Hunting. The AR-15 is a very effective varmint rifle. Its magazine capacity, high velocity round, and accuracy at range is useful against prey ranging from feral pigs to woodchucks to coyotes. When allowed under state hunting laws, and if manufactured to do so, a hunter can swap a larger-caliber barrel such as a .308 in place of the .223 caliber barrel for big game.

In this sense, the argument that "assault weapons" and "LCMs" are solely used for crime, have no sporting purposes, and are not used by private citizens for sporting competitions, or otherwise commonly used by responsible, law-abiding citizens for lawful purposes, is simply untrue.

## VIII.  SUITABILITY OF THE BANNED FIREARMS FOR LAWFUL PURPOSES.

There may be, as a general matter, a misapprehension that the firearms not banned by the Act are just as suitable as the banned firearms for self-defense, sporting purposes, and hunting. Generally speaking this is untrue. It is particularly false when one considers the AR-15.

Police officers use the firearms banned by the Act for self-defense because they provide superior firepower and are the most effective firearms in a self-defense situation. Since the right of a law-abiding citizen to defend himself is at least equal to, if not greater than, the right of a police officer to do so, then it follows *a fortiori* that law-abiding citizens must also be allowed to use the firearms banned by the Act for self-defense purposes. This is particularly true given that – unlike police officers – law-abiding citizens must frequently confront criminals without any backup.

If a citizen is confronted by a criminal armed with an "assault weapon" and a large capacity magazine it is unreasonable to require that citizen to defend herself with anything less than an "assault weapon" and a large capacity magazine. Forcing Plaintiffs to rely upon inferior firepower in order to defend themselves puts them at an unfair, and potentially deadly, disadvantage.

It is unquestionably true that the alternatives available to the Plaintiffs are inferior to the firearms criminalized by the Act: they are less accurate, less easy-to-use, are heavier (and therefore more difficult to aim and less safe to handle) and have more recoil than banned firearms. These characteristics (accuracy, ease-of-use, lightness, low recoil) greatly increase the functionality and ease-of-use of banned firearms, and greatly enhance the ability of a law-abiding citizen to defend him or herself.

The non-banned firearms that "remain available" under the Act are not as useful for self-defense, sporting competitions or hunting as the banned AR-15. While handguns are useful for self-defense, a firearm such as an AR-15 provides key advantages that legitimate gun owners require.

Intimidation: due to its larger size, an AR-15 is more intimidating to criminals than handguns. Military and police often use intimidation tactics to deter violence.   Sometimes the mere sight of such a firearm is enough to end a conflict before an innocent is hurt.[11]

---

[11] *See* http://www.guns.com/2013/01/29/new-york-man-scares-off-intruders-with-ar-15/ (last visited 12/04/13).

Accuracy: handguns are inherently less accurate than long guns. The shorter barrel of a pistol means that the round passes along fewer rifled groups, producing less velocity and less spin on the round. The pistol rounds themselves are smaller and less aerodynamically shaped than rifle rounds. Handguns are more difficult to steady because they lack a shoulder stock. Due to their smaller size, handguns absorb less of the recoil and "kick" more, further reducing accuracy. It is easier to put rounds on target with a rifle when the situation is stressful, even when the defenders are children or teenagers.[12]

Outmatch Criminals: most crimes are committed with handguns because they are concealable. The aggressor has the advantage early in a confrontation because he or she has the initiative and has likely readied his or her mind for combat. Since the victim is likely surprised or unprepared, he or she needs something to offset the aggressor's inherent advantages. Legal gun owners do not have to worry about concealment at home. They are not forced to carry smaller handguns because they have no need to hide their self-defense weapon at home. They can counter the aggressor's advantages through firepower and intimidation using an AR-15.

## IX.   THE RIGHT AND ABILITY TO DEFEND ONESELF.

The state apparently believes that the plaintiffs and other law-abiding citizens have no need to defend themselves with banned firearms. Yet, at the same time, the state would allow police officers and retired law enforcement to defend their own lives with banned firearms. Implicit within this claim is the notion that a citizen's right to defend himself is inferior to that of a police officer. This is a backward position that distorts the right of self-defense and, indeed, its very purpose.

The first line of defense for all law-abiding citizens is the citizen himself: police officers have neither the legal obligation nor the practical ability to rescue all crime victims. Citizens are not required to rely upon police officers to defend themselves against criminal attack and, as a practical matter, cannot do so when faced with the immediate threat of a criminal aggressor.

Like police officers, citizens must at times confront criminals armed with the most dangerous weaponry, including "assault weapons" and, in some instances, body armor that can stop many types of ammunition. At times, these confrontations occur without advance notice to the citizen and within the citizen's home.

A citizen's right to defend himself or herself, especially in the home, is equal to that of a police officer's. When faced with the threat of a criminal aggressor, especially in the home, a citizen's need to defend him- or herself is superior to that of a police officer's.

Civilians need an advantage over the criminals against whom they must defend themselves, especially in the home, and should not be required or expected to defend themselves against dangerous criminals without superior, or at the very least comparable, firepower. Armed criminals pose just as much of a threat to the life of a civilian as they do

---

[12] *See*
http://www.philly.com/philly/news/local/Elkins_Park_man_killed_after_forcing_his_way_into_apartment.html (last visited 12/04/13).

to police officers (whether on duty or off duty). There is no difference. In fact, common sense and experience show that civilians (who are not as highly trained, organized or suitably armed as police officers) are more frequently victimized by criminals than police officers. The Act prevents a citizen who is faced with the threat of a criminal who is illegally armed with an "assault weapon" and/or an LCM criminalized under the Act from responding to that threat with firepower that is equal or superior to the threat itself.

## X.   CONCLUSION

On a nationwide basis most pistols are manufactured with magazines holding 10 to 17 rounds, and many popular rifles are manufactured with magazines holding 10, 20, or 30 rounds. The Act's restriction of magazines that hold more than 10 rounds severely regulates the most commonly used pistols and rifles not just within the State of Maryland, but in the USA.

The Act's restrictions on so-called "assault weapons" is essentially a ban on a class of firearms that is commonly used by responsible, law-abiding citizens for lawful purposes, and are in fact some of the most popularly purchased, owned and used firearms for hunting, sport shooting, and self-defense in the United States today.

The Act's restrictions on folding stocks of rifles and shotguns are irrational, and do not reflect characteristics that make a rifle or shotgun more powerful, dangerous or deadly. Rather, they enable accurate shot placement and weapon retention in close quarters. A responsible firearm owner wants to be accountable for all rounds that he shoots. These characteristics of firearms increase the ability to protect one's family by accurate fire. These firearm characteristics are therefore necessary and rationally related to the core Second Amendment purpose of self-defense

The Act's limitation of the number of rounds allowable for a firearm in the home significantly impairs a homeowner's ability to successfully defend him or herself while under a criminal attack in the home.

12

64 LOCH REVAN HEIGHTS • ROCHESTER, NY 14617-3302
PHONE 585.752.4805 • E-MAIL GROSSI@ROCHESTER.RR.COM

# GUY A. ROSSI

## BIOGRAPHICAL SKETCH

Guy Rossi is a retired Sergeant from the Rochester, New York Police Department that specialized in patrol, recruit, field training and defensive tactics instruction. Since 1982 he has been a nationally recognized law enforcement trainer and has trained several hundred officers/instructors throughout the United States. Mr. Rossi developed Force Matrix Continuums and defensive tactic instructor manuals that are still being used as the foundation of instruction at the Monroe County Public Safety Training Facility. His experiences and teachings in officer survival skills and managing aggressive behavior have been published in over two hundred magazine articles and books. Upon retiring from active police service he was employed as a Program Coordinator of Curriculum Development for the Public Safety Training Facility (regional police academy) of Monroe Community College (MCC). While there he directly oversaw all law enforcement in-service training. Presently, he is a Program Coordinator of Curriculum Development for the Homeland Security Management Institute at MCC, a Security Consultant for Delta Global Services and the President of Guy Rossi and Associates, LLC.

Mr. Rossi has developed and instructed hundreds of cognitive and psychomotor skill related programs to include New York State Penal Law Article 35 – Defense of Justification, Liability Issues for Police Supervisors, Firearms and Defensive Tactic Instructor Courses, Multimedia for Law Enforcement Trainers and most recently a web-based learning program in Community College Citizen Preparedness for FEMA. He has been qualified as an expert witness on use of force by law enforcement officers and his works have recently been presented in an Amicus brief to the 9th Circuit Court of Appeals regarding open carry of firearms for law-abiding citizens.

Guy Rossi has a Master's Degree in Adult Education – Instructional Design. He is a charter and advisory board member of the International Law Enforcement and Educators Trainers Association (ILEETA) as well as the Editor of the ILEETA Review. Significant certifications/credentials include NYS Division of Criminal Justice Services Master Instructor in General Topics, Defensive Tactics, Firearms, Field Training and Aerosol Subject Restraint, Law Enforcement Accreditation Manager, Security Guard Instructor, Safariland Master Baton and Defensive Tactic Instructor, Taser Instructor and Force Science Analyst Certification.

## SUMMARY OF QUALIFICATIONS

- Eight years as Program Coordinator/Instructor Public Safety Training Facility
- Over thirty years experience as a curriculum developer for police agencies and the Public Safety Training
- Master Instructor certification by the New York Division of Criminal Justice Services (Office of Public Safety)
- Expert Witness in the areas of Police Recruit Training, Defensive Tactics and Officer Survival
- Extensive national seminar presentations in the areas of police training, field training and writing training articles for publication
- Multimedia and distance learning development
- Has served as Technical Editor for Police Marksman Magazine and Editor in Chief of the International Law Enforcement and Educators Association Review Journal.
- Grant Writing
- Force Science Research Certified Analyst

## EDUCATION

- M.S. Adult Education, Buffalo State University (SUNY) 2002, graduated with a Distinguished Service Award
- B.S.   Educational Studies – Instructional Design, Empire State College (SUNY), 2000
- A.A.S.  Police Science - Monroe Community College, Rochester, New York

## TEACHING COMPETENCIES

| | |
|---|---|
| [ Adult Education – Instructor Development | [ Officer Survival |
| [ Writing Training Articles for Publication | [ Firearms |
| [ Multimedia and Distance Learning | [ Use of Force/Defensive Tactics |
| [ Police Procedurals & Field Training | [ Law Enforcement Contemporary Issues |
| [ Curriculum Development | [ Grant Writing |
| [ Management of Aggressive Behavior | [ Taser |

## EMPLOYMENT

[March 2010 - Present] Delta Global Services  (DGS)
  Security Consultant – New York State

[September 2007-Present] Public Safety Training Facility of Monroe
  Community College
  o  Develop and instruct various instructional curriculums specific to
     law enforcement on instructional development, multimedia, officer
     survival, supervision, defensive tactics and security training.
  Adjunct Instructor (part-time)
  1.  Develop and instruct various instructional curriculums specific to
      law enforcement on instructional development, multimedia, officer
      survival, supervision, defensive tactics and security training.

[December 2007 - Present] Homeland Security Management Institute of
             Monroe Community College (HSMI)
  Program Coordinator (part-time)
  o  Develop, instruct and administrate various courses within the realm
     of Homeland Security.   Create and oversee distance-learning
     programs for HSMI.

[March 2007- July 2008] Irondequoit NY Police Department
  Special Projects Coordinator (part-time)
  2.  Report directly to the Chief of Police, write grants, oversee
      development and revision of procedural orders, police department
      website, accreditation and training.

[October 2005 – May 2007] International Law Enforcement Trainers and
Educators Association (ILEETA)
  Editor in Chief of the ILEETA Review*
  o  Oversee a quarterly publication for ILEETA to include editing,
     assigning articles and manag
  o  g the overall development of reviews on products and training for
     consideration by the membership.

*Returned as Editor April 2009 to present.

[June 2003 –September 2007]  Monroe Community College, Rochester, New York

    Program Coordinator – Curriculum Development
- Plan, develop and write new/revised curriculum for public safety personnel. Oversee and mentor new instructors in instructional methodologies. Prepare curriculum in various media formats according to the needs of the customers. Administrate the Defensive Tactic Training Staff and act as the Computer Liaison for the Public Safety Training Facility.

[ January 1999 – June 2004]  Monroe Community College, Rochester,  New York

    Technical Assistant – Law Enforcement Programs
- Assist in the program coordination of all in-service law enforcement programs.  Additional duties include oversight of the defensive tactics instructor staff, computer liaison with ETS and SUNY Distance Learning Committee.

[April 1987-August 1998]  City of Rochester Police Department
    Police Officer/Sergeant
- Police officer duties assigned to road patrol functions. Supervisory experience since 1991 to include patrol and investigatory activities.
- Assigned to the Professional Development Section (Training) in 1992 to include administration of the Field Training and Evaluation as well as the Recruit Training Unit.  Additional duties included supervision of the training unit and the Defensive Tactic Instructor Staff,

[April 1982-April 1987]  Town of Irondequoit Police Department
    Police Officer
- Police officer assigned to road patrol and training duties.

[August 1978 – April 1982]  Village of Fairport Police Department
    Police Officer
- Police officer assigned to road patrol and training duties.

[May 1977- August 1978]  Monroe County Sheriff's Department
    Deputy Sheriff – Part-Time
- Part-time Deputy Sheriff - Parks and Marine Division

## CERTIFICATIONS

| DATE: | TOPIC: | AGENCY: |
|-------|--------|---------|
| 11/12/12 | Verbal Defense and Influence National Conference | Vistelar |
| 11/09/12 | OCAT (pepper spray) Instructor-Trainer | Personal Protection Consultants |
| 11/09/12 | PATH Handcuffing Instructor- Trainer | Personal Protection Consultants |
| 11/01/12 | Monadnock Master Instructor Monadnock Defensive Tactics | Safariland Training Group |
| 11/01/12 | Monadnock Master Instructor – PR-24 Baton | Safariland Training Group |
| 11/01/12 | Monadnock Master Instructor – Expandable Baton | Safariland Training Group |
| 10/26/12 | Verbal Defense and Influence Instructor | Vistelar |
| 8/1/12 | International Assoc. Law Enforcement Firearms Master Instructor Program | IALEFI |
| 4/21/12 | ILEETA Conference Staff Instructor | ILEETA |
| 2/14/12 | Social Media Methods | Police Technical Safariland Training Group |
| 11/01/11 | Master Instructor Monadnock Defensive Tactics | Safariland Training Group |
| 11/01/11 | Master Instructor Monadnock Expandable Baton | Safariland Training Group |
| 11/01/11 | Master Instructor Monadnock PR-24 Baton | |
| 08/12/11 | Taser Instructor Recertification | Taser International |
| 08/10/11 | Lethal and Non-Lethal Uses of Force | Lorman Ed. Services |
| 07/12/11 | Use of Force Summit | Performance Institute |
| 06/28/11 | NYS Division of Criminal Justice Services – Firearms Instructor Recertification | NYS DCJS |
| 06/28/11 | NYS Division of Criminal Justice Services – General Topics Recertification | NYS DCJS |
| 4/16/11 | International Law Enforcement Educators and Trainers Association 2011 Conference | ILEETA |
| 4/13/11 | Sabre Civilian Safety Awareness Instructor | Sabre Intl. |
| 11/9/10 | PowerPoint for Public Safety | Police Technical |
| 06/11/10 | Force Science Analyst Certification | Force Science |

Rossi - Page 5

2/17/2013

| DATE: | TYPE: | AGENCY: |
|---|---|---|
| 2/9/10 | Safe Approach To Anger Management Instructor (SAM) | SAM |
| 2/9/10 | Management of Aggressive Behavior Inst. Trainer Recert. | MOAB Intl. |
| 2/09/10 | Oleo Resin Capsicum Instructor Trainer Recert. | PPC |
| 2/9/10 | Practical and Tactical Handcuffing Inst. Trainer Recert. | PPC |
| 4/15/08 | International Association of Law Enforcement Educators and Trainers Association – Conference Staff Instructor | ILEETA |
| 1/25/08 | Taser Trainer | Taser International |
| 1/17/08 | Law Enforcement Accreditation Program Manager | NYS DCJS |
| 1/10/08 | Monadnock Defensive Tactic System International Instructor | Monadnock Police Training Coun |
| 1/10/08 | Monadnock Expandable Baton International Instructor | Monadnock Police Training Coun |
| 1/10/08 | PR-24 International Instructor | Monadnock Police Training Coun. |
| 8/2/0 | Armed Security Guard | NYS DCJS |
| 5/1/07 | Grant Workshop for Law Enforcement | Richard J. Condon & Assoc. |
| 3/29/07 | Firearms Instructor | NYS Municipal Police Trn. Coun |
| 3/29/07 | General Topics Instructor | NYS Municipal Police Trn. Coun. |
| 11/17/06 | Simunition Scenario Instructor | Simunition |
| 10/17/06 | PowerPoint for Law Enforcement | Police Technical LLC |
| 10/14/06 | Writers Digest Characterization Workshop | Writers Digest |
| 5/26/06 | Hostage Negotiations Seminar | NYSHA |
| 4/29/06 | ILEETA Seminar Instructor/Conference | ILEETA |
| 4/2/06 | Taser Instructor | Taser International |
| 12/30/05 | Florida Dept. of L.E. Conference | FDLE |
| 10/21/05 | NYS Security Guard General Topic Recert | NYS DCJS |
| 8/2/05 | Street Survival Seminar | Calibre Press |
| 7/15/05 | E-Learning Design – William Horton | VNU Training |

| DATE: | TOPIC: | AGENCY: |
|---|---|---|
| 5/20/05 | Monadnock International Seminar PR-24, MEB & MDTS | Monadnock |
| 04/03/05 | Writer's Digest Extended Novel Writing Course | Writer's Digest |
| 04/02/05 | International Association of Law Enforcement Educators Training Association – Staff Instructor | ILEETA |
| 03/21/05 | Writers & Books Copywriting Course | Writers & Books |
| 06/30/04 | Dreamweaver MX 2 | CESC |
| 06/24/04 | Dreamweaver MX 2 | CESC |
| 5/20/04 | International PR-24 Instructor | Monadnock Training Council |
| 05/20/04 | International Straight Baton Instructor | Monadnock Training Council |
| 05/11/04 | Monadnock National PR-24 Seminar | Ohio Peace Officer Trn. Council |
| 04/15/04 | OCAT Instructor Trainer Course (Pepper Spray) | Personal Protection Consultants |
| 03/14/04 | Quik-Kuff Instructor | Quik-Kuff Inc. |
| 02/14/04 | Sexual Harassment Workshop | MCC |
| 12/01/03 | Virtual Campus Instruction | MCC |
| 09/24/03 | SUNY Coursespace – Distance Learning Development | MCC |
| 09/17/03 | Microsoft Access Levels 1-5 | Monroe Community College |
| 09/09/03 | PATH Instructor Trainer Course (Handcuffing) | Personal Protection Consultants |
| 07/01/03 | Aerosol Subject Restraint Instructor | NYS DCJS |
| 07/01/03 | General Topics Instructor | NYS DCJS |
| 07/01/03 | Firearms Instructor | NYS DCJS |
| 06/06/03 | Integrated Security and Emergency Management | Dutchess Community College |

| DATE: | TOPIC: | AGENCY: |
|---|---|---|
| 02/27/03 | Defensive Tactic Instructor | NYS DCJS |
| 02/27/03 | Firearms Instructor | NYS DCJS |
| 03/12/02 | Street Survival – Tactical Edge Seminar | Calibre Press Inc. |
| 01/24/02 | Incident Response to Terrorist Bombings Awareness | New Mexico Tech |
| 06/15/01 | Cap-Stun Aerosol Instructor Trainer | REB Training International |
| 03/09/01 | Data Projection Technology Seminar | MCC ETS |
| 11/08/00 | Technical Writing Seminar | Padgett-Thompson |
| 07/25/00 | Simunition Instructor | Simunition Inc. |
| 09/09/99 | Photoshop Workshop | Rockhurst College |
| 07/29/99 | Handgun/Long Gun Retention National Trainer | NLETC |
| 07/16/99 | Web Design Conference | Rockhurst College |
| 07/07/99 | National Field Training Officers Seminar Presenter | NAFTO |
| 07/01/99 | Firearms Instructor | NYS DCJS |
| 01/01/99 | Defensive Tactic Instructor | NYS DCJS |
| 11/20/98 | Management of Aggressive Behavior Instructor | REB Training International |
| 01/20/98 | American Society for Law Enforcement Training Seminar - Presenter | ASLET |
| 10/21/97 | Street Survival Seminar | Calibre Press |
| 06/13/97 | International PR-24 Instructor | Monadnock Training Council |
| 06/13/97 | International Straight Baton Instructor | Monadnock Training Council |
| 06/13/97 | International Monadnock D. T. System Instructor | Monadnock Training Council |
| 06/13/97 | CAS Expandable Baton National Instructor | Monadnock Training Council |
| 06/12/97 | Northamptonshire (UK) Police Spontaneous Knife Defense Instructor | Northamptonshire (UK) Police |

| DATE: | TOPIC: | AGENCY: |
|---|---|---|
| 06/08/97 | OCAT Instructor Trainer Course (Pepper Spray) | REB Training International |
| 04/25/97 | Defensive Tactic Instructor Refresher | PSTF MCC |
| 09/25/96 | Less Than Deadly Force and Deadly Force Policies vs. Practices | Van Meter and Assoc. |
| 08/15/96 | American Society for Law Enforcement Training Use of Force Training Seminar | ASLET |
| 02/27/96 | Leadership Styles Seminar | PSTF MCC |
| 07/06/95 | Use of Force Training Seminar – ASLET | ASLET |
| 05/11/95 | International PR-24 Instructor | Monadnock Training Council |
| 05/11/95 | Monadnock Straight Baton International Instructor | Monadnock Training Council |
| 05/10/95 | International PR-24 Instructor | Ohio Peace Officer Trn Council |
| 05/20/94 | CAS Expandable Baton National Instructor | Monadnock Training Council |
| 05/18/94 | OCAT Instructor Trainer Course (Pepper Spray) | REB Training International |
| 05/12/94 | Monadnock Straight Baton International Instructor | Monadnock Training Council |
| 05/11/94 | Defensive Tactics Instructor | Rochester NYPD |
| 01/04/94 | ASLET National Seminar | ASLET |
| 06/25/93 | Police Instructor Development | PSTF MCC |
| 04/29/93 | International PR-24 Instructor | Monadnock Training Council |
| 04/29/93 | Monadnock Straight Baton International Instructor | Monadnock Training Council |
| 01/09/93 | ASLET National Seminar | ASLET |
| 09/25/92 | Contemporary Issues for Police | PSTF MCC |
| 02/20/92 | Critical Incident Management | Rochester NYPD |
| 01/11/92 | ASLET National Seminar Staff Instructor | ASLET |
| 10/03/91 | Haz Mat Operations Level – Law Enforcement | PSTF MCC |
| 06/14/91 | OCAT Instructor Trainer Course (Pepper Spray) | REB Training International |

| DATE: | TOPIC: | AGENCY: |
|-------|--------|---------|
| 03/01/91 | Course in Police Supervision | NYS DCJS |
| 03/01/91 | Police Supervision | Rochester NYPD |
| 01/12/91 | ASLET National Seminar Staff Instructor | ASLET |
| 01/01/91 | Firearms Instructor | Municipal Police Trn Council |
| 11/17/90 | CAS Expandable Baton Instructor Trainer | Monadnock Training Council |
| 11/12/90 | Cap-Stun Instructor's Course | Dimensional Tactics Inc. |
| 09/19/90 | Handgun/ Long Gun National Trainer | NLETC |
| 09/19/90 | Lateral Vascular Neck Restraint | NLETC |
| 09/12/90 | PPCT International Training Conference | PPCT Management Systems |
| 08/12/90 | PPCT Defensive Tactics Instructor Trainer | PPCT Management Systems |
| 08/11/90 | PPCT Impact Weapons System Instructor/Trainer | PPCT Management Systems |
| 08/11/90 | PPCT Pressure Point Control Tactics System Instructor Trainer | PPCT Management Systems |
| 08/10/90 | PPCT Spontaneous Knife Defense Instructor | PPCT Management Systems |
| 04/01/90 | Street Survival | Calibre Press |
| 03/31/90 | Street Survival | Calibre Press |
| 01/13/90 | ASLET National Seminar Staff Instructor | ASLET |
| 10/24/89 | Doppler Traffic Radar Operator | Rochester Police Department |
| 07/19/89 | Lindell Handgun Retention System | Fitness Institute for Police Fire |
| 01/14/89 | ASLET International Training Seminar Staff | ASLET |
| 01/01/89 | Firearms Instructor | Municipal Police Trn Council |
| 12/09/88 | Field Training and Evaluation | Municipal Police Trn Council |
| 01/11/88 | Law Enforcement Trainers Seminar | Delgado Community College |
| 01/11/88 | ASLET International Seminar Staff Instructor | ASLET |

| DATE: | TOPIC: | AGENCY: |
|---|---|---|
| 03/13/87 | PPCT Defensive Tactics System Intermediate Instructor | PPCT Management Systems |
| 03/13/87 | PPCT Defensive Tactic System Instructor | PPCT Management Systems |
| 03/06/87 | Achieving Excellence in Law Enforcement | PSTF MCC |
| 01/30/87 | Intermediate PR-24 Instructor | Monadnock Training Council |
| 01/29/87 | Performance Conditioning Instructor Certification | Fitness Institute for Police Fire and Rescue |
| 11/13/86 | Street Survival II | Calibre Press Inc. |
| 08/12/86 | Firearms Instructor Refresher | PSTF MCC |
| 06/09/86 | Pressure Point Control Basic Certification | PPCT Management Systems |
| 06/09/86 | Justice System Training Association Trainer Seminar | JSTA |
| 06/09/86 | JSTA Instructor Seminar | Milwaukee Area Technical College |
| 01/17/86 | Intermediate PR-24 Instructor | Monadnock Training Council |
| 11/15/85 | Defensive Tactics Instructor | Indiana State Law Enforcement Training Board |
| 11/15/85 | Defensive Tactics Instructor | JSTA |
| 08/22/85 | RISC Management Handcuffing Trainer Certification | JSTA |
| 08/22/85 | Handcuffing Trainer Certification | PSTF MCC |
| 08/15/85 | Pressure Point Control Instructor Certification | JSTA |
| 08/15/85 | Pressure Point Control Instructor | PSTF MCC |
| 07/30/85 | Kubotan Instructor | DTI Inc. |
| 04/24/85 | Street Survival Seminar | Calibre Press Inc. |
| 02/12/85 | NRA Police Firearms Instructor | NRA |
| 01/11/85 | PR-24 Instructor | Monadnock Training Council |
| 12/19/84 | Active Countermeasures Trainer Certification | JSTA |

| DATE: | TOPIC: | AGENCY: |
|---|---|---|
| 10/01/84 | Police Firearms Instructor | Municipal Police Trn Council |
| 06/28/84 | Street Survival Seminar | Calibre Press Inc. |
| 07/27/83 | Street Survival Seminar | Calibre Press Inc. |
| 01/14/83 | PR-24 Instructor | Monadnock Training Council |
| 10/19/82 | Survival Training React and Control | United Telephone Co. of Ohio |
| 02/19/82 | Street Survival Tactics for Armed Encounters | Brookfield Police Department |
| 04/03/81 | Field Training and Evaluation | PSTF MCC |
| 02/22/80 | PR-24 Instructor | Monadnock Training Council |
| 05/23/79 | Interview and Interrogation | PSTF MCC |
| 11/03/78 | Breath Test Operator | Municipal Police Trn. Council |
| 09/19/78 | Doppler Traffic Radar Operator | Fairport Police Department |
| 03/25/78 | Basic Training Course for Police Officers | Monroe County Sheriff's Department |
| 03/25/78 | Basic Course for Police Officers | Municipal Police Training Council |

## PUBLICATIONS

| Date: | Topic: | Publication: |
|---|---|---|
| 07/01/11 | The Invisible Gorilla | ILEETA Review |
| 04/01/11 | PowerPoint for Public Safety Manual | ILEETA Review |
| 12/01/10 | Product Review – The Apple iPad:  What Can It Do for Trainers? | ILEETA Review |
| 09/01/10 | Course Review – Force Science Certification | ILEETA Review |
| 01/01/10 | Book Review:  The Art of Learning | ILEETA Review |
| 03/01/09 | The 28th Annual International Monadnock Conference | Tactical Response Magazine |
| 03/01/09 | Book Review: The Back of the Napkin | ILEETA Review |
| 01/01/09 | Book Review Slide:ology | ILEETA Review |
| 10/01/08 | Software Review:  Game Show Pro | ILEETA Review |
| 06/01/08 | Book Review:  Leadership: Texas Holdem Style | ILEETA Review |
| 03/01/08 | ILEETA Review –Writers Digest Magazine | ILEETA Review |
| 01/01/08 | What Cops Learn From Life-or-Death Encounters by Charles Remsberg, Chapter 3 – "Naked Fear" written by Guy Rossi | Book "Blood Lessons" |
| 12/01/07 | Technology Review:  The Big Switch PC to Mac | ILEETA Review |
| 09/01/07 | Technology Review:  Mind Mapping Software | ILEETA Review |
| 04/01/07 | Book Review:  Crazy Busy | ILEETA Review |
| 11/01/06 | Technology: A Bluetooth Workout | ILEETA Review |
| 12/30/05 | What Is the ILEETA Review | ILEETA Review |
| 12/30/05 | Macromedia Captivate Review | ILEETA Review |
| 07/01/04 | ILEETA's First International Training Conference Hailed as Success (Written with Bill Harvey, Guy Rossi co-author) | Police Magazine |
| 11/01/02 | Welcome Three New PMA Advisory Board Members | PMA |
| 07/01/00 | The Cutting Edge | PMA |
| 11/01/97 | Weapon Retention for the Thigh-Worn Holster | PMA |

| | | |
|---|---|---|
| 09/01/97 | Edged Weapon Defense | PMA |
| 09/01/96 | Trap Blocks:  Beyond The Kiss Principle | PMA |
| 07/01/96 | Controlling the Short Barreled Sub-Gun | PMA |
| 11/01/95 | Taking Control | Police Magazine |
| 03/01/95 | Field Training and Evaluation | Law & Order |
| 03/01/94 | Survival Tactics:  Don't Be Afraid of the Dark | PMA |
| 01/01/94 | Deceptive Body Movement | PMA |
| 01/01/94 | Stance, Balance and Movement | Best of Police Marksman Book |
| 01/01/94 | Persuasive Compliance Techniques Part 1 | Best of Police Marksman Book |
| 01/01/94 | Persuasive Compliance Techniques Part 2 | Best of Police Marksman Book |
| 01/01/94 | Persuasive Compliance Part 3, Pressure Point Control | Best of Police Marksman Book |
| 01/01/94 | Persuasive Compliance Part4, Pressure Point Control | Best of Police Marksman Book |
| 01/01/94 | Tactical Handcuffing Part One | Best of Police Marksman Book |
| 12/01/93 | The Stress Management Team | Colonie Guardian |
| 12/01/93 | Ring of Truth | Colonie Guardian |
| 12/01/93 | Jennifer's Nightmare | Colonie Guardian |
| 12/01/93 | Reasonable Suspicion | Colonie Guardian |
| 12/01/93 | No Fare | Colonie Guardian |
| 12/01/93 | Hot Stuff: A New Defensive – Tac-Down | Colonie Guardian |
| 09/01/93 | How Has The Rodney King Decision Affected Law Enforcement Training:  A Trainers Perspective | PMA |
| 09/01/93 | Management of Aggressive Behavior Book Review | PMA |
| 07/01/93 | Back-up Weapons Part 2 | PMA |
| 05/01/93 | Running on Faith (Commentary) | Police Magazine |

| | | |
|---|---|---|
| 05/01/93 | Back-up Weapons Part 1 | PMA |
| 01/01/93 | What's New in Concealment and Dress Holsters? | PMA |
| 01/01/93 | Practicing for the Street (Chapter 35 of the book, Total Survival by Ed Nowicki) | Performance Dimensions Publishing |
| 09/01/92 | Protect and Restraint:  The PR-24 Police Baton | PMA |
| 07/01/92 | Baton Training | PMA |
| 05/01/92 | Tactical Handcuffing Part Two | PMA |
| 04/01/92 | Book Review:  True Blue | Police Magazine |
| 03/01/92 | Tactical Handcuffing Part One | PMA |
| 12/01/91 | Ultimate Survivors:  Winning Against Incredible Odds (Video Review) | PMA |
| 11/01/91 | Handgun Retention/Disarming – Part III | PMA |
| 11/01/91 | Cap-Stun | PMA |
| 09/01/91 | Weapon Retention | PMA |
| 09/01/91 | Use of the Monadnock Straight Baton Review | PMA |
| 07/01/91 | Equipping a Surveillance Van | Law Enforcement Technology |
| 05/01/91 | Handgun Retention Part One | PMA |
| 05/01/91 | The Third Annual ASLET Seminar | PMA |
| 05/01/91 | Book Review:  Street Weapons | PMA |
| 03/01/91 | Street Survival Ten Years Later Part 2 | PMA |
| 03/01/91 | Hard Reactionary Techniques "Countermeasures" | PMA |
| 01/01/91 | Street Survival Ten Years Later Part 1 | PMA |
| 11/01/90 | Stunning Methods of Control | PMA |
| 10/01/90 | The Black Cloud (Fiction) | Law Enforcement Technology |
| 09/01/90 | Persuasive Compliance Part 4 Pressure Point Control | PMA |

| 09/01/90 | Are You Willing To Pay The Price? | ASLET Journal |
| 07/01/90 | Persuasive Compliance Part 3 Pressure Point Control | PMA |
| 06/01/90 | To Protect and Restrain | Law Enforcement Technology |
| 05/01/90 | Out of Sight – Out of Mind:  Distinguishing Concealed Weapons | Police Magazine |
| 05/01/90 | Persuasive Compliance Techniques Part 2 | PMA |
| 01/01/90 | Subject Control:  Stance, Balance and Movement | PMA |
| 11/01/89 | Reporting Subject Resistance | PMA |
| 10/01/89 | It Happened To Me (written anonymously) | Combat Handgun |
| 09/01/89 | Tactics for Subject Control | PMA |
| 09/01/89 | Commentary | ASLET Journal |
| 05/01/89 | American Society of Law Enforcement Trainers Seminar | PMA |
| 05/01/89 | Avoiding the Treat of Contact Diseases While Controlling Arrestees PMA | PMA |
| 05/01/89 | To The Best Of My Ability | ASLET Journal |
| 11/01/88 | Avoiding The Treat of Contact Diseases While Controlling Arrestee's | ASLET Journal |
| 05/01/88 | The 1988 American Society of Law Enforcement Trainers Seminar | PMA |
| 03/01/88 | Evaluating Deadly Force Decisions | Police Marksman Magazine (PMA) |
| 11/01/87 | Police Firearms Training for Off-Duty Confrontations | PMA |
| 07/01/87 | Simulation as a Testing Tool | PMA |
| 08/01/86 | Assaulted in Your Vehicle | Police Magazine |
| 07/01/86 | Progression of Force:  The Gray Area | PMA |

| 05/01/86 | A Broad Based System | International Association of Law Enforcement Firearms Instructors Newsletter |
| 03/01/86 | Defensive Tactics Simulation Training | PSDI Memorandum |
| 01/01/86 | Simulation In Training For PR-24 Requalification | PMA |
| 11/01/85 | Complacency Quiz | PMA |
| 09/01/85 | Letter to Editor | PMA |

**SPECIAL PUBLICATIONS:**

| 05/30/2011 | Amicus Brief Contributor – Edward Peruta v. County of San Diego | U.S.  9th Circuit Court of Appeals |

**PRESENTATIONS:**

| 1982 - present | Mr. Rossi has presented at numerous local and national conferences on defensive tactics, officer survival, mentorship, field training and evaluation as well as writing for law enforcement periodicals. Said presentations have occurred throughout the United States during his thirty year career at the International Monadnock , American Society of Law Enforcement Trainers (ASLET) the International Association of Law Enforcement Educators and Trainers Association (ILEETA) and the American Society of Industrial Security conferences to name a few. |

**AWARDS:**

| 09/10/09 | Inducted into the Monadnock Hall of Fame |

**ADVISORY BOARD MEMBERSHIPS**

| 04/22/2010 | Mr. Rossi named to the prestigious International Law Enforcement and Educators Trainer Association (ILEETA) Advisory Board |
| 04/22/11 | Brite Strike Advisory Board Member |
| 04/01/11 | Safe Approach To Aggressive Behavior (SAM) Advisory Board |

## ADDITIONAL PROFESSIONAL ACTIVITIES

[    Director of Seminar Relations for the American Society for Law Enforcement Training 1988-1996

[    Technical Editor for Police Marksman Magazine 1985-1990

[    Computer Liaison for the Public Safety Training Facility & Monroe Community College

[    Distance Learning Approval Committee for Monroe Community College

[    Recognized as an Law Enforcement Training and Use of Force Expert in State, Federal Courts and Arbitration Hearings.

## PROFESSIONAL MEMBERSHIPS

[    Charter Member, American Society for Law Enforcement Training (ASLET)

[    Charter Member, International Law Enforcement Educators and Trainers Association (ILEETA)

[    Member, International Association of Law Enforcement Firearms Instructors

[    Member, National Rifle Association

[    Member, Armed Citizen Defense Network

[    Member, Police Writers Association

## COMMUNITY ACTIVITIES

[    D.A.R.E. concert performances in New York State as a musician with the band *Lightning*, 1991-1998

[    D.A.R.E. concert performances in New York State as a musician with the band *Rochester Brass & Electric*, 1998-present

[    Monroe County Probation Officer Association Seminar Presenter, 2001 & 2004

[    Women's Self Defense Workshops, Monroe Community College, 2003-2004

[    October, 2005 – Presenter, Florida Criminal Justice Standards and Training Commission Instructor's Conference – "Extraordinary Instructors."

[   April 2006 – Presenter, Greater Rochester Chapter American Society for
    Public       Administration    Seminar    –    "Program    Development,"

[   Community College Citizen Preparedness Programs (FEMA) ongoing since
    January 2010

[   April 2011 – Presenter, Enough is Enough School Violence Presentations,
    Monroe Community College

## REFERENCES

Director John Perrone
Homeland Security Management Institute
1190 Scottsville Rd.
Rochester, New York  14624
585.753.3920 or email:  jperrone@monroecc.edu

Marie D'Amico
Deputy County Attorney
33 N. Fitzhugh St.
Rochester, NY  14614
585.753.1468 or email: marie.d'amico@dfa.state.ny.us

Edward Nowicki
Director International Law Enforcement Educators and Trainers Association
P.O. Box 1003
Twin Lakes, WI  USA  53181-1003
262.279.7879 or email at ed@ileeta.org

David Monk
Program Coordinator of In-Service Training
Public Safety Training Facility of Monroe Community College
1190 Scottsville Rd.
Rochester, New York  14624
585.753.3716 or email: dmonk@monroecc.edu

Frank Colaprete, Ed.D.
43 Collenton Drive
Rochester, New York 14626
585.368.9436 or email at colapre1@rochester.rr.com

Lieutenant Charles Loray
Rochester Police Department Special Events Unit
185 Exchange Street
Rochester, New York  14614
585.428.7209 or email: cl0424@cityofrochester.gov

## Guy Rossi Expert Trial and Deposition
### Testimony

I have testified as an expert at a trial and deposition in the past; most recently in

Federal Court
     Emon Dawkins vs. City of Utica – (for defendants)
     Newland, et al. v. County of Monroe (for defendants)
     Brozak V. County of Monroe, NY (for defendants)

State Court (Criminal)
     People v. Dowdell (Monroe County) (for prosecution)
     People v. Jerry Laramay (for defendant)

State Civil
     Brozak v. County of Monroe

Pending Cases --- Federal
     Homer v. Village of
     Avon
     Martin v. Town of
     Colonie
     Cochran v. Town of
     Colonie

Deposed
     9th District Amicus Brief (2011)
     Recognized as an expert and assisted in the research and writing of Peruta v.
     City of San Diego

     New York State Rifle and Pistol Association et. al. v. Andrew Cuomo
     (NYS SAFE ACT)

     Shew v. Malloy (CT)

## Attorneys of Reference

Teodoro X. Siguenza Esq.
Major Felony Bureau
Monroe County District Attorney's Office
47 South Fitzhugh Street
Rochester, NY 14614 (585)
753---4588
TSiguenza@monroecounty.gov

Edwin J. Tobin, Esq.
MAYNARD, O'CONNOR, SMITH & CATALINOTTO, LLP
6 Tower Place • Albany, NY • 12203
Tel: 518---465---3553
Fax: 518---465---5845
tobin@maynardoconnorlaw.com

Sean Hanna, Esq. (Assemblyman)
3045 E. Henrietta Rd.
Rochester, NY (585) 334-
--5210
hannaforassembly@gmail.com

Gerald E. O'Connor, Esq.
665 Main St # 400
Buffalo, NY 14203---1425
Gerard.O'Connor@selective.com

Brian P. Barrett, Esq.
72 Olympic Drive
Lake Placid, New York  12946
(518)523---1555
brian@bpbarrett.com

Emil M. Rossi, Esq.
The Hamilton White House
307 South Townsend Street,
Syracuse, NY 13202
(315) 471---0126
EMR@Rossi---Law---Office.com

Lawrence J. Andolina
2 State Street Suite 1000
Rochester, NY 14614 (585)
454---2181
landolina@trevettetal.com