Exhibit 16

to

Plaintiffs' Cross-Motion for Summary Judgment

and

Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Shawn J. Tardy, et al. vs.*
*Martin J. O'Malley, et al.*

---

*Dalaine Brady*
*Vol. 1*
*February 6, 2014*

---

*Gore Brothers Reporting & Videoconferencing*
*20 South Charles Street, Suite 901*
*Baltimore, MD 21201*
*410-837-3027*
*www.gorebrothers.com*



Reporting & Videoconferencing

Since 1961 - Serving MD, DC & VA - Worldwide

Min-U-Script® with Word Index

Q Captain Brady, let me invite your attention to DEF000139. And this is one of the series of e-mails that we received from defendant Maryland State Police. And the series that was numbered DEF112 through DEF164 appear to be e-mails from William Rasinski.

And Page 139 of these appear to be a February 11, 2013 e-mail from Corporal Rasinski to Jack Guns at Atlanticbb.net in which it states, "We leave the burden or being able to verbalize or verify that an AR-15 is an H-BAR upon the dealer, whether it is documentation, or the gun is marked. As long as you are comfortable that it is an H-BAR, and you are able to show the documentation, we don't need paperwork."

Can you tell me what this means in terms of the Maryland State Police's policy in reaching conclusions about whether a particular firearm is a copy of an enumerated firearm or an H-BAR that is not?

A So it's come to -- I've come to learn that the -- first off, the Colt AR-15 is the Colt AR-15 since it is predominantly the weapon of choice amongst a lot of the clients that we service. AR has come to

1  be the slang.  So with regard to the AR, I suspect it
2  means an AR style.
3              I know that the department does not have a
4  definition of H-BAR or heavy barrel.  And it appears
5  that Jack's Guns is a gun dealer.  So, initially, as I
6  read it, it appears that Rasinski is doing what he
7  should be doing, in that the dealer is in the best
8  position to make determinations as to whether or not a
9  gun is either on the enumerated list, is banned and
10 able to be sold.
11             My understanding, also, is that the Colt
12 stamps its barrel.  And it may be some sort of
13 proprietary business practice.  I believe I understand
14 others do, but not every heavy barrel is actually
15 stamped.  But like we can find information pretty
16 easily by manufacturers' Websites.  They will say on
17 the Website that the weapon is heavy barrel.
18             And so he's trying to, in my estimation
19 from this e-mail, provide for the dealer a way that he
20 can make this determination based on good standard
21 practice of the department.

44

1  similar to this where H-BAR has been asked and the
2  response is similar, whether or not it is stamped or
3  you find the manufacturer claiming it to be.
4      Q      Has the Maryland State Police considered
5  creating a long gun registry akin to the handgun
6  roster?
7      A      I'm not quite sure how to respond because I
8  don't know what the question is. I'm not fully
9  familiar with all the functional duties and
10 responsibilities of the Handgun Roster Board. I know
11 that it exists in statute and someone else runs it.
12 And I generally understand their function. So I
13 couldn't answer because I don't know what their scope
14 of duties are.
15     Q      Let me ask you another question.
16     A      Okay.
17     Q      Has the Maryland State Police, to your
18 knowledge, considered creating a list of long guns that
19 are approved for sale in Maryland?
20     A      The state police is considering publishing
21 the list of the weapons that they have been -- that

1  they have been asked to make a determination about
2  whether or not it believes they are copies of
3  enumerated weapons. To include the list of enumerated
4  weapons, which we put out to dealers quite frequently.
5  Just typically a cut and paste of the LexisNexis link.
6    Q    All right. If we can turn back for a
7  moment to Exhibit 2, which is the interrogatory answers
8  of the Maryland State Police. And if I may invite your
9  attention to Interrogatory 9 and the answer to
10 Interrogatory 9. I'll give you a moment there if you
11 could read that for me, please.
12    A    What page is it on, sir.
13    Q    It is on 15 and runs over to the top of
14 Page 16. And it's interrogatory 9.
15    MR. FADER: Are you asking her to read
16 that, do you mean out loud or to herself?
17    MR. SWEENEY: Oh, to herself, please. I
18 just want to make sure she has it clearly in mind
19 before I ask any other questions.
20    A    I've read it.
21    Q    This answer to Interrogatory 9 lists a

1    A    Yes.

2    Q    Have you had an opportunity to review that
3 now?

4    A    I have.

5    Q    Great. Let's start with the Saiga shotgun.
6 Do you know what particular model or models of Saiga
7 shotguns were considered to be copies of regulated
8 firearms at one point?

9    A    Particular models, I do not.

10    Q    All right. And of what enumerated firearms
11 were they considered to be copies?

12    A    I believe it was the AR-15, but I would be
13 guessing. I do know that prior to 2010 the department
14 had that singular view when it would consider whether
15 or not a weapon was a copy of an enumerated weapon.
16 And that was just simply based on cosmetics. The Saiga
17 was one of those that was reconsidered after the 2010
18 guidance that we received from counsel.

19    Q    Okay.

20    A    I now know the status of the Saiga is that
21 it is not banned because it is neither a semiautomatic

1 rife and, therefore, doesn't have the internal
2 components. And it is neither a Copycat 4 because it
3 does not have a folding stock. It is also not a
4 Copycat 5 because it does not have a revolving
5 cylinder. And I'm not sure if that encompasses many
6 models or a model.
7     Q    All right. So just to be clear that I
8 understand what I think I heard you just say. In 2010
9 counsel provided some guidance to the Maryland State
10 Police. Pursuant to that guidance certain prior
11 conclusions were reviewed.
12     One of them was the prior conclusion that
13 the Saiga shotgun was a copy of an enumerated firearm.
14 Pursuant to that subsequent review, the Maryland State
15 Police concluded that the Saiga shotgun or model or
16 models involved, were, in fact, not copies of the
17 enumerated firearm, correct?
18     A    Yes, sir.
19     Q    And is -- and we'll look at it in a little
20 more detail in a moment, but generally speaking -- and
21 the difference was that prior to 2010, the Maryland

53

1  State Police made such determinations, based upon
2  cosmetic similarity, and then that standard changed in
3  2010 pursuant to guidance from counsel.  Am I correct
4  in understanding your response in that regard?
5       A       With regard to the Saiga, yes, sir.
6       Q       All right.
7               MR. FADER:  And, John, I just want to make
8  it clear when she's talking about guidance from
9  counsel, it's a reference to the Attorney General
10 opinion that was made public.
11              THE WITNESS:  That's correct.
12              MR. SWEENEY:  Yes.  I have it and we'll
13 talk about that.  Thank you.
14      Q       And do you know who was responsible for the
15 subsequent review of the prior conclusion of Saiga
16 shotgun in 2010 or after 2010 that resulted in a change
17 in position?  Who were the individuals?
18      A       Corporal Edwards, and I believe he did
19 defer.  I'm going to say with Rasinski, but it could,
20 in fact -- I'm not sure who came first, but I know
21 Edwards was the one who reviewed the Saiga again.  Made

1  the decision.
2              (Brady Exhibit 6 and 7 were marked for
3  purposes of identification.)
4      Q      Captain Brady, I've marked as Exhibit 6 and
5  handed you a document that is dated May 24th, 2010 from
6  a number of lawyers in the Office of the Attorney
7  General, including Mark Bowen and signed by Douglas
8  Gansler.  Is that the guidance from counsel that you
9  referred to a moment ago in your testimony?
10     A      Yes, sir.
11     Q      And do you know what gave rise to this
12 guidance being issued by the attorney general?
13     A      Yes, sir.  I believe that was the .22 rim
14 fire.
15             (The reporter asked for clarification.)
16     A      .22 rim fire.
17             (Brady Exhibit 8 was marked for purposes of
18 identification.)
19     Q      Captain Brady -- Brady, may I direct your
20 attention to what I have marked as Exhibit 8, which
21 appears to be an October 7th, 2009 letter from Laura

1  Herman, captain and commander of the Licensing Division
2  of Maryland State Police, to John H. Josselyn.
3  J-O-S-S-E-L-Y-N. Reference .22 caliber rifles. Is
4  this relating to the .22 rim fire issue that you just
5  alluded to?
6      A    It is, sir.
7      Q    And have you seen this letter previously?
8      A    I have.
9      Q    And is Captain Herman one of your
10 predecessors?
11     A    She is.
12     Q    Okay. And am I correct in understanding
13 from this letter that at the time of the letter it was
14 the conclusion of the Maryland State Police that .22
15 caliber rifles cosmetically similar to regulated long
16 guns would be considered copies? Am I correct?
17     A    You are.
18     Q    All right. And did there come a time when
19 the Maryland State Police requested guidance of counsel
20 on that position?
21     A    Yes, sir.

1  Q    And what led to that request for guidance?

2  A    I would say that this is a great example of
3  what led to it. When clearly the department's eye was
4  on the cosmetic of a weapon and not the function of the
5  weapon.

6  Q    Do you know what -- precisely which of the
7  enumerated firearms the German sport gun GSG5 rim fire
8  target rifle involved in Exhibit 8 was considered to be
9  a copy of?

10  A    I do not.

11        (Brady Exhibit 9 was marked for purposes of
12  identification.)

13  Q    Captain Brady, let me show you what we have
14  marked as Exhibit 9. And that appears to be a document
15  dated November 4th, 2010 signed by Lieutenant Donald
16  Harrison, Commander, Licensing Division Maryland State
17  Police. And it's designated Firearms Bulletin 10-1.
18  And are you familiar with this document?

19  A    I am, sir.

20  Q    And can you tell me how this document came
21  to be issued?

1   A   So based off of the guidance that we
2   received from the Attorney General, the department was
3   able to clarify, modify, and put on the record its --
4   beginning of its policy for when it considers whether
5   or not a weapon is or is not a copy.

6   And, clearly, he notes that alone the
7   cosmetic -- the cosmetics cannot alone make that
8   determination.

9   Q   All right. And reading from the third
10  paragraph, it states, "Therefore, the Maryland State
11  Police firearms registration section will no longer
12  require an individual to complete an application to
13  purchase a regulated firearm (MSP787 RD-16, 77RD-2,
14  77R-3) for a semiautomatic .22 caliber rim fire rifle
15  that is only cosmetically similar to an assault
16  weapon." Have I read that correctly?

17  A   Yes, sir.

18  Q   And that is the Maryland State Police's
19  policy today, correct?

20  A   Well, today, sir, they are banned. The --
21  the weapons. So this would be talking about -- well,

1  the .22 is not, but the paragraph is no longer accurate
2  in that there is no more doing a 77. Those list of
3  weapons were regulated at the time.
4      Q    You -- you --
5      A    But you would not do one.
6      Q    You anticipated my next question.
7      A    I'm sorry.
8      Q    So let me -- no, that's fine. That's fine.
9  So let me go there. Presently there is no requirement
10 that anyone purchasing a semiautomatic .22 caliber rim
11 fire rifle, cosmetically similar to an enumerated
12 firearm, register it by filling out an application to
13 purchase a regulated firearm, correct?
14     A    Correct.
15     Q    All right. And it is not banned, so that
16 the citizens of Maryland can purchase semiautomatic .22
17 caliber rim fire rifles that are cosmetically similar
18 to an enumerated firearm, correct?
19     A    Yes, sir.
20     Q    All right. And am I correct in
21 understanding that none of the enumerated firearms are

```
                                                              59
1    .22 caliber?
2         A      That's correct.
3         Q      And that, therefore, because they are
4    not -- because the .22 caliber rim fire rifle does not
5    have functionally interchangeable parts, it would be
6    not considered a copy of an enumerated firearm and thus
7    banned, correct?
8         A      Yes, sir.
9         Q      All right.  If Bushmaster were to
10   manufacture a .22 caliber rim fire rifle
11   cosmetically -- stop there -- cosmetically similar to
12   an enumerated firearm, would it be banned in Maryland?
13        A      I would ask you if the weapon that you just
14   asked me about is a semiautomatic rifle?
15        Q      Yes.  Let's assume that for our
16   hypothetical.
17        A      Then, yes, sir, I believe it would be.
18        Q      And that is because the enumerated firearm
19   list includes Bushmaster semi auto rifles, correct?
20        A      I believe that's the standard.  Yes, sir
21   yes.
```

1   Q        Would a .22 caliber rim fire rifle variant
2  of an AK or AK-47 be banned in Maryland?
3           MR. FADER:  Objection.  Outside the scope
4  of the designation, but you can answer.
5   A        Would a .22 caliber rim fire be banned in
6  that it would be considered a copy of the AK47?
7   Q        If it were -- yes.  If it were cosmetically
8  similar to an AK or an AK-47, would that be banned?
9   A        No, sir.
10  Q        All right.  So -- just so I'm clear on
11 this, the only .22 caliber rim fire rifles that are
12 semiautomatic cosmetically similar to any of the
13 enumerated firearms that might be banned in Maryland at
14 this time would be anything manufactured by Bushmaster;
15 am I correct?
16          MR. FADER:  Objection.  You can answer, if
17 you know.
18  A        That would be my understanding.
19  Q        All right.  Thank you.  If we can turn our
20 attention back to --
21          MR. SWEENEY:  I forget what exhibit we

```
 1   guidance received by the Attorney General as to whether
 2   or not a particular firearm is a copy of an enumerated
 3   firearm?
 4       A     Yes, sir.
 5       Q     Okay.  And this Lieutenant Donald Harrison
 6   was your -- one of your predecessors as commander of
 7   the Licensing Division, correct?
 8       A     He was, sir.
 9       Q     All right.  Would you have the authority to
10   change this guidance?
11       A     I can create policy, yes, sir.
12       Q     All right.  And so would you be able to,
13   for instance, change the wording of the second
14   paragraph where it says, "Has completely
15   interchangeable internal components necessary for
16   the -- for the full operation and function" to say
17   something different?  Do you have the authority to do
18   that?
19       A     I believe to answer that question you have
20   to understand the authority to change policy for the
21   department.  While I could recommend change, it still
```