Exhibit 29

to

Plaintiffs' Cross-Motion for Summary Judgment

and

Opposition to Defendants' Motion for Summary Judgment

## Testimony in Support of SB 281 – Firearm Safety Act of 2013
### Maryland Senate Judicial Proceedings Committee

Daniel W. Webster, ScD, MPH
Professor and Director
Johns Hopkins Center for Gun Policy and Research[*]

Thank you, Chairman Frosh and members of the committee for allowing me to testify in support of Senate Bill 281, Firearm Safety Act of 2013. I am a professor with tenure at the Johns Hopkins University where I direct the Johns Hopkins Center for Gun Policy and Research. However, my testimony is offered by me individually, and does not represent the official position of the Johns Hopkins University. I have led numerous studies of gun violence and policies to prevent it for the past 23 years.

The proposed Firearm Safety Act of 2013 has several important provisions. I will focus most of my testimony on the provision to create a licensing system for purchasers of regulated firearms, but will also touch upon provisions to reduce ammunition capacity limits from more than 20 to more than 10 rounds, and require the reporting of events which trigger disqualification from legal firearm ownership on the basis of assessments of individuals' mental status and dangerousness to others.

Arguably, the most important objective of a state's gun laws is to prevent dangerous individuals from possessing firearms. Although Maryland has some useful laws to accomplish this task, the system is especially vulnerable to illegal straw purchases and individuals using false identification in their applications to purchase regulated firearms. A study conducted by the United States Government Accounting Office conducted tests on a random sample of gun stores and pawn shops listed in the yellow pages of local telephone directors in five states – Virginia, West Virginia, Montana, New Mexico, and Arizona – to determine the ease of using bogus identification cards (e.g., driver's licenses) to purchase firearms from licensed firearm dealers. All five states conform to minimum requirements of the Brady Act, relying on instant background checks, but do not require fingerprinting or waiting periods for firearms purchases. In none of the attempts to purchase firearms with a fake ID card did a gun dealer or employee of the gun shop question the validity of the ID card or fail to make the transaction. Based on their investigation, the GAO concluded that in the five states, "the instant background check does not positively identify purchasers of firearms," and that it "cannot ensure that the prospective purchaser is not a felon."

Although the GAO study did not investigate this, the casual scrutiny given to firearm sales applications suggest that the system could also be vulnerable to other deceptive practices of criminals and straw purchasers. For example, prospective purchasers could more easily put inaccurate information on their application forms such as using a slightly different spelling of a name or misrepresentation of a date of birth in order to avoid a denial of the application. Systems requiring firearm purchase applications be processed directly by law enforcement agencies – which I assume would be the case when the Secretary writes regulations to implement the statute - would result in fewer false applications for firearm purchases being processed and fewer guns in the wrong hands.

Thus, in addition to serving as a deterrent for illegal straw purchases, permit-to-purchase licensing and registration firearms laws could mitigate the potential negative consequences of negligent sales practices by gun dealers with more careful practices in screening firearms purchasers. A relatively

---

[*] Title and affiliation provided for identification purposes only. The opinions expressed are those of Dr. Webster and do not reflect any formal position for Johns Hopkins University.

1

small portion of gun dealers sell the majority of guns recovered by police from criminals and crime scenes (ATF, 2000). The wide disparity between licensed dealers and the number of guns that they sell that are later linked to crime is not fully explained by differences in sales volume, customer demographics, or even local crime rates (Wintemute, Cook & Wright, 2005). Undercover stings of licensed gun dealers conducted or instigated by the cities of Chicago, Detroit, and New York indicated that many were susceptible to facilitating illegal straw sales (Webster et al., 2006; Webster and Vernick, 2013). Federal investigations of gun trafficking indicate that straw purchasers and corrupt licensed dealers represent the most prominent channels for guns into the illegal market (Bureau of Alcohol, Tobacco and Firearms, 2000). Federal firearms sales laws have several weaknesses which make it difficult to curtail illegal straw purchases (Braga and Gagliardi, 2013; Vernick & Webster, 2013). For example, there is no specific statute making straw purchases illegal. When such cases are prosecuted, prosecutors usually must prove that the purchaser knowingly lied on the firearm sales application when certifying that the gun was not being purchased for someone else. Proving such intent at the point of retail sale can be very difficult.

Five states (Connecticut, Iowa, Massachusetts, New Jersey, and New York) and the District of Columbia require persons wishing to purchase handguns apply directly with a law enforcement agency and be photographed and fingerprinted. Missouri had such a system in place; however, the law was repealed on August 28, 2007. In a study which I led to assess the effects of the repeal of Missouri's permit-to-purchase licensing law, we used annual state-level data on crime guns recovered by police in Missouri and traced by the ATF during the period 2002 – 2011 to examine changes in a commonly-used indicator of illegal gun diversion, the number and proportion of guns with short sale-to-crime intervals – before and after the state repealed the law.

Immediately following the repeal of Missouri's permit-to-purchase licensing law, the share of guns recovered by Missouri police agencies that had an unusually short time interval from retail sale to crime indicative of trafficking more than doubled. Importantly, the sharp increase in short time-to-crime guns coincided with the length of time between the repeal of the law and a crime gun's recovery by police as depicted in Table 1 below. Crime guns with a sale-to-crime interval of less than three months increased from a pre-repeal stable mean of 2.9 percent to 4.5 percent in 2007 when the repeal was in effect for only four months, and then increased further to a mean of 8.4 percent for 2008 through 2011. Crime guns with sale-to-crime intervals of 3-12 months increased sharply beginning in 2008 from a pre-repeal mean of 5.9 percent to 13.9 percent for 2008-2011 when all such guns were purchased after the law's repeal. Following this same pattern of increases in the proportion of crime guns sold following the repeal of Missouri's permit-to-purchase law, the percentage of crime guns recovered one to two years after retail sale increase beginning in 2009 from a mean of 6.4 percent to 12.8 percent during 2009-2011. The sharp increase in very short sale-to-crime intervals for guns in Missouri cannot be explained away as being part of a national trend toward shorter time-to-crime guns. In fact, it is in direct conflict with national trends; the average sale-to-crime interval for the U.S. increased from 10.2 years in 2006 to 11.2 years in 2011.

My colleagues and I are beginning a study of the effects of Missouri's repeal of its permit-to-purchase licensing system on violent crime. Preliminary evidence suggests that the increase in the diversion of guns to criminals linked to the law's repeal may have translated into increases in homicides committed with firearms. From 1999 through 2007, Missouri's age-adjusted homicide rate fluctuated around a mean of 4.66 per 100,000 population per year then increased to a mean rate of 5.82 for the years 2008-2010, an increase of 25%. This increase was out of synch with changes in age-adjusted homicide rates nationally which decreased 10%[†] and

---

[†] Annual age-adjusted firearm homicide rates in the U.S. averaged 4.03 during 1999-2007 and 3.81 for 2008-2010.

with other states in the Midwest which declined by 5%.† States that currently have permit-to-purchase licensing requiring prospective purchasers to apply directly with a law enforcement agency have some of the lowest age-adjusted firearm mortality rates per 100,000 population in the nation for the period 2006-2010 – Connecticut 5.1, Iowa 6.3, Massachusetts 3.5, New Jersey 5.2, and New York 5.0 – compared with the overall rate for the nation of 9.5 (Centers for Disease Control and Prevention, 2013).

Table 1. Percentage of Missouri crime guns with short time intervals between retail sale and recovery by police for years 2002 – 2011.

| Year | up to 3 months | 3-12 months | 1-2 years | First sold in Missouri |
|---|---|---|---|---|
| 2002 | 2.9% | 5.2% | 5.2% | 54.9% |
| 2003 | 3.2% | 5.3% | 6.1% | 55.9% |
| 2004 | 2.1% | 5.6% | 5.7% | 55.6% |
| 2005 | 3.3% | 5.1% | 6.6% | 55.0% |
| 2006 | 3.2% | 7.5% | 7.2% | 56.4% |
| 2007 | 4.5% | 7.9% | 7.1% | 57.5% |
| 2008 | 9.4% | 12.6% | 6.7% | 62.5% |
| 2009 | 8.1% | 15.0% | 12.7% | 65.9% |
| 2010 | 7.6% | 13.7% | 13.0% | 67.8% |
| 2011 | 8.5% | 14.3% | 12.7% | 70.8% |

States with stricter gun sales laws tend to attract guns originating in states with weaker gun laws, resulting in proportionately fewer crime guns being sold by in-state gun dealers (Cook & Braga, 2003; Webster, Vernick, & Hepburn, 2001). This is likely to be due to a relative scarcity of guns to criminals in states with more comprehensive gun sales regulations which drives up the price and attracts suppliers from states with weaker gun laws. As can be seen in the last column in Table 1, following the repeal of Missouri's purchase permit law requiring handgun purchasers to obtain licenses from local sheriff's who would photograph and fingerprint applicants, the percentage of crime guns that had been sold by in-state gun dealers increases from 55.6 percent when the law was in place to 70.8 percent by 2011. This is a significant change for an indicator that tends to change very little over time in most states.

In a prior study that I led which used crime gun trace data for 25 U.S. cities compared the percentage of crime guns that were originally sold by a licensed retail gun seller inside the state versus outside the state was significantly lower in the cities located in states with permit-to-purchase licensing and handgun registration (33.7%), the same firearm sales regulations used by the District of Columbia, than in states with that had neither of those laws (84.2%). One of the cities with permit-to-purchase licensing and handgun registration (Detroit, MI), had a higher percentage of its crime guns originating from within state (47.5%) than the average in the other cities (22.8%), and Michigan did not require purchase applicants to be fingerprinted and photographed by law enforcement agencies. Little of this gross discrepancy between cities in states with purchase licensing and registration made directly at a law enforcement agencies could

---

† Firearm homicide rates in states in the Midwest other than Missouri averaged 3.52 during 1999-2007 and 3.33 for 2008-2010.

be explained by potential confounders (out-of-state population living in within close proximity, out-of-state population living in close proximity with weak gun laws, migration from other states, and percentage of guns recovered in drug crimes). Controlling for the prevalence of gun ownership in the state did reduce the effect of having permit-to-purchase licensing and registration; but the effect remained very strong and highly significant. Further, the proportion of crime guns coming from within the state was correlated with another indicator of criminal gun availability – the percentage of homicides committed with firearms (Webster, Vernick, and Hepburn, 2001).

A subsequent study that I led which used crime gun trace data from 53 U.S. cities for the years 2000-2002 examined the association between state gun sales regulations and the diversion of guns to criminals (Webster et al., 2009). Discretionary permit-to-purchase licensing was independently associated with lower levels of diversion of guns sold by in-state dealers.

More recently, I led a study which examined cross-sectional associations between a number of state gun sales laws and the per capita rate at which states export guns to criminals across state lines across the 48 contiguous U.S. states. Three variations of permit-to-purchase licensing laws were examined – 1) discretionary PTP laws which give law enforcement the discretion to refuse to issue permits as well as fingerprinting of applicants by law enforcement agencies; 2) PTP with fingerprinting which require applicants to appear at the law enforcement agency issuing the permits to be photographed and fingerprinted; and 3) non-discretionary PTP laws which require a permit to purchase a firearm but do not require applicants to go to agencies to be fingerprinted. Our analyses controlled for key confounders including the prevalence of gun ownership, out-of-state population migration, the number of people living near the border of states with strong gun laws, and whether a state bordered Mexico or Canada. Data on crime gun exports were obtained from the 2009 state-level crime gun trace data posted on the ATF's website. The three states that exported the fewest crime guns per capita were New York (2.7 per 100,000 population), New Jersey (2.8), and Massachusetts (3.7) had handgun registries and permit-to-purchase licensing. Data from the regression analysis found statistically significant lower per capita export of crime guns across state borders for discretionary PTP laws (lowered rate of exporting crime guns by 76% compared with states that did not have these laws) and non-discretionary PTP laws requiring fingerprinting at a law enforcement agency (lowered crime gun export rates 45%). Handgun registry laws were too highly correlated with permit-to-purchase licensing to include in the statistical model. Several other gun sales laws regulations were associated with reduced cross-state diversion of guns to criminals including regulation of private sales of handguns, junk gun bans, and laws requiring gun owners to report lost or stolen firearms (Webster et al., 2013).

The Firearm Safety Act of 2013 would improve current policies designed to keep firearms from the severely mentally ill who pose a danger to others, particularly if they were to possess firearms. SB 281 would improve our state's ability to identify through our background check system those who are prohibited from possessing firearms due to severe mental illness. A recent study evaluated a policy in Connecticut which improved that state's ability to identify and screen out those who were prohibited from possessing firearms due to mental illness through their handgun purchaser licensing system and found that prohibited individuals who were identifiable by their background check system as a result of the policy change committed violent

crimes at a significantly lower rate than was the case before the policy was implemented (Swanson et al, 2013).

Assault weapons and other firearms with large capacity ammunition feeding devices are commonly used in mass shootings and the greater the ammunition capacity of the firearm used in a mass shooting, the more victims were injured or killed by gunfire (Roth and Koper, 1997). By reducing the maximum capacity of ammunition feeding devices for semi-automatic firearms from more than 20 to more than 10, the Firearms Safety Act of 2013 may reduce the number of victims wounded or killed in mass shootings or other events in which a criminal assailant fires a large number of rounds. Incidents in which a law-abiding citizen would need and be able to use a firearm that could hold more than ten rounds of ammunitions are likely to be extremely rare. A study of 198 home invasion crimes in Atlanta, Georgia – a city where gun ownership likely to be quite high – found that residents attempted to use a firearm in self-defense in only three (1.5%) cases (Kellermann et al, 1995).

## References Cited

Bureau of Alcohol, Tobacco and Firearms (ATF). 2000. *Following the Gun.* Washington, D.C.: U.S. Department of the Treasury.

Bureau of Alcohol, Tobacco and Firearms (ATF). 2002. *Crime Gun Trace Reports (2000): The Youth Crime Gun Interdiction Initiative.* Washington, D.C.: U.S. Department of the Treasury.

Centers for Disease Control and Prevention, 2013. WISQARS Fatal Injury Reports, 1999-2010, for National, Regional, and States. Accessed February 5, 2013.

Kellermann, Arthur L, Westphal L, Fischer L, Harvard B. 1995. Weapon involvement in home invasion crimes. *JAMA.* 273(22):1759-62.

Roth JA, Koper CS. 1997. Appendix A in *Impact Evaluation of the Public Safety and Recreational Firearm Use Protection Act of 1994.* Urban Institute: Washington, DC.

Webster, Daniel W., Jon S. Vernick, and Lisa M. Hepburn. 2001. "The Relationship Between Licensing, Registration and Other State Gun Sales Laws and the Source State of Crime Guns." *Injury Prevention* 7: 184-189.

Webster, Daniel W., Jon S. Vernick, and Maria T. Bulzacchelli. 2009. "Effects of State-Level Firearm Seller Accountability Policies on Firearms Trafficking." *Journal of Urban Health* 86: 525-537.

Webster, Daniel W. and Jon S. Vernick. 2013 "Spurring Responsible Firearms Sales Practices through Litigation: The Impact of New York City's Lawsuits Against Gun Dealers on Interstate Gun Trafficking" In *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis,* Daniel W. Webster and Jon S. Vernick, Eds. Baltimore, MD: Johns Hopkins University Press.

Webster Daniel W., Jon S. Vernick, Emma E. McGinty, and Ted Alcorn. 2013 "Preventing the Diversion of Guns to Criminals through Effective Firearm Sales Laws." In *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis,* Daniel W. Webster and Jon S. Vernick, Eds. Baltimore, MD: Johns Hopkins University Press.

DEF001054

Wintemute, Garen J., Philip J. Cook, Mona A Wright. (2005) Risk factors among handgun retailers for frequent and disproportionate sales of guns used in violent and firearm related crimes. *Injury Prevention* 11:357-363.