IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| STEPHEN V. KOLBE, et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 1:13-cv-02841-CCB |
| | ) | |
| v. | ) | |
| | ) | |
| MARTIN J. O'MALLEY, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' REPLY MEMORANDUM TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Stephen V. Kolbe, Andrew C. Turner, Wink's Sporting Goods, Atlantic Guns, Inc. and association Plaintiffs Associated Gun Clubs of Baltimore, Inc., Maryland Shall Issue, Inc., Maryland State Rifle and Pistol Association, Inc., National Shooting Sports Foundation, Inc., and Maryland Licensed Firearms Dealers Association, Inc. (collectively, "Plaintiffs") submit this Reply Memorandum to Defendants' Opposition to Plaintiffs' Cross-Motion for Summary Judgment.

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney (Bar No. 08761)
T. Sky Woodward (Bar No. 10823)
James W. Porter, III (Admitted *pro hac vice*)
Marc A. Nardone (Bar No. 18811)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
P (202) 719-8216
JSweeney@babc.com
*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION .............................................................................................................................. 1

ARGUMENT ....................................................................................................................................... 3

      I.     THE MATERIAL FACTS IDENTIFIED BY DEFENDANTS ARE NOT DISPUTED BUT RATHER DEMAND SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS.... 3

           A.     The Banned Firearms Are Commonly Possessed by Law-abiding, Responsible Citizens. ...................................................................................................................... 3

           B.     The Banned Firearms Are Kept for Lawful Purposes. ........................................... 5

           C.     The Banned Firearms Are Not More Dangerous. .................................................... 7

           D.     Firearm Bans Are Not Effective. .............................................................................. 8

      II.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT UNDER THE SECOND AMENDMENT............................................................................................................... 13

           A.     The Bans Burden Second Amendment Rights.................................................... 13

           B.     The Bans Violate the Second Amendment. ......................................................... 16

           C.     The Bans Cannot Survive Strict Scrutiny. ........................................................... 17

           D.     The Bans Fail Even Under Intermediate Scrutiny. .............................................. 18

      III.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR EQUAL PROTECTION CLAIM................................................................................................... 24

      IV.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR DUE PROCESS CLAIMS. .......................................................................................................... 25

CONCLUSION.................................................................................................................................. 25

TABLE OF EXHIBITS TO PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT ....................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*Cory v. Whisman, Grygiel & Giordano, P.A.*,
No. WMN-06-2694, 2012 U.S. Dist. LEXIS 64334 (D. Md. May 8, 2012) ......................... 15, 20

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................................................ 1, 14, 16, 17

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ............................................................................................. 14

*Fitzgerald v. Manning*,
679 F.2d 341 (4th Cir. 1982) ............................................................................................. 13

*Fleming v. Livingston County*,
No. 08-cv-1174 2011 U.S. Dist. LEXIS 44745 (C.D. Ill. April 26, 2011) ................................. 15

*Fyock v. City of Sunnyvale*,
No. C-13-5807-RMW, 2014 U.S. Dist. LEXIS 29722 (N.D. Cal. March 5, 2014) ............ 4, 6, 13

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ......................................................................................................... 25

*Hathaway v. Bazany*,
507 F.3d 312 (5th Cir. 2007) ............................................................................................. 9

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ............................................................................... 4, 6, 13, 21

*House v. Mayo*,
324 U.S. 42 (1945) ........................................................................................................... 16

*Hughes v. Oklahoma*,
441 U.S. 322 (1979) ......................................................................................................... 19

*Hutchins v. D.C.*,
188 F.3d 531 (D.C. Cir. 1999) ........................................................................................... 19

*McLean v. 988011 Ontario, Ltd.*,
224 F.3d 797 (6th Cir. 2000) ............................................................................................. 10

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
No. 13-cv-291S, 2013 U.S. Dist. LEXIS 182307 (W.D. N.Y. Dec. 31, 2013) ................... 5, 6, 14

*Rothe Dev. Corp v. Department of Defense*,
　　413 F.3d 1327 (Fed. Cir. 2005)...................................................................................... 18

*San Francisco Veteran Police Officers Ass'n v. City & County of San Francisco*,
　　No. C-13-05351-WHA, 2014 U.S. Dist. LEXIS 21370 (N.D. Cal. Feb. 19, 2014) ............ 4, 6, 14

*Shew v. Malloy*,
　　No. 3:13CV739(AVC), 2014 U.S. Dist. LEXIS 11339 (D. Conn. Jan. 30, 2014) .............. 4, 6, 14

*Turner Broadcasting Systems, Inc. v. FCC*,
　　512 U.S. 622 (1994)....................................................................................................... 19

*United States v. Chester*,
　　628 F.3d 673 (4th Cir. 2010) ......................................................................................... 18

*United States v. Cone*,
　　714 F.3d 197 (4th Cir. 2013) ......................................................................................... 15

*United States v. Masciandaro*,
　　638 F.3d 458 (4th Cir. 2011) ...................................................................................... 1, 18

*Woollard v. Gallagher*,
　　712 F.3d 865 (4th Cir. 2013) ......................................................................................... 18

**Statutes**

Md. Code Ann. Crim. L. § 4-301(b).................................................................................... 5

Md. Code Ann. Pub. Saf. § 5-101(h)(1)(ii) ......................................................................... 5

Md. Code Ann. Pub. Saf. § 5-101(r)(2)(ii) .......................................................................... 5

**Other Authorities**

Fed. R. Civ. P. 26 ............................................................................................................. 15

Fed. R. Civ. P. 26(a) ........................................................................................................ 15

Fed. R. Civ. P. 26(e) ................................................................................................... 15, 20

Fed. R. Civ. P. 37(c)(1)..................................................................................................... 15

Fed. R. Evid. 702 .............................................................................................................. 9

Fed. R. Evid. 702 (b) .................................................................................................... 9, 10

*How to Build An AR-15 Lower Receiver: A Step-by-Step Visual Guide*, THE NEW RIFLEMAN,
      http://www.thenewrifleman.com/how-to-build-a-lower-receiver/ (last visited April 28, 2014) .... 5

Joseph Blocher, *Good Cause Requirements for Carrying Guns in Public*, 127 Harv. L. Rev. F. 218
      (2014) ...................................................................................................................................... 6

**INTRODUCTION**

Controlling precedent dictates that this case turns on whether the popular firearms and magazines banned by the challenged laws are commonly possessed by law-abiding, responsible citizens for lawful purposes. Because that is the only conclusion that can be drawn from the undisputed facts, Plaintiffs are entitled to summary judgment as a matter of law.

The Supreme Court expressly rejected the application of any interest balancing test to the exercise of Second Amendment rights in *Heller* because the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). The Supreme Court further noted that a prohibition on commonly possessed firearms would fail any standard of scrutiny for similar constitutional rights. *Id.* at 628-29 ("Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to 'keep' and use for protection of one's home and family,' . . . would fail constitutional muster."). Defendants urge this Court to engage in exactly the policy-driven, interest balancing test rejected by the Supreme Court.

If this Court turns away from the Supreme Court's teachings, Fourth Circuit precedent requires that strict scrutiny be applied. In *United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011), the Fourth Circuit held that, "there now exists a clearly-defined fundamental right to possess firearms for self-defense within the home," 638 F.3d at 467, such that "we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *Id*. at 470. Because Defendants have not even attempted to carry their burden to establish that the Act is narrowly tailored to achieve a compelling government interest (nor could they on this record),

Plaintiffs are entitled to summary judgment. Finally, if this Court ignores the guidance of the Fourth Circuit and employs intermediate scrutiny, Plaintiffs are still entitled to summary judgment because the Defendants have failed to adduce substantial evidence before the Maryland General Assembly sufficient to meet their burden under the Second Amendment.

In apparent recognition of the weakness of their evidentiary record, Defendants have resorted to a number of last-ditch evidentiary ploys. Defendants have manufactured misleading evidence purporting to negate Plaintiffs' proof that limited capacity magazines are not readily available in Maryland. Defendants have crafted supplemental declarations for their expert witnesses that are contradicted by earlier sworn deposition testimony of those same declarants. Defendants rely on evidence that they failed to disclose until their opposition brief on summary judgment. All of this evidence should be disregarded by the Court.

The undisputed facts also show that Plaintiffs are entitled to summary judgment on their Equal Protection claims. There is no material difference between Plaintiffs and retired law enforcement officers; no legitimate interest has been advanced for permitting retired law enforcement officers to exercise Second Amendment rights that are denied to the general public, including Plaintiffs. Because this special treatment is unconstitutional, and because the General Assembly indisputably intended retired law enforcement officers to have Second Amendment rights otherwise denied Maryland citizens, these bans must be severed from the Act and struck in their entirety.

Plaintiffs also are entitled to summary judgment on their Due Process claims. Defendant Maryland State Police's ("MSP") recent actions confirm that its shifting standards are unconstitutionally vague and will lead inevitably to arbitrary enforcement.

## ARGUMENT

**I.    THE MATERIAL FACTS IDENTIFIED BY DEFENDANTS ARE NOT DISPUTED BUT RATHER DEMAND SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS.**

Defendants' identify relatively few disputes with the statement of facts set forth in Plaintiffs' Cross-Motion for Summary Judgment. Defendants' Reply Memorandum in Support of Motion for Summary Judgment and Response in Opposition to Plaintiffs' Cross-Motion for Summary Judgment ("Opposition"), ECF No. 62 at 45-48. The "disputes" identified by Defendants, however, are either imagined or are not material to Defendants' motion.

### A.    The Banned Firearms Are Commonly Possessed by Law-abiding, Responsible Citizens.

Defendants strive in vain to avoid the inescapable conclusion from their own evidence with respect to commonality. Defendants first take issue with Plaintiffs' estimation of the number of banned firearms in circulation. Opposition at 45-46. Defendants' assertion that the range of estimated numbers of banned firearms owned by citizens is a dispute of material fact fatally undermines their argument that numerosity is not the proper measuring stick for determining if a firearm is commonly possessed. Defendants thus have conceded that the number of banned firearms possessed by law-abiding citizens is material and abandoned their argument that the Court adopt some other test to determine commonality.

There is no dispute with regard to the truly material issue: whether the firearms are commonly possessed. Defendants expressly concede the point: "competitive marksmanship is the only use for which *there is evidence that possession is common*." Opposition at 47 (emphasis added). Thus, Defendants admit not only that there is evidence that the banned firearms are commonly possessed, but also that the banned firearms are commonly possessed for at least one lawful purpose.

Nevertheless, Defendants attempt to fabricate an issue of material fact by noting that their "expert" admitted that there are at least five million banned firearms in the United States, Opposition at 45, while Plaintiffs' expert estimates this number to be over 8 million. *Id*. For the Court's purposes here, the difference is immaterial, as Defendants acknowledge in accepting the range of both numbers. Whether 5 million or 8 million, the fact is that the banned firearms are commonly possessed. Indeed, this is the understanding under which the federal courts that have considered the issue have proceeded. *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011)("*Heller II*") (concluding the firearms and magazines at issue in that case "are indeed in common use" based on evidence that there were "1.6 million AR-15s . . . manufactured since 1986" and "18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000"); *Fyock v. City of Sunnyvale*, No. C-13-5807-RMW, 2014 U.S. Dist. LEXIS 29722 at *13 (N.D. Cal. March 5, 2014)("The Court finds that magazines having a capacity to accept more than ten rounds are in common use, and are therefore not dangerous and unusual."); *San Francisco Veteran Police Officers Ass'n v. City & County of San Francisco*, No. C-13-05351-WHA, 2014 U.S. Dist. LEXIS 21370 at *14-15 (N.D. Cal. Feb. 19, 2014)(applying intermediate scrutiny to analyze a ban on magazines based on a record that showed "a large number of such magazines have been made and sold"); *Shew v. Malloy,* No. 3:13CV739(AVC), 2014 U.S. Dist. LEXIS 11339 at *25-26 (D. Conn. Jan. 30, 2014) (finding that the firearms and magazines banned by Connecticut were in "common use" because "millions of Americans possess the firearms banned by this act for hunting and target shooting" and "millions of Americans commonly possess firearms that have magazines which hold more than ten cartridges"); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, No. 13-cv-291S, 2013 U.S. Dist. LEXIS 182307 at *33-34, 37 (W.D. N.Y.

Dec. 31, 2013) (assuming the firearms and magazines banned by New York were commonly possessed for lawful purposes based on the fact that "at least 3.97 million AR-15 type rifles have been manufactured in the United States for the commercial market" and noting that defendants conceded that magazines capable of holding more than ten rounds were commonly possessed for lawful purposes).

Defendants also make much of the fact that the sales of the banned firearms have been accelerating in recent years. This fact, however, establishes Plaintiffs' point: the banned firearms are commonly possessed by law-abiding citizens and have become more and more popular with those citizens since their introduction into the market. *See* Supp. Decl. of Dalaine Brady, Defendants' Exhibit 80, Ex. C (illustrating that transfers of the banned firearms have increased nearly every year on record after the expiration of the federal ban). The increasing sales figures merely illustrate exactly how popular they are. In 2013, the banned firearms represented 29.5% of the regulated firearms transferred in Maryland.[1] *Id*. Given that the banned firearms accounted for nearly a third of the share of all regulated firearms transferred in the most recent year (the remainder being handguns), there can be no dispute that the banned firearms are commonly possessed based on the information provided by Defendants.

**B.**     **The Banned Firearms Are Kept for Lawful Purposes.**

Defendants purport to dispute Plaintiffs' assertion that the banned firearms are kept for lawful purposes. Opposition at 47. From the outset, it is clear that Defendants do not actually dispute the fact

---

[1]      Defendants also attempt to exclude Type "O" firearms, which are frames and receivers of banned firearms, from their calculations. Opposition at 8. Defendants' position misleads the Court as to the nature of the banned firearms. Under Maryland law, the term "firearm" includes frames and receivers. Md. Code Ann. Pub. Saf. § 5-101(h)(1)(ii). Thus, the term "Regulated Firearm," as it is used in the Public Safety Article, also includes frames and receivers. Md. Code Ann. Pub. Saf. § 5-101(r)(2)(ii). Finally, because the Act bans the acquisition of "Assault Long Guns," which are the firearms listed in Section 5-101(r)(2)(ii) of the Public Safety Article, the banned firearms necessarily include the frames and receivers. Md. Code Ann. Crim. L. § 4-301(b). Frames and receivers are banned because a complete firearm can be assembled easily with stock parts from a frame or receiver, thus making a complete firearm. *E.g., How to Build An AR-15 Lower Receiver: A Step-by-Step Visual Guide*, THE NEW RIFLEMAN, http://www.thenewrifleman.com/how-to-build-a-lower-receiver/ (last visited April 28, 2014) (noting that an AR-15 lower can be assembled with a parts kit and tools from one's garage).

that the banned firearms are used for lawful purposes, given that they concede that they are used for both hunting and competitive marksmanship. *Id*.

Defendants' expert, Dr. Webster, conceded during his deposition that the banned firearms are possessed for self-defense. Dep. of Daniel Webster, Ex. 45 at 114-116. Defendants now claim that Dr. Webster was making an assumption, and that his opinion should be disregarded by the Court. Defendants cannot have it both ways. Dr. Webster testified at length about his knowledge of the banned firearms. Either he was able to testify competently on the utility of the banned firearms for lawful purposes, or else all of his opinions should be afforded no weight because he is not a credible witness with respect to the issues at hand. While Defendants wish to retract Dr. Webster's sworn testimony, his opinion should guide the Court here. The contrary conclusion advanced by Defendants notwithstanding their own expert's concession strains credulity. Federal courts that have considered the issue generally have concluded that the firearms are kept for lawful purposes. *Heller II*, 670 F.3d at 1261; *Fyock,* 2014 U.S. Dist. LEXIS 29722 at *13; *Shew,* 2014 U.S. Dist. LEXIS 11339 at *25-26; *N.Y. State Rifle & Pistol Ass'n,* 2013 U.S. Dist. LEXIS 182307 at *33-34, 37; *but see San Francisco Veteran Police Officers Association,* 2014 U.S. Dist. LEXIS 21370 at *14-15.

Defendants argue that the banned firearms are not kept for self-defense by noting that there are no reported instances of a citizen firing a banned firearm in self-defense in Maryland. Opposition at 4. This fact is not material to the issues of this case. In *Heller*, the Supreme Court declared void the ban on handgun possession without reference to any instances or statistics related to firing the firearms in self-defense in the District. Indeed, searching for such evidence would have been a futile exercise because handguns were banned; there could not have been any lawful discharges in self-defense. *See also* Joseph Blocher, *Good Cause Requirements for Carrying Guns in Public*, 127 Harv. L. Rev. F. 218 (2014)

("When a person purchases a gun for self-defense, he generally does not know whether he will have to use it for that purpose -- fortunately, the vast majority of gun owners never do. But in light of *Heller*, the rule cannot be that only those people who actually fire a gun in self-defense are validly exercising their Second Amendment rights."). Thus, the frequency with which the banned firearms are actually fired in self-defense is not a material fact. Citizens need not discharge their firearm in the defense of their home and family to demonstrate that the firearm is kept for that lawful purpose. The evidence establishes, and Defendants concede, that these firearms are commonly possessed by law-abiding, responsible citizens for lawful purposes.

###    C.    The Banned Firearms Are Not More Dangerous.

Defendants attempt to counter Plaintiffs' ballistics evidence, despite failing to produce even one expert in ballistics.[2] Opposition at 48. Defendants contend, "the fact that some other rounds may penetrate farther does not call into question the undisputed fact that rounds from the banned firearms pose risks once they penetrate walls and doors, which they indisputably do." Opposition at 10. If it is Defendants' intention to point out to the Court that the banned firearms pose no risk above and beyond that of any other firearm with respect to the ability of a projectile to pose a threat after penetrating a wall or door, then they have achieved their goal and Plaintiffs are in complete agreement. Any bullet that

---

[2]    Three of Defendants' experts expressly outright denied being ballistics experts. Dep. of Chief James Johnson, Ex. 48 at 54 ("I am not a ballistics expert."); Dep. of Dr. Christopher Koper, Ex. 46 at 58 (stating that he had some "general knowledge" in ballistics, but "I should hesitate to call myself an expert"); Dep. of Joseph Vince, Ex. 51 at 21 (stating, in response to whether he would consider himself a ballistic expert, "[n]o, sir, I would not"). Commissioner Anthony Batts testified that he was not an expert at all.  Dep. of Comm'n Anthony Batts, Ex. 52 at 6 (stating, in response to a question as to whether he was prepared to testify to the matters identified by Defendants in their disclosures, "Generally. I am not an expert, but generally, yes."). None of Defendants' other witnesses has purported to be a ballistics expert, nor are any qualified by education, training, or experience in ballistics. *See* Decl. of Col. Marcus Brown, Defendants' Ex. 2; Decl. of Deputy Chief Henry Stawinski, Defendants' Ex. 5; Decl. of Dr. Daniel Webster, Defendants' Ex. 6; Decl. of Lucy Allen, Defendants' Ex. 9; Decl. of Capt. Dalaine Brady, Defendants' Ex. 10; Decl. of Dr. Edward Cornwell, III, Defendants' Ex. 12.

penetrates a wall or door poses a risk to anything behind that wall or door. This tautology, however, does not establish that the banned firearms are somehow a *particular* danger because of this.

Defendants' second argument appears to be that even though the rounds of most firearms are capable of passing through a wall or door, the .223 cal. round is uniquely dangerous after penetrating such a barrier. Again, without any expert testimony to support their position, Defendants claim "the .223/5.56mm round is more effective at incapacitating human beings" once it passes through a barrier. *Id.* at 11.[3] There is absolutely no evidence to support Defendants' claim in this regard, other than a non-expert's unsupported opinion. Thus, the undisputed expert evidence in this case establishes that the .223 cal. round fired by many of the banned firearms is no more dangerous than any other centerfire rifle or handgun round, and is less dangerous than many.

### D.    Firearm Bans Are Not Effective.

Defendants contend that Plaintiffs have mischaracterized the testimony of Dr. Koper on the issue of whether the federal assault weapons ban was effective, but nowhere show specifically how Plaintiffs have misstated the content of Dr. Koper's testimony or misquoted him. Opposition at 48.  Defendants are understandably unhappy that Dr. Koper's opinions when sworn and questioned at his deposition are contrary to their position.

---

[3]    Interestingly, Defendants rely only on the declaration of Deputy Chief Stawinksi to support this point. Deputy Chief Stawinski has never trained on an AR-15 rifle or other banned firearm and was not offered as an expert in ballistics. Decl. of Henry Stawinski, Defendants' Ex. 5 at ¶ 6. Apparently seeking to bolster the credibility of their non-expert witness, Defendants cite to paragraph 5 of his declaration to support the quoted statement above. Opposition at 11. This paragraph states, in its entirety, "I have a bachelor's degree in Biology from Boston College, and am pursuing a Master's degree in Management from Johns Hopkins University. I am also a graduate of the Senior Management Institute for Police through the Police Executive Research Forum and have a certificate in Negotiation from Harvard's Kennedy School." Decl. of Henry Stawinski, Defendants' Ex. 5 at ¶ 5. Defendants' brief and citation leave us only to speculate how the Deputy Chief's biology degree and negotiation skills qualify him to challenge the otherwise unrefuted opinions of two ballistics experts, including the former Supervisory Special Agent of the FBI Ballistics Research Facility.

Dr. Koper's opinions and declarations should be disregarded by the Court because they are not based on reliable data, as required by Federal Rule of Evidence 702. Moreover, Dr. Koper's declarations are directly contradicted by his earlier, sworn deposition testimony, requiring their exclusion under established federal law. Defendants attempt to sweep aside the lack of any actual evidence showing that the federal assault weapons ban had an impact on criminal activity by claiming hopefully that the federal ban would have had such an effect if "given more time." Opposition at 22 n. 13. This "argument" is nothing more than an admission that there is no evidence to support the claim that the federal ban had any impact on the frequency, lethality or injuriousness of gun violence. Thus, Defendants have effectively admitted that there is no data to support the notion that the Maryland laws will lessen the instances of firearm crime or that they will lessen the harmful effects of such crime.[4]

Federal Rule of Evidence 702 requires that an expert's opinion be "based on sufficient facts or data." Fed. R. Evid. 702 (b). Without an adequate basis in fact, an expert's opinions should not be admitted into evidence. *See Hathaway v. Bazany*, 507 F.3d 312, 317-18 (5th Cir. 2007) (affirming the exclusion of expert testimony where it was not based on sufficient facts and data). Dr. Koper, at his deposition, admitted that he "cannot conclude to a reasonable degree of probability that the federal ban on assault weapons and large capacity magazines reduced crimes related to guns." Dep. of Christopher Koper, Ex. 20 at 83:1-12, 96:4-8. He also confirmed the ban "didn't reduce the number of deaths or injuries caused by guns either . . . ." *Id*. at 96:9-11. He also admitted that he is not aware of any expert who has studied the impact of the federal ban and has come to a different conclusion. *Id*. at 95:1-6. He

---

[4]     Defendants assert repeatedly that if given more time, the federal law might have shown some impact. The federal law was in effect for a decade. Over the course of that decade, there is no evidence that it lessened the criminal use of "assault rifles" or that it lessened the harm caused in criminal assaults with firearms. Decl. of Christopher Koper, Defendants' Ex. 7 at Ex. B at 2, 92. Given that these are the only two possible positive effects of the challenged laws, there is no evidence, at all, to support Dr. Koper's predictions about the effectiveness of the Act.

admitted that "there has not been a clear decline in the use of [Assault Rifles]" in crime as a result of the federal assault weapon ban. Decl. of Christopher Koper, Defendants' Exhibit 7, Ex. B at 2. Moreover, the federal ban did not cause a decline in the criminal use of magazines with more than ten rounds. *Id.* Finally, he admitted that "[t]here has been no discernible reduction in the lethality and injuriousness of gun violence" as a result of the federal ban. Dep. of Christopher Koper, Ex. 20 at 94:11-14. With respect to prior state-level bans such as Maryland's, he stated that the available studies suggest "state-level [assault weapons] bans have not reduced crime." Decl. of Christopher Koper, Defendants' Exhibit 7, Ex. B at 81, n. 95; Dep. of Christopher Koper, Ex. 20 at 84:17-85:5. Moreover, Dr. Koper readily admits that "I have not undertaken any study or analysis of [the Maryland Act's] effects." Decl. of Christopher Koper, Defendants' Exhibit 7 at ¶ 77. Despite all of these admissions, Dr. Koper has opined that the Act has "the potential to reduce shooting injuries in the state over the long-run" based on "my detailed study of the federal ban in particular." Decl. of Christopher Koper, Defendants' Exhibit 7 at ¶ 86. Dr. Koper's study of the federal ban, however, found *no evidence* of any reduction in lethality or frequency of criminal use of firearms. Thus, Dr. Koper's opinion is based on absolutely no data. This is not predictive judgment; this is a leap of faith. This is precisely what the Rule 702 (b) requirement was designed to prevent, and Dr. Koper's opinion should not be permitted. *See McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (stating that an expert's opinion "must have a basis in established fact").[5]

Given that there is no data to support Dr. Koper's conclusions – only his unsupported assertion that given more time there might have been evidence of the federal ban having an impact – his opinion

---

[5]      Dr. Webster's "copycat" opinions should also be ignored. He conducted no independent research and relied on the work of Dr. Koper. Decl. of Dr. Daniel Webster, Defendants' Ex. 6 at ¶¶ 12, 15-16, 22, 24-28.

is too great a leap from the facts and data upon which he relies and cannot meet the necessary threshold for admissible evidence.

Presumably recognizing the paucity of evidence supporting their contention that the bans on firearms and magazines will have an effect on criminal activity or the consequences of criminal assaults, Defendants make much of the "weight other court's have afforded" Dr. Koper's work. Opposition at 17. This is not surprising given that Dr. Koper had never been deposed before this case, and no previous court had the benefit of his sworn testimony under cross examination, as does the Court here.

Defendants do not refute that the federal law that Dr. Koper studied, and upon which he bases all of his conclusions, included assault pistols in its definition of assault weapons. To be sure, there are times at which Dr. Koper distinguished assault pistols from assault rifles in his 2004 work. Decl. of Christopher Koper, Defendants' Ex. 7 at Ex. B at 2. These instances, however, cut against Defendants' position because, when Dr. Koper does speak separately of assault rifles, he admits: "There has not been a clear decline in the use of [assault rifles] . . . ." *Id.*

Defendants also criticize Plaintiffs for accurately quoting from Dr. Koper's published work that "a few studies suggest that state-level [assault weapon] bans have not reduced crime." Opposition at 20. Dr. Koper confirmed this conclusion under oath at his deposition. Dep. of Christopher Koper, Ex. 46 at 85. Dr. Koper now attempts to walk away from this statement in his most recent declaration, but does so at the clear expense of his own credibility and reliability. He states that his opinion quoted by Plaintiffs "offer[s] little if any insight into the potential effectiveness of Maryland's bans." Supp. Decl. of Christopher Koper, Defendants' Ex. 82 at ¶ 24. The reason for discounting his earlier statement, he says, is that the state assault weapons bans had "important differences," there "is little evidence on how state

assault weapon bans affect the availability and use of assault weapons," and the studies failed to examine criminal use of banned firearms in all criminal contexts. *Id.*

These same problems, however, permeate all of Dr. Koper's opinions regarding the possible efficacy of the Maryland laws. The only data-based analysis of any firearms law that Dr. Koper has performed was on the federal assault weapons ban that was in effect from 1994-2004. This law prohibited the sale of any new "assault weapons" and magazines with a capacity greater than ten rounds. The Maryland laws prohibit a different set of "assault weapons" and prohibit the sale, but not the import into the state, of all magazines with a capacity greater than ten. The federal analysis upon which Dr. Koper bases his entire opinion is susceptible to very same criticism that he levels against his earlier conclusion on the efficacy of state-level assault weapon bans. Either Dr. Koper's original statement that state-level bans are not effective is accurate because it is based on similar, if not identical, research, or all of Dr. Koper's conclusions are inapplicable to the instant case and should be disregarded by the Court as unreliable and not fitting closely with the facts.

Similarly, Defendants next take issue with Plaintiffs' showing that there is no reason to expect the Maryland laws to decrease firearm-related crime. Defendants apparently agree that there is no reason to expect such a reduction, Opposition at 21, but claim that the laws will "result in less severe consequences from those crimes." *Id.* Defendants' claim is unsupported by the evidence from their own expert. As Dr. Koper so aptly put it in his 2004 report, "gun crimes since the ban have been no less likely to cause death or injury than those before the ban, contrary to what we might expect . . . ." Decl. of Christopher Koper, Defendants' Ex. 7 at Ex. B at 92. Thus, Defendants' theory of the potential effect of the challenged laws is not even borne out by their own evidence.

Finally, Defendants attempt to rehabilitate Dr. Koper's admission that he is unable to state to a reasonable degree of scientific probability that the challenged laws will have any impact whatsoever. Defendants, of course, cannot un-ring the bell struck by Dr. Koper's sworn deposition testimony, Dep. of Christopher Koper, Ex. 46 at 170-72, so they instead argue the irrelevant point that Dr. Koper need not provide a specific, numerical probability of the likelihood of his conclusions that the challenged laws will cause a reduction in some aspect of firearm-related crime. Opposition at 23. Plaintiffs never asserted that Dr. Koper needed to provide a specific numeric probability that his conclusions were accurate, just an affirmation that his conclusions were to a reasonable degree of scientific probability, or more likely than not. *See Fitzgerald v. Manning*, 679 F.2d 341, 350 (4th Cir. 1982) (in the context of medical causation, "in order to qualify on causation, the opinion testimony . . . must be stated in terms of a 'reasonable degree of medical certainty"). Given that Dr. Koper was not able to state that his opinions were correct to a reasonable degree of scientific probability, his opinions are nothing more than a guess.[6]

## II. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT UNDER THE SECOND AMENDMENT.

### A. The Bans Burden Second Amendment Rights.

The challenged bans prevent law-abiding, responsible Maryland citizens from acquiring and possessing commonly owned firearms and magazines protected by the Second Amendment. That the bans burden Second Amendment rights cannot be disputed. This has been the conclusion reached by every federal court to consider the issue, and this Court should follow their lead in this regard. *See Heller II*, 670 at 1261; *Fyock*, 2014 U.S. Dist. LEXIS 29722 at *13 (magazines); *San Francisco Veteran*

---

[6]    In contrast, Dr. Koper did conclude to a reasonable degree of scientific probability that the federal ban neither reduced firearm crime nor the number of deaths or injuries caused by firearms. Dep. of Christopher Koper, Ex. 46 at 96. That Defendants try to walk away from the opinions Dr. Koper deemed conclusive to a reasonable degree of scientific probability, while simultaneously propping up statements that Dr. Koper himself could not support to that degree, is telling.

*Police Officers Ass'n*, 2014 U.S. Dist. LEXIS 21370 at *14-15 (magazines); *Shew,* 2014 U.S. Dist.

LEXIS 11339; *N.Y. State Rifle & Pistol Ass'n*, 2013 U.S. Dist. LEXIS 182307 at *33-34, 37.

Defendants make the claim that the challenged laws "do[] not burden the core right of self-

defense in the home," because other firearms are available for the Plaintiffs to acquire for home defense.

Opposition at 27. The Supreme Court expressly rejected this same "substitution of firearms" argument

in *Heller*: "It is no answer to say, as petitioners do, that it is permissible to ban the possession of

handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." *Heller*, 554 U.S. at

629. The record in this case establishes that the banned popular firearms designated as "assault long

guns" and the banned popular standard capacity handgun and rifle magazines are equally protected from

complete prohibition.

Defendants assert that only large capacity magazines are being regulated by the law. Opposition

at 33. All magazines are being regulated by the law because all magazines are being subjected to

regulations that impose an arbitrary cap on the number of rounds that they can hold. Every single

magazine is tested against the arbitrary limit of ten rounds, and, if it passes, is permitted. Every

magazine that does not pass the test is prohibited. Thus, every single magazine sold in Maryland is

regulated. It is undisputed that magazines are a necessary component to utilize properly any

semiautomatic firearm. Given this fact, there is no debate that magazines are protected by the Second

Amendment. Indeed, Defendants appear to concede this point when they state that a law banning all

magazines would be offensive to the Second Amendment in the same way the City of Chicago's ban on

all shooting ranges was held to be violative of the Second Amendment in *Ezell v. City of Chicago*, 651

F.3d 684 (7th Cir. 2011). Opposition at 34. Any law that impacts magazines burdens Second

Amendment rights.

Defendants also dispute Plaintiffs' evidence that magazines holding more than ten rounds are difficult, if not impossible, to acquire for many commonly owned handguns in Maryland. Opposition at 14-15. First, Defendants claim that Plaintiffs are relying on inadmissible evidence in this regard and, in the next sentence, proffer recently manufactured evidence that was never disclosed in discovery.[7] *Id.* at 15. Second, Plaintiffs' evidence is a commercial record of an attempted sales transaction that was kept in the normal course of business, by a licensed firearms dealer. Defendants make no claim that the emails are not authentic. For this reason, they are admissible business records. *See United States v. Cone*, 714 F.3d 197, 219-20 (4th Cir. 2013) ("[P]roperly authenticated e-mails may be admitted into evidence under the business records exception. . . ."). Finally, Defendants are attempting to mislead the Court with respect to the testimony of Mr. Bulinski. Sam Walters, the owner of the Cop Shop, sold the Glock magazines to Mr. Bulinski. Decl. of Sam Walters, Ex. 47 at ¶ 4. The magazines that were sold to Mr. Bulinski were for a Glock model 22, the standard issue for law enforcement officers and the most popular Glock model sold at the Cop Shop. What Mr. Bulinski fails to report is that the Cop Shop, which sells more Glocks than any other dealer in Maryland, if not the Mid-Atlantic, can obtain 10-round magazines in any quantity only for the Glock model 22. Mr. Bulinski could not have purchased a 10-round magazine at the Cop Shop for other models of Glocks. *Id.* at ¶ 5. The Cop Shop has virtually no

---

[7]     Given that Plaintiffs disclosed to Defendants Ms. Wink's email records at the very outset of discovery, it is unclear why Defendants waited until after the close of discovery to conduct their "experiment." Regardless of the rationale, Mr. Bulinski's "evidence" was never disclosed to Plaintiffs and is not admissible, even if it had any probative value, because Defendants never disclosed Mr. Bulinski as a witness pursuant to Fed. R. Civ. P. 26(a), even after they knew he would offer testimony. Defendants have an ongoing obligation to disclose all witnesses and evidence upon which they intend to rely. Fed. R. Civ. P. 26(e). Mr. Bulinski's declaration should be disregarded. Fed. R. Civ. P. 37(c)(1); *see also Cory v. Whisman, Grygiel & Giordano, P.A.*, No. WMN-06-2694, 2012 U.S. Dist. LEXIS 64334 at *18-*19 (D. Md. May 8, 2012) (stating that the obligation to supplement Rule 26 disclosures "does not end at the close of discovery"); *Fleming v. Livingston County*, No. 08-cv-1174 2011 U.S. Dist. LEXIS 44745 at *13-*14 (C.D. Ill. April 26, 2011) (finding a violation of Rule 26 when plaintiff failed to supplement his initial disclosures with a fact witness upon whom he intended to rely and granting defendant's Motion to Strike).

ten round magazines for sale, takes months to collect magazines, and can only acquire magazines by purchasing them at retail from other vendors, when they can be found. *Id.* at ¶ 6. Thus, Mr. Bulinski's too-clever "gotcha" does not call into question Plaintiffs' evidence that unbanned magazines are difficult, if not impossible in some instances, to acquire.

Defendants invoke the fact that the banned firearms and magazines have been used in mass shootings to support their position that the challenged laws fall outside the scope of the Second Amendment. Opposition at 34-35. It is unclear how this is a relevant inquiry, however. The Supreme Court noted bluntly that the fact that firearms may be used in crime is not sufficient to outweigh the Second Amendment interests of law-abiding, responsible citizens. *Heller*, 554 U.S. at 636. Indisputably, handguns are used far more frequently in crimes than the banned firearms, including mass shootings. Clearly, if the firearm most widely-used by criminals is protected by the Second Amendment, so too are firearms that are only used by criminals in extremely rare events.

The inescapable reality is that the challenged laws burden Second Amendment rights.

## B.    The Bans Violate the Second Amendment.

In *Heller*, the Supreme Court made clear that laws completely prohibiting commonly possessed firearms are unconstitutional. 554 U.S. at 628-29. Thus, once Plaintiffs establish that the banned firearms and magazines are commonly owned for lawful purposes, the Court's inquiry can be concluded.[8] The Supreme Court's decision in *Heller* was not limited to handguns. Rather, it broadly captured all firearms that are commonly possessed by responsible, law-abiding citizens for lawful

---

[8]    Unable to refute the Ninth Circuit's criticism in *Peruta* of courts that have applied erroneously a tiered approach to Second Amendment issues, Defendants have resorted to arguing that the denial of *certiorari* on this issue illustrates that they have the correct position. Defendants' Reply at 26, n.15. It has long been held that the denial of *certiorari* is not a comment on the merits of an argument. *See e.g. House v. Mayo*, 324 U.S. 42, 48 (1945) ("[T]he denial of *certiorari* by this Court imports no expression of opinion upon the merits of a case.").

16

purposes. To be sure, there can still be regulatory measures on the ownership of firearms, s*ee id.* at 626-27, but, by definition, a firearm that is commonly possessed for lawful purposes cannot be dangerous and unusual. The exception Defendants seek to carve out cannot exist in logic or in law. Prohibiting law-abiding, responsible citizens from possessing popular firearms and magazines that are commonly possessed for lawful purposes is "off the table." *Id.* at 636.

The evidence in this case leads to the ineluctable conclusion that the banned firearms and magazines are squarely under the umbrella of protection identified by the Supreme Court in *Heller*. As such, the Court should grant summary judgment in favor of Plaintiffs without resort to any balancing test, as was done in *Heller*.

**C.**     **The Bans Cannot Survive Strict Scrutiny.**

If this Court does apply a balancing test, Fourth Circuit law is quite clear that strict scrutiny is the only level of analysis that is appropriate in this case. Defendants' arguments in Opposition to Plaintiffs' position are unavailing.

Defendants tellingly avoid all of the Fourth Circuit law cited by Plaintiffs that illustrates strict scrutiny is warranted and rely instead on the opinions of courts in other circuits. *See* Opposition at 26-27. Defendants' argument can be distilled into one principle: only laws that completely prevent individuals from engaging in armed self-defense in the home with a pistol are subject to strict scrutiny. *See id.* at 28. This argument distorts the Second Amendment and ignores both *Heller* and Fourth Circuit law.

First, as Plaintiffs noted in their opening memorandum, Fourth Circuit law expressly states that a law impacting the possession of commonly-possessed firearms in the home by law-abiding, responsible citizens is subject to strict scrutiny. *See* Plaintiffs' Memorandum in Support of Plaintiffs' Motion for

Summary Judgment at 25-31. Second, Defendants' argument was implicitly rejected in *Heller*. In *Heller*, had the Court accepted the argument that all the Second Amendment protected was the ability to defend oneself with a firearm of some kind, it would have only struck down the requirement that any firearm be rendered inoperable. It did not. Instead, the Court set forth a simple framework: if a firearm is commonly possessed for lawful purposes, it cannot be banned.

That Fourth Circuit law dictates the use of strict scrutiny in this case is indisputable. *See*, *e.g.*, *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013);*United States v. Masciandaro*, 638 F.3d at 470; *United States v. Chester*, 628 F.3d 673, 682-83 (4th Cir. 2010). Defendants have not demonstrated either that there is any compelling state interest at stake, or that the bans are narrowly tailored to meet that interest.[9] Given that Defendants did not even present an argument that the challenged laws could meet the strict scrutiny standard, Plaintiffs are entitled to summary judgment under strict scrutiny.

### D.      The Bans Fail Even Under Intermediate Scrutiny.

In their Opposition, Defendants both misstate the proper role of the Court and mischaracterize their burden. It is not "enough," as Defendants claim (Opposition at 6-7), that the witnesses who have testified for the government have said that the law passes constitutional muster. Indeed, constitutional scrutiny would be a hollow exercise if all that was required to uphold a law was the unsupported opinions of those in favor of it.

Defendants attempt to avoid the inconvenient reality that they have put forth scant evidence that was actually considered by the Maryland General Assembly by claiming that Plaintiffs have "take[n] out

---

[9]      Defendants did not take issue with Plaintiffs' position that, under a strict scrutiny analysis, the Federal Circuit's decision makes clear that only evidence that was before the legislature can be considered. Plaintiffs' Memorandum in Support of Plaintiffs' Cross-Motion for Summary Judgment at 28-29; *see also Rothe Dev. Corp v. Department of Defense*, 413 F.3d 1327, 1338 (Fed. Cir. 2005). Defendants thus concede that the Court cannot consider evidence that was not before the legislature if the Court applies strict scrutiny,

18

of context the Supreme Court's statement in *Turner Broadcasting Systems, Inc. v. FCC*," 512 U.S. 622 (1994). Opposition at 28. Defendants are simply mistaken that *Turner* was remanded to introduce evidence that was never before Congress. The passage quoted by Defendants regarding the scope of remand illustrates why summary judgment was not appropriate in that case and how each party could supplement its position; on remand, the government could establish the sufficiency of the evidence by introducing more "predictive or historical evidence *upon which Congress relied*" and the broadcasters could support their position by introducing evidence of the actual harm suffered by broadcasters. *See Turner*, 512 U.S. at 667 (emphasis added). Indeed, Plaintiffs' reading of *Turner* is confirmed by other courts to consider the issue, both before and after the *Turner* decision. *See, e.g., Hughes v. Oklahoma*, 441 U.S. 322, 338 n.20 (1979) (under intermediate scrutiny, the State cannot rely on its lawyers to sift through the legislative record and provide post-hoc rationalizations for statutory restrictions on fundamental rights); *Hutchins v. D.C.*, 188 F.3d 531, 567 (D.C. Cir. 1999) (under intermediate scrutiny, a court must independently examine "the evidence before the legislature to determine whether an adequate foundation justified the challenged burdens").

Defendants next contend that the General Assembly had sufficient evidence before it to support the challenged laws. Opposition at 30. Defendants chose to put into evidence only two items that were before the legislature -- the testimony of Defendant O'Malley and Defendants' expert, Dr. Webster. After Plaintiffs demonstrated the insufficiency of that evidence, Defendants now claim that a recording of Chief Johnson testifying before the General Assembly exists, without even mentioning what Chief Johnson had to say. *Id.*

As is made clear by the Declaration of Sarah M. Hoyt, Defendants' Ex. 90 at 1-2, Plaintiffs' counsel retrieved a complete copy of the Bill File for 2013 Senate Bill 281, and Chief Johnson's

19

testimony was not included. Thus, it appears that his testimony is not part of the official record of what was considered by the General Assembly. Plaintiffs also requested that Defendants produce everything before the General Assembly, including the Bill File, in discovery, but Chief Johnson's testimony was not provided. Nor was this recording ever disclosed to Plaintiffs as something upon which Defendants would rely, even though Defendants had an ongoing obligation to disclose Chief Johnson's testimony. Fed. R. Civ. P. 26(e); *Cory v. Whisman, Grygiel & Giordano, P.A.*, No. WMN-06-2694, 2012 U.S. Dist. LEXIS 64334 at *18-*19 (D. Md. May 8, 2012) ("This Rule clearly requires that parties supplement their discovery responses as necessary to ensure their responses are complete and accurate. This obligation does not end at the close of discovery . . . ."). Had Plaintiffs known that Chief Johnson testified, they would have inquired extensively into his views in relation to this testimony during discovery. Plaintiffs are now prejudiced because of Defendants' actions in that they are unable to probe any inconsistencies or inaccuracies.

Defendants next make the claim that the General Assembly "had access to extensive social science research developed and discussed in detail in the D.C. Circuit's decision in *Heller II*." Opposition at 30. This statement is contrasted by the contents of the Bill File, which includes no such research. The quotation is taken from a letter from Defendant Attorney General Gansler to Defendant O'Malley on letterhead from the office of the Counsel for the General Assembly, Daniel Friedman. *See* Defendants' Ex. 86. Defendants' self-serving letter written between themselves cannot serve as the basis for finding that the General Assembly had access to information that was not included in the Bill File. Moreover, when Plaintiffs tested whether this was true by requesting all materials related to the consideration of the Act by any legislator, the "Counsel to the General Assembly," also appearing as Defendants' Counsel in this case, declined to provide anything, citing privilege. *See* Defendants' Ex. 89

at 1-2. That Defendants would now claim that information that is not in the Bill File was available to members of the General Assembly is disingenuous to say the least. Moreover, without any specifics, it is unclear to what information Defendants are referring. Defendants have failed to carry their burden to establish that the predictive judgments of the General Assembly were based on substantial evidence and that the Act is appropriately tailored to achieve the asserted government interests.

Even were the Court to consider Defendants' evidence that was never put before the General Assembly, Plaintiffs are still entitled to summary judgment. The formulation of intermediate scrutiny in the context of evaluating a prohibition of commonly possessed firearms was set forth by the D.C. Circuit in *Heller II*. 670 F.3d at 1258. Under this formulation, the government must establish a "tight fit" that employs "a means narrowly tailored to achieve the desired objective." *Id*. That the Defendants would call Plaintiffs' reliance on *Heller II*'s standard "frivolous," Opposition at 28, is odd considering the extent to which the Defendants have so far relied upon *Heller II* before this Court. *See, e.g.* Defendant's Opposition at 14, 24, 27, 28, 30, 33; Defendants' Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order, ECF No. 10 at 13, 14, 15, 16-17; *see also* Tr. of Hearing on Plaintiffs' Motion for Temporary Restraining Order at 34, 38-39, 42, 45 (October 1, 2013). Defendants have not even attempted to illustrate that the challenged laws are "narrowly tailored." They cannot meet their burden under the *Heller II* formulation of intermediate scrutiny.

Instead of confronting any of Plaintiffs' arguments related to the standard of review, Defendants have attempted to justify the challenged laws solely under the "reasonable fit" formulation of intermediate scrutiny, which sounds more like rational basis review as Defendants would have the Court apply it here. In this vein, Defendants seek refuge in the opinions of the senior law enforcement officers who testified on their behalf. The fact that the political appointee law enforcement officers retained as

witnesses by Defendants stated these beliefs is not particularly surprising. What is surprising is that Defendants are now claiming that "each officer's testimony is based on his own unique experience and knowledge." Opposition at 4-5 n.2. This statement is demonstrably false. In his deposition, Chief Johnson read repeatedly from a document he produced to answer questions asked by Plaintiffs' counsel about the dangerousness of the banned firearms and magazines. *See* Dep. of Chief James Johnson, Ex. 48 at 32-34. He admitted later in his deposition that this document was an example of documents that were put together by the employees of the National Partnership to Prevent Gun Violence. *Id*. at 115-19. As he so aptly put it: "I'll sit and I'll advise them how I want something prepared in writing. They collect and keep information. . . ." *Id*. at 118. Chief Johnson's testimony illustrates three points. First, his testimony is based on the research of someone else, not his own experience. Second, he doesn't even do the research himself; thus, his testimony is based on someone else's regurgitation of a third-party's research. Finally, and most critically, he drafts his position before he begins the research process. Chief Johnson's testimony, based on his own explanation of his process, is not "based on his own unique experience and knowledge;" rather, it is the end result of a process that begins with a conclusion in search of supporting evidence.

It is also not true that all executive-level law enforcement officers share the beliefs of Defendants' witnesses. In the video recently disclosed by Defendants of the hearing on 2013 Senate Bill 281, at which Chief Johnson testified, representatives of the Maryland Sheriffs' Association testified in opposition to the bill, declaring that the challenged laws would infringe on citizens' constitutional rights and would not have an impact on criminal activity. Hearing Before Senate Judicial Proceedings Committee on Senate Bill 281, http://mgahouse.maryland.gov/house/play/8697a09e-c001-4bb4-

a558f365e3c5422b/?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c;  *See also*  Transcript of the

Hearing Before the Senate Judicial Proceedings Committee on 2013 Senate Bill 281, Ex. 49 at 1.

Further betraying Defendants' position that the head law enforcement officers in the state

support the challenged laws is the testimony of Capt. (Ret.) Jack McCauley. Captain McCauley was

designated by Defendant MSP to be its representative at a meeting of the Maryland House Judiciary

Committee and to answer any questions related to the Act. Supp. Decl. of Capt. (Ret.) Jack McCauley,

Ex. 50 at ¶ 4.[10] Captain McCauley was asked by a delegate what the impact of the then-proposed laws

would be. *Id* at ¶ 5. Before Captain McCauley even began to speak, he was directed by a member of

Defendant O'Malley's staff, Shanetta Paskel, "not to answer the delegate's question." *Id*. at ¶ 6. Ms.

Paskel reiterated this directive when Captain McCauley sought clarification of her command. *Id.* at ¶ 7.

Captain McCauley obeyed Ms. Paskel's order because it was a direct command from an agent of

Defendant O'Malley, who was his superior. *Id.* at ¶ 8. Had he been permitted to speak, Captain

McCauley would have stated, based upon his experience, that the Act would have no impact on crime,

that the banned firearms are rarely, if ever, used in crime, that the banned firearms are not used

disproportionately against law enforcement officers, and that criminals wishing to acquire magazines

holding more than ten rounds would simply go out of state to get them. *Id.* at ¶ 8. Captain McCauley

also would have testified that the appropriate focus of legislation to influence firearm violence would be

to focus on mental health issues. *Id*. Immediately following the meeting, Ms. Paskel told Captain

McCauley that the Act "was not about policy; it is just votes." *Id*. at ¶ 9.

---

[10]     Not only was Captain McCauley Commander of the MSP Licensing Division and responsible for firearms control at that time, Supp. Dec. of Capt. (Ret.) Jack McCauley, Ex. 50 at ¶ 2, he also was the Co-Chair  (appointed by the Defendant Governor) of a Task Force to Study Mental Illness and Access to Firearms. Dec. of Capt. (Ret.) Jack McCauley, Ex. 15 at ¶ 8.

III.    **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR EQUAL PROTECTION CLAIM.**

Defendants cannot seem to find a consistent rationale for exempting retired law enforcement officers from the challenged laws. This can only be because there is no legitimate interest. Defendants' current position seems to be that retired law enforcement officers all have general training in some firearms, and this distinguishes them from the general public.

There is no dispute that the general population consists of individuals with varying levels of training with firearms, including Plaintiffs. *Compare* Decl. of Steven Kolbe, Ex. 1 *with* Decl. of Andrew Turner, Ex. 2. Further undisputed is the fact that not all law enforcement officers undergo training with the banned firearms. Thus, the community of retired law enforcement officers is the same as the general population with respect to training with the banned firearms.

Defendants' claim that every retired law enforcement officer has trained with the banned magazines is interrupted, literally, by their acknowledgement that any officer who retired and only used a revolver has not had such training. Opposition at 40. Clearly, *not* every retired law enforcement officer has training with the banned magazines, and Plaintiffs' assertions of being similarly situated stand unrefuted.

Given that Defendants have provided no argument to justify the exemptions for retired law enforcement officers, it is not surprising that they resort to arguing severability. Opposition at 49-50. The General Assembly clearly desired that retired law enforcement officers be permitted to acquire and possess the banned firearms, or else it would not have enacted the exceptions. Severing the exemptions from the bans would frustrate this purpose. In this context, severabilty means that only the portions of the Act from which law enforcement officers were exempted unconstitutionally -- the firearms and magazine bans --  are severed and struck from the rest of the Act's provisions.

IV.    **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR DUE PROCESS CLAIMS.**

MSP's actions since Plaintiffs filed their Cross-Motion for Summary Judgment confirm that its enforcement is arbitrary. LWRC International, Inc., is a Maryland-based firearm manufacturer. Dec. of John Brown, Ex. 53 at ¶¶ 2-3. Recently, LWRC attempted to confirm with Defendant MSP that the rifles it manufactures are compliant with Maryland law and could be lawfully sold to civilians. *Id.* at ¶ 4. Defendant MSP confirmed orally that the firearms were exempt because of their proprietary operating mechanism, but continues to refuse to provide LWRC with written confirmation. *Id.* at ¶¶ 6-7. This is in direct conflict with their letter to Plaintiff NSSF, which stated that all AR-15 copies, whether piston-driven or not, were banned. *Id.* at ¶¶ 10-11; *see also* Letter from Lt. Col. Pallozzi to Lawrence Keane, Ex. 36. After inquiring, LWRC still does not know whether it can sell its rifles in Maryland. Thus, it appears that Defendant MSP does not apply uniform principles to all inquiries. In addition to the fact that LWRC has no reliable guidance as to what it can and cannot do, Plaintiffs could be arrested for possessing some piston-driven AR-15 style firearms, but not others, without any standards by which to differentiate the permissible from the impermissible. This exposes Plaintiffs to a credible threat of arbitrary enforcement and is a violation of their Due Process rights. *See Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)("A vague law impermissibly delegates basic policy matters to policemen . . . for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.").

## CONCLUSION

For the reasons stated above, Plaintiffs are entitled to summary judgment on all counts.

**TABLE OF EXHIBITS TO PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Exhibit No.   Exhibit Title

45.   Transcript of the Deposition of Daniel Webster, January 17, 2014

46.   Transcript of the Deposition of Christopher Koper, February 3, 2014

47.   Declaration of Sam Walters

48.   Transcript of the Deposition of Chief James Johnson, December 17, 2013

49.   Transcript of the Hearing Before the Senate Judicial Proceedings Committee on 2013 Senate Bill 281

50.   Supplemental Declaration of Capt. (Ret.) Jack McCauley

51.   Transcript of the Deposition of Joseph Vince, January 17, 2014

52.   Transcript of the Deposition of Anthony Batts, December 19, 2013

53.   Declaration of John Brown