# Exhibit 50

## to

## Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Cross-Motion for Summary Judgment

## SUPPLEMENTAL DECLARATION OF CAPTAIN (RET.) JACK MCCAULEY

I, Jack McCauley, under penalty of perjury, declare and state, to the best of my knowledge, information, and belief, as follows:

1. I am over the age of 18, have personal knowledge of the facts and events referred to in this declaration, and am competent to testify to the matters stated below.

2. I am the former Commander of the Maryland State Police Licensing Division and a retired Captain of the Maryland State Police. The Licensing Division is the Division responsible for conducting the background checks for regulated firearms and for making the determinations of whether particular firearms are "copies" of any of the enumerated long guns in Section 5-101 of the Public Safety Article of the Maryland Code.

3. Prior to becoming Commander of the Licensing Division, I was a patrol officer, criminal investigator, narcotics investigator, homicide investigator, and Lieutenant in charge of overseeing the Gang Enforcement Unit and the Firearms Enforcement Section within the Criminal Investigation Division.

4. On or about Thursday, March 28, 2013, I was designated by the Maryland State Police to speak at a meeting with a subcommittee of the Maryland House Judiciary Committee to answer any questions the delegates might have with respect to the changes in the law proposed in the Maryland Firearm Safety Act (the "Act").

5. During that meeting, a delegate asked me if the proposed ban on certain firearms and detachable magazines would have an effect on crime in the state of Maryland.

6. As I began to respond, I was commanded by Shanetta Paskel, the Deputy Legislative Officer for the Office of Governor Martin O'Malley, not to answer the delegate's

1

question. Shocked that I would not be allowed to respond to a question asked by a member of the General Assembly, especially after being designated for the ostensible purpose of answering those questions at the meeting, I requested an immediate clarification of her directive. Ms. Paskel then reiterated, in no uncertain terms, that I was not to respond to the delegate's question.

7. There was a general uproar in the meeting as several members of the Committee took great offense at my refusal to answer the question, saying that Maryland State Police's response to this question went to an important issue of public policy. However, I determined at that time that Ms. Paskel was, in that capacity, my superior and I obeyed the direct order from an agent of Governor O'Malley's office. The meeting ended shortly thereafter.

8. If I had been permitted to answer the question posed to me at the meeting, I would have given the opinions I provided this Court in my earlier declaration, including specifically:

    a. The Act would have no effect on crime in Maryland;

    b. The banned firearms are almost never used in crimes. At most, they are used in 5% of firearm-related crimes in Maryland;

    c. The banned firearms are also not used disproportionately in attacks on law enforcement officers. In fact, the majority of officers who are assaulted with firearms are attacked with handguns;

    d. The Act would not have an impact on mass shootings. The Task Force to Study those with Mental Illness and their access to Firearms (of which I was Co-Chair), concluded that the most important factor to preventing mass shootings was ensuring proper mental health care to the public, treatment of mental illnesses, and training for law enforcement officers;

    e. The banned magazines are common throughout Maryland, and nearly all new semiautomatic handguns are sold with magazines with a capacity greater than ten, including the firearms that are used by the Maryland State Police and most law enforcement agencies in Maryland; and

    f. Persons who wish to acquire a magazine having the capacity of greater than ten rounds are likely to go out-of-state to make a purchase, rendering the Act's magazine ban ineffective except to restrict the rightful choices of firearms and magazines by law-abiding citizens.

9. Immediately following the end of the meeting, in the hallway immediately outside of the meeting room, Ms. Paskel explained why she ordered me not to answer, saying that the Act was "not about policy; it is just votes." I inferred from her statement that she meant that the Office of the Governor was pushing the Act solely to garner political favor and either believed that the Act would have no effect on crime generally or mass shootings, or did not care. My interpretation was validated when one of my then-colleagues with the Maryland State Police, who was present when the statement was made, became visibly angered by her statement. Ms. Paskel's statement seems to me to be an extension of the Office of the Governor's treatment of firearms issues generally, as, during my time with the Gang Enforcement Unit and the Firearms Enforcement Section, I was involved in the seizure of a number of firearms that were not involved in crime, very few of which were banned by the Act, because an emphasis was placed on the seizure of these firearms as the Office of the Governor wished to focus solely upon the number of firearms seized, and not decreasing crime.

I declare under penalty of perjury that the foregoing is true and correct.

_Jack C McCy_            4-24-14
Capt. (Ret.) Jack McCauley            Date