**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| STEPHEN V. KOLBE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | Case No.: 1:13-cv-02841-CCB |
| | ) | |
| v. | ) | |
| | ) | |
| MARTIN O'MALLEY, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE**

DOUGLAS F. GANSLER
Attorney General of Maryland


MATTHEW J. FADER (Fed. Bar # 29294)
JENNIFER L. KATZ (Fed. Bar # 28973)
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-7906 (tel.); 410-576-6955 (fax)
mfader@oag.state.md.us


DAN FRIEDMAN (Fed. Bar # 24535)
Assistant Attorney General
Office of the Attorney General
Legislative Services Building
90 State Circle, Room 104
Annapolis, Maryland 21401
410-946-5600 (tel.); 410-946-5601 (fax)
dfriedman@oag.state.md.us

Dated: May 16, 2014                    Attorneys for Defendants

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................. 1

ARGUMENT.................................................................................................................... 1

I.   CHIEF JOHNSON'S TESTIMONY BEFORE THE GENERAL ASSEMBLY WAS
     DISCLOSED, WAS PUBLICLY AVAILABLE, AND THE PLAINTIFFS WERE
     ALREADY AWARE OF IT. ......................................................................................... 2

II.  PROFESSOR KOPER'S EXPERT TESTIMONY IS APPROPRIATE AND
     ADMISSIBLE. .......................................................................................................... 6

III. PROFESSOR WEBSTER'S EXPERT TESTIMONY IS APPROPRIATE AND
     ADMISSIBLE. ........................................................................................................ 12

IV.  THE PLAINTIFFS HAVE NOT OFFERED ANY BASIS FOR EXCLUDING THE
     TESTIMONY OF DEFENDANTS' LAW ENFORCEMENT EXPERTS, NONE OF
     WHOM OFFERED EXPERT BALLISTICS TESTIMONY. .............................................. 16

V.   THE PLAINTIFFS HAVE NOT OFFERED ANY BASIS FOR EXCLUDING THE
     TESTIMONY OF LUCY ALLEN. ............................................................................. 17

VI.  THE PLAINTIFFS HAVE NOT OFFERED ANY BASIS FOR EXCLUDING THE
     TESTIMONY OF MAXIMILIAN BULINSKI. .............................................................. 20

VII. THE PLAINTIFFS HAVE NOT OFFERED ANY BASIS FOR EXCLUDING THE
     TESTIMONY OF JOSEPH VINCE. ........................................................................... 22

CONCLUSION .............................................................................................................. 24

## INTRODUCTION

The plaintiffs' motion to exclude evidence (ECF No. 65)[1] is both untimely and meritless.  The plaintiffs continue to mischaracterize the testimony and prior work of Professor Christopher Koper as well as the nature of the testimony offered by Professor Daniel Webster.  The plaintiffs also claim to be caught unaware that Chief James Johnson testified before the General Assembly in connection with the law at issue even though they have long been aware of it and had the opportunity to explore all of Chief Johnson's views when they took his deposition.  The plaintiffs also incorrectly characterize testimony of certain law enforcement officers as expert ballistics testimony when it is not; misapprehend the nature of the testimony offered by Lucy Allen and Maximilian Bulinski; and make arguments about the testimony of Joseph Vince that are both inaccurate and irrelevant.  Each of these witnesses offers relevant and admissible testimony upon which this Court is entitled to rely in rendering judgment.

## ARGUMENT

In addition to the specific arguments discussed below, the plaintiffs' motion to exclude should also be denied as untimely.  With the exception of the testimony of Maximilian Bulinski, all of the other witnesses whose testimony the plaintiffs seek to exclude were timely disclosed on or before January 10, 2014; each of these witnesses was

---

[1] Although, by its title, the plaintiffs' motion purports to be restricted to "expert testimony," they also seek to exclude fact testimony from one purely fact witness, Maximilian Bulinski, and from three hybrid fact and expert witnesses, Baltimore County Chief of Police James Johnson, Baltimore City Police Commissioner Anthony Batts, and Prince George County Police Department Deputy Chief Henry Stawinski.

deposed by the plaintiffs in or before January of 2014; the declarations at issue were all submitted in connection with the defendants' motion for summary judgment, filed on February 14, 2014 (ECF No. 44-1); and the same declarations were then discussed by the plaintiffs in their opposition to that motion, filed on March 17, 2014 (ECF No. 55-1). The plaintiffs nonetheless waited until April 29, 2014, simultaneous with the close of summary judgment briefing, to first contend that this testimony should be excluded, and they offer no explanation for their lack of timeliness.  For that reason, as well as those that follow, the Court should deny the plaintiffs' motion to exclude.

I.   CHIEF JOHNSON'S TESTIMONY BEFORE THE GENERAL ASSEMBLY WAS DISCLOSED, WAS PUBLICLY AVAILABLE, AND THE PLAINTIFFS WERE ALREADY AWARE OF IT.

In their opposition to the defendants' motion for summary judgment, the plaintiffs contended, erroneously, that this Court could only consider evidence that was directly before the General Assembly, and also argued, again erroneously, that Professor Webster was the only witness to testify before the General Assembly with respect to the challenged law.  *See* ECF No. 55-1 at 19.  In their reply brief, the defendants pointed out that Chief Johnson had also testified about the law, and provided a link to that testimony. The plaintiffs now ask that Chief Johnson's testimony before the General Assembly be excluded—and presumably would have the Court pretend the General Assembly never heard it—because, they contend:  (1) the testimony does not appear in the legislative bill file; (2) they were unaware that Chief Johnson had testified; (3) the testimony was not disclosed by the defendants; and (4) the plaintiffs were prejudiced by their inability to

2

probe Chief Johnson's testimony when they deposed him.  Mot. to Exclude (ECF No. 65) at 10-11.  The first of these contentions is irrelevant; the others are false.

The absence of a video recording of Chief Johnson's testimony in the paper copy of the legislative file maintained by the General Assembly is neither surprising nor relevant.  As per the normal practice of the Maryland General Assembly, the video recording is maintained not in the bill file but on the General Assembly's web page dedicated to the legislation at issue.[2]  There is no basis for attributing any significance to the absence of a copy of the video in the paper legislative bill file.  *See also Turner Broadcasting Systems, Inc. v. FCC*, 512 U.S. 622, 666 (1994) (legislature is not obligated to make complete record of proceedings to accommodate judicial review).

The plaintiffs' claim that they were unaware of Chief Johnson's testimony, s*ee* Mot. to Exclude (ECF No. 65) at 11 ("Had Plaintiffs known that Chief Johnson testified . . ."), is false.  Chief Johnson testified as part of a panel of proponents of the bill that included, among others, Governor Martin O'Malley, former Attorney General Joseph Curran, Secretary of Health and Mental Hygiene Joshua Sharfstein, and Professor Webster.  In the same session, immediately following that panel was a panel comprised of opponents of the bill.  As reflected in the video recording, the individual who took Chief Johnson's seat at the table was Shannon Alford of the National Rifle Association's

---

[2]  *See*  http://mgaleg.maryland.gov/webmga/frmMain.aspx?id=sb0281&stab=01&pid=billpage&tab=subject3&ys=2013rs  (to see the video, click on the video camera icon next to the word "Judiciary" in the row labeled "Committee(s)").

Institute for Legislative Action.[3]  At the table with Ms. Alford, and also taking their seats immediately after Chief Johnson left his, were representatives of three of the plaintiffs in this case, two of whom appeared as corporate representatives of those plaintiffs for deposition in this case.  Immediately to Ms. Alford's right was Richard Kussman, Vice President of Government Affairs for plaintiff Maryland State Rifle & Pistol Association (identified at 1:28:01).  Immediately to Ms. Alford's left was John Josselyn, legislative vice president (and declarant and corporate deponent) of plaintiff Associated Gun Clubs of Baltimore (identified at 1:15:34 of the hearing).  Initially two seats to Mr. Josselyn's left, later immediately to his left, was Patrick Shomo, President (and declarant and corporate deponent) of plaintiff Maryland Shall Issue (identified at 1:36:07 of the hearing).  Thus, representatives of the plaintiffs who were actively involved in prosecuting this very litigation were present at the hearing, and actually took over the table vacated by Chief Johnson to testify at the same hearing.

Moreover, even if they had not already been aware, the plaintiffs would have been made aware that Chief Johnson testified upon their review of the April 30, 2013 bill review letter from Attorney General Gansler to Governor O'Malley, which states: "Baltimore County Police Chief James W. Johnson presented oral testimony to the General Assembly that mirrored his recent congressional testimony in support of a federal assault weapons ban."  Ex. A, Letter from Atty. Gen'l D. Gansler to Gov. M.

---

[3]  *See*  http://mgahouse.maryland.gov/house/play/8697a09e-c001-4bb4-a558-f365e3c5422b/?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c (at 1:07:36).  Although the NRA chose not to join this action as a named party, plaintiffs' counsel in this case currently represent the NRA appearing as an amicus challenging the constitutionality of the State of New York's assault weapons and high capacity magazine bans.

O'Malley, Apr. 30, 2013, at 5 n.6.[4]  The bill review letter then provided an Internet link to the text of Chief Johnson's testimony before Congress.  *Id.* (citing testimony now available at http://www.judiciary.senate.gov/imo/media/doc/1-30-13JohnsonTestimony.pdf.). Not only did the defendants produce a copy of that letter in discovery in this case, but plaintiffs' counsel had a copy of it long before that.[5]

Furthermore, the plaintiffs' claim of prejudice is frivolous.  Not only were the plaintiffs and their counsel aware that Chief Johnson had testified long before this lawsuit was filed, but Chief Johnson was identified by the defendants in discovery as a hybrid fact/expert witness, *see* Ex. C, Defendants' Amended Disclosures, Nov. 15, 2013, at 2-3, and was then deposed by the plaintiffs, who had the opportunity to examine him with respect to all of his views, *see generally* S.J. Ex. 77, Johnson Dep. (ECF No. 62-2).

There is no basis on which to accept the plaintiffs' invitation to pretend that the General Assembly did not have access to evidence that was indisputably before it. The plaintiffs' request to exclude Chief Johnson's testimony before the General Assembly is frivolous and must be rejected.

---

[4] Exhibits to this brief are labeled by letter.  References to defendants' summary judgment exhibits are preceded by "S.J. Ex."  References to plaintiffs' summary judgment exhibits are preceded by "Plaintiffs' S.J. Ex."  For summary judgment exhibits from both parties, reference to the relevant ECF No. is also included.

[5] On October 7, 2013, plaintiffs' counsel, John Parker Sweeney, Esq., submitted to Attorney General Gansler and Assistant Attorney General Dan Friedman a Public Information Act request for documents that the Office of the Attorney General had "reviewed or relied upon in rendering" the April 30, 2013 bill review letter.  *See* Ex. B.

II.    **PROFESSOR KOPER'S EXPERT TESTIMONY IS APPROPRIATE AND ADMISSIBLE.**

The plaintiffs' motion to exclude Professor Koper's testimony should also be denied.   As discussed further below, the plaintiffs continue to misrepresent and misleadingly cite Professor Koper's prior writings while almost entirely ignoring his actual testimony in this case.   But perhaps most importantly, the plaintiffs continue to misapprehend the role of this Court and the role of expert testimony in this case. Analogizing this case to a medical malpractice case, in which one of the elements of a plaintiff's claim is causation, misapprehends the role of evidence in this case.   The issue before this Court is whether there is a reasonable fit between Maryland's ban on assault weapons and large-capacity magazines and Maryland's interest in public safety and reducing harm from gun violence.   *Woollard v. Gallagher*, 712 F.3d 865, 881-82 (4th Cir. 2013).   The issue is not proof of causation of an event that occurred in the past, but whether substantial evidence supports the predictive judgment of the Maryland General Assembly that the law it enacted will serve the State's compelling governmental interests in the future.   Legislation is not reviewed by courts to determine if it is wise or if the courts would come to the same conclusion after considering the available evidence.   *Id.* at 881 (Court cannot substitute the views of the plaintiffs "for the considered judgment of the General Assembly" that a firearm regulation "strikes an appropriate balance"); *see also Heller v. District of Columbia*, Civ. A. No. 08-1289, 2014 U.S. Dist. LEXIS 66569, at *22-35 (D.D.C. May 15, 2014) (*Heller III*).   Nor is the scope of relevant evidence available for legislative consideration confined to the types of evidence that could be

considered in proving causation in a court of law.  In reviewing the constitutionality of legislation, the question of substantial evidence relates to the legislature's judgment, and it is thus appropriate for this Court to consider evidence appropriate for legislative consideration.  *Id.*  Thus, a legislative body may "rely on predictions about the effect of" firearm laws, provided they are supported by "substantial evidence," and is not required to prove "definitively that the challenged gun regulations will actually further its important interests."  *Id.* at *29-30.  And, in making its case, the government is not restricted to relying on "empirical data," but may rely on "meaningful evidence," including "anecdotes . . . history, consensus, and simple common sense."  *Id.* at *34-35 (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001)).

Regardless, Professor Koper's testimony is admissible under any standard.  The plaintiffs admit that Professor Koper "is the only social scientist to have studied the effects of the federal assault weapons ban that was in place from 1994 until 2004."  Mot. to Exclude (ECF No. 65) at 3.  Professor Koper's credentials and experience in this area are uncontested and unsurpassed.  In coming to his opinions, Professor Koper examined: (1) criminal uses and dangers of assault weapons and large capacity magazines, and the best available research reflecting on them, *see* S.J. Ex. 7, Koper Decl. (ECF No. 44-7) ¶¶ 13-43; (2) the federal assault weapons ban, including its successes, failures, and flaws, *see id.* ¶¶ 44-71; and (3) Maryland's assault weapons and large capacity magazine bans, differences between those and the federal ban, and the likelihood of success of Maryland's law in light of the best available research and the experience of the federal law, *see id.* ¶¶ 73-86.  Maryland's bans had only recently been adopted, so a retrospective

7

examination of their success was not possible.   Professor Koper was thus left with applying his own unparalleled experience and knowledge in this area, the country's experience with the federal ban, and the provisions of Maryland's law, in light of the best available information and research that exists.  From that, Professor Koper concluded that "the Act is likely to advance Maryland's interest in reducing the harms caused by gun violence." *Id.* ¶ 86.

Federal Rule of Evidence 702 provides that a witness qualified as an expert may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The plaintiffs' contention that Professor Koper's testimony does not meet the second of these factors—whether it is based on sufficient facts or data—is misguided.  Aside from taking out of context particular statements in Professor Koper's prior works, the plaintiffs fail even to mention the vast majority of the facts and data on which Professor Koper relies, much less do they present a reasoned basis for rejecting them.   Among other things, the plaintiffs largely ignore Professor Koper's:  (1) testimony in this case; (2) 2013 report, *see* S.J. Ex. 7, Koper Decl. (ECF No. 44-7) at Ex. A; and (3) testimony explaining how the plaintiffs' use of out-of-context statements from his works is misleading, *see* S.J. Ex. 82, Supp. Decl. of C. Koper (ECF No. 62-7) ¶¶ 5-25.

Many of the plaintiffs' misleading contentions about Professor Koper have already been addressed in the defendants' reply brief in support of their motion for summary judgment (*see* ECF No. 62, at 17-24) and need not be repeated here.   Particularly misleading, however, is the plaintiffs' continued misuse of the following statement from Professor Koper's 2004 report:   "A few studies suggest that state-level assault weapon bans have not reduced crime."   Mot. to Exclude (ECF No. 65) at 7.   Despite it being pointed out by Professor Koper in the 2004 report itself, *see* S.J. Ex. 7, Koper Decl. (ECF No. 44-7), at Ex. B, p. 81 n.95 (including qualifications), by Professor Koper during his deposition, *see* Plaintiffs' S.J. Ex. 20, Koper Dep. (ECF No. 55-20) at 84-85 (statement is true "[w]ith the qualifiers that are stated in the rest of the footnote"), by Professor Koper in his supplemental declaration, *see* S.J. Ex. 82, Supp. Koper Decl. (ECF No. 62-7) ¶ 24, and by the defendants in summary judgment briefing, *see* ECF No. 62, at 20-21, the plaintiffs continue to repeat the statement as though it were not followed by qualifiers that demonstrate that the plaintiffs' reliance on the statement is misguided.   Thus, those studies offer little if any value in assessing the likely impact of Maryland's bans.   *Id.*

Notably, it is on this issue that the plaintiffs' now contend that Professor Koper's declaration testimony "is directly contradicted by his deposition testimony."   Mot. to Exclude (ECF No. 65) at 7.   Even stripped from its context and qualifiers, however, there is no inconsistency between the 2004 statement that a few state level bans in existence for brief periods in the early 1990s had not been shown to reduce overall crime, on the one hand, and Professor Koper's opinion that a different state-level ban enacted in 2013 likely will reduce negative effects of gun violence, on the other.   Moreover, as just discussed,

the statement was not made without context or qualifiers, and the plaintiffs' reliance on it is simply misguided.  There is nothing contradictory about Professor Koper's deposition testimony and his earlier statement.[6]

The plaintiffs also mischaracterize Professor Koper's testimony regarding a reasonable degree of scientific certainty.  Unlike the experts in the cases relied upon by the plaintiffs, Professor Koper was not asked for an opinion as to past causation.  *See, e.g.*, *Fitzgerald v. Manning*, 679 F.2d 341, 346 (4th Cir. 1982) (medical malpractice); *Miller v. Mandrin Homes, Ltd.*, No. CCB-05-2035, 2007 U.S. Dist. LEXIS 15193 (D. Md. Feb. 28, 2007) (excluded expert testified that photographs were consistent with prior presence of a landfill, but "did not declare, to a reasonable degree of scientific certainty," that the area had been a landfill in the past); *Daubert v. Merrell Down Pharms.*, 509 U.S. 579 (1993) (issue of medical causation of birth defects).  Instead, Professor Koper's predictive opinion is based on his conclusions from his extensive study of the federal assault weapons ban, the underlying studies he discusses, and his review of Maryland's law.  Although he could not provide any specific range of probability, or state the outcome to a certainty, Professor Koper concluded that the "Act is likely to advance

---

[6] The plaintiffs' reliance on *Newman v. Motorola, Inc.*, 218 F. Supp. 2d 769 (D. Md. 2002), *aff'd*, 78 F. App'x. 292 (4th Cir. 2003) (unpublished) (*per curiam*) is thus inapposite.  The issue in *Newman* was one of causation:  whether the plaintiff had carried its burden of demonstrating that radio frequency radiation from cell phones had caused a plaintiff's cancer.  *Id.* at 773.  Based on numerous problems in the putative expert's testimony, the evidence was excluded.  *Id.* at 783.  By contrast, in this case, in the context of review of the constitutionality of a statute—not medical causation evidence—Dr. Koper has opined, based on the best available evidence, that Maryland's bans are likely to advance the State's interest in public safety and reducing the harms caused by gun violence.

Maryland's interest in reducing the harms caused by gun violence."  That opinion is valid, admissible, and precisely the type of evidence upon which other courts have relied in upholding the constitutionality of similar laws.  *See, e.g.*, *New York State Rifle & Pistol Ass'n.*, No. 13-CV-291S, 2013 U.S. Dist. LEXIS 182307, at *52 (W.D.N.Y. Dec. 31, 2013); *Shew v. Malloy*, No. 3:13cv739, 2014 U.S. Dist. LEXIS 11339, at *30-32 (D. Conn. Jan. 30, 2014).

Notably, were plaintiffs to prevail in their view that no firearm regulation could pass constitutional muster without statistically-significant evidence of the past effectiveness of an identical law or a guarantee of future effectiveness—which their argument suggests they view as the minimum threshold for introduction of evidence to support the predictive judgment of a legislature—that would effectively bar any new firearm regulation.  The Supreme Court implicitly rejected that view when it promised that "state and local experimentation with reasonable firearm regulation will continue under the Second Amendment."  *McDonald v. City of Chicago*, 561 U.S. 742, ___, 130 S. Ct. 3020, 3047 (2010) (quotation omitted); *see also Heller III*, 2014 U.S. Dist. LEXIS 66569 at *29-30 (State is not required to prove "definitively that the challenged gun regulations will actually further its important interests").

Professor Koper's testimony is admissible and the plaintiffs' motion should be denied.

III.    **PROFESSOR WEBSTER'S EXPERT TESTIMONY IS APPROPRIATE AND ADMISSIBLE.**

The plaintiffs contend that Professor Webster's expert opinions must be excluded because he "did no research to ensure the validity of the facts presented by" Professor Koper.  Mot. to Exclude (ECF No. 65) at 8-9.  This contention is meritless.  As with Professor Koper, the plaintiffs raise no issue with Professor Webster's qualifications. Professor Webster holds advanced degrees and numerous faculty positions at Johns Hopkins University, including Professor of Health Policy and Management and Director of the Johns Hopkins Center for Gun Policy and Research at the Johns Hopkins Bloomberg School of Public Health.  S.J. Ex. 6, Webster Decl. (ECF No. 44-6) ¶ 1.  Over a nearly 30-year career, Professor Webster has devoted most of his research to gun-related injuries and violence, has directed numerous studies related to gun violence and prevention, and has published 79 articles in scientific, peer-reviewed journals.  *Id.* ¶¶ 2-5.

As an initial matter, it is simply untrue that Professor Webster relies solely on Professor Koper's work.   Professor Webster's declaration cites, discusses, and synthesizes numerous studies that, along with his own expertise and knowledge, all contribute to his opinion.[7]  Furthermore, with respect to Professor Koper's work directly,

---

[7] *See, e.g.*, S.J. Ex. 6, Webster Decl. (ECF No. 44-6) ¶¶ 12-19 (citing numerous sources in addition to reports by Professor Koper, including, without limitation, Philip J. Cook and Jens Ludwig, *Guns in America: Results of a Comprehensive National Survey of Firearm Ownership and Use,* Washington, DC: Police Foundation, 1997; Gary Kleck, *Targeting Guns: Firearms and Their Control.* New York: Aldine de Gruyter (1997); Mother Jones Magazine, *US Mass Shootings, 1982-2012, Data from Mother Jones' Investigation*; Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings*, September 2013; Luke Dillon, *Mass Shootings in the United States: An Exploratory Study of the Trends from 1982-2012,* Thesis for Master of Arts in Criminology, Law and

Professor Webster was the editor of a book, one chapter of which consisted of Professor Koper's 2013 report, which contains many of the same findings and conclusions contained in his declaration in this case (with the obvious exception of his opinions related directly to Maryland's law).  *See* Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994-2004: Key Findings and Implications*, pages 157-171 in Reducing Gun Violence in America: Informing Policy with Evidence and Analysis, Daniel W. Webster and Jon S. Vernick, eds. Baltimore: Johns Hopkins University Press, at 163 (2013) (attached as Exhibit A to Professor Koper's Declaration (ECF No. 44-7)).  Professor Webster subjected all of the chapters in that book to a peer review process in which each of the chapters, including Professor Koper's, was reviewed by individuals he identified as having relevant expertise.  Ex. D, Tr. of Dep. of D. Webster, at 53-56.

Perhaps more importantly, the plaintiffs misapprehend the cases from which they selectively quote.  It is not only acceptable, but standard practice, for an expert to rely on the studies of other experts in coming to and explaining their opinions.  *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 743 (N.D. Ill. 2005) ("[T]he process of analyzing assembled data while using experience to interpret the data is not illicit; an expert need not actively conduct his or her own tests to have a valid methodology."); *see also* S.J. Ex. 81, Webster Supp. Decl. (ECF No. 62-6) ¶ 7 ("[A]ssessing, analyzing, and opining on the

Society, George Mason University, September 2013; W.C. Adler, F.M. Bielke, D.J. Doi, & J.F. Kennedy, *Cops Under Fire: Law Enforcement Officers Killed with Assault Weapons and Guns with High-Capacity Magazines*, Washington, DC: Handgun Control, Inc., 1995; and Violence Policy Center, *"Officer Down" Assault Weapons and the War on Law Enforcement* (2003)).

results of research conducted by others in my field is well within my area of expertise, and is standard practice in my field.").  Indeed, a system that would require that an expert independently test the validity of every source on which he might rely would be unworkable.  The cases the plaintiffs cite, all but one unpublished district court decisions from other circuits, involve much different circumstances in which:  (1) the data or opinions being relied upon were subject to significant question and not subject to verification; and (2) the expert relied solely and directly on that work, without any analysis or validation.[8]

---

[8] *See, e.g.*, *Moore v. BASF Corp.*, Civ. A. No. 11-1001, 2012 U.S. Dist. LEXIS 170411 (E.D. La. Nov. 30, 2012) (for opinion purportedly relating to exposure of benzene in the 1980s, expert relied on a third party's report of another third party's unvalidated studies from the 1950s and 1960s and an unpublished memorandum, leaving the court "unable to assess the validity and methodology that produced these critical data"); *JRL Enters. v. Procorp Assocs.*, Civ. A. No. 01-2893, 2003 U.S. Dist. LEXIS 9397 (E.D. La. June 3, 2003) (expert opinion on lost profits excluded where it was based exclusively on the self-serving projections of the party retaining the expert as to the probability that sales would have been made); *Total Containment, Inc. v. Dayco Prods.*, Civ. A. No. 1997-cv-6013, 2001 U.S. Dist. LEXIS 15838, at *14-22 (E.D. Pa. Sept. 6, 2001) (expert opinion on lost sales excluded where based on unjustified assumption as to market share, unjustified exclusion of certain data, and reliance on self-serving and unvalidated projections of the party retaining the expert as to competitor market share and customer retention, as well as reports the expert admitted had "known difficulties"); *JMJ Enters. v. Via Veneto Italian Ice*, Civ. A. No. 97-CV-0652, 1998 U.S. Dist. LEXIS 5098, at *16-22 (E.D. Pa. Apr. 15, 1998) (expert opinion on lost sales from breach of contract excluded where based on unjustified assumption that sales would double annually by expert with no knowledge regarding the industry at issue).  The sole case from this district on which the plaintiffs rely is inapposite.  In *Berlyn, Inc. v. Gazette Newspapers, Inc.*, plaintiffs in an antitrust suit identified as an expert witness to define the relevant product market an individual whose background was "completely devoid of specific education, training, or experience in economics or antitrust analysis."  214 F. Supp. 2d 530, 537 (D. Md. 2002).  Although the plaintiffs attempted to educate the expert on those subjects by providing him with "texts and articles" to read, and by later providing him with case-related documents, *id.* at 538-39, the Court found this insufficient in light of the absence of the expert's qualifications on that issue, and the lack of any reliable principle or methodology.

In this case, by contrast, Professor Webster, whose qualifications have not been questioned, reviewed and synthesized the work of numerous current and publicly-available sources, and used them as a basis for explaining and supporting his own opinions, not simply reporting the opinions of others.  For example, Professor Webster did not just report what was contained within the *Mother Jones* article, but obtained the underlying data from *Mother Jones*, analyzed that data (which was produced to the plaintiffs in discovery), and used it to perform his own calculations, discussed at paragraphs 28-29 of his declaration.  S.J. Ex. 6, Webster Decl. (ECF No. 44-6) ¶¶ 28-29. Moreover, the data collected by *Mother Jones* about public mass shootings in the last 30 years—unlike unpublished reports on Benzene content from the 1950s or speculative estimates of future profitability from self-interested corporate executives, for example— is readily subject to public scrutiny and independent confirmation.   Furthermore, Professor Webster does not simply report Professor Koper's conclusions, but analyzes them in connection with other sources, including Professor Webster's own research regarding the implementation of Maryland's law banning "Saturday Night Special" handguns (identifying a sharp increase in sales of banned firearms leading up to effective date of statute, causing a delayed realization of its positive effects), in reaching his opinion that Professor Koper's research "is likely to understate potential public safety benefits of the federal ban of assault weapons and LCMs."  S.J. Ex. 6, Webster Decl. (ECF No. 44-6) ¶¶ 22-26.

Professor Webster's expert opinions are admissible and the plaintiffs' motion should be denied.

**IV.    THE PLAINTIFFS HAVE NOT OFFERED ANY BASIS FOR EXCLUDING THE TESTIMONY OF DEFENDANTS' LAW ENFORCEMENT EXPERTS, NONE OF WHOM OFFERED EXPERT BALLISTICS TESTIMONY.**

In a confusing portion of their motion, the plaintiffs seek to exclude expert ballistics testimony purportedly introduced "both by the declarations of law enforcement officers and Mr. Vince," but none of the three paragraphs of testimony they cite purports to contain any expert ballistics testimony.  Mot. to Exclude (ECF No. 65) at 11-12.

First, the plaintiffs identify Chief Johnson's testimony that "[a] shotgun would also be a superior self-defense weapon to an assault weapon, at least if it is loaded with appropriate shot that does not give rise to too great a risk of over penetration."  *Id.*  (citing S.J. Ex. 3, Johnson Decl. (ECF No. 44-3) ¶ 35).  Chief Johnson's acknowledgment that some shot that might be loaded into a shotgun may give rise to a risk of over penetration hardly constitutes expert ballistics testimony.  Chief Johnson's familiarity with shotguns comes both from formal law enforcement training and his personal ownership of a shotgun that he uses for hunting.  S.J. Ex. 77, Johnson Dep. (ECF No. 62-2) at 6, 67-69.

Second, the plaintiffs identify Commissioner Batts' testimony about research he personally directed regarding various rounds fired by officers under his command when he was in charge of the Long Beach, California SWAT team.  Mot. to Exclude (ECF No. 65) at 12 (citing S.J. Ex. 4, Batts Decl. (ECF No. 44-4) ¶ 21).  This testimony is not expert ballistics testimony, but Commissioner Batts's report of the results of research he directed, and which was reported to him in connection with his official duties.  S.J. Ex. 4, Batts Decl. (ECF No. 44-4) ¶ 21.

Third, the plaintiffs identify Deputy Chief Stawinski's testimony that "[m]ost assault weapons have significant penetration capabilities that are especially dangerous to both law enforcement officers and civilians alike."  Mot. to Exclude (ECF No. 65) at 12 (citing S.J. Ex. 5, Stawinski Decl. (ECF No. 44-5) ¶ 30).  Deputy Chief Stawinski went on in the immediately following paragraphs to explain that he had "personally observed" assault weapons rounds piercing soft body armor that would stop "virtually any handgun round," and that his police department had on display a piece of bullet-resistant glass "pierced straight through by a round from an assault weapon."  S.J. Ex. 5, Stawinski Decl. (ECF No. 44-5) ¶ 31.  Thus, Deputy Chief Stawinski was not purporting to offer expert ballistics testimony, but testimony based on his personal knowledge and experience as a law enforcement officer.

The premise of the plaintiffs' complaint, that these law enforcement officers were providing expert ballistics testimony, is inaccurate.  The motion to exclude testimony of Chief Johnson, Commissioner Batts, and Deputy Chief Stawinski should be denied.

## V.   THE PLAINTIFFS HAVE NOT OFFERED ANY BASIS FOR EXCLUDING THE TESTIMONY OF LUCY ALLEN.

The plaintiffs offer similarly-confused arguments to exclude portions of the testimony of Lucy Allen, partly by conflating two separate opinions offered by Ms. Allen.  *See* Mot. to Exclude (ECF No. 65) at 13.  Ms. Allen's first opinion, as to the rarity of incidents in which 10 or more rounds are fired, is based on her analysis of data compiled by the NRA Institute for Legislative Action ("NRA-ILA"), and does not rely on *Mother Jones* data.  S.J. Ex. 9, Allen Decl. (ECF No. 44-9) ¶¶ 7-12.  As to that opinion,

the plaintiffs contend, erroneously, that "Ms. Allen stated that she simply coded stories taken from a third party source and conducted her analysis based on this data." Mot. to Exclude (ECF No. 65) at 13. However, as described both in her declaration and in her deposition, in addition to coding the NRA-ILA accounts, Ms. Allen also sought confirmation of details from "new[s] stories describing the same event." Ex. E, Allen Dep. at 24; *see also* S.J. Ex. 9, Allen Decl. (ECF No. 44-9) ¶¶ 7-12. Thus, the plaintiffs' contention that Ms. Allen did no verification of the NRA-ILA information is false.

The plaintiffs also claim that this opinion of Ms. Allen is improper because it is based solely on anecdotal evidence. Mot. to Exclude (ECF No. 65) at 13. However, the analysis was based on a collection of 279 self-defense stories, collected for unrelated purposes over a three-year period of time. S.J. Ex. 9, Allen Decl. (ECF No. 44-9) ¶¶ 7-12. Although not scientifically compiled, it comprised "the largest collection of accounts of citizen self-defense of which I am aware," and, in light of the source, any collection bias should be expected to "be in favor of stories that put use of guns in self-defense in the best possible light." *Id.* ¶ 9; *see also* Ex. E, Allen Dep. at 24 (NRA-ILA database was "the most comprehensive source that we found"). Thus, Ms. Allen identified this as the most comprehensive source available to test a proposition as to which the plaintiffs have provided no evidence at all.

The cases on which the plaintiffs rely are inapposite. In *Allison v. McGhan Med. Corp.*, the Eleventh Circuit acknowledged the lesser value of anecdotal case studies *when compared* with "controlled, population-based epidemiological studies" reaching contrary conclusions. 184 F.3d 1300, 1316 (11th Cir. 1999). In this case, with summary

18

judgment briefing now concluded, the plaintiffs have not identified a single study on this subject, much less one that reaches a conclusion contrary to Ms. Allen's or that is more thorough than hers. And in *Kings Dodge, Inc. v. Chrysler Group, LLC*, the court simply notes that reliance on anecdotal evidence has been identified, along with six other factors, as a red flag, without discussion or application of that principal. Case No. 1:12-cv-445, 2013 U.S. Dist. LEXIS 168756 (S.D. Ohio Nov. 27, 2013). In *Heller III*, by contrast, the court expressly identified "anecdotes" as among the types of "meaningful evidence" on which a government may rely. 2014 U.S. Dist. LEXIS 66569 at *34-35 (quoting *Lorillard Tobacco*, 533 U.S. at 555). In this case, in light of the data available, the source used by Ms. Allen is appropriate and her testimony on that point is admissible and uncontradicted.

The second opinion offered by Ms. Allen relates to the use of large-capacity magazines in mass shootings, based on her analysis of "two comprehensive sources detailing historical mass shootings," S.J. Ex. 9, Allen Decl. (ECF No. 44-9) ¶¶ 13, one of which—data compiled by *Mother Jones* magazine—the plaintiffs fault Ms. Allen for relying on without conducting independent research. Unlike the cases on which the plaintiffs rely, however, in which experts were faulted for relying on opaque, unverifiable, and often self-serving sources of information, *see* discussion above at footnote 8, the *Mother Jones* data is a compilation of publicly-available information about mass public shootings. Moreover, the underlying data used by *Mother Jones* has been made available to the public, can be readily reviewed and tested, and yet has not been identified as untrustworthy by anyone.

19

The plaintiffs' motion to exclude testimony of Lucy Allen should be denied.

## VI.   THE PLAINTIFFS HAVE NOT OFFERED ANY BASIS FOR EXCLUDING THE TESTIMONY OF MAXIMILIAN BULINSKI.

The plaintiffs ask this Court to exclude the testimony of Maximilian Bulinski on the grounds that he was not identified as a witness before his declaration was provided in connection with the defendants' reply brief in support of their motion for summary judgment.  For several reasons, that motion must be denied.

First, Mr. Bulinski's testimony is clearly rebuttal/impeachment testimony that the defendants were not aware of until shortly before filing it.   In their opposition to the defendants' motion for summary judgment, the plaintiffs sought to introduce hearsay evidence in the form of an e-mail message contending that 10-round magazines were not available for certain firearms, including the Glock 22 and the Springfield XD.  *See* ECF No. 55-1 at 54 & Plaintiffs' S.J. Ex. 40 (ECF No. 55-40).   On March 27, 2014, after receiving the plaintiffs' opposition, Mr. Bulinski went to a Baltimore Glock dealer and asked to purchase two 10-round magazines for the Glock 22 (the first model of Glock handgun for which the e-mail stated such magazines were not then available).   S.J. Ex. 83, Bulinski Decl. (ECF No. 62-8) ¶¶ 2-3.   On that same day, Mr. Bulinski made an Internet purchase of a 10-round magazine for a Springfield XD handgun (also identified in the e-mail submitted by the plaintiffs), which arrived three days later.  *Id.* ¶¶ 6-7.   Until the defendants received the plaintiffs' brief, and Mr. Bulinski then purchased these magazines, the defendants were unaware that he would be used as a witness in any capacity and, thus, could not possibly have disclosed earlier that he might testify.

Second, although the plaintiffs now contend that the defendants should have foreseen that the plaintiffs would make use of the e-mail as purported proof that it was impossible to obtain 10-round magazines for certain firearms, *see* Plaintiffs' Reply Brief (ECF No. 69) at 15 n.7, the defendants did not anticipate the plaintiffs would use a November 2013 e-mail that constitutes inadmissible hearsay, and that purports to identify a temporary shortage of 10-round magazines that existed several months before it was submitted to this court, as their support for a false claim that those same 10-round magazines remained unavailable in March 2014.[9]

Third, even if Mr. Bulinski's identity had been revealed at some point between March 27, 2014, when the defendants first identified that they might present testimony from him, and April 11, 2014, when the defendants disclosed his testimony by providing his declaration, the plaintiffs could not possibly demonstrate any prejudice, nor have they made any effort to do so.  Moreover, the plaintiffs' apparent contention that immediate disclosure of a newly-identified rebuttal witness is required before a declaration from such a witness can be submitted in a court filing is betrayed by their own conduct, as the plaintiffs themselves failed to identify three pieces of evidence they submitted in connection with their own summary judgment reply brief, first submitted on April 29,

---

[9] In fact, even the declaration of Sam Walters that the plaintiffs have submitted in response to Mr. Bulinski's declaration demonstrates that 10-round magazines are not "impossible" to locate, but instead are subject to fluctuations in availability as manufacturers presumably adjust to demand for them.  Mr. Walters testified that at the time he signed the declaration he had at least some 10-round magazines in stock for three different Glock models, but not for two others, and that "[w]hether I have ten round magazines is a day-by-day proposition."  Walters Decl. (ECF No. 68-3) ¶¶ 5, 7.

2014, until a day after filing that reply brief.[10]   It was not until April 30, 2014 that the

plaintiffs provided supplemental disclosures identifying for the first time two witnesses

from whom they submitted declarations, and disclosing that they "may" use as evidence

the legislative hearing transcript they had submitted a day earlier as plaintiffs' summary

judgment exhibit 49.  *See* Ex. F, Plaintiffs' Supplemental Disclosures.

     The plaintiffs' motion to exclude Mr. Bulinski's testimony should be denied.

## VII.   THE PLAINTIFFS HAVE NOT OFFERED ANY BASIS FOR EXCLUDING THE TESTIMONY OF JOSEPH VINCE.

     The plaintiffs' motion to exclude concludes with a paragraph argument to exclude

from evidence those portions of the declaration of Joseph Vince that the plaintiffs' claim

to be devoted to "the history and functionality of firearms and their accessories."  Mot. to

Exclude (ECF No. 65) at 14.  The plaintiffs specifically take issue with ¶¶ 10-19 and

31-32 of Mr. Vince's declaration, *id.*, even though the defendants cite only two of those

paragraphs, ¶¶ 10-11, in their summary judgment briefing, *see* ECF No. 44-1, at 49.

Paragraph 10 states that "[s]emiautomatic rifles are a subgroup within the class of rifles,"

based on the definition of semiautomatic rifles quoted from the federal Gun Control Act

of 1968, which defined classes of firearms.  Paragraph 11 states that most of the assault

long guns banned by Maryland's law are a subclass of those semiautomatic rifles

"comprised of semiautomatic rifles with features designed for military combat."

---

[10] The plaintiffs originally filed their reply brief in support of their motion for summary judgment on April 29, 2014 (ECF No. 66).

From 1971 through 1999, Mr. Vince was an agent for the United States Bureau of Alcohol, Tobacco and Firearms, including positions as Deputy Chief and then Chief of the Firearms Enforcement Division from 1993 through 1997, and Chief of the Crime Gun Analysis Branch from 1997 through 1999. *See* S.J. Ex. 8, Vince Decl. (ECF No. 44-8) ¶ 4 and Ex. A. He is currently the Director of the Criminal Justice Programs at Mount St. Mary's University in Emmitsburg, Maryland. *Id.* ¶ 2. The plaintiffs' bald assertion that Mr. Vince is not qualified to identify a subclass of firearms by reference to definitions contained in federal law is baseless. Nor are any of the other paragraphs of Mr. Vince's declaration identified by the plaintiffs outside of his expertise, nor do the plaintiffs make any effort to explain how they would be. Mr. Vince acknowledged that he is not an expert with respect to, for example, the detailed internal mechanics of firearms, but the defendants have not relied on him for any such testimony. The plaintiffs have failed to identify any basis for the exclusion of Mr. Vince's testimony, and their motion should be denied.

## CONCLUSION

The Court should deny the plaintiffs' motion to exclude evidence (ECF No. 65).

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

             /s/
_____
MATTHEW J. FADER (Fed. Bar # 29294)
JENNIFER L. KATZ (Fed. Bar # 28973)
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-7906 (tel.); 410-576-6955 (fax)
mfader@oag.state.md.us

DAN FRIEDMAN (Fed. Bar # 24535)
Assistant Attorney General
Office of the Attorney General
Legislative Services Building
90 State Circle, Room 104
Annapolis, Maryland 21401
410-946-5600 (tel.); 410-946-5601 (fax)
dfriedman@oag.state.md.us

Dated: May 16, 2014                    Attorneys for Defendants

24