# EXHIBIT A

DOUGLAS F. GANSLER
ATTORNEY GENERAL
———

KATHERINE WINFREE
Chief Deputy Attorney General

JOHN B. HOWARD, JR.
Deputy Attorney General



DAN FRIEDMAN
Counsel to the General Assembly
———

SANDRA BENSON BRANTLEY
BONNIE A. KIRKLAND
KATHRYN M. ROWE
Assistant Attorneys General

# THE ATTORNEY GENERAL OF MARYLAND
## OFFICE OF COUNSEL TO THE GENERAL ASSEMBLY

April 30, 2013

The Honorable Martin O'Malley
Governor of Maryland
State House
Annapolis, Maryland 21401

Re: *Senate Bill 281, The "Firearm Safety Act of 2013"*

Dear Governor O'Malley:

We have reviewed and hereby approve Senate Bill 281, the "Firearm Safety Act of 2013" for your signature. As you know, attorneys from the Office of the Attorney General have worked with your office and the bill's sponsors throughout the legislative process to ensure that the components of this bill would be constitutional and legally defensible. We write today to explain those conclusions.

## I. The Second Amendment Framework

The Second Amendment to the U.S. Constitution provides that, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In 2008, the U.S. Supreme Court held that "the [District of Columbia's] ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). The *Heller* Court explained that the Second Amendment codifies a pre-existing "individual right to possess and carry weapons in case of confrontation." *Id.* at 591. But the *Heller* Court pointed out that "the right secured by the Second Amendment is not ... a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," and that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626 (describing historical limitations on firearms rights). Indeed, the *Heller* Court went so far as to identify a number of restrictions on keeping, carrying, and selling weapons as "presumptively lawful regulatory measures," including "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27 & n.26. The Court made clear that this and other

DEF 003773

The Honorable Martin O'Malley
April 30, 2013
Page 2

presumptively lawful measures were only "examples; our list does not purport to be exhaustive." *Id.* at n.26.

The Court of Appeals for the Fourth Circuit has adopted a two-pronged approach to analyzing laws under the Second Amendment. *Woollard v. Gallagher*, _____ F.3d _____, _____, 2013 U.S. App. LEXIS 5617, *23, (4th Cir. Mar. 21, 2013); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). Under this approach, the first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Chester*, 628 F.3d at 680 (internal quotation marks omitted). If not, the challenged law is valid. *Id.* If, on the other hand, the burdened conduct is found to be within the scope of the Amendment, then the second prong requires the application of "an appropriate form of means-end scrutiny." *Id.*[1] The Fourth Circuit—like nearly every other federal court to have considered the question—has adopted intermediate scrutiny as the appropriate test for regulation affecting behavior outside the core of in-home self-defense by law-abiding citizens. *United States v. Masciandaro*, 638 F.3d 458, 471 (4th Cir. 2011). Under that test, the government bears the burden of demonstrating that the challenged regulation "is reasonably adapted to a substantial government interest." *Id.*; *see also Chester*, 628 F.3d at 683 (under intermediate scrutiny, "the government must demonstrate … that there is a 'reasonable fit' between the challenged regulation and a 'substantial' government objective").[2]

Many opponents of this bill expressed their belief that there is a constitutional right to individual firearm possession that is exempt from regulation. That belief, however, is not supported by either the *Heller* decision itself, which is clear that there are important limitations on the exercise of the Second Amendment right, *Heller*, 554 U.S. at

---

[1]   Because the *Heller* Court did not provide much detail about the scope of the Second Amendment (other than to identify the "core" of the Second Amendment right as law-abiding citizens' possession and use of guns in their homes for self-defense), courts have frequently "deemed it prudent to … resolve post-*Heller* challenges to firearm prohibitions at the second step." *Woollard*, 2013 U.S. App. LEXIS 5617, *24.

[2]   Although the Fourth Circuit has adopted intermediate scrutiny as the appropriate test for this means-end analysis, *Masciandaro*, 638 F.3d at 471, the Office of the Attorney General continues to believe that a "reasonable regulation" standard, derived from pre-*Heller* state constitutional analyses, is the more appropriate standard of review and has preserved that issue in *Woollard* for possible review by the U.S. Supreme Court. *Woollard*, 2013 U.S. App. LEXIS 5617, *34 n.8. Our analysis of Senate Bill 281 under the currently prevailing intermediate scrutiny standard is not a waiver or abandonment of this position.

DEF 003774

The Honorable Martin O'Malley
April 30, 2013
Page 3

626-27, or by comparison to other important constitutional rights which are often regulated without constitutional violation. *See, e.g., Crawford v. Marion County Election Board*, 553 U.S. 181, 200-02 (2008) (affirming use of voter identification law to regulate participation in election); *Rosario v. Rockefeller*, 410 U.S. 752, 754-58 (1973) (upholding state voter registration requirements); *Perry Educ. Ass'n. v. Perry Local Educ. Ass'n.*, 460 U.S. 37, 44-46 (1983) (upholding time, place, and manner restrictions on free speech). Instead, proposed gun regulations must be analyzed under the standards of review that courts have developed to implement the *Heller* decision.

## II.   Assault Weapon and High-Capacity Detachable Magazine Bans

The specific holding in *Heller* concerned handguns, which the Court determined were constitutionally protected, in part, because they are "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629. Conversely, the *Heller* Court explained that the Second Amendment "does *not* protect those weapons *not* typically possessed by law-abiding citizens for lawful purposes." *Id.* at 624-25 (emphasis added) (discussing *U.S. v. Miller*, 307 U.S. 174 (1939)). The *Heller* Court suggested three factors to consider in determining if a class of firearms is protected by the Second Amendment:

- It must be "in common use at the time," *id.* at 627;

- It cannot be a "dangerous or unusual" class of weapons, *id.*; and

- There must be a nexus to core self-defense needs. *Id.* at 599.

*See also U.S. v. Pruess*, 703 F.3d 242, 246 n.2 (4th Cir. 2012).

In analyzing the assault weapons and high-capacity detachable magazine bans in Senate Bill 281, we first look to see if, considering these three factors, they are protected by the Second Amendment. Although we determine that neither assault weapons nor high-capacity detachable magazines are protected by the Second Amendment, we nonetheless will also determine if the State has sufficiently justified the proposed bans so as to satisfy intermediate scrutiny.

### A.   Assault Weapons Ban

Senate Bill 281 expands the longstanding (and never challenged) assault pistol ban to apply to a list of newly prohibited assault long guns, Maryland Public Safety ("PS")

DEF 003775

The Honorable Martin O'Malley
April 30, 2013
Page 4

Ann. Code, § 5-101(r)(2), and "copycat weapons" as defined in proposed Maryland Criminal Law ("CL") Ann. Code, § 4-301(e). In our view, the banned assault weapons satisfy none of the three factors suggested by the *Heller* Court in that: (1) they are relatively uncommon;[3] (2) they are dangerous and unusual; and (3) they are largely unrelated to home self-defense, at least as that term is commonly understood. In fact, language in *Heller* itself strongly suggests that the Supreme Court understands that military-style assault weapons are outside of the protections of the Second Amendment:

> It may be objected that if weapons that are most useful in military service—M-16 rifles and the like[4]—may be banned, then the *Second Amendment* right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the *Second Amendment*'s ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the

---

[3]   It is apparently difficult to estimate the number of assault weapons in private hands in the United States. In a 2012 report concerning gun ownership, the Congressional Research Service noted that the most recent estimate, from 1994, was 1.5 million assault weapons. William J. Krouse, *Gun Control Legislation* (Congressional Research Service, Nov. 14, 2012) at 9 & n.38. In that same year, 1994, an estimated 192 million firearms were privately owned in the United States, of which 65 million were handguns, 70 million were rifles, and 49 million were shotguns. Phillip J. Cook & Jens Ludwig, *Guns in America: National Survey on Private Ownership and Use of Firearms* (National Institute of Justice, May 1997). Thus in 1994, assault weapons accounted for less than 1% of the total firearms owned. Even assuming a significant undercount, differences based on definitions of assault weapons, and accounting for the age of the data, this figure is still just a tiny fraction of the total number of firearms in the United States. Accordingly, assault weapons, as opposed to the handguns at issue in *Heller*, are not "overwhelmingly chosen," "the most preferred firearm in the nation," or "the most popular weapon chosen by Americans." *Heller*, 554 U.S. at 628-29. Therefore, we think it is fair to say that assault weapons are not in common use, at least as the *Heller* Court intended the term.

[4]   The M-16 rifle is, for purposes of this analysis, essentially the military version of the AR-15, an assault weapon specifically banned by Senate Bill 281. *See Heller v. District of Columbia*, 670 F.3d 1244, 1263 (D.C. Cir. 2011) ("*Heller II*") (discussing similarities between M-16 and AR-15).

The Honorable Martin O'Malley
April 30, 2013
Page 5

> prefatory clause and the protected right cannot change our interpretation of
> the right.

*Heller*, 554 U.S. at 627-28. Thus, the Supreme Court assumed—and apparently considered the proposition to be so unassailable as to require no explanation—that military-style assault weapons are outside of the protection of the Second Amendment and may be banned. *See People v. James*, 94 Cal. Rptr. 3d 576, 586 (Cal. Ct. App. 2009) (relying on the above-quoted passage from *Heller* to determine that assault weapons are not protected by the Second Amendment). This should conclude the inquiry.

Moreover, even if assault weapons are within the scope of the Second Amendment's protection, there is more than sufficient evidence to support a "substantial relationship or reasonable 'fit' between, on the one hand, the prohibition on assault weapons ... and, on the other, [the State's] important interests in protecting police officers and controlling crime." *Heller v. District of Columbia*, 670 F.3d 1244, 1262 (D.C. Cir. 2011) ("*Heller II*") (affirming constitutionality of District of Columbia's ban on assault weapons); *see also Wilson v. County of Cook*, 968 N.E.2d 641 (Ill. 2012) (remanding case for development of record regarding whether assault weapons are within the scope of the Second Amendment and County's justification for ban). Here, in Maryland, the Legislature considered significant evidence of the lethality of assault weapons and their lack of utility as a common method of self-defense before adopting Senate Bill 281. For example, the standing committees of the General Assembly with jurisdiction to consider Senate Bill 281 (the Senate Judicial Proceedings Committee and, operating jointly, the House Judiciary and the Health and Governmental Operations Committees) received testimony that design features of assault weapons contribute to their lethality and that "the greater the ammunition capacity of the firearm used in a mass shooting, the more victims were injured or killed by gunfire."[5] There was also testimony about the dangers that assault weapons present to law enforcement.[6] Moreover, the

---

[5]  Testimony of Daniel W. Webster, Professor, Johns Hopkins Bloomberg School of Public Health and Director of the Johns Hopkins Center for Gun Policy and Research, at 5 (hereinafter, "Webster Testimony") (and sources cited therein).

[6]  Baltimore County Police Chief James W. Johnson presented oral testimony to the General Assembly that mirrored his recent congressional testimony in support of a federal assault weapons ban. *See Testimony for Chief Jim Johnson, Baltimore County, Maryland Chair, National Law Enforcement Partnership to Prevent Gun Violence to the U.S. Senate Judiciary Committee* (Jan. 30, 2013) *available at* http://www.judiciary.senate.gov/pdf/1-30-13JohnsonTestimony.pdf.

DEF 003777

The Honorable Martin O'Malley
April 30, 2013
Page 6

General Assembly also relied on social science research that supported assault weapons bans in other jurisdictions. *See, e.g., Heller II,* 670 F.3d at 1262-63 (discussing social science literature supporting D.C.'s assault weapon ban); Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban,* in <u>Reducing Gun Violence in America: Informing Policy with Evidence and Analysis</u> 167 (2013) (discussing federal assault weapons ban); Christopher S. Koper & Jeffrey A. Roth, *The Impact of the 1994 Federal Assault Weapons Ban on Gun Violence Outcomes: An Assessment of Multiple Outcome Measures and Some Lessons for Policy Evaluation,* 17 <u>J. of Qualitative Criminology</u> 33 (2001) (same). Therefore, it is our judgment that even if a reviewing court were to find that assault weapons were within the scope of the Second Amendment—a finding unsupported by *any* reported decision—it would still find that the ban is constitutional.

B.    *High-Capacity Detachable Magazine Ban*

Senate Bill 281 defines a detachable magazine as "an ammunition feeding device that can be removed readily from a firearm without requiring disassembly of the firearm action or without the use of a tool, including a bullet or a cartridge." Proposed CL § 4-301(f). The bill then states that a person "may not manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm." Proposed CL § 4-305(b). The effect is a ban in the State of Maryland (with exceptions for law enforcement) on detachable magazines holding more than 10 rounds: what we will call high-capacity detachable magazines.

As an initial matter, it is far from clear that a detachable magazine of any size, simply because it is used and associated with firearms, would be protected by the Second Amendment and subjected to the same constitutional analysis as an actual firearm. If such magazines are not protected, there would be no constitutional concern about the ban at all. For the sake of argument, however, we will analyze the constitutionality of a ban on high-capacity detachable magazines as though it is subject to the same analysis.

Applying the three factors suggested by *Heller* to determine whether a given weapon or class of weapons is within the scope of the Second Amendment produces a mixed result when applied to these high-capacity detachable magazines. We would be hard pressed to argue that high-capacity detachable magazines are not in common use today. In fact, many handguns in common use are currently sold with magazines that will

The Honorable Martin O'Malley
April 30, 2013
Page 7

be banned under Senate Bill 281.[7] It is clear that these magazines' ability to increase the amount of bullets fired in a short period renders them more "dangerous"[8] than other bullet loading systems, but it is unclear whether they could be classified as "unusual."[9] And it would seem unlikely that high-capacity detachable magazines have a nexus to standard home self-defense. *See* Webster Testimony, *supra* note 5 at 5 (citing Arthur L. Kellerman, *et al., Weapon Involvement in Home Invasion Crimes*, 273 J. Am. Med. Assoc. 1759 (1995)). Thus, applying the *Heller* factors, although we believe high-capacity detachable magazines to be outside of the Second Amendment's scope,[10] this presents an issue of first impression about which there is little guidance from the courts. That, however, is not dispositive of the constitutional analysis.

Even if we assume, *arguendo*, that high-capacity detachable magazines are entitled to protection under the Second Amendment, *see supra* note 1, we nonetheless conclude that a complete ban will survive constitutional scrutiny. That is because we are confident that a reviewing court will find that there is a substantial relationship between the prohibition of high-capacity detachable magazines and the State's objectives of controlling crime and protecting law enforcement officers. *See Heller II*, 670 F.3d at 1262-64 (affirming constitutionality of District of Columbia's ban on high-capacity detachable magazines); *Woollard*, 2013 U.S. App. LEXIS 5617, *31 (Given the extent of gun violence in Maryland, "we can easily appreciate Maryland's impetus to enact

---

[7] For example, a standard Glock pistol now comes equipped with two detachable seventeen-round magazines.

[8] All firearms are, by definition and design, "dangerous." Thus necessarily, the *Heller* Court must have meant something different or beyond the customary meaning of the term.

[9] We do not believe that the *Heller* Court intended to leave the determination of constitutionality to the caprice of gun manufacturers as they increase magazine capacity in an attempt to obtain larger market shares. Thus, we think that there must be a more specialized meaning to the terms "dangerous," *see supra* note 8, and "unusual" as used in *Heller* that will be elucidated in further developments in the case law.

[10] We note in this regard that Professor Laurence H. Tribe, the Carl M. Loeb University Professor and Professor of Constitutional Law at Harvard Law School, and author of a leading treatise on the U.S. Constitution, testified before the U.S. Senate Judiciary Committee that, in his view, high-capacity detachable magazines are outside the scope of the Second Amendment and can be regulated without triggering heightened scrutiny. Laurence H. Tribe, *Prepared Testimony: Proposals to Reduce Gun Violence: Protecting Our Communities While Respecting the Second Amendment* (Feb. 12, 2013).

The Honorable Martin O'Malley
April 30, 2013
Page 8

measures aimed at protecting public safety and preventing crime, and we readily conclude that such objectives are substantial governmental interests"). There is significant social science, much of which is part of the legislative record, to support this "substantial relationship."[11] The Legislature was also aware of recent mass shootings in which the perpetrators were armed with high-capacity detachable magazines and that some of these incidents were interrupted only when the shooter paused to reload. Thus, we believe that the ban on high-capacity detachable magazines will satisfy intermediate scrutiny and be found to be constitutional.

## III.   *Armor Piercing Bullets*

Senate Bill 281 creates a new crime for those who use "restricted firearm ammunition" in the commission of a crime of violence. Proposed CL § 4-110(a)(2). Ammunition manufactured from the materials listed in proposed CL § 4-110(a)(2) are harder, have more penetrating power, and are, therefore, capable of piercing armored vehicles and body armor. For this reason, such ammunition is commonly referred to as "armor-piercing" bullets or "cop-killer" bullets. Manufacture and sale of armor-piercing bullets for civilian use has been prohibited by federal law since 1986. 18 U.S.C. § 922(a)(7), (8); *Kodak v. Holder*, 907 Fed. Appx. 907 (4th Cir. 2009) (unpublished opinion affirming constitutionality of federal prohibition on armor-piercing bullets). Under Senate Bill 281, it will be a separate crime to possess or use these bullets "during and in relation to the commission of a crime of violence." Proposed CL § 4-110(b). We do not foresee any constitutional obstacle to this provision. First, there is no clear guidance that specific types of bullets are to be afforded the same constitutional protection as guns themselves. Even if they are, the Fourth Circuit Court of Appeals has been clear that "a presumptively lawful regulation could not violate the Second Amendment unless, as applied, it proscribed conduct 'fall[ing] within the category of ... *law-abiding responsible* citizens ... us[ing] arms in defense of hearth and home.'" *U.S. v. Pruess*, 703 F.3d 242, 245 (4th Cir. 2012) (emphasis in original) (quoting *U.S. v. Moore*, 666 F.3d 313, 319 (4th Cir. 2012)). Here, where the crime of use or possession of this "restricted firearm ammunition" can only occur "during and in relation to the commission of a crime of violence" there is no danger that it will be applied to law-abiding responsible citizens. Therefore, the proposed criminalization of the use of these bullets is constitutional.

---

[11]   Social science evidence supporting the ban on high-capacity detachable magazines was substantially similar to that regarding the assault weapon ban described above.

The Honorable Martin O'Malley
April 30, 2013
Page 9

## IV.   *Handgun Qualification License*

### A.   *Licensure Requirements*

Under the terms of Senate Bill 281, to be eligible to purchase, rent, or receive a handgun, one must possess a Handgun Qualification License issued by the Department of State Police or be specifically exempted from that requirement. To obtain a Handgun Qualification License, an applicant must:

> (1)   be at least 21 years old;
>
> (2)   be a Maryland resident;
>
> (3)   have taken an approved firearms safety course (or be exempted from that requirement); and
>
> (4)   not be prohibited by federal or state law from owning or possessing a firearm.

Proposed PS § 5-117.1(d). To verify that an applicant is not prohibited from owning or possessing a firearm, the applicant must submit fingerprints. The State Police then run a criminal history records check. Proposed PS § 5-117.1(f). A Handgun Qualification License is valid for 10 years and may be renewed. Proposed PS § 5-117.1(i). The fees for obtaining and renewing the Handgun Qualification License are discussed in the next section of this letter.

#### 1.   "Presumptively Lawful" Analysis

Applying the Fourth Circuit's two-part analysis to the Handgun Qualification License provisions of Senate Bill 281 requires us to turn back to the *Heller* decision. There, the Supreme Court provided a list of some "presumptively lawful regulatory measures":

> Nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

The Honorable Martin O'Malley
April 30, 2013
Page 10

*Heller*, 554 U.S. at 626-27 & n.26. The Court did not specify whether it meant that these "presumptively lawful" regulations were simply outside of the scope of the Second Amendment or whether such laws are within the scope of the Second Amendment but are nevertheless constitutional because they satisfy any applicable level of scrutiny. *Masciandaro*, 638 F.3d at 472-73 (describing but not resolving this "ambiguity" in the *Heller* opinion). In either case, however, we must take *Heller* at its word and, therefore, it is our view that a law like Senate Bill 281, which "impos[es] conditions and qualifications on the commercial sale of arms" is "presumptively lawful" under the Second Amendment. *Heller*, 554 U.S. at 626-27 & n.26; *see also Justice v. Town of Cicero*, 577 F.3d 768, 773-74 (7th Cir. 2009) (affirming constitutionality of town handgun registration scheme). Moreover, as the *Heller* Court was careful to make clear, this list of "presumptively lawful" regulations is illustrative only and not exhaustive. *Id.* n.26. We think, therefore, that it is reasonable to infer that imposing identical "conditions and qualifications" on non-commercial transactions of regulated firearms as are imposed on commercial sales will also be "presumptively lawful." The commercial nature of the transaction should not be relevant to the constitutional analysis. Thus, it is our view that, under the law applied in this Circuit, the Handgun Qualification License provisions of Senate Bill 281 are presumptively constitutional and no further means-end analysis will be required.

We note that a ban on possession of protected arms cloaked in the disguise of a law imposing conditions or qualifications on the sale of arms would presumably not be upheld under *Heller*. Senate Bill 281, however, does no such thing. In fact, Senate Bill 281's licensing requirement does not prohibit anyone who is otherwise lawfully allowed to own a handgun from complying with the straightforward requirements and obtaining a license. Moreover, the requirements themselves are clearly related to Maryland's interest in public safety and preventing crime.

> 2. "Longstanding Regulation" Analysis

The only extended judicial analysis of a handgun regulatory regime like that contemplated by Senate Bill 281 takes a slightly different analytical approach than we have suggested. In *Heller II*, the D.C. Circuit considered the constitutionality of a handgun registration regime that was enacted in the wake of the Supreme Court's original *Heller* decision. *Id.* at 1247. The D.C. Circuit read the above-quoted paragraph from *Heller* as if the modifier "longstanding" applied to each of the three examples. Thus, according to the D.C. Circuit, only "longstanding" registration laws should be entitled to the presumption of constitutionality. *Id.* at 1253. The D.C. Circuit then found that some "basic" aspects of a registration system had long existed (albeit in other parts of the

The Honorable Martin O'Malley
April 30, 2013
Page 11

country) and were thus valid. *Id.* at 1253-55. The D.C. Circuit found other parts of D.C.'s registration scheme to be "novel," *i.e.* not "longstanding," and therefore a potential burden on Second Amendment rights. *Id.* at 1255-56. The D.C. Circuit then remanded those "novel" aspects of the registration system to the District Court to determine whether they satisfied the intermediate scrutiny test. *Id.* at 1258-60.

Applying this *Heller II* test to Senate Bill 281, it is our view that the Handgun Qualification License provisions of the bill are both "basic" and "longstanding." In fact, we view those licensure requirements as merely an administrative means to improve compliance with existing Maryland laws regarding the qualifications of firearms purchasers. *See* PS § 5-117 (requiring a firearm application for purchase, rental, or transfer of a regulated firearm)); PS § 5-118(b)(3)(i) (requiring a purchaser to be at least 21 years old); PS § 5-118(b)(3)(ii), (iii) (prohibiting transfer to persons disqualified by state law); PS § 5-118(3)(x) (requiring completion of a firearms safety training course). For example, the requirement to submit fingerprints, proposed PS § 5-117.1(f)(3)(i), is simply a better, more accurate way of identifying an applicant for purposes of determining eligibility to obtain firearms. Moreover, Maryland law has long required fingerprint registration of presumably law-abiding citizens in dozens of contexts to prevent ineligible people from participating in activities or employment.[12] And finally, a requirement to submit fingerprints as a part of a firearms registration or owner licensure process is a longstanding feature of state laws in New Jersey,[13] New York,[14]

---

[12] The list is long and includes, among other professions, employees of childcare facilities, Md. Fam. Law Ann. Code, §5-562; bank incorporators, executive officers, and directors, Md. Fin. Inst. ("FI") Ann. Code, §3-203.1; credit union incorporators and directors, FI §6-309; mortgage lenders and originators, FI §11-506.1; check cashing services licensees, FI §12-107; certain county and city taxicab drivers, CP §§10-236.2 through 10-236.3; private detectives, Md. Bus. Occ. & Profs. ("BO") Ann. Code, §13-304; security systems technicians, BO §18-303; security guards and security agencies, BO §19-304; horse racers, BO §11-312; second hand precious metal object dealers and pawnbrokers, BO §12-204; locksmiths, Md. Bus. Reg. ("BR") Ann. Code, §12.5-204; local government employees and volunteers in many counties, Md. Crim. Proc. ("CP") Ann. Code, §§10-231 through 10-236.1; and debt management service providers, FI §12-909.

[13] N.J. Stat. Ann., § 2C:58-3(e) (fingerprinting required to obtain permit to purchase firearms since at least 1991).

[14] N.Y. Penal Law, § 400.00(4) (requirement of fingerprinting for permit to carry or possess firearms since 1963).

The Honorable Martin O'Malley
April 30, 2013
Page 12

Massachusetts,[15] Connecticut,[16] Hawaii,[17] and the District of Columbia.[18] Thus, the only new requirement under Senate Bill 281 to obtain a Handgun Qualification License—as opposed to an improved method of implementing existing law—is the requirement of Maryland residency. This requirement, however, is still simply a "basic" registration requirement and despite being new here, is of "longstanding" vintage in other states including New York. *Osterweil v. Bartlett*, 819 F. Supp. 2d 72 (N.D.NY 2011) (upholding the requirement of New York residency for New York gun licensing).[19] The *Heller II* Court was clear that such basic registration requirements are "self-evidently de minimis, for they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot be reasonably considered onerous." *Heller II*, 670 F.3d at 1255. Thus, under even the *Heller II* test, it is our view that the provisions requiring a Handgun Qualification License are all presumptively constitutional.

    3.    Strict/Intermediate Scrutiny Analysis

    Finally, even if a reviewing court disagrees about all of the foregoing, and some or all of the requirements to obtain a Handgun Qualification License are determined to be outside of the "presumptively lawful" category of regulations identified by the Supreme Court in *Heller*, they would still be constitutional if they satisfy the appropriate level of

---

[15] Mass. Gen. Laws, ch. 140, § 129B (2) (fingerprinting required for Firearm Identification Card since 1998); § 131(e) (fingerprinting required for license to carry firearm since 1957, expanded to also require fingerprints for possession of a firearm in 1998).

[16] Conn. Gen. Stat. § 53-202d (a)(4) (thumbprint of owner required for certificate of possession for assault weapon since 1993).

[17] Haw. Rev. Stat. Ann., § 134-2(b) (fingerprints required for permit to acquire firearms; requirement since 1988).

[18] D.C. Code Ann. § 7-2502.04(a) (requiring fingerprinting for registration since 2009); D.C. Mun. Reg. § 24-2312.1 (same). We note that the D.C. Circuit in *Heller II* determined fingerprinting to be a "novel" registration requirement and has, apparently, enjoined its use. *Heller II*, 670 F.3d at 1255. Even if the court was correct in labeling this as novel, a point with which we do not agree, *see supra* notes 13-17, that finding has not been fatal to the requirement. Rather, the D.C. Circuit remanded the matter back to the trial court to take evidence regarding whether the fingerprint registration requirement satisfies intermediate scrutiny. *Id.* at 1258-60.

[19] Federal law also imposes the equivalent of residency requirements by prohibiting interstate transfers except through licensed dealers. 18 U.S.C. § 922(a)(3).

The Honorable Martin O'Malley
April 30, 2013
Page 13

constitutional scrutiny. In light of the *de minimus* impact of these requirements on the constitutional right, it is not clear that a court would analyze them using heightened scrutiny at all. If a court did employ heightened scrutiny, the appropriate test under current Fourth Circuit law, *see supra* n.2, would be no greater than intermediate scrutiny, which is to say, the requirements will be found to be constitutional if it can be shown that they are "reasonably adapted to a substantial government interest." *Masciandaro*, 638 F.3d at 471 (adopting intermediate scrutiny); *Heller II*, 670 F.3d at 1256-58 (applying intermediate scrutiny to D.C.'s handgun registration scheme). If a court were to find that the licensure requirement substantially burdens core Second Amendment conduct— lawful self-defense of home and hearth with a handgun—it could apply strict scrutiny analysis, in which the State would be required to show that the restriction is necessary to achieve a compelling governmental interest. *See, e.g., Citizens United v. F.E.C.*, 558 U.S. 310, 130 S. Ct. 876, 898 (2010). We believe, however, that the State would be able to satisfy any level of scrutiny. There can be no doubt of the compelling governmental interest in protecting its citizens and police and reducing crime. *Woollard*, 2013 U.S. App. LEXIS 5617, *32. Moreover, there was substantial evidence presented at the committee hearing regarding this bill (and its House counterpart, House Bill 294) demonstrating the relationship between firearms licensing and crime prevention. The principal witness on this relationship was Dr. Daniel W. Webster. *See supra* n.4. Dr. Webster described his very substantial research on the topic, *see e.g.*, Daniel W. Webster, *et al., Preventing the Diversion of Guns to Criminals through Effective Firearms Sales Laws*, in Reducing Gun Violence in America: Informing Policy with Evidence and Analysis (2013) (describing the substantial increase in "crime guns originating in Missouri as a result of Missouri's repeal of "permit to purchase" licensing and that such laws were associated with significantly lower rates of diverting guns to criminals across state lines); Daniel W. Webster, *et al., Effects of State-Level Firearm Seller Accountability Policies on Firearms Trafficking*, 86 J. Urban Health 525 (2009); Daniel W. Webster, *et al, Relationship Between Licensing, Registration, and other Gun Sales Laws and the Source State of Crime Guns*, 7 Injury Prevention 184 (2001), and that of others. *See, e.g.*, Garen J. Wintemute, *et al., Risk Factors among Handgun Retailers for Frequent and Disproportionate Sales of Guns Used in Violent and Firearm Related Crimes*, 11 INJURY PREVENTION 357 (2005); U.S. General Accounting Office, *Firearms Purchased from Federal Firearm Licensees Using Bogus Identification* (2001). This social science "fit" evidence went unrebutted at the lengthy committee hearings. Thus, we are confident that a reviewing court will find more than sufficient evidence supports a finding that the requirement of a Handgun Qualification License is constitutional.

The Honorable Martin O'Malley
April 30, 2013
Page 14

> B.    *License Fees*

An applicant for a Handgun Qualification License must pay three administrative fees:

(1)    "the fee ... for access to Maryland criminal history records," proposed PS § 5-117.1(f)(3)(ii);

(2)    "the mandatory processing fee required by the Federal Bureau of Investigation for a national criminal history records check," proposed PS § 5-117.1(f)(3)(iii); and

(3)    "a nonrefundable application fee to cover the costs to administer the program of up to $50." Proposed PS § 5-117.1(g)(2).

The U.S. Supreme Court has yet to address the extent to which the government may impose a fee on an individual who is exercising a Second Amendment right. Several lower federal courts, however, have upheld fees associated with the regulation of firearms. In *Justice v. Town of Cicero*, the U.S. District Court for the Northern District of Illinois rejected an argument that "a fee requirement is inherently invalid." 827 F. Supp. 2d 835, 842 (N.D. Ill. 2011). The court in *Justice* upheld the fee because it found "no indication" that the fee was imposed for "any other purpose" than to defray costs associated with licensing. *Id.* Likewise in *Kwong v. Bloomberg*, the U.S. District Court for the Southern District of New York upheld a $340 license fee for handgun registration. 876 F. Supp. 2d 246 (S.D.N.Y. 2012). The court in *Kwong* first determined that New York City submitted sufficient evidence that the fee in question defrayed the City's administrative costs. *Id.* at 258. The court relied on case law indicating that fees may "be imposed to cover the costs of a regulatory scheme designed to combat potentially harmful effects of the constitutionally protected activity." *Id.* at 256. The court also alternatively upheld the fee if analyzed under immediate scrutiny. *Id.* at 259. The court determined that the $340 fee supported the City's important and substantial interests "to promote public safety and prevent gun violence." *Id.* Accordingly, the court found that "[t]he $340 application fee is substantially related to these important governmental interests because the fee is designed to recover the costs attendant to the licensing scheme." *Id. See also Heller II*, 670 F.3d 1244, 1255 (D.C. Cir. 2011) ("basic registration requirements [which include a $60 registration fee] are self-evidently de minimis, for they are similar to other

The Honorable Martin O'Malley
April 30, 2013
Page 15

common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous").[20]

During debate on Senate Bill 281, an argument was advanced, based on dicta from *Murdoch v. Pennsylvania*, that "[a] state may not impose a charge for the enjoyment of a right granted by the federal constitution." 319 U.S. 105, 113 (1943). From this statement, the bill's opponents argued that *any* fee for handgun registration is necessarily unconstitutional. Even in *Murdoch*, however, this quotation does not mean what is claimed for it. In *Murdoch*, the ordinance in question required religious groups to pay a license fee of $1.50 a day to distribute literature—an activity clearly protected by the First Amendment. *Murdoch*, 319 U.S. at 113. The Supreme Court invalidated the fee because it found it to be a "flat tax" and "not a nominal fee imposed as a regulatory measure to defray the expense of policing the activities in question." *Id.* at 113-14. Thus, even in *Murdoch*, the Court was willing to allow a fee calibrated to defray the State's administrative expenses in policing a constitutionally-protected activity. By contrast, two years earlier, the Supreme Court upheld a $300-a-day parade fee. *Cox v. New Hampshire*, 312 U.S. 569 (1941). As the United States Court of Appeals for the Fourth Circuit later explained,

> In upholding the [parade fee] statute, the Supreme Court [in *Cox*] affirmed the principle that fees that serve not as revenue taxes, but rather as means to "meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed," do not violate the Constitution.

*Center for Auto Safety v. Athey*, 37 F.3d 139, 144-45 (4th Cir. 1994) (quoting *Cox*, 312 U.S. at 577). Thus, it is our opinion that a court reviewing the fees associated with applying for a Handgun Qualification License, tied as they are to the administrative costs, will see these fees for what they are: constitutional administrative fees, not a "revenue tax" intended to raise money or inhibit the exercise of a constitutional right.

---

[20] We also note that there is a challenge pending in the U.S. District Court for the Eastern District of California to California's fees on the purchase and transfer of firearms. *Bauer v. Harris*, No. 11-01440 (E.D. Calif.). The allegations of that complaint are that the California fees are "excessive," not that no fees may be charged at all.

DEF 003787

The Honorable Martin O'Malley
April 30, 2013
Page 16

## V.   *Mental Health Provisions*

Among other bases for disqualification, current Maryland law prohibits possession of a regulated firearm (which is defined to include handguns and specific assault weapons) by a person who:

> suffers from a mental disorder as defined in § 10-101(f)(2) of the Health – General Article[21] *and* has a history of violent behavior against the person or another, unless the person has a physician's certificate that the person is capable of possessing a regulated firearm without undue danger to the person or to another; [or]
>
> has been confined for more than 30 consecutive days to a facility as defined in § 10-101 of the Health - General Article,[22] unless the person has a physician's certificate that the person is capable of possessing a regulated firearm without undue danger to the person or to another.

PS § 5-133(b)(6), (7) (emphasis added). Thus, under current Maryland law, a person may be prohibited from possessing a regulated firearm by either the combination of a mental disorder diagnosis and a history of violent behavior (PS § 5-133(b)(6)), or by hospitalization in a mental health facility for more than 30 consecutive days (PS § 5-133(b)(7)). In either case, the prohibition may be lifted by obtaining an appropriate physician's certification. A denial of relief may be challenged under the State's Administrative Procedure Act. Md. State Gov't ("SG") Ann. Code, § 10-201 *et seq.*

---

[21]   Section 10-101(f)(2) of the Health-General Article states: "'Mental disorder' includes a mental illness that so substantially impairs the mental or emotional functioning of an individual as to make care or treatment necessary or advisable for the welfare of the individual or for the safety of the person or property of another." Although current law and Senate Bill 281 both refer to "mental disorder as defined in § 10-101(f)(2)," that subprovision merely describes what the definition of mental disorder "includes," and the probable intent is to refer to the entire definition of mental disorder set forth in § 10-101(f).

[22]   "Except as otherwise provided in this title, 'facility' means any public or private clinic, hospital, or other institution that provides or purports to provide treatment or other services for individuals who have mental disorders. 'Facility' does not include a Veterans' Administration hospital." HG § 10-101(e)(1), (2).

The Honorable Martin O'Malley
April 30, 2013
Page 17

At the time the provisions for mental health disqualification were enacted in the 1970s, there was no doubt as to their constitutionality and consistency with federal law. More recent developments, however, require further analysis to determine whether that continues to be so.

As described above, the Supreme Court in *Heller* provided a list of some "presumptively lawful regulatory measures," that are not in doubt, including "longstanding prohibitions on the possession of firearms by … the mentally ill." *Heller*, 554 U.S. at 626-27 & n.26. We read this as a strong suggestion that there is no constitutional prohibition on a state prohibiting firearm ownership and possession by people with mental illness, particularly when there is a procedure to obtain relief from such prohibitions. *Tyler v. Holder*, ____ F. Supp. 2d ____, 2013 U.S. Dist. LEXIS 11511 (W.D. Mich. Jan. 29, 2013); *see also United States v. Spring*, 886 F. Supp. 2d 37 (D. Me. 2012) (requiring the possibility of a restoration process). Even assuming *arguendo* and contrary to the above-quoted language in *Heller* that due process rights attach to the disqualification and restoration process, it is our view that the current Maryland law continues to satisfy constitutional standards.[23]

Congress has also offered incentives to the states to bring their laws regarding gun possession by people with mental illness into conformity with a national standard. Particularly relevant for present purposes is the NICS Improvement Amendments Act of 2007 (the "NIAA"), 122 Stat. 2559. (NICS is the National Instant Criminal Background

---

[23] Courts have generally rejected attempts to invoke other constitutional provisions to support gun rights claims in Second Amendment cases. *Tyler*, 2013 U.S. Dist. LEXIS 11511 at *19 (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)) ("Where a particular Amendment 'provides an explicit textual source of a constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims"). Nonetheless, we conclude that these provisions do not run afoul of the Fourteenth Amendment's Due Process Clause even were a court to consider such a claim. The Due Process Clause does not require the same process in all situations. Rather, a reviewing court will employ a three-part balancing test that requires an evaluation of (1) the person's private interest; (2) the risk of erroneous deprivation through the procedures used; and (3) the government's interest, including both the importance of the function and the burdens that requiring a different procedure would cause. *See, e.g., Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Here, a court would weigh the gun rights of an individual with a mental disability; the relatively minimal likelihood of an erroneous determination of mental disability; and the grave cost to public safety of an erroneous determination. Given all this, we think it is beyond cavil that the current process satisfies any due process requirement.

The Honorable Martin O'Malley
April 30, 2013
Page 18

Check System operated by the Federal Bureau of Investigation.) Among other provisions of the NIAA, Congress determined what features would henceforth be necessary in a state "relief from disabilities" program to conform to the federal standard:

### SEC. 105. RELIEF FROM DISABILITIES PROGRAM REQUIRED AS CONDITION FOR PARTICIPATION IN GRANT PROGRAMS.

(a) PROGRAM DESCRIBED.—A relief from disabilities program is implemented by a State in accordance with this section if the program—

> (1) permits a person who, pursuant to State law, has been adjudicated as described in subsection (g)(4) of section 922 of title 18, United States Code, or has been committed to a mental institution, to apply to the State for relief from the disabilities imposed by subsections (d)(4) and (g)(4) of such section by reason of the adjudication or commitment;

> (2) provides that a State court, board, commission, or other lawful authority shall grant the relief, pursuant to State law and in accordance with the principles of due process, if the circumstances regarding the disabilities referred to in paragraph (1), and the person's record and reputation, are such that the person will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest; and

> (3) permits a person whose application for the relief is denied to file a petition with the State court of appropriate jurisdiction for a de novo judicial review of the denial.

(b) AUTHORITY TO PROVIDE RELIEF FROM CERTAIN DISABILITIES WITH RESPECT TO FIREARMS.—If, under a State relief from disabilities program implemented in accordance with this section, an application for relief referred to in subsection (a)(1) of this section is granted with respect to an adjudication or a commitment to a mental institution or based upon a removal of a record under section 102(c)(1)(B), the adjudication or commitment, as the case may be, is deemed not to have occurred for purposes of subsections (d)(4) and (g)(4) of section 922 of title 18, United States Code.

DEF 003790

The Honorable Martin O'Malley
April 30, 2013
Page 19

NIAA, 122 Stat. 2569-70. The federal law does not require the states to conform to NIAA standards. A state is not eligible for certain grants, however, if it does not implement such a program. § 103(c) ("To be eligible for a grant under this section, a State shall certify, to the satisfaction of the Attorney General, that the State has implemented a relief from disabilities program in accordance with section 105."). Thus, the federal government has provided a "carrot" but not a "stick" for state compliance. It is clear that Maryland's current program is not NIAA compliant.

Senate Bill 281 establishes new, broader standards for disqualification from gun rights for reasons related to mental health and intellectual disability as well as a new process for restoration of these rights. In doing so, the bill would bring State law into conformity with NIAA standards. Under the bill, a person will be disqualified from ownership or possession of a regulated firearm, if the person:

- "suffers from a mental disorder" and has a "history of violent behavior" against him or herself or against another. Proposed PS § 5-133(b)(6). The operative language is carried forward from the existing law;

- has been found to be "incompetent to stand trial" or "not criminally responsible" under the relevant provisions of the Criminal Procedure Article. Proposed PS § 5-133(b)(7), (8). These are new bases for disqualification;

- "has been involuntarily committed" for any period of time[24] or "has been voluntarily admitted for more than 30 consecutive days" in a mental health facility. Proposed PS § 5-133(b)(9), (10). The previous language treated voluntary and involuntary admissions as the same. The new language recognizes the difference between voluntary admission and involuntary commitment and makes disqualification immediate in the case of an involuntary commitment and only after 30 consecutive days of a voluntary admission; or

- "is under the protection of a [court-appointed] guardian." Proposed PS § 5-133(b)(11).

---

[24] State law does not elsewhere refer to an "involuntary commitment." As evidenced in proposed HG § 10-632(g), the term refers to an involuntary admission after an order by a hearing officer under HG § 10-632(e).

DEF 003791

The Honorable Martin O'Malley
April 30, 2013
Page 20

Proposed PS § 5-133(b) (6)-(12); *see also* proposed PS § 5-118(b)(3)(vii)-(xii) (providing identical standards for mental health-based disqualification from applying for a firearm qualification license); proposed PS § 5-205 (providing identical standards for mental health-based disqualification from possession of rifles and shotguns). Finally, Senate Bill 281 creates a process whereby those who are the subject of an involuntary commitment may be required to surrender their firearms. Proposed HG § 10-632.

Senate Bill 281 also establishes a new process to obtain relief from a firearms disqualification, which is set forth in proposed PS § 5-133.3. This process allows a person who was previously disqualified from gun possession or ownership by virtue of mental health- or intellectual disability-based criteria to apply for relief from the disqualification. To do so, a person must present an application supported, *inter alia*, by a certification from a psychiatrist or psychologist. Proposed PS § 5-133.3(d). The Department of Health and Mental Hygiene ("DHMH") reviews the application. DHMH must deny the application if it is found to be false, incomplete, or if

> the applicant has not shown by a preponderance of the evidence that the applicant will be unlikely to act in a manner dangerous to the applicant or to public safety and that granting a license to possess a regulated firearm or authorizing the possession of a rifle or shotgun would not be contrary to the public interest.

Proposed PS § 5-133.3(e). Otherwise, DHMH must certify that the person has been granted relief from the disqualification. Proposed PS § 5-133.3(f). If the application is rejected, the applicant may request a hearing by writing to the Secretary of Health and Mental Hygiene; that hearing must be held in accordance with the Administrative Procedure Act. Proposed PS § 5-133.3(g)(1), (2). The final administrative decision is subject to judicial review. Proposed PS § 5-133.3(g)(3).

The U.S. Department of Justice ("DOJ") has provided a worksheet to help states understand how compliance with the federal NIAA, discussed above, is determined. The DOJ worksheet identifies seven (7) minimum criteria that a relief from firearms disqualification program must satisfy: (1) the relief must be available as a matter of state law; (2) a person disqualified from gun ownership or possession must be afforded an opportunity to apply for relief; (3) the application for relief must be considered by a state court, board, commission, or other lawful authority; (4) the relief program must comport with due process; (5) the applicant for relief must have the opportunity to create a proper evidentiary record before the decisionmaker; (6) a decision granting relief must be based on a proper finding that the applicant "will not be likely to act in a manner dangerous to

DEF 003792

The Honorable Martin O'Malley
April 30, 2013
Page 21

public safety" and that "granting the relief not be contrary to the public interest;" and
(7) "de novo" judicial review must be available.[25] Based on these factors, it is our view
that the relief-from-disqualification provisions of Senate Bill 281 are NIAA compliant
and, more importantly, will be found by DOJ to be NIAA compliant.[26] Moreover, it is our
view that any NIAA compliant program for gun rights disqualification and restoration
will more than satisfy any constitutional obligation either under the Second Amendment
or the due process clause.[27]

## VI.   *Wear and Carry Permits*

Senate Bill 281 makes two changes to the provisions related to Maryland's
so-called "wear and carry" permit law. The first clarifies that wearing or carrying a
handgun in a manner that fails to comply with any conditions on the permit imposed by
the Department of State Police is a crime under § 4-203(b)(2) of the Criminal Law
Article. Although we had long believed that to be the law, the State Police had reported
that prosecutions for obvious violations of geographic or temporal restrictions had been
stymied by a misreading of this provision by some state circuit court judges. Second,
Senate Bill 281 imposes a new training requirement of 16 hours for new permitees and
8 hours for renewal permitees. Proposed PS § 5-306 (a)(5). The addition of this
requirement seems obviously intended to ensure that individuals permitted to wear and
carry handguns in public have training designed to do so safely and, thus, bears a
substantial relationship to the State's compelling interest in public safety. The Fourth
Circuit Court of Appeals recently affirmed the constitutionality of Maryland's "wear and

---

[25]   In applying this factor, the DOJ requires the possibility of judicial review by a
tribunal that may, but is not required to, defer to the initial factfinder, and which may, under
appropriate circumstances, receive additional evidence. Senate Bill 281 authorizes judicial
review consistent with that requirement.

[26]   DOJ recommends that, in implementing a relief from disqualification program, states
adopt a written procedure for ensuring that, as soon as practicable after a person has been granted
relief, the disqualification is removed from federal databases and from state databases that report
to NICS, and that DOJ is notified that the disqualification no longer applies.

[27]   Although we do not believe such analysis is necessary, if these new mental health
provisions are subjected to intermediate scrutiny, there is more than sufficient evidence to show
that persons with serious mental illness are at greater risk for violence than are those persons
without serious mental illness. Jeffrey W. Swanson *et al., Preventing Gun Violence Involving the
Seriously Mentally Ill* in Reducing Gun Violence in America: Informing Policy with Evidence
and Analysis (2013).

The Honorable Martin O'Malley
April 30, 2013
Page 22

carry" permit regime. *Woollard v. Gallagher*, ____ F.3d ____, 2013 U.S. App. LEXIS 5617 (4th Cir., Mar. 21, 2013). We do not expect the changes made by Senate Bill 281 to upset this result.

## VII.   *Disqualifying Crimes*

Senate Bill 281 also expands the circumstances in which a person is disqualified from gun ownership or possession by virtue of a criminal conviction, by adding the disqualification of individuals who receive a probation before judgment for a crime of violence, proposed PS § 5-101(b-1)(1)(i), and who are convicted of domestic-violence-related crimes except for assaults in the second degree. Proposed PS § 5-101(b-1)(2)(i). If crimes are expunged, however, they can no longer serve as a basis for disqualification. *Id.* We will analyze the two expansions separately.

Most of the crimes of violence listed in PS § 5-101(c) are felonies and, therefore, prohibitions on firearm possession by those convicted of these crimes are "presumptively lawful" under the Second Amendment. *Heller*, 554 U.S. at 626.[28] Moreover, as *Heller*'s examples of "presumptively lawful" regulation are "examples" only, and not an "exhaustive" list, *id.* at 627 n.26, we think it would be perfectly appropriate for a reviewing court to grant the same "presumptively lawful" status to Senate Bill 281's regulations disqualifying (1) violent misdemeanants; and (2) people that receive probations before judgment for crimes of violence. Another path to the same result is found in the "streamlined" process that the Fourth Circuit Court of Appeals uses to review Second Amendment challenges to statutes that disqualify persons from gun possession based on criminal conduct. Under the Fourth Circuit's test, only "law abiding responsible citizens" are entitled to the protections of the Second Amendment. *United States v. Pruess*, 703 F.3d 242, 245-46 (4th Cir. 2012). It seems clear to us that neither the distinction between felonies and misdemeanors, nor the court's decision to grant probation before judgment instead of sentencing for a conviction renders the persons involved as "law abiding responsible citizens." Thus, in our judgment, it does not offend the Second Amendment to preclude them from gun possession. Finally, even if persons convicted of misdemeanor crimes of violence and persons who receive probation before judgment for felony and misdemeanor crimes of violence retain Second Amendment

---

[28]   As described above, the Fourth Circuit has expressed some uncertainty about whether "presumptively lawful" regulations are simply outside of the scope of the Second Amendment or whether such laws are within the scope of the Second Amendment but are nevertheless constitutional because they satisfy any applicable level of scrutiny. *Masciandaro*, 638 F.3d at 472-73 (describing but not resolving this "ambiguity" in the *Heller* opinion).

DEF 003794

The Honorable Martin O'Malley
April 30, 2013
Page 23

rights, we remain confident that the State will be able to carry its burden under intermediate scrutiny. *United States v. Staten*, 666 F.3d 154, 160-61 (4th Cir. 2011) (affirming firearm disqualification of domestic violence misdemeanant).

## VIII.  *Lost and Stolen Guns*

Senate Bill 281 has new gun owner accountability provisions requiring the reporting to proper authorities of any lost or stolen guns within 72 hours. Proposed PS § 5-146. This requirement does not appear to infringe on anyone's Second Amendment rights, as it would seem a great stretch to say that the right to keep and bear arms includes a right to remain silent in the face of public danger associated with arms that one no longer possesses. Even if this requirement is found to implicate the Second Amendment, however, we have no doubt that it will satisfy any level of judicial scrutiny applied given the importance of the State's interest in keeping guns out of the hands of criminals and the efficacy of gun owner accountability provisions like this in helping to accomplish that goal. Research indicates that states that mandate the reporting of lost and stolen guns have less gun trafficking. *See, e.g.*, Daniel W. Webster, *et al., Preventing the Diversion of Guns to Criminals through Effective Firearms Sales Laws,* in <u>Reducing Gun Violence in America: Informing Policy with Evidence and Analysis</u> (2013) (describing effectiveness of gun seller and owner accountability provisions, including requirement to report lost and stolen guns, on reducing availability of "crime guns"). Thus, we are confident that these provisions are constitutional.

## IX.   *Provisions Related to Hunting*

Senate Bill 281 establishes a new prohibition against shooting or discharging firearms within 300 yards of a public or private school anywhere in the State. This is precisely the type of regulation of firearm use in a "sensitive place[]" like a "school[] or government building[]" that the Supreme Court has already held to be "presumptively lawful." *Heller*, 554 U.S. at 626 & n.26.

We caution the compiler of laws that the codification of this provision of Senate Bill 281 will have to be made carefully (and cross-references modified) if you also approve House Bill 365, which creates a separate, smaller safety zone around "dwelling house[s], residence[s], church[es], or any other building or camp occupied by human beings," which applies to archery hunters in Harford County.

DEF 003795

The Honorable Martin O'Malley
April 30, 2013
Page 24

## X.  *Dealer Provisions*

Senate Bill 281 imposes new recordkeeping obligations on licensed gun dealers in the State of Maryland. Proposed PS § 5-145. Moreover, the bill would allow the Secretary of State Police to suspend the license of a dealer who fails to comply with these new recordkeeping requirements. Proposed CL § 5-115. These new requirements, however, are supplemental to the federal recordkeeping requirements under 18 U.S.C. § 923(g)(1)(A), as the federal records may be "used to satisfy the requirements" of the new State requirement. Proposed PS § 5-145(a)(4). These new provisions will allow the Maryland State Police to supplement the enforcement efforts of the federal Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"). We do not anticipate any challenge to the State's power to enact this legislation. *See* 18 U.S.C. § 927 (federal Gun Control Act of 1968 does not preempt state law).

## XI.  *Other Various Provisions*

Senate Bill 281 also:

- expands the law enforcement exemption to the criminal prohibition on carrying weapons on school property. Proposed CL § 4-102.

- makes information about persons holding gun-related licenses exempt from disclosure under the Maryland Public Information Act ("MPIA"), proposed SG § 10-616(a)(v), a result that had previously been accomplished by regulation. SG § 10-617(c); COMAR 29.01.02.02B (9).[29]

---

[29] This new exemption to the MPIA reflects a compromise between the legitimate privacy interests of those who hold firearm-related licenses and the State's need to understand its crime problem and the efficacy of attempts to address it. Pursuant to this provision, a MPIA requestor who seeks information about gun-related licensees will be denied. Proposed SG § 10-616(a)(v); *but see* SG § 10-612(c) (allowing release of license-holder information to members of the General Assembly). This reflects a change from the current MPIA, which allows the release of the names but no other "sociological information" (personal addresses, phone numbers, social security numbers, etc.) of firearms-related licensees. SG § 10-617(c); COMAR 29.01.02.02B (9). The provision does not, however, prevent the Department of State Police from using information about licensees for crime prevention purposes, or for gathering and using data regarding firearms-related licensees, *but see* proposed PS § 5-117.1(f)(6)(ii) (preventing use of fingerprints obtained from Handgun Qualification License applications for crime prevention purposes), deriving statistical information, or, in the exercise of its duties, releasing that data as it sees fit.

The Honorable Martin O'Malley
April 30, 2013
Page 25

These changes, while potentially important, are not of constitutional significance.

## XII.   *Conclusion*

We hope that this thorough review will assure you and the citizens of Maryland that Senate Bill 281 was crafted carefully to balance the rights of legitimate gun owners with the need for increased public and law enforcement safety from gun violence. We are confident that the resulting legislation is constitutional and legally defensible.

Very truly yours,

Douglas F. Gansler
Attorney General

DFG/DF/kk

cc:   The Honorable John P. McDonough
Stacy A. Mayer
Karl Aro

DEF 003797

### Testimony in Support of HB 294 – Firearm Safety Act of 2013
### Maryland House Judiciary Committee
### Maryland House Health and Government Operations Committee

#### Daniel W. Webster, ScD, MPH
#### Professor and Director
#### Johns Hopkins Center for Gun Policy and Research[*]

Thank you, Chairmen Hammen & Vallario, and members of the committees, for allowing me to testify in support of House Bill 294, Firearm Safety Act of 2013. I am a professor with tenure at the Johns Hopkins University where I direct the Johns Hopkins Center for Gun Policy and Research. However, my testimony is offered by me individually, and does not represent the official position of the Johns Hopkins University. I have led numerous studies of gun violence and policies to prevent it for the past 23 years.

The proposed Firearm Safety Act of 2013 has several important provisions. I will focus most of my testimony on the provision to create a licensing system for purchasers of regulated firearms, but will also touch upon provisions to reduce ammunition capacity limits from more than 20 to more than 10 rounds, and require the reporting of events which trigger disqualification from legal firearm ownership on the basis of assessments of individuals' mental status and dangerousness to others.

Arguably, the most important objective of a state's gun laws is to prevent dangerous individuals from possessing firearms. Although Maryland has some useful laws to accomplish this task, the system is especially vulnerable to illegal straw purchases and individuals using false identification in their applications to purchase regulated firearms. A study conducted by the United States Government Accounting Office conducted tests on a random sample of gun stores and pawn shops listed in the yellow pages of local telephone directors in five states – Virginia, West Virginia, Montana, New Mexico, and Arizona – to determine the ease of using bogus identification cards (e.g., driver's licenses) to purchase firearms from licensed firearm dealers. All five states conform to minimum requirements of the Brady Act, relying on instant background checks, but do not require fingerprinting or waiting periods for firearms purchases. In none of the attempts to purchase firearms with a fake ID card did a gun dealer or employee of the gun shop question the validity of the ID card or fail to make the transaction. Based on their investigation, the GAO concluded that in the five states, "the instant background check does not positively identify purchasers of firearms," and that it "cannot ensure that the prospective purchaser is not a felon."

Although the GAO study did not investigate this, the casual scrutiny given to firearm sales applications suggest that the system could also be vulnerable to other deceptive practices of criminals and straw purchasers. For example, prospective purchasers could more easily put inaccurate information on their application forms such as using a slightly different spelling of a name or misrepresentation of a date of birth in order to avoid a denial of the application. Systems requiring firearm purchase applications be processed directly by law enforcement agencies – which I assume would be the case when the Secretary writes regulations to implement the statute – would result in fewer false applications for firearm purchases being processed and fewer guns in the wrong hands.

Thus, in addition to serving as a deterrent for illegal straw purchases, permit-to-purchase licensing and registration firearms laws could mitigate the potential negative consequences of negligent sales practices by gun dealers with more careful practices in screening firearms purchasers. A relatively small portion of gun

---

[*] Title and affiliation provided for identification purposes only. The opinions expressed are those of Dr. Webster and do not reflect any formal position for Johns Hopkins University.

1

DEF 003798

dealers sell the majority of guns recovered by police from criminals and crime scenes (ATF, 2000). The wide disparity between licensed dealers and the number of guns that they sell that are later linked to crime is not fully explained by differences in sales volume, customer demographics, or even local crime rates (Wintemute, Cook & Wright, 2005). Undercover stings of licensed gun dealers conducted or instigated by the cities of Chicago, Detroit, and New York indicated that many were susceptible to facilitating illegal straw sales (Webster et al., 2006; Webster and Vernick, 2013). Federal investigations of gun trafficking indicate that straw purchasers and corrupt licensed dealers represent the most prominent channels for guns into the illegal market (Bureau of Alcohol, Tobacco and Firearms, 2000). Federal firearms sales laws have several weaknesses which make it difficult to curtail illegal straw purchases (Braga and Gagliardi, 2013; Vernick & Webster, 2013). For example, there is no specific statute making straw purchases illegal. When such cases are prosecuted, prosecutors usually must prove that the purchaser knowingly lied on the firearm sales application when certifying that the gun was not being purchased for someone else. Proving such intent at the point of retail sale can be very difficult.

Five states (Connecticut, Iowa, Massachusetts, New Jersey, and New York) and the District of Columbia require persons wishing to purchase handguns apply directly with a law enforcement agency and be photographed and fingerprinted. Missouri had such a system in place; however, the law was repealed on August 28, 2007. In a study which I led to assess the effects of the repeal of Missouri's permit-to-purchase licensing law, we used annual state-level data on crime guns recovered by police in Missouri and traced by the ATF during the period 2002 – 2011 to examine changes in a commonly-used indicator of illegal gun diversion, the number and proportion of guns with short sale-to-crime intervals – before and after the state repealed the law.

Immediately following the repeal of Missouri's permit-to-purchase licensing law, the share of guns recovered by Missouri police agencies that had an unusually short time interval from retail sale to crime indicative of trafficking more than doubled. Importantly, the sharp increase in short time-to-crime guns coincided with the length of time between the repeal of the law and a crime gun's recovery by police as depicted in Table 1 below. Crime guns with a sale-to-crime interval of less than three months increased from a pre-repeal stable mean of 2.9 percent in 2007 when the repeal was in effect for only four months, and then increased further to a mean of 8.4 percent for 2008 through 2011. Crime guns with sale-to-crime intervals of 3-12 months increased sharply beginning in 2008 from a pre-repeal mean of 5.9 percent to 13.9 percent for 2008-2011 when all such guns were purchased after the law's repeal. Following this same pattern of increases in the proportion of crime guns sold following the repeal of Missouri's permit-to-purchase law, the percentage of crime guns recovered one to two years after retail sale increase beginning in 2009 from a mean of 6.4 percent to 12.8 percent during 2009-2011. The sharp increase in very short sale-to-crime intervals for guns in Missouri cannot be explained away as being part of a national trend toward shorter time-to-crime guns. In fact, it is in direct conflict with national trends; the average sale-to-crime interval for the U.S. increased from 10.2 years in 2006 to 11.2 years in 2011.

My colleagues and I are beginning a study of the effects of Missouri's repeal of its permit-to-purchase licensing system on violent crime. Preliminary evidence suggests that the increase in the diversion of guns to criminals linked to the law's repeal may have translated into increases in homicides committed with firearms. From 1999 through 2007, Missouri's age-adjusted homicide rate fluctuated around a mean of 4.66 per 100,000 population per year then increased to a mean rate of 5.82 for the years 2008-2010, an increase of 25%. This increase was out of synch with changes in age-adjusted homicide rates nationally which decreased 10%[†] and with other states in the Midwest

---

[†] Annual age-adjusted firearm homicide rates in the U.S. averaged 4.03 during 1999-2007 and 3.81 for 2008-2010.

DEF 003799

which declined by 5%.[†] States that currently have permit-to-purchase licensing requiring prospective purchasers to apply directly with a law enforcement agency have some of the lowest age-adjusted firearm mortality rates per 100,000 population in the nation for the period 2006-2010 – Connecticut 5.1, Iowa 6.3, Massachusetts 3.5, New Jersey 5.2, and New York 5.0 – compared with the overall rate for the nation of 9.5 (Centers for Disease Control and Prevention, 2013).

| Table 1. Percentage of Missouri crime guns with short time intervals between retail sale and recovery by police for years 2002 – 2011. | | | | |
|---|---|---|---|---|
| Year | up to 3 months | 3-12 months | 1-2 years | First sold in Missouri |
| 2002 | 2.9% | 5.2% | 5.2% | 54.9% |
| 2003 | 3.2% | 5.3% | 6.1% | 55.9% |
| 2004 | 2.1% | 5.6% | 5.7% | 55.6% |
| 2005 | 3.3% | 5.1% | 6.6% | 55.0% |
| 2006 | 3.2% | 7.5% | 7.2% | 56.4% |
| 2007 | 4.5% | 7.9% | 7.1% | 57.5% |
| 2008 | 9.4% | 12.6% | 6.7% | 62.5% |
| 2009 | 8.1% | 15.0% | 12.7% | 65.9% |
| 2010 | 7.6% | 13.7% | 13.0% | 67.8% |
| 2011 | 8.5% | 14.3% | 12.7% | 70.8% |

States with stricter gun sales laws tend to attract guns originating in states with weaker gun laws, resulting in proportionately fewer crime guns being sold by in-state gun dealers (Cook & Braga, 2003; Webster, Vernick, & Hepburn, 2001). This is likely to be due to a relative scarcity of guns to criminals in states with more comprehensive gun sales regulations which drives up the price and attracts suppliers from states with weaker gun laws. As can be seen in the last column in Table 1, following the repeal of Missouri's purchase permit law requiring handgun purchasers to obtain licenses from local sheriff's who would photograph and fingerprint applicants, the percentage of crime guns that had been sold by in-state gun dealers increases from 55.6 percent when the law was in place to 70.8 percent by 2011. This is a significant change for an indicator that tends to change very little over time in most states.

In a prior study that I led which used crime gun trace data for 25 U.S. cities compared the percentage of crime guns that were originally sold by a licensed retail gun seller inside the state versus outside the state was significantly lower in the cities located in states with permit-to-purchase licensing and handgun registration (33.7%), the same firearm sales regulations used by the District of Columbia, than in states with that had neither of those laws (84.2%). One of the cities with permit-to-purchase licensing and handgun registration (Detroit, MI), had a higher percentage of its crime guns originating from within state (47.5%) than the average in the other cities (22.8%), and Michigan did not require purchase applicants to be fingerprinted and photographed by law enforcement agencies. Little of this gross discrepancy between cities in states with purchase licensing and registration made directly at a law enforcement agencies could be explained by potential confounders (out-of-state population living in within close proximity, out-of-state

[†] Firearm homicide rates in states in the Midwest other than Missouri averaged 3.52 during 1999-2007 and 3.33 for 2008-2010.

3

DEF 003800

population living in close proximity with weak gun laws, migration from other states, and percentage of guns recovered in drug crimes). Controlling for the prevalence of gun ownership in the state did reduce the effect of having permit-to-purchase licensing and registration; but the effect remained very strong and highly significant. Further, the proportion of crime guns coming from within the state was correlated with another indicator of criminal gun availability – the percentage of homicides committed with firearms (Webster, Vernick, and Hepburn, 2001).

A subsequent study that I led which used crime gun trace data from 53 U.S. cities for the years 2000-2002 examined the association between state gun sales regulations and the diversion of guns to criminals (Webster et al., 2009). Discretionary permit-to-purchase licensing was independently associated with lower levels of diversion of guns sold by in-state dealers.

More recently, I led a study which examined cross-sectional associations between a number of state gun sales laws and the per capita rate at which states export guns to criminals across state lines across the 48 contiguous U.S. states. Three variations of permit-to-purchase licensing laws were examined – 1) discretionary PTP laws which give law enforcement the discretion to refuse to issue permits as well as fingerprinting of applicants by law enforcement agencies; 2) PTP with fingerprinting which require applicants to appear at the law enforcement agency issuing the permits to be photographed and fingerprinted; and 3) non-discretionary PTP laws which require a permit to purchase a firearm but do not require applicants to go to agencies to be fingerprinted. Our analyses controlled for key confounders including the prevalence of gun ownership, out-of-state population migration, the number of people living near the border of states with strong gun laws, and whether a state bordered Mexico or Canada. Data on crime gun exports were obtained from the 2009 state-level crime gun trace data posted on the ATF's website. The three states that exported the fewest crime guns per capita were New York (2.7 per 100,000 population), New Jersey (2.8), and Massachusetts (3.7) had handgun registries and permit-to-purchase licensing. Data from the regression analysis found statistically significant lower per capita export of crime guns across state borders for discretionary PTP laws (lowered rate of exporting crime guns by 76% compared with states that did not have these laws) and non-discretionary PTP laws requiring fingerprinting at a law enforcement agency (lowered crime gun export rates 45%). Handgun registry laws were too highly correlated with permit-to-purchase licensing to include in the statistical model. Several other gun sales laws regulations were associated with reduced cross-state diversion of guns to criminals including regulation of private sales of handguns, junk gun bans, and laws requiring gun owners to report lost or stolen firearms (Webster et al., 2013).

The Firearm Safety Act of 2013 would improve current policies designed to keep firearms from the severely mentally ill who pose a danger to others, particularly if they were to possess firearms. HB 294 would improve our state's ability to identify through our background check system those who are prohibited from possessing firearms due to severe mental illness. A recent study evaluated a policy in Connecticut which improved that state's ability to identify and screen out those who were prohibited from possessing firearms due to mental illness through their handgun purchaser licensing system and found that prohibited individuals who were identifiable by their background check system as a result of the policy change committed violent crimes at a significantly lower rate than was the case before the policy was implemented (Swanson et al, 2013).

4

Assault weapons and other firearms with large capacity ammunition feeding devices are commonly used in mass shootings and the greater the ammunition capacity of the firearm used in a mass shooting, the more victims were injured or killed by gunfire (Roth and Koper, 1997).
By reducing the maximum capacity of ammunition feeding devices for semi-automatic firearms from more than 20 to more than 10, the Firearms Safety Act of 2013 may reduce the number of victims wounded or killed in mass shootings or other events in which a criminal assailant fires a large number of rounds. Incidents in which a law-abiding citizen would need and be able to use a firearm that could hold more than ten rounds of ammunitions are likely to be extremely rare. A study of 198 home invasion crimes in Atlanta, Georgia – a city where gun ownership likely to be quite high – found that residents attempted to use a firearm in self-defense in only three (1.5%) cases (Kellermann et al, 1995).

## References Cited

Bureau of Alcohol, Tobacco and Firearms (ATF). 2000. *Following the Gun*. Washington, D.C.: U.S. Department of the Treasury.

Bureau of Alcohol, Tobacco and Firearms (ATF). 2002. *Crime Gun Trace Reports (2000): The Youth Crime Gun Interdiction Initiative.* Washington, D.C.: U.S. Department of the Treasury.

Centers for Disease Control and Prevention, 2013. WISQARS Fatal Injury Reports, 1999-2010, for National, Regional, and States. Accessed February 5, 2013.

Kellermann, Arthur L, Westphal L, Fischer L, Harvard B. 1995. Weapon involvement in home invasion crimes. *JAMA*. 273(22):1759-62.

Roth JA, Koper CS. 1997. Appendix A in *Impact Evaluation of the Public Safety and Recreational Firearm Use Protection Act of 1994.* Urban Institute: Washington, DC.

Webster, Daniel W., Jon S. Vernick, and Lisa M. Hepburn. 2001. "The Relationship Between Licensing, Registration and Other State Gun Sales Laws and the Source State of Crime Guns." *Injury Prevention* 7: 184-189.

Webster, Daniel W., Jon S. Vernick, and Maria T. Bulzacchelli. 2009. "Effects of State-Level Firearm Seller Accountability Policies on Firearms Trafficking." *Journal of Urban Health* 86: 525-537.

Webster, Daniel W. and Jon S. Vernick. 2013 "Spurring Responsible Firearms Sales Practices through Litigation: The Impact of New York City's Lawsuits Against Gun Dealers on Interstate Gun Trafficking" In *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis,* Daniel W. Webster and Jon S. Vernick, Eds. Baltimore, MD: Johns Hopkins University Press.

Webster Daniel W., Jon S. Vernick, Emma E. McGinty, and Ted Alcorn. 2013 "Preventing the Diversion of Guns to Criminals through Effective Firearm Sales Laws." In *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis,* Daniel W. Webster and Jon S. Vernick, Eds. Baltimore, MD: Johns Hopkins University Press.

Wintemute, Garen J., Philip J. Cook, Mona A Wright. (2005) Risk factors among handgun retailers for frequent and disproportionate sales of guns used in violent and firearm related crimes. *Injury Prevention* 11:357-363.

DEF 003802