# EXHIBIT D

1

1    IN THE UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF MARYLAND
3            (Northern Division)
4
5    SHAWN J. TARDY, et al.
6         Plaintiffs              Case No.
7    vs.                          1:13-cv-02841-CCB
8    MARTIN J. O'MALLEY, et al.
9         Defendants
10   _____/
11
12
13         The deposition of DANIEL WEBSTER, ScD,
14   taken on Friday, January 17, 2014, commencing at 9:04
15   a.m., at the offices of the Attorney General, 200 St.
16   Paul Place, Baltimore, Maryland, before Linda Lindsey,
17   CSR, Notary Public.
18
19
20
21   REPORTED BY:  Linda Lindsey, CSR

Shawn J. Cagle, et al.
Martin J. O'Malley, et al.

Case 1:13-cv-02841-CCB   Document 70-4   Filed 05/16/14   Page 3 of 4

Daniel Webster, ScD.
January 17, 2014

Page 50

1  at Sandy Hook Elementary School in Newtown, President
2  Ron Daniels called me and said that he had an idea
3  based upon some things he had done at two previous
4  academic institutions where -- where he had a
5  leadership position, in which following sort of seminal
6  type of events, um, where in a essence there was a
7  crises that he helped pull together people working on
8  policy in that area who had relevant expertise to very
9  quickly hold in essence, a symposium.
10    Asked the top experts to contribute papers
11  and chapters that they would then put into a book and
12  very quickly make available to policy makers in the
13  public to inform the questions being considered.
14    And so he asked me whether, um, he thinks
15  that I could help do something along those lines here
16  on -- on the topic of gun violence and gun policy, and
17  I said yes.
18  Q.  And did you hold a symposium?
19  A.  Yes, we did.
20  Q.  When was that?
21  A.  January 14th and 15th, I think.  It was

Page 51

1  mid-January of 2013.
2  Q.  All right.  And who gave the key note
3  address?
4  A.  Um, I don't know if there was a key note
5  address.
6  Q.  Well, who gave the opening remarks?
7  A.  So the opening remarks first were from
8  President Ron Daniels, then Michael Bloomberg and then
9  Martin O'Malley.
10  Q.  All right.  And Michael Bloomberg had just
11  given $250,000 to your Center; am I correct?
12  A.  Yes.
13  Q.  And --
14  A.  His -- his foundation.
15  Q.  And he gave the opening remarks at your
16  symposium; am I correct?
17  A.  That's correct.
18  Q.  As did our Governor Martin O'Malley, who is
19  a defendant in this lawsuit?
20  A.  That's correct.
21  Q.  And President Daniels in his introduction,

Page 52

1  I'm sorry, preface, refers to individuals being invited
2  to speak at the symposium, and also refers to
3  advocates, lobbyists and politicians on both sides of
4  the gun control debate.  Were individuals on both sides
5  of the gun control debate represented at that
6  symposium?
7  A.  Um, we did not really design this as -- as
8  a debate.  We designed this to the scholars and -- and
9  contributors that we thought could best inform gun
10  policy at this time.
11  Q.  All right.  So while you refer in your
12  acknowledgments to contacting 20 of the world's top
13  experts on gun policy, you made no effort to balance
14  the experts that you were inviting to the symposium,
15  correct?
16  A.  I went to the people who I thought were the
17  best.
18  Q.  Is it coincidence that they all tended to
19  agree with your views?
20  A.  Um, I don't know.  Again, I evaluated who I
21  thought were the top researchers who could inform this

Page 53

1  discussion and that's who I invited.
2  Q.  All right.  And you published what we've
3  marked as Webster 14, and you say in your
4  acknowledgments that it was put together in ten days;
5  am I correct?
6  A.  What happened -- no, we -- we wrote this --
7  we started writing and working on this roughly a week
8  after Newtown, in essence, word got out to begin
9  working on this.  Some of the works in here were
10  already in progress, they just didn't know that they
11  were going to be a chapter.  It was something others
12  were -- were working on in some cases.
13    But, basically, the -- the people who
14  contributed to this book put everything aside that they
15  were working on for the most part to -- to write the
16  papers.
17    We did the final edits after the summit.
18  And although we -- we got the main manuscript into John
19  Hopkins University Press probably that week, I'm trying
20  to just remember now.  But Johns Hopkins University
21  Press, basically, within ten days of all materials

Shawn J. Cade, et al.
Martin J. O'Malley, et al.
Case 1:13-cv-02841-CCB   Document 70-4   Filed 05/16/14   Page 4 of 4
Daniel Webster, ScD.
January 17, 2014

Page 54

1  being given to them they produced this book, that's --
2  that's what the ten days refers to.
3  Q.  And when -- when was it produced?
4  A.  This -- it -- it came out, I believe, on
5  the 27th of January.  26th, I'm not sure.  It was --
6  I'm not going to --
7  Q.  And so, am I correct, that these works were
8  generated between the unfortunate tragedy at Newtown,
9  Connecticut on December 14th, 2012 and January 27th
10  when it was published?
11      MR. FADER:  Objection.
12  A.  Yes, for the most part.  As I said before,
13  some of these things were works in progress before --
14  before the word got out to -- for the invitations.
15  Q.  Was there a formal peer review process for
16  any of these chapters?
17  A.  Yes.
18  Q.  And how were the peers selected?  The same
19  way the symposium invitees were selected?
20  A.  We identified people who, again, we thought
21  had expertise in the matter and sent out the chapters

Page 55

1  for their comment and review.
2  Q.  You agreed with me earlier that there are a
3  number of people who have skepticism about some of
4  these positions.  Did you make any effort to balance
5  the views of the peers that reviewed these articles?
6  A.  I'm sorry, could you repeat the question,
7  please?
8      MR. SWEENEY:  Could you read that back,
9  please.
10      (The requested testimony was read back by
11  the Court Reporter.)
12  A.  I -- I did not go about looking, you know,
13  to say, okay, here's a so-called pro-gun person and
14  here's someone who's not, and -- and get views from
15  both.  Again, we went to people who we thought had the
16  relevant expertise to end -- to review the chapters.
17  Q.  Isn't it true that you went to people who
18  not only had relevant expertise but what you considered
19  to be a correct viewpoint?
20  A.  No.
21  Q.  So it was just coincidence that you didn't

Page 56

1  happen to go with anybody who would be opposed to these
2  sort of gun control measures that are advocated in this
3  book?
4      MR. FADER:  Objection.
5  A.  I -- I -- I've answered your question, so I
6  don't think I have anything more to say.
7  Q.  All right.
8      MR. FADER:  John, we've been going about an
9  hour and 15 minutes, can we take a quick break?
10      MR. SWEENEY:  Of course.
11      (Whereupon, a recess was held at 10:14
12  a.m.)
13      (Proceedings resumed at 10:21 a.m.)
14      BY MR. SWEENEY:
15  Q.  Professor, if we can turn to the forward by
16  Mr. Bloomberg and direct your attention to the small
17  Roman xii of the foreword, the bottom of page?
18      MR. FADER:  John, we're -- we're not --
19  he's still finding the page.
20  A.  All right.  I think I'm there.
21  Q.  Near the bottom of the page Mr. Bloomberg

Page 57

1  in his opening remarks, and, apparently, carried
2  through in foreword of the book alludes to supporting
3  "limiting the availability of military style weapons
4  and of High-capacity magazines with more than ten
5  rounds".
6      Did Mr. Bloomberg in his opening remarks
7  urge the symposium to consider supporting that measure?
8  A.  I think what he said is almost word for
9  word right here in this foreword, to the best of my
10  knowledge.
11  Q.  All right.  And am I correct that in the --
12  by my count, 19 chapters in the book, you reference one
13  relating to that initiative and that would be Chapter
14  12 by Christopher Koper?
15  A.  Yeah.  Yes.
16  Q.  Did you select the peers that reviewed
17  Christopher Koper's Chapter 12 for the publication?
18  A.  Yes.
19  Q.  And you rely heavily on Christopher Koper's
20  publication and research in your report in this case;
21  am I correct, sir?