# EXHIBIT E

```
                                                                1

 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MARYLAND

 3                       (Northern Division)

 4

 5   SHAWN J. TARDY, et al.

 6            Plaintiffs              Case No.

 7   vs.                              1:13-cv-02841-CCB

 8   MARTIN J. O'MALLEY, et al.

 9            Defendants

10   _____/

11

12

13            The deposition of LUCY ALLEN was taken on

14   Friday, January 24, 2014, commencing at 1:13 p.m., at

15   the offices of NERA Economic Counsulting, 1166 Avenue

16   of The Americas, New York, New York, before Karen E.

17   Rigoni, Notary Public.

18

19

20

21

22

23

24

25   REPORTED BY:  KAREN E. RIGONI, CSR, RPR
```

Page 22

1  expertise can be brought to bear in this kind of
2  situation, that the kind of training and
3  analysis that's done in economics and that
4  economists analyze these sorts of issues, but I
5  think that the sort of analysis that I have done
6  is -- doesn't necessarily require economic
7  analysis. That quantitative, statistic and
8  analytic expertise and capability is -- would be
9  sufficient to understand and do the same sort of
10 analysis.
11 Q. In your report, in Paragraph 3, you
12 mention the economic issues relating to the flow
13 of guns into the criminal market that you
14 previously testified in, and that's a reference
15 to your NAACP casework that we talked about
16 previously, correct?
17 A. Not only in the NAACP work, but I
18 have -- as I said, I have done a lot of work
19 regarding guns and their use in crime. I have
20 analyzed the ATF database of guns used in crime.
21 I have spent a lot of time looking at data, data
22 regarding guns, data regarding crime.
23 Q. You state your hourly rate at 690 in
24 your report. What's the hourly rate of the
25 other staff members that worked on this project

Page 23

1  with you?
2  A. I don't know as I sit here. Something
3  I could look into.
4  Q. How much have you billed the Maryland
5  attorney general for this project?
6  A. I don't know if we have billed anything
7  to date.
8  Q. How much have you accrued by way of
9  time spent in billings?
10 A. I don't know.
11 Q. Can you provide that information? Do
12 you have it available?
13 A. I don't have it as I sit here, but,
14 sure, I could -- I can get that information.
15 Q. We'll ask for that. Thank you.
16 A. And just to be clear, I don't bill.
17 It's NERA. NERA bills for my time as well as
18 the people on my staff.
19 Q. Understood. And my question was
20 imprecise in that regard, but I made the same
21 assumption that this isn't something you do in
22 person. You're doing it through your employer
23 NERA.
24 A. Correct.
25 Q. In addressing the issue, the number of

Page 24

1  rounds of ammunition fired by individuals using
2  a gun in self-defense, what did you do?
3  A. The specific analysis that's described
4  and the findings that are described in my report
5  come from a coding, a quantification of all the
6  stories that were contained in a -- the NRA
7  maintains a database of stories of people
8  defending themselves. And so we looked through
9  all of those stories in a recent time period and
10 in addition looked for new stories describing
11 the same event and counted up how many rounds
12 were reported to have been fired by the
13 individuals defending themselves.
14 Q. Of all the sources of information in
15 the world on this subject, why did you choose
16 the NRA stories?
17 A. They had a large database of stories of
18 people defending themselves. We looked for
19 other sources of information for people
20 defending themselves and this was the most
21 comprehensive source that we found.
22 Q. Are you familiar with the work of
23 Dr. Kleck, K-l-e-c-k?
24 A. Yes.
25 Q. And he has gone directly to certain

Page 25

1  media sources in terms of looking for similar
2  data, correct?
3  A. I don't know that he has. I've looked
4  through a number of the data sources. I've
5  looked at Dr. Kleck's data. I've looked through
6  his books. I've reviewed his material. And,
7  you know, I've spent years reviewing Dr. Kleck's
8  work. I don't recall him specifically doing
9  something like this, no.
10 Q. You don't recall that he has conducted
11 searches of media databases for reports, news
12 reports on use of firearms?
13 A. He certainly has looked at news
14 reports. I mean, for example, in this matter,
15 he's issued a report and he describes news
16 stories regarding mass shootings, and he has a
17 list of mass shooting events and he's gone
18 through news stories. So, yes, I am aware of
19 him having looked at media and news stories.
20 Q. In the area of self-defense, he's
21 conducted certain interview-based surveys with
22 respect to defensive use of firearms; am I
23 correct?
24 A. Can you repeat that.
25    MR. SWEENEY: Could you read that back,