# EXHIBIT E

# In The Matter Of:

*Shawn J. Tardy, et al. vs.*
*Martin J. O'Malley, et al.*

*Christopher S. Koper, Ph.D.*
*Vol. 1*
*February 3, 2014*

*Gore Brothers Reporting & Videoconferencing*
*20 South Charles Street, Suite 901*
*Baltimore, MD 21201*
*410-837-3027*
*www.gorebrothers.com*



**GORE BROTHERS**
Reporting &
Videoconferencing

*Since 1961 - Serving MD, DC & VA - Worldwide*

Min-U-Script® with Word Index

1  respect to the impact of the ban, the federal ban on
2  assault weapons and large capacity magazines; correct?
3       A     Uh-huh.
4       Q     Other than that original research --
5            MR. FADER:  That was an "uh-huh."  You have
6  to say "yes."
7            THE WITNESS:  Sorry.  Correct.
8  BY MR. SWEENEY:
9       Q     I apologize.  Thank you, Mr. Fader.  In my
10 rush to move this forward, I don't always catch that
11 you haven't said a verbal yes, although I do absolutely
12 catch your uh-huh and your nod and I know that you're
13 with me, but you're right.  We have to make a record,
14 so thank you.
15      A     Okay.
16      Q     Have you done any other original research
17 in connection with banning assault weapons or large
18 capacity magazines or the impact of any such bans other
19 than that original research that you reported on in
20 1997?
21      A     The 2004 report.

1  Q    All right. And that's the one that you
2  said updated the 1997 data with the experience under
3  the ban since 1997; correct?
4  A    Correct.
5  Q    Now, have you done any other original
6  research with respect to bans on assault weapons or
7  large capacity magazines or their impact other than
8  those two studies?
9  A    No.
10     MR. SWEENEY: All right. Why don't we take
11 a quick break here? I'm getting a little dry and I'm
12 heading for the water fountain.
13     MR. FADER: Good.
14           (Off the record.)
15 BY MR. SWEENEY:
16  Q    Back on the record.
17     Turning to page one of your curriculum
18 vitae.
19  A    Okay.
20  Q    You worked for the Police Executive
21 Research Forum as a deputy director from 2007 to

1    additional work on the ban and got that funding from
2    them.
3         Q    And why did you revisit the issue again
4    reexamining your 2004 report in 2013?
5         A    For the 2013 book chapter, I was asked by
6    Daniel Webster if I would take part in the gun summit
7    at Johns Hopkins that you mentioned earlier, and they
8    asked if I would prepare basically a chapter that just
9    briefly summarized the results of the -- the 2004
10   report.
11        Q    All right.  In the last sentence of this
12   paragraph, you state, "My conclusions on the impact of
13   the federal ban are most accurately and completely set
14   forth in my 2004 and 2013 reports."  Do you see that,
15   sir?
16        A    Yes.
17        Q    So if I want to look at the most accurate
18   and complete conclusions that you've drawn on your work
19   on the federal ban, I would look to those two reports;
20   correct?
21        A    Yes.

```
 1    could affect the share of attacks that involve -- that
 2    result in injuries or deaths.
 3         Q    But -- but they -- you would not expect a
 4    ban on assault weapons or large capacity magazines to
 5    actually reduce the number of firearm-related assaults
 6    or robberies; correct?
 7         A    Correct.
 8         Q    And you would not expect a ban on assault
 9    weapons or large capacity magazines to reduce
10    firearm-related home invasions; correct?
11         A    No.  Correct, I mean.
12         Q    And you wouldn't expect a ban on assault
13    weapons or large capacity magazines to reduce the
14    number of firearms assaults on police officers;
15    correct?
16         A    Correct.  That's fair enough.
17         Q    On note 95 on that page, you address I
18    believe state bans on assault weapons in which you say,
19    "A few studies suggest that state-level assault weapon
20    bans have not reduced crime."  Am I reading that
21    correct?
```

1  A    Yes.
2  Q    And is that still your view today?
3  A    I've not seen any further studies of this
4  yet, but yes, I mean, essentially that's the
5  conclusion.
6  Q    All right.
7  A    With the qualifiers that are stated in the
8  rest of the footnote.
9  Q    Let's mark this as Exhibit 6, please.  Let
10 me show you what I've marked as Exhibit 6, which is an
11 article authored by Mark Gius, G-I-U-S, on an
12 examination of the effects of concealed weapon laws and
13 assault weapons bans on state-level murder rates.
14      (Koper Exhibit 6 was marked for
15 identification.)
16 A    Okay.
17 Q    And I first ask you are you familiar with
18 this article?
19 A    No.  I've not read this.
20 Q    And has anyone mentioned this to you?
21 A    Defense counsel did mention the existence

crimes resulting in death. I think the percentage of gunshot victimizations resulting in death. I also summarized in chapter nine of this report some of the other findings that we had had in the '97 report when we had looked at some different similar types of outcome measures.

Q    On page 96 of your 2004 report marked as Exhibit 5, that's your summary of your conclusions; correct?

A    Yes.

Q    And in the third sentence you state, "There has been no discernable reduction in the lethality and injuriousness of gun violence," is that correct?

A    Yes.

Q    And is that still your view today based upon your study and analysis of the impact of the federal ban on assault weapons and large capacity magazines?

A    Yes. Based on the data that I analyzed, it's still my view of it. Again, subject to the qualifications that I noted earlier.

1  MR. FADER: Objection. You can answer.

2  THE WITNESS: Again, you can't say that
3 you'll eliminate all public shootings. What these data
4 suggest is that you would reduce the number of victims.
5 I can't necessarily -- it's hard to put specific
6 probabilities on it, but that's what these data
7 suggest. When you see some -- some of these
8 comparisons that were done in Luke's Dillon's thesis
9 even showed statistically significant differences
10 between the LCM cases and the non-LCM cases, that would
11 seem to provide some better degree of scientific
12 certainty.

13 BY MR. SWEENEY:

14  Q  But because of the availability of multiple
15 firearms and multiple magazines that aren't large
16 capacity, can you truly say to a reasonable degree of
17 scientific probability that reducing the number of or
18 even eliminating the number of large capacity magazines
19 will reduce either the incidents of mass public
20 shootings or the number of people injured in such
21 public shootings?

1   A    I guess the best way to answer that would
2   be that we'd have to -- we'd have to test that. We'd
3   have to see a circumstance where use of large capacity
4   magazines was significantly reduced and see what impact
5   that has on -- on these sorts of shootings.
6   Q    And that's because we simply don't have
7   that evidence today; correct?
8   A    We do have some evidence relevant to that.
9   It's just how -- how far you can push it, I guess.
10  Q    Not far enough to state with a reasonable
11  degree of scientific probability; correct?
12       MR. FADER: Objection.
13       THE WITNESS: Yeah, I struggle a little bit
14  with that particular phrase because I can't put any
15  specific probability or tell you with -- with, you
16  know, five percent, one percent probability that there
17  will be this change. I can simply point to the numbers
18  that exist in these studies, and some of these
19  differences are statistically significant differences
20  and so it suggests in principle that if you could
21  reduce the use of these magazines, you could get a

187

1  reduction.
2  BY MR. SWEENEY:
3       Q    And when we're talking about the
4  probability, in order to say more probable than not
5  it's more than 50 percent likelihood.
6       A    Uh-huh.
7       Q    And I take it the evidence just doesn't
8  support that right now?
9            MR. FADER:  Objection.
10           THE WITNESS:  I would be cautious in making
11 the inferences about, you know, how certain it is that
12 it would happen.
13 BY MR. SWEENEY:
14      Q    And so you cannot say that it would be more
15 likely than not to achieve that?
16      A    Not -- I would have to see more
17 observation.  Have to see what happens.
18      Q    All right.  On page 13, footnote 26, you
19 touch on this in -- this issue of a perpetrator
20 substituting other guns for banned assault weapons, and
21 of course that would also include substituting multiple