1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF MARYLAND

3

4    STEPHEN V. KOLBE, et al.

5                    PLAINTIFFS

6

7        VS.                      CIVIL NO. CCB-13-2841

     MARTIN J. O'MALLEY, et al.

8                    DEFENDANTS

9
                                  Baltimore, Maryland
10
                                  July 22, 2014
11

12
          The above-entitled case came on for a motions
13   hearing before the Honorable Catherine C. Blake,
     United States District Judge
14

15
                    A P P E A R A N C E S
16

17   For the Plaintiffs:

18        John Parker Sweeney, Esquire
          Marc A. Nardone, Esquire
19        James W. Porter, III, Esquire
          Sky Woodward, Esquire
20

21   For the Defendants:

22        Matthew J. Fader, Esquire
          Jennifer L. Katz, Esquire
23        Dan Friedman, Esquire

24

25   Gail A. Simpkins, RPR
     Official Court Reporter

1                    P R O C E E D I N G S

2          THE CLERK:  The matter now pending before this

3     Court is Civil Case Number CCB-13-cv-2841, Kolbe, et

4     al. versus O'Malley, et al.  Counsel for the

5     plaintiffs are John Sweeney, Marc Nardone, James

6     Porter, III, Sky Woodward.  Counsel for the defendant

7     are Dan Friedman, Matthew Fader, Jennifer Katz.  This

8     matter now comes before the Court for a motions

9     hearing.

10         THE COURT:  All right.  Good morning again,

11    everyone, and I am looking forward to hearing from

12    you.  Having talked briefly to counsel yesterday, I

13    understand that the defendant is going to proceed

14    first, and I'm happy to hear from you.

15         MR. FADER:  Thank you.

16         Good morning, Your Honor, may it please the

17    Court.

18         When this lawsuit was filed last October, only

19    one federal court had decided the constitutionality of

20    assault weapons and large-capacity magazine bans in

21    the wake of the Supreme Court's landmark decisions in

22    Heller and McDonald.  That decision of the D.C.

23    Circuit has now been joined by federal district courts

24    in New York, Connecticut, and with respect to

25    large-capacity magazines, Colorado, in unanimously

1    holding that such laws do not violate the right to

2    keep and bear arms codified in the Second Amendment.

3         THE COURT:  There are no cases that have decided

4    to the contrary?

5         MR. FADER:  That's correct, Your Honor.

6    Although each of those courts either assumed or found

7    that the laws at issue burdened the Second Amendment

8    right in some way, they unanimously held that any such

9    burden is minimal, that intermediate scrutiny applied

10   to those challenges, and that evidence similar to that

11   presented in the record before this Court was more

12   than sufficient to meet the government's burden under

13   intermediate scrutiny.

14        This case, like those, presents the issue of

15   whether the Maryland's General Assembly acted within

16   its constitutional discretion when it enacted bans on

17   particularly dangerous firearms and magazines,

18   firearms designed for modern military assaults, and

19   both firearms and magazines disproportionately used in

20   mass public shootings and murders of law enforcement

21   officers.

22        The arguments the plaintiffs make in advocating

23   their position ignore the evidence presented in the

24   case, conflict with controlling Supreme Court and

25   Fourth Circuit precedent, and also contradict the

1    persuasive decisions of the now five other federal

2    courts to have upheld similar laws.

3        I want to start by articulating a few things

4    that this case is not about.  First, this case is not

5    about whether the Second Amendment is important.  The

6    Supreme Court has held that it is a right that

7    preexisted the Constitution, that is fundamental to

8    our concept of ordered liberty.  The State's position

9    in this case is not in conflict with that.

10       This case is also not about whether the Second

11   Amendment stands alone as an absolute right that does

12   not need to accommodate under any circumstances other

13   important public interests, including public safety.

14   The Supreme Court has held just as firmly that, like

15   other guarantees in the Bill of Rights, the Second

16   Amendment is not unlimited, notwithstanding its

17   absolute sounding language.

18       This case is also not about what the Supreme

19   Court has determined to be the central component of

20   the Second Amendment right, which is self-defense

21   within the home.  The evidence in this case is clear

22   that the firearms at issue are used only extremely

23   rarely in self-defense cases, that more than ten

24   rounds are fired in self-defense only extremely

25   rarely, if ever, and that other firearms and magazines

1    can and are used far, far, more often in self-defense.

2         THE COURT:  Let me ask you, what is the state of

3    the evidence on whether these weapons are commonly

4    used for either hunting or marksmanship, target

5    practice?

6         MR. FADER:  With respect to hunting, Your Honor,

7    I think that the state of the evidence is that there

8    is no evidence that they are commonly used for

9    hunting.  There is evidence that some people have used

10   them for hunting, but there is no evidence that they

11   are commonly or frequently used for hunting, nor is

12   there any evidence that they serve any better purpose

13   for hunting than hundreds of different firearms that

14   are still lawful to be purchased in the State of

15   Maryland.

16        With respect to marksmanship, there is evidence

17   that there are marksmanship competitions that are

18   specifically created for these firearms.  So there is

19   evidence that, to the extent that these are owned,

20   that a purpose for which people frequently own them is

21   marksmanship and to participate in some of these

22   competitions, or because these firearms are so similar

23   to firearms used in military combat, competitions have

24   been created for people to use them in scenarios that

25   imitate that.

1          But with respect to that issue, Your Honor, the

2     defendants' position is that that is not a use, the

3     competitive sporting purpose is not a use that is

4     protected by the Second Amendment as historically

5     understood.

6          The Supreme Court identified the central

7     component of that right as self-defense.  It also

8     noted that individuals at the time of the founding

9     would have found its use for hunting to be at least

10    equal to the sense of the importance of the use for

11    militia purposes.  It never mentioned competitive

12    sport shooting.  I think that the individuals who

13    ratified the Second Amendment in 1791 would have

14    found, in looking at the purpose of this amendment,

15    the expenditure of thousands of rounds of ammunition

16    in sport to be not something protected by their

17    understanding of the Second Amendment, which is what

18    the Supreme Court has determined should guide the

19    courts in analyzing that amendment.

20         THE COURT:  It appears from the McDonald case

21    that the appropriate date for the historical analysis

22    might also include 1868, or approximately, when the

23    Fourteenth Amendment was ratified.  Is there anything

24    that would suggest that at that time competitive

25    marksmanship was within the scope of the right?

1          MR. FADER:  Certainly nothing that's within the

2     record before Your Honor, and nothing that I'm aware

3     of.  There's nothing to indicate the competitive

4     marksmanship was understood to be protected.

5          Certainly shooting to gain competency with the

6     firearm, but that's something much different than the

7     competitive sports shooting for which these are used

8     today.

9          THE COURT:  Since we are talking about this

10    issue at the moment of common use, and you probably

11    would get to this anyway, but what is again in the

12    record -- let me be sure I understand your position --

13    on the numbers of assault weapons, I'll just call

14    them, banned weapons in Maryland?

15         MR. FADER:  The state of the record -- oh, in

16    Maryland.

17         THE COURT:  In Maryland, and in the United

18    States.

19         MR. FADER:  In the United States, the state of

20    the record is that -- the plaintiffs have alleged that

21    their numbers are that 8.2 million of those firearms

22    were around through the end of 2012.

23         That is using a definition for what the

24    plaintiffs have defined as modern sporting rifles,

25    which is not necessarily coextensive with the assault

1      rifles described in the Maryland law and appears to be

2      an amorphous definition that the plaintiffs use as

3      whatever manufacturers describe as being a modern

4      sporting rifle.

5          But even taking that as the number, we would

6      take that as, for summary judgment purposes, the upper

7      limit of what numbers there would be.  A witness

8      called by the defendants as a hybrid fact expert

9      witness, Chief Johnson, identified the number as five

10     million.  So it's I think fair to, for the purpose of

11     the summary judgment record, to treat it in that

12     range.

13         The plaintiffs have also, one of their expert

14     witnesses identified a study that they say shows that

15     the average owner of one of these firearms owns more

16     than three of them, 3.1 of them.  So for determining

17     how extensive ownership of these is, then it would

18     appear that fewer than three million Americans, less

19     than one percent of the population would own one of

20     those firearms.

21         The state with respect to Maryland is that --

22     let me get the exact numbers, but it is also that well

23     fewer than one percent of the population, if you go by

24     numbers of what has been sold as regulated firearms in

25     the State, would own them.

1          The total number of assault weapons sold through

2     2012, according to the data by the Maryland State

3     Police, would have been 43,647.  The number through

4     2013, as of the last data for the last brief that was

5     filed, was 58,075.  There would be more that were

6     processed after that from 2013.

7          If you include what has been referred to as the

8     Type O firearms, which are receivers that could be

9     used to build an assault rifle, or could be used to

10    build something that would still be lawful under this

11    law, even adding all of those, the numbers would be

12    69,072 through 2012, or 92,515 through 2013.

13          THE COURT:  Okay.  Thank you.

14          MR. FADER:  The Fourth Circuit has described a

15    two-prong test for addressing Second Amendment claims.

16    The first prong asks whether the law being challenged

17    burdens conduct protected by the Second Amendment as

18    historically understood.

19          The second prong asks, if the law does burden

20    such protected conduct, does the law satisfy the

21    applicable test under means and scrutiny?

22          The plaintiffs' suggestion that this Court

23    ignore binding Fourth Circuit precedent in favor of a

24    split Ninth Circuit panel decision that expressly

25    disagreed with the Fourth Circuit's decision regarding

1    handgun wear and carry law is obviously untenable.

2         Moreover, the plaintiffs simply misread the

3    Supreme Court's decision in Heller.  The Supreme Court

4    in Heller did not even suggest that no standard of

5    scrutiny would be applicable.  To the contrary, the

6    Supreme Court stated under any of the standards of

7    scrutiny that we have applied to enumerated

8    constitutional rights, banning from the home the most

9    preferred firearm in the nation, to keep and use for

10   protection of one's home and family, would fail

11   constitutional muster.  The Supreme Court thus implied

12   that it would look to a means and scrutiny test.  It

13   just didn't need to identify which one in that case.

14        THE COURT:  And in any event, it's quite clear

15   that that's the Fourth Circuit's approach.

16        MR. FADER:  It certainly is, Your Honor.

17        THE COURT:  On the means, and on the level of

18   intermediate scrutiny, and then I'll let you come back

19   to the first prong, there has been a recent submission

20   by the plaintiffs of I guess the McCullen case from

21   the Supreme Court.  They appear to suggest that that

22   might change or affect the standard for intermediate

23   scrutiny that should be applied in this Second

24   Amendment case.

25        Do you want to respond to that.

1           MR. FADER:  Certainly, Your Honor.  Thank you.

2           That case does not define the standard for

3      intermediate scrutiny.  In fact, the phrase,

4      intermediate scrutiny, is used only once in the

5      Supreme Court's decision in McCullen, and it is in

6      reference to a completely different case.

7           The issue where the Supreme Court referenced

8      intermediate scrutiny was to say that it was not

9      impermissible for the Supreme Court to address the

10     first prong of a standard of scrutiny test first, and

11     then proceed to the second prong, even if it was

12     ultimately going to find that the law didn't satisfy

13     the second prong.

14          The Supreme Court referenced that it had done so

15     in a different case employing intermediate scrutiny.

16     That's the only mention of intermediate scrutiny in

17     that case.

18          What the Supreme Court did was apply

19     straightforwardly a test that it has used in specific

20     circumstances dealing with First Amendment cases

21     involved in time, manner, place restrictions, and that

22     case specifically dealing with buffer zones outside of

23     abortion clinics.  It did not purport to redefine

24     intermediate scrutiny.

25          In fact, courts articulate an intermediate

1     scrutiny test in many different ways, and that has

2     been true with respect to intermediate scrutiny as

3     applied in the First Amendment context.  There are

4     many different articulations of that standard.  The

5     Supreme Court did not purport to change that in any

6     way.

7          In fact, the Fourth Circuit's articulation of

8     the means and scrutiny standard is fully justified by

9     Supreme Court cases articulating the standard in very

10    similar terms.

11         For example, in Clark versus Jeter, 486 U.S.

12    456, the Supreme Court articulated the intermediate

13    scrutiny standard as to withstand intermediate

14    scrutiny, a statutory classification must be

15    substantially related to an important governmental

16    objective, pretty much exactly what the Fourth Circuit

17    has articulated as the intermediate scrutiny standard

18    for this case.

19         That has not been overruled, and the McCullen

20    case didn't purport to overrule it.  It simply is the

21    case that courts have articulated that standard in

22    different ways in different cases.  This Court, of

23    course, sits in the Fourth Circuit, which has

24    articulated it in the way that it has been described

25    in our papers.

1           Under the Fourth Circuit's test, the first

2    question is does the law burden conduct within the

3    scope of the Second Amendment as historically

4    understood?

5           The concept of scope as the Supreme Court has

6    defined it is based on history and tradition.  It's

7    not established in the Constitution.  The Supreme

8    Court was clear in Heller that the right codified in

9    the Second Amendment preexisted the Constitution.  The

10   Supreme Court said this is not a right granted by the

11   Constitution, and it is not dependent on the

12   Constitution for its existence.  So the scope of the

13   amendment is defined by history and traditional.

14          Just as the Supreme Court stated in Heller that

15   it would border on the frivolous to argue that only

16   arms in existence in the 18th Century were protected

17   by the Second Amendment, so it would border on the

18   frivolous to argue that our understanding of the

19   limitations on that amendment would only be

20   limitations that were actually in existence at the

21   time of the Second Amendment.  And in fact, the

22   limitations that the Court identified in Heller as

23   presumptively lawful are limitations that were not in

24   place at the time of the Second Amendment.

25          There were not concealed carry laws at that

1    time.  Those arose in the early 19th Century.  There

2    were not prohibitions on felons and the mentally ill

3    to carry firearms.  Those arose in the 20th Century.

4    There were not the same protections on carry a firearm

5    into sensitive places.

6         So these are all limitations recognized by the

7    Supreme Court as presumptively lawful, which clearly

8    have as their purpose the protection of public safety

9    and which demonstrate that the Second Amendment is not

10   unlike all other constitutional rights, but in fact

11   sits within the other rights guaranteed by the Bill of

12   Rights as being subject to certain limitations, which

13   the Supreme Court has analyzed under means and

14   scrutiny standards.

15        Plaintiffs try to avoid looking at the issue of

16   scope in that context by glomming onto a single phrase

17   in the Heller decision, and they articulate numerosity

18   as the sole issue in defining whether something is

19   within the scope of the Second Amendment right.

20        Although there are some other courts that have

21   also addressed that issue using numerosity as the

22   threshold, the defendants believe that that misreads

23   the Heller case for several reasons.

24        First, in Heller, the common use concept came

25   into the decision not as a discussion of what is

1    absolutely protected by the Second Amendment, but as a

2    description of one of a number of limitations on that

3    right.  The Court identified that the Second Amendment

4    does not protect weapons that are not in common use at

5    the time.

6        The justification that the Court identified for

7    that limitation was not any historical focus on

8    numbers, but the historical practice of allowing a ban

9    on possession of weapons that are dangerous or

10   unusual.  That's the historical justification the

11   Supreme Court pointed to.

12       Moreover, focusing only on numerosity is

13   inconsistent with the other limitations that the

14   Supreme Court identified in Heller, an inexhaustive

15   list of presumptively lawful limitations that have

16   nothing to do with numerosity, and it also conflicts

17   with common sense.

18       If the threshold is simply how many of the

19   firearms there are, what is that number, and is there

20   a day whereby successful marketing campaigns or

21   successfully identifying a price point for certain

22   weapons, there is a magical transition into

23   constitutional protection for weapons that the day

24   before were not protected?

25       It also raises questions about when you would

1    look to the issue of common use with respect to a

2    particular law.  California enacted an assault weapons

3    and large-capacity magazine ban in 1989, when the

4    record is clear that there were far, far fewer assault

5    rifles in existence.

6        THE COURT:  As you suggest, a number of courts

7    have looked at this numerosity issue and whether

8    something is in common use.

9        Do you think there is an appropriate part of the

10   Heller/McDonald analysis that does focus on the number

11   of weapons, but just that is not sufficient in itself

12   to define scope?

13       MR. FADER:  I think the Supreme Court clearly

14   stated that the Second Amendment does not protect

15   firearms -- does not protect arms that are not in

16   common use at the time.

17       In Heller, the Supreme Court analyzed Miller and

18   said our conclusion from Miller, what they were really

19   saying is firearms not in common use at the time do

20   not get Second Amendment protection.

21       So I think the Supreme Court's focus on that was

22   for that purpose of identifying that limitation.  I do

23   not think that it established the converse and said

24   anything that is in common use, no matter how

25   dangerous, no matter how much it affects public

1    safety, is necessarily protected.  I don't think that

2    it established that counterpoint.

3         THE COURT:  Does it involve an analysis, which

4    we were talking about a little bit earlier, about the

5    use, I mean if they are common, but the use is

6    something other than self-defense?

7         MR. FADER:  I think it certainly could, Your

8    Honor.  I think that's not something that the Supreme

9    Court articulated.  But in light of the Supreme

10   Court's focus in _Heller_, I mean _Heller_ was all about

11   what the Second Amendment is.

12        Is it a militia-centric right that doesn't

13   provide individual rights, or is it for another

14   purpose?  The Supreme Court looked and said it's not

15   for the purpose of militia.  That's why it was

16   codified in the Second Amendment, but that's not what

17   the right meant, and the right meant that you had a

18   right for self-defense, and they also said that some

19   people believed the right was equally important for

20   hunting.

21        Certainly the Supreme Court has identified that

22   focus on purposes, and what people viewed the purpose

23   as being at the time the Second Amendment was ratified

24   as being relevant.  So I think it would be relevant to

25   that discussion, but I don't think that the

1    discussion -- as would be relevant issues of how

2    dangerous the firearms are and what risks they pose to

3    public safety, because that's what the Supreme Court

4    identified as the historical justification for the

5    common use limitation.

6        So I think all of those, not a focus simply on

7    how many are there, would be relevant to that

8    discussion.

9        One other scope point that I want to address

10   briefly --

11       THE COURT:  Sure.

12       MR. FADER:  -- with respect only to the

13   large-capacity magazines is whether they fall within

14   the scope of the Second Amendment at all.  I don't

15   think that the particular issues that the defendants

16   have raised here have been addressed by other courts;

17   although, other courts certainly have looked at this

18   with respect to numerosity issues and found that

19   magazines are protected.

20       But magazines are not arms themselves.  The

21   Supreme Court identified the definition of arms at the

22   time of the Second Amendment as the same as today,

23   weapons of offense, which a magazine by itself is not,

24   nor are large-capacity magazines necessary to operate

25   any firearm.  There is no evidence in this case that

1      there is any firearm that cannot be operated with a

2      magazine with a capacity of ten rounds or less.

3          THE COURT:  But certainly there are some

4      firearms that must have a magazine.

5          MR. FADER:  At least they must have a magazine

6      to fire more than one round.  If you can put one in

7      the chamber without a magazine, you can use that one

8      round.  But there are firearms that need magazines,

9      but not magazines with a capacity of more than ten

10     rounds, and that's the only thing that is banned by

11     Maryland law, is magazines with more than ten rounds.

12         THE COURT:  I think it's a little bit different

13     argument, though, to say that a magazine, which at

14     least to some degree would be seen as an integral part

15     of the firearm which is not banned, or which may come

16     under additional protection, to say that an integral

17     part of that weapon doesn't constitute a bearable arm.

18         There may be other reasons why, obviously, that

19     you are arguing that they don't need to be more than

20     ten rounds.  I'm just saying I have a little bit of a

21     difficulty with saying that LCM's are not even within

22     the protection of the Second Amendment at all.

23         MR. FADER:  I think the answer is the difference

24     between a large-capacity magazine and a magazine with

25     ten rounds or less.  This is not a law that affects

1   all magazines, and there is no firearm --

2        There's no arm.  It's the right to keep and bear

3   arms that's protected.  There's no arm that functions

4   differently or that can't function without a magazine

5   of ten rounds or less, and that's why the defendants

6   believe that those are outside the scope.

7        THE COURT:  Okay.

8        MR. FADER:  If the laws do burden conduct that

9   is protected by the Second Amendment to some degree,

10  the question becomes what level of scrutiny to apply.

11       The Fourth Circuit has identified the assessment

12  of which level of scrutiny should apply as taking into

13  account burdens on Second Amendment rights, the nature

14  of a person's Second Amendment interests, the extent

15  to which those interests are burdened by the

16  government regulation, and the strength of the

17  government's justification for the regulation.

18       Here, as every court that has considered this

19  issue has held --

20       THE COURT:  Let me just back up a minute since

21  you are moving into the burden analysis.  Is the State

22  taking the position that the analysis should stop at

23  the first prong, that they are dangerous and unusual

24  weapons, or that there is enough sufficient burden on

25  the Second Amendment that I would not even need to

1    move into the means and scrutiny?

2        Obviously you would argue the full set of both

3    prongs, but do you take that first position?

4        MR. FADER:  Yes, Your Honor.  There are two

5    prongs to the test.  In order to prevail in this case,

6    the plaintiffs have to prevail on both prongs.  The

7    defendants would need to prevail on one or the other,

8    and the defendants do take the position that these

9    laws fall outside the scope of the Second Amendment as

10   historically understood based on the historical

11   tradition of prohibiting, of allowing the prohibition

12   of dangerous and usual firearms.

13       THE COURT:  Okay.  That's what I thought.  I

14   just wanted to be clear.

15       Now so far the other courts that have looked at

16   this, my recollection is that they have all at least

17   assumed, without necessarily deciding, that there is a

18   burden on the Second Amendment, and they have moved

19   past that first prong.

20       MR. FADER:  That's true, Your Honor.  Some have

21   assumed, some have found, but they all have moved on

22   to the second prong of the analysis.  That's

23   consistent with the way the Fourth Circuit has treated

24   other laws, other Second Amendment challenges, where

25   it has assumed a burden on the Second Amendment rights

1    and gone on, without even discussing the burden issue

2    to uphold the statutes based on an application of

3    intermediate scrutiny.  So that's a method that would

4    be open to the Court as well.

5         As every court that has considered the issue has

6    held, intermediate scrutiny would apply to Second

7    Amendment challenges to assault weapons and

8    large-capacity magazine bans, because even if there is

9    a burden on the Second Amendment rights, it is a small

10   one.

11        The Fourth Circuit stated first in Chester, and

12   has gone on to repeat in other cases, we do not apply

13   strict scrutiny whenever a law impinges upon a right

14   specifically enumerated in the Bill of Rights.  And

15   indeed, the evidence is clear that this law does not

16   infringe on any central component of the Second

17   Amendment right, and any burden that it imposes is

18   minimal because there are many other firearms,

19   including the firearm the Supreme Court, the class of

20   firearms the Supreme Court has identified as

21   overwhelmingly chosen by Americans for the lawful

22   purpose of self-defense, the handguns that are all

23   still available, used for those purposes that the

24   Second Amendment serves.

25        The intermediate scrutiny test, as identified by

1    the Fourth Circuit, asks whether there is a reasonable

2    fit between this law and the government's substantial

3    interest, and that is the test that this Court uses

4    sitting in the Fourth Circuit.

5         As far as an application of the intermediate

6    scrutiny standard, the evidence that is before this

7    Court certainly support a reasonable fit between the

8    bans at issue and the government's substantial

9    interest in protecting public safety and reducing the

10   negative effects of firearm violence.

11        These firearms are primarily useful for

12   offensive military-style assaults, not for defensive

13   purposes or for hunting.  They were designed for use

14   in Militaria and are still adopted by militaries

15   around the world as the most effective firearms, with

16   the sole exception that those firearms are automatic

17   as opposed to semiautomatic firearms.

18        But a 30-round clip in a semiautomatic AR-15 can

19   still be emptied in five seconds, causing the D.C.

20   Circuit and other courts to treat it as virtually

21   indistinguishable from the M16 military version.

22        Moreover, as has been discussed in the briefs,

23   the United States Army and law enforcement agencies

24   have determined that even selective fire weapons that

25   have the capacity to fire in automatic or

1    semiautomatic mode are more effectively used for their

2    military and law enforcement purposes in semiautomatic

3    mode.

4         These firearms and magazines are also

5    disproportionately used in mass public shootings and

6    murders of law enforcement officers.

7         Large-capacity magazines have been identified as

8    used in 85 percent of mass shootings where the

9    magazine capacity is known.  Sometimes those numbers

10   are given as 50 percent of mass shootings because

11   shootings where the magazine capacity isn't known are

12   treated as being in the non-large-capacity magazine

13   category.  But where that magazine capacity is known,

14   the numbers show 85 percent.  The average number of

15   shots fired in those cases is 75.

16        From 1982 to 2012, 21 percent of mass public

17   shootings involved an assault rifle, and more than 50

18   percent used large-capacity magazines.  Even worse,

19   when these firearms and magazines are used, the data

20   show that they result in more fatalities, more

21   injuries than in situations in which they are not

22   used.

23        THE COURT:  Let me ask you to address the

24   question of the evidence a little bit.  Obviously

25   there are several motions to exclude that have been

1    filed.

2         Regarding Mr. -- is the correct pronunciation

3    Mr. Koper?

4         MR. FADER:  Yes.

5         THE COURT:  Obviously he has been cited in any

6    number of cases that have looked at this.  Do you know

7    if any of those other cases involved a motion to

8    exclude?  Was there a challenge even to the

9    admissibility of Mr. Koper's evidence?

10        MR. FADER:  I'm not aware of any challenge in

11   any of those cases.  No, Your Honor.

12        THE COURT:  Can you tell me a little bit more

13   about the issue involving the Mother Jones data and

14   any other database that Ms. Allen, among others, might

15   have relied on?  What exactly, and where is it from?

16        MR. FADER:  The Mother Jones database, Your

17   Honor, Mother Jones Magazine has collected information

18   on mass public shootings that have occurred beginning

19   in 1982, and it is consistently updated.  It's based

20   on public press reports, which, by the way,

21   differentiated from all of the other information in

22   the cases cited by the plaintiffs where the data that

23   was at issue was information by a private individual

24   saying I think my business would have made tons of

25   money if the contract hadn't been breached, and that

1    was data that was a black box that was inaccessible to

2    anybody else.

3        Here, what we are dealing with is a compilation

4    of information from public news sources of firearms

5    that were used, the number of shots that were fired,

6    the capacity of the magazines, and other information

7    about the incidents collected from public sources, so

8    that it is easily reviewed and investigated by anybody

9    who would be interested in checking its validity.

10       THE COURT:  And did any of the experts in this

11   case do that, look at the Mother Jones data, but also

12   go back and look at the public press reports that

13   underlie it?

14       MR. FADER:  No.  Yes, there are some instances

15   in which they went and looked at press reports, but

16   there was no systematic review of that information to

17   identify whether every single entry was correctly

18   reported from any news source.

19       But it is publicly-available information that

20   has been subject to scrutiny, and it's available to be

21   subject to scrutiny, which again distinguishes it from

22   the kinds of information relied on by experts the

23   courts have found not to be fair game, because it's

24   not accessible.  It's not subject to review.  It's not

25   subject to testing.  This is a much different type of

information.

THE COURT: Okay.

MR. FADER: Of course, these mass public shootings are very public events. So it's not hard to go back and try to find a news article to see if the information in it is incorrect in some respect.

THE COURT: There is also a National Rifle Association database that's relied on?

MR. FADER: And that's not a database as such as much as a collection of stories that Lucy Allen had relied on.

So the Mother Jones database, they have made an effort based on an understanding, based on a definition of mass public shooting to identify each and every shooting that falls within that definition and put information in that database. So it's an attempt at a comprehensive database of those incidents.

The National Rifle Association stories are different. Those are collections of stories that are reported by the National Rifle Association to highlight self-defense incidents.

Ms. Allen is clear that it is not a comprehensive database. It is not a systematically created database. It's a collection of stories, but

1        it is not the most comprehensive collection of

2        information about those incidents that she was able to

3        find, and no more comprehensive study has been

4        identified.

5              So plaintiffs cited, I don't remember the name

6        of the case, but they cited a case to say anecdotal

7        evidence is not preferred.  Well, what the case

8        actually says is when you have a comprehensive

9        systematic study that reaches one conclusion,

10       anecdotal evidence that contradicts it is not the best

11       evidence.

12             Here, there is no comprehensive

13       scientifically-assembled study.  What we have, the

14       most comprehensive study that she was able to find,

15       and that anybody has identified, is this database, or

16       is not the database, excuse me, but is a collection of

17       stories that has been analyzed for two different

18       periods and has found, out of over 600 incidents, only

19       one in which more than ten shots were fired in

20       self-defense.

21             THE COURT:  Thank you.

22             MR. FADER:  Moreover, the testimony of law

23       enforcement officers is that assault weapons and

24       large-capacity magazines are dangerous and unusual

25       firearms from some of Maryland's leading law

1    enforcement officers, and that the bans will advance

2    Maryland's interest in public safety by reducing the

3    availability of those firearms and magazines for use

4    by criminals, reducing the threat to innocent

5    civilians from unintentional misuse, and helping to

6    protect law enforcement officers.

7         I do want to say just a word about the

8    plaintiffs' claim that the Court cannot even consider

9    those sources of information, because they claim they

10   were not before the General Assembly at the time that

11   it enacted this law.  The plaintiffs' argument is

12   wrong in two ways.

13        First, there is no such limitation on the

14   Court's consideration of evidence.  Second, some of

15   the evidence actually was before the General Assembly.

16   The Fourth Circuit has been clear that there is no

17   requirement that evidence be before the General

18   Assembly to be considered by the Court.

19        In Woollard, the Fourth Circuit relied on the

20   evidentiary basis found in testimonial evidence of law

21   enforcement officers to support a law against the

22   Second Amendment challenge.

23        In United States versus Carter, the Fourth

24   Circuit emphasized that the government could meet its

25   intermediate scrutiny burden by resorting to a wide

1    range of sources, such as legislative text and

2    history, empirical evidence, case law and common

3    sense, as circumstances and context require.  The

4    defendants here rely on all of those sources.

5         The plaintiffs claim that that is in conflict

6    with the Supreme Court decision in Turner

7    Broadcasting, but they simply misread that case.  In

8    Turner Broadcasting, the Court stated that legislators

9    are not required to make an administrative record to

10   accommodate court review, and if they are not required

11   to make that record, then the courts can't be limited

12   to only looking at what is in a record.

13        More importantly, the Turner Broadcasting court

14   said that on remand, the court below could consider

15   introduction of additional evidence as to the harm

16   that the broadcasters in that case would incur.

17        The plaintiffs read into that sentence a

18   limitation saying that only the broadcasters could

19   introduce that evidence in opposing the government,

20   but for two reasons, they misread that.

21        First, the sentence doesn't say that.  More

22   importantly, in that case the broadcasters and the

23   federal government were on the same side.  The law

24   that was at issue was to protect broadcasters by

25   requiring cable companies to carry their signals.  It

1    was the government's burden to introduce evidence

2    about the harm on broadcasters; and, therefore, it was

3    the government that would have to be introducing that

4    additional evidence on remand.

5        So there is simply no support for the

6    plaintiffs' notion in that case or either of the cases

7    they cited for the first time in their reply brief,

8    which simply don't stand for the propositions for

9    which they have cited them.

10       The bottom line is that as the Fourth Circuit

11   has said, it is the legislature's job and not the

12   province of the court to weigh conflicting evidence

13   and make policy judgments regarding the dangers that

14   firearms pose to public safety.

15       This Court's responsibility is to determine

16   whether there is substantial evidence to justify the

17   General Assembly's predictive judgment, whether there

18   is a reasonable fit between the law and the

19   government's important interests.

20       There are two other claims that I would like to

21   just address briefly, Your Honor.

22       THE COURT:  Yes.

23       MR. FADER:  One is a claim under the Equal

24   Protection Clause.  As to both of these remaining

25   claims, there is a motion to dismiss pending, as well

1    as a motion for summary judgment.

2         The Equal Protection Clause keeps governmental

3    decision-makers from treating --

4         THE COURT:  Let me just stop you there.  Just on

5    a procedural basis, is there any reason to address the

6    motion to dismiss if it is all disposed with in the

7    summary judgment motion?

8         MR. FADER:  I think that it can be dismissed on

9    either grounds, Your Honor.  I think that there are

10   clear legal reasons that could be the basis for

11   dismissing on the motion to dismiss or for summary

12   judgment, but we are certainly treating them as

13   combined at this point.

14        THE COURT:  Okay.

15        MR. FADER:  Under Fourth Circuit jurisprudence,

16   and I'm talking specifically about Morrison versus

17   Garraghty, 239 F.3d, at 654, a plaintiff must first

18   demonstrate that he has been treated differently from

19   others with whom he is similarly situated in order to

20   make an equal protection claims.

21        In this case, the equal protection claims arise

22   from the plaintiffs' claim that exceptions in the law

23   applicable to retired law enforcement officers violate

24   their equal protection rights, but the plaintiffs are

25   not similarly situated to those retired law

1    enforcement officers.

2         The plaintiffs initially challenged two

3    exceptions with respect to assault weapons; one, an

4    exception for the transfer of firearms actually

5    obtained for a retired law enforcement officer in the

6    line of duty when he wasn't active duty.

7         The plaintiffs seem to have dropped any argument

8    with respect to that exception and have dropped any

9    claim that they are similarly situated, since those

10   law enforcement officers obviously would have had to

11   receive extensive training on those particular

12   firearms.

13        But they seem to be maintaining their claim that

14   the provision allowing an exception for transfer to a

15   retiring law enforcement officer at the time of

16   retirement is a violation of the Equal Protection

17   Clause.  But there again, the class of plaintiffs who

18   are not retired law enforcement officers are not

19   similarly situated to retired law enforcement

20   officers, who, in connection with their law

21   enforcement responsibilities, have had extensive

22   training not only on how to use the firearm, but how

23   to act in circumstances calling for the use of deadly

24   force, how to minimize other casualties on the

25   emotional, mental and psychological preparation needed

1    for the possibility of deadly force shooting

2    situations, which simply makes them not similarly

3    situated.

4         Moreover, as far as possible rationales on a law

5    that would be addressed under the rational basis test,

6    the General Assembly could certainly have rationally

7    concluded that retired law enforcement officers did

8    not present the same risks of having these instruments

9    fall into the hands of criminals, or used for ill

10   purposes, as if they were proliferating in the hands

11   of others.

12        The last claim in this case, Your Honor, is a

13   void for vagueness claim.  Here again, simple legal

14   principles are dispositive.

15        The Fourth Circuit has held that facial

16   vagueness challenges to criminal statutes are allowed

17   only when the statute implicates First Amendment

18   rights.  The plaintiffs have not disagreed with that

19   legal standard in the Fourth Circuit.

20        This case does not implicate First Amendment

21   rights.  The plaintiffs have only brought a facial

22   challenge to the law, and, therefore, that facial

23   challenge must fail.  This is a pre-enforcement facial

24   challenge to the law that cannot survive under that

25   standard.

1          The Supreme Court also in the Village of Hoffman

2     case said vagueness challenges to statutes which do

3     not involve First Amendment freedoms must be examined

4     in light of the facts of the case at hand.  One whose

5     conduct the statute clearly applies may not

6     successfully challenge it for vagueness.  Even --

7          THE COURT:  That opinion by the Supreme Court,

8     do you think that's consistent with what the Fourth

9     Circuit has said?

10          It seems to me the Fourth Circuit was a bit more

11     categorical than the Supreme Court was in the Village

12     case, and looking at the other courts that have

13     addressed this, most of them have addressed the

14     merits, I think.

15          MR. FADER:  Certainly some of the other courts

16     have addressed the merits; although, I don't know that

17     any of those were in situations in which there was not

18     an as applied challenge as well.

19          I think in the Village of Hoffman, that

20     statement is less categorical, but it applies to it as

21     an applied challenge.

22          It says vagueness challenges that don't involve

23     First Amendment freedoms must be examined in light of

24     the facts of the case at hand, indicating that there

25     must be facts that have been put forward with respect

1    to a particular plaintiff saying this is something I

2    want to be able to use, or this is conduct I want to

3    be able to engage in that is prohibited.

4        Here, the declarations that have been submitted

5    by the plaintiffs indicate that they know exactly what

6    is covered by this law.  They want to purchase or sell

7    AR-15s and AK-47s, and they are upset that this law

8    prohibits them from doing so.  There is no specific

9    factual scenario that would allow for an as-applied

10   challenge here.

11       And to the extent that the plaintiffs have

12   identified individual firearms or decisions by the

13   Maryland State Police that they consider incorrect, or

14   that they believe were made inappropriately, those are

15   not an appropriate basis for a facial challenge to a

16   law.

17       They have raised individual issues that could be

18   raised in state courts if there were to be a criminal

19   prosecution brought with respect to this, but that's

20   not the basis for a facial challenge to the law.

21       THE COURT:  Now when the plaintiffs brought the

22   McCullen case to our attention, they also included

23   something I think described as newly discovered

24   evidence, but they included a bulletin from July of

25   2014 issued by the Maryland State Police, I think

1    going to the issue of a copy, what is a copy.  If you

2    would like to address that.

3        MR. FADER:  Certainly.  The first point

4    addressing that, Your Honor, would be, again, that is

5    with respect to a particular firearm that they have

6    identified.  It is not even a firearm that any of the

7    plaintiffs have said that they want to acquire, but

8    aren't because of this law.

9        So it's not -- that kind of focus on individual

10   firearms is not appropriate in considering a facial

11   challenge where there is a clearly defined core of

12   prohibited conduct as established by the plaintiffs'

13   own allegation.  So a one-off situation doesn't make a

14   law facially unconstitutional.

15       With respect to the firearm at issue, what it

16   appears to be is that the plaintiffs disagree with the

17   State Police's preliminary determination as to whether

18   that particular firearm satisfied the test of having

19   completely interchangeable internal components.

20       There is a manual that comes with the firearm

21   that says that all of the major subassemblies of the

22   firearm are completely interchangeable with an AR-15,

23   and the plaintiffs have identified a part that they

24   believe is not fully interchangeable with an AR-15.

25   Under the Maryland State Police's policy, they will go

1    back and review that, and if they agree with it, then

2    they may change their view.

3         But this is a circumstance dealing with an

4    individual firearm, and the fact that there may be

5    further review, or even if there was an incorrect

6    decision as to that particular firearm does not call

7    into question the facial validity of the law itself.

8         Thank you.

9         THE COURT:  Thank you.  Thank you Mr. Fader.

10        Mr. Sweeney.

11        MR. SWEENEY:  May it please the Court.

12        THE COURT:  Good morning.

13        MR. SWEENEY:  I am John Parker Sweeney, and I

14   represent citizens of Maryland and citizen groups that

15   are challenging the bans in SB281 on popular firearms

16   and magazines.

17        We are grateful for the opportunity to appear

18   before Your Honor today.  At the outset, we want to

19   thank the Court for the opportunity to develop a

20   factual record.

21        I must commend Mr. Fader and Mr. Friedman for

22   their professionalism and civility that allowed us to

23   go through expedited discovery, including 40

24   depositions over the holidays, through a terrible

25   winter weather-wise to get here, and I am equally

1    proud to say that we have teed up these motions

2    without once requiring the Court to intervene and

3    resolve any disputes between us.

4         THE COURT:  Well, I will echo your thanks to

5    counsel on both sides.  I would certainly agree from

6    what I have seen everyone has handled this very

7    professionally.  These are important arguments, and I

8    appreciate how you dealt with it.

9         MR. SWEENEY:  This is the finest of litigating

10   in Maryland.  That's why I enjoy it so much.

11        What distinguishes this case from every other

12   case relied upon by Mr. Fader, starting with the

13   Heller II decision, and the more recent district court

14   cases, is that we have developed a full record,

15   including depositions of key witnesses.  The other

16   cases were largely resolved on summary judgment based

17   on declarations and expert reports, but without the

18   benefit of cross-examination through deposition.

19        Depositions in this case have demonstrated that

20   the defendants' experts' opinions offered by the

21   defendants to support the law in question are not

22   reliable, and should be excluded.

23        Let me start first by addressing Mr. Koper, who

24   Your Honor asked about during Mr. Fader's examination.

25   Mr. Koper is the principal author of two very

1    significant, indeed, critical studies in this area.

2         When the federal government banned assault

3    weapons and magazines with the capacity greater than

4    ten in 1994, that was for a ten-year period, and the

5    law required a study of its efficacy be done.  Mr.

6    Koper, Dr. Koper, excuse me, was charged by the

7    government, and under contract to the Department of

8    Justice, prepared those studies.

9         He prepared a 1997 interim study, as required

10   under the Act, and he repaired a 2004 updated study,

11   as required under the Act, and these studies were

12   considered by Congress when Congress allowed the law

13   to expire in 2004.

14        One of the things that we were able to do that

15   no one else has done is depose Dr. Koper.  I was,

16   frankly, more than a little surprised to find out that

17   he had never been deposed before.

18        And so what did we learn at Dr. Koper's

19   deposition?  First we asked him about the effect of

20   the federal bans.

21        He said in his report, "There has been no

22   discernible reduction in the lethality and

23   injuriousness of gun violence."  I asked him if that

24   report was correct, and he said yes.  This is at page

25   94 of his deposition.

1          I went on to say is that still your view today

2     based upon your study and analysis of the impact of

3     the federal ban on assault weapons and large-capacity

4     magazines?

5          Answer, yes.  Based on the data that I analyzed,

6     it's still my view of it.

7          I asked all right.  Are you aware of anyone

8     else's data with respect to studying the impact of the

9     federal ban on assault weapons and large-capacity

10     magazines that reached a conclusion different from the

11     conclusion that you stated here?

12          Answer, no.

13          I went on on page 96 to say isn't it true that

14     as you sit here today, you cannot conclude with a

15     reasonable degree of scientific probability that the

16     federal ban on assault weapons and large-capacity

17     magazines reduce crimes related to guns?

18          Answer, correct.

19          Question, and it didn't reduce the number of --

20          THE COURT:  But let me stop you for a minute.

21     The reducing crimes related to guns isn't really the

22     area of my focus in this case, is it?

23          Again, we are obviously not talking about a ban

24     on handguns or many other kinds of guns that are used

25     in the course of committing crimes.

1          MR. SWEENEY:  I went on to ask, Your Honor, and

2     it didn't reduce the number of deaths or injuries

3     caused by guns either, correct?

4          Answer, correct.

5          THE COURT:  Yes.

6          MR. SWEENEY:  I further went on to ask him about

7     the effect of state bans rather than the federal ban.

8     On page 84 of his deposition I said you address, on

9     note 95, I believe state bans on assault weapons in

10    which you say, "A few studies suggest that state-level

11    assault weapon bans have not reduced crime."  Am I

12    reading that correct?

13         Answer, yes.

14         Question, and is that still your view today?

15         Answer, I've not seen any further studies of

16    this yet, but yes, I mean, essentially that's the

17    conclusion.

18         I asked him about his study with respect to the

19    use of the banned firearms and assaults on law

20    enforcement officers.

21         On page 128, I asked would you agree with me

22    that law enforcement officers are far more likely to

23    be killed by motor vehicles in the line of duty than

24    assault rifles?

25         Answer, yes.

1          Question, vastly more likely to be killed by

2     handguns than by assault rifles?

3          Answer, yes.

4          Possibly even more like likely to be killed by

5     shotguns than by assault rifles, probably more likely?

6          Answer, probably.

7          I then asked him about mass shootings, page 131.

8          And if you assume four or more, referring to

9     individuals shot in one incident, can you state to a

10    reasonable degree of scientific probability based upon

11    the evidence available to you that banning assault

12    rifles will reduce the number of incidents of mass

13    shootings?

14         Answer, I can't say that based -- I mean I can't

15    make a firm projection of that based on any particular

16    available data.  There might be data to suggest that

17    there could be some reduction in that, but it's hard

18    to really clearly project what that would be or how

19    difficult it might be to detect statistically.

20         THE COURT:  Let me ask you, Mr. Sweeney, again,

21    the context in which I am evaluating these experts'

22    testimony or deciding whether to exclude it, it seems

23    to me is somewhat different from the traditional case,

24    medical malpractice, product liability, something

25    where it is required for an expert opining on

1    causation to reach an opinion, as you suggest,

2    something more likely than not, probable, scientific

3    probability.

4        It doesn't seem to me that is the precise

5    context here when what we are trying to evaluate is

6    whether there is a reasonable fit, that the

7    legislature's predictive judgment is supportable.  It

8    seems to me like a different kind of analysis.

9        MR. SWEENEY:  If the opinions advanced by the

10   State to support the constitutionality of the law that

11   restricts fundamental rights of American citizens

12   cannot be based upon the same evidence that meets Rule

13   702 and other federal cases, I don't think Your Honor

14   should affirm the statute.

15       THE COURT:  That was not the thrust of my

16   question.  I think Rule 702 needs to be --

17       What satisfies Rule 702 can vary depending on

18   the context of the case and the purpose for which an

19   opinion is being offered.  So I'm perhaps not making

20   myself clear.

21       MR. SWEENEY:  One of the issues in the Turner

22   Broadcasting case was whether or not the Congress had

23   before it evidence of the harm that it sought to

24   correct.  One of the things that the Supreme Court

25   said in that case was, on remand, there has to be

1   evidence to support that.

2          Causation is not irrelevant.  If the firearms in

3   question and the large-capacity magazines that are

4   being banned have not been shown, as Mr. Fader

5   asserts, to be disproportionately involved in mass

6   shootings, or the murders of law enforcement officers,

7   or indeed, crime in general involving firearms, then

8   there is no causation to underlie the infringement on

9   constitutional rights, which all the courts, as Your

10  Honor pointed out, have either assumed or found occurs

11  with these sorts of prohibitions.  We are the first

12  ones to actually probe the evidence relied on by the

13  defendants.

14         Let me conclude with a portion here of Dr.

15  Koper's testimony with respect to what he could

16  predict from bans similar to the ones that are before

17  Your Honor in this case.

18         On page 84 I asked, you would not expect a ban

19  on assault weapons or large-capacity magazines to

20  actually reduce the number of firearms-related assault

21  or robberies, correct?

22         Answer, correct.

23         Question, and you would not expect a ban on

24  assault weapons or large-capacity magazines to reduce

25  firearm-related home invasions, correct?

1          Answer, no.  Correct, I mean.

2          Question, and you wouldn't expect a ban on

3    assault weapons or large-capacity magazines to reduce

4    the number of firearm assaults on police officers,

5    correct?

6          Answer, correct.  That's fair enough.

7          A careful reading of his deposition shows that

8    he can't really support the efficacy of the bans in

9    question here.

10         Mr. Fader pointed out a number of critical,

11   let's call them material facts underlying his motion.

12   We proffered at the temporary restraining order

13   hearing to Your Honor that we would develop evidence

14   to support the critical elements of our challenge.  We

15   proffered that we would show that the banned firearms

16   are in common use.  Even using defendants' five

17   million nationwide and 92,000 in Maryland, we have

18   demonstrated that these are common.

19         THE COURT:  Let me ask you the same question

20   that I asked Mr. Fader.  What is the state of the

21   record that they are commonly used for self-defense?

22         MR. SWEENEY:  We have shown that the banned

23   firearms are chosen for self-defense.

24         Professor Webster, the only expert to testify

25   before the Maryland General Assembly, readily

1    acknowledged that the banned firearms are sometimes

2    used for self-defense.

3         We produced --

4         THE COURT:  Do you have the cite to that for

5    Professor Webster?

6         MR. SWEENEY:  I do.  It's page 115 of his

7    deposition, Your Honor.

8         THE COURT:  Of his deposition.  Thank you.

9         MR. SWEENEY:  Yes.  We produced a survey result

10   conducted by the plaintiff, National Shooting Sports

11   Foundation, of more than 22,000 owners of modern

12   sporting rifles, who gave as the number one and two

13   purposes for owning those firearms target shooting and

14   home defense.

15        THE COURT:  Do you have evidence of their use

16   for self-defense?  I understand the choice issue.  I

17   understand people wanting them for that purpose, but

18   actually using them in self-defense?

19        MR. SWEENEY:  Yes.  And may I say, Your Honor,

20   that the requirement of common use is not supported in

21   the text of Heller, and is a red herring.

22        Nothing in Heller requires handguns to have been

23   used for self-defense in the District of Columbia.

24   Indeed, they could not have been, because they had

25   long been banned.

1          Moreover, operable long guns were banned in the

2     homes of D.C. citizens, a prohibition which was

3     separately overturned in the District of Columbia.

4          There was no evidence before the Court in the

5     District of Columbia that either handguns or long guns

6     had ever been used in the defense of homes in the

7     District of Columbia.  It is not use that is the

8     linchpin here.  The linchpin is found in the text of

9     Heller, which talks about the nature of arms that are

10    protected by the Second Amendment.

11         The issue here is whether the firearms and

12    magazines banned here are typically possessed by

13    responsible law-abiding citizens for lawful purposes,

14    typically possessed.

15         Remember, the text of the Second Amendment is

16    keep and bear arms.  The operative verb is kept,

17    commonly kept for lawful purposes, commonly possessed,

18    and this is particularly true when we are talking

19    about defense of the home.

20         Heller went on to say the Second Amendment

21    extends to all instruments that constitute bearable

22    arms, even those that were not in existence at the

23    time of the founding.

24         Mr. Fader conceded that simply because we are

25    not talking about a blunderbuss, we don't lose the

1        protection of the Second Amendment.

2              But they went on to say, in reading their prior

3        decision in _Miller_, which was the only previous

4        Supreme court decision that determined what arms were

5        or were not subject to the Second Amendment, we read

6        _Miller_ to say only that the Second Amendment does not

7        protect those weapons not typically possessed by

8        law-abiding citizens for lawful purposes, such as

9        short barrel shotguns.

10              They went on to talk about the traditional

11        militia was formed from a pool of men bringing arms in

12        common use at the time for lawful purposes, like

13        self-defense.

14              Imagine, if you will, a hypothetical militia

15        muster in Towson, Maryland today, Your Honor.  Will

16        you not see assembled on the town green men bearing

17        the banned firearms that contain the banned magazines?

18              Of course, you will.  It's ridiculous to suggest

19        that that would not be the case.

20              THE COURT:  But if it were a random sample of

21        the population, what percentage of those people

22        showing up for the Towson militia would have the

23        banned guns?

24              MR. SWEENEY:  Well, considering the numbers that

25        we have, and if only armed citizens who chose to keep

1     arms at home were the ones who responded to the

2     militia, I would say a number substantially higher

3     than the one percent that Mr. Fader has already

4     conceded.  We don't have that evidence.

5          The Second Amendment under Heller protects the

6     arms that the people choose to keep in their homes in

7     case they need them for the lawful purposes of

8     self-defense, hunting, and marksmanship proficiency,

9     which even Mr. Fader has conceded is covered by the

10    Second Amendment.

11         There is no need to quibble about whether

12    competitive marksman is covered because proficiency

13    marksmanship is clearly covered by the Second

14    Amendment.

15         Every federal court that has considered this

16    issue has analyzed these laws under the Second

17    Amendment.  Not a single court has accepted Mr.

18    Fader's construction of commonly used and required

19    evidence of frequent use.

20         I am grateful to say that we do not have to

21    frequently use arms in the defense of our homes in

22    Maryland, and there would be no point in requiring

23    that as a precondition for the protection of arms

24    under the Second Amendment.

25         THE COURT:  Do you think, if we are at the

1    second prong where, as we discussed, courts have gone,

2    that the frequency of a particular use, of a

3    particular type of firearm does not bear on the Second

4    Amendment analysis at all, that it is not relevant to

5    deciding whether this is the kind of very substantial

6    and severe burden that was involved in Heller, all

7    guns, all handguns?

8         MR. SWEENEY:  No, it is not relevant, Your

9    Honor.

10        THE COURT:  Why not?

11        MR. SWEENEY:  Because the prohibition on popular

12   firearms and magazines, that is, commonly owned for

13   lawful purposes by the people, that prohibition is off

14   the table under Heller.  Before we get to the second

15   prong of your analysis, I would like to address that

16   issue briefly.

17        In Heller, there was no discussion by the Court

18   that Mr. Fader would have you follow of it's okay to

19   balance the interests here between whether or not the

20   people really need these firearms for self-defense,

21   and the government disputes that, or whether they are

22   protected by the Second Amendment, because Heller made

23   clear that a complete ban of firearms would be off the

24   table as a policy choice.

25        And yes, they did say that under any of the

1   heightened scrutiny analyses used by the Court in the

2   context of other fundamental rights, a prohibition on

3   handguns would fail.  So too would the prohibition on

4   operable long guns be equally found to be

5   unconstitutional in that case.

6        But the Court didn't stop there.  It went on to

7   say we know of no other enumerated constitutional

8   right whose core protection has been subjected to a

9   freestanding interest balancing approach.

10       The very enumeration of the right takes out of

11   the hands of government, even the third branch, the

12   power to decide on a case-by-case basis whether the

13   right is really worth insisting on.  A constitutional

14   guarantee subject to future judges' assessment of its

15   usefulness is no constitutional guarantee at all.

16       Constitutional rights are enshrined with the

17   scope they were understood to have when the people

18   adopted them, whether or not future legislatures or

19   even future judges think the scope too broad.

20       The Second Amendment is no different than like

21   the first.  It is the very product of an interest

22   balancing by the people, which Justice Breyer would

23   now conduct for them anew.  And whatever else it

24   leaves to future evaluations, it surely elevates above

25   all other interests the right of law-abiding,

1    responsible citizens to use arms in defense of hearth

2    and home.

3        Mr. Fader invites the Court to apply the

4    balancing test offered by Justice Breyer in dissent

5    and rejected by the majority in Heller.

6        THE COURT:  How exactly do you think he is

7    inviting me to do that at the first prong?  I mean I

8    haven't heard the words interest balancing, and I

9    thought what Mr. Fader said was I have to, as I do,

10   follow the Fourth Circuit, and if get to the second

11   prong, I apply an intermediate scrutiny test.

12       MR. SWEENEY:  Well, the Fourth Circuit precedent

13   does not require any interest balancing in this case.

14       THE COURT:  I'm agreeing with you.

15       MR. SWEENEY:  The Fourth Circuit precedent in

16   fact has never considered a complete prohibition on

17   firearms that have been commonly kept for lawful

18   purposes in the home.  That has never been before the

19   Fourth Circuit.  Any of its case law is not binding in

20   that regard.

21       What do we have in the Fourth Circuit?

22       The Masciandaro case said we observe that any

23   law regulating the content of speech is subject to

24   strict scrutiny.  We assume that any law that would

25   burden the fundamental core right of self-defense in

1      the home by a law-abiding citizen would be subject to

2      strict scrutiny.

3            Now, that sounds like a pretty strong statement.

4      That sounds like the Fourth Circuit would be saying if

5      we had to decide it, we would use strict scrutiny.

6            The Court went on in the Carter case to say as

7      we have noted, application of strict scrutiny is

8      important to protect the core right of self-defense

9      identified in Heller.

10           In Woollard, the Fourth Circuit panel that

11     reversed Judge Legg said we reject the view that would

12     place the right to arm one's self in public on equal

13     footing with the right to arm one's self at home,

14     necessitating that we apply strict scrutiny.

15           Plaintiffs' position is that a complete

16     prohibition of arms that are commonly kept for lawful

17     purpose in the home is off the table as a policy

18     choice.  There's no balancing.

19           But if Your Honor is to look at the Fourth

20     Circuit cases, the teaching of the Fourth Circuit is

21     not what Mr. Fader suggests.  The teaching of the

22     Fourth Circuit is clear.  On this record, the only

23     level of constitutional scrutiny, if in fact the ban

24     is not impermissible per se under Heller, the only

25     permissible level of strict scrutiny, strict scrutiny

1    requires something the defendants have not even

2    pretended to show, narrow tailoring in the choice of

3    the least restrictive alternative.

4        Not only is the evidence disputed that the bans

5    would even be effective, there is no evidence

6    whatsoever that alternatives were considered.

7        Let me pause here and go to the question of

8    intermediate scrutiny, because I see that it is on

9    Your Honor's mind.

10       Mr. Fader used language to suggest that oh, the

11   courts are all over the place.  There are lots of

12   different formulations of intermediate scrutiny.

13   What's a court to do?  The Fourth Circuit cases are

14   very helpful on what intermediate scrutiny means in

15   this context.

16       First, let's talk about, however, the only

17   Circuit Court that has decided one of these banned

18   cases, Heller II, which Mr. Fader referred to a number

19   of times during the temporary restraining hearing and

20   has been remarkably quiet on.

21       That case applied intermediate scrutiny and it

22   said the District must establish a tight fit between

23   the registration requirements and an important or

24   substantial government interest, a fit that employs

25   not necessarily the least restrictive means, but a

1    means narrowly tailored to achieve the desired

2    objective.

3         The cases cited by Mr. Fader in his brief on

4    time, place, and manner restrictions similarly use the

5    narrowly tailored to serve a significant government

6    interest formulation.

7         But let's not stop there.  Let's look at the

8    Fourth Circuit Second Amendment cases relied on by Mr.

9    Fader.  What did Chester cite to, the first case to be

10   considered?

11        It cited, in applying intermediate scrutiny, the

12   Board of Trustees v. Fox, and that case said what our

13   decisions require is a fit between the legislature's

14   ends and the means chosen to accomplish those ends, a

15   fit that is not necessarily perfect, but reasonable,

16   that represents not necessarily the single best

17   disposition, but one whose scope is in proportion to

18   the interest served, that employs not necessarily the

19   least restrictive means, but as we have put it in the

20   other context discussed above, a means narrowly

21   tailored to achieve the desired objective.

22        So too Chester looked to Marzzarella, the Third

23   Circuit case involving handguns that did not have

24   serial numbers on them, that also said the regulation

25   need not be the least restrictive means, but may not

1    burden more speech than is reasonably necessary in

2    applying the standard of intermediate scrutiny.

3         Masciandaro itself cited Chester, and it also

4    cited Ward v. Rock Against Racism, the Supreme Court

5    case that talked about regulations that are narrowly

6    tailored to pass intermediate scrutiny, as well as

7    Board of Trustees of State University, also referring

8    to we uphold such restrictions so long as they are

9    narrowly tailored to serve the significant government

10   interest.

11        Woollard also cited Masciandaro.  Carter cited

12   Chester and Marzzarella and Masciandaro.

13        The Fourth Circuit cases relied upon by Mr.

14   Fader, while perhaps not in the text saying narrowly

15   tailored, all cited cases, includes Supreme Court

16   cases, that talk about narrow tailoring.

17        THE COURT:  Uh-huh.

18        MR. SWEENEY:  Other district court cases

19   considering bans on firearms and magazines have also

20   cited case law that requires narrow tailoring under

21   intermediate scrutiny.

22        We saw in the New York State Rifle Association

23   case, they relied upon Kachalsky, a Second Circuit

24   case, and Masciandaro itself that they cited there.

25        In Shew, they cited Mazzarella.

1        In the Fiat case out of California, they cited

2   Chovan and Chester and Board of Trustees v. Fox,

3   already cited to Your Honor.

4        Narrow tailoring is a theme throughout the cases

5   relied upon by the Fourth Circuit and the District

6   Court cases relied upon by Mr. Fader, and what is

7   absent in this case is any effort by the State

8   whatsoever to show narrowly tailored.  There is no

9   evidence, nor even argument that alternatives that

10  would be less restrictive than a complete prohibition

11  have been considered and rejected, and wouldn't work

12  because ineffective, nor could there be.

13       Before these bans took effect last fall, there

14  were two regulations in effect governing the firearms

15  and magazines in question.  For sometime now Maryland

16  has put a cap of 20 rounds on the capacity of

17  magazines.

18       For sometime now, Maryland has required, under

19  its 77R regulation, that the firearms that are now

20  banned only be purchased after application and

21  background check, the so-called 77R process, which is

22  the only restriction on the purchase of handguns.

23       Now, Mr. Fader was unable to come up with any

24  evidence to support a problem preexisting the ban in

25  the State of Maryland to justify a complete

1    prohibition.  There was no evidence, and our brief is

2    replete with the statements of law enforcement

3    officers admitting that the firearms are not

4    disproportionately used in crime in Maryland; and,

5    praise the Lord, we have not had mass shootings, and

6    we have not had assaults on law enforcement officers

7    with the firearms in question.

8         There is no evidence that the state of

9    regulation in Maryland, prior to the effective date of

10   these bans on October 1, 2013, was such as to require

11   these bans, or that the prior regulations long in

12   effect were not less restrictive alternatives.

13        Less restrictive alternatives are required by

14   the McCullen court.  They are required by Standard

15   Broadcasting.  That is what must be shown, and that's

16   what has not been shown in this case.

17        The legislature had before it precious little

18   evidence.  What it did have was Dr. Webster's

19   statement focusing primarily upon the handgun

20   regulation, with one paragraph about the ban on the

21   firearms and magazines that was based solely upon Dr.

22   Koper's 1997 report.

23        It also had the testimony of Martin O'Malley,

24   and when we asked the defendants to produce all the

25   documents that supported that testimony, the answer

1      was there are none.

2             It had the testimony of Chief Johnson, and let

3      me pause there for a moment, Your Honor.

4             We were not provided with the testimony, the

5      oral testimony of Chief Johnson in advance of his

6      deposition.  It was not disclosed to us as a document

7      that the plaintiffs would rely upon.  It was not

8      provided to us in a copy that the plaintiffs

9      represented was the official Bill file.

10            We went down to Annapolis and we copied the Bill

11     file ourselves.  It was not in the Bill file there.

12     It was not even mentioned or relied upon in the

13     opening brief of the defendants.  They raise it for

14     the first time in their reply, and we were able to

15     obtain it.  It was never provided to Your Honor in its

16     entirety, but there's a critical statement in there.

17            Chief Johnson is talking about why a ban on

18     large-capacity magazines might prevent mass shooters

19     from being able to reload and continue shooting.  He

20     said you might be able to change a magazine in two

21     seconds if you're on a range in a calm environment.

22     But if you are not thinking clearly, it's going to

23     take longer than two seconds, if you can reload at

24     all.

25            Now if that doesn't apply to a home owner facing

1    in the middle of the night a sudden break-in, an

2    intruder.

3         The need for home defense only arises in the

4    most dire, uncertain and surprising context, and to

5    expect a home owner to have to change out magazines

6    every ten rounds under the circumstances of a

7    frightened response, to unknown and unnumbered number

8    of intruders coming into the home, is too much.

9         THE COURT:  Again, I'll come back to the

10   question.  I think I remember from the papers, there

11   was one instance cited, not in Maryland, but somewhere

12   else in the country, that might indicate a firing of

13   more than ten rounds in self-defense.

14        There are, on the other hand, certainly many

15   more, unfortunately, than one example of mass

16   shootings where more than ten rounds have been fired.

17   Am I wrong about that?

18        MR. SWEENEY:  One of the things that Dr. Koper

19   readily admitted is the number of these incidents is

20   quite small, and one must be very careful about

21   drawing any conclusions from them.

22        There was the unfortunate incidence of Elliot

23   Rodger on the Santa Barbara campus in California, in

24   which the troubled young man stabbed three of his

25   roommates to death, got in a high-powered BMW, sped

1    around the campus striking pedestrians and bicyclists,

2    and shot three more people with two handguns and 51

3    ten-round capacity magazines.  None of the firearms

4    that are subject to the ban here were involved in that

5    horrible assault.

6        Professor Webster was asked about it.  He didn't

7    mention bans like this being able to make a difference

8    in those things.  He talked about the need for greater

9    surveillance and vigilance with respect to mental

10   illness, and let me pause for a moment there, if I

11   may, and talk about that.

12       Maryland had a task force on mental illness and

13   firearms ongoing in 2013.  Dr. Webster was on it.

14       Captain McCauley, now retired from the Maryland

15   State Police, was its co-chair.  The task force came

16   out with a number of recommendations.  Dr. Webster

17   didn't mention them to the General Assembly when he

18   supported SB281.

19       In December we learned, in Dr. Webster's

20   deposition of 2013, Michael Bloomberg donated $250,000

21   to Dr. Webster's gun control center at the Johns

22   Hopkins Bloomberg School of Public Health that already

23   bears Mr. Bloomberg's name because of the generous

24   donations he has provided in the past.

25       Dr. Webster convened a symposium in January of

1    2013 in response, and he invited Mr. Bloomberg to

2    speak, along with Governor O'Malley.  They suggested

3    at the outset of this symposium that, among other

4    reforms, that there should be a ban on military-style

5    assault weapons and large-capacity magazines.

6         And lo and behold, not a month later, Mr.

7    O'Malley, Governor O'Malley was before the General

8    legislature asking for that, and Professor Webster was

9    supporting it, without any discussion of the sorts of

10   recommendation that Dr. Webster had been working on

11   with Captain McCauley and many others on a blue ribbon

12   panel to control the kinds of unfortunate incidents

13   that we saw with Elliot Roger.

14        The bans in this case have not been shown to be

15   effective when they were employed on the federal

16   level.  They have not been shown to be effective when

17   they have been employed in other states.  The bans in

18   this case will impermissibly intrude upon the

19   constitutional right of Marylanders to keep in their

20   homes popular firearms that they commonly choose to

21   use for lawful purposes, including self-defense.

22        The government does not have the right under the

23   Second Amendment to tell the citizens that they cannot

24   choose popular firearms.  These are popular firearms.

25   They are protected.  Any such ban is a policy choice

1    that's off the table.

2         Thank you, Your Honor.

3         THE COURT:  Thank you.  I'm going to take about

4    a five-minute break, and then I will be happy to hear

5    whatever rebuttal either side would like to make.

6         (A recess was taken.)

7         THE COURT:  Mr. Fader.  Let me just clarify one

8    thing at the beginning.  You're not challenging the

9    plaintiffs' standing in this case, are you?

10        MR. FADER:  There was a challenge in the motion

11   to dismiss to the standing of some of the business

12   plaintiffs.  But in light of where we are, and the

13   fact that there are plaintiffs who do have standing,

14   we are not challenging that.

15        THE COURT:  Okay.  Thank you.

16        MR. FADER:  Your Honor, there are a few points

17   that I want to address.  But I think preliminarily,

18   there was a colloquy early on when Mr. Sweeney was

19   presenting about the evidence, and the types of

20   evidence that are cognizable in a case of this nature,

21   and as Your Honor pointed out, this is different from

22   the context of a medical malpractice case when

23   causation is the issue, and there are well-defined

24   evidentiary standards that must be met for proof of

25   causation to be made before a jury.

1          Here, the Court is not looking at whether the

2     plaintiffs can satisfy a test for factors for tort

3     liability.  The question is whether there was

4     substantial evidence to support the General Assembly's

5     predictive judgment that this would advance Maryland's

6     purposes in public safety.

7          Necessarily, the types of evidence that the

8     Court can consider are the types of evidence that the

9     General Assembly could consider.  In examining what

10    would be substantial evidence before the General

11    Assembly, it does not make any sense, and no court has

12    ever held, that the General Assembly, when a law gets

13    challenged, all of a sudden has to be held to the

14    standard of what would be admissible in court.

15         The General Assembly is allowed to look at the

16    types of evidence that legislatures are able to

17    consider, and that's the type of evidence that, when a

18    court is considering whether the government has met

19    its burden, the Fourth Circuit has said that common

20    sense is a factor that the Court can consider in

21    looking at whether the government has satisfied its

22    burden under intermediate scrutiny.

23         A decision that we cited in briefing on the

24    motion to exclude, a very recent decision by the

25    District of Columbia District Court in the Heller III

1    case, looking at other elements of the District of

2    Columbia's law post-Heller took I think the most

3    thorough examination of this issue that has been taken

4    in the context of these Second Amendment challenges in

5    identifying the types of evidence that a court can

6    consider and found clearly, certainty is not required.

7         There is no requirement for scientific certainty

8    because you are dealing with the prerogatives of a

9    General Assembly as constrained by the constitutional

10   restraints of the Second Amendment, of course; but

11   it's the kind of evidence that can be considered by a

12   General Assembly that is appropriate to consider in

13   this context as well.

14        With respect to Professor Koper, Your Honor,

15   plaintiffs I think have built their case with respect

16   to Professor Koper around selective out-of-context

17   quotations, and ignoring Professor Koper's testimony

18   explaining what he meant, and ignoring the caveats

19   that he used when he first made those statements, and

20   quoting them without reference to any of those

21   caveats.

22        First of all, with respect to the federal ban,

23   Professor Koper is the only scholar to have done a

24   thorough investigation of the federal ban, and he did

25   not find it to be completely ineffective, as Mr.

1    Sweeney's presentation would indicate.

2         In fact, Professor Koper, although limited to

3    certain types of evidence that he had before him, has

4    described ways in which the federal ban did appear to

5    be effective.

6         In particular, although by the time he did his

7    report in 2004, there had not been systematic evidence

8    at that point of a reduction in large-capacity

9    magazines, Professor Koper both explained why that was

10   the case, and explained subsequent evidence coming

11   from studies of use of large-capacity magazines in

12   Virginia, indicating a very significant drop in the

13   criminal use of large-capacity magazines during the

14   period of the ban and a pretty significant rise

15   afterward, indicating that it did in fact have that

16   effect on recovery of magazines used in crimes.

17        But maybe more importantly are some of the

18   things that Professor Koper mentioned about the

19   federal ban itself and some of its limitations that

20   would cause a reasonable person looking at it to

21   understand that only over a long period of time would

22   a ban of that nature be expected to be effective.

23        One of the most significant problems with the

24   federal ban was the fact that it was not a ban on the

25   transfer of those firearms and magazines that it

1    covered.  It was a ban only on the transfer of

2    firearms and magazines that were first produced after

3    the date of the ban.

4         So there was actually free transfer of firearms

5    and magazines during most of the period of the federal

6    ban, and with respect to large-capacity magazines,

7    there were even millions of those imported from abroad

8    into this country, as long as they were manufactured

9    before the date the ban took effect, meaning, as

10   Professor Koper explained, and plaintiffs ignore, you

11   can't necessarily --

12        Availability is the key.  If you continue to

13   have these firearms and magazines available, readily

14   available for transfer, why is it that you would

15   expect to see a significant decline in their use if

16   they keep being injected into the system?

17        Maryland's ban takes a different approach.  It

18   bans the transfer of these firearms and magazines

19   going forward.  That's a significant departure, and

20   based on that significant limitation, which meant that

21   expectations of some as far as the results of the

22   federal ban weren't necessarily realized, although

23   there was progress during that time, but Maryland's

24   ban has taken a different approach.

25        The evidence is that criminals obtain their

1    firearms primarily through straw purchases, purchases

2    on the secondary market, and theft from law-abiding

3    individuals, meaning that if you are going to reduce

4    the availability of these firearms for criminal uses

5    and uses by people who may be mentally ill that have

6    been involved in some of these mass public shootings,

7    you need to reduce their availability generally.

8        That is something that in some ways the federal

9    ban wasn't able to accomplish because it continued to

10   allow transfers, but that Maryland's ban has

11   addressed, and which is one of the bases in which

12   Professor Koper said that he does expect it to be

13   likely that Maryland's ban over the long term will

14   promote Maryland's interest in public safety in

15   reducing the negative effects of handgun violence.

16       With respect to state bans, Professor Koper, a

17   footnote in Professor Koper's 1997 report, I'm sorry,

18   2004 report, identified that there had been two

19   studies of a limited nature looking at the wrong

20   outcome determination with respect to efficacy of

21   existing state bans on large-capacity magazines and

22   assault weapons, and he identified why no value should

23   be placed, why less value should be placed on those

24   studies, because they looked at the wrong outcome.

25   They looked at whether this reduced crime generally,

1    the straw man that the plaintiffs have erected saying

2    this ban doesn't reduce crime generally.

3          That's not the target.  The idea is there are

4    particularly dangerous firearms and magazines, and if

5    criminals are forced to substitute other firearms that

6    are less dangerous and other magazines that have

7    lesser capacity, that the result will be fewer shots,

8    fewer injuries, and, therefore, reducing the negative

9    effects of handgun violence.

10         So the plaintiffs have a strongly misleading

11   focus on quotes pulled out of context from Dr. Koper

12   that he has explained in his declarations in this

13   case.

14         THE COURT:  My recollection even of his

15   deposition surrounding some of those quotes is that he

16   would say yes, I agree, subject to qualification.

17         MR. FADER:  In fact, on that point of the State

18   bans, and a part conveniently omitted from the

19   citation to the declaration from the plaintiffs, he

20   said subject to the same qualifications I used in the

21   report.

22         They ignored the qualifications in the report.

23   They ignored the qualifications that he made in his

24   declaration and pretended they weren't there, and

25   that's true with respect to pretty much every citation

1      they have from Professor Koper's testimony.  Professor

2      Koper explained why, in his testimony about a specific

3      level of scientific probability, he couldn't provide

4      one.

5          Well, there's no requirement that the General

6      Assembly have evidence that something that it is going

7      to implement will work to a degree of scientific

8      certainty.  It's what support there is for the

9      predictive judgment that the General Assembly had

10     made.

11         Professor Koper explains why evidence from the

12     federal ban does not necessarily apply to a different

13     ban that Maryland is implementing now, especially with

14     improvements that Maryland may have made.

15         The plaintiffs are correct that the <u>Heller</u>

16     decision had no discussion of balancing, and balancing

17     is not what the State is asking this Court to do.

18         The Supreme Court in <u>Heller</u>, at page 634,

19     specifically discussed the balancing inquiry that

20     Justice Breyer was recommending, and the Supreme Court

21     specifically said that Justice Breyer's

22     interest-balancing test was not any of the traditional

23     forms of scrutiny that that Supreme Court had implied.

24         Intermediate scrutiny is not a form of interest

25     balancing.  It does not ask this Court to weigh the

1    evidence on one side or the other and come out with

2    your own conclusion as to what the best policy would

3    be.   That's not what intermediate scrutiny does.   It's

4    to look at whether there is a reasonable fit between

5    the law and the government's interest.

6         And yes, that reasonable fit inquiry has been

7    determined to look at whether the law is tailored to

8    the interest, is narrowly tailored, not in the sense

9    of a strict scrutiny standard of whether it is the

10   narrowest of all possible applications, but whether

11   there is a reasonable fit, whether it is reasonably

12   tailored.

13        Here, the General Assembly took a reasonable

14   tailored approach to this.   They didn't ban all

15   semiautomatic weapons.   They didn't ban all weapons

16   that had been used in crime.   This is focused on

17   particular firearms that have been manufactured, sold,

18   identified as particularly useful in military-style

19   assaults and have been found to be disproportionately

20   used in mass public shootings and the murder of law

21   enforcement officers.   It is not a balancing, and it

22   is a tailored law.

23        The plaintiffs also I think make a mistake in

24   attempting to find support from Heller with respect to

25   the issue of whether these firearms are popular, and

1     they are quoting from provisions in Heller which talk

2     about how the handgun is overwhelmingly chosen as a

3     class of weapons for lawful defense of the home.  The

4     plaintiffs read that as basically saying anything

5     that's popular gets protection absolutely and cannot

6     be banned.

7          That's manifestly misreading Heller, which was

8     focused on a particular class of weapons most used by

9     Americans for self-defense, a firearm that now, after

10    having a few years of sales that have been much

11    greater than any years before, may have at most

12    reached the level of being less than three percent of

13    the gun stock of the country, simply doesn't qualify

14    on the same plane as the entire class of weapons

15    overwhelmingly chosen by Americans for self-defense.

16         To the extent that there was discussion about

17    the intermediate scrutiny standard and different

18    articulations of it, I would submit that those are

19    different articulation of the standard and not

20    fundamental differences in the test being applied.

21         In fact, in each of the cases, including the

22    D.C. Circuit's decision in Heller II, and the other

23    cases in New York, Connecticut and Colorado, the

24    courts reached the same result, which is that these

25    laws satisfy intermediate scrutiny.  There is a

1    minimal, if any, burden on the Second Amendment right,

2    and that the government's evidence, substantially

3    similar to the evidence in this case, is sufficient to

4    meet that burden.

5         A word with respect to Chief Johnson's

6    testimony, Your Honor.  The testimony of Chief Johnson

7    before the General Assembly was not anything, first of

8    all, that was in the custody or control of the

9    defendants, and moreover, not anything that the

10   defendants had intended to use until the plaintiffs

11   made I think a legally inaccurate argument that the

12   Court's focus needed to be on evidence that was before

13   the General Assembly.

14        But more importantly, it's in the public record.

15   It's available for Your Honor to have taken judicial

16   notice of it, whether it was cited by any party.  It

17   also duplicates the testimony that he had in this case

18   on the same issues, and plaintiffs had a full

19   opportunity to examine him with respect to that when

20   they deposed him in this case.

21        Notably absent from the plaintiffs' presentation

22   was any discussion really of the testimony that the

23   law enforcement officers, the chief law enforcement

24   officers of Maryland's largest law enforcement

25   agencies have given in this case, which in and of

1    itself provides more than sufficient justification for

2    the predictive judgment to the General Assembly

3    discussing the particular dangers that these firearms

4    present to law enforcement in the context of mass

5    shootings and these active shooter events, that even

6    though we are fortunate enough to not have had one in

7    Maryland, that we are as much at risk as any state in

8    the country, except that our General Assembly is

9    trying to enact laws to protect against that.

10        The simple fact that, as Mr. Sweeney said,

11   praise the Lord, it hasn't happened here does not mean

12   that the General Assembly is left to simply hope that

13   it doesn't happen, without taking action, when there

14   is substantial evidence to support the predictive

15   judgment that it made.

16        For those reasons, Your Honor, unless Your Honor

17   has questions, the defendants would ask that the Court

18   grant their motion for summary judgment and dismiss

19   the lawsuit.

20        THE COURT:  Thank you, Mr. Fader.  I appreciate

21   it.

22        Mr. Sweeney, would you like a rebuttal?

23        MR. SWEENEY:  Briefly, Your Honor, yes.

24        I must say that rebuttal generated a flurry of

25   notes for me from my team.  I will do my best to give

1    them justice.

2         First, with respect to what Dr. Koper said about

3    the efficacy of the federal ban in his official report

4    to the Department of Justice and the United States

5    Congress in 2004, on page two, one, there has not been

6    a clear decline in the use of assault rifles.

7         Two, the ban has not yet reduced the use of

8    large-capacity magazines in crime.

9         Even if you are looking for a narrow purpose,

10   not the prevention of crimes, not the prevention of

11   assaults on law enforcement officers, not the

12   prevention of mass shootings, but simply less frequent

13   use of the banned firearms and magazines, that did not

14   occur in the ten years of the federal ban, according

15   to the official report on its effectiveness.

16        THE COURT:  Mr. Fader suggested that the federal

17   ban did not prohibit transfers of the existing

18   weapons?

19        MR. SWEENEY:  Well, Your Honor, the Maryland ban

20   is far more vulnerable to substitution than the

21   federal ban was.

22        Imagine, if you will, the difference between

23   having a ban that covers all of the United States and

24   a ban in Maryland that does not extend to

25   Pennsylvania, Delaware or Virginia, three contiguous

1    states, in which the magazines in question can readily

2    be purchased, brought into the state, and lawfully

3    possessed by Marylanders.  That was not an incident

4    with the federal ban.  The Maryland ban is far more

5    vulnerable to substitution of other firearms.

6         So true with respect to semiautomatic rifles

7    covered by the Maryland ban.  The heavy-barrel AR-15,

8    for instance, which is exempted from the ban by

9    statute, can be readily created out of any AR-15 by

10   simply substituting in a heavy barrel.

11        And what's the purpose of the heavy barrel?

12   Well, it's heavier.  It keeps the gun from floating up

13   during frequent fire, and it keeps the barrel from

14   overheating during many rounds being exchanged.  That

15   makes it very useful for competitive marksmanship.

16        Now if any AR-15 can be readily converted to

17   make it legal under Maryland's law, how could it be

18   any more vulnerable than the federal law was -- any

19   less vulnerable than the federal law was?

20        Let me address for a moment the Rule 702 issue,

21   Your Honor, because frankly, it troubles me.

22        While the test of substantial evidence to

23   support, and we maintain there is substantial evidence

24   before the legislature, because how could the

25   legislature have draw inferences from evidence which

1    was not before it?

2        But let's set aside whether it's the

3    substantiality of evidence before the legislature or

4    that which was added after the fact.  That evidence

5    itself must pass Rule 702, or what is Rule 702 for?

6        I have seen no case --

7        THE COURT:  I think Rule 702 primarily applies

8    to the admissibility of evidence in a court

9    proceeding.  It's not ordinarily something that the

10   legislature has to deal with.

11       MR. SWEENEY:  And this is a court proceeding.

12       THE COURT:  But when it's in front of a

13   legislature, it is a legislative proceeding.

14       MR. SWEENEY:  And when it comes to court, there

15   must be substantial evidence.

16       THE COURT:  Right.

17       MR. SWEENEY:  The substantiality of evidence

18   must be evidence which is admissible, and the

19   admissibility of evidence is ruled by, among other

20   things, Rule 702.

21       Mr. Fader's position is that the rights of

22   Marylanders can turn on junk science, and that's

23   perfectly fine, and that this Court has nothing to say

24   in that, that you have no role whatsoever in

25   determining the admissibility of that evidence,

1      whether it's reliable, whether it's credible, and

2      whether the experts are even basing their opinions on

3      expertise.

4           THE COURT:  Well, I don't agree with your

5      characterization of Mr. Fader's argument, but I

6      understand your point and your reasons for challenging

7      Dr. Koper's opinions.

8           MR. SWEENEY:  Dr. Koper's opinions are simply

9      not based on sufficient data.  They would not pass

10     muster under Rule 702.

11          Mr. Fader suggested there was a pipeline of

12     manufactured firearms that had been manufactured prior

13     to the effective date of the federal ban that affected

14     its efficacy.  There is no evidence that there was a

15     ten-year pipeline of supply.  In other words, whatever

16     pipeline there was, it certainly was not shown to have

17     lasted the full extent of the ten-year ban, and that

18     was certainly not addressed.

19          Even if you consider the evidence before the

20     legislature, there is no substantial tailoring here.

21     They didn't try to make this law as narrow as

22     necessary to intrude the least on Second Amendment

23     rights.  No effort was done by the General Assembly.

24     There is no evidence of that.  No effort was even done

25     by Mr. Fader.

1            He comes in and he says oh, well, we didn't ban

2        all semiautomatic rifles, only some, only the most

3        popular semiautomatic rifles.

4            We have in the record evidence from the Maryland

5        State Police that the AR-15 is the most popular

6        centerfire semiautomatic rifle in the United States,

7        followed only by the AK-47, both of them banned.

8            They cannot pretend that they have left unbanned

9        large swaths of semiautomatic rifles.  Even if there

10       was support for their subclass argument, their

11       subclass argument fails.

12           They draw their subclass argument from Heller

13       and they make it in three different contexts.

14           First they say because this isn't the ban of a

15       complete class of firearms, it isn't protected by the

16       Second Amendment.  It doesn't even involve the Second

17       Amendment.

18           Then they say well, there's no burden on Second

19       Amendment rights, because we didn't ban a complete

20       class of firearms.

21           The weight they try to put on the word class in

22       Heller will not be borne by the language there.

23           Judge Scalia said the handgun ban amounts to a

24       prohibition of an entire class of arms that is

25       overwhelmingly chosen by American society for that

1    lawful purpose.

2         In 1994, in the <u>Staples</u> case, cited and relied

3    upon by the defendants in their opening brief, the

4    Supreme Court had occasion to distinguish between

5    automatic and semiautomatic rifles.  The context of

6    that case is critical, and even more important is the

7    language used by the court there.

8         It is also important to understand that the

9    author of that opinion was Judge Thomas, who joined in

10   Scalia's opinion in <u>Heller</u>, Justice Scalia, who

11   authored <u>Heller</u>, Justice Kennedy, who joined in

12   Justice Scalia's opinion, as well as Justice Ginsburg,

13   who joined in the <u>Staples</u> majority opinion.

14        Now, what did that case involve?  It was a

15   violation of the same act that had been involved in

16   the <u>Miller</u> case about what arms are prohibited, and

17   what arms are covered by the Second Amendment.

18        Now, there wasn't a Second Amendment discussion

19   back in 1994, but what there was was a detailed

20   discussion about the critical distinction between

21   automatic and semiautomatic fire.  In fact, that's the

22   point for which Mr. Fader relies on that case in his

23   opening brief; but what he didn't read carefully

24   enough was what did that case really involve?

25        It was the prosecution of an individual who was

1      in possession of an AR-15 that had been converted to

2      make it capable of automatic fire, and the government

3      said you're guilty.  You're guilty under Miller.

4           This is a firearm that had to have been

5      registered with the ATF.

6           By the way, I can purchase an M16 today, pay the

7      tax stamp with the IRS -- the ATF, and I can come home

8      with it and use it in Maryland.  It's not banned by

9      the law, a fully automatic M16, but that's beside the

10     point.

11          What this case said was the government's

12     position was that an AR-15, a semiautomatic firearm,

13     is so dangerous that the person who owns it should

14     expect that it might fall under the Act and require

15     registration.

16          The individual said I didn't know it was capable

17     of automatic fire.  I never used it for automatic

18     fire.  I had no idea.

19          He was convicted, and the Supreme Court rejected

20     that, and they went through great detail about the

21     difference between automatic fire and semiautomatic

22     fire.  They said that the AR-15s capable of being

23     converted to fully automatic fire are a class of

24     weapons, a class of weapons, not just semiautomatic

25     rifles being a class of weapons, not AR-15

1    semiautomatic rifles being a class of weapons.

2         But AR-15 semiautomatic rifles capable of being

3    readily converted into automatic fire were referred to

4    by the Supreme Court in the Staples case not once as a

5    class, not twice as a class, three times as a class.

6         I doubt that Justice Scalia, writing in the

7    Heller case in 2008, was unmindful of the Staples

8    case, which he cited in his Heller case, or the fact

9    that they relied upon the word class to describe a

10   narrow category of only some semiautomatic rifles.  It

11   simply doesn't bear the weight that defendants would

12   try to put on it.

13        So what we come down to in this case is is there

14   evidence substantial or otherwise to support the Act?

15   Where is the narrow tailoring?  Why ten rounds?  Why

16   not 15?

17        Fifteen was the number involved in Colorado.

18   Seven was used in New York, and that was rejected out

19   of hand by the court.  Seven, on a case relied on by

20   Mr. Fader, was found to be constitutionally

21   impermissible.  The Colorado court said 15.

22        Where is the attempt to narrowly tailor?  Where

23   did ten come from?  Where is the support for it?

24        The Washington Post study that they rely on to

25   suggest that well, maybe there was an effect after all

1        with respect to the federal ban is another example of

2        unreliable data collected by the media, untested,

3        unreported in any peer review journal.

4               The people of Maryland deserve better, and we

5        are relying on Your Honor to be the gatekeeper.

6               Thank you very much for your time and for your

7        patience, Your Honor.

8               THE COURT:  Thank you, Mr. Sweeney.

9               As I said at the beginning, I do appreciate the

10       very careful, thorough briefing and argument from both

11       sides, and that you obviously have been able to work

12       together well.  These are important issues, and I will

13       get a written decision out for you as soon as

14       possible.  Thank you all very much.

15              (The proceedings concluded.)

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2          I hereby certify that the foregoing transcript in

3     the matter of Stephen V. Kolbe, et al., Plaintiffs vs.

4     Martin J. O'Malley, Defendants, et al., Civil Action

5     No. CCB-13-2841, before the Honorable Catherine C.

6     Blake, United States District Judge, on July 22, 2014

7     is true and accurate.

8

9                    _____

10                    Gail A. Simpkins

11                    Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

$250,000 [1] - 62:20

**1**

1 [1] - 59:10
115 [1] - 47:6
128 [1] - 42:21
131 [1] - 43:7
15 [2] - 83:16, 83:21
1791 [1] - 6:13
1868 [1] - 6:22
18th [1] - 13:16
1982 [2] - 24:16, 25:19
1989 [1] - 16:3
1994 [3] - 40:4, 81:2, 81:19
1997 [3] - 40:9, 59:22, 69:17
19th [1] - 14:1

**2**

20 [1] - 58:16
2004 [5] - 40:10, 40:13, 67:7, 69:18, 76:5
2008 [1] - 83:7
2012 [4] - 7:22, 9:2, 9:12, 24:16
2013 [7] - 9:4, 9:6, 9:12, 59:10, 62:13, 62:20, 63:1
2014 [3] - 1:10, 36:25, 85:6
20th [1] - 14:3
21 [1] - 24:16
22 [1] - 1:10, 85:6
22,000 [1] - 47:11
239 [1] - 32:17

**3**

3.1 [1] - 8:16
30-round [1] - 23:18

**4**

40 [1] - 38:23
43,647 [1] - 9:3
456 [1] - 12:12
486 [1] - 12:11

**5**

50 [2] - 24:10, 24:17
51 [1] - 62:2
58,075 [1] - 9:5

**6**

600 [1] - 28:18
634 [1] - 71:18
654 [1] - 32:17
69,072 [1] - 9:12

**7**

702 [9] - 44:13, 44:16, 44:17, 77:20, 78:5, 78:7, 78:20, 79:10
75 [1] - 24:15
77R [2] - 58:19, 58:21

**8**

8.2 [1] - 7:21
84 [2] - 42:8, 45:18
85 [2] - 24:8, 24:14

**9**

92,000 [1] - 46:17
92,515 [1] - 9:12
94 [1] - 40:25
95 [1] - 42:9
96 [1] - 41:13

**A**

abiding [5] - 48:13, 49:8, 52:25, 54:1, 69:2
able [12] - 28:2, 28:14, 36:2, 36:3, 40:14, 60:14, 60:19, 60:20, 62:7, 65:16, 69:9, 84:11
abortion [1] - 11:23
above-entitled [1] - 1:12
abroad [1] - 68:7
absent [2] - 58:7, 74:21
absolute [2] - 4:11, 4:17
absolutely [2] - 15:1, 73:5
accepted [1] - 50:17
accessible [1] - 26:24
accommodate [2] - 4:12, 30:10
accomplish [2] - 56:14, 69:9
according [2] - 9:2, 76:14
account [1] - 20:13
accurate [1] - 85:7
achieve [1] - 56:1,

56:21
acknowledged [1] - 47:1
acquire [1] - 37:7
act [2] - 33:23, 81:15
Act [4] - 40:10, 40:11, 82:14, 83:14
acted [1] - 3:15
Action [1] - 85:4
action [1] - 75:13
active [2] - 33:6, 75:5
added [1] - 78:4
adding [1] - 9:11
additional [3] - 19:16, 30:15, 31:4
address [10] - 11:9, 18:9, 24:23, 31:21, 32:5, 37:2, 42:8, 51:15, 64:17, 77:20
addressed [8] - 14:21, 18:16, 34:5, 35:13, 35:16, 69:11, 79:18
addressing [3] - 9:15, 37:4, 39:23
administrative [1] - 30:9
admissibility [4] - 25:9, 78:8, 78:19, 78:25
admissible [2] - 65:14, 78:18
admitted [1] - 61:19
admitting [1] - 59:3
adopted [2] - 23:14, 52:18
advance [2] - 29:1, 60:5, 65:5
advanced [1] - 44:9
advocating [1] - 3:22
affect [1] - 10:22
affected [1] - 79:13
affects [2] - 16:25, 19:25
affirm [1] - 44:14
agencies [2] - 23:23, 74:25
agree [5] - 38:1, 39:5, 42:21, 70:16, 79:4
agreeing [1] - 53:14
AK-47 [1] - 80:7
AK-47s [1] - 36:7
al [6] - 1:4, 1:7, 2:4, 85:3, 85:4
allegation [1] - 37:13
alleged [1] - 7:20
Allen [3] - 25:14, 27:10, 27:23
allow [2] - 36:9, 69:10
allowed [4] - 34:16, 38:22, 40:12, 65:15

allowing [3] - 15:8, 21:11, 33:14
alone [1] - 4:11
alternative [1] - 55:3
alternatives [4] - 55:6, 58:9, 59:12, 59:13
Amendment [74] - 3:2, 3:7, 4:5, 4:11, 4:16, 4:20, 6:4, 6:13, 6:17, 6:23, 9:15, 9:17, 10:24, 11:20, 12:3, 13:3, 13:9, 13:17, 13:21, 13:24, 14:9, 14:19, 15:1, 15:3, 16:14, 16:20, 17:11, 17:16, 17:23, 18:14, 18:22, 19:22, 20:9, 20:13, 20:14, 20:25, 21:9, 21:18, 21:24, 21:25, 22:7, 22:9, 22:17, 22:24, 29:22, 34:17, 34:20, 35:3, 35:23, 48:10, 48:15, 48:20, 49:1, 49:5, 49:6, 50:5, 50:10, 50:14, 50:17, 50:24, 51:4, 51:22, 52:20, 56:8, 63:23, 66:4, 66:10, 74:1, 79:22, 80:16, 80:17, 80:19, 81:17, 81:18
amendment [4] - 6:14, 6:19, 13:13, 13:19
American [2] - 44:11, 80:25
Americans [4] - 8:18, 22:21, 73:9, 73:15
ammunition [1] - 6:15
amorphous [1] - 8:2
amounts [1] - 80:23
analyses [1] - 52:1
analysis [10] - 6:21, 16:10, 17:3, 20:21, 20:22, 21:22, 41:2, 44:8, 51:4, 51:15
analyzed [3] - 14:13, 16:17, 28:17, 41:5, 50:16
analyzing [1] - 6:19
anecdotal [2] - 28:6, 28:10
anew [1] - 52:23
Annapolis [1] - 60:10
answer [15] - 19:23, 41:5, 41:12, 41:18, 42:4, 42:13, 42:15, 42:25, 43:3, 43:6, 43:14, 45:22, 46:1, 46:6, 59:25
anyway [1] - 7:11

appear [4] - 8:18, 10:21, 38:17, 67:4
applicable [3] - 9:21, 10:5, 32:23
application [4] - 22:2, 23:5, 54:7, 58:20
applications [1] - 72:10
applied [9] - 3:9, 10:7, 10:23, 12:3, 35:18, 35:21, 36:9, 55:21, 73:20
applies [3] - 35:5, 35:20, 78:7
apply [10] - 11:18, 20:10, 20:12, 22:6, 22:12, 53:3, 53:11, 54:14, 60:25, 71:12
applying [4] - 56:11, 57:2
appreciate [3] - 39:8, 75:20, 84:9
approach [5] - 10:15, 52:9, 68:17, 68:24, 72:14
appropriate [5] - 6:21, 16:9, 36:15, 37:10, 66:12
AR-15 [11] - 23:18, 37:22, 37:24, 77:7, 77:9, 77:16, 80:5, 82:1, 82:12, 82:25, 83:2
AR-15s [2] - 36:7, 82:22
area [2] - 40:1, 41:22
argue [3] - 13:15, 13:18, 21:2
arguing [1] - 19:19
argument [10] - 19:13, 29:11, 33:7, 58:9, 74:11, 79:5, 80:10, 80:11, 80:12, 84:10
arguments [2] - 3:22, 39:7
arise [1] - 32:21
arises [1] - 61:3
arm [5] - 19:17, 20:2, 20:3, 54:12, 54:13
armed [1] - 49:25
arms [20] - 3:2, 13:16, 16:15, 18:20, 18:21, 20:3, 48:9, 48:16, 48:22, 49:4, 49:11, 50:1, 50:6, 50:21, 50:23, 53:1, 54:16, 80:24, 81:16, 81:17
Army [1] - 23:23
arose [2] - 14:1, 14:3
article [1] - 27:5

**articulate** [2] - 11:25, 14:17
**articulated** [5] - 12:12, 12:17, 12:21, 12:24, 17:9
**articulating** [2] - 4:3, 12:9
**articulation** [2] - 12:7, 73:19
**articulations** [2] - 12:4, 73:18
**as-applied** [1] - 36:9
**aside** [1] - 78:2
**assault** [29] - 2:20, 7:13, 7:25, 9:1, 9:9, 16:2, 16:4, 22:7, 24:17, 28:23, 33:3, 40:2, 41:3, 41:9, 41:16, 42:9, 42:11, 42:24, 43:2, 43:5, 43:11, 45:19, 45:20, 45:24, 46:3, 62:5, 63:5, 69:22, 76:6
**assaults** [7] - 3:18, 23:12, 42:19, 46:4, 59:6, 72:19, 76:11
**assembled** [2] - 28:13, 49:16
**Assembly** [22] - 3:15, 29:10, 29:15, 29:18, 34:6, 46:25, 62:17, 65:9, 65:11, 65:12, 65:15, 66:9, 66:12, 71:6, 71:9, 72:13, 74:7, 74:13, 75:2, 75:8, 75:12, 79:23
**Assembly's** [2] - 31:17, 65:4
**asserts** [1] - 45:5
**assessment** [2] - 20:11, 52:14
**Association** [4] - 27:8, 27:19, 27:21, 57:22
**assume** [2] - 43:8, 53:24
**assumed** [5] - 3:6, 21:17, 21:21, 21:25, 45:10
**ATF** [2] - 82:5, 82:7
**attempt** [2] - 27:17, 83:22
**attempting** [1] - 72:24
**attention** [1] - 36:22
**author** [2] - 39:25, 81:9
**authored** [1] - 81:11
**automatic** [11] - 23:16, 23:25, 81:5, 81:21, 82:2, 82:9, 82:17, 82:21, 82:23, 83:3

**availability** [4] - 29:3, 68:12, 69:4, 69:7
**available** [8] - 22:23, 26:19, 26:20, 43:11, 43:16, 68:13, 68:14, 74:15
**average** [2] - 8:15, 24:14
**avoid** [1] - 14:15
**aware** [3] - 7:2, 25:10, 41:7

**B**

**background** [1] - 58:21
**balance** [1] - 51:19
**balancing** [12] - 52:9, 52:22, 53:4, 53:8, 53:13, 54:18, 71:16, 71:19, 71:22, 71:25, 72:21
**Baltimore** [1] - 1:9
**ban** [60] - 15:8, 16:3, 41:3, 41:9, 41:16, 41:23, 42:7, 45:18, 45:23, 46:2, 51:23, 54:23, 58:24, 59:20, 60:17, 62:4, 63:4, 63:25, 66:22, 66:24, 67:4, 67:14, 67:19, 67:22, 67:24, 68:1, 68:3, 68:6, 68:9, 68:17, 68:22, 68:24, 69:9, 69:10, 69:13, 70:2, 71:12, 71:13, 72:14, 72:15, 76:3, 76:7, 76:14, 76:17, 76:19, 76:21, 76:23, 76:24, 77:4, 77:7, 77:8, 79:13, 79:17, 80:1, 80:14, 80:19, 80:23, 84:1
**banned** [21] - 7:14, 19:10, 19:15, 40:2, 42:19, 45:4, 46:15, 46:22, 47:1, 47:25, 48:1, 48:12, 49:17, 49:23, 55:17, 58:20, 73:6, 76:13, 80:7, 82:8
**banning** [2] - 10:8, 43:11
**bans** [24] - 2:20, 3:16, 22:8, 23:8, 29:1, 38:15, 40:20, 42:7, 42:9, 42:11, 45:16, 46:8, 55:4, 57:19, 58:13, 59:10, 59:11, 62:7, 63:14, 63:17,

68:18, 69:16, 69:21, 70:18
**Barbara** [1] - 61:23
**barrel** [5] - 49:9, 77:7, 77:10, 77:11, 77:13
**based** [16] - 13:6, 21:10, 22:2, 25:19, 27:13, 39:16, 41:2, 41:5, 43:10, 43:14, 43:15, 44:12, 59:21, 68:20, 79:9
**bases** [1] - 69:11
**basing** [1] - 79:2
**basis** [7] - 29:20, 32:5, 32:10, 34:5, 36:15, 36:20, 52:12
**bear** [6] - 3:2, 20:2, 48:16, 51:3, 83:11
**bearable** [2] - 19:17, 48:21
**bearing** [1] - 49:16
**bears** [1] - 62:23
**becomes** [1] - 20:10
**beginning** [3] - 25:18, 64:8, 84:9
**behold** [1] - 63:6
**below** [1] - 30:14
**benefit** [1] - 39:18
**beside** [1] - 82:9
**best** [4] - 28:10, 56:16, 72:2, 75:25
**better** [2] - 5:12, 84:4
**between** [13] - 19:24, 23:2, 23:7, 31:18, 39:3, 51:19, 55:22, 56:13, 72:4, 76:22, 81:4, 81:20, 82:21
**bicyclists** [1] - 62:1
**Bill** [6] - 4:15, 14:11, 22:14, 60:9, 60:10, 60:11
**binding** [2] - 9:23, 53:19
**bit** [6] - 17:4, 19:12, 19:20, 24:24, 25:12, 35:10
**black** [1] - 26:1
**Blake** [2] - 1:13, 85:6
**Bloomberg** [3] - 62:20, 62:22, 63:1
**Bloomberg's** [1] - 62:23
**blue** [1] - 63:11
**blunderbuss** [1] - 48:25
**BMW** [1] - 61:25
**Board** [3] - 56:12, 57:7, 58:2
**border** [2] - 13:15, 13:17

**borne** [1] - 80:22
**bottom** [1] - 31:10
**box** [1] - 26:1
**branch** [1] - 52:11
**breached** [1] - 25:25
**break** [2] - 61:1, 64:4
**break-in** [1] - 61:1
**Breyer** [3] - 52:22, 53:4, 71:20
**Breyer's** [1] - 71:21
**brief** [7] - 9:4, 31:7, 56:3, 59:1, 60:13, 81:3, 81:23
**briefing** [2] - 65:23, 84:10
**briefly** [5] - 2:12, 18:10, 31:21, 51:16, 75:23
**briefs** [1] - 23:22
**bringing** [1] - 49:11
**broad** [1] - 52:19
**broadcasters** [5] - 30:16, 30:18, 30:22, 30:24, 31:2
**Broadcasting** [5] - 30:7, 30:8, 30:13, 44:22, 59:15
**brought** [4] - 34:21, 36:19, 36:21, 77:2
**buffer** [1] - 11:22
**build** [2] - 9:9, 9:10
**built** [1] - 66:15
**bulletin** [1] - 36:24
**burden** [22] - 3:9, 3:12, 9:19, 13:2, 20:8, 20:21, 20:24, 21:18, 21:25, 22:1, 22:9, 22:17, 29:25, 31:1, 51:6, 53:25, 57:1, 65:19, 65:22, 74:1, 74:4, 80:18
**burdened** [2] - 3:7, 20:15
**burdens** [2] - 9:17, 20:13
**business** [2] - 25:24, 64:11

**C**

**cable** [1] - 30:25
**California** [3] - 16:2, 58:1, 61:23
**calm** [1] - 60:21
**campaigns** [1] - 15:20
**campus** [2] - 61:23, 62:1
**cannot** [8] - 19:1, 29:8, 34:24, 41:14, 44:12, 63:23, 73:5,

80:8
**cap** [1] - 58:16
**capable** [4] - 82:2, 82:16, 82:22, 83:2
**capacity** [37] - 2:20, 2:25, 16:3, 18:13, 18:24, 19:2, 19:9, 19:24, 22:8, 23:25, 24:7, 24:9, 24:11, 24:12, 24:13, 24:18, 26:6, 28:24, 40:3, 41:3, 41:9, 41:16, 45:3, 45:19, 45:24, 46:3, 58:16, 60:18, 62:3, 63:5, 67:8, 67:11, 67:13, 68:6, 69:21, 70:7, 76:8
**Captain** [1] - 63:11
**captain** [1] - 62:14
**careful** [3] - 46:7, 61:20, 84:10
**carefully** [1] - 81:23
**carry** [5] - 10:1, 13:25, 14:3, 14:4, 30:25
**Carter** [3] - 29:23, 54:6, 57:11
**Case** [1] - 2:3
**case** [97] - 1:12, 3:14, 3:24, 4:4, 4:9, 4:10, 4:18, 4:21, 6:20, 10:13, 10:20, 10:24, 11:2, 11:6, 11:15, 11:17, 11:22, 12:18, 12:20, 12:21, 14:23, 18:25, 21:5, 26:11, 28:6, 28:7, 30:2, 30:7, 30:16, 30:22, 31:6, 32:21, 34:12, 34:20, 35:2, 35:4, 35:12, 35:24, 36:22, 39:11, 39:12, 39:19, 41:22, 43:23, 44:18, 44:22, 44:25, 45:17, 49:19, 50:7, 52:5, 52:12, 53:13, 53:19, 53:22, 54:6, 55:21, 56:9, 56:12, 56:23, 57:5, 57:20, 57:23, 57:24, 58:1, 58:7, 59:16, 63:14, 63:18, 64:9, 64:20, 64:22, 66:1, 66:15, 67:10, 70:13, 74:3, 74:17, 74:20, 74:25, 78:6, 81:2, 81:6, 81:14, 81:16, 81:22, 81:24, 82:11, 83:4, 83:7, 83:8, 83:13, 83:19
**case-by-case** [1] - 52:12

**cases** [28] - 3:3, 4:23, 11:20, 12:9, 12:22, 22:12, 24:15, 25:6, 25:7, 25:11, 25:22, 31:6, 39:14, 39:16, 44:13, 54:20, 55:13, 55:18, 56:3, 56:8, 57:13, 57:15, 57:16, 57:18, 58:4, 58:6, 73:21, 73:23
**casualties** [1] - 33:24
**categorical** [2] - 35:11, 35:20
**category** [2] - 24:13, 83:10
**Catherine** [2] - 1:13, 85:5
**causation** [5] - 44:1, 45:2, 45:8, 64:23, 64:25
**caused** [1] - 42:3
**causing** [1] - 23:19
**caveats** [2] - 66:18, 66:21
**CCB-13-2841** [2] - 1:6, 85:5
**CCB-13-cv-2841** [1] - 2:3
**center** [1] - 62:21
**centerfire** [1] - 80:6
**central** [5] - 4:19, 6:6, 22:16
**centric** [1] - 17:12
**Century** [3] - 13:16, 14:1, 14:3
**certain** [3] - 14:12, 15:21, 67:3
**certainly** [17] - 7:1, 7:5, 10:16, 11:1, 17:7, 17:21, 18:17, 19:3, 23:7, 32:12, 34:6, 35:15, 37:3, 39:5, 61:14, 79:16, 79:18
**certainty** [3] - 66:6, 66:7, 71:8
**CERTIFICATE** [1] - 85:1
**certify** [1] - 85:2
**chair** [1] - 62:15
**challenge** [15] - 25:8, 25:10, 29:22, 34:22, 34:23, 34:24, 35:6, 35:18, 35:21, 36:10, 36:15, 36:20, 37:11, 46:14, 64:10
**challenged** [3] - 9:16, 33:2, 65:13
**challenges** [7] - 3:10, 21:24, 22:7, 34:16,

35:2, 35:22, 66:4
**challenging** [4] - 38:15, 64:8, 64:14, 79:6
**chamber** [1] - 19:7
**change** [5] - 10:22, 12:5, 38:2, 60:20, 61:5
**characterization** [1] - 79:5
**charged** [1] - 40:6
**check** [1] - 58:21
**checking** [1] - 26:9
**Chester** [6] - 22:11, 56:9, 56:22, 57:3, 57:12, 58:2
**Chief** [5] - 8:9, 60:2, 60:5, 74:5, 74:6
**chief** [2] - 60:17, 74:23
**choice** [5] - 47:16, 51:24, 54:18, 55:2, 63:25
**choose** [3] - 50:6, 63:20, 63:24
**chose** [1] - 49:25
**chosen** [6] - 22:21, 46:23, 56:14, 73:2, 73:15, 80:25
**Chovan** [1] - 58:2
**Circuit** [40] - 2:23, 3:25, 9:14, 9:23, 9:24, 12:16, 12:23, 20:11, 21:23, 22:11, 23:1, 23:4, 23:20, 29:16, 29:19, 29:24, 31:10, 32:15, 34:15, 34:19, 35:9, 35:10, 53:10, 53:12, 53:15, 53:19, 53:21, 54:4, 54:10, 54:20, 54:22, 55:13, 55:17, 56:8, 56:23, 57:13, 57:23, 58:5, 65:19
**Circuit's** [5] - 9:25, 10:15, 12:7, 13:1, 73:22
**circumstance** [1] - 38:3
**circumstances** [5] - 4:12, 11:20, 30:3, 33:23, 61:6
**citation** [2] - 70:19, 70:25
**cite** [2] - 47:4, 56:9
**cited** [23] - 25:5, 25:22, 28:5, 28:6, 31:7, 31:9, 56:3, 56:11, 57:3, 57:4, 57:11, 57:15, 57:20, 57:24, 57:25, 58:1,

58:3, 61:11, 65:23, 74:16, 81:2, 83:8
**citizen** [2] - 38:14, 54:1
**citizens** [8] - 38:14, 44:11, 48:2, 48:13, 49:8, 49:25, 53:1, 63:23
**Civil** [2] - 2:3, 85:4
**CIVIL** [1] - 1:6
**civilians** [1] - 29:5
**civility** [1] - 38:22
**claim** [9] - 29:8, 29:9, 30:5, 31:23, 32:22, 33:9, 33:13, 34:12, 34:13
**claims** [5] - 9:15, 31:20, 31:25, 32:20, 32:21
**clarify** [1] - 64:7
**Clark** [1] - 12:11
**class** [17] - 22:19, 33:17, 73:3, 73:8, 73:14, 80:15, 80:20, 80:21, 80:24, 82:23, 82:24, 82:25, 83:1, 83:5, 83:9
**classification** [1] - 12:14
**Clause** [3] - 31:24, 32:2, 33:17
**clear** [13] - 4:21, 10:14, 13:8, 16:4, 21:14, 22:15, 27:23, 29:16, 32:10, 44:20, 51:23, 54:22, 76:6
**clearly** [5] - 14:7, 16:13, 35:5, 37:11, 43:18, 50:13, 60:22, 66:6
**CLERK** [1] - 2:2
**clinics** [1] - 11:23
**clip** [1] - 23:18
**co** [1] - 62:15
**co-chair** [1] - 62:15
**codified** [3] - 3:2, 13:8, 17:16
**coextensive** [1] - 7:25
**cognizable** [1] - 64:20
**collected** [3] - 25:17, 26:7, 84:2
**collection** [4] - 27:10, 27:25, 28:1, 28:16
**collections** [1] - 27:20
**colloquy** [1] - 64:18
**Colorado** [4] - 2:25, 73:23, 83:17, 83:21
**Columbia** [5] - 47:23, 48:3, 48:5, 48:7, 65:25

**Columbia's** [1] - 66:2
**combat** [1] - 5:23
**combined** [1] - 32:13
**coming** [2] - 61:8, 67:10
**commend** [1] - 38:21
**committing** [1] - 41:25
**common** [17] - 7:10, 14:24, 15:4, 15:17, 16:1, 16:8, 16:16, 16:19, 16:24, 17:5, 18:5, 30:2, 46:16, 46:18, 47:20, 49:12, 65:19
**commonly** [11] - 5:3, 5:8, 5:11, 46:21, 48:17, 50:18, 51:12, 53:17, 54:16, 63:20
**companies** [1] - 30:25
**competency** [1] - 7:5
**competitions** [3] - 5:17, 5:22, 5:23
**competitive** [7] - 6:3, 6:11, 6:24, 7:3, 7:7, 50:12, 77:15
**compilation** [1] - 26:3
**complete** [7] - 51:23, 53:16, 54:15, 58:10, 58:25, 80:15, 80:19
**completely** [4] - 11:6, 37:19, 37:22, 66:25
**component** [3] - 4:19, 6:7, 22:16
**components** [1] - 37:19
**comprehensive** [7] - 27:17, 27:24, 28:1, 28:3, 28:8, 28:12, 28:14
**concealed** [1] - 13:25
**conceded** [3] - 48:24, 50:4, 50:9
**concept** [2] - 4:8, 13:5, 14:24
**conclude** [2] - 41:14, 45:14
**concluded** [2] - 34:7, 84:15
**conclusion** [6] - 16:18, 28:9, 41:10, 41:11, 42:17, 72:2
**conclusions** [1] - 61:21
**conduct** [8] - 9:17, 9:20, 13:2, 20:8, 35:5, 36:2, 37:12, 52:23
**conducted** [1] - 47:10
**conflict** [3] - 3:24, 4:9, 30:5

**conflicting** [1] - 31:12
**conflicts** [1] - 15:16
**Congress** [4] - 40:12, 44:22, 76:5
**Connecticut** [2] - 2:24, 73:23
**connection** [1] - 33:20
**consider** [10] - 29:8, 30:14, 36:13, 65:8, 65:9, 65:17, 65:20, 66:6, 66:12, 79:19
**consideration** [1] - 29:14
**considered** [10] - 20:18, 22:5, 29:18, 40:12, 50:15, 53:16, 55:6, 56:10, 58:11, 66:11
**considering** [4] - 37:10, 49:24, 57:19, 65:18
**consistent** [2] - 21:23, 35:8
**consistently** [1] - 25:19
**constitute** [2] - 19:17, 48:21
**Constitution** [5] - 4:7, 13:7, 13:9, 13:11, 13:12
**constitutional** [13] - 3:16, 10:8, 10:11, 14:10, 15:23, 45:9, 52:7, 52:13, 52:15, 52:16, 54:23, 63:19, 66:9
**constitutionality** [2] - 2:19, 44:10
**constitutionally** [1] - 83:20
**constrained** [1] - 66:9
**construction** [1] - 50:18
**contain** [1] - 49:17
**content** [1] - 53:23
**context** [17] - 12:3, 14:16, 30:3, 43:21, 44:5, 44:18, 52:2, 55:15, 56:20, 61:4, 64:22, 66:4, 66:13, 66:16, 70:11, 75:4, 81:5
**contexts** [1] - 80:13
**contiguous** [1] - 76:25
**continue** [2] - 60:19, 68:12
**continued** [1] - 69:9
**contract** [2] - 25:25, 40:7
**contradict** [1] - 3:25

contradicts [1] - 28:10
contrary [2] - 3:4, 10:5
control [3] - 62:21, 63:12, 74:8
controlling [1] - 3:24
convened [1] - 62:25
conveniently [1] - 70:18
converse [1] - 16:23
converted [4] - 77:16, 82:1, 82:23, 83:3
convicted [1] - 82:19
copied [1] - 60:10
copy [3] - 37:1, 60:8
core [4] - 37:11, 52:8, 53:25, 54:8
correct [15] - 3:5, 25:2, 40:24, 41:18, 42:3, 42:4, 42:12, 44:24, 45:21, 45:22, 45:25, 46:1, 46:5, 46:6, 71:15
correctly [1] - 26:17
counsel [4] - 2:4, 2:6, 2:12, 39:5
counterpoint [1] - 17:2
country [4] - 61:12, 68:8, 73:13, 75:8
course [5] - 12:23, 27:3, 41:25, 49:18, 66:10
COURT [59] - 1:1, 2:10, 3:3, 5:2, 6:20, 7:9, 7:17, 9:13, 10:14, 10:17, 16:6, 17:3, 18:11, 19:3, 19:12, 20:7, 20:20, 21:13, 24:23, 25:5, 25:12, 26:10, 27:2, 27:7, 28:21, 31:22, 32:4, 32:14, 35:7, 36:21, 38:9, 38:12, 39:4, 41:20, 42:5, 43:20, 44:15, 46:19, 47:4, 47:8, 47:15, 49:20, 50:25, 51:10, 53:6, 53:14, 57:17, 61:9, 64:3, 64:7, 64:15, 70:14, 75:20, 76:16, 78:7, 78:12, 78:16, 79:4, 84:8
court [24] - 2:19, 20:18, 22:5, 30:10, 30:13, 30:14, 31:12, 39:13, 49:4, 50:15, 50:17, 55:13, 57:18, 59:14, 65:11, 65:14, 65:18, 66:5, 78:8, 78:11, 78:14, 81:7,

83:19, 83:21
Court [83] - 1:25, 2:3, 2:8, 2:17, 3:11, 3:24, 4:6, 4:14, 4:19, 6:6, 6:18, 9:22, 10:3, 10:6, 10:11, 10:21, 11:7, 11:9, 11:14, 11:18, 12:5, 12:9, 12:12, 12:22, 13:5, 13:8, 13:10, 13:14, 13:22, 14:7, 14:13, 15:3, 15:6, 15:11, 15:14, 16:13, 16:17, 17:9, 17:14, 17:21, 18:3, 18:21, 22:4, 22:19, 22:20, 23:3, 23:7, 29:8, 29:18, 30:6, 30:8, 35:1, 35:7, 35:11, 38:11, 38:19, 39:2, 44:24, 48:4, 51:17, 52:1, 52:6, 53:3, 54:6, 55:17, 57:4, 57:15, 58:6, 65:1, 65:8, 65:20, 65:25, 71:17, 71:18, 71:20, 71:23, 71:25, 75:17, 78:23, 81:4, 82:19, 83:4, 85:11
Court's [8] - 2:21, 10:3, 11:5, 16:21, 17:10, 29:14, 31:15, 74:12
courts [21] - 2:23, 3:6, 4:2, 6:19, 11:25, 12:21, 14:20, 16:6, 18:16, 18:17, 21:15, 23:20, 26:23, 30:11, 35:12, 35:15, 36:18, 45:9, 51:1, 55:11, 73:24
covered [7] - 36:6, 50:9, 50:12, 50:13, 68:1, 77:7, 81:17
covers [1] - 76:23
created [4] - 5:18, 5:24, 27:25, 77:9
credible [1] - 79:1
crime [7] - 42:11, 45:7, 59:4, 69:25, 70:2, 72:16, 76:8
crimes [5] - 41:17, 41:21, 41:25, 67:16, 76:10
criminal [4] - 34:16, 36:18, 67:13, 69:4
criminals [4] - 29:4, 34:9, 68:25, 70:5
critical [6] - 40:1, 46:10, 46:14, 60:16,

81:6, 81:20
cross [1] - 39:18
cross-examination [1] - 39:18
custody [1] - 74:8

**D**

D.C [4] - 2:22, 23:19, 48:2, 73:22
Dan [2] - 1:23, 2:7
dangerous [10] - 3:17, 15:9, 16:25, 18:2, 20:23, 21:12, 28:24, 70:4, 70:6, 82:13
dangers [2] - 31:13, 75:3
data [13] - 9:2, 9:4, 24:19, 25:13, 25:22, 26:1, 26:11, 41:5, 41:8, 43:16, 79:9, 84:2
database [11] - 25:14, 25:16, 27:8, 27:9, 27:12, 27:16, 27:17, 27:24, 27:25, 28:15, 28:16
date [5] - 6:21, 59:9, 68:3, 68:9, 79:13
deadly [2] - 33:23, 34:1
deal [1] - 78:10
dealing [5] - 11:20, 11:22, 26:3, 38:3, 66:8
dealt [1] - 39:8
death [1] - 61:25
deaths [1] - 42:2
December [1] - 62:19
decide [2] - 52:12, 54:5
decided [3] - 2:19, 3:3, 55:17
deciding [3] - 21:17, 43:22, 51:5
decision [18] - 2:22, 9:24, 9:25, 10:3, 11:5, 14:17, 14:25, 30:6, 32:3, 38:6, 39:13, 49:3, 49:4, 65:23, 65:24, 71:16, 73:22, 84:13
decision-makers [1] - 32:3
decisions [5] - 2:21, 4:1, 36:12, 56:13
declaration [2] - 70:19, 70:24
declarations [3] - 36:4, 39:17, 70:12

decline [2] - 68:15, 76:6
defendant [2] - 2:6, 2:13
DEFENDANTS [1] - 1:8
defendants [17] - 8:8, 14:22, 18:15, 20:5, 21:7, 21:8, 30:4, 39:21, 45:13, 55:1, 59:24, 60:13, 74:9, 74:10, 75:17, 81:3, 83:11
Defendants [2] - 1:21, 85:4
defendants' [3] - 6:2, 39:20, 46:16
defense [32] - 4:20, 4:23, 4:24, 5:1, 6:7, 17:6, 17:18, 22:22, 27:22, 28:20, 46:21, 46:23, 47:2, 47:14, 47:16, 47:18, 47:23, 48:6, 48:19, 49:13, 50:8, 50:21, 51:20, 53:1, 53:25, 54:8, 61:3, 61:13, 63:21, 73:3, 73:9, 73:15
defensive [1] - 23:12
define [2] - 11:2, 16:12
defined [5] - 7:24, 13:6, 13:13, 37:11, 64:23
defining [1] - 14:18
definition [5] - 7:23, 8:2, 18:21, 27:14, 27:15
degree [5] - 19:14, 20:9, 41:15, 43:10, 71:7
Delaware [1] - 76:25
demonstrate [2] - 14:9, 32:18
demonstrated [2] - 39:19, 46:18
Department [2] - 40:7, 76:4
departure [1] - 68:19
dependent [2] - 13:11
depose [1] - 40:15
deposed [2] - 40:17, 74:20
deposition [10] - 39:18, 40:19, 40:25, 42:8, 46:7, 47:7, 47:8, 60:6, 62:20, 70:15
depositions [3] - 38:24, 39:15, 39:19

describe [2] - 8:3, 83:9
described [5] - 8:1, 9:14, 12:24, 36:23, 67:4
description [1] - 15:2
deserve [1] - 84:4
designed [2] - 3:18, 23:13
desired [2] - 56:1, 56:21
detail [1] - 82:20
detailed [1] - 81:19
detect [1] - 43:19
determination [2] - 37:17, 69:20
determine [1] - 31:15
determined [5] - 4:19, 6:18, 23:24, 49:4, 72:7
determining [2] - 8:16, 78:25
develop [2] - 38:19, 46:13
developed [1] - 39:14
difference [4] - 19:23, 62:7, 76:22, 82:21
differences [1] - 73:20
different [24] - 5:13, 7:6, 11:6, 11:15, 12:1, 12:4, 12:22, 19:12, 26:25, 27:20, 28:17, 41:10, 43:23, 44:8, 52:20, 55:12, 64:21, 68:17, 68:24, 71:12, 73:17, 73:19, 80:13
differentiated [1] - 25:21
differently [2] - 20:4, 32:18
difficult [1] - 43:19
difficulty [1] - 19:21
dire [1] - 61:4
disagree [1] - 37:16
disagreed [3] - 9:25, 34:18
discernible [1] - 40:22
disclosed [1] - 60:6
discovered [1] - 36:23
discovery [1] - 38:23
discretion [1] - 3:16
discussed [4] - 23:22, 51:1, 56:20, 71:19
discussing [2] - 22:1, 75:3
discussion [11] - 14:25, 17:25, 18:1, 18:8, 51:17, 63:9, 71:16, 73:16, 74:22,

81:18, 81:20
**dismiss** [5] - 31:25,
32:6, 32:11, 64:11,
75:18
**dismissed** [1] - 32:8
**dismissing** [1] - 32:11
**disposed** [1] - 32:6
**disposition** [1] - 56:17
**dispositive** [1] - 34:14
**disproportionately** [5]
- 3:19, 24:5, 45:5,
59:4, 72:19
**disputed** [1] - 55:4
**disputes** [2] - 39:3,
51:21
**dissent** [1] - 53:4
**distinction** [1] - 81:20
**distinguish** [1] - 81:4
**distinguishes** [2] -
26:21, 39:11
**DISTRICT** [2] - 1:1, 1:2
**district** [3] - 2:23,
39:13, 57:18
**District** [11] - 1:13,
47:23, 48:3, 48:5,
48:7, 55:22, 58:5,
65:25, 66:1, 85:6
**document** [1] - 60:6
**documents** [1] - 59:25
**donated** [1] - 62:20
**donations** [1] - 62:24
**done** [6] - 11:14, 40:5,
40:15, 66:23, 79:23,
79:24
**doubt** [1] - 83:6
**down** [2] - 60:10,
83:13
**Dr** [17] - 40:6, 40:15,
40:18, 45:14, 59:18,
59:21, 61:18, 62:13,
62:16, 62:19, 62:21,
62:25, 63:10, 70:11,
76:2, 79:7, 79:8
**draw** [2] - 77:25, 80:12
**drawing** [1] - 61:21
**drop** [1] - 67:12
**dropped** [2] - 33:7,
33:8
**duplicates** [1] - 74:17
**during** [7] - 39:24,
55:19, 67:13, 68:5,
68:23, 77:13, 77:14
**duty** [3] - 33:6, 42:23

# E

**early** [2] - 14:1, 64:18
**easily** [1] - 26:8
**echo** [1] - 39:4
**effect** [8] - 40:19,

42:7, 58:13, 58:14,
59:12, 67:16, 68:9,
83:25
**effective** [8] - 23:15,
55:5, 59:9, 63:15,
63:16, 67:5, 67:22,
79:13
**effectively** [1] - 24:1
**effectiveness** [1] -
76:15
**effects** [3] - 23:10,
69:15, 70:9
**efficacy** [5] - 40:5,
46:8, 69:20, 76:3,
79:14
**effort** [4] - 27:13, 58:7,
79:23, 79:24
**either** [5] - 3:6, 5:4,
31:6, 32:9, 42:3,
45:10, 48:5, 64:5
**elements** [2] - 46:14,
66:1
**elevates** [1] - 52:24
**Elliot** [2] - 61:22,
63:13
**emotional** [1] - 33:25
**emphasized** [1] -
29:24
**empirical** [1] - 30:2
**employed** [2] - 63:15,
63:17
**employing** [1] - 11:15
**employs** [2] - 55:24,
56:18
**emptied** [1] - 23:19
**enact** [1] - 75:9
**enacted** [3] - 3:16,
16:2, 29:11
**end** [1] - 7:22
**ends** [2] - 56:14
**enforcement** [29] -
3:20, 23:23, 24:2,
24:6, 28:23, 29:1,
29:6, 29:21, 32:23,
33:1, 33:5, 33:10,
33:15, 33:18, 33:19,
33:21, 34:7, 34:23,
42:20, 42:22, 45:6,
59:2, 59:6, 72:21,
74:23, 74:24, 75:4,
76:11
**engage** [1] - 36:3
**enjoy** [1] - 39:10
**enshrined** [1] - 52:16
**entire** [2] - 73:14,
80:24
**entirety** [1] - 60:16
**entitled** [1] - 1:12
**entry** [1] - 26:17
**enumerated** [3] - 10:7,

22:14, 52:7
**enumeration** [1] -
52:10
**environment** [1] -
60:21
**equal** [5] - 6:10, 32:20,
32:21, 32:24, 54:12
**Equal** [3] - 31:23,
32:2, 33:16
**equally** [3] - 17:19,
38:25, 52:4
**erected** [1] - 70:1
**especially** [1] - 71:13
**Esquire** [7] - 1:18,
1:18, 1:19, 1:19,
1:22, 1:22, 1:23
**essentially** [1] - 42:16
**establish** [1] - 55:22
**established** [4] - 13:7,
16:23, 17:2, 37:12
**et** [6] - 1:4, 1:7, 2:3,
2:4, 85:3, 85:4
**evaluate** [1] - 44:5
**evaluating** [1] - 43:21
**evaluations** [1] -
52:24
**event** [1] - 10:14
**events** [2] - 27:4, 75:5
**evidence** [85] - 3:10,
3:23, 4:21, 5:3, 5:7,
5:8, 5:9, 5:10, 5:12,
5:16, 5:19, 18:25,
22:15, 23:6, 24:24,
25:9, 28:7, 28:10,
28:11, 29:14, 29:15,
29:17, 29:20, 30:2,
30:15, 30:19, 31:1,
31:4, 31:12, 31:16,
36:24, 43:11, 44:12,
44:23, 45:1, 45:12,
46:13, 47:15, 48:4,
50:4, 50:19, 55:4,
55:5, 58:9, 58:24,
59:1, 59:8, 59:18,
64:19, 64:20, 65:4,
65:7, 65:8, 65:10,
65:16, 65:17, 66:5,
66:11, 67:3, 67:7,
67:10, 68:25, 71:6,
71:11, 72:1, 74:2,
74:3, 74:12, 75:14,
77:22, 77:23, 77:25,
78:3, 78:4, 78:8,
78:15, 78:17, 78:18,
78:19, 78:25, 79:14,
79:19, 79:24, 80:4,
83:14
**evidentiary** [2] -
29:20, 64:24
**exact** [1] - 8:22

**exactly** [4] - 12:16,
25:15, 36:5, 53:6
**examination** [3] -
39:18, 39:24, 66:3
**examine** [1] - 74:19
**examined** [2] - 35:3,
35:23
**examining** [1] - 65:9
**example** [3] - 12:11,
61:15, 84:1
**except** [1] - 75:8
**exception** [4] - 23:16,
33:4, 33:8, 33:14
**exceptions** [2] -
32:22, 33:3
**exchanged** [1] - 77:14
**exclude** [4] - 24:25,
25:8, 43:22, 65:24
**excluded** [1] - 39:22
**excuse** [2] - 28:16,
40:6
**exempted** [1] - 77:8
**existence** [5] - 13:12,
13:16, 13:20, 16:5,
48:22
**existing** [2] - 69:21,
76:17
**expect** [7] - 45:18,
45:23, 46:2, 61:5,
68:15, 69:12, 82:14
**expectations** [1] -
68:21
**expected** [1] - 67:22
**expedited** [1] - 38:23
**expenditure** [1] - 6:15
**expert** [5] - 8:8, 8:13,
39:17, 43:25, 46:24
**expertise** [1] - 79:3
**experts** [3] - 26:10,
26:22, 79:2
**experts'** [2] - 39:20,
43:21
**expire** [1] - 40:13
**explained** [5] - 67:9,
67:10, 68:10, 70:12,
71:2
**explaining** [1] - 66:18
**explains** [1] - 71:11
**expressly** [1] - 9:24
**extend** [1] - 76:24
**extends** [1] - 48:21
**extensive** [3] - 8:17,
33:11, 33:21
**extent** [5] - 5:19,
20:14, 36:11, 73:16,
79:17
**extremely** [2] - 4:22,
4:24

# F

**F.3d** [1] - 32:17
**facial** [8] - 34:15,
34:21, 34:22, 34:23,
36:15, 36:20, 37:10,
38:7
**facially** [1] - 37:14
**facing** [1] - 60:25
**fact** [19] - 8:8, 11:3,
11:25, 12:7, 13:21,
14:10, 38:4, 53:16,
54:23, 64:13, 67:2,
67:15, 67:24, 70:17,
73:21, 75:10, 78:4,
81:21, 83:8
**factor** [1] - 65:20
**factors** [1] - 65:2
**facts** [4] - 35:4, 35:24,
35:25, 46:11
**factual** [2] - 36:9,
38:20
**fader** [1] - 39:12
**Fader** [28] - 1:22, 2:7,
38:9, 38:21, 45:4,
46:10, 46:20, 48:24,
50:3, 50:9, 51:18,
53:3, 53:9, 54:21,
55:10, 55:18, 56:3,
56:9, 57:14, 58:6,
58:23, 64:7, 75:20,
76:16, 79:11, 79:25,
81:22, 83:20
**FADER** [32] - 2:15,
3:5, 5:6, 7:1, 7:15,
7:19, 9:14, 10:16,
11:1, 16:13, 17:7,
18:12, 19:5, 19:23,
20:8, 21:4, 21:20,
25:4, 25:10, 25:16,
26:14, 27:3, 27:9,
28:22, 31:23, 32:8,
32:15, 35:15, 37:3,
64:10, 64:16, 70:17
**Fader's** [4] - 39:24,
50:18, 78:21, 79:5
**fail** [3] - 10:10, 34:23,
52:3
**fails** [1] - 80:11
**fair** [3] - 8:10, 26:23,
46:6
**fall** [5] - 18:13, 21:9,
34:9, 58:13, 82:14
**falls** [1] - 27:15
**family** [1] - 10:10
**far** [11] - 5:1, 16:4,
21:15, 23:5, 34:4,
42:22, 68:21, 76:20,
77:4
**fatalities** [1] - 24:20

**favor** [1] - 9:23
**federal** [31] - 2:19, 2:23, 4:1, 30:23, 40:2, 40:20, 41:3, 41:9, 41:16, 42:7, 44:13, 50:15, 63:15, 66:22, 66:24, 67:4, 67:19, 67:24, 68:5, 68:22, 69:8, 71:12, 76:3, 76:14, 76:16, 76:21, 77:4, 77:18, 77:19, 79:13, 84:1
**felons** [1] - 14:2
**few** [4] - 4:3, 42:10, 64:16, 73:10
**fewer** [5] - 8:18, 8:23, 16:4, 70:7, 70:8
**Fiat** [1] - 58:1
**fifteen** [1] - 83:17
**file** [3] - 60:9, 60:11
**filed** [3] - 2:18, 9:5, 25:1
**fine** [1] - 78:23
**finest** [1] - 39:9
**fire** [12] - 19:6, 23:24, 23:25, 77:13, 81:21, 82:2, 82:17, 82:18, 82:21, 82:22, 82:23, 83:3
**firearm** [24] - 7:6, 10:9, 14:4, 18:25, 19:1, 19:15, 20:1, 22:19, 23:10, 33:22, 37:5, 37:6, 37:15, 37:18, 37:20, 37:22, 38:4, 38:6, 45:25, 46:4, 51:3, 73:9, 82:4, 82:12
**firearm-related** [1] - 45:25
**firearms** [81] - 3:17, 3:18, 3:19, 4:22, 4:25, 5:13, 5:18, 5:22, 5:23, 7:21, 8:15, 8:20, 8:24, 9:8, 14:3, 15:19, 16:15, 16:19, 18:2, 19:4, 19:8, 21:12, 22:18, 22:20, 23:11, 23:15, 23:16, 23:17, 24:4, 24:19, 26:4, 28:25, 29:3, 31:14, 33:4, 33:12, 36:12, 37:10, 38:15, 42:19, 45:2, 45:7, 45:20, 46:15, 46:23, 47:1, 47:13, 48:11, 49:17, 51:12, 51:20, 51:23, 53:17, 57:19, 58:14, 58:19, 59:3, 59:7, 59:21,

62:3, 62:13, 63:20, 63:24, 67:25, 68:2, 68:4, 68:13, 68:18, 69:1, 69:4, 70:4, 70:5, 72:17, 72:25, 75:3, 76:13, 77:5, 79:12, 80:15, 80:20
**firearms-related** [1] - 45:20
**fired** [5] - 4:24, 24:15, 26:5, 28:19, 61:16
**firing** [1] - 61:12
**firm** [1] - 43:15
**firmly** [1] - 4:14
**First** [6] - 11:20, 12:3, 34:17, 34:20, 35:3, 35:23
**first** [31] - 2:14, 4:4, 9:16, 10:19, 11:10, 13:1, 14:24, 20:23, 21:3, 21:19, 22:11, 29:13, 30:21, 31:7, 32:17, 37:3, 39:23, 40:19, 45:11, 52:21, 53:7, 55:16, 56:9, 60:14, 66:19, 66:22, 68:2, 74:7, 76:2, 80:14
**fit** [11] - 23:2, 23:7, 31:18, 44:6, 55:22, 55:24, 56:13, 56:15, 72:4, 72:6, 72:11
**five** [5] - 4:1, 8:9, 23:19, 46:16, 64:4
**five-minute** [1] - 64:4
**floating** [1] - 77:12
**flurry** [1] - 75:24
**focus** [10] - 15:7, 16:10, 16:21, 17:10, 17:22, 18:6, 37:9, 41:22, 70:11, 74:12
**focused** [2] - 72:16, 73:8
**focusing** [2] - 15:12, 59:19
**follow** [2] - 51:18, 53:10
**followed** [1] - 80:7
**footing** [1] - 54:13
**footnote** [1] - 69:17
**FOR** [1] - 1:2
**force** [4] - 33:24, 34:1, 62:12, 62:15
**forced** [1] - 70:5
**foregoing** [1] - 85:2
**foregoing** [1] - 71:24
**formed** [1] - 49:11
**forms** [1] - 71:23
**formulation** [1] - 56:6
**formulations** [1] -

55:12
**fortunate** [1] - 75:6
**forward** [3] - 2:11, 35:25, 68:19
**Foundation** [1] - 47:11
**founding** [1] - 6:8, 48:23
**four** [1] - 43:8
**Fourteenth** [1] - 6:23
**Fourth** [38] - 3:25, 9:14, 9:23, 9:25, 10:15, 12:7, 12:16, 12:23, 13:1, 20:11, 21:23, 22:11, 23:1, 23:4, 29:16, 29:19, 29:23, 31:10, 32:15, 34:15, 34:19, 35:8, 35:10, 53:10, 53:12, 53:15, 53:19, 53:21, 54:4, 54:10, 54:19, 54:20, 54:22, 55:13, 56:8, 57:13, 58:5, 65:19
**fox** [1] - 58:2
**Fox** [1] - 56:12
**frankly** [2] - 40:16, 77:21
**free** [1] - 68:4
**freedoms** [2] - 35:3, 35:23
**freestanding** [1] - 52:9
**frequency** [1] - 51:2
**frequent** [3] - 50:19, 76:12, 77:13
**frequently** [3] - 5:11, 5:20, 50:21
**Friedman** [3] - 1:23, 2:7, 38:21
**frightened** [1] - 61:7
**frivolous** [2] - 13:15, 13:18
**front** [1] - 78:12
**full** [4] - 21:2, 39:14, 74:18, 79:17
**fully** [4] - 12:8, 37:24, 82:9, 82:23
**function** [1] - 20:4
**functions** [1] - 20:3
**fundamental** [5] - 4:7, 44:11, 52:2, 53:25, 73:20
**future** [4] - 52:14, 52:18, 52:19, 52:24

**G**

**Gail** [2] - 1:25, 85:10
**gain** [1] - 7:5

**game** [1] - 26:23
**Garraghty** [1] - 32:17
**gatekeeper** [1] - 84:5
**general** [1] - 45:7
**General** [25] - 3:15, 29:10, 29:15, 29:17, 31:17, 34:6, 46:25, 62:17, 63:7, 65:4, 65:9, 65:10, 65:12, 65:15, 66:9, 66:12, 71:5, 71:9, 73:2, 74:7, 74:13, 75:2, 75:8, 75:12, 79:23
**generally** [4] - 69:7, 69:25, 70:2
**generated** [1] - 75:24
**generous** [1] - 62:23
**Ginsburg** [1] - 81:12
**given** [2] - 24:10, 74:25
**glomming** [1] - 14:16
**governing** [1] - 58:14
**government** [16] - 20:16, 29:24, 30:19, 30:23, 31:3, 40:2, 40:7, 51:21, 52:11, 55:24, 56:5, 57:9, 63:22, 65:18, 65:21, 82:2
**government's** [9] - 3:12, 20:17, 23:2, 23:8, 31:1, 31:19, 72:5, 74:2, 82:11
**governmental** [2] - 12:15, 32:2
**Governor** [2] - 63:2, 63:7
**grant** [1] - 75:18
**granted** [1] - 13:10
**grateful** [2] - 38:17, 50:20
**great** [1] - 82:20
**greater** [3] - 40:3, 62:8, 73:11
**green** [1] - 49:16
**grounds** [1] - 32:9
**groups** [1] - 38:14
**guarantee** [2] - 52:14, 52:15
**guaranteed** [1] - 14:11
**guarantees** [1] - 4:15
**guess** [1] - 10:20
**guide** [1] - 6:18
**guilty** [1] - 82:3
**gun** [4] - 40:23, 62:21, 73:13, 77:12
**guns** [9] - 41:17, 41:21, 41:24, 42:3, 48:1, 48:5, 49:23, 51:7, 52:4

**H**

**hand** [4] - 35:4, 35:24, 61:14, 83:19
**handgun** [6] - 10:1, 59:19, 69:15, 70:9, 73:2, 80:23
**handguns** [10] - 22:22, 41:24, 43:2, 47:22, 48:5, 51:7, 52:3, 56:23, 58:22, 62:2
**handled** [1] - 39:6
**hands** [3] - 34:9, 34:10, 52:11
**happy** [2] - 2:14, 64:4
**hard** [2] - 27:4, 43:17
**harm** [3] - 30:15, 31:2, 44:23
**Health** [1] - 62:22
**hear** [2] - 2:14, 64:4
**heard** [1] - 53:8
**hearing** [5] - 1:13, 2:9, 2:11, 46:13, 55:19
**hearth** [1] - 53:1
**heavier** [1] - 77:12
**heavy** [3] - 77:7, 77:10, 77:11
**heavy-barrel** [1] - 77:7
**heightened** [1] - 52:1
**held** [8] - 3:8, 4:6, 4:14, 20:19, 22:6, 34:15, 65:12, 65:13
**Heller** [41] - 2:22, 10:3, 10:4, 13:8, 13:14, 13:22, 14:17, 14:23, 14:24, 15:14, 16:17, 17:10, 39:13, 47:21, 47:22, 48:9, 48:20, 50:5, 51:6, 51:14, 51:17, 51:22, 53:5, 54:9, 54:24, 55:18, 65:25, 66:2, 71:15, 71:18, 72:24, 73:1, 73:7, 73:22, 80:12, 80:22, 81:10, 81:11, 83:7, 83:8
**Heller/McDonald** [1] - 16:10
**helpful** [1] - 55:14
**helping** [1] - 29:5
**hereby** [1] - 85:2
**herring** [1] - 47:21
**high** [1] - 61:25
**high-powered** [1] - 61:25
**higher** [1] - 50:2
**highlight** [1] - 27:22
**historical** [6] - 6:21, 15:7, 15:8, 15:10,

18:4, 21:10
**historically** [4] - 6:4,
9:18, 13:3, 21:10
**history** [3] - 13:6,
13:13, 30:2
**Hoffman** [2] - 35:1,
35:19
**holding** [1] - 3:1
**holidays** [1] - 38:24
**home** [18] - 4:21, 10:8,
10:10, 45:25, 47:14,
48:19, 50:1, 53:2,
53:18, 54:1, 54:13,
54:17, 60:25, 61:3,
61:5, 61:8, 73:3,
82:7
**homes** [5] - 48:2,
48:6, 50:6, 50:21,
63:20
**Honor** [44] - 2:16, 3:5,
5:6, 6:1, 7:2, 10:16,
11:1, 17:8, 21:4,
21:20, 25:11, 25:17,
31:21, 32:9, 34:12,
37:4, 38:18, 39:24,
42:1, 44:13, 45:10,
45:17, 46:13, 47:7,
47:19, 49:15, 51:9,
54:19, 58:3, 60:3,
60:15, 64:2, 64:16,
64:21, 66:14, 74:6,
74:15, 75:16, 75:23,
76:19, 77:21, 84:5,
84:7
**Honor's** [1] - 55:9
**Honorable** [2] - 1:13,
85:5
**hope** [1] - 75:12
**Hopkins** [1] - 62:22
**horrible** [1] - 62:5
**hundreds** [1] - 5:13
**hunting** [10] - 5:4, 5:6,
5:9, 5:10, 5:11, 5:13,
6:9, 17:20, 23:13,
50:8
**hybrid** [1] - 8:8
**hypothetical** [1] -
49:14

## I

**idea** [2] - 70:3, 82:18
**identified** [23] - 6:6,
8:9, 8:14, 13:22,
15:3, 15:6, 15:14,
17:21, 18:4, 18:21,
20:11, 22:20, 22:25,
24:7, 28:4, 28:15,
36:12, 37:6, 37:23,
54:9, 69:18, 69:22,

72:18
**identify** [3] - 10:13,
26:17, 27:14
**identifying** [3] - 15:21,
16:22, 66:5
**ignore** [3] - 3:23, 9:23,
68:10
**ignored** [2] - 70:22,
70:23
**ignoring** [2] - 66:17,
66:18
**II** [3] - 39:13, 55:18,
73:22
**III** [3] - 1:19, 2:6, 65:25
**ill** [3] - 14:2, 34:9, 69:5
**illness** [2] - 62:10,
62:12
**imagine** [2] - 49:14,
76:22
**imitate** [1] - 5:25
**impact** [2] - 41:2, 41:8
**impermissible** [3] -
11:9, 54:24, 83:21
**impermissibly** [1] -
63:18
**impinges** [1] - 22:13
**implement** [1] - 71:7
**implementing** [1] -
71:13
**implicate** [1] - 34:20
**implicates** [1] - 34:17
**implied** [2] - 10:11,
71:23
**importance** [1] - 6:10
**important** [11] - 4:5,
4:13, 12:15, 17:19,
31:19, 39:7, 54:8,
55:23, 81:6, 81:8,
84:12
**importantly** [4] -
30:13, 30:22, 67:17,
74:14
**imported** [1] - 68:7
**imposes** [1] - 22:17
**improvements** [1] -
71:14
**IN** [1] - 1:1
**inaccessible** [1] - 26:1
**inaccurate** [1] - 74:11
**inappropriately** [1] -
36:14
**incidence** [1] - 61:22
**incident** [2] - 43:9,
77:3
**incidents** [8] - 26:7,
27:18, 27:22, 28:2,
28:18, 43:12, 61:19,
63:12
**include** [2] - 6:22, 9:7
**included** [2] - 36:22,

36:24
**includes** [1] - 57:15
**including** [6] - 4:13,
22:19, 38:23, 39:15,
63:21, 73:21
**inconsistent** [1] -
15:13
**incorrect** [3] - 27:6,
36:13, 38:5
**incur** [1] - 30:16
**indeed** [4] - 22:15,
40:1, 45:7, 47:24
**indicate** [4] - 7:3,
36:5, 61:12, 67:1
**indicating** [1] - 35:24,
67:12, 67:15
**indistinguishable** [1]
- 23:21
**individual** [8] - 17:13,
25:23, 36:12, 36:17,
37:9, 38:4, 81:25,
82:16
**individuals** [4] - 6:8,
6:12, 43:9, 69:3
**ineffective** [2] - 58:12,
66:25
**inexhaustive** [1] -
15:14
**inferences** [1] - 77:25
**information** [13] -
25:17, 25:21, 25:23,
26:4, 26:6, 26:16,
26:19, 26:22, 27:1,
27:6, 27:16, 28:2,
29:9
**infringe** [1] - 22:16
**infringement** [1] -
45:8
**injected** [1] - 68:16
**injuries** [3] - 24:21,
42:2, 70:8
**injuriousness** [1] -
40:23
**innocent** [1] - 29:4
**inquiry** [2] - 71:19,
72:6
**insisting** [1] - 52:13
**instance** [2] - 61:11,
77:8
**instances** [1] - 26:14
**instruments** [2] -
34:8, 48:21
**integral** [2] - 19:14,
19:16
**intended** [1] - 74:10
**interchangeable** [2] -
37:19, 37:22, 37:24
**interest** [16] - 23:3,
23:9, 29:2, 52:9,
52:21, 53:8, 53:13,

55:24, 56:6, 56:18,
57:10, 69:14, 71:22,
71:24, 72:5, 72:8
**interest-balancing** [1]
- 71:22
**interested** [1] - 26:9
**interests** [6] - 4:13,
20:14, 20:15, 31:19,
51:19, 52:25
**interim** [1] - 40:9
**intermediate** [34] -
3:9, 3:13, 10:18,
10:22, 11:3, 11:4,
11:8, 11:15, 11:16,
11:24, 11:25, 12:2,
12:12, 12:13, 12:17,
22:3, 22:6, 22:25,
23:5, 29:25, 53:11,
55:8, 55:12, 55:14,
55:21, 56:11, 57:2,
57:6, 57:21, 65:22,
71:24, 72:3, 73:17,
73:25
**internal** [1] - 37:19
**intervene** [1] - 39:2
**introduce** [2] - 30:19,
31:1
**introducing** [1] - 31:3
**introduction** [1] -
30:15
**intrude** [2] - 63:18,
79:22
**intruder** [1] - 61:2
**intruders** [1] - 61:8
**invasions** [1] - 45:25
**investigated** [1] - 26:8
**investigation** [1] -
66:24
**invited** [1] - 63:1
**invites** [1] - 53:3
**inviting** [1] - 53:7
**involve** [6] - 17:3,
35:3, 35:22, 80:16,
81:14, 81:24
**involved** [9] - 11:21,
24:17, 25:7, 45:5,
51:6, 62:4, 69:6,
81:15, 83:17
**involving** [3] - 25:13,
45:7, 56:23
**irrelevant** [1] - 45:2
**IRS** [1] - 82:7
**issue** [28] - 3:7, 3:14,
4:22, 6:1, 7:10, 11:7,
14:15, 14:18, 14:21,
16:1, 16:7, 20:19,
22:1, 22:5, 23:8,
25:13, 25:23, 30:24,
37:1, 37:15, 47:16,
48:11, 50:16, 51:16,

64:23, 66:3, 72:25,
77:20
**issued** [1] - 36:25
**issues** [7] - 18:1,
18:15, 18:18, 36:17,
44:21, 74:18, 84:12
**itself** [8] - 16:11,
18:23, 38:7, 57:3,
57:24, 67:19, 75:1,
78:5

## J

**James** [2] - 1:19, 2:5
**January** [1] - 62:25
**Jennifer** [2] - 1:22, 2:7
**Jeter** [1] - 12:11
**job** [1] - 31:11
**John** [3] - 1:18, 2:5,
38:13
**Johns** [1] - 62:21
**Johnson** [5] - 8:9,
60:2, 60:5, 60:17,
74:6
**Johnson's** [1] - 74:5
**joined** [4] - 2:23, 81:9,
81:11, 81:13
**Jones** [5] - 25:13,
25:16, 25:17, 26:11,
27:12
**journal** [1] - 84:3
**judge** [1] - 80:23
**Judge** [4] - 1:13,
54:11, 81:9, 85:6
**judges** [1] - 52:19
**judges'** [1] - 52:14
**judgment** [13] - 8:6,
8:11, 31:17, 32:1,
32:7, 32:12, 39:16,
44:7, 65:5, 71:9,
75:2, 75:15, 75:18
**judgments** [1] - 31:13
**judicial** [1] - 74:15
**July** [3] - 1:10, 36:24,
85:6
**junk** [1] - 78:22
**jurisprudence** [1] -
32:15
**jury** [1] - 64:25
**justice** [1] - 76:1
**Justice** [11] - 40:8,
52:22, 53:4, 71:20,
71:21, 76:4, 81:10,
81:11, 81:12, 83:6
**justification** [5] - 15:6,
15:10, 18:4, 20:17,
75:1
**justified** [1] - 12:8
**justify** [2] - 31:16,
58:25

**K**

**Kachalsky** [1] - 57:23
**Katz** [2] - 1:22, 2:7
**keep** [8] - 3:2, 10:9, 20:2, 48:16, 49:25, 50:6, 63:19, 68:16
**keeps** [3] - 32:2, 77:12, 77:13
**Kennedy** [1] - 81:11
**kept** [4] - 48:16, 48:17, 53:17, 54:16
**key** [2] - 39:15, 68:12
**killed** [3] - 42:23, 43:1, 43:4
**kind** [4] - 37:9, 44:8, 51:5, 66:11
**kinds** [3] - 26:22, 41:24, 63:12
**known** [3] - 24:9, 24:11, 24:13
**KOLBE** [1] - 1:4
**Kolbe** [2] - 2:3, 85:3
**Koper** [20] - 25:3, 39:23, 39:25, 40:6, 40:15, 61:18, 66:14, 66:16, 66:23, 67:2, 67:9, 67:18, 68:10, 69:12, 69:16, 70:11, 71:2, 71:11, 76:2
**Koper's** [9] - 25:9, 40:18, 45:15, 59:22, 66:17, 69:17, 71:1, 79:7, 79:8

**L**

**landmark** [1] - 2:21
**language** [4] - 4:17, 55:10, 80:22, 81:7
**large** [27] - 2:20, 2:25, 16:3, 18:13, 18:24, 19:24, 22:8, 24:7, 24:12, 24:18, 28:24, 41:3, 41:9, 41:16, 45:3, 45:19, 45:24, 46:3, 60:18, 63:5, 67:8, 67:11, 67:13, 68:6, 69:21, 76:8, 80:9
**large-capacity** [25] - 2:20, 2:25, 16:3, 18:13, 18:24, 19:24, 22:8, 24:7, 24:18, 28:24, 41:3, 41:9, 41:16, 45:3, 45:19, 45:24, 46:3, 60:18, 63:5, 67:8, 67:11, 67:13, 68:6, 69:21, 76:8

**largely** [1] - 39:16
**largest** [1] - 74:24
**last** [5] - 2:18, 9:4, 34:12, 58:13
**lasted** [1] - 79:17
**law** [81] - 3:20, 8:1, 9:11, 9:16, 9:19, 9:20, 10:1, 11:12, 12:3, 16:2, 19:11, 19:25, 22:13, 22:15, 23:2, 23:23, 24:2, 24:6, 28:22, 28:25, 29:6, 29:11, 29:20, 29:21, 30:2, 30:23, 31:18, 32:22, 32:23, 32:25, 33:5, 33:10, 33:15, 33:18, 33:19, 33:20, 34:4, 34:7, 34:22, 34:24, 36:6, 36:7, 36:16, 36:20, 37:8, 37:14, 38:7, 39:21, 40:5, 40:12, 42:19, 42:22, 44:10, 45:6, 48:13, 49:8, 52:25, 53:19, 53:23, 53:24, 54:1, 57:20, 59:2, 59:6, 65:12, 66:2, 69:2, 72:5, 72:7, 72:20, 72:22, 74:23, 74:24, 75:4, 76:11, 77:17, 77:18, 77:19, 79:21, 82:9
**law-abiding** [8] - 48:13, 49:8, 52:25, 54:1, 69:2
**lawful** [17] - 5:14, 9:10, 13:23, 14:7, 15:15, 22:21, 48:13, 48:17, 49:8, 49:12, 50:7, 51:13, 53:17, 54:16, 63:21, 73:3, 81:1
**lawfully** [1] - 77:2
**laws** [10] - 3:1, 3:7, 4:2, 13:25, 20:8, 21:9, 21:24, 50:16, 73:25, 75:9
**lawsuit** [2] - 2:18, 75:19
**LCM's** [1] - 19:21
**leading** [1] - 28:25
**learn** [1] - 40:18
**learned** [1] - 62:19
**least** [6] - 6:9, 19:5, 19:14, 21:16, 55:3, 55:25, 56:19, 56:25, 79:22
**leaves** [1] - 52:24
**left** [2] - 75:12, 80:8
**legal** [4] - 32:10,

34:13, 34:19, 77:17
**legally** [1] - 74:11
**Legg** [1] - 54:11
**legislative** [2] - 30:1, 78:13
**legislators** [1] - 30:8
**legislature** [8] - 59:17, 63:8, 77:24, 77:25, 78:3, 78:10, 78:13, 79:20
**legislature's** [3] - 31:11, 44:7, 56:13
**legislatures** [2] - 52:18, 65:16
**less** [13] - 8:18, 19:2, 19:25, 20:5, 35:20, 58:10, 59:12, 59:13, 69:23, 70:6, 73:12, 76:12, 77:19
**lesser** [1] - 70:7
**lethality** [1] - 40:22
**level** [9] - 10:17, 20:10, 20:12, 42:10, 54:23, 54:25, 63:16, 71:3, 73:12
**liability** [2] - 43:24, 65:3
**liberty** [1] - 4:8
**light** [4] - 17:9, 35:4, 35:23, 64:12
**likely** [6] - 42:22, 43:1, 43:4, 43:5, 44:2, 69:13
**limit** [1] - 8:7
**limitation** [6] - 15:7, 16:22, 18:5, 29:13, 30:18, 68:20
**limitations** [10] - 13:19, 13:20, 13:22, 13:23, 14:6, 14:12, 15:2, 15:13, 15:15, 67:19
**limited** [3] - 30:11, 67:2, 69:19
**linchpin** [1] - 48:8
**line** [3] - 31:10, 33:6, 42:23
**list** [1] - 15:15
**litigating** [1] - 39:9
**lo** [1] - 63:6
**look** [9] - 10:12, 16:1, 26:11, 26:12, 54:19, 56:7, 65:15, 72:4, 72:7
**looked** [9] - 16:7, 17:14, 18:17, 21:15, 25:6, 26:15, 56:22, 69:24, 69:25
**looking** [11] - 2:11, 6:14, 14:15, 30:12,

35:12, 65:1, 65:21, 66:1, 67:20, 69:19, 76:9
**Lord** [2] - 59:5, 75:11
**lose** [1] - 48:25
**Lucy** [1] - 27:10

**M**

**M16** [3] - 23:21, 82:6, 82:9
**magazine** [17] - 2:20, 16:3, 18:23, 19:2, 19:4, 19:5, 19:7, 19:13, 19:24, 20:4, 22:8, 24:9, 24:11, 24:12, 24:13, 60:20
**Magazine** [1] - 25:17
**magazines** [55] - 2:25, 3:17, 3:19, 4:25, 18:13, 18:19, 18:20, 18:24, 19:8, 19:9, 19:11, 20:1, 24:4, 24:7, 24:18, 24:19, 26:6, 28:24, 29:3, 38:16, 40:3, 41:4, 41:10, 41:17, 45:3, 45:19, 45:24, 46:3, 48:12, 49:17, 51:12, 57:19, 58:15, 58:17, 59:21, 60:18, 61:5, 62:3, 63:5, 67:9, 67:11, 67:13, 67:16, 67:25, 68:2, 68:5, 68:6, 68:13, 68:18, 69:21, 70:4, 70:6, 76:8, 76:13, 77:1
**magical** [1] - 15:22
**maintain** [1] - 77:23
**maintaining** [1] - 33:13
**major** [1] - 37:21
**majority** [2] - 53:5, 81:13
**makers** [1] - 32:3
**malpractice** [2] - 43:24, 64:22
**man** [2] - 61:24, 70:1
**manifestly** [1] - 73:7
**manner** [2] - 11:21, 56:4
**manual** [1] - 37:20
**manufactured** [4] - 68:8, 72:17, 79:12
**manufacturers** [1] - 8:3
**Marc** [2] - 1:18, 2:5
**market** [1] - 69:2
**marketing** [1] - 15:20
**marksman** [1] - 50:12

**marksmanship** [9] - 5:4, 5:16, 5:17, 5:21, 6:25, 7:4, 50:8, 50:13, 77:15
**Martin** [2] - 59:23, 85:4
**MARTIN** [1] - 1:7
**MARYLAND** [1] - 1:2
**Maryland** [36] - 1:9, 5:15, 7:14, 7:16, 7:17, 8:1, 8:21, 9:2, 19:11, 36:13, 36:25, 37:25, 38:14, 39:10, 46:17, 46:25, 49:15, 50:22, 58:15, 58:18, 58:25, 59:4, 59:9, 61:11, 62:12, 62:14, 71:13, 71:14, 75:7, 76:19, 76:24, 77:4, 77:7, 80:4, 82:8, 84:4
**Maryland's** [11] - 3:15, 28:25, 29:2, 65:5, 68:17, 68:23, 69:10, 69:13, 69:14, 74:24, 77:17
**Marylanders** [3] - 63:19, 77:3, 78:22
**Marzzarella** [2] - 56:22, 57:12
**Masciandaro** [5] - 53:22, 57:3, 57:11, 57:12, 57:24
**mass** [18] - 3:20, 24:5, 24:8, 24:10, 24:16, 25:18, 27:3, 27:14, 43:7, 43:12, 45:5, 59:5, 60:18, 61:15, 69:6, 72:20, 75:4, 76:12
**material** [1] - 46:11
**matter** [5] - 2:2, 2:8, 16:24, 16:25, 85:3
**Matthew** [2] - 1:22, 2:7
**Mazzarella** [1] - 57:25
**McCauley** [2] - 62:14, 63:11
**McCullen** [5] - 10:20, 11:5, 12:19, 36:22, 59:14
**McDonald** [2] - 2:22, 6:20
**mean** [7] - 17:5, 17:10, 42:16, 43:14, 46:1, 53:7, 75:11
**meaning** [2] - 68:9, 69:3
**means** [13] - 9:21, 10:12, 10:17, 12:8, 14:13, 21:1, 55:14,

55:25, 56:1, 56:14, 56:19, 56:20, 56:25
**meant** [4] - 17:17, 66:18, 68:20
**media** [1] - 84:2
**medical** [2] - 43:24, 64:22
**meet** [3] - 3:12, 29:24, 74:4
**meets** [1] - 44:12
**men** [2] - 49:11, 49:16
**mental** - 33:25, 62:9, 62:12
**mentally** [2] - 14:2, 69:5
**mention** [3] - 11:16, 62:7, 62:17
**mentioned** [2] - 6:11, 60:12, 67:18
**merits** [2] - 35:14, 35:16
**met** [2] - 64:24, 65:18
**method** [1] - 22:3
**Michael** [1] - 62:20
**middle** [1] - 61:1
**might** [9] - 6:22, 10:22, 25:14, 43:16, 43:19, 60:18, 60:20, 61:12, 82:14
**Militaria** [1] - 23:14
**militaries** [1] - 23:14
**military** [7] - 3:18, 5:23, 23:12, 23:21, 24:2, 63:4, 72:18
**military-style** [3] - 23:12, 63:4, 72:18
**militia** [7] - 6:11, 17:12, 17:15, 49:11, 49:14, 49:22, 50:2
**militia-centric** [1] - 17:12
**Miller** [6] - 16:17, 16:18, 49:3, 49:6, 81:16, 82:3
**million** [4] - 7:21, 8:10, 8:18, 46:17
**millions** [1] - 68:7
**mind** [1] - 55:9
**minimal** [3] - 3:9, 22:18, 74:1
**minimize** [1] - 33:24
**minute** [3] - 20:20, 41:20, 64:4
**misleading** [1] - 70:10
**misread** [3] - 10:2, 30:7, 30:20
**misreading** [1] - 73:7
**misreads** [1] - 14:22
**mistake** [1] - 72:23
**misuse** [1] - 29:5

**mode** [2] - 24:1, 24:3
**modern** [4] - 3:18, 7:24, 8:3, 47:11
**moment** [4] - 7:10, 60:3, 62:10, 77:20
**money** [1] - 25:25
**month** [1] - 63:6
**moreover** [7] - 10:2, 15:12, 23:22, 28:22, 34:4, 48:1, 74:9
**morning** [3] - 2:10, 2:16, 38:12
**Morrison** [1] - 32:16
**most** [13] - 10:8, 23:15, 28:1, 28:14, 35:13, 61:4, 66:2, 67:23, 68:5, 73:8, 73:11, 80:2, 80:5
**Mother** [5] - 25:13, 25:16, 25:17, 26:11, 27:12
**motion** [10] - 25:7, 31:25, 32:1, 32:6, 32:7, 32:11, 46:11, 64:10, 65:24, 75:18
**motions** [4] - 1:12, 2:8, 24:25, 39:1
**motor** [1] - 42:23
**move** [1] - 21:1
**moved** [2] - 21:18, 21:21
**moving** [1] - 20:21
**MR** [56] - 2:15, 3:5, 5:6, 7:1, 7:15, 7:19, 9:14, 10:16, 11:1, 16:13, 17:7, 18:12, 19:5, 19:23, 20:8, 21:4, 21:20, 25:4, 25:10, 25:16, 26:14, 27:3, 27:9, 28:22, 31:23, 32:8, 32:15, 35:15, 37:3, 38:11, 38:13, 39:9, 42:1, 42:6, 44:9, 44:21, 46:22, 47:6, 47:9, 47:19, 49:24, 51:8, 51:11, 53:12, 53:15, 57:18, 61:18, 64:10, 64:16, 70:17, 75:23, 76:19, 78:11, 78:14, 78:17, 79:8
**murder** [1] - 72:20
**murders** [3] - 3:20, 24:6, 45:6
**must** [17] - 12:14, 19:4, 19:5, 32:17, 34:23, 35:3, 35:23, 35:25, 38:21, 55:22, 59:15, 61:20, 64:24, 75:24, 78:5, 78:15,

78:18
**muster** [3] - 10:11, 49:15, 79:10

# N

**name** [2] - 28:5, 62:23
**Nardone** [2] - 1:18, 2:5
**narrow** [8] - 55:2, 57:16, 57:20, 58:4, 76:9, 79:21, 83:10, 83:15
**narrowest** [1] - 72:10
**narrowly** [9] - 56:1, 56:5, 56:20, 57:5, 57:9, 57:14, 58:8, 72:8, 83:22
**nation** [1] - 10:9
**National** [4] - 27:7, 27:19, 27:21, 47:10
**nationwide** [1] - 46:17
**nature** [5] - 20:13, 48:9, 64:20, 67:22, 69:19
**necessarily** [11] - 7:25, 17:1, 21:17, 55:25, 56:15, 56:16, 56:18, 65:7, 68:11, 68:22, 71:12
**necessary** [3] - 18:24, 57:1, 79:22
**necessitating** [1] - 54:14
**need** [13] - 4:12, 10:13, 19:8, 19:19, 20:25, 21:7, 50:7, 50:11, 51:20, 56:25, 61:3, 62:8, 69:7
**needed** [2] - 33:25, 74:12
**needs** [1] - 44:16
**negative** [3] - 23:10, 69:15, 70:8
**never** [6] - 6:11, 40:17, 53:16, 53:18, 60:15, 82:17
**New** [4] - 2:24, 57:22, 73:23, 83:18
**newly** [1] - 36:23
**news** [3] - 26:4, 26:18, 27:5
**night** [1] - 61:1
**Ninth** [1] - 9:24
**NO** [1] - 1:6
**non** [1] - 24:12
**non-large-capacity** [1] - 24:12
**none** [2] - 60:1, 62:3
**notably** [1] - 74:21

**note** [1] - 42:9
**noted** [2] - 6:8, 54:7
**notes** [1] - 75:25
**nothing** [6] - 7:1, 7:2, 7:3, 15:16, 47:22, 78:23
**notice** [1] - 74:16
**notion** [1] - 31:6
**notwithstanding** [1] - 4:16
**Number** [2] - 2:3
**number** [24] - 8:5, 8:9, 9:1, 9:3, 15:2, 15:19, 16:6, 16:10, 24:14, 25:6, 26:5, 41:19, 42:2, 43:12, 45:20, 46:4, 46:10, 47:12, 50:2, 55:18, 61:7, 61:19, 62:16, 83:17
**numbers** [11] - 7:13, 7:21, 8:7, 8:22, 8:24, 9:11, 15:8, 24:9, 24:14, 49:24, 56:24
**numerosity** [6] - 14:17, 14:21, 15:12, 15:16, 16:7, 18:18

# O

**O'MALLEY** [1] - 1:7
**O'Malley** [6] - 2:4, 59:23, 63:2, 63:7, 85:4
**objective** [3] - 12:16, 56:2, 56:21
**observe** [1] - 53:22
**obtain** [2] - 60:15, 68:25
**obtained** [1] - 33:5
**obviously** [8] - 10:1, 19:18, 21:2, 24:24, 25:5, 33:10, 41:23, 84:11
**occasion** [1] - 81:4
**occur** [1] - 76:14
**occurred** [1] - 25:18
**occurs** [1] - 45:10
**October** [2] - 2:18, 59:10
**OF** [1] - 1:2
**offense** [1] - 18:23
**offensive** [1] - 23:12
**offered** [3] - 39:20, 44:19, 53:4
**officer** [2] - 33:5, 33:15
**officers** [22] - 3:21, 24:6, 28:23, 29:1, 29:6, 29:21, 32:23, 33:1, 33:10, 33:18,

33:20, 34:7, 42:20, 42:22, 45:6, 46:4, 59:3, 59:6, 72:21, 74:23, 74:24, 76:11
**official** [3] - 60:9, 76:3, 76:15
**Official** [1] - 1:25, 85:11
**often** [1] - 5:1
**omitted** [1] - 70:18
**once** [3] - 11:4, 39:2, 83:4
**one** [41] - 2:19, 8:13, 8:15, 8:19, 8:23, 10:13, 15:2, 18:9, 19:6, 19:7, 21:7, 22:10, 28:9, 28:19, 31:23, 33:3, 35:4, 37:13, 40:14, 40:15, 43:9, 44:21, 44:24, 47:12, 50:3, 55:17, 56:17, 59:20, 61:11, 61:15, 61:18, 61:20, 64:7, 67:23, 69:11, 71:4, 72:1, 75:6, 76:5
**one's** [3] - 10:10, 54:12, 54:13
**one-off** [1] - 37:13
**ones** [3] - 45:12, 45:16, 50:1
**ongoing** [1] - 62:13
**open** [1] - 22:4
**opening** [3] - 60:13, 81:3, 81:23
**operable** [2] - 48:1, 52:4
**operate** [1] - 18:24
**operated** [1] - 19:1
**operative** [1] - 48:16
**opining** [1] - 43:25
**opinion** [7] - 35:7, 44:1, 44:19, 81:9, 81:10, 81:12, 81:13
**opinions** [5] - 39:20, 44:9, 79:2, 79:7, 79:8
**opportunity** [3] - 38:17, 38:19, 74:19
**opposed** [1] - 23:17
**opposing** [1] - 30:19
**oral** [1] - 60:5
**order** [3] - 21:5, 32:19, 46:12
**ordered** [1] - 4:8
**ordinarily** [1] - 78:9
**otherwise** [1] - 83:14
**ourselves** [1] - 60:11
**out-of-context** [1] - 66:16

outcome [2] - 69:20, 69:24
outset [2] - 38:18, 63:3
outside [3] - 11:22, 20:6, 21:9
overheating [1] - 77:14
overrule [1] - 12:20
overruled [1] - 12:19
overturned [1] - 48:3
overwhelmingly [4] - 22:21, 73:2, 73:15, 80:25
own [5] - 5:20, 8:19, 8:25, 37:13, 72:2
owned [2] - 5:19, 51:12
owner [3] - 8:15, 60:25, 61:5
owners [1] - 47:11
ownership [1] - 8:17
owning [1] - 47:13
owns [2] - 8:15, 82:13

**P**

page [9] - 40:24, 41:13, 42:8, 42:21, 43:7, 45:18, 47:6, 71:18, 76:5
panel [3] - 9:24, 54:10, 63:12
papers [2] - 12:25, 61:10
paragraph [1] - 59:20
Parker [2] - 1:18, 38:13
part [5] - 16:9, 19:14, 19:17, 37:23, 70:18
participate [1] - 5:21
particular [14] - 16:2, 18:15, 33:11, 36:1, 37:5, 37:18, 38:6, 43:15, 51:2, 51:3, 67:6, 72:17, 73:8, 75:3
particularly [4] - 3:17, 48:18, 70:4, 72:18
party [1] - 74:16
pass [3] - 57:6, 78:5, 79:9
past [2] - 21:19, 62:24
patience [1] - 84:7
pause [3] - 55:7, 60:3, 62:10
pay [1] - 82:6
pedestrians [1] - 62:1
peer [1] - 84:3
pending [2] - 2:2,

31:25
Pennsylvania [1] - 76:25
people [15] - 5:9, 5:20, 5:24, 17:19, 17:22, 47:17, 49:21, 50:6, 51:13, 51:20, 52:17, 52:22, 62:2, 69:5, 84:4
per [1] - 54:24
percent [2] - 8:19, 8:23, 24:8, 24:10, 24:14, 24:16, 24:18, 50:3, 73:12
percentage [1] - 49:21
perfect [1] - 56:15
perfectly [1] - 78:23
perhaps [2] - 44:19, 57:14
period [4] - 40:4, 67:14, 67:21, 68:5
periods [1] - 28:18
permissible [1] - 54:25
person [2] - 67:20, 82:13
person's [1] - 20:14
persuasive [1] - 4:1
phrase [2] - 11:3, 14:16
pipeline [3] - 79:11, 79:15, 79:16
place [5] - 11:21, 13:24, 54:12, 55:11, 56:4
placed [2] - 69:23
places [1] - 14:5
plaintiff [2] - 32:17, 36:1, 47:10
plaintiffs [41] - 2:5, 3:22, 7:20, 7:24, 8:2, 8:13, 10:2, 10:20, 14:15, 21:6, 25:22, 28:5, 30:5, 30:17, 32:24, 33:2, 33:7, 33:17, 34:18, 34:21, 36:5, 36:11, 36:21, 37:7, 37:16, 37:23, 60:7, 60:8, 64:12, 64:13, 65:2, 66:15, 66:10, 70:1, 70:10, 70:19, 71:15, 72:23, 73:4, 74:10, 74:18
PLAINTIFFS [1] - 1:5
Plaintiffs [2] - 1:17, 85:3
plaintiffs' [9] - 9:22, 29:8, 29:11, 31:6, 32:22, 37:12, 54:15, 64:9, 74:21

plane [1] - 73:14
point [10] - 15:21, 18:9, 32:13, 37:3, 50:22, 67:8, 70:17, 79:6, 81:22, 82:10
pointed [4] - 15:11, 45:10, 46:10, 64:21
points [1] - 64:16
Police [5] - 9:3, 36:13, 36:25, 62:15, 80:5
police [1] - 46:4
Police's [2] - 37:17, 37:25
policy [6] - 31:13, 37:25, 51:24, 54:17, 63:25, 72:2
pool [1] - 49:11
popular [9] - 38:15, 51:11, 63:20, 63:24, 72:25, 73:5, 80:3, 80:5
population [3] - 8:19, 8:23, 49:21
Porter [2] - 1:19, 2:6
portion [1] - 45:14
pose [2] - 18:2, 31:14
position [10] - 3:23, 4:8, 6:2, 7:12, 20:22, 21:3, 21:8, 54:15, 78:21, 82:12
possessed [5] - 48:12, 48:14, 48:17, 49:7, 77:3
possession [2] - 15:9, 82:1
possibility [1] - 34:1
possible [3] - 34:4, 72:10, 84:14
possibly [1] - 43:4
post [1] - 66:2
Post [1] - 83:24
post-Heller [1] - 66:2
power [1] - 52:12
powered [1] - 61:25
practice [2] - 5:5, 15:8
praise [2] - 59:5, 75:11
pre [1] - 34:23
pre-enforcement [1] - 34:23
precedent [4] - 3:25, 9:23, 53:12, 53:15
precious [1] - 59:17
precise [1] - 44:4
precondition [1] - 50:23
predict [1] - 45:16
predictive [6] - 31:17, 44:7, 65:5, 71:9, 75:2, 75:14

preexisted [2] - 4:7, 13:9
preexisting [1] - 58:24
preferred [2] - 10:9, 28:7
preliminarily [1] - 64:17
preliminary [1] - 37:17
preparation [1] - 33:25
prepared [2] - 40:8, 40:9
prerogatives [1] - 66:8
present [2] - 34:8, 75:4
presentation [2] - 67:1, 74:21
presented [2] - 3:11, 3:23
presenting [1] - 64:19
presents [1] - 3:14
press [3] - 25:20, 26:12, 26:15
presumptively [3] - 13:23, 14:7, 15:15
pretend [1] - 80:8
pretended [2] - 55:2, 70:24
pretty [4] - 12:16, 54:3, 67:14, 70:25
prevail [3] - 21:5, 21:6, 21:7
prevent [1] - 60:18
prevention [2] - 76:10, 76:12
previous [1] - 49:3
price [1] - 15:21
primarily [4] - 23:11, 59:19, 69:1, 78:7
principal [1] - 39:25
principles [1] - 34:14
private [1] - 25:23
probability [4] - 41:15, 43:10, 44:3, 71:3
probable [1] - 44:2
probe [1] - 45:12
problem [1] - 58:24
problems [1] - 67:23
procedural [1] - 32:5
proceed [2] - 2:13, 11:11
proceeding [3] - 78:9, 78:11, 78:13
proceedings [1] - 84:15
process [1] - 58:21
processed [1] - 9:6
produce [1] - 59:24
produced [3] - 47:3, 47:9, 68:2

product [2] - 43:24, 52:21
professionalism [1] - 38:22
professionally [1] - 39:7
professor [4] - 46:24, 62:6, 71:1, 71:11
Professor [14] - 47:5, 63:8, 66:14, 66:16, 66:17, 66:23, 67:2, 67:9, 67:18, 68:10, 69:12, 69:16, 69:17, 71:1
proffered [2] - 46:12, 46:15
proficiency [2] - 50:8, 50:12
progress [1] - 68:23
prohibit [1] - 76:17
prohibited [3] - 36:3, 37:12, 81:16
prohibiting [1] - 21:11
prohibition [1] - 21:11, 48:2, 51:11, 51:13, 52:2, 52:3, 53:16, 54:16, 58:10, 59:1, 80:24
prohibitions [2] - 14:2, 45:11
prohibits [1] - 36:8
project [1] - 43:18
projection [1] - 43:15
proliferating [1] - 34:10
promote [1] - 69:14
prong [14] - 9:15, 9:16, 9:19, 10:19, 11:10, 11:11, 11:13, 20:23, 21:19, 21:22, 51:1, 51:15, 53:7, 53:11
prongs [2] - 21:3, 21:5, 21:6
pronunciation [1] - 25:2
proof [1] - 64:24
proportion [1] - 56:17
propositions [1] - 31:8
prosecution [2] - 36:19, 81:25
protect [8] - 15:4, 16:14, 16:15, 29:6, 30:24, 49:7, 54:8, 75:9
protected [16] - 6:4, 6:16, 7:4, 9:17, 9:20, 13:16, 15:1, 15:24, 17:1, 18:19, 20:3,

20:9, 48:10, 51:22, 63:25, 80:15

**protecting** [1] - 23:9

**protection** [13] - 10:10, 14:8, 15:23, 16:20, 19:16, 19:22, 32:20, 32:21, 32:24, 49:1, 50:23, 52:8, 73:5

**Protection** [3] - 31:24, 32:2, 33:16

**protections** [1] - 14:4

**protects** [1] - 50:5

**proud** [1] - 39:1

**provide** [2] - 17:13, 71:3

**provided** [4] - 60:4, 60:8, 60:15, 62:24

**provides** [1] - 75:1

**province** [1] - 31:12

**provision** [1] - 33:14

**provisions** [1] - 73:1

**psychological** [1] - 33:25

**public** [25] - 3:20, 4:13, 14:8, 16:25, 18:3, 23:9, 24:5, 24:16, 25:18, 25:20, 26:4, 26:7, 26:12, 27:3, 27:4, 27:14, 29:2, 31:14, 54:12, 65:6, 69:6, 69:14, 72:20, 74:14

**Public** [1] - 62:22

**publicly** [1] - 26:19

**publicly-available** [1] - 26:19

**pulled** [1] - 70:11

**purchase** [3] - 36:6, 58:22, 82:6

**purchased** [3] - 5:14, 58:20, 77:2

**purchases** [2] - 69:1

**purport** [3] - 11:23, 12:5, 12:20

**purpose** [17] - 5:12, 5:20, 6:3, 6:14, 8:10, 14:8, 16:22, 17:14, 17:15, 17:22, 22:22, 44:18, 47:17, 54:17, 76:9, 77:11, 81:1

**purposes** [17] - 6:11, 8:6, 17:22, 22:23, 23:13, 24:2, 34:10, 47:13, 48:13, 48:17, 49:8, 49:12, 50:7, 51:13, 53:18, 63:21, 65:6

**put** [7] - 19:6, 27:16, 35:25, 56:19, 58:16,

80:21, 83:12

## Q

**qualification** [1] - 70:16

**qualifications** [3] - 70:20, 70:22, 70:23

**qualify** [1] - 73:13

**questions** [2] - 15:25, 75:17

**quibble** [1] - 50:11

**quiet** [1] - 55:20

**quite** [2] - 10:14, 61:20

**quotations** [1] - 66:17

**quotes** [2] - 70:11, 70:15

**quoting** [2] - 66:20, 73:1

## R

**Racism** [1] - 57:4

**raise** [1] - 60:13

**raised** [3] - 18:16, 36:17, 36:18

**raises** [1] - 15:25

**random** [1] - 49:20

**range** [3] - 8:12, 30:1, 60:21

**rarely** [2] - 4:23, 4:25

**rather** [1] - 42:7

**ratified** [3] - 6:13, 6:23, 17:23

**rational** [1] - 34:5

**rationales** [1] - 34:4

**rationally** [1] - 34:6

**reach** [1] - 44:1

**reached** [3] - 41:10, 73:12, 73:24

**reaches** [1] - 28:9

**read** [4] - 30:17, 49:5, 73:4, 81:23

**readily** [7] - 46:25, 61:19, 68:13, 77:1, 77:9, 77:16, 83:3

**reading** [3] - 42:12, 46:7, 49:2

**realized** [1] - 68:22

**really** [8] - 16:18, 41:21, 43:18, 46:8, 51:20, 52:13, 74:22, 81:24

**reason** [1] - 32:5

**reasonable** [12] - 23:1, 23:7, 31:18, 41:15, 43:10, 44:6, 56:15, 67:20, 72:4, 72:6, 72:11, 72:13

**reasonably** [2] - 57:1, 72:11

**reasons** [6] - 14:23, 19:18, 30:20, 32:10, 75:16, 79:6

**rebuttal** [3] - 64:5, 75:22, 75:24

**receive** [1] - 33:11

**receivers** [1] - 9:8

**recent** [3] - 10:19, 39:13, 65:24

**recess** [1] - 64:6

**recognized** [1] - 14:6

**recollection** [2] - 21:16, 70:14

**recommendation** [1] - 63:10

**recommendations** [1] - 62:16

**recommending** [1] - 71:20

**record** [16] - 3:11, 7:2, 7:12, 7:15, 7:20, 8:11, 16:4, 30:9, 30:11, 30:12, 38:20, 39:14, 46:21, 54:22, 74:14, 80:4

**recovery** [1] - 67:16

**red** [1] - 47:21

**redefine** [1] - 11:23

**reduce** [10] - 41:17, 41:19, 42:2, 43:12, 45:20, 45:24, 46:3, 69:3, 69:7, 70:2

**reduced** [3] - 42:11, 69:25, 76:7

**reducing** [6] - 23:9, 29:2, 29:4, 41:21, 69:15, 70:8

**reduction** [3] - 40:22, 43:17, 67:8

**reference** [2] - 11:6, 66:20

**referenced** [2] - 11:7, 11:14

**referred** [3] - 9:7, 55:18, 83:3

**referring** [2] - 43:8, 57:7

**reforms** [1] - 63:4

**regard** [1] - 53:20

**regarding** [9] - 9:25, 25:2, 31:13

**registered** [1] - 82:5

**registration** [2] - 55:23, 82:15

**regulated** [1] - 8:24

**regulating** [1] - 53:23

**regulation** [6] - 20:16, 20:17, 56:24, 58:19,

59:9, 59:20

**regulations** [3] - 57:5, 58:14, 59:11

**reject** [1] - 54:11

**rejected** [4] - 53:5, 58:11, 82:19, 83:18

**related** [5] - 12:15, 41:17, 41:21, 45:20, 45:25

**relevant** [6] - 17:24, 18:1, 18:7, 51:4, 51:8

**reliable** [2] - 39:22, 79:1

**relied** [16] - 25:15, 26:22, 27:8, 27:11, 29:19, 39:12, 45:12, 56:8, 57:13, 57:23, 58:5, 58:6, 60:12, 81:2, 83:9, 83:19

**relies** [1] - 81:22

**reload** [2] - 60:19, 60:23

**rely** [3] - 30:4, 60:7, 83:24

**relying** [1] - 84:5

**remaining** [1] - 31:24

**remand** [3] - 30:14, 31:4, 44:25

**remarkably** [1] - 55:20

**remember** [3] - 28:5, 48:15, 61:10

**repaired** [1] - 40:10

**repeat** [1] - 22:12

**replete** [1] - 59:2

**reply** [2] - 31:7, 60:14

**report** [10] - 40:21, 40:24, 59:22, 67:7, 69:17, 69:18, 70:21, 70:22, 76:3, 76:15

**reported** [2] - 26:18, 27:21

**Reporter** [1] - 1:25, 85:11

**REPORTER'S** [1] - 85:1

**reports** [4] - 25:20, 26:12, 26:15, 39:17

**represent** [1] - 38:14

**represented** [1] - 60:9

**represents** [1] - 56:16

**require** [5] - 30:3, 53:13, 56:13, 59:10, 82:14

**required** [11] - 30:9, 30:10, 40:5, 40:9, 40:11, 43:25, 50:18, 58:18, 59:13, 59:14, 66:6

**requirement** [4] -

29:17, 47:20, 66:7, 71:5

**requirements** [1] - 55:23

**requires** [3] - 47:22, 55:1, 57:20

**requiring** [3] - 30:25, 39:2, 50:22

**resolve** [1] - 39:3

**resolved** [1] - 39:16

**resorting** [1] - 29:25

**respect** [33] - 2:24, 5:6, 5:16, 6:1, 8:21, 12:2, 16:1, 18:12, 18:18, 27:6, 33:3, 33:8, 35:25, 36:19, 37:5, 37:15, 41:8, 42:18, 45:15, 62:9, 66:14, 66:15, 66:22, 68:6, 69:16, 69:20, 70:25, 72:24, 74:5, 74:19, 76:2, 77:6, 84:1

**respond** [1] - 10:25

**responded** [1] - 50:1

**response** [2] - 61:7, 63:1

**responsibilities** [1] - 33:21

**responsibility** [1] - 31:15

**responsible** [2] - 48:13, 53:1

**restraining** [2] - 46:12, 55:19

**restraints** [1] - 66:10

**restriction** [1] - 58:22

**restrictions** [3] - 11:21, 56:4, 57:8

**restrictive** [7] - 55:3, 55:25, 56:19, 56:25, 58:10, 59:12, 59:13

**restricts** [1] - 44:11

**result** [4] - 24:20, 47:9, 70:7, 73:24

**results** [1] - 68:21

**retired** [7] - 32:23, 32:25, 33:5, 33:18, 33:19, 34:7, 62:14

**retirement** [1] - 33:16

**retiring** [1] - 33:15

**reversed** [1] - 54:11

**review** [6] - 26:16, 26:24, 30:10, 38:1, 38:5, 84:3

**reviewed** [1] - 26:8

**ribbon** [1] - 63:11

**ridiculous** [1] - 49:18

**Rifle** [4] - 27:7, 27:19, 27:21, 57:22

rifle [4] - 8:4, 9:9, 24:17, 80:6
rifles [18] - 7:24, 8:1, 16:5, 42:24, 43:2, 43:5, 43:12, 47:12, 76:6, 77:6, 80:2, 80:3, 80:9, 81:5, 82:25, 83:1, 83:2, 83:10
Rights [4] - 4:15, 14:12, 22:14
rights [17] - 10:8, 14:10, 14:11, 17:13, 20:13, 21:25, 22:9, 32:24, 34:18, 34:21, 44:11, 45:9, 52:2, 52:16, 78:21, 79:23, 80:19
rise [1] - 67:14
risk [1] - 75:7
risks [2] - 18:2, 34:8
robberies [1] - 45:21
rock [1] - 57:4
Rodger [1] - 61:23
Roger [1] - 63:13
role [1] - 78:24
roommates [1] - 61:25
round [3] - 19:6, 19:8, 62:3
rounds [14] - 4:24, 6:15, 19:2, 19:10, 19:11, 19:20, 19:25, 20:5, 58:16, 61:6, 61:13, 61:16, 77:14, 83:15
RPR [1] - 1:25
Rule [9] - 44:12, 44:16, 44:17, 77:20, 78:5, 78:7, 78:20, 79:10
ruled [1] - 78:19

**S**

safety [9] - 4:13, 14:8, 17:1, 18:3, 23:9, 29:2, 31:14, 65:6, 69:14
sales [1] - 73:10
sample [1] - 49:20
Santa [1] - 61:23
satisfied [2] - 37:18, 65:21
satisfies [1] - 44:17
satisfy [4] - 9:20, 11:12, 65:2, 73:25
saw [2] - 57:22, 63:13
SB281 [2] - 38:15, 62:18
Scalia [3] - 80:23,

81:10, 83:6
Scalia's [2] - 81:10, 81:12
scenario [1] - 36:9
scenarios [1] - 5:24
scholar [1] - 66:23
School [1] - 62:22
science [1] - 78:22
scientific [6] - 41:15, 43:10, 44:2, 66:7, 71:3, 71:7
scientifically [1] - 28:13
scientifically-assembled [1] - 28:13
scope [14] - 6:25, 13:3, 13:5, 13:12, 14:16, 14:19, 16:12, 18:9, 18:14, 20:6, 21:9, 52:17, 52:19, 56:17
scrutiny [58] - 3:9, 3:13, 9:21, 10:5, 10:7, 10:12, 10:18, 10:23, 11:3, 11:4, 11:8, 11:10, 11:15, 11:16, 11:24, 12:1, 12:2, 12:8, 12:13, 12:14, 12:17, 14:14, 20:10, 20:12, 21:1, 22:3, 22:6, 22:13, 22:25, 23:6, 26:20, 26:21, 29:25, 52:1, 53:11, 53:24, 54:2, 54:5, 54:7, 54:14, 54:23, 54:25, 55:8, 55:12, 55:14, 55:21, 56:11, 57:2, 57:6, 57:21, 65:22, 71:23, 71:24, 72:3, 72:9, 73:17, 73:25
se [1] - 54:24
Second [68] - 3:2, 3:7, 4:5, 4:10, 4:15, 4:20, 6:4, 6:13, 6:17, 9:15, 9:17, 10:23, 13:3, 13:9, 13:17, 13:21, 13:24, 14:9, 14:19, 15:1, 15:3, 16:14, 16:20, 17:11, 17:16, 17:23, 18:14, 18:22, 19:22, 20:9, 20:13, 20:14, 20:25, 21:9, 21:18, 21:24, 21:25, 22:6, 22:9, 22:16, 22:24, 29:22, 48:10, 48:15, 48:20, 49:1, 49:5, 49:6, 50:5, 50:10, 50:13, 50:16,

50:24, 51:3, 51:22, 52:20, 56:8, 57:23, 63:23, 66:4, 66:10, 74:1, 79:22, 80:16, 80:18, 81:17, 81:18
second [8] - 9:19, 11:11, 11:13, 21:22, 29:14, 51:1, 51:14, 53:10
secondary [1] - 69:2
seconds [3] - 23:19, 60:21, 60:23
see [4] - 27:5, 49:16, 55:8, 68:15
seem [3] - 33:7, 33:13, 44:4
selective [1] - 23:24, 66:16
self [27] - 4:20, 4:23, 4:24, 5:1, 6:7, 17:6, 17:18, 22:22, 27:22, 28:20, 46:21, 46:23, 47:2, 47:16, 47:18, 47:23, 49:13, 50:8, 51:20, 53:25, 54:8, 54:12, 54:13, 61:13, 63:21, 73:9, 73:15
self-defense [25] - 4:20, 4:23, 4:24, 5:1, 6:7, 17:6, 17:18, 22:22, 27:22, 28:20, 46:21, 46:23, 47:2, 47:16, 47:18, 47:23, 49:13, 50:8, 51:20, 53:25, 54:8, 61:13, 63:21, 73:9, 73:15
sell [1] - 36:6
semiautomatic [18] - 23:17, 23:18, 24:1, 24:2, 72:15, 77:6, 80:2, 80:3, 80:6, 80:9, 81:5, 81:21, 82:12, 82:21, 82:24, 83:1, 83:2, 83:10
sense [6] - 6:10, 15:17, 30:3, 65:11, 65:20, 72:8
sensitive [1] - 14:5
sentence [2] - 30:17, 30:21
separately [1] - 48:3
serial [1] - 56:24
serve [3] - 5:12, 56:5, 57:9
served [1] - 56:18
serves [1] - 22:24
set [2] - 21:2, 78:2
seven [1] - 83:18
Seven [1] - 83:19
several [2] - 14:23,

24:25
severe [1] - 51:6
Shew [1] - 57:25
shooter [1] - 75:5
shooters [1] - 60:18
Shooting [1] - 47:10
shooting [8] - 6:12, 7:5, 7:7, 27:14, 27:15, 34:1, 47:13, 60:19
shootings [17] - 3:20, 24:5, 24:8, 24:10, 24:11, 24:17, 25:18, 27:4, 43:7, 43:13, 45:6, 59:5, 61:16, 69:6, 72:20, 75:5, 76:12
short [1] - 49:9
shot [2] - 43:9, 62:2
shotguns [2] - 43:5, 49:9
shots [4] - 24:15, 26:5, 28:19, 70:7
show [5] - 24:14, 24:20, 46:15, 55:2, 58:8
showing [1] - 49:22
shown [7] - 45:4, 46:22, 59:15, 59:16, 63:14, 63:16, 79:16
shows [2] - 8:14, 46:7
side [3] - 30:23, 64:5, 72:1
sides [2] - 39:5, 84:11
signals [1] - 30:25
significant [9] - 40:1, 56:5, 57:9, 67:12, 67:14, 67:23, 68:15, 68:19, 68:20
similar [6] - 3:10, 4:2, 5:22, 12:10, 45:16, 74:3
similarly [6] - 32:19, 32:25, 33:9, 33:19, 34:2, 56:4
Simpkins [2] - 1:25, 85:10
simple [2] - 34:13, 75:10
simply [15] - 10:2, 12:20, 15:18, 18:6, 30:7, 31:5, 31:8, 34:2, 48:24, 73:13, 75:12, 76:12, 77:10, 79:8, 83:11
single [4] - 14:16, 26:17, 50:17, 56:16
sit [1] - 41:14
sits [2] - 12:23, 14:11
sitting [1] - 23:4

situated [5] - 32:19, 32:25, 33:9, 33:19, 34:3
situation [1] - 37:13
situations [3] - 24:21, 34:2, 35:17
Sky [2] - 1:19, 2:6
small [2] - 22:9, 61:20
so-called [1] - 58:21
society [1] - 80:25
sold [3] - 8:24, 9:1, 72:17
sole [2] - 14:18, 23:16
solely [1] - 59:21
sometime [2] - 58:15, 58:18
sometimes [2] - 24:9, 47:1
somewhat [1] - 43:23
somewhere [1] - 61:11
soon [1] - 84:13
sorry [1] - 69:17
sorts [2] - 45:11, 63:9
sought [1] - 44:23
sounding [1] - 4:17
sounds [2] - 54:3, 54:4
source [1] - 26:18
sources [5] - 26:4, 26:7, 29:9, 30:1, 30:4
specific [3] - 11:19, 36:8, 71:2
specifically [6] - 5:18, 11:22, 22:14, 32:16, 71:19, 71:21
sped [1] - 61:25
speech [2] - 53:23, 57:1
split [1] - 9:24
sport [2] - 6:12, 6:16
sporting [4] - 6:3, 7:24, 8:4, 47:12
Sports [1] - 47:10
sports [1] - 7:7
stabbed [1] - 61:24
stamp [1] - 82:7
stand [1] - 31:8
Standard [1] - 59:14
standard [18] - 10:4, 10:22, 11:2, 11:10, 12:4, 12:8, 12:9, 12:13, 12:17, 12:21, 23:6, 34:19, 34:25, 57:2, 65:14, 72:9, 73:17, 73:19
standards [3] - 10:6, 14:14, 64:24
standing [3] - 64:9,

64:11, 64:13
**stands** [1] - 4:11
**Staples** [4] - 81:2,
81:13, 83:4, 83:7
**start** [2] - 4:3, 39:23
**starting** [1] - 39:12
**state** [16] - 5:2, 5:7,
7:15, 7:19, 8:21,
36:18, 42:7, 42:9,
42:10, 43:9, 46:20,
59:8, 69:16, 69:21,
75:7, 77:2
**State** [17] - 5:14, 8:25,
9:2, 20:21, 36:13,
36:25, 37:17, 37:25,
44:10, 57:7, 57:22,
58:7, 58:25, 62:15,
70:17, 71:17, 80:5
**State's** [1] - 4:8
**state-level** [1] - 42:10
**statement** [4] - 35:20,
54:3, 59:19, 60:16
**statements** [2] - 59:2,
66:19
**STATES** [1] - 1:1
**states** [2] - 63:17, 77:1
**States** [9] - 1:13, 7:18,
7:19, 23:23, 29:23,
76:4, 76:23, 80:6,
85:6
**statistically** [1] - 43:19
**statute** [4] - 34:17,
35:5, 44:14, 77:9
**statutes** [3] - 22:2,
34:16, 35:2
**statutory** [1] - 12:14
**Stephen** [1] - 85:3
**STEPHEN** [1] - 1:17
**still** [8] - 5:14, 9:10,
22:23, 23:14, 23:19,
41:1, 41:6, 42:14
**stock** [1] - 73:13
**stop** [5] - 20:22, 32:4,
41:20, 52:6, 56:7
**stories** [5] - 27:10,
27:19, 27:20, 27:25,
28:17
**straightforwardly** [1] -
11:19
**straw** [2] - 69:1, 70:1
**strength** [1] - 20:16
**strict** [9] - 22:13,
53:24, 54:2, 54:5,
54:7, 54:14, 54:25,
72:9
**striking** [1] - 62:1
**strong** [1] - 54:3
**strongly** [1] - 70:10
**studies** [8] - 40:1,
40:8, 40:11, 42:10,

42:15, 67:11, 69:19,
69:24
**study** [11] - 8:14, 28:3,
28:9, 28:13, 28:14,
40:5, 40:9, 40:10,
41:2, 42:18, 83:24
**studying** [1] - 41:8
**style** [2] - 23:12, 63:4,
72:18
**subassemblies** [1] -
37:21
**subclass** [2] - 80:10,
80:11, 80:12
**subject** [12] - 14:12,
26:20, 26:21, 26:24,
26:25, 49:5, 52:14,
53:23, 54:1, 62:4,
70:16, 70:20
**subjected** [1] - 52:8
**submission** [1] -
10:19
**submit** [1] - 73:18
**submitted** [1] - 36:4
**subsequent** [1] -
67:10
**substantial** [13] - 23:2,
23:8, 31:16, 51:5,
55:24, 65:4, 65:10,
75:14, 77:22, 77:23,
78:15, 79:20, 83:14
**substantiality** [2] -
78:3, 78:17
**substantially** [3] -
12:15, 50:2, 74:2
**substitute** [1] - 70:5
**substituting** [1] -
77:10
**substitution** [2] -
76:20, 77:5
**successful** [1] - 15:20
**successfully** [2] -
15:21, 35:6
**sudden** [2] - 61:1,
65:13
**sufficient** [6] - 3:12,
16:11, 20:24, 74:3,
75:1, 79:9
**suggest** [10] - 6:24,
10:4, 10:21, 16:6,
42:10, 43:16, 44:1,
49:18, 55:10, 83:25
**suggested** [3] - 63:2,
76:16, 79:11
**suggestion** [1] - 9:22
**suggests** [1] - 54:21
**summary** [7] - 8:6,
8:11, 32:1, 32:7,
32:11, 39:16, 75:18
**supply** [1] - 79:15
**support** [17] - 23:7,

29:21, 31:5, 39:21,
44:10, 45:1, 46:8,
46:14, 58:24, 65:4,
71:8, 72:24, 75:14,
77:23, 80:10, 83:14,
83:23
**supportable** [1] - 44:7
**supported** [3] - 47:20,
59:25, 62:18
**supporting** [1] - 63:9
**Supreme** [53] - 2:21,
3:24, 4:6, 4:14, 4:18,
6:6, 6:18, 10:3, 10:6,
10:11, 10:21, 11:5,
11:7, 11:9, 11:14,
11:18, 12:5, 12:9,
12:12, 13:5, 13:7,
13:10, 13:14, 14:7,
14:13, 15:11, 15:14,
16:13, 16:17, 16:21,
17:8, 17:9, 17:14,
17:21, 18:3, 18:21,
22:19, 22:20, 30:6,
35:1, 35:7, 35:11,
44:24, 49:4, 57:4,
57:15, 71:18, 71:20,
71:23, 81:4, 82:19,
83:4
**surely** [1] - 52:24
**surprised** [1] - 40:16
**surprising** [1] - 61:4
**surrounding** [1] -
70:15
**surveillance** [1] - 62:9
**survey** [1] - 47:9
**survive** [1] - 34:24
**swaths** [1] - 80:9
**Sweeney** [9] - 1:18,
2:5, 38:10, 38:13,
43:20, 64:18, 75:10,
75:22, 84:8
**SWEENEY** [24] -
38:11, 38:13, 39:9,
42:1, 42:6, 44:9,
44:21, 46:22, 47:6,
47:9, 47:19, 49:24,
51:8, 51:11, 53:12,
53:15, 57:18, 61:18,
75:23, 76:19, 78:11,
78:14, 78:17, 79:8
**Sweeney's** [1] - 67:1
**symposium** [2] -
62:25, 63:3
**system** [1] - 68:16
**systematic** [3] - 26:16,
28:9, 67:7
**systematically** [1] -
27:24

T

**table** [4] - 51:14,
51:24, 54:17, 64:1
**tailor** [1] - 83:22
**tailored** [12] - 56:1,
56:5, 56:21, 57:6,
57:9, 57:15, 58:8,
72:7, 72:8, 72:12,
72:14, 72:22
**tailoring** [1] - 55:2,
57:16, 57:20, 58:4,
79:20, 83:15
**talks** [1] - 48:9
**target** [3] - 5:4, 47:13,
70:3
**task** [2] - 62:12, 62:15
**tax** [1] - 82:7
**teaching** [2] - 54:20,
54:21
**team** [1] - 75:25
**teed** [1] - 39:1
**temporary** [2] - 46:12,
55:19
**ten** [19] - 4:23, 19:2,
19:9, 19:11, 19:20,
19:25, 20:5, 28:19,
40:4, 61:6, 61:13,
61:16, 62:3, 76:14,
79:15, 79:17, 83:15,
83:23
**ten-round** [1] - 62:3
**ten-year** [3] - 40:4,
79:15, 79:17
**term** [1] - 69:13
**terms** [1] - 12:10
**terrible** [1] - 38:24
**test** [18] - 9:15, 9:21,
10:12, 11:10, 11:19,
12:1, 13:1, 21:5,
22:25, 23:3, 34:5,
37:18, 53:4, 53:11,
65:2, 71:22, 73:20,
77:22
**testify** [1] - 46:24
**testimonial** [1] - 29:20
**testimony** [15] - 28:22,
43:22, 45:15, 59:23,
59:25, 60:2, 60:4,
60:5, 66:17, 71:1,
71:2, 74:6, 74:17,
74:22
**testing** [1] - 26:25
**text** [5] - 30:1, 47:21,
48:8, 48:15, 57:14
**THE** [61] - 1:1, 1:2,
2:2, 2:10, 3:3, 5:2,
6:20, 7:9, 7:17, 9:13,
10:14, 10:17, 16:6,
17:3, 18:11, 19:3,

19:12, 20:7, 20:20,
21:13, 24:23, 25:5,
25:12, 26:10, 27:2,
27:7, 28:21, 31:22,
32:4, 32:14, 35:7,
36:21, 38:9, 38:12,
39:4, 41:20, 42:5,
43:20, 44:15, 46:19,
47:4, 47:8, 47:15,
49:20, 50:25, 51:10,
53:6, 53:14, 57:17,
61:9, 64:3, 64:7,
64:15, 70:14, 75:20,
76:16, 78:7, 78:12,
78:16, 79:4, 84:8
**theft** [1] - 69:2
**theme** [1] - 58:4
**themselves** [1] - 18:20
**therefore** [3] - 31:2,
34:22, 70:8
**thinking** [1] - 60:22
**Third** [1] - 56:22
**third** [1] - 52:11
**Thomas** [1] - 81:9
**thorough** [3] - 66:3,
66:24, 84:10
**thousands** [1] - 6:15
**threat** [1] - 29:4
**three** [8] - 8:16, 8:18,
61:24, 62:2, 73:12,
76:25, 80:13, 83:5
**threshold** [2] - 14:22,
15:18
**throughout** [1] - 58:4
**thrust** [1] - 44:15
**tight** [1] - 55:22
**today** [8] - 7:8, 18:22,
38:18, 41:1, 41:14,
42:14, 49:15, 82:6
**together** [1] - 84:12
**tons** [1] - 25:24
**took** [4] - 58:13, 66:2,
68:9, 72:13
**tort** [1] - 65:2
**total** [1] - 9:1
**town** [1] - 49:16
**Towson** [2] - 49:15,
49:22
**tradition** [2] - 13:6,
21:11
**traditional** [4] - 13:13,
43:23, 49:10, 71:22
**training** [2] - 33:11,
33:22
**transcript** [1] - 85:2
**transfer** [7] - 33:4,
33:14, 67:25, 68:1,
68:4, 68:14, 68:18
**transfers** [2] - 69:10,
76:17

transition [1] - 15:22
treat [2] - 8:11, 23:20
treated [3] - 21:23, 24:12, 32:18
treating [2] - 32:3, 32:12
troubled [1] - 61:24
troubles [1] - 77:21
true [7] - 12:2, 21:20, 41:13, 48:18, 70:25, 77:6, 85:7
Trustees [3] - 56:12, 57:7, 58:2
try [5] - 14:15, 27:5, 79:21, 80:21, 83:12
trying [2] - 44:5, 75:9
turn [1] - 78:22
Turner [4] - 30:6, 30:8, 30:13, 44:21
twice [1] - 83:5
two [16] - 9:15, 21:4, 28:17, 29:12, 30:20, 31:20, 33:2, 39:25, 47:12, 58:14, 60:20, 60:23, 62:2, 69:18, 76:5, 76:7
two-prong [1] - 9:15
type [3] - 26:25, 51:3, 65:17
Type [1] - 9:8
types [6] - 64:19, 65:7, 65:8, 65:16, 66:5, 67:3
typically [3] - 48:12, 48:14, 49:7

# U

U.S [1] - 12:11
ultimately [1] - 11:12
unable [1] - 58:23
unanimously [2] - 2:25, 3:8
unbanned [1] - 80:8
uncertain [1] - 61:4
unconstitutional [2] - 37:14, 52:5
under [31] - 3:12, 4:12, 9:10, 9:21, 10:6, 13:1, 14:13, 19:16, 31:23, 32:15, 34:5, 34:24, 37:25, 40:7, 40:10, 40:11, 50:5, 50:16, 50:24, 51:14, 51:25, 54:24, 57:20, 58:18, 61:6, 63:22, 65:22, 77:17, 79:10, 82:3, 82:14
underlie [2] - 26:13, 45:8

underlying [1] - 46:11
understood [6] - 6:5, 7:4, 9:18, 13:4, 21:10, 52:17
unfortunate [2] - 61:22, 63:12
unfortunately [1] - 61:15
unintentional [1] - 29:5
UNITED [1] - 1:1
United [9] - 1:13, 7:17, 7:19, 23:23, 29:23, 76:4, 76:23, 80:6, 85:6
University [1] - 57:7
unknown [1] - 61:7
unless [1] - 75:16
unlike [1] - 14:10
unlimited [1] - 4:16
unmindful [1] - 83:7
unnumbered [1] - 61:7
unreliable [1] - 84:2
unreported [1] - 84:3
untenable [1] - 10:1
untested [1] - 84:2
unusual [3] - 15:10, 20:23, 28:24
up [5] - 20:20, 39:1, 49:22, 58:23, 77:12
updated [2] - 25:19, 40:10
upheld [1] - 4:2
uphold [2] - 22:2, 57:8
upper [1] - 8:6
upset [1] - 36:7
useful [3] - 23:11, 72:18, 77:15
usefulness [1] - 52:15
uses [3] - 23:3, 69:4, 69:5
usual [1] - 21:12

# V

vagueness [5] - 34:13, 34:16, 35:2, 35:6, 35:22
validity [2] - 26:9, 38:7
value [2] - 69:22, 69:23
vary [1] - 44:17
vastly [1] - 43:1
vehicles [1] - 42:23
verb [1] - 48:16
version [1] - 23:21
versus [4] - 2:4, 12:11, 29:23, 32:16
view [5] - 38:2, 41:1,

41:6, 42:14, 54:11
viewed [1] - 17:22
vigilance [1] - 62:9
Village [2] - 35:1, 35:11, 35:19
violate [2] - 3:1, 32:23
violation [2] - 33:16, 81:15
violence [4] - 23:10, 40:23, 69:15, 70:9
Virginia [2] - 67:12, 76:25
virtually [1] - 23:20
void [1] - 34:13
vs [1] - 85:3
VS [1] - 1:6
vulnerable [4] - 76:20, 77:5, 77:18, 77:19

# W

wake [1] - 2:21
Ward [1] - 57:4
Washington [1] - 83:24
ways [5] - 12:1, 12:22, 29:12, 67:4, 69:8
weapon [2] - 19:17, 42:11
weapons [38] - 2:20, 5:3, 7:13, 7:14, 9:1, 15:4, 15:9, 15:22, 15:23, 16:2, 16:11, 18:23, 20:24, 22:7, 23:24, 28:23, 33:3, 40:3, 41:3, 41:9, 41:16, 42:9, 45:19, 45:24, 46:3, 49:7, 63:5, 69:22, 72:15, 73:3, 73:8, 73:14, 76:18, 82:24, 82:25, 83:1
wear [1] - 10:1
weather [1] - 38:25
weather-wise [1] - 38:25
Webster [8] - 46:24, 47:5, 62:6, 62:13, 62:16, 62:25, 63:8, 63:10
Webster's [3] - 59:18, 62:19, 62:21
weigh [2] - 31:12, 71:25
weight [2] - 80:21, 83:11
well-defined [1] - 64:23
whatsoever [3] - 55:6, 58:8, 78:24

whereby [1] - 15:20
wide [1] - 29:25
winter [1] - 38:25
wise [1] - 38:25
withstand [1] - 12:13
witness [2] - 8:7, 8:9
witnesses [2] - 8:14, 39:15
Woodward [2] - 1:19, 2:6
Woollard [3] - 29:19, 54:10, 57:11
word [4] - 29:7, 74:5, 80:21, 83:9
words [2] - 53:8, 79:15
world [2] - 23:15
worse [1] - 24:18
worth [1] - 52:13
writing [1] - 83:6
written [1] - 84:13

# Y

year [3] - 40:4, 79:15, 79:17
years [3] - 73:10, 73:11, 76:14
yesterday [1] - 2:12
York [4] - 2:24, 57:22, 73:23, 83:18
young [1] - 61:24

# Z

zones [1] - 11:22