## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| STEPHEN V. KOLBE, et al. | * | |
| | * | |
| | * | |
| v. | * | Civil No. CCB-13-2841 |
| | * | |
| | * | |
| MARTIN J. O'MALLEY, et al. | * | |
| | * | |

******

## AMENDED MEMORANDUM

On May 16, 2013, in the wake of a number of mass shootings, the most recent of which claimed the lives of twenty children and six adult staff members at Sandy Hook Elementary School in Connecticut, the Governor of Maryland signed into law the Firearm Safety Act of 2013. The Act bans certain assault weapons and large-capacity magazines ("LCMs").

Plaintiffs Stephen V. Kolbe, Andrew C. Turner, Wink's Sporting Goods, Inc., Atlantic Guns, Inc., Associated Gun Clubs of Baltimore, Inc. ("AGC"), Maryland Shall Issue, Inc., Maryland State Rifle and Pistol Association, Inc., National Shooting Sports Foundation, Inc. ("NSSF"), and Maryland Licensed Firearms Dealers Association, Inc. ("MLFDA")[1] brought this action against defendants Martin J. O'Malley, Douglas F. Gansler, Marcus L. Brown, and Maryland State Police ("MSP"),[2] requesting a judgment declaring Maryland's gun control legislation unconstitutional.[3] Now pending before the court are the defendants' motion for

---

[1] The plaintiffs are various associations of gun owners and advocates, companies in the business of selling firearms and magazines, and individual gun-owning citizens of Maryland.

[2] All the defendants are sued in their official capacities.

[3] The defendants do not challenge the plaintiffs' standing to bring this lawsuit. Exercising its independent duty to ensure that jurisdiction is proper, the court is satisfied that individual plaintiffs Kolbe and Turner face a credible threat of prosecution under the Firearm Safety Act. *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014). Kolbe currently owns a semi-automatic handgun that comes with detachable magazines holding more than ten rounds. (Kolbe Decl., ECF No. 55-2, ¶ 3.) Although he does not own a long gun banned by the Firearm Safety

summary judgment and the plaintiffs' cross-motion for summary judgment.  Also pending are

the plaintiffs' motion to exclude testimony, which the defendants have opposed, and a number of

unopposed motions, including the defendants' motions for protective orders and John Cutonilli's

motion for leave to file a brief as amicus curiae.  The parties have fully briefed the issues, and

oral argument was held on July 22, 2014.  For the reasons stated below, I find the law

constitutional, and accordingly will grant the defendants' motion for summary judgment and

deny the plaintiffs' cross motion.[4]  The plaintiffs' motion to exclude will be denied, the

defendants' motions for protective orders will be granted, and Cutonilli's motion to file an

amicus brief will be denied.[5]

## BACKGROUND

The Firearm Safety Act of 2013 provides in general that, after October 1, 2013, a person

may not possess, sell, offer to sell, transfer, purchase, or receive "assault pistols,"[6] "assault long

---

Act, he indicates that, but for the Act, he would purchase one along with detachable magazines holding more than ten rounds.  (*Id.* ¶¶ 4–5.)  Turner currently owns three long guns classified as assault weapons, all of which come with detachable magazines holding in excess of ten rounds.  (Turner Decl., ECF No. 55-3, ¶ 3.)  He claims that, but for the Act, he would purchase other banned firearms and large capacity magazines.  (*Id.* ¶¶ 4–5.)  *Cf. New York State Rifle and Pistol Ass'n, Inc. v. Cuomo* (*NYSRPA*), -- F. Supp. 2d --, 2013 WL 6909955, at *5 (W.D.N.Y. Dec. 31, 2013) (concluding that individual plaintiffs had standing to challenge a New York gun control statute, as they owned rifles, pistols, and large capacity magazines regulated by the statute and desired to acquire weapons that the statute rendered illegal); *see also Ezell v. City of Chicago*, 651 F.3d 684, 695–96 (7th Cir. 2011) (deciding that plaintiffs, who wished to engage in range training, had standing to bring a Second Amendment challenge to a Chicago ordinance banning firing ranges, reasoning that the very existence of the ordinance implied a threat to prosecute).  As Kolbe and Turner have standing, jurisdiction is secure, and the court may adjudicate this dispute whether or not the additional plaintiffs have standing.  *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977).

[4] The court will deny as moot the defendants' motion to dismiss the complaint and the defendants' motion to dismiss the third amended complaint.

[5] The court does not find Cutonilli's proffered amicus brief, which consists of his interpretation of the Second Amendment and relevant precedents, useful to the disposition of this case.  *See Finkle v. Howard Cnty., Md.*, -- F. Supp. 2d --, 2014 WL 1396386, at *2 (D. Md. Apr. 10, 2014) (noting the trial court's discretion in deciding whether to grant leave to file as amicus curiae and that "a motion for leave to file an amicus curiae brief . . . should not be granted unless the court deems the proffered information timely and useful" (alteration in original) (citations and internal quotation marks omitted)).  The court, however, has considered the amicus briefs proffered by Marylanders to Prevent Gun Violence and the Brady Center in support of the defendants.  The court has also considered the amicus briefs of the Pink Pistols and the National Rifle Association ("NRA") in support of the plaintiffs.

[6] The plaintiffs are not challenging the Act's ban on assault pistols.

guns,"[7] and "copycat weapons" (together, "assault weapons").[8]  Md. Code Ann., Crim. Law

("CR") §§ 4-301(d), 4-303(a)(2).  In addition, the Act states that a person "may not manufacture,

sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of

more than 10 rounds of ammunition for a firearm."[9]  Id. § 4-305(b).  A person who violates the

Act "is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3

years or a fine not exceeding $5,000 or both," although different penalties are provided for a

person who uses an assault weapon or LCM in the commission of a felony or a crime of

violence.  Id. § 4-306.

The Act exempts from the ban the transfer of an assault weapon from a law enforcement

agency to a retired law enforcement officer as long as: (1) it is sold or transferred on retirement

---

[7] The Firearm Safety Act defines assault long guns by reference to § 5-101(r)(2) of the Public Safety Article.  Md. Code Ann., Crim. Law § 4-301(b).  Thus, the Act bans:

> a firearm that is any of the following specific assault weapons or their copies, regardless of which company produced and manufactured that assault weapon: (i) American Arms Spectre da Semiautomatic carbine; (ii) AK-47 in all forms; (iii) Algimec AGM-1 type semi-auto; (iv) AR 100 type semi-auto; (v) AR 180 type semi-auto; (vi) Argentine L.S.R. semi-auto; (vii) Australian Automatic Arms SAR type semi-auto; (viii) Auto-Ordnance Thompson M1 and 1927 semi-automatics; (ix) Barrett light .50 cal. semi-auto; (x) Beretta AR70 type semi-auto; (xi) Bushmaster semi-auto rifle; (xii) Calico models M-100 and M-900; (xiii) CIS SR 88 type semi-auto; (xiv) Claridge HI TEC C-9 carbines; (xv) Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle; (xvi) Daewoo MAX 1 and MAX 2, aka AR 100, 110C, K-1, and K-2; (xvii) Dragunov Chinese made semi-auto; (xviii) Famas semi-auto (.223 caliber); (xix) Feather AT-9 semi-auto; (xx) FN LAR and FN FAL assault rifle; (xxi) FNC semi-auto type carbine; (xxii) F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun; (xxiii) Steyr-AUG-SA semi-auto; (xxiv) Galil models AR and ARM semi-auto; (xxv) Heckler and Koch HK-91 A3, HK-93 A2, HK-94 A2 and A3; (xxvi) Holmes model 88 shotgun; (xxvii) Avtomat Kalashnikov semiautomatic rifle in any format; (xxviii) Manchester Arms "Commando" MK-45, MK-9; (xxix) Mandell TAC-1 semi-auto carbine; (xxx) Mossberg model 500 Bullpup assault shotgun; (xxxi) Sterling Mark 6; (xxxii) P.A.W.S. carbine; (xxxiii) Ruger mini-14 folding stock model (.223 caliber); (xxxiv) SIG 550/551 assault rifle (.223 caliber); (xxxv) SKS with detachable magazine; (xxxvi) AP-74 Commando type semi-auto; (xxxvii) Springfield Armory BM-59, SAR-48, G3, SAR-3, M-21 sniper rifle, M1A, excluding the M1 Garand; (xxxviii) Street sweeper assault type shotgun; (xxxix) Striker 12 assault shotgun in all formats; (xl) Unique F11 semi-auto type; (xli) Daewoo USAS 12 semi-auto shotgun; (xlii) UZI 9mm carbine or rifle; (xliii) Valmet M-76 and M-78 semi-auto; (xliv) Weaver Arms "Nighthawk" semi-auto carbine; or (xlv) Wilkinson Arms 9mm semi-auto "Terry".

Md. Code Ann., Pub. Safety ("PS") § 5-101(r)(2).  According to the plaintiffs, the most widely owned firearms of those banned by the Act are the AR-15, the AK-47, and their copies.
[8] Individuals who lawfully possessed assault long guns or copycat weapons before October 1, 2013, however, may continue to possess those weapons.  Md. Code Ann., Crim. Law § 4-303(b)(3).
[9] The court will refer to such detachable magazines as "large capacity magazines" or "LCMs."  It does not appear that CR § 4-305 bans mere possession of LCMs.

or (2) it "was purchased or obtained by the person for official use with the law enforcement agency before retirement." *Id.* § 4-302(7).  The Act also exempts retired law enforcement officers from the ban on LCMs.  *Id.* § 4-305(a)(2), (b).

Just days before the Firearm Safety Act was to go into effect, on September 26, 2013, the plaintiffs filed their complaint, followed the next day by a motion for a temporary restraining order ("TRO"), challenging the law's constitutionality with respect to its ban on assault long guns, copycat weapons, and LCMs.  The court heard argument on the TRO on October 1, 2013, and decided that the plaintiffs did not show they were entitled to the extraordinary relief. Following the hearing on the TRO, the parties agreed that, instead of considering a preliminary injunction request, the court should proceed to consider this matter on the merits.

Accordingly, the court will now consider the plaintiffs' claims that the Firearm Safety Act (1) infringes their Second Amendment rights,[10] (2) violates the Equal Protection Clause of the Fourteenth Amendment, and (3) is void for vagueness.

## ANALYSIS

### I.   Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphasis added).  Whether a fact is material depends upon the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Id.*  "A

---

[10] The plaintiffs challenge the bans imposed by the Firearm Safety Act on their face, not merely as applied to their particular circumstances.  *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011) (explaining that, in a facial challenge, "[t]he remedy is necessarily directed at the statute itself and *must* be injunctive and declaratory; a successful facial attack means the statute is wholly invalid and cannot be applied *to anyone*" (emphasis in original)).

party opposing a properly supported motion for summary judgment 'may not rest upon the mere

allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that

there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d

514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court must

view the evidence in the light most favorable to the nonmovant and draw all justifiable

inferences in his favor.  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted); *see also*

*Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*,

721 F.3d 264, 283 (4th Cir. 2013) (citation omitted).  At the same time, the court must not yield

its obligation "to prevent factually unsupported claims and defenses from proceeding to trial."

*Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).

## II.  Motion to Exclude Testimony

The plaintiffs ask the court to exclude various expert and fact testimony offered by the

defendants.  Rule 702 of the Federal Rules of Evidence, which governs the admissibility of

expert testimony, states:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable principles
> and methods; and (d) the expert has reliably applied the principles and methods to
> the facts of the case.

The party seeking to introduce expert testimony has the burden of establishing its admissibility

by a preponderance of the evidence.  *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592 n.10

(1993).  A district court is afforded "great deference . . . to admit or exclude expert testimony

under *Daubert*."  *TFWS, Inc. v. Schaefer*, 325 F.3d 234, 240 (4th Cir. 2003) (citations and

internal quotation marks omitted); *see also Daubert*, 509 U.S. at 594 ("The inquiry envisioned

by Rule 702 is . . . a flexible one . . . ."). "In applying *Daubert*, a court evaluates the methodology or reasoning that the proffered scientific or technical expert uses to reach his conclusion; the court does not evaluate the conclusion itself," *Schaefer*, 325 F.3d at 240, although "conclusions and methodology are not entirely distinct from one another," *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In essence, the court acts as gatekeeper, only admitting expert testimony where the underlying methodology satisfies a two-pronged test for (1) reliability and (2) relevance. *See Daubert*, 509 U.S. at 589.

Rule 701 of the Federal Rules of Evidence, which governs the admissibility of lay testimony, states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

"[L]ay opinion testimony *must* be based on personal knowledge . . . ." *United States v. Perkins*, 470 F.3d 150, 155–56 (4th Cir. 2006) (emphasis in original). "At bottom, . . . Rule 701 forbids the admission of expert testimony dressed in lay witness clothing . . . ." *Id.* at 156 (quoting *United States v. Santos*, 201 F.3d 953, 963 (7th Cir. 2000)).

## A. Koper

Dr. Christopher Koper, as the plaintiffs admit, is the only social scientist to have studied the effects of the federal assault weapons ban that was in place from 1994 to 2004. (*See* Koper Decl., ECF No. 44-7, ¶ 5.) In addition, he has studied issues related to firearms policy for twenty years, publishing numerous studies in peer-reviewed journals on topics related to crime and firearms. (*Id.* ¶¶ 3, 6–7.) The plaintiffs ask the court to exclude Koper's expert testimony on two grounds, neither of which is persuasive.

First, the plaintiffs claim that Koper's opinion that the Firearm Safety Act is likely to advance Maryland's interest in protecting public safety is not based on sufficient data, as required by Rule 702, because his study of the federal ban found that the ban did not decrease firearms-related crimes, the lethality and injuriousness of gun crimes, or the criminal use of banned LCMs.  (Pls.' Mot. to Exclude, ECF No. 65, at 3–4.)  Further, the plaintiffs claim, his previous research revealed that state-level bans did not result in any reduction in crime.  (*Id.* at 4.)  The plaintiffs also allege that many of Koper's opinions regarding the efficacy of the Firearm Safety Act contradict deposition testimony.  (*Id.* at 7.)

As an initial matter, the plaintiffs often mischaracterize Koper's statements and his research, cherry-picking items and presenting them out of context.  For example, they cite Koper's acknowledgment in 2004 that a few studies suggest state-level assault weapons bans did not reduce crime as inconsistent with his conclusions regarding the Firearm Safety Act.  (*Compare* Koper Decl., Ex. B, at 81 n.95 ("[A] few studies suggest that state-level AW bans have not reduced crime . . . ."), *with* Koper Decl. ¶¶ 77–86 (opining that the Firearm Safety Act is likely to, *inter alia*, limit the number of long guns in Maryland, limit the number of LCMs in circulation, reduce the number and lethality of gunshot victimizations, and reduce the use of assault weapons and LCMs in crime).)  But the plaintiffs omit Koper's numerous qualifications of those state studies.  (*See* Koper Decl., Ex. B, at 81 n.95 ("[I]t is hard to draw definitive conclusions from these studies . . . : there is little evidence on how state AW bans affect the availability and use of AWs . . . ; studies have not always examined the effects of these laws on gun homicides and shootings . . . ; and the state AW bans that were passed prior to the federal ban . . . were in effect for only three months to five years . . . before the imposition of the federal ban, after which they became largely redundant with the federal legislation and their effects more

7

difficult to predict and estimate.").)  Even ignoring the context in which Koper's 2004 statement was made, there is nothing necessarily inconsistent about a 2004 statement that a few state-level bans were not shown to reduce overall crime and Koper's opinion that a different state-level ban, enacted in 2013, likely will reduce the negative effects of gun violence.

To the extent Koper's prior research concluded the federal ban was not effective in various ways, his opinions in the current case are based on several other pieces of data, which the plaintiffs entirely ignore in arguing his testimony should be excluded.  (*See, e.g.*, Koper Decl. ¶¶ 13–43.)  Further, Koper is clear in noting that the federal weapons ban had several features that may have limited its efficacy that are not present with Maryland's ban.  (*Id.* at ¶¶ 79–81.)

The plaintiffs also challenge Koper's testimony on the basis that he is unable to conclude the Firearm Safety Act will have the desired effects to a "reasonable degree of scientific certainty."  It appears the plaintiffs are claiming that expert opinions may not be considered in determining the constitutionality of the bans at issue here unless they are stated with such scientific certainty.  In making their argument, however, the plaintiffs fail to recognize that the inquiry under Rule 702, as noted above, is flexible, *see Daubert*, 509 U.S. at 594, and that, although a reasonable degree of scientific certainty is required for the admission of expert testimony to prove causation in medical malpractice cases—the types of cases the plaintiffs cite to support their position—applying such a standard here would misapprehend the court's inquiry. In attempting to further the state's important interests, the legislature is not required to refrain from acting until it has evidence demonstrating proposed legislation will certainly have the desired effects.  It is allowed to make predictions.  *See Turner Broadcasting Sys., Inc. v. F.C.C.* (*Turner I*), 512 U.S. 622, 665 (1994) ("Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and

inferences for which empirical support may be unavailable."). The court will defer to those

predictions as long as they are the result of reasonable inferences and deductions based on

substantial evidence. *See Heller v. District of Columbia* (*Heller III*),-- F. Supp. 2d --, 2014 WL

1978073, at *8 (D.D.C. May 15, 2014) (citing *Turner Broadcasting Sys., Inc. v. F.C.C.* (*Turner

II*), 520 U.S. 180, 211 (1997)). Koper's testimony is well-suited to answer the question facing

the court and is precisely the kind of evidence upon which other courts have relied in assessing

similar assault weapon and LCM bans. *See Heller v. District of Columbia* (*Heller II*), 670 F.3d

1244, 1263 (D.C. Cir. 2011); *Fyock v. City of Sunnyvale*, -- F. Supp. 2d --, 2014 WL 984162, at

*8–9 (N.D. Cal. Mar. 5, 2014); *San Francisco Veteran Police Officers Ass'n v. San Francisco*, --

F. Supp. 2d --, 2014 WL 644395, at *5, *7 (N.D. Cal. Feb. 19, 2014); *Shew v. Malloy*, -- F. Supp.

2d --, 2014 WL 346859, at *9 n.50 (D. Conn. Jan. 30, 2014); *NYSRPA*, 2013 WL 6909955, at

*15–18.[11] The court will not, therefore, exclude Koper's testimony.

### B. Webster

The plaintiffs argue that Dr. Daniel Webster's testimony should be excluded because he

has not conducted any original research but rather has relied on the work of Koper and the data

he acquired from the *Mother Jones* publication.[12]

It is acceptable for an expert to rely on the studies of other experts in reaching his own

opinions, although courts have excluded testimony where the expert failed to conduct any

independent examination or research to ensure the reliability of the information on which he

relies. *See Doe v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 470 (M.D.N.C. 2006)

---

[11] It does not appear that the admissibility of similar testimony by Koper was challenged in any other case in which he was cited.

[12] The plaintiffs also claim that Webster's opinions in paragraphs seven through nine of his declaration, as to the dangerousness of particular firearms, are outside the scope of his expertise and, in any event, are not relevant to the present case. Because the court does not rely on or refer to Webster's opinions in that part of his declaration for its findings here, the court need not resolve the issue.

(citation and internal quotation marks omitted) ("Where proffered expert testimony is not based on independent research, but instead on such a literature review, the party proffering such testimony must come forward with other objective, verifiable evidence that the testimony is based on scientifically valid principles.  One means of showing this is by proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication."); *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530, 539–40 (D. Md. 2002) (excluding an expert because his methods were "wholly lacking in independent research," and there was no evidence that his opinion was "the product of reliable principles and methods, and [was] based upon sufficient facts or data").

Here, over a nearly thirty-year career, Webster has devoted most of his research to gun-related injuries and violence, has directed numerous studies related to gun violence and its prevention, and has published seventy-nine articles in scientific, peer-reviewed journals.  (*See* Webster Decl., ECF No. 44-6, ¶¶ 2–5.)  Although it is true he relies on Koper's research in his declaration, Webster served as editor of the book that included Koper's 2013 report and, as editor, he subjected Koper's 2013 report to a peer review process.  (*See* Koper Decl., Ex. A; Webster Dep., ECF No. 70-4, at 57:11–18.)  Likewise, Webster relies on data from the *Mother Jones* publication, but the data were subject to independent analysis by Koper and his graduate student.  (*See* Koper Decl. ¶¶ 25–28.)  In any event, the plaintiffs have offered nothing to suggest the *Mother Jones* data are unreliable or inaccurate.  Accordingly, the court is satisfied that the information on which Webster relies in forming his expert opinion is reliable, and will not exclude his testimony.

### C.  Vince and Law Enforcement Officers

The plaintiffs argue that the "ballistics opinions" of Joseph Vince and executive law

enforcement officers should be excluded, as the opinions are outside the scope of their expertise.[13] They do not, however, identify the paragraphs of Vince's declaration to which they take objection. As the court neither relies on nor refers to any testimony by Vince on "ballistics," the court need not resolve this issue. Turning to the disputed testimony offered by Baltimore County Police Department Chief James Johnson, Baltimore City Police Department Commissioner Anthony Batts, and Prince George's County Police Department Deputy Chief Henry Stawinski, the court agrees with the defendants that none of this testimony contains expert opinions on ballistics. Johnson merely acknowledges that some shots that may be loaded into a shotgun have a risk of over-penetration;[14] Batts offers testimony about research he directed and which was reported to him in connection with his official duties; and Stawinksi testifies on his personal observations of assault weapons piercing soft body armor. (*See* Johnson Decl., ECF No. 44-3, ¶ 35 (opining that "[a] shotgun would . . . be a superior self-defense weapon to an assault weapon, at least if it is loaded with [an] appropriate shot that does not give rise to too great a risk of over penetration"); Batts Decl., ECF No. 44-4, ¶ 21 (testifying about research he personally directed regarding various rounds fired by officers under his command); Stawinski Decl., ECF No. 44-5, ¶ 30 (stating that "[m]ost assault weapons have significant penetration capabilities that are especially dangerous to both law enforcement officers and civilians alike")).) The officers' testimony, based on their personal knowledge and experiences, is properly admissible.[15]

### D. Allen

---

[13] Additionally, the plaintiffs claim that Vince's "firearms-related opinions," (*see* Vince Decl., ECF No. 44-8, ¶¶ 10–19, 31–32), should be excluded as outside his area of expertise. Because the court neither relies on nor refers to Vince's opinions in that part of his declaration, the court does not need to decide the issue.

[14] Johnson's familiarity with shotguns stems from his formal law enforcement training, as well as his personal ownership of a shotgun that he uses for hunting. (*See* Johnson Dep., ECF No. 62-2, at 6:8–12; 67:5–69:19.)

[15] In any event, the court does not rely on or refer to Johnson's or Batts's disputed testimony, and the plaintiffs, therefore, are not prejudiced by its admission.

The plaintiffs claim that the court should exclude Lucy Allen's expert opinions related to the frequency with which the banned weapons are used defensively for two reasons.  First, they claim that her conclusions are based on the coding of stories she did not independently verify.  The court notes, however, that the database which Allen studied is maintained by the NRA, suggesting, if anything, that her study may have a bias in favor of finding more instances of the defensive use of firearms.  Moreover, the plaintiffs proffer nothing to suggest the stories collected by the NRA are unreliable or inaccurate.  Second, they argue that she cannot base her opinions on stories, which, they claim, are inappropriate anecdotal evidence.  In light of the apparent dearth of other evidence demonstrating that the firearms at issue here are used for self-defense, Allen's use of the NRA database is appropriate and acceptable.  Not only do the cases to which the plaintiffs cite for the opposite conclusion not stand for the proposition that an expert can never rely on anecdotal evidence, they expressly contemplate the use of such evidence.[16]

*See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316 (11th Cir. 1999) (acknowledging that case reports do not provide reliable scientific proof of *causation*, but recognizing their importance for "raising questions and comparing clinicians' findings").[17]

### E.  Johnson and Bulinski

Finally, the plaintiffs seek to exclude Johnson's testimony in front of the Maryland General Assembly and Maximillian Bulinski's declaration because the defendants did not disclose them in accordance with Federal Rule of Civil Procedure 26(a) or (e).  *See also* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a

---

[16] The court fails to see how one would find the rate with which guns are used for defensive purposes without relying on anecdotal evidence.

[17] To the extent the plaintiffs challenge Allen's reliance on the *Mother Jones* data, their challenge must fail.  As explained above, the data were subject to independent review by Koper and his graduate student.

motion . . . ."). Evidence a party has failed to timely disclose will not be excluded if the failure is substantially justified or harmless. *S. States Rack and Fixture, Inc v. Sherwin-Williams Co.*, 318 F.3d 592, 595–96 (4th Cir. 2003) (articulating five factors the court should consider when deciding whether exclusion is proper: the surprise to the party against whom the evidence is offered, the ability of the party to cure that surprise, the extent to which the testimony would disrupt trial, the explanation for the failure, and the importance of the testimony).

Any failure to disclose Johnson's testimony in front of the General Assembly was harmless. The portions of Johnson's testimony relevant to the plaintiffs' challenge here are not substantively different from his statements in his declaration. Nor do the plaintiffs allege any manner in which they are different. The plaintiffs thus were not prejudiced because they were not deprived of a full opportunity to examine Johnson on his views of the Firearm Safety Act or gun-related crime.

The defendants' failure to disclose Bulinski's testimony is substantially justified. The defendants first had notice they would need to investigate evidence related to Bulinski's declaration when the plaintiffs filed their opposition memorandum on March 17, 2014. The defendants did not learn they would want to offer Bulinski's testimony until March 27, 2014, when he attempted to make the purchases about which he testifies. This was only fifteen days before they filed their reply memorandum. In addition, because the testimony is responsive to the plaintiffs' evidence, the testimony does not raise new issues of which the plaintiffs were unaware such that the plaintiffs are prejudiced. In fact, the plaintiffs do not claim any prejudice in their papers. Further, Bulinski's testimony offers valuable information given the plaintiffs' limited evidence as to the availability of firearms magazines with capacities of ten rounds or less.

The court will not exclude Johnson's testimony or Bulinski's declaration.

**III.      Second Amendment**

The plaintiffs claim that Maryland's ban on various assault weapons and LCMs infringes their Second Amendment rights.  The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."  U.S. Const. amend. II.  It is applicable to the states through the Fourteenth Amendment.  *McDonald v. City of Chicago, Ill.*, 130 S. Ct. 3020, 3026, 3050 (2010).

In *District of Columbia v. Heller* (*Heller I*), the Supreme Court found that the Second Amendment codified a pre-existing, individual right to keep and bear arms and that its core protection was the right of "law-abiding, responsible citizens to use arms in defense of hearth and home."  554 U.S. 570, 592, 635 (2008).  Accordingly, the Court found that a complete prohibition on handguns—the class of weapon "overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]" in the home—infringed on the central protection of the Second Amendment and thus failed any level of constitutional scrutiny.  *Id.* at 628–29; *see also Woollard v. Gallagher*, 712 F.3d 865, 874 (4th Cir. 2013) (noting that self-defense in the home is the "core protection" of the Second Amendment right).

The Court also recognized, however, that the right to bear arms is not unlimited, and articulated some of its boundaries.  With respect to the types of weapons protected, the Court found that the Second Amendment does not protect "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Heller I*, 554 U.S. at 626.  Instead, it only protects those that are "'in common use at the time,'"[18] and "typically possessed

---

[18] The Supreme Court has not articulated the time during which common use is measured.  Most courts that have addressed the issue have looked at the current use of a weapon.  At least one court has noted the Supreme Court's failure to clarify the time frame, although it still referenced statistics on current use.  *See Shew*, 2014 WL 346859, at *5 & n.37.

by law-abiding citizens for lawful purposes."[19]  *Id.* at 625, 627 (quoting *Miller*, 307 U.S. 174,

179 (1939)); *see also Heller II*, 670 F.3d at 1260 ("[W]e must also ask whether the prohibited

weapons are typically possessed by law-abiding citizens for lawful purposes; if not, then they are

not the sorts of 'Arms' protected by the Second Amendment." (internal citations omitted)).

Further, the Court found "longstanding" regulations of firearms "presumptively lawful,"

identifying as examples regulations prohibiting the possession of firearms by felons or the

mentally ill, prohibiting the carrying of firearms in "sensitive places," or imposing conditions on

the commercial sale of firearms.  *Heller I*, 554 U.S. at 626–27 & n.26.

Given that the right to bear arms is not boundless, the Fourth Circuit, like several others,

applies a two-part approach to Second Amendment claims.  *Woollard*, 712 F.3d at 874–75; *see

also Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1150 (9th Cir. 2014); *Nat'l Rifle Ass'n of Am.,

Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012);

*United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Heller II*, 670 F.3d at 1252; *Ezell*,

651 F.3d at 703–04; *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010).  First, the

court determines whether the challenged law "imposes a burden on conduct falling within the

scope of the Second Amendment's guarantee."  *Woollard*, 712 F.3d at 875 (quoting *United

States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010)).  "This historical inquiry seeks to determine

whether the conduct at issue was understood to be within the scope of the right at the time of

ratification."  *Id.* (quoting *Chester*, 628 F.3d at 680) (internal quotation marks omitted).  If it was

not, then the law regulating such conduct is valid.  *Id.*  If the conduct does fall within the scope

of the Second Amendment right, then the court must move to the second part of the inquiry and

[19] With its holding, the Court rejected claims that the Second Amendment protects the right to possess weapons that would be effective in modern military combat, such as M-16 rifles, but that are "highly unusual in society at large." *Heller I*, 554 U.S. at 627–28.  In doing so, the Court noted that "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." *Id.* at 627.

apply "the appropriate form of means-end scrutiny." *Id.* (quoting *Chester*, 628 F.3d at 680) (internal quotation marks omitted).

### A. Infringement of the Second Amendment Right

The court must first determine whether the weapons at issue here are of the type falling within the Second Amendment's scope.  The defendants do not appear to claim Maryland's ban on assault weapons and LCMs is longstanding such that it is presumptively valid. *See Heller II*, 670 F.3d at 1253 ("A requirement of newer vintage is not . . . presumed valid.").  The court must instead evaluate whether the banned assault long guns and LCMs are in common use for lawful purposes. *See Heller I*, 554 U.S. at 625, 627; *Heller II*, 670 F.3d at 1260; *Shew*, 2014 WL 346859, at *5; *NYSRPA*, 2013 WL 6909955, at *10–11.  If they are not—or if they are dangerous and unusual—they fall outside the Amendment's protections, and Maryland's law banning the weapons is valid without further analysis. *See Heller I*, 554 U.S. at 627; *Woollard*, 712 F.3d at 875.[20]

The plaintiffs contend that, according to data from the MSP, the banned long guns have been generally increasing in popularity since 1995.  (*See* Dalaine Brady Decl., Ex. C, ECF No. 44-10.)  Indeed, over the past three years in Maryland, there have been approximately 35,000 transfers of assault weapons and frames and receivers of such weapons.[21]  (*Id.*)  The plaintiffs also claim that at least 5 million of the banned assault weapons are possessed nationwide, and

---

[20] There is an apparent tension between the requirement of a historical analysis that examines the scope of the right as understood in 1868, *see McDonald*, 130 S.Ct. at 3041–42, and the need to evaluate whether the banned firearms are "in common use" at the present time, but it is not necessary to address that tension for purposes of this opinion. It may be that the purpose of the right to bear arms—i.e., self-defense—is measured at the time of ratification, while the kind of weapons used for that purpose—e.g., handguns or assault rifles—is measured at the time the state law is passed.
[21] Since 1994, Maryland has gathered information regarding the transfer of regulated firearms. (*See* Brady Decl. ¶¶ 21–29.)  It is important to note, however, that all transfers were recorded, even if the transfer was of a firearm previously transferred. (*Id.* ¶ 33.)  Thus, for example, if a single firearm was transferred five times over the past two decades, it would appear as five separate transactions. (*Id.*)  In this way, the information collected by Maryland may overstate the number of regulated firearms.

16

that the number may be as high as 8.2 million.  (*See* Johnson Dep., ECF No. 55-17, at 43:2–9; *see also* James Curcuruto Decl., Ex. A, ECF No. 55-9, ¶ 1 ("Figures from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Annual Firearms Manufacturers and Exports Reports (AFMER) show that between 1990 and 2012, United States manufacturers produced approximately 4,796,400 AR-platform rifles for sale in the United States commercial marketplace. . . .  During these same years, . . . approximately 3,415,000 AR- and AK-platform rifles were imported into the United States for sale in the commercial marketplace.").)  The popularity of these firearms, the plaintiffs claim, is further evidenced by the frequency with which they are manufactured and sold.  (*See* Curcuruto Decl., Ex. A, ¶ 1 (noting that, in 2012, more AR- and AK-platform rifles were manufactured in or imported to the United States than the most commonly sold vehicle); *see also id.* ¶ 3 (indicating that retailers reported that AR- and AK-platform rifles accounted for 20.3% of the firearms they sold in 2012).)

As for the LCMs banned by the Firearm Safety Act, the plaintiffs assert that they are standard with the purchase of most new pistols, and have been sold in the civilian market for over one hundred years.  (*See* Guy Rossi Decl., Ex. A, ECF No. 55-11, at 2; *see also* James Supica Decl., Ex. A, ECF No. 55-14, at 7.)  They claim that, across the nation, LCMs represent seventy-five million, or forty-six percent, of all magazines in U.S. consumer possession between 1990 and 2012.  (Curcuruto Decl., Ex. A, ¶ 6; *see also* Koper Decl., Ex. B, at 1 (stating that gun industry sources estimated that, as of 1995, there were 25 million LCMs available in the United States, and that an additional 4.7 million LCMs were imported into the country from 1995 to 2000).)  Marylanders owned about 725,000 of those LCMs during that time.  (Curcuruto Decl., Ex. A, ¶ 6.)  Based on the absolute numbers of assault weapons and LCMs, the plaintiffs ask the court to conclude that they are in common use.

Further, the plaintiffs argue that the banned assault weapons and LCMs are commonly possessed for self-defense and competitive marksmanship.[22]  They claim that assault weapons banned by the Firearm Safety Act represent about sixty percent of the firearms used at AGC's firing range in Marriottsville, Maryland.  (*See* John Josselyn Decl., ECF No. 55-6, ¶ 7.)  In addition, "[f]or the past quarter of a century AR15's have consistently been used by winning competitors at the U.S. Civilian Marksmanship National Match target shooting championships held each year at Camp Perry, Ohio."  (Gary Roberts Decl., ECF No. 55-10, ¶ 18.)  Likewise, some competitions "are designed specifically for pistols, rifles and shotguns capable of holding a greater number of rounds than the Act permits."  (Rossi Decl., Ex. A, at 2.)  Finally, the plaintiffs assert that the banned firearms and LCMs are used in a small percentage of crime in Maryland, are used infrequently in mass shootings and murders of law enforcement officers, and are no more dangerous to law enforcement officers than other rifles.  (*See* Mark Gius Decl., Ex. A, ECF No. 55-12, at 2 (estimating that, at most, 2.52% of murder victims in the United States were killed with assault rifles); Table 27, Law Enforcement Officers Feloniously Killed, ECF No. 55-28 (indicating that, from 2003 to 2012, of the 493 law enforcement murders caused by firearms, 92 of those, or 18.7%, involved rifles, an unspecified subset of which were assault rifles); Webster Dep., ECF No. 55-18, at 104:9–17 (suggesting that rifles not banned under the Firearm Safety Act are equally effective in penetrating law enforcement armor as the assault rifles that are banned); *see also* Roberts Decl. ¶ 5 ("There is nothing ballistically special or different about a .223/5.56mm bullet whether fired from an AR-15 or some other rifle of the same caliber.");

---

[22] The plaintiffs also claim that the banned assault long guns and LCMs are in common use for hunting, which the Supreme Court has indicated may be a use protected by the Second Amendment.  *See Heller I*, 554 U.S. at 599.  The plaintiffs proffer no evidence, however, to suggest that the weapons at issue are used or even possessed for that purpose.  Further, although the court recognizes the need to build proficiency with a firearm for the purposes of hunting or self-defense, there has been no indication from the Supreme Court that competitive marksmanship in itself is a purpose protected by the Second Amendment.  *See id.* at 626 (noting the Second Amendment right is not one to "keep and carry any weapon whatsoever in any manner whatsoever and *for whatever purpose*" (emphasis added)).

Case 1:13-cv-02841-CCB   Document 81   Filed 08/22/14   Page 19 of 47

Buford Boone Decl., ECF No. 55-13, ¶ 4 ("[T]he soft body armor commonly worn by law enforcement officers is rated only to stop handgun rounds.  It is not rated to stop most center-fire rifle rounds.").)  The plaintiffs, therefore, maintain that the banned assault weapons and LCMs are commonly used for lawful purposes.

According to the defendants, by contrast, assault weapons comprise a small portion of the current civilian gun stock in the United States.  (*See* Lawrence Tribe Testimony, ECF No. 44-74, at 24 (estimating that approximately seven million assault weapons are owned in the United States today); *see also* Marylanders to Prevent Gun Violence Br., ECF No. 40, at 4, 6–7 (estimating that the number of assault weapons in the United States is closer to the number of machineguns than the number of handguns).)  Koper estimates that, at the time of the 1994 federal ban, assault weapons comprised less than one percent of the civilian gun stock.  (Koper Decl. ¶ 19.)  Assuming that recent sales have increased the number of assault weapons in the current civilian market to nine million, such weapons would represent about three percent of the civilian gun stock.  (*See* William J. Krouse, Cong. Research Serv., *Gun Control Legislation*, ECF No. 44-28, at 8 (estimating that, by 2009, the total number of firearms available to U.S. civilians was approximately 310 million).)  The defendants also assert that the absolute number of assault weapons far exceeds the number of people who own them.  In recent decades, gun ownership in the United States has become increasingly concentrated; fewer households own firearms, but those households owning guns own more of them.  (*See* Webster Decl. ¶¶ 13–14; *see also* NSSF Rep., ECF No. 44-75, at 13 (indicating that the average owner of modern sporting rifles had 2.6 such weapons in 2010 and 3.1 such weapons in 2013).)[23]  Using NSSF's figure that the average

---

[23] Although it is not entirely clear what weapon qualifies as a modern sporting rifle, it appears NSSF began using this term in an effort to rebrand assault weapons, and the plaintiffs use this term to refer to AR- and AK-platform rifles.  (*See* Curcuruto Dep., ECF No. 44-44, at 79:14–80:21 (suggesting that he knows what a modern sporting rifle

assault weapons owner has 3.1 such weapons, this means less than 1% of Americans own an assault weapon.  In Maryland specifically, from 1994 to 2012, there were a total of 604,051 transfers of regulated firearms, of which only 46,577 were assault weapons.  (*See* Brady Decl., Ex. C.)  Assuming again that the average assault weapons owner has 3.1 such weapons, this means approximately 15,000 Marylanders own 46,577 assault weapons.  The defendants assert that, in light of Maryland's approximately 4.5 million adult residents, the number of Marylanders owning assault weapons is well below 1%.[24]  *See* U.S. Census Bureau: State & County QuickFacts, Maryland (last revised July 8, 2014), *available at* http://quickfacts.census.gov/qfd/states/24000.html.

The defendants further claim that assault weapons and LCMs[25] are not commonly used for self-defense, and indeed the plaintiffs fail to identify a single incident in which a Marylander defended herself using an assault weapon.  With the exception of one incident not relevant here,[26] Maryland law enforcement officials are unaware of any Marylander using an assault weapon, or needing to fire more than ten rounds, to protect himself.  (Johnson Decl. ¶¶ 30–31, 39–40; Batts Decl. ¶¶ 29–31, 37; Stawinski Decl. ¶¶ 24–25, 34; Marcus Brown Decl., ECF No. 44-2, ¶ 18; *see also* Webster Decl. ¶ 20 (stating that he is aware of no study or data suggesting that assault weapons features and LCMs are necessary for personal defense); Tribe Testimony at 14 (explaining that "in the case of high-capacity magazines, significant market presence does not

---

is when he sees it); *see also id.* at 69:9–72:16, 92:6–9 (indicating that NSSF created the term "modern sporting rifles" to cover, *inter alia*, "semiautomatic AR- or AK-platform rifle[s] and the variances thereof").)

[24] The defendants recognize that, in 2013, the number of Marylanders owning assault weapons was likely higher due to the many last-minute sales leading up to the implementation of the Firearm Safety Act.

[25] The defendants dispute that LCMs are "bearable arms" falling within the scope of the Second Amendment's protection.  *See Heller*, 554 U.S. at 582 ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms . . . .").  The court need not resolve this issue and will assume, although not decide, that they are bearable arms under the Second Amendment.

[26] Anthony Batts, the Commissioner of the Baltimore Police Department, is aware of just one incident in which a civilian in Baltimore City fired more than ten rounds in a self-defense incident, but a number of the rounds were fired as the perpetrators were fleeing the scene.  (Batts Decl. ¶ 31; *see also* Josselyn Dep., ECF No. 44-46, at 15:15–19:10.)

necessarily translate into heavy reliance by American gun owners on those magazines for self-defense").)  The defendants' expert, Lucy Allen, confirms that it is rare for a self-defender to fire more than ten rounds.  (Allen Decl., ECF No. 44-9, ¶ 8.)  Upon analyzing the NRA Institute for Legislative Action's reports on self-defense incidents occurring between January 2011 and December 2013, she determined that, on average, 2.1 bullets were fired.  (*Id.* ¶¶ 11–12.)  Put simply, the defendants argue that, although the plaintiffs may believe that particular assault weapons and LCMs are well-suited for self-defense, there is no evidence to support their claims.

The defendants finally argue that the banned assault weapons and LCMs fall outside Second Amendment protection as dangerous and unusual arms.  They assert that the banned firearms, which are substantially similar—and indeed, as discussed below, possibly more effective—in functioning, dangerousness, and killing capacity as their fully automatic counterparts, are military-style weapons designed for offensive use.  (*See* Supica Dep., ECF No. 44-41, at 75:7–77:8; Boone Dep., ECF No. 44-42, at 95:8–25; Curcuruto Dep., ECF No. 44-44, at 91:3–11; Rossi Dep., ECF No. 44-43, at 94:15–95:11; H.R. Rep. 103-489, ECF No. 44-23, at 18–20; *see also* 2011 Bushmaster Product Catalogue, ECF No. 44-70, at 3 (advertising the Bushmaster ACR (adaptive combat rifle) as "the ultimate military combat weapons system" and "[b]uilt specifically for law enforcement and tactical markets")); *see also Staples v. United States*, 511 U.S. 600, 602–03 & n.1 (1994) (identifying the AR-15 as "the civilian version of the military's M–16 rifle" and explaining that, although the AR-15 is only semi-automatic, it nevertheless "requires no manual manipulation by the operator to place another round in the chamber after each round is fired").  Likewise, LCMs serve an obvious military function by allowing the shooter to fire many rounds without having to pause to reload. (*See* 2011 ATF Study, ECF No. 44-16, at 10 (reporting the working group's determination that "magazines

capable of holding large amounts of ammunition, regardless of type, are particularly designed and most suitable for military and law enforcement applications"); *see also* 1998 ATF Study, ECF No. 44-15, at 38 (explaining that a firearm's ability "to accept a detachable large capacity military magazine gives [it] the capability to expel large amounts of ammunition quickly," which "serves a function in combat and crime, but serves no sporting purpose").)

This capacity, the defendants reason, can allow a criminal to cause mass casualties, while depriving victims and law enforcement of an opportunity to escape or overwhelm an assailant as he reloads his weapon. (*See* Gary Kleck Dep., ECF No. 44-51, at 139:11–25 (explaining that, in the mass shooting at an Aurora, Colorado movie theater, the assailant was able to fire 100 rounds without reloading); *see also* Newspaper Articles, ECF No. 44-40 (documenting situations in which bystanders or law enforcement officers were able to intervene as the assailant attempted to reload); Batts Decl. ¶ 49 (reasoning that, when a mass shooter must load ten 10-round magazines to fire 100 rounds, as opposed to a single 100-round drum, bystanders have about 6 to 9 more chances to escape and bystanders or law enforcement officers have about 6 to 9 more chances to intervene during a pause in firing).) Indeed, assault weapons and LCMs are disproportionately represented in mass shootings. (*See* Koper Decl. ¶ 25 (explaining that 21% of 62 mass shootings between 1982 and 2012 involved the use of an assault rifle, and that more than half of those incidents involved assault weapons, LCMs, or both); Allen Decl. ¶ 15 (indicating that, over the last three decades, LCMs were used in 85% of mass shootings where the magazine capacity was known, and that, in the past two years, LCMs were used in 5 of the 7 mass shootings with known magazine capacity); *see also* Webster Decl. ¶ 15). And the use of assault weapons and LCMs in mass shootings is correlated with more fatalities and more injuries than shootings in which they were not used. (*See* Koper Decl. ¶¶ 27, 37–43.) Beyond mass shootings, the defendants claim

that assault weapons and LCMs are also disproportionately represented in murders of law

enforcement officers.  (*See id.* ¶¶ 16, 22–23, 29, 35 (explaining that, before the federal assault

weapons ban went into effect, assault weapons accounted for up to nine percent of murders of

law enforcement officers, and that, in 1994, LCMs were involved in thirty-one to forty-one

percent of murders of officers); Webster Decl. ¶ 18 (internal citations omitted) ("[A] study of

murders of police officers while on duty in 1994 found that assault weapons were used in 16% of

the murders and 31% to 41% of the police officers were murdered with a firearm with a[n] LCM.

The Violence Policy Center examined data on law enforcement officers murdered in the line of

duty from the FBI for 1998-2001 and found 19.4% (41 of 211) had been shot with an assault

weapon.").)  In sum, the defendants claim that assault weapons and LCMs are not commonly

used and, in any event, are not useful or commonly used for self-defense.

Upon review of all the parties' evidence, the court seriously doubts that the banned

assault long guns are commonly possessed for lawful purposes, particularly self-defense in the

home, which is at the core of the Second Amendment right, and is inclined to find the weapons

fall outside Second Amendment protection as dangerous and unusual.  First, the court is not

persuaded that assault weapons are commonly possessed based on the absolute number of those

weapons owned by the public.  Even accepting that there are 8.2 million assault weapons in the

civilian gun stock, as the plaintiffs claim, assault weapons represent no more than 3% of the

current civilian gun stock, and ownership of those weapons is highly concentrated in less than

1% of the U.S. population.  The court is also not persuaded by the plaintiffs' claims that assault

weapons are used infrequently in mass shootings and murders of law enforcement officers.  The

available statistics indicate that assault weapons are used disproportionately to their ownership in

the general public and, furthermore, cause more injuries and more fatalities when they are used.[27]

As for their claims that assault weapons are well-suited for self-defense, the plaintiffs proffer no

evidence beyond their desire to possess assault weapons for self-defense in the home that they

are in fact commonly used, or possessed, for that purpose.[28]  Finally, despite the plaintiffs'

claims that they would like to use assault weapons for defensive purposes, assault weapons are

military-style weapons designed for offensive use, and are equally, or possibly even more

effective, in functioning and killing capacity as their fully automatic versions.[29]

Nevertheless, the court need not resolve whether the banned assault weapons and LCMs

are useful or commonly used for lawful purposes, *see Woollard*, 712 F.3d at 875–76 (making

clear that courts need not decide the infringement issue to rule on Second Amendment claims),

and will assume, although not decide, that the Firearm Safety Act places some burden on the

Second Amendment right.  *See Heller II*, 670 F.3d at 1260–61.

**B.  The Appropriate Level of Means-End Scrutiny**

Because the court assumes the Firearm Safety Act infringes on the Second Amendment,

it must decide what level of means-ends scrutiny to apply to determine the law's

constitutionality.

The Supreme Court held in *Heller I* that a heightened level of scrutiny applies to

---

[27] In their papers and at the hearing on the parties' motions, the plaintiffs claim assault weapons are not used disproportionately in crimes, pointing to, for example, the fact that law enforcement officers are more likely to be killed by motor vehicles or handguns.  (*See, e.g.*, Hr'g Tr., ECF No. 76, at 42:21–43:6.)  The plaintiffs misunderstand the disproportionality to which the defendants are referring and which the court finds supports the legislature's conclusion.  It may be that police officers are killed more often by handguns than assault weapons, but the evidence also demonstrates assault weapons are used disproportionately to their ownership in the population.
[28] Plaintiffs cite an NSSF survey of 5,070 "modern sporting rifle" owners in which "home defense" was the second most important reason responders gave for owning the guns, behind recreational target shooting, as evidence that assault weapons are commonly owned for self-defense.  (Curcuruto Decl., Ex. B, at 33.)  The survey question only asked how important home defense was for owning the weapon and provided an average rating between one and ten.  The court is not persuaded that these data demonstrate assault weapons are commonly owned for self-defense.
[29] The Supreme Court indicated in *Heller I* that M-16 rifles could be banned as dangerous and unusual.  554 U.S. at 627.  Given that assault rifles like the AR-15 are essentially the functional equivalent of M-16s—and arguably more effective—the same reasoning would seem to apply here.

regulations found to burden the Second Amendment right, 554 U.S. at 628 n.27, but did not

further articulate whether and when strict or intermediate scrutiny applies.  From the Court's

holding in *Heller I*, the Fourth Circuit has subsequently determined that whether strict or

intermediate scrutiny applies requires the court to consider "the nature of the person's Second

Amendment interest, the extent to which those interests are burdened by government regulation,

and the strength of the government's justifications for the regulation."  *United States v.

Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011).

        The Fourth Circuit has likened the analysis to that under the First Amendment, where

content-based regulations must survive strict scrutiny, while time, place, and manner restrictions

only must survive intermediate scrutiny.  *Id.* at 470–71; *Chester*, 628 F.3d at 682; *see also Heller

II*, 670 F.3d at 1262; *United States v. Marzzarella*, 614 F.3d 85, 97–98 (3d Cir. 2010).  Applying

a similar framework to Second Amendment cases, the Fourth Circuit noted that "we assume that

any law that would burden the 'fundamental,' core right of self-defense in the home by a law-

abiding citizen would be subject to strict scrutiny."  *Masciandaro*, 638 F.3d at 470.  On the other

hand, "less severe burdens on the right, laws that merely regulate rather than restrict, and laws

that do not implicate the central self-defense concern of the Second Amendment, may be more

easily justified."[30]  *Id.* (quoting *Chester*, 628 F.3d at 682) (internal quotation marks omitted); *see

also Peruta*, 742 F.3d at 1167-68 (reserving a higher standard of scrutiny for those laws that

destroy the core right, but a lower standard for those that merely burden it); *Kachalsky v. Cnty. of

Westchester*, 701 F.3d 81, 93–96 (2d Cir. 2012) (holding intermediate scrutiny is appropriate

---

[30] The Fourth Circuit has applied intermediate scrutiny to laws regulating the ability to carry arms outside the home and to laws prohibiting misdemeanants from possessing a firearm.  *See, e.g.*, *Woollard*, 712 F.3d at 876 (addressing a requirement that an individual demonstrate a "good and substantial reason" for carrying a handgun in public before he can obtain a permit to do so); *Masciandaro*, 638 F.3d at 471 (addressing a regulation barring the carrying of loaded weapons in a motor vehicle in a national park); *Chester*, 628 F.3d at 683 (addressing a statute prohibiting those convicted of a misdemeanor crime involving domestic violence from possessing a firearm).

where a firearm regulation does not burden the core protection of self-defense in the home);

*Heller II*, 670 F.3d at 1261 (noting that the court determines the level of scrutiny "by assessing

how severely the prohibitions burden the Second Amendment right"); *Marzzarella*, 614 F.3d at

97 (finding intermediate scrutiny was appropriate for evaluating the prohibition of unmarked

firearms because the law did not severely limit the possession of firearms and left a person free

to possess any otherwise lawful firearm of his choosing).

Applying that framework here, the court finds intermediate scrutiny is appropriate for

assessing the constitutionality of Maryland's ban because it does not seriously impact a person's

ability to defend himself in the home, the Second Amendment's core protection.  It does not ban

the quintessential weapon—the handgun—used for self-defense in the home.  Nor does it prevent

an individual from keeping a suitable weapon for protection in the home.  In fact, the plaintiffs

can point to no instance where assault weapons or LCMs were used or useful in an instance of

self-defense in Maryland.[31]  As already discussed, four law enforcement agents leading state and

local law enforcement offices in Maryland could not identify a single instance in which an

assault weapon or more than ten rounds of ammunition were used or were necessary to ward off

an attacker.  (Johnson Decl. ¶¶ 30–31, 39–40; Batts Decl. ¶¶ 29–31, 37; Stawinski Decl. ¶¶ 24–

25, 34; Brown Decl. ¶ 18; *see also* Webster Decl. ¶ 20.)  Therefore, although the bans remove a

class of weapons that the plaintiffs *desire* to use for self-defense in the home, (*see, e.g.*, Kolbe

Decl. ¶ 8), there is no evidence demonstrating their removal will significantly impact the core

protection of the Second Amendment.  Accordingly, intermediate scrutiny applies.  *See Heller II*,

670 F.3d at 1261–62 (applying intermediate scrutiny where the court found the prohibitions on

---

[31] The plaintiffs include a letter in the record from a former Maryland State Trooper in which the Trooper recounts an instance where, while on duty, he fired twenty-one rounds at a criminal who had a hostage—completely emptying the magazines in his two firearms—and actually shot the criminal eight times.  (Letter from Lawrence J. Nelson, ECF No. 55-34, at 1.)  The letter provides no evidence as to whether it was necessary to dispense all twenty-one rounds.

assault rifles and LCMs did not "effectively disarm individuals or substantially affect their ability to defend themselves"); *Colorado Outfitters Assoc. v. Hickenlooper*, -- F. Supp. 2d --, 2014 WL 3058518, at *14 (D. Colo. June 26, 2014) (finding intermediate scrutiny applied to a ban on LCMs with more than fifteen rounds because, although touching the core right to bear arms for defense of self and home, it did not severely limit a person's ability to keep arms for that purpose); *Fyock*, 2014 WL 984162, at *6–7 (finding a ban on LCMs only warranted intermediate scrutiny because, although close to the core right of self-defense in the home, the law only created a minor burden on that right given the number of alternatives); *San Francisco Veteran Police Officers Ass'n*, 2014 WL 644395, at *4–5 (finding intermediate scrutiny applied to a ban on LCMs because the ban "merely burdens" but does not "destroy" the right to self-defense); *Shew*, 2014 WL 346859, at *7 (finding intermediate scrutiny appropriate because the challenged legislation "provides alternate access to similar firearms and does not categorically ban a universally recognized class of firearms"); *NYSRPA*, 2013 WL 6909955, at *12–13 (finding intermediate scrutiny appropriate because "nearly universally" courts had applied intermediate scrutiny in the Second Amendment context and because application of strict scrutiny would be inconsistent with the Supreme Court's holding that some regulations are presumptively valid).

The plaintiffs raise two arguments as to why strict scrutiny should apply, but they are not persuasive. First, they contend that, any time a firearm is in common use and used for lawful purposes, a ban on ownership is per se unconstitutional. There is nothing in the relevant case law to support such a claim and, in fact, such a holding would be contrary to established Fourth Circuit precedent. *See Masciandaro*, 638 F.3d at 470 (applying intermediate scrutiny to a regulation presumed to infringe on the Second Amendment's protections). Further, *Heller I* does

not require such a holding.  Although the Supreme Court found commonly used weapons to fall within the Second Amendment's protection, it said nothing of when intermediate or strict scrutiny applies.  *See Heller I*, 554 U.S. at 628-29; *see also Chester*, 628 F.3d at 682 ("We do not apply strict scrutiny whenever a law impinges upon a right specifically enumerated in the Bill of Rights.").

Second, the plaintiffs claim that strict scrutiny should apply any time a regulation touches the core right of self-defense in the home, regardless of the extent to which the regulation burdens it.  To support their position, the plaintiffs point to the Fourth Circuit's assumption in dicta in *Masciandaro* that "*any law* that would burden" the core right would be subject to strict scrutiny.  638 F.3d at 470 (emphasis added).  The plaintiffs, however, ignore the rest of the Fourth Circuit's opinion.  Immediately before the cited language, the Fourth Circuit recognized that not all burdens are treated the same under the Second Amendment and that it is only those that impose a "severe burden" on the core right that require "strong justification."  *Id.* (quoting *Chester*, 628 F.3d at 682).  The court concludes, therefore, that Fourth Circuit precedent is in line with the holdings of other circuits: where the burden is not severe, even assuming a regulation touches the core right, intermediate scrutiny applies.

## C.  Applying Intermediate Scrutiny

To survive intermediate scrutiny, the government must demonstrate that the laws at issue are "reasonably adapted to a substantial government interest."  *Woollard*, 712 F.3d at 876 (quoting *Masciandaro*, 638 F.3d at 471) (internal quotation marks omitted); *Chester*, 628 F.3d at 683 (holding the government must demonstrate that there is a "reasonable fit" between the law at issue and the government's substantial interest).  The Fourth Circuit has made clear that intermediate scrutiny "does not require that a regulation be the least intrusive means of achieving

28

the relevant government objective, or that there be no burden whatsoever on the individual right

in question." *Masciandaro*, 638 F.3d at 474. Nor does the fit have to be perfect. *Woollard*, 712

F.3d at 878. Instead, Maryland's interests only must be "substantially served" by the law. *Id.*

Further, the Fourth Circuit in *Woollard* made clear that where the government has satisfied the

requirements of the relevant level of scrutiny, the court would not question the government's

policy judgments in favor of other options. *Id.* at 881 (noting that the court "cannot substitute

[its] views for the considered judgment of the General Assembly"). Thus, the court cannot find a

law unconstitutional solely because the plaintiffs have offered arguably more effective

alternatives for serving the government's objective.[32]

The Fourth Circuit has expressly found that the government has a substantial interest in

providing for public safety and preventing crime, *id.* at 877; *see also Masciandaro*, 638 F.3d at

473 (finding that the government has a substantial interest in providing for public safety in

national parks), the interests the defendants advance here. In fact, the court has implied that

protecting public safety may even be a compelling interest. *Masciandaro*, 638 F.3d at 473

(noting that cases have described the government's interest in public safety as "compelling" and

citing cases). In any event, the plaintiffs admit that the government has a "compelling

government interest" in ensuring public safety. (Pls.' Mem., ECF No. 55-1, at 31.)

Finding the government has a sufficient interest, the court must decide whether

Maryland's ban on assault weapons and LCMs substantially serves that interest. As a

---

[32] To the extent the plaintiffs cite the Supreme Court's recent opinion in *McCullen v. Coakley*, 134 S.Ct. 2518 (2014), (*see* Pls.' Corr., ECF No. 74), to claim the intermediate scrutiny standard is somehow more stringent than the standard as articulated by the Fourth Circuit, there is nothing in the Supreme Court's opinion to suggest that the Court intended to alter the standard in any way. Further, although courts have recognized parallels between the First Amendment and the Second Amendment when determining which standard of scrutiny to apply, no court has ever held they are exactly the same such that the court's analysis here is controlled by the First Amendment analysis regarding time, place, and manner restrictions. The Fourth Circuit has articulated how intermediate scrutiny is to be applied under the Second Amendment, *see, e.g.*, *Woollard*, 712 F.3d at 878–89; *Masciandaro*, 638 F.3d at 473–74, and this court is bound by its precedents.

preliminary matter, the plaintiffs contend that the court should look only to the evidence that was

in front of the legislature when it enacted the law to determine whether the law passes

intermediate scrutiny.  Plaintiffs base their claim on the Supreme Court's statement in *Turner I*

that when applying intermediate scrutiny, a court must "assure that, in formulating its judgments,

[the legislature] has drawn reasonable inferences based on substantial evidence."  512 U.S. at

666.  In the only case plaintiffs cite to support their interpretation of this language, the Third

Circuit did not hold that the court could consider only evidence that was in front of the

legislature.  Instead, it found that what the legislature relied on was unclear and then decided that

the state could point to other means of support, such as common sense, history, and studies.

*Drake v. Filko*, 724 F.3d 426, 437–38 (3d Cir. 2013) (citing *IMS Health, Inc. v. Ayotte*, 550 F.3d

42, 55 (1st Cir. 2008)).  Notably, and as the defendants point out, the Supreme Court in *Turner I*

also stated that Congress did not have to develop a record as an administrative agency would and

indicated that evidence outside the legislative record could be introduced in the litigation.  512

U.S. at 666–67.

  The Fourth Circuit has held that "the Constitution does not mandate a specific method by

which the government must satisfy its burden under heightened judicial scrutiny," and that the

government "may resort to a wide range of sources, such as legislative text and history, empirical

evidence, case law, and common sense."  *United States v. Carter*, 669 F.3d 411, 418 (4th Cir.

2012).  In *Woollard*, for example, although citing several pieces of evidence that led to its

finding that a reasonable fit existed between a "good and substantial reason" requirement for

issuing handgun permits and the purpose of public safety, the court never mentioned or

investigated whether the evidence was also in front of the legislature.  712 F.3d at 879–80; *see

also United States v. Chester*, 847 F. Supp. 2d 902, 906–07 (S.D.W.V. 2012) (on remand from

the Fourth Circuit, considering evidence from non-legislative sources to find the government had

satisfied its burden under intermediate scrutiny).  Even where the Fourth Circuit has articulated

the standard from *Turner I*, it has stated that the court could "look to evidence outside the

legislative record in order to confirm the reasonableness of Congress's predictions."  *Satellite*

*Broadcasting and Comm. Ass'n v. Fed. Commc'ns Comm'n*, 275 F.3d 337, 357 (4th Cir. 2001)

(citing *Turner II*, 520 U.S. at 196).

Turning to the record in this case, Maryland's ban on assault long guns and LCMs

survives intermediate scrutiny.[33]  The evidence demonstrates that assault weapons have several

military-style features making them especially dangerous to law enforcement and civilians.

(ATF, Importability of Certain Semiautomatic Rifles, ECF No. 44-14, at 6–7 (describing the

military features of semi-automatic assault rifles); 1998 ATF Study at 1 (same).)  The AR-15, for

example, is essentially the same as the military's M-16 rifle, with the exception that the AR-15 is

semi-automatic instead of fully automatic.  (*See* Johnson Decl. ¶ 36 ("The only difference

between automatic firearms actually used by the military, such as the M16, and assault weapons

covered by the ban, such as the AR-15, is that the M16 is fully automatic.")); *see also Staples*,

511 U.S. at 603 (noting that the AR-15 is "the civilian version of the military's M-16 rifle").

The difference in the rate of fire from a semi-automatic and fully automatic weapon, however,

appears to be minimal.  (*See* Brian Siebel Testimony, ECF No. 44-24, at 197 (noting that an

assault rifle could empty a thirty-round magazine in two seconds on fully automatic mode and

only five seconds on semi-automatic mode); Kleck Dep. at 151:10–15 (stating that an untrained

person using a semi-automatic rifle can probably fire six rounds in a second); Johnson Decl. ¶ 36

("The rate of fire from [semi-automatic] weapons is limited only by the speed at which the

---

[33] Every court that has addressed the issue has considered evidence very similar—and sometimes identical—to that
presented by the parties here and found bans on assault weapons and LCMs to survive intermediate scrutiny.  *See,*
*e.g.*, *Heller II*, 670 F.3d at 1262–64; *Shew*, 2014 WL 346859, at *8–9; *NYSRPA*, 2013 WL 6909955, at *14–18.

shooter can pull the trigger.")).

Having the features of military weapons, assault weapons are designed to cause extensive damage and can fire many rounds in quick succession, from a greater distance and with greater accuracy than many other types of guns—including, in some respects, their automatic counterparts.  (*See* U.S. Army's M16/M4 Training Manual, ECF No. 44-25, at 7-9 (stating that "rapid semi-automatic fire is superior to automatic fire in all measures: shots per target, trigger pulls per hit, and time to hit"); Brown Decl. ¶ 12 (explaining that the banned weapons are "designed for the battlefield, for the soldier to be able to shoot a large number of rounds across a battlefield at a high rate of speed"); 1998 ATF Study at 1 (noting that semi-automatic rifles "had a military configuration that was designed for killing and disabling the enemy and that distinguished the rifles from traditional sporting rifles"); *see also* Johnson Decl. ¶¶ 22, 25–26, 32–33; Batts Decl. ¶¶ 20, 33; Stawinski Decl. ¶ 44; Siebel Testimony at 197–98.)  Further, as already discussed above, the evidence demonstrates that assault weapons are often used in mass shootings and cause more fatalities and injuries when used. (*See, e.g.*, Koper Decl. ¶¶ 21–29.)

The evidence also demonstrates that criminals using assault rifles pose a heightened risk to law enforcement.  (*See* Batts Decl. ¶ 45 (indicating that the military features of assault weapons, such as flash suppressors and pistol grips, provide criminals with a "military-style advantage" in a firefight with law enforcement).)  For example, rounds shot from such weapons have the capability—more so than rounds shot from many other types of guns—to penetrate the soft body armor worn by law enforcement officers, as well as many kinds of bullet-resistant glass used by law enforcement.[34] (Johnson Decl. ¶ 45 (reasoning that assault weapons pose a particular

---

[34] Plaintiffs claim the law enforcement officers' observations cannot support this finding because they are not ballistics experts.  Although they may not be ballistics experts, their anecdotal and experience-based testimony is appropriately considered here.  The plaintiffs also claim that assault weapons are not unique in their penetration capabilities.  As discussed more fully below, however, that some other firearms also have increased penetration

threat to law enforcement officers because their rounds easily penetrate soft body armor);

Stawinski Decl. ¶¶ 30–32 (offering personal observations of bullets from assault weapons

piercing soft body armor and bullet-resistant glass where bullets from handguns and other

firearms did not); *see also* Brown Decl. ¶ 23.)  Further, assault weapons allow criminals to

engage law enforcement officers with greater firepower, (Johnson Decl., Ex. A, at 2 (reasoning

that assault weapons allow criminals to "up the ante with firepower in excess of what police

officers typically use"); Johnson Decl., Ex. B, at 2 ("Assault weapons are routinely the weapons

of choice for gang members and drug dealers . . . and are all too often used against police

officers.")), and they have been used to murder law enforcement officers in a rate

disproportionate to their presence in civilian society, (*see* Violence Policy Ctr., *"Officer Down"*

*Assault Weapons and the War on Law Enforcement*, ECF No. 44-56, at 5 (citing FBI data

demonstrating that 19.4% of law enforcement officers killed in the line of duty were killed by

assault weapons between 1998 and 2001); *see also* Koper Decl. ¶¶ 16, 22–23, 29, 35; Webster

Decl. ¶¶ 15, 18.)  Finally, several law enforcement officers offered affidavit statements regarding

their experience with criminals obtaining assault weapons through straw purchases from

authorized retailers, on the secondary market from legal owners, or through theft from legal

owners, (*e.g.*, Johnson Decl. ¶ 48; Batts Decl. ¶ 48); *see also Abramski v. United States*, 134 S.

Ct. 2259, 2267–68, 2267 n.7 (2014) (describing a typical straw purchase in which a felon or

other person barred from gun ownership purchases a gun through an intermediary and citing a

Department of the Treasury report from 2000 that, in several prior years, almost half of all ATF

firearm trafficking investigations involved straw purchases), suggesting that limiting the

availability of the firearms generally will limit their availability to criminals.

---

abilities does not undermine the legislature's conclusion that banning assault weapons would protect public safety
and decrease the effects of violent firearm-related crime.

Assault weapons pose a heightened risk to civilians as well.  For civilians in their homes, the penetrating capabilities of bullets fired from assault weapons pose a higher risk than that posed by other firearms.  They can penetrate walls and other home structures and remain more effective than penetrating bullets fired from other guns, endangering those in neighboring rooms, apartments, or even other homes.  (Brady Ctr. to Prevent Gun Violence, *Assault Weapons "Mass Produced Mayhem"*, ECF No. 44-58, at 16 (citing a statement by Jim Pasco, executive director of the Fraternal Order of Police, that he would not be surprised if a bullet fired from an AK-47 went through six walls of conventional drywall in a home); *see also* Stawinski Decl. ¶ 33.) Further, with the military-style features of assault weapons, they are made even more dangerous because civilians often do not receive the same kind of training that law enforcement officers receive.  (Vince Decl. ¶ 21.)

The evidence demonstrates, therefore, that the ban on assault weapons is likely to further the government's interest in protecting public safety by removing weapons that cause greater harm when used—to both civilians and police—and create greater obstacles for law enforcement in stopping and detaining criminals who are using them.

The record also shows a reasonable fit between banning LCMs and the government's substantial interest in protecting public safety and reducing the negative effects of firearm crimes.  First, more rounds available equates with more shots fired and more individuals injured. (*E.g.*, Brown Decl. ¶ 24; Johnson Decl. ¶ 44; *see also* Koper Decl. ¶ 15 (noting that the "best available evidence" indicates that attacks with guns with LCMs "generally result in more shots fired, persons wounded, and wounds per victim").)  In addition, the evidence demonstrates that over the last three decades LCMs of more than ten rounds were used in thirty-four out of forty

mass shootings[35] in which the magazine capacity was known, and that the average number of

shots fired, in the twenty-seven shootings for which the number was available, was seventy-five.

(Allen Decl. ¶¶ 15–16.)  They are also disproportionately used in the killing of law enforcement

officers.  (Koper Decl. ¶ 35 (noting that in 1994, LCMs were estimated to have been used in

thirty-one to forty-one percent of gun murders of police).)  There is also evidence that LCMs

contribute to more fatalities per incident than in non-LCM cases.  (*Id.* ¶¶ 38–42.)  Further, the

evidence demonstrates that the break in time when a shooter must reload because he has spent a

magazine is critical to disabling someone engaged in a violent, offensive attack or to allow

potential victims to escape.[36]  (*See* Johnson Decl. ¶¶ 54–56; Stawinski Decl. ¶ 40; *see also*

Newspaper Articles, ECF No. 44-40 (citing several examples where a shooter was disabled while

attempting to reload his firearm).)

     With respect to civilians, untrained civilians using LCMs tend to fire more rounds than

necessary, thus endangering more bystanders.  (Johnson Decl. ¶ 38; Stawinski Decl. ¶ 35; *see*

*also* Batts Decl. ¶ 42 ("The risk of indiscriminate firing from untrained or undertrained

individuals with access to large numbers of highly-lethal rounds, especially combined with the

improbability that such rounds will actually be necessary to end any particular attack, is an

additional and, in my view, unacceptable risk to public safety . . . ."); Josselyn Dep. at 74:7–9

("It's not uncommon to have the police arrive on a scene and see someone there still pulling the

trigger, even though the gun is long empty . . . .")); *see also Heller II*, 670 F.3d at 1263–64

(finding an aggravated risk from "the tendency . . . for defenders to keep firing until all bullets

have been expended" (quoting Siebel Testimony)).  The court thus finds a reasonable fit between

---

[35] For the purpose of these figures, mass shootings were those in which four or more people were killed and that did not include armed robbery or gang violence.  (Allen Decl. ¶¶ 13–14.)

[36] The plaintiffs state in their brief that a "shooter intent on firing as many rounds as possible can fire thirty rounds using three ten-round magazines and reloading equally as fast as a shooter firing deliberately can fire thirty rounds from a thirty-round magazine."  (Pls.' Mem. at 77.)  They point to no support in the record for such a claim.

the ban on LCMs and the government's interest in public safety.

The plaintiffs make several claims as to why the assault weapons ban does not further the government's substantial interests.  Some of their arguments rely, however, on a misapplication of the intermediate scrutiny standard and are therefore not persuasive.  For example, the plaintiffs claim there are several other types of guns which are not banned that can pierce soft body armor and walls as well.  This argument ignores, however, that the fit between a regulation and the government's purpose need not be perfect.  *See Woollard*, 712 F.3d at 877.  The law at issue here does not have to eliminate all guns that have the ability to pierce soft body armor.  The court cannot find the ban unconstitutional simply because it does not by itself solve an entire problem.[37]  *See id.* at 881–82.  Instead, the evidence demonstrates that the banned weapons pose a threat to law enforcement and public safety because of a combination of features of which the ability to penetrate soft body armor is just one.  (*See* Webster Supp. Decl., ECF No. 62-6, ¶ 6.) Once finding that the ban will sufficiently further the government's substantial interests in protecting public safety and preventing crime—including murders of police officers—to pass intermediate scrutiny, the court cannot question the legislature's judgment that the Firearm Safety Act was the appropriate balance of various interests when compared to other possible regulations.

The remainder of the plaintiffs' arguments rely on mischaracterizations of Koper's expert opinions and reports, as discussed earlier in this opinion.  Plaintiffs place particular emphasis on Koper's findings regarding the federal assault weapons ban.  The fact that some effects of the federal ban were hard to measure, however, or the fact that the ban was not entirely effective in eliminating all crime involving assault weapons, does not undermine Koper's conclusion that

---

[37] For similar reasons, the plaintiffs' claim that there is no reasonable fit because the evidence does not demonstrate *all* mass shootings would be eliminated is not persuasive.

Maryland's ban on assault weapons and LCMs is likely to reduce the number and lethality of gunshot victimizations, and reduce the use of assault weapons and LCMs in crimes. (Koper Decl. ¶¶ 77–86.) First, Koper's expert opinion is based on more than the effects of the federal assault weapons ban. Second, as Koper points out, the federal assault weapons ban and the Maryland Firearm Safety Act are different, with Maryland's law closing some of the loopholes that may have made the federal ban less effective. (*Id.* ¶¶ 79–81.) The plaintiffs do not appear to dispute this fact. Nor do they appear to claim that the differences have no impact on the bans' relative effectiveness. Finally, the court emphasizes again that to pass intermediate scrutiny the law need not be the best solution for furthering the government's interest; it must only substantially further it. *See Woollard*, 712 F.3d at 877.

In sum, the defendants have met their burden to demonstrate a reasonable fit between the Firearm Safety Act and the government's substantial interests in protecting public safety and reducing the negative effects of firearm-related crime. Accordingly, the Act does not violate the Second Amendment.

## IV.    Equal Protection

The plaintiffs argue that the Firearm Safety Act violates the Equal Protection Clause of the Fourteenth Amendment by treating retired law enforcement officers differently than other individuals. The Equal Protection Clause guarantees that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Accordingly, "all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Morrison v. Garraghty*, 239 F.3d 648, 653–54 (4th Cir. 2001) (citation and internal quotation marks omitted) (stating that the Equal Protection Clause "keeps governmental decisionmakers from treating differently persons who are

in all relevant respects alike").  Nevertheless, when legislation is challenged on equal protection

grounds, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the

classification drawn by the statute is rationally related to a legitimate state interest."[38]  *City of*

*Cleburne*, 473 U.S. at 440.

This standard for considering equal protection challenges affords "the States a wide scope

of discretion in enacting laws which affect some groups of citizens differently than others."

*McGowan v. State of Md.*, 366 U.S. 420, 425 (1961).  As further explained by the Supreme

Court:

> The constitutional safeguard is offended only if the classification rests on grounds
> wholly irrelevant to the achievement of the State's objective.  State legislatures
> are presumed to have acted within their constitutional power despite the fact that,
> in practice, their laws result in some inequality.  A statutory discrimination will
> not be set aside if any state of facts reasonably may be conceived to justify it.

*Id.* at 425–26.  Accordingly, in general, when considering an equal protection challenge to

legislation, the court should first determine whether the government is treating similarly situated

individuals differently, and then decide whether there is a rational basis for the differential

treatment.

The court agrees with the defendants that retired law enforcement officers are differently

situated by virtue of their experiences ensuring public safety and their extensive training on the

use of firearms.  *See Shew*, 2014 WL 346859, at *9–11 (emphasis added) (rejecting an equal

protection challenge to Connecticut legislation allowing on- and off-duty law enforcement

officers to possess assault weapons and LCMs because "[t]he charge of protecting the public,

*and the training that accompanies that charge*, is what differentiates the exempted personnel

---

[38] "The general rule gives way," for example, "when a statute classifies by race, alienage, or national origin."  *City of Cleburne*, 473 U.S. at 440.  In that situation, the court applies "strict scrutiny," and upholds the statute only if it is narrowly tailored to serve a compelling state interest.  *See Morrison*, 239 F.3d at 654.  Neither party argues, however, that the court should apply a heightened level of scrutiny in considering the plaintiffs' equal protection challenge.

from the rest of the population"); *see also Williams v. Puerto Rico*, 910 F. Supp. 2d 386, 399–400 (D.P.R. 2012) (deciding that Puerto Rico's Weapons Act of 2000, which allowed certain former and current government officials to possess and carry firearms but prohibited other citizens from doing so, passed the rational basis test).[39]

In Maryland, law enforcement officers who wish to carry firearms must successfully complete the applicable firearms classroom instruction, training, and qualification. *See* COMAR 12.04.02.03A; *see, e.g.*, COMAR 12.04.02.06 (requirements applicable to long guns). They must then submit to firearms training every year thereafter. *See* COMAR 12.04.02.08A. If the officers do not submit to the required annual training, their firearms are seized until the training is completed. *See* COMAR 12.04.02.08E. In addition to receiving extensive training on the use of firearms generally, law enforcement officers must receive further specialized training to use assault weapons. They are taught how and when assault weapons may be used, as well as techniques to minimize the risk of harm to innocent civilians. (*See* Batts Decl. ¶ 27; *see also* Johnson Decl. ¶¶ 18–22.) Even after they have received this training, they must undergo periodic requalification to continue carrying assault weapons in the line of duty. (*See* Batts Decl. ¶ 27; Johnson Decl. ¶ 20–21.) Retired law enforcement officers have also received training on the use of LCMs; in particular, they have been taught how to assess each shot for effectiveness and how to evaluate the circumstances before continuing to fire additional rounds. (*See* Johnson

---

[39] The plaintiffs rely on *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002), *abrogated on other grounds by District of Columbia v. Heller (Heller I)*, 554 U.S. 570 (2008), to argue that the Firearm Safety Act violates equal protection, but the Ninth Circuit's analysis is flawed. In *Silveira*, the Ninth Circuit assessed the constitutionality of a California law, which imposed "a ban on the possession of assault weapons by private individuals" but made an exception "allowing the possession of assault weapons by retired peace officers who acquire them from their employers at the time of their retirement." *Id.* at 1059, 1089–92. The Ninth Circuit concluded that the "retired officer exception" lacked a rational basis, reasoning that "[t]he exception does *not* require that the transfer be for law enforcement purposes, and the possession and use of the weapons is not so limited." *Id.* at 1089–90. Although the *Silveira* court acknowledged that it must first determine whether a state action results in differential treatment of similarly situated persons, it did not analyze whether the California law resulted in such an outcome. *See id.* at 1088–92. It appears the court simply assumed that retired peace officers and private individuals were similarly situated, and went directly to whether the California law had a rational basis. Accordingly, to the extent the plaintiffs rely on *Silveira*, it is unpersuasive.

39

Decl. ¶ 27.)  Finally, they have received judgment training on the use of deadly force and how to safely handle and store firearms, including in their homes.  *See* COMAR 12.04.02.10C–D.

The plaintiffs attempt to argue that retired law enforcement officers are similarly situated to the general public because they may not have had training specific to the banned firearms or magazines.  In making this argument, however, the plaintiffs overlook the broader point that retired law enforcement officers are not similarly situated to other persons with respect to firearms training and experience generally.  In any event, one of the exceptions in the Firearm Safety Act allows the transfer of an assault weapon from a law enforcement agency to a retired law enforcement officer if it was used by the officer in the course of duty before retirement. Thus, any officer qualifying for this exception must have had extensive training on that particular assault weapon.  Moreover, in at least the MSP, Baltimore County Police Department, Baltimore Police Department, and Prince George's County Police Department, standard service weapons issued to law enforcement personnel come with LCMs.  (*See* Brown Decl. ¶ 32 (MSP standard service weapons come with fifteen-round magazines); Johnson Decl. ¶ 23 (Baltimore County Police Department standard service weapons come with fourteen-round magazines); Batts Decl. ¶ 25 (Baltimore Police Department standard service weapons come with fifteen-round magazines); Stawinksi Decl. ¶ 11 (Prince George's County Police Department standard service weapons come with fifteen-round magazines).)  Accordingly, officers retiring from those departments, at least in the recent past, have had training with respect to LCMs.

Based on all the training and instruction retired law enforcement officers have received, they are better equipped than the general public to handle and store firearms safely and to prevent them from getting into the wrong hands.  The court cannot conclude that the State of Maryland is treating differently persons who are in all relevant respects alike, and the plaintiffs'

equal protection challenge must fail.

## V.     Void for Vagueness

Finally, the plaintiffs argue that the Firearm Safety Act is void because the list of banned assault weapons is unconstitutionally vague.  In particular, they assert that the Act fails to inform a reasonable person as to what constitutes a "copy" of the banned assault long guns.  *See* CR § 4-301(d) (emphasis added) (stating that an "[a]ssault weapon" is "(1) an assault long gun; (2) an assault pistol; or (3) *a copycat weapon*"); *see also* PS § 5-101(r)(2) (emphasis added) (stating that a "[r]egulated firearm" means "a firearm that is any of the following specific assault weapons *or their copies*, regardless of which company produced and manufactured that assault weapon").[40]

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  A law may be impermissibly vague because it (1) fails to provide sufficient notice so that ordinary people understand what conduct it prohibits or (2) authorizes or even encourages arbitrary or discriminatory enforcement.  *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (plurality opinion); *see also Fed. Commc'ns Comm'n  v. Fox  Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012).  "As the Supreme Court has noted, 'perhaps the most meaningful aspect of the vagueness doctrine is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.'"  *United States v. Lanning*, 723 F.3d 476, 482 (4th Cir. 2013) (quoting *Smith v. Goguen*, 415 U.S. 566,

---

[40] The defendants argue that the plaintiffs may not bring a facial vagueness challenge to the Firearm Safety Act, as it in no way implicates the First Amendment.  While the Fourth Circuit has stated that a facial vagueness challenge to a criminal statute is allowed only when the statute implicates First Amendment rights, *see United States v. Klecker*, 348 F.3d 69, 71 (4th Cir. 2003), it has nevertheless considered such challenges to non-First Amendment criminal statutes, *see, e.g.*, *Martin v. Lloyd*, 700 F.3d 132, 135–37 (4th Cir. 2012).  The court need not decide whether a facial vagueness challenge is available in this case because the Firearm Safety Act is not impermissibly vague.

574 (1974)).

In considering a facial vagueness challenge, the court must "first determine whether the enactment implicates a substantial amount of constitutionally protected conduct." *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012). If the enactment does not, "then the challenge should only succeed if the law is impermissibly vague in all of its applications." *Id.* (citation and internal quotation marks omitted); *see also United States v. Comstock*, 627 F.3d 513, 518 (4th Cir. 2010) (citation and internal quotation marks omitted) (indicating that "a facial challenge cannot succeed if a statute has a plainly legitimate sweep"). Where a statute imposes criminal penalties, however, "the standard of certainty is higher and the statute can be invalidated on its face even where it could conceivably have . . . some valid application." *Martin*, 700 F.3d at 135 (citation and internal quotation marks omitted); *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982) ("The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.").

Nevertheless, the Fourth Circuit has made clear that a statute is not impermissibly vague simply because it does not "spell out every possible factual scenario with celestial precision." *United States v. Hager*, 721 F.3d 167, 183 (4th Cir. 2013) (citation and internal quotation marks omitted); *see also, e.g., Richmond Boro Gun Club, Inc. v. City of New York*, 896 F. Supp. 276, 289–90 (E.D.N.Y. 1995) (rejecting a facial vagueness challenge to a New York City law's definition of an "assault weapon" because citizens had notice of the "core" group of banned weapons), *aff'd*, 97 F.3d 681 (2d Cir. 1996). Rather, "[a] statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score." *Hager*, 721 F.3d at 183 (citation and internal quotation marks omitted).

Turning to the present case, the court notes that the term "copies" is not new to Maryland firearms law. In *NYSRPA*, the court considered how long the language at issue had existed in rejecting a vagueness challenge to New York's ban on "any magazine that 'can be *readily* restored or converted to accept' more than 10 rounds of ammunition." 2013 WL 6909955, at *22–23 (citation omitted) (emphasis added). Noting that the "readily" language had been used in federal law since 1994, and was adopted by New York in 2000, the court found no evidence of any confusion in the years since. *Id.* at *22. Similarly, here, Maryland firearms law has regulated certain assault weapons and their copies for over two decades. *See* 1994 Laws of Md., Ch. 456. Yet, the plaintiffs have not identified any arrest or conviction resulting from a misunderstanding of the term "copies," nor have they identified any acquittal based on the alleged vagueness of this word. The court cannot conclude that the term "copies" is unconstitutionally vague when there has not been a single arrest, conviction, or acquittal based on a misunderstanding in more than twenty years.

Moreover, the plaintiffs fail to show the Firearm Safety Act lacks an identifiable "core" of prohibited conduct, even under the stricter standard for criminal statutes. The Act bans certain firearms listed by make and model, as well as their copies. *See* CR § 4-301(d); PS § 5-101(r)(2). Although the Act does not list all prohibited weapons—indeed it would be impossible to do so— the court cannot conclude the term "copies" is vague when read together with the list of banned firearms. *See Shew*, 2014 WL 346859, at *13–14 (rejecting a facial vagueness challenge to a Connecticut gun control statute that listed numerous banned firearm models and their "copies or duplicates"); *Coal. of New Jersey Sportsmen, Inc. v. Whitman*, 44 F. Supp. 2d 666, 679–80 (D.N.J. 1999) (rejecting a vagueness challenge to a New Jersey gun control statute that included a ban on certain firearms listed by make and model as well as any firearms "substantially

identical" to the listed firearms); *Wilson v. Cnty. of Cook*, 968 N.E.2d 641, 652 (Ill. 2012)

(determining that the phrase "copies or duplicates," used in a Cook County ordinance banning

particular models of assault weapons, was not vague when read together with the list of banned

weapons); *see also Benjamin v. Bailey*, 662 A.2d 1226, 1241–42 (Conn. 1995) (deciding that use

of the word "type" to capture like weapons—for example, the "AK-47 type"—did not render the

statute facially vague).[41]

     The term "copies" has been further clarified through a formal opinion of the Attorney

General of Maryland and a Firearms Bulletin from MSP, the state entity primarily charged with

enforcing the firearms law.  *See Whitman*, 44 F. Supp. 2d at 680 ("A court should consider

limiting constructions of the law offered by enforcement agencies."); *see also Village of Hoffman

Estates*, 455 U.S. at 504 (indicating that a jurisdiction may "adopt administrative regulations that

will sufficiently narrow potentially vague or arbitrary interpretations of [an] ordinance").

According to the Attorney General, "[c]osmetic similarity to an enumerated assault weapon

alone would not bring a weapon within the regulated firearms law;" rather, "to come within the

definition of 'regulated firearm,' a copy of a designated assault weapon must be similar in its

internal components and function to the designated weapon."  95 Op. Att'y Gen. Md. 101, 101

(2010).  Relying on this opinion, MSP issued its bulletin explaining that it considers a firearm

that is cosmetically similar to one of the enumerated assault weapons to be a copy only if it also

possesses "completely interchangeable internal components necessary for the full operation and

---

[41] The plaintiffs attempt to rely on *Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250 (6th Cir. 1994), but in that case, the court took issue with language not included in the Maryland Firearm Safety Act.  The ordinance at issue in *Springfield* banned "slight modifications or enhancements" of specific models of assault weapons.  *Id.* at 252.  As explained by the Sixth Circuit, an ordinary consumer cannot be expected to know which changes are "slight," nor can he be expected to know "the developmental history of a particular weapon."  *Id.* at 253.  This reasoning is not applicable to the plaintiffs' claims because the Firearm Safety Act does not require a citizen to be intimately familiar with the inner workings of any firearm.  As explained below, consumers may consult with dealers and manufacturers to determine whether a particular weapon qualifies as a copy, and MSP is available to respond to their remaining inquiries.

function of any one of the specifically enumerated assault weapons."  (MSP Firearms Bulletin #10-2, ECF No. 55-43; *see also* Brady Decl. ¶ 10.)  Thus, in enforcing the Firearm Safety Act, MSP is limited by its published guidance, which has been distributed to Maryland firearms dealers and is available to the public.  (Brady Decl. ¶ 7.)

Even the plaintiffs' own statements confirm that there is an identifiable core of prohibited conduct.  For example, Wink's admits that a "substantial number" of the long guns it sells are now classified as assault weapons.  (Carol Wink Decl., ECF No. 44-63, ¶ 4; *see also* Stephen Schneider Decl., ECF No. 44-62, ¶ 6 (admitting that regulated long guns classified now as assault weapons represent a "substantial number of all long guns sold by MLFDA's individual members, including Atlantic Guns").)  Kolbe likewise indicates that he would like to purchase an AR-15, but that he knows he cannot do so under the Act.  (Kolbe Dep., ECF No. 44-55, at 57:19–58:9.)  In light of the plaintiffs' demonstrated understanding of the firearms prohibited by the Firearms Safety Act, the court cannot conclude that the Act fails to provide sufficient notice of banned conduct.[42]

As for the plaintiffs' claims that the Firearm Safety Act encourages arbitrary enforcement, they do not offer any facts to suggest that MSP has engaged or will engage in arbitrary enforcement.  "When the terms of a regulation are clear and not subject to attack for vagueness, the plaintiff bears a high burden to show that the standards used by officials enforcing

---

[42] According to the plaintiffs, the Act is vague with respect to its application to the "Colt AR-15 Sporter H-BAR rifle."  *See* PS § 5-101(r)(2)(xv) (emphasis added) (banning "Colt AR-15, CAR-15, and all imitations *except Colt AR-15 Sporter H-BAR rifle*").  They claim that they cannot figure out if a given rifle is permitted as a copy of a Colt AR-15 Sporter H-BAR rifle, or is banned as a copy of a Colt AR-15.  As explained by the defendants, however, MSP relies on a "manufacturer's designation of a firearm as an H-BAR or heavy-barreled version of an AR-15 to determine whether it is exempt from the ban as a copy of a Colt AR-15 Sporter H-BAR."  (Brady Decl. ¶ 17.)  The plaintiffs simply need to inquire as to the manufacturer's designation to determine whether a particular firearm qualifies for the exception in § 5-101(r)(2)(xv).  The plaintiffs also claim that the Act is vague because LWRC International, LLC, a Maryland-based firearms manufacturer, does not know whether the AR-style rifles it manufactures are banned.  But, according to LWRC, MSP orally advised that the rifles it manufactures are exempt from the assault weapons ban.  (*See* John Brown Decl., ECF No. 69-9, ¶¶ 3–6.)  To the extent LWRC is still uncertain as to the status of particular AR-style rifles, the court concludes that it nevertheless has notice of the "core" group of banned weapons.  *See Richmond Boro Gun Club, Inc.*, 896 F. Supp. at 289.

the statute nevertheless give rise to a vagueness challenge." *Wag More Dogs, Ltd. Liability Corp. v. Cozart*, 680 F.3d 359, 372 (4th Cir. 2012).  As stated above, the plaintiffs have not pointed to a single arrest or prosecution based on a misunderstanding of the "copies" language, nor have they indicated that an arrest or prosecution has been threatened.  MSP has published its standards for determining whether a firearm constitutes a copy and, to the extent consumers or dealers still have questions about specific firearms, it is available to respond to their inquiries.[43]

(*See* MSP Firearms Search, ECF No. 74-3 (providing a list of questions to answer to determine whether a weapon is banned as a copy of an assault long gun and offering a list of firearms that have been reviewed by MSP and determined to be copies); MSP Firearm Review Form, ECF No. 74-4 (allowing a consumer to request MSP review of a particular firearm after contacting a firearms dealer, the firearm's manufacturer, or an attorney); *see also* Brady Decl. ¶¶ 12–13; Schneider Dep., ECF No. 44-45, at 22:17–23:21; Robert Warnick Dep., ECF No. 44-49, at 49:11–19; Wink Dep., ECF No. 44-53, at 27:9–28:9.)  In sum, the court rejects the plaintiffs' vagueness challenge to the Firearm Safety Act.

---

[43] The plaintiffs argue that MSP's change in interpretation as to certain firearms—in particular, the Saiga 12 shotgun, .22 caliber replicas of AR-15s, and the Bushmaster H-BAR—means the term "copies" is unconstitutionally vague.  But MSP's change in interpretation with respect to the Saiga 12 shotgun and .22 caliber replicas of AR-15s resulted from the Attorney General's opinion, which in fact narrowed the interpretation of copies and thereby decreased the number of possible prosecutions.  (Brady Supp. Decl., ECF No. 62-5, ¶¶ 2–5.)  In any event, "[a]n agency is allowed to change its mind, so long as its new interpretation is reasonable."  *United States v. Deaton*, 332 F.3d 698, 711 (4th Cir. 2003).  As for MSP's changed interpretation regarding the status of the Bushmaster H-BAR, Brady explains that the change is the product of statutory interpretation based on a unique provision of the law applying specifically to Bushmaster semi-automatic rifles.  (*See* Brady Decl. ¶¶ 18–20.)  The court agrees with the defendants that this unique issue, limited to this specific firearm and based on a question of statutory interpretation, does not warrant a facial challenge to the entire Firearm Safety Act.

**CONCLUSION**

In summary, the Firearm Safety Act of 2013, which represents the considered judgment of this State's legislature and its governor, seeks to address a serious risk of harm to law enforcement officers and the public from the greater power to injure and kill presented by assault weapons and large capacity magazines.  The Act substantially serves the government's interest in protecting public safety, and it does so without significantly burdening what the Supreme Court has now explained is the core Second Amendment right of "law-abiding, responsible citizens to use arms in defense of hearth and home."  Accordingly, the law is constitutional and will be upheld.

A separate order follows.


August 22, 2014                                    _____/S/_____
Date                                                          Catherine C. Blake
                                                                 United States District Judge